UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:18CR92(JBA) |
| | : | |
| v. | : | |
| | : | |
| LEON VACCARELLI | : | October 2, 2020 |

## <u>GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING</u>

The Government submits this memorandum in anticipation of the sentencing of Leon Vaccarelli, which is presently scheduled for October 15, 2020.  Vaccarelli abused both his position as a registered representative and his position of trust in the community to defraud vulnerable and unsuspecting victims of approximately $1.5 million between 2011 and 2017. Vaccarelli took victims' retirement funds—promising higher rates of return and/or positive investments—and immediately converted those funds to his own use, including among other uses, to pay his own mortgage payments, to cover private school tuition for his children, and even used funds to pay back an earlier investor in typical Ponzi-like fashion.  Vaccarelli is a conman, a fraud, and an unrepentant recalcitrant liar.

Vaccarelli perpetuated his fraud through materially false statements and omissions not only to his clients and friends (some of whom had known him since his childhood) but also to his affiliated broker-dealer, The Investment Center, which, had it been aware that Vaccarelli was offering "private" securities to clients, would undoubtedly have scrutinized and disallowed such conduct.  Vaccarelli made materially false statements to victim-investors about the purported success of their investments—attempting to cover his tracks.  Vaccarelli even lied to Salisbury

1

Bank and Trust and to the probate court in order to get control of and subsequently raid the trust of an older individual in need of financial care-taking out of approximately $500,000.  Vaccarelli callously and selfishly spent the retirement savings of people who could ill afford to lose the money they had saved for their golden years, causing great financial and emotional harm.

As reflected in the Guidelines range of 210 to 262 months, Vaccarelli's conduct was egregious, and warrants a very significant term of incarceration.  This recommendation is based on the seriousness of the offense, the need to promote respect for the law, the need to provide just punishment for the offense, the need to avoid unwarranted sentence disparities, and the need for general and specific deterrence.

Additionally, this case has considerable importance for deterring individuals who are or who have been licensed financial professionals, like the defendant, who was licensed as a financial advisor in the financial industry.  Financial professionals need to be reminded that those who use their positions and their reputations as financial professionals and who abuse their positions of trust for their own personal gain will be punished severely.

Furthermore, the defendant's repeated and flagrant dishonesty in handling the retirement funds of friends who trusted him, coupled with his false statements on the stand, militates heavily in favor of a severe sentence to achieve the goals of sentencing including, *inter alia*, specific deterrence.  Moreover, as discussed below, none of the arguments he now raises, nor his claimed alcohol use, change this fact.

Finally, it is quite significant that Vaccarelli defrauded members of his Waterbury church community and people who considered him a friend and who mistakenly believed he had their best financial interests at heart.  The victims were hard-working individuals—including a retired

school administrator, a nurse, a laborer, and a factory worker—who trusted him with their hard-earned savings and retirement funds.  Many of the victims were not wealthy; for some, $50,000 or $100,000 represented a significant portion of their savings.  The victims were not banks, insurance companies, or large corporations but were real working people who were depending upon their principal as well as the promised interest, to secure their future.  However, the financial impact does not fully measure the sense of betrayal, the emotional impact, and the other collateral effects of such a fraud.  The totality of the impact on the victims in this case is substantial and significant.  This is so not only because of the substantial economic impact, but also because of the sense of violation and the complete abuse of the trust that the victims, many of whom had known him for many years, have suffered because of Vaccarelli's crimes.

I.   **Procedural Background and Summary of Offense Conduct**

A.   **Procedural Background**

On May 2, 2018, a federal grand jury sitting in New Haven, Connecticut, returned a twelve-count indictment charging Defendant Vaccarelli with three counts of mail fraud, in violation of 18 U.S.C. § 1341; six counts of wire fraud, in violation of 18 U.S.C. § 1343; and three counts of money laundering, in violation of 18 U.S.C. § 1957.  *See* Doc. No. 1.

On March 5, 2019, the same Grand Jury returned a Superseding Indictment as to Vaccarelli, adding an additional three counts of wire fraud and six counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5.  *See* Doc. No. 61.

On May 29, 2019, culminating an approximately two-week trial, the jury returned verdicts of guilty on all twenty-one counts: three counts of mail fraud (Counts 1-3); nine counts of wire fraud (Counts 4-12); six counts of securities fraud (Counts 13-18); and three counts of money

laundering (Counts 19-21).  *See* Doc. No. 119.

Vaccarelli made motions pursuant to Fed. R. Crim. P. 29 and 33 for a judgment of acquittal or, in the alternative, a new trial.  *See* Doc. 133.  Following briefing by Vaccarelli and the Government, the Court denied those motions.  *See* Doc. No. 137.

### B.    <u>Offense Conduct</u>

The offense conduct is accurately summarized in the Presentence Report ("PSR") at ¶¶ 8-41, and is supplemented by the detailed trial record which includes the testimony of numerous victim-investors.  In addition, as the Court is aware, the facts were summarized in the Government's opposition to the defendant's post-trial motions.  *See* Doc. No. 135.  Accordingly, only a brief summary is provided herein.

Between 2011 and 2017, the defendant, operating under the business name Lux Financial, engaged in a scheme and artifice to defraud—with the intent to deprive victim-investors of funds, all for the purpose of obtaining and utilizing such funds for his own benefit. Vaccarelli was a registered representative affiliated with The Investment Center, a company which provided him with an aura of respectability and trustworthiness.  Unbeknownst to The Investment Center, beginning in 2011, Vaccarelli began to misappropriate client funds.

To induce victim-investors to provide funds, he made material misrepresentations to them, telling them their funds would be invested and that they would receive positive rates of return.  For example, Vaccarelli represented to Susan Rustic that he would invest her $100,000 in a 36-month CD earning 7 percent interest.  Based upon that representation, Ms. Rustic provided him with the $100,000, taking $70,000 from her account at The Investment Center and $30,000 from an annuity.  *See* PSR at ¶ 18.  Notwithstanding Vaccarelli's representations, he failed to

invest Ms. Rustic's money in a CD.  Instead, upon receiving the money, Vaccarelli immediately

proceeded to spend her funds on his personal expenses, including using $75,000 to pay off a

previous senior note to another investor, over $5,000 for his home mortgage, almost $15,000 for

his business mortgage, and $3,200 paid to a restaurant.  Vaccarelli spent Ms. Rustic's money as

if it were his own.  *See* PSR at ¶ 20.  As another example, he told Christine Chauncey that she

could earn 8 percent interest through investment in a special fund for friends and family.

Vaccarelli gave Ms. Chauncey a Private Direct Investment Agreement which indicated that her

investment of $47,000 was in a 15-month senior note earning 8 percent per year.  *See* PSR at ¶

32.  But Vaccarelli never invested Ms. Chauncey's money.  There were no senior notes, no

return of 8 percent, and there was no separately managed account.  After receiving Ms.

Chauncey's $47,000, Vaccarelli used it for the mortgage on his Leavenworth commercial

property and gave some to his wife for use by his family.  *See* Government Exhibit ("GX") 25 at

49.

  The defendant grew up in Waterbury and had strong ties to the community—including

his church.  He capitalized on those ties, and on people's trust, cultivating relationships — often

with elderly people — for the purpose of defrauding them and pocketing their money.  Vaccarelli

represented to them that their funds were safe, that he would invest their money in various

vehicles, and that it would earn specific rates of interest.  These were lies.  However, because

they trusted him, the victim-investors believed him.

  As Ms. Susan Rustic testified, she "considered Leon Vaccarelli a friend of mine, and I

believed that he considered me a friend of his, as well."  Trial Transcript ("Tr.") at 148.  Ms.

Rustic had known Vaccarelli for years and she, like the other victim-investors, trusted him.  At

one point she even "told him [she] trusted him implicitly and he thanked [her]." Tr. at 153.
Other victims echoed these and similar sentiments. For example, Michael Brough, who lost the
entirety of a retirement funds from a prior job testified that he trusted Vaccarelli and "[h]e's a
friend of mine" and "I considered Leon a friend." Tr. at 100, 101. Ms. Chauncey, a retired
school administrator who had met Vaccarelli years earlier when Vaccarelli was managing his
uncle's store, described their relationship as follows: "we just got to be friendly, waving at each
other, and then started conversations and got to be friendly." Tr. at 264. Vaccarelli fraudulently
induced Ms. Chauncey to invest with him telling her he was "starting a special fund for just
friends and family." Tr. at 284. Denise Augelli (and her husband) had known Vaccarelli from
the time he started kindergarten with her son. Tr. at 362. Her husband had coached the school
basketball team—including Vaccarelli, and Mrs. Augelli continued to see Vaccarelli in
Waterbury, noting that he served as a Eucharistic minister at their church. Tr. at 363. Mrs.
Augelli was impressed when she saw Vaccarelli's office, and even as he was about to steal her
retirement, thought favorably of him—as she testified, "I thought, God bless him, he's doing so
well." Tr. at 371. Mrs. Augelli trusted him. *Id*. Not surprisingly, Mrs. Augelli described the
effects of Vaccarelli's fraud by saying, "it devastated me, because I knew him and I couldn't
believe he did this to me. I trusted him, and I don't understand why he did it, still." Tr. at 378.
Vaccarelli stole Mrs. Augelli's retirement money, as he stole retirement savings of Ms. Rustic,
Mr. Roussel, Mr. Brough, Ms. Warren, Ms. Sienkowski, Ms. Truhan, Ms. Strobel, and Ms.
LaPorta.

Even after the defendant obtained their money, he perpetuated his lies through follow-up
false statements—all designed to induce victim-investors to invest more money and/or to lull

them into a false sense of security, allowing him to further perpetrate the fraud. For example, Vaccarelli provided a letter to Ms. Chauncey, in which he stated, "as of today October 11, 2016 you have on deposit $47,000 in the Senior Note program of Leon Vaccarelli. The account earns 8% annual interest. . . . You will receive the appropriate income tax documents and independent verification from the CPA firm of Zackin, Zimyeski, and Sullivan of Waterbury at year end . . . ." GX 16B. In fact, Vaccarelli had not put Ms. Chauncey's money in a "Senior Note program," but had spent her money. There was no senior note program. Vaccarelli had simply stolen her money. Moreover, testimony from the accountants established that Vaccarelli's representations concerning the independent verification by the CPA firm were similarly fabricated.

Even after the Securities and Exchange Commission ("SEC") had searched the defendant's office—and his fraudulent scheme had unraveled—he continued to make material misrepresentations. From the treatment facility he checked himself into, he sent a message to Mrs. Augelli, telling her, in part, "I could not in good conscience let you and Mr. Augelli continue to think your money is gone or stolen. I am horrified and distraught that you were led to believe this. You will retire and be able to buy your granddaughter's wedding dress!" GX 204. In fact, Vaccarelli had already spent the Augellis' money and there was none of that money for the promised wedding dress.

Vaccarelli even raided a trust set up for the care and maintenance of a mentally disabled person. Vaccarelli lied to Salisbury Bank and Trust and to the probate court to take control of Lyn Burton's trust account. In a letter dated January 6, 2014, Vaccarelli certified to the probate court that he was willing to accept the responsibilities of successor trustee, and even presented the Court with a list of credentials including his membership on the Board of Directors of the

Archdiocesan School Board and on the Finance Council for his parish.  He used these positions to ingratiate himself to the probate court, yet he clearly never intended to exercise his fiduciary obligations with respect to Ms. Burton.  *See* GX 751.  Instead of preserving and protecting the trust's assets of about half a million dollars, Vaccarelli spent significant portions of the trust assets for his own personal expenditures, depriving Ms. Burton of a means to support herself. She is now supported by the State of Connecticut.  The money her parents had carefully left behind for her wellbeing was taken by Vaccarelli.

In short, the defendant lied to victim-investors, telling them he would invest their funds. He did not invest their money.  Instead, he took their money and used it as if it were his own. He used their funds for all manner of personal and business expenditures, including mortgage payments on his new house, payments for his children's private school tuition, and other expenses.  He spent their money with absolutely no regard for their retirement plans and goals, their wellbeing, or the trust they had placed in him.  In a very real sense, he was a predator who robbed his victims of their financial security.

## C.    Victim Impact

Based on their testimony—and the victim impact statements submitted to date— Vaccarelli's conduct had far-reaching effects on his victims.  Clearly, the financial harm is serious.  Even victims were who later compensated through The Investment Center continue to suffer financial harm.  Instead of having their money invested and enjoying the benefits of rises in the stock market and/or compound interest, they lost out on years of financial gains and planning.  Many were forced to spend time and energy attempting to recapture funds which they believed to have been safe.  Victims were also damaged emotionally, as Vaccarelli preyed upon

people who trusted him.  These victims may go through life trusting less, and being more suspicious of people because of what Vaccarelli did.   As one victim wrote, "The whole ordeal has been emotionally and financially straining for my entire family. . . ."  *See* Victim Impact Statement, Filed Under Seal.

## II.    Statutory and Sentencing Guidelines Exposure

The Government agrees with U.S. Probation Officer's recitation of the statutory maximum sentence, and also the Guidelines computations, which yield an advisory Guidelines range of 210 to 262 months of imprisonment.

### A.    Statutory Maximum Sentence

For each of the 3 counts of mail fraud and 9 counts of wire fraud, the defendant faces 20 years of imprisonment, 3 years of supervised release, a fine of up to $250,000 (or twice the gross gain or loss resulting from the offense), and a mandatory special assessment of $100.  *See* PSR at ¶¶ 119, 122, 128, 129.  For each of the six counts of securities fraud, the defendant faces 20 years of imprisonment, 3 years of supervised release, a fine of up to $5 million, and a mandatory special assessment of $100.  *See id.*  For each of the 3 counts of money laundering, the defendant faces a term of imprisonment for up to 10 years, 3 years of supervised release, a fine of up to $250,000 (or twice the gross gain or loss resulting from the offense), and a mandatory special assessment of $100.  *See id.*

### B.    Sentencing Guidelines

The Government agrees with the U.S. Probation Officer's assessment that Vaccarelli's total offense level is 37, that his Criminal History Category is I, and that the advisory range is 210 to 262 months.  *See* PSR at ¶ 120.  As noted in the defendant's memorandum (Doc. No. 151,

hereinafter referred to as "Def. Mem."), he objects to a number of the applicable enhancements.

The defendant's base offense level for fraud is 7 under U.S.S.G. § 2B1.1(a)(1). There is an enhancement of 16 for a loss more than $1,500,000 but less than $3,500,000. U.S.S.G. § 2B1.1(b)(1)(I).  Next, four levels are added because the offense resulted in serious financial hardship to five or more victims pursuant to U.S.S.G. § 2B1.1(b)(2)(B).[1]  Next, two levels are added because the defendant used sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10)(C). Four levels are added because at the time of the offense, the defendant was an investment advisor and the offense involved a violation of the securities law pursuant to U.S.S.G. § 2B1.1(b)(20)(A).[2]  Two levels are added because there were victims of the offense who were vulnerable victims pursuant to U.S.S.G. § 3A1.1(b)(1).  And two more levels are added for obstruction of justice pursuant to U.S.S.G. § 3C1.1.  The resulting Adjusted Offense Level is a level 37, resulting in a recommended advisory Guidelines range of 210-262 months incarcerated.

1.  <u>Offense Level</u>

a.  <u>Base Offense Level and Loss Amount</u>

The Government agrees with the U.S. Probation Officer's determination that pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.  Additionally, the Government agrees that the loss amount exceeds $1.5 million and thus 16 levels are added.  *See* PSR at ¶¶ 39-41, 50.  The defendant endeavors to argue that certain amounts should not be included in the calculated loss amount.  *See* Def. Mem. at 3.  However, his arguments are without merit.

---

[1] The crime also involved more than 10 victims which would result in an addition of 2 levels pursuant to U.S.S.G. § 2B1.1(b)(2)(A), however, since § 2B1.1(b)(2)(B) applies, section § 2B1.1(b)(2)(A) is inapplicable.

[2] Note: because four (4) level are added since the defendant was an investment advisor and the offense involved a violation of the securities law pursuant to U.S.S.G. § 2B1.1(b)(20)(A) the two-level enhancement for an  abuse of a position of trust or use of a special skill, under U.S.S.G. § 3B1.3. is not applicable.  *See* § 2B1.1 app. n. 16(C).

First, Vaccarelli argues that the total loss amount should be reduced by $7,904.13 with respect to Ms. Chauncey because Ms. Chauncey settled a lawsuit with Vaccarelli. Vaccarelli is wrong. The Probation Office and the Government's computation did reduce the amount of the loss suffered by Ms. Chauncey by $59,692.66, which was the amount of the settlement. The remainder constitutes actual loss suffered by the victim due to Vaccarelli's fraud. The fact that she settled a separate civil action does not change the loss suffered in regards to the criminal case. In fact, an argument could be advanced that none of the $59,692.66 should be credited against loss pursuant to U.S.S.G. § 2B1.1. app. n. 3(E) because Ms. Chauncey discovered the fraud and thus the money was returned "after" the fraud was detected. Nevertheless, the Government agrees with the figure used by Probation. PSR ¶ 39.

Second Vaccarelli he argues that $7,000 of the $57,000 for the Schultz family constituted a fee that he presumably somehow deserved—conveniently claiming a large fee from a vulnerable victim. Moreover, as the PSR rightly points out, since Vaccarelli was stealing their money, he cannot now claim to earn any purported fees for managing their money. *See* Addendum to the PSR at 3. If Vaccarelli had told them the truth about his fraud they would undoubtedly not allowed him to manage their money and he would not have earned any fees.

Third, the defendant argues that over $85,000 from Ms. Sienkowski's money was due to him pursuant to a handshake deal between himself and Ms. Sienkowski's deceased husband. *See* Def. Mem. at 3. As discussed in greater detail below, that argument should be rejected. There is nothing in the record to support a purported $100,000 handshake deal and in fact all the evidence suggests that this claim is a Vaccarelli fabrication. In fact, his testimony as to this baseless claim forms the basis of an obstruction of justice enhancement, yet he now repeats this claim with

respect to sentencing.

Lastly, in the Def. Mem. at 3, the defendant argues that the entirety of the funds taken from the Burton Trust should not be included because he paid certain expenditures for Ms. Burton and earned a fee of $24,000 per month over 3 years.  There is simply no evidence to claim entitlement to a fee of $24,000 per month.  This claim is unsupported by the record and lacks credulity for numerous reasons.  Vaccarelli obtained the position of trustee through fraud. He lied to the probate court and thus, is not entitled to any fees whatsoever.  Additionally, the figure of $24,000 per month on a $500,000 trust is patently absurd.  As Mr. Essex, the representative of the prior trustee Salisbury Bank and Trust testified, fees were based on the value of the trust.  Roughly, the fee for a trust worth approximately $500,000 would have been only $6,250 per year, not $24,000 per month.  Tr. at 754-55.  When Salisbury Bank & Trust was actually fulfilling its obligations with respect the trust, and maintained the value of the trust by having it generate income through among other revenue streams, dividends, it would have been entitled to a fee of about 1% per year.  Vaccarelli, now claims for the first time, that he was entitled to almost four times the amount the bank would have earned in a year, *each month*.  By his computations, he claims to have been entitled to $288,000 per year in fees (as compared to the bank's $6,250).  Had Vaccarelli intended to charge such highly excessive and extortionate fees, the probate court undoubtedly would have expected such a representation to have been made when he sought to become successor trustee.  Surely, the court would have denied his application.  Moreover, given that Vaccarelli immediately began to use the trust assets as his own, he was clearly entitled to no fee whatsoever.

It bears mention that the Court could consider the expenditures by Vaccarelli of the ill-

gotten trust funds to support Ms. Burton, the beneficiary of the trust, as "credited against loss" pursuant to U.S.S.G. § 2B1.1 app. n. 3(E)(i).  If the Court were to conclude that more than $122,002.33 was spent in this manner, the loss amount would be less than $1,500,000 and the specific offense characteristic for loss would be an increase of 14 (rather than 16).  However, while the Government agrees that some funds were expended to cover living expenses for Ms. Burton such as rent, the Government cannot definitively conclude it was more than $122,002.33. Moreover, the Government asserts that it was the full value of the Burton Trust that was taken by fraud and thus a reasonable estimate of loss is $479,816.36.  This loss figure, as used by the U.S. Probation Officer, is a reasonable estimate of loss and notably, that figure itself, does not included any lost interest or other funds, such as earnings or dividends, that the Burton Trust was expected to receive and would have received based on the previously existing portfolio holdings, had Vaccarelli not liquidated the portfolio for his own benefit.  In addition, to an extent, the payments the defendant made for Ms. Burton's benefit may constitute "lulling" payments, as they were intended to keep the fraud going—and to prevent her from reporting the fraud.  Thus, these payments can be seen as furthering the crime and forestalling discovery of his lies.

Another factor that the Court should consider when considering the loss figure is the fact that every dollar of the victims' collective loss was Vaccarelli's gain.  The seriousness of the financial harm in this case is demonstrated by the fact that Vaccarelli took and had control over every dollar that he stole.  What he took from the victims was his direct gain.  As contrasted with other financial cases, the loss was not market driven nor was it increased due to some external factors, such as decline of collateral or the economy.  But Vaccarelli took every dollar for himself.  Moreover, the way Vaccarelli spent the money on a new house, sending his children to

private school, and selfishly on himself, while his elderly and somewhat elderly victims were left with little for retirement, underscores the brazenness of his greed and selfishness. These facts demonstrate not only the seriousness of the offense but the nature and characteristics of Vaccarelli the person, discussed in greater detail below.

        b.  <u>Substantial Financial Hardship to 5 or More Victims</u>

The PSR appropriately includes a four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(B) because the offenses resulted in financial hardship to more than 5 victims. In Application Note 4(F)(iii), the Sentencing Commission directs the Court to consider, among other factors, whether a victim "suffer[ed] a substantial loss of a retirement, education, or other savings or investment fund." A number of victims suffered such losses.

The defendant concedes, as he must, that Denise Augelli suffered substantial financial hardship. *See* Def. Memorandum at 3. Ms. Augelli's note to the defendant, admitted as GX 205, stated in relevant part: "Because of you I can not buy my granddaughter's wedding dress. Because of you my husband and I will never retire. My husband is filled with anxiety and stress[.] I just cry because I've known you since you were five years old [a]nd I trusted you." As Ms. Augelli testified, those funds were intended to subsidize what they got from Social Security, and she could help her children. *See* Tr. at 374. She also planned to buy her granddaughter a wedding dress. When asked if at this point, she could buy her granddaughter's dress, she answered, "No. I could charge it. But I will. I'll find a way." Tr. at 376. It is clear that Ms. Augelli suffered substantial financial harm as a result of Vaccarelli's actions.

Ignoring the volumes of evidence and testimony, Vaccarelli inexplicably claims that no other victim-investors suffered such substantial financial harm. Vaccarelli is wrong. As the

evidence proved at trial, most of the victim-investors lost significant portions of their retirement savings. Significantly, after being appointed successor trustee to the Burton Trust, Vaccarelli not only failed to safeguard the assets of the Burton Trust as he had represented he would to the probate court and the bank, he immediately and willfully abused that position and took significant trust assets for his own benefit. *See* PSR at ¶¶ 24-26. Vaccarelli literally emptied the trust of hundreds of thousands of dollars, leaving Ms. Burton destitute.

Other victim-investors lost substantial portions of their retirement savings as well. One victim explained in her victim impact statement regarding her loss, "because Leon defrauded me of $100,000.00 I could no longer afford a small one-level home. That dream was shattered. My hope to someday do some traveling was gone." Victim Impact Statement, filed under seal. Similarly, another victim had plans for his savings which were impaired by the defendant's fraud. In his statement, he noted, "[t]his is money that I could have used for my children's homes or for my grandchildren's college tuition . . . ." Victim Impact Statement, filed under seal.

Another victim, Michael Brough was twice victimized by the defendant. As he testified, "this is all the money I had for my retirement." Tr. at 130. Likewise, Guiseppina LaPorta lost significant savings in her retirement. Ms. LaPorta testified about providing her $27,361.55 check to Vaccarelli for him to invest, in order that she could receive a monthly payment. *See* Tr. at 383-84. Ms. LaPorta provided additional funds, in order to have $50,000 invested for the purpose of receiving monthly payments, akin to a retirement annuity. *See* Tr. at 384; Tr. at 404 (testimony of Ms. Moffa).

In addition, Kathleen Strobel lost $45,000 of her retirement savings. Vaccarelli

represented to her that her funds would be rolled over into another IRA or put into a senior note. This was false. Vaccarelli instead pooled her retirement savings with that of other victim-investors' and used it to make a Ponzi-like payment to a previous investor who was demanding a return of *her* money. *See* PSR at ¶ 33. Accordingly, as discussed by the U.S. Probation Officer in paragraph 51 of the PSR, more than five victims suffered substantial losses of retirement, savings, and/or investment funds, and section 2B1.1(b)(2)(B) is applicable.

### c. Two Level Increase for Sophisticated Means

The Government agrees with the U.S. Probation Officer's assessment that a 2-level enhancement for use of sophisticated means is appropriate pursuant to U.S.S.G. § 2B1.1(b)(10)(C). *See* PSR at ¶ 52. The United States Sentencing Guidelines § 2B1.1(b)(10)(c) provides for a two-level enhancement "[if] the offense . . . involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means . . . ." "Sophisticated means" under that sections "means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinary indicates sophisticated means." Application Note 9(B).

Here the criminal conduct was, by any measure, sophisticated. Consistent with the Guidelines commentary discussing sophisticated means, Vaccarelli created a shell or fraudulent company, LWLVACC, that operated in essence as a fictitious entity that allowed him to defraud investors. In connection with his scheme, Vaccarelli created fictitious investor agreements that he made by taking language from the legitimate documents located on the website of The Investment Center. He also provided fictitious financial update letters to investors that he

created to foster the appearance that their money was safe and earning interest.  Since the victims had no way of knowing the lies and falsities that Vaccarelli used in crafting the investment documents and the letters with his calculations of the value of their holdings, they were duped by the financial assertions.  Additionally, the investment agreements looked real and fooled the investors.  Vaccarelli obviously used his office and the trappings of his status as a registered representative (or broker) to create a convincing sophisticated veneer of legitimacy.  The documents and agreements that Vaccarelli used in connection with his pitch and his scheme allowed him to create an air of legitimacy, because he utilized as his model an agreement utilized by actual investment professionals at the Investment Center.  Thus, they contained all the trappings of legitimacy.

As the Second Circuit has held, for the enhancement to apply, each individual step in the scheme need not be intricate or sophisticated; rather, it is only necessary that the offense conduct "when viewed as a whole, [is] notably more intricate than that of a garden-variety [ ] fraud scheme."  *United States v. Cole*, No. 07-4623-cr, 296 Fed. Appx. 195 (2d Cir. 2008) (unpublished) (quoting *United States v. Hance*, 501 F.3d 900, 909-910 (8th Cir. 2007)); *United States v. Lewis*, 93 F.3d 1075, 1083 (2d Cir. 1996) ("Even if each step in the planned tax evasion was simple, when viewed together, the steps comprised a plan more complex than merely filling out a false tax return" and found sophisticated means enhancement applied).  In *United States v. Regensberg*, No. 09-2704-cr, 2010 WL 2501042 at *1 (2d Cir. 2010) (unpublished), the Court applied the enhancement when a defendant ran a Ponzi scheme and the execution of the scheme included "creation of fraudulent loan documents, detailed reporting of fake earnings, use of Ponzi scheme payments to lull his investors, and alteration of an account statement to make it

appear as if he had not lost his investors' money." The Second Circuit determined that this conduct over three years "was the sort of repetitive conduct . . . [that] demonstrates that more than routine planning was involved," and agreed that the enhancement for sophisticated means was appropriate. *Id.* Likewise, in *Cole*, the Second Circuit found that fabricating financial statements constituted, at least in part, sophisticated means, where Cole also fabricated financial statements and utilized a mail forwarding service to make it look as though his victims were receiving the financial statements from an address in Nevada, where his shell corporation was located. 296 Fed. Appx. at 197. The Second Circuit identified a number of facts in *United States v. Amico* which established sophisticated means; certain of these facts are consistent with Vaccarelli's conduct. *See Amico*, 416 F.3d 163 (2d Cir. 2005). Notably, this includes the creation of false documents, and "other tactics designed to conceal the scheme". *Id.* at 169.

Here, Vaccarelli's conduct was both sophisticated and complex. He utilized a bank account held in the name of LWLVACC, LLC, the existence of which he concealed from The Investment Center. That account received certain victim funds, and the defendant directed funds to that account. This is a factor to consider in determining the level of sophistication of the fraud. *See* U.S.S.G. § 2B1.1 app. n. 9(B). For example, Vaccarelli instructed Linda Warren to endorse a check to LWLVACC, LLC. While Vaccarelli represented that Warren would earn a higher rate of interest than she was previously earning, in fact, he did not invest her funds, but used her money for expenses to include checks to his wife and $30,000 payable to Leavenworth Professional Center. *See* PSR at ¶¶ 22, 23.

Moreover, he utilized sophisticated means to conceal his crimes. For example, he provided letters to victim Guiseppina LaPorta, telling her, for example, that she had "on deposit

18

$33,482.18 in the client funds account of Leon Vaccarelli," that the account earned 4 percent annual interest, and that funds were available for withdrawal within three business days' notice. *See* PSR at ¶ 29; GX 252. That information was false, as after Ms. LaPorta's funds were deposited, they were spent as Vaccarelli's own money, and were not kept in a client funds account earning 4 percent annual interest. *See* PSR at ¶ 29. He also provided a letter to Christine Chauncey, assuring her that she had "on deposit $47,000 in the Senior Note program of Leon Vaccarelli" and that the account earned 8 percent annual interest, and that the accrued interest earned to date was over $3,000. In fact, Ms. Chauncey's funds had not been invested. Moreover, Vaccarelli claimed that she would receive tax documents from a CPA firm; all of that information was false. *See* PSR at ¶ 32. His creation of such false documentation was complex and constitutes sophisticated means.

Furthermore, Vaccarelli used the unknowing participation of his business partner to defraud Ms. Truhan. The entire sequence of events—which included having Ms. Truhan open a new checking account and obtaining the check so he could cause funds to be transferred to himself after her securities were liquidated—was cold, calculated, and sophisticated. When Vaccarelli sought to execute the securities trades to liquidate a portion of Ms. Truhan's funds, and have them transferred to her newly opened checking account, he had the assistance of his partner to help execute the securities trades. His then-partner did so without knowledge of the fraud and Vaccarelli obtained the $300,000. This was clearly sophisticated as were his lies to take custody of the Burton Trust.

Vaccarelli's conduct was similar to that of the defendant in *United States v. Loles*, where the Court held that the sophisticated means enhancement was warranted where a defendant

convicted of mail and wire fraud "falsified hundreds of documents using his computer to create fake forms and account statements reflecting fictitious bond prices . . . controlled what proved to be shell companies . . . sent out false tax forms . . . and by taking all these steps managed to conceal the scheme from his victims for nearly eight years." *Loles*, No. 14-1110, 628 Fed. Appx. 7, 10 (2d Cir. 2015) (unpublished summary order). Here Vaccarelli also created false documents, such as fake investment agreements, and false investor update letters to show the value of the holdings, used multiple bank accounts to move and hide the proceeds, and concealed his fraud, including using Lux Financial and LWLVACC.

The nature of Vaccarelli's conduct, coupled with his use of multiple bank accounts, a shell company, false documents, and false balances, and his use a lawyer to settle the Chauncey matter,[3] together demonstrate that the means Vaccarelli used were sophisticated in both the execution and concealment of the fraud. Thus, the Government agrees with the U.S. Probation Officer that the means used by Vaccarelli were "sophisticated" and his conduct falls squarely within the definition of sophisticated means. Accordingly, the additional two levels should be applied pursuant to U.S.S.G. § 2B1.1(b)(10)(C).

        d.  <u>Four Level Increase for Defendant's Position as Investment Advisor</u>

The Government also agrees with the U.S. Probation Officer's inclusion of the 4-level enhancement pursuant to USSG § 2B1.1(b)(20)(A)(iii) because he was an investment adviser at the time of his crimes. *See* PSR at ¶ 53. The defendant does not challenge this enhancement. Evidence at trial established that Vaccarelli was a registered representative of The Investment

---

[3] *See United States v. Charroux*, 3 F.3d 827 (5th Cir. 1993) (upholding sophisticated means enhancement where defendant sought advice of various tax professionals in order to lend appearance of legitimacy); *see also United States v. Ramirez*, 146 Fed.Appx. 518 (2d Cir. 2005) (sophisticated means enhancement was warranted where defendant used his specialized skills as an immigration attorney to perpetrate complex fraud).

Center and an investment adviser at IC Advisory Services, Inc.  *See* PSR at ¶ 9.  Vaccarelli

utilized his position as a registered representative and investment adviser to prey upon

unsuspecting victim-investors.

### e.  Vulnerable Victims

The U.S. Probation Officer properly included a 2-level enhancement pursuant to U.S.S.G.

§ 3A1.1(b)(1) because the defendant knew or should have known that certain victims of the

offense were vulnerable.  *See* PSR at ¶ 54.  Specifically, at minimum, the defendant knew and

should have known that Ms. Burton was especially vulnerable—as he assumed a fiduciary

position with respect to her and she was mentally disabled.  He also was aware that Carmela

Truhan was elderly, in an assisted living facility, and was especially vulnerable.  Vaccarelli

waited until Truhan's daughter, Victoria Hughes, left their meeting to obtain a check from Ms.

Truhan.  *See* PSR at ¶ 41.  The defendant does not appear to contest this enhancement.

Vaccarelli clearly sought out and targeted vulnerable victim-investors and defrauded

them.  The trial evidence established that as part of the scheme, Vaccarelli sought out investors

who were less sophisticated and took their money.  It should not go unnoticed that Vaccarelli did

not take the funds from the investment accounts of his sophisticated clients, such as the two

certified public accountants from the CPA firm of Zackin Zimyeski Sullivan.  However,

Vaccarelli did pick and choose and cleverly steal investment funds from his vulnerable and less

sophisticated clients.  Any argument that he was in a drunken haze or had some sort of

"undiagnosed mental illness" that contributed to his conduct (Def. Mem. (Doc. No. 151) at 2) is

belied by the fact that vulnerable victims, like the almost 90-year old Ms. Truhan and Ms.

Burton, the beneficiary of the Burton trust, were targeted while his sophisticated clients had no

21

such issues with their investments.

As discussed above, these victims suffered the additional non-pecuniary harm of having someone who they knew, who they trusted, take their retirement nest eggs.  Section 3A1.1(b) of the Sentencing Guidelines provides for a two-level increase: "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b).   The enhancement "reflect[s] the public interest in more severely punishing those whose choice of victim demonstrates an 'extra measure of criminal depravity.'" *United States v. Sangemino*, 136 F.Supp.2d 293, 298 (S.D.N.Y. 2001) (citing *United States v. Hershkowitz*, 968 F.2d 1503, 1505 (2d Cir. 1992)).   That extra level of depravity exists here.   "In addition, § 3A1.1(b) does not require that the defendant choose the victim because of her or his vulnerability; it requires only that the defendant "knew or should have known of this quality when deciding to go ahead with the crime." *Id.* quoting (*United States v. McCall*, 174 F.3d 47, 50 (2d Cir. 1998) (citation omitted)).  Here, Vaccarelli knew the characteristics he was targeting and he purposely choose victims because of their particular qualities.  He did not drive to the CPA firm and ask them to sign a starter check for $300,000, but he did drive to the assisted living home and do exactly that to Ms. Truhan after her daughter had left.

In *McCall*, the Second Circuit observed that the courts have read two limits into section 3A1.1(b).  First, the vulnerability of the victim must bear some nexus to the crime . . . .  Second, "the defendant generally must have singled out the vulnerable victim[ ] from a larger class of potential victims." *McCall*, 174 F.3d at 50.  Here, the Probation Officer properly found that the victims were necessarily vulnerable.  Vaccarelli targeted these victims to further the crime based on their demographic characteristics, which were generally age and capacity to handle their

finances, the crime related directly to that vulnerability, and he clearly singled them out from the larger class of his securities investor-clients generally.  Accordingly, this specific offense characteristic should apply.

f.  <u>Obstruction of Justice</u>

As reflected in the PSR at ¶¶ 43 and 56, a two-level enhancement is also appropriate pursuant to U.S.S.G. § 3C1.1 because the defendant obstructed justice in testifying falsely during the trial.  In giving false testimony he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution, or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct . . . ."  U.S.S.G. § 3C1.1.  While the enhancement does not apply where a defendant merely exercises a constitutional right—e.g., through refusal to enter a guilty plea, the provision may apply where the defendant testifies falsely (although not should not be applied where a false statements results from confusion, mistake, or faulty memory).  *See* Application Note 2.  In providing a non-exhaustive list of covered conduct, the Sentencing Commission expressly identified "committing . . . perjury" as applicable conduct. Application Note 4(B).  The Second Circuit has held in this regard:  "'[To] base a § 3C1.1 enhancement . . . upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter.'" *United States v. Salim*, 549 F.3d 67, 73 (2d Cir. 2008) (quoting *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997)).

Here, Vaccarelli willfully testified falsely as to material matters.  As noted in the PSR, Vaccarelli consistently argued that he was incapacitated in a "drunken haze" during all of the

years of his criminal conduct PSR at ¶ 43.  Specifically, when asked about how drinking affected

his memory during the time before he went into detox, Vaccarelli testified:  "It's a haze.

Everything in this time period is – it's a drunken haze."  Tr. at 1273.  In fact, during that time

period, Vaccarelli plotted and executed sophisticated frauds.  He traveled to Ms. Truhan's

assisted living facility.  He drafted multiple documents (containing materially false statements

about investments) to lull his victims into a false sense of security.  Incredibly, when asked about

the fact he was able to engage in such sophisticated conduct, Vaccarelli still claimed to be in a

"drunken haze":

> Q.   Okay.  So you're able to move all this money around from place to place
> from Ms. Chauncey and other people, including the Strobels, to pay back
> June Antonacci, to pay back for office supplies.  But your testimony was
> that you're just in a drunken haze?
>
> A.   I was.
>
> Q.   And this – you're making these technical moves from account to account,
> paying the mortgages, paying the mortgages on the building, negotiating
> with the bank and you're in a drunken haze.  Is that your testimony?
>
> A.   Yes.  There is no rhyme or reason as to why –
>
> Q.   Let me just stop you.  Is your answer yes or no?
>
> A.   I was in a drunken haze.

Tr. at 1337-38.  When asked about the fact he hired an attorney in connection with a FINRA

complaint, the defendant testified, "In my drunken haze, I did have faculties to call a lawyer and

say I need a lawyer."  Tr. at 1346.  When asked about a letter given to Ms. LaPorta, in which the

defendant falsely claimed that Ms. LaPorta had over $33,000 on deposit in a client funds

account, and made representations about "changing suitability practices," the defendant testified

in part, "[i]n my drunken haze, I put that in there . . . ."  Tr. at 1396.  When asked about a letter

related to the Sienkowskis, the defendant said, "I was always in a drunken haze in this period of time" and "If I wasn't in a drunken haze, I wouldn't have written the letter . . . ."  Tr. at 1398. Vaccarelli claimed to have been in a persistent "drunken haze" in dealing with everyone—*e.g.*, when asked, "[a]nd you weren't in a drunken haze when you were dealing with, for instance, Carrie Zimyeski and some of your other clients; correct?", Vaccarelli answered, "I disagree with that."  Tr. at 1437.

Notwithstanding Vaccarelli's assertions—which were belied by his conduct during this period—Vaccarelli's victim-investors generally provided testimony that directly contradicted his claims of intoxication.  For example, Ms. Rustic met with Vaccarelli on "dozens" of occasions, and never found him difficult to understand and never found him to be slurring his words, and only saw him with a drink at his Christmas party.  *See* Tr. at 186-87.  As another example, Mr. Roussel testified that the few occasions he had a drink with Mr. Vaccarelli, Vaccarelli had two drinks and said, in substance, that he could not have more because he had to go back to work. Tr. at 470.  Vaccarelli's attempt to influence the jury to believe that he lacked the requisite intent because he operated under a persistent "drunken haze" for a period of years was a transparent effort to provide false evidence to the trier of fact.  In Application Note 6 to section 3C1.1, "'[m]aterial' evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."  Certainly, the "drunken haze" mantra was intended to influence the jury to believe (falsely) that Vaccarelli could not form the requisite intent.  As such, this repeated false statement constitutes obstruction of justice.

Relatedly, the defendant testified with respect to Ms. Truhan—from whom he embezzled

25

$300,000 via check when her daughter had to leave a meeting to take care of a sick child—the defendant claimed to remember little:

> Q.      You took all of these individual steps to get $300,000 into your account, and it's your testimony to this jury that you were drunk and you don't remember?
>
> A.      I was drunk while I was doing it, absolutely.
>
> Q.      And you drove from Waterbury to Madison, had a meeting at an assisted living home, filled out documents, drove back, talked to Barry, had him sell securities, and you're saying 'I was drunk the whole time'?  That's your testimony?
>
> A.      That was my normal day, yes.

Tr. at 1454.  Truhan's daughter, on the other hand, did not describe Vaccarelli being drunk. Moreover, it defies common sense that Vaccarelli could have been drunk at the same time he drove from Waterbury to Madison, met with Ms. Truhan and Ms. Hughes, waited for Ms. Hughes to leave, caused paperwork to be completed, talked to his business partner, concocted a story that Ms. Truhan was helping her daughter buy a home, and caused the sale of securities to be sold and the proceeds deposited into the very account for which he held a signed check. Again, Vaccarelli's testimony was intentionally designed to mislead the jury as the trier of fact.

In addition, the defendant falsely testified that the approximately $85,000 taken from Patricia Sienkowski was a fee for his services.  In fact, in 2012 (the same year in which Ms. Sienkowski's husband was on hospice and ultimately passed away), Vaccarelli processed a cash surrender for Ms. Sienkowski, causing a check to be issued by ING to Ms. Sienkowski.  *See* GX 1051; Tr. at 881.  Vaccarelli kept approximately $85,000 of the $100,000 taken from the ING account.  Vaccarelli testified that Mr. Sienkowski (now deceased) made a 'handshake deal' with him, that if Vaccarelli made him a million dollars, he would get $100,000.  *See* Tr. at 1305.

26

Vaccarelli claimed that he "did negotiate with Tom and gave them that $15,000 back . . . .   And obviously, you know, the family wasn't happy with the fee, but it was a deal that Tom and I made." Tr. at 1305.  Moreover, this purported additional "fee" was never reported to The Investment Center.  In short, Vaccarelli falsely testified that his dealings—with a deceased witness—involved a handshake deal for him to receive $100,000, an arrangement that simply makes no sense – because it didn't happen.

The above described testimony was simply not true.  If the jury had believed any of these claims, it may well have influenced their decision, including on specific substantive counts. Since the jury found him not credible they concluded the statements were false.  *See United States v. Johns*, 27 F.3d 31, 34 (2d Cir.1994) ("Under the law of this Circuit ... we look to the *defendant's* representations in deciding the issue of materiality.  If those representations could affect the sentence (if believed), then it is irrelevant that the government has possession of other information that rebuts the defendant's representations"); *United States v. Rodriguez*, 943 F.2d 215, 218 (2d Cir. 1991) ("The definition of a 'material' statement embraces all false statements that would tend to affect a defendant's sentence, whether or not discovery of the falsity of the statement is inevitable.").  *See also United States v. Sweeney*, No. 11-3083-cr, 485 F. App'x 468, 470 (2d Cir. 2012) (unpublished) (holding that a two-point enhancement for lying is proper even if the "lie was immaterial to the 'issue under determination'" at a plea allocution, and even if the government knew the defendant was lying and therefore not misled by it).  The record clearly supports a finding that Vaccarelli perjured himself multiple times throughout his testimony, and these perjurious statements support the enhancement for obstruction.

There can be no serious doubt that Vaccarelli's testimony at trial was replete with false

27

statements as to material matters.  As such, the Government agrees with the U.S. Probation

Officer that Vaccarelli's testimony in this regard was materially false and forms the basis for an

obstruction of justice enhancement.

> g.   No Credit For Acceptance

As recommended by the Probation Office, Defendant Vaccarelli should not be awarded

credit for acceptance of responsibility pursuant to U.S.S.G. § 3E.1.1(a). Vaccarelli opted to go to

trial and put the Government to its burden of proof.  The Defendant continues to maintain his

innocence.  It would be wholly inappropriate to award credit for acceptance of responsibility

when it is clear he has shown no remorse or acceptance for the wrongs he committed.

Accordingly, the defendant's total offense level should remain at 37.  PSR at ¶¶ 46-70.

> 2.   Criminal History Category

The Government agrees that the defendant falls within Criminal History Category I.  *See*

PSR at ¶ 75.

> 3.   Guidelines Range

 With a total offense level of 37 and a Criminal History Category of I, Vaccarelli faces an

advisory Guidelines range of 210 to 262 months of imprisonment, supervised release of 1 year to

3 years, and a fine of between $40,000 and $30 million.  *See* PSR at ¶¶ 120, 122, 130.

**III.   No Departures Would be Appropriate for Defendant's Purported Drinking Problem or His Family Circumstances**

In his sentencing Memorandum Vaccarelli raises a number of arguments seeking a lesser

term of incarceration.  These arguments, mainly based on his purported drinking and his

"support" for his children do not support a lower sentence.

1.  Vaccarelli Purported Drinking Issues Do not Support a Lesser Sentence

The Court should reject any argument advanced by Vaccarelli regarding his purported drinking problem, which he also tries to now cast as "mental illness."  Notwithstanding the jury's verdict—which rejected the defendant's claim that he lacked the capacity to commit the offenses due to alcoholism—the defendant seeks to argue that he should receive some sort of consideration.  He should not.

First, while the defendant does not frame his argument as a Guidelines argument, section 5H1.4 of the Guidelines provides in relevant part:

> Drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure.  Substance abuse is highly correlated to an increased propensity to commit crime.  Due to this increased risk, it is highly recommended that a defendant who is incarcerated also be sentenced to supervised release with a requirement that the defendant participate in an appropriate substance abuse program . . . .

U.S.S.G. § 5H1.4.  While in other circumstances, the Guidelines contemplate the possibility of a departure for needed treatment (*see* U.S.S.G. § 5C1.1, note 7, discussing defendants in Zone C of the Guidelines), here, a departure or variance would not be appropriate.  The defendant's criminal conduct was pervasive; it was serious; it caused great harm.

The defendant's transparent attempt to hide behind his assertion—notwithstanding the conflicting evidence—that he was motivated by years' long alcoholic stupor, should be viewed with great skepticism and more plainly seen as an attempt to avoid responsibility.  *See also* U.S.S.G. § 5K2.0(d)(1) (***prohibiting departures*** based on drug or alcohol dependence or abuse); *accord United States v. Payton*, 159 F.3d 49, 61 (2d Cir. 1998); *United States v. Wheeler*, No. 04cr424-15(RWS), 2004 WL 2646625, at *6 (S.D.N.Y. Nov. 18, 2004) (unpublished).

While Vaccarelli asserts that his purported "disorder must have significantly influenced

him to engage in the conduct of conviction," (Def. Mem. at 11), he has presented no credible evidence to suggest that any mental health disorder caused him to commit the instant offenses. In fact, it took a significant amount of skill and cunning to defraud only the investors who would not notice and not the other more sophisticated or more focused clients of Lux Financial.

In contrast to his clever conduct, the reports offered by mental health professionals are of limited value. Dr. Zonana's report appears to have been based largely on Vaccarelli's own statements. Dr. Zonana notes this limitation, observing "[h]is self-reports are difficult to evaluate as he told inconsistent reports to his therapists over the past year and a half . . . ." Zonana Report at 16. Vaccarelli also provided materially false information to Dr. Zonana – claiming "all of the clients were aware of the proposed investment plan and were willing participants and he did not surreptitiously take money from their accounts. There is no pattern of pervasive or enduring criminal activity." Zonana Report at 17. It is clear that Vaccarelli lied to a select portion of his client-investors (and not others), telling the victims that their funds would be invested in a CD or separate client account, and that it would earn specific rates of interest. No CDs were purchased. There was no client account. And the defendant perpetuated his scheme to defraud between 2011 and 2017. Cleary, this was a "pattern of pervasive [and] enduring criminal activity." To the extent that Dr. Zonana believed that a mental illness contributed to Vaccarelli's criminal conduct—which is not entirely clear—that belief appears to be based on false information provided by Vaccarelli. In *United States v. Henry*, No. 13-CR-91, 2016 WL 30665, at *4-5 (E.D.N.Y. Jan. 2, 2016) (unpublished), the district court denied a downward departure and the *Henry* court noted that the defendant and his doctor provided "no evidence that Henry suffered from a 'significantly reduced mental capacity' during the commission of the

offense *or* that there was any causal link between any mental health issue and Henry's offense conduct." *Id.* at \*5; *see also United States v. Qualls*, 25 F. Supp. 3d 248, 259 (E.D.N.Y. 2014) (declining to grant a downward departure because although the defendant suffered from mental illness, a causal link was not established between the mental illness and the commission of the defendant's offenses).  Here there is no evidence of reduced mental capacity and plainly no evidence of a causal link.

Second alcoholism is, unfortunately, relatively common.  Generally, people who deal with alcohol abuse do not steal hundreds of thousands dollars from clients.  They do not create false documents.  They do not try to steal $300,000 from an elderly woman in an assisted living facility.  They do not assume the duties of a successor trustee for funds necessary for the support of an incompetent individual, all under false pretenses.  In short, there is nothing to suggest that alcoholism has any causal connection to the defendant's conduct.  Defendant Vaccarelli has failed to establish that his purported alcohol issue, that seems to have begun around the time when the Securities and Exchange Commission searched his office, somehow caused him to commit the extensive and well-hidden securities fraud.  *See, e.g.*, *United States v. Brady*, 417 F.3d 326, 330-35 (2d Cir. 2005) (finding that "serious physical, emotional, mental, and possibly sexual abuse at the hands of [defendant's] father," ***did not*** warrant a downward departure without evidence of causation).  In fact, blaming his criminal conduct on his drinking appears to be a convenient and false attempt at blame-shifting.

Third, the extent of the defendant's alcoholism is not clear.  In 2012, when seeking to get a disability policy that currently pays him thousands of dollars a month, Vaccarelli represented to the insurance company that he drank only a modest amount.  *See* GX 1228.  He now claims that

the statement, to get the insurance policy was not true.  *See* PSR at ¶ 100.  Additionally, during

the middle of the scheme for which he was convicted, Vaccarelli took a class in connection with

a 2016 DUI arrest (*see* PSR at ¶ 78).  In the workbook he that completed as part of the program,

Vaccarelli wrote, "I have always been responsible!  I admit that I did misuse on this night in

question!"  GX 1200 at 29.  He reiterated, "I made <u>one</u> mistake <u>one</u> night!  Otherwise I am

responsible!"  GX 1200 at 40.  He also answered questions about his use of alcohol.  Other than

admitting that drinking had put him in dangerous situations like impaired driving, he denied all

other issues with drinking.  *See* GX 1200 at 32.  Thus, it can and should be concluded, based on

the information provided to the insurance company and information provided in connection with

the DUI class, Vaccarelli did not have a significant issue with alcohol.  The "serious" alcohol

problem and purported mental illness only seems to have appeared after the SEC arrived at this

office to conduct the search.

Moreover, as noted above, Vaccarelli has provided inconsistent information to treatment

providers.  *See* Zonana Report at 16.  As the defendant's therapist, Donna Gleissner, testified at

trial, a diagnosis of alcohol use disorder is based on a number of factors.  A determination of

whether a person exhibited that symptom was based largely on self-reporting.  *See*, *e.g.*, Tr. at

1588 (agreeing that assessment of a factor "requires truthful report of a client").  As a result,

there is a danger that a person—such as Vaccarelli—could falsely report symptoms, as illustrated

below:

> AUSA:            So based on the fact that a lot of the criteria require self-
>                  reporting of a patient or client, is it possible that someone
>                  can falsely report symptoms of alcohol use disorder?
>
> MS. GLEISSNER:   Yes.

Tr. at 1590.

The limitations of diagnosis in reliance in large part on self-reports was further discussed:

AUSA:              If there was a benefit for a person to exaggerate signs of alcohol use disorder, is it possible for someone to self-report inaccurate information about their symptoms or the severity of their symptoms?

MS. GLEISSNER:    Yes, it's possible.

Tr. at 1617.

Here, Vaccarelli sought help for alcoholism only _after_ the SEC searched his office. Then, he checked himself into a rehabilitation facility, raising serious question as to whether Vaccarelli exaggerated his drinking in an attempt to create a defense to the charges. Moreover, as noted above, victim-investors did not generally describe Vaccarelli drinking excessively, notwithstanding Vaccarelli's claims. Information Vaccarelli provided to Dr. Zonana is also inconsistent with a serious drinking problem. He reported to Dr. Zonana that he was able to drink in moderation, and was not motivated to stop drinking. _See_ Zonana Report at 15-16 ("He has never really seen his drinking as a substantial problem and currently has continued to drink since his discharge" and expressed disinterest in being abstinent, and indicated he used alcohol up to 3 to 4 times per week, but was able to stop after 1 to 3 drinks). Given Vaccarelli's conflicting statements, it is difficult to assess the duration and extent of Vaccarelli's drinking.

Additionally, as reported by the United States Probation Officer who has been providing supervision, Vaccarelli has been required to provide alcohol tests by blowing into an alcohol reader and has not had any failed test. Thus, it can be concluded that any alcohol related "illness" has been resolved or treated and he has maintained sobriety for almost two years while under the supervision of the United States Probation Office.

Finally, what is clear is that Vaccarelli was not in a drunken haze for all of 2011 to 2017, when he engaged in sophisticated, complex conduct, and met with victim-investors without raising concern as to his drinking.  Most importantly, it was clear to the jury, and undoubtedly to the Court, that Vaccarelli's claim that everything was a "drunken haze" was patently false.  He should not be given a lesser sentence based on this claimed condition.

   2.   <u>The Status as a Divorced Parent with Children Does not Support a Departure</u>

Next Vaccarelli argues that because he is a father, with children, one of whom stays with him, he is entitled to a lesser sentence.  *See* Def. Mem. at 1.  This argument should be rejected. The defendant's family responsibilities as a divorced father who has joint custody of the children with his ex-wife, while admirable, is not unique, and plainly he does not play an irreplaceably role in the care-taking of his children.  Furthermore, this factor is clearly not present to a substantial degree such that a departure or variance would be warranted.  Many defendants are divorced fathers with children, plenty of whom are involved in child rearing.

In his sentencing memorandum Vaccarelli argues that he should get a sentence of probation because he takes care of his children "virtually every waking moment."  Def. Mem. at 1.  This argument is obviously inconsistent with his claim to be suffering from a debilitating mental illness or being in a drunken haze.  Moreover, pursuant to the divorce decree, he has joint legal custody with his ex-wife and children's primary residence is with their mother. Additionally, even as hyperbole, his assertion regarding his role is largely legally irrelevant as there are numerous other adults including the children's mother who are available to take care of the children.

As a general principle, the Second Circuit and numerous other courts have recognized

that all custodial terms of imprisonment impose a hardship on important family responsibilities. *See United States v. Sprei*, 145 F.3d 528, 534 (2d Cir. 1998); *United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991); *United States v. Cacho*, 951 F.2d 308, 311 (11th Cir. 1992); *United States v. Daly*, 883 F.2d 313, 319 (4th Cir. 1989); *United States v. Brewer*, 899 F.2d 503, 508 (6th Cir. 1990).  Moreover, as the Second Circuit noted in *United States v. Tejeda*, separation from family members is "inherent in the punishment of incarceration." *United States v. Tejeda*, 146 F.3d 84, 87 (2d Cir. 1998).

It is axiomatic that a prison term will necessarily separate convicted defendants from their families.  Because of this inherent aspect of incarceration and because each and every defendant who has living family members who rely on him or her in some important way -- be it emotional support, financial support, physical support, or even all of these -- the Sentencing Commission and the Courts have made the determination that "family ties and responsibilities are not ordinary relevant in determining whether a departure may be warranted." U.S.S.G. 5H1.6.

Courts, most notably the Second Circuit, have limited the application of a departure based on family circumstances finding such a departure to be disfavored and that such a departure "must be reserved for situations that are truly extraordinary."  *United States v. Walker*, 191 F.3d 326, 338 (2d Cir. 1999); *see also United States v. Smith*, 331 F.3d 292, 294 (2d Cir. 2003) ("Because the Guidelines disfavor departure based on family responsibilities, such a departure is not permitted except in extraordinary circumstances").  Further, such departures have been upheld in cases where the defendant at issue was the **sole** or **only caregiver available**, not simply because they were the most trusted, best situated, or the most loved caregiver, but

35

because they were found to be the only person available to provide the necessary care at issue.

*See, e.g., United States v. Johnson*, 964 F.2d 124, 128–30 (2d Cir. 1992) (no abuse of discretion to depart where defendant was "solely responsible for the upbringing of his three young children, including an infant, and of the young child of her institutionalized daughter"); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (no abuse of discretion to depart where defendant solely financially responsible for wife, two children, ages 4 and 11, and for disabled dependent father and grandmother, all of whom lived in the same house).

> As explained by the Second Circuit in *United States v. Sprei*, 145 F.3d at 534:
>
> Family ties and responsibilities are a discouraged basis for departure. [*NB*: the Nov. 1, 2018 version now uses the term "not ordinarily relevant"] *See* U.S. Sentencing Guidelines Manual § 5H1.6 policy statement. This is because "many defendants shoulder responsibilities to their families.... Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992). The presence of a hardship resulting from imprisonment is therefore ordinarily not enough to warrant a departure. It is only "[e]xtraordinary circumstances. . . not capable of adequate consideration. . . . [that] may constitute proper grounds for departure." *Id*. In other words, only if a district court finds the hardship to be exceptional may it downwardly depart on that basis. *See United States v. Galante*, 111 F.3d 1029, 1034 (2d Cir. 1997).

As the Second Circuit explained in *Sprei*, all families suffer when a loved one commits a serious crime.  This fact may be especially difficult on a family when the defendant has led what otherwise appeared on the surface to friends and acquaintances to have been a law-abiding life.

Moreover, the Second Circuit has, in fact, reversed under an abuse of discretion standard a departure where a single mother of a four-year old child was facing incarceration and the defendant's aunt was available to provide childcare.  *United States v. Mateo-Ruiz*, 112 Fed. Appx. 790, 792 (2d Cir. 2004).  In *United States v. Smith*, 331 F.3d 292 (2d Cir. 2003), the Second Circuit reversed, under abuse-of-discretion standard, a family circumstances departure

36

where the defendant was not the sole care giver or financial supporter of his 2-year-old son.

The situation in the case of *United States v. Madrigal*, 331 F.3d 258, 260 (2d Cir. 2003) seems somewhat analogous to Vaccarelli's case, and in that case the Court reversed a family circumstance departure, under abuse-of-discretion standard, for a defendant who had six children (only one of whom was under the age of 18).  The Second Circuit did so in the absence of evidence that the defendant was the only person capable of providing adequate care, noting that where the family as a whole remained cohesive and where the defendant's three older children were available to care for their younger siblings, and defendant's extended family was also available for care-giving.  Here as in *Madrigal*, there are adults who are available to serve as caregivers in Defendant's absence, importantly the children's own mother who has joint custody and who maintains their primary residence.  *Accord, United States v. Carrasco*, 313 F.3d 750, 756-57 (2d Cir. 2002); *United States v. Tejeda*, 146 F.3d at 87-88 (reversing, under abuse-of-discretion standard, departure and citing "the existence of a stable family (a wife and two children)—something that is by no means extraordinary—does not satisfy the 'exceptional hardship' criterion established by our precedents").

Moreover, it goes without saying that each and every parent is, in his or her own way, unique and irreplaceable to his or her own child.  That said however, addressing the arguments advanced by Vaccarelli, his particular family ties and responsibilities are not so truly exceptional or extraordinary, nor does his place as a 'provider' who provides by drawing on a questionable disability insurance policy, distinguish his situation from that of other defendants facing incarceration who similarly provide support to family members.

To the extent that the defendant seeks a departure or variance based on loss of caretaking

37

or financial support, the Court should consider factors including whether "the loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant."  Application Note 1(B)(ii) to U.S.S.G. § 5H1.6.  "[T]he fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration."  *Id.* Moreover, the Court should consider whether there is "no effective remedial or ameliorative programs reasonably . . . available, making the defendant's caretaking or financial support irreplaceable to the defendant's family."  *Id.* at (iii).

Here, the defendant and his ex-wife share custody of the children.  The defendant provides support from a disability insurance policy.  Even if the defendant were not incarcerated, it is not clear how much longer the defendant would be eligible to receive the disability payments, since his application for the policy is directly contrary to his trial testimony and his claimed alcohol problem.  Indeed, if the defendant's testimony concerning his drinking were to be believed, then he necessarily procured the policy through fraud — by virtue of his asserting in March 2012, that he consumed 4 to 5 alcoholic beverages per week.  *See* PSR at ¶ 100; GX 1228. Vaccarelli appears to claim that he did, in fact, provide false information to the insurance company—offering that, as an alcoholic, he minimized his alcohol content and was in "denial." PSR at ¶ 100.  Thus, if the insurance policy was obtained by fraud, his ability to provide any money going forward becomes highly suspect.

Also, while the defendant's physical presence would undoubtedly be missed, his ex-wife appears to have plenty of supports in place to enable her to provide care to the children.  *See* PSR

at ¶ 94.  According to the Probation Officer's investigation, the defendant's ex-wife has become certified as a CNA, has a job lined up, and has applied for other benefits.  *See* PSR at ¶ 95.  She states that she "is not concerned about supporting the children because she has an 'army of support,' including family and friends."  PSR at ¶ 95.  Based on those facts—and the seeming unlikelihood that the defendant's disability payments will continue indefinitely under these circumstances—the defendant should not receive a departure or variance on this ground.

When the Court is ultimately determining an appropriate sentence, Vaccarelli's status as a father and his commensurate family responsibilities warrant relevant consideration, but they plainly do not override the need for a lengthy period of incarceration in this case.  While the defendant has seven minor children, he had the children during the fraud and yet made the calculus to commit his crimes between 2011 and 2017 while already a father.  He thus prioritized his own wants and greed above the desire to be available going forward in his children's lives.  He chose to squander his future with them.  And perhaps worse, in the process of committing the crimes and conducting his scheme, he presented himself to the public and to his victims as an engaged member of the community including in the church he attended with the children, all while swindling people out of their retirement savings.  Thus, in a way, he used his family and his children to create the appearance of being a good and honorable person, which he was not.

Obviously, the separation from a parent is difficult, but controlling case law dictates that when other family members, especially another parent, are available and to provide support, this departure is not appropriate.  While it is certainly unfortunate that his children will be deprived of their father's physical presence during his time in incarceration, it is a consequence stemming directly from the defendant's criminal conduct.

**III.**   <u>**Sentencing Factors Set Forth in 18 U.S.C. § 3553(a) Support a Lengthy Sentence**</u>

As discussed in detail below, the sentencing factors set forth in 18 U.S.C. § 3553(a) support a lengthy sentence of many, many years, especially given the pain and harm that Vaccarelli caused, as reflected in the victim impact letters and the trial testimony of the numerous victims he defrauded.  Indeed, the severity of the crime is demonstrated by the fact that even if the Court were to sentence the defendant to just half of the middle to higher end of the actual calculated Guidelines range, this would still result in a sentence in excess of ten years.

In *United States v. Crosby*, 397 F.3d 103, the Second Circuit explained that, in light of *United States v. Booker*, 543 U.S. 220 (2005), district courts should engage in a three-step sentencing procedure.  <u>First</u>, the district court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."  *Crosby*, 397 F.3d at 112.   That step is addressed above.

<u>Second</u>, the district court should consider whether a departure from that Guidelines range is appropriate.  *Crosby*, 397 F.3d at 112.  As addressed above, there do not appear to be any grounds for a downward departure within the Guidelines' rubric.

<u>Third</u>, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose.  *Crosby*, 397 F.3d at 112-13.

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

40

(1)     the nature and circumstances of the offense and the history and characteristics of
        the defendant;
(2)     the need for the sentence imposed—
        (A)     to reflect the seriousness of the offense, to promote respect for the law,
                and to provide just punishment for the offense;
        (B)     to afford adequate deterrence to criminal conduct;
        (C)     to protect the public from further crimes of the defendant; and
        (D)     to provide the defendant with needed educational or vocational training,
                medical care, or other correctional treatment in the most effective manner;
(3)     the kinds of sentences available;
(4)     the kinds of sentence and the sentencing range established [in the Sentencing
        Guidelines];
(5)     any pertinent policy statement [issued by the Sentencing Commission];
(6)     the need to avoid unwarranted sentence disparities among defendants with similar
        records who have been found guilty of similar conduct; and
(7)     the need to provide restitution to any victims of the offense.

The Second Circuit has instructed district judges to consider the Guidelines "faithfully"

when sentencing. *Crosby*, 397 F.3d at 114. "*Booker* did not signal a return to wholly

discretionary sentencing." *United States v. Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006) (citing

*Crosby*, 397 F.3d at 113). The fact that the Sentencing Guidelines are no longer mandatory does

not reduce them to "a body of casual advice, to be consulted or overlooked at the whim of a

sentencing judge." *Crosby*, 397 F.3d at 113. Because the Guidelines are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat

the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at

596; *see also Rattoballi*, 452 F.3d at 133 (the Guidelines "'cannot be called just 'another factor'

in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple

factors and, with important exceptions, their calculations were based upon the actual sentences of

many judges.'") (quoting *United States v. Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (*en

banc*); *Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007).

41

The Second Circuit has "recognize[d] that in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough*, 128 S. Ct. at 574 ("[w]e have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'") (quoting *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007)); *Rattoballi*, 452 F.3d at 133 ("In calibrating our review for reasonableness, we will continue to seek guidance from the considered judgment of the Sentencing Commission as expressed in the Sentencing Guidelines and authorized by Congress.").

As the Court is well aware, Section 3553(a) provides that the Sentencing Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing.  The Court is no doubt familiar with this case having presided over the entirety of the jury trial to verdict.  Thus, the Court should, after considering all the information provided in this case, including the history and characteristics of the defendant, and all the 3553(a) factors, impose a sentence that: (i) reflects the seriousness of the offense, which here is very serious; (ii) promotes respect for the law; (iii) serves as a "fair and just punishment" for Vaccarelli's fraud scheme in which more than 15 victims, counting couples and a trustee beneficiary, lost approximately $1.5 million dollars, including some like Lyn Burton and Mrs. Augelli, and others, who could not afford to lose the money; (iv) provides general deterrence and specific deterrence to Vaccarelli who appears to lack any awareness of the cruelty of his acts and does not appear to take seriously the nature of the offense; (v) avoids unwarranted sentence

disparities; and (vi) provides restitution to the victims of the offense as discussed above.

Consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), should result in a significant lengthy sentence of incarceration, to be followed by a real and meaningful term of supervised release as well as restitution to all the victims in the full amount of their losses. A significant term of incarceration of a significant number of years is needed to further all the goals of sentencing.

A.     Nature and Circumstances of the Offense

By all accounts the nature of this crime was, in a very real sense, predatory. It was about as much of a predatory-type crime as a financial crime can be. The circumstances of this crime demonstrate an individual, in the form of the defendant, who acted out of greed and a sense of entitlement—entitlement to money that which belonged to others—many of whom were his friends and who trusted him. The defendant used and abused his position as a financial advisor and as a well-respected member of the community, to take from his victims when they trusted him with their money. The high advisory Guidelines range, that includes numerous specific offense characteristics and enhancements, demonstrates the seriousness of the Defendant's crimes, the misuse of his position as a licensed professional, and the lack of any credit for acceptance of responsibility.

As illustrated in the PSR and by the evidence at trial, the defendant's conduct was motivated by greed. Vaccarelli sought out mostly older individuals with whom he developed seemingly close relationships. He groomed his victims. For example, he fostered a long-term business and friendly relationship with Ms. Rustic. As she testified, she trusted Vaccarelli and told him so. The defendant then abused that trust—which enabled him to make off with

$100,000 of Ms. Rustic's savings, damaging her both financially and emotionally.  She is just one of the many victims who trusted him.  In that way, Vaccarelli's scheme to defraud was deeply personal.  It was invasive and heartless.  Vaccarelli had known Mrs. Augelli and her husband since he was a child, and yet, when Mrs. Augelli trusted him with her retirement savings, he took it for himself.  He showed no remorse and no contrition throughout the entirety of the trial.  Even granting the fact that he exercised his constitutional right to go to trial, Vaccarelli smugly testified, albeit falsely, that in essence, it was not his fault but that he was in a "drunken haze."

Vaccarelli chose elderly individuals like Ms. Laporta, Ms. Truhan, and the Sienkowskis.  He chose vulnerable victims like Ms. Burton.  He stole money from people who could ill afford to lose it—often people with modest retirement savings, which was supposed to support a nest egg to last a lifetime.  The long list of victims includes people like Ms. Warren and Ms. Chauncey who spent decades dedicated to their professions—not especially lucrative ones, but professions that serve the greater good of the community — only to have their well-deserved financial stability taken away from them.  Vaccarelli heartlessly stole from the same people who were his friends, people who rooted for him, like Ms. Chauncey who was proud to be his first client.  He took the retirement funds and the life-times of savings, that represented people's hopes and dreams—like those of Mrs. Augelli—who only wanted to buy her granddaughter a wedding dress.  Vaccarelli, who was supposed to guide people as an investment adviser, instead willfully chose to steal and squander his clients' financial futures.

Vaccarelli did this between 2011 and 2017, and would not have stopped but for the fact that law enforcement, including the SEC, detected the crime.  Vaccarelli used multiple bank

accounts, including one held under the name LWLVACC, LLC, an entity he failed to report to

The Investment Center, to complete the crime.  Likewise, seeking to avoid scrutiny, he failed to

report the fact that he was offering private securities in the form of modified agreements.  He

didn't report them because they were bogus. Vaccarelli also failed to report his position as

successor trustee of the Burton Trust.  Vaccarelli went to great lengths to prevent The Investment

Center from scrutinizing his activities.  And he went to great lengths to provide false information

to client-investors in order to prevent them from realizing the fraud.  For this conduct, the

defendant should receive a lengthy sentence of incarceration.

      B.    <u>History and Characteristics of the Defendant</u>

Nothing in the defendant's privileged background explains or excuses his conduct in this

case.  Unlike many defendants, Vaccarelli grew up in a loving household.  He attended Catholic

school, went on vacation every year, and had a nice extended family.  The defendant remembers

large family gatherings and over twenty years of summer vacation in Lake George.  *See* PSR at ¶

86.  While he described his father drinking excessive amounts of alcohol, he further described

his father as being "happy go lucky," and not an angry or abusive drinker.  *See* PSR at ¶ 87.  The

defendant attended a private college in Rhode Island.  *See* PSR at ¶ 108.  Thereafter, he obtained

relevant licenses for work as a stockbroker, insurance broker, and investment advisor.  *See* PSR

at ¶ 109.  The defendant worked in this industry for years, ultimately becoming affiliated with

The Investment Center, and working as an independent contractor through Lux Financial

Services.  Vaccarelli reported earning between $200,000 and $350,000 per year (*see* PSR at ¶

114), by comparison, a huge salary the likes of which most Americans will never make in one

year's time and for some not even in 10 years' time.  Notwithstanding the fact that Vaccarelli

enjoyed a relatively privileged upbringing—and was capable of earning a significant income—he callously and heartlessly defrauding unsuspecting victim-investors.

The conduct in this case makes clear that Vaccarelli's character is reprehensible.  He stole from genuinely good people like Mrs. Augelli.  He took the retirement funds of senior citizens.  He cleverly stole $300,000 through trickery and guile by getting a check from a woman who was nearly 90-years old at the time—and opportunistically taking advantage of the few minutes the victim's adult daughter was not present, needing to care for her ill child.  Perhaps most depraved is the fact he raided the trust of a mentally incapacitated person.  *See* victim impact statement, filed under seal.  Supposedly serving as a successor trustee, he gleefully testified at trial that they "became famous drinking buddies . . . ."  Tr. at 1357.  *See also* Tr. at 1460.  To the extent that Vaccarelli's testimony is true in this regard, it is clear that he thoroughly abused the court system in causing himself to be appointed as successor trustee.  Not only did Vaccarelli spend money intended for Ms. Burton's care and maintenance as his own, he allegedly contributed to her incapacity by using her as a "drinking buddy."  To the extent that such conduct is true, that he would go drinking with a client who is in need of care and over whose money he acts as trustee, the conduct is deplorable.  To the extent that Vaccarelli offered such testimony falsely, to bolster his alcoholism defense, he obstructed justice.

The character traits most consistently presented by the evidence is the fact that Vaccarelli is a narcissist and is dishonest.  He was dishonest in his dealings with victim-investors.  He now claims to have been dishonest with the insurance company concerning his drinking, thus now admitting the separate crime of insurance fraud.  And he repeatedly provided false testimony.

In addition, with respect the defendant's claim that he provided false information to the

insurance company in 2012, the Court should consider the facts that: (1) if the defendant did in fact provide false information, he has committed insurance fraud; and (2) if he did not provide false information, then he is now providing materially false information to the Court in an attempt to influence his sentencing.  Under either scenario, the defendant's character for dishonesty—also made clear through the conduct in this case—is further revealed, and should be considered by the Court.

While the defendant points to a history of volunteerism (which is hardly exceptional, *see* PSR at ¶ 116) as a reason for the Court to impose a probationary sentence, he fails to mention that he used his volunteerism to facilitate the fraud.  While the defendant's involvement with his church is laudable, he volunteered with the church at the same time he was engaged in the criminal conduct in the instant case.  Indeed, he used funds stolen from victims to make tuition and other payments to the church's school for his children.  *See* PSR at ¶ 12.  Ms. Augelli testified that she left the same church where Vaccarelli attended because of the incident with Vaccarelli.  *See* Tr. at 363-64.  Furthermore, the defendant listed volunteer activities on questionnaires submitted to The Investment Center and also on a resume provided to the probate court in connection with his effort to gain appointment as successor trustee for the Burton Trust. *See* GXs 751; 352 at 3; 353 at 3; 354 at 1; 409 (Form U4) at 3.  Thus, the defendant used his volunteerism not for good, but to capitalize financially on his positions with the church and to develop a reputation in the community (and with the probate court) for trustworthiness and engagement.  When in fact, he was anything but trustworthy.

When he told Linda Warren that "not even the Pope" could touch her money, he abused that reference to the church—as what he told her was materially false—as Vaccarelli spent her

money as he sought fit.  Tr. at 900.  In reality, even the Pope could not protect Ms. Warren's money.  Vaccarelli's community engagement does not warrant favorable consideration by this Court because it was in fact part of the fraud.

Accordingly, an examination of Vaccarelli's history and characteristics makes clear the need for a lengthy term of imprisonment.  Vaccarelli orchestrated a massive fraud and caused great harm to his victims and has revealed himself to be nothing more than a narcissistic conman running a complex multi-year scam.

C.   The Sentence Must Reflect the Seriousness of the Offense and Promote Respect for the Law

There can be no doubt that this is a serious offense. Defrauding approximately 15 individuals, many who had saved a lifetime for retirement, and preying upon their trust is a serious crime.  Not only do crimes like Vaccarelli's deprive people of their money, but it also impacts them by making them feel violated and abused, particularly given the fact many of his victims had known him for years.  It is one type of crime to have one's purse stolen or bank account looted by a total stranger, it is quite another to have one's retirement stolen by someone you coached in basketball, whom one has known for years and whom one considered a friend, or with whom one worshiped.  The latter type of financial crime is arguably much worse.

As detailed extensively above and at trial, Vaccarelli systematically lied to people – in many instances to people with whom he had previously developed a personal connection.  He met in people's homes, as with Ms. LaPorta, and shared meals with them, and he lied directly to their faces at these in-person meetings – and then stole their money. The personal nature of the fraud makes this a more serious crime because unlike perhaps an

48

insider trading securities fraud case or a mortgage fraud case where the fraudster manipulates a market, the defendant was manipulating individual people with whom he had cultivated a personal relationship.  The way he took their money, including while literally in their homes, only to take their investments and then move on, demonstrates the callousness and temerity that Vaccarelli employed.

In crafting an appropriate sentence, the Court should consider the extent to which Vaccarelli targeted individuals who were particularly susceptible to his fraud.  This type of targeting of victims of a certain demographic (retirees or near retirees) who he determined would be susceptible to his pitch, is certainly the type of targeting that should receive additional punishment.

Moreover, respect and protection for the elderly is something that the law must promote and the sentencing in this case must reflect the seriousness of taking advantage of our senior citizens. The National Research Council's definition for elder abuse: "(a) intentional actions that cause harm or create a serious risk of harm to a vulnerable elder by a caregiver or other person who stands in a trust relationship to the elder, or (b) failure by a caregiver to satisfy the elder's basic needs or to protect the elder from harm."[4] This definition, which appears on National Institute of Justice's elder abuse home page, includes *financial exploitation*, physical abuse, and neglect (emphasis added).[5]  By these measures, Vaccarelli's scheme qualifies as a form of financial exploitation and financial abuse of

---

[4] Elder Abuse, National Institute of Justice, OFF. OF JUST. PROGRAMS, https://www.nij.gov/topics/crime/elder-abuse/Pages/welcome.aspx; NAT'L RES. COUNCIL, ELDER MISTREATMENT: ABUSE, NEGLECT, AND EXPLOITATION IN AN AGING AMERICA (Richard J. Bonnie & Robert B. Wallace eds., 2003).
[5] Elder Abuse, National Institute of Justice, OFF. OF JUST. PROGRAMS, https://www.nij.gov/topics/crime/elder-abuse/Pages/welcome.aspx.

elders.  This fact should weigh heavily in assessing the seriousness of the crime and should result in increased punishment.

This crime itself was neither a minor financial crime nor a one-time mistake of judgment.  This was not an aberration.  Vaccarelli created for himself an opportunity to take advantage of his victims, including senior citizens, and crafted a plan using LWLVACC and a phoney 'friends and family note program' to steal the victims' money. He created fake documents and told a string of lies with the sole intention of inducing the victims to give him access to their money.  Furthermore, this crime lasted for years, and the attempted cover-up continued even through trial with Vaccarelli's perjurious testimony regarding claimed drunken hazes and purported handshake deals.  The fact that the Defendant was willing to take advantage of senior citizens speaks to his poor character.  His willingness to lie and deceive with no regard for others in society or for the rule of law -- including his willingness to lie in Court under oath -- similarly reflects on the seriousness of the offense, his poor character, and his lack of respect for the law.

When individuals like Vaccarelli who hold themselves out as licensed investment advisors with training and experience then steal money, the entire marketplace suffers.  The Government respectfully asks the Court to impose a significant period of incarceration to demonstrate that those who take advantage of the public's trust to defraud elderly investors are punished with something more than a proverbial slap on the wrist.  The sentence must be significant enough to promote public respect for the law and demonstrate that those who use trickery and lies to defraud investors are not above the law.  A significant amount of prison time should be imposed in these types of cases in order to demonstrate that those individuals who

commit financial crimes are punished with meaningful sentences.  It has been suggested that

Vaccarelli should serve approximately one year in prison for every victim whose retirement

account he raided and whose trust he abused.  A sentence such as that would demonstrate the

seriousness of the offense and promote respect for the law.

      D.     <u>Court Should Consider General and Specific Deterrence</u>

As the Court is well aware, pursuant to 18 U.S.C. § 3553(a)(2)(B), the Court must also

impose a sentence that "afford[s] adequate deterrence to criminal conduct." A prison sentence in

the range of many years can serve as a powerful deterrent against the commission of lucrative

financial crimes.  Unless white-collar criminals understand that there are serious and certain

consequences for their actions, the temptation to take money from clients will likely go

unchecked.  General deterrence serves an important function and works—perhaps even more

effectively than in the context of other types of criminal conduct—to prevent financial crimes of

the sort the Defendant committed.  Specifically, in that regard, this case has already received

coverage not only in the local press as would be expected, but also in the trade publications

related to investment advisors.  The fact that the industry press is monitoring the conviction and

presumably sentencing of Vaccarelli makes general deterrence that much more efficacious with

respect to licensed professionals.

With respect to deterrence, the Second Circuit noted in the case of *United States v.*

*Cutler,* a case involving bank fraud and a related tax offense, that **the relative length of the**

**sentence does seem important in providing deterrence**. *Cutler,* 520 F.3d 136, 163 (2d Cir.

2008), *abrogated in part on other grounds* (emphasis added).  Importantly, the Second Circuit

recognized the role of the length of a sentence in providing deterrence.

As a general principal, there is a widely held belief among legal scholars that society at large does not ostracize white-collar criminals in the same way as it does violent offenders. This fact militates in favor of longer sentences for white-collar defendants as opposed to shorter ones. *See* Peter J. Henning, *The Changing Atmospherics of Corporate Crime Sentencing in the Post-Sarbanes-Oxley Act Era*, 3 J. Bus. & Tech. L. 243 (2008) at 256.[6] The need for general deterrence in white-collar cases is paramount because the collateral effects of a felony conviction tend to be largely lost on white-collar criminals. Many are able to successfully re-enter society post-conviction, often reprising similar roles as those they once held. As such, a term of imprisonment is arguably more important than other available punishments to maintain respect for the law and provide adequate deterrence for such defendants. Accordingly, this fact makes incarceration a more important factor for deterring Vaccarelli and others like him from committing future crimes.

General deterrence serves a truly important function and works, perhaps even more effectively, to prevent financial crimes of the sort Vaccarelli committed, than in the context of other types of criminal conduct. In *United States v. Zukerman*, 897 F.3d 423 (2d Cir. 2018), a tax evasion case where the defendant was sentenced to an above-guidelines term of imprisonment of 70 months, the Second Circuit determined that general deterrence has a particularly important role in the prosecution of tax crimes, given the significant resources required to monitor and prosecute these types of offenses. The Court further noted that general deterrence is especially effective in the prevention of such crimes due to the nature of the typical offender. *See Id.* at 429. The Second Circuit found that the district court had been "eminently

---

[6] Located at: http://digitalcommons.law.umaryland.edu/jbtl/vol3/iss2/4)

reasonable" in sentencing the defendant to an above guidelines range for general deterrence purposes given the fact that the enforcement of tax laws has a "'significant and positive deterrent effect' on would-be tax violators as compared to most criminals." *Id.* at 429.  The same is true for other white collar crimes such as fraud and money laundering.  Moreover, because white collar criminals are more "'likely to account for the size of a fine and the likelihood that it will be imposed' and are therefore more likely to eschew criminal conduct if it will be unprofitable," general deterrence is particularly effective in inhibiting potential criminal white collar offenders because they make reasoned decisions based on potential outcomes. *See id.*

In *United States v. Park,* 758 F.3d 193 (2d Cir. 2014), the Second Circuit found that general deterrence occupies an especially important role in sentencing for criminal tax offenses. The Court emphasized that because tax prosecutions are rare and limited in relation to the estimated levels of incidence, deterring others from violating the tax law is a primary consideration under the Guidelines. *Id.* at 201.   Thus it seems well settled that, as the Second Circuit has determined in *Zukerman, Park*, and *Cutler*, general deterrence through the implementation of significant and meaningful terms of incarceration plays an important role in the prevention of white collar crime.  What the Second Circuit has held with regard to the length of sentences acting as a deterrent is relevant and applicable here, perhaps even more importantly because Vaccarelli was a licensed registered representative, who even with supervision and reporting requirements from The Investment Center, still conducted a million-dollar fraud.

As two noted experts in the field writing in the Yale Law Journal explained, "civil penalties and criminal sanctions (at least before Enron) did not apparently deter many white-collar offenders. The rampant white-collar crime seen at Enron and the litany of corporate crime

53

exposed thereafter is testament to the fact that the old sentencing regime was an insufficient deterrent." Andrew Weissmann & Joshua A. Block, White-Collar Defendants and White-Collar Crimes, 116 Yale L.J. Pocket Part 286 (2007), available at http://www.yalelawjournal.org/forum/white-collar-defendants-and-white-collar-crimes. Accordingly, the need for general deterrence weighs in favor of a lengthy multi-year sentence.

In addition to the goal of general deterrence, Vaccarelli also merits specific deterrence. There is simply no reason to believe that a significantly below-Guideline sentence will curb Vaccarelli's tendency to lie, cheat, and steal.

Indeed, criminal prosecution was the only way in which Vaccarelli was eventually held to account for his actions. In fact, as the Court no doubt recalls, before the criminal authorities were involved, Vaccarelli used the justice system and a non-disclosure agreement, together with the funds of other victims to settle a case and avoid facing serious consequences for his conduct. Vaccarelli settled a civil case with one of his early victims who detected wrongdoing and sued him, namely, Ms. Chauncey, and Vaccarelli required her to enter into a non-disclosure agreement to get her settlement payment. This not only perpetuated the scheme, but demonstrates that simply being discovered and 'caught' did nothing to stop his criminal behavior. The fact that Vaccarelli used other victim money to finance the settlement payment also establishes that Vaccarelli is given to resorting to outright theft when he faces the kinds of personal difficulties that millions of Americans address within the bounds of the law every day. Given this conduct, a significant punishment is necessary to specifically deter Vaccarelli and demonstrate to him directly that such behavior is unacceptable and can never be repeated.

In fact, the defendant's perjury on the stand demonstrates that he is as strident as ever and

54

cannot or will not accept responsibility for his criminal conduct.  Vaccarelli did not simply have

a bad day (or years) while he was drunk, as he would have had the jury believe.  A lengthy

period of incarceration would allow Vaccarelli the time to awaken to the reality that he has acted

as a con-artist.  If ever there were a white-collar criminal who needed the specific deterrence

provided by a lengthy sentence, it is Vaccarelli, based on his tendency to lie and his callous

conduct to his victims, even at trial.

     E.  <u>Need for Just Punishment and to Protect the Community</u>

     In addition to deterrence, there is also a need for punishment.  The goal of affording just

punishment would not be served by a significantly below Guideline sentence.  Here, the

defendant has been convicted of multiple counts of mail fraud, wire fraud, securities fraud, and

money laundering.  It is necessary for the Court to punish him justly, as the Court would any

other defendant who was convicted of multiple serious offenses.   Moreover, in that regard, the

need to avoid unwarranted sentence disparities among defendants similarly situated is controlled

largely by using the Guidelines as a starting point.  *See Gall*, 128 S. Ct. at 594.

     The punishment for someone who was not a licensed registered representative and who

did not defraud vulnerable victims and who did not cause serious substantial hardship to a group

of victims would still likely be a number of years of incarceration.  The fact that Vaccarelli

committed his crimes and did so with these very important specific offense characteristics makes

his conduct much more egregious than just the fraud alone.  Thus the punishment must account

for all these egregious specific offense characteristics.

     Finally, it is also a consideration that Vaccarelli needs to be separated from the investing

public for a sufficiently lengthy period of time so that he may develop a sense of right and

wrong.  Based the fact that he continues to draw thousands of dollars a month from a disability insurance policy that is built on fraud (or more likely a disability claim that is based on a fraud), means that Vaccarelli is literally still engaging in criminal conduct.  *See* GX 1228.  This complete lack of regard for right and wrong is the type of conduct for which he needs to be placed in custody for a significant number of years, as he is, in essence, continuing a scheme by lying about his claimed disability.

This may be one of the rare white-collar cases where a significant term of imprisonment is necessary to physically separate the defendant from the public.  On the stand, Vaccarelli lied about his conduct and he has yet to accept responsibility for the crimes he committed.  The Government was successful at trial as a jury verdict demonstrated.  While, notwithstanding all evidence to the contrary, Vaccarelli is entitled to maintain his innocence, he cannot continue to engage in illegal conduct.  It is clear that the investing public must be protected from Vaccarelli, such that he is not able to promote further fraudulent schemes.  He cannot be given a significantly below Guidelines sentence while he continues to engage in aspects of his scheme, namely now, insurance fraud.

F.   Restitution Should be Order for the Full Amount of the Losses

In addition to the period of incarceration, the defendant should be ordered to make full restitution to the victims of the fraud and forfeit all right, title, and interest in any and all property, real or personal, which constitutes the value of the proceeds traceable or derived from the fraud scheme.  This could potentially include, his "disability" insurance policy since he used ill-gotten funds to pay the premiums.

The Mandatory Victims Restitution Act ("MVRA") provides, in part, that in sentencing a

56

defendant convicted of a felony committed through fraud or deceit, the court must order the defendant to pay restitution to any identifiable victim directly and proximately harmed by the offense of conviction.  *See* 18 U.S.C. § 3663A(a)(2).  The procedures to be followed in determining whether, and to what extent, to order restitution pursuant to the MVRA are those set out in 18 U.S.C. § 3664.  *See id.* at § 3663A(d).  Section 3664 provides that "[i]n each order of restitution, the court shall order restitution to each victim **in the full amount of each victim's losses** as determined by the court and without consideration of the economic circumstances of the defendant."  *Id.* at § 3664(f)(1)(A) (emphasis added).   In connection with any proposed order of restitution, the sentencing court may refer any issue . . . to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court.  *Id.* at § 3664(d)(6).  "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence."  *Id.* at § 3664(e).

Here, the defendant caused financial harm to approximately 15 or more victim-investors, all of whom are entitled to restitution pursuant to 18 U.S.C. § 3663A. To this end, the Government calculates the restitution amount to be $1,622,002.33. Accordingly, pursuant to MVRA, the Court should order full restitution.  *See* 18 U.S.C. § 3664(f)(1)(A); *United States v. Harris*, 302 F.3d 72, 75 (2d Cir. 2002) ( "[T]he district court was required to order restitution and determine the amount thereof without consideration of the economic circumstances of the defendant." ).

Title 18 U.S.C. § 3664(f)(3)(B) provides that if the Court finds that "the economic circumstances of the defendant do not allow the payment of any amount of a restitution order,

and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments," then the Court may order that the defendant make nominal periodic payments.  *See* 18 U.S.C. § 3664(f)(3)(B).

Based on the facts of this case, including the size of the restitution order and the lack of clear accurate information provided to Probation, the Government cannot accurately state whether or not the defendant would have the funds necessary (or any funds for that matter) to make full restitution.  *See United States v. Fiore*, 381 F.3d 89, 98 n.9 (2d Cir. 2004) (sentencing court required the defendant to pay monthly installments following his release from incarceration; each monthly installment was based upon a formula which imposed a graduated percentage of his earned income based on the income amount); *United States v. Walker*, 353 F.3d 130, 132 (2d Cir. 2003) (sentencing court required the defendant to pay ten percent of his gross monthly earnings toward restitution during the 3 year period of supervised release); *United States v. Jaffe*, 314 F.Supp.2d 216, 226 (S.D.N.Y. 2004)(requiring the defendant to pay the greater of $150,000 or fifteen percent of his post-tax annual income on a monthly basis).

The Government asserts that the total amount of restitution to be ordered should be in the amount of $1,622,002.33.  *See* PSR at ¶ 42.  Additionally the Court should insist on a clear and accurate financial statement and require further information be supplied by the defendant and/or defense counsel concerning the assets controlled by the defendant.  *See Hughey v. United States*, 495 U.S. 411, 413 (1990); *United States v. Germosen*, 139 F.3d 120, 131 (2d Cir. 1998); *United States v. Silkowski*, 32 F.3d 682, 689 (2d Cir. 1994).

Moreover, the restitution portion of the judgment can provide for periodic payments that extend beyond any term of imprisonment and term of supervision, until the debt has been paid in

full.  Pursuant to 18 U.S.C. § 3613(b), a defendant's obligation to pay restitution does not expire until, at the earliest, twenty (20) years after the entry of judgment.  *See* 18 U.S.C. § 3613(b), 18 U.S.C. § 3613(f) (making all provisions of 18 U.S.C. § 3613 applicable to restitution).  The Court may set a date certain for payment of the balance of the restitution debt, but it is not required to do so.  *See* 18 U.S.C. §§  3572(d)(1) and 3664(f)(3)(A).

**IV.** __Conclusion__

Accordingly, as discussed above, the defendant's conduct took place over a lengthy period of years, involved ruinous financial harm to numerous victims, and was an egregious example of greed, fraud, and abuse. A very significant term of incarceration is necessary to recognize the severity of the offense, to constitute just punishment, to deter the defendant and others from further fraudulent conduct, and to protect the community from further crimes by this defendant.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY


*Michael S. McGarry /S/*
_____
MICHAEL S. McGARRY
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT25713
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700


_____/s/ *Jennifer R. Laraia*_____
JENNIFER R. LARAIA
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT29637
1000 Lafayette Boulevard, 10th Floor
Bridgeport, CT 06604
(203) 696-3000

60

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on October 2, 2020 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF.


                       ____/s/_____

                       MICHAEL S. McGARRY
                       ASSISTANT U.S. ATTORNEY