```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT


_____
UNITED STATES OF AMERICA,        )
                 Plaintiff,      ) No: 3:18-CR-92 (JBA)
                                 )
      v.                         ) May 13, 2019
LEON VACCARELLI,                 )
                 Defendant.      ) 8:42 a.m.
_____)
                                  141 Church Street
                                  New Haven, Connecticut




                     JURY TRIAL DAY 1




B E F O R E:
          THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
          and 14 JURORS
```

```
                                  Official Court Reporter:
                                  Tracy L. Gow, RPR
                                  203-910-0323
```

2

1   A P P E A R A N C E S:

2   For the Government:
        MICHAEL S. McGARRY, AUSA
3       U.S. Attorney's Office-NH
        157 Church St., 25th Floor
4       New Haven, CT 06510
        203-821-3751
5       Email: michael.mcgarry@usdoj.gov

6       JENNIFER LARAIA, AUSA
        U.S. Attorney's Office-BPT
7       1000 Lafayette Blvd., 10th Floor
        Bridgeport, CT 06604
8       203-696-3029
        Email: jennifer.laraia@usdoj.gov

9
    For the Defendant:
10      JONATHAN J. EINHORN, ESQ.
        Law Office of Jonathan J. Einhorn
11      129 Whitney Avenue
        New Haven, CT 06510
12      203-777-3777
        Email: einhornlawoffice@gmail.com

13
        RACHEL MIRSKY, ESQ.
14      Mirsky Law LLC
        900 Chapel Street
15      10th Floor
        New Haven, CT 06510
16      203-290-2779
        Email: rachel@mirskylawct.com

17
    Also present:
18      LEON VACCARELLI
        SA RUSSEL DAY, FBI

19

20

21

22

23

24

25

1                        **<u>INDEX</u>**

2                        **EXAMINATION**

3  **Witness Name**                                        **Page**

4  MICHAEL BROUGH

5     Direct By MR. McGARRY.................................... 67

6     Cross By MR. EINHORN.................................... 131

7     Re-Direct By MR. McGARRY ................................ 140

8  SUSAN RUSTIC

9     Direct By MS. LARAIA.................................... 143

10    Cross By MR. EINHORN.................................... 185

11    Re-Direct By MS. LARAIA ................................ 186

12  CIRO PELUSO

13    Cross By MR. EINHORN.................................... 217

14    Re-Direct By MR. McGARRY ................................ 225

15  CARMINE DiSAPIO

16    Direct By MS. LARAIA.................................... 229

17

18

19

20

21

22

23

24

25

```
1              (Call to Order, 8:44 a.m.)

2              (Out of the presence of the Jury.)

3          THE COURT:  Good morning, Counsel.  Please be

4    seated.

5          MR. McGARRY:  Good morning, Your Honor.

6          MR. EINHORN:  Good morning, Your Honor.

7          THE COURT:  This is the beginning of our trial in

8    United States v. Leon Vaccarelli, 18-CR-92.

9          I'll have appearances, please, starting with the

10   Government.

11         MR. McGARRY:  Good morning, Your Honor.  Mike

12   McGarry from the U.S. Attorney's Office for the United States

13   of America.  With me today at counsel table is Assistant

14   United States Attorney Jennifer Laraia, Special Agent Russell

15   Day from the FBI.  Also in the courtroom is Tom Ardito, a

16   United States Postal Inspector; and a forensic accountant,

17   Benjamin -- or, Benvenito -- I apologize -- Benvenito

18   Almodovar from the FBI.

19         THE COURT:  And for the Defendant?

20         MR. EINHORN:  Good morning, Your Honor.  Jon Einhorn

21   for the Defendant.

22         MS. MIRSKY:  Good morning, Your Honor.  Rachel

23   Mirsky for the Defendant.

24         THE COURT:  Good morning.  And good morning,

25   Mr. Vaccarelli.
```

1          All right.  Let's get to the motions that the

2    Defendant has filed far out of time and try to understand

3    what is the substance behind them, inasmuch as they are a bit

4    cursory.  Mr. Einhorn.

5          MR. EINHORN:  Yes, Your Honor.

6          THE COURT:  You've received the Government's

7    opposition?

8          MR. EINHORN:  I did.  And it's -- this is only in an

9    attempt to speed up the trial and to help the Court;

10   otherwise, I would just stand here and object as each one of

11   these witnesses testified, but I thought Your Honor would

12   appreciate this way.

13         And considering the nature of the evidence, I wasn't

14   able to file until late because we weren't -- the Government

15   hadn't quite zeroed-in on who they were going to call.

16         With regard to FINRA, if Your Honor please, that's

17   the organization that registers people like Mr. Vaccarelli --

18   or, in his former life.  It's a successor to the NASD,

19   National Association of Securities Dealers.

20         Now, I have no objection to the Government putting

21   on a witness to talk about background.  I think it -- in

22   fact, it fits within the whole story.  Mr. Vaccarelli was

23   registered with FINRA, and that's fine.  But in the documents

24   that the Government gave me -- and I have no idea of knowing

25   if they're really going to offer them or not.

1          First of all, there's talk of a $7500 fine that

2     FINRA imposed upon Mr. Vaccarelli.  I think it's obvious and

3     clear that that's prejudicial and certainly not relevant to

4     this trial.  It was not even a civil penalty.  It was an

5     administrative penalty.

6          THE COURT:  Well, wasn't it -- isn't it relevant

7     that that fine was allegedly paid with client money?

8          MR. EINHORN:  I think you can -- I think we can

9     structure it so that the jury will understand, by some sort

10    of stipulation or agreement, that the fine was paid or a fine

11    was paid with Government money, but not necessarily to FINRA.

12    That would prejudice my client, I believe.

13          The other argument the Government makes is that,

14    Well, it doesn't really matter, it's only 7500 out of what

15    they claim is a million-five.  And I think that's a faulty

16    argument, too.  If it's prejudicial, it's prejudicial.  It

17    doesn't matter that it's 7500 or $750.  I think the amount is

18    not necessarily consequential.  So I think it's prejudicial

19    to talk about that.

20          Also, I think there's no relevance, if Your Honor

21    please, for the Government to put on any evidence from FINRA

22    that he might have misrepresented or, the Government claims I

23    believe, falsely filled out some applications or

24    questionnaires with FINRA.  That's not relevant to this

25    trial.  That's not the charges for which he's facing in this

1    particular case; and, again, it's prejudicial to him, because

2    the Government is trying to paint a picture of Mr. Vaccarelli

3    outside of the criminal charges that he sits here on.  So

4    that's my FINRA argument.

5            Shall I go on, or do you want me to stop --

6            THE COURT:  When you say "outside of the charges,"

7    the Government argues that it is context.  Why isn't -- and I

8    don't know what the faults in the application completion

9    was/were, but why is that not context for the jury to

10   understand the securities and brokerage business that is the

11   backdrop of these charges?

12           MR. EINHORN:  They can understand generally that

13   it's necessary to fill out forms and to be registered.  But

14   to focus on falsehood, that's -- that's looking at his prior

15   history.  Even if these were misdemeanor charges, they

16   wouldn't likely get in.  But all I'm saying is, these were

17   administrative documents that were filled out, and the mere

18   fact that there might have been some falsehoods -- the

19   Government hasn't indicated what they are yet, so I may be

20   jumping the gun a little on that point.

21           But if the Government is attempting to show that

22   that there were false statements made in those

23   questionnaires, that's outside of the purview of this case.

24   And it's not even judged by the same standard in this case.

25   It's -- and it's highly prejudicial.  Unduly prejudicial, I

1  should say.

2      I have no idea -- one last thing on the FINRA.  I

3  have no idea where else the Government is going to go with

4  regard to FINRA, and I was just hoping to give Your Honor a

5  heads-up before I pop up and down objecting.  As I say, I

6  have no problem with the background issue on FINRA.

7      THE COURT:  All right.  You also challenge the issue

8  of evidence from The Investment Center.

9      MR. EINHORN:  Again, with regard to The Investment

10  Center, I have no problem with the background information,

11  and perhaps a little further, since Mr. Vaccarelli was

12  essentially an independent contractor with The Investment

13  Center.  So I do believe that there's some relevance on that,

14  particularly since the name comes up and appears in client

15  documents.

16      What I object to is with regard to The Investment

17  Center going into any particular claims they have that

18  Mr. Vaccarelli misstated, made false statements, or somehow

19  violated their own rules, just as violations of the FINRA

20  rules.

21      The way I look at it very simply, is, you know, if a

22  cashier steals from Stop & Shop and that violates Stop &

23  Shop's rules, that's not the violation.  The cashier might be

24  on trial for shoplifting or larceny, but certainly not on

25  trial for the violation of Stop & Shop's own rules.

1          And that, I think, is what the Government is trying

2     to use here to prejudice Mr. Vaccarelli, that is to say -- to

3     argue to the jury that, Well, he violated FINRA rules and he

4     violated The Investment Center's own regulations.

5          THE COURT:  So if these are shown to be policies and

6     regulations that applied to the Defendant during the period

7     of time when he was handling client money, why isn't the

8     Government's argument that, in part, this shows knowledge and

9     intent?  Why does that not fit?

10         MR. EINHORN:  It shows knowledge and intent as to,

11    for example, The Investment Center's rules.  I mean, for

12    example, one of the things that the Government is going to

13    claim, and probably rightfully so, is that The Investment

14    Center had a rule against its contractors personally

15    investing monies from their clients.  And they're going to

16    claim that Mr. Vaccarelli's conduct in investing client's

17    funds in his -- himself, really, was a violation of The

18    Investment Center rules.

19         Well, I agree.  It's a violation of The Investment

20    Center rules.  But it doesn't show anything with regard to

21    mail fraud, wire fraud or money laundering or any of the

22    other charges in this particular case.  It only is relevant

23    as to violations of The Investment Center's own policy.

24         And, secondly, it's highly prejudicial.  Because for

25    the jury to hear, Well, not only is he charged with a crime

1    in this case, but The Investment Center says he violated

2    their agreement.

3         THE COURT:  But if he did his investing through The

4    Investment Center, and if clients are shown to have relied on

5    his relationship with The Investment Center and its *bona*

6    *fides,* why isn't that some information that they can take

7    into account in deciding whether Mr. Vaccarelli was engaged

8    in fraud or just engaged in business?

9         MR. EINHORN:  I think there's some things that they

10   can say I relied upon it -- for example, Because they were a

11   known name, or I Googled them, or whatever.  But to have -- I

12   think it's unlikely that any witness is going to say, Oh,

13   yes, I knew the rules of The Investment Center were that

14   Mr. Vaccarelli couldn't take my money and invest it in

15   himself but, nonetheless, I let him do it.

16        It opens up doors on cross-examination, too, as to

17   the witness's knowledge of The Investment Center's rules that

18   I think are fairly tedious or wind around pathways that we

19   don't have to go.

20        But I just -- I don't see where a violation of The

21   Investment Center's rules are anything but prejudicial, and

22   certainly not relevant to the charges.

23        THE COURT:  Okay.  Anything further?  Shall we hear

24   from the Government?

25        MR. EINHORN:  The third, which is sort of a related

1    area, we left open the issue of the SEC investigation, which

2    I believe is a similar issue.  That's probably not going to

3    happen in the next couple of days, but I would object, as I

4    briefed in some depth I believe, the -- not only the

5    prejudice, but the inappropriateness of having the SEC

6    testify in this case.

7            THE COURT:  All right.  So, earlier, in response to

8    your motion, I granted your motion to preclude, with a

9    modification that the Government couldn't directly introduce

10   evidence of the existence of an SEC proceeding but was free

11   to use evidence derived from that proceeding or that

12   investigation, which, presumably, it would have to do through

13   the SEC witnesses who were the ones who were competent to

14   testify about that.  I'm not sure I understand --

15           MR. EINHORN:  Yeah.

16           THE COURT:  -- your objection.

17           MR. EINHORN:  My concern is that -- and maybe this

18   should wait to see what the witnesses say.  I'm just not sure

19   about the size of the door Your Honor left open for the

20   Government on that point.

21           THE COURT:  Well, if you had a tax fraud case, for

22   instance, would it be your position that employees from the

23   IRS couldn't testify as to certain functions of their office

24   or certain requirements from taxpayers?

25           MR. EINHORN:  No, not at all.  I think that's --

1           THE COURT:  Why is this not similar?

2           MR. EINHORN:  Because it's a -- it's specifically a

3   violation of those requirements that constitute the fraud.

4   In this particular case, violations of The Investment Center

5   might go totally unchallenged in criminal court in this

6   particular -- or in any case.  It may well be that The

7   Investment Center would, themselves, sanction Mr. Vaccarelli,

8   which they didn't do.

9           I should also point out that if the Government opens

10  the door on the FINRA investigation -- going back to that for

11  just a second.  Again, I don't know what evidence the

12  Government is going to offer, but there's -- there's at least

13  two FINRA arbitrations with clients of Mr. Vaccarelli's.  And

14  it seems to me, that once we start getting into FINRA, then

15  discussions about those particular arbitrations -- which,

16  again, are civil in nature -- might be heard by the jury.

17          THE COURT:  All right.  Mr. McGarry.

18          MR. McGARRY:  So -- thank you, Your Honor.  Which of

19  the three subject matters would you like me to start with?

20          THE COURT:  He started with FINRA.  Why don't you.

21          MR. McGARRY:  Very good.

22          I think the FINRA -- I think the IRS analogy that

23  the Court makes is on point.  The FINRA testimony and the

24  FINRA documents, as we put in our papers -- and I will rely

25  on our papers, because I think --

1          THE COURT:  Okay.  I've read your papers.  Is there
2     anything with respect to how you wish to respond to
3     Mr. Einhorn's arguments this morning --
4          MR. McGARRY:  Sure.
5          THE COURT:  -- that would be helpful to the Court?
6          MR. McGARRY:  The fact that FINRA provides the
7     background -- it does provide background and context.
8     Because, as we put in our motion and I'll just repeat
9     briefly, it's different than somebody who is running a *Ponzi*
10    scheme or a fraud out of a barber shop or out of a bar.  It
11    was part of the fraud.  And we attached the document.  But
12    the fact that he was a licensed broker, that he had a Series
13    7 and, I believe, a Series 66 --
14          I believe there's a juror in the courtroom, or
15    someone who --
16          The fact that he had those licenses, held himself
17    out as a professional, put it on his literature, not only
18    provides the basis but also -- was part of the context, but
19    also was the basis for the fraud, in that people trusted him
20    and tended to believe him more than they would a barber or a
21    bartender who said they had a great investment.
22          Second of all, it goes to -- specifically, to his
23    knowledge and his intent.  Because he had the training, he
24    has the license, he had the experience.  And in order to
25    maintain a license, you have to go through the education

1     process, which tells him what things are prohibited and what

2     things are not prohibited.

3          And he is, in fact, educated, not just on the

4     regulations but on the law.  And there are documents that we

5     would offer to introduce that describe the training that he

6     had and what goes into getting a license.  Furthermore, with

7     respect to FINRA, the individual from FINRA, you know, can

8     identify the types of training that he had.

9          And I'm just seeing if there's anything else that

10    I -- oh, and the fine.  So I think that's where Mr. Einhorn

11    started.  It does go from victims' money.  And I think you're

12    actually -- I'm not sure if it's a victim that you'll hear

13    from today, but it's $7500.  He has no other substantial

14    money in the account, the victim's fund comes in, it gets

15    moved, and then it gets paid to FINRA.

16         The reason we think that that's important that the

17    jury know why it's a fine is because with a name like the

18    Financial Institution Regulatory Authority, one might think

19    its an investment.  Like, on its face it looks financial in

20    nature, and it clearly is a personal expense.  It also was a

21    fine related to trading in peoples' accounts without

22    authorization, which is, in essence, what he did here.

23         THE COURT:  But isn't that where the rub is from the

24    Defendant's standpoint?  And that is, that the jury may

25    confuse the issue of what's on trial here and whether or not

1    whatever it was he was fined for several years earlier by

2    FINRA may be also fraud or indicative of prior fraud, et

3    cetera?

4            MR. McGARRY:  Well --

5            THE COURT:  Why can't you use the information about

6    victims' investment being used for personal reasons and leave

7    it there?

8            MR. McGARRY:  We could, and I think we've put that

9    in a footnote.  However, I think the reason why we're

10   pressing the point somewhat is that it goes, again, to the

11   Defendant's knowledge.  Not like -- prior to the fraud

12   exploding to over a $1,000,000 -- and there was some fraud

13   previous to the fine -- he's made aware, and we can

14   demonstrate that he's made aware, that he's not permitted to,

15   you know, move client money -- in most of the accounts --

16   without authorization.  He's fined, and he pays the fine.

17           So, his knowledge is heightened.  Not just is he a

18   registered representative, but he's a registered

19   representative, the rules of which have been reinforced and

20   reiterated.  But instead of his conduct stopping, his conduct

21   becomes even worse, and he takes money from a trust and he

22   takes money from another woman and trades in their accounts

23   for, I believe, about $800,000.  Well, that's little bit too

24   high.  Probably about $400,000 -- some from the trust, and

25   $300,000 from another woman, Ms. Truhan, where he trades in

1    her account, moves the money to a checking account, and then

2    writes check to himself.

3           THE COURT:  Let me ask this:  If you are permitted

4    to introduce evidence from FINRA -- or about FINRA, and what

5    it requires in order to hold and maintain a license, one of

6    the rules or regulations of which is you can't move money

7    from a client's account without authorization, and then the

8    evidence that as to this, this and this, there was no

9    authorization to move those client funds.

10          MR. McGARRY:  Correct.

11          THE COURT:  And that's a set of crimes that are

12   charged in this Indictment.  Wouldn't it be satisfactory to

13   have the FINRA regs, his knowledge of those regs because he

14   was certified -- he was licensed and trained, and so forth --

15   and the exact fact that he had violated administrative regs

16   previously -- I don't know whether or not there's going to be

17   some other place for cross-examination on that, but it seems

18   to me that it's not necessary and it does run a risk of taint

19   that would not be -- that would be unduly prejudicial, in

20   terms of confusing the jury, Oh, FINRA is in charge of

21   regulating all these brokers, Oh, he got fined by FINRA, Oh,

22   he must be the fraudster that the Indictment claims he is?

23          MR. McGARRY:  Well, I can't disagree with the Court.

24   I think, as you perhaps alluded to, if Mr. Vaccarelli were to

25   take the stand --

1          THE COURT:  I think that all bets are off at that

2    point.

3          MR. McGARRY:  -- I think that's fair game.

4          And I would also ask, just so we're all on the same

5    page, that we be able to point out that there was a pay -- an

6    administrative or some type of payment.  Again, I'm trying to

7    be -- trying to follow what you said, that this $7,500 was --

8    as related to his license and his continued licensing, such

9    that it falls into a personal expense, so it can't be

10   confused that it was somehow an investment with them.

11         THE COURT:  No, no.  That's fine --

12         MR. McGARRY:  Okay.

13         THE COURT:  -- that you are clarifying that this

14   money did not -- was not being used as the client intended --

15   that is, as an investment -- but was for personal expenses

16   unrelated to the client's financial protection.  And that

17   would be fine.

18         And that is what you can do with that FINRA fine.

19   It may come back, but it just seems to me that at the outset

20   it would, on a 403 balancing, without any other context or

21   reason, be -- weighs in favor of excluding the very narrow

22   purpose of what that personal expense was.

23         MR. McGARRY:  That's -- yes, Your Honor.

24         And if I -- but I just want to underscore that I

25   think that even with the first witness, documents are going

1    to come in where they apply to be clients of Mr.

2    Vaccarelli's, and it says, you know, The Investment Center is

3    FINRA, SIPC, you know, it's all -- it's in the footers, it's

4    in the documents.  FINRA language is peppered throughout the

5    exhibits because they are the regulatory body that oversees.

6         THE COURT:  And that's fine.  And to the extent that

7    a witness needs to describe that what that means is not an

8    investment on behalf of a client, but is related to --

9         MR. McGARRY:  Right.

10        THE COURT:  -- licensing, whatever.

11        MR. McGARRY:  Sure.

12        THE COURT:  Licensing and fees.

13        MR. McGARRY:  We'll -- we'll call it that when he

14   testifies.

15        THE COURT:  And, so, that's where I think we should

16   go at this point.  All right?

17        MR. McGARRY:  So, yes.  So like, again, because of

18   the witnesses today, the documents are going to have FINRA in

19   the footer.  They are going to -- witnesses will testify that

20   because he was a licensed broker, that was important to them.

21   And it will be connected later that the license, in fact,

22   comes from FINRA.

23        So I think most of the witnesses will say, Yes, I

24   knew he was licensed, that was important to me he's a

25   registered representative.  And then later in the trial, the

1    jury will know more of what that actually means.

2           As far as The Investment Center, which Mr. Einhorn

3    spoke about, first of all, it is alleged, I believe in

4    paragraphs 12, paragraph 15, paragraph 21, that Mr.

5    Vaccarelli used his affiliation with The Investment Center

6    not just to hold himself out as a registered representative,

7    which he did, but he also used documents that he obtained

8    from The Investment Center -- we assert -- copied them, made

9    them into his own agreements.

10          And I think also in paragraph 21 of the Indictment,

11   The Investment Center has annual compliance questionnaires,

12   and they ask certain things, and he makes material false

13   statements to The Investment Center in his annual

14   questionnaire -- which have been marked as, I believe

15   Government's Exhibit 353, and others in that same area -- 353

16   is one of them that I have in front of me -- where he's asked

17   questions, you know:  Do you have any other outside

18   businesses?  He discloses some businesses.  He doesn't

19   disclose that he's acting as a trustee of a

20   half-a-million-dollar trust, which, therefore, they couldn't

21   ever oversee his activities related to that trust because he

22   didn't disclose it.

23          He failed to tell them about one of his entities --

24   LWLVACC.  He told them about some of the bank accounts, he

25   didn't tell them about that bank account, and hundreds of

1    thousands of dollars went into that bank account.

2         THE COURT:  Well, there's actually nothing that I

3    see in the Defendant's papers or that I have heard in

4    argument that would suggest that the information and evidence

5    related to The Investment Center, including its regulations

6    and policies for those who are formally associated with The

7    Investment Center and permitted to be a broker through The

8    Investment Center, is improper in any way.

9         MR. McGARRY:  Okay.

10        THE COURT:  So I think that we can -- it is clearly

11   relevant, not only for context and background but knowledge

12   and willfulness, if you've signed up to be a broker through

13   The Investment Center and agreed to, therefore, be compliant

14   with its regulations and its terms, and you fail to do so and

15   that's shown to be -- by material misrepresentations,

16   material omissions -- that, to my mind, is probative and

17   proper evidence of knowledge and willfulness on the conduct

18   underlying the charges.  It does not seem to me to be unduly

19   prejudicial, and so, you may be permitted to offer The

20   Investment Center operational evidence.

21        MR. McGARRY:  Thank you, Your Honor.

22        The final topic that Mr. Einhorn raised, which I

23   thought had been settled by the Court, and I know you issued

24   a brief memo order, but I direct the Court to the transcript

25   of March 29 from the pretrial conference where -- and I'll

1    quote the Court to the Court:

2          "I think this colloquy has been useful.  I think

3    that we can preclude evidence of the actual SEC civil

4    proceeding against him, but that's a narrow ruling and does

5    not preclude the Government from using SEC witnesses on the

6    issues," you go on to say, "of the defense of alcoholism, the

7    fraudulent nature that the Government alleges characterized

8    Mr. Vaccarelli's representation with his clients."

9          The word that I focused on is "proceeding."  And we

10   have -- and we were speaking with the SEC last week

11   regarding their witness and whether or not we even need their

12   witness, given the fact that we did get some stipulations as

13   far as their documents.  But one fact that I think will come

14   in through the witnesses, the lay witnesses, is that they got

15   a call from the SEC, not talking about the civil proceeding,

16   but distinguishing the difference between an investigation

17   and a proceeding.

18         And we've been very careful not to talk about the

19   lawsuit, the SEC's case.  But I think what is relevant is

20   that they got a phone call, and a number of them called Mr.

21   Vaccarelli and asked him about it; and he, in some sense,

22   parried the question, in other instances said "It's no big

23   deal, they've been after me for a couple years."

24         Someone, interestingly enough -- and I'm not sure if

25   she's going to testify today, just because I'm thinking of

1   the witnesses in my head, but -- said, Oh, that's an old

2   thing, I paid a fine, that's -- you know, that's water under

3   the bridge, which is an interesting statement from him about

4   a fine -- having just talked about the FINRA fine, and we'll

5   take steps to preclude the reference to the FINRA fine --

6   that he then uses it as a shield, so to speak, by saying it's

7   not a big deal, don't worry about the SEC, I paid a fine,

8   that's old news.

9           So I think the point I'm making is, it's hard for

10  these witnesses to tell their story -- hard, if not

11  impossible -- as to, Well, what happened next?

12          Well, then I got this call out of the blue from

13  someone who said she was from the SEC.  What did you say to

14  her?  I didn't want to talk to her.  I didn't know anything

15  about it.  I wasn't sure if it was real.  I hung up.  I

16  called Mr. Vaccarelli.  He told me X, Y and Z.

17          So I think in that sense, without talking about the

18  civil proceeding, without talking about the case in front of

19  Judge Haight that's been stayed, I think that the witnesses,

20  to tell the Court and the jury their story, need to say that

21  they got a call from the SEC and -- some people spoke to the

22  SEC, some people didn't speak to the SEC.  It was kind of up

23  to the individual victim.

24          THE COURT:  I don't think that that is at odds with

25  my ruling that evidence of an SEC proceeding is precluded.

1        MR. McGARRY:  Okay.

2        THE COURT:  It doesn't, in fact, serve as a proxy

3   for evidence of an SEC proceeding, as opposed to some

4   investigatory undertaking.  The significance, as I believe

5   that you've just pointed out, is what Mr. Vaccarelli's

6   response was, which is consistent with the context that the

7   Government offers it as continuing to lull investors.

8        I suppose -- I was just trying to think whether it

9   puts in the jury's mind that there was something going on,

10  but that's pretty general, and it is in only Mr. Vaccarelli's

11  own words that appear to put that in play.

12        MR. McGARRY:  And I agree with the Court.  And I

13  also think that as the trial progresses, some of them will

14  say, Well, then, you know, I spoke with Mr. Russ Day from the

15  FBI, or I spoke with Mr. Ardito from the Postal Inspection

16  Service.

17        So the fact that there was an investigation, I don't

18  think -- I believe that when the FBI calls somebody, the fact

19  that the SEC has previously called or subsequently called is

20  kind of no moment.

21        THE COURT:  I don't know about that.  But what I've

22  told the jury already is the Indictment, which is obviously

23  the culmination of an investigation of some sort, is not in

24  and of itself evidence, that the Government has the burden of

25  proving each of these counts.  I don't see that the way you

1    intend to handle the SEC is unduly prejudicial.  It is -- and

2    because it is a reflection of a continued -- what is, the

3    Government alleges, to be a continued pattern of lulling

4    investors by misrepresent -- by -- well, lulling investors,

5    that he is doing nothing wrong.

6           The reason I stopped myself was that -- how will the

7    jury know that this is a misrepresentation?  In other words,

8    if it were true it was no big deal, they've been after him

9    for years, he paid a fine, it's water under the bridge, if

10   that's true, why would that be a misrepresentation?

11          MR. McGARRY:  Well, I guess if it were true, it

12   wouldn't be a misrepresentation.  But I think the jury, just

13   as part of the case, can judge whether or not that statement,

14   like any other lulling statement, is -- is true or not.  If

15   someone says, Don't worry, your money is safe, we can allege

16   that that's an additional lulling statement.

17          THE COURT:  I mean, that's your purpose; is it not?

18          MR. McGARRY:  Correct, that it's a lulling

19   statement.  And then I guess it would be up to the Government

20   to prove, Look at the bank account, look where the money

21   went.

22          THE COURT:  And what's the nexus between where the

23   money went, what the bank accounts show, and calls from the

24   SEC that victims -- that are explained by the Defendant?

25          MR. McGARRY:  Right.  I guess in the sense that it

1   is a big deal -- and that would be up for the jury to

2   decide -- and it's not water under the bridge, which, again,

3   would be for the --

4            THE COURT:  But it's -- when you say "big deal," if

5   we're not having any SEC testimony that there was an

6   investigation, only the results of the investigation, how is

7   it ever proven or disproven that it's not a big deal, it's

8   water under the bridge?

9            MR. McGARRY:  Sure.  And I think Mr. Russ Day --

10  Agent Day, when he testifies, could testify that at some

11  point the S -- he was contacted by the SEC and either began

12  or furthered the investigation after they -- and they sent

13  some documents, and that's why it says SEC down on the

14  bottom.  So, in essence, they handed it off to the Postal

15  Inspectors and the FBI.

16           THE COURT:  But that's where I think we run into a

17  problem.  And that is, whatever was being done on the

18  investigation.  The reason and the fact of an investigation

19  is not part of the Government's burden of proving

20  these -- the criminality behind these charges.  So that if

21  Agent Day were to say that he requested and received

22  documents from the SEC by way of authentication, that's not

23  problematic.

24           MR. McGARRY:  Right.

25           THE COURT:  But the issue of --

1          MR. McGARRY:  But isn't it --

2          THE COURT:  -- testimony of victims who got a call

3    from the SEC --

4          MR. McGARRY:  Right.

5          THE COURT:  -- is a little bit uncertain in my mind

6    as to why it does provide, in the way that you've described,

7    the context and background that is not unduly prejudicial

8    because it doesn't sort of go anywhere.  It doesn't have an

9    outcome.

10         MR. McGARRY:  Well, it literally doesn't have an

11   outcome because the -- that case has been stayed, which I

12   think is fine.  And we don't need to tell the jury that, and

13   we won't.

14         But I just think, in order for the witnesses to say,

15   What did you do next, what happened next, when they confront

16   Mr. Vaccarelli and he says, you know, words to the effect of,

17   you know, it's no big deal -- I think one woman, just so --

18   Ms. Rustic, who is going to testify today, she said -- again,

19   not to merge the issues, but she said that she got worried,

20   she went on the Internet.  She ended up -- her sister found

21   the FINRA fine, and she asked Mr. Vaccarelli about that, as

22   well.  And he said, you know, that was years ago, don't worry

23   about it.

24         Again, I think, like any false statement, it's up --

25   it's a statement of the Defendant, it's in furtherance of the

1    fraud, and it's just up to us to prove whether or not it's

2    material and whether or not it's false.

3           THE COURT:  I'm not going to preclude it at this

4    point.  I just am listening, and I think you're right.  I

5    think there's no reason it can't come in, but I want to be

6    careful that the proper context is there and not more than

7    what we had previously delineated.

8           MR. McGARRY:  Okay.  Thank you, Your Honor.

9           MR. EINHORN:  Your Honor, if I may just quickly.

10   I'm concerned about the Government's efforts to use prior bad

11   acts in this particular case when not only are some of them

12   prejudicial, but they're beyond the pail of what we're doing.

13          For example, Your Honor's metaphor about the tax

14   fraud case and violating the rules of the IRS, that's not the

15   situation here, with all due respect, Your Honor.  This is a

16   separate entity -- the Investment Center.  And, so, unlike a

17   tax fraud case, where we're dealing with tax issues, this is

18   -- these are different violations.  These are different

19   issues.

20          And I think the jury is clearly going to be -- going

21   to conflate that with the case in point.  I would ask Your

22   Honor before that comes up with regard to The Investment

23   Center, which I think is Wednesday, not to allow testimony as

24   to violations of their own rules.

25          THE COURT:  But I've just ruled that I'm not going

 1   to do that.

 2          MR. EINHORN:  I know.  I'm asking Your Honor to

 3   consider it.  I understand Your Honor has ruled on it.

 4          The last thing.  I just wanted to add -- and this

 5   probably doesn't have to be taken up at this point.  I know

 6   Your Honor has already ruled on Dr. Zonana, but I have a

 7   little bit of a new wrinkle I wanted to raise at some later

 8   date on that.

 9          THE COURT:  If you're filing a motion for

10   reconsideration, can you do it in writing?

11          MR. EINHORN:  Of course.

12          THE COURT:  Thank you.

13          THE COURT:  So I guess I'm curious about your 404(b)

14   argument, which is -- I mean, since it's not being offered to

15   prove character, but is being offered for a purpose such as

16   mode of opportunity, intent, preparation, plan, knowledge,

17   identity, so forth, I don't see why it's not proper.

18          MR. EINHORN:  Are we back -- is Your Honor

19   addressing the FINRA and The Investment Center argument

20   again?

21          THE COURT:  No.  You said that -- well, I understood

22   what you were saying to be with respect to the evidence that

23   the Government wants to offer about the SEC.  I thought that

24   you were saying --

25          MR. EINHORN:  Oh, I'm sorry.

1          THE COURT:  -- your comments were related to The

2     Investment Center?

3          MR. EINHORN:  Yes.

4          THE COURT:  Oh.

5          MR. EINHORN:  That's all.  I know Your Honor ruled

6     on it, but I would ask Your Honor -- I was hoping Your Honor

7     would reconsider that.  No, the SEC issue --

8          THE COURT:  Well, I'm not going to reconsider right

9     now.  I don't see any reason.  If there becomes a reason,

10    obviously we don't continue with some erroneous order.  But

11    at this point, the fact that The Investment Center is the

12    entity through which Mr. Vaccarelli invested client monies

13    and was, therefore, subject to its requirements, doesn't seem

14    to me to be problematic or unduly prejudicial,

15    notwithstanding the fact that it may be prejudicial.  It's,

16    in fact, probably intended to be prejudicial.

17         MR. EINHORN:  I'll raise it again if the issue

18    should come up.

19         THE COURT:  That's fine.  You are free to do that.

20         All right.  Is there anything else before we begin

21    trial?

22         MR. McGARRY:  Just I wanted to point out for the

23    Court we've instructed Mr. Ardito, who is there, to make sure

24    no witnesses come into the courtroom.  So he'll probably

25    be --

1          THE COURT:  So is this a sequestration order?

2          MR. McGARRY:  No.  I just wanted to point out that

3     that's what he's been asked to do, which is the young fellow

4     with the goatee, is walking around the back of your courtroom

5     to make sure no witnesses come in.  We just -- but Mr.

6     Almodovar, he is the financial analyst.  He's going to be in

7     the courtroom most of the time, and he's expected to testify

8     towards the end of the trial.

9          THE COURT:  All right.  I don't have a motion from

10    either side for a sequestration order.  If I did, I take it

11    you would request that Mr. Almodovar be permitted to remain

12    in the courtroom, as often witnesses who are going to

13    testify, including on the basis of prior testimony --

14          MR. McGARRY:  That is correct.

15          THE COURT:  -- would need to be.  Is there a motion

16    for sequestration?

17          MR. EINHORN:  There is, Your Honor, yes.  I

18    apologize.  I thought we discussed it in the motion hearing,

19    and we didn't.

20          THE COURT:  All right.  So I'm going to issue that

21    order, which means that no witness who is expected to testify

22    in the case can be in the courtroom prior to his or her

23    testimony.  And that if -- and that they are precluded from

24    talking to anybody who has already testified.  And with that

25    in place, we have our "guardian of no witnesses" in the back

1    of the courtroom.  And it's important that this order be

2    complied with.  And if it's violated, there is a risk, even

3    the likelihood, that that witness wouldn't be permitted to

4    testify, with the exception being made for case agent on the

5    case and Mr. Almodovar -- and Mr. Vaccarelli, of course.

6          MR. EINHORN:  Thank you.

7          THE COURT:  And anybody else who needs to be in the

8    courtroom during trial?

9          MR. EINHORN:  Not from the Defendant, Your Honor.

10         MR. McGARRY:  No.  I think -- I think Mr. Ardito --

11    I could see maybe someone wanting to call him.  I'm thinking

12    Mr. Einhorn might want to call him if a witness says

13    something directly contrary to something that is in a report

14    that he wrote, but I don't know if he's allowed to prove that

15    up by collateral.

16         So I don't think anyone else.  But I do know that

17    Mr. Ardito was part of the investigative team, so if

18    something were to come up, we might ask the Court to make an

19    exception for him.  But he's not going to be sitting.  He'll

20    be in and out throughout the trial.

21         THE COURT:  All right.  Any problem with that,

22    Mr. Einhorn?

23         MR. EINHORN:  That's fine.

24         MR. McGARRY:  That makes sense; right?

25         MR. EINHORN:  Yeah, that's fine.  Logistically, in

```
1   past trials with Your Honor, you've allowed us each to use
2   one of the two anterooms.
3             THE COURT:  Yes.  And you may do that.
4             MR. EINHORN:  Yes, please.
5             THE COURT:  And are they unlocked?
6             MR. EINHORN:  Yes, they're unlocked.  And with Your
7   Honor's permission, too, we'll tell the marshals that we'll
8   probably have our lunches in those rooms, if it's okay just
9   to bring food in there.
10            THE COURT:  That's fine.  That's fine.  And at the
11  end of the day, make sure that, if you are leaving anything
12  there, that the room is locked so there can't be any belief
13  that there's been any tampering with your work or intrusion
14  of your work product.  All right?
15            Would you like the one on the right as we leave or
16  the left as we leave?
17            MR. EINHORN:  Traditionally -- we've sort of
18  selected rooms, traditionally.
19            THE COURT:  Very well.  This is like where you sit
20  at which table.  Every once in a while in a blue moon,
21  somebody switches it up and it's --
22            MR. EINHORN:  Well, actually, I'd rather sit next to
23  the jury.
24            THE COURT:  I bet.
25            MR. McGARRY:  It's usually the lawyers from New York
```

33

1   who come up and just sit wherever they want that --

2          THE COURT:  And then we sort it out by burden of

3   proof.  Yeah.

4          Okay.  Anything else?

5          MR. McGARRY:  I don't know if the Court wants to

6   stay or -- but we'd like to move the podium before the --

7          THE COURT:  Go right ahead.  Ms. Freberg needs to

8   check and see if all our witnesses -- I mean all our jurors

9   are here.  Okay.

10          MR. McGARRY:  And we are going to have to set up our

11   computer, too.

12          THE COURT:  Okay.  And then I will, before your

13   opening statements, give them a brief set of instructions,

14   familiarize them with some of the terms that you will be

15   using at a certain point and what the claims are.

16          All right.  We will recess, then.

17          (Recess taken, 9:31 a.m.)

18          (Out of the presence of the Jury, 9:43 a.m.)

19          THE COURT:  All right.  I understand that all jurors

20   are now here and we are ready to proceed.  Please bring in

21   the jury.

22          (Jury in, 9:43 a.m.)

23          THE COURT:  All right.  Good morning, ladies and

24   gentlemen.

25          THE JURY:  Good morning, Your Honor.

1            THE COURT:  Counsel, you may be seated.  We are

2      here, ready to begin the trial in *United States of America v.*

3      *Leon Vaccarelli.*

4            As I told you at jury selection, our first order of

5      business will be to swear you in, which will happen in just

6      one moment -- oh, we don't have all our jurors.

7            Now we do.  Do we have all our jurors?  There's a

8      seat -- all right.

9            If you would kindly stand and raise your right hand,

10     your oath as jurors will be administered to you.

11            (Jury sworn, 9:45 a.m.)

12            THE COURT:  All right.  Now, I'm going to give you

13     some preliminary jury instructions, and it's to serve three

14     purposes:  One, it is to begin to orient you to your work as

15     jurors in this case, and hopefully reduce perhaps some of the

16     uncertainty.  Secondly, it will give you information on

17     what's required of you by way of conduct.  And the third is,

18     I'm going to give you some preliminary instructions on the

19     law that will be applicable in this criminal case.  And it's

20     only the beginning of much more detailed instructions, which

21     I will give you after all the evidence has concluded.

22            Those instructions you will have in writing, each of

23     you, and you may refer to them and consult with them during

24     your deliberations, but I want to give you some preliminary

25     instructions which will begin to familiarize you with the

1   language and the terms that will be used to describe the

2   offenses that are alleged in the Indictment; and, hopefully,

3   that will also give a context for you to hear the evidence

4   that will be presented momentarily.

5           It will be your duty in this case to find from the

6   evidence what the facts are.  You, and you alone, are the

7   judges of the facts, and you will then apply those facts to

8   the law as I will give it to you.  And you must follow that

9   law, whether you agree with it or not.

10          Please understand that nothing that I say or do in

11  the course of the trial should be taken by you in any way as

12  indicating what your verdict should be.  I will have no such

13  opinion.  That is solely your province, just as you should

14  have no opinion about what the law is.

15          During trial you may hear references to "counsel,"

16  "attorneys" or "lawyer."  Those terms all mean the same

17  thing.  If you hear references to "the Court" that means the

18  presiding judge, which is me, Janet Bond Arterton.

19          The evidence from which you will find the facts will

20  consist of the testimony of the witnesses, documents and

21  other items that will be received into the record as exhibits

22  by numbers.  You will have all admitted exhibits with you in

23  the courtroom -- in the jury deliberation room when you are

24  deliberating.

25          There are two kinds of evidence -- direct evidence

1  and circumstantial evidence.  Direct evidence, as its name

2  suggests, is direct proof of a fact.  Most commonly,

3  testimony of an eyewitness.  Circumstantial evidence is proof

4  of one fact from which you can infer or conclude that another

5  fact exists.  And you can consider both types of evidence --

6  circumstantial, as well as direct evidence.  The law makes no

7  distinction between the type of evidence, direct or

8  circumstantial, and leaves it up to you how you will weigh

9  it.

10        It will be up to you, also, to decide which

11  witnesses you believe, which witnesses you don't believe, how

12  much of any witness's testimony you accept or reject, and

13  what weight, if any, you give to a witness's testimony.

14  Credibility is a very important function of the jurors.

15        But I want to highlight for you certain things that

16  are not evidence and must not be considered by you as

17  evidence.  The statements or the arguments or the questions

18  by the lawyers -- and if I were to ask any questions -- those

19  questions are not evidence.  Questions that are put to

20  witnesses, not evidence.  Only the answer.

21        If there are objections to questions, the objections

22  are also not evidence.  Lawyers have an obligation to their

23  clients to make objection if they believe that evidence is

24  being offered in a way that's improper under our Federal

25  Rules of Evidence.  Please do not be influenced by the

1    objection or by my ruling on it.  If the objection is

2    sustained, then you'll ignore the question.  Or, if any part

3    of the answer was given prematurely, ignore that.  If it's

4    overruled, then you'll treat the answer as you would any

5    other.

6           Sometimes I may instruct you that a certain item of

7    evidence will be received for a limited purpose.  I will tell

8    you what that limited purpose is, and you must follow that

9    instruction and not use that evidence for any and all

10   purposes in your consideration.  Testimony that I exclude or

11   tell you to disregard is obviously not evidence, and it must

12   not be considered.  And, of course, anything that you have

13   seen or heard outside the courtroom is not evidence and must

14   be disregarded.  Remember, you will be deciding this case

15   solely on the basis of the evidence that is presented here in

16   this courtroom.

17          Now, since the law presumes Mr. Vaccarelli to be

18   innocent, the burden of proving his guilt beyond a reasonable

19   doubt is on the Government throughout trial.  No defendant

20   ever has a burden to prove his or her innocence or produce

21   any evidence at all.  So, here, that means the Government

22   must prove Mr. Vaccarelli's guilt on each count.  It's his

23   choice whether he remain silent and present no evidence.  And

24   if that's what he does, you, as jurors, may not draw any

25   inference from any such election, because obviously there are

1    many reasons why a person may decide to exercise his or her

2    right to remain silent and just to put the Government to its

3    proof.

4            So, presume Mr. Vaccarelli is innocent throughout

5    the case and throughout your deliberations, until such time,

6    if any, that you're satisfied that the Government has

7    overcome this presumption and proved his guilt beyond a

8    reasonable doubt.

9            If the Government falls short of meeting this

10   burden, you must return a verdict of not guilty on that count

11   for which you found the Government's evidence fell short.  On

12   the other hand, if you find the Government has met its burden

13   of proving beyond a reasonable doubt that the Defendant is

14   guilty on one or more of the counts in the Indictment, you

15   should return a verdict of guilty on those counts.

16           Now, let me just go over very briefly some of this

17   specific case.  You'll recall that I told you that the

18   Indictment, which is how this case gets started, is simply a

19   written statement of what the Government claims that the

20   Defendant did.  It is not any kind of evidence of the

21   allegations of the criminal activity that's contained in the

22   Indictment.

23           In this Indictment, there are 21 counts against

24   Mr. Vaccarelli, and you will be considering each count

25   separately and you will be returning a separate verdict on

1    the verdict form that you will have with you at the end of

2    the case to provide your verdict of guilty or not guilty on

3    each count.  And the Defendant has pled not guilty to all

4    counts.  That puts the burden on the Government of proving

5    each element of each count beyond a reasonable doubt.

6           All right.  I'm going to give you a summary of what

7    these counts are and what they require the Government to

8    prove.

9           Counts One, Two and Three charge Leon Vaccarelli

10   with mail fraud.  The crime of mail fraud involves a scheme

11   to defraud in furtherance of which a Defendant knowingly

12   causes the mails to be used.

13          Counts One through Three charge the same crime, but

14   each charged count involves a different use of the mails.  So

15   you must consider each count separately as you determine

16   whether the Government has proved three elements:

17          One, that there was a scheme or artifice to defraud

18   or obtain money or property by materially false or fraudulent

19   pretenses, representations or promises; second, that

20   Mr. Vaccarelli knowingly and willfully participated in this

21   scheme or artifice to defraud with knowledge of its

22   fraudulent nature and with specific intent to defraud; and,

23   third, that in the execution of that scheme, Mr. Vaccarelli

24   used or caused the use of mails or a private or interstate

25   carrier.

1          In Counts Four through Twelve, Mr. Vaccarelli is

2     charged with wire fraud.  Wire fraud involves a scheme to

3     defraud in violation of -- excuse me -- in furtherance of

4     which a Defendant knowingly causes the interstate wires to be

5     used.  And Counts Four through Twelve charge the same crime,

6     but each charged count is as to a different use of the wires.

7          The Government must prove three elements to prove

8     wire fraud:  That there was a scheme or artifice to defraud

9     or obtain money or property by materially false or fraudulent

10    pretenses, representations or promises; second, that the

11    Defendant knowingly and willfully participated in the scheme

12    or artifice to defraud with knowledge of its fraudulent

13    nature and with specific intent to defraud, or that he

14    knowingly and intentionally aided and abetted others in the

15    scheme; third, in execution of the scheme, the Defendant used

16    or caused the use of interstate wires.

17         Counts Thirteen through Eighteen charge Leon

18    Vaccarelli with securities fraud, which involves fraud and

19    deceit in connection with the sale or purchase of stock.

20    While Counts Thirteen through Eighteen charge the same crime,

21    each charged count, as previously, is as to a different

22    securities transaction and different securities, so you will

23    consider each count separately.

24         The Government must prove three elements on Counts

25    Thirteen through Eighteen:  First, that in connection with

1   the purchase or sale of the security identified in that

2   count, the Defendant did any of the following:

3        Employed a device, scheme or artifice to defraud,

4   made an untrue statement of material fact or omitted to state

5   a material fact which made what was said, under the

6   circumstances, misleading, or engaged in an act, practice or

7   course of business that operated or would operate as a fraud

8   or deceit upon a purchaser or seller;

9        Second, that the Defendant acted willfully,

10  knowingly and with the intent to defraud;

11       And, third, that the Defendant knowingly used or

12  caused to be used mails or any instrument of -- means or

13  instrument of transportation or communication in interstate

14  commerce in furtherance of the fraudulent conduct.

15       And, finally, Counts Nineteen through Twenty-One

16  charge Mr. Vaccarelli with money laundering, which involves

17  engaging in monetary transactions and property derived from

18  specified unlawful activity in amounts larger than $10,000.

19       Again, in the same form as earlier, Counts Nineteen

20  through Twenty-One charge the same crime but as to different

21  monetary transactions, and you will be considering each of

22  those counts separately.

23       There are five elements for the money laundering

24  counts that the Government must prove:  One, that the

25  Defendant engaged or attempted to engage in a monetary

1    transaction in or effecting interstate commerce;

2           Two, that the monetary transaction involved

3    criminally derived property of a value greater than $10,000;

4           Three, that the property was derived from specified

5    unlawful activity;

6           Four, that the Defendant acted knowingly -- that is,

7    with knowledge -- that the transaction involved proceeds of a

8    criminal offense;

9           And, fifth, that the transaction took place in the

10   United States, or that the Defendant is a U.S. person.

11          All these counts, One through Twenty-One, also

12   charge aiding and abetting and willfully causing a crime.

13          The aiding and abetting statute says:  Whoever

14   commits an offense against the United States or aids or abets

15   or counsels, commands or induces or procures its commission

16   is punishable as a principal.

17          The willfully causing statute provides:  Whoever

18   willfully causes an act to be done, which, if directly

19   performed by him, would be an offense against the United

20   States, is punishable as a principal.

21          Under these statutes, it's not necessary for the

22   Government to show the Defendant himself physically committed

23   the crime he's charged with in order for the Government to

24   sustain its burden of proof.  A person who aids or abets

25   another to commit the offense or who willfully causes the

1    offense to be done is just as guilty of that offense as if he
2    committed it himself.

3          In order to aid or abet, it's necessary the
4    Defendant knowingly associated himself in some way with the
5    crime, that he participated in the crime by doing some act to
6    help the crime succeed.  And a Defendant may be found guilty
7    if the offense charged is found by the jury beyond a
8    reasonable doubt -- having been proved as to another person,
9    the Defendant, who aided and abetted that person, is
10   similarly guilty of the commission of the offense.

11         So that is the construction of how the 21 counts are
12   set up, what the elements are, and will give you at least an
13   outline for the Government's evidence and burden.

14         Now, a few words about your conduct as jurors.
15   Until the case is submitted to you at the end of all the
16   evidence and after my charge on the applicable law, you
17   mustn't discuss the case with anyone, not even your fellow
18   jurors.  Ultimately, you will, but not until the case is
19   submitted to you.  And then, when the case is submitted to
20   you, you can only discuss it in the jury room and only when
21   all your fellow jurors are present.

22         It's very important from this point on to make sure
23   that you keep an open mind and not decide any issue in the
24   case until the entire case has been submitted to you with my
25   instructions.

1           And remember the words of your oath which you just

2     took, You do solemnly swear that you will consider the

3     matters in evidence, matters in issue between the Government

4     and the Defendant, according to the law as the judge shall

5     instruct you and based upon the evidence presented in court,

6     and you will render a true and just verdict during the course

7     of the trial.

8           Until you have announced your verdict in court, you

9     will speak nothing to anyone of the case before the Court,

10    nor shall you permit any person to speak to you concerning

11    the same.  After your verdict has been announced in court,

12    you will speak to no one concerning the deliberations or the

13    vote of any individual juror other than yourself, unless the

14    Court gives you permission to do so.

15          Now, our system of justice depends on citizens like

16    you being able and willing to make careful and fair

17    decisions.  Scientists studying the way our brains work have

18    found that, for all of us, our first responses are often

19    reflexes, often based on stereotypes or biases.  And even

20    though these quick reflexes may not be what we are

21    consciously thinking or that we may not actually be aware,

22    they can influence our thoughts, how we remember what we see,

23    what we hear, who we believe or disbelieve, and how we make

24    important decisions.

25          And, clearly, you are being asked to make important

1    decisions in this case, so be very attentive to not letting

2    bias, prejudice or public opinion affect your decision.  And

3    you must not be biased in favor or against the Government or

4    in favor or against Mr. Vaccarelli or any witness because of

5    any disability, gender, race, religion, ethnicity, sexual

6    orientation, age, national origin or socioeconomic status.

7              Now, because everybody uses the same front door to

8    the courthouse, it is distinctly possible that you may meet

9    outside of this courtroom the lawyers or witnesses or court

10   personnel, and all may appear to be unfriendly or distant.

11   Do not take offense.  This is how it should be, because

12   you're not supposed to have substantial contact with any of

13   us outside this formal courtroom setting.  So please do not

14   be surprised by aloofness; and, of course, none of us will be

15   surprised by your aloofness.  Your juror button that you will

16   wear throughout is telling us be aloof from that person, all

17   right, because we understand that you have a special role to

18   play and that we need to help you play that.

19             Importantly, which I alluded to at the end of our

20   jury selection, don't do any research or make any

21   investigation about this case or anybody who is referenced in

22   the case or testifies.  Don't do it on your own.  You're

23   going to decide the case as jurors, based solely on the

24   evidence presented here, and you must not conduct any

25   independent research about any aspect or individual in the

1   case.

2          So don't consult dictionaries, reference matter, the

3   Internet, websites, blogs, or use any electronic tools to

4   obtain information about the case which you think would help

5   you decide the case.  It might be wrong.  And it certainly

6   would be wrong to consider it, because you are considering

7   only the evidence that all of you have heard all at the same

8   time.

9          Now, I've told you that you can't discuss the case

10  with anyone until after you retire to deliberate, and I

11  realize that that becomes a little bit awkward as the days go

12  on and people say, So what's going on?  You can talk to them

13  about the trial at the end of the case and tell them that you

14  will, if you choose to, but that you are under oath not to

15  talk about it with anyone, and that includes your fellow

16  jurors.

17         We say that for two reasons:  Number one, you need

18  to hear the whole case before you can discuss it; and, two,

19  you need to discuss it only with your fellow jurors present.

20  If you don't do that, you might prematurely make a

21  false -- an erroneous conclusion about what you heard or saw

22  because you haven't seen the whole thing; and, secondly, if

23  just two or three of you talk about the evidence amongst you,

24  the whole -- you will not have the benefit of all of the

25  jurors' deliberation.

1            So don't talk to anyone about the case, don't use

2    your cells or the Internet or any tool of technology to

3    communicate electronically with anyone.  Save your newspapers

4    until after the trial.  Tell your parents, tell your family

5    and friends and work colleagues that you'll talk to them

6    later.  And do not communicate on any of those electronic

7    methods, whether it's e-mail, text, Twitter, Instagrams,

8    SnapChat, Facebook or YouTube, or any blog or website.

9            This is very important.  In the past, where jurors

10   have violated this oath and done so, it has required a

11   mistrial and beginning all over again.  If you become aware

12   of another juror's violation, you have a duty to inform me as

13   soon as possible.

14           So I hope that these preliminary instructions help

15   to orient you as you begin to hear the evidence.  I will be

16   instructing you again in much greater detail.  Keep the

17   principles that I've given you in mind, keep an open mind.

18           And if you want to take notes during the trial, you

19   can do so, but those notes are for your own use.  They aren't

20   to be given to anybody else or read by anybody else.  And if

21   you take notes, or if your fellow jurors take notes, it's not

22   like a written transcript.  Your memory is what serves in

23   this case.  And to the extent you take notes to aid the

24   memory, that's fine.

25           When you leave the courtroom for a recess or at the

1   end of the day, please leave your notebooks on your chair.

2   Ms. Freberg will collect them at the end of the day and

3   secure them and redistribute them.

4         Okay.  Our trial will now begin.  Counsel for the

5   Government and for Mr. Vaccarelli will give you their opening

6   statements.  Please remember these statements are not

7   evidence and it is intended to help you have a road map of

8   what each side thinks this case is going to show or not show.

9         The Government will then present its evidence in

10  support of the charges in the Indictment.  After that is

11  concluded, the Defendant may present evidence but is not

12  obligated to do so.  After the evidence is in, I will

13  instruct you on the law, and then the attorneys will present

14  closing arguments to summarize and interpret the evidence for

15  you from their standpoint.  And then after those closing

16  arguments, you will then retire to consider your verdict of

17  guilty or not guilty, each of which must be unanimous.

18        All right.  We will now proceed, and we'll call on

19  the Government for opening statement.

20        Ms. Laraia.

21                          ***

22        (Opening Statements, page 49 to page 65.)

23

24

25

```
 1                              ***
 2              THE COURT:  All right.  Thank you.
 3              All right.  We are ready to proceed with the
 4    evidence.  The Government bearing the burden of proof will go
 5    first.  Mr. McGarry.
 6              MR. McGARRY:  May I turn the podium slightly, Your
 7    Honor?
 8              THE COURT:  Yes, please.
 9              MR. McGARRY:  If I can.
10              Is that usually where you like it, Your Honor?
11              Okay.  Your Honor, at this time the Government calls
12    Michael Brough.
13              THE COURT:  All right.  Mr. Brough, if you'll kindly
14    come to the witness stand over there, remain standing, raise
15    your right hand, and you will be sworn to tell the truth.
16                   (MICHAEL BROUGH sworn, 10:37 a.m.)
17              COURTROOM DEPUTY:  Please be seated.  State your
18    name for the record, spelling your last name, and give the
19    city and state in which you reside.
20              THE WITNESS:  Michael Brough, last name B-R-O-U-G-H,
21    I reside in Cheshire, Connecticut.
22              THE COURT:  All right.  Mr. McGarry, you may
23    proceed.
24              MR. McGARRY:  Thank you, Your Honor.
25                            DIRECT EXAMINATION
```

```
1    BY MR. McGARRY:

2         Q.   Good morning, Mr. Brough.

3         A.   Good morning.

4         Q.   I believe you just said you live in Cheshire?

5         A.   That's correct.

6         Q.   Is that where you came from to join us this

7    morning?

8         A.   Yes.

9         Q.   Have you ever testified in federal court before?

10        A.   I have not.

11        Q.   First time?

12        A.   Yes.

13        Q.   Can you tell the ladies and gentlemen of the jury

14   where you're currently working?

15        A.   I'm working for a company called Loparex.  Loparex

16   makes siliconized paper release liners.  So the best way to

17   describe it is when you take a Band-aid off, that paper that

18   you pull off that exposes the adhesive, that's a siliconized

19   paper.  I sell those in films, papers and polyesters.

20        Q.   And are you married?

21        A.   Yes.

22        Q.   What's your wife's name?

23        A.   Karen Brough.

24        Q.   And do you have any children?

25        A.   Yes, I do.
```

1    Q.    How many?

2    A.    Two.

3    Q.    And their ages?

4    A.    My son is 18, soon to be 19; and my daughter is

5    17.

6    Q.    Okay.  If you could tell the ladies and gentlemen of

7    the jury how far you went in school?

8    A.    I have a bachelor's degree from the University of

9    Connecticut, with general studies.

10   Q.    And let me now kind of turn to the -- what brings us

11   here today.  Do you know the Defendant Leon Vaccarelli?

12   A.    I do.

13   Q.    How do you know him?

14   A.    I met Leon probably back in early 2013.  I had some

15   financial problems with a lot of debt, and I'd reached

16   reached out to a good friend of mine, Rob Kleinschmidt

17   (phonetic), looking for a financial advisor, and he

18   recommended Leon because I believe Leon was married to his

19   cousin.

20   Q.    To Rob's cousin?

21   A.    I believe so, yes.  So I went down, met Leon, went

22   through my entire debt and bills, and I think he charged me

23   $750 and kind of gave me some recommendations on how to go

24   about paying my debt off, to be debt-free, because that was

25   my goal.

1      Q.    And when you went -- I think you said you went down
2    and met with him.  Was that -- which office was that that you
3    met him at?
4      A.    I believe it was on Bank Street.
5      Q.    And, subsequently, has he moved offices?
6      A.    Yes.  In fact, he was moving at the time that I met
7    him.  There was boxes everywhere and, you know, he was
8    getting ready to move very soon.
9      Q.    Do you know where -- have you been to his new
10   office?
11     A.    I have, yes.
12     Q.    And where is that?
13     A.    That's on Leavenworth Street.
14     Q.    Again, in Waterbury?
15     A.    Yes.  49 Leavenworth Street.
16     Q.    Okay.  Have you been to his office?
17     A.    I have.
18     Q.    And have you been to any functions at his office?
19     A.    Yes.  I used to meet with him periodically.
20     Q.    Okay.  Have you been to any holiday parties,
21   Christmas parties at his office?
22     A.    Yeah, yeah.  Leon used to have holiday parties at
23   various places in Waterbury during Christmas.
24     Q.    And was there also another individual, just without
25   getting into anything that that other person said, another

1    individual, an accountant, that you met with about your

2    financial planning?

3        A.   Yeah.  So I had met with Leon in the old building,

4    and then we met in the new building.  And I had taken a loan

5    off a 401(k), which I had left the job, so I had to pay all

6    the money back, with penalties.  So there are a lot of tax

7    ramifications with something like that, so Leon introduced me

8    to Keith Sullivan as an accountant.

9        Q.   Okay.  And does Mr. Sullivan have a partner at his

10   accounting firm?

11       A.   Yes.

12       Q.   And do you know her name?

13       A.   I think "Zimanski" (phonetic).  His wife.

14       Q.   And I won't ask you to spell it.

15       A.   Good.

16       Q.   You said that they're married?

17       A.   Yes.

18       Q.   Okay.  So you mentioned that you had a 401(k).  What

19   company was that from?

20       A.   Scapa North America.  They're an adhesive tape

21   manufacturer.

22       Q.   So they make adhesive tape?

23       A.   That's correct.

24       Q.   Similar to the line of business that you're kind of

25   in now?

1    A.   Correct, a component.

2    Q.   Okay.  And approximately what year was it -- I think

3    you may have told us, but approximately what year was it that

4    you had that 401(k) money from Scapa?

5    A.   It was approximately 2013.  And I wasn't sure quite

6    what to do with the money, so upon meeting Leon, you know, he

7    said, Well, do you need the money?  And I said, Well,

8    possibly, because I want to start my own side business,

9    selling adhesive tape on the side.

10        And he said, Well, if you need it, we can put it in

11   an account.  It'll make a little money, but the best thing

12   about it is you can get it if you want it, it's two or three

13   days to get it, but we'll have to pay it back within 60 days.

14   That was what he told me.

15   Q.   Okay.

16   A.   So I thought this is a great scenario.  I can have

17   my money there, I'm not paying any tax on it; and if I need

18   to get it, I can, to further my business, and then pay it

19   back in the 60-day time frame.  So it seemed like a great

20   setup.

21   Q.   And do you remember approximatley how much money you

22   were moving from that Scapa 401(k)?

23   A.   It was roughly $38,000.  38-5 maybe.

24   Q.   Did you fill out any paperwork in relation to this

25   initial transaction?

1      A.   Yes.  I filled out something from The Investment

2   Center.

3      Q.   Okay.  Let me show you what's been marked

4   Government's Exhibit 300.

5           MR. McGARRY:  I don't think there's any objections.

6           MR. EINHORN:  No.

7           MR. McGARRY:  Okay.

8   BY MR. McGARRY:

9      Q.   Okay.  And let me have you take a look at

10   Government's Exhibit 300.  Do you recognize this document?

11      A.   Yes.

12      Q.   I see you leaning in.  I'm going to try to pull it

13   up a little more, if I can.  Okay.  Is that helpful?

14      A.   Yes.

15      Q.   It has your name on there; correct?

16      A.   Correct.

17      Q.   And let's see if I can go up a little bit.  It has

18   the date?

19      A.   Yeah.

20      Q.   So that is approximately -- what's the date?

21      A.   February 5, 2014

22      Q.   Okay.  And there is a -- there's Mr. Vaccarelli's

23   name.  You see that?

24      A.   That's correct.

25      Q.   And there's another name next to that?

1      A.    Yes.

2      Q.    What's that name?

3      A.    I believe that's his partner Barry.

4      Q.    Okay.  And have you met Barry?

5      A.    I have.

6      Q.    Okay.  And if you could just read the first two

7    sentences?

8      A.    Dear, Mr. Brough.  Thank you for choosing a

9    financial consultant affiliated with The Investment Center

10   Corporation to assist you with your financial needs.  When

11   you work with a financial consultant with The Investment

12   Center, you're working with someone who has met the highest

13   standards of professionalism and dedication to client

14   service.

15         MR. McGARRY:  And I'd like to move -- I thought I

16   had moved it in, but I would like to formally move this

17   exhibit --

18         THE COURT:  Without objection, Government 300 is a

19   full exhibit.

20         MR. McGARRY:  Okay.

21   BY MR. McGARRY:

22     Q.    Now, just -- I want to make sure that it's pulled up

23   on the screens.  It appears to be.

24         Again, just to recap quickly, and I apologize for

25   not having formally moved it in, Mr. Brough.  There's the

74

1    date; correct?

2         A.   Yes.

3         Q.   And your name and town?

4         A.   Yeah.

5         Q.   And I believe you had mentioned the two people that

6    you were -- or the two account executives.  The first name

7    is?

8         A.   Leon.

9         Q.   And am I highlighting the section that you just

10   read?

11        A.   That's correct.

12        Q.   Okay.  Let me ask you about that -- and, again, I

13   apologize for not pulling it up before when you read it.  It

14   says, affiliated with The Investment Center, you're working

15   with a financial consultant at The Investment Center, someone

16   who has met the highest standards of professionalism and

17   dedication to client service.

18             Was that consideration important to you?

19        A.   Absolutely.  It led me to believe that he's an

20   expert in his field, and The Investment Center is a company

21   that I can trust where my money is going.

22        Q.   And did you trust him?

23        A.   Absolutely.

24        Q.   Okay.  And scrolling down, directing your attention

25   to the bottom, do you recognize that footer at all?

```
 1      A.   No.

 2      Q.   Down here.

 3      A.   Member of FINRA.

 4      Q.   Is that anything that you discussed with Mr.

 5   Vaccarelli when you were deciding to invest?

 6      A.   No.

 7      Q.   Okay.  Fair enough.  Let's see.  I'm trying to --

 8   there we go.

 9           Okay.  So let me pull that back up again.  Oh,

10   that's not what I was looking for.

11           MR. McGARRY:  We have a new computer system, Your

12   Honor, so --

13   BY MR. McGARRY:

14      Q.   All right.  Directing your attention to the second

15   page, okay, can you read -- is that big enough for you to

16   read on the screen?

17      A.   Yeah, I can probably make it out.

18      Q.   All right.

19           MR. McGARRY:  Thank you, Ms. Laraia.

20           Oh, that's not working.

21   BY MR. McGARRY:

22      Q.   Okay.  It has your name on there?

23      A.   Yes.

24      Q.   Again, your address?

25      A.   Yes.
```

1    Q.   It says -- do you see where it says "married"?

2    A.   Yes.

3    Q.   And then you have -- it talks about liquidity.

4    That's the point I wanted to kind of focus on.  It's a small

5    word because I can't blow it up at this time.  But can you

6    tell the jury what that says?

7    A.   Medium.

8    Q.   And what did you understand that to mean?

9    A.   The money is available if I needed it.

10    Q.   Okay.  And let me direct your attention to the

11    fourth page.  Believe it or not, I practiced with this the

12    other day, but I'm trying to get this to come up.

13        Okay.  Let me -- I'm just going to blow up these

14    first couple sections.  Okay.  Can you read that part where

15    it says "important information about your account"?

16    A.   Yes.

17    Q.   Okay.  And can you read for the jury the first part

18    about where it says "congratulations"?

19    A.   Sure.

20        Congratulations again on choosing Vaccarelli

21    Michitsch and The Investment Center to service your

22    investment needs.  Please take some time to read the

23    following important information regarding policies/procedures

24    concerning your account.  These policies and procedures are

25    designed for your protection.

1    Q.   And then it talks about payment information.  Okay.
2    Was it important that -- before I get to payment, was it
3    important that they had policies and procedures for your
4    protection?
5    A.   Yes.
6    Q.   Why?
7    A.   It meant my money was safe.
8    Q.   Okay.  All right.  I'm going to try to make this
9    bigger.  There we go.  How's that?  Better?  All right.
10   Okay.
11        All right.  So I was asking you -- you said that it
12   was important to you.  Again, why?  And I apologize.
13   A.   Because I knew my money was safe.
14   Q.   Okay.  And I think you said that money was some of
15   your retirement funds; is that correct?
16   A.   That's correct.  That's all the money I had for my
17   retirement.
18   Q.   And referring here, it says "payment information."
19   Do you see that?
20   A.   Yes.
21   Q.   Okay.  If you could read the first paragraph for the
22   jury?
23   A.   "Payment information:  For brokerage accounts --
24   I.e., accounts held at your clearing firm, Pershing, LLC --
25   payment for the purchase of stocks, options, bonds, mutual

1   funds or any other equity investments should always be made

2   payable to Pershing LLC and mailed to The Investment Center,

3   P .0 Box 770, Bedminster, New Jersey 07921, Attention:  Head

4   cashier."

5       Q.   Okay.

6       A.   "Please include your account number on your check."

7       Q.   And we'll get to it, but do you know if -- were you

8   issued an account number?

9       A.   I believe I was.

10      Q.   Okay.  Did you ever discuss, specifically with Mr.

11  Vaccarelli, the payment information and making checks payable

12  to Pershing, LLC?

13      A.   No.

14      Q.   Let me direct your attention to the next one, for

15  direct investments.  Do you see where it says that, the

16  second paragraph?

17      A.   Yes.

18      Q.   Picking up, if you could read "payments for the

19  purchase of mutual funds."

20      A.   All right.

21           "Payments for the purchase of mutual funds,

22  annuities or any other direct investment should always be

23  made payable to the approved investment company or product

24  sponsor from which you are purchasing the investment."

25      Q.   Okay.  Did you have any conversations with Mr.

1   Vaccarelli about that?

2      A.   I did not.

3      Q.   Okay.  And let me move down here, where it says

4   "statements and confirmations."  Do you see that?

5      A.   Yes.

6      Q.   All right.  If you could just read the first two

7   sentences there for the jury.

8      A.   "Statements and confirmations:  The Investment

9   Center has engaged Pershing, LLC, our clearing firm, or has

10  agreements with a number of product sponsors to custody

11  assets on your behalf.  You will receive monthly statements

12  on active accounts and quarterly statements on inactive

13  accounts."

14     Q.   Okay.  Did you receive statements from Mr.

15  Vaccarelli related to this first $38,000?

16     A.   I did not.

17     Q.   Okay.  Did you talk to him about that?

18     A.   Yes.

19     Q.   Okay.  What did you say to him, what did he say to

20  you?

21     A.   He said it was there if I needed it, it was making a

22  little bit of money.  You know, and "if you wanted to move it

23  let me know."

24     Q.   Okay.  Let me jump a little bit forward in this.

25  Let me direct your attention to page 9 of this exhibit.

1    Okay.  You see -- do you recognize -- the top right corner,

2    you see that there's a number that has been partially

3    redacted?

4        A.   Yes.

5        Q.   Okay.  What do you recognize that number to be?

6        A.   That's my account number with The Investment

7    Center.

8        Q.   Okay.  And it says here that you had an account

9    category?

10       A.   That's correct.

11       Q.   And what category is that?

12       A.   It's under IRA.  I'm sorry -- brokerage.

13       Q.   And the account type?

14       A.   Retirement.

15       Q.   Okay.  And in the middle part I think is what you

16   talked to us about.

17       A.   Yes, traditional IRA.

18       Q.   And did you discuss -- the type of investment that

19   you had, did you discuss that with Mr. Vaccarelli?

20       A.   Yeah, just basically it was what we previously

21   discussed, that the money was in the account, it was making a

22   little bit of interest and it was available if I needed it as

23   long as I paid it back within 30 days -- I'm sorry -- 60

24   days.

25       Q.   Okay.  And scrolling down a little bit, do you see

1  your name in the middle?

2     A.   Yes.

3     Q.   And whose name is underneath that?

4     A.   Karen Brough.

5     Q.   Okay.  And who is Karen Brough?

6     A.   My wife.

7     Q.   And is she here today?

8     A.   Yes, she is.  She's right there.

9     Q.   You're pointing to her in the front row?

10    A.   Yes.

11    Q.   And it mentions her profession.  You see that?

12    A.   That's correct.  She's a teacher.

13    Q.   And where is she a teacher?

14    A.   Holy Cross High School in Waterbury, Connecticut.

15    Q.   And did you have occasion to discuss that fact with

16 Mr. Vaccarelli?

17    A.   Yeah.  Leon is alumni of Holy Cross High School, as

18 well, so I think they had a lot in common about the school

19 itself and, you know, the direction of where it was going.

20    Q.   Okay.  And did that fact at all play at all?

21    A.   Yeah, it made me feel a little bit more comfortable.

22 I mean, he's from Waterbury.  My wife is from Waterbury.

23 They both went to the same high school.  I believe he's on

24 the Chamber of Commerce in Waterbury.  My friend, Rob

25 Kleinschmidt, used him as an investor.  The accountant that

```
1   he introduced me to I believe had some investments with him
2   as well -- Keith Sullivan.  You know, based on his website
3   that he had for Lux Financial, he was a registered stock
4   broker.  He had a couple other licenses.  I don't recall
5   where they were from.
6           But I felt extremely comfortable investing with him
7   due to his credentials and due to knowing people that knew
8   him.
9   Q.   And just to finish up with this document.  Directing
10  you to the middle, do you recognize the signatures there?
11  A.   I do not.
12  Q.   Let me direct you to the name above that signature.
13  What is that name?
14  A.   Leon Vaccarelli.
15  Q.   And the date?
16  A.   That's 1/27/14.
17  Q.   And then underneath that, does it say "branch
18  manager"?
19  A.   Yes.
20  Q.   And who is listed as branch manager?
21  A.   Leon Vaccarelli.
22  Q.   And, then, is there a signature under there?
23  A.   That's correct; there is, yes.
24  Q.   Okay.  And directing your attention to -- just to
25  finish up with this document.  Page 15 of this document.  Do
```

83

```
1   you recognize that signature?
2       A.   Yes, I do.
3       Q.   And whose signature is that?
4       A.   That's mine.
5       Q.   Okay.  And, again, your address is redacted;
6   correct?
7       A.   Yes.
8       Q.   And did you sign this document?
9       A.   I did.
10      Q.   Okay.  Directing your attention to page 16 of
11  Government's Exhibit 300.  Again, do you recognize your name
12  and signature?
13      A.   I do.
14      Q.   And on the top, do you recognize that?
15      A.   I do.  That's my account number.
16      Q.   Okay.  Directing your attention to the next page of
17  this document.  What is this document entitled?
18      A.   "Traditional IRA Adoption Agreement."
19      Q.   And do you see your name in the middle?
20      A.   I do.
21      Q.   And what company was designated as the, I guess the
22  financial organization?
23      A.   The Investment Center.
24      Q.   Okay.  And, again, let me stop there.  And is this
25  delineated -- or the box is checked for IRA; correct?
```

1      A.   That's correct.

2      Q.   All right.  And, finally, let me direct your

3  attention to, I believe page 21 of this document.  Again, are

4  there signature blocks there?

5      A.   Yes.

6      Q.   And who are the signature blocks -- whose names are

7  affiliated with the signature blocks?

8      A.   The first one is mine, Michael Brough, signed

9  1/27/14 with my signature; and the second one is Leon

10  Vaccarelli, signed 1/27/14.

11      Q.   Okay.

12           MR. McGARRY:  Let me -- I'd like to move in, at this

13  time, Government's Exhibit 301.

14           MR. EINHORN:  No objection, Your Honor.

15           THE COURT:  No objection, 301 is a full exhibit.

16  BY MR. McGARRY:

17      Q.   Do you recognize Government's Exhibit 301?

18      A.   I do.

19      Q.   And what is that exhibit?

20      A.   That is the check I had from my retirement

21  account.

22      Q.   Okay.  And what did you do with this check?

23      A.   I gave it to Mr. Vaccarelli.

24      Q.   And it says -- could you read what's "pay to order

25  of" on there?

1    A.   Yes, pay to order of Fidelity Investments, FBO --

2    which I assume is "for benefit of" -- Brough, Michael B.,

3    Cheshire, Connecticut 06410.

4    Q.   Okay.  And how much is this for?

5    A.   $38,862.61.

6    Q.   And who did you give it to?

7    A.   I gave it to Leon.

8    Q.   Okay.  And let me highlight that -- can you kind of

9    read -- maybe one could rotate it, but maybe we'll all turn

10   our heads for a second.  Can you read what's written there?

11   A.   I'll try not to snap my neck.  It says "deposit

12   only."

13   Q.   And then there's an account number.  Do you see

14   where it says "7051"?

15   A.   Yes.

16   Q.   Was that your account number?

17   A.   No.  I don't recall that account number.

18   Q.   Okay.  And then do you see a signature?

19   A.   Yes.

20   Q.   Okay.  Did you have any conversations with Mr.

21   Vaccarelli about you endorsing this check?

22   A.   No.

23   Q.   Okay.  Did you ever endorse this check or in any way

24   send it to Pershing or to The Investment Center?

25   A.   No.

1    Q.   Okay.  Just again tell the jury, what did you

2    physically do with this check?

3    A.   I gave it to Leon because I saw him frequently, and

4    he said he would take care of it and deposit it in the

5    account.

6    Q.   All right.  And then take a look at the second page

7    of Government's Exhibit 301.  Do you see the second page of

8    Government's Exhibit 301?

9    A.   I do.

10   Q.   Do you recognize the dollar amount?

11   A.   It's the exact same dollar amount on the check

12   $38,862.61.

13   Q.   And do you recognize the signature that I just

14   highlighted?

15   A.   Looks like Leon's signature.

16   Q.   And then it says -- you see where it says "checking

17   money market"?

18   A.   Yes.

19   Q.   Okay.  Did you have any conversations with Mr.

20   Vaccarelli about putting the money into a checking account?

21   A.   Absolutely not.

22   Q.   Okay.  Now, we had read earlier on Government's

23   Exhibit -- let's see -- Government's Exhibit 300.  And if we

24   go to page 4 of Government's Exhibit 300, in the middle, I

25   think it talked about getting confirms.  Do you remember we

1  talked about that?

2      A.   Yes.

3      Q.   Let's see if I can find where it talks about

4  confirms, payment information.  Did you get a confirm related

5  to -- "statements and confirmations," the highlighted part.

6  Did you get a confirm or a confirmation from Mr. Vaccarelli

7  related to this $38,000?

8      A.   I did not.

9      Q.   Okay.  Did you ever talk to him about getting a

10 confirm or a confirmation?

11     A.   I did not.  I assumed the money was safe and it was

12 in the account as we discussed, and, you know, I trusted

13 him.

14     Q.   And when you said "in the account," which account

15 did you believe it went into?

16     A.   From The Investment Center.

17     Q.   Okay.  And directing your attention to the account

18 number on this deposit slip.  Do you see that?

19     A.   Yes.

20     Q.   Okay.  Let me show you what's been marked

21 Government's Exhibit 302 --

22          MR. McGARRY:  Which I'll offer into evidence.

23          MR. EINHORN:  No objection, Your Honor.

24          THE COURT:  Full exhibit.

25 BY MR. McGARRY:

1      Q.   Okay.  And if you can take a look at Government's

2  Exhibit 302, do you see the name on the top of Government's

3  Exhibit 302, the initials on the very top?

4      A.   Yes.

5      Q.   Okay.  What are those initials?

6      A.   I don't know.

7      Q.   Okay.  Well, could you read them for the jury and

8  the court reporter?

9      A.   It says "LWLVACC," space, "LLC."

10     Q.   And do you know what that is?

11     A.   No.

12     Q.   Okay.  Do you recognize the address?

13     A.   The address is where Lux Financial was located.

14     Q.   Okay.  And directing your attention to the last four

15 digits of this account number, do you recognize that?

16     A.   I don't.  It's 7051.

17     Q.   Was that the same account that was on the deposit

18 slip of page 2 of Government's Exhibit 301?

19     A.   I believe it was.

20     Q.   Okay.  And scrolling down, directing your attention

21 to the middle, do you see where it says "Deposit

22 Watertown"?

23     A.   Yes.

24     Q.   Okay.  And what is the balance before the deposit

25 comes in?

1     A.    It's $1,031.60.

2     Q.    Okay.  And do you recognize the amount of the

3     deposit?

4     A.    Yes.

5     Q.    Okay.  And what is that?

6     A.    $38,862.61.  It's the exact amount of the check that

7     I gave Leon.

8     Q.    Okay.  And now directing your attention to this.

9     You see some debits from the account?

10    A.    Yes.

11    Q.    Okay.  Did you have -- let me show you --

12          MR. McGARRY:  Moving Government's Exhibit 307.

13          THE COURT:  Full exhibit, no objection.

14          MR. McGARRY:  Okay.

15    BY MR. McGARRY:

16    Q.    You see where I've highlighted on Government's

17    Exhibit 302 the line for $4,000?

18    A.    Yes.

19    Q.    Okay.  Let me show you what's been marked as

20    Government's Exhibit 307.  Do you see that check in front of

21    you?

22    A.    Yes.

23    Q.    Okay.  And directing your attention to where it says

24    "draw."  Okay.  Did you have any discussions with Mr.

25    Vaccarelli about taking $4,000 of your money as a draw?

1    A.    No; none, whatsoever.

2    Q.    Okay.  When was the first time, if ever, that you

3    saw this check, which is Government's Exhibit 307?

4    A.    I saw it, I think, a couple weeks ago.

5    Q.    Was that when meeting with the Government?

6    A.    That's correct.

7    Q.    In preparation for your testimony?

8    A.    That's correct.

9    Q.    And at any point in time did Mr. Vaccarelli tell you

10   that he was going to take your money and use it as a draw?

11   A.    No.

12   Q.    Okay.  Is his using your money as a draw, would that

13   be consistent or inconsistent with what he told you he would

14   do with your money?

15   A.    Total inconsistent --

16        MR. EINHORN:  I'll object to the form of the

17   question.  That's argumentative.  Using -- whether or not

18   he's using his money or other money or whatever, that's

19   argument.

20        THE COURT:  Is there any way you want to rephrase

21   that, Mr. McGarry?

22        MR. McGARRY:  Sure.  I can try to rephrase it.

23   BY MR. McGARRY:

24   Q.    Directing your attention to Government's Exhibit

25   302, you see that on your screen?

1      A.   Yes.

2      Q.   Okay.  And you see the balance in the account;

3  correct?

4      A.   That's correct.

5      Q.   And then you see where it says a debit of $4,000;

6  correct?

7      A.   Yes.

8      Q.   Okay.  Directing your attention to Government's

9  Exhibit 307.  Directing your attention to this check, are you

10  able to see the check?

11      A.   Yes.

12      Q.   Okay.  Do you see what it says "For"?

13      A.   Yes.

14      Q.   Okay.  And what is the word written "For"?

15      A.   "Draw."

16      Q.   Okay.  And you recognize the signature?

17      A.   Yes.

18      Q.   Whose signature it appears to be?

19      A.   Leon Vaccarelli's signature.

20      Q.   Okay.  And who is the check made out to?

21      A.   Mr. Leon Vaccarelli.

22      Q.   Okay.  Did Mr. Vaccarelli ever tell you he was going

23  to use some of your money and write a check to himself?

24      A.   No.

25           MR. EINHORN:  Again, objection, Your Honor.  That's

1    argumentative as to where the funds went.

2             THE COURT:  Overruled.  The question is simple:  Did

3    Mr. Vaccarelli ever tell you he would use some of your money

4    and write a check to himself?  Your answer was no.

5             THE WITNESS:  Correct.

6             THE COURT:  You may proceed.

7    BY MR. McGARRY:

8        Q.   Would him using some of your money for himself or

9    writing a check to himself be consistent or inconsistent with

10   what he had told you he would do with your money?

11       A.   Totally inconsistent.

12       Q.   Why?

13       A.   Because he told me the money was in an account

14   there, and that I could get it if I needed it.  And I would

15   never give him authorization to use my money for his personal

16   or business expenses.  Never.

17       Q.   What was that money intended to be going to be used

18   for?

19       A.   My retirement.

20       Q.   And your wife's, as well?

21       A.   That's correct.

22       Q.   Okay.  And, again, if you could read the date of

23   this check?

24       A.   The date says 1/17/14.  So, January 17, 2014.

25       Q.   All right.  Going back to the chronology.  Did your

1    relationship in 2014-2015 continue with Mr. Vaccarelli?

2        A.   Yes.

3        Q.   Okay.  Tell the jury about that.

4        A.   I worked for a company called Paychex at the time.

5    They handled payroll, 401(k), and handled taxes for

6    companies -- payroll taxes, essentially.  So prior to me

7    taking the job with Paychex, Mr. Vaccarelli was a client of

8    Paychex, so I used to see him frequently, see if I could give

9    him any more benefits.  And we'd meet periodically just to

10   discuss any other possible opportunities he had for me from a

11   payroll standpoint, to get new clients.

12       Q.   Okay.  And where would you meet?

13       A.   We would meet in his office.

14       Q.   Let me --

15            MR. McGARRY:  I think Government's Exhibit 40 is --

16   or 41.  So I'll move 41, 42, 43 and 44, which I think are

17   photos.

18            MR. EINHORN:  May I see them first?

19            MR. McGARRY:  Your Honor, if we could have the

20   Court's assistance, I'll pull them up for Mr. Einhorn on the

21   screen.  Pulling up 41, 40, 42, 43, and I think it's -- so it

22   would be 43.  So it would be 40, 41, 42 and 43.

23            MR. EINHORN:  I'd object, Your Honor.  They're

24   photographs.  I don't think they're relevant to this

25   particular case.  They just show location, so --

94

```
 1            THE COURT:  Do you want to have -- do you want to
 2   voir dire the witness --
 3            MR. McGARRY:  Sure.
 4            THE COURT:  -- with respect to his --
 5            MR. McGARRY:  Sure.
 6   BY MR. McGARRY:
 7       Q.   Do you recognize the photo marked as Government's
 8   Exhibit 40?
 9       A.   I do.
10       Q.   Okay.  What is it a photo of?
11       A.   It's a photo of the Leavenworth Professional Center.
12       Q.   And have you been to the Leavenworth Professional
13   Center?
14       A.   Yes, I have.
15       Q.   Approximately how many times?
16       A.   Oh, God.  Twenty, thirty.
17       Q.   Okay.  Does this photo fairly and accurately depict
18   the front of the Leavenworth Professional Center?
19       A.   Yes, it does.
20            MR. McGARRY:  Okay.  I'd like to move this into
21   evidence, Your Honor.
22            THE COURT:  And why did he go to Leavenworth?
23   BY MR. McGARRY:
24       Q.   And why did you have occasion to go to Leavenworth?
25       A.   Because Mr. Vaccarelli was a client of Paychex.
```

1      Q.   Okay.

2      A.   And I would go there to service his account.

3      Q.   Were you also a client of his?

4      A.   That's correct, and I was a client of him as well.

5      Q.   Did you go there at times to meet with him to talk

6   about your investments with him that you believed had gone to

7   The Investment Center?

8      A.   That's correct.

9           THE COURT:  Okay.  It's admissible.  Number 40.

10          MR. McGARRY:  And why don't we put that up for the

11   jury.

12   BY MR. McGARRY:

13     Q.   Okay.  And just, again, now that the jury has it in

14   front of them, can you can tell us just what this is?  Just

15   describe it in your own words.

16     A.   It's the location of Lux Financial.

17     Q.   Okay.

18          MR. McGARRY:  I'd like to offer this into evidence.

19   Now, again, with the Court's help, Your Honor, I'll pull up

20   for the witness Government's Exhibit 41.

21   BY MR. McGARRY:

22     Q.   Do you recognize Government's Exhibit 41?

23     A.   I do.

24     Q.   And how do you recognize Government's Exhibit 41?

25     A.   That's Signature's Restaurant, where I would meet

96

1  with Leon occasionally.

2       Q.   And when you met with him at Signature's Restaurant,

3  did you have occasion to discuss the investment funds that

4  you had given him?

5       A.   Yes, occasionally.

6       Q.   Is this a fair and accurate representation of what

7  Signature's Restaurant looks like from that point of view?

8       A.   Absolutely.

9            MR. McGARRY:   I would offer Government's Exhibit

10  41.

11           MR. EINHORN:   No objection.

12           THE COURT:   Full Exhibit, 41.

13  BY MR. McGARRY:

14       Q.   Okay.   Let me show you just -- and, again, so tell

15  the jury what they're seeing.

16       A.   They're telling -- right there is a picture of

17  Signature's Restaurant, located right near Leon's office.

18       Q.   Okay.   And you went there and met with him

19  occasionally?

20       A.   Yes.

21       Q.   Okay.   Do you know, by the way, who owns Signature's

22  Restaurant?

23       A.   I believe Leon owned it.

24       Q.   Okay.   I'd like to show you what's been marked --

25  just the witness and, of course the, Court -- Government's

1    Exhibit 42.  Do you recognize Government's Exhibit -- and

2    I'll zoom-in a little bit.  Do you recognize the individual

3    and the office in Government's Exhibit 42?

4        A.   Yes.

5        Q.   And what is Government's Exhibit 42?

6        A.   That's Leon Vaccarelli at his office.

7        Q.   Okay.  And have you been to that office?

8        A.   I have.

9        Q.   How many times?

10       A.   Quite a few.

11       Q.   Okay.  Is that a fair and accurate representation of

12   what his office looked like?

13       A.   Yes, it is.

14            MR. McGARRY:  I'd offer Government's Exhibit 42.

15            MR. EINHORN:  No objection.

16            THE COURT:  42 is a full exhibit.

17   BY MR. McGARRY:

18       Q.   Okay.  So can you just tell the jury, like, what

19   floor this photo would be taken on?

20       A.   I think it was on the second floor.

21       Q.   Okay.  And that was his office?

22       A.   That's correct.

23       Q.   Was there also a conference room?

24       A.   Yes, there was.

25       Q.   Well, if I could pull up -- well, actually before we

```
 1   pull up Government's Exhibit 43, just tell the jury what

 2   they're seeing.

 3        A.   That's his office.  Very professional looking.

 4   Everything seems to be neat and organized.

 5        Q.   And is that Mr. Vaccarelli in the middle?

 6        A.   That is Mr. Vaccarelli right there.

 7        Q.   Okay.  And I'll pull up for the witness and the

 8   Court Government's Exhibit 43.  Let me ask you, what is

 9   Government's Exhibit 43?

10        A.   Looks like a conference room.

11        Q.   And have you been to the conference room?

12        A.   I have.

13        Q.   Have you been to the conference room to talk with

14   Mr. Vaccarelli about your investments?

15        A.   Yes.

16        Q.   Okay.  Is that a fair and accurate representation of

17   the conference room?

18        A.   It is.

19             MR. McGARRY:  I'd offer Government's Exhibit 43.

20             MR. EINHORN:  No objection.

21             THE COURT:  Full exhibit.

22             MR. McGARRY:  Okay.  Let the jury see that.

23   BY MR. McGARRY:

24        Q.   So just describe for the record what the jury is

25   seeing here in this photo.
```

1    A.   It's a nice, plush conference room.  I think it was

2  just redone over, had really nice plush chairs.  A little

3  more comfortable than the one I'm sitting in here.  But,

4  anyway, it was a great place to meet, and, you know, we

5  discussed business there.  My wife and I met him on several

6  occasions there, just to discuss the investments.

7    Q.   Okay.  You mentioned your wife -- Karen; correct?

8    A.   Yes.

9    Q.   Did at some point in time Karen move money over to

10  Mr. Vaccarelli?

11    A.   Yes.

12    Q.   Tell the jury about that.

13    A.   I'm not quite sure of the date, but she worked for a

14  company called Uniroyal Chemical, who she had a 401(k) with.

15    Q.   Okay.

16    A.   And she wanted to move it over to a firm that we

17  trusted, to somebody that we trusted, so she went ahead and

18  opened up her own account for The Investment Center, filled

19  out the same paperwork that I did, and moved the money -- I

20  forget the financial institution where it came from, but she

21  moved it over to The Investment Center.

22    Q.   Approximately how much, if you remember?

23    A.   I think it was around $70,000.

24    Q.   Did she get statements?

25    A.   Yes.

1   Q.   Okay.  And, again, to remind the jury, did you get

2   statements?

3   A.   No.

4   Q.   Okay. Did you ever talk to Mr. Vaccarelli about the

5   fact that your wife's account got statements but you didn't

6   get statements for your IRA?

7   A.   I did not.  I trusted him, and I thought it was in

8   an account, per our discussion, that maybe it wasn't

9   necessarily affiliated with an account that gives regular

10  statements.

11  Q.   And did you believe him?

12  A.   Yeah, absolutely.  He's a friend of mine.  I trusted

13  him, and, you know, I believed the money was there and was

14  just in an account.

15  Q.   Did you put in a second investment?

16  A.   Yes.  Scapa North America had a pension fund.

17  Q.   Okay.  So let me slow you down.  Scapa was the

18  company that you had left?

19  A.   That's correct.

20  Q.   Okay.  You were saying they had a pension fund?

21  A.   Right.  So if you'd worked there for a number of

22  years, you could possibly get a pension when you retired, a

23  certain amount per month.

24       They were looking to consolidate financial assets

25  there, and they dissolved that entire pension fund.  So with

 1    that, they gave me, an employee, an option to get a couple

 2    $100 a month or to get a lump sum payment.

 3         Q.   Okay.  What did you decide to do?

 4         A.   I discussed it with Leon, and he said, you know,

 5    take the lump sum payment.  You know, we can possibly invest

 6    that and you could make more money than you ever would

 7    getting a couple $100 a month.

 8         Q.   And did you follow his recommendation?

 9         A.   I did.

10         Q.   Okay.  Why?

11         A.   Because I trusted him, he was a registered broker,

12    and, you know, I considered Leon a friend.

13         Q.   Okay.  And as far as you now, everything was fine at

14    this point?

15         A.   Yeah, everything was fine.

16         Q.   So let me --

17              MR. McGARRY:  I would offer Government's Exhibit 2

18    and 2A?

19              THE COURT:  Is 44 being offered?

20              MR. McGARRY:  Oh, I'm sorry.  Did I not offer 44?  I

21    apologize, Your Honor.

22              THE COURT:  They don't know what 44 is.

23              MR. McGARRY:  Oh, I'm sorry.  No, I'm not going to

24    offer 44 at this time.  43 was the last photo.  But I would

25    offer Government's Exhibit 2 and 2A.

```
 1          MR. EINHORN:  I just wanted to take a look at those
 2   two first, please.  Those two I don't have.
 3          MR. McGARRY:  You have them right there.  You don't
 4   have 2?
 5          MR. EINHORN:  No.
 6          MR. McGARRY:  Okay.  If I could show the witness and
 7   the Court Government's Exhibit 2?  You can look at my notes
 8   if it's quicker.
 9          MR. EINHORN:  Yeah, I'll take a look.  Okay, now I
10   know what it is.
11          MR. McGARRY:  2A is -- it's from --
12          MR. EINHORN:  Yeah.  Yeah, it's okay.  Where is 2B?
13          MR. McGARRY:  I don't think they have --
14          MR. EINHORN:  Oh, just 2A.
15          MR. McGARRY:  2, 2A.
16          MR. EINHORN:  2, 2A, no objection, Your Honor.
17          THE COURT:  2, 2A, full exhibits.
18   BY MR. McGARRY:
19      Q.  Let me show you what's been marked as Government's
20   Exhibit 2 in evidence.  What is Government's Exhibit 2?  Do
21   you have it in front of you?
22      A.  Yes.
23      Q.  Okay.  What is that check?
24      A.  It's a check from LPL Financial, paid to the order
25   from -- pay to Lux Financial, order of FBO -- which, again, I
```

1    assume means "for benefit of" -- Michael Brough IRA, account

2    number ending in 4096, which is consistent with the account

3    number I had with The Investment Center.

4        Q.   And, now, it says 49 Leavenworth Street, Suite

5    204?

6        A.   That's correct.

7        Q.   Was that the suite that we just looked at the photos

8    for?

9        A.   That's correct, it is.

10       Q.   And let me show you what's been marked Government's

11   Exhibit 2A in evidence.  Do you recognize this document -- or

12   at least let me ask you if you recognize -- I'll blow that up

13   for you.  Okay.  You see where it says "account

14   registration"?

15       A.   Yes.

16       Q.   Okay.  What is that?

17       A.   That is distributing my pension fund check from

18   Scapa North America to Lux Financial -- again, IRA for

19   benefit of Michael Brough -- and the second part highlighted

20   says "IRA FBO Michael Brough," and has the account number

21   consistent with The Investment Center.  So that's where I

22   assumed the money was going.

23       Q.   And it talks about "mailed to third-party address."

24   Do you see that?

25       A.   Yes.

1    Q.   Okay.  Did you talk to Mr. Vaccarelli about having

2    the check mailed?

3    A.   Yes.

4    Q.   Okay.  Tell the jury about that.

5    A.   I'd called him.  He said, Just have it mailed to me

6    and I'll get it deposited for you.

7    Q.   Was there a time, if you recall, where LPL mailed it

8    initially somewhere else?

9    A.   Yes, they mailed it down to The Investment Center in

10   New Jersey.

11   Q.   And what happened?

12   A.   I believe they rejected the check, because it wasn't

13   made out to Pershing, LLC.

14   Q.   Okay.  And then what happened?

15   A.   They'd called me and I called Leon, and he said,

16   Just have it sent directly to me and I'll get it deposited.

17   Q.   And when he told you to have it sent or mailed to

18   him, what did you do?

19   A.   I called up my LPL Financial and had them send it

20   directly to Lux Financial, 49 Leavenworth Street.  I told

21   Leon it was on the way.

22   Q.   Okay.  And that was this check; correct?

23   A.   That's correct.

24   Q.   Okay.  Now, so, when he told you that he would take

25   care of it, what did you understand or think he was going to

1     do with the check?

2         A.    Deposit it in the same account I had from The

3     Investment Center ending in 4096.

4         Q.    Okay.  And take a look at Government's Exhibit --

5     it's the bottom part of Government's Exhibit 2.  Do you see

6     an account number written there?  This is, again, sideways.

7         A.    Yeah, I see AB2, blocked out 4096, but that's got a

8     slash through it.

9         Q.    Right.  Now, did you make that slash?

10        A.    No, I did not.

11        Q.    Okay.  And do you see the two letters written next

12    to the slash?

13        A.    I do.

14        Q.    Okay.  And what letters are those?

15        A.    L-V.

16        Q.    Do you know -- are those your initials?

17        A.    No, they are not.

18        Q.    Who has the initials L-V?

19        A.    I believe Leon Vaccarelli.

20        Q.    And under that it says -- looks like it says "DEP

21    Only"?

22        A.    Yeah.

23        Q.    What do you take that to mean?

24        A.    Deposit only.

25        Q.    Okay.  And did you write that?

1    A.   I did not.

2    Q.   Okay.  Let me show you -- and I'm going to show

3   Mr. Einhorn to maybe save time -- I think you have it --

4   government's Exhibit 303.

5         MR. EINHORN:  I've got that.  Thanks.

6         MR. McGARRY:  Okay.  I'd offer Government's Exhibit

7   303.

8         MR. EINHORN:  No objection.

9         THE COURT:  All right, then.  Full exhibit.

10   BY MR. McGARRY:

11   Q.   Okay.  So showing you what's been marked

12   Government's Exhibit 2 still on the screen, and again going

13   back up, do you see your Investment Center account partially

14   redacted with the last four numbers 4096?

15   A.   I do.

16   Q.   Okay.  Showing you what's been marked as

17   Government's Exhibit 303, do you also recognize this to be

18   the check?

19   A.   Yes.

20   Q.   And the check that you just testified about?

21   A.   That's correct.

22   Q.   With the same cross-out?

23   A.   Yes.

24   Q.   Okay.  Showing you the second page of Government's

25   Exhibit 303, do you see where it says "deposit"?

1    A.   Yes.

2    Q.   Okay.  And do you see the numbers 5007?

3    A.   Yes.

4    Q.   Okay.  Is that 4096?

5    A.   No.

6    Q.   Okay.  Do you recognize the amount?

7    A.   Yes.

8    Q.   Okay.  What is that amount?

9    A.   $41,011.81.

10    Q.   Okay.  Do you see here where it says "post to

11   account 5007"?

12    A.   Yes.

13        MR. McGARRY:  Okay.  And let me offer Government's

14   Exhibit 305.

15        THE COURT:  Hearing no objection, it's a full

16   exhibit.

17        MR. EINHORN:  No objection.

18   BY MR. McGARRY:

19    Q.   Let me show you what's been marked Government's

20   Exhibit 305 in evidence.  And directing you to the top, do

21   you see where it says account 5007?

22    A.   Yes.

23    Q.   And do you see the name on this account?

24    A.   Yes.

25    Q.   And what is the name on the account?

1      A.   Leon WL Vaccarelli, DBA Lux Financial Services, 49

2    Leavenworth Street, Suite 204.

3      Q.   And is that the same address that Leon told you to

4    have the check mailed to?

5      A.   That's correct.

6      Q.   Okay.  And directing your attention to the middle of

7    Government's Exhibit 305, do you see that?

8      A.   Yes.

9      Q.   Do you see the deposit amount?

10     A.   I do.

11     Q.   Okay.  And what is the deposit amount?

12     A.   $41,011.81.

13     Q.   Okay.  And was that the amount of your pension

14   buy-out or pay-out that you got from Scapa?

15     A.   That's correct.

16     Q.   Okay.  And what was the balance in the account prior

17   to the deposit of $41,000?

18     A.   Looks like a whopping $657 -- I'm sorry -- $600.57.

19     Q.   Okay.  And do you see a number of withdrawals and

20   transfers, withdrawals and transfers?

21     A.   Yes.

22     Q.   Okay.  Did you direct Mr. Vaccarelli to do any

23   withdrawals or transfers related to your $41,000?

24     A.   Absolutely not.

25     Q.   Okay.  Did you receive any withdrawals or transfers

1    related to your $41,011?

2        A.   Absolutely not.

3        Q.   Okay.  Do you know -- what did you believe had

4    happened to your $41,000 at that point in time?

5        A.   I thought it was added to my original check for

6    $38,800, and I thought I had about 70- or $80,000 there

7    available to me.

8        Q.   Okay.  And why did you think that?

9        A.   Because Leon told me it would be available.

10       Q.   Okay.  And at that time, did it make sense?

11       A.   Yeah, it made perfect sense.

12       Q.   Okay.  And did he seem credible?

13       A.   Absolutely.

14       Q.   And did you believe him?

15       A.   I did.  We had a friendship, and I trusted him.  We

16   knew a lot of mutual people.  He was a registered broker

17   backed by The Investment Center, so I personally had no

18   reason not to believe him that the money was invested where

19   he said it was.

20            THE COURT:  Mr. McGarry, if it suits you, this is a

21   good time for us to take a recess, unless you are almost

22   finished with this witness.

23            MR. McGARRY:  I think this would be a good time,

24   Your Honor.  We're moving along, but we can take a break.

25            THE COURT:  All right.  Ladies and gentlemen, we'll

```
1   take a fifteen-minute recess.  Again, remember to leave your
2   notebooks here -- they'll be on your seat when you come back
3   in -- and don't discuss the case.  We stand in recess.
4           MR. McGARRY:  We might have an issue with one of the
5   monitors, Your Honor.
6           THE COURT:  We will make a call and get it fixed.
7   What seems to be wrong?
8           A JUROR:  It just fell down.
9           THE COURT:  It just fell.  Let's see if we can get
10  that fixed.  Thank you.
11          (Jury out, 11:28 a.m.)
12          THE COURT:  All right.  Mr. Brough, please don't
13  discuss your testimony during the recess, and we'll be back
14  in 15 minutes.
15          THE WITNESS:  Thank you, Your Honor.
16          THE COURT:  Thank you.
17          (Recess taken, 11:28 a.m.)
18          (Out of the presence of the jury, 11:54 a.m.)
19          THE COURT:  All right.  I understand repairs have
20  been made, and we are ready to bring the jury back in.
21  Please be seated.  Would you please bring Mr. Brough back in,
22  and he can be in the witness box?
23          (Witness enters, 11:57 a.m.)
24          (Jury in, 11:58 a.m.)
25          THE COURT:  All right.  Ladies and gentlemen, please
```

1  be seated.  The malfunctioning screen has been repaired.

2  Don't touch.

3          All right.  Mr. Brough, you remain under oath.

4          Mr. McGarry, you may continue.

5          MR. McGARRY:  Thank you, Your Honor.

6  BY MR. McGARRY:

7      Q.   Mr. Brough, before we broke we were talking about

8  Government's Exhibit 305, which now appears on the right-hand

9  side of your screen, and I've also now pulled up Government's

10 Exhibit 2 on the left-hand side of your screen.  Can you see

11 those?

12     A.   Yes.

13     Q.   Okay.  And on Government's Exhibit 2 there's an

14 account number, which I think you testified was your account

15 number.  Do you see that?

16     A.   That's correct; yes.

17     Q.   Okay.  And also on the right-hand side there is an

18 account number -- I'm sorry -- there's an account -- I'm

19 going to zoom-in where -- you see that, where momentarily it

20 said account number 5007?

21     A.   Yes.

22     Q.   Okay.  And then directing your attention to the name

23 on the account.  Do you see where it says "Leon Vaccarelli

24 Lux Financial Services"?

25     A.   Yes.

1      Q.   Okay.  Did you have any discussions, that you

2  recall, with Mr. Vaccarelli regarding your money going into a

3  Lux account rather than going to The Investment Center?

4      A.   Absolutely not.

5      Q.   Okay.

6           MR. McGARRY:  I'm going to say no to that.  There

7  was a popup on the screen, Your Honor.

8  BY MR. McGARRY:

9      Q.   And, again, I think you alluded to it on the first

10  one.  I just want to make sure on this second of your two

11  investments, the $41,011, which I believe is also in

12  Government's Exhibit 303 pulled up on your screen, and

13  showing you page 2 of Government's Exhibit 303.  What was the

14  return that you discussed with Mr. Vaccarelli, the amount of

15  interest or return that you would get on your money?

16      A.   He said I would make a little bit of money.

17      Q.   Okay.  And was that okay with you?

18      A.   Yeah.

19      Q.   Okay.  Why?

20      A.   Just because I knew the money was available in kind

21  of the best of both worlds.  I was making a little bit of

22  money on it; but if I needed it for my business, it was

23  available to me.

24      Q.   Now, was there anything unclear or was he in any way

25  incapacitated when you were discussing your investment, this

1  particular one?

2      A.   No.

3      Q.   Did he seem to understand what you were saying?

4      A.   Yeah.  He seemed to have a clear understanding that

5  the money was there, it was available, making a little bit.

6  If I needed it for my business, I could quickly get access to

7  the funds as long as I returned it within 60 days -- 60

8  calendar days, not 60 business day.  I remember that

9  specifically.

10     Q.   That sounds pretty specific.

11          Did you understand -- when he was speaking, did you

12  understand the words he was using?

13     A.   Yeah.

14          MR. EINHORN:  Your Honor -- Your Honor, please,

15  could you ask counsel not to do leading questions in this

16  area?

17          THE COURT:  I don't think that was leading.

18          MR. EINHORN:  Well, it suggests the answers to the,

19  particularly to the witness, the last line of questions.

20          MR. McGARRY:  The question was "Did"?

21          THE COURT:  Overruled.

22  BY MR. McGARRY:

23     Q.   Did or did he not ever slur his words when he was

24  describing the interest that you would receive on this money?

25     A.   He did not.  It was an understanding it was a very

1    small amount.

2        Q.    Throughout the time frame -- I believe that this

3    is -- was deposited into account April, 5007 of 2016.  Do you

4    see that?

5        A.    Yes, 11:46.

6        Q.    So did you continue to see him?

7        A.    Yes.

8        Q.    And did you continue to see him at Signature's

9    Restaurant, including -- pulling up Government's Exhibit

10   41?

11       A.    Yes, occasionally.

12       Q.    And did you continue to see him at his office,

13   pulling up Government's Exhibit 42?

14       A.    Occasionally.

15       Q.    Did there come a time moving towards May of 2007

16   [sic] when you had communications with him?

17       A.    Yeah.  At that point, I'd wanted to possibly move my

18   money.

19       Q.    Okay.  Why did you want to move your money?

20            THE COURT:  2007?

21            MR. McGARRY:  I'm sorry.  2017.

22            THE WITNESS:  Because there was a point where I

23   didn't need the money for my business anymore, and I wanted

24   it invested in a solid 401(k) where I was getting a higher

25   return.

1   BY MR. McGARRY:

2       Q.   Okay.  And just to kind of pull that out a little

3   bit.  Why did you -- why were you able to now move your money

4   into a solid 401(k) where you were getting a rate of return,

5   whereas before you needed a little more flexibility?

6       A.   My business had enough money in the account, and you

7   know, I didn't think I needed the money for my business

8   anymore.

9       Q.   Okay.  And did you explain that to Mr. Vaccarelli?

10      A.   I did.

11      Q.   Okay.  Did he understand?

12      A.   Yep.

13      Q.   Was there any confusion?

14      A.   No.

15      Q.   Okay.  Directing your attention to May of 2017 --

16           MR. McGARRY:  And I'm going to introduce

17   Government's Exhibit 309, which we --

18           MR. EINHORN:  No objection.

19           MR. McGARRY:  Okay.

20           THE COURT:  Full exhibit.

21   BY MR. McGARRY:

22      Q.   Did you have texting communications with him?

23      A.   Yeah, we had gone back -- you know, I have two kids.

24   My daughter is a Premier soccer player, my son's a volleyball

25   player, and we're just really, really busy.

1          So I had attempted to set up a meeting with Leon,

2    starting around May 3 of 2017.  I was busy, he was extremely

3    busy, and I believe his mother was ill at the time.  So we'd

4    kind of went back and forth, God, for about four to six weeks

5    before we really narrowed down a time frame.  He was busy, I

6    was busy, and we finally agreed to meet --

7        Q.   Let me stop you there for a second.  Let me pull up

8    Government's Exhibit 309 in evidence.  Is this the text

9    exchange you were talking about?

10       A.   Yes.

11       Q.   Okay.  And do you recall giving this text exchange

12   to the Government prior to your testimony today?

13       A.   Yes.

14       Q.   Okay.  And do you see your initials down at the

15   bottom?

16       A.   Yes.

17       Q.   Okay.  So tell the jury about the exchange that went

18   back and forth.

19       A.   We had went back and forth -- again, starting on

20   May 3  If you can see, I think I text him to say let's get

21   together.  And his text to me -- do you want me to read the

22   text back?

23       Q.   If it will help your testimony, sure.

24       A.    Okay.  Hi, Mike.  Just landed at JFK from San

25   Diego.  I will call you tomorrow afternoon.  Leon Vaccarelli.

1          Michael Brough:  Okay, sounds good, safe travels.

2          Thank you, he says.

3          May 22  Mike, good morning.  I'm just confirming

4     6:15 p.m. tonight in my office.  Let me know if you need a

5     change.  I have wide open next week -- Leon Vaccarelli.

6          Q.   And you wrote back?

7          A.   Let's make it 6, okay?

8          Q.   All right.  Let me jump you to page -- I'm going to

9     page 3, if I can.  And how about, what did you text him on

10    May 23?

11         A.   So we left off.  And I said, Can you do tonight at

12    six?  He says, Ugh.  I took a 5:30 in Sharon, Connecticut.

13    7:00 p.m. Thursday, question, question.  Saturday a.m.,

14    question.

15         Q.   Okay.  Let me jump down to page 4.  Just going down.

16    What did you text to him May 25?  Can you read that?

17         A.   Yeah.  He said, Let's shoot for next week.  Oh, I

18    say, Let's shoot for next week, take care of your mother.

19         Q.   Okay.

20         A.   And then on June 14 I get back to him:  Hi, Leon.

21    What is your schedule like for the balance of the week?  I

22    was thinking about a Roth IRA ASAP.

23         Q.   Okay.  Did you think that your money was still with

24    The Investment Center at this point?

25         A.   Absolutely.

1    Q.   And what was that understanding based on?

2    A.   Based on conversations with Leon, and based on the

3    fact that I had no reason to believe it wasn't in that

4    account.

5    Q.   Okay.  And what do you mean you were thinking about

6    a Roth IRA ASAP?

7    A.   To move it over to a high rate of return.

8    Q.   Okay.  And that was a particular type of IRA that

9    you talked about with Mr. Vaccarelli?

10   A.   That's correct.  Well, the first account, it was my

11   understanding that I could get access to the money as long as

12   I paid it back within 60 days.  This account I'm referring to

13   would tie it up completely with a high rate of return.

14   Q.   And you had a back and-forth with him about it?

15   A.   That's correct.

16   Q.   Okay.  Let me show you the next page.  Can you read

17   what he texted to you and what you texted back?

18   A.   Leon Vaccarelli:  Send me a time and address for

19   lunch, 1:00 p.m. or later works best, but I can make 12 or

20   12:30 work.  If need be, Monday, Wednesday or Friday next

21   week as well for lunch down your way!  There is no

22   deadline -- down your way, exclamation point.  There is no

23   deadline for Roth IRA, by the way, and we have pending

24   recharacterization for IRA.

25   Q.   Okay.  What did you understand he mean there is no

1    deadline for a Roth, by the way?

2        A.   Basically, it means that I could take the money that

3    I had in his account and move it over to a regular IRA.

4        Q.   Okay.  And what did -- what is this reference to "we

5    have pending recharacterization for IRA"?

6        A.   I wasn't sure.  My understanding, that maybe he

7    could take the money that I had invested with him and move it

8    over to an IRA and recharacterize it, obviously so I wouldn't

9    have to pay taxes on it or be in any trouble with the IRS.

10       Q.   Did he ever say he was going to recharacterize it as

11   putting it in his account?

12       A.   Absolutely not.

13       Q.   Would that have been a surprise to you?

14       A.   Yes.

15       Q.   And at some point did you meet?

16       A.   Yeah, we ended up meeting.  I think it was on

17   June 21  He said come down to Signature's.

18       Q.   Okay.

19       A.   I had my wife with me at the time.

20            Let's do Wednesday at 6:15, Leon, thumbs up.

21            June 21 -- I'm getting ready to go to meet with

22   Leon.  Meet up in your office or do you want to meet right at

23   Signature's?

24       Q.   Okay.

25       A.   Leon Vaccarelli:  Go directly to Signature's,

```
 1    exclamation point. I'll meet you guys there.  Perfect, with a
 2    smiley face emoji.
 3       Q.   Okay.
 4       A.   Let me know when you get there.
 5       Q.   Okay.  And that was the meeting you were going to
 6    talk about recharacterizing your IRA?
 7       A.   That's correct.  And college planning, as well.
 8       Q.   Okay.  Well, did you have the meeting?
 9       A.   We did.
10       Q.   And where was the meeting?
11       A.   At Signature's Restaurant in Waterbury.
12       Q.   And is that shown in Government's Exhibit 41?
13       A.   Yes.
14       Q.   Okay.  Tell the jury about the meeting.  What do you
15    recall?
16       A.   We went in.  Leon was going to buy us dinner.  And
17    we had met there, and I had met my wife there.  She,
18    unfortunately, couldn't stay.  She had to pick up my daughter
19    for soccer practice.  So I stayed with Leon.  He basically
20    engaged in some dialogue.  He had a copy of my wife's account
21    with her money in it.
22       Q.   Okay.
23       A.   And he didn't have anything for me.
24       Q.   Did you ask him about that?
25       A.   I did not ask him.  But, again, I trusted him, and I
```

```
 1   thought it was in a secure account somewhere and, you know,
 2   wasn't getting any return.  So then I proceeded to ask him,
 3   What's better, a Roth IRA or a 401(k) traditional?  He said
 4   depends on what you want.  So I said, Well, jeesh, let me
 5   think about that.  And then we discussed college planning in
 6   great detail.
 7        Q.   And what did he say about that?
 8        A.   He said go early decision.  I think his daughter had
 9   just went early decision to a small school upside of Boston.
10        Q.   Okay.
11        A.   And he said that was the best way to go.
12        Q.   Did you talk about anything -- about any monies that
13   you had?
14        A.   Yeah, I think we had an extra couple $1,000 in
15   Karen's account.  And, you know, we said, Well, what should
16   we do with this?  And he said immediately, Hide it, get rid
17   of it.  Get rid of it and hide it.
18        Q.   Why is that?
19        A.   I don't know.  It was a little perplexing to me, you
20   know what I mean, why he said that.
21        Q.   Was that in connection with college planning?
22        A.   Yeah, I think so.  Maybe to not have the funds
23   available for possible aid, from a college standpoint.
24        Q.   Okay.  And how long was the meeting?
25        A.   Let's see.  My wife was there probably about 45
```

1    minutes.  She had an appetizer.  And then I think I stayed,

2    had my dinner and, you know, probably stayed another hour,

3    hour and a half.

4         Q.   And did you make a final decision about what to do

5    with your $80,000?

6         A.   I did not.  He said, Let me know what you want to

7    do.

8         Q.   Okay.  Was there any confusion about what you were

9    talking about, about the $80,000?

10        A.   No.  Discussed the final assets, you know.  Karen

11   had roughly 70, and I think, if I recall correctly, he said I

12   had close to 90 with the money I made with the small return

13   on it.  And then specifically he asked me how much my house

14   was worth.  I said my house is worth about four hundred.  And

15   he said, How much do you owe on it?  I said, Well, I owe

16   about three hundred.  He said, there's another hundred

17   thousand.  So, you know, I'm feeling pretty good that we got

18   a couple $100,000 liquid assets possibly.

19        Q.   Okay.  And what happened next with respect to your

20   money?

21        A.   We left.  And I was at work, I think the following

22   week, and I got a call from the SEC by the --

23        Q.   Now, don't tell me what they said to you.

24        A.   Okay.

25        Q.   But what was your reaction?

1    A.    I was blown away.  No.

2    Q.    Why were you blown away?

3    A.    Because I'd known Leon, trusted Leon with my money,

4    and, you know, there's no way he's not doing what he's

5    supposed to do or what we agreed on.

6    Q.    Okay.  And, so, what did you do?

7    A.    I got a little concerned and I called the guy who

8    initially referred me to Leon, Rob Kleinschmidt, and said --

9    Q.    Don't tell me what Rob said.

10   A.    Oh, I'm sorry.  Yep.

11   Q.    Okay.  What did you say to Rob?

12   A.    Just said I'm a little concerned about this.  And,

13   you know, at that point I really kind of decided to get my

14   money out of there.

15   Q.    Did you call anyone else?

16   A.    I called Leon.

17   Q.    Okay.  What did you say to him, what did he say to

18   you?

19   A.    I said -- well, first I called him, and he didn't

20   answer.  He said, Call you back in 20 minutes.

21   Q.    Now, take a look at the screen.  I've pulled up the

22   last page of the Government's Exhibit --

23   A.    I believe it's right there, yeah.

24   Q.    -- 309.  Is that what you're referring to?

25   A.    Yes.

1      Q.   Okay.

2      A.   Do you want me to read that back, as well.

3      Q.   Well, you said, Please give me a call.

4      A.   Yes.

5      Q.   And then what did he say?

6      A.   He said, Okay, give me 20 minutes or so.  And then I

7   say, Okay, talk to you then.

8      Q.   Okay.  And then what did you type next?  Looks like

9   about -- I guess that's July.  So let's stay in June.  Let's

10  stay in June.

11     A.   Yeah.

12     Q.   Let's stay in June.  We won't get to July just yet.

13  So tell the jury what happened in your June phone call.

14     A.   So Leon had called me back and we spoke.  And I

15  said, I just got a call from the SEC.

16     Q.   What did he say about that?

17     A.   He said, Oh -- and he totally downplayed it, Oh, you

18  know, they've been bothering me for four, five years now, I

19  can't get them off my back, you know.

20          I said, Well, do you want me to call them back or --

21          Call 'em if you want to, he says, but, you know,

22  it's no big deal.  It's no big deal.

23     Q.   Okay.  And what did you do?

24     A.   I felt, Okay.  You know, I trusted him.  He's a

25  friend of mine, registered broker, had all the individual

1  justification I was looking for from an investor, and I

2  didn't think about it.  I didn't call them back.

3      Q.   Did you at any point go down to his office?

4      A.   I left for a business meeting shortly after that,

5  down in -- I believe I was in Delaware.

6      Q.   Okay.

7      A.   And I went to call Leon back repeatedly with no

8  answer.  So, now I'm getting a little concerned.

9      Q.   Okay.

10     A.   I called his office, not there.

11     Q.   Who did you talk to?

12     A.   I talked to Barry Michitsch, his partner.

13     Q.   Okay.  Did you talk to any of the secretaries or

14  assistants?

15     A.   Nope.

16     Q.   Okay.

17     A.   Kept asking for Leon, Leon wasn't there, didn't know

18  where Leon was.  Finally got in touch with Barry, spoke to

19  him.  Say, Hey, I'm a little curious where my money is, these

20  are my accounts, I can't get in touch with Leon, I want to

21  move this over.  He says, Well, let me call you back.

22     Q.   Okay.

23     A.   So at this point, you know, three, four, five hours

24  go by.  Now, I've got eighty grand on the hook and I'm

25  thinking, you know, I want to know where my money is.  So he

1  doesn't call me back.  I call him four, five times.

2          He finally calls me back, says, Mike, we don't have

3  a record of your money, we don't know where it is.  So at

4  that point I think I made my way up to Ohio, had a business

5  call out there.  And he told me he would call me back the

6  following day.  He didn't call me.  I flew home, and at that

7  point I was going to go down to Lux Financial and find out

8  what was going on.

9      Q.   Did you go down?

10     A.   I did go down.

11     Q.   And did you find out what was going on?

12     A.   I did.  I had spoke with Barry, and I believe I

13  called the SEC on my way down to Lux.

14     Q.   Okay.

15     A.   And just to say that I had more concern about this

16  and would be willing to talk to them in greater detail.

17     Q.   Okay.  Without telling us what they said, do you

18  remember what you said?

19     A.   Yes, I basically said that I was concerned.  I'd

20  invested $80,000.  You know, the money didn't seem to be

21  available, and I was going down to Lux Financial now to find

22  out where it was.

23     Q.   Okay.  And were you able to find out what happened

24  to your $80,000?

25     A.   No, I didn't tell him I was coming.  I came down

1    there, and I spoke with Barry.  You know, I said what's going

2    on here?  He said, Mike, we have no money of your account.  I

3    don't know where it is, to be honest with you.

4             He said call the --

5             MR. EINHORN:  Objection, Your Honor.

6    BY MR. McGARRY:

7        Q.   Yeah.  Let's not hear what Barry said.

8        A.   Okay.

9        Q.   But was this -- for time frame, was this before or

10   after July 4?  Around when was this?

11       A.   This is probably July 7th, 8th, 9th.

12       Q.   Okay.  And what did you do next?

13       A.   I went down to The Investment Center to try to find

14   out where my money is.

15       Q.   To the Investment Center or to --

16       A.   I'm sorry, to Lux Financial, to find out where my

17   money is.  Spoke with Barry.

18       Q.   Without telling us what he said, what did you do

19   next?

20       A.   Then I called the SEC.

21       Q.   Okay.

22       A.   And had a conversation with them -- again,

23   explaining more detail.

24       Q.   Okay.

25       A.   And then I called The Investment Center per -- well,

```
 1    I called The Investment Center to speak with them, to see if
 2    they had any idea where my money was.
 3         Q.   How did you know to call The Investment Center?
 4         A.   Barry had instructed me to.
 5         Q.   Okay.  And did you call The Investment Center?
 6         A.   I did.
 7         Q.   And what did you tell them?
 8         A.   I told them I had concerns.  My money is supposed to
 9    be invested there and there's no record of it.
10         Q.   Did you then call somebody else?
11         A.   Yes, then I called the SEC back and --
12         Q.   What did you tell the SEC?
13         A.   I told them that I had just called The Investment
14    Center and they didn't have a record of my money.
15         Q.   Okay.  And what did you do after that?
16         A.   I think I called The Investment Center back and told
17    them I wanted my $80,000 back or I was going to threaten
18    legal action.
19         Q.   Okay.  And without telling me any conversation you
20    might have had with your own lawyer, did you more than
21    threaten legal action?
22         A.   Yes.
23         Q.   Okay.  What did you do?
24         A.   I just said I'm going to go public with this or I'm
25    going to threaten legal action unless you guys give me my
```

1    money back.

2        Q.   Okay.  Did at some point you get a call -- and

3    without telling anything that they said -- did you get a call

4    from the Postal Inspector or the FBI?

5        A.   Yes.

6        Q.   Approximately when was that?

7        A.   That's a good question.  Probably early, mid July.

8        Q.   Okay.  Let me scroll down.  I see this text here.

9    Can you read this text?

10       A.   Yes.  This is the point where -- you know, I knew my

11   money was not where it was supposed to be and I wanted to

12   move it over.  This is me, Michael Brough, writing to Leon

13   Vaccarelli:  Leon, I hope things are well with you and your

14   family.  Unfortunately, I have a family friend I'm going to

15   move my money to.  Do you know my account numbers for my

16   money?  Thanks, Mike.

17       Q.   Okay.  And scrolling down, there seems to be -- did

18   you get a response?

19       A.   Nothing.  Nothing at all.

20       Q.   Okay.  Did he at any point call you back?

21       A.   No, never.  That was the last correspondence I ever

22   had with Leon.

23       Q.   Okay.  And did you end up -- again, without telling

24   me anything lawyers might have said, did you end up taking up

25   legal action?

1    A.   I did, yes.

2    Q.   Okay.  And were you able to get some money back

3    through that legal action?

4    A.   Yes.

5    Q.   Okay.  Did you -- as you sit here today, were you

6    able to get any money from Mr. Vaccarelli?

7    A.   Absolutely not.

8    Q.   Okay.  Net-net, with all stuff, where are you in

9    regards to your $80,000?

10   A.   I'm minus about 30,000.

11   Q.   Okay.  And how much time and effort have you put in

12   to try to --

13   A.   A tremendous amount of time, effort, lack of sleep.

14   I mean, this killed me.  And this is all the money I had for

15   my retirement.  I was petrified from a tax standpoint after

16   talking with Keith Sullivan, saying we're going to have to

17   pay tax on this money because it's been taken out.  I didn't

18   know how it was going to affect my overall income, plus I had

19   no retirement.  I didn't know what else was going to happen.

20         So a lot of sleepless nights, a lot of stress and,

21   you know, a little bit of anger, because I had trusted Leon

22   with my money, and, you know, obviously he didn't do what he

23   told me he was going to do.

24   Q.   Knowing what you know now, would your investment

25   decision have be different?

1    A.   Totally.

2    Q.   How?

3    A.   I would have went to a bigger firm and got regular

4    statements on my account and find out where it was from the

5    day I gave the check over to weekly updates as to where the

6    money was.

7         MR. McGARRY:  If I could just have a minute, Your

8    Honor?

9         THE COURT:  Yes.

10        MR. McGARRY:  I have no more questions at this time,

11   Your Honor.

12        THE COURT:  Cross-examination.

13        MR. EINHORN:  Yes, Your Honor.

14        MR. McGARRY:  Thank you, Mr. Brough.

15                    CROSS-EXAMINATION

16   BY MR. EINHORN:

17    Q.   Good afternoon, Mr. Brough.  My name is Jon Einhorn.

18   I represent Leon Vaccarelli, and I'm just going to ask you a

19   couple questions here this afternoon.

20        MR. EINHORN:  May I have just a moment, Your Honor?

21        THE COURT:  Yes.

22        MR. EINHORN:  Sorry, Your Honor.  Technology is

23   great.

24        THE WITNESS:  I think we need some computer training

25   here, Your Honor.

1          MR. EINHORN:  That's right.  They don't do that in

2     law school.

3          THE COURT:  I bet they do.

4          MR. EINHORN:  They probably do now, you're

5     absolutely right.  They barely did typewriter training when I

6     was in law school.

7     BY MR. EINHORN:

8          Q.   I'm just going to ask you a few questions, Mr.

9     Brough.  First of all, I'm showing you a picture on the

10     screen of Signature's Restaurant.  You've been there with

11     Leon; right?

12          A.   Yes.

13          Q.   About how many occasions?

14          A.   I can't recall.  Quite a few.

15          Q.   Quite a few?

16          A.   Yeah.

17          Q.   And on those occasions, was Leon drinking?

18          A.   You know, I would go there because I had a good

19     relationship with the manager -- I believe his name was Marty

20     Devito -- and I had a good relationship with Leon, and I was

21     working for Paychex.  So I was always in the Waterbury area,

22     and I used to go there and kind of roost, and set up my

23     computer and, you know, have a selzer with water, and, you

24     know, sit at the bar and kind of do things.

25          And Leon would come down probably 1:30, 2:00, and

1   yes, he would have a drink.

2       Q.   And as a matter of fact, you would go drinking with

3   Leon, also, on occasion; isn't that so?

4       A.   We had a beer occasionally.

5       Q.   Sure.  I'm showing you a picture here, of course, of

6   Signature's.  But there were other locations where you went

7   drinking with Leon; isn't that so?

8       A.   Actually, I don't recall any.  I would say his

9   Christmas party.

10      Q.   How about Diorio's?  Do you remember going drinking

11  with Leon at Diorio's in Waterbury?

12      A.   Maybe.

13      Q.   How about the Webster [sic] Hills Golf Course?

14          MR. McGARRY:  Your Honor, I'm going to object as to

15  relevance.

16          THE COURT:  Overruled.

17          MR. EINHORN:  Thank you, Your Honor.

18  BY MR. EINHORN:

19      Q.   How about the Webster [sic] Hills Golf Course; did

20  you ever go drinking there with Leon?

21      A.   Sorry, the Western Hills Golf Course?

22      Q.   Yes.

23      A.   I might have went there and maybe had a beer.

24      Q.   What about Vasi's; do you remember drinking with

25  Leon there?

1    A.    No, not drinking there.  I remember having lunch.

2    Q.    And how about just in his office; do you remember

3  drinking with Leon in his office?

4    A.    No, never.

5    Q.    Do you know if he had alcohol in his office?

6    A.    I do not.

7    Q.    Do you remember if, in fact, there were decanters --

8  behind him in this picture, actually -- some liquor

9  decanters, there to his right?

10    A.    Do I remember those?  Being full or -- I'm not sure

11  what your question is.

12    Q.    Well, I don't know.  You identified this picture as

13  being an accurate picture of Leon in his office.

14    A.    Yes.

15    Q.    And, so, my question to you is:  Since you identify

16  this as being accurate and the picture includes liquor

17  decanters, do you remember those?

18    A.    I do not, offhand.

19    Q.    Okay.  All right.  You remember speaking -- well,

20  withdrawn.

21          Do you remember any occasions where Leon Vaccarelli

22  was severely intoxicated?

23    A.    Yes, at the meeting at Signature's.  I think

24  June 21, you know, he met my wife and I, and, you know, I

25  could see he was visibly intoxicated at the time.

1    Q.   Okay.  What does that mean, "visibly intoxicated" or
2    "severely intoxicated"?
3    A.   Not -- I just think that he'd been drinking.
4    Q.   Were you --
5    A.   He wasn't incapacitated, by any means, but you could
6    tell -- he wasn't incapacitated to the point where he was
7    stumbling walking, but you could tell he was inebriated.
8    Q.   Do you remember being interviewed by the FBI this
9    past April -- about a month ago?
10   A.   Yeah.
11   Q.   And do you remember how you described his condition
12   at that time?
13   A.   Yeah.  You know, he was visibly intoxicated and
14   maybe slurring his words a little bit.
15   Q.   Did you use the phrase "severely intoxicated"?
16   A.   I might have.
17   Q.   Okay.  Now, in terms of the documents that we went
18   through earlier, I'm not going to ask you to go through them
19   again, but you went through various documents with us here --
20   application forms and so forth?
21   A.   Yeah.
22   Q.   Did you review these before you signed them?
23   A.   Not extensively.  Again, I trusted him, so whatever
24   he told me I believed.
25   Q.   Okay.  So you didn't review them; right?

1     A.   No.

2     Q.   As a matter of fact, the Government just went

3  through some of the details of the documents, in particular

4  about not making payments to anybody except Pershing?

5     A.   Right.

6     Q.   And you didn't know that until recently; right?

7     A.   No.

8     Q.   Because you didn't review the documents?

9     A.   Well, I did -- Leon told me where to send the

10  checks, and I trusted him.

11     Q.   Okay.  Now, you also told us there came a time when

12  you -- sorry, my voice is a little weird -- there came a time

13  when you got a call from the SEC.  And, so, you also told us

14  that you went to Leon and said, Hey, Leon, what's this all

15  about?  And he --

16     A.   I called him, yes.

17     Q.   You called him, sorry.  You called him and said,

18  What's this all about?  And he told you at least that they'd

19  been bothering him.  Isn't it true he also said to you when

20  you said --

21          MR. McGARRY:  Objection, Your Honor.

22          THE COURT:  It will be hearsay if you are asking

23  what Mr. Vaccarelli told him.

24          MR. EINHORN:  That's what I asked, yes.

25          THE COURT:  Yes.  That objection is sustained.

1    BY MR. EINHORN:

2        Q.   All right.  Let me ask you this:  You told us a

3    little earlier what Mr. Vaccarelli said, right, to you?

4        A.   Yes.

5        Q.   And the comments that Mr. Vaccarelli said to you,

6    they included the comments "don't lie"; right?

7        A.   Don't what?

8        Q.   Don't lie?

9        A.   Oh, it wasn't specifically "don't lie."  It was

10   just, Call them if you want to, they've been bothering me for

11   four years, three years.  I don't specifically remember him

12   saying "don't lie."

13       Q.   Now, you know we're here this afternoon on a

14   criminal case; right?

15       A.   That's correct.

16       Q.   Okay.  And you know what that means -- he's being

17   charged with a crime; right?

18       A.   Yes.

19       Q.   Okay.  You brought a civil action against The

20   Investment Center; right?

21       A.   I did.

22       Q.   Okay.  It wasn't against Leon, but it was against

23   The Investment Center; right?

24       A.   Right.  But Leon was registered with The Investment

25   Center.

1    Q.   Thank you.  You beat me to the punch.  So you
2  brought this claim against The Investment Center.  And what
3  was the purpose of that claim?
4    A.   To retain my funds.
5    Q.   Sure.  And it was in the nature of a civil action,
6  right, not criminal?
7    A.   Yes.
8    Q.   Okay.  And in that, you obtained legal counsel from
9  New York?
10    A.   That's correct.
11    Q.   That's somebody who specializes in these cases?
12    A.   Right.
13    Q.   Yeah.  Okay.
14    A.   Do you want their name or --
15    Q.   No, that's all right.  It's probably not important
16  here.
17         So in the course of that action that you brought --
18  it was an arbitration; right?
19    A.   Yes.
20    Q.   And in that arbitration, did you win or did you
21  lose?
22    A.   I won.
23    Q.   Okay.  When you say you won, what does that mean?
24  What was the total award you got?
25    A.   Well, I can't say I totally won, but I got $80,000

1   back from The Investment Center, minus the lawyer's fees.

2       Q.   Okay.  Let's put the lawyer's fees aside for just a

3   second.  Is it fair to say that what you got back in this

4   arbitration from The Investment Center was the amount of

5   money that you lost with Leon?  Right?

6       A.   No.

7       Q.   Well, again, forgetting about the lawyer's fees, it

8   was about the same amount; wasn't it?

9       A.   Yes, prior to the lawyer's fees I guess it was.

10      Q.   Prior to the lawyer's fees.  All right.  And you

11  decided to hire a lawyer; right?

12      A.   Absolutely.

13      Q.   Okay.  And you had to pay your lawyer; right?  We do

14  charge.

15      A.   He doesn't work for free, unfortunately.

16      Q.   No.  I can't say I do, either.  So we all charge, so

17  you had to pay your lawyer?

18      A.   I did.

19      Q.   And the FINRA case, the arbitration that you brought

20  against FINRA, was that settled or was it ended by a

21  decision, a determination of an arbitrator?

22      A.   That's a good question.  I kind of left it up to my

23  attorney.  He told me what was going on and then finally told

24  me that they'd agreed to the pay the settlingment.

25      Q.   The settlement, meaning the total amount?

```
1       A.   That's correct.
2       Q.   Okay.  All right.
3            MR. EINHORN:  May I have just a moment, Your Honor?
4            THE COURT:  Yes.
5            (Counsel confers with Defendant.)
6            MR. EINHORN:  Nothing further, Your Honor.  Thank
7  you.  Thank you, sir.
8            THE COURT:  Thank you.  Redirect?
9            MR. McGARRY:  Briefly
10           MR. EINHORN:  Sure.
11                    REDIRECT EXAMINATION
12  BY MR. McGARRY:
13      Q.   Mr. Einhorn asked you about the money that you
14  received after bringing an action.  Did you get any
15  interest?
16      A.   No.
17      Q.   All right.  Had Mr. Vaccarelli represented to you
18  that you would get interest?
19      A.   Yeah, I would get a little bit of interest, he
20  said.
21      Q.   You also represented you had some tax consequences
22  for taking your money?
23      A.   Yes.
24      Q.   Okay.  Did you get any money for the tax
25  consequences?
```

1    A.   Nothing.

2    Q.   Okay.  When you were talking with Mr. Vaccarelli

3  previously, had he made any representations about the tax

4  consequences?

5    A.   No.

6    Q.   Did he tell you that you would be in an IRA and

7  there wouldn't be tax consequences, or there would be, or

8  what do you recall?

9         MR. EINHORN:  Objection, leading.

10        THE COURT:  Sustained.

11  BY MR. McGARRY:

12    Q.   All right.  What do you recall him telling you about

13  when you moved the money from the Scapa pension?

14    A.   From the Scapa pension?  He said I could put it in

15  the account, there wouldn't be any tax or penalties for it,

16  it would just be tied up in a separate account I could get to

17  if I needed it, and it would make a little bit of money.

18    Q.   Did that prove to be true or not true?

19    A.   That was inaccurate.

20    Q.   You were also asked a couple questions about that

21  June 21 meeting.  I think you testified that you never saw

22  Mr. Vaccarelli drink alcohol in his office; correct?

23    A.   Yes.

24    Q.   Okay.  You met with him in his office; didn't you?

25    A.   Yes.

```
1      Q.   And did you -- you met with him in the conference
2    room; correct?
3      A.   Yes.
4      Q.   Okay.  So did you have any trouble communicating
5    with him or understanding him when you were in his office?
6      A.   No.
7      Q.   Okay.  Was he coherent?
8      A.   Yes.
9      Q.   Did he make sense?
10     A.   Yes.
11     Q.   Was he drunk?
12     A.   No.
13     Q.   And were your investment decisions based on
14   conversations that you had with him in that office?
15     A.   Yes.
16          MR. McGARRY:  I have no more questions, Your
17   Honor.
18          THE COURT:  Anything further?
19          MR. EINHORN:  No, Your Honor.  Thank you.
20          THE COURT:  All right.  Mr. Brough, thank you very
21   much.  You are excused.  You may step down.
22          (Witness excused, 12:31 p.m.)
23          THE COURT:  Will the Government please call its next
24   witness?
25          MS. LARAIA:  Your Honor, the Government calls Susan
```

1   Rustic.

2          (Witness enters, 12:32 p.m.)

3          THE COURT:  All right.  Ms. Rustic, would you kindly

4   go to the witness stand over there, remain standing, raise

5   your right hand.

6          (SUSAN RUSTIC sworn, 12:32 p.m.)

7          COURTROOM DEPUTY:  Please be seated.  State your

8   name for the record, spelling your last name.

9          THE WITNESS:  Susan Elizabeth Rustic, R-U-S-T-I-C.

10          COURTROOM DEPUTY:  Can you please give the city and

11   state in which you reside?

12          THE WITNESS:  Terryville, Connecticut.

13          COURTROOM DEPUTY:  Thank you.

14          THE COURT:  You may proceed, Ms. Laraia.

15          MS. LARAIA:  Thank you, Your Honor.

16                         DIRECT EXAMINATION

17   BY MS. LARAIA:

18      Q.   Good afternoon, Ms. Rustic.

19      A.   Good afternoon.

20      Q.   I think you just testified you live in Terryville?

21      A.   Yes.

22      Q.   How long have you lived there?

23      A.   Since 2001.

24      Q.   Okay.  Ms. Rustic, do you work now or are you

25   retired?

1      A.    I'm retired.

2            THE COURT:  Could you please keep your voice up?

3      That bar across there is the microphone.

4            THE WITNESS:  Okay.

5            THE COURT:  Thank you.

6      BY MS. LARAIA:

7      Q.    Now, what kind of work did you do previously?

8      A.    Primarily, banking.

9      Q.    Okay.  Just to get right into why we're here, do you

10     know Leon Vaccarelli?

11     A.    I do.

12     Q.    And how did you meet Mr. Vaccarelli?

13     A.    I had received a retroactive cost-of-living

14     adjustment on a Workers' Comp. claim, and my attorney at that

15     time had referred me to Leon.

16     Q.    Okay.  Now, without getting into any conversations

17     between you and your attorney, did you trust that attorney

18     who referred you to Mr. Vaccarelli?

19     A.    I did.

20     Q.    And what was the purpose for him referring you to

21     Mr. Vaccarelli?

22     A.    To invest my money with him.

23     Q.    So what were you looking for, in terms of having

24     someone to your invest your money?

25     A.    I was looking for my money to grow, to gain

1    interest.

2        Q.   Okay.  And what was the purpose for your money --

3    what did you intend to do with it?

4        A.   I just intended to leave it there, to save it, to

5    put it away.  I had no intention of spending it.

6        Q.   For retirement?

7        A.   Yes.

8        Q.   Okay.  Now, approximately when did you first meet

9    Mr. Vaccarelli?

10       A.   My records indicate that I met Leon on March 6 of

11   2008.

12       Q.   And why is it that you have such a specific

13   recollection of the date?

14       A.   On that date, I wrote two checks from the money that

15   I had received.  One was made payable to ING, the other was

16   made payable to Pershing.  They were both dated March 6 of

17   2008.  I also recall that the first time I met with Leon I

18   asked my father to accompany me and it was his birthday.  His

19   birthdate is 3/6.

20       Q.   And that was your father's birthday?

21       A.   Yes, it is.

22       Q.   Now, those two checks that you talked about, were

23   those for the purpose of making investments through Mr.

24   Vaccarelli?

25       A.   Yes.  One was to purchase an annuity, the other was

1    to open a brokerage account.

2        Q.   Okay.  Now, the beginning of your relationship with

3    Mr. Vaccarelli, do you remember where his office was?

4        A.   Yes.  At that time it was on Bank Street in

5    Waterbury.

6        Q.   And where did you meet with Mr. Vaccarelli on that

7    first meeting?

8        A.   In his offices.

9        Q.   Okay.  And as your relationship continued -- or I

10   should just back up for a second.

11           Did you meet with Mr. Vaccarelli again after that

12   first meeting on March 6?

13       A.   Yes, I did.

14       Q.   And did you continue to meet with him over a period

15   of years?

16       A.   Yes.

17       Q.   And approximately how frequently would you say that

18   you met with Mr. Vaccarelli or spoke with him on the phone?

19       A.   It varied.  It depended upon my needs or if he

20   needed me to sign something.  It could run anywhere from a

21   couple times a month to maybe once a month to maybe more than

22   several times a month.

23       Q.   Okay.  Was it fair to say that it was multiple times

24   in a year?

25       A.   Yes, definitely.

1    Q.   Okay.  Now, how would you describe your relationship

2    with Mr. Vaccarelli from your first meeting with him and then

3    going forward over the years?

4    A.   As we got to know one another, we became quite

5    friendly.  Any time I called him or he called me, the

6    conversation more often than not would turn from a business

7    nature to a personal nature.  He would ask about me -- what I

8    was doing, how I was doing, how my family was.  In turn, he

9    shared personal information with me.

10        When my husband passed away in December of 2011,

11   Leon attended his memorial service.  Leon had never met him.

12   When my dad passed away in January of 2016, Leon called me at

13   home to express his condolences, and he said that he was

14   going to try to make the memorial service because it was in

15   downtown Waterbury.

16   Q.   Okay.

17   A.   I don't know if he did or not.  On another occasion,

18   he asked me if I would be interested in working as a nanny

19   for him.

20   Q.   And is it your understanding that he has children?

21   A.   Yes.

22   Q.   Did he share that with you?

23   A.   Yes, I knew from speaking with him that he had a

24   large family.

25   Q.   Did you decide to become a nanny for his children?

```
1        A.   I did not.

2        Q.   Okay.  Did you ever attend any Christmas parties?

3        A.   I did.

4        Q.   And just describe those for us.

5        A.   It was a large function.  The first couple of years

6    I knew Leon, I didn't attend -- my husband wasn't interested.

7    After my husband passed away, I decided I would go.  I really

8    didn't know anyone.  It was uncomfortable.  But then I

9    started meeting people.  It was an open buffet, an open bar.

10   There was entertainment, dancing.  That was pretty much it.

11       Q.   Okay.  Is it fair to say that you were friends with

12   Mr. Vaccarelli?

13       A.   I considered Leon Vaccarelli a friend of mine, and I

14   believed that he considered me a friend of his, as well.

15       Q.   Okay.  Now, just to focus a little bit on your

16   investments.  So at any point did you open an account with

17   The Investment Center through Mr. Vaccarelli?

18       A.   Yes.

19       Q.   And did you have investments with The Investment

20   Center?

21       A.   I did.

22       Q.   Okay.  I'm going to show you Government's Exhibit

23   650B.

24            MS. LARAIA:  I understand there's no objection.

25            MR. EINHORN:  No objection, Your Honor.
```

1           THE COURT:  All right.  Full exhibit.

2           MS. LARAIA:  I'd ask that that be admitted.

3    BY MS. LARAIA:

4      Q.   All right.  I'm going to highlight the first --

5    sorry, let me make this a little larger.

6           Now, is this a document with The Investment Center

7    on the top left?

8      A.   It is.

9      Q.   And what was your understanding of what The

10   Investment Center was?

11     A.   The Investment Center was a large firm that handled

12   all types of investments.  A brokerage firm.

13     Q.   And what was your understanding of what Mr.

14   Vaccarelli's relationship was to The Investment Center?

15     A.   He worked as an agent for them.

16     Q.   And do you see your name on this document?

17     A.   I do.

18     Q.   Is that where I've just tried to highlight,

19   anyways?

20     A.   Yes.

21     Q.   And what was it here that you were attempting to do

22   or was attempting to be done with this form?

23     A.   It was purchasing an annuity.

24     Q.   And do you remember where that annuity was?

25     A.   Pardon me?

1    Q.   Do you remember what company that annuity was

2    with?

3    A.   Now it's with Prudential.  There have been a couple

4    of changes over the years, but it's with Prudential.

5    Q.   Okay.  I'm just going to highlight again another

6    section here.  What kind of annuity was it, just based on

7    this form?

8    A.   A variable annuity.

9    Q.   All right.  Looking down at the bottom here, do you

10   see the name Leon Vaccarelli?

11   A.   I do.

12   Q.   And do you recognize the signature?  I'll just

13   highlight the signature here.

14   A.   It's hard to recognize, but it looks like his

15   signature.

16   Q.   And "his" being Mr. Vaccarelli?

17   A.   Yes.

18   Q.   Would you tell us the date next to that signature?

19   A.   April 17 of 2012.

20   Q.   Okay.  Let me turn to page 3.  Did you also sign

21   this document?

22   A.   I did.  That's my signature.

23   Q.   That's your signature.  And is that also the same

24   date?

25   A.   Yes, but that's not my writing.

```
1      Q.   So this -- I'm just going to highlight this.  So
2   4/17/12, was that your writing?
3      A.   No, it's not.
4      Q.   But the signature right here, was that your
5   signature?
6      A.   Yes, it is.
7      Q.   Okay.  And did you receive or did you have to fill
8   out or have an application filled out to obtain this
9   annuity?
10     A.   Yes, I believe I did.
11     Q.   Okay.  I'm just going to highlight the top of this
12  document.  Can you just read the title of the document
13  here?
14     A.   It says:  Prudential Premier Retirement Variable
15  Annuity Application Form.  Annuities are issued by Pruco Life
16  Insurance.
17     Q.   And was this your application?
18     A.   Yes, it is.
19     Q.   Okay.  And was your application ultimately approved
20  for the annuity?
21     A.   Yes, it was.
22     Q.   In addition to this Prudential annuity, did you have
23  any other investments with The Investment Center?
24     A.   I did.
25     Q.   And, specifically, did you have a brokerage
```

1    account?

2         A.   Yes, I had a brokerage account.

3         Q.   Now, in the course of your relationship with Mr.

4    Vaccarelli, did you provide information to him about your

5    assets?

6         A.   I did.

7         Q.   All of your assets?

8         A.   Yes, I did.

9         Q.   And what was the purpose of that?

10        A.   Pardon me?

11        Q.   What was the purpose of giving him that

12   information?

13        A.   In order for him to estimate what he was going to

14   invest on my behalf.

15        Q.   Okay.  Now, let's just get to that.  What control

16   did you give Mr. Vaccarelli over your investments at The

17   Investment Center?

18        A.   I pretty much gave him full control.

19        Q.   And what did you tell him, specifically?  What did

20   you tell him about what authority he had to make investments

21   on your behalf?

22        A.   I told him that he had full authority.

23        Q.   Okay.  And why was it that you gave him that

24   authority?

25        A.   I trusted him.

1    Q.   Did you ever tell him that you trusted him?

2    A.   I did.  On one occasion, he called me at home to

3    tell me he was making a change in my portfolio.  At that

4    time, I told him I trusted him implicitly and he thanked

5    me.

6    Q.   Okay.  And you said he called to make a change to

7    your portfolio.  Was that in your investment account?

8    A.   Something to do with my investment account.  I don't

9    recall what it was specifically.

10   Q.   And did he periodically call you to tell you if he

11   was going to invest in something different or make a change?

12   A.   Occasionally, he would, yes.

13   Q.   And did you generally take his advice?

14   A.   I did.

15   Q.   At any point, did you discuss with Mr. Vaccarelli an

16   investment strategy?

17   A.   Yes, when I first met with him.

18   Q.   And what was it that you told him?

19   A.   He explained -- he had asked me if there was -- if I

20   wanted to earn a lot of interest, it would be high risk.  Or

21   I just wanted something at a low interest rate, at a lower

22   risk factor or if I wanted something moderate.  I wanted to

23   earn interest but I didn't want anything high risk, so I told

24   him I wanted to invest my money somewhere middle of the

25   road.

1    Q.   All right.  So, a moderate risk?

2    A.   Yes.

3    Q.   Okay.  Now, just fast-forwarding a little bit.  At

4  some point in 2015, did Mr. Vaccarelli present you with a

5  specific investment opportunity?

6    A.   He did.

7    Q.   And what was that?

8    A.   He called me at my home and told me that he could

9  get a great rate on a CD -- 7 percent on a 36-month CD.

10   Q.   Just based on your experience in the banking world,

11 what is a CD, if you know?

12   A.   Certificate of Deposit.

13   Q.   And what is your understanding of how a CD works?

14   A.   It's for a specific length of time at a specific

15 rate that you earn interest.

16   Q.   Okay.  And how was it that you received this

17 information from Mr. Vaccarelli that this was an opportunity

18 for you?

19   A.   I don't understand your question.

20   Q.   I'll rephrase that.  Did you meet with him in person

21 or did you talk to him in some other way?

22   A.   Initially, we spoke on the phone.

23   Q.   Okay.  And did you make the phone call to him or did

24 he make the phone call to you?

25   A.   He made the phone call to me.

1    Q.   Okay.  At any point, did you meet with Mr.

2  Vaccarelli about that same potential investment

3  opportunity?

4    A.   I did.

5    Q.   And what do you remember about meeting with Mr.

6  Vaccarelli?

7    A.   Prior to meeting with him, I asked him if I had -- I

8  asked him how much money he was thinking about investing, and

9  he told me a hundred thousand dollars.  And I asked him if I

10  would have enough money on hand in my brokerage account in

11  order to make my monthly draw to cover my living expenses.

12  He assured me I did.

13       From that point, I did meet with him in the office.

14  I believe the first time I met with him, I had to sign

15  paperwork.

16    Q.   Okay.  Let's just back up for a second.  So, you

17  mentioned a monthly draw.  So, what was that?

18    A.   That was an amount that I withdrew from my account,

19  my brokerage account at The Investment Center, and that was

20  to cover my living expenses.

21    Q.   So, you asked him whether if you tied up this

22  $100,000 you would have enough to continue taking that

23  money?

24    A.   For the next three years.

25    Q.   And was it your understanding that the money would

1    be tied up for 36 months if you decided to go with that

2    investment?

3        A.    Yes.

4        Q.    Okay.  Now, let's just go to the meeting in person.

5    Was that at his office?

6        A.    Yes, it was.

7        Q.    And do you remember at that point where his office

8    was located?

9        A.    On Leavenworth Street in Waterbury.

10       Q.    And had you been to that office previously?

11       A.    I had.

12       Q.    Tell us what you remember about that first meeting.

13       A.    I believe the first meeting was signing paperwork

14   over, him telling me where he was taking the money from in

15   order to purchase the CD.

16       Q.    Okay.  Did he explain the investment to you again?

17       A.    Just that it was a 36-month CD at 7 percent.

18       Q.    And 7 percent per year?

19       A.    Yes.

20       Q.    Okay.  Was there anything different about the

21   description that Mr. Vaccarelli gave you in the office, as

22   opposed to what he had told you on the phone?

23       A.    No.

24       Q.    Okay.  At that point, did you sign any documents?

25       A.    Yes, I believe I did.

1    Q.   Okay.  Did you have the $100,000 in cash or did you

2    have to take it out from somewhere else?

3    A.   $30,000 of it was taken from my annuity, and $70,000

4    of it was taken from my brokerage account.

5    Q.   Okay.  Now, I'm going to show you Government's

6    Exhibit 8.

7         MS. LARAIA:  And I believe there's no objection, so

8    I'd ask that it be admitted.

9         MR. EINHORN:  No objection.

10        THE COURT:  Okay.  8 is a full exhibit.

11   BY MS. LARAIA:

12   Q.   Okay.  And you said that $30,000 came from

13   somewhere.  Where was that?

14   A.   From my annuity with Prudential.

15   Q.   Okay.  Now, this first page, does this appear to be

16   a cover sheet -- a fax cover sheet, specifically?

17   A.   Yes, it does.

18   Q.   Did you fax this yourself?

19   A.   I did not.

20   Q.   Okay.  I just want to focus on this letterhead at

21   the top.  Do you see where it says Lux Financial Services?

22   A.   I do.

23   Q.   What was Lux Financial Services?

24   A.   That was the company -- that Leon's company.

25   Q.   Okay.  And how about this address, 49 Leavenworth

1    Street?

2        A.    That was the date of -- the address of his

3    business.

4        Q.    Okay.  And who is this fax addressed to?

5        A.    Prudential Annuities Center.

6        Q.    And who does it indicate that it's from?

7        A.    Leon Vaccarelli.

8        Q.    And it's regarding who?

9        A.    Susan Rustic.

10       Q.    Okay.  And, to the best of your knowledge, is this

11   your account number?

12       A.    I'm assuming it is.

13       Q.    Okay.  And the date here, what is that?

14       A.    11/19/15.

15       Q.    Is that at or about the time that you met with Mr.

16   Vaccarelli?

17       A.    That's the date I met with him the first time.

18       Q.    Okay.  So that was your first meeting at his

19   office?

20       A.    Right, regarding this matter.

21       Q.    Regarding this matter.  And in the Comment section,

22   what does that say?

23       A.    "Partial withdrawal."

24       Q.    Okay.  And is that what this was?

25       A.    Yes.

1    Q.   Okay.  So there was still some money remaining in
2    the annuity; is that correct?
3    A.   Yes.
4    Q.   Okay.  Okay.  I'm going to scroll through this.  I
5    just want to highlight right here.  Do you see that annuity
6    number E, and then there's a redaction, 5590?
7    A.   I can't read it.
8    Q.   I'm going to make this a little bit bigger if I can.
9    There we go.
10   A.   Yes.
11   Q.   Okay.  And, again, your name right below that?
12   A.   Yes.
13   Q.   Okay.  I just want to focus on this top section
14   right here.  Do you see where it says section -- I'm going
15   try to make it a little bigger -- "Section 6:  Payment and
16   Mailing Instructions," the very top?
17   A.   Yes.
18   Q.   Okay.  What was your understanding of how this
19   money -- or I should back up for a second.
20        What was going to happen specifically with the money
21   from the Prudential annuity?
22   A.   That he withdraw?
23   Q.   Yes.
24   A.   That it was going to be invested in a Certificate of
25   Deposit.

1    Q.   Before we get there -- so you were going to give a

2    $100,000 to Mr. Vaccarelli to invest; is that right?

3    A.   Yes.

4    Q.   Okay.  And that money came partly from Prudential?

5    A.   Yes.

6    Q.   And partly from somewhere else?

7    A.   Right.

8    Q.   Did this money, this $30,000 from Prudential, go

9    directly to Mr. Vaccarelli or did it do something else?

10   A.   No, it was deposited into my checking account.

11   Q.   Okay.  And, so, I just want to talk about how that

12   happened.  What was your understanding of how the money was

13   going to be deposited into your checking account?

14   A.   The $30,000 was deposited via an ACH transaction.

15   Q.   Okay.  And is that -- let's just look at the section

16   here.  Do you see where it says direct deposit ACH to a

17   bank?

18   A.   Yes.

19   Q.   Okay.  And what is the bank name listed there?

20   A.   Thomaston Savings Bank.

21   Q.   And did you have an account at Thomaston Savings

22   Bank?

23   A.   I did.  My checking account.

24   Q.   And do you see the voided check in the middle of the

25   page?

```
1     A.   Yes.

2     Q.   Whose check was that?

3     A.   That was my check.

4     Q.   Okay.  And is that your -- was that a check from

5   your bank account at the Thomaston Savings Bank?

6     A.   It is.

7     Q.   And is that where those funds were sent?

8     A.   Yes.

9     Q.   And, again, I just want to go down to page 8.  Is

10  this your signature on this page?

11    A.   It is.

12    Q.   And what is the date?

13    A.   11/19/2015.

14    Q.   And, again, was that the date of your meeting with

15  Mr. Vaccarelli, the first in-person meeting for this

16  transaction?

17    A.   It is.

18    Q.   I want to show you Government's Exhibit 652.

19         MR. EINHORN:  No objection.

20         THE COURT:  Full exhibit.

21         MS. LARAIA:  Thank you, Your Honor.

22  BY MS. LARAIA:

23    Q.   Do you recognize this document?

24    A.   I do.

25    Q.   And what is this?
```

1    A.   It's a document from Prudential regarding my
2  annuity.  My portfolio.
3    Q.   Is this an account statement like you'd received
4  from the annuity?
5    A.   Yes.
6    Q.   Okay.  I just want to zero-in on a couple parts
7  here.  So, what's the statement date?
8    A.   October 1, 2015 through December 31, 2015.
9    Q.   Okay.  And I want to highlight something, or I guess
10  enhance something right below it.  Does it indicate here who
11  your financial professional was?
12    A.   Leon W. Vaccarelli.
13    Q.   And does it say "The Investment Center" with an
14  address, then Leon's address in Waterbury?
15    A.   Yes.
16    Q.   Okay.  Now, focusing on this middle section, where
17  it says "Your Portfolio," do you see the beginning account
18  balance for this particular statement period?
19    A.   I do.
20    Q.   And what was that?
21    A.   $345,021.23.
22    Q.   Okay.  And do you see any withdrawals for this
23  particular period?
24    A.   There was a $30,000 withdrawal.
25    Q.   Okay.  And, again, what happened to that $30,000?

1   Where did it go?

2        A.   It went into my checking account.

3        Q.   Okay.  Now, where did the other $70,000 to make up

4   your hundred thousand dollars' investment come from?

5        A.   It came from my brokerage account with The

6   Investment Center.

7        Q.   Okay.  I'm going to show you Exhibit 1A.

8             MR. EINHORN:  No objection, Your Honor.

9             THE COURT:  Full exhibit.

10  BY MS. LARAIA:

11       Q.   Do you recognize this document?

12       A.   I do.

13       Q.   What is this?

14       A.   It's my monthly account statement from The

15  Investment Center.

16       Q.   Okay.  And is this your brokerage account?

17       A.   It is.

18       Q.   I'm going to highlight a section here.  Okay.  Can

19  you read who your investment professional is?

20       A.   Vaccarelli, slash, Michitsch.

21       Q.   Who is Michitsch, if you know?

22       A.   That's Barry Michitsch.  He was Leon's former

23  partner.

24       Q.   And how do you -- did you know Barry through Mr.

25  Vaccarelli?

1    A.    I knew of him.

2    Q.    And does he do anything for you now?

3    A.    He does.

4    Q.    And what is that?

5    A.    He handles my portfolio.

6    Q.    Was Mr. Michitsch involved at all in your meetings

7    and conversations with Mr. Vaccarelli about this $100,000,

8    36-month --

9    A.    He was not.

10    Q.    Did you talk to anyone other than Mr. Vaccarelli

11    about that investment?

12    A.    No.

13    Q.    Just to focus on another part of this page, what's

14    the beginning account value for this period?

15    A.    $323,084.84.

16    Q.    And do you see any withdrawals?

17    A.    $73,000 withdrawal.

18    Q.    And what was the $73,000, if you know?

19    A.    $3,000 of that is what I was withdrawing monthly for

20    my living expenses.  The other $70,000 was what was given to

21    Leon for the $100,000 Certificate of Deposit, along with the

22    $30,000 that was taken from my annuity.

23    Q.    Now, I'm just going to highlight here.  At the

24    bottom of page 8, do you see the three -- we'll start

25    11/2/15.  Do you see a transaction on that date?

1    A.   Yes, I do.

2    Q.   And what is the amount of that transaction?

3    A.   $3,000.

4    Q.   And just tell us again, what's that $3,000 for?

5    A.   That's to cover my monthly expenses, my living

6    expenses.

7    Q.   Okay.  And that was the money that you were -- that

8    was the monthly amount that you were asking Mr. Vaccarelli

9    whether you'd have enough money to cover?

10   A.   That's correct.

11   Q.   Okay.  Now, let's look down at 11/24/15.  What's the

12   amount of that withdrawal?

13   A.   $70,000.

14   Q.   And now let's just focus on the middle.  Can you

15   read what that says?

16   A.   "Check disbursement."

17   Q.   Okay.  And how about the column next to that.

18   Except for -- let's just start with "As per your request"?

19   A.   As per your request, overnight delivery.

20   Q.   Okay.  "As per your request via overnight

21   delivery"?

22   A.   Right.

23   Q.   Okay.  Now, I'm going to show you Government's

24   Exhibit 1C?

25        MR. EINHORN:  No objection, Your Honor.

```
1              THE COURT:  Full exhibit.

2              MS. LARAIA:  Thank you, Your Honor.

3     BY MS. LARAIA:

4         Q.   Now, do you recognize this?

5         A.   I do.

6         Q.   What is this?

7         A.   This was a check that was drawn on Pershing from my

8     brokerage account with The Investment Center for $70,000.

9         Q.   So this is a check -- this check represents the

10    $70,000 withdrawal from your account?

11        A.   It does.

12        Q.   And how did you receive this check?

13        A.   I received it via Express Mail.

14        Q.   At your home?

15        A.   At my home.

16        Q.   And where was your home at the time?

17        A.   I reside at 13 Holt Street, Unit 86, in Terryville,

18    Connecticut.

19        Q.   Okay.  Now, just looking at the bottom.  The back of

20    the check.  Did you endorse the check?

21        A.   I did.

22        Q.   Is that your signature?

23        A.   It is.

24        Q.   And, so, what did you do with that check after you

25    received it?
```

```
1        A.   I deposited it into my checking account with
2    Thomaston Savings Bank.
3        Q.   Okay.  I'm going to show you Government's Exhibit
4    654.
5             MS. LARAIA:  I'm going to ask that be full, Your
6    Honor.
7             MR. EINHORN:  No objection, sorry.
8             THE COURT:  Full exhibit.
9    BY MS. LARAIA:
10       Q.   Do you recognize this document?
11       A.   I do.
12       Q.   Okay.  Do you remember how or where this document
13   came from?
14       A.   I believe that's -- well, it's hard to tell with
15   what --
16       Q.   Sorry about that.
17       A.   -- I'm seeing here.  It's a copy of my checking
18   account statement.
19       Q.   Okay.  And did you obtain that statement?
20       A.   Yes, I did.
21       Q.   And which bank was this statement for?
22       A.   Thomaston Savings Bank.
23       Q.   All right.  I'm just going to make the top of this a
24   little bigger here.  What's the statement date here?
25       A.   11/30 of 2015.
```

1       Q.   Okay.  Now, I just want to highlight this bottom

2  section.  Focusing your attention on that transaction on 11/3

3  that I'm highlighting, do you see any deposit?

4       A.   $3,000.

5       Q.   And what was that, if you know?

6       A.   It was what I withdrew from my brokerage account on

7  a monthly basis that was deposited into my checking

8  account.

9       Q.   Okay.  Now let's go to the second page.  Would you

10  just read off what the first transaction is for 11/24?

11      A.   "External deposit, Pruco Life of Arizona payment."

12      Q.   And what's the amount of that deposit?

13      A.   $30,000.

14      Q.   And, again, how was that deposit made?

15      A.   It was made via ACH.

16      Q.   And, now, looking down to 11/25, there are number of

17  transactions, but do you see a transaction that's highlighted

18  that says "deposit"?

19      A.   Yes, for $70,000.

20      Q.   And what was that?

21      A.   That was the check that I received.

22      Q.   Okay.  Now, I'm going to show you Government's

23  Exhibit 658.

24           MR. EINHORN:  No objection, Your Honor.

25           THE COURT:  Full exhibit.

```
 1              MS. LARAIA:   Thank you, Your Honor.
 2   BY MS. LARAIA:
 3       Q.   So what did you do -- or, sorry, I'll strike that.
 4            Do you recognize this document?
 5       A.   I do.
 6       Q.   What is this?
 7       A.   It's a check from my checking account.
 8       Q.   Okay.  And what is the purpose of this check?
 9       A.   This check was what I gave Leon in order to invest
10   in the 36-month CD.
11       Q.   Okay.  And what's the date of that check?
12       A.   November 27, 2015
13       Q.   And the amount?
14       A.   $100,000.
15       Q.   And do you see this middle part here, where it says
16   "Pay to the order of"?
17       A.   I do.
18       Q.   And what does that say?
19       A.   "LWLVACC, LLC."
20       Q.   Is that your handwriting?
21       A.   It is.
22       Q.   Okay.  Why did you put LWLVACC on that check?
23       A.   That's what Leon instructed me to do.
24       Q.   Where were you when Mr. Vaccarelli told you to put
25   LWLVACC on the check?
```

1    A.   In his conference room at his office.

2    Q.   Now, did you have more than one meeting with Mr.

3    Vaccarelli about this investment -- more than one in-person

4    meeting?

5    A.   Yes, on the 19th and then again the day I wrote the

6    check.

7    Q.   Okay.  So, November 27 you would have had another

8    meeting with Mr. Vaccarelli?

9    A.   Yes.

10   Q.   Is this your signature at the bottom here?

11   A.   It is.

12   Q.   Okay.  And is there any specific instruction you

13   gave to Mr. Vaccarelli when you gave him this check?

14   A.   I did.

15   Q.   What was that?

16   A.   I told him not to deposit the check -- not to

17   negotiate it until funds were good because I had just

18   deposited the $70,000 check.

19   Q.   Okay.  So, you wanted to make sure the money

20   cleared?

21   A.   I wanted to make sure funds were available before he

22   deposited that check.

23   Q.   Now, looking at the bottom part of this exhibit,

24   what does that say?  I know it's sideways, but what does that

25   say?

1    A.   It stands for "deposit only."

2    Q.   And there's an account 7051.  Do you see that?

3    A.   I do.

4    Q.   Did you write "deposit only" or "7051"?

5    A.   I did not.

6    Q.   And did you know -- are you familiar with the

7    account number 7051?

8    A.   I am not.

9    Q.   Now, in this second meeting with Mr. Vaccarelli,

10   just describe for us what your conversation with him was.

11   A.   When I first sat down with him, I asked him if I

12   should make the check out to Lux Financial Services, and he

13   told me no.  He instructed me to make the check out to

14   LWLVACC, LLC, and I did.

15   Q.   Did he tell you anything about what LWLVACC is or

16   was?

17   A.   He just told me that it was another one of his

18   business accounts.

19   Q.   And who was present for this meeting with you and

20   Mr. Vaccarelli?

21   A.   It was just the two of us.

22   Q.   Okay.  Like your other meeting, as well?

23   A.   Yes.

24   Q.   Now, I want to show you what's been marked

25   Government's Exhibit 657.

| | |
|---|---|
| 1 | MR. EINHORN:  No objection, Your Honor. |
| 2 | THE COURT:  Full exhibit. |
| 3 | BY MS. LARAIA: |
| 4 | Q.   Okay.  And I want to scroll down -- oops. |
| 5 | Okay.  Do you recognize your signature on this |
| 6 | document? |
| 7 | A.   I do.  That's my signature. |
| 8 | Q.   And what is the date on that document? |
| 9 | A.   11/27/2015. |
| 10 | Q.   Is that the same date as the date of your check for |
| 11 | a $100,000? |
| 12 | A.   It is. |
| 13 | Q.   Is that the same date that you had met, to the best |
| 14 | of your knowledge and recollection, with Mr. Vaccarelli? |
| 15 | A.   Yes. |
| 16 | Q.   And do you remember this document? |
| 17 | A.   Vaguely. |
| 18 | Q.   Okay.  Do you remember going through this document |
| 19 | with Mr. Vaccarelli? |
| 20 | A.   No, I don't. |
| 21 | Q.   Okay.  Now, in your meetings with Mr. Vaccarelli, |
| 22 | did he ever have documents for you to sign? |
| 23 | A.   He did. |
| 24 | Q.   And would he go through all of the documents page by |
| 25 | page? |

1    A.   No, not necessarily.  Most of the time he would

2  have -- he would put a document in front of me, it would be

3  turned to the last page, and told me he needed my signature

4  there.  Other times it was marked with one of the tags, with

5  a "sign here" sticker on it.

6    Q.   Do you remember whether Mr. Vaccarelli went through

7  this with you?

8    A.   I don't believe he did.

9    Q.   Okay.  And, so, you said sometimes he'd have little

10  sticky notes that say to "sign here"?

11    A.   Uh-huh.

12    Q.   Or he'd have it turned to the last page.  Did you

13  sign documents like that?

14    A.   Yes, I did.

15    Q.   And why did you sign them?

16    A.   He told me he needed my signature, and I trusted

17  him.

18    Q.   And why was it that you trusted him?

19    A.   He never gave me a reason not to until -- to that

20  point.  He had always taken an interest in my financial

21  affairs and my personal affairs.

22    Q.   And this is -- and at this point, how would you

23  describe your relationship with Mr. Vaccarelli?

24    A.   At this point --

25    Q.   At this point in November, 2015

1     A.    Fine.

2     Q.    I just want to focus a little on this agreement --

3  or on this document, rather.  What is the title of this

4  document?

5     A.    Private Direct Investment Agreement.

6     Q.    And, if you would, would you please read for us this

7  first paragraph here?

8     A.    "Agreement by and between LWLVACC, LLC -- in

9  parentheses, "Leon Vaccarelli" -- "whose principal mailing

10 address is 49 Leavenworth Street, Waterbury, Connecticut

11 06702, hereinafter referred to as 'the advisor,' in

12 quotations, "and one or more 'clients'" -- client in

13 quotations.

14    Q.    Okay.  Let's just go down to the second section

15 here.  Do you see where it says "investment programs"?

16    A.    I do.

17    Q.    And there are a number of items with open boxes?

18    A.    Yes.

19    Q.    I'm just going to highlight this section in the

20 middle.  Would you read that one, please?

21    A.    "Separately managed accounts, 36-month Senior Note,

22 7 percent per annum, no liquidity of principal."

23    Q.    Did Mr. Vaccarelli ever describe for you this

24 investment, this hundred thousand dollars' investment, as a

25 36-month Senior Note?

1    A.    No, he did not.

2    Q.    Had you ever, before preparing for trial, had you

3    ever heard that term "Senior Note"?

4    A.    No, I have not.

5    Q.    What, specifically, did Mr. Vaccarelli tell you that

6    he would use your $100,000 for?

7    A.    A 36-month CD at 7 percent.

8    Q.    Okay.  Seven percent per year?

9    A.    Yes, per annum.

10    Q.    Okay.  Did you receive any kind of marketing

11    materials or any kind of prospectus from Mr. Vaccarelli when

12    you made this investment with him?

13    A.    Regarding this?

14    Q.    Regarding this investment.

15    A.    No, I did not.

16    Q.    Did he explain any risk of your $100,000

17    investment?

18    A.    No, he did not.

19    Q.    What was your understanding about whether there was

20    any risk?

21    A.    I didn't understand that there would be any risk

22    involved.  Generally, a Certificate of Deposit has no risk.

23    Q.    So you expected to earn 7 percent per year?

24    A.    Yes, I did.

25    Q.    At any point, did you receive statements from Mr.

1   Vaccarelli about this 36-month CD earning 7 percent per

2   year?

3       A.   No, I didn't.

4       Q.   Did you ever receive any interest payments?

5       A.   I did not.

6       Q.   At any point, did that raise a question for you?

7       A.   No, it didn't.

8       Q.   And why was that?

9       A.   I just figured that at the end of the 36 months I

10  would receive something.  I would probably be getting a phone

11  call from Leon, telling me it had matured and we were going

12  to do thus-and-so with the money at that point.

13      Q.   Okay.  For other investments like your brokerage

14  account at The Investment Center, did you receive a

15  statement?

16      A.   Yes, I did.

17      Q.   And about how frequently would that occur?

18      A.   On my brokerage account, I received it on a monthly

19  basis.

20      Q.   And just to go back to the investment in the

21  36-month CD, did you ever receive any statement?

22      A.   I did not.

23      Q.   Okay.  At any point, was there any question in your

24  mind about this $100,000 invested in the 36-month CD?

25      A.   Yes, there did come a point.

1    Q.   And how did that happen?

2    A.   I received a phone call from the SEC.

3    Q.   Okay.  And without telling us what they said to you,

4    what did you do after you received that call?

5    A.   I called Leon.

6    Q.   And did you get him on the phone?

7    A.   I did.

8    Q.   Describe for us your conversation.

9    A.   I told him that I had just received a disturbing

10   phone call.  And he said, Oh, from whom?  And I told him the

11   SEC had called.  And he asked me for what -- or, What did

12   they want?

13   Q.   And what did you tell him?

14   A.   I told him that I had received a call, and they told

15   me that --

16          MR. EINHORN:  Objection, Your Honor.

17          THE COURT:  Let's not talk about what they told you,

18   just whether you acted based on what they had told you.

19          MS. LARAIA:  Your Honor, I think the witness is

20   testifying about what she told Mr. Vaccarelli.

21          THE COURT:  No.  "And they told me that" -- that's

22   where we stopped.

23          MS. LARAIA:  Yes, Your Honor.  But she's relating

24   what she --

25          THE COURT:  Why don't you ask the question again

1    that clarifies who's saying what to whom.

2              MS. LARAIA:  Yes, Your Honor.

3    BY MS. LARAIA:

4        Q.   Turning to your conversation with Leon -- so let me

5    back up.  After you received the call from someone at the

6    SEC, you called Leon?

7        A.   Yes, I did.

8        Q.   And what did you say to him?

9        A.   I told him I had just received a disturbing phone

10   call.

11       Q.   And what was his response?

12       A.   He said, Oh, from whom?

13       Q.   And what did you tell him?

14       A.   The SEC.

15       Q.   Okay.  Did he say anything when you told him it was

16   the SEC?

17       A.   Oh, what did they want?

18       Q.   And what did you tell Leon?

19       A.   I told Leon that they called me because they wanted

20   to know --

21             MR. EINHORN:  Objection, Your Honor.

22             MS. LARAIA:  Your Honor, I think she's relating what

23   Mr. Vaccarelli said, and it's relevant in terms of --

24             THE COURT:  That's not what she's saying.

25             MS. LARAIA:  It's not offered for the truth, Your

1    Honor.  It's offered for Mr. Vaccarelli's response.

2         THE COURT:  After you told him what the SEC called

3    you for, what was Mr. Vaccarelli's response?

4         THE WITNESS:  I'm sorry, Your Honor.  Would you

5    repeat that?

6         THE COURT:  Yes.  After you told Mr. Vaccarelli what

7    the SEC called you for, what was Mr. Vaccarelli's response to

8    you?

9         THE WITNESS:  He told me that he was sure it was

10   much to do about nothing.

11   BY MS. LARAIA:

12   Q.   Was there any other part of your conversation -- I'm

13   sorry.  Let me strike that.

14        He told you it was probably much to do about

15   nothing, and what did you say?

16   A.   I said, Fine.  I asked him if he wanted the phone

17   number of the individual who had called me.  He said yes.  I

18   said, I'll have to get it off my caller ID, I'll call you

19   back.

20        I retrieved the information, I called Leon back, I

21   gave him the phone number and the first name of the

22   individual.

23   Q.   Were you satisfied with Mr. Vaccarelli's answer when

24   he said that it was probably much to do about nothing?

25   A.   Yes, at that point I was.

1    Q.    Okay.

2    A.    I thought I had done something wrong.

3    Q.    Was there anyone present with you when you received

4  that call from the SEC and made the call to Mr. Vaccarelli?

5    A.    Yes, my sister was present.

6    Q.    And where were you when that -- when these phone

7  calls were taking place?

8    A.    In my home.

9    Q.    And without telling us the specifics, what, if

10 anything, did your sister do?

11   A.    She Googled Leon's name on her phone.

12   Q.    And without telling us what your sister said, did

13 she tell you something?

14   A.    Yes, she did.

15   Q.    And what did you do?

16   A.    I called Leon a third time.

17   Q.    And this was all on the same day?

18   A.    It was all on the same day.

19   Q.    About what kind of time frame?

20   A.    Within an hour's time.

21   Q.    Okay.  Without telling us -- or let me back up.

22         When you called the third time, did you reach Mr.

23 Vaccarelli on the phone?

24   A.    I did.

25   Q.    Without telling us what you said specifically, did

```
1    he say anything to you about your money?

2         A.   Yes, he did.

3         Q.   What was that?

4         A.   He became very snippy with me, and he said -- and I

5    quote -- "Susan, your money's all there.  You get your

6    monthly statements.  Call Bob if you want.  I'm on my way to

7    an appointment."

8         Q.   Okay.  "Your money's all there"?

9         A.   Yes.

10        Q.   And "Call Bob if you want"?

11        A.   Yes.

12        Q.   Do you know anyone named Bob?

13        A.   He was referring to Bob Kolesnik, my attorney.

14        Q.   Have you had any communication with Mr. Vaccarelli

15   since that phone call?

16        A.   I have not.

17        Q.   Have you ever received any of your $100,000 back

18   from Mr. Vaccarelli?

19        A.   No, I have not.

20        Q.   Have you gotten your money back at this point from

21   anywhere?

22        A.   No, I have not.

23        Q.   Have you made any attempt to get your money back?

24        A.   Yes, I have.

25        Q.   And just describe for us what that is.
```

```
 1      A.    I've had phone conversations and correspondence,

 2   primarily with Doug Wright at The Investment Center.

 3      Q.    Okay.  And you understand that you will receive

 4   something back from The Investment Center?

 5      A.    Yes.

 6      Q.    Is it fair to say that you're still negotiating?

 7      A.    Yes, it's fair.

 8      Q.    At any point, have you received interest payments

 9   for this 36-month note at 7 percent?

10      A.    I have received nothing in that regard.

11      Q.    At any point, did Mr. Vaccarelli tell you that he

12   was going to put your $100,000 into his own bank account or

13   an account he controlled?

14      A.    He did not.

15      Q.    And what did he say he was going to do with it?

16      A.    He was going to invest it in a 36-month CD at 7

17   percent.

18      Q.    Did he ever tell you that he was going to use it to

19   cover expenses?

20      A.    He did not.

21      Q.    Did he ever tell you that the money was a loan to

22   him?

23      A.    He did not.

24      Q.    Did you ever loan him money?

25      A.    Absolutely not.
```

1    Q.   Did you ever give him a gift of a $100,000?

2    A.   I did not.

3    Q.   Did he ever tell you that your money was going to be

4    used to pay back someone else?

5    A.   No, he did not.

6    Q.   Would it have mattered to you if he said that that

7    was the purpose for your money?

8    A.   It certainly would have.

9    Q.   Would it have mattered to you that he was going to

10   use your money to pay for a commercial loan?

11   A.   It would have, yes.

12   Q.   Or to make a mortgage payment?

13   A.   Yes.

14   Q.   And why is that?

15   A.   Because it was my money.  I didn't have that kind of

16   money to give to him.  He was my financial advisor.

17   Q.   And why would that have raised a concern for you, if

18   he had told you that the money was going to one of those

19   other things instead of the 36-month CD?

20   A.   I would have wondered why my financial advisor was

21   using my money to go towards something like that.

22        MS. LARAIA:  One moment, Your Honor.

23        (Counsel confer.)

24        MS. LARAIA:  Let me just flip back for one minute.

25   BY MS. LARAIA:

1    Q.   Do you remember a few minutes ago we looked at your

2    bank statement from the Thomaston Savings Bank?

3    A.   Yes.

4    Q.   And one of those -- one of those payments into your

5    savings -- I'm sorry -- your Thomaston Savings Bank account,

6    was an ACH transfer?

7    A.   Yes.

8    Q.   Do you know if an ACH transfer is a wire transfer,

9    essentially?

10   A.   It's similar to a wire transfer.  An ACH transfer is

11   an automated clearinghouse transaction.  It generally --

12   there's no fee attached to it, generally takes three days

13   from the date of origination to clear to your account, versus

14   a wire which has a fee attached.  And, generally, if a wire

15   is done, you receive same-day availability to your funds.

16   Q.   So, this is essentially an electronic transfer from

17   one bank to another?

18   A.   Yes.

19   Q.   Okay.

20        MS. LARAIA:  That's all I have, Your Honor.

21        THE COURT:  Cross-examination.

22        MR. EINHORN:  Yes, Your Honor.

23        THE COURT:  We are running a little bit late for

24   lunch, aren't we?  Let's -- before you do -- how long will

25   your cross-examination be?

1          MR. EINHORN:  Not very long.

2          THE COURT:  Why don't we finish that, and then we

3     will break for lunch.

4          MR. EINHORN:  Okay.

5                    CROSS-EXAMINATION

6     BY MR. EINHORN:

7          Q.   Good afternoon, Ms. Rustic.  My name is Jon Einhorn,

8     and I represent Leon Vaccarelli.  Just a couple questions for

9     you this afternoon.

10         A.   All right.

11         Q.   First of all, you told us about a conversation you

12    had with Leon after the SEC had contacted you; right?

13         A.   Correct.

14         Q.   And you also told the FBI about that conversation

15    when you met with them; right?

16         A.   I did.

17         Q.   And you told them that Leon told you to be honest --

18    didn't he?

19         A.   Yes, he did.

20         Q.   Okay.

21         A.   If they called back a second time.

22         Q.   Okay.  And the second thing I want to ask you is

23    this:  How long have you known Leon?

24         A.   Since 2008.

25         Q.   Since 2008?

1    A.   Yes.

2    Q.   And were there occasions from 2008 that I guess you

3  went to social functions with him, parties or whatever?

4    A.   I never went with Leon anywhere socially.

5    Q.   I didn't mean it that way.  I apologize.  I meant

6  have you seen him in social gatherings, occasions?

7    A.   The only place I've ever seen Leon at a social

8  occasion was at his annual Christmas party.

9    Q.   Do you know if he kept liquor in his office?

10    A.   I have no idea if he did or not.

11    Q.   Do you know if Leon was a drinker?

12    A.   The only time I ever saw him with a glass in his

13  hand was at his annual Christmas party.  I have no idea what

14  the contents were.

15         MR. EINHORN:  Nothing further, Your Honor.

16         THE COURT:  Redirect.

17         MS. LARAIA:  Just briefly, Your Honor.

18                  REDIRECT EXAMINATION

19  BY MS. LARAIA:

20    Q.   Over the course of the time that you knew Mr.

21  Vaccarelli, about how many times would you say that you met

22  with him in person?

23    A.   Goodness.  Dozens.

24    Q.   And on any of those occasions, did you find him

25  difficult to understand?

1    A.   Never.

2    Q.   Was he ever slurring his words?

3    A.   Never.

4    Q.   And the one time you saw him with a drink was at his

5  Christmas party?

6    A.   Yes.

7         MS. LARAIA:  Nothing further, Your Honor.

8         THE COURT:  Anything further?

9         MR. EINHORN:  Thank you, Your Honor.  No.

10        THE COURT:  All right.  Ms. Rustic, thank you very

11  much.  You are excused, and you may go.

12        THE WITNESS:  Thank you.

13        (Witness excused, 1:22 p.m.)

14        THE COURT:  Ladies and gentlemen, we will break for

15  lunch and we will be back at approximately 5 'til 2.  Please

16  leave your notebooks here.

17        (Jury out, 1:23 p.m.)

18        THE COURT:  And after lunch, who will the Government

19  be calling?

20        MR. McGARRY:  We're going to call a gentleman by the

21  name of Mr. Ciro Peluso, P-E-L-U-S-O.

22        THE COURT:  Will there be anything before we break

23  for lunch, that you need to take up?

24        MR. EINHORN:  Not from the Defendant, Your Honor.

25        MR. McGARRY:  I don't want to keep the Court if the

1    Court wanted -- but the one point I just wanted to explain.

2    My objection as to relevance regarding Mr. Brough and Mr.

3    Vaccarelli drinking is, I just -- I don't know if it's really

4    been established that, other than through Mr. Einhorn's

5    argument, that that drinking is necessarily relevant to a

6    fact in dispute in this case.

7            And we kind of briefed it related to the doctor, and

8    we all heard the opening statement, so I wanted the Court to

9    know the basis for my objection.  And I don't know if you

10   want us to continue to object, but it seems that whether one

11   cannot have criminal intent because one drinks a lot is --

12   was an issue that was somewhat briefed related to the expert,

13   and I didn't know if we were going to go down that same road

14   with lay people.  And that's the concern to me, that there's

15   just a certain sense of it's not relevant to a decision the

16   jury has to make.

17           THE COURT:  Mr. Einhorn.

18           MR. EINHORN:  Your Honor, that's our theory of the

19   case.  We gave notice early on in the case that we were going

20   to pursue that direction.  I certainly could call back all

21   these witnesses again later.

22           THE COURT:  Well, that's what I assumed you were

23   avoiding when we said that we would prefer to have a witness

24   on the stand once.  Obviously the cross-examination about

25   drinking wasn't anything to do with the Government's

1    case-in-chief, so I assumed it was to avoid recalling them.

2            With respect to the legal import, if anything, of

3    Mr. Vaccarelli's drinking as a matter of law, as

4    differentiated from as a matter of fact, you all were going

5    to prepare proposed requests for charge to the jury, which

6    will clarify for them what it is that they should take into

7    account, if anything, of whatever it is they find proved

8    about drinking.  Okay.

9            MR. McGARRY:  Yes, Your Honor.

10           THE COURT:  I think that's the best way to handle

11   it; otherwise, I don't see how Mr. Vaccarelli's --

12           MR. EINHORN:  Yes, Your Honor.

13           THE COURT:  -- theory of the case, other than to say

14   that it's not a theory of the case.

15           All right.  We will have lunch until 5 'til 2.

16           MR. McGARRY:  Thank you, Your Honor.

17           MR. EINHORN:  Thank you, Your Honor.

18           (Recess taken, 1:26 p.m.)

19           (Out of the presence of the jury, 2:01 p.m.)

20           THE COURT:  All right.  Counsel, I understand the

21   jurors are all ready and back from lunch.  We'll bring them

22   in.  Will you bring Ciro Peluso into the courtroom, as well,

23   please?

24           MR. McGARRY:  Shall we have him take the witness

25   stand while the jury is taking their seats?

1          THE COURT:  Yes, please.  And I'm not sure what

2    exhibit, if any, is up on their --

3          MR. McGARRY:  I think Breigh closed it for the jury.

4          THE COURT:  Okay.

5          MR. McGARRY:  So, they can't see it.  And I spoke

6    with Mr. Einhorn at lunch, and I think we're going to move in

7    the exhibits at the beginning.  Hopefully speed things up.

8          (Witness enters, 2:02 p.m.)

9          THE COURT:  All right.  Mr. Peluso, you may have a

10   seat but don't get too comfortable, because as soon as the

11   jury comes back I'm going to ask you to stand up and be

12   sworn.  But you don't have to do that yet.  Okay?

13         MR. McGARRY:  If I could approach, Your Honor?  I'm

14   just going to pour a fresh glass of water.

15         THE COURT:  Yes.

16         (Jury in, 2:03 p.m.)

17         THE COURT:  All right.  Please be seated, ladies and

18   gentlemen, and we will continue evidence.

19         Mr. McGarry, will you introduce us to our next

20   witness?

21         MR. McGARRY:  Yes.  Thank you, Your Honor.  At this

22   time, the Government calls Mr. Ciro Peluso.

23         THE COURT:  All right, sir.  Would you kindly stand

24   up, raise your right hand, and the oath will be administered

25   to you.

1          (CIRO PELUSO sworn, 2:03 p.m.)

2          COURTROOM DEPUTY:  Please be seated.  State your

3  name for the record and spell your last name.

4          THE DEFENDANT:  Peluso, P-E-L-U-S-O.  First name

5  Ciro, CIRO.

6          COURTROOM DEPUTY:  And if you could just tell us the

7  city and state in which you reside.

8          THE WITNESS:  I can't hear you.

9          COURTROOM DEPUTY:  The city and state in which you

10  live.

11          THE COURT:  Where do you live?  What town or city do

12  you live in?

13          THE DEFENDANT:  New City, New York 10956.

14          THE COURT:  All right.  Thank you.  You may be

15  seated.

16                     DIRECT EXAMINATION

17  BY MR. McGARRY:

18      Q.   Good afternoon, Mr. Peluso.

19      A.   Good afternoon, sir.

20      Q.   I'm going to stay near the microphone so you can

21  hear.  If you can't hear my question, just please ask me to

22  repeat it.  I'd be happy to.

23      A.   Yes.

24          THE COURT:  And you're going to need to talk into

25  your microphone so the jurors can hear you.  So, stay moved

1   closer.  Thank you.

2   BY McGARRY:

3       Q.   You were just sworn and said you live in New City,

4   New York; is that correct?

5       A.   Yes, sir.

6       Q.   Okay.  Have you ever testified in Federal Court

7   before?

8       A.   No, sir.

9       Q.   Okay.  Are you currently working or not working?

10      A.   Not working.  Retired.

11      Q.   Retired.  What did you do before you retired?

12      A.   High rise construction in New York City.

13      Q.   Okay.  Tell the jury what high rise construction in

14  New York City is?

15      A.   Well, we build office buildings -- 60, 70 floors

16  high.  I was a carpenter.

17      Q.   Did you go out on the beams, like those fellows in

18  the old pictures?

19      A.   Yes.

20      Q.   And were you part of a union?

21      A.   Yes.

22      Q.   Which union?

23      A.   Carpenter's Union 257.

24      Q.   And what year did you retire?  Or how many years

25  ago, about?

```
 1      A.   Well, I'm 84 now.  Retired at 62.

 2      Q.   So, about 22 years ago?

 3      A.   Yeah.

 4      Q.   You said you're 84 now.  What year were you born?

 5      A.   August 29, 1934.

 6      Q.   Okay.  Do you know the Defendant, Leon Vaccarelli?

 7      A.   I do.

 8      Q.   How do you know the Defendant, Leon Vaccarelli?

 9      A.   Well, I went to two office parties with him, and

10   then I took him as -- he took me as his client for my

11   stock.

12      Q.   Okay.  Did you go to his office parties with

13   someone?

14      A.   Yes.

15      Q.   Who did you go with?

16      A.   My fiancee, Jeanette Depinto.

17      Q.   You said she's your fiancee.  Did you guys set a

18   date yet?

19      A.   Not yet.

20      Q.   All right.  And was she a client of Mr. Vaccarelli's

21   when you went to the parties?

22      A.   Yes.

23      Q.   Okay.  And were you a client or not yet?

24      A.   Not yet.

25      Q.   Okay.  Do you remember talking to him?
```

1    A.   Yes, sure.

2    Q.   What did you guys talk about?

3    A.   Oh, we talked -- he used to come to the house.  I

4  used to make him Italian toast and bring cheese for his kids,

5  and bread, and we just talked in general.  And then we talked

6  about stock, investing with him, and that's how I got

7  started.

8    Q.   Okay.  You said you made Italian toast?

9    A.   Yeah.  Well, it's Italian bread.

10    Q.   Like, is it French toast?

11    A.   Instead of using white toast, you use Italian bread.

12    Q.   Okay.  Where do you get the Italian bread?

13    A.   Arthur Avenue.

14    Q.   Where is that?

15    A.   That's in the Bronx.  Called Little Italy.

16    Q.   In Little Italy in the Bronx?

17    A.   Yes.

18    Q.   And did you bring the bread up?

19    A.   I did.

20    Q.   And did you have breakfast with Mr. Vaccarelli?

21    A.   He came to the house, and I would make him toast.

22    Q.   And whose house?

23    A.   Jeannette Depinto's house.

24    Q.   Okay.  And while he was at the house having

25  breakfast, did he talk to you about investments?

1    A.   He did.

2    Q.   Okay.  What do you remember -- tell the jury, if you

3   could, what you remember him telling you about investments.

4    A.   Well, he told me I had a good investment for 7

5   percent interest.

6    Q.   Okay.

7    A.   It's in a bond.  Some kind of a construction bond, I

8   think.

9    Q.   Okay.

10   A.   And I invested in that, and put my IRA in his

11  hands.

12   Q.   Okay.

13   A.   And that's it.  Then I needed money.

14   Q.   Okay.

15   A.   And he told me to -- he can use the IRA, and I had

16  to have it back within 30 days.

17   Q.   Okay.

18   A.   I had a loan out with a construction guy that I

19  loaned money to, and he does construction work and then he

20  pays me back.  He was due in about two or three weeks, so I

21  needed it before that.

22   Q.   Let me stop you there for a second.  You said a

23  construction guy who you were doing loans to.  Does that

24  person have a name?

25        Well, I loaned it to -- this lawyer has a person

1  that needs money to -- he buys houses, he fixes them, but he

2  needs money right away.  He can't wait for the banks.

3      Q.   Okay.  So is it like a house-flip?

4      A.   Yeah, he does that.

5      Q.   You buy a house, flip it?

6      A.   Yeah, he does that.

7      Q.   Okay.  And this person who buys the house and flips

8  them, were you providing the funding for some of the

9  construction?

10      A.   Yes.  Yes.

11      Q.   Okay.  And did that venture make money for you?

12      A.   It did.

13      Q.   Okay.  Did there come a time -- I want to get to

14  some of the documents, and if you could just stop for a

15  second.

16          MS. McGARRY:  Your Honor, at this time I'd like to

17  offer and move Government's Exhibits 150 through 161,

18  inclusive, as well as 158A and Government's Exhibit 401.

19          MR. EINHORN:  No objection, Your Honor.

20          THE COURT:  Why isn't 158A included in 150 to 161?

21          MR. McGARRY:  It would be, but I wanted to point

22  that out because not every exhibit has an A.

23          THE COURT:  All right.  And I understand that

24  counsel have agreed, there's no objection.  These are --

25          MR. EINHORN:  Yes, Your Honor.

```
1            THE COURT:  These exhibits are full exhibits, and
2    you may proceed.
3            MR. McGARRY:  Okay.
4    BY MR. McGARRY:
5       Q.   Let me pull up on your screen in front of you what's
6    been marked and in evidence as Government's Exhibit 150.  Do
7    you recognize this document?  Do you see the document on your
8    screen?
9       A.   Oh.  Oh, yes.
10      Q.   Okay.  What is that document?
11      A.   That's my Investment Center, where he put my money
12   in.
13      Q.   Okay.  And that has your name on it; correct?
14      A.   It does.
15      Q.   And it has his name on it, correct, highlighted in
16   yellow?
17      A.   Yes, it does.
18      Q.   And can you read the date for the jury?
19      A.   Right.
20      Q.   Is that January 15, at about the time that you first
21   decided to invest with Mr. Vaccarelli?
22           THE COURT:  I'm sorry.  January?
23           THE WITNESS:  To the best of my knowledge, yes.
24           MR. McGARRY:  January 2, 2015.
25   BY MR. McGARRY:
```

1    Q.   Okay.  And directing your attention to the second
2    page, do you see the highlighted part?
3    A.   Yes.
4    Q.   It's got your name, your city; correct?
5    A.   That's correct.
6    Q.   And it's got your year of birth?
7    A.   Yes.
8    Q.   Okay.  Under the account, it says "Account Type."
9    Can you read those three letters for the jury?
10   A.   Where's the account?
11   Q.   Right up here.
12   A.   Oh, the three letters?
13   Q.   Yeah.
14   A.   IRA.
15   Q.   Okay.  And what does that mean?  What type of
16   account is it?
17   A.   That's my investment in -- my retirement fund.
18   Q.   Okay.  And is that what you invested with him?
19   A.   Yes.
20   Q.   Okay.  Let me direct your attention to this
21   paragraph here in yellow, where it says "Payment
22   Information."  Do you see that?
23   A.   Yes.
24   Q.   It says "For brokerage accounts -- i.e., accounts at
25   our clearing firm -- payments for purchase of stocks,

1    options, bonds, mutual funds or other equity investments

2    should always be made payable to Pershing, LLC."

3        A.   Yes.

4        Q.   Do you see that?

5        A.   Right.

6        Q.   Okay.  It says:  "For direct investments" -- I'm

7    going to jump ahead -- it says:  "Payments for the purchase

8    of mutual funds should always be made payable to the approved

9    investment company."  Do you see that?

10       A.   Yes.

11       Q.   Okay.  Did you have any conversations with Mr.

12   Vaccarelli about how to make out your checks when you were

13   investing with him?

14       A.   Not really.

15       Q.   Okay.

16       A.   I trusted him, and I just made out a check.

17       Q.   Okay.  And was your account at a different brokerage

18   firm before you moved it over to Mr. Vaccarelli's firm?

19       A.   It was at Merrill Lynch.

20       Q.   Okay.  Do you see page 10 of Government's Exhibit

21   150, Account Transfer Form?

22       A.   Yes, I do.

23       Q.   Okay.  And are those, I guess, the last four digits

24   of your Social Security number, 4151?

25       A.   That's correct.

1    Q.   And is this where you moved your account over?  Is

2    this form the form you used to move your account to --

3    A.   I believe so.

4    Q.   Okay.  And did you transfer your full account from

5    Merrill Lynch to Leon Vaccarelli?

6    A.   Every penny.

7    Q.   Okay.  And do you recognize your signature there?

8    A.   That's my signature, yes.

9    Q.   Okay.  And I want to show you a few -- moving to

10   page 23.  You recognize your name on that page?

11   A.   Yes, it does.

12   Q.   Okay.  And do you recognize the name "Leon

13   Vaccarelli" above the signature?

14   A.   I guess the way he spells it.  I don't --

15   Q.   And what's the date of this signature?

16   A.   12/29/14.

17   Q.   Okay.  So that was a couple weeks or so after you

18   had met him at the -- maybe a couple days after you had met

19   him at the Christmas party?

20   A.   Yes.

21   Q.   Okay.  All right.  So you started to tell us a

22   little bit about the person who flipped houses.  Again, I

23   just want to go back to that.  Did you take money from your

24   IRA at some point in -- later in 2015, to help finance one of

25   those house-flips or the construction projects?

1    A.   What happened was, I had my own money and it wasn't

2    due for a couple weeks later, and he needed it before that.

3    Q.   Okay.

4    A.   So he told me that he would --

5    Q.   And I'm sorry, who's the "he"?

6    A.   Leon.

7    Q.   Okay.

8    A.   That he could take it out of my IRA.  As long as I

9    had it back within 60 days, I would pay no penalty.

10   Q.   Okay.

11   A.   So what happened is, we did take it.  I gave it out.

12   When I got the money back, I gave it to him in the check.  He

13   came to the house and he took the check, and that's the last

14   time I seen it.

15   Q.   Okay.  You kind of jumped right to the end, but I

16   guess we don't want to waste time if your wedding's coming.

17        Let me show you this check, Government's Exhibit

18   151.  Is this the check that you were talking about?

19   A.   Yes, it is.

20   Q.   Tell the jury, if you would, why it's coming from a

21   law firm.  How did that work?

22   A.   Well, when I give the money out, we go through a

23   lawyer and we use a -- we both use the same lawyer.

24   Q.   Okay.

25   A.   And he gave the money to the lawyer, and the lawyer

1    made the check and gave it to me.

2        Q.    Okay.  So after the person flipped the house, the

3    money went to the lawyer?

4        A.    He gets his money back from the bank or whatever.

5    He gets it back.

6        Q.    Okay.

7        A.    Or he sells it.  The lawyer would -- who made me out

8    the check that time, and I gave it to Leon.

9        Q.    Okay.  And did you sign it?

10       A.    Yes, I did.

11       Q.    Do you recognize your signature there?  You got to

12   turn your head a little, but do you recognize your

13   signature?

14       A.    Yes, I do.

15       Q.    And that's your signature?

16       A.    Yes.

17       Q.    Above the signature, do you see where it says "Pay

18   to Order LWLVACC, LLC"?

19       A.    I see it.

20       Q.    Okay.  Is that your handwriting?

21       A.    No, that was never on my check.

22       Q.    Okay.  And referring you to the next page, this

23   check appears to have been deposited into an account with

24   account ending in 7051.  Do you see that?

25       A.    Yes, I do.

1    Q.   Okay.  And is that the amount of your check, a

2    $100,000?

3    A.   Yes, that is.

4    Q.   Okay.

5    A.   Yes, that's my check.

6    Q.   And where did you want the check to go?

7    A.   Back in my IRA.

8    Q.   Okay.  And did you tell that to Mr. Vaccarelli?

9    A.   I did, and he said I can get you 3 percent interest

10   on it.

11   Q.   Okay.  And was that important to you, to get 3

12   percent?

13   A.   Well, yes.

14   Q.   Okay.  Why?

15   A.   Because if I ever need it again or something was --

16   I could get it back out.

17   Q.   Okay.  So you gave him the 3 percent, and did he

18   tell you how long you would have to -- how much lead time or

19   how much time you would have to say if you needed to get it

20   back out?

21   A.   I think he said it was 30 days, give him time of 30

22   days and he would get my money back.

23   Q.   Okay.  And, again, did you believe him?

24   A.   Of course.  Yes.

25   Q.   Let me show you what's in evidence, Government's

1  Exhibit 152.  And, again, I'm going -- do you remember the

2  name -- the letters that were written on the back of your

3  account?

4       A.   Yes.

5       Q.   That was LWLVACC?

6       A.   Right.

7       Q.   And the number 7051; do you remember that?

8       A.   Yes.

9       Q.   Okay.  Did Mr. Vaccarelli -- what, if anything, did

10  Mr. Vaccarelli tell you about depositing the money into an

11  account of the name of LWLVACC?

12       A.   He never said that.  It's supposed to go back into

13  my IRA account.

14       Q.   Okay.  If you could, I know it's small, but can you

15  read for the jury what appears to be the balance of this

16  account prior to a $100,000 deposit?

17       A.   Minus 539.85.

18       Q.   Okay.  And then how much is the deposit?

19       A.   $100,000.

20       Q.   Okay.  And how much was your check for?

21       A.   A hundred thousand.

22       Q.   Okay.  And then let me show you -- there's a couple

23  of checks here, check 3951 and 3952 and 3962.  Do you see

24  those checks, the numbers over here?

25       A.   I see them.

1   Q.   Okay.  Let me show you -- and there's also 3948.  Do
2   you see that, as well?
3   A.   Yes.
4   Q.   Okay.  Let me show you Government's Exhibit 155,
5   which is check 3948.  Do you see that?
6   A.   I do.
7   Q.   Do you know what the Leavenworth Professional Center
8   is?
9   A.   No, I don't.
10  Q.   Okay.  Did you ever have any conversations with Mr.
11  Vaccarelli about money going to the Leavenworth Professional
12  Center?
13  A.   No, I did not.
14  Q.   Okay.  Let me show you Government's Exhibit 156.  Do
15  you know someone named Robert Kolesnik?
16  A.   I think -- I don't know if that was his partner.
17  Q.   Okay.  It says down the bottom -- or reading the
18  memo line, do you see where it says "Signature's"?
19  A.   Yes.
20  Q.   Do you know what Signature's is?
21  A.   Signature's; I think that's a restaurant.
22  Q.   Okay.  Did Mr. Vaccarelli -- what, if anything, did
23  he tell you about your money going to Mr. Kolesnik with a
24  reference to Signature's?
25  A.   No.

1      Q.   He didn't tell you about that?

2      A.   No.

3      Q.   Okay.  Would that have been something you would have

4   wanted to know in giving him the $100,000 check?

5      A.   Well, what I wanted to know was that he put it in my

6   IRA, not to give it to anybody else or put it in his personal

7   account.

8      Q.   Let me show you what's been marked as Government's

9   Exhibit 157, and this is check number -- blow it up there --

10  3952.  Do you see that?

11     A.   Yes, sir.

12     Q.   How much is that check for?

13     A.   3,500.

14     Q.   And that's -- and do you see the name on that

15  check?

16     A.   Yes, I do.

17     Q.   What's the name on that check?

18     A.   It's Miss (phonetic) -- oh, Vaccarelli.  I think

19  that's his wife.

20     Q.   Okay.  Did you ever meet her?

21     A.   I met her once.

22          (Reporter interruption.)

23          THE COURT:  Just a moment.  The court reporter is

24  missing something.

25  BY MR. McGARRY:

1    Q.    Sure.  What is the name on that check?

2    A.    Missella (phonetic)?

3    Q.    How about the second name?

4    A.    Vacchella (phonetic)?  I can't say it.  Leon.

5    Q.    Is it Vaccarelli?

6    A.    Vaccarelli.  That's it.  I couldn't say it.

7    Q.    Okay.  And does the first name start with an M?

8    A.    Yes.

9    Q.    And I believe, before we lost the transcript from

10   our talented court reporter, you said you think that's his

11   wife.  Do you remember --

12   A.    That's his wife.

13   Q.    The name on the check?

14   A.    Yes.

15   Q.    And did you meet her?

16   A.    I met her once or twice.  I met her once -- yeah, I

17   met her once or twice, I believe.

18   Q.    Okay.  And let me show you Government's Exhibit 158.

19   Is that the same name on the check?

20   A.    Yes, it is.

21   Q.    Okay.  And going back to Government's Exhibit 152,

22   do the amounts here in this withdrawal column, are they the

23   amounts that we just saw on those checks for the relevant

24   checks?  Do they appear to -- do you see the same numbers

25   that we just saw on the individual checks on this account

1   statement?

2       A.   Yes.

3       Q.   Okay.  All right.  So let's move away from the

4   documents for a minute.  I want to, you know, hear from you.

5   Did you continue to interact with, meet with, or see Mr. Leon

6   Vaccarelli after you gave him your check?

7       A.   Yes.

8       Q.   Okay.  Tell the jury what that was like.  What did

9   you talk about?

10      A.   Well, just conversation.  He came to the house once

11  or twice.  But I didn't know anything about it until my

12  accountant told me I owed the IRA $35,000.

13      Q.   I'm sorry, you didn't know anything about what until

14  you talked to your accountant?

15      A.   That there was no money in the account.

16      Q.   Okay.  Well, let me show you --

17      A.   That I had supposedly withdrawn it all and they were

18  charging 35,000 in interest.

19      Q.   And who was going to charge you $35,000?

20      A.   The tax people.

21      Q.   Did you say the IRS?

22      A.   Yes.

23      Q.   Okay.  Let me show you Government's Exhibit 159 real

24  quick.  Do you recognize the front page here of Government's

25  Exhibit 159?

1      A.   Oh, yes.

2      Q.   And what is that?  Is that one of your account

3  statements?

4      A.   Yeah, that's my statement.

5      Q.   Okay.  Let me show you 158A, if that's going to come

6  up.

7           MR. McGARRY:  Oh, it's not in the system, Your

8  Honor.  It wasn't loaded into the computer, Your Honor.  I'm

9  just going to hand this, if I could, to the witness?

10          THE COURT:  You may.

11  BY MR. McGARRY:

12     Q.   Take a look, if you would, at Government's Exhibit

13  158A.  What is that document?

14     A.   My account statement.

15     Q.   Okay.  And what's the balance on that account

16  statement?

17     A.   $1,350.

18     Q.   Did your $100,000 go back in that account?

19     A.   No.

20     Q.   Okay.  And let me see if I can pull up 161.

21          MR. McGARRY:  Again, not in the computer.  Let me

22  approach, Your Honor?

23          THE COURT:  You may.

24  BY MR. McGARRY:

25     Q.   What is Government's Exhibit 161?

1      A.    $108,527.00.

2      Q.    Is that your account statement?

3      A.    Yes.

4      Q.    Okay.  Did your $100,000 go back into this account,

5  or not?

6      A.    No.  No.  No.  No, sir.

7      Q.    Okay.  And what, if anything, did Mr. Vaccarelli

8  tell you about moving your money and using it, or moving

9  it -- then moving it in the form of checks to Monica

10  Vaccarelli?

11      A.    Never mentioned it.

12      Q.    Okay.  Would that have been something you'd want to

13  know?

14      A.    Sure.

15      Q.    Why?

16      A.    Because that's my money.

17      Q.    Okay.  Do you recall getting some checks back from

18  him after you had put your $100,000 back with him?

19      A.    I needed 20,000, and he got me 20,000 back.

20      Q.    Okay.  Let me show you Government's Exhibit 153 in

21  evidence.  Do you recognize this?

22      A.    Yes.

23      Q.    Okay.  What is that check?

24      A.    That check is for $20,000.

25      Q.    Okay.  And that was from Mr. Vaccarelli?

1    A.    Yes, it was.

2    Q.    Okay.  Did he tell you where the $20,000 came

3    from?

4    A.    No, he didn't.  He just -- I thought it was coming

5    from my stock.

6    Q.    Okay.  And why did you think it was coming from your

7    stock?

8    A.    Because that's where all my money is.

9    Q.    Okay.  Let me show you Government's Exhibit 154.  Do

10   you recognize this check for $4,000?

11   A.    Yeah, I believe so.

12   Q.    Okay.  Why did Lux Financial, on the memo line --

13   why did you get this check for $4,000?

14   A.    I'm not too sure, but I figure it's from interest or

15   something from my stock.

16   Q.    Okay.  Okay.  And why do you figure that?  Who told

17   you that?

18   A.    Because I think my IRA, or something, you got to

19   take out so much a year.

20   Q.    Okay.  Again, during this time period in 2017 up

21   until April of 2017, did you have breakfast with Leon

22   Vaccarelli other times?

23   A.    I'm not sure, but probably did.

24   Q.    How many times do you think you had breakfast with

25   him?

1    A.   Five, eight times.

2    Q.   Okay.  Who did the cooking?

3    A.   I did.

4    Q.   Did Ms. Depinto --

5    A.   Well, only mostly for breakfast.

6    Q.   Okay.

7    Q.   And you said before, I think, that you brought up

8    some cheese?

9    A.   I would bring this cheese up that he liked, and some

10   bread with the olives.

11   Q.   And where was that from?

12   A.   All from Arthur Avenue.

13   Q.   And who did you give it to?

14   A.   I gave it to him when he came to the house.

15   Q.   Why were you --

16   A.   Why?  Because he was nice.  I liked him.  He was a

17   nice guy, and I gave him -- when he'd come up once in a

18   while, I'd bring him -- not every time, but once in a while

19   when I went to Arthur Avenue I'd bring him back a piece.

20   Q.   Okay.  Did you ever go to his office on Leavenworth

21   Street in Waterbury?

22   A.   No.

23   Q.   Where did you meet with him whenever you had to do

24   business with him?

25   A.   I always met him at my house.

1      Q.    Okay.  And that's the house that --

2      A.    Jeannette's house.

3      Q.    Ms. DePinto?

4      A.    Yes.

5      Q.    Okay.  When you gave him the $100,000 check, did you

6   get, like, a receipt or a confirmation or anything like

7   that?

8      A.    Nothing.  I just trusted him.  I signed the check

9   over to him, and he said he'd put it back in my IRA.

10     Q.    Okay.  And after you talked to the accountant about

11  the taxes, did you talk to Mr. Vaccarelli?

12     A.    I called him, and he says, It was a mistake, I'll

13  correct it.  He called my accountant.  And I never heard

14  anything about the IRA, that I had to pay it, until later

15  on.

16     Q.    And what did you have to pay?

17     A.    I was supposed to pay 35,000.

18     Q.    Of taxes?

19     A.    Right.  But they cleared it up.  They corrected it.

20     Q.    Okay.

21     A.    I don't know what he told my accountant, but after

22  that he said, Okay, you don't owe it.

23     Q.    Okay.  And have you been able to get your -- you got

24  back twenty-four.

25     A.    Right.

1    Q.   Have you been able to get any more money of your

2    hundred thousand back from Mr. Vaccarelli?

3    A.   Not after that 20,000, no.

4    Q.   Okay.  And have you talked to him about it?  Have

5    you tried to reach out to him?

6    A.   Well, he said it was a mistake, he was going to

7    straighten it out.  And then after that, his partner called

8    and wanted to meet me, and he told me that I was one of many

9    people that is on a list that money is gone.

10   Q.   Okay.  And as you sit here today, net-net, if you

11   can do the math, how much do you think you lost by putting

12   your retirement money with Mr. Vaccarelli?

13   A.   A hundred thousand?  I figure ten, fifteen

14   thousand.

15   Q.   So you got -- in addition to the hundred thousand?

16   A.   Three years of IRA no interest.

17   Q.   So you're talking about the interest that you didn't

18   get.  Okay.  So you gave him a hundred?

19   A.   Right.

20   Q.   And you got back twenty?

21   A.   Right.

22   Q.   And you got back the four?

23   A.   Yes, sir.

24   Q.   So there you're about seventy-six.

25   A.   Yes.

1    Q.   Do you know where that 76,000 is?

2    A.   No.

3    Q.   And about -- you mentioned the interest.

4    A.   Well, the seventy-six is -- four thousand was for

5    something else, not from my IRA.

6    Q.   Okay.

7    A.   So it's 80,000.

8    Q.   So you'd say, as you sit here today, you lost 80,000

9    plus any interest that you didn't get?

10   A.   Plus the three years of interest.

11   Q.   Okay.  And did you speak with anyone at The

12   Investment Center?

13   A.   They called me.  We went back and forth.  I can't

14   recall everything, but --

15   Q.   Sure.  What did you tell -- don't tell me what they

16   said, but what did you tell them?

17   A.   I told them that I gave him a hundred thousand, I

18   got back twenty, and there's 80,000 that I didn't get.

19   Q.   Okay.

20   A.   And they said they'd look into -- you know.

21   Q.   Right.

22   A.   An investigation.  They called me.  They talked to

23   me.

24   Q.   And did they -- just recently, did The Investment

25   Center send you any money?

1    A.   Oh, yeah, they made up the 80,000.

2    Q.   Okay.  And what about the interest?

3    A.   Without interest, without anything.  I had to sign

4    my life away to get it back.

5    Q.   Okay.  Tell the jury about that.  What do you mean

6    you had to sign your life away?

7    A.   Well, that's it.  I couldn't sue them for anything.

8    That was it.

9    Q.   Okay.

10   A.   Just that eighty back, and that was the end of it.

11   Q.   Okay.  Knowing what you know now, would you have

12   given Mr. Vaccarelli that $100,000 check?

13            MR. EINHORN:  Objection, Your Honor.

14            THE COURT:  What I know now?  No.

15            MR. EINHORN:  Just a minute, sir.  Objection, Your

16   Honor.  That's not relevant.

17            THE COURT:  I'm going to sustain the objection, but

18   I think you can ask that question in a different way.

19            MR. McGARRY:  Okay.

20   BY MR. McGARRY:

21   Q.   Is there information that you would have liked to

22   have before you made your -- gave that $100,000 check to Mr.

23   Vaccarelli?

24   A.   Oh, sure.  If I'd have known, I would have been

25   smart enough to tell him to put -- to write it out to the

1    company name instead of him.

2        Q.   Okay.  And is that something you would have liked to

3    have known before you gave him the check?

4        A.   Yes, definitely.

5        Q.   Would that have been important in your decision as

6    to what to do with that check?

7        A.   Yes, definite.  You know, I trusted him.  I thought

8    that, you know, he was honest, and I gave it to him.

9        Q.   Okay.

10           MR. McGARRY:  Could I just have a minute, Your

11   Honor?

12           THE COURT:  Yes.

13           (Counsel confer.)

14           MR. McGARRY:  I have no more questions at this time.

15   Mr. Peluso, thank you for your time.

16           THE WITNESS:  All right.  Thank you.

17           THE COURT:  All right.  Let's have

18   cross-examination, please.

19                       CROSS-EXAMINATION

20   BY MR. EINHORN:

21       Q.   Good afternoon, Mr. Peluso.

22       A.   Good afternoon, sir.

23       Q.   My name is Jon Einhorn, and I represent Leon

24   Vaccarelli.

25       A.   Yes, sir.

1      Q.   I'm going to ask you a couple questions.  First of

2   all, let's talk money, just so it's clear.  First you told

3   the Government that, in fact, you were out 80,000.  But then

4   the Government just brought it out that you got back that

5   80,000; right?

6      A.   I did.

7      Q.   Okay.  So you put up a hundred, and you got back a

8   hundred; right?  You're not out any money; are you?

9      A.   Not from the -- no.

10      Q.   Sorry, I couldn't hear you.

11      A.   No, sir.

12      Q.   Okay.  Thank you.

13           Now, how many times did you actually meet with Leon;

14   do you remember?

15      A.   Five, six, eight times, something.

16      Q.   Yeah, something like that.  And were a number of

17   those breakfasts?

18      A.   At my house.  And once for dinner.

19      Q.   You said once for dinner and the rest for breakfast?

20      A.   Once for dinner, and the rest were at my house.  And

21   when we went to the Christmas party.

22      Q.   And the Christmas party.  All right.  Forget the

23   Christmas party for just a sec.  The breakfasts.  When you

24   had breakfasts at your house with Leon, were you drinking?

25   There was wine over breakfast; right?

1    A.   Breakfast?

2    Q.   Yes, sir.

3    A.   No.

4    Q.   You never had any wine over breakfast?

5    A.   Not at breakfast.  I know we had orange juice.

6    Q.   Just orange juice.  Did you have coffee and

7  Anisette?

8    A.   No Anisette.  Coffee, maybe.

9    Q.   So, on what occasions, then, did you drink with

10  Leon?

11    A.   Occasionally, I think if we went -- when we went out

12  to -- he took us out to eat, and one more time when I

13  introduced him to somebody.  And that was it, that I know

14  of.

15    Q.   And do you remember drinking a gallon of wine with

16  him, with a Marco Minudi -- Menudo (phonetic), sorry.  Do you

17  remember that?

18    A.   Yes.

19    Q.   Do you remember he brought a gallon of wine.

20    A.   Yes.

21    Q.   And you went through the gallon of wine with Leon?

22    A.   That was four people.

23    Q.   There were four people?

24    A.   Right.

25    Q.   And you all went through a gallon of wine?

1    A.   More or less.

2    Q.   Was it a breakfast or a dinner?

3    A.   We had heroes, Italian heroes.

4    Q.   It was what?

5    A.   We had Italian heroes, lunch.

6    Q.   Lunch, okay.  So it was lunch that you had the

7  gallon of wine?

8    A.   We had Italian heroes and -- we ate Italian, and we

9  spent about three, four hours.

10   Q.   Okay.  All right.  I'm curious about one thing.  You

11 testified that at first you were told that there would be a

12 penalty on closing out your IRA, and then later you were told

13 there's no penalty.  I see from the information on you that

14 you're over 59-and-a-half; right?  Me, too.

15   A.   Yes.

16   Q.   Okay.  There's not supposed to be a penalty on an

17 IRA if you withdraw it after 59-and-a-half, so why was there

18 a penalty?

19   A.   What are you talking about?

20   Q.   Sure.  Let me start again.  You say your accountant

21 told you that there was a penalty when you withdrew the money

22 from your IRA; right?

23   A.   This happened about three years ago.

24   Q.   Three years ago, okay.

25   A.   Okay.  Now, let's get it straight.

1    Q.    Yeah.

2    A.    Three years ago my accountant called me up and says,

3    You owe the tax people $35,000.

4    Q.    Okay.

5    A.    I called up Leon.  I told Leon, What's going on

6    here, my money's in the IRA.  He says, Oh, I'll take care of

7    it.  He called my accountant.  My accountant said, Okay.  He

8    explained everything to me on the phone, you don't owe it.

9    The next thing I knew, it was taken.  It was gone.

10    Q.    It was gone.

11    A.    So I didn't have to pay IRA -- the tax people,

12    because there was no money there.  Now I have to pay them.

13    Q.    Now you have to pay it?

14    A.    Well, sure, if I don't put the money back in the

15    IRA, I have to pay whatever there is, the penalty.

16    Q.    Who told you that?

17    A.    Who says I didn't?

18    Q.    All right.  Why do you think you have to put the

19    money back in an IRA?

20    A.    I have to pay a penalty if I don't.

21    Q.    All right.  I'm looking at your records, your

22    records indicate you were born in 1934; is that right?

23    A.    That's correct.

24    Q.    Three years ago you were more than 59-and-a-half;

25    right?

1      A.    Yes.

2      Q.    All right.  Well more than 59-and-a-half; right?

3  You and me both.  So you do know that after 59-and-a-half

4  there's no penalties taking out money from an IRA.  Do you

5  know that?

6      A.    Oh, I think you don't know it.  I know that you pay

7  a penalty if you take your money out of the IRA.  They insist

8  that you take it out because there's no tax on it.  So when

9  you take it out, you got to pay tax on the money you take

10 out.

11     Q.    Okay.  Have you gotten a letter from the IRS telling

12 you that you owe money on your IRA?

13     A.    Not yet.

14     Q.    Not yet.  You haven't gotten anything; have you?

15     A.    Not yet.

16     Q.    All right.  I submit, sir, you won't.

17     A.    No.

18     Q.    Because you're more than a 59-and-a-half.

19     A.    No, I think you're wrong.

20           MR. McGARRY:  Objection, Your Honor.

21           MR. EINHORN:  Withdrawn.

22           THE COURT:  Sustained.

23           MR. EINHORN:  Withdrawn.

24 BY MR. EINHORN:

25     Q.    Now, you originally -- I'll use the word "invested"

1    a hundred thousand dollars with Leon; right?

2        A.    Yes.

3        Q.    You intended that to be a sort of a loan; didn't

4    you?

5        A.    When I took it out for a couple weekends for a loan,

6    I get -- it was for a loan, yes.

7        Q.    It was for a loan.

8        A.    But if you know the law, IRS allows you two months

9    to put the money back in without penalty.  So when I got my

10   money in from the first loan, I put -- I gave it to Leon to

11   put back into my IRA.  If you take out money a little at a

12   time, you pay a little interest.  If you take it all out, you

13   pay about 30, 40,000.

14       Q.    Okay.  So the hundred thousand that you invested

15   with Leon was meant to be a loan; right?

16       A.    No, no.

17       Q.    What was it meant to be?

18       A.    It was meant to be a loan for somebody else, not for

19   Leon.

20       Q.    Who was it meant to be a loan for?

21       A.    For the guy I loan the money to when he does -- when

22   he needs it for the construction money.

23       Q.    All right.  Let me ask you this a little

24   differently.  Is that what you do, you loan money to people

25   who need money for construction or other purposes?

```
1       A.    I have a certain amount of money that I retired on,
2   and I loaned it out to people that need it for construction
3   money.  They can't go to the bank and get it right away.
4       Q.    Sure.
5       A.    And they pay me back -- within six months, a year,
6   something like that -- with interest.
7       Q.    All right.  And what kind of rates do you charge?
8       A.    Ten.
9       Q.    Ten?
10      A.    Yeah.
11      Q.    So that's what do you, you loan money.  That's your
12  business?
13      A.    I got one -- or I got money that I retired with, I
14  saved all my life for, and my IRA I saved all my life for,
15  and that's separate from the money I have out.
16      Q.    And when you say "the money I have out," you mean
17  money that's been loaned to people for construction or other
18  purposes?
19      A.    I loan it to people one time only.
20      Q.    Okay.  All right.  And that's what you do, you make
21  money on it, right, interest at 10 percent a year?
22      A.    Yes.
23      Q.    Sure.
24            MR. EINHORN:  Okay.  Nothing further, Your Honor.
25  Thank you.
```

1          THE COURT:  Thank you.  Redirect.

2          MR. McGARRY:  I just want to clear up a couple

3    things real quick.

4                    REDIRECT EXAMINATION

5    BY MR. McGARRY:

6    Q.   You we were asked a lot of questions about

7    penalties.  Are you saying that you when you take money out

8    of your IRA, you have to pay taxes on it?

9    A.   Yes.

10   Q.   Okay.  And is that what the $35,000 was?

11   A.   Because there was -- he took it all.  Instead of

12   putting the money in --

13   Q.   Right.

14   A.   -- he didn't put it in.  So the IRS sent my

15   accountant a bill for $35,000 in taxes.

16   Q.   Is that because the IRS thought you had taken money

17   from your IRA?

18   A.   The IRA asked --

19          MR. EINHORN:  I'm going to object to the way the

20   question is phrased.

21          THE COURT:  This is an area you started into.

22          MR. EINHORN:  I guess I did.  All right.

23          THE COURT:  Do you want to rephrase that question in

24   any way?

25          MR. McGARRY:  Sure.

```
1    BY MR. McGARRY:
2        Q.   Do you know why the IRS thought you had taken money
3    out of your IRA when you thought you had put it back into
4    your IRA?
5        A.   No, I don't know why, how they figured that out.
6        Q.   Okay.
7        A.   But the money was out, so I never put it back in and
8    I guess --
9        Q.   Okay.  You said you never put it back in.  Did you
10   give it to somebody and ask them to put it back in?
11       A.   That I did.
12       Q.   Who was that person?
13       A.   Leon Vaccarelli.
14       Q.   Did Leon Vaccarelli put the money back in?
15       A.   He did not.
16       Q.   Okay.  You were also asked a couple questions about
17   a loan.  Who -- did you give the loan to somebody who was
18   doing the construction flip on the house?
19       A.   I gave it to a person that has a lot of friends that
20   she -- or people that she does business with.
21       Q.   Right.  And they do like a Flip or Flop?
22       A.   If she runs short, she don't have enough -- if they
23   need the money to do a project, she asked me if I could loan
24   them the money, and that's how I got involved in it.
25       Q.   And they gave you the money back?
```

1    A.   Yes.

2    Q.   And then did you --

3    A.   I gave it back to Leon, and Leon kept it in his own

4    account, which you seen.

5    Q.   And did you ever loan, quote/unquote, money to Leon

6    Vaccarelli?

7    A.   Never.

8    Q.   Okay.  You told us a little bit about that issue

9    with the IRS.  Do you know, if you can remember, the three

10   hours or four hours that you had heroes and lunch and Mr.

11   Vaccarelli was there, was that before or after you gave him

12   the $100,000 check that he didn't put back in your IRA?

13   A.   I believe it was before.

14   Q.   It was before, okay.

15   A.   They were going to invest in him.

16   Q.   What's that?

17   A.   They were going to invest in him, too.

18   Q.   Oh, the other people at the --

19   A.   Right.

20   Q.   Do you know if they gave him money?

21   A.   No, because that's when everything broke.  After

22   that, everything broke out that he never put my money in

23   there.

24   Q.   At any point during the three or four hours that you

25   were having heroes or hogis with him, did he mention that if

1    you gave him money he would put it in his personal account

2    and not into your -- back in your IRA?

3        A.   No.  He was supposed to be putting it in, like I was

4    supposed get 7 percent on one loan -- or 3 percent.  It was 7

5    percent.

6        Q.   The first one was 7 percent?

7        A.   He said:  If I can do it, I'll try and get you 7

8    percent.

9        Q.   Okay.  Did he end up getting you any interest at

10   all?

11       A.   No, because after that everything broke out, and

12   that was the end of it.  I haven't seen him since then.

13            MR. McGARRY:  I have no more questions, Your

14   Honor.

15            THE COURT:  All right.  Mr. Peluso, you are excused.

16   You may step down.  Thank you.

17            THE WITNESS:  Thank you.

18            (Witness excused, 2:26 p.m.)

19            THE COURT:  Please call your next witness.

20            MS. LARAIA:  Your Honor, the Government calls

21   Carmine DiSapio.

22            THE COURT:  All right.  Mr. DiSapio, would you come

23   to the witness stand over there, please, and don't sit down

24   just yet.  Raise your right hand, and you'll be sworn.

25            (CARMINE DiSAPIO sworn, 2:46 p.m.)

```
 1              COURTROOM DEPUTY:  Please be seated.  State your
 2   name for the record, and spell your last name, and then tell
 3   us which city and state you live in.
 4              THE WITNESS:  Carmine DiSapio, Terryville,
 5   Connecticut, 46 East Washington Road.
 6              THE COURT:  Tell us how to spell your last name,
 7   please.
 8              THE WITNESS:  DiSapio, D-I, capital S-A-P-I-O.
 9              THE COURT:  Thank you.  You may proceed.
10              MS. LARAIA:  Thank you, Your Honor.
11                       DIRECT EXAMINATION
12   BY MS. LARAIA:
13      Q.   Good afternoon, Mr. DiSapio.  What do you do for
14   work?
15      A.   I own Fine Line Construction.
16      Q.   What kind of work does Fine Line Construction do?
17      A.   We do anywhere from a range of foundation work,
18   asphalt, driveways, stone work, sheetrock, additions.  All
19   general contracting due to construction.
20      Q.   And do you do the construction work yourself?
21      A.   Sometimes when needed.
22      Q.   Okay.  And do you have subcontractors that you work
23   with, as well?
24      A.   I do.
25      Q.   Okay.  Do you have anyone that works with you?
```

1       A.   I do.

2       Q.   How many people, approximately?

3       A.   Depending on time frame.  Wintertime we're a

4    skeleton crew.  Summertime we start to get busy.  Could be in

5    the range of four to ten different guys.

6       Q.   When did that company, Fine Line Construction,

7    begin?

8       A.   '08.

9       Q.   And are you the owner?

10       A.   I am.

11       Q.   Do you know someone named Leon Vaccarelli?

12       A.   I do.

13       Q.   Do you see him in the courtroom today?

14       A.   I do (indicating).

15       Q.   Would you please point out Mr. Vaccarelli and

16    identify something he's wearing?

17       A.   In the middle of the gentleman and the woman,

18    wearing the suit and tie.

19            MR. EINHORN:  We'll stipulate.

20            THE COURT:  All right.  Indicating Mr. Vaccarelli.

21    Go ahead.

22    BY MS. LARAIA:

23       Q.   How do you know Mr. Vaccarelli?

24       A.   I know Leon -- I went to Our Lady of Mt. Carmel

25    School, and Leon and his family were part of that.  I was

1    born and raised in Town Plot, and Leon's family is also in

2    the area.  So, really, that's kind of --

3        Q.   Let's just back up for a second.  So you mentioned

4    Our Lady of Mt. Carmel.  What is Our Lady of Mt. Carmel?

5        A.   It's a parish, but it's also a Catholic school that

6    we went to.

7        Q.   And what grades does Our Lady of Mt. Carmel cover?

8        A.   Kindergarten through 8th.

9        Q.   Okay.  And you attended that school?

10       A.   I did.

11       Q.   And did you know Mr. Vaccarelli at that school?

12       A.   I did.

13       Q.   And did you grow up in Waterbury?

14       A.   I did.

15       Q.   Are you in any way a distant relative of Mr.

16   Vaccarelli?

17       A.   I believe my father and his father are second

18   cousins or something to do like that.

19       Q.   Growing up, were you ever at family gatherings

20   together?

21       A.   No.

22       Q.   Fair to say you knew him from the school?

23       A.   Neighborhood, something like that.

24       Q.   Knew who he was?

25       A.   Correct.

1     Q.   Were you friends as children?

2     A.   No.

3     Q.   Same grade in school?

4     A.   I believe I'm older than Mr. Vaccarelli.

5     Q.   Okay.  Now, at some point, did you do some

6  construction work in a development on Joshua Town Road in

7  Waterbury?

8     A.   I did.

9     Q.   And can you just describe what that development

10 is?

11    A.   It's a -- it was a new development in the Waterbury

12 area.  I started with -- my other cousin lives on that road,

13 so I started there.  And people that had purchased homes in

14 that development seen our work and would just pull over, ask

15 us what we do, how we do it.  They seen -- Mr. Vaccarelli

16 seen what -- two of the homes that we did, and he approached

17 me on doing some construction work at his home.

18    Q.   And just a little bit about that development.  Do

19 you know who the developer was for that particular project?

20    A.   It's Eric Strachan.

21    Q.   Now, is that development a street?

22    A.   It's a dead-end road, correct.

23    Q.   And was it a road full of new houses or older

24 houses?

25    A.   It's custom homes.

1      Q.   Okay.  And were those being built at the time that
2   you're talking about?
3      A.   Correct.
4      Q.   How would you describe how those houses looked on
5   that street?  Were they big?  Were they little?
6      A.   They're probably the higher-end homes in the city of
7   Waterbury.
8      Q.   And I think you mentioned that you had a cousin who
9   lives on that street?
10     A.   I do.
11     Q.   And where did your cousin live on that street?
12     A.   He's the first house on the development.
13     Q.   Okay. And did you do work on any of those
14  properties?
15     A.   I did.
16     Q.   You said Mr. Vaccarelli approached you to do some
17  work?
18     A.   He did.
19     Q.   And how did he contact you?
20     A.   I believe he pulled over as we were doing work
21  on -- we did -- Leon actually lives two houses past my cousin
22  on the same side.  So we started with him, and then we also
23  did Leon's neighbor, that his yard and their yard -- the
24  Springles -- actually touch together.
25     Q.   Is that the neighbor in between Mr. Vaccarelli's

1   house --

2   A.   To the left of him.

3   Q.   -- and your cousin's house, or on the other side?

4   A.   On the other side of Leon.

5   Q.   So what did Mr. Vaccarelli ask that you do?

6   A.   Mr. Vaccarelli's yard was -- the grade was on a very

7   high -- low pitch.  He said to me that down the road he was

8   thinking about putting a pool in, and he wanted to know if we

9   could construct a wall that would hold back all of his

10  grading material; that if he ever decided to put a pool in,

11  he could do it because the grade would be level at that

12  time.

13  Q.   So it was your understanding that if you put in a

14  wall, then there would be some fill to even out the grade?

15  A.   A lot of fill; yeah, correct.  It was a big wall.

16  Q.   Okay.  Did you do any other work at Mr. Vaccarelli's

17  house?  Or did he ask you to do any other work?

18  A.   We also put a patio underneath the deck that he had

19  built, a pressure treated deck that was suspended in the air.

20  We put a concrete slab on-grade it's called, and then down

21  the road we were going to bluestone it for him.

22  Q.   Okay.  Now, during the course of your work at Mr.

23  Vaccarelli's home, did you take any photographs?

24  A.   I did.

25  Q.   Why do you take photographs?

1    A.   For the reasons of just legal reasons, or customers

2    want to know, because they're not there all the time, if we

3    say during our contract that we give you what we give you, I

4    have proof to show.  Or if nonpayment, you know, we have all

5    the steps that we do.  So it's really just for my sake and

6    the customer's sake.

7    Q.   Is that, in part, because of inspections?

8    A.   Sometimes, if we pull a permit on something.  But

9    really, if that's the case, the inspector comes out and just

10   okays what we do.

11   Q.   Okay.  And, so, would you take photographs

12   throughout a process of doing a job?

13   A.   Correct.

14   Q.   I'd like to show you -- and this is just for

15   identification -- Government's Exhibit 111.  And I'm going to

16   ask you to look at this one, and I'm going to show you

17   Government's Exhibit 112, as well, also for identification.

18   Government's Exhibit 114 for identification, Government's

19   Exhibit 115 for identification, Government's Exhibit 116 for

20   identification, and Government's Exhibit 117 for

21   identification, and Government's Exhibit 118 for

22   identification.

23        Did you see all those photographs?

24   A.   I did.

25   Q.   Do you recognize those photographs?

1      A.   I do.

2      Q.   And what are those photographs, just generally, as a

3  whole?

4      A.   That's most of the work we did at Mr. Vaccarelli's

5  house.

6      Q.   And are those photographs taken by yourself or

7  someone on your crew?

8      A.   Someone on my crew.  That's actually me in the

9  photograph.

10         MS. LARAIA:  Your Honor, I move the admission of

11  Government's Exhibits 111, 112, 114, 115, 116, 117 and 118.

12         MR. EINHORN:  It seems a little excessive, Your

13  Honor.  I mean, it's not a construction case.  One photo

14  would do it, but I don't see the point of having --

15         THE COURT:  Let's have the full set anyhow.  I'm

16  going to overrule the objection.  Those are admissible.  Did

17  you wish to question further about them?

18         MS. LARAIA:  Yes, Your Honor.

19         THE COURT:  Thank you.

20  BY MS. LARAIA:

21      Q.   I'm just going to pull up Government's Exhibit 111

22  now in evidence.  Can you please describe for us what is

23  depicted in this photograph?

24      A.   That's the rear of Mr. Vaccarelli's house, and it

25  just kind of shows the grade that was there prior to us

1    getting there to construct the wall.

2        Q.   And you said that that's the rear of Mr.

3    Vaccarelli's house.  Which color house is Mr. Vaccarelli's

4    house?

5        A.   The yellow one.

6        Q.   Okay.  And how about the house to the left in this

7    picture; do you know whose house that is?

8        A.   That's Phil Mongelluzzo's house.

9        Q.   And is that on the side closer to your cousin's or

10   on the other side?

11       A.   My cousin's is to the left of that, looking at this

12   picture.

13       Q.   Okay.  I'm going to show you Government's Exhibit

14   112.  Now, what can you see in this picture?

15       A.   That actually looks like we were taking the panels

16   off the wall that we just constructed in Leon's yard.

17       Q.   Okay.  And which house is Mr. Vaccarelli's house?

18       A.   The yellow one.

19       Q.   And on the left side, yellow?

20       A.   The left side, correct.

21       Q.   And we'll get to the wall in a little bit.  I'm

22   going to show you Government's Exhibit 115.  Is that the wall

23   that you and your crew constructed?

24       A.   That is the wall.

25       Q.   Okay.  What was the height of that wall?

1      A.   The wall itself is eight foot, and the footing is

2   one foot.  So it's nine foot total.

3      Q.   Okay.  And what is the purpose for putting in a wall

4   like that?

5      A.   We back-filled most of that, and then to grade-off

6   somewhat, to have Leon a flat backyard for future use.

7      Q.   Okay.  I'm going to show you Government's Exhibit

8   116.  Is that another view of that wall?

9      A.   That is.

10      Q.   And 117.  Is that, again, the wall?

11      A.   Correct.

12      Q.   Do you know whether Mr. Vaccarelli ultimately put in

13   a pool in the yard?

14      A.   I do not.

15      Q.   I'm going to show you Government's Exhibit 114.

16   What is this?

17      A.   That's another patio that we constructed under

18   Leon's pressure-treated deck.

19      Q.   Okay.  You said "another patio."  There was just one

20   patio at his house; right?

21      A.   Correct.  There's a deck above that,

22   pressure-treated, and this was going to be a bluestone patio

23   underneath it.

24      Q.   And, so, what's happening right in this photograph?

25      A.   That was prior to us pouring concrete.

1    Q.   Okay.  I'm going to show you Government's Exhibit

2    118.  And what's happening in this photograph?

3    A.   That's me pouring the concrete.

4    Q.   When you say it's you pouring the concrete, are you

5    wearing the blue hat?

6    A.   I'm wearing the blue hat.

7    Q.   And is there a member of your crew or someone else

8    doing something else here?

9    A.   Correct.  That's -- he's smoothing the concrete on

10   the other side of me.

11   Q.   Okay.  Can you just describe Mr. Vaccarelli's house

12   for us, just based on your observations in the time that you

13   were working on his house?

14   A.   At that time, it wasn't completed yet, but it's --

15   all those homes are beautiful homes.  They're the higher --

16   like I said, they're the higher-end homes in the city of

17   Waterbury.

18   Q.   Okay.  I'm also going to show you, for

19   identification only, Government's Exhibit 122.  Do you

20   recognize that photograph?

21   A.   I do.

22   Q.   What is that?

23   A.   That's the development where Leon lives.

24   Q.   Okay.  Is that a fair and accurate representation of

25   Mr. Vaccarelli's house and the street -- on Joshua Town

1    Road?

2         A.   Yes.

3         Q.   And have you been over to that area since the time

4    that you performed work for Mr. Vaccarelli?

5         A.   I have.

6         Q.   And how frequently are you in that area?

7         A.   Well, we have a family reunion every year at my

8    cousin's house, so usually it's --

9         Q.   Two houses away?

10        A.   Maybe twice, three times, if my cousin doesn't need

11   my help for something.

12        Q.   So that's two houses away from Mr. Vaccarelli?

13        A.   Correct.

14             MS. LARAIA:  Your Honor, I move the admission of

15   Government's 122.

16             MR. EINHORN:  Same objection.

17             THE COURT:  Is there a particular purpose?

18             MS. LARAIA:  Yes, Your Honor.  I think it's

19   relevant, given what clients' money was spent for.

20             THE COURT:  From the exhibit?

21   BY MS. LARAIA:

22        Q.   I have one more exhibit to show you.  I'm going to

23   show you Government's Exhibit -- I'm sorry.  122 I'll show to

24   the jury, not --

25        Looking at Government's Exhibit 122, where is Mr.

1   Vaccarelli's house?

2       A.   In the middle.  The yellow one.

3       Q.   The yellow house, okay.  And this street; what is

4   this?

5       A.   Joshua Town Road.

6       Q.   Joshua Town Road, all right.  I have one more

7   exhibit for you.  I'm going to show you Government's Exhibit

8   120 for identification.  I'm sorry, I'm going to show you

9   124.  Do you recognize that photograph?

10      A.   I do.

11      Q.   What is that?

12      A.   That's Mr. Vaccarelli's house.

13      Q.   Is that a fair and accurate representation of his

14  house?

15      A.   Yes.

16          MS. LARAIA:  Your Honor, I move the admission of

17  124.

18          MR. EINHORN:  No objection.

19          THE COURT:  124 is a full exhibit.

20  BY MS. LARAIA:

21      Q.   And not to belabor the point, is that the front of

22  Mr. Vaccarelli's home?

23      A.   It is.

24      Q.   Consistent with other homes on that street?

25      A.   Yes.

1     Q.   Okay.  Now, I just want to talk about your agreement

2   with Mr. Vaccarelli.  Did you have an arrangement or an

3   agreement with respect to how much he was going to pay you

4   for the work that you did?

5     A.   I did.

6     Q.   And do you know how much he was supposed to pay

7   you?

8     A.   The total cost of -- I want to say it was in the

9   lower twenties.

10     Q.   Something like 21,000?

11     A.   Somewhere in that area, correct.

12     Q.   Now, when you do a project, do you require any

13   payment before you start a project?

14     A.   We require 50 percent up front.

15     Q.   Okay.  And did you get money from Mr. Vaccarelli?

16     A.   I did.

17     Q.   And how much money do you remember getting from

18   him?

19     A.   It was probably in the range around 10,000-10,800,

20   somewhere in that range.

21     Q.   When you talk about 10,800, what was the form of

22   that payment?

23     A.   It was cash.  Mr. Vaccarelli paid me cash.

24     Q.   And where did you receive cash from Mr.

25   Vaccarelli?

```
 1        A.    Mr. Vaccarelli had me meet him at his office on Bank
 2   Street in Waterbury.
 3        Q.    And did he tell you anything when he gave you the
 4   cash?
 5        A.    I don't recollect.  You know what I mean?  Small
 6   talk, maybe.
 7        Q.    Okay.  I'm also going to show you Government's
 8   Exhibit 104 for identification.  Do you recognize this?
 9        A.    I do.  That was another payment that Mr. Vaccarelli
10   made to me.
11        Q.    For the work that you did at Joshua Town Road?
12        A.    Correct.
13             MS. LARAIA:  Your Honor, I'd move the admission of
14   Government's 104.
15             MR. EINHORN:  No objection.
16             THE COURT:  Full exhibit.
17   BY MS. LARAIA:
18        Q.    I just want to -- I'm sorry.  I did the wrong button
19   here.  I just want to make this a little larger here.
20             Can you just tell us who this check is payable to?
21        A.    Carmine L. DiSapio.  That's me.
22        Q.    And what is the amount of that check?
23        A.    Seven thousand.
24        Q.    Okay.  And could you just read the "For" line?
25        A.    It says "Deposit work Joshua Town Road."
```

1      Q.   And what's the date on that check?

2      A.   9/21/2011.

3      Q.   Is that around the time that you were doing work at

4   Mr. Vaccarelli's home?

5      A.   Correct.

6      Q.   Now, just looking at the very top.  I can't

7   highlight because this is already highlighted, but do you see

8   something, LWLVACC?

9      A.   I do.

10      Q.   And do you know what that was?

11      A.   Well, I knew it was something to do with Leon, but

12   no, I never asked him.

13      Q.   And how do you know it was something to do with

14   Leon?

15      A.   Because he gave me the check.

16      Q.   Okay.  Now, just to be clear, the money that you got

17   from Mr. Vaccarelli, that cash and that $7,000, was that all

18   for work done at Joshua Town Road?

19      A.   It was.

20      Q.   The work that you did?

21      A.   Correct.

22      Q.   The patio and the wall?

23      A.   Correct.

24      Q.   Now, that doesn't exactly add up to 21,000; right?

25      A.   No.

1      Q.    Did you get the rest of the money?

2      A.    No, I didn't.

3      Q.    And what happened?

4      A.    I proceeded to go into the development one day and I

5    seen -- we also, per contract, we had to do his front

6    sidewalk.  After driving through, whatever reason it was, I

7    seen that the sidewalk was done.  We kind of did this in

8    steps.  I proceeded to call Mr. Vaccarelli and asked him what

9    was going on, and he told me that he had someone else finish

10   our project that we had a contract with.

11     Q.    And, so, what did you say?

12     A.    At the time?  Oh, I told him he had like until

13   Friday to get me my money, and he said he didn't -- he didn't

14   know what to -- you know, he wasn't going to pay us, he

15   didn't know what to do.

16     Q.    Did you say anything to him?

17     A.    I kind of threatened him on the phone at that

18   time.

19     Q.    Did you actually mean that you were going to carry

20   through with the threat or just something you said?

21     A.    No, it was just something I said.

22     Q.    So you didn't receive the rest of the money; fair to

23   say?

24     A.    Correct.

25     Q.    Okay.  But the 7,000 and the other $10,000 in cash

1    was for the work that you did at his house?

2        A.    Correct.

3             MS. LARAIA:   That's all I have, Your Honor.

4             THE COURT:   Cross-examination.   Is this long or

5    short?

6             MR. EINHORN:   It'll be a little longer than my other

7    witnesses, Your Honor.

8             THE COURT:   All right.   I'm sorry, Mr. DiSapio,

9    you're going to have to come back tomorrow at 9:30.   We'll

10   finish your examination at that time.

11            THE WITNESS:   Okay.

12            THE COURT:   Please don't discuss your testimony with

13   anybody until you get back here and testify.

14            THE WITNESS:   Okay.

15            THE COURT:   Thank you.

16            Ladies and gentlemen, you have a pleasant afternoon,

17   chilly but pleasant, and we'll see you tomorrow at 9:30.

18   Leave your notebooks here.   Please don't discuss this case.

19            (Jury out, 3:06 p.m.)

20            THE COURT:   All right.   Sir, you may go.   Thank you

21   very much.   See you tomorrow at 9:30.

22            (Witness excused, 3:06 p.m.)

23            THE COURT:   Anything before we adjourn for the day?

24            MR. McGARRY:   Nothing from the Government, Your

25   Honor.

1          MR. EINHORN:  Not from the Defendant, Your Honor.

2    Thank you.

3          THE COURT:  Hearing nothing, we stand adjourned.

4          (Proceedings adjourned, 3:06 p.m.)

5

6

7          COURT REPORTER'S TRANSCRIPT CERTIFICATE

8    I hereby certify that the within and foregoing is a true and

9    correct transcript taken of the proceedings in the

10   above-entitled matter.

11

12                         /s/  Tracy L. Gow
                           Tracy L. Gow, RPR
13                         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25