```
              UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT


_____
UNITED STATES OF AMERICA,       )
              Plaintiff,        ) No: 3:18-CR-92 (JBA)
                                )
      v.                        ) May 14, 2019
LEON VACCARELLI,                )
              Defendant.        ) 9:40 a.m.
_____ )
                                  141 Church Street
                                  New Haven, Connecticut




                    JURY TRIAL DAY 2




B E F O R E:
          THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
          and 14 JURORS
```

```
                              Official Court Reporter:
                              Tracy L. Gow, RPR
                              203-910-0323
```

1   A P P E A R A N C E S:

2   For the Government:
         MICHAEL S. McGARRY, AUSA
3        U.S. Attorney's Office-NH
         157 Church Street, 25th Floor
4        New Haven, CT 06510
         203-821-3751
5        Email: michael.mcgarry@usdoj.gov

6        JENNIFER LARAIA, AUSA
         U.S. Attorney's Office-BPT
7        1000 Lafayette Boulevard, 10th Floor
         Bridgeport, CT 06604
8        203-696-3029
         Email: jennifer.laraia@usdoj.gov

9
     For the Defendant:
10       JONATHAN J. EINHORN, ESQ.
         Law Office of Jonathan J. Einhorn
11       129 Whitney Avenue
         New Haven, CT 06510
12       203-777-3777
         Email: einhornlawoffice@gmail.com

13
         RACHEL MIRSKY, ESQ.
14       Mirsky Law LLC
         900 Chapel Street
15       10th Floor
         New Haven, CT 06510
16       203-290-2779
         Email: rachel@mirskylawct.com

17
     Also present:
18       LEON VACCARELLI
         SA RUSSEL DAY, FBI

19

20

21

22

23

24

25

**<u>INDEX</u>**

**EXAMINATION**

**Witness Name**                                                        Page

CARMINE DiSAPIO

   Cross By MR. EINHORN.......................................253

   Re-Direct By MS. LARAIA .................................259

CHRISTINE CHAUNCEY

   Direct By MR. McGARRY....................................261

   Cross By MR. EINHORN.....................................318

   Re-Direct By MR. McGARRY ................................322

CARRIE ANN ZIMYESKI

   Direct By MR. McGARRY....................................324

   Cross By Mr. Einhorn.....................................337

   Re-Direct By Mr. McGarry ................................339

   Re-Cross By Mr. Einhorn .................................340

KEITH SULLIVAN

   Direct By MS. LARAIA.....................................342

   Cross By MR. EINHORN.....................................354

   Re-Direct By Ms. Laraia .................................359

DENISE AUGELLI

   Direct By Ms. Laraia.....................................361

GIUSEPPINA LaPORTA

   Direct By Ms. Laraia.....................................380

   Cross By Ms. Mirsky.....................................388

   Re-Direct By Ms. Laraia .................................390

1

## INDEX (Cont'd)

2

**EXAMINATION**

3

**Witness Name**                                                        **Page**

4

SILVANNA MOFFA

5

   Direct By Ms. Laraia......................................... 396

6

   Cross By Ms. Mirsky......................................... 416

7

   Re-Direct By Ms. Laraia ................................... 418

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              (Call to Order, 9:40 a.m.)

2              (Out of the presence of the Jury.)

3              THE COURT:  Good morning, Counsel, ladies and

4    gentlemen, Mr. Vaccarelli.

5              MR. McGARRY:  Good morning, Your Honor.

6              MR. EINHORN:  Good morning, Your Honor.

7              THE COURT:  We're ready to proceed with our jury.

8    And is Mr. DiSapio here?

9              MR. McGARRY:  Yes.

10             THE COURT:  And could you get him?  Is there

11   anything before we begin?

12             All right.  Our jurors are here, please bring them

13   in.

14             (CARMINE DiSAPIO, previously sworn, 9:40 a.m.)

15             THE COURT:  Good morning.

16             THE WITNESS:  Good morning.

17             (Jury in, 9:40 a.m.)

18             THE COURT:  Good morning, ladies and gentlemen.

19   Please be seated.  We will continue this morning with the

20   testimony of Mr. Carmine DiSapio, who you will recall began

21   his -- did his direct testimony yesterday, and we will

22   proceed with cross-examination by Mr. Einhorn.

23             And Mr. DiSapio, you'll recall that you remain under

24   oath.

25             All right.  Mr. Einhorn you may proceed.
```

1          MR. EINHORN:  Thank you, Your Honor.

2          Would you open up the exhibits to the jury, please?

3    I've just placed one on the screen thank you.  Thank you.

4                    CROSS-EXAMINATION

5    BY MR. EINHORN:

6    Q.   Mr. DiSapio, just quickly, my name is Jon Einhorn,

7    and I represent Leon Vaccarelli.

8    A.   Yes.

9    Q.   First of all, I'm showing you Government's Exhibit

10   124, which you talked about as one of the finer houses in

11   Waterbury, and words to that effect.  It's a raised ranch;

12   right?

13   A.   Right now I have nothing.  It's saying out of -- I

14   can't see what you're -- it says "out of scan range."

15   Q.   Oh, there's nothing on your screen?

16   A.   No.

17   Q.   Okay.  Sorry.

18          (Pause.)

19          THE WITNESS:  Okay.

20          MR. EINHORN:  Thank you.  Thanks, Breigh.

21   BY MR. EINHORN:

22   Q.   All right.  So this is the house you're referring

23   to; right?

24   A.   Correct.

25   Q.   And you do construction, obviously?

```
1      A.   I do.
2      Q.   Okay.  And you're familiar with houses in general;
3   right?
4      A.   I am.
5      Q.   This is a raised ranch; right?
6      A.   A higher-end raised ranch.
7      Q.   It's not a center hall colonial; right?
8      A.   No, sir.
9      Q.   It's not some three-story palace, or more; is it?
10      A.   No.
11      Q.   It's a raised ranch; right?
12      A.   I guess if that's what you call it, yes.
13      Q.   All right.  Now, you also told us yesterday that at
14   some point you weren't allowed to finish your work, your
15   construction work on the patio; right?
16      A.   Correct.
17      Q.   Was that the only thing left for you to do on the
18   job?
19      A.   We were supposed to bluestone the back patio
20   underneath his pressure-treated deck, and we were going to do
21   something in the front here, the sidewalk.
22      Q.   And when you say you were to do those additional
23   jobs, was there a written contract with you?
24      A.   There was.
25      Q.   There was a written contract?
```

```
1      A.    There was.

2      Q.    With you and Mr. Vaccarelli?

3      A.    Yes, there was.

4      Q.    You got it with you?

5      A.    I don't.

6      Q.    And did you show it to the agents when you met with

7  them?

8      A.    No, I didn't.

9      Q.    Did you show it to anybody?

10     A.    No, I didn't.

11           And on this contract, since you say it mentioned the

12  front sidewalk, are you familiar with the fact that the front

13  sidewalk was the responsibility of the general developer --

14  the general contractor.

15     A.    Correct.  There was a sidewalk already there.

16     Q.    All right.

17     A.    What we were going to do was we were going to add

18  on -- we were going to flare it.  Originally he wanted it

19  moved up, more into the middle of his driveway, sort of

20  call --

21     Q.    So it -- go ahead.  Sorry.

22     A.    The sidewalk was already there.  What we were going

23  to do was just add in.  Because he had a bluestone patio, we

24  were going to replicate that to make it look uniform to the

25  front of his home.
```

1      Q.    Sure.  And at some point you testified you had a
2    dispute with Mr. Vaccarelli?
3      A.    I did.
4      Q.    And what was the dispute over?
5      A.    He didn't follow on the contract, and he didn't
6    finish paying me.  We were supposed to go back and finish the
7    job, and then he had a balance due.
8      Q.    And he hired -- actually, what you told the agents,
9    isn't it, is that he hired somebody else to come in and work
10   and that's what angered you?
11     A.    That's right.  Eric Strachan has a mason that
12   strictly works for him -- his name is Terry -- and Leon
13   actually had Terry finish off, I guess, what we were supposed
14   to finish off.
15     Q.    And Eric Strachan is a general contractor?
16     A.    He's the developer, correct.
17     Q.    The developer of this project?
18     A.    Correct.
19     Q.    So, you were upset.  You were angry; right?
20     A.    Absolutely.
21     Q.    How angry?
22     A.    Enough to call him on it.
23     Q.    And when you say "enough to call him on it," you
24   said yesterday you kind of threatened him.  What does that
25   mean?

1    A.   Well, speaking with him, I told him he was under

2    contract, and he had said to me that he chose to use Terry.

3    And from what I got out of that, because Leon owed me about

4    3800, because the way we took the portions of the money, he

5    had Terry finish my project for less than what he owed us.

6         So, say, he paid Terry like a thousand, he owed me

7    thirty-eight, so he ended up getting away with saving himself

8    twenty-eight.  So when I said to Mr. Vaccarelli -- I forgot

9    exactly what day it was, but we'll just say it was like a

10   Friday.  I said, Leon, you got until Friday to have my money,

11   I said, otherwise I'm going to burn your house down.

12   Q.   You said you were going to burn his house down?

13   A.   I did.

14   Q.   This is a house with a wife and eight children?

15   A.   I don't know, how many --

16   Q.   You knew he had a lot of children and a wife living

17   there; right?

18   A.   I do.

19   Q.   And you made this threat.  And were you on drugs at

20   the time you made the threat?

21   A.   No, sir.

22   Q.   Were you serious about making that threat?

23   A.   I couldn't be that serious, the house is still

24   standing.

25   Q.   But you were angry; right?

1      A.   I was angry.

2      Q.   You were angry enough to say that -- did you also

3   say you were going to kill him and his family?

4      A.   No, I didn't say that.

5      Q.   And when you told him you were going to burn down

6   his house, you didn't do it because somebody else in the town

7   talked to you and said Stay away, don't do it; right?

8      A.   Correct.

9      Q.   Okay.  And when you made that threat about burning

10  down the house, in fact, you have a criminal history for

11  violence; don't you?

12          MS. LARAIA:  Objection, Your Honor.

13          THE WITNESS:  No, I don't.

14          THE COURT:  Excuse me.  Just wait.  The basis?

15          MS. LARAIA:  Relevance and also basis.

16          THE COURT:  Your claim, Mr. Einhorn?

17          MR. EINHORN:  No, Your Honor.  I'll withdraw it.

18          THE COURT:  All right.  The jury will disregard the

19  question and the beginning of the answer.  Thank you.

20  BY MR. EINHORN:

21     Q.   And the work you did on this particular house, did

22  you pull a permit for it?

23     A.   No, we didn't.

24     Q.   Okay.

25          MR. EINHORN:  Nothing further, Your Honor.

1          THE COURT:  All right.  Redirect.

2          MS. LARAIA:  Just briefly, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MS. LARAIA:

5     Q.   Good morning, Mr. DiSapio.

6     A.   Good morning.

7     Q.   Mr. Einhorn just asked you about the conversation

8    you had with Mr. Vaccarelli after he didn't pay you the rest

9    of the money he had contracted with you.

10    A.   Correct.

11    Q.   Okay.  And you said that you threatened to burn down

12   his house?

13    A.   Correct.

14    Q.   And did you ever intend to really burn down his

15   house?

16    A.   No, ma'am.  Let me just state, I been in business

17   now, I think since '08.  And under our home improvement

18   contractor's number, we have a zero complaint record in 11

19   years.  So that means every customer and client that I dealt

20   with, big commercial properties to residential, we never had

21   an issue with anyone.

22    Q.   Okay.  And I just want to bring back up -- this is

23   Government's Exhibit 124 that Mr. Einhorn just asked you

24   about.  The streets on this -- or, I'm sorry -- the houses on

25   this street, on Joshua Town Road, is it fair to say most of

1   these are custom homes?

2   A.   It was a custom development.  That's how it was

3   actually sold.  It was Custom Homes by Eric Strachan.

4   Q.   So what does it mean that something is a custom

5   home?

6   A.   It's not your average home.

7   Q.   Is that a good thing or a bad thing?

8   A.   It's more for the higher-end people that could

9   afford higher-end homes.  It's a higher-end development.

10   Q.   And I'm just going to show you again Government's

11   Exhibit 104.  And just to be clear here, this check, $7,000,

12   what was that for?

13   A.   That was the second payment that Mr. Vaccarelli had

14   given me.

15   Q.   For work at his house on Joshua Town Road?

16   A.   Correct.  What I do is, I take a deposit as we --

17   before we start.  After we do so much, we take a second

18   payment, and then our final payment we usually leave until

19   we're completely done.  That was the second payment, and we

20   never received a third payment.

21   Q.   Okay.  So the third payment is the one you didn't

22   get?

23   A.   Correct.

24   MS. LARAIA:  No further questions, Your Honor.

25   THE COURT:  Anything further?

1          MR. EINHORN:  No, Your Honor.  Thank you.

2          THE COURT:  All right.  Mr. DiSapio, thank you.  You

3    may step down.  You are excused.

4          THE WITNESS:  Thank you.

5          (Witness excused, 9:50 a.m.)

6          THE COURT:  Please call your next witness.

7          MR. McGARRY:  Thank you, Your Honor.  At this time

8    the Government calls Ms. Christine Chauncey to the stand.

9          THE COURT:  Ms. Chauncey, if you'd kindly come over

10   to the witness stand and just remain standing, and

11   Ms. Freberg will administer the oath to you.

12          (CHRISTINE CHAUNCEY sworn, 9:51 a.m.)

13          COURTROOM DEPUTY:  You can be seated.  Please state

14   your name for the record and spell your last name.

15          THE WITNESS:  Christine Chauncey.

16          COURTROOM DEPUTY:  Spell your last name.

17          THE WITNESS:  C-H-A-U-N-C-E-Y.

18          COURTROOM DEPUTY:  And can you tell us what city and

19   state you live in?

20          THE WITNESS:  I live in Waterbury.

21          THE COURT:  Mr. McGarry, you may proceed.

22          MR. McGARRY:  Thank you, Your Honor.

23                        DIRECT EXAMINATION

24   BY MR. McGARRY:

25     Q.   Good morning, Ms. Chauncey.

```
1        A.    Good morning.

2        Q.    I believe you just said you live in Waterbury.

3        A.    Yes, I do.

4        Q.    How long have you lived in Waterbury?

5        A.    My whole life.

6        Q.    Okay.  And have you ever testified in Federal Court

7   before?

8        A.    No.

9        Q.    First time?

10       A.    Yes.

11       Q.    Okay.  Are you nervous?

12       A.    Mezza-mezz (phonetic).

13       Q.    Okay.  Are you currently working or not working?

14       A.    I am a retired school administrator.  I retired in

15   2009 as vice principal at Walsh school.  And my friends are

16   all principals and they called me back to tutor, so I've been

17   tutoring, instructional tutor, for ten years now.

18       Q.    And how long were you in the school system before

19   you retired before being called back as a tutor?

20       A.    Thirty-seven and a half years.

21       Q.    Okay.

22       A.    Then I lasted three months on retirement, and I went

23   out of my mind.  And I got called back by one of my friends

24   who was a principal, to tutor.

25       Q.    And do you tutor in any particular subject, like
```

1    math, reading?

2        A.    It depends.  The first couple years it was reading

3    and math.  Now, mostly it's been literacy and math.  And

4    reading -- I'm sorry.

5        Q.    And do you have any children?

6        A.    I have three children.

7        Q.    And, just briefly, what do they do?

8        A.    My oldest daughter is a reading literacy coach in

9    Bethel.

10       Q.    Okay.  She's in the family business, I guess.

11       A.    She's in the family business.  I'm inspiring.  My

12   middle daughter is a nurse.  She lives in Fishers, Indiana.

13   And my son is a doctor.  He's an emergency room physician in

14   Philadelphia.  Will be moving to Memphis.  He's getting

15   married.  My future daughter got a fellowship at St. Jude's,

16   and she's a pediatric oncologist hematologist.

17       Q.    And where is he going to be moving to?

18       A.    Memphis, Tennessee.

19       Q.    Okay.  I think you said that.  Approximately when

20   was he in graduate school or in -- I guess they call it

21   medical school.  Do you remember when he was in medical

22   school, when he got out of medical school?

23       A.    Two years ago.

24       Q.    Okay.

25       A.    Yeah.

1    Q.   And is that four years, seven years?  I'm honestly

2    not sure with residency how long one is in school.

3    A.   He was in med school for four years at UConn, and

4    then he did a three-year residency at Hartford Hospital.

5    Q.   Okay.  Moving to the subject that brings us here, do

6    you know the Defendant, Leon Vaccarelli?

7    A.   Yes, I do.

8    Q.   How long have you known him?

9    A.   I would say over 20 years.  I think we met in the

10   1990s.

11   Q.   And briefly tell the ladies and gentlemen of the

12   jury how you met him.

13   A.   He worked at his uncle's grocery store, Pat's IGA,

14   and I used to do my grocery shopping on Sundays, because it's

15   the only time I had with the three kids.

16   Q.   And were you a single mom?

17   A.   Yes, I'm a single mom.

18   Q.   So when you met him or saw him at Pat's IGA, what

19   was your interaction with him?

20   A.   Well, it was just because I was there every week, we

21   started talking.  He was managing the store, and we just got

22   to be friendly, waving at each other, and then started

23   conversations and got to be friendly.

24   Q.   And do you know if he was an investment advisor at

25   that time or was this before he --

1      A.   No, he was still in college in Rhode Island.  I

2   don't remember what college.  And he was in finances.  And in

3   one of our conversations he told me he was going into

4   finances.  And I had been divorced for a while, but I managed

5   to save money, and I said I was looking to invest the money

6   for my children's college education.

7      Q.   And tell the jury about when you first decided to

8   invest with him.  What was that like?

9      A.   I went to his office.  It was American Express or

10  Ameriprise.

11     Q.   Okay.

12     A.   And he said I was his first client.  And we had a

13  meeting.  He had a binder.  We had discussed what my future

14  goals and objectives were.  One of them was to own a cottage

15  in Maine, and the other ones were to get my kids through

16  UConn.

17     Q.   And was he by himself or was there a senior

18  person?

19     A.   No, he had a senior person with him.

20     Q.   Okay.  And did you invest with him at that time?

21     A.   Yes, I did.

22     Q.   Do you remember approximately how much?

23     A.   I think it was around $50,000.

24     Q.   Okay.  Do you remember anything, in particular --

25  how he looked, how he was dressed -- as compared to seeing

1    him at the IGA?

2        A.    He was dressed in a business suit.  He was -- he had

3    just graduated.  It was his first job.

4        Q.    Okay.  And you said -- I think you said you were his

5    first customer, if not one of his first customers.  How do

6    you know that?

7        A.    Because that's what he told me, and that's the way

8    he introduced me to people after that, that I had been his

9    first customer.

10       Q.    And did he mention that later on in your

11   interactions with him when you went to the office?

12       A.    When I went to the office -- I think the other side

13   of the office was a law firm that he shared the floor with.

14       Q.    Okay.

15       A.    And there was a lawyer in there.  Her name is

16   Stephanie Cummings.  She's now a state rep.  And he

17   introduced me to Stephanie, and he said, She was my first

18   customer.

19       Q.    Okay.  Did you ever go to his office when he was at

20   Bank Street?

21       A.    Yes.

22       Q.    Okay.  And then did you also go to his office at

23   Leavenworth?

24       A.    Yes.

25       Q.    Okay.  Just let me see if -- I don't know if you've

1   seen this picture, but -- in evidence.  Let's see.  I'll pull

2   up what's in evidence Government's Exhibit 40.  Do you

3   recognize that entryway?

4       A.    That's 49 Leavenworth?  Yes.

5       Q.    And that's where you would go to meet?

6       A.    The new building, yes.

7       Q.    And pulling up what's been marked in evidence as

8   Government's Exhibit 43.  I'll zoom-in on that.

9       A.    That's his conference room.

10      Q.    And had you been there?

11      A.    Yes.

12      Q.    Over the years, how many occasions?

13      A.    I usually went once a year, when it was income tax

14  time, to make sure I had all the proper forms to file.

15      Q.    And did you meet in this conference room?

16      A.    Yes.

17      Q.    Did you meet him other times during the year?  Did

18  he come to your house?  Approximately how many times a year

19  did you see him?

20      A.    Definitely at income tax time.

21      Q.    Okay.

22      A.    Before that, in the early years it might have been

23  two or more times, if I had some business, if I needed money,

24  if I wanted to discuss the investments, if I needed money for

25  the kids' school, if I was doing -- buying real estate in

1    Maine, to go over finances.  But then usually, towards the

2    end, there was just once a year when I had to get the

3    information for my income tax.

4        Q.   Okay.  And did you speak with him on the phone in

5    between those times?

6        A.   Probably.

7        Q.   Okay.  I'd like to pull up another document, but

8    before I do --

9            MR. McGARRY:  Your Honor, at this time, I believe

10   without objection but I'll call them out for the record and

11   for our court reporter, we'd like to move into evidence

12   Government's Exhibit 16, 16A, 16B, 550 through 557 inclusive,

13   557A, 559 and 561.

14           We're going to reserve on 561.

15           THE COURT:  All right.  We'll just mark that for ID.

16   Is there objection?

17           MR. EINHORN:  I'm sorry, there's no objection to any

18   of the documents.

19           THE COURT:  All right.  Then we will admit them on

20   consent, all of them, as full exhibits.

21   BY MR. McGARRY:

22       Q.   Okay.  Ms. Chauncey, let me pull up Government's

23   Exhibit 550, and I don't want to spend too much time with it,

24   but do you recognize what is Government's Exhibit 550 in

25   evidence?

1      A.   This was the document when he switched over to the

2   investment --

3           THE COURT:  Can you keep your voice up, please?

4           THE WITNESS:  Oh, I'm sorry.

5           THE COURT:  The bar there is your microphone.  Thank

6   you.

7           THE WITNESS:  Okay.  I had to check it out to make

8   sure.  This was when he switched over to The Investment

9   Center, that I had to sign a paper to agree to it.

10  BY MR. McGARRY:

11     Q.   Okay.  So tell the jury about that.  You said this

12  is when he switched over.

13     A.   Yeah.

14     Q.   Tell them --

15     A.   Oh, he switched -- during the years, he switched

16  investment companies -- Ameriprise.  There was one in Canada.

17  And he would call me down when he was switching for the

18  benefit of my portfolio, and you had to sign documents that

19  you were okay with this.  So this is when he transferred his

20  business partnership to The Investment Center.

21     Q.   And was the other -- was the Canadian one QA3, or

22  something like that?

23     A.   Yes.

24     Q.   And he was at Ameriprise, as far as you recall?

25     A.   Yeah.

1     Q.    Then QA3, and then the Investment Center?

2     A.    Yes.

3     Q.    And you moved with him each time?

4     A.    Yes.

5     Q.    And let me go to the second page.  Do you recognize

6     your name and basically your profile on there?

7           I can zoom it in a little bit more.

8     A.    Yes.

9     Q.    Okay.  We've blocked out your birthday, but,

10    unfortunately, they don't block out the birth year, so...

11    But it is what it is.

12    A.    I'm going to be 69.  Who cares?

13    Q.    It says your risk tolerance at this time was

14    moderate.  Let me just, again, go down to the next page.  And

15    did you have any conversations with him about the details of

16    this paperwork -- about payment information, confirmations,

17    receiving statements, things of that sort?

18    A.    No, I didn't, because I assumed because we had been

19    together so long that it would be the same procedure.

20    Q.    Okay.  And as a general matter, was it the same

21    procedure?

22    A.    Yes.

23    Q.    Okay.  Let me jump ahead a little bit to

24    Government's Exhibit 551 in evidence, and I'll direct your

25    attention to the date, which is March 21 of 2012 in the

1    amount of $20,000 made out to Lux Financial Services.  Do you

2    see that?

3         A.   Yes, I do.

4         Q.   Okay.  Tell the jury, if you recall, what you

5    remember about this investment.

6         A.   This Webster account was my rental property in Maine

7    account, where I deposited rental checks, I paid mortgages,

8    and I paid the bills from for my cottages.  I owned two.  It

9    got to be too much, I sold one.  And this check was from that

10   account, which would probably include the profit from the

11   cottage and the rental money that I had left over from it.

12   It was a seasonal rental.

13        Q.   Was that in Old Orchard Beach?

14        A.   Old Orchard Beach, Maine.

15        Q.   Okay.  And is that on the coast?

16        A.   Yes, southern Maine.

17        Q.   And you sold it in 2012, and you provided this check

18   to Mr. Vaccarelli?

19        A.   Yes.

20        Q.   And directing your attention to the "Pay to the

21   Order Of," do you see what it's made out to?

22        A.   Lux Financial Services.

23        Q.   What was Lux Financial Services?

24        A.   Leon's company.

25        Q.   Who told you to make it out to Lux Financial

1  Services?

2       A.   He did.

3       Q.   Do you recognize what appears to be a signature on

4  the back?

5       A.   Yes.

6       Q.   And is that your signature or is that -- do you

7  recognize that as your signature or someone else's, if you

8  know it?

9       A.   It's not my signature.

10      Q.   Okay.  Do you recognize it as Mr. Vaccarelli's

11 signature, or no?  If you do, you do.  If you don't --

12      A.   It looks like it.

13      Q.   Okay.  Going back to Government's Exhibit 550 for a

14 second, and going to page 3, where it talks about:  "Payments

15 for the purchase of stock, options, bonds, mutual funds and

16 any other equity investments should always be payable to

17 Pershing, LLC."  Do you see that?

18      A.   Yes.

19      Q.   But the check that we just looked at was made out to

20 LUX?

21      A.   Yes.

22      Q.   Did you have any conversations with Mr. Vaccarelli

23 about why you would be making this particular check out to

24 LUX?

25      A.   Not that I recall, but I assumed that it was going

1    into his account and he would purchase --

2         Q.   Stock?

3         A.   -- stock through there.  That's the way I thought it

4    went, because I very rarely -- my basic portfolio was an

5    inheritance from my father.

6         Q.   Okay.  So you weren't adding to --

7         A.   So he took care of that money.  I never really wrote

8    out checks to him, because I didn't have that much money

9    except at these occasions with the real estate.

10        Q.   Right.  And what was your understanding as to where

11   the money from 551 was going to be invested in?

12        A.   I thought it would just go right into the portfolio

13   that had my father's stocks and bonds?

14        Q.   Any particular stocks or bonds that you would --

15        A.   No.

16        Q.   Did you think it would be spread out?

17        A.   I thought it would be just spread out between

18   whatever Leon thought was the best.

19        Q.   And was that -- what was that understanding based

20   on?

21        A.   The way we had previously done business.

22        Q.   Okay.  And did he tell you anything to the contrary

23   about this $20,596?

24        A.   Not that I recall.

25        Q.   Let me just take you to the second page.  It says

1 account 7051.  Do you know what that account is?

2    A.   No.

3    Q.   Okay.  And it says --

4    A.   Naugatuck Savings Bank.  No.

5    Q.   It says "checking," slash, "money market."  Do you

6 see that?

7    A.   Yes.

8    Q.   Did you have any conversation with Mr. Vaccarelli

9 about your money going into a checking, slash, money

10 market?

11    A.   No.

12    Q.   Okay.  Do you recall if you ever got a confirm for

13 this investment?

14    A.   I don't recall.

15    Q.   And I think 564 --

16        MR. McGARRY:  Okay.  I'd like to move in

17 Government's Exhibit 564.

18        MR. EINHORN:  No objection.

19        THE COURT:  Full exhibit.

20 BY MR. McGARRY:

21    Q.   Do you recognize this document?

22    A.   It would be a statement that I usually got from The

23 Investment Center.

24    Q.   Okay.  And can you tell the date period?

25    A.   March 1, 2012 to March 31, 2012.

1    Q.   Okay.  And do you remember the date of the check

2    that was Government's Exhibit 551?

3    A.   Was in March around the same date, I think.

4    Q.   Okay.  And let's see.  Just paging down, do you know

5    if -- you said it would be spread out.  Do you know if there

6    were, in fact, any additions made to your account statement

7    during March of this year?

8    A.   No, I wouldn't recall.

9    Q.   Okay.  Let's see.  Let's go to -- okay.  And just

10   pulling up the Activity Summary section, do you see under

11   Activity Summary, Additional Transactions, do you see any

12   reference to more than $20,000 being placed into your

13   account?

14   A.   No, I do not.

15   Q.   Okay.  At the time, did you believe that your money

16   had gone into the same account at The Investment Center?

17   A.   Yes, I did.

18   Q.   Okay.  And what was that based on?  What was that

19   understanding based on?

20   A.   Because I trusted Leon, I was busy raising three

21   kids, I depended on him to take over this for me.  He had

22   always -- he had never given me any other reason not to

23   believe him.

24         MR. EINHORN:  Your Honor, could we -- I apologize.

25   Could we approach the bench quickly?

1       THE COURT:  Yes.

2       MR. EINHORN:  Thank you.

3       THE COURT:  One moment, ladies and gentlemen.  It's

4  just much shorter to do it this way than send you out.

5     ***SIDEBAR CONFERENCE, 10:11 a.m., all counsel present,

6                         as follows:

7       MR. EINHORN:  Your Honor, this witness signed a

8  release, which includes within it considerable language about

9  not disparaging Mr. Vaccarelli.  There's also a nondisclosure

10 agreement, but that allows for court testimony.  That's okay.

11      But in terms of the nondisparagement language, I

12 don't think this witness should be allowed to testify

13 pursuant to this.  And if I wait until she finishes

14 testifying to raise this and to introduce what is this

15 particular exhibit, it'll be kind of late, in the jury's

16 mind, so I wanted to call it to the Court's attention now.

17      THE COURT:  And what, specifically, about her

18 testimony do you think violates the nondisparagement clause?

19      MR. EINHORN:  She's just starting to get into it

20 now, talking about negative things about Leon.  I don't mind

21 the background stuff, that's fine -- she was a customer of

22 his and so forth.  But the Government is starting to get into

23 the use of her funds and so forth.  That would be

24 disparaging.

25      THE COURT:  Is there any portion of that release

1   that references testimony compelled in court?

2        MR. EINHORN:  I'm sorry.  Only in the section that

3   says that -- only in the nondisclosure section, and it

4   says -- it talks about disclosing information if required by

5   a court order.  But that's not inconsistent, I believe, with

6   the nondisparagement section.

7        THE COURT:  Is she under subpoena?

8        MR. McGARRY:  Yes, she is.

9        MR. EINHORN:  In other words, my position is she can

10  still testify of course, because it's a court order, but

11  she's still limited as to what she can say.  And I know the

12  Government has a copy of this, since I'm reading from a

13  Government proposed exhibit.

14       THE COURT:  So your view is that if she is asked

15  questions of fact and she answers truthfully and accurately,

16  even though that answer is -- if that answer is

17  negative -- negatively reflects on Mr. Vaccarelli, that she

18  is obligated by her release not to give that testimony?

19       MR. EINHORN:  That's my position, yes.

20       MR. McGARRY:  Your Honor, I disagree.  I think it's

21  a red herring.  I think she is here, under subpoena, in

22  Federal Court to testify truthfully.  She's not here as a

23  character witness.  She's not being asked, Do you have an

24  opinion of Mr. Vaccarelli?  She's being asked what happened,

25  what was she told, what was she not told.  She may be asked

1     if it would have made a difference to her investment

2     decisions if she knew where the money was being used or

3     spent, but she is clearly under subpoena and she's in court

4     to answer questions under oath, and I think it's definitely

5     covered by that paragraph.

6           But, also, I don't think that one can be silenced

7     and not give truthful testimony in a criminal trial if there

8     happens to be a settlement, when they're under subpoena.

9           THE COURT:  Anything further, Mr. Einhorn?

10          MR. EINHORN:  No, Your Honor.  Thank you.  No, I

11    think it -- well, yes, actually.  This is a contract between

12    her and Mr. Vaccarelli.  Just like the contract, by the way,

13    between him and The Investment Center.  And my argument is

14    the same as it was when I argued before Your Honor yesterday

15    on The Investment Center.  That's a contract issue.  If she

16    testifies, as she may end up doing, she'll be breaching that

17    contract.

18          THE COURT:  Is the remedy for that breach of

19    contract something that takes place outside of court?

20          MR. EINHORN:  I think the remedy is something that

21    would involve court -- maybe not this particular proceeding,

22    though.  Yes, probably not this proceeding.  But I do think

23    it's something that certainly the jury should know about and

24    I'm obviously going to raise it on cross-examination, but

25    it's a little late by then.

1          THE COURT:  May I see this?

2          MR. EINHORN:  Yes, of course (handing).

3          THE COURT:  This is 560?

4          MR. McGARRY:  Correct.  And we specifically marked

5     it -- turned it over weeks ago.  Well, it was turned over

6     months ago.

7          THE COURT:  Let me read it.

8          (Pause.)

9          THE COURT:  The phrase -- paragraph B -- that says:

10    "Chauncey shall not take, support, encourage, induce or

11    voluntarily or involuntarily participate in any action or

12    attempted action that would negatively comment on, disparage,

13    or call into question the business operations, policies or

14    conduct of Leon Vaccarelli that would damage Leon Vaccarelli,

15    Lux Financial, LWLVACC's reputation, business relationships,

16    present or future business or reputation," I do not find that

17    language to insulate Mr. Vaccarelli from her subpoenaed

18    testimony under oath in a criminal matter.

19         I further find that if Mr. Vaccarelli disagrees and

20    believes that she has breached paragraph B by her subpoenaed

21    testimony in answer to the Government's questions, that the

22    remedy for that is not preclusion of her testimony here, but

23    is as otherwise available in a civil action, if any.

24         Paragraph A is a confidentiality clause, requiring

25    Chauncey, absent authority from Vaccarelli, to communicate

1   with regard to any and all matters which are the subject of

2   the release, to include but not be limited to the lawsuit and

3   the terms of this release.

4          I similarly do not read a confidentiality agreement

5   effectuated between two parties in a civil matter and

6   settlement of a civil claim to preclude that party's, one or

7   the other party's testimony with regard to those matters that

8   are matters that are the subject of this release.

9          So, in addition, I would question what the effect is

10  of her being cross-examined on this by Mr. Vaccarelli's

11  counsel, to the extent it elicits information that is --

12  constitutes any information of any nature with regard to any

13  and all matters that are the subject of this release.

14         So I'm not going to preclude her testimony, and we

15  will proceed.

16         MR. EINHORN:  Yes, Your Honor.  Thank you.

17         ***SIDEBAR CONFERENCE concludes, 10:22 a.m.***

18  BY MR. McGARRY:

19  Q.   Ms. Chauncey, we had I think finished talking about

20  the $20,000 investment.  I'd kind out of like to move on just

21  to another topic, just generally take a step back.  Where do

22  you live?  I think you told us the town, but what street do

23  you live on?

24  A.   128 Joshua Town Road.

25  Q.   And is Mr. Vaccarelli a neighbor of yours?

1    A.   Yes, he is.

2    Q.   Okay.  Let me show you, if I can get a photo,

3  Government's Exhibit 120.  Do you recognize the yellow house

4  in the middle of Government's Exhibit 120 in evidence?

5    A.   Yes, that's the Vaccarelli home.

6    Q.   And how far do you live from there?

7    A.   We're separated by two houses and a lot.

8    Q.   Okay.  At any point in time, did you -- you said you

9  knew Mr. Vaccarelli for about 22 years.  Do you remember when

10  he was moving to Joshua Town Road?

11    A.   It would have been four or five years before I did.

12    Q.   And did you have any discussions with him about his

13  move to Joshua Town Road?

14    A.   We were on very good terms at that time, and they

15  were building a house because they needed more room.  He took

16  me to see the house, the inside, once while it was being

17  built.

18    Q.   Was it a nice house?

19    A.   I think it was nice.

20    Q.   Did he tell you where he was getting the money for

21  the new house?

22    A.   No, and I wouldn't ask.

23    Q.   Okay.  Did he appear to be doing well?

24    A.   Yes.

25    Q.   Okay.  At some point in time, did he ask you about

1    becoming his neighbor?

2        A.    Yes, he did.

3        Q.    Tell the jury about that.

4        A.    Well, my house was small, and I was always

5    complaining I didn't have a garage and I didn't have an

6    attic.  So he called me one day, and he said he wanted to

7    show me these lots.  And he looked at me and says, Chris, I

8    want you to be my neighbor.

9        Q.    Okay.

10       A.    And he took me down.  The builder was waiting -- and

11   this was three lots down from his -- and he showed me the

12   lot, and I liked it.  Then he drove out to the builder -- the

13   builder was building a home in Watertown.  So then I drove

14   out with him to see this house that he was building in

15   Watertown, and I really liked it.

16       Q.    Do you remember the name of the builder?

17       A.    Eric Strachan.

18       Q.    Okay.  And did you eventually buy a house, the house

19   that you live in now?

20       A.    I bought the lot.

21       Q.    Okay.  And what did you do then?

22       A.    I bought the lot, and it was when the market was

23   okay.  I had sold my cottage in Maine, and I wanted to

24   reinvest the money and make some money.  But having a cottage

25   was too much responsibility, especially four hours away.  I

1    wanted something that I wouldn't have to maintain and have

2    repairs.  So I figured I'd buy the lot and flip it.

3         Q.   Okay.

4         A.   But then the market crashed.  So then I own a house

5    and a lot, and the property values are going down in

6    Waterbury while the taxes are going up.

7         Q.   Okay.

8         A.   So I figured -- after three or four years, I figured

9    I had to stop the bleeding, because I'm paying taxes on a

10   house that the value is going down on, the lot that I tried

11   to sell that the taxes were going up on.  So I figured if I

12   finally built a house as an investment, a big house, that

13   would be "family-er" -- because my kids were grown and moved

14   away, that it would be a good investment property for resale,

15   to have a big family home.

16        Q.   And did you talk to Mr. Vaccarelli about that

17   decision?

18        A.   Yes.

19        Q.   Okay.  And what did you end up doing?

20        A.   I ended up building the house.

21        Q.   And were you able to sell it?

22        A.   No.

23        Q.   Okay.  Do you still own it?

24        A.   I still own it.

25        Q.   Do you live in it?

1     A.   I live in it.

2     Q.   Okay.  And he's still your neighbor?

3     A.   He lives -- from what I understand, he doesn't live

4  there anymore.  He lives around the corner, down the

5  street.

6     Q.   Okay.  Moving again now to another topic.  At some

7  point in time -- directing your attention to approximately

8  2015, did there come a time where Mr. Vaccarelli approached

9  you or talked to you about making another investment or a

10  different investment?

11     A.   Yes.  That was probably -- I met with him in March

12  usually, to check to make sure that I had all my paper -- all

13  my statements ready to do my income tax.

14     Q.   Okay.

15     A.   And at that meeting, after we checked that I had all

16  my paperwork, he told me that he was starting a special fund

17  for just friends and family.

18     Q.   Okay.

19     A.   And that I had this account, which happened to be my

20  Athene annuity, that was only making 3 percent, and he

21  wanted -- he says I could make more money -- 8 percent, I

22  think it was -- for 15 months.  And I said to him, Why me?

23  And he said because I qualify, which I have no idea what I

24  had to do to qualify.

25     Q.   But you qualified?

1    A.    But I qualified.  Luckily for me, I qualified.

2    Q.    So at the time you thought that was a good thing?

3    A.    I did not go into this meeting -- I was perfectly

4    satisfied with what I had.  The annuity was making 3 percent.

5    That was fine with me.  He initiated the conversation on this

6    15-month, where I would make more interest on it, and I was

7    hesitant.  And I said, I'm not sure about this, Leon --

8    because he originally wanted more money.

9    Q.    How much did he want originally?

10   A.    He wanted $90,000, which would have left 10,000 in

11   the account.  And I said -- I thought about it, and I said,

12   no, I'm not giving you that much money, I'll give you half.

13   I'm not sure about this, Leon, but -- I said, I'm really not

14   sure about this, but I trust you.  And he looked me in the

15   eye and he said, Thank you for this trust, I thank you for

16   this trust you have in me.

17   Q.    Let me pull up Government's Exhibit 16 in evidence

18   in front of you.  Do you recognize this document?

19   A.    That was the Private Direct Investment Agreement

20   that he gave me to sign.

21   Q.    Okay.  And focusing on that part where it says

22   "Separately Managed Account, 15-month Senior Note, 8 percent

23   per annum, no liquidity of principal."  Do you see that?

24   A.    Yes.

25   Q.    Was that consistent with what he told you

1  verbally?

2      A.   Yes.

3      Q.   And it references up top that it will rely upon the

4  financial and other information contained in the new account

5  form.  Do you see that?

6      A.   Yes.

7      Q.   Okay.  Do you know what new account form that was

8  referring to?

9      A.   No, I don't, but I assume that that money was going

10 into a new investment.

11     Q.   Okay.  And this was the 8 percent investment?

12     A.   An 8 percent investment.

13     Q.   Okay.  It talks about a separately managed account.

14 Do you see that?

15     A.   Yes.

16     Q.   Okay.  What did you understand that to mean?

17     A.   That the money that I was putting in would go into

18 something.  It would be like a stock that I bought in my

19 name.

20     Q.   Okay.  It talks about a 15-month Senior Note.  What

21 did Mr. Vaccarelli explain to you about the term or the

22 period of time of this investment?

23     A.   Just that it was going to be for 15 months.

24     Q.   And --

25     A.   And then I would get 8 percent at the end of the 15

1    months.

2        Q.    Okay.

3        A.    Instead of the 3 percent that I was earning on the

4    annuity.

5        Q.    And what did you think about that return, 8

6    percent?

7        A.    It was for 15 months, I thought it was okay.

8        Q.    Was that an important factor or a factor in your

9    decision to do this?  The fact that you'd get 8 percent or --

10       A.    I have to be honest with you.

11       Q.    Always.

12       A.    I was not looking for any more money.  What I had

13   was fine.  My father left me a substantial amount.  I never

14   went into the office saying, Could we make more money?  We

15   did have discussions on the stocks that I had and how they

16   were doing.

17       Q.    Okay.

18       A.    But I would never go in and say, Hey, I could be

19   making more money.

20            It made sense for this, but I was very unsure about

21   this.  But it was Leon, and he had never steered me wrong,

22   and I trusted him.  So I figured, What's 15 months at 8

23   percent?

24       Q.    Okay.  And just kind of going through a few other

25   things.  It talks about an individual account.  That's your

1    name; correct?

2         A.   Yes.

3         Q.   $47,000?

4         A.   Yes.

5         Q.   The name of the investment manager, Leon

6    Vaccarelli?

7         A.   Yes.

8         Q.   And then it has, Total Fees, zero; Up front one

9    time, zero, slash, and then there's three -- what do those

10   zeros mean to you?

11        A.   That he wasn't charging me any management fee or a

12   loading up fee.

13        Q.   And it says down on the bottom:  You should

14   periodically review your account with your representative.

15             Did you review this $47,000 investment periodically

16   with Mr. Vaccarelli?

17        A.   No.  I got no paperwork on it.

18        Q.   Okay.  And was that different from your other

19   investments with him?

20        A.   I always got monthly Investment Center reports.

21        Q.   Directing your attention just to the middle --

22   actually, why don't we go -- we'll go to the very end, just

23   so -- and do you recognize your signature?

24        A.   Yes, I do.

25        Q.   And do you recognize the handwriting on the

1    bottom?

2       A.   Yes, we signed it.  I remember him signing that and

3    saying, "Approved."

4       Q.   Okay.

5       A.   And I did also ask him about the penalty fee, taking

6    the money out of the account.

7       Q.   Well, tell the jury about that.

8       A.   When he was taking the money out of the annuity, I

9    said, Well, what about penalty fees?  And he said, You'll be

10   making it up in the interest.

11      Q.   And that was the 8 percent interest?

12      A.   Uh-huh, and it was going to be an odd one, around

13   $4,000, a little bit more.

14      Q.   And you mentioned a few times Athene, I think.  Take

15   a look at Government's Exhibit 553 in evidence.  Do you

16   recognize this document?

17      A.   Yeah.

18      Q.   What is 553?

19      A.   That's the statement I got from Athene after I

20   withdrew the money.

21      Q.   Okay.  And --

22      A.   $47,194 was left, and I don't know what happened to

23   the $194.

24      Q.   Okay.  So you took out just over $47,000?

25      A.   It was the 50 with a penalty, minus the penalty.

1    Q.   Okay.  And take a look at Government's Exhibit 16A.

2    16 was the contract.  Do you recognize this document?

3    A.   Yes.  After I got the money, the check, I deposited

4    it, and I went down and I wrote out that check to him.  And I

5    remember that specifically, because I was writing it out and

6    I didn't have his LLC address in front of me, and I said,

7    What is it?  And he had to tell me the letters LWLVACC, LLC.

8    Q.   And that's your handwriting?

9    A.   Yes.

10   Q.   And it's from the Teachers Credit Union?

11   A.   Yes.

12   Q.   And that's where you banked?

13   A.   Yes.

14   Q.   Because you're a teacher?

15   A.   Yes.

16   Q.   And it says "Deposit only."  You see that?  Is that

17   your handwriting?

18   A.   No.

19   Q.   And then there's the last four digits, the other

20   part of the account number having been redacted for the

21   Court.  Do you know what that account is?

22   A.   No.  My account -- I only have one account at the

23   credit union, and those are not the numbers.

24   Q.   Okay.  And going back to Government's Exhibit 16,

25   this contract.  Do you know where you were when you executed

1   this?

2       A.   In his office.

3       Q.   Okay.  And who was there?

4       A.   Just he and I.

5       Q.   Was there anyone else, like there was when you met

6   with someone from Ameriprise?

7       A.   No.

8       Q.   No senior person from The Investment Center?

9       A.   No.

10      Q.   Okay.  And let's see.  Directing your attention just

11  to paragraph 5, I'll just -- if you could read for us just

12  that first -- looks like a long sentence.  I don't know if

13  it's a run-on sentence.  You could tell us.

14      A.   I will not correct any grammatical error.

15      Q.   All right.  Can you just read that for the Court and

16  the jury?

17      A.   "5, Commission Products:  Client acknowledges that

18  the mutual fund and/or variable annuity life products may

19  have been or may in the future be purchased by the client

20  through an SEC-registered and FINRA member broker-dealer,

21  including the advisor's affiliated broker-dealer, The

22  Investment Center, Incorporated, for which product sales the

23  client may have paid a commission."

24      Q.   Did you -- you knew he was affiliated with the The

25  Investment Center; correct?

1    A.    Yes, I did.

2    Q.    Okay.  Do you know what that means, "SEC-registered

3    and FINRA member"?

4    A.    Securities and Exchange Commission.

5    Q.    Okay.  What does that mean to you?

6    A.    The Government that regulates all this, the

7    securities and investments.

8    Q.    Okay.  Was that something that was generally

9    important to you in dealing with Mr. Vaccarelli?

10    A.    I never had to think about it.

11    Q.    Fair enough.  Let me refer your attention to the

12    next page.  Let's see.  It talks about risk acknowledgement.

13    Do you see that?

14    A.    Yes.

15    Q.    It talks about market risk, currency, economic

16    political business.  Did you discuss the risks of this

17    investment at all with Mr.  --

18    A.    No, we didn't go over this.

19    Q.    Did he tell you anything, any risks of the Friends

20    and Family 8 percent 15-month investment you were making?

21    A.    No, he did not.

22    Q.    Okay.

23    A.    Because I said to him, What kind of investment was

24    it?  And I said, Why are you doing this?  And because the

25    stock market was so shaky, I said, Are you diversifying into

 1    other areas?  And he said, yes he was, but nothing

 2    specific.

 3        Q.   Okay.  And it says in this next line:  "The advisor

 4    acting in good faith shall not be liable for any action,

 5    omission, investment, recommendation, decision or loss in

 6    connection with this agreement."

 7             Did you believe at the time that he was acting in

 8    good faith?

 9        A.   Yes, I did.

10        Q.   Now, did you get any statements during the course of

11    the 15 months?

12        A.   No, I did not.

13        Q.   Now, I showed you Government's Exhibit 16A, and we

14    focused on the last four digits of the number.  Let me show

15    you Government's Exhibit 552.  And can you read those last

16    four numbers here, 7051?

17        A.   Uh-huh.

18        Q.   Okay.  Taking a look at -- do you see up in the top

19    right corner the same four digits?

20        A.   Yes.

21        Q.   And do you see the initials LWLVACC, LLC?

22        A.   Statement account, customer account.

23             THE COURT:  You need to keep your voice up,

24    please.

25    BY MR. McGARRY:

1      Q.   Do you see --

2      A.   Yes.  Oh, right there.  Yes, I do.

3      Q.   Is that the account that the check was written out

4  to?

5      A.   Yes, exactly.

6      Q.   Okay.  Scrolling down, do you see where it says

7  "Business Checking"?

8      A.   Yes, I do.

9      Q.   What, if anything, did Mr. Vaccarelli tell you about

10  your money going into a business checking account?

11      A.   Nothing.

12      Q.   Okay.  Directing your attention to the third page,

13  can you read the highlighted line on September 24?

14      A.   "Insufficient funds charge, pay check 3858, $33."

15      Q.   And what's the --

16      A.   Minus $267.89.

17      Q.   And is that under the column for "Balance"?

18      A.   Yes.

19      Q.   And how much is then deposited on September 28?

20      A.   $47,000.

21      Q.   Okay.  And how much was your investment for?

22      A.   $47,000.

23      Q.   Okay.  And after the $47,000 comes in, there seem to

24  be a number of withdrawals.  You see that?

25      A.   Yes.

1    Q.   And checks.

2         Did you have any discussions with Mr. Vaccarelli

3    about the use of your funds?

4    A.   As far as I know at this point in time, it had been

5    invested.

6    Q.   Did he ever tell you anything about using some of

7    the money for the mortgage on his Leavenworth property?

8    A.   Never.

9    Q.   Did he ever tell you about some of the money going

10   to a Monica Vaccarelli?

11   A.   No.

12   Q.   Do you know Monica Vaccarelli?

13   A.   That's his wife.

14   Q.   Okay.  And would you have wanted to know if some of

15   the money was going to a business mortgage?

16   A.   Yes.

17   Q.   Would you have wanted to know if some of your money

18   was going to Monica Vaccarelli?

19   A.   Yes.

20   Q.   Okay.  Let me -- at some point in time, and this is

21   September of 2015 -- I guess you can't see the top of it, I

22   can.  But we'll blow it back up.  Do you see the date,

23   September of 2015?

24   A.   Yes.

25   Q.   Okay.  At some point in time after that, during tax

```
1   season, did you have an issue?  Did something happen, a
2   conversation with an accountant?
3       A.   Yes.
4       Q.   Okay.  Tell the jury, without telling us, you know,
5   what the accountant specifically told you, what happened when
6   you were doing your taxes?
7       A.   I went to pick up my taxes, and Leon had advised me
8   that I needed a mortgage for interest payments for my stock
9   portfolio -- it would be a tax break.  So the year before
10  that, I had gotten a refund.
11      Q.   Okay.
12      A.   So I go pick up my taxes, and I said, What's my
13  refund?
14      Q.   Okay.  Let me stop you there for a second.  You're
15  saying -- are you saying that because you had mortgage
16  interest on your house, you could use that on your taxes?  Is
17  that what you meant when you said mortgage?
18      A.   No, he said I needed interest for a tax break.
19      Q.   Okay.  Okay.
20      A.   So I go and pick up my taxes when they're done, and
21  I -- because I had gotten a refund the year before, I'm
22  figuring, Well, this is working out, I'm getting a refund.  I
23  said to my accountant, Well, how much of a refund am I
24  getting this year?  And he said, You're not.  And I said, I'm
25  not?  What do you mean I'm not?
```

1        MR. EINHORN:  Well, objection, Your Honor.

2        THE COURT:  Sustained.

3   BY MR. McGARRY:

4        Q.   So you were informed -- you said, "What do you mean

5   I'm not?"  Why did you say that?

6        A.   Because it was over $8,000 that I had to pay in

7   taxes.

8        Q.   And was that surprising to you?

9        A.   It was a shock.

10       Q.   Why?

11       A.   Because it was an extreme amount of money, and it

12  was completely different from the previous year.

13       Q.   Okay.  Now, was your Athene account that we looked

14  at, was that set up as like an IRA, or was that set up --

15       A.   An annuity.

16       Q.   An annuity.  And did moving the money out of there

17  cause the tax problem?

18       A.   Yes.

19       Q.   Okay.

20       A.   Part of it counted as my income.

21       Q.   And what did you do after talking with your

22  accountant?

23       A.   He had to explain to me three times, because I could

24  not believe this.

25       Q.   Okay.

1    A.   So I called Leon after I left my accountant's

2    office, and said I needed to see him right away.

3    Q.   Okay.

4    A.   And he said I couldn't see him that day but I could

5    come in the next day.

6    Q.   Okay.  And did you see him the next day?

7    A.   I saw him the next day.

8    Q.   And what did you say to him, what did he say to

9    you?

10   A.   I said to him, I have to pay $8,000 on that money

11   that you took out and I didn't know it was going to go to my

12   income.  And my first thought was, he's my financial advisor,

13   how could he not tell me that this was going to jack up my

14   taxes?

15   Q.   Okay.

16   A.   He must have known when he took this money out that

17   part of it was going to be counted as income and jacked me up

18   into a next tax -- a higher tax bracket.

19   Q.   Okay.  And what did he say to you?

20   A.   He started berating me.  He was a totally different

21   character.  He was angry.  He was hostile.  He was

22   contemptuous.  He said, You have to pay taxes.  He was just

23   berating me.

24   Q.   Okay.

25   A.   He says, You have to pay taxes.  He says, you're

1  just like all my other older clients who don't want to pay

2  taxes.  You have to pay for Government services.

3          And it was just -- I was stunned.  It was making no

4  sense.  And I said, Leon, I know I have to pay taxes, but not

5  $8,000 more of taxes that I wouldn't have to pay.

6          And he said -- he continued berating me.  He took

7  out a confirmation paper that I had brought down, and he

8  says, This is how much money you put in, This shows the fees

9  that I got paid, my commission, This shows the balance.

10         And I said, I know that.  Why are you showing me

11  this?  And I was astounded.  I just couldn't -- I was in

12  tears.  I was in tears.  He said how dare my accountant

13  accuse him of -- question his integrity, that he was going to

14  call him.  And I said, You're not going to call him.

15         And he knew what he was doing, he worked with Barry,

16  they set up some kind of algorithm during the month to get --

17  to buy good stocks, review stocks that were going to be good.

18  Q.    And how do you know that?

19  A.    That's what he told me.

20  Q.    Okay.  So what happened after this meeting?

21  A.    I left in tears, I went home.  It was so out of

22  character for him.

23  Q.    And did you end up writing a letter to him?

24  A.    I -- before that, I called my friend who's a

25  businessman.

1      Q.   Okay.

2      A.   And I decided there was too much -- he crossed the

3  line.  He crossed the line.  He was my financial advisor, we

4  were friends, but he crossed the line.

5      Q.   Okay.  Did you -- just to finish up on the tax

6  story, did you end up filing for an extension or --

7      A.   I had to file for an extension, because when he was

8  going over my papers, he looked at one, and on the back of

9  one he said there was a wrong box checked, and I don't

10  remember clearly if he said it was checked as an IRA and it

11  wasn't supposed to be, but it had to be corrected.

12      Q.   And did he take responsibility for that or what

13  happened?

14      A.   Later on, I got a note from his secretary that she

15  took responsibility, that -- the note said that she was new

16  at the time and she had checked the wrong box on the back of

17  the paper, so Leon said he was going to send it in to get

18  corrected.

19      Q.   Okay.  Now, this was all about -- we've been talking

20  about the money coming out of Athene.  I want to get to that.

21  But before that, did you write a letter to him on or about

22  September 5 of 2016.  Let me show you what's been marked --

23      A.   Yes.

24      Q.   -- as Government's Exhibit 556, and pull that up.

25      A.   Yes.

1    Q.   Do you recognize this letter?

2    A.   Yes.  This was after I had met with my new financial

3    advisor.

4    Q.   Okay.

5    A.   And do you want me to read it?

6    Q.   Well, I'll read parts of it.  It says:  You have

7    always put my best interests first.

8         Did you believe that to be accurate at the time?

9    A.   Yes, I did.  He had my complete trust.

10   Q.   And had you believed what he told you up to that

11   point?

12   A.   Yes.

13   Q.   Do you believe that your 47,000 was in the Friends

14   and Family 8 percent 15-month investment?

15   A.   Yes, I did.

16   Q.   Then it says:  Comments were made in anger that were

17   hurtful and only emphasized about the difference of opinions

18   about money and finances.

19        Why did you write that?

20   A.   Because our paths were diverging.  I'm -- I wanted

21   to -- the money was there.  It was there for my children if

22   they needed it, but they were all -- they all had good jobs.

23   My son was in medical school.  I had the money there for

24   backup for them if they need it for anything.  They were

25   buying houses.  Ryan was in med school.  But my firm belief

1  is you work hard for what you want, and you do it by

2  yourself.  And I wanted my kids to have character and have

3  pride in what they accomplish themselves.

4        The money was there for them if they needed it in an

5  emergency.  It was there for backup, but they had to work

6  hard for what they wanted.

7      Q.   Okay.  And did you ever intend that $47,000 to go to

8  Mr. Vaccarelli?

9      A.   Never.

10     Q.   Okay.  Did you send an e-mail after sending this

11 letter to Mr. Vaccarelli's partner, Barry?

12     A.   Yes, I did, because I kept asking, Where is this

13 $47,000?  I'm not getting any statements.  And I called him

14 several times on the phone, and all he said was, Your money

15 is safe.

16     Q.   That's what Mr. Vaccarelli said?

17     A.   Yes.

18     Q.   And did you believe him at that time?

19     A.   I was still believing him, but it was getting shaky,

20 because logically I said, But where?  All he had to do

21 through this whole time was give me a statement.  All I

22 wanted was, Show me the confirmation of where this money is

23 from -- where it was invested.  And I kept getting the

24 run-around.

25     Q.   Take a look at Government's Exhibit 557.  Do you

1  recognize this e-mail?

2      A.   In desperation, I texted his partner, Barry, and I

3  said this was confidential and urgent.  It said I'd like to

4  talk to him in strict confidence about a private investment

5  Leon had me invest in.  I was very worried about the

6  investment, as I never get any paperwork on it and get no

7  updates and very little info about it.  It was for 15 months.

8  Will be up in March.  I will explain further when I talk to

9  you.

10     Q.   And did you ever talk to -- did you get a chance to

11  talk to Barry?

12     A.   No.  Leon called a couple days later -- no, I had

13  called the office, and I called at lunchtime because -- I

14  don't remember exactly -- I wanted to talk to his secretary,

15  Maryanne.  I had a question about some paperwork.  And I

16  called at lunchtime.  Leon never answers the phone, but he

17  picked up.

18     Q.   Okay.

19     A.   And he had just gotten the letter, and he said,

20  Chris, I'm so -- he was very apologetic.  I'm so sorry.  It

21  was so out of character.

22     Q.   Okay.

23     A.   Would you consider -- I want you to consider

24  something.  Give it a day.  Would you consider having Barry

25  manage your portfolio?

1      Q.   Okay.

2      A.   And I said, I don't think so.  And he said, You

3   wouldn't consider it?  I said, No, Leon, it's better if we

4   part ways after that meeting.

5      Q.   And let me show you what's been marked as

6   Government's Exhibit 557A, and tell me if you remember -- and

7   that's going to make it yellow, but let me also blow it up

8   and make it a little larger.  What did you write to Barry?

9      A.   When I talked to Leon, he said my money was safe and

10  that I would be getting a statement shortly.

11     Q.   Okay.

12     A.   It was an annual statement, my money was safe.

13     Q.   And what happened next?

14     A.   Well, he had told me in the conversation -- I said,

15  Well, how did you see the e-mail?  And he said, Barry and I

16  have a business account and we get each other's e-mail.  And

17  I said, Oh really.

18     Q.   So you thought you sent a confidential e-mail to

19  Barry?

20     A.   But they were all on -- he expected me to believe

21  that they had a business account where they each saw each

22  other's e-mails.  So he explained that it was -- everything

23  was plausible, or maybe I just wanted it to be plausible.

24          And, so, he explained that it was safe, that I would

25  be getting a statement.  And I said, Well, okay then, it

1    should be in a few weeks, a week or two?  And he said yeah.

2    And he said, Do me a favor, e-mail Barry and tell him that

3    it's all straightened out.

4        Q.   And that was what you did?

5        A.   That's what I did.  I said, We're okay --

6        Q.   Government's Exhibit 557.

7        A.   -- it's all set, Leon gave me an explanation.

8        Q.   Okay.  And then was there another meeting?  Did he

9    come to your house?

10       A.   Yes, he did.

11       Q.   Let me pull up Government's Exhibit 16B, and I'll

12   blow it up.  But before we read from it, why don't you tell

13   the jury about that meeting at your house.

14       A.   Well, I kept asking him -- I didn't get a statement

15   like he said I was going to, so I called him.

16       Q.   And --

17       A.   And I said, Where's the statement?

18       Q.   What did he say?

19       A.   He said that he had it, he had been driving around

20   with it for two weeks in his visor.

21       Q.   Okay.

22       A.   And that he kept forgetting to drop it off.

23       Q.   Okay.

24       A.   And I said, I've been waiting all week.

25       Q.   Okay.

1     A.   And he says, Chris, don't ever wait that long.  I've

2  been driving around with it in my visor.  I'm going to drop

3  it off.

4     Q.   And did he come over your house?

5     A.   Another week goes by, and he came over with this --

6  this in a folder and a copy of the direct agreement account

7  that you just showed.

8     Q.   The first one, which is Government's Exhibit 16,

9  that contract?

10     A.   Yes, the private direct -- the contract.

11     Q.   Okay.  Maybe I'll spare you and let me read and you

12  can tell us about it.  It says:  "This letter is to serve as

13  an attestation that as of today, October 11, 2016, you have

14  on deposit $47,000 in the Senior Note program of Leon

15  Vaccarelli."

16           What did you understand that to mean?  First of all,

17  what is an attestation?

18     A.   I said to him, Leon, this means nothing.  You said

19  you were going to bring over the official paperwork.

20     Q.   Okay.

21     A.   I said, This doesn't tell me anything.  I want to

22  know where the money was -- is.

23     Q.   Okay.  What about the term "Senior Note Program of

24  Leon Vaccarelli"?

25     A.   Well, that matched what was in the original

1   contract.

2        Q.   It goes on to say:  "The account earns 8 percent

3   annual interest.  The accrued interest earned to date is

4   $3,761.19."  Do you see that?

5        A.   Yes.

6        Q.   Did he ever pay you that interest or was it just on

7   paper?  Tell the --

8        A.   It was just on paper.

9        Q.   Okay.  And what did you think about that sentence?

10       A.   That was just what was in the original agreement.

11       Q.   Okay.

12       A.   That he said that I would get that much money.

13       Q.   And it was going to mature on January 24 of '17?

14       A.   Yes.

15       Q.   Okay.  Jumping down to here.  Maybe you can read

16   this part for us.

17       A.   Start with "You will receive"?

18       Q.   Yes.

19       A.   "You will receive an appropriate income tax document

20   and independent verification from the CPA firm of Zackin

21   Zimyeski and Sullivan of Waterbury at year-end and final

22   distribution of the principal and interest in January, 2017 "

23       Q.   Okay.  And it's signed by Leon Vaccarelli?

24       A.   Yes.

25            MR. McGARRY:  There's water here.  Can I approach,

1    Your Honor?

2            THE COURT:  Yes.

3            MR. McGARRY:  There's water here.  Don't want to

4    make you do all that reading.

5            THE WITNESS:  Thank you.

6    BY MR. McGARRY:

7        Q.   So what did you think about the fact that he told

8    you you would receive appropriate income tax documents and

9    independent verification?

10       A.   Well, he had been telling me this for months now.

11   But when he came in and handed me the folder and I looked at

12   it, I opened it up, and I expected a letter from an

13   investment company because this -- he said -- he was annoyed

14   at me.  I'm going to finally bring you the proof.

15       Q.   Okay.

16       A.   So he came in and handed me this folder, and I

17   started to open it and he says, Do me a favor, don't call The

18   Investment Center.

19       Q.   Okay.

20       A.   And I didn't understand.  I was really confused.

21   Like why -- and I said to him, Why would I call The

22   Investment Center?  And he said because he wasn't supposed to

23   have this LLC and he would get in trouble if they knew about

24   it.  So I had to turn around -- he was standing here, and I

25   was reading the folder, and I had to turn my back on him

1    because I said, Holy Guacamole, he just told on himself.

2        Q.   Okay.

3        A.   That was the nail in the coffin for me.

4        Q.   And was it "holy guacamole" or maybe something a

5    little bit more PG?

6        A.   I said I would behave and use proper language.

7        Q.   Fair enough.  And I know that you told us at the

8    beginning that you have twenty-plus years as a teacher.  What

9    do you mean --

10       A.   37-and-a half.

11       Q.   Thank you.  What do you mean when you said he just

12   told on himself?

13       A.   Because after getting the runaround and no paperwork

14   and stalling and holding up my taxes, and I had to pay for an

15   extension, and holding up that paperwork for me, it was like

16   I got -- finally got hit by the two-by-four.  I said, Was he

17   it holding up?  Because when I went -- I called him.  I was

18   working at Driggs School, which is like two blocks from his

19   office, when I didn't get this paper -- the copy of the

20   corrected paper that he said had to be corrected.

21       Q.   Right.

22       A.   And I said, I'm coming -- I'm at school, I'm getting

23   out at 11:30, I'm going to be down to pick up the paper.  And

24   he said, No.  I said, I'm coming down there to get the paper.

25            And I went down after I got out of school, and I

```
 1    said to him -- nobody was -- the receptionist wasn't there.
 2    And I rang the bell, and he came out with the paper.
 3          And I said to him, Leon, this is unacceptable.  This
 4    is the first time in over 20 years I'm really mad at you.
 5        Q.   All right.
 6        A.   And he said, Well, you can file your taxes in
 7    October.  I said, I don't want to file my taxes in October.
 8    That's not your decision.  I need my refund -- that I thought
 9    I was going to get -- to pay my property taxes for the City
10    in July.
11        Q.   Right.  So this was an earlier conversation.
12        A.   This is income tax.
13        Q.   And you were thinking about when --
14        A.   To file my incomes tax.  And this form didn't come
15    in.  It was held up.
16        Q.   Right.
17        A.   I had to file the extension.  Then when I picked
18    them up, I found out about the 8,000.
19        Q.   Right.  So at the meeting at your house when you had
20    to turn around and say, Holy Guacamole, did you confront him?
21    Or did you ask him to leave?  What happened next?
22        A.   He was agitated, and I was -- I was very
23    uncomfortable.  And he brought me a bottle of homemade wine.
24        Q.   What did you do with the wine?
25        A.   I dumped it down the sink.
```

1    Q.   Okay.

2    A.   How dare he.  How dare he.

3    Q.   And did you end up calling the accounting firm?

4    A.   Yes, I did.

5    Q.   Did you do it immediately or did you talk to someone

6  first?

7    A.   I was -- no, I didn't talk to anyone first.  I was

8  so upset about this again, I called the accounting firm the

9  next day, because I'm trying desperately to find out where

10  this money is.

11    Q.   Okay.  And did you speak with someone at the

12  accounting firm?

13    A.   I spoke to Carrie Zim --

14    Q.   Zimyeski?

15    A.   Zimyeski.

16    Q.   Okay.  Without telling us specifically what she

17  said, did you get a satisfactory answer?

18    A.   She did not know what I was talking about.

19    Q.   Okay.  Did you have to read her the letter?

20    A.   I read her the letter.

21    Q.   Did you send her the letter?

22    A.   I texted her the letter.  She says, Where are you?

23  She wanted a copy of it immediately.  She said, I don't know

24  what you're talking about.

25        MR. EINHORN:  Objection.

```
1              THE COURT:  I don't think it's offered for the

2       truth; is it?

3              MR. McGARRY:  No, it's offered to why did she send

4       the letter.

5              THE COURT:  I'm going to permit that for a limited

6       purpose.

7       BY MR. McGARRY:

8       Q.   So did you send her the letter?

9       A.   I texted her the letter.

10      Q.   You, like, took a picture of it and sent it on your

11      phone?

12      A.   Yes.

13      Q.   Okay.  And after you spoke -- and after you spoke

14      with her, Ms. Zimyeski, did you speak with Leon Vaccarelli?

15      A.   No.

16      Q.   Did he call you, reach out to you, try to speak with

17      you?

18      A.   Yes.

19      Q.   Okay.  Tell us about that.

20      A.   He called me a couple days later, after they had

21      called him to stop using their name.

22      Q.   Okay.  What did he say to you?

23      A.   It was early in the morning, and I was just

24      about -- I was leaving for school.  And I wasn't going to

25      pick up because I had to get to school and I was, as usual,
```

1    late.

2        Q.   Did he leave a message?

3        A.   He left a message.  He was in a panic.  He said,

4    Chris -- my answering machine picked up.  And he says, Chris,

5    Chris, this is Leon.  You called the accounting firm.  It's

6    all a big misunderstanding.  Call me.  And I didn't call him

7    back.  Then he text me to call him, and then he called me on

8    my land line.  And then I texted him back, and I said, Do not

9    call me or contact me unless it's through my lawyer, I'm

10   done.

11       Q.   Okay.  And you ended up hiring a lawyer?

12       A.   Yes.

13       Q.   Did you end up filing a lawsuit?

14       A.   Yes.

15       Q.   Okay.  Take a look at Government's Exhibit 561 in

16   evidence.  Again, I want to blow it up for you and the jury

17   to see.  Do you recognize this document?

18       A.   Yes, that's what my lawyer --

19       Q.   And is that --

20       A.   -- sent to him.

21       Q.   All right.  So you recognize this accounting?

22       A.   Yes.

23       Q.   Okay.  It talks about $62,000, down the bottom.  Do

24   you see that?

25       A.   Yes.

1    Q.    And it talks about your original investment -- 47?

2    A.    Uh-huh.

3    Q.    Did you end up settling the lawsuit and actually

4    getting some money?

5    A.    I got -- yes, I settled the lawsuit.  I got the

6    money back, and I insisted on getting the $8,000 back,

7    because that was an omission by error on his part.  My lawyer

8    had gone over the figures, and the date was wrong on the

9    repayment and the interest amount was wrong, so my lawyer

10   corrected those.

11   Q.    Okay.  Take a look at Government's Exhibit 559.  And

12   directing your attention to the back of that check.  Turning

13   your head sideways, do you see where it says "Pay to the

14   Order of Sean Fitsmaurice"?

15   A.    Yes.

16   Q.    Okay.  Who is Sean Fitzmaurice?

17   A.    He's my lawyer.

18   Q.    Did you have any conversations with Mr. Vaccarelli

19   about him paying you back?

20   A.    I never spoke to him after the meeting at my

21   house.

22   Q.    Okay.  Showing you the second page of 559 -- and the

23   Government will just have a few more questions.

24         At some point in time, did you get a telephone call

25   from someone from the SEC?

1    A.   Yes.

2    Q.   Okay.  Without telling us what they said, did you

3  initially answer their questions?

4    A.   I was hesitant at first, because I didn't know if it

5  was -- you get so many crank calls.

6    Q.   Sure.  Was there another reason you were hesitant,

7  as well?

8    A.   We had a con --

9    Q.   Without getting into any details -- yes, you can say

10  what you were going to -- yes, was there another reason?

11    A.   There was a confidentiality agreement.  And I just

12  didn't -- I was very hesitant.  And I said, How do I know who

13  you really are?  And it happened that my best friend was at

14  my house.  And she was a district manager, really high up in

15  Social Security, and she says, No, it says U.S. Government on

16  the Caller ID.  So it was for real.

17    Q.   Okay.  And since your lawsuit, have you had any

18  conversations at all with Mr. Vaccarelli?

19    A.   No.

20    Q.   Have you gotten any texts from him?

21    A.   No.

22    Q.   And is this the first time you've seen him in some

23  time?

24    A.   Yes.

25    Q.   Okay.  I had shown you that check.  I believe

1    Government's Exhibit 559.  You see that?

2        A.   Yes.

3        Q.   And I think I showed you the accounting for that,

4    which I think was -- was that 561?

5            MR. EINHORN:  Yeah.

6            MR. McGARRY:  561.

7    BY MR. McGARRY:

8            Earlier, at the beginning of your testimony, you

9    testified about that $20,000 that I think you had gotten from

10   the Old Orchard Beach -- the sale of the Old Orchard Beach

11   cottage?

12       A.   Yes.

13       Q.   Is that on here anywhere?

14       A.   No.

15       Q.   Why not?

16       A.   Because that had been two years previous.

17       Q.   Okay.  And do you -- was that at all included in the

18   money that you got back?

19       A.   No.

20       Q.   Okay.  So, as you sit here today, did you ever get

21   any money back from that $20,000 from the sale of the

22   cottage?

23       A.   I have no idea what happened to it.

24       Q.   Okay.

25           MR. McGARRY:  I have no more questions, Your

1   Honor.

2   THE COURT:  All right.  Before we begin

3   cross-examination, we will take a recess.  Please leave your

4   notebooks here, please don't discuss the case, and we will be

5   back in 15 minutes.  Thank you.

6   (Jury out, 11:09 a.m.)

7   THE COURT:  All right.  We will take a recess until

8   11:25.  Ms. Chauncey, if you would kindly return then and, in

9   the interim, don't discuss your testimony with anyone.

10   THE WITNESS:  Thank you.

11   THE COURT:  All right.  Counsel, anything further

12   before we recess?

13   MR. McGARRY:  Nothing from the Government.

14   MR. EINHORN:  Actually, just to give your Your Honor

15   the heads-up.  The Government just opened the door to the use

16   of 560, the release, so I intend to do that.

17   MR. McGARRY:  Well, shall we have the witness step

18   outside, Your Honor, before we --

19   THE COURT:  Make good use of your 15 minutes.  It's

20   very scrimpy.

21   (Witness steps down, 11:10 a.m.)

22   MR. McGARRY:  So, Your Honor, I think I specifically

23   stopped the witness, and if -- you have the transcript -- and

24   I asked her to -- cut her off and stopped her right there, I

25   thought, consistent with your earlier ruling.

1        THE COURT:  My ruling was only that she was not

2   precluded by that release from testifying under subpoena in a

3   criminal matter on the grounds that the parties can't

4   interfere with the criminal prosecution by their own

5   agreement to silence another party.

6        MR. McGARRY:  Okay.

7        THE COURT:  So I don't know what that -- my ruling

8   had nothing to do with the admissibility of 560.

9        MR. McGARRY:  Okay.

10       MR. EINHORN:  Thank you, Your Honor.  Thank you.

11       THE COURT:  All right.  We'll stand in recess.

12       (Recess taken, 11:11 a.m.)

13       (Out of the presence of the jury, 11:30 a.m.)

14       THE COURT:  All right, Counsel, we are ready for the

15   jury.

16       (Witness takes stand, 11:30 a.m.)

17       (Jury in, 11:30 a.m.)

18       THE COURT:  All right.  Please be seated, ladies and

19   gentlemen.  Ms. Chauncey, you remain under oath, and

20   Mr. Einhorn will begin his cross-examination.

21       You may proceed.

22       MR. EINHORN:  Thank you, Your Honor.

23                    CROSS-EXAMINATION

24   BY MR. EINHORN:

25       Q.   Good morning, Ms. Chauncey.  My name is Jon Einhorn,

1    and I represent Leon Vaccarelli.  Actually, I only would like

2    to ask you questions in one very brief area.

3              MR. EINHORN:  If Your Honor please, I would offer

4    Government Exhibit 560.

5              THE COURT:  All right.  It is a full exhibit, absent

6    objection.

7              MR. McGARRY:  No objection.

8              MR. EINHORN:  Thank you, Your Honor.

9    BY MR. EINHORN:

10       Q.   Ms. Chauncey, I've put up on the screen something

11   that's labeled "Release."  You've seen this before; right?

12       A.   Release.  Can I look at it, please; take time to see

13   it?

14             MR. EINHORN:  So if I turn to the --

15             THE COURT:  Mr. McGarry is going to give her a hard

16   copy.

17             MR. McGARRY:  If it's okay with Mr. Einhorn.

18             THE COURT:  That's fine.

19             MR. EINHORN:  That would be terrific.  Thank you.

20   BY MR. EINHORN:

21       Q.   I'm just turning to, on the screen, just to show

22   you, too, if it helps, what appears to be a signature over

23   your name.

24       A.   On the last page?

25       Q.   Yep.  That's your name; right?

1    A.   Yes.

2    Q.   You signed it.  And the fellow that took your

3  acknowledgement, that was your lawyer, right, Sean

4  Fitzmaurice?

5    A.   Yes.

6    Q.   And, so, this particular document that's labeled

7  Release, I'm not going to ask you to read it, but what it

8  does is -- well, you would agree with me this releases all

9  claims you have against Leon Vaccarelli for money; right?

10  That's the purpose of this?

11    A.   Yes.

12    Q.   Okay.  And it sets forth a dollar amount, and that's

13  the amount that was agreed on to resolve the claim?

14    A.   For the Private Direct Investment Agreement.

15    Q.   For the Private Direct Investment Agreement.  But,

16  actually, if you go down to what I have highlighted here, it

17  says "including but not limited to the Private Direct

18  Investment Agreement"; right?  That was part of the

19  settlement.

20    A.   Where are you?

21    Q.   Sure.  I highlighted it.

22    A.   Oh.

23    Q.   Sorry.  You have to look at the screen now.

24    A.   Oh.

25    Q.   Right.  So that was part of the settlement?  Want me

1    to keep going a little bit, just so it's clearer.  If you

2    look -- let me ask you to take the document in your hand.

3        A.   Uh-huh.

4        Q.   And go to the very bottom of the page.  Okay?

5        A.   Yeah.

6        Q.   And you see where it says -- it starts off, you're

7    releasing -- the bottom paragraph starts off "Chauncey

8    releases and forever discharges Leon Vaccarelli"; right?

9        A.   Uh-huh.

10       Q.   Okay.  And --

11            THE COURT:  I'm sorry.  You need to say yes or no

12   for the court reporter's benefit.

13            THE WITNESS:  I'm sorry.  Yes.

14            MR. EINHORN:  Thank you, Your Honor.

15   BY MR. EINHORN:

16       Q.   And then going down to the bottom of the page, it

17   starts off -- and I want you to read where it says "to

18   include but not limited," would you start reading there,

19   please?

20       A.   "To include but not limited to a transaction

21   evidenced by Private Direct Investment Agreement for the

22   principal amount of $47,000 dated 9/24/15."

23       Q.   Keep going.

24       A.   "And, B, the liquidation" --

25       Q.   Keep going.

1    A.   -- "of the annuity investment known as Athene

2    annuity, and any and all other aspects of financial advice,

3    trades, purchases."

4    Q.   Okay.  So it's a general release?

5    A.   Uh-huh.

6    Q.   Yes?

7    A.   Yes.  I'm sorry.

8    Q.   I don't mean to be rude, I just want to make it --

9    A.   I'm sorry.

10   MR. EINHORN:  Okay.  Thank you very much.  No

11   further questions, Your Honor.

12   THE COURT:  Anything on redirect?

13   MR. McGARRY:  Briefly, Your Honor.

14                   REDIRECT EXAMINATION

15   BY MR. McGARRY:

16   Q.   Are you here pursuant to subpoena today?

17   A.   Yes.

18   Q.   Okay.  And the Government, in a polite way, gave you

19   a subpoena and said you have to come to court?

20   A.   Yes.

21   Q.   Okay.  And the release related to 59 -- about

22   $59,000; correct?

23   A.   Yes.

24   Q.   Okay.  Did you ever find out where Mr. Vaccarelli

25   got the money to pay you back?  Where he got -- what the

```
 1    source of funds was --

 2        A.    No.

 3        Q.    I'm sorry?

 4        A.    No.

 5        Q.    Okay.

 6              MR. McGARRY:  No more questions.

 7              THE COURT:  All right.  Ms. Chauncey, thank you very

 8    much.  You may step down, and you are excused.

 9              THE WITNESS:  Thank you.

10              (Witness excused, 11:36 a.m.)

11              THE COURT:  Will the Government call its next

12    witness.

13              MR. McGARRY:  Yes, Your Honor.  At this time, the

14    Government calls Ms. Carrie Zimyeski.

15              (Witness enters, 11:36 a.m.)

16              THE COURT:  All right.  Ms. Zimyeski, if you'd

17    kindly come to the witness stand.  Please remain standing.

18    Please raise your right hand.

19              (CARRIE ANN ZIMYESKI sworn, 11:36 a.m.)

20              COURTROOM DEPUTY:  Please be seated.  State your

21    name for the record.

22              THE WITNESS:  Carrie Ann Zimyeski.

23              COURTROOM DEPUTY:  And can you tell us what city and

24    state you live in?

25              THE WITNESS:  Connecticut.
```

```
1               COURTROOM DEPUTY:  And what city?

2               THE WITNESS:  Middlebury.

3               COURTROOM DEPUTY:   Thank you.

4                         DIRECT EXAMINATION

5   BY MR. McGARRY:

6       Q.   Good afternoon, Ms. Zimyeski.  Can you tell us how

7   you're currently employed?

8               THE COURT:  We're not at the afternoon quite yet.

9               MR. McGARRY:  Oh, thank goodness.

10  BY MR. McGARRY:

11      Q.   Good morning.  How are you currently employed?

12      A.   I am a partner at a local CPA firm in Waterbury,

13  Connecticut.

14      Q.   And what is name of the local CPA firm?

15      A.   Zackin Zimyeski Sullivan.

16      Q.   And who is the Sullivan who is a part of the CPA

17  firm?

18      A.   Keith Sullivan.

19      Q.   And what's your relationship to Keith?

20      A.   He's my husband.

21      Q.   Is there still a Zackin at the firm?

22      A.   No.  Zackin is retired.

23      Q.   Okay.  Zackin Zimyeski Sullivan.  How did you get

24  your name first and his name second?  Has that been

25  discussed?
```

1    A.   Many times, but I have seniority.

2    Q.   Fair enough.  And you said you've been there how

3    long?

4    A.   I have been there 40 years.

5    Q.   And what -- just briefly, so they can appreciate,

6    what type of accounting work does Zackin Zimyeski Sullivan

7    do?

8    A.   So we are a small local firm -- small businesses,

9    individuals.  We do everything from audits; reviews;

10   compilation, which is attestation work; down to basic tax

11   preparation.

12   Q.   And you mentioned basic tax preparation.  Did you do

13   any basic -- you or your firm -- do any basic tax preparation

14   for Mr. Leon Vaccarelli?

15   A.   Yes.

16   Q.   Was he directly your client, was he Mr. Sullivan's

17   client, or does it not really matter?

18   A.   It definitely matters.  We have separate clients,

19   and he was Keith Sullivan's client.

20   Q.   Okay.  Separate and apart from doing his -- besides

21   the tax preparation, did your firm do any other work for

22   him?

23   A.   No.

24   Q.   Okay.  Did you ever do a full-on audit, where you go

25   to the office and set up shop and do books and records and --

1      A.    No.

2      Q.    -- accounts and --

3            Okay.  Did you -- separate and apart from the work

4    that you did -- your firm did for him, did you also -- you

5    and your husband -- also invest some money with Leon

6    Vaccarelli?

7      A.    Yes.

8      Q.    Approximately how much?

9      A.    Probably -- I don't know how much my husband, but I

10   had my own account.  It was my retirement account.  And at

11   the end, it probably had about a $100,000.

12     Q.    Okay.  Let me show you just briefly what's been

13   marked Government's Exhibit 56 in evidence.  And I'll

14   highlight the bottom of it.

15           Do you recognize your e-mail address at the top?

16     A.    Yes, I do.

17     Q.    This is going back a couple years, but I'll read.

18           "Leon, just curious.  Why are we purchasing mutual

19   funds?  I thought we were going to stay away from them and

20   focus on securities.  Thanks, Carrie."

21           Do you remember this e-mail?

22     A.    I do.

23     Q.    Okay.  Why did you send it?

24     A.    Because I was reviewing my investments, and we had

25   discussed it the last time we met and I was just checking up

```
1   on it.  I think it's prudent.

2      Q.   And when you reviewed your investments, did you have

3   occasion to speak with Mr. Vaccarelli about your

4   investments?

5      A.   Well, this particular time he answered me.

6      Q.   In this e-mail?

7      A.   In this e-mail, yes.

8      Q.   And he writes, "Hi, Carrie.  Thanks for your

9   question.  It's nice to know some clients are paying

10  attention to their accounts."

11          Were you paying attention to your account?

12     A.   I was.

13     Q.   Okay.  And do you take that to mean that some

14  clients may not have been paying as close attention to their

15  accounts?

16     A.   Well, I --

17          MR. EINHORN:  I'll object to that.

18          THE COURT:  I'm going to sustain the objection.

19  What is going on with other clients would be beyond the scope

20  of her knowledge.

21          MR. McGARRY:  Fair enough.  Thank you, Your Honor.

22  BY MR. McGARRY:

23     Q.   What did you take that to mean, that first

24  sentence?

25     A.   It's nice to know some clients are paying attention?
```

1    I was assuming that it was just a compliment or a comment,

2    whatever.

3        Q.   He also goes on to say, "The two mutual funds in

4    your portfolio account for only 13 percent of the total

5    portfolio, and they are both international funds."

6            MR. EINHORN:  Your Honor, I would object to this --

7    the relevance of this line of questioning.

8            THE COURT:  What is your purpose?

9            MR. McGARRY:  I'm asking her about her back and

10   forth.

11           THE COURT:  No, I understand what you're doing.  But

12   the purpose?

13           MR. McGARRY:  I think it goes to show knowledge,

14   ability, competence.

15           THE COURT:  On Mr. Vaccarelli's part?

16           MR. McGARRY:  Correct.

17           THE COURT:  I'm going to permit it.

18           MR. McGARRY:  Okay.

19   BY MR. McGARRY:

20       Q.   And it goes on to say, "Our focus is certainly

21   equities, and U.S. equities at that."

22           Can you tell us about your discussion with him

23   regarding the make-up of your portfolio?

24       A.   Well, I guess I wasn't happy with just the mutual

25   funds.  I usually was cautious about international funds,

1  which he's referring to, and he was explaining to me that

2  this was a good way -- this was an appropriate way to

3  invest.

4      Q.   And it goes on to say -- and maybe you could read

5  that last sentence that I'm highlighting in yellow.

6      A.   "However, we do not want to ignore overseas

7  opportunities in your allocation.  And when investing

8  internationally, in my view, the funds are a better way to

9  go, as fund managers have more tools and expertise in what's

10  going on internationally than I do."

11      Q.   Okay.  Did that make sense to you?

12      A.   It made a lot of sense.

13      Q.   Okay.  And did you accept that?

14      A.   Yes, I was satisfied at that point.  I understood.

15      Q.   And did you keep your money with him?

16      A.   I did.

17      Q.   Okay.  As an aside, at any time when you were

18  talking about your finances, was he drunk?

19      A.   No.

20      Q.   That might seem like a weird question, but I thank

21  you for answering it.

22          MR. EINHORN:  Seems like a leading question.  I

23  would object to the Government asking leading questions.

24          THE COURT:  I don't think that's a leading question.

25  Overruled.

1   BY MR. McGARRY:

2       Q.   I'd like to direct your attention -- and how many

3   years have you been a client -- have you been a client -- of

4   Mr. Vaccarelli's investment services?

5       A.   I'm going to say it had to be over ten -- ten years.

6   I would say it could be longer, but --

7       Q.   And approximately how frequently would you speak

8   with him in each year?  How many times a year?

9       A.   Maybe once or twice, depending -- you know, not that

10  often.

11      Q.   Okay.  Fair enough.  I'd like to direct your

12  attention now to Government's Exhibit 16B in evidence, and I

13  made it yellow first.  And let me bring that up.

14      A.   Thank you.

15      Q.   Do you recall seeing this letter?

16      A.   Yes.

17      Q.   And did you see it in or around October of 2016?

18      A.   Yes.

19      Q.   Okay.  Tell the jury, if you would, the

20  circumstances regarding you seeing this letter back in 2016.

21      A.   I received a call from a client who's also a

22  professional friend, and they were concerned and they asked

23  me a question.  They said that they had a friend or

24  associate -- Christine Chauncey -- and that she was -- had

25  her investments with Leon Vaccarelli, who was also her

1   neighbor, and that she was very concerned about her

2   investments and what Leon had said to her.  And she wasn't --

3   you know, she was concerned about her investments.

4           And she had gone to this gentleman -- his name is

5   Pat deFrancisco -- and asked him about it, and he has asked

6   her to get all the information, the documentation, she had

7   together, and he would review it.  And when he saw it, he

8   came across this letter, which had our name in it.

9           Now, our firm has been doing his accounting and tax

10  work for years.  And he knew me and considered me to be

11  reputable, so he wanted to call and find out if we were,

12  indeed, involved with it at all.  And I told him I didn't

13  know anything about it, and I was -- you know, I had no idea

14  that we were not doing any, you know, investment work for

15  Leon, or anything of that sort.  That was -- that was a

16  little concern.  He asked me if Ms. Christine Chauncey could

17  call me, if that would be okay.

18      Q.   Okay.  And what did you say?

19      A.   And I said -- you know, I said sure, you know, I'd

20  be happy to talk to her and explain --

21      Q.   Sure.

22      A.   -- you know, my relationship or my capacity.  And,

23  so --

24      Q.   Did she call you?

25      A.   She called me, yeah.  Right away she called me back.

1    When I got off the phone with Pat, she called me back -- or

2    she called me, and she read the letter to me, and I was just

3    like, that's impossible, you know.  And I asked her if she

4    would send me a copy of it.  And she did, she faxed over a

5    copy.

6         Q.   Okay.

7         A.   And, you know, I saw the letter and, you know, and I

8    basically got back on the phone with her and said, No, this

9    is not true and we are not doing anything and don't expect

10   anything from our -- you know, we're not doing anything.

11   This is not a true statement, a true letter.

12        Q.   And are you referring to the statement that says:

13   "You will receive the appropriate income tax documents and

14   independent verification from the CPA firm Zackin Zimyeski

15   and Sullivan of Waterbury at year end"?  That's the part that

16   you --

17        A.   Took exception to.

18        Q.   Okay.  It also talks about a Senior Note Program.

19   Do you see that earlier?

20        A.   Yes.

21        Q.   Did your firm do any income tax documents for the

22   Senior Note Program of Leon Vaccarelli?

23        A.   No.

24        Q.   Did your firm do any independent verification of the

25   Senior Note Program of Leon Vaccarelli?

1    A.   No.

2    Q.   Okay.  And did your firm provide, at year-end, a

3    final distribution -- or I guess, did you provide anything at

4    all to Ms. Chauncey at year-end, other than the information

5    on the phone call?

6    A.   No.

7    Q.   Okay.  Did you have an engagement letter with

8    Mr. Vaccarelli to do anything like this?

9    A.   No.

10   Q.   Tell the jury what an engagement letter is.

11   A.   An engagement letter is kind of a contract between a

12   CPA firm and their clients, and they'd list out what the

13   responsibilities are of the firm and the responsibilities of

14   the client, and both the firm and the client would sign

15   them.

16   Q.   Okay.  And did you have any engagement letter

17   pertaining to anything like referenced in this letter?

18   A.   No.

19   Q.   You also -- I think you just testified briefly that

20   you were a client of his?

21   A.   Yes.

22   Q.   And would there need to be some sort of conflict

23   check or conflict of interest waiver or something?

24   A.   If we actually did what we would call audit or

25   attestation work, there might be an independence issue.

1    Q.   But that wasn't an issue --

2    A.   No.

3    Q.   -- because you didn't do any audit or attestation

4  work?

5    A.   No.

6    Q.   Generally speaking, does your firm do anything like

7  described in this letter, of independent verification of

8  Senior Note Programs?

9    A.   No.

10   Q.   Do you even know what that is specifically referring

11 to?

12   A.   No.

13   Q.   When you got this letter -- and have you told us

14 everything that you remember about your conversation with

15 Christine Chauncey?

16   A.   Yes.  Yes.

17   Q.   Okay.  When you got this letter -- and focusing

18 again on the name of your firm, which, actually, since we've

19 joked about it a little bit, but in all seriousness, what is

20 the name of your firm?

21   A.   Zackin Zimyeski Sullivan.

22   Q.   So this word "and"?

23   A.   No, not even there.

24   Q.   Not even there.  But there is a Sullivan?

25   A.   Yes.

1    Q.   Okay.  What did you do next after talking to Ms.
2  Chauncey?
3    A.   I immediately -- needless to say, I was very
4  distraught.  I went in and talked to my partner, who --
5  Keith, my husband, and showed him the letter.  And, you know,
6  said he had to do something about it, he needed to contact
7  Leon.
8    Q.   Okay.  And without telling us specifically what he
9  said, do you know if he contacted Leon?
10   A.   He did.  He contacted Leon immediately and,
11  basically very sternly told him that this was totally
12  unacceptable, and what was he doing and --
13       MR. EINHORN:  Well, I move it be stricken.
14  BY MR. McGARRY:
15   Q.   Let me stop you there.
16       THE COURT:  I'm going to strike that.
17       MR. McGARRY:  Just the last part?
18       THE COURT:  The part about -- you may keep "he
19  contacted Leon immediately."
20       MR. McGARRY:  Okay.
21  BY MR. McGARRY:
22   Q.   How far away is your office from his office?
23   A.   Probably from here to where the jury is.
24   Q.   And is there -- are there doorways?  Was it glass?
25  What's the make-up?

1    A.    There are doorways.  Our doors are usually open.

2    Q.    Regular walls, though?

3    A.    Regular walls.

4    Q.    Okay.  Could you hear him from your office when he

5    was in his office when he was talking to Mr. Vaccarelli?

6    A.    Yes.

7    Q.    Okay.  Without telling us the words, what was the

8    volume and the tone when you heard him talking to

9    Mr. Vaccarelli about the letter that was sent to

10   Ms. Chauncey?

11   A.    It was very loud, and it was very stern.

12   Q.    Okay.  Did you give him -- talking about Keith

13   Sullivan -- a copy of this letter?

14   A.    Yes.

15   Q.    Okay.  And that was the copy you received from

16   Ms. Chauncey?

17   A.    Yes.

18         MR. McGARRY:  Okay.  If I could just have a minute?

19         THE COURT:  Yes.

20         MR. McGARRY:  Thank you very much, Your Honor.  I

21   have no further questions.

22         THE COURT:  Thank you.

23         Cross-examination?

24         MR. EINHORN:  Yes, Your Honor.  May I have just a

25   moment?

1          THE COURT:  Yes.

2                        CROSS-EXAMINATION

3    BY MR. EINHORN:

4        Q.   Good morning, Ms. Zimyeski.  My name is Jon Einhorn,

5    and I represent Leon Vaccarelli.

6             You just told us that you spoke with your husband --

7    your partner, Keith Sullivan -- and he -- sounded like he

8    spoke very loudly to Leon Vaccarelli about the letter that we

9    talked about.  And fair to say he disapproved of it; right?

10       A.   Yes.

11       Q.   Okay.  And obviously you disapproved of it, too?

12       A.   Yes.

13       Q.   Okay.  Did you terminate Mr. Vaccarelli as a client

14   after that?

15       A.   Mr. Vaccarelli was not my client.

16       Q.   Okay.  Did the firm terminate Mr. Vaccarelli as a

17   client after that?

18       A.   I do not believe so.

19       Q.   As a matter of fact, Mr. Vaccarelli continued to be

20   your client for at least a year after that; right?  You

21   continued to do legal work -- legal work -- accounting work

22   for him; right?

23       A.   We prepared his tax return.

24       Q.   You what?

25       A.   Prepared his tax return.

1    Q.   You prepared his tax return.  After this letter --

2    upon which apparently you disagreed, your husband disagreed,

3    he issued stern language to Mr. Vaccarelli -- nobody was

4    upset enough to give him the boot out the door; right?  Yes

5    or no?

6    A.   No.

7    Q.   Okay.

8         (Counsel and Defendant confer.)

9    BY MR. EINHORN:

10   Q.   And one last thing.  You also told us that initially

11   Leon was managing your money -- and sounds like you were

12   happy with his management; is that fair to say, by the way?

13   Did I exaggerate on that?  Were you happy with his management

14   skills?

15   A.   Yes.

16   Q.   After this business with the letter that both you

17   and your husband would say that it was unauthorized, did you

18   terminate your use of Mr. Vaccarelli and manage your own

19   funds?

20   A.   So, I immediately reviewed my finances and realized

21   that my finances were fine.  My money was -- you know, there

22   was -- I had no issues with the handling of my investments.

23   Q.   So the answer is no, you didn't terminate with

24   Mr. Vaccarelli?

25   A.   No.  I've actually moved over to Barry.

1      Q.   When did you do that?

2      A.   Very shortly after this.  I actually started -- you

3  know, I don't have a date, but I moved over.

4      Q.   So he still continued as your client.  Was it while

5  he was still your -- a client of the firm that you moved over

6  with Barry, or was it after?

7      A.   Not sure.

8      Q.   Fair to say it didn't happen immediately with the --

9  with the disapproval both you and your husband had of the use

10  of the firm name?  Didn't happen right away, did it?

11      A.   No.

12          MR. EINHORN:  Okay.  Nothing further, Your Honor.

13  Thank you.

14          THE COURT:  Redirect?

15          MR. McGARRY:  Briefly.

16                    REDIRECT EXAMINATION

17  BY MR. McGARRY:

18      Q.   Brief.  Showing you Government's Exhibit 16.  Have

19  you ever seen this document, or a document like it?

20          Let me rephrase the question.

21          Did Mr. Vaccarelli ever offer you a Private Direct

22  Investment Agreement, something called a Friends and Family

23  Agreement?

24      A.   No.

25      Q.   Okay.  You were asked some questions about whether

```
 1   he was terminated as a client.  Is he still a client of your
 2   firm?
 3       A.   No.
 4       Q.   Okay.
 5            MR. McGARRY:  No more questions.
 6            THE COURT:  All right.
 7            MR. EINHORN:  May I add on that last question, Your
 8   Honor?
 9            THE COURT:  Yes.
10                      RECROSS-EXAMINATION
11   BY MR. EINHORN:
12       Q.   You were just -- you just indicated he's no longer a
13   client.  How long after this business with the letter did he
14   continue as a client?  Was it at least a year?
15       A.   We did not prepare his tax return for 2017.
16       Q.   But you still continued to send out 1099s and do
17   other accounting work?
18       A.   I do not know the services.
19       Q.   That would be something that your husband would
20   know?
21       A.   Yes.
22       Q.   Because, in fact, he was a person who managed his
23   account?
24       A.   That is correct.
25       Q.   Did you go to your husband and say, Hey, get rid of
```

```
1    this guy, this is terrible, we don't want anything to do with

2    him, after that letter?  Did you ever say that?

3        A.   No.

4              MR. EINHORN:  Thank you.  Nothing further.

5              THE COURT:  All right.  Thank you.

6              Ms. Zimyeski, you may step down.  You are excused.

7              THE WITNESS:  Thank you.

8              (Witness excused, 11:57 a.m.)

9              THE COURT:  Please call your next witness.

10             MS. LARAIA:  Your Honor, the Government calls Keith

11   Sullivan.

12             (Witness enters, 11:57 a.m.)

13             THE COURT:  All right.  Mr. Sullivan, if you would

14   come to the witness stand.  When you get there, raise your

15   right hand and you'll be sworn.

16             (KEITH SULLIVAN sworn, 11:57 a.m.)

17             COURTROOM DEPUTY:  Please be seated.  State your

18   name for the record, spelling your last name.

19             THE WITNESS:  Keith Sullivan.  K-E-I-T-H,

20   S-U-L-L-I-V-A-N.

21             COURTROOM DEPUTY:  Can you tell us what city and

22   state you live in?

23             THE WITNESS:  Excuse me?

24             COURTROOM DEPUTY:  Can you tell us what city and

25   state you live in?
```

```
 1              THE WITNESS:  Middlebury, Connecticut.  Do you need
 2      me to spell that?
 3              THE COURT:  No.  We're good.
 4                          DIRECT EXAMINATION
 5      BY MS. LARAIA:
 6         Q.   Good morning, Mr. Sullivan.
 7         A.   Good morning.
 8         Q.   What do you do for work?
 9         A.   I am a Certified Public Accountant.
10         Q.   And is that title sometimes abbreviated?
11         A.   CPA.
12         Q.   CPA.  How long have you been a CPA?
13         A.   Since about 1993.
14         Q.   And what does it take to become a CPA?
15         A.   Well, you have to have the appropriate schooling,
16      which includes -- back then, it was a four-year degree.  You
17      also have to pass a CPA exam, which has four parts, and you
18      take it over two and a half days.  That was also back then.
19              And in addition to that, you have to have worked at
20      a CPA firm for at least three years, and then you can be --
21      pass an ethics exam, and then you can become certified.
22         Q.   And you went through that entire process and you
23      were certified?
24         A.   Yes.
25         Q.   Are you licensed by the State or any other
```

1    organization?

2       A.    Licensed by the State of Connecticut.

3       Q.    Okay.  Now, do you work for a CPA firm?

4       A.    Yes.

5       Q.    What is that?

6       A.    Zackin Zimyeski Sullivan, CPA, LLC.

7       Q.    And given your name is in the title, are you a

8    partner of that firm?

9       A.    Yes.

10      Q.    Who else is a partner?

11      A.    Carrie Zimyeski.

12      Q.    And who is she?

13      A.    She's my wife.

14      Q.    What kind of services does your firm offer to its

15   clients?

16      A.    We're a general accounting firm.  We handle small

17   businesses.  We handle individual tax returns.  That's our,

18   sort of our main focus.

19      Q.    Okay.  And we'll get into a little bit of that in a

20   minute.  What kind of clients do you have?

21      A.    Our clients vary.  Our larger clients might be up to

22   a hundred million a year in revenue, down to doing 1040s and

23   small mom-and-pop clients.

24      Q.    So, businesses of all variety?

25      A.    Yes.

1     Q.   And some individual tax work, as well?

2     A.   Yes.

3     Q.   Okay.  And how is your firm staffed, is it just you

4  and Ms. Zimyeski, or do you have anyone else?

5     A.   It's myself, Ms. Zimyeski, we have CPAs on staff,

6  and we have paraprofessionals on staff, and we have

7  administration.

8     Q.   Now, just focusing on the tax component of your

9  business for a moment.  Would you or your wife always be the

10  person to prepare a client's tax return?

11     A.   No.  Normally, the returns are prepared by a staff

12  member and reviewed by myself or Carrie.

13     Q.   And, so, would one of you or Ms. Zimyeski have to

14  sign off on a client's return before it was given to a client

15  to file or before you filed it on behalf of a client?

16     A.   That is correct.

17     Q.   Okay.  Now, when a client's tax return is prepared,

18  what kind of information do you or your staff rely upon to

19  repair a return?

20     A.   Well, that varies, depending on the client and the

21  level of service to the client.  So on the higher-end or the

22  more in-depth service we may be doing, reviewing their books,

23  going through -- possibly doing an audit, doing -- reviewing,

24  checking their bank reconciliations, looking at -- going

25  through their checkbook and stuff like that.

1          We also have clients who will come in and basically

2    say, Here's my tax records, file the return.  It depends on

3    the level of service the client requires.

4    Q.   And when you said someone comes in and says, Here

5    are my records, what might that client give you?

6    A.   It can be as simple as filling out a tax organizer,

7    which we provide, or just in some cases it's giving us, you

8    know, a piece of paper with the information on it.

9    Q.   Okay.  And you said that there are levels of service

10   for clients.  Just explain what different levels of service

11   your firm provides to its different clients.

12   A.   Well, again, it depends on what the client is

13   requesting or requiring.  In some cases, we're providing

14   extensive services.  This is usually with your larger clients

15   where we're providing a financial statement and a tax return.

16   In some cases, we're doing bookkeeping work for the client,

17   and in some cases we're just simply preparing a tax return.

18   Q.   And if you're just simply preparing a tax return, is

19   the information you input, information provided by a

20   client?

21   A.   Yes.

22   Q.   Now, was Mr. Vaccarelli -- was Leon Vaccarelli,

23   specifically, a client of your firm?

24   A.   Yes.

25   Q.   What kind of client was Mr. Vaccarelli?

1      A.   He was a tax client.

2      Q.   And when you say he was a tax client, what level of

3  service did Mr. Vaccarelli have your firm perform for him?

4      A.   Prepare tax returns.

5      Q.   Okay.  Did Mr. Vaccarelli ever ask you to audit his

6  books or look at his bank statements?

7      A.   No.

8      Q.   Ever ask you to come into his office and look

9  through his files or his finances?

10     A.   No.

11     Q.   Was he what you'd call a basic tax client?

12     A.   Yes.

13     Q.   And, so, about how much might you charge

14  Mr. Vaccarelli to prepare his personal tax returns?

15     A.   It was in the range of probably 700 to 14-, 1500,

16  depending on what we were doing in a given year.

17     Q.   And would that make him a big client or a small

18  client for your firm?

19     A.   We -- that would be a small client.  Our numbers are

20  usually between 1.3 and 1.4 million in total revenue.

21     Q.   So about how many tax returns might your firm

22  prepare in any given year?

23     A.   1040s, which would be individual returns?  It's over

24  800.

25     Q.   Now, when Mr. Vaccarelli was a client of yours, did

1    you prepare what you said are Form 1040s for him?

2        A.   Our firm prepared them.

3        Q.   Okay.  And do you know what kind of records

4    Mr. Vaccarelli provided to your firm in order for those

5    returns to be prepared.

6        A.   Yeah.  Mr. Vaccarelli would usually give me a

7    summary page of the expenses for his Schedule C, and then any

8    personal items that he had for his -- other parts of his tax

9    return.

10        Q.   And income, as well?

11        A.   Yes, that would be part of the summary.

12        Q.   Okay.  And if there was a 1099 or something like

13    that, you might receive that?

14        A.   Yes.

15        Q.   Okay.  And were his tax returns prepared during the

16    time he was a client based upon the information he would have

17    provided?

18        A.   Yes.

19        Q.   Was Mr. Vaccarelli your tax client, as opposed to

20    Ms. Zimyeski's tax client?

21        A.   Yes.

22        Q.   So what does that mean, in terms of who reviewed the

23    tax returns prepared for Mr. Vaccarelli?

24        A.   That would mean that I would be the person reviewing

25    the returns.

1      Q.   Okay.  Now, if Mr. Vaccarelli had wanted you to

2  reconcile his figures or go through his books and records,

3  was that a service that your firm could have provided?

4      A.   Yes.

5      Q.   And was that something that you would have charged a

6  higher fee for?

7      A.   Yes.

8      Q.   Did he ever request that?

9      A.   No.

10      Q.   Did your firm prepare tax returns for Mr. Vaccarelli

11  for 2015 and 2016, specifically Forms 1040?

12      A.   Yes.

13      Q.   And have you reviewed records from your firm in

14  connection with the preparation of those tax returns?

15      A.   Yes.

16      Q.   Okay.  Based on your review of those records, were

17  there any fiduciary fees listed on the return prepared by

18  your office?

19      A.   Yes.

20      Q.   What's a fiduciary fee?

21      A.   A fiduciary fee is a fee that's paid to a person

22  who's considered a fiduciary or a trustee of a trust, so that

23  is a fee for services provided.

24      Q.   Okay.  So, services that someone might provide to a

25  trust?

1    A.   Yes.

2    Q.   Okay.  Are you familiar with the name of something

3  called the Sheila Burton Trust?

4    A.   Yes.

5    Q.   And what do you know about a Sheila Burton Trust?

6    A.   Leon was a trustee.  We prepared that tax return.

7    Q.   And based upon information from Mr. Vaccarelli?

8    A.   Yes.

9    Q.   Okay.  Now, just based on your review of the

10  documents prepared by your firm for 2015 and 2016, was there

11  any particular amount of fiduciary fees reported on

12  Mr. Vaccarelli's 1040 for the Sheila Burton Trust?

13    A.   Yes, 24,000.

14    Q.   For both 2015 and 2016?

15    A.   Yes.

16    Q.   And fair to say that that number would have come

17  from Mr. Vaccarelli?

18    A.   Yes.

19    Q.   It wasn't something that was made up by your firm?

20    A.   No.

21    Q.   Now, just to be clear.  Other than preparing tax

22  returns for Mr. Vaccarelli, or any business he was involved

23  in, did your firm do any kind of verification or auditing for

24  him?

25    A.   No.

1    Q.   I'm going to show you what's been admitted as

2    Government's Exhibit 16B.  This is going to come up on your

3    screen.  Have you seen this document before?

4    A.   Yes.

5    Q.   How did you come to first see this document?

6    A.   My wife gave it to me, who would be Carrie

7    Zimyeski.

8    Q.   Okay.  What was your wife's demeanor when she

9    provided this letter to you?

10   A.   She was very upset.

11   Q.   And when you looked at the letter, what was your

12   reaction?

13   A.   I was furious.

14   Q.   And why was that?

15   A.   Because there was no authorization to use my name or

16   my firm's name in this documentation.  We had no knowledge of

17   any of this.  And, you know, I -- as a CPA, our name is our

18   value.  And, you know, we were both very upset that someone

19   went and just took and used our name without our permission.

20   It's something that we didn't do or have anything to do

21   with.

22   Q.   Is it fair to say that it concerned your

23   professional reputation?

24   A.   Yes.

25   Q.   And potential licensing?

1   A.   Potentially, yes.

2   Q.   I'm just going to make this part a little larger

3   here.

4        Do you see the part where it says that Ms. Chauncey

5   has on deposit $47,000 in the Senior Note Program of Leon

6   Vaccarelli?

7   A.   Yes.

8   Q.   Do you see that?  Had you ever heard of a Senior

9   Note Program of Leon Vaccarelli before you saw this letter?

10  A.   No.

11  Q.   Had Mr. Vaccarelli ever called you and told you

12  about the Senior Note Program?

13  A.   No.

14  Q.   Did you know Ms. Chauncey?

15  A.   No.

16  Q.   Do you know her even now?

17  A.   No.

18  Q.   I'm going to highlight this, just to sort of make

19  larger the bottom section.

20       Do you see where it says, "You will receive

21  appropriate incomes tax documents and independent

22  verification from the CPA firm of Zackin Zimyeski and

23  Sullivan of of Waterbury at year-end"?  Do you see that?

24  A.   Yes.

25  Q.   What does that mean to you "appropriate income tax

1    documents and independent verification"?

2        A.   I don't know, because we don't -- first of all, we

3    were never asked to do anything, and I don't even know the

4    scope of the work that he was looking for.

5        Q.   Did you ever go to his office and look through any

6    of his files, for example?

7        A.   No.

8        Q.   Did he ever bring you files to your office for his

9    investments that he was offering the clients?

10       A.   No.

11       Q.   I just want to highlight this.

12            Zackin Zimyeski and Sullivan; is that the

13   appropriate name for your firm?

14       A.   No.  And we also don't go by the "CPA firm of."

15       Q.   So what's wrong with the name other than the "CPA

16   firm of"?

17       A.   Well, our name is Zackin Zimyeski Sullivan.  My name

18   is Keith Sullivan, it's not "and" Sullivan.  So we have never

19   had that in our name.

20       Q.   Now, after your wife, Ms. Zimyeski, provided you

21   with this letter, what did you do?

22       A.   I contacted Leon, and I told him he needed to come

23   up to our office right away, I had something I needed to go

24   over with him.

25       Q.   And did he come down to the office?

1      A.    Yes.

2      Q.    And what happened then?

3      A.    I was very upset and was very animated, and I told

4   him that I can't believe that he did this without our

5   permission, utilized our name.  And that I don't know what

6   this is about, but he had better get this straightened out

7   right away.  He was very -- told me to calm down and, you

8   know, somewhat apologetic and said, I'm sorry about it and

9   I'll straighten it out and it won't happen again.  And I said

10  this should have never happened.  I was not happy.

11     Q.    Do you remember anything else he said to you?

12     A.    Not really.  I mean, that was the gist of the

13  conversation.

14     Q.    But fair to say he was apologetic?

15     A.    Yes, and he said he would straighten it out.  I told

16  him he needed to.

17     Q.    And what was your tone like with him when he came

18  in?

19     A.    Animated, to say the least.  I was unhappy.

20     Q.    Fair to say your voice was loud?

21     A.    Yeah.

22     Q.    And would you say that you spoke very sternly to

23  him?

24     A.    Yes.  I was very upset at the time.

25     Q.    Okay.  Just to be clear.  Did you ever do income or

1   -- independent verification for Mr. Vaccarelli for any of the

2   investments he offered to clients?

3      A.   No.  I don't even know what that would mean.

4           MS. LARAIA:  Just a moment, Your Honor.

5           (Counsel conferring.)

6   BY MS. LARAIA:

7      Q.   Do you still prepare tax returns or offer any

8   services to Mr. Vaccarelli?

9      A.   No.

10     Q.   Did there come a time when you terminated your

11  relationship with him as a client?

12     A.   Yes.

13          MS. LARAIA:  Nothing further, Your Honor.

14          THE COURT:  Cross-examination?

15          MR. EINHORN:  Yes, Your Honor.

16                      CROSS-EXAMINATION

17  BY MR. EINHORN:

18     Q.   Good afternoon, Mr. Sullivan.

19     A.   Good afternoon, sir.

20     Q.   My name is Jon Einhorn, and I represent Leon

21  Vaccarelli.  A couple questions.

22     A.   Did you say Einhorn?

23     Q.   Yes.  Yes.  Do we know each other?

24     A.   I don't think so.

25     Q.   I don't know.

1      A.   Are you from Waterbury?

2      Q.   No.  I don't know any Einhorns in Waterbury, either.

3      A.   Okay.

4      Q.   So let me just ask you a few questions about your

5   testimony --

6      A.   Sure.

7      Q.   -- here this afternoon.  Yes, this afternoon.

8           First of all, you were just asked whether or not

9   Leon is still a client of the office, and your answer was no.

10          How long after the letter of October 16 did he no

11   longer become a client of the office?

12     A.   I'm not sure of the exact date, but it was -- I

13   informed him in between that and the April 15 of the next

14   year.

15     Q.   Of the next year, being 2017?

16     A.   Yes.

17     Q.   Okay.  So, he continued with your office at least

18   from October, 2016, to April, 2017?

19     A.   Yes.

20     Q.   Okay.  And when you just told us that you were very

21   upset, your voice was loud, stern and upset, apparently it

22   wasn't enough to throw him out of the office and terminate

23   his relationship; right?

24     A.   Well, Leon came to me and was very apologetic and

25   said he took care of everything, and he asked if we could

1    help him out.  And I told him that this would be the last,

2    you know, thing I do for you.

3        Q.   So even though you were concerned -- our name is our

4    value, your wife is upset, you're concerned about your

5    professional reputation -- you kept him on; right?

6        A.   Yes.

7        Q.   Okay.  And as we sit here today, do you still do any

8    legal work for Leon -- accounting work for Leon?

9        A.   No.

10       Q.   Well, isn't it so that you still do work for the

11   restaurant and the Leavenworth office building?

12       A.   Yes.

13       Q.   You do.  You know Leon is a --

14       A.   Partner, yes.

15       Q.   -- a partner in one of those buildings?

16       A.   Yes.

17       Q.   So you still do accounting work, in part, for Leon?

18       A.   I do accounting work for the entities, which at this

19   point, to my knowledge, are managed by Bob Kolesnik.  Leon is

20   a partner, yes.

21       Q.   But -- right.  To your knowledge, Leon is still a

22   partner in those entities; right?

23       A.   Yes, yes.

24       Q.   Okay.  All right.  Now, it sounds like -- and I'm

25   not trying to put words in your mouth -- you and Leon were

```
1    friendly, at least in the past; isn't that fair to say?
2        A.   In the distant past.
3        Q.   Did you used to do social things together?
4        A.   Occasionally.
5        Q.   You used to go drinking together?
6        A.   No.
7        Q.   Did you ever go drinking with him?
8        A.   We may have had beers together from time to time.
9        Q.   From time to time, at various locations in
10   Waterbury?
11       A.   Going back to the early, you know, 2000s and around
12   there, yes.
13       Q.   Sure.  You knew, as a matter of fact, based upon
14   these occasions when you used to drink together, he was a
15   heavy drinker?
16       A.   I did not know that.
17       Q.   Did you know what his drink of choice was?
18       A.   No.
19       Q.   You know yours was beer; right?
20       A.   No.
21       Q.   Yours wasn't beer?
22       A.   Mine is various, depending on --
23       Q.   Various drinks, okay.
24       A.   Yeah.
25       Q.   You would agree with me that -- if you know,
```

1  actually, that Leon went into inpatient rehabilitation for

2  alcoholism?

3          MS. LARAIA:  Objection, Your Honor.

4          MR. EINHORN:  Well, I thought I asked the question

5  properly.  I'll rephrase it.

6          MS. LARAIA:  Relevance, Your Honor.

7          THE COURT:  So for the purpose of not recalling

8  Mr. Sullivan on the Defendant's behalf, we are attempting to

9  have all questioning of a witness, even though this question

10 obviously exceeds the scope of your direct.

11         Was that the basis of your objection?

12         MS. LARAIA:  Your Honor, I think it's a question of

13 relevance.  I don't think it's at all relevant whether

14 Mr. Sullivan knows what Mr. Vaccarelli might have done at a

15 later period.

16         THE COURT:  What's your claim, Mr. Einhorn?

17         MR. EINHORN:  May I rephrase the question, and I

18 think it'll become clear?

19         THE COURT:  Yes.

20 BY MR. EINHORN:

21    Q.   You testified that there came a time when you

22 stopped rendering accounting services for Mr. Vaccarelli

23 personally, individually; right?

24    A.   Yes.

25    Q.   And isn't it so that you stopped rendering these

1  services for him individually because he went into inpatient

2  rehabilitation out of the state?

3          THE COURT:  You may answer that.  Is that --

4          THE WITNESS:  That is not the reason.

5  BY MR. EINHORN:

6      Q.   Did you know, in fact, that he did?

7      A.   I had heard that --

8          THE COURT:  No, no.  I'm going to sustain the

9  objection on that.

10         MR. EINHORN:  Nothing further, Your Honor.  Thank

11  you.

12         THE COURT:  Okay.  Redirect?

13                    REDIRECT EXAMINATION

14  BY MS. LARAIA:

15     Q.   Mr. Sullivan, Mr. Einhorn just asked you about

16  whether there was a reason that you terminated Mr. Vaccarelli

17  as a client.  Do you remember that?

18     A.   Yes.

19     Q.   Why did you terminate Mr. Vaccarelli as a client?

20     A.   Well, after we had heard about the problems that he

21  was having, and we had clients of ours who had come to us and

22  told us that they had been, in their opinion, defrauded by

23  him, we severed our relationship with him.

24     Q.   And at any point over the time you've known

25  Mr. Vaccarelli, when he's come to your office has he been

```
1    drunk?
2         A.   No.
3         Q.   Have you ever seen him drunk?
4         A.   No.
5              MS. LARAIA:  Nothing further, Your Honor.
6              THE COURT:  Okay.  Thank you, then, Mr. Sullivan.
7    You may step down and you may go.
8              THE WITNESS:  Thank you.
9              (Witness excused, 12:20 p.m.)
10             THE COURT:  Please call your next witness.
11             MS. LARAIA:  Your Honor, the Government calls Denise
12   Augelli.
13             (Witness enters, 12:20 p.m.)
14             THE COURT:  All right.  Ms. Augelli, would you
15   kindly go to the witness stand over there, and then don't
16   quite sit down but raise your right hand.
17             THE WITNESS:  Okay.
18             (DENISE AUGELLI sworn, 12:20 p.m.)
19             COURTROOM DEPUTY:  Please be seated.  State your
20   name for the record, and spell your last name.
21             THE WITNESS:  Denise Augelli, A-U-G-E-L-L-I.
22             COURTROOM DEPUTY:  And can you tell us what city and
23   state you live in?
24             THE WITNESS:  Waterbury, Connecticut.
25             THE COURT:  All right.  You may proceed, Ms. Laraia.
```

```
1              MS. LARAIA:  Thank you, Your Honor.
2                      DIRECT EXAMINATION
3    BY MS. LARAIA:
4         Q.   Good afternoon, Ms. Augelli.
5         A.   Hi.
6         Q.   Are you employed?
7         A.   Yes.
8         Q.   What do you do for work?
9         A.   Medical assistant.
10        Q.   Where are you a medical assistant?
11        A.   Cardiology Associates of Waterbury.
12        Q.   Okay.  What kind of work do you do for Cardiology
13   Associates?
14        A.   EKGs, blood tests, work up patients, call them with
15   test results, take their messages, answering their
16   questions.
17        Q.   About how long have you done that kind of work?
18        A.   I've been there 29 years.
19        Q.   Is that -- is Cardiology Associates a group of
20   doctors?
21        A.   Yes, seven.
22        Q.   I think you said "of Waterbury."  So is it in
23   Waterbury?
24        A.   Yes.
25        Q.   Do you have any children?
```

1    A.    Three.

2    Q.    And how old are your children?

3    A.    Oh, trick question -- 49, 44 in June, and 42.

4    Q.    And how about grandchildren?

5    A.    I have five.

6    Q.    Okay.  Do you know Leon Vaccarelli?

7    A.    Yes.

8    Q.    How did you first meet Leon Vaccarelli?

9    A.    In kindergarten, when he started school with our

10   son --

11   Q.    Okay.

12   A.    -- and through the years.

13   Q.    And where did Mr. Vaccarelli and your son attend

14   kindergarten?

15   A.    Our Lady of Mt. Carmel Grammar School.

16   Q.    And was he in your son's class or a different

17   class?

18   A.    Yeah.  I met -- I think they were in the same class.

19   I think there might have been just one in each grade back

20   then.

21   Q.    Now, was he ever at your house, if you remember?

22   A.    Yeah, when the kids were little, and then again one

23   time after that.

24   Q.    Okay.  Do you have any memories about him growing

25   up, playing sports or anything like that?

```
 1        A.    Just -- he was just a nice little kid who played
 2   with the kids and went to school with my son.
 3        Q.    Was your husband a basketball coach?
 4        A.    Yeah, my husband coached the basketball team at
 5   Mt. Carmel.
 6        Q.    Did Mr. Vaccarelli play basketball?
 7        A.    Uh-huh.
 8        Q.    Your husband was his coach?
 9        A.    Yes, sir -- ma'am.  I'll be okay.
10        Q.    Fair to say you're a little nervous?
11        A.    A little, yeah.  I've never did this before.
12        Q.    You've never testified in Federal Court before?
13        A.    No.
14        Q.    Okay.  Now, when Mr. Vaccarelli -- fast-forward a
15   little bit.
16              When he became an adult, did you ever see him around
17   Waterbury, the community?
18        A.    Yeah, in church, because we went to the same
19   church.
20        Q.    And what's the church that you attended?
21        A.    Our Lady of Mt. Carmel in Waterbury.
22        Q.    And did you ever see Mr. Vaccarelli do any
23   particular work at the church?
24        A.    He was a eucharistic minister.
25        Q.    Okay.  Do you still go to Our Lady of Mt. Carmel?
```

364

```
1    A.   No.  We left after this incident.
2    Q.   Because of an incident with Mr. Vaccarelli?
3    A.   Yes.
4    Q.   And we'll get into that in a minute.
5    A.   Uh-huh.
6    Q.   Do you know what Mr. Vaccarelli ended up doing for
7  work after he grew up and --
8    A.   Financial planner, advisor, investor.
9    Q.   And at some point, did he have his own company?
10   A.   Yes.
11   Q.   Did he ever say anything to you about wanting to
12 manage your money?
13   A.   Well, I had a little pension with him that I
14 transferred a long time ago.  And then, you know, he would
15 just say -- you know, I would thank him for helping me, and
16 he would say, just remember when you retire I want to, you
17 know, manage your pension.  And I promised him that I would
18 let him do that.
19   Q.   Okay.  Now, I just want to talk about an investment
20 with -- that you had with Mr. Vaccarelli.
21   A.   Uh-huh.
22   Q.   Did you ever invest some money to be used for your
23 granddaughter's education?
24   A.   It was for her tuition to Holy Cross.
25   Q.   So, tell us a little bit about that.
```

1     A.   Well, I don't remember how much money I had, but my

2     granddaughter wanted to go to Holy Cross.  So I promised her

3     that she could.  So, I had that money.  So, I would take it

4     out every year to make tuition payments, and then we would

5     pay monthly payments every month, too, so she could go to

6     school there.

7     Q.   And Holy Cross is a high school?

8     A.   Yeah, in Waterbury.  Holy Cross High School,

9     Waterbury, uh-huh.

10    Q.   When you needed to make those payments, what would

11    you do?

12    A.   I would just call Leon and say, I need money for

13    tuition, you know, Can you send me the check?  And, you know,

14    it was -- I don't remember all the particulars, but he would

15    send me the check, and, you know, it worked out well.

16    Q.   And you were able to pay for her tuition?

17    A.   Tuition, uh-huh.

18    Q.   Okay.  At any point, did you go to Leon for another

19    investment?

20    A.   Well, our business -- like, Cardiology Associates

21    was bought by Prospect Foundation or Prospect Holdings, so

22    then our 403(b) had to become a 401(k).  So, we got -- so,

23    they said you could either transfer it to the company they

24    had, or if you knew someone.  And because I promised Leon he

25    could manage my pension when I retired, I figured, well -- I

1    sent him a note I wasn't going to retire but I'd like him to

2    manage my pension, because I promised him.  So I filled out

3    the papers, and yeah.  So --

4         Q.   I'm going to show you what's been marked

5    Government's Exhibit 204A.

6              MS. LARAIA:  I'd offer that for admission.

7              MR. EINHORN:  No objection.

8              THE COURT:  All right.  204A, full exhibit.

9    BY MS. LARAIA:

10        Q.   Okay.  And the type on this isn't great, but do you

11   recognize this message?

12        A.   Uh-huh, yes.

13        Q.   What is that?

14        A.   That's the message that I sent Leon to let him know

15   that we had to move our pension, and that I wanted to -- him

16   to manage it because I -- that's what I said I would do.

17        Q.   And, so, is this a message that you sent over

18   something called Facebook Messenger?

19        A.   It is, yeah, uh-huh.

20        Q.   So I'm just going to highlight this here.  I'm just

21   going to read it.  "Hi, Leon.  Prospect Holdings acquired our

22   practice."

23             Do you see that?

24        A.   Oh, yeah, I see it; yeah.

25        Q.   And you said, "I have forms to transfer my pension

1   somewhere.  I'd like to transfer it to you."

2          Is that what you told him?

3      A.   Yeah.

4      Q.   Okay.  And fair to say you asked him to call you and

5   you left your phone number?

6      A.   I couldn't find his phone number, so, yeah, I said

7   could he call me, uh-huh.

8      Q.   Okay.  And at the bottom here, how do you end your

9   message to him right here, starting with "thank you"?  Can

10  you read that?

11     A.   "Thank you, Leon.  Love, Ms. Augelli.  Hope your mom

12  is doing better," because his mom was sick.

13     Q.   Okay.  Let me show you what's been marked

14  Government's Exhibit 203.

15          MS. LARAIA:  And offer that for admission.

16          THE WITNESS:  Well, that's how you transfer your

17  money over, I guess, right?

18          MS. LARAIA:  Your Honor?

19          MR. EINHORN:  Oh, sorry.  No objection.

20          THE WITNESS:  Oh, sorry.

21  BY MS. LARAIA:

22     Q.   I'm showing you Government's Exhibit 203.  And it

23  came back up on your screen.

24          Now, is it your understanding that this is basically

25  how -- you know, the mechanism by which you would transfer --

```
 1      A.    Uh-huh.

 2      Q.    -- the money under the old system to

 3   Mr. Vaccarelli --

 4      A.    To the new system, yeah.

 5      Q.    -- when the office you were working for was

 6   acquired?

 7            THE COURT:  You need to say "yes" or "no."  "Uh-huh"

 8   doesn't show up.

 9            THE WITNESS:  Sorry.  Yes.  Okay.  Sorry.

10            THE COURT:   Thank you.

11   BY MS. LARAIA:

12      Q.    And I'm going to ask you to read the date at the

13   bottom here.  What's that?

14      A.    November 10, 2016.

15      Q.    Is that about the time that you had moved this money

16   over to Mr. Vaccarelli?

17      A.    Yes.

18      Q.    Okay.  If I go down here -- and is that your

19   signature on this document?

20      A.    Yes.

21      Q.    And who is this, Joseph Morley?

22      A.    He was our -- he's one of the doctors that I work

23   for, and he -- I guess they managed the pension or they're in

24   charge of the pension, so you have to get their signature.

25      Q.    So, it'd be fair to say the entirety of your plan
```

```
 1   with them was being transferred over to Mr. Vaccarelli?
 2        A.    Uh-huh, yes.
 3        Q.    And at some point did you receive a check?
 4        A.    Yes.
 5        Q.    I'm going to show you Government's Exhibit 200.
 6              MS. LARAIA:  And offer as a full exhibit.
 7              MR. EINHORN:  No objection.
 8              THE COURT:  Full exhibit.
 9   BY MS. LARAIA:
10        Q.    Okay.
11              THE COURT:  Did we accept 203 as a full exhibit?
12   Was it offered?
13              MS. LARAIA:  Yes, Your Honor.
14   BY MS. LARAIA:
15        Q.    All right.  I'm just going to make this a little bit
16   larger, but is this the check that you received when you
17   moved the money from MassMutual to Mr. Vaccarelli?
18        A.    Yes.
19        Q.    Okay.  And I'm just going to ask you to tell us what
20   the amount of the check was?
21        A.    $72,696.42.
22        Q.    Okay.  And does this say it's payable to Lux
23   Financial?
24        A.    Yes.
25        Q.    And do you know what Lux Financial is?
```

1    A.   It was the -- Leon's business, the financial advisor

2    business.

3    Q.   Okay.  Was it payable to Lux Financial -- or why did

4    the company know to make it payable to Lux Financial?

5    A.   Because I had to fill out the paperwork to do

6    that.

7    Q.   Okay.  At any point -- let me back up.

8         How did you -- or what did you do after you received

9    this check?

10   A.   I brought it down to Leon.

11   Q.   And where did you give it to Leon?

12   A.   At his business.  The building where the probate

13   court is, his office was in that building.

14   Q.   Is that on Leavenworth Street?

15   A.   I think.

16   Q.   In Waterbury?

17   A.   Uh-huh.  It's Waterbury, yes.  Sorry.

18   Q.   Okay.  And you said that you went down to the

19   office.  Can you just describe what happened when you went

20   down to the office?

21   A.   It was after work, so we had to call him to let him

22   know we were down there because the doors were locked.  And

23   then he let us in, and we went up to the office.

24   Q.   Okay.  And what did the office look like?

25   A.   Beautiful.  Room after room of beautiful leather

1  chairs and tables, and it was beautiful.

2      Q.   And, so, what did you think?

3      A.   I thought, God bless him, he's doing so well.  So,

4  yeah.

5      Q.   And was it just you who went down to give him the

6  check?

7      A.   My husband.

8      Q.   So your husband was with you?

9      A.   Uh-huh.  Yes.  Sorry.

10     Q.   Now, what conversation did you have with

11 Mr. Vaccarelli about what this money was going to be used

12 for?

13     A.   Well, he said, "Mrs. Augelli, I'm not going to do

14 anything with it right away.  I want to shop around so I find

15 something that you and Mr. Augelli get the best return on

16 your money for."  I said, "Okay."

17          And he said, "Are you going to call me for any of

18 this money right away?"  And I said, "No.  I'm going to save

19 it for my kids."  And he said, "Nevermind your kids,

20 Ms. Augelli.  You and Mr. Augelli enjoy yourself.  Go on a

21 vacation.  You deserve it.  You did enough for the kids."

22 But it was for my kids.

23     Q.   Okay.  Did you trust him?

24     A.   I did, because he was good the first time.  I had no

25 reason not to trust him.

1    Q.   Did you believe him?

2    A.   Yes, I did.

3    Q.   Now, after you gave him this check and you left the

4    office, did you ever receive any statements?

5    A.   No.  And I didn't think anything of it.  And then I

6    called the office one day to say, "Am I going to get any

7    statements?"  A girl answered the phone.  She sounded young.

8    And he, from the background, just shouted out, "You'll get

9    your statements at the end of the year, Ms. Augelli.  Is that

10   okay?"  And I said, "Yeah, it's okay," because I didn't -- I

11   don't know, I didn't think.

12   Q.   So you recognized his voice in the background?

13   A.   Yes.

14   Q.   Okay.  Did Mr. Vaccarelli ever tell you that any of

15   your money was going to be transferred into his personal bank

16   account?

17   A.   No.

18   Q.   Did he ever tell you he would use some of your money

19   for the office Christmas party?

20   A.   No.

21   Q.   That he would give some of it to his wife, Monica?

22   A.   No.

23   Q.   Did you tell him that any of those things were okay

24   to do with your money?

25   A.   No.

```
 1        Q.   Would it have made a difference to you in deciding

 2   whether to take your retirement fund and give it to

 3   Mr. Vaccarelli to invest if you had known that those things

 4   would happen?

 5        A.   Yeah, because it's for my kids.

 6        Q.   Now, at any point, did you get your money back from

 7   Mr. Vaccarelli, or anywhere else?

 8        A.   No.

 9        Q.   I'm going to show you what's been marked

10   Government's Exhibit 205.

11             MS. LARAIA:  And I'll offer that.

12             MR. EINHORN:  No objection.

13             THE COURT:  205 is a full exhibit.

14   BY MS. LARAIA:

15        Q.   Okay.  Do you recognize what's on your screen as

16   Government's Exhibit 205?

17        A.   Yes.

18        Q.   What is this?

19        A.   It's a note that I put on Facebook to Leon because I

20   couldn't get in touch with him by phone.

21        Q.   Okay.  And the first line, "How did my pension

22   become your pension?"

23        A.   Uh-huh.

24        Q.   Yes?

25        A.   Yes.
```

1    Q.   And you said, "Because of you, I cannot buy my
2    granddaughter's wedding dress.  Because of you, my husband
3    and I will never retire.  My husband is filled with anxiety
4    and stress.  I just cry, because I've known you since you
5    were five years old and I trusted you."
6         Is that what it says?
7    A.   Yes.
8    Q.   And let me ask you:  What did you plan to do with
9    the money that you had invested in Mr. Vaccarelli?
10   A.   Well, I was going to put it in the bank, I guess, or
11   use it.  I mean, I figured if we took $500 a month, that
12   would help us, you know, to subsidize what we got from Social
13   Security, and then I could help my kids.
14   Q.   And do you have a granddaughter who is getting
15   married?
16   A.   Michaela got engaged on February 17.
17   Q.   And do you plan to buy her her wedding dress, or did
18   you plan to buy her her wedding dress?
19   A.   Yes.
20   Q.   Now, did Mr. Vaccarelli respond to you in any way
21   after you posted this on Facebook?
22   A.   He sent me a letter to let me know my money was safe
23   and I could buy my granddaughter's wedding dress and that I
24   could retire, and that he knew this was going to happen if he
25   went away to rehab, that it would hit the fan and people

1 would say things, but -- and for a minute, I had hope that

2 maybe he did have my money.

3     Q.   Okay.  And we're going to get to that in just a

4 minute.

5          When you first gave your money to Mr. Vaccarelli,

6 the $72,000-and-change that you gave to him, did he tell you

7 what type of investment exactly or he was going to shop

8 around?

9     A.   He was going to shop around for the best return --

10 that would give us the best return on the money.

11     Q.   For you?

12     A.   Yeah.  Yeah.  Yeah, me and my husband.

13     Q.   And, so, Mr. Vaccarelli told you he would invest it

14 for you and your husband?

15     A.   Yes.

16     Q.   I'm going to show you Government's Exhibit 204.

17          MS. LARAIA:  And offer it as a full exhibit.

18          MR. EINHORN:  No objection.

19          THE COURT:  204 is a full exhibit.

20 BY MS. LARAIA:

21     Q.   Okay.  Is this part of Mr. Vaccarelli's response to

22 you?

23     A.   Yes.

24     Q.   I'm going to highlight some of this here.

25          "Dear Ms. Augelli, I'm e-mailing you probably

1    against the advice of my attorney, but I could not in good

2    conscience let you and Mr. Augelli continue to think your

3    money is gone or stolen."

4         Do you see that?

5    A.   Yes.  Yes.

6    Q.   To this day, have you seen any of your money?

7    A.   No.

8    Q.   "I'm horrified and distraught that you were led to

9    believe this.  You will retire and be able to buy your

10   granddaughter's dress."

11        Do you see that?

12   A.   Yes.

13   Q.   And at this point, can you buy your granddaughter's

14   wedding dress?

15   A.   No.  I could charge it.  But I will.  I'll find a

16   way.

17   Q.   But it would have been a lot easier with having the

18   $72,000; right?

19   A.   Yeah.

20   Q.   And it goes on.  "I've been absent."  And at some

21   point later, do you see where it says, "I will instruct my

22   lawyer to send you a letter next week.  You will find it

23   helpful and a relief."

24        Did you actually get a letter from an attorney?

25   A.   Oh, we did.

1    Q.   And was it helpful?

2    A.   No.  It said he couldn't talk to us, we'd have to

3  get an attorney.  He could only talk to another attorney,

4  so --

5    Q.   And did you have an attorney?

6    A.   No, because I figured more money out the window for

7  an attorney, so I just --

8    Q.   Okay.  And the top part here, did he say that he was

9  absent because he checked into an addiction center?

10   A.   Yes.

11   Q.   And that he was only allowed one ten-minute call per

12 day, so he won't be able to respond promptly?

13   A.   Uh-huh.

14   Q.   Is that yes?

15   A.   Yes.  Yeah.  Sorry.  Yes.  Jeez.

16   Q.   So the next part here after the attorney sentence,

17 "Instructions were left for anyone asking about money not

18 placed with a broker-dealer to contact my attorney while I

19 was away in treatment.  I can only assume that you did not

20 receive this information."

21        Had you ever -- besides this contact from

22 Mr. Vaccarelli, had anyone else called you and told you to

23 call the attorney before you got this message?

24   A.   No.  No.

25   Q.   Does the next sentence say:  "I'm very sorry for

1    that and this whole situation.  I do not blame you for

2    feeling the way you did when you made the Facebook post.  I

3    probably would have done the same thing.  You had every right

4    to feel and express yourself as you did."

5          And did you feel like what you posted was

6    accurate?

7          A.   Yes.

8          Q.   And he asked that you delete the post.  Did you end

9    up deleting it?

10         A.   No.

11         Q.   Why is that?

12         A.   Because I sort of thought this letter was a crock.

13   Sorry.

14         Q.   And he ends this letter:  "If by chance you're not

15   satisfied after communicating or meeting with my lawyer, I

16   would completely understand," and any expressions you might

17   make -- sorry -- "any expressions you might make.  And

18   lastly, know I would never do anything to hurt you.  I just

19   want to do a great job for you, which I intend to do."

20         Fair to say this has hurt you?

21         A.   I'm sorry.  What?

22         Q.   Is it fair to say what's happened has hurt you?

23         A.   Well, it devastated me, because I knew him and I

24   couldn't believe he did this to me.  I trusted him, and I

25   don't understand why he did it, still.

1    Q.   After this message you received from Mr. Vaccarelli,

2  have you ever spoken to him again?

3    A.   Never spoke to him, no.  Never saw him.

4         MS. LARAIA:  That's all I have, Your Honor.

5         THE COURT:  Cross-examination.

6         MR. EINHORN:  No, Your Honor.  No questions.

7         THE COURT:  All right, then.  Ms. Augelli, thank you

8  very much.  You are excused.  You may step down.

9         THE WITNESS:  Thank you.

10         (Witness excused, 12:41 p.m.)

11         THE COURT:  Please call your next witness.

12         MS. LARAIA:  Your Honor, the Government calls

13  Giuseppina LaPorta.

14         MR. McGARRY:  Your Honor, there's going to be an

15  interpreter, if necessary, who is here.  Where would the

16  Court like us to put an additional chair?

17         THE COURT:  I think on the far side of the witness

18  box.

19         MR. McGARRY:  Can I use the chair in the corner?

20         THE COURT:  That would be fine.

21         MR. McGARRY:  May I approach the Courtroom Deputy?

22         THE COURT:  Yes.  We have a hand mic.  All right.

23  Let's first swear-in the interpreter.

24         (SANTUZZA MIRTO, Interpreter, sworn, 12:43 p.m.)

25         COURTROOM DEPUTY:  Please be seated.  State your

1    name for the record.

2            THE INTERPRETER:  Santuzza Mirto.  Italian

3    interpreter.

4            THE INTERPRETER:  S-A-N-T-U-Z-Z-A.  Last name is

5    M-I-R-T-O.

6            THE COURT:  All right.  Ms. LaPorta, please tell us

7    your town of residence.

8            THE WITNESS:  Where I'm a resident now?

9            THE COURT:  Yes.  Let me just stop you.  First of

10   all, I will need to swear-in the witness.  Second of all, we

11   need to have direct translation and not discussion between

12   you and Mrs. LaPorta.  It all has to be you translate her

13   question for us, and then you give us what you have told her

14   as answer.  Okay?

15           Ms. LaPorta, would you kindly stand up and raise

16   your right hand, and the oath will be administered to you.

17           (GIUSEPPINA LaPORTA sworn, 12:44 p.m.)

18           COURTROOM DEPUTY:  Please be seated.  State your

19   name for the record.

20           THE WITNESS:  Giuseppina LaPorta.

21                        DIRECT EXAMINATION

22   BY MS. LARAIA:

23       Q.   Ms. LaPorta, what city do you live in right now?

24       A.   Watertown, Connecticut.

25       Q.   And where were you born?

1    A.   I was born in Italy.

2         MR. EINHORN:  Can I ask just -- I can't hear the

3    interpreter.

4         THE COURT:  You need to speak into the microphone,

5    please, Ms. LaPorta.

6    A.   I was born in Italy.

7    BY MS. LARAIA:

8    Q.   I understand you have an interpreter here.  Do you

9    speak any English?

10   A.   I speak some English, yes.

11   Q.   And what other languages do you speak?

12   A.   Spanish.  I speak Spanish.

13   Q.   And what is your -- what language is your

14   interpreter using now?

15   A.   Italian.

16   Q.   Ms. LaPorta, do you have any children?

17   A.   I have two -- a boy and a girl.

18   Q.   Do you work right now?

19   A.   No.

20   Q.   Did you -- where did you work previously?

21   A.   I worked for Westchester Electronics -- Winchester

22   Electronics.

23   Q.   Winchester Electronics.  Was that a factory?

24   A.   Yes, it's a factory.

25   Q.   And what kind of work did you do at the factory?

1    A.    I was a machine operator.

2    Q.    At some point, did you meet Leon Vaccarelli?

3    A.    I meet Leon.

4          THE COURT:  I'm sorry.  Ms. LaPorta, you're going to

5    have to either speak all English or all Italian.  Okay?  We

6    can't go back and forth.

7          So the question is:  At some point, did you meet

8    Leon Vaccarelli?

9    A.    I met Leon Vaccarelli in 2009.

10   BY MS. LARAIA:

11   Q.    And how did you meet Mr. Vaccarelli?

12   A.    I met Leon Vaccarelli because of my sister.  She

13   went to Italy, and they went together, and he helped my

14   sister.  And he also helped me because I had some problems

15   with -- with money in the bank.

16   Q.    Was there some -- strike that.

17         Did you ask Mr. Vaccarelli to help you with your

18   money?

19   A.    Yes, yes, I asked him.  I asked Mr. Vaccarelli to

20   help me because I had trouble with the money.  The money in

21   the bank was going down.

22   Q.    At some point, did you bring him some money to

23   invest for you?

24   A.    No.  I had asked Mr. Vaccarelli, when the money

25   wasn't doing so well, to help me, and he actually went to get

383

1  the money at the bank and had them placed in Prudential,

2  because I had a 401(k).

3      Q.   I'm going have to ask you to speak up.  I'm having a

4  little trouble hearing.

5          THE COURT:  You need to keep the microphone close to

6  your mouth, please.

7  BY MS. LARAIA:

8      Q.   Ms. LaPorta, I'm going to show you what's been

9  marked Government's Exhibit 7, and I'll ask that this be

10 admitted, and also Exhibit 10, 251, 256 and 254.

11         MR. EINHORN:  No objections.

12         THE COURT:  All right.  They are full exhibits.

13 BY MS. LARAIA:

14     Q.   Ms. LaPorta, looking at the screen in front of you.

15 Is that check money that you invested with Mr. Vaccarelli?

16     A.   Yes.

17         THE COURT:  That exhibit number is what?

18         MS. LARAIA:  7, Your Honor.

19         THE COURT:  7?

20         MS. LARAIA:  Yes, Your Honor, 7.

21 BY MS. LARAIA:

22     Q.   And I just want to highlight this bottom line.  Is

23 that your signature?

24     A.   My signature is the one in yellow.

25     Q.   Okay.  And why did you give this $27,361.55 to

```
1   Mr. Vaccarelli?
2       A.   Because he was going to invest them, and I was going
3   to receive $100 or $200, or whatever.
4       Q.   Did you want to receive --
5       A.   Exactly.
6       Q.   Did you want an investment so that you would receive
7   monthly payments?
8       A.   Exactly.  How do you say -- the 401(k) ended.
9       Q.   And did Mr. Vaccarelli agree to invest your money
10  for you?
11      A.   Yes, yes, yes.
12      Q.   Did he ever tell you that he was going to use your
13  money for something else, like for his children, for
14  example?
15      A.   Oh, no.  No.
16      Q.   I'm going to show you Government's Exhibit 251, and
17  also Exhibit 10.  Now I'm showing you Government's Exhibit
18  10.  Now, what is this?
19      A.   This is the check that I got from my bank and I gave
20  to Mr. Vaccarelli to complete the $50,000.
21      Q.   And you said complete the $50,000.  Did you want to
22  invest $50,000 so that you'd get monthly payments?
23      A.   Exactly.
24      Q.   And did Mr. Vaccarelli agree to invest the money for
25  you?
```

1    A.   Yes, yes.

2    Q.   At any point, did he tell you that he would use the

3    money for something different?

4    A.   No.  No, he didn't say anything to me.

5    Q.   When you say he didn't say anything to you, do you

6    mean he didn't say anything to you about using it for another

7    purpose?

8    A.   No, he didn't say that to me.

9    Q.   Okay.  Did he tell you that he would invest it for

10   you?

11   A.   Yes, that he was going to invest them for me.

12   Q.   Did you trust Mr. Vaccarelli?

13   A.   I trusted him because he helped me.

14   Q.   Now, I'm going to show you Government's Exhibit 256.

15   It's been admitted.

16        Now, is this a check that Mr. Vaccarelli provided to

17   you for $501?

18   A.   The first time.

19   Q.   Okay.  What was this payment for, if you know?

20   A.   It was for the money that I had invested with him,

21   the $50,000.

22   Q.   So was it your understanding that it was interest

23   earned on that money?

24   A.   Interest, yes.

25   Q.   I'm going to show you Government's Exhibit 254.  Do

1   you remember receiving this $3,218.91 from Mr. Vaccarelli?

2       A.   Yes, yes.

3       Q.   And what was your understanding of the purpose of

4   this payment?

5       A.   He told me that it was payment for the whole year,

6   that he had done the accounting calculations and instead of

7   giving me monthly payments I would get a one-time payment for

8   the year.

9       Q.   Okay.  So this was a full year's worth of

10  interest?

11      A.   Yes, yes.

12      Q.   At any point did Mr. Vaccarelli give you cash?

13      A.   To me, no, he didn't give me cash.

14      Q.   At any time did you invest some cash with him?

15      A.   Yes, yes.

16      Q.   How did that happen?

17      A.   It happened that I returned from Italy, and I

18  brought 5,000 to his office to invest, to put with the other

19  monies.

20      Q.   Okay.  So you had been on the trip to Italy, and you

21  brought back $5,000 and you brought it to him to invest?

22      A.   Yes, yes, yes.

23      Q.   Now, over the time that you knew Mr. Vaccarelli, did

24  he ever come to your home to meet with you?

25      A.   Yes, he came to my house, because when we had

1    problems with the 401(k), he came over, he brought me

2    documents and he said to me that I should be getting more,

3    because after 70 years old you're going to have some

4    problems.  So, yes, he did come to my house.

5        Q.   Over the years when he came and visited your house,

6    did he come more than once?

7        A.   Yes, yes, more than once.

8        Q.   How many times do you think he visited you?

9        A.   Every time he needed to renew a document, I'd either

10   call him or he'd call me and he'd say, you know, we have to

11   do this.

12       Q.   And he would come to your house so that you could do

13   whatever business it was that he recommended?

14       A.   Yes, yes, yes.

15       Q.   Ms. LaPorta, I think you testified that you met

16   Mr. Vaccarelli through your sister; is that right?

17       A.   Yes, yes.

18       Q.   And what is your sister's name?

19       A.   My sister is called Maria Diversa (phonetic).

20       Q.   And did you understand her to be a client of

21   Mr. Vaccarelli's, as well?

22       A.   Yes, yes.

23           MS. LARAIA:  I have no further questions, Your

24   Honor.

25           THE COURT:  All right.  Cross-examination?

```
1            MR. EINHORN:  May I have just a moment, Your Honor?
2                       CROSS-EXAMINATION
3   BY MS. MIRSKY:
4       Q.   Good afternoon, Ms. LaPorta.  My name is Rachel
5   Mirsky.  I'm one of the defense attorneys for Mr. Vaccarelli.
6   I just have a few questions.
7            Oh, sorry.  Forgot.
8            I just have a few questions for you, so it'll only
9   be a few moments of your time.
10           So you mentioned that you would often meet
11  Mr. Vaccarelli at your home; correct?
12      A.   Yes.
13      Q.   He would come to your home to address any matters
14  related to the business that you had with him related to your
15  investments?  Yes?
16      A.   Yes, yes.
17      Q.   And at those meetings, do you recall observing
18  Mr. Vaccarelli drinking?
19      A.   He would drink, but not a lot.  It would be maybe
20  one glass of wine.  I would offer him something.
21      Q.   Sorry.  I'm having trouble -- could you repeat that
22  last part, because she was still speaking?
23      A.   You asked me if Mr. Vaccarelli used to drink.  We
24  offered him a glass of wine, but he didn't get drunk.
25      Q.   So you often would share some wine when he was
```

1   visiting; correct?  That was a typical --

2       A.   We'd offer coffee and -- a glass of wine, a

3   coffee.

4       Q.   Thank you.  Also another question about your -- the

5   investment that you gave to the money -- excuse me -- that

6   you gave to Mr. Vaccarelli to invest.

7            Did you receive this money back?

8       A.   No.

9       Q.   You don't remember having any interaction with

10  something called The Investment Center?

11      A.   What do you mean The Investment Center?

12      Q.   Was there any -- did you have any communication

13  regarding attempts to get any of your money back?

14      A.   Yes, I tried, but he didn't answer.  I called a

15  number of times and he didn't answer.

16      Q.   Thank you, Ms. LaPorta.

17           Did you make any other attempts outside of

18  communicating with Mr. Vaccarelli in order to get the return

19  of your money back?

20      A.   Yes.  We called the office, his office.  His partner

21  answered the phone.  We tried, but --

22      Q.   I appreciate that.  So I'm referring to any other

23  agencies, entities that are not associated with

24  Mr. Vaccarelli's office directly.

25           Any communication, any attempts to get that money?

1          MS. LARAIA:  Objection.  Relevance, Your Honor.

2          THE COURT:  I'm going to permit it.

3          MS. MIRSKY:  I think there's some confusion about

4     the name.

5          THE COURT:  Start with whether she's familiar with

6     the name The Investment Center.

7          MS. MIRSKY:  I tried, Your Honor.

8     BY MS. MIRSKY:

9     Q.   Just to be clear.  Ms. LaPorta, are you familiar

10    with the name The Investment Center, that phrase

11    specifically?

12    A.   No.

13    Q.   Okay.  Thank you, Ms. LaPorta.

14         MS. MIRSKY:  Nothing further, Your Honor.

15         THE COURT:  Thank you.  Anything further on

16    redirect?

17         MS. LARAIA:  Just a few questions, Your Honor.

18                    REDIRECT EXAMINATION

19    BY MS. LARAIA:

20    Q.   Ms. LaPorta, just to be clear.  Did you get your

21    money back?

22    A.   No.

23    Q.   During the meetings that you had with Mr. Vaccarelli

24    at your home, was your daughter, Silvanna, ever present?

25    A.   Yes.  Last times, yes.  Before, my husband was

1    present, and then he died.  And after, my daughter was

2    present.

3        Q.   And did you speak in English or in Italian, or

4    something else with Mr. Vaccarelli?

5        A.   No, in English.  I spoke in English.

6        Q.   And can your daughter translate, if need be?

7        A.   Yes.  If there was something that I didn't

8    understand, my daughter -- my daughter helped out.

9        Q.   And you testified that sometimes you'd offer him

10   something like a glass of wine?

11       A.   Naturally.  All Italians are that way.

12       Q.   Okay.  But you never saw him drink a lot?

13       A.   No, not in my house, no.

14       Q.   And when he was at your house, did you also offer

15   him any food?

16       A.   Yes, yes, yes.

17       Q.   What kind of food?

18       A.   Biscotti, cake.  Cookies, cakes, those types of

19   things.

20       Q.   Cheese?

21       A.   Cheese, sausage.  What we have at home.

22       Q.   And, so, would he eat some of those things?

23       A.   Of course.  If you put it in front of them, you

24   know, like, he accepted it.

25            MS. LARAIA:  No further questions, Your Honor.

```
 1              THE COURT:  Anything further, Ms. Mirsky?

 2              MS. MIRSKY:  No, Your Honor.

 3              THE COURT:  Very well.  And speaking of food, we

 4   will take lunch.

 5              Thank you, Ms. LaPorta.  You may go.

 6              (Witness excused, 1:07 p.m.)

 7              THE WITNESS:  Thank you.

 8              THE COURT:  Thank you, Ms. Mirto.

 9              All right.  All right.  Ladies and gentlemen, we'll

10   be back at quarter 'til 2 from lunch.  Enjoy your lunch and

11   don't talk about the case, and leave your notebook here.  And

12   don't do any research about the case.  And all of the

13   previous instructions are incorporated by reference.

14              Okay.  Enjoy.

15              (Jury out, 1:07 p.m.)

16              THE COURT:  All right.  Who will the next witness

17   be, please?

18              MS. LARAIA:  Silvanna Moffa, Your Honor.

19              MR. McGARRY:  It's Ms. LaPorta's daughter, in

20   English.

21              THE COURT:  All right.  Thank you.  Anything before

22   we break for lunch?

23              MR. EINHORN:  No, Your Honor.

24              THE COURT:  Very well.  We stand in recess.

25              (Pause.)
```

1              THE COURT:  I guess we are not in recess.  We are

2      reopened after recess.

3              MR. McGARRY:  Briefly, Your Honor.  Thank you for

4      reopening.

5              For scheduling purposes, we have the daughter of

6      Ms. LaPorta -- Silvanna Moffa -- which may or may not take us

7      to the end of the day.  I was just going to ask on the record

8      the Court's preference, and Mr. Einhorn's preference, if we

9      finish slightly before 3:00 o'clock.  We have a full slate of

10     witnesses tomorrow.  We have Mr. Almodovar here, if the Court

11     wanted to fill in with him just so we didn't waste any time

12     on the Court's schedule, but we wouldn't be able to finish

13     him and we would rather not bump all the witnesses tomorrow.

14             So we could start with him and take -- continue his

15     testimony later in the trial, or we could end a few minutes

16     early.  I don't know what the Court's preference is, and I'm

17     happy to talk about it with Mr. Einhorn, but I just wanted

18     everyone to know.

19             THE COURT:  Well, my preference would be, because we

20     never know whether we will run into a delay later on and

21     we've promised these people that we will be finished by the

22     30th.

23             MR. McGARRY:  Correct.

24             THE COURT:  And we're only sitting 'til 2:00 o'clock

25     tomorrow.  So let's complete Mrs. Moffa and begin with

1   Mr. Almodovar as far as you can get, and then we will take
2   him out of order the next day, I presume.
3           MR. McGARRY:  Well, actually, no, it'd probably be
4   much later in the trial because we have a number of
5   witnesses, some of whom are from out of town and some of whom
6   are elderly, that we've given them specific days that we're
7   trying to keep them to.  And I expect Mr. Almodovar would be
8   many -- you know, a couple hours, once we fully get into the
9   crux of it.  We could try to --
10          THE COURT:  Do you have any brief witness that you
11  would put in at the end of today?  It sounds to me as if it
12  would be unwise to break up Mr. Almodovar's testimony.
13          MR. McGARRY:  What we could do is, we've got some
14  stipulations, which I know Mr. Einhorn has signed.  We're in
15  the process of getting copies back and forth.  We could read
16  the stipulations, which we would do at some point during the
17  trial.
18          THE COURT:  Let's do that.  And if we have to break
19  early, we will do that.  But I think that does not sound as
20  if we should start Mr. Almodovar now and then pick him up
21  many days later.  Okay?  Is that --
22          MR. McGARRY:  Fair enough.  Appreciate that.
23          THE COURT:  -- all right with you, Mr. Einhorn?
24          MR. EINHORN:  Yes, Your Honor.
25          THE COURT:  We are now again in recess.

```
 1                (Luncheon recess, 1:12 p.m.)

 2                (Out of the Presence of the Jury, 1:53 p.m.)

 3                THE COURT:  All right, Counsel.  I'm advised the

 4    jurors are all back from lunch.  We'll bring them in.  And

 5    will you bring Ms. Moffa in?

 6                (Witness enters, 1:54 p.m.)

 7                THE COURT:  All right.  Ms. Moffa, if you'll just

 8    have a seat over there, when the jury comes in I'll ask you

 9    to rise and be sworn in.  All right?

10                THE WITNESS:  Thank you.

11                (Jury in, 1:55 p.m.)

12                THE COURT:  Please be seated, ladies and gentlemen.

13                All right.  We're ready to proceed with the next

14    witness.

15                MS. LARAIA:  Yes, Your Honor.

16                THE COURT:  Ms. Laraia, are you going to present the

17    next witness?

18                MS. LARAIA:  Yes, Your Honor.

19                THE COURT:  And would you care to identify who she

20    is?

21                MS. LARAIA:  Your Honor, the Government calls

22    Silvanna Moffa.

23                THE COURT:  Ms. Moffa, kindly stand up and raise

24    your right hand.  The oath will be administered to you.

25                (SILVANNA MOFFA sworn, 1:55 p.m.)
```

1          COURTROOM DEPUTY:  Please be seated and state your

2     name for the record.

3          THE WITNESS:  Silvanna Moffa.

4          COURTROOM DEPUTY:  Please spell your last name.

5          THE WITNESS:  M-O-F-F-A.

6          COURTROOM DEPUTY:  And can you tell us what city and

7     state you live in?

8          THE WITNESS:  Watertown, Connecticut.

9          THE COURT:  You may proceed.

10                    DIRECT EXAMINATION

11    BY MS. LARAIA:

12        Q.   Good afternoon, Ms. Moffa.

13        A.   Good afternoon.

14        Q.   I'm just going to ask you to speak into the

15    microphone.  It's that bar.

16             Ms. Moffa, are you related to someone named

17    Giuseppina LaPorta?

18        A.   Yes.  She's my mother.

19        Q.   And is she in the courtroom right now?

20        A.   Yes, she is.

21        Q.   Okay.  Have you been involved in helping your mother

22    with her finances?

23        A.   Yes.

24        Q.   I'll just jump right into it.  Have you ever met

25    Leon Vaccarelli?

1    A.   Yes.

2    Q.   How was it that you met Mr. Vaccarelli?

3    A.   I met him in his office when I would take my mom to

4  go, you know, discuss her finances, and he would come over to

5  my mom's house and I would sometimes be present.

6    Q.   Okay.  So were you present for some of the meetings

7  between your mother and Mr. Vaccarelli?

8    A.   Yes.

9    Q.   And what did Mr. Vaccarelli do for your mother?

10   A.   Well, he was her financial advisor.

11   Q.   Okay.  I'm going to show you what's been previously

12  admitted as Government's Exhibit 7.  Do you recognize this?

13   A.   Yes.

14   Q.   And how do you recognize it?

15   A.   It was my mother's -- one of my mother's 401(k)

16  accounts, or her pension accounts, that she wanted closed so

17  that she could invest it in something that would earn more

18  interest.

19   Q.   Okay.  And did you ever actually see this check?

20   A.   Yes.

21   Q.   And before meeting with the Government in

22  preparation for trial, where had you seen the check?

23   A.   In my mom's kitchen.

24   Q.   Describe for us what happened in your mom's kitchen.

25   A.   Leon was coming over.  And, you know, she handed him

```
 1   the check and he put it in a manila folder.  And, you know,

 2   she asked him to invest it in something so that it would

 3   protect her principal and earn interest, and he said, "I'll

 4   take care of it."

 5       Q.   Okay.  Did he tell you anything about specifically

 6   at that point what it would be invested in?

 7       A.   No.

 8       Q.   But was it clear that the investment was for your

 9   mother?

10       A.   Absolutely, yes.

11       Q.   To earn money on a monthly basis?

12       A.   Yes, to earn interest, yes.

13       Q.   At any point, did Mr. Vaccarelli say he was going to

14   use this check for any sort of personal expense?

15       A.   No.

16       Q.   Did he say that it was a loan to him?

17       A.   No.

18       Q.   And was it a gift to him?

19       A.   No, it was not.

20       Q.   Now, at any point, did you have occasion to do some

21   research about this check?

22       A.   I did.

23       Q.   And what was that?

24       A.   Some time had gone by, and I happened to be at my

25   mom's and she casually asked me what happened with that
```

1   money, because she had never received a statement.  And, so,

2   I started, you know, looking through her financial folders

3   that she had, and I couldn't find any statements that

4   pertained to this account number or anything with that amount

5   of the 27,361, anything new.

6           So I called Prudential, and the representative I

7   spoke to said that the check had been cashed or deposited in

8   Ion Bank.  And I was puzzled, because my mom has no -- does

9   no business with Ion Bank.  And I asked them to fax me a copy

10  of this check.

11          And, in the meantime, I called Lux Financial, or I

12  called Leon's office and I spoke to his secretary, Marianne,

13  and I asked her to look into my mother's folder or account

14  there to see if she could find anything that had Ion Bank,

15  you know, account.  And she got a little flustered because

16  She wasn't able to find anything, and she said she would have

17  Leon call -- call us.

18      Q.   And at any point, did you talk to Mr. Vaccarelli

19  about that issue?

20      A.   He called me a couple days later, yes.

21      Q.   And did you ask him anything about the check?

22      A.   Well, I asked him, you know -- he actually said, you

23  know, that Marianne was nervous, and he told her not to worry

24  about it, that it was all taken care of.  And he was

25  basically calling to reassure me that, you know, it was fine,

1    everything was fine.

2        Q.   Okay.  And did he say anything about whether you

3    trusted him?

4        A.   Yes, he did.  Yes, he did.  He asked me, you know,

5    "Do you not trust me?"  He was kind of a little defensive,

6    and I basically said, "Well, we didn't know where the check

7    had gone, you know, where it was."  It had been close to a

8    year.

9        Q.   And at that point, did he tell you it was

10   invested?

11       A.   Yes, he said he had -- he said he would send me a

12   letter of attestation, telling me, you know, what the balance

13   was and where he had it, like where it was invested, the

14   client funds account.

15            MS. LARAIA:  Your Honor, I'm going to move to admit

16   Government's Exhibit 250 through 262.  I know there are a few

17   that are already admitted, but that range inclusive.

18            MR. EINHORN:  No objection.

19            THE COURT:  All right.  Full exhibit.

20            MS. LARAIA:  Thank you, Your Honor.

21   BY MS. LARAIA:

22       Q.   I'm going to show you Government's Exhibit 252.  Do

23   you recognize this?

24       A.   Yes.

25       Q.   How did you first see it, if you remember?

1    A.   It was faxed to me at my home.

2    Q.   So do you have a fax machine at your house?

3    A.   Yes.

4    Q.   Okay.  Now, what's the -- I'm just going to ask you

5    to read the date of this letter.

6    A.   April 6, 2016.

7    Q.   Okay.  And who is it addressed to?

8    A.   Giuseppina LaPorta, my mother.

9    Q.   Okay.  Just get to the body of the letter here.

10   Would you just read that first paragraph for us?

11   A.   "This letter is to serve as an attestation that as

12   of today, April 6, 2016, you have on deposit $33,482.18 in

13   the client funds account of Leon Vaccarelli.  The account

14   earns 4 percent annual interest.  The account is available

15   for withdrawal in any amount with three business days'

16   notice."

17   Q.   Okay.  Was this figure, this $33,482.18, was that

18   consistent with your expectation for what might be in an

19   account for your mother?

20   A.   Yes.

21   Q.   Why is that?

22   A.   It was because I recall my mother having said she

23   had given him $5,000 in cash several years back, and then

24   that $27,000 check, plus earned interest over time had, you

25   know, added up to that $33,000-plus figure.  So it seemed

1    consistent with what she had given him.

2        Q.   It was consistent with your expectation?

3        A.   Exactly, yes.

4        Q.   And then the next paragraph, do you see where it

5    says:  "On March 31, 2017, due to changing suitability

6    practices and code of conduct practices, as well as concerns

7    regarding liability and potential conflict of interest, the

8    account will be retired in early April of 2017.  You will

9    receive a check for your full balance."

10            Do you see that?

11       A.   Yes.

12       Q.   Do you know what that means?

13       A.   Not really.

14       Q.   Did Mr. Vaccarelli ever explain anything about

15   changing suitability practices --

16       A.   No.

17       Q.   -- or concerns about liability?

18       A.   Not really, no.

19       Q.   Potential conflict of interest?

20       A.   Not really.

21       Q.   Okay.

22       A.   I don't recall.

23       Q.   And, again, I just want to highlight this last

24   sentence here.  You see where it says:  "Again, you may take

25   a withdrawal in any amount at any time before April, 2017

1    with three business days' notice."

2           Do you see that?

3      A.   Yes.

4      Q.   And is that consistent with the sentence -- the

5    ending sentence of the first paragraph?

6      A.   Yes.

7      Q.   Okay.  Now, after you received this letter of

8    attestation, did you share it with your mother?

9      A.   Yes.

10     Q.   And does your mother generally read English?

11     A.   No, she doesn't.

12     Q.   So what would you have done?

13     A.   I went over, I read it to her.  Basically told her

14   that she had this amount on deposit with him, and I filed it

15   for her.

16     Q.   Okay.  And "filed," you mean what?

17     A.   Put it in a folder and put it where she keeps her

18   financial records in the filing cabinet.

19     Q.   So, fair to say you translated it for her?

20     A.   Exactly, yes.

21     Q.   And when your mother met sometimes with

22   Mr. Vaccarelli, would you sometimes translate, if

23   necessary?

24     A.   Sometimes, but, you know, -- yes, sometimes, but not

25   always.  She was -- you know, he was able to understand what

1    she would say.

2        Q.   She speaks some English?

3        A.   Yeah, she does.

4        Q.   Okay.  Just to focus again on this document,

5    Government's Exhibit 252, do you see this letterhead?

6        A.   Yes.

7        Q.   Do you know what Lux Financial Services?

8        A.   Yes.  It was Leon's business.

9        Q.   Okay.  Now, I'm also going to show you Government's

10   Exhibit 10.  Now, is this a check -- again, payable to your

11   mother -- for $16,500?

12       A.   Yes.

13       Q.   And had you seen this check before?

14       A.   Yes.

15       Q.   And tell us about that.

16       A.   I took her to the bank, to TD Bank, and she wanted

17   to withdraw 16,500 from her account because she wanted to add

18   it to her balance that she had with him to make it an even

19   $50,000, so that she could start accruing more interest on

20   her money at 4 percent, and possibly getting monthly payments

21   from that, you know, bigger amount.

22       Q.   Okay.  So you brought your mother to the bank?

23       A.   Yes.

24       Q.   And she obtained this check?

25       A.   Yes.

1    Q.    And do you know what your mother did with the

2    check?

3    A.    She gave it to Leon.  He came to the house and

4    picked it up.

5    Q.    Do you remember if you were present for that

6    meeting?

7    A.    I don't recall.

8    Q.    Okay.  Now, at any point, did you have a

9    conversation with Mr. Vaccarelli about what type of

10   investment this was?

11   A.    I did.  It was sometime after these two checks were

12   in his possession.  I asked him about the client funds

13   account, and he had indicated that many years back he had an

14   account opened by a woman, an elderly woman, at Naugatuck

15   Valley Savings and Loan, and it was at this interest rate and

16   it, you know, had stayed that way for a long time.  So that's

17   where he deposited, you know, specific clients or like

18   special people or a select few.

19   Q.    Was it your understanding based on your

20   conversations with Mr. Vaccarelli that this was an investment

21   available to everyone?

22   A.    Yeah -- actually, no, it was only a select few.

23   Q.    And was -- so your mother was considered like a

24   select investor, I guess?

25   A.    Yeah.  There was only select people that he had that

1  he did this for.

2      Q.   Okay.  I'm going to show you Government's Exhibit

3  260.  Okay.  Do you remember this document?

4      A.   Yes.

5      Q.   And what is the date on the top of this document?

6      A.   September 29, 2016.

7      Q.   And is this a fax?

8      A.   Yes.

9      Q.   And who is it to and who is it from?

10     A.   It was from me, sending it for my mother from my fax

11  machine, to Leon.  Because by this point in time, she had the

12  $50,000 with him, and she wanted to set up monthly payments

13  automatically going into her checkbook so she could write out

14  bills for her utilities.  And this it what it was for.  I

15  sent him this cover letter plus the Wells Fargo account

16  statement with her account number on it so that the money

17  could --

18     Q.   Okay.

19     A.   -- you know, start being wired into the Wells Fargo

20  account.

21     Q.   So I just want to focus on this part here.  So this

22  is regarding client funds account?

23     A.   Yes.

24     Q.   And you -- as you indicated here, you're asking --

25  excuse me.  It says Wells Fargo bank statement with account

1    number where a $166 per month should be direct deposited.  Is

2    that right?

3        A.   Correct, yes.

4        Q.   And, so, was it your understanding from what

5    Mr. Vaccarelli told you, that she should be getting a

6    monthly --

7        A.   Yeah.

8        Q.   -- payment?

9        A.   Yeah.  That he was going to try to set up, yes.

10       Q.   And at any point, did you have conversations with

11   him because it hadn't happened?

12       A.   Well, after this, it took a long time for -- you

13   know, this wasn't happening.  There was nothing showing up in

14   the -- in the Wells Fargo account.  And that's when I believe

15   he probably presented her with another check.

16       Q.   Okay.  And we'll get to that in minute.

17            Did you also ask for an updated attestation

18   letter?

19       A.   I did, yes.

20       Q.   Okay.  And we're going to go to the next page of

21   this document.  Okay.  And did you attach this document to

22   your fax?

23       A.   Yes, I did.

24       Q.   And what is this?

25       A.   This is my parents' --

```
1              THE COURT:  What docket number is that?
2              MS. LARAIA:  Your Honor, this is 260.
3              THE COURT:  All right.  260.  Okay.  Thank you.
4              MS. LARAIA:  Page 2 of 260.
5              THE COURT:  Thank you.
6              THE WITNESS:  This is the account letter that --
7    from Wells Fargo, with her account number on it for their
8    checking account, my parents' checking account.
9    BY MS. LARAIA:
10        Q.   And the ending numbers, what are those?
11        A.   3945.
12        Q.   Okay.  And let me make this section a little larger.
13   Was that your father and your mother?
14        A.   Yes.
15        Q.   And at this point, this being in 2016, had your
16   father passed away?
17        A.   Yeah.  My father passed away in 2014.
18        Q.   Okay.  It looks like -- so is this your name on
19   here?
20        A.   Yes.
21        Q.   Were you a power of attorney?
22        A.   Yes, for my father, yes.
23        Q.   And, so, the purpose of providing this document to
24   Mr. Vaccarelli was what?
25        A.   So that he could initiate a transfer into this
```

1  account ending in 3945 monthly, of $166 monthly, give or

2  take.

3      Q.   Okay.  Now, I'm going to show you Government's

4  Exhibit 253.  I believe you testified that you asked for a

5  second attestation letter in your fax?

6      A.   I did.

7      Q.   And did you receive this document?

8      A.   Yes, I did.

9      Q.   And can you just read the date of this document?

10     A.   October 11, 2016.

11     Q.   Okay.  Again, addressed to your mother, Giuseppina

12  LaPorta?

13     A.   Yes.

14     Q.   And now I just want to highlight -- sorry -- make

15  larger this section.

16         Would you read that portion for us?

17     A.   "This letter is to serve as an attestation that as

18  of today, October 11, 2016, you have on deposit $50,728.98 in

19  the client funds account of Leon Vaccarelli.  The account

20  earns 4 percent annual interest.  The account is available

21  for withdrawal in any amount within five business days'

22  notice."

23     Q.   Okay.  So at this point, this being in October of

24  2016, the amount had grown from what was previously

25  represented to a little over 50,000; fair to say?

1    A.    Yes.

2    Q.    And was that consistent with your expectation of

3    what should be in your mother's account?

4    A.    Yes.

5    Q.    And, again, what was that expectation based on?

6    A.    It was based on the initial $5,000 cash deposit, the

7    $27,000 check, the additional $16,500 check and all interest

8    accrued on it.

9    Q.    Because she was supposed to be earning the 4

10   percent?

11   A.    Exactly, yes.

12   Q.    Okay.  Is there anything different about --

13   particularly this last sentence, and the representation about

14   money being available for withdrawal in the previous

15   attestation letter?

16   A.    The previous attestation had three days -- three

17   business days' notice, and this attestation letter had

18   increased to five business days' notice to receive our

19   money.

20   Q.    Okay.  All right.  Now, I'm also going to show you,

21   if I can -- okay.

22        On the left side of your screen, do you see

23   Government's Exhibit 253, the October 11 attestation letter

24   that we were just talking about?

25   A.    Yes.

1     Q.   And this document on the right -- oops -- let's see.

2  Let me try that again.  Here we go.

3          This document on the right, have you ever seen that

4  before?

5     A.   Never.

6     Q.   Okay.  And do you know who Christine Chauncey is?

7     A.   I do not.

8     Q.   Okay.  I just want to ask you to take a look at this

9  date.

10    A.   October 11, 2016.

11    Q.   Okay.  And just the first line.

12    A.   "This letter is to serve as an attestation that as

13 of today, October 11, 2016, you" --

14    Q.   Okay.  And just looking over at your mother's

15 letter, Exhibit 253, same first line, same date?

16    A.   Yes.

17    Q.   Okay.  Okay.  Now, at any point, did you and

18 Mr. Vaccarelli communicate about some money going into your

19 parents' account, that account that you had sent him the page

20 from?

21    A.   The Wells Fargo account.  Yes, we did.  We

22 discussed -- you know, he was having a hard time getting the

23 money or the wire transfer set up.  So, yes, we did discuss

24 that.

25    Q.   Okay.  And at some point, did he leave you a

1   voicemail about that?

2       A.   Well, that was like later in -- yes, in the

3   following year, in October.

4       Q.   Well, let me show you this.  So Government's Exhibit

5   254, is that a check for $3,218.91, payable to your mother?

6       A.   Yes.

7       Q.   Okay.  And just looking at the bottom here, I know

8   it's sideways, but does it say "DEP" or "deposit only" number

9   3945?

10      A.   Yes.

11      Q.   And do you recognize those last four numbers?

12      A.   Yes.  That's my parents' checkbook account number.

13      Q.   And the date here -- so it is a little later --

14  April 5, 2017?

15      A.   Yes.

16      Q.   And around that time, did you receive a voicemail

17  from Mr. Vaccarelli?

18      A.   I did.  It was the exact same day.

19      Q.   I'm going to play for you Government's Exhibit 261.

20           (Audio playing, 2:16 p.m.)

21  BY MS. LARAIA:

22      Q.   Okay.  So do you know why he left you that message?

23  Or let me just -- actually, I'll strike that.

24           Had you contacted or attempted to contact

25  Mr. Vaccarelli before you received that voicemail?

1      A.   Yes, several times.

2      Q.   And what was the substance of your attempts to

3    contact him?

4      A.   Money was never showing up in the account, in the

5    checking account, as from the Fall, from the prior -- you

6    know, that prior fax that I sent him.  It was always a lot of

7    back and forth, and just never made it into the account for

8    some reason.

9      Q.   Okay.  And that check that we just saw, Government's

10   Exhibit 254, so this check appears to have written on it for

11   deposit to that account following your attempts to --

12     A.   Yes.

13     Q.   Okay.  Now, at any point did you attempt to contact

14   Mr. Vaccarelli a little later than April, the same year of

15   2017?  Did you have any other contact with Mr. Vaccarelli?

16     A.   I did have contact with him regarding my Aunt Maria

17   Diversa's, you know, death and the location of her Will.  And

18   much later than that, I contacted him, I believe in June, to

19   set up a meeting to try to get my mom's money out of, you

20   know, that account.

21     Q.   So why was it that you were attempting to set up the

22   meeting to have your mother's money removed from the

23   account?

24     A.   I became suspect with the change in the letter from

25   a three days' business notice to five days' business notice

1    -- yeah, five days' business notice, and I just didn't -- it

2    just didn't sound -- nothing sounded kosher anymore, you

3    know.  Like just, you know, the back and forth, a lot of

4    shuffling going back and forth.  His -- his interests in

5    perhaps representing my aunt's estate, and then he took the

6    liberty to contact an attorney to look for her Will without,

7    you know, ever having me direct him.  So just things just

8    weren't settling right.

9        Q.   Okay.  And I'm going to play -- did you leave him a

10   message in an attempt to set up a meeting?

11       A.   Yes.

12       Q.   And is that a -- did he return a call and leave a

13   voicemail?

14       A.   Yes, he did.

15       Q.   And did you provide that voicemail to the

16   Government?

17       A.   Yes, I did.

18       Q.   I'm going to play for you Government's Exhibit 262.

19            (Audio playing, 2:20 p.m.)

20   BY MS. LARAIA:

21       Q.   And I believe you said that that was around sometime

22   in June?

23       A.   Yes.

24       Q.   Around June 20th?

25       A.   Yes, around the end of June.

1     Q.   Did you ever receive a return call from

2    Mr. Vaccarelli?

3     A.   No.  That was probably the last voicemail I ever

4    got.

5     Q.   At any point, has your mother received back her

6    money?

7     A.   No, she has not.

8          MS. LARAIA:  One moment, Your Honor.

9          (Counsel confer.)

10   BY MS. LARAIA:

11    Q.   Did you make any attempts to assist your mother to

12   get back her money?

13    A.   I did.

14    Q.   And what have you attempted to do?

15    A.   Well, initially, I contacted Leon, and, you know,

16   that never happened.  And then I've been in contact with The

17   Investment Center since this whole, you know, situation

18   happened.  So I've been back and forth with them, and that

19   was --

20    Q.   And at this point, The Investment Center has not

21   paid any money?

22    A.   No, they have not.

23    Q.   So did you submit a -- I think a questionnaire on

24   behalf of your mother?

25    A.   I did, yes.

1      Q.   But The Investment Center has not paid at this

2   point?

3      A.   No, they have not.

4           MS. LARAIA:  Nothing further, Your Honor.

5           THE COURT:  All right.  Cross-examination?

6                     CROSS-EXAMINATION

7   BY MS. MIRSKY:

8      Q.   Good afternoon, Ms. Moffa.

9      A.   Good afternoon.

10     Q.   Just a few questions.  You just answered some

11   questions about The Investment Center.  So, you're familiar

12   with The Investment Center; correct?

13     A.   A little, yes.

14     Q.   Generally speaking?

15     A.   Yes, generally speaking.

16     Q.   And The Investment Center, one of their functions is

17   to -- is they provide the opportunity for individuals that

18   have invested with certain individuals to inquire if they

19   want to get money back, if there's any issues related to

20   that.  That's one of the things they address?

21     A.   Okay.

22     Q.   Now, you mentioned that you did fill out some

23   paperwork that was submitted to The Investment Center;

24   correct?

25     A.   Yeah.  It was like a claim.  A claim form.

1    Q.   Right.  Exactly.  And that's a pending action; is
2    that a fair characterization?  You filled it out and you
3    haven't gotten a final resolution yet?
4    A.   Well, they've called, and they suggested that it
5    looks like the insurance company has approved it but they're
6    -- that's been several months and we haven't heard anything.
7    They're looking for, you know -- I actually am at a loss as
8    to why nothing's been -- nothing's come yet.
9    Q.   Okay.  But it's still an open action?
10   A.   Yeah, yeah.
11   Q.   You haven't gotten a final decision yet?
12   A.   Nothing in writing, let's put it that way.
13   Q.   So it's still open, okay.
14        Now, I also had a question -- you provided a
15   statement that was through the FBI, that was around the first
16   week of May, if you remember, approximately.  It was fairly
17   recently that you spoke to them.
18   A.   Okay.  I don't remember what it was.
19   Q.   Did you speak to -- one moment -- a gentleman by the
20   name of Mr. Ardito?  Does that name sound familiar to you?
21   A.   Yes.  Tom.
22   Q.   Yeah.  Okay.  And do you remember in your statement
23   mentioning that Mr. Vaccarelli would come to the house; is
24   that --
25   A.   Yes.

```
 1        Q.   You're referencing your parents' home?

 2        A.   Yes, my mother and father's home, yes.

 3        Q.   And that Mr. Vaccarelli, he liked Anisette?

 4        A.   Yes.  He would put Anisette in his espresso.

 5        Q.   Anisette.  And just to clarify for the jury,

 6   Anisette is a form of alcohol; correct?

 7        A.   Yes.

 8        Q.   And how often do -- would you estimate he came to

 9   the home?

10        A.   Several times a year.

11        Q.   Several times a year?

12        A.   Yeah.

13        Q.   Okay.

14             MS. MIRSKY:  One moment, Your Honor.

15             Nothing further, Your Honor.  Thank you.

16             THE WITNESS:  Thank you.

17             THE COURT:  Anything further?

18             MS. LARAIA: Just a couple questions.

19                        REDIRECT EXAMINATION

20   BY MS. LARAIA  :

21        Q.   When Mr. Vaccarelli came to your mother's home to

22   meet with your mother when you were present, did he drive to

23   the home?

24        A.   Yes, he did.

25        Q.   And did he leave by driving or did you ever have to
```

```
1   call him a cab?

2       A.   No, he left by driving.

3           MS. LARAIA:  Nothing further, Your Honor.

4           THE COURT:  Thank you.  All right.  Ms. Moffa, thank

5   you very much.  You may step down, and you are excused.

6           (Witness excused, 2:25 p.m.)

7           THE COURT:  All right.  Mr. McGarry.

8           MR. McGARRY:  Yes, Your Honor.  At this point in the

9   afternoon, I think, with the Court's permission, rather than

10  beginning another witness who we may not finish and

11  cross-examine, the Government was going to read in some

12  stipulations that the parties have agreed to.  I can do that.

13  I don't know if the Court has a jury instruction that you do

14  or if you --

15          THE COURT:  No.  I just want to explain that a

16  stipulation is an agreement as to certain facts or documents

17  that both sides agree to and you won't hear further evidence

18  of it, but that stipulation itself is evidence and you will

19  have that in the jury room with you.

20          And Mr. McGarry, I think, intends to read one or

21  more such stipulations?

22          MR. McGARRY:  Yes, Your Honor.  And I know the Court

23  indicated they'd have them in the jury room.  We also put a

24  sticker on them, calling them an exhibit.  Maybe more for

25  identification or if they come in as an exhibit, however the
```

1   Court's practice is.  But they are labeled, and I'll identify

2   them as such.

3           THE COURT:  So they will be -- 45 is a full exhibit,

4   because it will be with the jurors.

5           MR. McGARRY:  Okay.  Government's Exhibit 45

6   reads -- has the caption and reads:  Joint Stipulation

7   Regarding Authenticity and Business Records.

8           United States and Defendant Leon Vaccarelli and his

9   counsel stipulate and agree that the following documents are

10  authentic under Federal Rules of Evidence 901 in the trial in

11  the above-captioned matter:

12          One, bank records obtained in this case from, (1)

13  Ion Bank; 2, Salisbury Bank and Trust; 3, Thomaston Savings

14  Bank; and 4, Liberty Bank; and 5, Liberty Bank, including but

15  not limited to bank account statements, signature cards,

16  copies of checks, deposit tickets, withdrawal tickets, wire

17  request forms, and e-mail correspondence.

18          Two, documents obtained from the United -- U.S.

19  Securities and Exchange Commission, that have be produced in

20  this case with Bates ranges bearing SEC-Lux-P; SEC-TDA-E;

21  SEC; SEC-CHAUNCEY-C-E; SEC-EPROD3-E and SEC-SBE;

22          And paragraph three, documents obtained from

23  Prudential; Voya Financial -- formerly ING -- TD Ameritrade;

24  and LPL Financial, which were produced in this case;

25          Four, Exhibit 803 is a business record produced by

1    Hearth Premier Senior Living.

2         While reserving all rights to object on grounds of

3    relevance pursuant to Federal Rule of Evidence 401 or that

4    the proffered evidence is unduly prejudicial pursuant to

5    Federal Rule of Evidence 403, the United States and the

6    Defendant, Leon Vaccarelli, stipulate that the documents

7    referenced above constitute business records of the stated

8    entities in that the documents were made and kept in the

9    ordinary course of a regularly conducted business by a person

10   with knowledge at or about the time, and admissible pursuant

11   to Federal Rule of Evidence 8036.

12        And I'll point out that it's signed by myself,

13   Michael McGarry, by Jennifer Laraia, and by Mr. Einhorn.

14        And I would say if there is a typo in there with the

15   Liberty twice, it was probably mine, Your Honor.

16        THE COURT:  Just kind of hung up about Liberty; is

17   that it?

18        MR. McGARRY:  It's a great bank, Your Honor.

19        Document Government's Exhibit 46 is a stipulation --

20   Joint Stipulation Regarding Interstate Banking Transfers and

21   Instruments of Communication in Interstate Commerce.  The

22   United States and the Defendant, Leon Vaccarelli, and his

23   counsel stipulate and agree to the following facts for all

24   purposes in the trial of the above-captioned matter:

25        The wire transfer -- paragraph 1 -- the wire

1    transfers referenced in Counts Four, Five, Six and Nine of

2    the Superseding Indictment were made via interstate wires

3    through the Fedwire and Electronic Funds Transfer system with

4    the data transmitted electronically from the respective bank

5    issuing the wire transfer -- open paren -- Salisbury Bank and

6    Trust, comma, Ion Bank, comma, Prudential Annuities, closed

7    paren, through the relevant Federal Reserve Bank outside of

8    Connecticut to the ultimate receiving bank, open paren, Ion

9    Bank and Wells Fargo Bank, closed paren.  Salisbury Bank and

10   Trust and Ion Banks are located in Connecticut, and the

11   interstate wires were used in executing the transfer.

12            Paragraph two:  The wire transfers referenced in

13   Counts Seven and Ten of the Superseding Indictment were made

14   via interstate wires through the Fedwire and Electronic Funds

15   Check Clearing System with the data pertaining to the

16   negotiated instrument -- that is, the checks -- having been

17   transmitted electronically from the respective banks issuing

18   the checks -- Wachovia Bank of Delaware N.A. and TD Bank --

19   through the relevant Federal Reserve bank outside of

20   Connecticut to the bank where the checks were deposited

21   ultimately receiving the funds, Ion Bank, located back in

22   Connecticut.

23            Paragraph three:  The checks referenced in Counts

24   Sixteen, Seventeen and Eighteen of the Superseding Indictment

25   related to the respective sale of securities were negotiated

1    and cleared through instruments of communication in

2    interstate commerce -- that is, the facilities of the

3    interstate banking system -- in that the checks drawn on the

4    respective banks -- Teachers Federal Credit Union, Wells

5    Fargo Bank N.A., and Liberty Bank -- were negotiated and

6    cleared through the banking system with Ion Bank located in

7    Connecticut ultimately receiving the funds.

8            And again, page 2 is signed by myself, Ms. Laraia,

9    and Mr. Einhorn.

10           Stipulation num -- document Government's Exhibit 47

11   again has the caption of the case, and it is a Joint

12   Stipulation Regarding the Use of Interstate Wires with

13   Respect to Facsimiles.

14           The United States and Defendant, Leon Vaccarelli,

15   and his counsel stipulate and agree to following facts for

16   all purposes in the trial of the above-captioned matter:

17           Facsimiles, or faxes, referenced in Count Eight and

18   Eleven of the Superseding Indictment were executed using the

19   interstate wires to send and receive the respective

20   facsimiles.

21           A, the facsimile referenced in Count Eight was sent

22   from Lux Financial in Waterbury, Connecticut, to Prudential

23   Annuities Center with locations outside Connecticut by way of

24   a toll-free 1-800 fax number.

25           B, the facsimile referenced in Count Ten was sent

1    from Lux Financial in Waterbury, Connecticut, to Voya

2    Financial outside of Connecticut, with a location in Des

3    Moines, Iowa, by way of a fax number with the area code 515,

4    which area code is assigned to Des Moines, Iowa, region --

5    the Des Moines, Iowa region.

6          Again, signed by myself, Ms. Laraia and Mr. Einhorn.

7          Government's Exhibit 48 is a joint stipulation with

8    the heading of the case, entitled Joint Stipulation Regarding

9    FDIC and Bank Activities Affecting Interstate Commerce.

10         The United States and Defendant, Leon Vaccarelli,

11   and his counsel stipulate and agree to the following facts

12   for all purposes in the trial of the above-captioned matter:

13         One:  At all times relevant to the superseding

14   Indictment in th case, Ion Bank, formerly known as Naugatuck

15   Savings Bank, was a federally insured financial institution

16   whose deposits were insured by the Federal Deposit Insurance

17   Corporation -- FDIC -- and was engaged in and the activities

18   of which affected interstate and foreign commerce.

19         Paragraph two:  At all times relevant to the

20   Superseding Indictment in this case, Thomaston Savings Bank

21   was a federally insured financial institution whose deposits

22   were insured by the Federal Deposit Insurance Corporation --

23   FDIC -- and that was engaged in and the activities of which

24   affected interstate and foreign commerce.

25         Three:  At all times relevant to the superseding

1    Indictment in this case, Salisbury Bank and Trust was a

2    federally insured financial institution whose deposits were

3    insured by the Federal Deposit Insurance Corporation --

4    FDIC -- and that was engaged in and the activities of which

5    affected interstate and foreign commerce.

6         Four:  At all times relative to the Superseding

7    Indictment in this case, Liberty Bank was a federally insured

8    financial institution whose deposits were insured by the

9    Federal Deposit Insurance Corporation, and was -- FDIC -- and

10   was engaged in and the activities of which affected

11   interstate and foreign commerce.

12        Paragraph five:  At all times relevant to the

13   Superseding Indictment in this case, Teachers Federal Credit

14   Union was a federally insured financial institution whose

15   deposits were insured by the Federal Deposit Insurance

16   Corporation -- FDIC -- and was engaged in and the activities

17   of which affected interstate and foreign commerce.

18        And on page 2 it has my signature, Ms. Laraia's

19   signature, and Mr. Einhorn's signature.

20        I think I have two more, Your Honor.

21        Next one, marked Government's Exhibit 49, Joint

22   Stipulation Regarding the Use of the Internet in Interstate

23   Commerce, reads:

24        The United States and Defendant, Leon Vaccarelli,

25   and his counsel stipulate and agree to the following facts

1    for all purposes in the trial of the above-captioned matter:

2            The sale of securities referenced in Counts

3    Thirteen, Fourteen and Fifteen of the Superseding Indictment

4    involved the use of instruments of communication in

5    interstate commerce where IP address 50.198.105.214, comma,

6    which was assigned to Lux Financial located in Connecticut,

7    was used to access the TD Ameritrade web-based trading

8    platform to execute the sales of securities and causing the

9    settlement of proceeds in a TD Ameritrade account.

10           Two:  If called as a witness, a representative of TD

11   Ameritrade would testify that the authentication servers for

12   the TD Ameritrade web-based trading platform was located in

13   Carrollton, C-A-R-R-O-L-L-T-O-N, Texas, in 2015.

14           And, finally, this is slightly out of order, but

15   Government's Exhibit 44, which is -- has the caption, it's a

16   stipulation -- it's a Stipulation Regarding the Testimony of

17   Ms. Monica Vaccarelli.

18           The Government and Defendant, Leon Vaccarelli, and

19   his counsel stipulate and agree that if Monica Vaccarelli

20   were called as a witness to testify in this case, Monica

21   Vaccarelli would testify as follows:

22           One:  Monica Vaccarelli and Leon Vaccarelli were

23   married between 2005 and early 2018.  The Vaccarellis have

24   eight children, ranging in age from college age to under five

25   years old.

1        Two:  Monica Vaccarelli was not involved in Leon

2   Vaccarelli's investment business in any capacity, was not an

3   investment advisor or registered representative, did not work

4   at Lux Financial, and did not handle, invest or have any

5   involvement with client funds.

6        Three:  All checks written to and funds provided to

7   Monica Vaccarelli by Leon Vaccarelli, including from accounts

8   held under the name of Leon Vaccarelli and LWLVACC, LLC, were

9   provided for the purpose of paying for personal and family

10   expenses of the Vaccarellis and their children.  Monica

11   Vaccarelli did not invest funds for Leon Vaccarelli's

12   clients.

13        Paragraph four:  Between 2011 and 2017, a number of

14   the Vaccarellis' children attended Our Lady of Mt. Carmel

15   School in Waterbury, Connecticut, which is affiliated with

16   Our Lady of Mt. Carmel Church.  The Vaccarellis made payments

17   to Our Lady of Mt. Carmel -- OLMC -- School for tuition,

18   lunches, and other fees.

19        Paragraph five:  Laurelton Hall is a high school in

20   Connecticut where one of the Vaccarelli children attend.  The

21   Vaccarellis made payments to Laurelton Hall for expenses

22   related to the child attending the school.

23        Six:  The Vaccarelli family paid for a membership at

24   the Edgewood Bath and Tennis Club in Middlebury, Connecticut.

25        Seven:  Exhibit 1121, a check dated 7/1/2014,

1    payable to Barbara Keller in the amount of $7,350 from Monica

2    Vaccarelli, is for the purpose of a beach house rental in

3    Madison, Connecticut, for the Vaccarelli family.

4         Eight:  Exhibit 1131, a check dated 5/1/2015,

5    payable to Barbara Keller in the amount of $5,000 from Leon

6    Vaccarelli, was for a beach house rental in Madison,

7    Connecticut, for the Vaccarelli family.

8         And the stipulation is signed by myself, by

9    Ms. Laraia, and by Mr. Einhorn.

10        That is the conclusion of the dramatic reading of

11   the stipulations in this case, Your Honor.

12        THE COURT:  All right.  Thank you.

13        These stipulations, as you can perhaps anticipate,

14   will be -- make the presentation of evidence to you much more

15   efficient.  It will reduce the number of witnesses that are

16   needed, and you will have no further evidence on the subject

17   of the topic of each of those stipulations.  That will be for

18   your consideration.

19        All right.  That completes what we have to do today.

20   You may leave a little early.  Tomorrow, we will adjourn at

21   two o'clock.  All right?  So have a -- two o'clock, okay?

22        MR. McGARRY:  Your Honor, if I may, just for

23   planning purposes for everyone.  There will be lunch, and

24   then adjourn at two o'clock, is that correct, that the jury

25   will still have that regular short lunch break?

1           THE COURT:  I guess so.

2           MR. McGARRY:  Okay.  I just thought people would

3    want to know.

4           THE COURT:  We don't want to send you out so hungry.

5           And then we will have the full day on Friday,

6    meaning --

7           MR. McGARRY:  Thursday.

8           THE COURT:  -- Thursday, 8:30 -- 9:30 'til 3:00.  We

9    will not sit on Friday.  I think I told you that at jury

10   selection.  And then we will be back on Monday, 9:30 to 3:00.

11   And we are on schedule, so you may be calm about that.

12          Have a nice afternoon.  We will see you tomorrow.

13   Leave your notebooks here.  Don't discuss the case.  Don't

14   research the case.

15          (Jury out, 2:42 p.m.)

16          THE COURT:  All right.  Is there anything further,

17   Counsel?

18          MR. EINHORN:  Well, the only thing I wanted to renew

19   rather than do it tomorrow, is my objection to the Government

20   presenting violations of policy or rules on behalf of The

21   Investment Center tomorrow.  I know Your Honor's ruled on

22   this and we discussed it, but thinking more about it, Your

23   Honor, it really is purely a contract matter between my

24   client, Mr. Vaccarelli, and The Investment Center, and it's

25   just a breach of contract.  I don't see why that would be

1   relevant to proving or assisting in the proof of fraud.

2           THE COURT:  Do you want to be heard any further,

3   Mr. McGarry?

4           MR. McGARRY:  Just if I may use the -- I think it

5   goes to intent, Your Honor, and knowledge and *mens rea.*   And

6   since we have an Elmo, one of the documents the Court might

7   see tomorrow is Government's Exhibit 369, which, as the Court

8   can read, alerts Mr. Vaccarelli that failing to adhere with

9   the requirements regarding the appropriate handling of

10  customer funds may result in criminal charges.

11          So, again, it's not saying this is relevant evidence

12  because it's a breach of contract.  This is saying this is

13  relevant evidence because you were told by The Investment

14  Center that the way -- there's a way to handle client funds

15  and a way not to handle client funds, and you should know

16  that there could be criminal charges.

17          So if one were to say I couldn't form the intent, I

18  didn't have *mens rea,* the testimony and evidence from The

19  Investment Center, I think, is directly on point that -- to

20  proving to the Government with its burden of proof beyond a

21  reasonable doubt that he did form criminal intent.

22          THE COURT:  All right.  I'm going to overrule the

23  renewed objection.  I am unpersuaded that there is no

24  relevance to the TIC's policy and rules as they applied to

25  Mr. Vaccarelli.  Whether or not they constitute a contract or

1    not is not the point.  The point is what he knew he was

2    required to do or not do with respect to the handling of

3    client funds and the possible consequences of violation of

4    those rules.  I think that's fully appropriate use of,

5    presumably, TIC's policies and rules related to the handling

6    of client funds.

7          So, the objection is overruled.

8          MR. EINHORN:  Yes, Your Honor.  Thank you.

9          THE COURT:  I am working on the charge.  I hope that

10   you will please submit supplemental charges, such as you may

11   have anticipated doing, particularly on the issue of criminal

12   intent and the claimed alcoholism and where that should be

13   considered and how that should be considered by the jury.

14         All right?

15         MR. McGARRY:  Yes.

16         THE COURT:  Very good, then.  We will stand in

17   recess, and we will see you tomorrow at 9:30.  Thank you.

18   Have a nice day.

19         (Proceedings adjourned, 2:46 p.m.)

20            COURT REPORTER'S TRANSCRIPT CERTIFICATE

21   I hereby certify that the within and foregoing is a true and

22   correct transcript taken of the proceedings in the

23   above-entitled matter.

24                         /s/  Tracy L. Gow
                           Tracy L. Gow, RPR
25                         Official Court Reporter