```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
```

_____
UNITED STATES OF AMERICA,      )
              Plaintiff,       ) No: 3:18-CR-92 (JBA)
                               )
     v.                        ) May 15, 2019
LEON VACCARELLI,               )
              Defendant.       ) 9:40 a.m.
_____)
                                 141 Church Street
                                 New Haven, Connecticut


                      JURY TRIAL DAY 3



B E F O R E:
          THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
          and 14 JURORS


                                      Official Court Reporter:
                                      Tracy L. Gow, RPR
                                      203-910-0323

1   A P P E A R A N C E S:

2   For the Government:
        MICHAEL S. McGARRY, AUSA
3       U.S. Attorney's Office-NH
        157 Church Street, 25th Floor
4       New Haven, CT 06510
        203-821-3751
5       Email: michael.mcgarry@usdoj.gov

6       JENNIFER LARAIA, AUSA
        U.S. Attorney's Office-BPT
7       1000 Lafayette Boulevard, 10th Floor
        Bridgeport, CT 06604
8       203-696-3029
        Email: jennifer.laraia@usdoj.gov

9
    For the Defendant:
10      JONATHAN J. EINHORN, ESQ.
        Law Office of Jonathan J. Einhorn
11      129 Whitney Avenue
        New Haven, CT 06510
12      203-777-3777
        Email: einhornlawoffice@gmail.com

13
        RACHEL MIRSKY, ESQ.
14      Mirsky Law LLC
        900 Chapel Street
15      10th Floor
        New Haven, CT 06510
16      203-290-2779
        Email: rachel@mirskylawct.com

17
    Also present:
18      LEON VACCARELLI
        SA RUSSEL DAY, FBI

19

20

21

22

23

24

25

1                               **<u>INDEX</u>**

2                          **EXAMINATION**

3   **Witness Name**                                                  **Page**

4     Direct By MS. LARAIA...................................... 436

5     Cross By MR. EINHORN...................................... 467

6     Re-Direct By MS. LARAIA .................................. 469

7   JUSTIN ANUARIO

8     Direct By MR. McGARRY..................................... 472

9     Voir Dire By MR. EINHORN ................................. 547

10     Direct By MR. McGARRY..................................... 549

11     Voir Dire By MR. EINHORN ................................. 577

12     Direct By MR. McGARRY..................................... 578

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to Order, out of the presence of the Jury,
 2    9:40 a.m.)
 3              THE COURT:  Good morning, Counsel, ladies and
 4    gentlemen, Mr. Lucarelli -- Vaccarelli, I'm sorry.
 5              THE DEFENDANT:  It's okay.
 6              THE COURT:  All right.  We're ready to proceed.
 7    Anything before we bring in the jury, who is now here?
 8              MR. McGARRY:  If I can just check for a second with
 9    our IT person to see if everything is ready to go.
10              All set.
11              THE COURT:  And your next witness is?
12              MS. LARAIA:  Denis Roussel.
13              THE COURT:  All right.  Let's bring in the jury.
14              (Jury in, 9:40 a.m.)
15              THE COURT:  Good morning, ladies and gentlemen.
16              THE JURY:  Good morning.
17              THE COURT:  Please be seated.  We are ready to
18    proceed with the Government's next witness.
19              MS. LARAIA:  Your Honor, the Government calls Denis
20    Roussel.
21              (Witness enters, 9:42 a.m.)
22              THE COURT:  Mr. Roussel, would you come over to the
23    witness stand, please.  And when you get there, raise your
24    right hand -- remain standing and raise your right hand.  The
25    oath will be administered to you.
```

```
1              (DENIS ROUSSEL sworn, 9:42 a.m.)
2              COURTROOM DEPUTY:  Please be seated.  State your
3     name for the record.
4              THE WITNESS:  Denis Roussel.
5              COURTROOM DEPUTY:  Spell your last name.
6              THE WITNESS:  R-O-U-S-S-E-L.
7              COURTROOM DEPUTY:  And can you tell us the city and
8     state that you live in?
9              THE WITNESS:  In Terryville, Connecticut.
10                        DIRECT EXAMINATION
11    BY MS. LARAIA:
12       Q.  Good morning, Mr. Roussel.  Mr. Roussel, how long
13    have you lived in Connecticut?
14       A.  Since 1966.
15              THE COURT:  Sir, you're going to need to speak into
16    the microphone.  It's that bar in front of you.  If you just
17    sit closer, I think it will be fine.
18    BY MS. LARAIA:
19       Q.  Okay.  And did you say from -- since 1966?
20       A.  Yes.
21       Q.  Okay.  Where were you born?
22       A.  New Brunswick, Canada.
23       Q.  Okay.  And when you came to Connecticut, what kind
24    of work did you do?
25       A.  I worked in the factory.
```

```
1      Q.   And where did you spend the majority of your
2  career?
3      A.   In construction.
4      Q.   And is there a specific company that you worked
5  for?
6      A.   Mohawk Northeast.
7      Q.   And what kind of work does Mohawk do?
8      A.   Pipe work in the beginning, and then we did road
9  work, bridge work.
10          THE COURT:  Can you speak a little bit slower?  I'm
11  having a hard time understanding you at a distance.
12          THE WITNESS:  Okay.
13          THE COURT:  Okay?
14          THE WITNESS:  Yes.
15          THE COURT:  Go ahead.
16  BY MS. LARAIA:
17      Q.   Okay.  Did you say that Mohawk did some pipe work
18  and some bridge work and some road work?
19      A.   Yes.
20      Q.   Okay.  What did you do specifically for Mohawk, just
21  some of the jobs you did?
22      A.   I was kind of a foreman and operating equipment,
23  truck driver.
24      Q.   Okay.  Did you operate trucks and things like
25  that?
```

```
 1      A.   Yes.
 2      Q.   Okay.  Approximately how long did you work for
 3   Mohawk?
 4      A.   Thirty-seven years.
 5      Q.   Okay.  And are you doing any work right now?
 6      A.   A little bit here and there.
 7      Q.   Okay.  And why is it that you're still working
 8   now?
 9      A.   I don't want to stay doing nothing, and extra
10   money.
11      Q.   Do you have any children?
12      A.   Yes.
13      Q.   How many children do you have?
14      A.   Two.
15      Q.   How about grandchildren?
16      A.   Yes, three.
17      Q.   Okay.  How old are your grandchildren?
18      A.   One is 21, 20 and 18.
19      Q.   Okay.  Do you know Leon Vaccarelli?
20      A.   Yes.
21      Q.   Do you remember approximately how long you've known
22   Mr. Vaccarelli for?
23      A.   About 19, 20 years.
24      Q.   Okay.  How did you first meet him?
25      A.   I met him through -- I had an American Express card,
```

1  and it had the thing on there for an advisor, and I called

2  the number and that's how I met him.

3      Q.  So, was that financial advice or a financial advisor

4  you were looking for?

5      A.  Yes.

6      Q.  Okay.  And you called the number, and you were

7  connected to Mr. Vaccarelli or connected with him?

8      A.  Yes, with somebody and --

9      Q.  Okay.  At any point, did Mr. Vaccarelli operate out

10  of somewhere other than American Express?

11      A.  Yeah, after -- Investment Center.

12      Q.  Okay.  Did he end up having his own office at any

13  point?  Did he have his own office?

14      A.  At the beginning that wasn't his own, I guess.

15  There were a whole bunch of people there.

16      Q.  Okay.  How about sometime later, at some point later

17  in the time that you knew Mr. Vaccarelli?

18      A.  Yeah.

19      Q.  Okay.  And do you remember going to an office in

20  Waterbury?

21      A.  Yes.

22      Q.  Okay.  Now, what was -- over the course of the time

23  that you knew Mr. Vaccarelli, what did he do for you?

24      A.  Invest my money, I guess.

25      Q.  Okay.  So was he your financial advisor?

```
1      A.   Yeah.

2      Q.   And he helped you with investments?

3      A.   Yeah, yeah.

4      Q.   Okay.  At some point -- I think you mentioned The

5   Investment Center.  At some point, did you open an account

6   with something called The Investment Center?

7      A.   Yes.

8      Q.   Okay.  Through Mr. Vaccarelli?

9      A.   Yes.

10      Q.   I'm going to show you --

11           MS. LARAIA:  Actually, Your Honor, I would move the

12   admission of Government's Exhibits 12, 100, 101, 102, 103,

13   104, 107, 108, 109 and 110, as I believe there's no

14   objection.

15           MR. EINHORN:  No objection.

16           THE COURT:  All right.  Those exhibits are full

17   exhibits without objection.

18           MS. LARAIA:  Thank you, Your Honor.

19   BY MS. LARAIA:

20      Q.   Mr. Roussel, I'm going to show you on your screen

21   Government's Exhibit 100.  Did that show up on your screen?

22      A.   Yes.

23      Q.   Okay.  Oops, I made it yellow, but -- now, is that

24   your name in the top left?

25      A.   Yes.
```

1    Q.   Okay.  And you were living in Terryville,

2    Connecticut?

3    A.   Yes.

4    Q.   And do you see -- who's listed here as the account

5    executive for your account?

6    A.   Leon Vaccarelli.

7    Q.   Okay.  And is this a document from The Investment

8    Center?

9    A.   Yes.

10   Q.   I just want to make this paragraph a little bit

11   larger here.  I'm going to ask you to take a look at this as

12   I read this:

13        "Thank you for choosing a financial consultant

14   affiliated with The Investment Center, Inc., to assist you

15   with your financial needs.  When you work with a financial

16   consultant of The Investment Center, you're working with

17   someone who's met the highest standards of professionalism

18   and dedication to client service."

19        Do you see that?

20   A.   Yes.

21   Q.   And when you opened the account with The Investment

22   Center, what was your expectation about your financial

23   advisor?

24   A.   That it was going to be invested.

25   Q.   Okay.  And by someone who had professional

```
 1    credentials?
 2         A.   Yes.
 3         Q.   Okay.  I'm going to show you page -- I'll just
 4    highlight this, actually, first.  What's the date on this
 5    document?
 6         A.   February 25, 2011.
 7         Q.   Okay.  I'm going to show you page 14.
 8              Okay.  And just looking at the top here, is this
 9    from an account agreement?  Does that say "account agreement"
10    at the top of that document?
11         A.   Yes.
12         Q.   Okay.  And I'm just going to ask you if this is your
13    signature?
14         A.   Yes.
15         Q.   And what is the date on that, accompanying your
16    signature?
17         A.   2/15/2011.
18         Q.   Okay.  So, fair to say that you've had an account at
19    The Investment Center since at least February of 2011?
20         A.   Yep.
21         Q.   Okay.  I'm going to show you Government's Exhibit
22    101.  Now, still talking about 2011 but a few months later --
23    I'm just going to highlight this top portion here -- or
24    enlarge this top portion, rather.
25              What's the date on this document?
```

1      A.   9/8/11.

2      Q.   Now, at some point in 2011, did you make an

3  investment with Mr. Vaccarelli?

4      A.   Yes.

5      Q.   Okay.  And I'm going to show you -- or actually,

6  let's just stay on this page for a second.  I think I might

7  need to get our IT person.  Okay.  There we go.

8           Just looking at the top portion of this document

9  here, do you recognize the name Lux Financial Services?

10     A.   Yes.

11     Q.   And what was that?

12     A.   That's Vaccarelli's company.

13     Q.   I'm sorry, who's company?

14     A.   Leon.

15     Q.   Leon's company, okay.  And there's an address listed

16  here.  Do you see this, where it says 231 Bank Street,

17  Waterbury, Connecticut?

18     A.   Yes.

19     Q.   Do you remember Mr. Vaccarelli having an office

20  address on or around Bank Street?

21     A.   Yes.

22     Q.   Okay.  Just going to the next page here.  Now, this

23  document; do you see the name ING at the top?

24     A.   Yes.

25     Q.   Did you have an investment with ING back in 2011?

```
 1    A.    Yes.
 2    Q.    And, in 2011, did you make or take a partial
 3  withdrawal from that ING investment?
 4    A.    Yes.
 5    Q.    Okay.  Just going to scroll through.  And,
 6  specifically, do you see where it says "specified percentage
 7  10 percent"?
 8    A.    Yes.
 9    Q.    All right.  Mr. Roussel, do you recognize any of the
10  signatures on this document?
11    A.    Yes, mine.
12    Q.    Your signature.  And do you recognize underneath
13  here this other person's name?
14    A.    Yes.
15    Q.    Who is that?
16    A.    Maryanne -- I can't read the last name.
17    Q.    Okay.
18    A.    She worked for Leon.
19    Q.    She worked for Leon?
20    A.    Yeah.
21    Q.    Had you met her before --
22    A.    Yes.
23    Q.    -- or did you meet her at any point?
24    A.    Yes.
25    Q.    And what was your understanding of what she did for
```

1   Mr. Vaccarelli?

2       A.   She was taking care of paperwork.  She was the

3   secretary or --

4       Q.   Administrative type work?

5       A.   Yeah.

6       Q.   Now, Mr. Roussel, I want to show you what's been

7   admitted as Government's Exhibit 102.  Do you recognize

8   this?

9       A.   Yes.

10      Q.   Okay.  Just tell us generally what this is.

11      A.   Excuse me?

12      Q.   Just tell us what you see on the screen here.

13      A.   It's a check from ING, $30,695.48.

14      Q.   Okay.  And is that that partial withdrawal from your

15  ING account?

16      A.   Yes.

17      Q.   I want to focus on the date for a minute here.  What

18  is the date -- I know it's small -- in the sort of top right?

19  Let me see if I can make it a little bit bigger here.

20      A.   9/13/2011.

21      Q.   All right.  Payable to you?

22      A.   Yes.

23      Q.   Okay.  Now, just looking down at the bottom portion

24  here, the image of the back of the check, do you recognize

25  the signature that I'm highlighting on the far right?

A. Yes, it's mine.

Q. And, so, what did you do with this check after you received it?

A. I gave it to Leon.

Q. Okay. And when you gave it to Mr. Vaccarelli, did you endorse the back of the check --

A. Yes.

Q. -- when you handed it over?

A. Yes. Yes.

Q. And do you remember how you gave it to Mr. Vaccarelli? Was it in person or -- did you drop it off?

A. In person.

Q. Okay. And do you happen to recognize the signature below yours?

A. Not really.

Q. Okay. Now, when you gave this check to Mr. Vaccarelli, what conversation did you have with him?

A. He just told me I had money in there and I could get that out.

Q. Okay. And when he said -- so, before you received this check, had you had a conversation with Mr. Vaccarelli about taking out some of the money to invest?

A. He never said what it was for. Just took it out, and I figured it was to invest.

```
 1        Q.   Okay.  So he didn't have a specific thing to invest
 2   in?
 3        A.   No.
 4        Q.   Was it your understanding it was for an
 5   investment?
 6        A.   Well, yes.
 7        Q.   Okay.  And why was that your understanding?
 8        A.   Because he was the advisor.
 9        Q.   That's what he does for you; right?
10        A.   Supposedly -- yeah, supposedly knew what he was
11   doing.
12        Q.   Okay.  At any point, did Mr. Vaccarelli tell you
13   that this check was actually a gift to him?
14        A.   Nope.
15        Q.   Or a loan to him?
16        A.   Nope.
17        Q.   Or that it would be used for anything other than
18   investment for you?
19        A.   Nope.
20        Q.   Okay.  If it -- if you had -- let me start that
21   again.
22             Had you known that this money wouldn't be invested
23   for you, would that have impacted your decision as to whether
24   to give this check to Mr. Vaccarelli?
25        A.   Yes.
```

1    Q.   Why is that?

2    A.   Because that was my money.  It was to be invested

3  for me.

4    Q.   And what was the purpose for investing your money?

5  Why were you investing?

6    A.   So when I retired I would be able to live a little

7  longer.

8    Q.   Okay.  I'm going to show you Government's Exhibit

9  103.  Now, I'm going to highlight this name at the top here.

10  Do you see that LWLVACC, LLC?

11    A.   Yes.

12    Q.   Do you know what that is?

13    A.   Nope.

14    Q.   Okay.  Fair to say that this here is not your bank

15  statement?  This bank statement --

16    A.   No.

17    Q.   -- for LWLVACC?

18    A.   No, that's not my bank statement.

19    Q.   Okay.  Now, I just want to show you, looking at this

20  account activity here, do you see this column right here

21  where it says "credits" and there's another column that says

22  "debits"?

23    A.   Yes.

24    Q.   And on the far right, there's a column that says

25  "balance."  Do you see that?

1    A.    Yes.

2    Q.    Okay.  I just want to make this section a little bit

3    larger.  On 9/19, do you see a deposit into the account?

4    A.    Yes.

5    Q.    And what is the amount of that deposit?

6    A.    $30,695.48.

7    Q.    Okay.  Is that number at all familiar to you?

8    A.    Yes.

9    Q.    Why is that?

10   A.    Because it came out of the -- that other thing we

11   looked at, ING.

12   Q.    Is that the same as your check?

13   A.    Yeah.

14   Q.    Okay.  Same amount as your check.

15         Before this check -- or before this amount was

16   deposited to this bank account, I just want to ask you to

17   read the balance that I'm going to highlight right here.

18   What was the balance before?

19   A.    $183.74.

20   Q.    Okay.  Now, after that check or that money was

21   deposited, do you see that there are debits, money coming out

22   of the account?

23   A.    Yes.

24   Q.    Okay.  And I particularly want to focus your

25   attention here, 9/21.  Do you see a check number 2886?

```
1      A.   Yes.

2      Q.   And what is the amount of that check?

3      A.   700 -- 7,000.

4      Q.   Okay.  $7,000.

5           Now, just to back up for a minute.  At any point,

6  did Mr. Vaccarelli tell you that he would put money into an

7  account -- your money -- into an account held under the name

8  of LWLVACC?

9      A.   Nope.

10     Q.   Okay.

11          MR. EINHORN:  This is argument, Your Honor.  I'd

12 object.

13          THE COURT:  No.  I'm going to overrule that.

14 BY MS. LARAIA:

15     Q.   And I think you answered that question, so I'm going

16 to move to Government's Exhibit 104, which has previously

17 been admitted.

18          Do you see that check, number 2886?

19     A.   Yes.

20     Q.   Is that the same number that we just looked at for

21 the $7,000 check?

22     A.   Yes.

23     Q.   Okay.  Do you know someone named Carmine DiSapio?

24     A.   Nope.

25     Q.   And I'm just going to highlight this for you here.
```

1  Do you see where it says "Deposit work Joshua Town Road"?  Do

2  you see where it says "Deposit work Joshua Town Road"?

3       A.   Yes.

4       Q.   Okay.  Do you know what that means, "Deposit work

5  Joshua Town Road"?

6       A.   Nope.

7       Q.   At any point, did Mr. Vaccarelli tell you that he

8  was going to use some of your money to pay someone named

9  Carmine DiSapio?

10      A.   Nope.

11      Q.   Or for work done -- for "Deposit work Joshua Town

12 Road"?

13      A.   Nope.

14      Q.   All right.  Now, I'm going to show you Government's

15 Exhibit 12.  So I'm going to fast-forward a little bit.

16           In 2016, did you make another movement of money for

17 the purpose of investment?

18      A.   Yes.

19      Q.   Okay.  Just looking at the top here, what's the

20 title of this document?

21      A.   IRA/ESA Distribution Request.

22      Q.   Okay.  And the top part here, is that your name

23 under the account owner information?

24      A.   Yes.

25      Q.   Okay.  And what's the date with the stamp?

```
1    A.   October 12th of 2016.
2    Q.   Okay.  And just looking at the bottom here, can you
3  tell us the amount of the distribution?
4    A.   60,000.
5    Q.   Okay.  I'm going to scroll through here.
6         Okay.  Now, this I'm showing you now is page 4.  Do
7  you see where it says at the top of the section "Step 5,
8  method of delivery"?  Do you see that at the very top there?
9    A.   Yes.
10   Q.   And underneath there, do you see the checked box for
11 "Federal fund wire"?
12   A.   Yes.
13   Q.   And do you see a routing number and a bank name and
14 Bristol, Connecticut, and then a partially redacted account
15 number?
16   A.   Yes.
17   Q.   Do you recognize that partially redacted account
18 number?
19   A.   Yes.
20   Q.   And who's account was that?
21   A.   Mine.
22   Q.   Okay.  So was it your understanding that this money
23 was going to be routed to your bank account?
24   A.   Yes.
25   Q.   Okay.  And just this last page I'll ask you about.
```

```
1    Do you recognize the signature on this page?
2        A.   Yes.
3        Q.   And what is the date accompanying the signature?
4        A.   1/11/2016 [sic].
5        Q.   Does it look like 10/11?
6        A.   10/11/2016.
7        Q.   Okay.  Now, why were you taking $60,000 out of this
8    account?
9        A.   Because he told me that I could do that, to invest
10   it at 7 and a half percent.
11       Q.   And you said "he" told you you could do that --
12       A.   Yeah.
13       Q.   -- invest at 7 and a half percent?
14       A.   Yeah.
15       Q.   Who is the "he"?
16       A.   Leon.
17       Q.   Leon Vaccarelli?
18       A.   Yes.
19       Q.   Okay.  And, so, he told you you would earn 7 and a
20   half percent interest on an investment?
21       A.   7 to 7 and a half percent, yeah.
22       Q.   Okay.  7 to 7 and a half percent?
23       A.   Yeah.
24       Q.   Did he tell you in what way it would be invested to
25   earn 7 to 7 and a half percent?
```

454

1   A.   No.

2   Q.   Okay.  And why did you decide to do that?

3   A.   Because 7 and a half percent, I guess it was just

4   transferring money from one place to another.

5   Q.   Did you consider that to be a good return on

6   investment?

7   A.   Yes.

8   Q.   Now, I'm going to show you Government's Exhibit 107.

9   Is this a statement from your account at The Investment

10  Center?

11  A.   Yes.

12  Q.   And just specifically here, is this statement period

13  October of 2016?

14  A.   Yes.

15  Q.   And I want to identify just below your information

16  here, who is listed as your investment professional?

17  A.   Vaccarelli and --

18  Q.   Hard to pronounce.

19  A.   Barry, yeah.  I can't read the last name.

20  Q.   You said Barry?

21  A.   Yeah.

22  Q.   Who is Barry?

23  A.   He's a partner with Vaccarelli.

24  Q.   Okay.  Now, did Barry also do any work for you at

25  this point?

1    A.    Yes.

2    Q.    What kind of work was Barry doing for you?

3    A.    Just take -- took care of paperwork.

4    Q.    Okay.  In terms of this particular investment, money

5    that was going to be invested at 7 to 7 and a half percent,

6    was that something that you talked about with Leon or with

7    Barry?

8    A.    With Leon.

9    Q.    Now, just looking at this statement again -- I'm

10   going to enlarge the section here.  Can you read for us the

11   beginning account value for this period?

12   A.    192,724.11.

13   Q.    Okay.  And do you see any -- it says "Net cash

14   deposits and withdrawals."

15   A.    Yes.

16   Q.    What is listed there?

17   A.    62,800.

18   Q.    Okay.  And I'm going to flip forward here to page 7.

19         Okay.  Now, do you see a transaction here on 10/3 of

20   2016?

21   A.    Yes.

22   Q.    And just tell us what that is for, if you know, this

23   $2800 transaction?

24   A.    That's a normal distribution taken out from my

25   account.

1    Q.   Okay.  So just explain what was happening every

2    month.

3    A.   Yes.

4    Q.   Just explain for the jury what was happening every

5    month.

6    A.   Every month I took $2800 out of the account, and it

7    went into my account.

8    Q.   And that was just for living expenses?

9    A.   Yes.

10   Q.   Okay.  Now, I just want to look at the bottom here.

11   On 10/12/16, what do you see here?

12   A.   62 -- $60,000.

13   Q.   Do you see where it says -- the letters are sort of

14   squished together, but "Federal funds sent" and then "Bank of

15   America"?

16   A.   Yes.

17   Q.   Okay.  So, fair to say, did those funds -- did the

18   $60,000 get to your bank account?

19   A.   It went to my account.

20   Q.   To your Bank of America account?

21   A.   Yep.

22   Q.   I want to show you Government's Exhibit 109 -- or,

23   I'm sorry -- Government's Exhibit 108.  We'll start there.

24   Do you recognize this?

25   A.   Yes.

1    Q.   Okay.  Tell us what this is.

2    A.   This is the check I gave to Leon for $54,000.

3    Q.   Okay.  So not the full 60,000 that you took out, but

4    $54,000?

5    A.   54,000, yeah.

6    Q.   And just tell us the date of that check.

7    A.   10/11/16.

8    Q.   Okay.  And do you see -- in the "Pay to the order"

9    section, what does that say?

10   A.   LWLVACC, LLC.

11   Q.   Okay.  And did you have an understanding of what

12   LWLVACC was?

13   A.   No.

14   Q.   Is this your handwriting on the check for LWLVACC?

15   A.   Nope.

16   Q.   Whose handwriting is it?

17   A.   It's Leon.

18   Q.   How about right here, what does that say in the

19   "for" line?

20   A.   It says "Senior Note Leon."

21   Q.   Is this your signature to the right of that?

22   A.   Yes.

23   Q.   And the "Senior Note Leon," did you write that or

24   did someone else?

25   A.   Leon did.

```
1        Q.    I'm going to show you the bottom part here.  Do you
2    see where it's highlighted "DEP" or deposit "only 7051"?
3        A.    Yeah.
4        Q.    Okay.  Now, just to go back for a second.  What
5    was -- or what did you do with this check?
6        A.    I --
7        Q.    You said that --
8        A.    I gave it to Leon.
9        Q.    You gave it to Leon.  And he filled out some of that
10   information?
11       A.    Yes.
12       Q.    And were you there when that information was filled
13   out?
14       A.    Yes.
15       Q.    Okay.  And did you have any conversation about what
16   was going to happen with this money?
17       A.    Just -- at that point, no, just the 7 and a half
18   percent he told me before.
19       Q.    Okay.  So nothing changed about what this was for?
20       A.    No.
21       Q.    And was it your understanding that this was for a
22   fixed term or for a certain amount of time?
23       A.    For two years.
24       Q.    Okay.  So, in those two years, did you have any
25   understanding about whether you could access that money?
```

1    A.    No.

2    Q.    I'll just ask you to make sure I understand your

3    answer.  You didn't have an understanding or you couldn't

4    access that money?

5    A.    I guess I couldn't access that money for two

6    years.

7    Q.    Okay.  And was that based -- or what is -- why was

8    it that you thought you couldn't access the money for two

9    years?

10   A.    Because that's what Leon told me.

11   Q.    Okay.  And when you provided this check to

12   Mr. Vaccarelli, did you tell him that it was a gift?

13   A.    No.

14   Q.    Or a loan?

15   A.    No.

16   Q.    What was it for?

17   A.    Was to invest.

18   Q.    At the 7 or 7 and a half percent?

19   A.    Yeah.

20   Q.    Now, I'm going to show you Government's Exhibit 109.

21         Actually, before we do that, do you see this account

22   at the bottom, this "Deposit only 7051"?

23   A.    Yeah.

24   Q.    Okay.  Just to highlight here.  Oops.  That didn't

25   make it any bigger.

460

```
 1            What's the account number here, the unredacted
 2     portion of the account number?
 3         A.   7051.
 4         Q.   Okay.  Do you see here, this is an account statement
 5     for LWLVACC?
 6         A.   Yes.
 7         Q.   And did you understand that to be something
 8     affiliated with Leon?
 9         A.   What was that?
10         Q.   Did you have any understanding of what LWLVACC was
11     after he put it on your check?
12         A.   Not really, no.
13         Q.   Okay.  Let me just make this a little bit larger
14     here.
15            Now, on October 13th, can you tell us -- can you
16     read off for us what --
17         A.   54,000.
18         Q.   I'll just make sure I repeat the question.  So is
19     there a deposit on October 13th?  Was there a deposit to this
20     account on October 13th?
21         A.   Yes.
22         Q.   And is that the 54,000?
23         A.   Yes.
24         Q.   At any point, did Mr. Vaccarelli tell you that he
25     was going to use any of your money to pay someone named Ciro
```

1    Peluso?

2        A.   No.

3           MR. EINHORN:  Objection.  Your Honor, I believe this

4    is argumentative because the Government is attempting to

5    connect the dots on various exhibits and arguing that monies

6    were used in a certain fashion, which is the jury's

7    province.

8           THE COURT:  The question here is:  Did

9    Mr. Vaccarelli tell Mr. Roussel that he was going to use any

10   of Mr. Roussel's money to pay Ciro --

11          MS. LARAIA:  Ciro Peluso.

12          THE COURT:  -- Ciro Peluso.

13          MR. EINHORN:  Which presumes a fact that only the

14   jury can determine.

15          THE COURT:  That -- it's a factual question.

16   Whatever inferences are drawn from that will come later.  I

17   don't think that makes it inadmissible.

18          MR. EINHORN:  Yes, Your Honor.

19          THE COURT:  Can you answer that question, sir?

20   Please repeat the question, Ms. Laraia.

21          MS. LARAIA:  Yes, Your Honor.

22   BY MS. LARAIA:

23       Q.   At any point, did Mr. Vaccarelli tell you that he

24   was going to use any of your money to pay someone named Ciro

25   Peluso?

1    A.   No.

2    Q.   Just one more thing to show you here.  Now, just

3  looking at the bottom.  Do you see a transaction -- well,

4  what is the very last transaction on October 24th on this

5  page?

6    A.   $7,341.29.

7    Q.   So that's the balance over here?

8    A.   Yes.

9    Q.   And do you see where it says "4074 check"?

10   A.   Yes.

11   Q.   And what's the amount?

12   A.   $4,000.

13   Q.   Now, I just want to show you Government's Exhibit

14  110.  Do you see that number "4074"?

15   A.   Yes.

16   Q.   And what's the amount of this check?

17   A.   $4,000.

18   Q.   Do you know someone named Breiann Sedano?

19   A.   Nope.

20   Q.   At any point, did Mr. Vaccarelli tell you that he

21  was going to use any of your money to pay Breiann Sedano?

22   A.   No.

23        MR. EINHORN:  Your Honor, same objection.  I won't

24  keep jumping up if we can just preserve my objection to this

25  line of questioning.

1           THE COURT:  Okay.  The questions are related to

2    whether Mr. Vaccarelli told the witness that he would use the

3    money in a certain way.  That's just a factual question.  It

4    does not presume that he did use the money in that way, and

5    that will require further development for the jury's benefit.

6           So you may have a continuing objection, but that is

7    how I see the admissibility of this question, without any

8    presumption that what was -- when the answer to the question

9    is no, Mr. Vaccarelli didn't say he would use the money for a

10   particular purpose, that doesn't mean that he did use the

11   money for a particular purpose.

12          You understand that, ladies and gentleman?  Okay.

13          MR. EINHORN:  Thank you, Your Honor.

14          THE COURT:  Go ahead.

15          MS. LARAIA:  Thank you.

16   BY MS. LARAIA:

17     Q.   And I am not -- I don't remember if you answered the

18   question.  I apologize.  So I'll just ask it again.

19          At any point, did Mr. Vaccarelli tell you that he

20   was going to use any of your money to pay someone named

21   Brieann Sedano?

22     A.   No.

23     Q.   And what did he tell you he was going to use your

24   money for?

25     A.   To invest it.

1    Q.    And for 7 to 7 and a half percent?

2    A.    Yes.

3    Q.    Okay.  During the time that you were investing money

4    with The Investment Center and Mr. Vaccarelli, particularly

5    focusing on this time period between 2011 and, let's say,

6    2016, how often did you meet with him?

7    A.    Quite often.  At least once a month.

8    Q.    Okay.  And what was the purpose of meeting with

9    him?

10   A.    If I had a question for him or I was going --

11   sometimes I would withdraw some more money, needed to get

12   some money to put into the account for $2800 a month.

13   Q.    Okay.  Do you, yourself, have any kind of investment

14   experience or any kind of financial background?

15   A.    No.

16   Q.    Did you trust Mr. Vaccarelli?

17   A.    Yes.

18   Q.    Why was that?

19   A.    Because I thought that he was a good advisor, he was

20   doing good with my money.

21   Q.    Did you think that he would do a better job with

22   your money than you would if you were trying to invest it

23   yourself?

24   A.    Yes.

25   Q.    Fair to say you thought he was doing a good job?  Is

 1   it fair to say you thought he was doing a good job?

 2        A.   Yes.

 3        Q.   At any point, did you give a gift to

 4   Mr. Vaccarelli?

 5        A.   Yes.

 6        Q.   What was that?

 7        A.   A ticket to a restaurant.

 8        Q.   Like a gift card to a restaurant?

 9        A.   A gift card to a restaurant, yeah.

10        Q.   More than once?

11        A.   A few times.

12        Q.   And was there a particular occasion for which you

13   gave him a gift?

14        A.   Christmastime.

15        Q.   Okay.  And was there a particular restaurant you

16   gave him a ticket or a gift card to?

17        A.   There was one in Bristol that I remember, Cava or

18   something like that.

19        Q.   Do you remember what kind of restaurant it was?

20        A.   Italian restaurant.

21        Q.   At any point, did you receive a statement from

22   Mr. Vaccarelli about that $30,000 investment in 2011 or the

23   2016 $54,000 investment?

24        A.   No.

25        Q.   Okay.  At any point, did you become concerned about

1    your money?

2        A.   Not really.

3        Q.   At any point -- well, let me ask you this:  Do you

4    have your money?

5        A.   Nope.

6        Q.   Fair to say you're concerned about it now?  Is it

7    fair to say you're concerned about it now?

8        A.   Yes.

9        Q.   At any point, did you receive a call from anyone

10   concerning Mr. Vaccarelli?

11       A.   Yes.

12       Q.   And after you got that call, what did you do?

13       A.   I went to Leon's office and I asked him what was

14   going on.

15       Q.   And did you have the occasion to speak with

16   Mr. Vaccarelli when you went down to his office?

17       A.   Yes.

18       Q.   And what did he say?

19       A.   He said that one time he did something wrong, and he

20   paid for it and it was okay.

21       Q.   And --

22       A.   Didn't know what was going to happen here.

23       Q.   So did he say anything about your money?

24       A.   Nope.

25       Q.   Did you at that point -- or what did you think at

1    that point, about your money?

2        A.   I thought it was still in the investment.  I didn't

3    think that there was anything wrong.

4        Q.   Have you gotten back either the $30,000 you invested

5    in 2011 or the $54,000 you invested in 2016?

6        A.   No.

7        Q.   Have you ever gotten any interest or any return on

8    investment for either of those?

9        A.   Nope.

10            MS. LARAIA:  Just one moment, Your Honor.

11            (Counsel confer.)

12            MS. LARAIA:  Nothing further.

13            THE COURT:  Cross-examination.

14            MR. EINHORN:  Yes, Your Honor.

15                       CROSS-EXAMINATION

16   BY MR. EINHORN:

17       Q.   Good morning, Mr. Roussel.

18       A.   Good morning.

19       Q.   I represent Leon Vaccarelli, and I'm just going to

20   ask a few questions this morning about your testimony.

21            First of all, have you ever gone drinking with

22   Mr. Vaccarelli?  Ever had drinks with him?

23       A.   Yes.

24       Q.   Sure.  Was that sort of a regular thing, when you

25   would see him you'd go have drinks with him?

1    A.   No.  No.

2    Q.   Did it happen often?

3    A.   Two, three times maybe.

4    Q.   That's all?

5    A.   Yeah, no.  Yeah, yeah.

6    Q.   In all the years you knew him, you only went two,

7    three times?

8    A.   Only when he moved to Leavenworth, next to the

9    restaurant.

10   Q.   Right.  And the restaurant, Signature's Restaurant,

11   which I've just brought up on the screen, that's where you

12   went; right?

13   A.   Yes.

14   Q.   And you went there a number of times with Leon;

15   right?

16   A.   Went there, I would say three times.

17   Q.   Just three times?  That's all?

18   A.   Yes.

19   Q.   Over all the years?

20   A.   Yes.  He wasn't there all them years.

21   Q.   All right.  Let me ask you something else.  You were

22   asked about getting your money back.  You did make a claim

23   with The Investment Center; didn't you?

24   A.   Yes.

25   Q.   You did.  Okay.  And you filed papers with The

```
 1   Investment Center asking to have your money returned to
 2   you?
 3        A.   Yes.
 4        Q.   But you haven't gotten it back yet; right?
 5        A.   Nope.
 6        Q.   It's in process or pending or they're working on
 7   it?
 8        A.   Supposedly it's in process.
 9        Q.   Okay.  All right.
10             MR. EINHORN:  Nothing further, Your Honor.  Thank
11   you.
12             THE COURT:  Redirect.
13             MS. LARAIA:  Just briefly, Your Honor.
14                      REDIRECT EXAMINATION
15   BY MS. LARAIA:
16        Q.   Mr. Roussel, Attorney Einhorn just asked you whether
17   you'd ever had drinks with Mr. Vaccarelli.  Do you remember
18   that?
19        A.   Yes.
20        Q.   Okay.  And you mentioned that you went with him to
21   Signature's, which is up on the screen -- Government's
22   Exhibit 41.
23        A.   Yes.
24        Q.   Okay.  Now, when you went with him to Signature's,
25   would you have a meal?
```

```
1    A.   Yes.
2    Q.   So what meal might you have?  What meal did you
3    have?
4    A.   I don't know.
5    Q.   Not what did you eat specifically, but what time of
6    day was it?
7    A.   Noon.  Noontime.  Yeah, afternoon, yeah.
8    Q.   So lunchtime?
9    A.   Yeah.
10   Q.   And how many drinks would Mr. Vaccarelli have on
11   these couple -- on these few occasions?
12   A.   Two.
13   Q.   And did he say anything to you about whether he
14   could drink any more?
15   A.   No.  He had to go back to work, couldn't drink too
16   much more.
17   Q.   So what did he say to you about that?
18   A.   He'd say, Well, we're not going to have any more, or
19   you can have another one but I won't, I got to go back to
20   work.
21   Q.   Have you ever seen Mr. Vaccarelli impaired?
22   A.   Nope.
23   Q.   Drunk?
24   A.   Nope.
25   Q.   Have you ever been to an office Christmas party --
```

```
 1      A.   Yes.

 2      Q.   -- thrown by his office?

 3      A.   Yes.

 4      Q.   Did you see him drunk there?

 5      A.   Nope.

 6           MS. LARAIA:  No further questions, Your Honor.

 7           THE COURT:  Anything further?

 8           MR. EINHORN:  No, Your Honor.  Thank you.

 9           THE COURT:  All right.  Mr. Roussel, thank you.  You

10   may step down.  You are excused.

11           (Witness excused, 10:23 a.m.)

12           THE COURT:  Please call your next witness.

13           MR. McGARRY:  Thank you, Your Honor.

14           Your Honor, at this time, the Government calls

15   Mr. Justin Anuario.  I can spell it or I could have him spell

16   it.

17           THE COURT:  Well, he will be spelling it.

18           MR. McGARRY:  Okay.  Then I'll give the court

19   reporter a break, then.

20           THE COURT:  All right.  Mr. Anuario, please raise

21   your right hand and the oath will be administered.

22           (JUSTIN ANUARIO sworn, 10:24 a.m.)

23           COURTROOM DEPUTY:  Please be seated.  State your

24   name for the record.

25           THE WITNESS:  Name is Justin Anuario.
```

```
1              COURTROOM DEPUTY:  Can you spell your last name?
2              THE WITNESS:  Yes, it's A-N-U-A-R-I-O.
3              COURTROOM DEPUTY:  And can you tell us what city and
4    state you live in?
5              THE WITNESS:  I currently reside in Hackettstown,
6    New Jersey.
7              MR. McGARRY:  May I inquire, Your Honor?
8              THE COURT:  You may.
9                         DIRECT EXAMINATION
10   BY MR. McGARRY:
11       Q.   Mr. Anuario -- did I pronounce that correctly?
12       A.   Yes.
13       Q.   Where did you come from to join us today?
14       A.   Our firm is located in Bedminster, New Jersey.
15       Q.   And when you say "our firm," what is your firm?
16       A.   The Investment Center, Inc.
17       Q.   Okay.  Before I ask you about The Investment Center,
18   Inc., can you briefly tell the jury a little bit about your
19   educational background, how far you went in school and what
20   you studied?
21       A.   Sure.  I graduated from Jersey City State College,
22   which is now called New Jersey City University.  My major --
23   I graduated with a bachelor's in criminal justice.  That's as
24   far as I got.
25       Q.   And after college, did you go into a certain
```

1  field?

2      A.    I started in the insurance field at a third-party

3  marketing organization, where we assisted bank employees with

4  getting licensed to sell fixed annuities, and then I

5  eventually moved to their compliance area and worked on fixed

6  annuity review and so forth.

7      Q.    Okay.  And approximately when did you join The

8  Investment Center?

9      A.    In 2002.

10     Q.    And what is your title?

11     A.    My title is Vice President of Compliance.

12     Q.    Okay.  I'm sure that you can talk for a long time on

13 this next question, but briefly, what is compliance?  What do

14 you do as Vice President of Compliance?

15     A.    Well, I'm a direct report to our chief compliance

16 officer.  I oversee the day-to-day operations with our

17 compliance staff, you know, whether it's the branch

18 examiners -- you know, we have an analyst, we have a

19 registration department.

20          So, we do full function on compliance.  Review of

21 accounts.  You know, we deal with customer complaints.  We do

22 advertising and correspondence reviews.  We are full-service.

23     Q.    And is one of the goals of compliance to make sure

24 that the registered representatives affiliated with The

25 Investment Center are in compliance?

```
1        A.   Yes.

2        Q.   Can you briefly explain that?

3        A.   Yes.  We -- our goal, obviously, is to make sure the

4   reps are following our firm policies and procedures; and, you

5   know, obviously, investor protection is our first and

6   foremost, you know, goal.

7        Q.   Okay.  Taking just a step back.  You said you're

8   Vice President of Compliance at The Investment Center?

9        A.   Yes.

10        Q.   What is The Investment Center?

11        A.   The Investment Center is a full-service, independent

12   broker-dealer, which we are registered to sell stocks, bonds,

13   mutual funds.  All -- we are full-service, so we can sell

14   everything to the end customer.

15        Q.   And do you have registered reps or sometimes

16   called -- and I'm using air quotes -- "stock brokers" that

17   are affiliated with The Investment Center?

18        A.   Yes, we do.  "Stock broker" is an older term now.  I

19   mean, we're a firm that can offer all securities, meaning

20   stocks.  We do have reps that sell stocks.  We do have reps

21   that do financial planning.  We have reps that sell mutual

22   funds, annuities, insurance products.  So we're

23   full-service.

24        Q.   So if the -- just so the jury can maybe understand,

25   if on a spectrum you had, like, E*TRADE, where somebody opens
```

1    up -- I'm guessing and correct me if I'm wrong -- an account

2    and they do their own trades, they buy their own investments,

3    and then you had something like Merrill Lynch that a lot of

4    people have heard about and seen commercials on TV, where on

5    the spectrum is The Investment Center?

6        A.    We're probably closer -- more towards the Merrill

7    Lynch model, but we're an independent model.  Merrill Lynch,

8    they own all their facilities, all the locations.  On our

9    side, the registered rep, which we consider them as

10   independent contractors, they own or rent their own office

11   space, they own their computers.  We don't own any of that.

12   We're just the back office support where they will submit all

13   of their paperwork through us.

14       Q.    Okay.  And I think you mentioned that you're a

15   full-service broker-dealer.

16       A.    Correct.

17       Q.    Do you have various requirements and rules and

18   things that you, as a firm, have to follow in order to be in

19   that business?

20       A.    Yes.  We're a member of FINRA, which is our -- which

21   is the Financial Regulatory Authority.  Those are one of our

22   regulators.  We have to conform to their policies and their

23   -- you know, they have a manual, as well, which that's how

24   our chief compliance officer creates our manual, is at their

25   standard, and most of the time above and beyond that.

1    Q.   And you mentioned, I think, that you have registered

2    representatives -- or "reps," I think is what you said --

3    that work for or with The Investment Center; is that

4    correct?

5        A.   That is correct.

6        Q.   Are they employees of The Investment Center?

7        A.   No, they are not employees.

8        Q.   Can you explain that to the jury?

9        A.   They are independent contractors of The Investment

10   Center, so -- which means that they, like I said previously,

11   they pay for everything themselves.  They just utilize us as

12   their broker-dealer for -- to facilitate the purchase and

13   sale of securities that are approved by the firm.

14       Q.   So, again, just trying to wrap up this area, as far

15   as paying for the office, paying for computers, paying staff

16   and receptionists and things like that, does The Investment

17   Center pay those expenses for the registered reps that are

18   affiliated with the The Investment Center?

19       A.   No, The Investment Center pays no expenses for their

20   offices or anything of that nature.  They're 1099 employees,

21   which means that they're -- you know they just get

22   commissions and/or fees, depending on what type of accounts

23   they have.

24       Q.   So why would someone, a registered representative,

25   choose to work for The Investment Center, rather than

1   someplace like a full-service broker like Merrill Lynch or

2   maybe a full-service advisor -- I shouldn't maybe use the

3   word "broker" -- where they would pay for everything?

4        A.   Well, typically reps that come to our firm, they are

5   more of a seasoned rep, So they have a client base already.

6   They come to our firm as an independent contractor because

7   they would generally receive a higher payout structure from

8   our firm, as opposed to a Merrill Lynch, which has other

9   operating expenses that they would have to pull from, which

10  may reduce the overall expense -- the overall payout to the

11  advisor or registered representative.

12       Q.   And speaking of compensation, how does The

13  Investment Center pay the reps that are affiliated?

14       A.   It's straight commission and/or fees, which go out

15  every two weeks to the rep via -- it could be either direct

16  deposit, or a physical check is sent to the rep.

17       Q.   And can a registered rep affiliated with The

18  Investment Center -- is that a the good word, "affiliated,"

19  by the way?  Associated?

20       A.   Yeah, they're registered with The Investment

21  Center.

22       Q.   Okay.  A registered representative, who is

23  registered with The Investment Center, can they get paid

24  directly from the client?

25       A.   No, they cannot.

1       Q.   Why not?

2       A.   It's not permitted.  The only way a registered rep

3   can get paid is through us, when a client opens an account or

4   whatever.  And all checks are made payable to either our

5   clearing firm or a direct vendor that we'd approved.

6       Q.   If someone goes in for advice -- financial advice,

7   financial planning, planning for paying for college,

8   what-have-you -- can they pay the registered rep, who is

9   registered with The Investment Center, just money for their

10  time or for their service or for their advice?

11      A.   Technically, no, they cannot.  They would have to --

12  that's an affilliated -- we have an affiliated registered

13  investment advisor through our firm that facilitates

14  financial planning, where the advisor can do a financial

15  planning agreement with the client, which is a document that

16  we provide, and they can charge -- whether it's hourly or,

17  you know, a one-time financial planning fee, which would

18  then -- the checks have to be payable to our registered

19  investment advisor, which is IC Advisory Services, Inc., and

20  all of that flows through our firm for payment.

21      Q.   So they couldn't just take a payment in cash and,

22  "Here's something for your time"?

23      A.   No, they cannot.  It has to come through us.

24      Q.   I think you may have mentioned it, but I just want

25  to make sure the jury can understand.  If somebody wants to

1    buy an investment product through a registered rep who is

2    affiliated or registered with The Investment Center, and The

3    Investment Center has the product to sell -- like, and I know

4    it's not like sneakers -- how does the registered rep sell

5    the product to the customer through The Investment Center?

6    How does that work?

7        A.    Well, one way is, if the client opens up an account

8    through our custodian, which is Pershing, the account would

9    be opened and the rep can make a recommendation to the

10   client.  You know, whether or not the client wants to buy or

11   sell a stock or a mutual fund.  And then once that approval

12   is obtained from the client, the transaction will be placed

13   through the Pershing system.

14       Q.    And is Pershing sometimes referred to as a clearing

15   firm or as a -- I don't know if there's another word?

16       A.    Yes, clearing firm, custodian.

17       Q.    Custodian.  What does a clearing firm do?  What does

18   a custodian do?

19       A.    Well, a custodian, they custody the assets.  So if

20   a client has an account that's held through us on the

21   brokerage side, Pershing would custody those assets.  We

22   don't custody assets.  So it would be held -- all the assets

23   would be held at Pershing, you know, and then all the

24   transactions are cleared through Pershing, which means that

25   if a client buys or sells a security, it clears through

1    Pershing.  Pershing is the one that facilitates that trade.

2         Q.   Okay.  Just to jump ahead a little bit but still as

3    background, if someone is going to buy an investment product,

4    who do they make the payment out to?

5         A.   If it's through -- if it's an account with Pershing,

6    it would be made out to Pershing, LLC.  If it's an account

7    with a direct vendor, like an approved direct mutual fund

8    account, it would be payable to that vendor directly.

9         Q.   What would just be one example of an approved --

10        A.   Like a Prudential or American Funds.

11        Q.   So if someone were to buy an annuity from

12   Prudential, the check would be made out to whom?

13        A.   To Prudential.

14        Q.   Okay.  If someone were going to buy securities or

15   something where Pershing is the custodian, who would the

16   check be made out to?

17        A.   Pershing, LLC.

18        Q.   Could the check be made out to The Investment

19   Center?

20        A.   It can be, yes.  It can be.

21        Q.   Okay.  Can the check be made out to a private

22   company or business that the registered representative has?

23        A.   No.

24        Q.   Okay.  And again jumping ahead a little bit, but do

25   registered reps know that?

1    A.    Yes.

2    Q.    How do you know that your registered reps know

3    that?

4    A.    Well, they -- there's multiple ways.  I mean, they

5    sign off on their independent contractor's agreement when

6    they come on board, which goes through a -- you know, a lot

7    of information.  They also -- we do have a questionnaire that

8    we do every year.  We have compliance meetings that we do

9    every year on various topics.

10        So there's multiple -- there's multiple areas.

11   There's also -- all the manuals are located on our website,

12   which all reps have access to, so there's multiple areas.

13   Q.    Okay.  Just as background, have you heard the term

14   discretionary accounts?

15   A.    Yes.

16   Q.    Okay.  What is a discretionary account compared to a

17   nondiscretionary account?

18   A.    Discretionary account is when a client authorizes

19   the rep to place transactions on their behalf without giving

20   approval for each transaction.  Nondiscretionary is every

21   time a rep wants to make a recommendation or if a client

22   wants to do a transaction, they have to approve that

23   transaction during that trading day, which is typically

24   between 9 and 4.

25   Q.    So I just want to -- did The Investment Center have

1  only one type of accounts or --

2      A.   The Investment Center does not permit discretionary

3  accounts on the retail side, which means the commission-based

4  side, nonadvisory-type platform.  So we do not permit that.

5  The rep would have to obtain approval from the client on that

6  trading day for all transactions in those types of

7  accounts.

8      Q.   Okay.  Now, we've been talking a little bit about

9  things in general.  You mentioned, when we talked about the

10  difference between Merrill Lynch and The Investment Center,

11  that brokers usually join your firm with a book of business.

12  What is a book of business?

13      A.   Typically, you know, they already have a client

14  base.  Depending on the firms they're coming from, they could

15  either -- depends on the privacy policies from the firms

16  they're coming from, but for the most part, they can bring

17  those clients to a firm like ours by re-papering the

18  accounts, and then the clients are now under The Investment

19  Center.

20      Q.   Let me turn now, if I can, to what brings us here

21  today.  Do you know the Defendant, Leon Vaccarelli?

22      A.   Yes.

23      Q.   Have you met him?

24      A.   Yes.

25      Q.   Have you spoken with him on the phone?

1    A.   Yes.

2    Q.   Approximately how many times have you met him?

3    A.   Probably a couple of times I've met him.

4    Q.   Approximately how many times have you spoken with

5    him on the phone?

6    A.   A few times a year, during him being registered with

7    our firm.

8    Q.   Okay.  At some point -- and you just said it, but

9    I'm going to direct your attention there.  At some point, did

10   he join your firm?

11   A.   Yes.

12   Q.   Okay.  Can you recall when that was?

13   A.   I believe it was sometime in 2011.

14   Q.   Okay.  And did he come with a book of business?

15   A.   Yes.

16   Q.   Okay.  In order to join your firm -- and we've been

17   throwing around the term "registered rep" a lot, "registered

18   representative," what does that mean?  Again, do they -- does

19   someone need to have a license?  Does somebody need to have

20   been trained or can someone show up right out of college and

21   say, Hi, I'd like to be a registered rep, tell me what to

22   do?

23   A.   Typically, no.  They would have to be licensed.  We

24   do have some reps that bring on other individuals that want

25   to get licensed and we sponsor them to get licensed.

1      Q.   Okay.

2      A.   But in this case, no.  Yeah, typically they're

3 Series 6 or Series 7, which means a Series 6 is someone that

4 can sell like mutual funds, annuities.  Series 7 is pretty

5 much full-service -- stocks, bonds, mutual funds.

6      Q.   And when Mr. Vaccarelli joined your firm, was he

7 licensed?

8      A.   Yes.

9      Q.   And did he have a book of business?

10     A.   Yes.

11     Q.   Okay.  Let me -- I'm going to start with

12 Government's Exhibit 350, which is the registered

13 representative agreement between The Investment Center and

14 Leon Vaccarelli.

15          MR. McGARRY:  If there's no objection, I'll pull it

16 up for Mr. Anuario and the Court.

17          MR. EINHORN:  No objection.

18          THE COURT:  No objection.  350 is a full exhibit.

19 BY MR. McGARRY:

20     Q.   If you could take a look, Mr. Anuario, I'm going to

21 highlight -- let me actually go back and blow it up first.

22 Do you recognize Government's Exhibit 350?

23     A.   Yes.

24     Q.   Okay.  What is Government's Exhibit 350?

25     A.   That is the independent contractor registered

1    representative agreement.

2         Q.   And I think I just asked you this question, but it

3    appears to be in writing.  Can you read paragraph 2 for the

4    ladies and gentlemen of the jury?

5         A.   Sure.  "The contractor is a duly qualified and

6    licensed registered representative currently in good standing

7    under applicable regulations."

8              THE COURT:  If you could slow down just a bit.

9              THE WITNESS:  Oh, sorry, sorry.

10             MR. McGARRY:  You're from New Jersey.

11             THE WITNESS:  Yes.  Sorry about that.

12             "The contractor is a duly qualified and licensed

13   registered representative currently in good standing under

14   applicable regulations promulgated by the Securities and

15   Exchange Commission, FINRA, and other governmental and

16   regulatory agencies."

17        Q.   Okay.  And the contractor is referred to -- is Leon

18   Vaccarelli; correct?

19        A.   Correct.

20        Q.   Okay.  I'm going to -- let's see if I can just jump

21   to the very end of this document, page 11.  Who signed this

22   document?

23        A.   Mr. Vaccarelli.

24        Q.   And who else?

25        A.   Ralph Devito, who is the president of The Investment

1    Center, and Deborah Lembeck.  She works in our Registration

2    Department/Licensing Department.

3        Q.   Okay.  And this is the registered representative

4    agreement; correct?

5        A.   That is correct.

6        Q.   I'm going to go back to the first page where we

7    were.  So, what is Mr. Vaccarelli representing to your firm

8    by signing this contract, that he's a --

9        A.   That he's a registered representative of The

10   Investment Center, that he will follow all firm policies and

11   procedures.  There's multiple things on this agreement of how

12   commissions are paid; of how, you know, he is, you know --

13   you know, it talks about -- it talks about, you know, his

14   registration.  It talks about some regulation.  There's

15   multiple things here.

16       Q.   Why don't I, instead of having you try to guess, why

17   don't we go through some of them.  Let me direct your

18   attention -- and this may have been what you told us already,

19   but paragraph -- I believe it is 1.  It looks like --

20   actually, I think it is 3-C, or Section 1, Definitions, C:

21            "The term 'registered representative' means a

22   person who is registered with FINRA, including a registered

23   principal, and who, for compensation, engages in the business

24   of rendering professional services on behalf of a securities

25   broker-dealer."  Is that your understanding?

1    A.    Yes.

2    Q.    And was Mr. Vaccarelli such a registered

3  representative?

4    A.    Yes.

5    Q.    And is the securities broker-dealer referenced there

6  The Investment Center?

7    A.    Yes.

8    Q.    Okay.  Directing your attention to the second page,

9  if you could maybe read the highlighted part of Section 2,

10  Basic Agreement?

11    A.    Sure.  "The company agrees to act as broker-dealer

12  for the purchase and sale of various securities, which

13  company is authorized to purchase and sell under various laws

14  and Governmental agencies and contractor may place various

15  buy and sell orders through company and on behalf of

16  customers in accordance with the terms of this agreement."

17    Q.    Okay.  It says he can place buy and sell orders

18  through the company.  And The Investment Center is the

19  company; correct?

20    A.    That is correct.

21    Q.    Okay.  Could he also be -- and I'm referring now

22  specifically to Mr. Vaccarelli -- could he have also have

23  been affiliated with a different company at the same time?

24    A.    Well, with us, he was affiliated with IC Advisory

25  Services, Inc., which is our registered investment advisor.

1  He would not be able to be affiliated with another

2  broker-dealer as well as ours.

3      Q.   So he couldn't -- and, again, if my lingo is not

4  correct, please correct me, since you drove all the way here

5  from Jersey -- could he be a registered representative of the

6  The Investment Center, slash, registered representative of

7  Edward Jones?

8      A.   No.

9      Q.   And then kind of be affiliated with both you guys at

10  the same time?

11      A.   No.

12      Q.   That would not be permitted?

13      A.   Correct.

14      Q.   Okay.  Directing your attention to the next page --

15  and, again, this entire document is in front of you, and I'll

16  point out some parts.  If I miss a part, please let me know,

17  but the contractor's duties -- again, the contractor is who?

18      A.   Mr. Vaccarelli.

19      Q.   Okay.  If you could read -- I guess just read that

20  paragraph slowly for our court reporter and for the ladies

21  and gentlemen of the jury.

22      A.   Sure.  "The duty of the contractor under this

23  agreement will be to make a good faith, reasonable effort to

24  enter securities orders from the contractor's customers and

25  to enter such orders with the company on behalf of the

```
 1    contractor's customers.  Contractor shall at all times comply
 2    with all applicable rules and regulations promulgated by the
 3    U.S. Securities and Exchange Commission" -- "the SEC," in
 4    quotes -- "FINRA, any stock, commodity or other option
 5    exchange in the various states in which the company or
 6    contractor is registered or licensed.  Failure to so comply
 7    constitutes a material breach of this agreement."
 8         Q.   Okay.  So, was Mr. Vaccarelli on notice that he had
 9    to comply with all the rules and regulations of SEC and
10    FINRA?
11         A.   Yes.
12         Q.   And was it part of your job to make sure that he did
13    so?
14         A.   Yes.
15         Q.   Directing your attention to Section 5A, and this
16    document -- we're still looking at the same signed document;
17    correct?
18         A.   Yes.
19         Q.   Could you read paragraph 5A?
20         A.   Sure.  "The contractor acknowledges and understands
21    that the contractor is engaged in the contractor's own
22    business independent of the company, that the contractor's
23    relationship with the company is that of an independent
24    contractor, and that the contractor is not an employee of the
25    company."
```

1    Q.   Okay.  So, is that what you explained to us earlier?

2    A.   Yes.

3    Q.   Okay.  And, again, I'm just -- maybe I won't have

4    you read it, but I'm going to highlight and ask if paragraph

5    C is what you talked about earlier in response to my

6    questions about office space, furniture and other facilities.

7    Does that lay out those terms?

8    A.   Yes.

9    Q.   Okay.  And directing your attention to paragraph F.

10   Maybe read it to yourself, and maybe you can tell the ladies

11   and gentlemen of the jury what your understanding is,

12   specifically with the fact that "the contractor shall

13   maintain his own books and records in strict compliance with

14   the applicable requirements of the regulations."  What

15   regulations is that referring to?

16   A.   That's referring to FINRA, the SEC, state

17   regulators, and so forth.

18   Q.   Okay.  And he was required to keep books and

19   records?

20   A.   Yes, at the branch; correct.

21   Q.   And did you guys -- I shouldn't say "you guys."  Let

22   me rephrase that.

23        Does The Investment Center have the right to go look

24   at the books and records?

25   A.   Yes.

1    Q.   And what's that called when you do that?

2    A.   A compliance examination or branch examination.

3    Q.   And did you sometimes do that to Mr. Vaccarelli's

4    business?

5    A.   Yes.

6    Q.   Did he have a business or a name that he operated

7    under that The Investment Center was aware of?

8    A.   Yes.

9    Q.   What was that business?

10   A.   Lux Financial.

11   Q.   And why would someone -- and perhaps if you know why

12   Mr. Vaccarelli, has the name Lux Financial?

13   A.   Well, in our -- like we stated earlier, in our

14   independent model, the reps, the registered reps/independent

15   contractors can brand their own name and, thus, creating

16   something like a Lux Financial, or if they want to create

17   like a corporation or LLC or something along those lines.  Or

18   they are permitted to use our name, just without the "Inc."

19   So it would just be, like, The Investment Center, you know.

20   Q.   So it could say "The Investment Center - Justin"?

21   A.   Correct.

22   Q.   If you had opened up --

23   A.   A branch, correct.

24   Q.   As a registered rep?

25   A.   Yes.

1     Q.   Or you could have a name?

2     A.   Yes.

3     Q.   And Mr. Vaccarelli had Lux Financial?

4     A.   Yes.

5     Q.   Okay.  I'm kind of jumping a little bit ahead, but

6   did The Investment Center know or was aware -- were you made

7   aware of something called "LWLVACC, LLC"?

8     A.   No, we were unaware of that.

9     Q.   Okay.  Are registered representatives who are

10  registered with The Investment Center, are they obliged or

11  obligated to tell you about other businesses or entities or

12  corporations or partnerships that they have?

13    A.   Yes, they are.

14    Q.   Okay.  And is an LLC something that you were

15  supposed to be told about?

16    A.   Yes.

17    Q.   And were you told about LWLVACC?

18    A.   No, we were not.

19    Q.   Okay.  Let me go just to page -- we're going to get

20  into a little bit of detail on this, but if you could --

21  referring you to paragraph G.  It says:  "The company may

22  from time to time provide training materials, training

23  sessions and marketing instruction to its registered

24  representatives in addition to the general administrative

25  support required to execute the orders placed by the

1    contractor for a contractor's customers and to maintain

2    account records for such customers."  Do you see that?

3        A.   Yes.

4        Q.   Okay.  It mentions the word "customers."  We've

5    talked a lot about The Investment Center.  We've talked about

6    Mr. Vaccarelli.  When you use the word "customers" in this

7    agreement, what are you referring to as customers?

8        A.   Those are the end retail customers, the customers

9    that are -- you know, that purchase and sell those

10   securities --

11       Q.   That would be --

12       A.   Open up the accounts.

13       Q.   -- people who invest with Mr. Vaccarelli and through

14   Mr. Vaccarelli to The Investment Center?

15       A.   That is correct, yes.

16       Q.   Okay.  And have you become familiar with the names

17   of some of the people who were his customers?

18       A.   Yes.

19       Q.   And it also talks about from time to time providing

20   training materials.  Did you provide training materials?

21       A.   Yes, we do.  We provide training materials on

22   various topics.  Most of the time they go out via e-mail or

23   posted on our website.  And, also, reps are required to do

24   continuing education on an annual basis, which is done on the

25   computer, which is an online -- online courses.

1      Q.   Okay.  And you said that's on an annual basis?

2      A.   Yes, that's on an annual basis.

3      Q.   Is that in order to keep their license, to maintain

4  being in good standing?

5      A.   Yeah, it's required by regulation to -- yep, to do

6  that on an annual basis, that is correct.

7      Q.   Okay.  Take a look at H, and if you could read that

8  for the ladies and gentlemen of the jury.

9      A.   Sure.  "Contractor will view, download and carefully

10  read the branch manager supervisory manual and Registered

11  Representative Manual located on the company's website.

12  Contractor will adhere to the policies and procedures stated

13  in these manuals and any subsequent changes or amendments

14  thereto."

15      Q.   And is that an important provision?

16      A.   Very important.

17      Q.   I think we have some pages of it, but what's

18  contained in the manual?

19      A.   The manual is the policies and procedures that the

20  registered reps must follow.  They're also located on our

21  website, as well.

22      Q.   Okay.  Directing your attention to M.  Briefly, what

23  is paragraph M?

24      A.   "The contractor shall file such periodic reports

25  with the company as the company may require from time to

1    time.  In its discretion, including but not limited to

2    regulatory compliance reports, the contractor shall make

3    available all books and records for review at the discretion

4    of the company."

5        Q.   Okay.  And he was required to do that?

6        A.   That is correct.

7        Q.   Did your company ever get any books and records

8    pertaining to LWLVACC?

9        A.   No.

10       Q.   Okay.  Moving attention to N, I think you discussed

11   this, but is this the provision that we talked about being

12   affiliated or -- only with The Investment Center?

13       A.   Yes, that is correct.

14       Q.   Okay.  Directing your attention to the rest of this

15   paragraph, "Will place orders for purchase or sale of

16   securities only with the company and will not directly or

17   indirectly solicit orders for securities transactions on

18   behalf of any other broker-dealer, nor take orders for

19   customers for securities transactions that are placed with

20   any other broker-dealer."  What does that mean?

21       A.   That means the same as the first part of that, which

22   the reps are only permitted to take orders from customers and

23   facilitate those through us, no other firm.

24       Q.   And I have two more paragraphs on this page.  If you

25   could tell us the importance of paragraph O.  I'll read it

1    slowly:  Contractor must not receive compensation in any

2    manner, either directly or indirectly, from any offer or sale

3    of an investment product unless the company -- unless company

4    has given prior written approval.

5             What's the importance of that paragraph?

6        A.    The importance of that is to make sure that we're

7    fully aware of all of the activities of the rep and that

8    we -- you know, everything must come to us for approval.

9        Q.    Paragraph P reads:  Contractor will not engage in

10   any private securities transactions without company's prior

11   written approval as required by FINRA Rule 304 -- is that

12   a -- is it 340?

13       A.    3040.

14       Q.    3040.  The 3040 Rule, I guess.  Contractor also

15   agrees to disclose to company all outside business activities

16   as mandated by FINRA Rule 3030.  Contractor further

17   represents that he or she has disclosed all current outside

18   business activities to the company.

19            What's the importance of that paragraph?

20       A.    The importance of that, there's twofold.  The

21   private securities transactions, those have to be submitted

22   to our compliance department prior -- before any activity can

23   be done, and must receive approval from us.

24       Q.    Okay.

25       A.    Outside business activities, you have to fully

1    disclose anything you're doing outside the scope of The

2    Investment Center, and they have to be prior approved.

3        Q.   And would having an account under an LLC be

4    considered a private -- an outside business activity?

5        A.   Yes.

6        Q.   And would offering somebody an agreement, a -- you

7    know, "You give me your money, I'll give you 6 percent

8    interest for 32 months," would that fall under the private

9    securities transaction clause?

10       A.   Yes.

11       Q.   Now, I showed you the last page of this document.

12   Let me show you, I guess, the last page and the

13   second-to-last page.  Lux Financial Services; you were

14   familiar with that, correct?

15       A.   Yes.

16       Q.   And the address?

17       A.   Yes, Waterbury.  The street address I'm not, but

18   Waterbury I am familiar with, yes.

19       Q.   Okay.  And do you know if Mr. Vaccarelli moved

20   offices during his tenure with The Investment Center?

21       A.   I believe, yes.

22       Q.   Okay.  And going to the last page, that is the

23   signature page; correct?

24       A.   That is correct.

25       Q.   Having shown you -- I'm also going to show you 367,

1    368 and 369, as well as 370 and 371.  I say those, in part,

2    for Mr. Einhorn and the Court.

3         But did you take steps to make sure that Mr.

4    Vaccarelli was aware and familiar and knowledgeable in his

5    mind of all these requirements?

6       A.   Yes.

7       Q.   Okay.  Let me show you --

8            MR. McGARRY:  -- and offer in evidence Government's

9    Exhibit 367.

10           MR. EINHORN:  Your Honor, I know we discussed this

11   twice before, but I renew my objection.

12           THE COURT:  All right.  And if there's no new

13   grounds, I will continue with my prior ruling and overrule

14   your objection.  All right.

15           MR. EINHORN:  Yes, Your Honor.

16           THE COURT:  367 is a full exhibit.

17   BY MR. McGARRY:

18      Q.   Okay.  Could you please tell -- Mr. Anuario, could

19   you please tell the ladies and gentlemen of the jury what

20   Government's Exhibit 367 is?

21      A.   Yes, that's an excerpt from our Registered

22   Representative Manual on prohibited acts,

23      Q.   And was Mr. Vaccarelli required to review and read

24   and acknowledge that he had reviewed and read the Registered

25   Representative Manual?

1    A.    Yes.

2    Q.    Could you tell the jury about that?  How do you make

3    sure that happens?

4    A.    Well, when he came on board, obviously he signed an

5    independent contractor's agreement.  On an ongoing basis, he

6    would -- during our Annual Compliance Questionnaires and all

7    of that, it's documented in all of that on an annual basis.

8    Compliance meetings, depending on the topics, would reference

9    the manual in a lot of cases.  So there's a lot of -- there's

10   a lot of communication there.

11   Q.    Okay.  Directing your attention to the first bullet

12   point -- oh, actually the first paragraph:  Registered

13   representatives -- let me stop that.  What is the first

14   sentence of this document?

15   A.    Would you like me to read it?

16   Q.    Yes, please.

17   A.    Okay.  "Registered individuals, principals and

18   representatives of the Investment Center, Inc., who handle

19   customer accounts are specifically prohibited from the

20   following."

21   Q.    And the first bullet of this Prohibitive Acts

22   prohibits what?

23   A.    "Engaging in private securities transaction; that

24   is, any transaction not sponsored or authorized by an

25   authorized principal of this broker-dealer.  Registered

1    individuals may not effect securities transactions for any

2    person or entity outside the scope of his or her employment

3    with this broker-dealer."

4        Q.    You mentioned that one of your primary concerns in

5    compliance is customer safety and safety of their

6    investments; is that correct?

7        A.    That's correct.

8        Q.    Okay.  Does this fall under that, per number; is

9    this --

10       A.    Yes.

11       Q.    How does this play in with that?

12       A.    All the prohibited acts play into that.

13       Q.    Tell the jury how.

14       A.    These are -- all these acts that are documented

15   relate to acts that the reps just can never make or do -- in

16   some cases, without the prior approval from us; in some

17   cases, at all.  So that's what this document relates to.

18       Q.    Okay.  Let me scroll down a little bit.  Reading

19   this bullet point:  "Raising money individually or as an

20   agent for any business enterprise without the prior written

21   consent of an authorized principal of this firm."

22            Why is that a prohibitive act?  Why could Mr.

23   Vaccarelli not raise money individually or as an agent for

24   any business enterprise?

25       A.    Because that would be outside the scope of what is

501

1  required, as far as opening accounts through us and

2  facilitating the money through us.  It cannot be facilitated

3  on any outside source.

4      Q.   Can you and the Compliance Department and The

5  Investment Center help protect investor safety if you don't

6  know about Mr. Vaccarelli raising money?

7      A.   No.

8      Q.   Okay.  Does it make it much more difficult?

9      A.   Much more difficult, yes.

10     Q.   Let me direct your attention to this.  Maybe you can

11 explain what this means, the highlighted bullet, and then

12 tell us why it's important.

13     A.   "Acting as personal custodian of client securities,

14 stock powers, money or other property."

15          What that means is taking in, you know, same thing

16 as Pershing, as our custodian, where they take in the -- you

17 know, the checks made payable to Pershing.  Reps to are not

18 permitted to do the same thing, where they would take in

19 anything and act as a custodian, which they're not permitted

20 to do, or act as a registered broker-dealer, which they're

21 not permitted to do.

22     Q.   So, can they take money and just put it in their own

23 checking account?

24     A.   No.

25     Q.   Why not?

1      A.    That is prohibited by all laws, including ours.

2      Q.    Let me go to the second page.  If you take a look at

3   the second bullet.  Can you tell us, why is borrowing money

4   from a client, other than the limited situations where this

5   is permitted under FINRA Rule 3040, prohibited?

6      A.    Yes.  FINRA rule does permit the borrowing of money

7   as long as it's approved by the broker-dealer -- by us -- but

8   there's only certain factors.  Like typically for an

9   immediate family situation or something along those lines.

10  It's -- we would never permit it for any outside -- just a

11  client relationship.

12     Q.    So, a broker can't bor -- a registered rep can't

13  borrow money from a client?

14     A.    That is correct, without our prior written

15  consent.

16     Q.    Okay.  Do you know if he ever -- if Mr. Vaccarelli

17  ever asked you for written consent to borrow money from any

18  clients?

19     A.    No, I'm not aware of that at all.

20     Q.    Moving down.  Let's see.  Maintain joint account and

21  securities with any client.  That is prohibited?

22     A.    That is prohibited.  The only joint account we would

23  allow in that capacity is if it's the registered rep's spouse

24  or something along those lines.

25     Q.    Or entering into any business transaction or

1   relationship jointly with a client without the specific prior

2   written approval of an appropriate principal.

3        What does that mean?

4   A.   That's, like, if they're going to -- if the

5   registered rep is getting involved in maybe buying something

6   with another -- with another individual, that would need to

7   be pre-approved by our compliance department prior to

8   commencing an activity, if it's even approved at all.

9   Q.   Okay.  Let me --

10       MR. McGARRY:  I'm going to offer, Your Honor,

11  Government's Exhibit 368, which is, I guess, not yet

12  admitted.

13       MR. EINHORN:  Same objection, Your Honor.

14       THE COURT:  368 is a full exhibit over objection.

15  BY MR. McGARRY:

16  Q.   What is -- and I'll blow it up a little bit for you.

17  What is Government's Exhibit 368?

18  A.   That is an excerpt from our Registered

19  Representative Manual related to loans between registered

20  persons and customers.

21  Q.   Okay.  And does it -- I think you just told us about

22  this, but it's got its own page, it looks like?

23  A.   Right.

24  Q.   Rule 3240 prohibits you -- that would be Mr.

25  Vaccarelli in his agreement; correct?

```
1    A.   Correct.

2    Q.   From borrowing money from or lending money to a

3  customer; correct?

4    A.   That is correct.

5    Q.   Again, would he be made aware of this prohibition?

6    A.   Yes.

7    Q.   And as far as you know, was he made aware of this

8  prohibition?

9    A.   Yes.

10   Q.   Okay.  All right.  Let me direct your attention to

11 Government's Exhibit 369.

12        MR. McGARRY:  Again, not yet in evidence but I offer

13 it.

14        MR. EINHORN:  Same objection, Your Honor.

15        THE COURT:  Same ruling.  369 is a full exhibit.

16 BY MR. McGARRY:

17   Q.   Okay.  If you could read the first sentence -- and

18 as you read it, I will turn it yellow -- of Government's

19 Exhibit 369.

20   A.   Sure.  "It is not appropriate for any registered

21 personnel to take personal control of any customer funds,

22 checks and/or securities."

23   Q.   And then the next paragraph?

24   A.   "Your failure to adhere to the requirements

25 regarding the appropriate handling of customer funds, checks,
```

1    securities, may result in criminal charges, as well as

2    regulatory fines and sanctions."

3         Q.   Is this an important provision?

4         A.   Very important.

5         Q.   Why?

6         A.   Because this goes into the account that registered

7    reps are not permitted to take control of any customer funds,

8    meaning in their name or anything of that nature.  It must

9    be -- it must be made out to the appropriate parties.

10        Q.   And was Mr. Vaccarelli made aware of this

11   provision?

12        A.   Yes.

13        Q.   And was he made aware of the fact that failure to

14   adhere with this requirement could result -- may result in

15   criminal charges, as well as regulatory fines and

16   sanctions?

17        A.   Yes.

18        Q.   He was made aware of that?

19        A.   Yes.

20        Q.   Okay.  On this topic, last paragraph:  "If at any

21   time you accept a customer check made payable to you, it will

22   be considered grounds for immediate dismissal."

23             Do you see that?

24        A.   Yes.

25        Q.   And why is that provision in your Registered

1   Representative Manual?

2       A.   Just to make the registered reps aware that

3   receiving customer funds would -- could -- could be a

4   termination at that point.

5       Q.   And where it says "payable to you," what if it were

6   payable to an entity or an LLC that they controlled, would

7   that same provision apply?

8       A.   Same provision applies, yes.

9       Q.   Okay.  What if -- and this is -- let me rephrase

10  that.

11          Is a registered representative such as Mr.

12  Vaccarelli permitted to take money and hold it in an account,

13  a checking account that he controls, in order to shop around

14  for a little while to try to find the best rate for a

15  customer?

16          MR. EINHORN:  Again, I -- it's the same general area

17  of objection that I've been raising, but I wanted to raise it

18  again here just to make it clear that I object to this as to

19  relevancy in this case.

20          THE COURT:  All right.  This is all part of the

21  regulations, rules and policies that the Government is

22  offering as binding or obligating a registered representative

23  like Mr. Vaccarelli, and I'm going to overrule your objection

24  inasmuchas that is relevant on knowledge and we will proceed.

25          And, so long as you have nothing -- no quarrel with

1    the form of that question, it may be re-read or re-asked.

2              MR. EINHORN:  No, no.  I was going to ask if Your

3    Honor would instruct the jury, however, that the violation of

4    this, of the internal policies, is not, in fact, a criminal

5    violation.

6              MR. McGARRY:  Your Honor --

7              THE COURT:  I'm not going to do that.  We will give

8    the jury full instructions that they are to follow at the end

9    of the case without -- except where required, without giving

10   individualized instructions on particular areas of law.

11   BY MR. McGARRY:

12       Q.   Do you remember my question?

13       A.   No.

14       Q.   Okay.  I will try to rephrase it, rather than try to

15   go back and read it.

16              Under Prohibited Acts, is it prohibited for a

17   registered representative affiliated with The Investment

18   Center, such as Mr. Vaccarelli was, to take a client's money

19   and hold it while they shop around -- hold it in their own

20   account while they shop around for an investment for a

21   customer?

22       A.   No, that is not permitted.

23       Q.   And why not?

24       A.   They are not permitted to hold those funds until

25   they decide on where they want to invest it.  The only way to

1    do it, if the customer wanted to open an account and sit it

2    in a money market or something, they would make the check

3    payable, like I said, to the proper entity and then it

4    would -- it could sit there until they decide where they want

5    to invest it.

6        Q.    Okay.  And, so, that would have to be at The

7    Investment Center?

8        A.    That is correct.

9        Q.    In a money market or a cash account?

10       A.    Yeah, or at a direct vendor.  They also have money

11   markets, that's correct.

12       Q.    We've gone through a couple of pages of the

13   Registered Representative Manual.  Are registered

14   representatives required to acknowledge that they've read and

15   understood these requirements?

16       A.    Yes.

17       Q.    And did Mr. Vaccarelli so acknowledge?

18       A.    Yes.

19       Q.    Are they required to keep a copy of the manual?  And

20   maybe that's old school, where you people used to have paper

21   manuals.  Is it available online?

22       A.    Yes, it's available on our website.  They don't have

23   to technically keep a copy of it, because there could be some

24   updates here and there.  But it is available online where

25   they have access to that, yes.

1    Q.   And are they expected to keep current with any

2    updates and revisions?

3    A.   Yes.

4    Q.   And do they have to make any sort of acknowledgement

5    on an annual basis that they're keeping current and that they

6    are aware of the policies and the rules?

7    A.   Typically -- yes.  It's typically at the exam where

8    we would, you know, make sure they know where to access the

9    compliance documents -- as well as FINRA rules, as well --

10   that are online.

11   Q.   I want to take a step away from the documents for a

12   second, because I think you alluded to this before.  But does

13   The Investment Center have training requirements, and did

14   they have training requirements when Mr. Vaccarelli was

15   registered with The Investment Center?

16   A.   Yes, there are training requirements.  Like I said

17   previously, through one of our vendors, called RegEd, where

18   they would take online courses on an annual basis,

19   depending -- on various topics.  That's developed by our

20   chief compliance officer.  And, yeah, that would be on an

21   annual basis.

22        On the FINRA side, to keep their licenses active, it

23   is every three years they would do CEUs, as well.

24   Q.   And do you know if during the period relevant to

25   this case, if Mr. Vaccarelli kept his license active?

1    A.   Yes.  And he has taken various courses through the
2    system, yes.
3    Q.   Okay.  And when you say the courses, is there a
4    difference between just like a marketing type of thing, like,
5    Here's a product you might like, and a compliance course that
6    you are required to take -- not you, but that registered reps
7    are required to take -- in order to stay current?
8    A.   They are -- those courses are on various topics, but
9    they're mostly on the compliance end.  Every year, at least
10   one course is an anti-money laundering course that are
11   required to take, and then it's other courses that are
12   decided upon for that year.
13   Q.   Okay.  Do you know if FINRA has training or testing
14   centers that -- what do you know about that?  And how would
15   that apply to the registered representatives, specifically
16   Mr. Vaccarelli?
17   A.   Yes, FINRA does have testing centers, but that's
18   mainly for obtaining a license.
19   Q.   Okay.
20   A.   They used to use those testing centers also for
21   continuing education, but now they have changed.  Now they're
22   online.
23   Q.   So, the FINRA testing is online, as well?
24   A.   Yeah, just the CE.  The testing is still at the
25   center, at a testing center, for the exams.

1      Q.   Right.

2      A.   But the CE is now online, but that's current.

3  That's just recently, a few months.

4      Q.   Okay.  And does your firm, The Investment Center,

5  also have, like, conferences or annual meetings?

6      A.   We do.  Our marketing department puts out like

7  regional conferences, as well as an education conference and

8  top rep-type conferences.

9      Q.   Now, you're with compliance.  If it's just

10  marketing, I won't ask much.  But do those conferences have a

11  compliance or an educational component about, you know,

12  complying with the law?

13      A.   They could.  Off the top of my head, I'm not a

14  hundred percent positive.

15      Q.   Let me not -- let me not --

16      A.   We have a compliance meeting that we do that is done

17  on an annual basis that's information that the reps would

18  read on various compliance topics, and they would sign off

19  saying that they've read it, through our website.

20      Q.   And do you know, based on your the position as Vice

21  President of Compliance, if Mr. Vaccarelli during the

22  relevant time period signed off that he had read those?

23      A.   Yes.

24      Q.   Okay.  I think you had mentioned earlier --

25          I want to move to another set of documents.

1 Government's Exhibit it's going to be 352, 353, I believe

2 355, -56, -57, -58.  That's my next group, which I think

3 we've provided you that list last night, the Annual

4 Compliance Questionnaires.

5       MR. EINHORN:  Yes.  Oh, if you're seeking to

6 introduce them --

7       MR. McGARRY:  I'd like to introduce the Annual

8 Compliance Questionnaires, starting with Government's Exhibit

9 352.

10       MR. EINHORN:  Well, I object, Your Honor.  I'm not

11 sure you need me to make a speech on it, but same reasons.

12       THE COURT:  Okay.  I know what we need to do.  It's

13 time to take a recess.

14       All right.  We'll take fifteen minutes, ladies and

15 gentlemen.  The usual rules -- leave your notebook here,

16 don't discuss the case, don't research anything about it.

17       (Jury out, 11:15 a.m.)

18       MR. McGARRY:  Should we dismiss the witness, Your

19 Honor?

20       THE COURT:  Yes.  Mr. Anuario, please take a

21 fifteen-minute break, but during that, don't discuss your

22 testimony with anyone or let anybody talk to you about your

23 testimony.

24       THE WITNESS:  Understood.  Thank you.

25       THE COURT:  Okay.  Thank you.

1          (Witness steps down, 11:15 a.m.)

2          THE COURT:  All right.  The exhibits that are now

3     being offered by the Government -- 352, -53, -55, -56, -57

4     and -58 -- the first of which is the Annual Compliance

5     Questionnaire, what are the others, because I think

6     Mr. Einhorn's objection goes to all of them?

7          MR. McGARRY:  Yes.  They are all -- the next group,

8     I'm going to try to do it by groups, they are all Annual

9     Compliance Questionnaires.  And I think there's a part that

10    relates to the Court's ruling, and it's -- I'm glad we took

11    the break to let the Court know we've redacted -- later on

12    there's some -- there were some answers related to FINRA,

13    which we have redacted, and I believe we have made those

14    357A, 358A, and maybe -- if there's another one, we've

15    redacted that.  And can I pull that up for the Court?

16         THE COURT:  I take it that would not be in my

17    exhibit notebook?

18         MR. McGARRY:  If Ms. Kenarski were fully assigned to

19    the case as usual, it would be.  I know that she's also

20    helping on nine other things.  We did redact it.  I don't

21    know if we made hard copies this morning.

22         THE COURT:  Okay.  Let's put it up for 357A, 358A,

23    and these are the redactions --

24         MR. McGARRY:  I believe so.

25         THE COURT:  -- regarding the FINRA fine.  Is that

```
 1   right?
 2           MR. McGARRY:  Yes, Your Honor.  As you can see here
 3   on 357, Question 8 is answered.
 4           THE COURT:  Can you enlarge that?
 5           MR. McGARRY:  Yes.
 6           So what we did, after the Court ruled on the FINRA,
 7   is, I believe we -- and I'm going to pull up the, I think the
 8   revised or edited -- if it's -- and you can now see -- so I
 9   would not offer -- I would offer for, I guess for
10   identification, 357, but offer only for the jury's
11   consumption at this time 357 --
12           THE COURT:  A.
13           MR. McGARRY:  -- A.
14           THE COURT:  Okay.
15           MS. McGARRY:  And I think the same would be for 358,
16   which --
17           MS. LARAIA:  Mike, go back for a second.
18           MR. DAY:  I think she missed a piece above that,
19   which we can't show.
20           MS. LARAIA:  Yeah, go to 5.1.
21           MR. McGARRY:  Yeah, okay.  I guess Question 5:  In
22   the past, have you been named in any customer complaint?
23           See, that -- again, that was a complaint.  I
24   think -- I guess the reason I didn't ask Ms. Kenarski to
25   redact that -- and if I should have, I apologize -- that 8
```

1  actually dealt with, I think, the actual fine, and 3 -- it

2  was not clear to me that 5.1, where Mr. Vaccarelli said "the

3  FINRA nonsense already on file" if a mere complaint was the

4  same thing that ended up in the fine.

5          So I guess we can try to redact that if the Court

6  would prefer.  That is a statement of the Defendant.

7          THE COURT:  All right.  Well, I don't see anything

8  wrong with 5.

9          MR. McGARRY:  Okay.

10          THE COURT:  But let me just see.  So 5.1, where it

11  says:  "Please provide details," colon, and then under that

12  it says, "The FINRA nonsense already on file," dot, dot, dot.

13  That's Mr. Vaccarelli's response?

14          MR. McGARRY:  Correct.  The reason I redacted --

15          THE COURT:  It's not really a -- all right.  Go

16  ahead.

17          MR. McGARRY:  It's not a finding by FINRA.  And 8

18  says -- and I'll show you 357 unredacted, where it says:  Are

19  you now or while at the firm have you been involved in any

20  type of regulatory inquiry or investigation or has the SEC,

21  the FINRA, any exchange or state regulatory body sanctioned

22  you?"  He says yes.  And then it goes -- they ask the

23  question again.  And on the next page:  "Have you promptly

24  reported such matters to Compliance?"  To his credit, he says

25  Yes.

1          "Have you amended your U-4?"  He says, Yes.

2          So, we have redacted the answers to that, because it

3    had the word "sanctioned."

4          THE COURT:  Now, if you go back up to, or wherever

5    this -- I'm not sure I understand why the response to 5.1

6    refers to what you just were showing me under 8.

7          MR. McGARRY:  I would -- I believe because the

8    customer complaint ended up in a sanction.  5 by itself

9    doesn't indicate to the reader that FINRA made a judgment and

10   sanctioned him, just that a customer complained and Mr.

11   Vaccarelli obviously --

12         THE COURT:  Oh, I see.  So this is, Provide details

13   of any customer complaint, and so forth.  Okay, I understand.

14         MR. McGARRY:  Right.  So, 5 is somewhat ambiguous.

15   It kind of -- it's attesting innocence.  8, which we

16   redacted, is a conclusion by FINRA, which is what we tried to

17   avoid.  So, can I switch to the redacted one to make sure

18   we're good?

19         THE COURT:  Yeah, but you did not redact 5.1?

20         MR. McGARRY:  Correct.

21         THE COURT:  I'll hear Mr. Einhorn, but I don't see

22   why that should be redacted.

23         MR. EINHORN:  You know what?  In the scale of

24   things, of course I have a general objection I'd like to

25   address in a minute, but I agree with Your Honor, that

1   doesn't -- I don't think it's clear to the jury or anybody

2   what that refers to, so I don't think it's worth going back

3   and redacting it.

4          THE COURT:  Okay.  Other than it refers back to,

5   Yes, you've been named in a customer complaint, et cetera.

6          Okay.  All right.  Now let's see what the redacted 8

7   looks like.

8          MR. McGARRY:  I'm pulling up for the Court 357A,

9   where there is no Question 8, and then I'm going to go to the

10  next page, and there's -- where the sub-questions were

11  answered.  Those are redacted, as well.

12         THE COURT:  That looks like what I had in mind.

13         MR. McGARRY:  I have to -- I suggested it to

14  Ms. Kenarski and, as you know, Your Honor, she's very

15  thorough.

16         THE COURT:  I know that.  We know how smoothly

17  things goes here when she's in the courtroom.

18         MR. McGARRY:  This is true.  And, unfortunately, for

19  us -- for us and the trial team, she was promoted.

20         THE COURT:  All right.  Mr. Einhorn, let's quickly

21  hear your objection to this whole series of exhibits related

22  to Annual Compliance Questionnaires.

23         MR. EINHORN:  Sure.  If Your Honor please, we've

24  gotten to the point with this witness, who portends to be

25  probably the longest witness of the trial, and now the tail

1  is --

2           THE COURT:  A little longer than Mr. Roussel.

3           MR. EINHORN:  A little bit longer, yeah.  And now

4  the tail is wagging the dog, because now what the jury is

5  hearing about in great detail, and will be hearing more

6  about, is essentially violations of an agreement between Mr.

7  Vaccarelli and The Investment Center.

8           And the Government, in fact, a minute ago, used the

9  word "innocence" to Your Honor.  This is not a criminal case.

10  And this is not -- we're in a criminal case, but the

11  relationship between Mr. Vaccarelli and The Investment Center

12  is not criminal, and his breach of this agreement, which the

13  Government, I know, is going to spend more time on, I do not

14  believe is relevant to what the jury will ultimately decide

15  in this case.

16          And considering the length and breadth of it, that's

17  why I asked for an instruction.  It's not an ordinary

18  situation, where there's just a passing reference to

19  something, but the Government is going into great detail

20  proving and showing violations of this contract between Mr.

21  Vaccarelli and The Investment Center.

22          And any -- a reasonable juror is going to construe,

23  I think, those as being evidence of his guilt in this case.

24  And that's why I think it's very important that we tell them

25  that that's not what this is.

1          I think I certainly, listening to all these various

2     violations, Did he have a separate account, Did he use a

3     different name, and so forth, and the Government is -- I know

4     they barely got into it.  It's overwhelming, is my point, the

5     extent.

6          THE COURT:  You have requested an instruction.  I

7     don't recall seeing in the instructions that you've submitted

8     that you seek an instruction to the effect that violation of

9     The Investment Center internal policies does not consititute

10    a criminal violation.  Have you submitted something to that

11    effect?

12         MR. EINHORN:  Not yet, Your Honor, but I didn't know

13    where the Government was going to go with this.  It seems to

14    me imminently reasonable -- I never know, obviously, where

15    the Government is going to go with examination.  It seems me

16    imminently reasonable to assume that they wouldn't be going

17    in this direction, and I did assume that.

18         THE COURT:  Why does this not head in the direction

19    of good faith and *mens rea*, et cetera?

20         MR. EINHORN:  Okay.

21         THE COURT:  But maybe I should -- is there

22    some -- what's the purpose of the Government's offering all

23    of this evidence of the regulatory relationship between TIC,

24    Mr. Vaccarelli, and FINRA and the SEC?

25         MR. McGARRY:  Sure.  Well, first of all, my

1    questions I have crafted so that they are, in this particular

2    document we just went through, it's a statement by Mr.

3    Vaccarelli that he's going to comply.  So it's, in essence, a

4    false statement, a false representation as part of the

5    scheme.

6              And in paragraph 21 of our Indictment, the

7    Indictment returned by the Grand Jury states:  It was further

8    part of the scheme to defraud that in order to seek to

9    forestall the discovery of his scheme and to endeavor to

10   cover up his conduct, Vaccarelli made material

11   misrepresentations on his Annual Compliance Questionnaires

12   provided to TIC, including falsely representing, among other

13   things, the bank accounts he controlled, his engaging in

14   private investment agreements, his handling of client funds,

15   including comingling.

16             So if he had said years ago, I have this other

17   account LWLVACC -- when they do an audit, presumably they

18   would say, Okay, we need to see that account -- they would

19   see the hundreds of thousands of dollars go through there.

20   That's just one example.  But, also, it kind of goes to his

21   knowledge that what he's doing is not just that it is

22   prohibited, and the fact that he's lying about his conduct on

23   an annual basis throughout the scheme every time he fills out

24   one of these questionnaires, which, as we'll get to after the

25   break, he fills out on I believe outside activity forms, that

1    he coaches basketball, that he's on the church committees,

2    that he does stuff with his community, but he leaves out that

3    he has -- managing the trust of Ms. Sheila Burton -- or the

4    Sheila Burton Trust for Ms. Linda Burton -- and he leaves out

5    that he has this LWLVACC.  So it's an affirmative

6    misrepresentation to cover up his financial fraud.

7            MR. EINHORN:  Your Honor, it's a misrepresentation

8    and a lack of good faith as to The Investment Center.  That's

9    not the charges here.  Clearly, it's bad faith with regard to

10   that.  Clearly, there's misrepresentations with regard to

11   them.  That's not the charges here.

12           And with regard to lulling.  The lulling has to do

13   with investors, lulling investors.  But if he's lulling the

14   The Investment Center, which the conduct for which is not

15   charged in the Indictment, that's not appropriate.

16   That's not lulling.

17           I just think the extent to which the Government has

18   gone on this is just -- they're -- it is overwhelming to the

19   point where it looks like the Government is, in large part,

20   proving a fraud case through a breach of contract action.

21           THE COURT:  Okay.  I'm not going to preclude this

22   area of testimony, but I do invite you to, ASAP, give me your

23   charge --

24           MR. EINHORN:  Sure.

25           THE COURT:  -- that you want me to consider with

1    respect to how the jury should consider evidence of violation

2    of TIC's policies, and we will get that straightened out.

3              But the Government's purpose of showing what it

4    claims are material misrepresentations on the questionnaires,

5    which are designed for compliance review, as part of the

6    scheme to conceal or defraud -- conceal the defrauding, I

7    think that's proper.  But focus on the right charge and the

8    right wording of that charge.  Both sides should do that.

9              MR. EINHORN:  Are you talking about -- when Your

10   Honor says "focus on the charge," and so forth, then Your

11   Honor is not going to give an instruction to the jury until

12   the final charge.

13             THE COURT:  I'm not, no.

14             MR. EINHORN:  Okay.

15             THE COURT:  If -- I understand your claim that this

16   is overwhelming, et cetera, but it is also a critical

17   instruction, and I'm not just going to do it off the top of

18   my head, and I'm not going to do it right now so as to make

19   it appear that there's some part of this evidence that is in

20   some way needing this charge.

21             I can rethink that, but right now I think this is a

22   distinction that you've raised before, that's been in this

23   case since the pretrial conference, and that is something

24   that needs to be addressed very carefully.

25             Anything further from the Government?

1           MR. McGARRY:  Not at this time, Your Honor.

2           THE COURT:  Okay.  Let's take two minutes, and then

3    we will be back.

4           MR. McGARRY:  Thank you.

5           (Recess taken, 11:32 a.m.)

6           (Out of the presence of the Jury, 11:47 a.m.)

7           THE COURT:  All right, Counsel.  We are ready to

8    bring the jury back in.  I guess they will learn what the

9    time warp is.  Fifteen minutes doesn't really mean that.

10          MR. McGARRY:  Should I get the witness, Your Honor?

11          THE COURT:  Yes, I was just going to say, why don't

12   you bring Mr. Anuario back.

13          (Witness takes stand, 11:48 a.m.)

14          (Jury in, 11:48 a.m.)

15          THE COURT:  All right.  Ladies and gentlemen, please

16   be seated.  I bet you're thinking that time travels

17   differently in the courtroom versus when you are out.  You

18   are right.

19          All right.  Thank you for your patience.  We just

20   had important matters to complete.

21          All right.  We'll continue with the testimony of

22   Mr. Anuario.  Mr. McGarry, you may proceed.

23          MR. McGARRY:  Yes, Your Honor.

24          At this time -- I'm going to say them all

25   together -- we're going to move Government's Exhibit 352,

1    353, 355, 356A, 357A and 358A, and I have marked for

2    identification 356, 357 and 358, but will not move those at

3    this time, those last three.

4              THE COURT:  All right.  And they are admitted as

5    full exhibits over objection.

6              MR. EINHORN:  Thank you.

7              THE COURT:  And you may proceed.

8              MR. McGARRY:  Thank you, Your Honor.

9    BY MR. McGARRY:

10       Q.   Mr. Anuario, if you could take a look at

11   Government's Exhibit 352, which I think appears on your

12   screen.  I'm going to show you the first page and then a

13   couple of pages inside of these documents.  What is

14   Government's Exhibit 352?

15       A.   That is the firm's Annual Compliance Questionnaire.

16       Q.   Okay.  And is it fair to say you send this out

17   annually?

18       A.   Yes.

19       Q.   Who do you send it to?

20       A.   All the registered reps.

21       Q.   And what is the purpose of sending the registered

22   reps an Annual Compliance Questionnaire?

23       A.   The purpose is just to make sure that they answer

24   all the questions and understand our firm's policies and

25   procedures, and it's just an annual certification that's

```
 1    required so they fully understand and adhere to our
 2    policies.
 3         Q.    And what year is Government's Exhibit 352?
 4         A.    2010-2011.
 5         Q.    Okay.  And was Mr. Vaccarelli responsible or
 6    required to fill these out every year?
 7         A.    Yes.
 8         Q.    And was he required to answer specific questions
 9    related to his role as a registered rep?
10         A.    Yes.
11         Q.    Showing you what's been marked 352, showing you the
12    last page and then going up and showing you the signature
13    page, do you see -- what is that signature page?
14         A.    That's the attesttation, where it says "I have
15    completed this questionnaire and answered all questions
16    truthfully and accurately."
17         Q.    Okay.  And was that required for each of the
18    years?
19         A.    Yes.
20         Q.    Okay.
21         Q.    Okay.  Let me show you -- going to page 4, and do
22    you remember what year -- this is 2011; correct?
23         A.    Yes.
24         Q.    Okay.  Let me show you what is page 4, and directing
25    your attention -- actually, I believe it says page 4.  It
```

1    happens to be the 5th page of the document, of the exhibit.

2         Directing your attention to question 2.1.21, what is

3    the question?

4    A.   "Do you currently have bank accounts for your

5    securities related business?"

6    Q.   And what is checked?

7    A.   "No."

8    Q.   Okay.  And let me -- just jumping ahead a little

9    bit, why don't we jump to the following year.  Showing you

10   what's Government's Exhibit 353 in evidence, what is

11   Government's Exhibit 353?

12   A.   That is the 2011-2012 Annual Compliance

13   Questionnaire.

14   Q.   And, again, showing you the last page, who signed

15   this one?

16   A.   Leon Vaccarelli.

17   Q.   And this one -- when I say "this one," referring to

18   Government's Exhibit 353; correct?

19   A.   Correct.

20   Q.   Okay.  Let me show you what's been marked or what

21   appears as, I believe, marked as page 3.  Do you see the

22   question 2.1-5.  Do you see that?

23   A.   Yes.

24   Q.   And what is that question and what is the answer?

25   A.   "Have you borrowed from or loaned money to any

1   customer?"  The answer is "No."

2     Q.  Let me show you the next page.  2.1.1; what is the

3   question, what is the answer?

4     A.  "Have you acted as a trustee or custodian of any

5   account, money, securities or stock powers for any

6   customers"?  "No."

7     Q.  Let's see.  Directing your attention to 2.2.11.

8   Just scrolling down this way.  There's a lot of questions on

9   here; is that correct?

10     A.  Yes.

11     Q.  What is 2.2.11?

12     A.  "Have you engaged in any private securities

13   transactions?"  This answer is "No."

14     Q.  This is, again, for 2011-2012; correct?

15     A.  Yes.

16     Q.  Okay.  Directing your attention to 2.2.15; what is

17   the question, what is the answer?

18     A.  "Have you engaged in any capital-raising activities

19   for any company, orgnization or business entity?"

20        The answer is "No."

21     Q.  And would an LLC be considered a business entity?

22     A.  Yes.

23     Q.  Okay.  And moving --

24        MR. McGARRY:  I'm going to move now to Government's

25   Exhibit -- I believe I -- Government's Exhibit 354, which I

1   don't believe I said, is of the same nature.  I'd move that

2   at this time.

3           THE COURT:  That's already been -- oh, 354.

4           MR. McGARRY:  No objection?

5           MR. EINHORN:  Same objection.  I thought it was

6   moved, though.

7           THE COURT:  Okay.  Was that not on your -- that was

8   not on your original request?

9           MR. McGARRY:  I believe I did not speak it.

10          THE COURT:  Okay.  It is a full exhibit with the

11  same objection noted and overruled.

12          MR. McGARRY:  Okay.

13  BY MR. McGARRY:

14      Q.   What is Government's Exhibit 354?

15      A.   That is the 2012-2013 Annual Compliance

16  Questionnaire.

17      Q.   And I notice that the form is little bit different

18  than the earlier ones?

19      A.   Yes.

20      Q.   Can you tell the jury the difference between the

21  format that they're seeing?

22      A.   Sure.  This is a similar format, just different

23  vendors.  We used a different vendor in the prior years to

24  facilitate this.

25      Q.   And showing you the middle of page 1, where it talks

1   about outside business, do you see where it says:  "Are you

2   engaged in any outside business activities"?

3        A.   Yes.

4        Q.   Okay.  And if you look at the answers, what did Mr.

5   Vaccarelli say in regards to 2.1 and 2.2?

6        A.   Archdiocese --

7        Q.   Okay.

8        A.   "Archdioces school board, OLMC finance board, part

9   owner of office building," and "sell life insurance

10  products."

11       Q.   Do you see where it says:  "Do you have any other

12  outside business activities to report"?

13       A.   Yes.

14       Q.   Okay.  Would a bank account for an LLC be considered

15  an outside business activity?

16       A.   An LLC would be considered an outside business

17  activity, yes.

18       Q.   Is there any reference to LWLVACC on this

19  questionnaire?

20       A.   No, there is not.

21       Q.   If you could read question 3 and the answer to

22  question 3?

23       A.   "Are you engaged in any investment-related outside

24  business activity other than your affiliation with TIC and

25  ICA" -- which TIC is abbreviated for The Investment Center.

1    ICA is abbreviated for IC Advisory Services, Inc. -- and the

2    answer is "No."

3        Q.   And the answer related to "part owner of an office

4    building," do you have a recollection of Mr. Vaccarelli

5    seeking permission with respect to the purchase of an office

6    building?

7        A.   Yes.

8        Q.   Okay.

9             MR. McGARRY:  I'd like to offer Government's Exhibit

10   370, 371 -- at least those two at this time -- e-mail

11   communication.  Let me pull up Government's Exhibit 370.

12            THE COURT:  Was there an objection to that,

13   Mr. Einhorn?

14            MR. EINHORN:  No, Your Honor, not to these.

15            THE COURT:  Okay.  370, 371 are full exhibits.

16            MR. McGARRY:  Okay.

17   BY MR. McGARRY:

18       Q.   What is Government's Exhibit 370?

19       A.   That is an e-mail communication to Mr. Vaccarelli.

20       Q.   And who is it from?

21       A.   From me.

22       Q.   Okay.  And if you could just -- it says:  "Per our

23   conversation this afternoon, attached are the Acknowledgement

24   and Release form for Mr. Kolesnik to sign."

25            Tell the jury what's going on here.

1    A.   Mr. Vaccarelli called our department and

2    requested -- he was looking to purchase an office building

3    with Mr. Kolesnik, and they -- and he came to us, and we went

4    through it together and we explained to him what was needed,

5    and we went further with it.  Mr. Kolesnik stated that he was

6    Mr. Vaccarelli's cousin.  He's also an attorney, I believe.

7    So he filled out one of our Acknowledgement and Release

8    forms, you know, for us to review and then we eventually

9    approved the private securities transaction.

10    Q.   Did Mr. -- yeah, you referred to it, directing your

11    attention here.  Again from you, you write:  "Per our

12    conversation this morning, this would be considered a private

13    securities transaction and would require you to obtain prior

14    approval from the compliance department."

15         Do you see that?

16    A.   Yes.

17    Q.   Okay.  Why is it referred to as a private securities

18    transaction?

19    A.   Because it's a transaction that's being conducted

20    outside the scope of normal business.

21    Q.   Okay.  And it doesn't have to be traded on an

22    exchange to be --

23    A.   That is correct.

24    Q.   Okay.  And did Mr. Vaccarelli understand, from your

25    conversations with him and your e-mails with him, that he

1    needed to get permission in order to engage in a private

2    securities transaction?

3         A.   Yes, he did.

4         Q.   And related to the building, would that also be

5    considered an outside business activity?

6         A.   Yes.  Yes.

7         Q.   Okay.  And did you talk to him about that?

8         A.   Yes.

9         Q.   Please -- did you write:  "Please also fill out the

10   attached outside business form and submit to the compliance

11   department for review"?

12        A.   Yes, that was from me.

13        Q.   Okay.  Did Mr. Vaccarelli appear to understand that

14   he had to disclose this outside business activity?

15        A.   Yes.

16        Q.   Okay.  And as far as you knew at this time, was he

17   disclosing the private securities transactions he was

18   involved in and the outside business activities he was

19   involved in?

20        A.   Yes.

21        Q.   Okay.  Going -- and let's see.  Going back to

22   Government's Exhibit 354.  And -- okay, just scrolling down.

23   I see that he listed Lux Financial in the middle of the page.

24   Do you see that?

25        A.   Yes.

1    Q.   Okay.  Let me move ahead, go to 371, just to finish

2    that discussion.  What are you e-mailing to Mr. Vaccarelli

3    and what is he e-mailing back related to the building?

4    A.   Yes, we were asking him about selling compensation,

5    because that's part of the private securities transaction

6    rule on the FINRA side, which means that they cannot receive

7    any selling compensation for the transaction, and that was

8    confirmed in an e-mail from Mr. Vaccarelli.

9    Q.   Okay.  And, again, he appeared to understand?

10   A.   Yes.

11   Q.   Okay.  Let me show you what's been marked as

12   Government's Exhibit 355 in evidence.  What is Government's

13   Exhibit 355?

14   A.   2013-2014 Annual Compliance Questionnaire.

15   Q.   And what does he say for Question 2?

16   A.   "Are you engaged in any outside business activities

17   and/or do you serve as an officer, director or employee of

18   another business organization other than your affiliation

19   with The Investment Center or IC Advisory Services, Inc."?

20   "No."

21   Q.   And how about Question 3?

22   A.   "Are you engaged in any investment-related outside

23   business activity other than your affiliation with The

24   Investment Center or IC Advisory Services?"  "No."

25   Q.   And what is the date of this document?

1     A.   The "date completed" was February 28th of 2014.

2     Q.   Okay.  As far as an outside business activity, would

3  serving as a trustee for a trust be considered an outside

4  business activity?

5     A.   Yes, it would.

6     Q.   Would that have to be disclosed?

7     A.   Yes.

8     Q.   Okay.  What would the -- do you have a policy about

9  someone serving as a trustee at The Investment Center or

10  related to your registered reps?

11     A.   Yes.  We -- you know, The Investment Center will not

12  permit reps acting as trustees for anyone other than,

13  typically, their immediate family members.

14     Q.   And would someone need to seek permission one way or

15  the other whether or not they could even -- before they could

16  even be a trustee?

17     A.   Yes, prior approval must be obtained; correct,

18  yes.

19     Q.   And would you expect if someone were acting as a

20  trustee for 2013-14 annual compliance -- this one dated

21  February of '14 -- expect them to disclose that to you?

22     A.   Yes, it has to be disclosed prior to doing the

23  activity.

24     Q.   Let me ask you about question 1.8.  Can you read 1.8

25  and read the answer?

1    A.    "Have you accepted cash from customers?"  "No."

2    Q.    Okay.  1.9?

3    A.    "Have you borrowed from or loaned money to any

4    customers?"  "No."

5    Q.    And how about 1.11?  And maybe I should have stayed

6    with the questions, but take a look at 1. --

7    A.    "Have you acted as a trustee or custodian of any

8    account, money, securities or stock powers for any

9    customers?"  "No."

10   Q.    So if one were unclear as to whether it's an outside

11   business activity, would this question pick it up,

12   presumably?

13   A.    Yes.

14   Q.    Okay.  And scrolling down again to question 1.2.1,

15   what's the question there and what's the answer?

16   A.    "Do you currently have bank accounts for your

17   securities-related business?"  "No."

18   Q.    And if somebody did have bank accounts, would

19   they -- is that the place where they could say yes?

20   A.    Yes.

21   Q.    And when you do -- you mentioned that you do an

22   audit or an examination?

23   A.    Yes.

24   Q.    Does looking at bank accounts, is that included in

25   that audit and that investigation?

1    A.   Yes, it is.

2    Q.   And why is that?

3    A.   We include that for -- we sample time frames to

4    include that to make sure that there's no securities

5    violations or anything of that nature, and make sure

6    everything is being done properly.

7    Q.   Okay.  Could you just read 1.27?

8    A.   Yes.  1.27?  "Have you engaged in any private

9    securities transactions?"  "No."

10   Q.   And how about 1.34; could you please read that?

11   A.   "Have you received, read and understood TIC's

12   independent contractor's agreement and have you conducted all

13   your business as a registered representative of TIC in

14   accordance with the terms of that agreement?"

15   Q.   Okay.  He writes No and --

16   A.   It says "No," and one of our compliance officers

17   sent a copy to him.

18   Q.   Okay.  And then he it says "task history

19   approved"?

20   A.   Yes.

21   Q.   What does that indicate to you?

22   A.   That indicates that our compliance officer submitted

23   a copy to Mr. Vaccarelli and it was all resolved.

24   Q.   Okay.  So that means that he had read the agreement

25   and understood the agreement; correct?

1    A.   Yes, that is correct.

2    Q.   Okay.  And moving down, 1.44.

3    A.   Yeah.  "Do you circle, highlight, underline or

4  otherwise alter any part of a prospectus before giving it to

5  or discussing it with a client?"  "No."

6    Q.   What is a prospectus?

7    A.   A prospectus is a document that's related to mutual

8  funds or annuities that is -- that the client is supposed to

9  read before investing.

10   Q.   Okay.  And are investments supposed to be offered

11 with a prospectus?

12   A.   Yes, most -- like mutual funds, annuities.  Like

13 stocks do not have a prospectus or anything like that.

14   Q.   Let me ask you, if you could, to read question

15 1.13?

16   A.   "Do you ensure that initial payments or premiums are

17 only made by a check payable to the product vendor or

18 clearing firm?"  "Yes."

19   Q.   And he answered Yes?

20   A.   Yes.

21   Q.   That means that he ensures that payments are made

22 payable to the product or vendor?

23   A.   That is correct.

24   Q.   Okay.  That's what he told The Investment Center;

25 correct?

1    A.   Yes.

2    Q.   Okay.  I want to go down to section 4.  Question

3    1.15:  "While associated with the firm, have you commingled

4    your funds with a client's?"

5         Could you explain to the jury what it means to

6    commingle and tell them what the answer to that question

7    was?

8    A.   The answer to the question was "No."  Commingle

9    funds is taking money from a customer and commingling with

10   your own, which is not permitted by our firm.

11   Q.   And why is it not permitted?

12   A.   Because it's against -- it's against regulatory --

13   regulatory policies and procedures.  It's against -- it's

14   against security -- it's a securities violation in all

15   related matters, and only -- like we stated before, only

16   funds can be sent to us for processing.  It can never go to

17   the advisor for any reason, whatsoever.

18   Q.   And if you could -- I just highlighted, I believe

19   1.8.  Can you read that?

20   A.   Yes.  "While associated with the firm, have you

21   accepted cash, a money order, or a cashier's check from a

22   client in any amount or for a purpose other than those that

23   are expressly permitted by your firm's procedures?"  "No."

24   Q.   And he answered "No"; correct?

25   A.   Correct.

1   Q.   Okay.  Let me show you Government's Exhibit 356A.

2   What is Government's Exhibit 356A?

3   A.   That is the 2014-2015 Annual Compliance

4   Questionnaire.

5   Q.   And, again, this is for Mr. Vaccarelli; correct?

6   A.   Yes.

7   Q.   And are a lot of the questions the same every year?

8   And are there --

9   A.   Yeah, we change them sometimes yearly, but yeah,

10  they're all the same.  There may be questions that are added

11  annually.

12  Q.   Okay.  So let me not ask every single question for

13  every single year, these being in evidence, but let me direct

14  your attention to 1.8.

15  A.   Sure.  "Have you accepted cash from customers?"

16  "No."

17  Q.   And his answer?

18  A.   "No."

19  Q.   And 1.9?

20  A.   "Have you borrowed from or loaned money to any

21  customers?"  "No."

22  Q.   And 1.11?

23  A.   "Have you acted as a trustee or a custodian of any

24  account, money, securities or stock powers for any

25  customers?"  "No."

1      Q.    Okay.  And 1.27?

2      A.    "Have you engaged in any private securities

3   transactions?"  "No."

4      Q.    1.29?

5      A.    "Have you engaged in any capital-raising activities

6   for any company, corporation or business entity?"  "No."

7      Q.    Going down to section 4.  How about 1.4?

8      A.    "While associated with the firm, have you ever

9   promised or actually paid money to a client in connection

10  with a securities transaction?"  "No."

11     Q.    So let me focus on that for a second.  Would it be

12  permitted for a registered rep to calculate interest for an

13  individual and pay them money from their own LLC bank account

14  or from their own company bank account?

15     A.    No, that is against --

16           MR. EINHORN:  Same objection, Your Honor, I would

17  note to the question, for the reasons we discussed before.

18           THE COURT:  Overruled.

19  BY MR. McGARRY:

20     Q.    And your answer?

21     A.    No, that's not permitted.

22     Q.    All right.  And, again, 1.5 for this year.  It was

23  answered?

24     A.    "While associated with the firm, have you commingle

25  your funds with a client's?"  "No."

1    Q.   Okay.  And 1.8 was -- I'll let the jury read it,

2    spare you the trouble.  There's some water there if you need

3    it.  Is the answer to 1.8 also "No"?

4    A.   Yes, it's also "No."

5    Q.   Okay.  Directing your attention to 357A, what year

6    is this compliance questionnaire for?

7    A.   2015 to '16.

8    Q.   Okay.  And, again, directing your attention, I'm

9    going to scroll down.  Are many of the questions similar?

10   A.   Yes, they're all similar.  There may have been some

11   questions added, but none deleted.

12   Q.   Okay.  Question 1.8, the question and the answer?

13   A.   "Have you accepted cash from customers?"  "No."

14   Q.   Question 1.9?

15   A.   "Have you borrowed money from or loaned money to any

16   customers?"  "No."

17   Q.   Question 1.11?

18   A.   "Have you acted as a trustee or custodian of any

19   account, money, securities or stock powers for any

20   customers?"  "No."

21   Q.   Question 1.21?

22   A.   "Do you currently have bank accounts for your

23   securities-related business?"  "No."

24   Q.   Okay.  1.27?

25   A.   "Have you engaged in any private securities

1    transactions?"  "No."

2        Q.   1.29?

3        A.   "Have you engaged in any capital-raising activities

4    for any company, corporation or business entity?"  "No."

5        Q.   Moving to section 4.  Directing your attention to

6    1.4 in section 4.

7        A.   "While associated with the firm, have you ever

8    promised or actually paid money to a client in connection

9    with a securities transaction?"  "No."

10       Q.   Okay 1.5?

11       A.   "While associated with the firm, have you commingled

12   your funds with a client's?"  "No."

13       Q.   1.8?

14       A.   "While associated with the firm, have you accepted

15   cash, a money order or a cashier's check from a client in any

16   amount or for a purpose other than those that are expressly

17   permitted by your firm's procedures?"  "No."

18       Q.   Okay.  And let me show you Government's Exhibit

19   358A.  And what is 358A?

20       A.   2016-'17 questionnaire -- Annual Compliance

21   Questionnaire.

22       Q.   And the date that that was completed?

23       A.   March 7th of 2017.

24       Q.   Okay.  And it has the Leavenworth address;

25   correct?

1      A.    That is correct.

2      Q.    Again scrolling down, question 1.8 and 1.9, the

3  question and answer?

4      A.    "Have you accepted cash from customers?"  "No."

5            "Have you borrowed from or loaned money to any

6  customers?"  "No."

7      Q.    And 1.11?

8      A.    "Have you acted as a trustee or custodian of any

9  account, money, securities or stock powers for any

10 customers?"  "No."

11     Q.    Okay.  What would The Investment Center do if

12 someone had not sought permission but just checked or wrote

13 "Yes" for, for instance, Question 1.11?

14     A.    We would follow up with the registered

15 representative to find out what's going on.

16     Q.    Would that be a phone call, e-mail, visit?

17     A.    Could be any of the three.

18     Q.    Okay.  Going down to 1.21, if you could read that?

19     A.    "Do you currently have bank accounts for your

20 securities-related business?"  "No."

21     Q.    1.27?

22     A.    "Have you engaged in any private securities

23 transactions?"  "No."

24     Q.    1.29?

25     A.    "Have you engaged in any capital-raising activities

 1    for any company, corporation or business entity?"  "No."

 2         Q.   Okay.  And I do want to ask you I think one more

 3    followup on this, towards the section -- it looks like

 4    section 3.  If you could again, for this year, read question

 5    1.10 of this section?

 6         A.   "Do you ensure that initial payments or premiums are

 7    only made by a check made payable to the product vendor or

 8    clearing firm?"  "Yes."

 9         Q.   And the clearing firm was who?

10         A.   Pershing.

11         Q.   Okay.  Let me -- these all being in evidence, let me

12    move to another area.

13              MR. McGARRY:  I'd like to offer into evidence

14    Government's Exhibit 375, 376, 379 at this time, which I

15    believe are --

16              Is there something called the Annual Private

17    Securities Transaction Attestation?

18              THE WITNESS:  Yes.

19              MR. McGARRY:  And I would offer those three years at

20    this time -- 375, 376 and 379.

21              MR. EINHORN:  I'd object to these.  They refer to

22    FINRA rules.  They refer to The Investment Center rules.

23              THE COURT:  You want *voir dire* on these documents

24    for this witness?

25              MR. McGARRY:  Would you like me to *voir dire* or --

1          THE COURT:  Mr. Einhorn -- before he decides whether

2     he will object or not.

3          MR. McGARRY:  Sure.  Why don't we -- if we can block

4     it, I can pull it up for the witness.

5          THE COURT:  Fine.

6          MR. McGARRY:  And for the Court.

7     BY MR. McGARRY:

8     Q.   Before I have Mr. Einhorn ask you any questions, can

9     you please take a look at this document, which is before the

10    Court but not the jury, but tell us what this document is?

11    A.   It's an Annual Private Securities Transaction

12    Attestation, which is provided at the branch exams for the

13    rep to read and complete.

14    Q.   Okay.  And if you could read -- or describe what the

15    middle paragraph says?

16    A.   Sure.  "Private securities transactions" --

17    Q.   Without reading from it, just describe for the

18    Court --

19    A.   Oh, sorry.

20    Q.   -- what this paragraph defines?

21    A.   Yes.  A private securities transaction is, in

22    general terms, just any securities transaction outside the

23    regular scope of our -- of the The Investment Center, which

24    is -- it could be new offerings of securities, it could be --

25    that are not registered with the regulators.  Or it can be,

1    you know, what was done by buying -- by purchasing the

2    building, that could be considered a private securities

3    transaction.  That's what that is.

4        Q.   Okay.  And directing your attention to the second

5    page, and I'm going to do a better screen grab for you and

6    for the Court.  Without reading from the document, because

7    it's not before the jury yet, who signed this document?

8        A.   So, the registered rep would sign the document.

9        Q.   And who signed this particular document?

10       A.   Mr. Vaccarelli.

11       Q.   And what -- is his name written there?

12       A.   Yes, Leon Vaccarelli.

13       Q.   And is it dated?

14       A.   Yes, August 7, 2014.

15       Q.   And what is he representing to The Investment Center

16   by signing -- and this is an Investment Center document;

17   correct?

18       A.   That is correct.

19       Q.   And what is he representing in August of 2014 by

20   signing and submitting this document?

21       A.   That he has not engaged in any private securities

22   transaction.

23       Q.   And how about the second representation?

24       A.   And also without receiving prior written approval

25   from our firm.

1      Q.   So he hasn't done it and he hasn't done it without

2    receiving approval?

3      A.   Correct.

4      Q.   And that was for what year?

5      A.   For the year of 2014.

6           MR. McGARRY:  I'd again offer this document, Your

7    Honor.

8           THE COURT:  Mr. Einhorn, do you wish to query?

9           MR. EINHORN:  Thank you, Your Honor.

10                         *VOIR DIRE*

11   BY MR. EINHORN:

12     Q.   Mr. Anuario, you can see but the jury can't see

13   what's proposed as Exhibit 375.  In addition to what you

14   identified as Leon Vaccarelli's signature, doesn't it also

15   contain a definition from the NASD?

16     A.   Yes.

17     Q.   And what's the NASD?

18     A.   The NASD is, they're formerly -- FINRA.  They're now

19   FINRA.  The NASD -- FINRA

20     Q.   They're their predecessor?  It was a predecessor?

21     A.   Yes.  Yes.

22     Q.   And the section that I'm referring to actually has a

23   definition of private securities transactions; right?

24     A.   That's correct.

25           MR. EINHORN:  Yeah, I object to this for a number of

548

1    reasons, Your Honor, one of which is the same reason I've

2    mentioned earlier, and I don't think I need to go through it

3    again, that it's not relevant to our case.

4         But, secondly, that in addition to having a very

5    simple second page that, as the witness indicated, is an

6    attestation by Mr. Vaccarelli that he didn't do certain

7    things, the first page is definitional, and I think the

8    problem is that the use of those definitional terms may

9    conflict with the federal -- with Your Honor's definitional

10   terms.  And I think it's -- I don't think it's necessary to

11   have the first page on this exhibit.  I don't think it's

12   necessary to have the whole thing, but definitely the first

13   page is prejudicial.

14        THE COURT:  Mr. McGarry.

15        MR. McGARRY:  I do not think it violates Rule 403,

16   Your Honor.  I think it complies with Rule 401.  I think the

17   statement on the second page is illucidated by the statements

18   on the first page.  I think we have -- the witness is here to

19   explain it.  And to the extent if there were any sort of

20   diversion between a definition in this document, which is

21   introduced for the facts of the case -- specifically what Mr.

22   Vaccarelli represented to the Defendant -- I'm sorry -- what

23   the Defendant, Mr. Vaccarelli, represented to the The

24   Investment Center -- that would be a fact, and I know that

25   the Court is going to instruct the jury on the law.

1          THE COURT:  So, if I may ask.  By way of

2    clarification, this first page that contains the definitional

3    material, to which Defendant takes objection, was given to

4    Defendant?

5          THE WITNESS:  Yes.  Yes, Your Honor.

6          THE COURT:  I'm going to overrule the objection.

7          MR. EINHORN:  Yes, Your Honor.

8          THE COURT:  The relationship between administrative

9    rules, employer policies and procedures, and the law

10   applicable to the crimes charged will be clarified in the

11   charge that you will get when we have all the evidence in,

12   such that you can understand that legal charge in relation to

13   the evidence that you've heard.

14         All right.  You may proceed.

15         MR. McGARRY:  And I would ask that the Courtroom

16   Deputy make these -- I assume when you say that I can

17   proceed, that it's admitted, Your Honor.  Am I correct?

18         THE COURT:  375, -76 and -79 are all admitted over

19   objection.

20         MR. McGARRY:  Thank you, Your Honor.

21                        DIRECT EXAMINATION

22   BY MR. McGARRY:

23   Q.   Again, Mr. Anuario, please take a look at

24   Government's Exhibit -- I believe 375, which is now in

25   evidence and is in front of you.  It was previously

550

1    highlighted for the discussion.  What is -- just, basically,
2    what is this document?
3        A.    This document is just an attestation that we -- that
4    our examiners would bring on-site to the examination to have
5    the registered reps read and complete.
6        Q.    Okay.  And it has in quotes "selling away," meaning
7    a securities transaction occurring away from the
8    broker-dealer with which an individual is registered.
9             What does that mean?
10       A.    That's -- selling away is, you know, if a rep
11   conducts securities transactions away from our firm, which
12   means that it's not facilitating investments that are
13   approved by the firm.  It's not going through the firm.  It's
14   outside of the firm's scope.
15       Q.    And does your firm consider a private securities
16   transaction, any securities transaction outside the regular
17   course or scope of Mr. Vaccarelli's employment with The
18   Investment Center, as it reads there, his representation --
19   or his affiliation with The Investment Center?
20       A.    Yes.  Yes.  Yes.
21       Q.    And turning to the second page, what did Mr.
22   Vaccarelli represent and say to The Investment Center in
23   checking these boxes and signing the document?
24       A.    Mr. Vaccarelli represented that he has not engaged
25   in any private securities transaction in the past year,

1   because these are conducted at the exams; and, also, he has

2   not engaged in any private securities transactions for which

3   he did not receive prior written approval, as well.

4        Q.   And what's the date of this, Government's Exhibit

5   375?

6        A.   The date is August 7, 2014.

7        Q.   Okay.  Government's Exhibit 376.

8             THE COURT:  Mr. McGarry, I'm going to propose that

9   we stop here, that we take a quick half-hour lunch.  Recall

10  that we are only going to be here 'til 2, so we will do our

11  very best to actually make it a half-hour lunch.  Okay?

12            So you are excused with all the same instructions.

13            (Jury out, 12:26 p.m.)

14            THE COURT:  All right.  Mr. Anuario, we will be back

15  in half an hour.  Once again, please don't discuss your

16  testimony with anyone or let anyone discuss it with you.  All

17  right?

18            THE WITNESS:  Understood.

19            THE COURT:  We will be in recess for thirty minutes.

20            (Recess taken, 12:27 p.m.)

21            (Out of the presence of the jury, 1:00 p.m.)

22            THE COURT:  All right.  Let's bring back the jury.

23            (Jury in, 1:01 p.m.)

24            THE COURT:  All right.  Welcome back to Exhibit 376.

25  You may be seated.

552

1              Mr. McGarry, you may continue.  Sir, you may be

2    seated.

3              THE WITNESS:  Thank you.

4              MR. McGARRY:  Thank you, Your Honor.

5    BY MR. McGARRY:

6      Q.   Mr. Anuario, could you please just remind the jury

7    what Government's Exhibit 376 is?

8      A.   Annual Private Securities Transaction Attestation.

9              THE COURT:  Oh, slow down, please.

10             THE WITNESS: Yeah.  Sorry.

11   BY MR. McGARRY:

12     Q.   And is this the same or similar attestation as

13   Government's Exhibit 375?

14     A.   Yes.

15     Q.   And did Mr. Vaccarelli sign this attestation?

16     A.   Yes, he did.

17     Q.   It doesn't appear that any boxes are checked on the

18   top?

19     A.   Correct.

20     Q.   Did your firm accept this and keep it as part of its

21   records?

22     A.   Yes, we accepted it.

23     Q.   Let me show you Government's Exhibit 379.  Oh, I'm

24   sorry.  What's the date on 376, before I leave it?

25     A.   January 13, 2016.

1    Q.   Okay.  And Government's Exhibit 379; what is

2    Government's Exhibit 379?

3    A.   Annual Private Securities Transaction Attestation.

4    Q.   Okay.  And turning to the second page, what is Mr.

5    Vaccarelli attesting to on this page?

6    A.   He's attesting to, "In the past year I have not been

7    engaged in any private securities transactions," and he

8    signed it.

9    Q.   And let me show you -- let me ask you the date of

10   this one?

11   A.   January 19, 2017.

12   Q.   And it's signed by Mr. Vaccarelli?

13   A.   Yes.

14   Q.   Okay.  And pulling up the right-hand side of the

15   screen -- let's see.  Actually, I don't know.  Let me hold

16   off on that one for a second.

17        Pulling up, over here, Government's Exhibit 376,

18   second page.  Directing your attention to the date.

19   A.   January 13, 2016.

20   Q.   Okay.  Okay.  And moving that to the left and

21   pulling up Government's Exhibit 657 on the right, in

22   evidence.  What is the date of Government's Exhibit, the last

23   page, 657?

24   A.   November 27, 2015.

25   Q.   Okay.  And the date of Government's Exhibit 376?

1    A.    January 13, 2016.

2    Q.    And showing you page 1 of 657, what is this document

3  entitled?

4    A.    The title is Private Direct Investment Agreement.

5    Q.    Okay.  And whose name is in the first line?

6    A.    LWLVACC, LLC, in parentheses Leon Vaccarelli.

7    Q.    Had your firm been informed about LWLVACC, LLC?

8    A.    No, we were not.

9    Q.    And this document being November, what did -- was

10 this -- was any private securities transaction disclosed to

11 your firm on this form in January of '16?

12   A.    No, there was not.

13   Q.    Okay.  If there had been a private securities

14 transaction, would you have expected it to be disclosed?

15   A.    Yes.

16   Q.    I want to just -- we talked about this before.  I

17 want to just admit two documents -- 372 and 373,

18 correspondence to your firm related to the building.

19        MR. EINHORN:  If you want to put those in, sure.

20        MR. McGARRY:  Okay.

21 BY MR. McGARRY:

22   Q.    372.  What is Government's Exhibit 372, if you -- I

23 don't think we did this one before, but just to -- what is

24 this e-mail?

25   A.    This is the approval of the private securities

1   transaction.

2        Q.   Okay.  And what is Government's Exhibit 373?

3        A.   It's a fax cover sheet to my attention.

4        Q.   And where -- in what state would you have received

5   this fax, by the way?

6        A.   The state is New Jersey.

7        Q.   And it's from who?

8        A.   From Leon Vaccarelli.

9        Q.   And what is, without getting too much into the

10  details, what is Mr. Vaccarelli sending you and why?

11       A.   He's sending me -- per our request, he is sending me

12  an Acknowledgement and Release form signed by Mr. Kolesnik

13  related to the building purchase.

14       Q.   Okay.  And was that an outside business that he

15  needed to disclose?

16       A.   Yes.

17       Q.   Okay.  And was that something that he needed -- was

18  outside businesses something that he was required to

19  disclose?

20       A.   That's correct.

21       Q.   Okay.

22            MR. McGARRY:  I'd like to move -- offer and move

23  377, 378 and 380, which are "outside business" forms.

24            MR. EINHORN:  377?

25            MR. McGARRY:  Yeah, 378 and 380.

```
1   BY MR. McGARRY:
2       Q.   So, while Mr. Einhorn is reviewing those, in this
3   instance Mr. Vaccarelli did seek your permission.  And did he
4   get approval related to the building?
5       A.   Yes.
6       Q.   Okay.  Referring you to 377.
7            MR. EINHORN:  No objection.  I'm sorry, I'm just
8   reading.
9            MR. McGARRY:  Okay.
10  BY MR. McGARRY:
11      Q.   Do you recognize this document?
12      A.   Yes.
13      Q.   And --
14           THE COURT:  That's no objection for 377, -78 and
15  -80?
16           Well, we'll do it one at a time that's fine.  377 is
17  full exhibit.
18           MR. EINHORN:  That's fine, Your Honor, all three.
19           MR. McGARRY:  Thank you.
20           THE COURT:  Thank you.
21  BY MR. McGARRY:
22      Q.   Okay.  What is 377, Government's Exhibit 377?
23      A.   This is presented at the branch exam.  This is an
24  outside business activity confirmation from the FINRA site
25  where all of those are recorded.
```

1    Q.   And is this something that your firm gets and

2   maintains?

3    A.   Yes.

4    Q.   And does this one appear to be signed?

5    A.   Yes.

6    Q.   And dated?

7    A.   Yes.

8    Q.   And I'm going to zoom-in on this.  Have you had a

9   chance to review these documents prior to your testimony

10   today?

11    A.   Yes.

12    Q.   Okay.  Do you see where -- I'm just going to

13   highlight one thing here.  Do you see where it says:  "Budget

14   committee, scholarship committee and basketball coach"?

15    A.   Yes.

16    Q.   Why would Mr. Vaccarelli include on this form that

17   he was a basketball coach, for instance?

18    A.   He is on the scholarship committee and also the

19   budget committee, so any roles in that manner would require

20   an outside business activity to be submitted to the firm.

21    Q.   And, again, he discloses the commercial property;

22   correct?

23    A.   Yes.

24    Q.   Okay.  Reviewing this now and having reviewed it

25   prior to today, was any -- is anywhere in here disclosed

1    LWLVACC?

2        A.    No.

3        Q.    Okay.  Was there anywhere disclosed in here for this

4    year that he was serving as a trustee?

5        A.    No, there is not.

6        Q.    Okay.  Showing you what's been marked as

7    Government's Exhibit 378, this one's a little clearer.

8    Again, the same questions.  There's certain things disclosed

9    here; correct?

10       A.    That is correct.

11       Q.    Okay.  But is there any discussion of a trust?

12       A.    No.

13            MR. McGARRY:  I'm going to offer this document

14   (handing).

15   BY MR. McGARRY:

16       Q.    And is there any reference to or notice given of the

17   outside business or other business of LWLVACC?

18       A.    No, there's not.

19       Q.    Okay.  And what's the date of this document?

20       A.    July 13 of 2016.

21            MR. McGARRY:  Okay.  I'd like to offer, Your Honor,

22   I believe without objection, Government's Exhibit 751.

23            MR. EINHORN:  No objection.

24            THE COURT:  Full exhibit.

25   BY MR. McGARRY:

1    Q.   Okay.  Take a look at Government's Exhibit 751.

2    Have you seen this document before?

3    A.   Just recently, yes.

4    Q.   In preparation for your testimony today?

5    A.   Yes.

6    Q.   Okay.  And directing your attention to the

7    highlighted part:  "I reviewed the trust documents, met with

8    both Linda Burton and Attorney Robert Kolesnik, and I'm

9    willing to accept the responsibilities of successor trustee."

10        Do you see that language?

11   A.   Yes, I do.

12   Q.   Are you familiar with the name Robert Kolesnik?

13   A.   I am, yes.

14   Q.   Is that the individual you testified was related to

15   and business partner with Mr. Vaccarelli?

16   A.   That is correct, yes.

17   Q.   And did -- on any of the outside business forms, was

18   Mr. Vaccarelli serving as a trustee disclosed?

19   A.   No, it was not.

20   Q.   And would that have been something that The

21   Investment Center would have wanted to have been disclosed to

22   them?

23   A.   Yes, prior to doing it; yes, correct.

24   Q.   And why is that?

25   A.   It's regulatory requirements, so we have to adhere

1   to those.

2      Q.   And is that something that you would like to -- is

3   it important to know if there's income coming from other

4   sources?

5      A.   Oh, absolutely; yes.

6      Q.   And why is that?

7      A.   Just to make sure that there's nothing being done

8   that's outside the scope of our business that we don't know

9   about.

10     Q.   And would controlling a large trust be something

11  that would be -- that should be disclosed?

12     A.   Yes, that is.

13     Q.   Okay.  Turning to Government's Exhibit 380, do you

14  recognize this document?

15     A.   Yes, I do.

16     Q.   And what is this?

17     A.   This is an outside business activity of -- showing

18  all the outside business activities that were approved and on

19  file and disclosed, and signed off by Mr. Vaccarelli.

20     Q.   And having looked at this prior but also having

21  looked at this today, is there any reference to LWLVACC?

22     A.   No, there is not.

23     Q.   Okay.  And has there -- is there any reference to

24  being the trustee of a trust?

25     A.   No.

1       Q.   Okay.  Let me jump to another topic.

2            MR. McGARRY:  I'd like to offer and move

3       Government's Exhibit 351, which is a direct investment

4       management document.

5            MR. EINHORN:  No objection.

6            THE COURT:  Full exhibit.

7            MR. McGARRY:  Okay.  Thank you, Your Honor.

8       BY MR. McGARRY:

9       Q.   What is this document?

10      A.   This is the firm's Direct Investment Agreement

11      Managed Account Form.

12      Q.   Okay.  And what is the import or the importance of

13      this form?

14      A.   This is a form where our affiliated RIA -- IC

15      Advisory Services, Inc. -- this is where -- the customer will

16      fill out and sign this.  This is to engage a third-party,

17      approved third-party manager on the fee-based side to

18      facilitate and invest the client's money.

19      Q.   Okay.  And is this document, I guess available

20      online?  Is it something that's downloadable?  How would one

21      get a copy of this document?

22      A.   Yes.  This is available online.  Either you can

23      print the document or it is fillable, and then it has to be

24      printed and signed and dated by the client and the advisor.

25      Q.   Okay.  And you're familiar with this document?

1    A.    Yes, I am.

2    Q.    And is it a three-page document?

3    A.    Yes.

4    Q.    And what is this box down here, in the box?

5    A.    So, the box down there, that's to be filled out on

6    the left-hand side by -- the IAR would be Mr. Vaccarelli or

7    another registered rep of our firm.  They would sign it, date

8    it, put their rep number, which is their identification

9    number; and then on the right-hand side, that's signed off by

10   a compliance officer, dated, we put the office number of the

11   rep, and then the total fee that's charged to the customer.

12   Q.    And let me go back to the top of this document, and

13   let me show you what's been marked as Government's Exhibit 16

14   in evidence.  Have you had a chance to look at Government's

15   Exhibit 16 and compare it to the document that is

16   Government's Exhibit 351?

17   A.    Yes.

18   Q.    Okay.  And were you able to conclude anything about

19   the two documents?

20   A.    It appears that it was -- almost all the content is

21   the same, except for the top part where it identifies the

22   LWLVACC Leon Vaccarelli, and removes our firm's name, as well

23   as our firm's logo in the upper right-hand side, and a change

24   in title to the form, as well.

25   Q.    And what's the title on Government's Exhibit 16?

1       A.    Private Direct Investment Agreement.

2       Q.    And then it says -- does it also read Private Direct

3   Invest Agreement Agreement here?

4       A.    Yes, I see that; yes.

5       Q.    And what is your title on the actual document?

6       A.    A Direct Investment Agreement Managed Account.

7       Q.    And this appears to have filled out the name

8   Christine Chauncey in there.  Do you see that?

9       A.    Yes, I do.

10      Q.    Referring to the 351 on the left, actually why don't

11  we go to the last page.  What's down here, this barcode and

12  this reference here?

13      A.    That's for firm use.  We barcode our documents for

14  scanning purposes, and we just abbreviate the name and then

15  put the version -- the version month and year.

16      Q.    And that relates to Direct Investment Agreement?

17      A.    Yes.

18      Q.    Going down to the third page, you told us about the

19  box.

20      A.    Yes.

21      Q.    Referring to the last page, on the right, do the

22  lines related to signature -- this part is the same?  Does it

23  appear to be similar?

24      A.    Yes.

25      Q.    How about the box for the compliance department?

1    A.    The box is missing.

2    Q.    Okay.  Going up to the first page.  I'm going to

3    zoom-in here on the left side, 351 -- and excuse me, if we go

4    down to where it says:  "All investments involve some type of

5    risk."  Do you see that?

6    A.    Yes.

7    Q.    And could you read the highlighted part?

8    A.    "Before you invest, please make sure that you have

9    read and understand the risk factors that apply to your

10   investment as described in the prospectus, if applicable."

11   Q.    Okay.  And directing your attention to Government's

12   Exhibit 16 on the right, can you read the paragraph that's on

13   the right?

14   A.    "All investments involve some type and level of

15   risk.  Risk is the possibility that you will lose money or

16   not make any additional money by investing in the investment.

17   You should periodically review your account with your

18   representative."

19   Q.    Are those paragraphs different?

20   A.    Yes.

21   Q.    How are they different?

22   A.    The paragraph that I -- the "before you invest"

23   sentence is missing from that.

24   Q.    What, if anything, did Mr. Vaccarelli tell you or

25   representatives of the The Investment Center about using The

1    Investment Center Direct Investment Agreement Managed

2    Account, Government's Exhibit 351, and changing it or

3    altering it and using it with his customers?

4         A.    We were not aware of that form that he was using.

5         Q.    I'd like to pull up on the right side -- and I'm not

6    sure if it's in evidence -- Government's Exhibit 18, which

7    is, I believe, a similar document -- I'm on the right side,

8    with respect to Ms. Truhan.

9              MR. McGARRY:  No objection?

10             MR. EINHORN:  No objection.  I didn't know you were

11   offering it.  Sure.

12             MR. McGARRY:  I'd offer that in full.

13             THE COURT:  Full exhibit.

14   BY MR. McGARRY:

15        Q.    Have you had a chance to review Government's Exhibit

16   18, which is now on the right-hand side of the screen?

17        A.    Yes.

18        Q.    Okay.  And what did you notice about Government's

19   Exhibit 18, compared to what's on the left-hand side of the

20   screen?

21        A.    Looks like it's all -- the title of the form is

22   together in one paragraph, and it looks like Lux Financial

23   was also added to the document, as well as LWLVACC, LLC.

24        Q.    And scrolling down to the middle of the second page,

25   picking up where it says, 5, Commission.  I know it's small.

1    If you can't read it, Mr. Anuario, please let me know.  Can

2    you read the part where it talks about The Investment Center,

3    starting with "Commission"?

4        A.   Sure.  It's titled Number 5, "Commission Products:

5    Client acknowledges that mutual fund and/or variable annuity

6    life products may have been or may in the future be purchased

7    by the client through an SEC-registered and FINRA-member

8    broker-dealer, including the advisor's affiliated

9    broker-dealer, The Investment Center, Inc., for which product

10   sales the client may have paid a commission."

11       Q.   And were you aware that Mr. Vaccarelli was using The

12   Investment Center, the name of the firm, in this document

13   that's on the right?

14       A.   No, we were not aware of it.

15       Q.   Okay.  And just moving down a little bit.  Again,

16   referring you on to the right of the screen, you see in the

17   middle of the text --

18       A.   Yes.

19       Q.   What do you see there in the middle of the text?

20       A.   Looks like the barcode is put in the middle of the

21   text.  Not the barcode, but it's the -- the information below

22   the barcode.

23       Q.   And that's kind of like the document identifier?

24       A.   Yes.

25       Q.   Do you know why that would appear right in the

1    middle of the document?

2        A.   No, I don't.   No.

3        Q.   Okay.  Also showing you what's -- I think we did 657

4    already.  I'd like to also show you Government's Exhibit 851.

5             MR. McGARRY:  I don't think it's yet in evidence,

6    Your Honor, but I'd offer 851.

7             MR. EINHORN:  No objection.

8             THE COURT:  Full exhibit.

9    BY MR. McGARRY:

10       Q.   Do you recognize what this document is?

11       A.   Yes.

12       Q.   What is this?

13       A.   This is a Private Direct Investment Agreement.

14       Q.   And whose signature is on the last page?

15       A.   Antoinette Izzi.

16       Q.   Do you recognize that name?

17       A.   I do recognize that name, yes.

18       Q.   And who is Antoinette Izzi?

19       A.   That was a client of the firm.

20       Q.   When you say the firm, was it a client of The

21   Investment Center?

22       A.   And Mr. Vaccarelli's.

23       Q.   But she was affiliated with Mr. Vaccarelli?

24       A.   Yes.

25       Q.   She was one of his clients?

1    A.   Yes.  Also a client of The Investment Center.

2    Q.   And she had an account there?

3    A.   She did have an account, yes.

4    Q.   Okay.  Showing you Government's Exhibit -- I think

5    not yet in evidence, but a similar document -- 700.  And --

6         MR. EINHORN:  No objection.

7    BY MR. McGARRY:

8    Q.   And what is Government's Exhibit 700?

9         (Reporter interruption.)

10        THE COURT:  700 is a full exhibit absent objection.

11   BY MR. McGARRY:

12   Q.   Okay.  What is Government's Exhibit 700?

13   A.   That is a Private Direct Investment Agreement.

14   Q.   Okay.  And does this have -- just paging down, does

15   this have the box for the compliance department?

16   A.   No, it does not.

17   Q.   And whose the name on this one?

18   A.   Looks to be Linda Warren.

19   Q.   And do you know the name Linda Warren?

20   A.   Yes, I do.

21   Q.   And who is Linda Warren?

22   A.   She's also a client of both The Investment Center

23   and Mr. Vaccarelli.

24   Q.   Okay.  Did Mr. Vaccarelli ever disclose as outside

25   activity or a private investment agreement, an agreement like

1    this with Ms. Warren?

2         A.   No, he did not.

3         Q.   Should he have?

4         A.   Yes.

5         Q.   Okay.  Let me move to another subject matter.

6              MR. McGARRY:  I'd like to offer, and I spoke with

7    Mr. Einhorn at the break, a series of 1099s -- Government's

8    Exhibit 362, -63, -64, -65, and 366.

9              MR. EINHORN:  I would object, Your Honor.  I don't

10   see any relevance in the 1099s.

11             THE COURT:  Your claim, Mr. McGarry?

12             MR. McGARRY:  These are the documents that The

13   Investment Center has, in which the payments or the

14   commissions related to Mr. Vaccarelli's relationship and his

15   affiliation with The Investment Center, the commissions that

16   he was paid, which shows he was related to The Investment

17   Center, that he was being paid by The Investment Center, and

18   that he was being paid pursuant to commissions, though I

19   would ask the witness what the payments represented.

20             MR. EINHORN:  Well, if the purpose is to show that

21   he had a relationship with The Investment Center, there's an

22   exhibit, the first exhibit we did, where he signed a contract

23   with them.  I'm assuming -- Exhibit 350.  I'm assuming the

24   Government has some other motive in offering these.

25             MR. McGARRY:  Well, motive would be another reason,

1   Your Honor.

2           THE COURT:  Let's do this.  I want to hear you a

3   little further on that.  If you've established all the

4   foundation that you need through this witness, can we move to

5   another area?  And then if we have time before two o'clock,

6   I'll hear you more extensively or I'll hear you before we

7   reconvene tomorrow.

8           MR. McGARRY:  Sure.  I'd like to jump to another

9   area, somewhat similar, but offer Government's Exhibit 359,

10  which maybe if -- I'll just ask if I could approach, Your

11  Honor.

12          THE COURT:  Yes.

13  BY MR. McGARRY:

14      Q.   What is Government's Exhibit 359?

15      A.   It's a Commission Statement Summary.

16      Q.   I'm sorry?

17      A.   A Commission Statement Summary.

18      Q.   And what is a Commission Statement Summary?

19      A.   This shows all the commissions earned by the rep and

20  the branch.

21      Q.   Does it also list the names of a number of his

22  clients?

23      A.   Yes, it does.

24      Q.   Okay.  And have you had a chance to review that

25  before today?

1    A.   Yes.

2    Q.   And is that a record of of The Investment Center

3  that was created at or about the time?

4    A.   Yes.

5    Q.   Okay.  And it's somewhat done electronically where

6  they track all the commissions?

7    A.   Correct.  It's done electronically, and then this

8  statement is typically sent via e-mail.

9    Q.   To the --

10    A.   To the registered rep, yeah.

11         MR. McGARRY:  I'd offer this, Your Honor.

12         MR. EINHORN:  Same objection, Your Honor.  And I --

13  if we get that far, I'll *voir dire* the witness as to the

14  names of the clients.  But I -- for the same reason as

15  before, I don't see the relevance of commission statements in

16  this trial.

17         THE COURT:  Okay.  These are commissions paid by The

18  Investment Center for transactions that clients of Mr.

19  Vaccarelli and The Investment Center undertook in that year?

20         MR. McGARRY:  Correct, actually -- ones that

21  actually occurred, yes.

22         MR. EINHORN:  Some of which clients aren't the

23  victims in this case, if you will.

24         THE COURT:  And your offer is because this is the

25  regular recording of information provided to The Investment

1    Center through Mr. Vaccarelli?

2         MR. McGARRY:  Correct.  And he would have gotten --

3    received commissions for a number of these clients.  And

4    there may be clients, which I believe this witness can

5    testify to, whose names do not appear who have come and

6    testified at trial.

7         THE COURT:  I'm going to permit this.  I understand

8    Mr. Einhorn's argument that where the commissions and the

9    records to generate those commissions were in order, it is

10   not relevant.  It is, however, from the Government's

11   standpoint a point of comparison.  And I will permit it for

12   the inferences, if any, of that comparison.

13        MR. EINHORN:  May I suggest, Your Honor, in that

14   regard, understanding your ruling, the first three pages of

15   the commission statement do not contain that type of

16   information.  It's just general information, and it does not

17   contain client's names for comparison purposes.

18        THE COURT:  All right.  Let me ask you to please get

19   any information from Mr. Anuario with respect to this

20   document.  It may be that we need to redact parts of it or

21   submit it in a limited form, but let's use Mr. Anuario's

22   presence here to establish what is necessary to be

23   established through him.

24        MR. McGARRY:  Okay.  Thank you, Your Honor.

25   BY MR. McGARRY:

1    Q.   I'm going to stay on the paper, old-fashioned for a

2    minute or two, if I may.   Directing your attention to

3    Government's Exhibit -- I believe it's 359, page 5.  And have

4    you had a chance to review in your preparation for your

5    testimony today a number of the names that appear?

6    A.   Yes.

7    Q.   Okay.  Because of the objection, leaving aside the

8    numbers or the commissions that were paid, can you -- are you

9    familiar with the name --

10          I'll do it one by one, Your Honor

11          -- Carmella Truhan?

12    A.   Yes, I am.

13    Q.   And her name appearing on that sheet, what does that

14    tell you?

15    A.   That tells me that she -- there was a transaction

16    that generated a commission.

17    Q.   Okay.  Fair enough.  How about Manuel Correia,

18    C-O-R-R-E-I-A?

19    A.   Yes, that name sounds familiar yes.

20    Q.   And he appears on the -- that name appears on the

21    commission sheet?

22    A.   Yes.

23    Q.   What does that tell you -- or you could tell the

24    jury what that means -- *vis-a-vis* Mr. Vaccarelli?

25    A.   That means, once again, that there was a transaction

1    placed that generated commissions.

2         Q.   Okay.  And how about Raymond Antonacci?

3         A.   Yes, that sounds familiar, yes.

4         Q.   Marcia Schultz?

5         A.   Yes.

6         Q.   Antoinette Izzi.

7         A.   Yes.

8         Q.   And Christine Chauncey?

9         A.   Yes.

10        Q.   Susan Rustic?

11        A.   Yes.

12        Q.   Linda Warren?

13        A.   Yes.

14        Q.   The Truhan Living Trust?

15        A.   Yes.

16        Q.   Patricia Sinkowski?

17        A.   Yes.

18        Q.   Was Robert Koleznik there, also?

19        A.   Yes, he was a client, as well.  Yes.

20        Q.   All right.  How about a Carrie Zimyeski?

21        A.   Yes, she's a client.

22        Q.   And somebody by the name of, looks like Rob --

23   Robert Kleinschmidt?

24        A.   Yes.

25        Q.   Okay.

1      A.   A client, as well.

2      Q.   Did you also have a chance to review, in

3  preparation, this commission sheet, as well as, I believe --

4  if I can get the other ones.  Maybe was it 360.  We'll

5  check -- as well as other commission sheets, which I think

6  are 360, but we'll double-check that.

7           Did you -- were you able at all to find the name

8  Augelli, Mr. and Mrs. Augelli, in the commission sheets at

9  all?

10     A.   No.

11     Q.   Are you familiar with that name and have you

12  searched your database for the name Mrs. Augelli?

13     A.   Yes, I'm familiar with the name.  Our database shows

14  she was never a client of the firm.

15     Q.   And you've looked?

16     A.   Yes, I've looked.

17     Q.   And have they submitted a claim to try to get some

18  money?

19     A.   They have.

20     Q.   And when you looked in your written -- in your

21  records, including the commission sheets as a representation

22  of your records, was the name Augelli found?

23     A.   No, we cannot locate Augelli at all; no.

24     Q.   How about the name LaPorta?  Mrs. LaPorta?

25     A.   Off the top, I mean, I recognize the name.

1    Q.   And how do you recognize the name?

2    A.   I recognize the name based on reviewing these.

3    Q.   Okay.

4    A.   I'm not sure if she had an account with us.  I just

5    don't remember that at all.

6    Q.   And if you look in Government's Exhibit 359, did

7    you -- are you able to see the name Giussepina LaPorta?

8    A.   I do not see that.  I am not seeing it, the name

9    here.

10   Q.   All right.

11        MR. McGARRY:  All right.  Your Honor, with that,

12   I'll move on to another area.

13   BY MR. McGARRY:

14   Q.   And, I'm sorry, I didn't hear your last answer.

15   A.   Oh, I did not see her name in the commission

16   statement, no.

17        MR. EINHORN:  Is this being offered, Your Honor?

18        MR. McGARRY:  Well, I was going to reserve it, based

19   on --

20        THE COURT:  It's offered.  You have already objected

21   to it for the same reason you objected to the 362 through 366

22   series.

23        MR. EINHORN:  Well, may I *voir dire* the witness on a

24   different ground than on this document?

25        THE COURT:  Yes.

```
1              MR. EINHORN:  Thank you.

2                          VOIR DIRE

3   BY MR. EINHORN:

4       Q.   Sir, I'm going to show you the same document that

5   you just looked at, and I understand that you just went

6   through --

7              THE COURT:  259?

8              MR. EINHORN:  Yes, I apologize.  359.

9              THE COURT:  I'm sorry, 359.

10             MR. EINHORN:  Yes, thank you.

11  BY MR. EINHORN:

12      Q.   And, in 359, you identify a number of names; right?

13      A.   Yes.

14      Q.   And names that were clients or not clients, but

15  names; right?

16      A.   Yes.

17      Q.   I'm going to show you the beginning of 359, and it

18  looks like there's some additional pages; right?

19      A.   Yes.

20      Q.   Those don't include the names of any clients at all;

21  do they?

22      A.   They do not, no.

23      Q.   And those are just summary pages; aren't they?

24      A.   That is correct.

25             MR. EINHORN:  Your Honor, that was my other basis
```

1    for objection.  Those don't belong here.

2         THE COURT:  Okay.  We will discuss that without

3    taking up the jury's time.

4         MR. EINHORN:  Okay.

5                   DIRECT EXAMINATION

6    BY MR. McGARRY:

7    Q.   Okay.  Moving to another topic.  Let me show you

8    what's been marked in evidence, Government's Exhibit 16B.

9    Who signed this document?

10   A.   Mr. Vaccarelli.

11   Q.   Okay.  And directing your attention to the first two

12   lines.  Do you see that?

13   A.   Yes.

14   Q.   And could you read that for the jury?

15   A.   Yes.

16        "This letter is to serve as an attestation that as

17   of today, October 11, 2016, you have on deposit 47,000 in the

18   Senior Note Program of Leon Vaccarelli."

19   Q.   Okay.  What -- were you aware of a Senior Note

20   Program of Leon Vaccarelli?

21   A.   We were not aware of that.

22   Q.   Okay.  I think earlier you talked about selling

23   away.

24   A.   Correct.

25   Q.   And private securities transactions.

1          Was -- as part of his relationship with The

2     Investment Center, was Mr. Vaccarelli permitted to run his

3     own Senior Note Program?

4     A.    No, he was not.

5     Q.    And did you have any knowledge of it?

6     A.    No, we did not.

7     Q.    Okay.  Was it disclosed on any of the

8     questionnaires?

9     A.    No, it was not.

10    Q.    Was it disclosed in any of the other U4 filings that

11    your firm was able to look at business -- outside business

12    activities?

13    A.    No.

14    Q.    Okay.  Have you seen this document before?

15    A.    Only during the prep.

16    Q.    Okay.  Were you surprised?

17    A.    Very.

18    Q.    Why?

19    A.    Well, just by the nature of it.  I mean, it just

20    surprises me.  Just the first sentence alone, you know, this

21    is obviously something our firm would never approve.

22    Q.    And why is that?

23    A.    Because, once again, it's almost saying that

24    there -- it's an unregistered security, the way it reads, and

25    our firm would not permit that in any capacity.  The reps are

```
1   only allowed to sell the products that we offer and

2   approve.

3       Q.   And just directing your attention here.  Have you

4   ever heard of the law firm of Zachin Zimyeski and Sullivan?

5       A.   I have never, no.

6            THE COURT:  It's not a law firm.

7   BY MR. McGARRY:

8       Q.   I'm sorry -- the CPA firm?

9       A.   I have not.

10      Q.   Have you ever heard of the the CPA firm Zachin

11  Zimyeski Sullivan?

12      A.   No.

13      Q.   Okay.  I want to direct your attention to

14  Government's Exhibit 300, which I believe is -- I believe is

15  in evidence.  Do you recognize the name Mike Brough?

16      A.   Yes, I do.

17      Q.   Or Michael Brough.  Okay.  I want to direct your

18  attention to Government's Exhibit 304, an e-mail

19  communication --

20           MR. McGARRY:  Which is not yet in evidence, but I

21  would offer it.

22           MR. EINHORN:  No objection.

23           THE COURT:  304 is a full exhibit.

24           MR. McGARRY:  Okay.

25  BY MR. McGARRY:
```

1    Q.    Who is Terri Penderson (phonetic)?

2    A.    Terri Peterson is an employee of The Investment

3    Center.  She's in our cashiering department.

4    Q.    And what do you recall about the transaction that is

5    memorialized, in part, in Government's Exhibit 304?

6    A.    As far as opening the account, is that what --

7    Q.    No.  I showed you the account opening.  But do you

8    recall there being some communication regarding a check?

9    A.    Yes.  Yes, I do.  The check was written, if I

10   remember correctly, to Lux Financial, I believe.

11   Q.    Let me show you Government's Exhibit 2 in evidence.

12   Okay.  Go ahead.

13   A.    And that check was sent back from our cashiering

14   department, informing the client not to make the check

15   payable to any other entity besides Pershing, LLC.

16   Q.    And do you recognize the AB-2 and then the account

17   number?

18   A.    Yes.

19   Q.    And what does that nomenclature represent?

20   A.    AB-2 that would be a Pershing account.  That's an

21   IRA account.  The 2 is IRA.  The prefix is provided by

22   Pershing.  So that would be a Pershing IRA account.

23   Q.    Okay.  And it's made out to Lux Financial?

24   A.    Yes.

25   Q.    Directing your attention to the second part of what

1  appears to be -- The Investment Center account number appears

2  to have been crossed out and it says "deposit only."  Do you

3  see that?

4      A.   Yes.

5      Q.   And there seems to be some initials there?

6      A.   Yes.

7      Q.   Were you aware -- was The Investment Center made

8  aware, ever, of Mr. Vaccarelli cashing checks into or

9  depositing checks into Lux Financial accounts when the checks

10 are for the benefit of a client?

11     A.   No, we were not.

12     Q.   Would that have been permitted by The Investment

13 Center?

14     A.   That would not be permitted.

15     Q.   And why not?

16     A.   As previously stated, that -- the firm does not

17 permit any checks to be cashed by any registered

18 representative of the firm, nor can it be made payable to the

19 registered representative or any company that he or she

20 controls.

21     Q.   And if you had been asked about that, do you know

22 what, in following your policies and procedures, what the

23 firm would have said?

24     A.   If -- yeah.  No, if it came through our desk, I

25 mean, that would have -- we would have taken action related

1   to this matter.

2        Q.   And what types of steps would that have included?

3        A.   I mean, it could include anywhere from termination

4   to fines to suspensions.  There's a multitude of --

5        Q.   Okay.

6        A.   -- things.

7        Q.   Let me show you a couple of exhibits.

8             MR. EINHORN:  I'm sorry, can I just ask what the

9   exhibit number was on that one?

10            MR. McGARRY:  2.

11            MR. EINHORN:  Number 2?

12            MR. McGARRY:  Number 2.

13            THE COURT:  The check was number 2.

14            MR. EINHORN:  I was looking for the e-mail.  I

15   apologize.

16            THE COURT:  That's 304.

17            MR. EINHORN:  304.  Thank you.

18   BY MR. McGARRY:

19        Q.   Pulling that up for the Court.  And, so, what was

20   the resolution with the mailing of the check.  Do you recall

21   whether it was mailed and then mailed back to Mr. Brough?

22        A.   When it came to our firm, we mailed it back to

23   Mr. Brough with a cover letter.

24        Q.   Okay.  And it was payable to Lux?

25        A.   That check was payable to Lux, that is correct.

1    Q.   Okay.  Let me show you what's I believe in evidence,
2    Government's Exhibit 1A.  I believe that's in evidence.  Do
3    you recognize the name Susan Rustic?
4    A.   Yes, I do.
5    Q.   Directing your attention to page 8.  And the letters
6    seem a little smooshed together, but can you tell us what it
7    says there?  Check number, as per your request?
8    A.   Yes, that's a check that was sent to the client's
9    address of record per her request.
10   Q.   And what's the last -- it says "overnight delivery";
11   is that correct?
12   A.   Yes, the client must have requested overnight
13   delivery.  Usually, if not overnight delivery, we just send
14   it regular mail.
15   Q.   Okay.  And let me show you what's been marked --
16        MR. McGARRY:  And I'll offer Government's Exhibit
17   1C, an Investment Center document.
18        MR. EINHORN:  No objection.
19        THE COURT:  Full exhibit.
20   BY MR. McGARRY:
21   Q.   What is Government's Exhibit 1C?
22   A.   That is a check sent from Pershing to the client.
23   Q.   Okay.
24   A.   Per her request.
25   Q.   And it says your firm's name in the middle?

```
 1        A.   That is correct.

 2        Q.   Using the Bank of Delaware?

 3        A.   Bank of New York.

 4        Q.   Or Bank of New York, Delaware?

 5        A.   Yes.

 6        Q.   And it appears to have been negotiated?

 7        A.   Yes, it appears to be endorsed by Ms. Rustic, it

 8   looks like.

 9        Q.   And then you would have mailed it to her home

10   address; is that correct?

11        A.   The address of record, correct, on the account;

12   yes.

13        Q.   Okay.  And let me show you Exhibit 1D, also a

14   Pershing record.

15             MR. McGARRY:  Not yet in evidence, but I would offer

16   it.

17             MR. EINHORN:  No objection.

18             THE COURT:  Full exhibit.

19   BY MR. McGARRY:

20        Q.   And what is 1D?

21        A.   1D is an internal document that shows the check has

22   been issued.

23        Q.   Okay.  Okay.  It says -- could you tell us about the

24   print location?

25        A.   The print location is New Jersey, which means that
```

586

1    it's printed at our office in Bedminster.

2        Q.   Do they print fast in New Jersey, because I

3    understand they talk fast in New Jersey.

4        A.   They do talk fast.  Yes, it could also be printed

5    directly at Pershing and mailed directly from Pershing.

6    That's why that's there.

7        Q.   So you know where it was printed from?

8        A.   Correct.

9        Q.   And that it was mailed overnight delivery?

10       A.   Overnight delivery.

11       Q.   To Ms. Rustic?

12       A.   To Ms. Rustic.

13       Q.   Okay.  I'd like to show you what's Government's

14   Exhibit 12, I believe in evidence.  Do you recognize -- do

15   you see the word "investor" down at the bottom?

16       A.   No, that's not part of the form.

17       Q.   Right, but that is --

18       A.   I recognize the form, yes.

19       Q.   And do you recognize this as a form that would have

20   been sent to The Investment Center?

21       A.   Yes.

22       Q.   Okay.  And who is the client?

23       A.   Denis Roussel.

24       Q.   And just focusing on the bottom for a second, does

25   that appear to have been faxed?

```
 1        A.   Yes.
 2        Q.   Okay.  Where is The Investment Center located?
 3        A.   In Bedminster, New Jersey.
 4        Q.   Okay.  So that -- and do you know where Mr.
 5   Vaccarelli's firm, Lux Financial, is located?
 6        A.   In Connecticut.
 7        Q.   Okay.  Are they different states?
 8        A.   Yes.
 9        Q.   Okay.  I want to show you Government's Exhibit 452.
10   I'm not sure if it's in evidence, but an Investment Center
11   document.  Do you know Emily Kopeck (phonetic)?
12        A.   Yes.  Her name is Kopecky, with a Y.  Yeah, she was
13   a -- she's a former employee of The Investment Center.
14        Q.   And she worked there while you worked there?
15        A.   Yes.
16        Q.   And you know her?
17        A.   Yes.
18        Q.   Okay.
19             MR. McGARRY:  I'd offer this exhibit.
20             MR. EINHORN:  I have no objection.
21             THE COURT:  Full exhibit.
22   BY MR. McGARRY:
23        Q.   Okay.  Do you recognize the name Ray and June
24   Antonacchi, or Antonacci?
25        A.   Yes, I do.  Yes.
```

1    Q.   Okay.  And what are the instructions in the
2    comments.  What is that -- what do you take that to mean?
3    A.   It's that the client is requesting a one-time ACH,
4    which is a money -- direct money movement from an account to
5    the customer's bank account.
6    Q.   Okay.  And that -- either an account number is
7    there, and AB?
8    A.   Yes, AB1.  Yep.
9    Q.   And just so the jury can see.  And what's page 2 of
10   this document, Government's Exhibit 452?  Does that appear to
11   be a fax confirmation?
12   A.   That's correct, yes.
13   Q.   And does it say where it was faxed from?
14   A.   Yes, Lux Financial.
15   Q.   And it has a 203-number?
16   A.   Yes, I see that.  Yes.
17   Q.   Okay.  And it was sent to Emily Kopecky?
18   A.   Yes.
19   Q.   And did she work with you in New Jersey?
20   A.   Yes.
21   Q.   Okay.  Let me show you -- I'd like to show you a
22   couple of account opening documents and some other documents
23   related to some names that you might be familiar with.
24        MR. McGARRY:  I would offer Government's Exhibit
25   850, 851 and 852.

```
 1              MR. EINHORN:  No objection, Your Honor.
 2              THE COURT:  Full exhibits.
 3   BY MR. McGARRY:
 4        Q.   What is Government's Exhibit 851 -- I'm sorry --
 5   850?
 6        A.   That is the firm's welcome letter.
 7        Q.   Okay.  And we --
 8        A.   When a client opens an account.
 9        Q.   And we've seen this earlier; correct?
10        A.   Yes.
11        Q.   And that has a profile?
12        A.   Yes.
13        Q.   And, again -- you may have told us, but there's
14   payment information included in there?
15        A.   Yes, there is.
16        Q.   Okay.  Showing you 851 in evidence, what does this
17   appear to be?
18        A.   Private Direct Investment Agreement.
19        Q.   Okay.  And is that on the form of The Investment
20   Center?  Was it on the actual form of The Investment
21   Center?
22        A.   I mean, it's not an Investment Center form, no.
23        Q.   Okay.  And 852.  LWLVACC, LLC; would that be an
24   appropriate way to invest money with The Investment Center?
25        A.   No, that is not.
```

```
 1       Q.   Okay.
 2            MR. McGARRY:  I'd like to -- Government's Exhibit
 3  900, 901, 902 and 903.
 4            MR. EINHORN:  No objections, Your Honor.
 5            THE COURT:  All right.  Full exhibits.
 6  BY MR. McGARRY:
 7       Q.   I'm going to show you what's Government's Exhibit
 8  900.  What is Government's Exhibit 900?
 9       A.   A welcome letter to the client.
10       Q.   And who is the client?
11       A.   Manuel and Maria Correia.
12       Q.   And it looks like it's a joint type account -- JCT?
13       A.   Yes.
14       Q.   That means they're together?
15       A.   Yes, joint account, yes.
16       Q.   The profile; correct?
17       A.   That is correct.
18       Q.   You see it says Bedminster, New Jersey; correct?
19       A.   That's correct.
20       Q.   And showing you what's Government's Exhibit 901,
21  this bank record appears to be a check; correct?
22       A.   That's correct.
23       Q.   And who's the check made out to?
24       A.   Lux Financial.
25       Q.   About three hours ago you told us about the training
```

1   that you do.  What training do you do with respect to your

2   registered representatives who are affiliated with The

3   Investment Center if they get a check made out to their

4   entity?

5       A.   Well, we follow up with them and explain to them

6   that that is not permitted and needs to be -- we void the

7   check, and it needs to be reissued if it came through us.  In

8   this case, it did not.

9       Q.   And are they permitted to negotiate the check and

10  deposit it into their account?

11      A.   No, they are not.

12      Q.   Showing you Government's Exhibit 903.  What does

13  that appear to be?

14      A.   A bank check to Mr. Manuel Correia.

15      Q.   Okay.  And what's the memo line?

16      A.   Leon Vaccarelli.

17      Q.   As the vice president of compliance, do you know why

18  Mr. Vaccarelli would be giving a bank check to one of his

19  clients?

20      A.   No, I would not.  That would not be permitted.  That

21  is against securities laws.

22      Q.   Okay.  And 950 -- I'm sorry, maybe I should --

23          MR. McGARRY:  950, 951, 952 and 953, I'd offer

24  those?

25          MR. EINHORN:  Let me take a look.

1          MR. McGARRY:  Feel free.

2          MR. EINHORN:  No objections, Your Honor.

3          THE COURT:  All right.  Full exhibits.

4    BY MR. McGARRY:

5    Q.   Okay.  And what is Government's Exhibit 950?

6    A.   Another welcome letter to the client.

7    Q.   Okay.  And it has the same type of packet.  I'm

8    going to go through it quickly.

9    A.   That's correct, yes.

10   Q.   It talks about payment information?

11   A.   Correct.

12   Q.   And that's for -- could you tell us what person

13   that's for?

14   A.   That was for Marcia and Scott Schultz

15   Q.   Okay.  And showing you Government's Exhibit 951.

16   Again, who is that check made out to?

17   A.   Lux Financial Services.

18   Q.   And is that in keeping with the protocol of The

19   Investment Center?

20   A.   No, that is not permitted with The Investment

21   Center.

22   Q.   952 in evidence; who is that check from and who is

23   it to?

24   A.   From Marcia Schultz to Lux Financial, as well.

25   Q.   And how much is that for?

1    A.    $50,000.

2    Q.    Okay.  And 953.

3    A.    Another check from Marcia Schultz payable to Lux

4    Financial for $4,000.

5    Q.    And how do -- do you keep accurate books and records

6    of the amount of money invested by clients of The Investment

7    Center if the money goes to an account of the registered

8    rep?

9    A.    We cannot.  There are no books and records for

10    that.

11    Q.    Okay.  I'd like to show you, I believe a document

12    that's in evidence, Government's Exhibit 250.  Do you see the

13    name Giueseppina LaPorta?

14    A.    I do, yes.

15    Q.    And you said that in your position you became

16    familiar with that name; correct?

17    A.    That is correct.

18    Q.    Did you find any records of an investment of $27,361

19    by a Ms. LaPorta?

20    A.    This was -- this was a -- they brought one -- when

21    Leon -- Mr. Vaccarelli -- came on to The Investment Center, I

22    believe that investment was already made and they brought

23    over the account as a change of broker-dealer form.

24    Q.    Okay.

25    A.    That's what we uncovered.

1    Q.   That's how you learned about her name?

2    A.   Correct.

3    Q.   Okay.  And let me show you a document, 252, in

4  evidence.  Actually, let me start with 254, which is --

5  actually, we'll start with 252, Government's Exhibit 252.

6         If you could take a look at this document.  Have you

7  seen this document before?

8    A.   Just during this prep work.  No, not prior.

9    Q.   And, so, not -- and whose letterhead is this on?

10   A.   It's on the Lux letterhead.

11   Q.   And it says "registered representative"; correct?

12   A.   It does, yes.

13   Q.   Okay.  And it also lists Breigh Sedano; correct?

14   A.   Yes, it does.

15   Q.   And MaryAnne Marticello?

16   A.   Yes.

17   Q.   And if you could just read this, and then I want to

18  ask you a few questions about it.

19   A.   Sure.  "Dear Giuseppina, This letter is to serve as

20  an attestation that as of today, April 6, 2016, you have on

21  deposit 33,482.18 in the client funds account of Leon

22  Vaccarelli."

23   Q.   All right.  Let me stop you there.  What is a client

24  funds account of Leon Vaccarelli?

25   A.   I have no idea.

1      Q.   Were you ever made aware that he had client funds
2  accounts?
3      A.   No, we were not made aware of that.
4      Q.   Okay.  Keep -- you were reading.  Could you continue
5  to read "the account earns"?
6      A.   "The account earns 4 percent annual interest.  The
7  account is available for withdrawal in any amount with three
8  business days' notice."
9      Q.   Does that make any sense to you?
10      A.   No, it does not.
11      Q.   And going to the second part.  I'm going to
12  double-click and make it a little better grab there.
13           It reads:  "On March 31, 2017, due to changing
14  suitability practices and code of conduct practices, as well
15  as concerns regarding liability and potential conflict of
16  interest, the account will be retired, and in early April of
17  2017, you will receive a check for your full balance."
18           What does that mean?
19      A.   I'm not quite sure what that means.
20      Q.   Is that language or lingo something you're familiar
21  with in --
22      A.   I am not familiar with that.  "Retired" is not -- I
23  mean, clients close accounts all the time, but I've never
24  seen it written like that.
25      Q.   How about changing -- I'm not sure if the changing

1    modifies practices -- either changing practices of code of

2    conduct or practices in code of conduct practices, do you

3    know what code of conduct practices Mr. Vaccarelli is

4    referring to?

5         A.   No.   I mean, I know regulators have code of conduct,

6    which is against what this is, so I'm not quite sure what

7    that refers to.

8         Q.   Okay.  And directing your attention to 253, October

9    11 -- do you recognize this document at all?

10        A.   Yes, just from recently reviewing it; yes, I do.

11        Q.   Okay.  And this is another attestation?

12        A.   Correct.

13        Q.   Now Ms. LaPorta has $50,728 in a client funds

14   account.  Same question:  Do you know about a client funds

15   account of Leon Vaccarelli?

16        A.   No.

17        Q.   "The account earns 4 percent annual interest."  Do

18   you see that?

19        A.   Yes.

20        Q.   And it says:  "the account is available for

21   withdrawal in an amount within five business days."  Do you

22   see that?

23        A.   Yes, I do.

24        Q.   Do you know why it was three business days and now

25   it's five business days?

1      A.   I do not, no.

2      Q.   Okay.  And, again, there's changing suitibility

3   practices.  Again, same question:  Do you know anything about

4   that?

5      A.   I know nothing about that.

6      Q.   Other than in preparing for trial, have you ever

7   seen these documents?

8      A.   No, I have not.

9      Q.   Is this something that Mr. Vaccarelli ever

10  communicated to you that he was doing?

11     A.   No, he did not.

12     Q.   Okay.

13          THE COURT:  It's now two o'clock, Mr. McGarry.

14          MR. McGARRY:  Can I do one more document, Your

15  Honor, and then -- or, I'll stop.  I've been doing this long

16  enough to know when to stop.

17          THE COURT:  It's not going to conclude this witness?

18          MR. McGARRY:  Correct.

19          THE COURT:  You can't go back to New Jersey

20  tonight.

21          THE WITNESS:  Oh, man.

22          THE COURT:  All right.  Ladies and gentlemen, we

23  will recess for the day.  We will start again tomorrow at

24  9:30, and have a pleasant afternoon.  It is appearing to

25  become more and more pleasant.  Enjoy.  Leave your notebooks

1    here.  Don't discuss the case.  Don't research the case.  See

2    you tomorrow.

3               (Jury out, 2:00 p.m.)

4               THE COURT:  All right.  You are excused,

5    Mr. Anuario, 'til tomorrow at 9:30.  Please don't discuss

6    this case with anyone.

7               (Witness steps down, 2:01 p.m.)

8               THE COURT:  I have a hearing at 2.  Some of the

9    people participating in that hearing are here.  I'd like to

10   begin it.  Is there anything that needs to be taken up?

11              MR. McGARRY:  I have one question, Your Honor.  I

12   heard -- it was very clear that you said 9:30 for the

13   witness.  Do any of the objections to the documents, which if

14   we needed to take them up tomorrow, require him to be here,

15   such that if the Court had questions you would, rather than

16   him just having coffee in the morning, to come and be

17   available regarding the documents in question?

18              Because I'm not going to talk to him tonight at all.

19              THE COURT:  You portray a rather informal scene.  He

20   would come and have coffee with us?

21              MR. McGARRY:  No, he would have coffee by himself

22   and saunter in at 9:29, since no one is going to talk to him

23   since he's on the stand.  But I didn't know if the Court

24   wanted him earlier.

25              THE COURT:  I think -- because what I was trying to

1    have you do is get from him whatever was relevant to the

2    issues of the objections on the 1099s and the commission

3    summaries that are the subject of Mr. Einhorn's objection.   I

4    think Mr. Einhorn's objection boils down to those first three

5    pages --

6              MR. EINHORN:  Yes, Your Honor.

7              THE COURT:  -- that don't seem to have anything to

8    do with clients.  They seem to be a breakdown of how the

9    commission that ultimately the registered representative gets

10   was calculated.  Are you claiming those first three pages?

11             MR. McGARRY:  No.  And I just think the Court is

12   probably well aware what we were trying to establish, and I

13   think the commission records show that there were certain

14   clients who don't show up because the money never made it to

15   The Investment Center, and to corroborate the testimony as to

16   are these -- did the money get there?

17             THE COURT:  That was the purpose I understood to be

18   of the offer --

19             MR. McGARRY:  Correct.

20             THE COURT:  -- was, this is the list of clients that

21   The Investment Center knows of; and when compared with other

22   documents in evidence, there will -- the Government will be

23   claiming that there are clients not showing up on that list.

24             And for that reason, I've overruled Mr. Einhorn's

25   objection.  But if we can agree that the first three pages

1    will go out, will that satisfy you?

2         MR. EINHORN:  It will, Your Honor, yes.

3         THE COURT:  Okay.

4         MR. EINHORN:  I think there's three separate

5    exhibits that are similar.  They may not all be three

6    pages -- they may be two pages in some cases -- but it's

7    clear they're just summary pages.

8         MR. McGARRY:  We can either redact those or remove

9    them altogether so we don't have giant black pages, and start

10   them numbered on pages 3 or 4 respectively and give them an

11   A.

12        THE COURT:  And then if you have that which reflects

13   commissions paid, why do you need the 1099s for all those

14   fees paid?

15        MR. McGARRY:  I think the 1099s, Your Honor, if the

16   Court looks --

17        THE COURT:  I need to look at them.  I have not

18   looked at them.

19        MR. McGARRY:  There is a declining income reported

20   from The Investment Center that -- I don't want to say

21   "mirrors," but is the opposite, so maybe it mirrors the way

22   that mirrors are opposite, the money coming in from the

23   fraud.  So, the 1099 money is measurably going down while the

24   fraud money is measureably going up, so I do think it goes to

25   motive and intent.

601

1          MR. EINHORN:  How does it go to motive or intent?  I

2     don't see that at all.  It goes to math.  That's all.  And

3     that's not an issue in this case.

4          THE COURT:  Sometimes motive and intent is the

5     product of math.

6          MR. EINHORN:  I agree with that, yes.  But in this

7     particular case, I don't agree with --

8          THE COURT:  Okay.  I'm going to take a look at the

9     1099s, and we will take that up first thing in the morning,

10    meaning at 9:30 pronto and we will return to our witness's

11    testimony, and we will stand in recess right now.

12         MR. McGARRY:  Thank you, Your Honor.

13         THE COURT:  Are we going to finish your witnesses by

14    the end of the week, as in tomorrow?

15         MR. McGARRY:  Not all of them, no.

16         THE COURT:  Okay.

17         MR. McGARRY:  We're on pace, though.

18         THE COURT:  I know.

19         MR. McGARRY:  I think we're going to be able to

20    eliminate some of the ones --

21         MR. EINHORN:  If Your Honor please, I didn't object

22    to Mr. Roussel, but he was clearly repetitive as to -- almost

23    word for word, and I would --

24         THE COURT:  Oh, he had many fewer words.

25         MR. EINHORN:  Fewer.  Yes, they were fewer.  But

1    there's been some repetitive witnesses, and I just wanted to

2    alert the Court I --

3              THE COURT:  I am aware.  I think that the fact that

4    there are multiple alleged victims does not mean that their

5    testimony is in some way improperly cumulative.

6              All right.  We stand in recess.

7              (Proceedings adjourned, 2:06 p.m.)

8

9

10            COURT REPORTER'S TRANSCRIPT CERTIFICATE

11   I hereby certify that the within and foregoing is a true and

12   correct transcript taken of the proceedings in the

13   above-entitled matter.

14

15                              /s/  Tracy L. Gow
                                Tracy L. Gow, RPR
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25