```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT



_____
UNITED STATES OF AMERICA,      )
              Plaintiff,       ) No: 3:18-CR-92 (JBA)
                               )
      v.                       ) May 16, 2019
LEON VACCARELLI,               )
              Defendant.       ) 9:40 a.m.
_____ )
                                 141 Church Street
                                 New Haven, Connecticut



                      JURY TRIAL DAY 4



B E F O R E:
          THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
          and 14 JURORS
```

```
                                 Official Court Reporter:
                                 Tracy L. Gow, RPR
                                 203-910-0323
```

604

1   A P P E A R A N C E S :

2   For the Government:
         MICHAEL S. McGARRY, AUSA
3        U.S. Attorney's Office-NH
         157 Church Street, 25th Floor
4        New Haven, CT 06510
         203-821-3751
5        Email: michael.mcgarry@usdoj.gov

6        JENNIFER LARAIA, AUSA
         U.S. Attorney's Office-BPT
7        1000 Lafayette Boulevard, 10th Floor
         Bridgeport, CT 06604
8        203-696-3029
         Email: jennifer.laraia@usdoj.gov

9
    For the Defendant:
10       JONATHAN J. EINHORN, ESQ.
         Law Office of Jonathan J. Einhorn
11       129 Whitney Avenue
         New Haven, CT 06510
12       203-777-3777
         Email: einhornlawoffice@gmail.com

13
         RACHEL MIRSKY, ESQ.
14       Mirsky Law LLC
         900 Chapel Street
15       10th Floor
         New Haven, CT 06510
16       203-290-2779
         Email: rachel@mirskylawct.com

17
    Also present:
18       LEON VACCARELLI
         SA RUSSEL DAY, FBI

19

20

21

22

23

24

25

**INDEX**

**EXAMINATION**

| Witness Name | Page |
|---|---|

JUSTIN ANUARIO

   Cont'd Direct By MR. McGARRY ............................. 608

   Cross By MR. EINHORN....................................... 637

   Re-Direct By MR. McGARRY ................................. 656

   Re-Cross By MR. EINHORN .................................. 659

   Further By MR. McGARRY ................................... 661

KIMBERLY LEBRON

   Direct By MS. LARAIA....................................... 668

JUNE ANTONACCI

   Direct By MS. LARAIA....................................... 713

   Cross By MR. EINHORN....................................... 740

   Re-Direct By MS. LARAIA ................................. 742

   Re-Cross By MR. EINHORN ................................. 743

STEVEN ESSEX

   Direct By MR. McGARRY..................................... 745

   Cross By MR. EINHORN....................................... 799

1          (Call to Order, out of the presence of the Jury,

2     9:40 a.m.)

3          THE COURT:  Good morning, Counsel, ladies and

4     gentlemen.

5          MR. EINHORN:  Good morning, Your Honor.

6          THE COURT:  Good morning, Mr. Vaccarelli.  The

7     Government has given me a new copy of 359 without the first

8     three pages, as we discussed.  It will now be admissible.

9          As to the 1099s reflecting fees paid to Mr.

10    Vaccarelli in the relevant periods of time, they, too, will

11    be admissible over objection.

12         The Government's purpose is a proper one -- namely,

13    it's theory that there was a relationship between the

14    diminishing fee from The Investment Center and the increased

15    activity of Lux.

16         So I'm going to admit those exhibits, and we're

17    ready to proceed.  Is there anything further?

18         MR. McGARRY:  Yes, Your Honor, just briefly.  You

19    mentioned 359.  360 and 361, and a couple newly marked

20    exhibits -- 381, -82, -83, -84.

21         THE COURT:  Just a moment.

22         MR. McGARRY:  Sorry.

23         THE COURT:  Yes.

24         MR. McGARRY:  383, 384 and 385 are also commission

25    sheets.  And we've marked them, we've taken off the front

1   page.  I don't think there's an objection.  I'm not going to
2   belabor the point.  But I think with the objections yesterday
3   and trying to rush to possibly get the witness back to New
4   Jersey, I was not very clear.  I just don't want the jury to
5   think that we're either hiding something or anything, so I
6   wanted to put a few more in.  And I'm not going to spend much
7   time with them, but that just cover different time periods.
8           THE COURT:  That's fine.  There's no objection?
9           MR. EINHORN:  No objection.
10          THE COURT:  All right.  Very well.  Then
11  those exhibits will be marked as full, and we'll bring in the
12  jury and we'll bring in Mr. Anuario.
13          (JUSTIN ANUARIO, previously sworn, takes stand, 9:43
14  a.m.)
15          THE COURT:  Good morning.
16          THE WITNESS:  Good morning.
17          (Jury in, 9:43 a.m.)
18          THE COURT:  All right, ladies and gentlemen.  Good
19  morning.
20          ALL:  Good morning.
21          THE COURT:  It is a good one; isn't it?
22          ALL:  Yes.
23          THE COURT:  And you get tomorrow off.  Please be
24  seated.  We will proceed and continue with Mr. Anuario.
25          You may proceed, Mr. McGarry.  You may be seated,

1     sir.  You remain under oath.

2          MR. McGARRY:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4     BY MR. McGARRY:

5     Q.   Good morning, Mr. Anuario.

6     A.   Good morning.

7     Q.   Yesterday -- I have on the screen, and I think if we

8     could have it pulled up, in evidence Government's Exhibit

9     359, which I don't believe the jury saw yesterday.

10          THE COURT:  It has now been admitted.

11    BY MR. McGARRY:

12    Q.   And I want to kind of just zoom-in on the top.  And

13    I have a couple of these.  I'm not going to go through them

14    in great detail, but I wanted to give you an opportunity to

15    explain what these documents are.  What is Government's

16    Exhibit 359?

17    A.   That is a rep commission statement.

18    Q.   Okay.  And what is a rep commission statement?

19    A.   It's a document that is provided to the registered

20    rep that shows commissions earned for that time frame.

21    Q.   And then, for instance, this one says for paydate

22    April 4 of 2014?

23    A.   Correct.

24    Q.   Are there different commission statements for

25    different types of products?

1      A.   No, this is the commission statement for

2  everything.

3      Q.   Okay.  And I'm going to hand you, if I can,

4  Government's Exhibit 359, a paper copy, which might speed

5  your testimony a little bit, and I have it on the screen.

6  Feel free to look at either one.

7           Just tell the jury, if you would, what this is

8  showing.  And maybe hold that question in your mind for a

9  second.  Do all the clients appear every month, even if there

10  are sales or trades not made during that period, if you know?

11      A.   No, they would only appear if there was a

12  transaction made or any commissions earned.

13      Q.   Okay.  So, for instance, we see the name Truhan, we

14  see the name Antonacci, and we see the name Carreia on this

15  sheet.  But it looks, down in the far couple of right-hand

16  columns, there's zeros, but in the third column there seems

17  to be -- is that a dollar amount?

18      A.   Yeah, that appear -- I don't know for sure, but that

19  appears to be maybe some sort of trail commission, which is

20  real small dollar amounts.  But I'm not sure.

21      Q.   Okay.  Fair enough.  And we also see, for instance,

22  for Raymond Antonacci there seems to be a commission here on

23  some trades?

24      A.   Yes.  Those are actual trades, yes.

25      Q.   Okay.  If somebody were to buy and hold a security,

1    would a commission appear every month or just in the month
2    where the trade is made?
3        A.   Where the trade is made.  Depending on the
4    investment, the registered rep could earn some trail
5    commissions along the way.  Usually that's yearly, but yeah,
6    it's usually always when the trade is placed is when the
7    commission is earned.
8        Q.   Okay.
9            MR. McGARRY:  Your Honor, I'm offering -- also
10   offering -- I know we may have done this before, but for the
11   record, 381, 382, 383, 384 and 385.
12           MR. EINHORN:  No objection, Your Honor.
13           THE COURT:  All right.  Absent objection -- oh,
14   those are admitted, and we have discussed those.
15           MR. McGARRY:  Yes.
16           THE COURT:  You may proceed.
17   BY MR. McGARRY:
18       Q.   So I mentioned securities.  If somebody buys a
19   mutual fund, is there a commission affiliated with that?
20       A.   Yes.
21       Q.   And if somebody were to buy and hold a mutual fund,
22   they buy it, for instance in 2014, would it appear at the
23   time they buy it?
24       A.   The commission should appear at the time they buy
25   it, yes.

1    Q.   And then would it continue to appear every single

2    month or is it just when that trade happens?

3    A.   Typically, not every single month.  There could be

4    some sort of -- depending on what sort of mutual fund is

5    purchased, that there could be some sort of trail commission.

6    It's usually an annual thing.

7    Q.   Let me pull up Government's Exhibit 381 in evidence,

8    and I'm going to -- again, if you could tell the jury the

9    date of this commission sheet?

10   A.   Paydate is January 30, 2012.

11   Q.   Okay.  And is paydate monthly or bi-weekly, if

12   that's the right term?  Every two weeks or every month?

13   A.   Every two weeks.

14   Q.   So we've identified a number of these.  Is it

15   accurate that there would be, I guess twenty-five-and-a-half

16   or 26 for every year?

17   A.   I believe that's pretty accurate, yes.

18        So, just so the jury can appreciate it, would the

19   stack be -- there'd be a lot.  There'd be more.  This is just

20   a representative stack.

21   A.   Yes, it could be larger; yes.

22   Q.   Okay.  Let me take your attention to Government's

23   Exhibit 381.  Yesterday I handed you a document -- it may

24   have been 359 -- and I asked you, I believe -- and the court

25   reporter, I'm sure, has the exact record, so if you disagree

1    with me, please correct me -- I believe I asked you if you

2    saw Ms. Giueseppina LaPorta on it.  You may have said no, not

3    on that one.

4         A.   Correct.

5         Q.   I didn't want to mislead you by any means to think

6    that because she wasn't on that one she wouldn't be on

7    another one.  I believe you said you remembered something

8    about Prudential.  Do you remember that testimony?

9         A.   Yes, I do.

10        Q.   Okay.  I pulled up 381, which has been admitted

11   today, and highlighted where it says "Prudential."  Can you

12   expand briefly on your testimony from yesterday of what you

13   recall about Ms. LaPorta and Prudential.

14        A.   What I recall is, I believe Ms. LaPorta came over as

15   a change of broker-dealer.  It's just moving the account

16   under The Investment Center's name when Mr. Vaccarelli came

17   on board with The Investment Center.  That appears to be --

18   it appears to be some sort of trail commission from the

19   Prudential annuity that she owned.

20        Q.   And you said something -- trail commission being

21   that it kind of follows an earlier trade?

22        A.   Yeah, it all depends on the prospectus, on how they

23   kind of pay it, depending on what type of contract she owned.

24   But that's what that appears to be.

25        Q.   Okay.  Let me -- and you said -- did you say

```
 1   something yesterday about you didn't see a commission for new
 2   money?  Do you remember testifying to that?
 3       A.   I do.  I don't remember seeing any new money from
 4   Ms. LaPorta.
 5       Q.   Okay.  And do you think if there would be new money,
 6   it would appear on a commission sheet?
 7       A.   It would, yes.
 8       Q.   Okay.  To be fair, though, you have not looked at
 9   every single commission sheet for the entire period of
10   time?
11       A.   No.  Correct, I have not.  No.
12       Q.   Okay.  I want to direct your attention now to
13   Government's Exhibit 385 in evidence and ask you to take a
14   look at the date.  And I did it yellow, but let me undo the
15   yellow.  Let me blow it up first.  Can you read what
16   paydate/pay period this is for?
17       A.   Yes, that's December 9, 2016.
18       Q.   Okay.  And it appears -- what is the first trade
19   date on the top of the page?
20       A.   The trade date is showing November 21, 2016.
21       Q.   Okay.  It looks to me that the names are not in
22   alphabetical order.  Are they in order of the trades, if you
23   know?
24       A.   It appears to be they're in order by transaction
25   number, there on the left-hand side.
```

1    Q.   I see.  Okay.  And also while we're here, could you

2    tell the jury what the AB1s and AB2s represent?

3    A.   Yes.  Those are brokerage accounts held in custody

4    by Pershing.  The AB1 is a nonqualified, which is more --

5    which is a nonIRA account.  And the AB2s are IRA accounts.

6    Q.   Are there other AB's that we would see for clients

7    of the -- of Mr. Vaccarelli through The Investment Center?

8    A.   There could be if Mr. Vaccarelli did any kind of

9    advisory accounts, because those would be AB6 or AB7, but

10   that's the only other ABs.

11   Q.   Okay.  Let me show you the last page.  That looks

12   like a summary.  Do you see here -- it appears that we go up

13   to December 2  Do you see that?

14   A.   I do see that, yes.

15   Q.   Does The Investment Center, on the commission

16   sheets, split days or do they do the whole day?  I mean,

17   could you only have half of December 2 or would you get the

18   end of the trading day?

19   A.   That's a good question.  I'm not quite sure of that

20   answer.  I would think it would be the full day, but I'm not

21   sure.

22   Q.   Okay.  Fair enough.  Looking here from December --

23   November 29, we have December, 6662  Do you see where the

24   cursor is?

25   A.   Yes.

1      Q.   And if there is December 6 and all the way down to

2    December 7, those look like they could be -- I want to go to

3    the top and make sure we have the trade dates.

4      A.   Those are settlement dates.

5      Q.   Settlement dates, okay.  For a paydate December 9,

6    would normally a trade date of December 2 appear on a sheet

7    for December 9?

8      A.   It should.  It should.  I don't see why it

9    wouldn't.

10      Q.   And, in fact, do you see a December 2 trade date for

11    someone named Terese or Teres Colucci (phonetic)?

12      A.   Yes, I do.

13      Q.   Okay.  I want to pull up Government's Exhibit 200 in

14    evidence, and let me direct your attention to this exhibit.

15    Do you see where it says "Lux Financial, Denise Augelli"?

16      A.   I do, yes.

17      Q.   And do you see down here, where it says the date of

18    December 2?

19      A.   I do, yes.

20           Okay.  And directing your attention to the back of

21    the check -- again, December 2?  You see that.

22      A.   Yes, I do.

23      Q.   And if that were military time, would that be about

24    three o'clock or 3:04?

25      A.   Yes.  Yes.  3:04, yes.

1    Q.   Okay.  And you're familiar -- I believe I asked you

2    yesterday, are you familiar with the name Ms. Augelli?

3    A.   Yes, I am.

4    Q.   Okay.  Would you -- again, take a look at what the

5    check is.  What's the check made out to?

6    A.   Lux Financial.

7    Q.   Is it made out to Pershing?

8    A.   No, it is not.

9    Q.   Does it appear to have been deposited or

10   negotiated?

11   A.   Yes.

12   Q.   Going back to Government's Exhibit 385, on the same

13   date, does there appear to be any commission paid on a

14   $72,000 trade of any sort, referencing a Ms. Augelli?

15   A.   No.

16   Q.   Okay.  Do you have an understanding as to why there

17   would not be a commission paid on the transaction to Lux

18   Financial of $72,000 from Ms. Augelli?

19   A.   Yes, it never came through our firm.

20   Q.   Okay.  And have you become familiar with the name

21   Augelli throughout your time as vice president of compliance

22   recently, within the last --

23   A.   Yes, recently.  Yes.

24   Q.   And in what capacity have you become familiar of the

25   name of Augelli?

1    A.    Just during the review and the investigation that

2    was going on.

3    Q.    Okay.  And do you know if she has submitted a claim

4    to your firm?

5    A.    I don't know for sure.  She may have.

6    Q.    Okay.

7    A.    But I don't know for sure.

8    Q.    Fair enough.  Again, just talking about the

9    commission sheets, and taking a step back.  When one works

10   for The Investment Center like Mr. Vaccarelli did, and they

11   make a whole year of commissions, at the end of the year do

12   you issue them a document to report earnings?

13   A.    Yes, our accounting department does.  They issue a

14   1099.

15   Q.    And, again, do you know why they get a 1099, as

16   compared to a W-2, which is what salaried employees get?

17   A.    I believe it's because they're an independent

18   contractor, so they're not employed by the firm.

19   Q.    Okay.  Fair enough.  And let me show you -- I'm

20   going to show you Government's Exhibits, and offer into

21   evidence, 362, 363, 364, 365 and 366, and I'll ask you to

22   identify them.

23          Okay.  And as we're doing this, is there -- other

24   than commissions, is there other types of compensation that

25   The Investment Center would pay to their affiliated

1    registered representative like Mr. Vaccarelli?

2        A.   There could be.  Could be advisory fees.  Typically

3    advisory fees and commissions, if they're licensed to do

4    advisory business.

5        Q.   And would that -- we've got the commission sheets,

6    which we did -- would all those fees be captured in the

7    1099?

8        A.   I believe it all is, yes.

9        Q.   Take a look at Government's Exhibit 382 -- or 362.

10   I misspoke, or misread.  What is this exhibit?

11       A.   That is a 1099.

12       Q.   And what is the year?

13       A.   2012.

14       Q.   And what is the amount?

15       A.   The amount is 194,239.07.

16       Q.   And would that be $194,239?

17       A.   Yes.

18       Q.   Okay.  And this is the bottom of the page?

19       A.   Yes.

20       Q.   Okay.  And it says "nonemployee compensation";

21   again, is that because they're an independent contractor?

22       A.   Yes, that is.

23       Q.   And let me show you -- that was 2012; correct?

24       A.   Yes, that's correct.

25       Q.   Let me show you 363 in evidence.  What year is

```
 1   this?

 2       A.   2013.

 3       Q.   And can you tell the ladies and gentlemen of the

 4   jury the compensation in box 7 paid to Leon?

 5       A.   $215,370.04.

 6       Q.   And that's for what year?

 7       A.   That's for 2013.

 8       Q.   Let me turn now to 364.  Directing your attention to

 9   the blown-up portion of 364, what year is this a 1099 for?

10       A.   2014.

11       Q.   And could you read for the jury the nonemployee

12   compensation in for 2014 in box 7?

13       A.   Sure.  $220,989.83.

14       Q.   Let me show you 365.

15            So this one says $220,989; correct?

16       A.   Yes.

17       Q.   Okay.  Showing you -- I mistyped -- 365.  What

18   year does Government's Exhibit 365 represent?

19       A.   2015.

20       Q.   Okay.  And can you read for the ladies and gentlemen

21   of the jury the nonemployee compensation for that year for

22   Mr. Leon Vaccarelli?

23       A.   $110,312.01.

24       Q.   Is that about half of what was in 2014?

25       A.   Yes, I believe so; yes.
```

1       Q.   Okay.  Directing your attention to 366, Government's

2  Exhibit 366, what year is this for?

3       A.   2016.

4       Q.   Okay.  Enlarging it so you can see it better, what

5  is the compensation for 2016?

6       A.   $117,952.51.

7       Q.   Okay.  I want to move to another area.  I've got a

8  couple documents to show you.

9            MR. McGARRY:  Let me show you The Investment Center

10  document -- I don't believe it's in evidence, but I'd just

11  like to offer it -- Government's Exhibit 1050.

12           MR. EINHORN:  No objection, Your Honor.

13           THE COURT:  All right.  Full exhibit.

14  BY MR. McGARRY:

15       Q.   Do you recognize Government's Exhibit 1050?

16       A.   Yes, that's The Investment Center new account

17  form.

18       Q.   Okay.  Enlarging it for you to see, it has an AB1

19  number?

20       A.   That is correct.

21       Q.   What type of account is that?

22       A.   That is a Pershing account, brokerage account.

23       Q.   Can you determine whether it's an IRA or a --

24       A.   It's a nonIRA.

25       Q.   And what is the name on the account?

```
 1        A.    Patricia Senkowski.

 2        Q.    And are you familiar with that name?

 3        A.    Yes.

 4        Q.    And how are you familiar with that name?

 5        A.    Just during this investigation and prior.

 6        Q.    Okay.  Just showing the jury the pages and the date

 7   on this new account form, referring you to the bottom of the

 8   page.  Can you read that?

 9        A.    Oh, yes.  I'm sorry.  February 24, 2011.

10        Q.    And the investment professional?

11        A.    Leon Vaccarelli.

12        Q.    Okay.  And that's the -- and then it's signed by the

13   customer; is that correct?

14        A.    Yes, that is correct.

15        Q.    Okay.  Okay.  I want to show you another similar

16   form.  Government's Exhibit 801.

17              I'm going to be offering 801, 802, 806 and 804.

18   Starting with 801 --

19              Any objection?

20              MR. EINHORN:  No, no objection.

21              THE COURT:  Thank you.  801, -2, -6 and -4 are full

22   exhibits.

23              MR. EINHORN:  I want to see -2, -6 and -4 first.

24   Are they the same thing?

25              MR. McGARRY:  So, -2.  -6 is her account statement.
```

1           MR. EINHORN:  Oh, I see.

2           MR. McGARRY:  And -4 is the wire request.

3           MR. EINHORN:  No objection, Your Honor.

4           THE COURT:  Very well.  They're all full exhibits.

5    You may proceed.

6           MR. McGARRY:  Thank you.

7    BY MR. McGARRY:

8      Q.   Directing your attention to the screen, do you see

9    document, Government's Exhibit 801?

10     A.   Yes.

11     Q.   What is this document?

12     A.   An The Investment Center new account form.

13     Q.   And who is it -- what is the account title,

14   directing your attention to --

15     A.   Account title is the Truhan Living Trust.

16     Q.   Okay.  And next to that is the name?

17     A.   Carmela Truhan is the trustee.

18     Q.   Are you familiar with that name?

19     A.   Yes, I am.

20     Q.   And, again, this appears to be an AB1 account?

21     A.   That's correct.

22     Q.   Scrolling down, just to show you the second page.

23   It has the name Manna M. Muth.  Do you know who -- or is it

24   Mark?

25     A.   That's Maria.

1    Q.   Maria, okay.

2    A.   She is a rep also, of our firm.

3    Q.   And it says Mark J. Mauro?

4    A.   Yes, also a registered rep of our firm.

5    Q.   Are they still with the firm?

6    A.   Yes, they are still with the firm.

7    Q.   Do you know where they are located?

8    A.   New Jersey.

9    Q.   If someone opens an account in New Jersey and they

10   move to Connecticut, are they permitted to still use the same

11   registered rep, or if they're transacting securities in

12   Connecticut, do they have to have a registered rep in

13   Connecticut?

14   A.   No, they don't.  The reps that have those accounts

15   would just get registered in the State of Connecticut to do

16   business.

17   Q.   And if the reps do not get registered in the State

18   of Connecticut, what does The Investment Center do?

19   A.   Then we'd either move it to another registered rep

20   of the firm or the client would just move it to another firm

21   of their choosing.

22   Q.   Do you know if the Truhan Living Trust was moved

23   from the registered reps on the account opening form to Mr.

24   Vaccarelli?

25   A.   I believe so.  I don't know for sure, but I believe

1   that's the case, yes.

2       Q.   All right.  Let me show you 802.  And what is this

3   document?

4       A.   This is an Investment Center account agreement.

5       Q.   And who is it signed by or who does it appear to be

6   signed by?

7       A.   Carmela Truhan.

8       Q.   Okay.  Now, I want to show you Government's Exhibit

9   806, and this might be a little more interesting than 802.

10  We've got color on it.  What is this document?

11      A.   This is a statement, a statement that's provided by

12  Pershing but obviously has our name on it.

13      Q.   And Pershing is your custodian?

14      A.   That is correct.  Our clearing firm, yes.

15      Q.   Your clearing firm?

16      A.   Yes.

17      Q.   And just since I don't think the jury has seen one

18  of these yet, can you tell the jury -- just explain what it

19  is and what this is showing.

20      A.   This is showing that the client's registration,

21  which is the Truhan Living Trust.  It has their account

22  number and the period for which the statement is referencing.

23      Q.   And that's January --

24      A.   And it has all the values and what they're invested

25  in, and so forth.

1   Q.   This period would be January 1 to January 31?

2   A.   Yes.

3   Q.   Of what year?

4   A.   Of 2017.

5   Q.   It has the beginning value and then there seems to

6   be -- it says "net cash deposits and withdrawals."  Do you

7   see that?

8   A.   Yes, I do see that.

9   Q.   Okay.  So that would be net of any withdrawals and

10  any deposits?

11  A.   Correct.

12  Q.   I guess that's why it says that.

13       And what is this pie chart?

14  A.   That pie chart is just referencing what the client

15  holds, you know.  Like the green is money market, the yellow

16  is equities.  Mutual funds in blue.

17  Q.   And equities are like stocks in companies?

18  A.   That is correct.

19  Q.   And mutual funds are what?

20  A.   Just investment company, you know, mutual funds that

21  are a pool of investments within a mutual fund.

22  Q.   And that's where the investment company kind of

23  makes the pool up and then people buy the pool?

24  A.   Yeah, they would buy that specific fund, and it's

25  built of -- it could be built of multiple stocks.

1     Q.   Okay.  So if you had an oil and gas mutual fund, it

2   would have a combination of oil and gas companies?

3     A.   That is correct.

4     Q.   Or an energy fund?

5     A.   That is correct.

6     Q.   A tech fund?

7     A.   That is correct, yes.

8     Q.   Just going through the pages.  Again, are these

9   provided every month to people?

10     A.   Typically they are, unless there's no activity.

11   Then, at a minimum, I believe they're provided quarterly.

12     Q.   Okay.  Thanks for that clarification.

13          Directing your attention -- I'm going to try to go

14   page down, see if it's quicker.  Looks like it is.  I want to

15   direct your attention to page 7 of this document.  Do you see

16   page 7?

17     A.   Yes.

18     Q.   Okay.  I want to direct your attention to the middle

19   part where it says "securities sold"?

20     A.   Yeah.

21     Q.   Do you see that figure?

22     A.   Yes.

23     Q.   And then where it says "withdrawals."  Do you see

24   that figure?

25     A.   Yes.

1  Q.   Okay.  Yesterday, I believe you told us, but now we

2  have a specific example, what would Mr. Vaccarelli have had

3  to do in order to have authority to sell securities in this

4  account?

5  A.   He would have to obtain approval from the authorized

6  party on the account to place the trade.

7  Q.   Okay.  And then after placing the trade, what

8  happens to the money from selling securities?

9  A.   Then it would -- it would settle.  Depending on

10  what's being sold, it would settle, then the funds would be

11  available for withdrawal if needed.

12  Q.   Okay.  So they can be sold and then held for -- you

13  know, in, like, a money market?

14  A.   Yeah, they would automatically go to a money market.

15  Q.   What is the second highlighted part, "Withdrawals,"

16  what does that indicate to you?

17  A.   That indicates that the client took money out of the

18  account.

19  Q.   Okay.  And directing your attention to the next

20  page, can you see -- is there a deduction where it says

21  "total cash debits this period"?

22  A.   Yes.

23  Q.   Okay.  And what is that?

24  A.   That would be what was taken out for, it looks like

25  $300,000.

1    Q.   Okay.  And directing you to page 9, the date of

2    1/13, it looks like it says fed -- the letters are squished

3    together, so maybe read them -- or I'll read them and you

4    tell me if that's what it says.  Appears to say "federal

5    funds sent," and then it has a USD down there.  But then it

6    says Liberty Bank, Liberty Bank, Liberty Bank, $300,000, U.S.

7    Dollars.  Do you see that?

8    A.   Yes.  Yes, I do.

9    Q.   And what does this indicate?

10   A.   That indicates that a fund wire was sent to the

11   client.

12   Q.   Okay.  And that's through the Federal Reserve?

13   A.   Yeah, that's directly through the system, yeah,

14   directly to the bank.

15   Q.   And which bank was it sent to?

16   A.   It states Liberty Bank.

17   Q.   Let me show you Government's Exhibit 804 in

18   evidence.  Is this an Investment Center document?

19   A.   Yes, it is.

20   Q.   Okay.  And what is this document, 804?

21   A.   This is a fed fund wire request form.

22   Q.   Okay.  And why don't you just take us through this

23   real quick.  It has the date; correct?

24   A.   Yes.

25   Q.   It has the account number?

1      A.   Yes.

2      Q.   Does that appear to be the same account number that

3   we looked at for the Truhan Living Trust?

4      A.   Yes, it does.

5      Q.   And it has an amount.  What is the amount?

6      A.   300,000.

7      Q.   It has the name of the bank?

8      A.   Yes.

9      Q.   Which is?

10      A.   Liberty Bank.

11      Q.   Okay.  And the person's name, and there's a

12   signature; correct?

13      A.   That is correct.

14      Q.   Focusing your attention down here, I guess it has

15   State of Connecticut?

16      A.   Yes.

17      Q.   And then there's a -- there's a notary stamp and a

18   name, and a person's name.  Is that required?  Why is there a

19   notary stamp?

20      A.   If you look above, under "amount to be wired," it is

21   required if over $25,000.

22      Q.   Oh, there you go.  "Note:  This form must be

23   notarized."

24           And what does that mean, somebody -- the notary

25   witnessed the signing?

1    A.   Yes, witnessed the signature and notarized the

2    document.

3    Q.   Okay.  And do you know why this appears to be shaded

4    and like --

5    A.   I think because when they do the seal --

6    Q.   Yep.

7    A.   -- you can't see it, so they just put a pencil over

8    it.

9    Q.   Okay.  And that's in case this document is faxed,

10   for instance?

11   A.   Yeah, it appears to be faxed.

12   Q.   Okay.  And that would be down here, the fax line?

13   A.   That's what it looks like, yes.

14   Q.   Okay.  And would that be faxed to your office in New

15   Jersey?

16   A.   Yes.

17   Q.   Okay.  And I think it's up here.  It has a number.

18   A.   Yes.

19   Q.   Bedminster, New Jersey?

20   A.   Yes.

21   Q.   And then going to the second page, it's a voided

22   check.  We've redacted part of the number, but what is the

23   purpose of the voided check?

24   A.   Just for verification purposes for -- to know where

25   the money is going.

```
1       Q.   And I'd like to direct your attention to the
2  approximate date -- or the date on this document, January
3  12th.  Do you see that?
4       A.   Yes.
5       Q.   Directing your attention to Government's 18 in
6  evidence.  You saw this document yesterday; correct?
7       A.   Yes, I did.
8       Q.   Okay.  And how would you describe this document?
9  What -- in your own words, what is this?  What does it appear
10 to be?
11      A.   It appears to be a copy from our document that we
12 have, our Direct Investment Management Form.
13      Q.   But it's not the actual one; correct?
14      A.   It's not the actual one, correct.
15      Q.   And we talked about this DIR-IN-MAN yesterday.
16      A.    Right.  It's that little barcode that was supposed
17 to be at the bottom, the DRI --
18           THE COURT:  You're going on New Jersey time.  Slow
19 down.
20           THE WITNESS:  Oh, sorry.  It says D-I-R-I-N-M-A-N,
21 it's like an abbreviation, and then it has the date of the
22 document, which is September of 2012.
23 BY MR. McGARRY:
24      Q.   That's the date of the -- the go by or the --
25      A.   Yeah, that was the date the document was created.
```

1    Q.   The actual document?

2    A.   Yes.

3    Q.   Fair enough.  Okay.  That's what I wanted to ask

4    you.

5    A.   Yes.

6    Q.   And just paging again through the document, we went

7    through it yesterday, but it has a lot of the same language

8    of your -- of the actual Investment Center document; is that

9    correct?

10   A.   Yes, that is correct.

11   Q.   Okay.  And what name is written there?

12   A.   Carmela Truhan.

13   Q.   Okay.  All right.  And let me show you what's been

14   marked as Government's Exhibit 18A, which I believe is in

15   evidence; if not, I'll offer it into evidence, but -- and we

16   talked about the commissions before.  Do you see that

17   document?

18   A.   I do, yes.

19   Q.   Okay.  And who's it made out to?

20   A.   Lux Financial.

21   Q.   Would there be a commission earned on a document --

22   on a check to Lux Financial?

23   A.   No, there would not.

24   Q.   Okay.  And explain why.

25   A.   Because that transaction did not come through the

1    firm, so there would be no commission paid.

2        Q.    Okay.  And, again, going back to Government's

3    Exhibit 18 -- I'm sorry, 18A -- which has a date.  Do you see

4    the date?  What's the date on that document?

5        A.    January 11th, 2017.

6        Q.    Okay.  And showing you Government's Exhibit 379 in

7    evidence, what's the title of this document?

8        A.    Annual Private Securities Transaction Attestation.

9        Q.    And what's the date of this document?

10       A.    January 19, 2017.

11       Q.    Okay.  Is that approximately eight days after the

12   check you just saw?

13       A.    That is correct.

14       Q.    Okay.  And who signed Government's Exhibit 379?

15       A.    Leon Vaccarelli.

16       Q.    And what is he attesting to and telling The

17   Investment Center on this document?

18       A.    Telling The Investment Center that he has not

19   engaged in any private securities transaction in the last

20   year.

21       Q.    And if you would, just read this portion that I'm

22   highlighting above the signature.

23       A.    Sure.  "By signing this statement, I attest to the

24   terms stated herein, and I am also indicating that I continue

25   to fully understand my responsibilities under the regulatory

1    rules cited herein.  I also attest that I have provided all

2    requested checking account information, business and/or

3    personal; that I have deposited any selling compensation I've

4    received from any securities-related transactions."

5        Q.   Did you ever receive any information on the $300,000

6    transaction from the Truhan family in January of '17?

7        A.   No, we did not.

8        Q.   I'm going to pull up -- moving to a slightly new

9    area, I just have a few more questions.  Let me show you

10   what's Government's Exhibit 612.

11           MR. McGARRY:  And I'd offer it in evidence.

12           MR. EINHORN:  No objection.

13           THE COURT:  Full exhibit.

14   BY MR. McGARRY:

15       Q.   Now, this does not say "Truhan" on it, but it says

16   Strobel; is that correct?

17       A.   Yeah.

18       Q.   To a Robert and Kathleen Strobel?

19       A.   Yes, that's correct.

20       Q.   Do you recognize this document and do you recognize

21   the signature?

22       A.   Yes.

23       Q.   What is this document?

24       A.   This document is informing the clients that Mr.

25   Vaccarelli has been terminated from The Investment Center.

1      Q.   Okay.  And did you send these to all of his clients,
2   if you remember?
3      A.   This went to all the clients, yes.
4      Q.   Not just the clients whose names we've heard today
5   or yesterday?
6      A.   No.
7      Q.   And who signed it?
8      A.   Doug Wright, who's our chief compliance officer.
9      Q.   And would each one reference their account number?
10     A.   Yes.  They're masked, but yes.
11     Q.   Kind of the same way that, for the Court, they've
12  been masked here in court?
13     A.   Exactly.  Correct.
14     Q.   Just for privacy purposes.
15     A.   Correct.
16     Q.   And identity issues.
17     A.   Correct.
18     Q.   Okay.  I just want to -- I'm not going to ask you to
19  read it.  I'll just put it up there for a second, and maybe
20  the jurors can read it themselves.  And just so they can
21  appreciate, has The Investment Center still been in contact
22  with Barry Michitsch?
23     A.   Yes, he is still a registered representative of our
24  firm.
25     Q.   Okay.  The last area that I want to get to is

1   dealing with -- we've talked about claims and people

2   requesting money from The Investment Center.  Has The

3   Investment Center also been sued by some people?

4       A.   Yes, there have been some lawsuits, from what I

5   understand.

6       Q.   Okay.  Without getting into too much detail and

7   whatever counsel has mentioned regarding any pending

8   lawsuits, can you generally tell us what The Investment

9   Center is doing and what they're not doing?

10      A.   From what I understand, The Investment Center has

11  been working very hard with the clients involved in this

12  situation, and some have been -- the claims have been

13  processed.  Some are still in the process.  And then there

14  are a few that were never Investment Center clients, so that

15  has been, you know, extremely problematic.

16      Q.   And you're working with an insurance policy;

17  correct?

18      A.   Yes, our insurance carrier; yes.

19      Q.   And when you say "problematic," is it if they're

20  never an Investment Center client, is it more difficult for

21  The Investment Center to call on its insurance to try to pay

22  them back?

23      A.   Yes, it is.

24      Q.   Okay.  When you are working with these people, do

25  you at all -- is The Investment Center, if you know and if

1    you're authorized to talk about it, is calculated interest --

2    like, for instance, if somebody's promised 4 percent or 8

3    percent by Mr. Vaccarelli, do they get that interest?

4        A.   I don't know the answer to that question.

5        Q.   Fair enough.  I won't push you on that.  Has The

6    Investment Center on these payments back to clients, have you

7    gotten any payments from Mr. Vaccarelli to cover any of the

8    payments to the client?

9        A.   Not that I'm aware of.

10       Q.   How about from Lux Financial?

11       A.   Not that I'm aware of.

12       Q.   How about from LWLVACC?

13       A.   No, not that I'm aware of.

14       Q.   Okay.

15            MR. McGARRY:  I have no more questions.  Thank you,

16   Your Honor.

17            THE COURT:  Thank you.  Cross-examination.

18                        CROSS-EXAMINATION

19   BY MR. EINHORN:

20       Q.   Good morning, Mr. Anuario.

21       A.   Good morning.  How are you doing?

22       Q.   Good.  How are you?

23       A.   Good.  Good.

24       Q.   My name is Jon Einhorn, and I represent Leon

25   Vaccarelli.  I'm going to ask you some questions about your

1    testimony here this morning -- or yesterday, actually, and

2    this morning.

3            Let's see.  You told us that the relationship

4    between The Investment Center and Mr. Vaccarelli was a

5    contract relationship; right?

6        A.    That is correct.

7        Q.    All right.  And, in fact, I brought up on the screen

8    Exhibit 350.  And would you read us -- I've highlighted it in

9    yellow.  Just read us the title of this document.

10       A.    Yes.  "Registered representative agreement between

11   The Investment Center, Inc., and Leon Vaccarelli, hereinafter

12   referred to as 'the contractor.'".

13       Q.    Is this -- this is sort of a standard form you use

14   for your contractors?

15       A.    That is correct, yes.

16       Q.    All right.  Okay.  So, this is a contract.  This is

17   a written agreement.  And I'm not going to go through all the

18   terms of it.  You've testified here yesterday afternoon and I

19   think somewhat this morning that Mr. Vaccarelli breached some

20   of the terms of this written agreement; is that so?

21       A.    Yes, that is correct.

22       Q.    All right.  That was your testimony.  And the remedy

23   for this breach is, first of all, that Mr. Vaccarelli can be

24   terminated; right?

25       A.    Yes.

1    Q.   And, also, you could sue him for the breach?

2    A.   From what I understand.  I'm not -- I don't know the

3  answer to that.

4    Q.   Okay, fine.  So you're not sure about suing him.

5  And, in fact, let me ask you that question, since I raised

6  it:  Has The Investment Center sued Mr. Vaccarelli civilly

7  yet?

8    A.   Not to my knowledge.

9    Q.   Not to your knowledge, okay.  Has he been

10  terminated?

11   A.   Yes.

12   Q.   Okay.  When was he terminated?

13   A.   I believe it was sometime in 2017.

14   Q.   Okay.  We just saw a termination letter sent to

15  clients.

16   A.   Yes.

17   Q.   I think I got the right one.  Here it is.

18   A.   Yes.

19   Q.   So, Exhibit 612 is a sample termination letter sent

20  to clients.  And what's the date on this letter?

21   A.   The date is July 24, 2017.

22   Q.   Okay.  Do you know if Mr. Vaccarelli was terminated

23  on or about that time?

24   A.   Yes, that's what it sounds like, yes.

25   Q.   Was he sent a letter?

1    A.   As far as I know, yes.

2    Q.   Where is that letter?

3    A.   I don't know.  I don't have that.

4    Q.   Did you bring it with you?

5    A.   I did not bring it with me.

6    Q.   Did you turn it over to the Government in all the

7    meetings you had with the Government?

8    A.   I'm not sure, to be honest with you.

9    Q.   All of the files of the Investment Center, as

10   pertains to Leon Vaccarelli, are available to you; isn't that

11   so?

12   A.   Yes.

13   Q.   Okay.  And weren't you asked to turn over those

14   files to the Government?

15   A.   Yes.

16   Q.   And you're not certain if you turned over the

17   termination letter or not?

18   A.   I mean, based on the contract -- contractor's

19   agreement, we are able to terminate at any time.

20   Q.   I understand.  I'm just -- you said that it was

21   probably in writing.

22   A.   Yeah.

23   Q.   And I'm asking you to see the writing.

24   A.   I don't have that handy, but I'm pretty sure we did

25   send that, because we send the U5 document to Mr. Vaccarelli,

1    as well.

2        Q.   All right.  Let me, first of all, ask you:  You said

3    earlier that he was terminated in or about July of 2017;

4    right?

5        A.   Yes, correct.

6        Q.   Okay.  You're aware that he went into detox,

7    inpatient treatment, on July 10th, 2017?

8        A.   I was aware, yes.

9        Q.   Okay.  Was the termination letter sent while he was

10   in detox?

11       A.   That, I don't know what date it was sent.  I don't

12   have that.

13       Q.   It was around that time, though.

14       A.   Most likely around that time, yes.

15       Q.   Okay.  Do you recall getting any correspondence from

16   his then legal counsel pertaining to his termination?

17       A.   I'm not sure.  I don't deal with that aspect of it.

18   I don't know if any correspondence has been sent back and

19   forth.

20       Q.   That'd would be in the file, too, though?

21       A.   That should be.

22       Q.   If it exists, of course.

23            Okay.  Now, again, just going back to your

24   testimony.  You said that he had breached -- Leon had

25   breached the contract in several ways; right?

1    A.   Yes.

2    Q.   And one of the ways I think you talked about had to

3  do with the use of these private placement agreements that he

4  was doing?

5    A.   Yes, the private securities transaction.

6    Q.   Private securities transaction, Okay.  When did it

7  first come to light to The Investment Center that he was

8  doing that sort of thing?

9    A.   When the SEC showed up at his office.

10    Q.   And didn't there come a time early on -- earlier on,

11  when, in fact, you learned of a check?  Wasn't there a young

12  lady named Pedersen that worked for you?

13    A.   Terri Pederson, yes.

14    Q.   And didn't there come a time, as a matter of fact

15  with a Michael Brough check, where you learned that, in fact,

16  there was a check, and Tori Pedersen (phonetic) -- I'm

17  looking at Exhibit 304, Your Honor -- Tori Peterson wrote to

18  Mr. Michitsch and Mr. Vaccarelli and said, Hey, what's the

19  deal with this check?  Right?

20    A.   Yes.

21    Q.   Okay.  So what's the date on that?  Can you read it

22  for us?  It's small, I know.

23    A.   It looks like March 29, 2016, maybe.

24    Q.   Okay.  That's before he was terminated; right?

25    A.   Yes.

1    Q.    Probably over a year before he was terminated?

2    A.    Yes.

3    Q.    Why wasn't he terminated immediately on finding that

4    apparently there was a check that went to the firm and not to

5    The Investment Center?

6    A.    I don't know the answer to that.  That was -- we

7    informed the client of the incorrect payable.  That's what I

8    know.

9    Q.    But you didn't terminate him?

10   A.    We did not terminate him.

11   Q.    Was there any disciplinary action taken?

12   A.    Not that I'm aware of.

13   Q.    Now, one of the things that you told us that happens

14   with regard to The Investment Center and a representative

15   such as Mr. Vaccarelli, is they file these annual compliance

16   questionnaires; right?

17   A.    Yes, that is correct.

18   Q.    Okay.  I'm going to show you the first one, at least

19   that we were seeing.  And it's Exhibit 352, and it's the

20   annual compliance questionnaire 2010-2011; am I right?

21   A.    That is correct, yes.

22   Q.    Okay.  I'm showing to you on the screen -- I'm going

23   to scroll all the way down to the very last page, assuming it

24   catches up with me.  It'll get there.  But you would agree

25   with me there's a summary, isn't there, the very last page of

1    this form?

2        A.   Summary of findings, I believe.

3        Q.   Yes, sir.  We're getting there.  All right.  I've

4    just scrolled down to last page.

5            MR. EINHORN:  Looks like page 13 of 13 on this

6    exhibit, Your Honor.

7    BY MR. EINHORN:

8        Q.   And, again, this is 2010-2011.

9            The first finding here -- if you agree with me,

10   sir -- is that the registered representative engaged in

11   outside business.  Okay?  That was the first thing?

12       A.   Yes, I see that.

13       Q.   All right.  The second finding is that he hasn't

14   submitted copies of customer correspondence for approval and

15   so forth; right?

16       A.   That is correct.

17       Q.   Was he disciplined because of those failures?

18       A.   Not that I'm aware of, no.

19       Q.   All right.  What happened with regard to those two

20   failures; are you aware?

21       A.   I am not aware of what happened on those.

22       Q.   This is what you do, though.  You're a compliance

23   officer; right?

24       A.   I am, yes; you are correct.

25       Q.   Okay.  So that's for the year 2010-2011.  He wasn't

1  terminated, I assume, which is obvious.

2      A.   Before he came on board.  He came on board 2011,

3  yes.

4      Q.   And let's look at the next years.

5      A.   Sure.

6      Q.   So, the next year, which is Exhibit 353, in

7  2011-2012, if again we skip to the back, we're going to find

8  a summary; aren't we?

9      A.   Yes, I see that.

10     Q.   Okay.  And this one -- if you agree with me, sir,

11 and it looks like it's page 13 of 13 on Exhibit 353 -- first

12 of all, there's the same finding about outside business

13 activities; right?

14     A.   Yes, I see that.

15     Q.   And the same finding about he hasn't submitted

16 copies of customer correspondence for approval; right?

17     A.   Yes, I see that.

18     Q.   And was anything done to Mr. Vaccarelli because of

19 those failures?

20     A.   I'm assuming there was a followup done.  They might

21 be in the actual document itself.  That could be possible.

22     Q.   Inside the document itself?

23     A.   Could be possible.

24     Q.   Would you like to look at it?

25     A.   This is an older document, so this is an older

1   vendor that we utilized.

2        Q.   Okay.  And would you like an opportunity to look at

3   the document to see if, in fact, there was compliance done on

4   those?

5        A.   Sure.

6        Q.   Sure.

7             MR. EINHORN:  May I have just a moment, Your

8   Honor?

9             THE COURT:  Sure.

10            (Pause.)

11   BY MR. EINHORN:

12       Q.   All right.  I'm going to skip back, since -- would

13   you like the same opportunity on 352, also?

14       A.   Yeah, it should be a very similar document.

15       Q.   Sure.

16       A.   Thank you.

17       Q.   All right.  I'm showing you, sir --

18            MR. EINHORN:  May I approach the witness, Your

19   Honor?

20            THE COURT:  You may.

21   BY MR. EINHORN:

22       Q.   I'm giving you a copy of 352.

23       A.   Sure.

24       Q.   It's marked.  And I'm going to show you -- first I'm

25   going to show you the last page.  I know you're more familiar

1    with it than me, but the last page is the finding summary?

2        A.   Yes, I see.

3        Q.   And this is the questionnaire itself?

4        A.   Yes.

5        Q.   Would you scan it and see if there's any answer to

6    our queries about responses to those two failures?

7        A.   Sure.  So if you look at -- if you look at page, I

8    think it's page 1 of 13, it does show as a finding, but it

9    does show what Mr. Vaccarelli did not submit as an outside

10   business and then actually did upon this completion.

11            Same as 2.1, where it shows the outside customer

12   correspondence.  He did write that, you know, e-mails

13   monitored, which we did monitor his e-mail, and also that he

14   was -- he does some basic client communications, like

15   appointment confirmations, et cetera.  That was documented in

16   the form.  Appears to be okay.

17       Q.   When you say it appears to be okay, does that mean

18   it was -- both issues were laid to rest?

19       A.   Both issues were laid to rest and resolved, looks

20   like.

21            MR. EINHORN:  All right.  May I show the witness

22   another document?

23            THE COURT:  Yes.

24   BY MR. EINHORN:

25       Q.   I'm going to show you the next year.

1    A.    Sure.

2    Q.    Take that one back.

3    A.    Sure.

4    Q.    The next is Exhibit 353 and it's for 2011-2012, and

5    I'll ask you to do the same thing.

6    A.    Sure.  So, same thing on the outside business

7    question.  He did reference the Archdiocese of Hartford,

8    which was resolved, as well as in the 2.1, it does say

9    that -- where it asks for an explanation, he says there isn't

10   any outstanding customer correspondence.  So those both would

11   have been laid to rest.

12   Q.    So for those two years in question, there were, in

13   fact -- I want to say the same or at least similar complaints

14   about Mr. Vaccarelli two years in a row; right?

15   A.    It appears to be, yes.

16   Q.    All right.  And no discipline was taken?

17   A.    Not that I'm aware of.

18   Q.    No termination?

19   A.    No termination.

20   Q.    And one of the other things you said to us earlier

21   had to do with discretionary accounts by a registered rep;

22   right?

23   A.    Yes.

24   Q.    You said they're prohibited?

25   A.    Yes.

1      Q.   All right.  I'm going to show you -- I know it's
2   a different form.  Obviously you went to a different vendor,
3   you said?
4      A.   Yeah.
5      Q.   But in 356A -- and I'm going to give you a copy
6   again to look at -- wasn't he given authority to do
7   discretionary accounts?
8      A.   No authority.  The only authority that's granted is
9   on the advisory side, like I previously stated.
10      Q.   All right.  I'm going to show you 356A.
11      A.   Sure.
12           MR. EINHORN:  May I, Your Honor?
13           THE COURT:  You may.
14   BY MR. EINHORN:
15      Q.   And I'm going to -- just to save time, I'm going to
16   point to within that document Section 1.26.
17      A.   Yes, I see that.
18      Q.   Okay.  And does that deal with discretion?
19      A.   Yes, and that's time and price discretion, which is
20   related to the trade --
21           THE COURT:  I'm sorry.  That's what?
22           THE WITNESS:  Oh, I'm sorry.  It's called FINRA rule
23   related to time and price discretion.  That is authorized on
24   the trading day.  You're able to do that, as long as a client
25   gives you that authorization, you could decide whether or not

```
 1    to buy or if the time is right during that trading day.  That

 2    is permitted.

 3    BY MR. EINHORN:

 4        Q.   And as a matter of fact, looking down on that

 5    particular number, it indicates it was approved, that he

 6    could do that sort of work?

 7        A.   Time and price discretion is approved; yes.

 8        Q.   Thank you.  Now, there came a time when you told us

 9    about what's marked as Government's Exhibit 351, and you

10    noted that Mr. Vaccarelli had essentially copied your form

11        A.   Yes.

12        Q.   Okay.  And used -- I don't want to say much of it.

13    It's apparently almost all of it; right?  Is that fair to

14    say?

15        A.   That's fair to say, yes.

16        Q.   Okay.  He didn't use the barcode?

17        A.   Correct.

18        Q.   And I think there was something else at the end?

19        A.   Changed the name at the top.

20        Q.   Changed the name at the top; right?

21        A.   His name.

22        Q.   All right.  But he used your form?

23        A.   Yes.

24        Q.   Or at least the form of your company?

25        A.   Yes.
```

1    Q.   All right.  Is that form copyrighted in any way?

2    A.   No, it's not copyrighted.

3    Q.   So, the fact that he used that form, is it

4    prohibited in some way?

5    A.   It's not prohibited to use the form.

6    Q.   Okay.  He just -- he took the form and he decided to

7    use it himself; right?

8    A.   Yes.

9    Q.   I got lawyers who steal my briefs all the time.  Not

10   prohibited.

11   A.   No, I'm not --

12   Q.   Okay.  Now, the 1099s.  The Government talked to you

13   about 1099s that were issued for Mr. Vaccarelli's

14   compensation.

15        MR. EINHORN:  I'll bring it up, Your Honor.  363 --

16        THE WITNESS:  Yes, I see it.

17        MR. EINHORN:  -- is the first one.

18        And 363 is for the year 2013.  Just tell the ladies

19   and gentlemen of the jury the name of the person to whom this

20   particular 1099 is issued?

21        THE WITNESS:  Leon Vaccarelli.

22   BY MR. EINHORN:

23   Q.   In fact, all the 1099s we saw this morning were

24   issued just to Leon?

25   A.   That is correct.

1      Q.    Who else works as a registered rep with Lux

2   Financial Services -- or worked in those days?

3      A.    Barry Michitsch and *Ckbreigh Sedano, I believe were

4   the other registered reps.

5      Q.    So, there were three people; right?

6      A.    Yes, that is correct.

7      Q.    And is it fair to say that both Barry Michitsch and

8   Breigh Sedano also would have gotten 1099s?

9      A.    That's fair to say, sure.

10     Q.    Okay.  So in order to get an accurate picture of the

11  total that was issued to the firm in commissions in any one

12  year, you'd really need to add all three of them; wouldn't

13  you?

14     A.    I mean, for the branch.

15     Q.    For the branch.  Sorry.  Of course.

16     A.    Sure.

17     Q.    Okay.  Yeah.  I mean, you're only getting a partial

18  picture when you look at what's going on with regard to

19  commission for Leon; right?

20     A.    Sure.  Yes.  Yes.  I'm sorry.

21     Q.    We do that.  It's not meant to be rude.  I'm sorry.

22            So, in fairness then, for example, the 353 is about

23  $215,000 -- it is, 215,000 and change, and then you testified

24  that 366 goes down to -- for 2016, a few years later, goes

25  down to $117,000?

1      A.   Yes, I see that.  Yes.

2      Q.   All right.  But you don't know the reason for the

3  decrease; do you?

4      A.   No, I do not.

5      Q.   You do know that around that time Leon's mother was

6  sick and dying; right?  You're familiar with that; right?

7      A.   I am not familiar with that, no.

8      Q.   You're not familiar how sick she was?

9      A.   I am not.

10      Q.   You're not familiar with the fact that *CKBrie and

11  Barry were taking on a larger workload at the brokerage?

12      A.   I'm not aware of that, but I'm sure they would

13  have.

14      Q.   Sure.  Okay.  All right.  And the Government asked

15  you about claims that were made by various customers.

16      A.   Yes.

17      Q.   And I think your testimony was -- correct me if I'm

18  wrong -- some have been paid, some were in process, and

19  there's a couple that are contested for certain issues;

20  right?

21      A.   Yes.

22      Q.   Those three categories?

23      A.   Yes.

24      Q.   Okay.  But this is an issue that's being addressed

25  even as we speak, I assume, by The Investment Center?

1    A.    Yes.

2    Q.    Civil compensation.  Civil compensation -- or

3  reimbursement is a fairer way to put it -- to these

4  customers, these clients; right?

5    A.    I mean, I'm not -- I'm not sure about the civil

6  aspect of it.  I don't deal with that, so I'm just going by,

7  you know --

8    Q.    Sure.  Well, you're -- okay.  I won't confuse

9  things.

10    A.    Yeah.

11    Q.    It's compensation from either The Investment Center

12  or its insurance carrier to these people?

13    A.    Insurance carrier, yes.

14    Q.    Sure.  Okay.

15          And the termination letter -- just one last thing.

16  I'm trying to pick your memory on this because we don't have

17  it in front of us here.  What was the reason given for his

18  termination?  And let me ask you before you answer, wasn't

19  the reason lack of contact with clients?

20    A.    I'm not -- the reason is documented on public record

21  on FINRA's brokerage site.

22    Q.    Sure.  And wasn't that the reason, lack of contact

23  with clients?

24    A.    That doesn't sound familiar with me.  I don't know

25  the reason, but it's perfectly viewable right on FINRA's

```
 1   website.  On a broker check website, it'll say what the
 2   reason was, I believe.
 3        Q.   Because he was in detox at the time you sent the --
 4        A.   Okay.
 5        Q.   -- termination?
 6        A.   Understood.
 7        Q.   Okay.
 8             MR. EINHORN:  May I have just a moment, Your Honor,
 9   please?
10             THE COURT:  Yes.
11             (Pause.)
12   BY MR. EINHORN:
13        Q.   Just one other thing in terms of the total
14   compensation disclosures that were made either in 1099s or in
15   the prior exhibits.
16        A.   Sure.
17        Q.   If there were annuities that were given to
18   clients -- sold to clients, rather.
19        A.   Yes.
20        Q.   Would they be shown in the compensation -- in the
21   commission section?
22        A.   Variable annuities would be.  There could be, you
23   know, other insurance-related products if there was an
24   approved OBA on file -- outside business activity -- on file.
25   That may not show in there if they were doing it as an
```

```
 1   outside business.
 2       Q.   Okay.  You beat me to the punch.  That's what I was
 3   going to ask you.  So, insurance-related products?
 4       A.   Possibly wouldn't be on there.
 5       Q.   Would possibly not be shown on there.
 6       A.   Variable would be.
 7       Q.   Okay.  Variable annuities would be, but other
 8   insurance products wouldn't?
 9       A.   Typically not, unless it came through us, our
10   firm.
11       Q.   And when you say "came through us," it was allowable
12   for a broker -- a rep, I'm sorry -- to sell insurance
13   products?
14       A.   Allowable to sell fixed insurance products as long
15   as it's prior approved by our compliance department.
16       Q.   Sure.  Okay.
17            MR. EINHORN:  I have nothing else at this time, Your
18   Honor.  Thank you.
19            THE COURT:  Redirect.
20            MR. McGARRY:  Yes, Your Honor.
21                        REDIRECT EXAMINATION
22   BY MR. McGARRY:
23       Q.   Just picking up on the last question, do you know
24   one way or the other whether or not Mr. Vaccarelli had a
25   volume of insurance products that he got approval from the
```

1    company to sell?

2         A.   I don't know, no.

3         Q.   Okay.  And the 1099s that are reported to the IRS,

4    that would include all compensation -- not salary, but all,

5    in essence, salary that he got from The Investment Center,

6    regardless of the type of investment product; correct?

7         A.   That's correct.

8         Q.   Okay.  You mentioned early on and during the

9    cross-examination that the -- when the date that the SEC

10   showed up at the office?

11        A.   Yes.

12        Q.   Do you know that date?

13        A.   I believe it was in June of 2017, but I'm not a

14   hundred percent sure.

15        Q.   You don't know the exact date.

16        A.   I don't know the exact date.

17        Q.   Fair enough.

18        A.   With the State of Connecticut, from what I

19   understand.

20        Q.   And tell the jury what you mean by that.

21        A.   The State of Connecticut and the SEC both showed up

22   at Mr. Vaccarelli's office.

23        Q.   Would that be the regulators from -- not the entire

24   state?

25        A.   No, no.

1    Q.   I know we're a small state, but --

2    A.   No, I believe there were regulators involved, yes.

3    Q.   Okay.  You were were asked a couple of questions

4    about complaints and following up and how some matters were

5    laid to rest.  Do you remember those questions?

6    A.   Yes.

7    Q.   Can the compliance department follow up on a

8    complaint if the customer doesn't make a complaint?

9    A.   No, we cannot.

10    Q.   So if the customer doesn't know something, can they

11    complain to you?

12    A.   I mean, a customer can always complain to us.

13    Q.   Right.

14    A.   But if we don't know about it, there's not much we

15    can do.

16    Q.   If you don't know about the issue, you can't follow

17    up on it?

18    A.   That's correct.

19    Q.   Okay.  Can the compliance office approve an outside

20    business if you don't know about it?

21    A.   No, we cannot.

22    Q.   Is that why there's supposed to -- the registered

23    representatives like Mr. Vaccarelli are supposed to tell

24    you?

25    A.   That is correct, yes.

1      Q.   Also, you were asked some questions about civil

2   matters.

3           Okay.   Directing your attention to Government's

4   Exhibit 369, was Mr. Vaccarelli made aware that his conduct,

5   depending on what it was, could result in criminal charges?

6      A.   Yes, he was.

7      Q.   And he was made aware of that through the registered

8   representative manual?

9      A.   Correct, yes.

10     Q.   And was that also part of the training?

11     A.   Yes, that's -- that is part of the training, yes.

12          MR. McGARRY:   I have no further questions, Your

13   Honor.

14          MR. EINHORN:   May I just ask two brief followups on

15   that, Your Honor?

16          THE COURT:   Yes.

17                    RECROSS-EXAMINATION

18   BY MR. EINHORN:

19     Q.   Just two things, and then we'll let you go back to

20   the Garden State, Mr. Anuario.

21     A.   Thank you.

22     Q.   First of all, you were just asked if, in fact, Mr.

23   Vaccarelli would have been given notice that there was a

24   possibility of criminal charges for noncompliance with some

25   of your rules; right?

1      A.   Yes.

2      Q.   But that's not your job.  You don't do criminal --

3   The Investment Center doesn't bring criminal charges; do

4   they?

5      A.   No, we do not.

6      Q.   You just have a civil contract.  You have a contract

7   with Mr. Vaccarelli; right?

8      A.   We have a contract, yes.

9      Q.   And you told us earlier, a breach of that contract

10   results in termination?

11      A.   Yes.

12      Q.   Which happened?

13      A.   Yes.

14      Q.   Okay.  Second question:  You were also asked about

15   Mr. Vaccarelli's authority to sell insurance, but, in fact,

16   he disclosed that in his other business --

17      A.   Yeah.

18      Q.   -- form; didn't he?  I'm going to show you Exhibit

19   378, which appears to be for the year 2016.  And in there

20   doesn't it state, in addition, as of March, 2012 Lux

21   Financial now does medical, life and travel insurance?

22      A.   Yeah, I see that, yes.

23      Q.   Okay.  Thank you.

24           MR. EINHORN:  Nothing further, Your Honor.

25           THE COURT:  Anything further?

```
1            MR. McGARRY:  One question, Your Honor.  And I know

2    you'll keep me to it.

3                        FURTHER REDIRECT

4    BY MR. McGARRY:

5        Q.   Did Mr. Vaccarelli disclose LWLVACC, LLC?

6            MR. EINHORN:  Well, that's outside of the scope of

7    my --

8        Q.   -- in Government's Exhibit 378 that Mr. Einhorn just

9    showed you?

10            MR. EINHORN:  It's outside of the scope of my

11    examination.  It's outside of the scope of the Government's

12    examination.

13            THE COURT:  I'm going to sustain the objection.

14            MR. EINHORN:  Thank you, Your Honor.

15            THE COURT:  Any further questions?

16            MR. McGARRY:  Nope, no more questions.

17            THE COURT:  All right, sir.  You are finished.

18    Thank you very much.

19            THE WITNESS:  Thank you.

20            THE COURT:  You may now head for Hackensack, and

21    thank you.

22            THE WITNESS:  Thank you, Your Honor.

23            THE COURT:  You're excused.

24            (Witness excused, 10:51 a.m.)

25            THE COURT:  All right.  I'm thinking we'll take a
```

1    morning break before we start with the next witness.  So

2    let's take 15 minutes, and then we'll return.

3              (Jury out, 10:51 a.m.)

4              THE COURT:  Who will be your next witness,

5    Mr. McGarry or Ms. Laraia?

6              MR. McGARRY:  I'd ask Ms. Laraia to answer that.

7              MR. LARAIA:  Your Honor, it's Kimberly Lebron.

8              THE COURT:  All right.  Let's take our break and

9    then we will have Ms. Lebron.

10             MR. EINHORN:  May I just raise one quick thing, Your

11   Honor.  Last night at 8:25, the Government gave notice that

12   they would be calling Lyn Burton today, but she doesn't

13   appear on the notice on Tuesday and that's the first I'd had

14   that she would appear today, and that's really too short to

15   prepare for her.  Even if I was in town last night, it

16   wouldn't matter.  I still wouldn't be able to prepare.  I

17   would ask that she not go on today for lack of notice.

18             MR. McGARRY:  I don't think there was lack of

19   notice.  For Tuesday, we provided the Wednesday witnesses and

20   then last night we provided the witnesses for today.  And

21   because Mr. Anuario had been held over, I think one of the

22   witnesses we had to move to next week.  But I think we gave

23   notice, as we've been trying to do, the day before.

24             MR. EINHORN:  Here it is.  I have the notice it

25   doesn't include --

1          THE COURT:  Mr. Einhorn says that this was last

2     night.

3          MR. McGARRY:  Correct.  Correct.

4          THE COURT:  For today.

5          MR. McGARRY:  I don't disagree with him.  I believe

6     that we have been giving him the witnesses for the whole, you

7     know, the week, and then we just kind of moved the ones that

8     were in between to Monday since Mr. Anuario got held over and

9     that she was always scheduled to come today.  So we didn't

10    think that it was any surprise to him, and we were just

11    giving him both the exhibits for today and the people for

12    today, as we've been trying to do throughout the trial to

13    make it go quicker.

14         THE COURT:  So if she's called later this afternoon,

15    can you use the lunch period to prepare for her?

16         THE DEFENDANT:  No.

17         MR. EINHORN:  I don't see how.  I have a box of

18    materials on her back at my office, and I'd have to go

19    through that box and see --

20         THE COURT:  Do you have someone you can substitute?

21         MR. McGARRY:  I mean, the other person who goes

22    with -- she's the woman of the trust of -- Lynn Burton, of

23    the Sheila Burton Trust.  We do have the trustee, and they

24    kind of go together.  We could put the trustee on and try to

25    cover most of that ground, and then have her come later.  But

1    we kind of didn't expect her to be a lengthy witness.

2    Perhaps Mr. Einhorn had expected a lengthy cross, which of

3    course is his prerogative, but we wanted to put her up and

4    then the trustee.

5            THE COURT:  If we put the trustee, and then we get

6    to Lynn Burton Monday.

7            MR. McGARRY:  She has a probate hearing on Monday,

8    so it might have to be as late as Tuesday, I guess.  We're

9    shooting for the last day on Tuesday.

10           THE COURT:  All right.  So the trustee is named who?

11           MR. McGARRY:  Stephen Essex.  I mean, we can give

12   Mr. Einhorn, you know, the remainder of the witnesses.  We

13   gave him all the witnesses, and it's almost -- it kind of

14   answers its own --

15           THE COURT:  But the problem is to focus on who is

16   going to be on what day or within what two days.

17           MR. McGARRY:  Sure.

18           THE COURT:  And that means that opposing counsel can

19   then just prepare for those witnesses and not have to do

20   preparation for everyone and then re-prep.

21           MR. McGARRY:  And we thought that it was clear, and

22   if it wasn't, I apologize to the Court, I apologize to

23   Mr. Einhorn.  It was -- you know, we thought we were, you

24   know, by sending the exhibits and the people the night

25   before, we thought that it was clear who was coming.

1          THE COURT:  It is, but it's late.  That's the

2     problem.

3          MR. McGARRY:  And, again, I thought it was clear

4     earlier than last night.  I thought last night was a

5     reiteration of what we'd already discussed earlier in the

6     trial.  And if it wasn't, we'll re-double our efforts to give

7     him, you know, as much lead time as we know.  But as the

8     Court well knows, people's schedules get juggled and we have

9     to make moves on the fly.

10          THE COURT:  Sure.  Okay.  Let's be in recess for

11     about seven more minutes.

12          (Recess taken, 10:56 a.m.)

13          (Out of the presence of the Jury, 11:13 a.m.)

14          THE COURT:  All right.  Please be seated.  Ms.

15     Laraia, are you getting Ms. Lebron?

16          MR. LARAIA:  Yes, Your Honor.  And Mr. McGarry just

17     -- oh, he's right back.  We're just trying to deal with our

18     witness who will be coming back next week.

19          MR. McGARRY:  Your Honor, I was just checking with

20     Ms. Burton and her attorney.  So the Court has decided

21     they're not going to testify today?

22          THE COURT:  Well, this is the problem.  While I

23     recognize that Mr. Einhorn wasn't home last night anyhow, but

24     if it's a big witness and he didn't know that she was coming

25     on today, that defeats the problem of notifying who precisely

1    is going to be called within 48 hours.

2              MR. McGARRY:  Yes.

3              THE COURT:  And if that is what the problem is, then

4    I think it's only fair to do that.  If Mr. Einhorn can at

5    least -- well, let's see what you can do over lunch.  I think

6    they can't.  I think that they need to come back.

7              MR. McGARRY:  Okay.  So, that's fine.  I just want

8    to -- if I can have a minute to tell her and her lawyer, and

9    I think it's going to be Tuesday, which it is what it is.

10             THE COURT:  And you all think that the Government

11   will finish its evidence on Tuesday?

12             MR. McGARRY:  That's our current schedule.  If

13   there's a box of cross-examination -- again, Mr. Einhorn has

14   been very strategic and efficient with his cross-examination.

15   If Ms. Burton is a longer one, it might roll over to

16   Wednesday.  But we think -- I think we're trying to eliminate

17   witnesses.  And yes, Tuesday end of day, or, depending on Mr.

18   Almodovar, at the latest Wednesday, which I think would give

19   Mr. Einhorn plenty of time.

20             I think we talked on the phone without the Court,

21   that, you know, he was hoping that we could finish within six

22   trial days, and I think Tuesday/Wednesday would be --

23             THE COURT:  Well, we're good -- in terms of the

24   jury's expectations, we're in fine shape.  At some point I

25   need to speak directly to Mr. Vaccarelli about his right to

```
 1   testify or not testify.  I think I won't do that right now.
 2   All right.
 3            MR. McGARRY:  So with the Court's permission, I'll
 4   step outside --
 5            THE COURT:  Yes.
 6            MR. McGARRY:  -- and tell them that they should plan
 7   on coming Monday afternoon if they can.  I know she has a
 8   probate matter that day; so, most likely Tuesday.
 9            THE COURT:  That's fine.  Thank you.
10            MR. EINHORN:  Thank you, Your Honor.
11            MR. LARAIA:  Your Honor, should I have the witness
12   step up?
13            THE COURT:  Yes, why don't you do that, and why
14   don't we bring the jury in.
15            (Witness takes stand, 11:16 a.m.)
16            (Jury in, 11:17 a.m.)
17            THE COURT:  All right.  Please be seated.
18            Ms. Laraia, please introduce your witness.
19            MR. LARAIA:  Yes, Your Honor.  The Government calls
20   Kimberly LeBron.
21            THE COURT:  Ms. Lebron, if you'll raise your right
22   hand, the oath will be administered to you.
23            (KIMBERLY LEBRON sworn, 11:18 a.m.)
24            COURTROOM DEPUTY:  Please be seated.  State your
25   name for the record.
```

```
 1            THE WITNESS:  My name is Kimberly Lebron.

 2            COURTROOM DEPUTY:  Can you spell your last name?

 3            THE WITNESS:  L-E-B-R-O-N.

 4            COURTROOM DEPUTY:  And can you tell us what city and

 5   state you live in?

 6            THE WITNESS:  I'm located at 203 Main Street in

 7   Thomaston, Connecticut.

 8            THE COURT:  You may proceed.

 9                       DIRECT EXAMINATION

10   BY MR. LARAIA:

11     Q.   Is the address that you just gave us, is that the

12   business address?

13     A.   That's the business address.

14     Q.   And that's in Thomaston?

15     A.   Correct.

16     Q.   What do you do for work?

17     A.   I am the senior vice president/chief credit officer

18   for Thomaston Savings Bank.

19            THE COURT:  The microphone is that bar in front of

20   you.  If you could speak into it and speak a little bit

21   louder.

22            THE WITNESS:  Okay.

23            THE COURT:  Thank you.

24            THE WITNESS:  I'm the senior vice president/chief

25   credit officer for Thomaston Savings Bank.
```

1    BY MS. LARAIA:

2        Q.    Now, what kind of bank is Thomaston Savings Bank?

3        A.    It's a $1,000,000,000 mutual savings bank.

4        Q.    Does it have multiple branches?

5        A.    Yes, it does.

6        Q.    And do you know how many?

7        A.    Fifteen.

8        Q.    Are they all in Connecticut?

9        A.    Yes.

10       Q.    Is your bank FDIC-insured?

11       A.    Yes, it is.

12       Q.    When did you start working at Thomaston Savings

13   Bank?

14       A.    January of 2003.

15       Q.    Before that, had you worked in any other financial

16   institutions?

17       A.    Yes.

18       Q.    And where were those?

19       A.    I worked for Savings Bank of Danbury in Connecticut.

20   I also worked for Fleet Bank and Shawmut Connecticut National

21   Bank, all in the state of Connecticut.

22       Q.    And how about before that; did you do any other type

23   of work?

24       A.    I was in the U.S. Army.

25       Q.    And what did you do for the U.S. army?

1    A.   I was a paralegal, battalion level.

2    Q.   Now, as a senior vice president and chief credit

3 officer for Thomaston Savings Bank, what does your job

4 involve?

5    A.   Basically, I oversee all of the back office lending

6 areas.  So, credit underwriting, credit administration, loan

7 closing, collections, servicing.

8    Q.   And do you supervise any other people?

9    A.   I have five direct reports.

10    Q.   Okay.  Do those people include people involved in

11 lending?

12    A.   All involved in lending, yes.

13    Q.   Now, does Thomaston Savings Bank offer both

14 residential and commercial mortgages?

15    A.   Yes, we do.

16    Q.   And this is a really basic question, but what is a

17 mortgage?

18    A.   A mortgage is a lien on your property that a bank

19 will take when it lends money to an individual.

20    Q.   Okay.  And can people get a mortgage if they're

21 buying a home?

22    A.   Correct.

23    Q.   And how about if you're buying a piece of land and

24 building a home?

25    A.   Correct.

1      Q.   And what is your role with respect to both

2  residential and commercial mortgages?

3      A.   Again, I oversee every aspect -- currently, I

4  oversee every aspect of when they're underwritten, when they

5  closed, and then after -- the servicing of them after they've

6  been closed.

7      Q.   Okay.  So, from the point of application through an

8  approval process and through collecting payments?

9      A.   Correct.

10      Q.   Now, at some point did the Thomaston Savings Bank

11  approve a residential mortgage for Mr. Vaccarelli?

12      A.   Yes.

13      Q.   And do you remember if it was for Mr. Vaccarelli

14  himself or with anyone else?

15      A.   It was with his wife Monica.

16      Q.   And have you had a chance to review records from

17  Thomaston Savings Bank in connection with that mortgage?

18      A.   Yes.

19      Q.   I'm going to show you Government's Exhibit 500.

20          MS. LARAIA:  And I would offer that.

21          MR. EINHORN:  No objection, Your Honor.

22          THE COURT:  Full exhibit.

23  BY MR. LARAIA:

24      Q.   Okay.  Do you see Government's Exhibit 500 on the

25  screen in front of you?

1     A.   Yes.

2     Q.   Can you tell us what this document is?  I know the

3 type isn't very dark.

4     A.   This is a transaction history that comes off the

5 bank's operating core system.  That's how we track payments,

6 charges on loans.

7     Q.   So, essentially, financial transactions on a loan?

8     A.   Correct.

9     Q.   And you said -- you mentioned the core system?

10     A.   Yes.

11     Q.   At some point, was there a different system?

12     A.   Yes, we are now on what -- the system is called

13 COCC, and we changed over to that system in 2013.  Prior to

14 that we were on Fiserv.

15     Q.   Okay.  Fair to say that payments or transaction

16 history before the core system isn't all captured on this

17 document?

18     A.   Correct.

19     Q.   Now, I want to show you this, or just enlarge the

20 top left here.  What is this transaction history for?

21     A.   It's for a residential mortgage on Leon and Monica's

22 residential mortgage.

23     Q.   And can you read what the address of that residence

24 is?

25     A.   84 Joshua Town Road in Waterbury.

1    Q.   Okay.  And I'm just going to point this out.  Do you

2    see the date range there, transaction history for 1/1/2000 to

3    2-something 2019?

4    A.   Yes.  Correct.

5    Q.   Fair to say it's not really that large of a range?

6    A.   Correct.

7    Q.   Okay.  Now, just looking at the account number here,

8    can you tell us what the last four digits are of that account

9    number, if you can read it on this page?

10   A.   Looks like 3433 is part of it.

11   Q.   And I'll go down a page and see if this makes it a

12   little better.  How about there?

13   A.   Yes, 3433.

14   Q.   Okay.  Now, just walking through a little bit

15   here -- actually, we'll start at the very end, if I can.  Are

16   the histories roughly in reverse chronological order?

17   A.   Yes.

18   Q.   So just starting -- actually, I'll go up here.  Just

19   as an example here, what can you tell us from what the entry

20   that I've enlarged at the top of the screen?

21   A.   That is a payment that was processed on this loan

22   effective 10/17 and posted by the bank on 10/17.  So breaking

23   out the principal, interest and escrow balances.

24   Q.   Okay.  And when it says total -- when it says -- I'm

25   going to highlight this.  It says 2476.64.  What does that

1   mean?

2       A.   That's the total amount of the payment the bank

3   received.

4       Q.   Okay.  And the payment would then be allocated to

5   principal maybe, and interest and escrow?

6       A.   Yes.

7       Q.   Okay.  And just a basic explanation, but why does

8   the bank have an escrow account?

9       A.   Escrow account is to pay the interest and the taxes.

10      Q.   Okay.  So, the property taxes?

11      A.   Property taxes and the homeowner's insurance.

12  Sometimes it can include other things, such as septic

13  payments or flood insurance.

14      Q.   Now, I just want to highlight the far-right column

15  here.  Can you read what that number is and tell us what that

16  means?

17      A.   $258,826.76.  That was the running balance after the

18  payment was applied.

19      Q.   Okay.  And now on each -- I'm going to try to go

20  down a little bit, if I can get it to do that.

21           Okay.  So as I scroll down here, do you see more

22  similar transactions reflecting account activity and changes

23  in the amount of balance due, based upon the application of

24  payments?

25      A.   Yes.

1    Q.   Is it fair to say that -- so this is just one page

2    of the document.  But if we go up a few more pages, do you

3    see similar activity?

4    A.   Yes, I do.

5    Q.   Okay.  I want to show page 10 of this document, if I

6    can.  Okay.  I'm just going to highlight the bottom entry

7    here.  Now, what have I just highlighted?

8    A.   Late charge balance.

9    Q.   And could you just explain why there might be a late

10   charge balance on someone's account?

11   A.   When they're not paid within the grace period.  Our

12   residential mortgages usually have a 15-day grace period.  So

13   the first business day after that -- if it falls on a

14   weekend -- it will assess a late charge.

15   Q.   Okay.  And when someone makes his or her next

16   payment, is some of that payment supposed to be applied

17   towards that late charge?

18   A.   Correct, depending on how much money the bank

19   receives.  Sometimes late charges can accumulate over time.

20   Q.   Okay.  Now, I just want to ask you:  Before your

21   testimony today, have you reviewed a number of checks and

22   Government's Exhibits 501A all the way through 501 double Q,

23   representing -- well, let me just ask you this:  Have you

24   reviewed a number of checks in Government's Exhibit 501A

25   through 501 double Q?

1     A.   Yes, I did.

2     Q.   And did those all appear to represent payments or

3   attempted payments for this mortgage loan -- being this

4   residential mortgage loan?

5     A.   Yes.

6          MS. LARAIA:  Your Honor, I'd move the admission of

7   Government's Exhibit 501A through 501QQ, and I would note

8   that there is no 501DD.

9          MR. EINHORN:  No objection, Your Honor.

10          THE COURT:  All right.  Those exhibits are

11   admitted.

12   BY MR. LARAIA:

13     Q.   Okay.  I'm going to show you Government's Exhibit

14   501A to start.  Now, prior to your testimony, did you compare

15   the checks in 501A through 501 QQ to transactions on

16   Government's Exhibit 500 that we just looked at?

17     A.   Yes, I did.

18     Q.   Okay.  And did they each represent a transaction?

19     A.   Yes.

20     Q.   Okay.  Fair to say that most of them were payments

21   that were applied?

22     A.   Yes.

23     Q.   And was there one payment that was returned?

24     A.   Yes, there was.

25     Q.   Okay.  And why might a payment be returned?

1    A.    That means when it was processed there wasn't enough

2    funds, either in our bank or the other bank, so it was

3    returned.

4    Q.    And did any of those checks reflect a split, meaning

5    some of the check applied towards the mortgage payment and

6    some of the check being used for some other purpose?

7    A.    Yes.

8    Q.    And this is just an example, but just so the jurors

9    can see this, is this one of the checks that represents a

10    mortgage payment on the account 3433.

11          THE COURT:  Do we have an exhibit number?

12          MR. LARAIA:  Sorry.  That's 501A.

13          THE COURT:  Oh, we're still on that.  Okay.

14          MR. LARAIA:  Still on 501A.

15          THE WITNESS:  Yes.

16    BY MS. LARAIA:

17    Q.    Okay.  And just to call your attention to the top

18    here, what is the name on the account used to make this

19    payment?

20    A.    Leon WL Vaccarelli.

21    Q.    And this check isn't a check drawn on your bank; is

22    that right?

23    A.    Correct.

24    Q.    Which bank was the bank issuing that check?

25    A.    Naugatuck Savings Bank.

1    Q.   Okay.  And can you tell us the last four digits of
2    that bank account?
3    A.   1757.
4    Q.   And just looking at the bottom here, was that check
5    then processed by Thomaston Savings Bank?
6    A.   Yes, it was.
7    Q.   And applied to that mortgage account?
8    A.   Yes, it was.
9    Q.   Okay.  I'm going to show you another example.  I
10   won't go through all of these, but this is 501E.  And just to
11   highlight again here, what's the name on the account used to
12   make this payment?
13   A.   LWLVACC, LLC.
14   Q.   And can you read for us the For section here?
15   A.   It says it's for the February and March mortgage
16   payment.
17   Q.   Okay.  And what's the ending four digits of that
18   account number?
19   A.   7051.
20   Q.   And, again, this check was not drawn on Thomaston
21   Savings Bank; is that correct?
22   A.   Correct.
23   Q.   But processed and received by Thomaston Savings
24   Bank?
25   A.   Correct.

1     Q.   Okay.  I'm going to show you one more example,

2   501KK.  Oops, I just made it yellow but not larger.  So would

3   you read us the name on that account?

4     A.   Leon WL Vaccarelli.

5     Q.   Okay.  And how about the last four digits of that

6   account?

7     A.   1757.

8     Q.   Is that the same last four digits as the first check

9   we looked at?

10    A.   Correct.

11    Q.   Okay.  This time it's Ion Bank?

12    A.   Correct.

13    Q.   Do you know if Ion Bank took over Naugatuck Savings?

14    A.   Yes, it did.

15    Q.   Do you see the For line here.  Can you read that for

16  us?

17    A.   It says Monica and mortgage.

18    Q.   Okay.  And what's the date of that check?

19    A.   7/7/2016.

20    Q.   And based on your review, do you know if a portion

21  of this check went to the mortgage and a portion was used for

22  something else?

23    A.   Yes, I believe it was 3,000 went to the mortgage and

24  then 3,000 went to Monica.

25    Q.   Okay.  And just to recall to your attention

1    Government's Exhibit 500, was the mortgage in the name of

2    both Leon Vaccarelli and Monica Vaccarelli?

3        A.   Correct.

4        Q.   Now, we've been talking for a few minutes about a

5    home mortgage, but at some point did Mr. Vaccarelli or an

6    entity he was related to obtain a commercial loan with

7    Thomaston Savings Bank?

8        A.   Yes.

9        Q.   And, specifically, did he obtain a loan for a

10   property on Leavenworth Street?

11       A.   Yes, he did.

12       Q.   Specifically, 47 Leavenworth Street and another

13   property?

14       A.   Correct.

15            MR. EINHORN:  Your Honor, could we approach the

16   bench on this issue briefly?

17            THE COURT:  Yes.  Excuse us, ladies and gentlemen.

18

19            **SIDEBAR CONFERENCE, 11:33 a.m., as follows:

20

21            MR. EINHORN:  Your Honor, I understand the

22   Government's claim obviously is that he used funds,

23   investors' funds, partly to pay the mortgage, and I think

24   it's admissible, obviously, to go where they're going.

25            But with regard to the commercial loan that was with

1  he and Mr. Kolesnik, I don't believe there's any such claim,

2  and I wanted to use this opportunity to point out that I

3  think that there's some of the proposed exhibits that include

4  personal information that --

5           MR. LARAIA:  I'm not going to offer that.

6           MR. EINHORN:  Oh, you're not going to offer 502?

7           MR. LARAIA:  No.

8           MR. EINHORN:  Okay.  Thank you.  I wasn't sure if

9  502 was going to be inclusive.  Okay.  I'm sorry.

10          MR. LARAIA:  Your Honor, if I may, there is a claim,

11 one of the charged counts, on one of the money laundering

12 counts, is a payment made for the commercial mortgage using

13 victims' money.

14          THE COURT:  Which victim?

15          MR. LARAIA:  Susan Rustic.  And in addition, this

16 witness would testify about a bank account held in the name

17 of Leavenworth Professional Center.  There's a $30,000 check,

18 and I don't remember off the top of my head which victim's

19 money that is, but that was also -- that is a money

20 laundering count, as that check was deposited to the

21 Leavenworth Professional Center account over which Mr.

22 Vaccarelli was a signer.

23          THE COURT:  All right.  Seems to answer that

24 question.

25          MR. EINHORN:  It does.  I was more concerned about

```
1    the credit reports and so forth.
2              MR. LARAIA:  So the Government would seek to
3    offer -- and I'll just show you.
4              MR. EINHORN:  Sure.
5              MR. LARAIA:  502 we would not.  We would offer 503,
6    504, and that's assuming no objection.
7              MR. EINHORN:  Sure.
8              MR. LARAIA:  The witness has familiarity with this
9    name.
10             MR. EINHORN:  Sure.
11             MS. LARAIA:  But this is a check used in connection
12   with the closing.  This is a subsequent check, 505, also used
13   in connection with the closing.  This is June Antonacci's
14   money.
15             MR. EINHORN:  Fine.
16             MR. LARAIA:  And 506, because that's a similar
17   transaction history for the commercial loan.
18             MR. EINHORN:  I don't think it's --
19             MR. LARAIA:  508, this is just another personal
20   statement.  We would not offer 509.
21             MR. McGARRY:  502 and 509 have dialogue.
22             MR. LARAIA:  502 and 509 have a lot of --
23             MR. EINHORN:  Right.  And then the Government's just
24   mentioned 503 and 508, which are personal financial
25   statements.  And rather than hop up later, I'd object to the
```

1  financial statements.

2          THE COURT:  Which exhibit is that?

3          MR. EINHORN:  503 and 508.  You're not going to do

4  that.

5          MR. LARAIA:  I wasn't planning to, no.

6          MR. EINHORN:  Okay.

7          THE COURT:  So you're not going to be offering 503

8  and 508?

9          MR. McGARRY:  No, we are.

10          MR. LARAIA:  We are, Your Honor.

11          THE COURT:  And what is the objection?  Obviously

12  it's --

13          MR. EINHORN:  I don't see the relevancy of his

14  financial statement.  I mean, I guess they obviously were

15  submitted to Thomaston Savings Bank, but that doesn't make

16  them admissible.

17          MR. LARAIA:  Your Honor, one of the focuses, these

18  are documents that were submitted in connection with the

19  approval process for the original commercial loan and the

20  refinance.  On both Mr. Vaccarelli was asked to list his

21  income, his assets -- I think that's relevant -- but most

22  particularly, the liability section, he does disclose certain

23  liabilities but doesn't disclose any liability to a client,

24  any kind of note.  And there are a number of notes.

25          MR. McGARRY:  Senior Notes.

1          MS. LARAIA:  And one actually -- for example, if I

2     referenced 503, there's no disclosure of a note.  There was a

3     Senior Note that had been issued to the witness who is about

4     to testify next, in February or January of 2012.  This, I

5     believe, is maybe September of 2012, and it's not listed here

6     as a $20,000 liability.

7          I think it's relevant both as the fact that it

8     wasn't disclosed, but also, to the extent Mr. Vaccarelli

9     takes the position that any of his dealings with clients are

10    loans, are personal loans, he's failed to disclose all of

11    those.  And there was, as Mr. McGarry points out, the Senior

12    Note program that Mr. Vaccarelli purported to create is not

13    disclosed.

14         THE COURT:  And this is all part of the scheme and

15    artifice that the Government is alleging or is this money

16    laundering evidence, or both?

17         MR. LARAIA:  I think that it is part of the scheme.

18    I also think it does go most particularly to the specific

19    money laundering counts.  It does -- I think it goes to

20    both.

21         THE COURT:  I don't see the merit in your objection,

22    Mr. Einhorn.

23         MR. EINHORN:  Yes, Your Honor.

24         THE COURT:  I'll overrule that.

25         **SIDEBAR CONFERENCE concluded, 11:39 a.m.**

```
1              THE COURT:  You may proceed.

2              MR. LARAIA:  Thank you, Your Honor.

3    BY MS. LARAIA:

4       Q.   I think when we left off, do you remember if I asked

5    you whether Mr. Vaccarelli obtained a commercial loan in

6    connection with a property at 47 Leavenworth Street?

7       A.   Yes.

8       Q.   Okay.  And did he do that?

9       A.   Did I do that?

10      Q.   Did Mr. Vaccarelli obtain a commercial loan?

11      A.   Oh, yes.

12      Q.   And can you just tell us what kind of property 47

13   Leavenworth Street was?

14      A.   It's a commercial office building in downtown

15   Waterbury.

16      Q.   And do you remember what year that mortgage was

17   issued in?

18      A.   I believe it was 2012.

19      Q.   Okay.  And do you remember the approximate amount of

20   that mortgage?

21      A.   The original, one million.

22      Q.   Okay.  And did that mortgage involve just Mr.

23   Vaccarelli or did it involve any other person?

24      A.   There was one other guarantor on that property.

25      Q.   And who was the other guarantor?
```

1     A.   Robert Kolesnik.

2     Q.   And you mentioned guarantor.  What does it mean for

3  someone to be a guarantor on a mortgage?

4     A.   That means that the actual borrower is a business

5  entity, so the bank's process or procedure is to obtain the

6  guarantors or the owners of that business entity to guarantee

7  the debt.

8     Q.   Okay.  And in this case, were there entities

9  involved?

10     A.   Yes, there was.

11     Q.   Okay.  And Mr. Vaccarelli was what you described as

12  a guarantor?

13     A.   Correct.

14     Q.   And Mr. Kolesnik was also a guarantor?

15     A.   Correct.

16     Q.   Okay.  Could you just describe for us how Thomaston

17  Savings Bank decides whether to extend a commercial mortgage

18  or a loan?

19     A.   We take all the information provided to us from the

20  applicants.  We do additional due diligence.  We gather all

21  the information and we do what's called underwriting.  So we

22  underwrite the property, we underwrite the borrower, we

23  underwrite the guarantors.

24     Q.   Okay.  And in the case of a commercial building such

25  as 47 Leavenworth, would you be at all interested in the

1    tenants of the building, for example?

2         A.   Yes, we do.

3         Q.   Okay.  In terms of rents they might bring in?

4         A.   Correct.

5         Q.   Do you look at any financial profile or information

6    from the guarantors?

7         A.   Yes, we do.

8         Q.   And why is that?

9         A.   Because we're looking to see if there's -- when we

10   look at a deal, we look at three primary repayment sources:

11   One would become the primary, which in this case would be the

12   rental income generated from the property; the second, we

13   would look to the guarantors, so in case that first primary

14   resource is gone; and then third usually is the liquidation

15   of the property.

16        So to figure out where we stand on our secondary

17   repayment source, we have to analyze the individuals.

18        Q.   Okay.  And does that include business information

19   from the guarantors?

20        A.   Yes.

21        Q.   Okay.  I'm going to show you what's been marked

22   Government's Exhibit 503.

23        MS. LARAIA:  And I'd ask that it be admitted if

24   there's no objection.

25        MR. EINHORN:  No objection, Your Honor.

1          THE COURT:  Full exhibit.

2     BY MS. LARAIA:

3          Q.   Can you tell us what this document is?

4          A.   This is a Thomaston Savings Bank personal financial

5     statement.  It's required on all guarantors or individual

6     applicants.

7          Q.   Okay.  And I'm just going to make this a little bit

8     larger.  Whose personal financial statement is this?

9          A.   Leon Vaccarelli.

10         Q.   And can you just tell us who is listed as his

11    employer?

12         A.   Lux Financial.

13         Q.   And at the time, what was the address of that

14    employer?

15         A.   231 Bank Street, Suite A, in Waterbury.

16         Q.   And in the next section, I know this is a little bit

17    difficult to read, but what's the word that I just

18    highlighted?

19         A.   Assets.

20         Q.   And what kind of information do people report in the

21    Assets section?

22         A.   Could be anything from real estate that they own;

23    liquid assets, such as bank accounts, marketable securities,

24    retirements, automobiles, businesses they own.

25         Q.   Okay.  And going at the bottom here, do you see

1    where it says "salary"?

2        A.   Yes.

3        Q.   So here, just read for us what's listed as the gross

4    business income?

5        A.   Yeah.  300,000.

6        Q.   Okay.  Now, on the other side, can you read for us

7    the word that I've highlighted?

8        A.   Liabilities.

9        Q.   What are liabilities, just generally?

10       A.   Everything that the individual owns -- owes to other

11   creditors.

12       Q.   Okay.  So, for example, you see here where it says

13   "auto" and there's an amount listed?

14       A.   Yes.

15       Q.   And you see where it says "mortgages payable on real

16   estate"?

17       A.   Yes.

18       Q.   Okay.  And what's the amount of that?

19       A.   260,000.

20       Q.   And is that roughly consistent with what Mr.

21   Vaccarelli's home mortgage would have been?

22       A.   Roughly, yes.

23       Q.   And that was the loan we saw with your bank?

24       A.   Correct.

25       Q.   And is there any other liability listed here?

1    A.    Student loan.

2    Q.    Okay.  And what was the amount of that?

3    A.    11,690.

4    Q.    Okay.  Were there any other liabilities listed

5    here?

6    A.    Not listed, no.

7    Q.    Okay.  Were there any loans to anyone else listed?

8    A.    No.

9    Q.    Any notes or Senior Notes?

10   A.    No.

11   Q.    On a form -- or on this personal financial

12   statement, does the bank expect to see any business

13   liabilities?

14   A.    Not always.  Sometimes, depending on how the

15   structure is, some applicants will not list business debts.

16   Q.    Okay.  And how about in a case like this where Mr.

17   Vaccarelli is self-employed with Lux Financial?

18   A.    Yes, we would be looking for it.

19   Q.    And why is that?

20   A.    Because he's personally liable, so it would go

21   against his personal guarantee.

22   Q.    Okay.  And at what stage is the bank using a

23   personal financial statement?

24   A.    At what stage?

25   Q.    Yeah, what stage?  When would a form like this be

1  submitted?

2      A.   At the time of application.

3      Q.   Okay.  And I'll just go to the next page.  Okay.

4  And what's the date on this document?

5      A.   10/25/2012.

6      Q.   Okay.  And do you see a signature?

7      A.   Yes, I do.

8      Q.   Okay.  Do you happen to recognize it?

9      A.   Yes.

10      Q.   And whose signature do you recognize?

11      A.   Leon Vaccarelli.

12      Q.   Okay.  I'm just going to ask you to read from this

13  paragraph here.  All right.  Can you just read that

14  highlighted section?

15      A.   Each of the undersigned represents, warrants and

16  certifies that the information provided is herein true,

17  complete -- correct and complete.

18      Q.   And does the bank rely upon the accuracy of the

19  information provided to it?

20      A.   Yes, we do.

21      Q.   Okay.  Now, at any point did Mr. Vaccarelli disclose

22  to Thomaston Savings Bank whether he had borrowed any money

23  in connection with a downpayment on the Leavenworth

24  property?

25      A.   No.

1    Q.   And does the bank look for that information?

2    A.   Yes, we do.

3    Q.   Okay.  And why is that?

4    A.   Because it impacts the repayment of our loan if

5    there's additional debt that we're unaware of.

6    Q.   Is that because it changes the risk assessment?

7    A.   It does.

8    Q.   Okay.  Now, did the bank approve this loan?

9    A.   Yes, we did.

10   Q.   Now, I'm going to show you what's been marked

11   Government's Exhibit 504.

12          MS. LARAIA:  I don't believe there's an objection.

13          MR. EINHORN:  Sorry?

14          MR. LARAIA:  504.

15          MR. EINHORN:  No objection.

16          THE COURT:  Full exhibit.

17   BY MR. LARAIA:

18   Q.   Ms. Lebron, can you tell us, just generally what is

19   this document?

20   A.   It's a check made payable for $75,000 to Gennaro

21   Bizzaro Trustee.

22   Q.   And is this check from Thomaston Savings Bank?

23   A.   No, it's not.

24   Q.   Okay.  And it's not to Thomaston Savings Bank,

25   either; is it?

1    A.   Correct.

2    Q.   I just want to ask you, do you recognize the name

3  Genarro Bizzaro Trustee?

4    A.   Yes, I do.

5    Q.   And how is that?

6    A.   It's on one of the -- I believe it's the purchase

7  and sale agreement.

8    Q.   And did Mr. Bizzaro represent one of the parties in

9  the purchase and sale?

10   A.   Yes.

11   Q.   Was that the seller -- who would be receiving the

12  money?

13   A.   Yes.

14   Q.   Okay.  And what's the amount of that check?

15   A.   75,000.

16   Q.   Okay.  And can you read the Remitter line for us?

17   A.   L. Vaccarelli.

18   Q.   Okay.  I'm also going to show you Government's

19  Exhibit 505.

20        MS. LARAIA:  I'd offer it as full if there's no

21  objection.

22        MR. EINHORN:  No objection, Your Honor.

23        THE COURT:  Full exhibit.

24  BY MR. LARAIA:

25   Q.   Is this another check to Mr. Bizzaro, trustee?

1    A.    Yes.

2    Q.    Okay.  And I just want to show you or ask you to

3  read the date that I've highlighted.

4    A.    December 27, 2012.

5    Q.    And what's the Remitter line on this check?

6    A.    LWLVACC, LLC, and Leon Vaccarelli.

7    Q.    Okay.  And the amount of that check?

8    A.    $15,000.

9    Q.    Okay.  And December of 2012, was that at or around

10  the time that that mortgage was issued?

11   A.    I believe so.

12   Q.    Okay.  Now, was there a second loan made by

13  Thomaston Savings Bank that related to the Leavenworth

14  property?

15   A.    Yes.

16   Q.    Do you remember what year that was in?

17   A.    I believe it was 2015.

18   Q.    I'm going to show you Government's Exhibit -- I'll

19  start with 517.

20        MS. LARAIA:  I'd offer it as full.  I can show that.

21        MR. EINHORN:  No objection.

22        THE COURT:  Full exhibit.

23  BY MR. LARAIA:

24   Q.    Okay.  Ms. Lebron, can you just describe what we're

25  looking at here?

1    A.    This is an e-mail from one of my closers.  What

2  happens is sometimes we are unable to meet as a committee for

3  loan approvals, so the credit department will e-mail them out

4  to the approving authority.  This is an e-mail of a change

5  that was made to one of the loans, and it's reflecting my

6  approval of that transaction.

7    Q.    Okay.  So, is this in the process where that second

8  loan was being analyzed and maybe modified and then

9  ultimately approved?

10    A.    This one, I believe it was approved, and then there

11  were changes that were made after the original approval and

12  it went back through.

13    Q.    Okay.  Now, I'm just going to ask you to look at

14  this bottom section first.

15    A.    Yes.

16    Q.    Is Matthew Scott someone who worked at Thomaston

17  Savings Bank?

18    A.    He did.

19    Q.    And can you just tell us -- actually, I'll just ask

20  you to read the text of that e-mail.

21    A.    All right.

22         Hey, Mark.  Attached is the updated writeup for

23  Terese, LLC, and Carmel, LLC, with an updated loan amount of

24  1,495,000 and an interest rate of 4.65 percent fixed for the

25  construction period and initial seven years with

1   additional -- with the additional 20,000 needed for work to

2   be completed on the 29 Leavenworth Street, Waterbury,

3   property.

4       Q.   Okay.  And you see the reference at the top here

5   Terese, LLC, and Carmel, LLC?

6       A.   Yes.

7       Q.   Were those the entities that were involved with the

8   mortgages?

9       A.   The borrowing entities, yes.

10      Q.   And Mr. Kolesnik and Mr. Vaccarelli were what?

11      A.   They were the owners.

12      Q.   Okay.

13      A.   Each owned one individually.

14      Q.   Were each also a guarantor?

15      A.   Yes.

16      Q.   Okay.  And, now, in this next e-mail up discusses

17  some -- it says relatively minor changes; is that right?

18      A.   Correct.

19      Q.   And is this an e-mail, at the top, from you?

20      A.   Yes, it is.

21      Q.   Okay.  And what did you say?

22      A.   I approved.

23      Q.   Okay.  And were you part of the required approval

24  process?

25      A.   Yes.

1      Q.   Now, this second loan, did this involve a purchase

2  of any other business?

3      A.   Yes, it involved the purchase of an additional

4  building, and I believe it housed the Signature's

5  Restaurant.

6      Q.   Okay.  I'm going to show you Government's Exhibit

7  508.

8           MS. LARAIA:  And ask that it be admitted, if no

9  objection.

10          MR. EINHORN:  No objection.

11          THE COURT:  508 is a full exhibit.

12  BY MR. LARAIA:

13     Q.   Now, is this another personal financial statement?

14     A.   Yes.

15     Q.   Submitted to Thomaston Savings Bank?

16     A.   Yes.

17     Q.   And I'm going to go to page 2 first.  Would this one

18  have been submitted in connection with the 2014 loan?

19     A.   Yes.

20     Q.   Essentially, a refinance and also some addition?

21     A.   Yes.

22     Q.   Just going back to the first page.  It has a name up

23  here and a phone number.  Who is that?

24     A.   Mark Crook is a commercial lender at Thomaston

25  Savings Bank.

1    Q.   Okay.  Was he involved in analyzing this particular

2    transaction?

3    A.   He was the lender involved, yes.

4    Q.   Okay.  And, again, I want to focus -- again, the

5    form requires assets and liabilities, among other things?

6    A.   Correct.

7    Q.   Okay.  And just focusing on the right-hand column

8    here to start.  Oops, that didn't work.

9         Okay.  So looking at the liabilities section, can

10   you tell us what's listed there?

11   A.   An auto loan for 19,751; a residential mortgage for

12   249,000; and a student loan at 9,800.

13   Q.   Any other liabilities reported?

14   A.   No.

15   Q.   Any loans to people?  Notes?  Anything like that?

16   A.   No.

17   Q.   And, again, would you expect or would the bank

18   expect any business liability from Mr. Vaccarelli to have

19   been reported?

20   A.   Yes.

21   Q.   So, ultimately, was the loan approved?

22   A.   Yes, it was.

23   Q.   At any point, either during that process or at an

24   earlier point, did you meet Mr. Vaccarelli?

25   A.   One time I was with Mark Crook out on a call.  He

1    needed to stop in to see Mr. Vaccarelli.  I was with him.

2        Q.   And do you remember where that was?

3        A.   It was at his original location on Bank Street.

4        Q.   Okay.  And do you remember anything about Mr.

5    Vaccarelli?

6        A.   No, just -- just being introduced to him.

7        Q.   Okay.  I'm going to show you Government's Exhibit

8    506.

9             MR. EINHORN:  Sorry?

10            MR. LARAIA:  506.

11            MR. EINHORN:  No objection.

12            MR. LARAIA:  I'd ask that it be admitted as a full

13   exhibit.

14            THE COURT:  Full exhibit.

15   BY MR. LARAIA:

16       Q.   Now, what is this document?

17       A.   This is a transaction history for the

18   business -- the business mortgage.

19       Q.   Okay.  So that Leavenworth property and group?

20       A.   Correct.

21       Q.   Okay.  So I'm just going to start at the top here.

22            Okay.  So just tell us what kind of information is

23   indicated on this document?

24       A.   Because this loan had a period of time that the bank

25   allowed for some rehab to be done, we allowed them to take

1    advances.  So the initial disbursement is to pay off the

2    first -- the original loan, and then principal disbursements

3    were made as work was done on the property.

4        Q.   Okay.  And in the far-right column, there are

5    figures there reflective for, for example, for a loan

6    balance?

7        A.   Yes.

8        Q.   And I just want to focus on the top of the document

9    for a second.  Can you read the last four digits of that

10   account number?

11       A.   6463.

12       Q.   Now turning to the second page.  Okay.  Now,

13   focusing on the transaction with a regular payment

14   11/30/2015, what happens there?

15       A.   So, the payment was received, and 5,793 was applied

16   to interest.  The note balance of 3,000 was towards the

17   principal, and then 4,818 went to the escrow.

18       Q.   And what was the total amount of that payment?

19       A.   14,935.25.

20       Q.   Okay.  And just to go back for a second.  What is

21   the due date for that payment?

22       A.   This payment was applied towards the 10/1/15 billing

23   invoice, and a portion of it went to the 11/1/2015 invoice.

24       Q.   All right.  I'm going to show you -- let me just

25   highlight again.  What's the total amount of that payment?

1    A.   14,935.25.

2    Q.   I'm going to show you Government's Exhibit 19.

3         MS. LARAIA:  And I'd move that that be admitted as a

4    full exhibit.

5         MR. EINHORN:  No objection, Your Honor.

6         THE COURT:  Full exhibit, Number 19.

7    BY MR. LARAIA:

8    Q.   Okay.  Ms. Lebron, would you please tell us what

9    this is?

10   A.   It was a check made payable to the bank for the

11   commercial mortgage 6463.

12   Q.   Okay.  And what is the date on that check?

13   A.   November 30th, 2015.

14   Q.   And the amount?

15   A.   14,935.25.

16   Q.   Okay.  Does this reflect the payment on the

17   commercial mortgage which we just looked at a minute ago?

18   A.   Yes, it does.

19   Q.   And, again, the last four digits listed here, is

20   that consistent with the commercial mortgage?

21   A.   Yes, it is.

22   Q.   I'll just ask you to read the bank account or the

23   name of the bank account for this check?

24   A.   LWLVACC, LLC, care of Lux Financial.

25   Q.   Okay.  And the last four digits on that checking

1   account?

2        A.   7051.

3        Q.   And was this payment received and processed by the

4   bank and credited towards that mortgage account?

5        A.   Yes.

6        Q.   Okay.  Now, before your testimony today, have you

7   reviewed some other checks that reflect payments for that

8   commercial mortgage?

9        A.   Yes, I did.

10            MS. LARAIA:  Your Honor, I would move the admission

11   of Government's Exhibits 511 through 515 and ask that they be

12   admitted as full.

13            MR. EINHORN:  No objections.

14            THE COURT:  Full exhibits.

15   BY MS. LARAIA:

16        Q.   And I'll just walk through those quickly.  One of

17   the -- this is Government's Exhibit 511.  $11,956.94; is that

18   one of the payments on the commercial mortgage?

19        A.   Yes.

20        Q.   And I'll just ask you to read the For section right

21   here.

22        A.   For loan, commercial mortgage, 6463, June.

23        Q.   Okay.  And I'll show you Government's Exhibit 512.

24   What's this?

25        A.   Another check made payable to Thomaston Savings

1   Bank, 6463.

2       Q.   And what's the amount of that one?

3       A.   $10,365.40.

4       Q.   Okay.  And also -- or this one drawn on the account

5   LWLVACC, LLC, care of Lux Financial?

6       A.   Yes.

7       Q.   I'll show you Government's Exhibit 513.  Is this

8   another check applied to Mr. Vaccarelli's commercial

9   mortgage?

10      A.   Yes.

11      Q.   $19,617.06?

12      A.   Yes.

13      Q.   And could you just read the For line here?

14      A.   Pay mortgage, Terese Carmel loan to Leavenworth.

15      Q.   All right.  I'll show you 514.  What's this one?

16  What is this document?

17      A.   Another payment towards the loan.

18      Q.   Okay.  This one for over 14,000?

19      A.   $14,453.51.

20      Q.   And, lastly, I'll show you Government's Exhibit 515.

21  What is this document?

22      A.   Another check made payable to Thomaston Savings Bank

23  in the amount of 8,000.

24      Q.   And also applied to the commercial mortgage?

25      A.   Correct.

1    Q.   I just want to highlight the date.  Could you read

2    that for us?

3    A.   8/29/2016.

4    Q.   And what is the amount?

5    A.   8,000.

6    Q.   And before your testimony, have you had a chance to

7    review this payment to determine whether it represents part

8    of a payment?

9    A.   Correct.  This is not the full amount.

10   Q.   Okay.  So, what do you mean by that?

11   A.   The bank received -- the full payment was made, but

12   only 8,000 came from this check.  The remaining funds came

13   from elsewhere.

14   Q.   Okay.  So, this is part of the payment, and then

15   another part of it came from somewhere else?

16   A.   Correct.

17   Q.   Okay.  Now, based on your review of Thomaston

18   Savings Bank's records, was there a bank account opened for

19   something called Leavenworth Professional Center?

20   A.   I believe so.

21   Q.   Now I'll show you what's been marked Government's

22   Exhibit -- let's see -- 21A.

23        MS. LARAIA:  I'd offer that as full.

24        MR. EINHORN:  No objection, Your Honor.

25        THE COURT:  21A is a full exhibit.

1          MR. LARAIA:  Thank you, Your Honor.

2    BY MS. LARAIA:

3        Q.   Do you recognize that?

4        A.   Yes.

5        Q.   Okay.  And just can you tell us what the name on

6    this account is?

7        A.   Leavenworth Professional Center care of Lux

8    Financial Service.

9        Q.   I'm going to go back for a minute.  And is this an

10   account statement from Thomaston Savings Bank?

11       A.   Yes, it is.

12       Q.   Okay.  I want to go back for a minute, and I'll show

13   you Government's Exhibit 35.

14          MS. LARAIA:  And I'd also offer that as a full

15   exhibit.

16          MR. EINHORN:  No objection.

17          THE COURT:  35 is a full exhibit.

18   BY MS. LARAIA:

19       Q.   What is this document?

20       A.   This is a signature card.

21       Q.   And what is a signature card?

22       A.   When an individual opens up a bank account, we

23   obtain signature cards to make sure that there's no

24   forgeries, that we have something to compare it against.

25       Q.   So if you have a signature card, would that reflect

1    all of the people authorized to sign on an account?

2        A.   Yes, it does.

3        Q.   Okay.  And the title of this account is what?

4        A.   Leavenworth Professional Center, LLC.

5        Q.   And can you tell us the last four digits of the

6    account number?

7        A.   9506.

8        Q.   All right.  Just focusing a little further down

9    here.  Okay.  Is there some business information?

10       A.   Yes, there is.

11       Q.   Okay.  And what is that?

12       A.   It states the name of the business, the location,

13   the resolution date as to when it was created, the nature of

14   business, what type of business it is.

15       Q.   Okay.  And this particular business, what's listed

16   as the business address?

17       A.   84 Joshua Town Road, Waterbury, Connecticut.

18       Q.   Do you recognize that address?

19       A.   Yes, I do.

20       Q.   And why do you recognize it?

21       A.   It's the same address that we have for Leon

22   Vaccarelli as his personal dwelling.

23       Q.   Okay.  And the contact name for the business is

24   who?

25       A.   Leon Vaccarelli.

1    Q.   Okay.  And, now, just to focus on the signers; who

2   were the signers on this bank account?

3    A.   It is Leon Vaccarelli and Robert Kolesnik.

4    Q.   Okay.  Mr. Vaccarelli has that 84 Joshua Town Road

5   address?

6    A.   Correct.

7    Q.   And Mr. Kolesnik has a different address?

8    A.   Correct.

9    Q.   This is the second page.  I'll blow it up a little

10  bit.

11       Okay.  And are there signatures for both Mr.

12  Vaccarelli and for Mr. Kolesnik?

13   A.   Yes.

14   Q.   And what are the dates by those signatures?

15   A.   12/27/2012.

16   Q.   Actually, I'm going to show you Government's Exhibit

17  21.

18            MS. LARAIA:  And offer that as a full exhibit.

19            MR. EINHORN:  No objection.

20            THE COURT:  Full exhibit.

21  BY MS. LARAIA:

22   Q.   Ms. Lebron, would you tell us what this is?  I've

23  sort of highlighted it.

24   A.   It's a check made payable to Leavenworth

25  Professional Center.

1    Q.   And what's the amount of that check?

2    A.   30,000.

3    Q.   And the date?

4    A.   8/12/2016.

5    Q.   And what does the check indicate that it's for?

6    A.   It says a loan.

7    Q.   Okay.  And do you recognize the signature on that

8  check?

9    A.   Yes.

10    Q.   Who is that?

11    A.   Leon Vaccarelli.

12    Q.   And would you just read for us the last four digits

13  of the account that check is drawn upon?

14    A.   7051.

15    Q.   And, again, that's not an account at Thomaston

16  Savings Bank; correct?

17    A.   Correct.

18    Q.   And which bank is that drawn on?

19    A.   Ion Bank.

20    Q.   Now, was this check received by Thomaston Savings

21  Bank?

22    A.   Yes.

23    Q.   And processed?

24    A.   Yes.  Next page, see if you can show -- that's the

25  account number.

1    Q.   Okay.  The -- I'm just going to ask you to read this

2    part here.  Do you see where it says "DEP only"?

3    A.   Yeah, deposit only.

4    Q.   Okay.  And what are the last four digits of that

5    account number?

6    A.   9506.

7    Q.   And is there a processing date here?

8    A.   Yeah, 8/12/2016.

9    Q.   Now, I'm going to go back to Government's Exhibit

10   21A, and I'm going to pull up the top part first.  What are

11   the last four digits of that account number?

12   A.   9506.

13   Q.   And what's the statement period?

14   A.   July 30, 2016 to August 31, 2016.

15   Q.   And, again, which bank account are we looking at, in

16   terms of what name is that?

17   A.   Leavenworth Professional Center.

18   Q.   And here, does it also say Care of Lux --

19   A.   Lux Financial Services, yes.

20   Q.   With a Leavenworth address?

21   A.   Yes.

22   Q.   Okay.  And I'm just going to the third page.  All

23   right.  Do you see any deposit on August 12th?

24   A.   Yes, for $30,000.

25   Q.   Okay.  Is that that $30,000 check that we just saw

1   being deposited?

2       A.   Yes.

3       Q.   Before that check is deposited to the account, what

4   was the balance?

5       A.   A negative $690.99.

6       Q.   Okay.  And I want to show you what's been marked

7   Government's Exhibit 21B.

8            MS. LARAIA:  And I'd offer that as full, as well?

9            MR. EINHORN:  No objection.

10           THE COURT:  21B, a full exhibit.

11  BY MR. LARAIA:

12      Q.   Can you tell us what is depicted on this document?

13      A.   Copies of checks that were presented on that

14  account.

15      Q.   Okay.  And you said "presented."  So does that mean

16  drawn upon that account?

17      A.   Yes.  Yes.

18      Q.   Okay.  So, checks that were written out of that

19  account?

20      A.   Written out of that account, yeah.

21      Q.   Now, just going down to the bottom of that page, the

22  bottom of the first page, do you see a check payable to

23  Thomaston Savings Bank?

24      A.   Yes, I do.

25      Q.   And what's the amount of that check?

1    A.   $6,207.62, I believe.  It's hard to see.

2    Q.   And what's the memo line for that check?

3    A.   Mortgage Carmel Terese.

4    Q.   And the date on that check?

5    A.   8/29/2016.

6    Q.   And I also want to show you page 4 of this exhibit.

7  Okay.  What is this?

8    A.   It's a check made payable to Leon Vaccarelli from

9  the Leavenworth Professional Center checking account.

10    Q.   And do you recognize the signature on that check?

11    A.   Yes.

12    Q.   And whose is that?

13    A.   Leon Vaccarelli.

14    Q.   And what's the amount of that check?

15    A.   2,700.

16    Q.   Okay.

17         MR. LARAIA:  Your Honor, I have no further

18  questions.

19         THE COURT:  Cross-examination.

20         MR. EINHORN:  No questions, Your Honor.  Thank you.

21         THE COURT:  All right, then.  Thank you, Ms. Lebron.

22  You are excused.  You may step down.

23         (Witness excused, 12:09 p.m.)

24         THE COURT:  Will the Government please call its next

25  witness?

```
 1              MR. LARAIA:  Your Honor, the Government calls June
 2     Antonacci.
 3              (Witness enters, 12:09 p.m.)
 4              THE COURT:  All right.  Ms. Antonacci, if you'd come
 5     to the witness stand over there, remain standing, raise your
 6     right hand.
 7              (JUNE ANTONACCI sworn, 12:10 p.m.)
 8              COURTROOM DEPUTY:  Please be seated and state your
 9     name for the record.
10              THE WITNESS:  Pardon me?
11              COURTROOM DEPUTY:  Can you be seated and state your
12     name for the record?
13              THE WITNESS:  June Antonacci.
14              THE COURT:  And can you spell your last name?
15              THE WITNESS:  A-N-T-O-N-A-C-C-I.
16              COURTROOM DEPUTY:  And can you tell us what city and
17     state you live in?
18              THE WITNESS:  I live in Connecticut in the summer,
19     Florida in the winter.
20              THE COURT:  And in Connecticut in the summer where
21     do you live?
22              THE WITNESS:  Middlebury.
23              THE COURT:  Thank you.  You may be seated.
24              THE WITNESS:  Okay.
25              THE COURT:  And you may proceed, Ms. Laraia.
```

```
1              MR. LARAIA:  Thank you, Your Honor.
2                         DIRECT EXAMINATION
3    BY MR. LARAIA:
4         Q.   Good afternoon, Ms. Antonaychi (phonetic) --
5    Antonacci.
6         A.   I know -- yes.
7         Q.   How do you pronounce your last name?
8         A.   Antonacci.
9         Q.   Antonacci.  And I think you just mentioned you live
10   in Middlebury, Connecticut, and also down in Florida?
11        A.   Correct.
12        Q.   Okay.  What part of the year do you live in Florida
13   and what part in Connecticut?
14        A.   November through April in Florida, and May through
15   October in Connecticut.
16        Q.   And down in Florida, what city do you live in?
17        A.   Pompono Beach.
18        Q.   Okay.  Ms. Antonacci, do you know Leon Vaccarelli?
19        A.   Yes.
20        Q.   How is it that you met Mr. Vaccarelli?
21        A.   I met him through my husband.
22        Q.   Okay.  And who is your husband?
23        A.   Ray.
24        Q.   And what was Ray's last name?
25        A.   Antonacci.
```

1    Q.   Has Ray passed away?

2    A.   Yes.

3    Q.   And when did that happen?

4    A.   June, 2014.

5    Q.   So, how did your husband introduce you to Mr.

6    Vaccarelli?

7    A.   I guess we decided -- Ray decided to have our

8    investments with Leon at the time.  I can't remember the

9    first company he was with, but it became Lux Financial.

10   Q.   Okay.  And would you say that your husband and Mr.

11   Vaccarelli knew each other for a short time, or a long

12   time?

13   A.   As long as -- as long as Ray was doing business with

14   him, so it was quite a few years.

15   Q.   Okay.  Do you remember when you first met Mr.

16   Vaccarelli?

17   A.   No, I'm not too sure of the first time.

18   Q.   Okay.  Now, you said your husband invested money

19   with Mr. Vaccarelli?

20   A.   Yes.

21   Q.   Okay.  Now, when your husband was living, did you

22   handle the money or did your husband?

23   A.   My husband did.

24   Q.   Okay.  Do you know whether your husband invested

25   through something called The Investment Center?

1      A.   Yes.

2      Q.   And have you received and seen statements from The

3  Investment Center?

4      A.   Yes.

5      Q.   At any point during the course of the time that your

6  husband invested money with Mr. Vaccarelli, did he ever come

7  to your home?

8      A.   Yes.

9      Q.   And were you generally present for meetings, or not

10 present?

11     A.   I was there, but I wasn't sitting at the table all

12 the time.

13     Q.   Okay.  So what might you be doing?

14     A.   Just maybe watching TV or, you know.

15     Q.   Okay.  Now, at any point did you and your husband

16 make an investment with Mr. Vaccarelli that was outside the

17 The Investment Center?

18     A.   Yes.

19     Q.   And what do you remember about that?

20     A.   I'm not too sure whether Ray had been to lunch with

21 Leon.  Ray came home, he said -- I think Ray came home and

22 said he was -- that Leon was going to be coming up to the

23 house, either that or he was already with Ray and they came

24 up to the house.

25     Q.   And, so, were you at home when --

1    A.    I was home.

2    Q.    -- Mr. Vaccarelli came?

3    A.    Yes.

4    Q.    Okay.  Now, what do you remember about any

5    conversation between yourself and your husband and Mr.

6    Vaccarelli when he was at your home?

7    A.    Leon -- or -- can I call him Leon?  Or should I call

8    him Mr. Vaccarelli?

9    Q.    Whatever you're comfortable with.

10   A.    Leon.  Leon had asked Ray to invest some money into

11   a real estate deal that Leon was having -- that was going to

12   be on his own, not with Ray.  Just he wanted money from

13   Ray.

14   Q.    So, you understood that to be a real estate

15   investment?

16   A.    Right.

17   Q.    Okay.  And what do you remember Mr. Vaccarelli

18   saying about the investment?

19   A.    He was going to invest in some real estate in

20   Waterbury, and he was going to pay Ray interest on the money

21   that Ray had given him.

22   Q.    Okay.  How would you describe your husband's

23   relationship with Mr. Vaccarelli at that time?

24   A.    He really trusted Leon.  He had a high regard for

25   Leon.

1    Q.   At any point, had Mr. Vaccarelli come and stayed
2  with you in Florida?
3    A.   He did.
4    Q.   And what do you remember about that?
5    A.   I can't remember if he came for one or two days, but
6  he did come.  He stayed at our home, and the reason that he
7  was going to be there was that he had business that he was
8  doing in Florida.
9    Q.   Okay.  And did your husband have a friendly
10  relationship with Mr. Vaccarelli at that point?
11    A.   Yes.
12    Q.   Now, I want to show you what's been marked
13  Government's Exhibit 450.
14         MS. LARAIA:  And I'd offer that as a full with no
15  objection.
16         MR. EINHORN:  No objection.
17         THE COURT:  Full exhibit.
18  BY MR. LARAIA:
19    Q.   Okay.  Do you recognize this document?  It should be
20  a document on your screen.
21    A.   Yes.
22    Q.   Okay.  What do you remember about this document?
23         Let me try another question.  Was this a document
24  that was executed in connection with this real estate
25  investment?

1      A.   At our kitchen table.

2      Q.   So, yes?

3      A.   Yes.

4      Q.   Okay.  I'm just going to ask you to read the title

5    of the document and the first paragraph.  And could you just

6    read that for the jury?

7      A.   Excuse me?

8      Q.   Could you just read the title of the document and

9    the first paragraph for the jury?

10      A.   You mean the Private Direct?

11      Q.   Yes.

12      A.   Private Direct Investment Agreement.

13      Q.   Okay.  And does it say "Agreement between LWLVACC,

14    LLC, DBA Lux Financial Services," and then there's an

15    address, and one or more client?

16      A.   Uh-huh, yes.

17      Q.   Okay.  Now, just focusing on the second section, can

18    you tell us what is checked off?

19      A.   Separately managed account, 30 months Senior Note, 6

20    percent per annum.  No liquidity of principal, interest paid

21    monthly commencing February 1, 2013.

22      Q.   Okay.  And what was the amount of the investment?

23      A.   $200,000.

24      Q.   And was your -- what you just read before, the

25    $200,000 30-month Senior Note, 6 percent per annum, to no

1    liquidity of principal interest paid monthly commencing

2    February 1, 2013, was that consistent with your understanding

3    of the investment at your kitchen table?

4        A.   Yes.

5        Q.   And did Mr. Vaccarelli explain that to you and your

6    husband?

7        A.   Yes.

8        Q.   Do you see next to $200,000, do you see JA and RA?

9        A.   Uh-huh.

10       Q.   You need to answer yes or no.

11       A.   Yes.

12       Q.   Okay.  Who are JA and RA?

13       A.   JA, that would be me.  RA would be my husband.

14       Q.   Okay.  And, so, were those -- did you, yourselves,

15   initial the document?

16       A.   Yes.

17       Q.   And looking at this last page, who signed the

18   document?

19       A.   Ray signed first, and I'm the second signature.

20       Q.   Okay.  And in connection with this investment, did

21   you and your husband provide $200,000 to Mr. Vaccarelli?

22       A.   Yes.

23       Q.   I'm going to show you Government's Exhibit 451.

24            MS. LARAIA:  I'd ask that that be admitted.

25            MR. EINHORN:  No objection.

1           THE COURT:  Full exhibit.

2    BY MR. LARAIA:

3        Q.   Ms. Antonacci, what is this?  What is this document

4    on your screen?

5        A.   That's the check.

6        Q.   Okay.  And whose handwriting is on this check?

7        A.   I made out the check, but Ray signed the check.

8        Q.   Okay.  So the signature down here is your

9    husband's?

10       A.   Yes.

11       Q.   And this other writing on the check is yours?

12       A.   That's mine.

13       Q.   Okay.  What is LWLVACC, LLC, if you know?

14       A.   I can't remember what it was.

15       Q.   Do you know why you put it on the document?

16       A.   It was his private -- it was his private company,

17   rather than the investment company.

18       Q.   Okay.  So your understanding was that this was Mr.

19   Vaccarelli's company?

20       A.   Correct.

21       Q.   And what's the date of your check?

22       A.   11/28/12.

23       Q.   All right.  And, so, what was your expectation about

24   interest being paid on this loan?

25       A.   A $1,000 a month.

1     Q.   Okay.  Because it's 6 percent per year?

2     A.   Correct.

3     Q.   Okay.  Now, at any point did you have any cause for

4  concern about the interest?

5     A.   About the?

6     Q.   About the interest payment?

7     A.   The interest?  I did.

8     Q.   Why was that?

9     A.   The Investment Center, when I was looking at the

10  statements, there was a time where there was a $1,000 being

11  taken out of the Investment Center.

12     Q.   Okay.  So you and your husband had an account at The

13  Investment Center; is that right?

14     A.   Yes.

15     Q.   And did you receive monthly statements from that

16  account?

17     A.   Yes.

18     Q.   And, I think like you're describing, were you

19  looking at those statements?

20     A.   Yes.  Yes.

21     Q.   And what did you see on the statements?

22     A.   A $1,000 was deducted each month.

23     Q.   Okay.

24     A.   From our personal account.

25     Q.   Okay.  So you were seeing a $1,000 a month coming

1   out of your Investment Center account?

2   A.   Yes.

3   Q.   Okay.  And at any point did you speak to Mr.

4   Vaccarelli about that?

5   A.   I did.

6   Q.   And tell us what you said to him and what he said to

7   you.

8   A.   I asked him why there was a $1,000 coming out of the

9   account.  I hadn't noticed it until it was up to $16,000.

10  And he said to me, which I didn't understand, was that Ray

11  and I had signed a form that we would want the interest,

12  which would be -- what, 36,000?  Is that -- or was it twelve?

13  Yeah, 36,000 to be paid to us at the end of the note, which

14  really didn't make sense to me.

15  Q.   Okay.  Did he say something like you had set it up

16  that way?

17  A.   Yeah, he did.  He said you set it up that you would

18  get the interest at the end when the note -- when he was

19  going to pay us back the 200,000.

20  Q.   Did he tell you why your money was coming out of

21  your own account?

22  A.   If he did, I don't remember.  I just felt

23  uncomfortable about it.

24  Q.   Okay.  So the $1,000 a month that you were supposed

25  to be getting in interest wasn't coming from LWLVACC or Mr.

1    Vaccarelli?

2         A.   It was coming out of our account.

3         Q.   So, the interest payments you were getting are

4    coming out of your own money?

5         A.   Yes.

6         Q.   And when you spoke to Mr. Vaccarelli about that, did

7    he ultimately pay you $16,000?

8         A.   He did.

9         Q.   I'm going to show you Government's Exhibit 5.

10             MS. LARAI:  And I'd offer that as a full exhibit.

11             I'll just show it to the witness.

12             MR. EINHORN:  No objection.

13             THE COURT:  Full exhibit.

14   BY MR. LARAIA:

15        Q.   Okay.  I'm just going to ask you to look at the top

16   of this document.  Do you see the title Domestic Outstanding

17   Wire Transfer?

18        A.   Yes.

19        Q.   And what's the amount of the wire transfer?

20        A.   $16,000.

21        Q.   Okay.  And who's listed as the sender?

22             Leon Vaccarelli -- well, LWLVACC, LLC.

23        Q.   Okay.  And your expectation was that that was Leon

24   Vaccarelli?

25        A.   Yes, uh-huh.

1     Q.   And who are the people for whom this is supposed to

2  be credit to?

3     A.   Ray and June Antonacci.

4     Q.   Okay.  And at this point, did you have an address

5  down in Florida?

6     A.   I did.

7     Q.   At Light House Point?

8     A.   Yes.

9     Q.   Okay.  And at this time of year -- just to highlight

10  this here -- when the date -- the date of the request to

11  transfer, 4/19/14.  Do you see that?

12     A.   Yes.

13     Q.   At that time of year, where were you and your

14  husband generally located?

15     A.   In Light House Point, Florida.

16     Q.   Okay.  And when would you usually come back to

17  Connecticut?

18     A.   May.

19     Q.   Okay.  Now, after -- well, let me back up for a

20  second.  So, you received the $16,000; is that right?

21     A.   Uh-huh.

22     Q.   Is that yes?

23     A.   Yes.

24     Q.   Okay.  What, if anything, did you do with your

25  investments with Mr. Vaccarelli at that point?

 1      A.    I talked to my husband, because I felt that if there

 2   was smoke there was fire and that he was doing something in

 3   the account, which was taking the thousand out that he didn't

 4   have permission to do; so, therefore, we should close out our

 5   investment account, which was The Investment Center

 6   account.

 7      Q.    Okay.  And did you ultimately do that?

 8      A.    We did.

 9      Q.    Okay.  Do you remember the date that you caused the

10   money to be transferred to something else?

11      A.    April 1.

12      Q.    And why was that?  Why do you remember that?

13      A.    Because it was April Fool's Day.

14      Q.    At any point did you have any conversation with Mr.

15   Vaccarelli about the fact that your money had moved from The

16   Investment Center to something else?

17      A.    He called me that morning, April 1.

18           THE COURT:  What year are we talking?

19           THE WITNESS:  That was two thousand and -- 2014.

20   BY MR. LARAIA:

21      Q.    So, around the same time as this wire transfer --

22      A.    Yes.

23      Q.    -- in 2014?

24      A.    Uh-huh.

25      Q.    And I think you said that Mr. Vaccarelli called you.

1  And what did you say to him and what did he say to you?

2      A.   He said to me, What is going on?  He called early

3  that morning and he said, What is going on, because the

4  account had been closed.

5      Q.   And what did you say to him?

6      A.   And I said something like, You had taken the money

7  out and Ray and I had decided that it would be better if

8  the -- that we move the investments to some other company.

9      Q.   Okay.  And did Mr. Vaccarelli say anything in

10  response to that?

11      A.   He wanted to talk to us, but we were in Florida.

12  And he asked could he come and speak with us when we got back

13  up to Connecticut in May.

14      Q.   And did you agree to do that?

15      A.   I think he came to the house.  I'm not quite sure.

16  And he wanted to talk about it, to see if he could continue

17  to handle the account with The Investment Center, and I said,

18  I think we really need to wait and give -- I think it was

19  with -- I think it was maybe with Morgan Stanley.  I think we

20  need to give them a chance.  We can't just take -- give them

21  the account and just take it away.  I think we need to wait

22  and see how they were doing before we would give it back to

23  Leon.

24      Q.   Okay.  So you mentioned going to someone else.  Had

25  you in the meantime gone to a different financial

1    professional?

2         A.   Right.  I had called the accountant, and he

3    introduced us to someone at Morgan Stanley.

4         Q.   Okay.

5         A.   When Ray and I had gone to the accountant

6    together.

7         Q.   Okay.  At that point, you still had this $200,000

8    note with -- or agreement -- with Mr. Vaccarelli; is that

9    right?

10        A.   Yeah.  Yes.

11        Q.   Okay.  And, so, you and your husband at that point,

12   after the $16,000 had been paid back, you didn't move your,

13   or ask to get back your $200,000 right away; did you?

14        A.   No.  I can't remember.  I don't think it was due

15   then.

16        Q.   Okay.  So you let the investment remain to get the

17   interest and to get your money back at some later point?

18        A.   Correct.

19        Q.   Okay.  Now, at any point did you have any e-mail

20   communication with Mr. Vaccarelli about that investment, that

21   $200,000 investment?

22        A.   I did, when it was due.

23        Q.   Okay.  And I'm going to show you what's been marked

24   Government's Exhibit 458.

25              MS. LARAI:  And offer it as full.

1      MR. EINHORN:  No objection.

2      THE COURT:  Full exhibit.

3  BY MR. LARAIA:

4      Q.   I'm going to start on the third page.  Okay.  Is

5  this an e-mail from you to Mr. Vaccarelli?

6      A.   Yes.

7      Q.   Okay.  And can you read the date of that e-mail for

8  us?

9      A.   August 3, 2015.

10     Q.   All right.  Would you read your e-mail to Mr.

11 Vaccarelli for the jury?

12     A.   Hi, Leon.  Just received another interest payment

13 into my checking account.  My records show that you deposited

14 $16,000 on April, 2014, and I have been receiving monthly

15 payments for 1,000 each month since.  A total of 15,000 --

16 that was a total of 15,000.  The note was for 30 months, so

17 Ray's investment of $200,000 should have been returned to me

18 this month, rather than the $1,000 interest.  Can you please

19 call me?  Or, even better, e-mail me, as I am out of town for

20 the week, to advise when you will make the deposit into my

21 account.

22     Q.   Okay.  So at this point, in April of 2015, by your

23 computations, was your note due, or was the $200,000 due back

24 to you?

25     A.   Yes, it was due.

 1    Q.   Okay.  And based on this e-mail, it indicates that

 2   you had reviewed some of your records?

 3    A.   Yes.

 4    Q.   Okay.  And those records indicated you'd been

 5   receiving the monthly payments, a $1,000 a month, after the

 6   wire?

 7    A.   Uh-huh.

 8    Q.   And it also refers to Ray's investment.  Do you see

 9   that?

10    A.   Yes.

11    Q.   Okay.  And at this point, had Ray passed away?

12    A.   He did.

13    Q.   Okay.  So this was just you handling the money at

14   this point?

15    A.   Yes.

16    Q.   Okay.  I'm just going to go up and ask you to look

17   at this next section here.  Now, on August 5, did you receive

18   a response, basically "I am out of office until Friday.  I

19   will review and respond on Friday.  I hope all is well."  Do

20   you see that?

21    A.   Yes, uh-huh.

22    Q.   And I'm going to focus your attention on the top.

23   Now, a few days later, on Saturday, August 8, did you send

24   another message to Mr. Vaccarelli?

25    A.   I did.

1    Q.   And would you read that message for the jury?

2    A.   Leon, To date you have paid me 31 payments, February

3    through January 20, 1312 payments; February through

4    January 20, 1412 payments:  February through August 2

5    payments.  I thought it was a 30-month investment.

6    Q.   Okay.  Do you see where it says --

7    A.   Sorry, don't agree with your accountant.  Will

8    expect payment in full in October then.  Thanks for checking.

9         Because there had been a phone call, I think, before

10   this, when Leon had told me that his accountant said it

11   wasn't ready to be paid.

12   Q.   Okay.  And you said that was a phone call or

13   communication with Mr. Vaccarelli?

14   A.   Yes.

15   Q.   Okay.  And I'm going to show you this, because I

16   missed this one.  The day before, August 7  Do you see

17   that?

18   A.   Yes.

19   Q.   So, could the communication have been via e-mail?

20   A.   It must have been.

21   Q.   Okay.

22   A.   But I think I spoke with him at some point.

23   Q.   Okay.  Now, just looking at this e-mail, is that an

24   e-mail from Mr. Vaccarelli that you received?  Or, to you?

25   A.   Yes.

1     Q.   And I'm just going to read this so you don't have to

2  keep reading all these.

3          "I just spoke to the accountant and reviewed the

4  paperwork/ledger.  You were scheduled for one more interest

5  payment on September 1 and final distribution of your 200K in

6  October.  As you may recall, the program started in December,

7  2012, but interest did not start accruing until February,

8  2013.  It took about six weeks to start.  On the exit it also

9  takes about six weeks to liquidate, but you still receive

10 interest.  If you have any questions, please call me next

11 week."

12         Do you see that?

13    A.   Yes.

14    Q.   Okay.  And that -- when it says here, "I just spoke

15 to the accountant," is that what you're referring to when you

16 said here, "Sorry, don't agree with your accountant"?

17    A.   Yes.

18    Q.   Okay.  I'm going to show you Government's Exhibit

19 459.

20         MS. LARAIA:  And ask that that be admitted as

21 full?

22         MR. EINHORN:  No objection.

23         THE COURT:  Full exhibit.

24 BY MR. LARAIA:

25    Q.   Ms. Antonacci, would you tell us what this is?

1      A.    This is me disagreeing with his accountant.

2      Q.    And did you send this letter to Mr. Vaccarelli or

3  give it to him in some way?

4      A.    I don't know if I e-mailed it or if I mailed it.

5      Q.    But did you in some way communicate it to Mr.

6  Vaccarelli?

7      A.    Yes.

8      Q.    Okay.  And this is now August 20th, 2015.  Do you

9  see that?

10     A.    Yes.

11     Q.    Okay.  And just looking at this first paragraph,

12  would you read that one for the jury?

13     A.    "I am still in disagreement with your accountant

14  about the payoff date.  It was a 30-month investment, paying

15  a thousand a month for 30 months.  My bank records show that

16  you have paid me 31,000 in interest through August, 2015 "

17     Q.    And, again, did you go through and indicate that

18  $16,000 had been paid, that represented the money that was

19  refunded to us, as you were paying us interest from our own

20  account, The Investment Center.  Do you see that?

21     A.    Yes.

22     Q.    And is that based on this, your review of the

23  document, of what had happened?

24     A.    Yes.

25     Q.    And it says next:  In fact, 14 months of interest

1   after that date would take us through June, 2015 and at the

2   end, either way, it is due and payable.  Do you see that?

3       A.   Yes.

4       Q.   At this point were you trying to get your 200,000

5   back?

6       A.   Yes.

7       Q.   All right.  Now, just looking at the bottom.  Would

8   you read those two paragraphs for us?

9       A.   Nowhere in the agreement does it say that it takes

10  six weeks to liquidate before I receive the money.  That was

11  not the agreement that Ray made with you.  I will expect

12  payment in full by September the 15th, 2015.

13      Q.   Okay.  Now, at any point did you ask anyone else to

14  help you to collect this $200,000?

15      A.   I did.  I asked a friend.

16      Q.   Okay.  Who was the friend?

17      A.   Norman Drubner.

18      Q.   And what was Mr. Drubner?

19      A.   He was an attorney.

20      Q.   Okay.  And did you -- without telling us what you

21  and that person discussed, was it your understanding that

22  that friend did something on your behalf?

23      A.   He called -- yes, he called as a friend -- he called

24  as a friend to me, to Leon.

25      Q.   Okay.  And just to jump to the end, did you

1   eventually get back $200,000 from Mr. Vaccarelli?

2       A.   I did.

3       Q.   Okay.  Now, I want to show you what's been marked

4   Government's Exhibit 460 and ask that that be admitted?

5           MR. EINHORN:  Yep.  No objection.

6           THE COURT:  Full exhibit.

7   BY MR. LARAIA:

8       Q.   Is this some of that $200,000 -- $125,000 of it,

9   specifically?

10      A.   Yes.

11      Q.   Okay.  Did you get the $200,000 all at once?

12      A.   No.

13      Q.   Was there any conversation with Mr. Vaccarelli about

14  the repayment?

15      A.   He asked if he could pay it in two payments --

16  125,000, and a month later 75,000.  And I said that would be

17  fine.

18      Q.   Okay.  I'll just go down.  Do you recognize the

19  signature on the back of that check?

20      A.   That's mine.

21      Q.   Okay.  And just to be clear, this 125,000, was this

22  a partial repayment of that $200,000 investment?

23      A.   Yes.

24      Q.   Okay.  Now I'm going to show you Government's

25  Exhibit 461.

```
 1            MS. LARAIA:  And I'll ask that that be admitted as
 2    full?
 3            MR. EINHORN:  No objection.
 4            THE COURT:  Full exhibit.
 5    BY MR. LARAIA:
 6        Q.   Okay.  Tell us what this is.
 7        A.   The second check for $75,000 was a check that
 8    bounced.
 9        Q.   Okay.  And is this an e-mail after that check had
10    bounced?
11        A.   Yes.
12        Q.   Okay.  Is this an e-mail from you to Mr.
13    Vaccarelli?
14        A.   Yes.
15        Q.   And what is the date of the e-mail?
16        A.   October 27, 2015.
17        Q.   And can you read the body of the e-mail or just
18    that -- how about just the first paragraph of that e-mail?
19        A.   Hi, Leon.  I must have misunderstood.  I thought you
20    were going to mail the replacement check for $75,000 to the
21    Middlebury address.
22        Q.   Okay.  And just looking at this again, the date
23    here, October 27, 2015; is that right?
24        A.   Yes.
25        Q.   Okay.  I'm going to show you Government's Exhibit
```

```
 1    462.

 2            MS. LARAIA:  And ask that that be admitted.

 3            MR. EINHORN:  No objection.

 4            THE COURT:  Full exhibit.

 5    BY MR. LARAIA:

 6       Q.   Okay.  Now, is this a check for $75,000 payable to

 7    you?

 8       A.   Yes.

 9       Q.   Okay.  Let's just focus down here.  Can you read

10    this date 10/20/2015?

11       A.   Yes.

12       Q.   A couple weeks before, or I guess a little bit

13    before your e-mail to Mr. Vaccarelli?

14       A.   Yes.

15       Q.   Okay.  And, so, fair to say this check is the one

16    that didn't clear?

17       A.   Correct.

18       Q.   Okay.  Did you ever get a replacement check?

19       A.   Well, I did.  I think it came as a bank check,

20    maybe.

21       Q.   Okay.  I'm going to show you Government's Exhibit

22    464.

23            MS. LARAIA:  And ask that that be admitted as

24    full?

25            MR. EINHORN:  No objection.
```

1          THE COURT:  Full exhibit.

2    BY MR. LARAIA:

3       Q.   Just tell us what this is.

4       A.   That's the replacement check.

5       Q.   Okay.  What's --

6       A.   75,000.

7       Q.   And what's the date on that check?

8       A.   11/30/2015.

9       Q.   And the amount, $75,000?

10      A.   Yes.

11      Q.   What is the memo line?  What does this say?

12      A.   Payoff -- what is it, "SR Note"?

13      Q.   Maybe "Payoff," like abbreviation Senior Note,

14   something like that?

15      A.   Yeah, maybe.

16      Q.   Okay.  What is the name on the bank account that

17   that check is drawn on?

18      A.   LWLVACC, LLC, Care Of Lux Financial.

19      Q.   Okay.  Just looking at the bottom here, do you

20   recognize that signature?

21      A.   That's my signature.

22      Q.   And what would you have done with this check when

23   you got it?

24      A.   Deposit it into the bank.

25      Q.   Okay.  So did you endorse the back and deposit it?

1       A.   Yes.

2       Q.   At this point, I'm going to go back to Government's

3    Exhibit 463.

4            MS. LARAIA:  And ask that that be admitted as a full

5    exhibit.

6            MR. EINHORN:  No objection.

7            THE COURT:  Full exhibit.

8    BY MR. LARAIA:

9       Q.   Okay.  I just want to focus on the bottom for a

10   second.  Is this an e-mail from you to Mr. Vaccarelli?

11      A.   Yes.

12      Q.   Okay.  And what's the date of this e-mail?

13      A.   November 30, 2015.

14      Q.   Okay.  And what did you say to Mr. Vaccarelli in the

15   e-mail?

16      A.   "Will cash tomorrow if that's okay."

17      Q.   Okay.  Okay.  And I'm also going to show you the

18   top.  Okay.  And what was the answer?

19      A.   "Yes, thank you."  And "It's all set."

20      Q.   Okay.  And the date on this, was that November 30th,

21   2015?

22      A.   Yeah.  Yes.

23      Q.   Make that a little larger.

24      A.   Yes.

25      Q.   Okay.  And fair to say that check cleared?

```
 1      A.   Yes.
 2      Q.   Okay.  I'm going to show you also Government's
 3 Exhibit 20.
 4           MS. LARAIA:  And ask that that be admitted as a full
 5 exhibit.
 6           THE COURT:  Hearing no objection, it's a full
 7 exhibit.
 8           MR. EINHORN:  No objection.
 9           MR. LARAIA:  I'm sorry, Your Honor.  That may
10 already be admitted.
11 BY MS. LARAIA:
12      Q.   Is that the same check that we just saw, just a
13 different exhibit number, the $75,000 Payoff Senior Note?
14      A.   Yes.
15      Q.   Okay.
16           THE COURT:  Is it the same as 464?
17 BY MS. LARAIA:
18      Q.   And is that the same as Government's Exhibit 464,
19 this check right here?
20      A.   Yes.
21      Q.   Okay.  And at any point did Mr. Vaccarelli tell you
22 where the money came from to pay back the $200,000?
23      A.   No.
24           MR. LARAIA:  Nothing further, Your Honor.
25           THE COURT:  All right.  Cross-examination.
```

CROSS-EXAMINATION

1

2   BY MR. EINHORN:

3       Q.   Good afternoon, Ms. Antonacci.  My name is Jon

4   Einhorn and I represent Leon, and I'm just going to ask you a

5   couple quick questions.  Okay?

6       A.   Okay.

7       Q.   Did you just come up from Florida, or are you back

8   in Connecticut?  Do you live there?

9       A.   No, I came up the end of -- April 25.

10      Q.   All right.  So you're here.  So, first of all, is

11  it -- it's fair to say, isn't it, that your late husband,

12  Ray, and Leon were good friends?  They were tight?

13      A.   They were business friends.  They were not social

14  friends.

15      Q.   Sure.  But they were business friends?

16      A.   Right.

17      Q.   Right.  And they got along really well with each

18  other?  Businesswise I'm just talking about.

19      A.   Yes.

20      Q.   Sure.  And the transaction we're talking about this

21  afternoon was a $200,000 loan to Leon; right?

22      A.   Correct.

23      Q.   And I'm not sure I followed everything with the

24  checks there, but the loan was paid back, the 200,000 was

25  paid back?

1      A.   Yes.

2      Q.   Okay.  All right.  Now, if your husband had any -- I

3  don't want to say "under the table" -- but had any other

4  discussions with Leon about the payments of the interest in

5  the meantime, would you have known about it or do you think

6  it's possible he and Leon had some private conversations

7  about payments?

8      A.   I'm sure he had quite a few private conversations

9  with Leon.

10     Q.   Okay.  All right.  As a matter of fact, do you think

11  it's possible that he told Leon just defer the interest for

12  now and then we'll do it later?

13     A.   Well, that's the paper that Leon had said that Ray

14  and I had signed.

15     Q.   Sure

16     A.   But I never saw that paper.

17     Q.   I see.  Okay.  All right.  All right.  So you're

18  whole?  You got your money back; right?

19     A.   Yes.

20     Q.   Ray's money.

21          Great.  Thank you very much.

22          MR. EINHORN:  Nothing further, Your Honor.

23          THE COURT:  Redirect.

24          MR. LARAIA:  Just briefly, Your Honor.

25                    REDIRECT EXAMINATION

1    BY MR. LARAIA:

2        Q.   Now, in April of 2014 -- I'm going to show you

3    Government's Exhibit 5.  And do you see the date here on this

4    document, 4/19/14?

5        A.   Yes.

6        Q.   Okay.  In April of 2014, when Mr. Vaccarelli paid

7    you back $16,000 that had come out of your own bank account,

8    was your husband alive in April of 2014?

9        A.   Yes.

10       Q.   Okay.  And was your husband aware that you had a

11   conversation with Mr. Vaccarelli about this money coming out

12   of your own bank account?

13       A.   He was aware, because he didn't want to do it.  He

14   didn't want to talk to Leon.

15       Q.   Okay.  And at any point, did you understand that

16   your husband had agreed with Mr. Vaccarelli that there was

17   some other arrangement or was your husband aware that $16,000

18   was going to be paid back to you?

19       A.   Could you repeat that?

20       Q.   Sure.

21       Q.   Was your husband aware that Mr. Vaccarelli was going

22   to be paying back $16,000 of money that was taken out of your

23   own money to pay you?

24       A.   Yes.

25       Q.   Okay.  And at any point did it come up in the

```
 1   conversation with Mr. Vaccarelli that there was some other

 2   separate deal that he'd had with your husband that you didn't

 3   know about?

 4        A.   A deal that I did not know about?

 5        Q.   Did Mr. Vaccarelli ever tell you that there was some

 6   other arrangement with your husband that you didn't know

 7   about?

 8        A.   No.

 9             MR. LARAIA:  Okay.  No further questions.

10             MR. EINHORN:  May I just inquire on that point?

11             THE COURT:  You may.

12                      RECROSS-EXAMINATION

13   BY MR. EINHORN:

14        Q.   Just so it's clear, the 16,000 that you got back

15   didn't come out of your money.  That came from Leon to you to

16   pay you back the 16,000; right?

17        A.   Yes.

18             MR. EINHORN:  Okay.  Nothing further.

19             THE COURT:  All right.  If there's nothing

20   further --

21             MR. LARAIA:  No, Your Honor.

22             THE COURT:  -- then thank you, Ms. Antonacci.  You

23   may go.  You are excused.

24             THE WITNESS:  Okay.

25             (Witness excused, 12:51 p.m.)
```

1          THE COURT:  All right.  I think we'll break for

2    lunch, rather than getting started on the new witness.  So

3    we'll be back in half an hour, and leave your notebooks here,

4    please.  You may go.  Thank you.

5               (Jury out, 12:51 p.m.)

6          THE COURT:  Who will your next witness be?

7          MR. McGARRY:  It's going to be Mr. Steven Essex, and

8    he is from the Salisbury Bank and Trust.

9          THE COURT:  All right.

10         MR. McGARRY:  And then the last witness of the day

11   is a Mr. Brian Klanica, who Ms. Laraia tells me is a short

12   witness -- in time, not in height.

13         THE COURT:  All right.  Very good.  We'll stand in

14   recess.  Thank you.

15         MR. McGARRY:  Thank you.

16         MR. EINHORN:  Thank you, Your Honor.

17              (Recess taken, 12:52 p.m.)

18              (Out of the presence of the Jury, 1:35 p.m.)

19         THE COURT:  All right, Counsel.  Please be seated.

20   Please bring in the jury and please bring in Mr. Essex.

21         MR. McGARRY:  Should I have him --

22         THE COURT:  Yes.

23         MR. McGARRY:  Okay.  Mr. Essex, if you would just

24   head right on up to the witness stand.

25              (Witness enters, 1:37 p.m.)

```
 1              (Jury in, 1:37 p.m.)
 2              THE COURT:  Please be seated, ladies and gentlemen.
 3    We will proceed with the Government's evidence.
 4              Mr. McGarry, will you introduce your next witness,
 5    please?
 6              MR. McGARRY:  Yes, Your Honor.  At this time, the
 7    Government calls Mr. Steven Essex.
 8              THE COURT:  All right.  Mr. Essex, would you kindly
 9    stand up and raise your right hand, and the oath will be
10    administered.
11              (STEVE ESSEX sworn, 1:38 p.m.)
12              COURTROOM DEPUTY:  Please be seated, and state your
13    name for the record.
14              THE WITNESS:  Steve Essex.
15              COURTROOM DEPUTY:  Can you spell your last name?
16              THE WITNESS:  E-S-S-E-X.
17              COURTROOM DEPUTY:  And can you tell us which city
18    and state you live in?
19              THE WITNESS:  Simsbury, Connecticut.
20              THE COURT:  All right.  You may proceed.
21              MR. McGARRY:  Thank you, Your Honor.
22                        DIRECT EXAMINATION
23    BY MR. McGARRY:
24       Q.   Good afternoon, Mr. Essex.  Where do you currently
25    work?
```

1          A.    Salisbury Bank and Trust in Lakeville,

2     Connecticut.

3          Q.    And how long have you worked at Salisbury Bank and

4     Trust?

5          A.    Since June of 2009.

6          Q.    Can you tell the ladies and gentlemen of the jury a

7     little bit about your educational background and your

8     experience?

9          A.    Sure.  I graduated in 1991 from the University of

10    Connecticut with a degree in economics.  Last couple years of

11    college, I was working as a teller.  So I've been in banking

12    since late eighties.  I worked for Connecticut National,

13    Shawmut, Fleet, FleetBoston.  I was with Merrill Lynch for a

14    couple of years doing financial planning.  With Ridgefield

15    Bank for about a year as a financial planner.  Six years with

16    the Trust Company of MassMutual, and that was as a trust

17    officer in business development.  And since 2009, with

18    Salisbury Bank and Trust.  I was there as a trust officer

19    until about 2014.  And since 2014, I've been the head of the

20    trust department.

21         Q.    And as a trust -- well, first of all, what is a

22    trust officer?

23         A.    It is a banker who administers trust accounts.  So

24    you have to have expertise in -- a little bit of a legal

25    expertise, tax, investment, financial planning.  It also

1    becomes a little bit of -- I don't know -- I guess, social

2    work.  You're often a mediator with families because there's

3    often disputes about money.  So it's a multi-disciplined

4    function.

5         Q.   Does a trust officer manage or oversee trusts?

6         A.   Yes.

7         Q.   Okay.  What is a trust?

8         A.   A trust is a legal document, like a Will.  There's

9    all types of trusts, but it's -- it's oftentimes its own

10   separate tax-paying entity, not to get into too much detail.

11   The parties of a trust are the trustee.  The trustee is

12   responsible for the administration of the trust and all

13   aspects of it.

14        There is one, and sometimes several beneficiaries of

15   that trust, who benefit from the administration of the trust.

16   And then there's often the ones that benefit at the end of

17   the trust term, who are called remaindermen.

18        Q.   And can a trust have -- does a trust generally have

19   assets in it?

20        A.   Yes.  In general, yes.

21        Q.   Is that -- can that be stocks, bonds, real estate?

22   Can it even be real assets, like, I don't know, diamonds and

23   jewels and things of that sort?

24        A.   Yes.

25        Q.   Okay.  Did you have any particular training in order

1   to become a trust officer?

2       A.   You certainly can.  There are courses that you can

3   take.  In my experience, or with me personally, I just

4   started off with no trust administration experience in the

5   early '90s, and I just came up as an assistant that became a

6   junior officer and then a trust officer, and just throughout

7   the years, understanding how to administer a trust.

8       Q.   And so the jury can appreciate, where is Salisbury

9   Bank and Trust?

10      A.   The home office is in Lakeville, Connecticut.

11  Lakeville is in the absolute northwestern corner Connecticut.

12  It borders Massachusetts and New York.

13      Q.   And where were working or which branch?

14      A.   I worked in the Canaan, Connecticut, branch, which

15  is just south of the Massachusetts border, and then also in

16  Lakeville.

17      Q.   Okay.  When Salisbury Bank and Trust manages a trust

18  -- is that the correct word, "manage," by the way?

19      A.   Yes.

20      Q.   Are they -- who is the trustee?

21      A.   The trustee in this case was the bank, Salisbury

22  Bank and Trust.  They're named in the document as the

23  trustee.  As a trust officer, I'm an employee of the bank and

24  my job is to administer the trust.

25      Q.   And if the bank -- and when you say "this case," are

1    you -- what trust were you the trust officer for that brings

2    you here today?

3        A.   It was the Sheila Burton Trust.

4        Q.   And was there a particular individual who was a

5    beneficiary of the Sheila Burton Trust?

6        A.   Lynn Burton.

7        Q.   Okay.  And speaking of -- was that one of the many

8    trusts that you were a trust officer for?

9        A.   Yes.

10       Q.   If you could explain to the ladies and gentlemen of

11   the jury how a trust officer would manage a trust, what you

12   have to do to make decisions with respect to the trust.

13       A.   The trust has investments that are the trust assets.

14   Those assets serve to support the beneficiary.  So after --

15   you have to understand how to manage a portfolio of stocks

16   and bonds, mutual funds, whatever the trust is invested in.

17            You have to work very closely with the beneficiary,

18   if it is for their support, because you have to understand

19   what they need.  So, oftentimes, that involves creating a

20   budget for them to make sure that you're making the best use

21   of the trust assets.

22       Q.   Did you have to also do some financial planning --

23       A.   Yeah.

24       Q.   -- and whether it's forecasting or risk management

25   with regard to the trust?

1     A.   Yeah, absolutely.  So, you know, you've got some

2   assets in the trust.  You can make reasonable assumptions

3   about how much that trust will earn in income, or grow.  Then

4   you can understand how much you can afford to distribute out

5   to a beneficiary for their support without jeopardizing the

6   value of the trust.  So then you're working with the

7   beneficiary to say, Okay, here's what you have to work with

8   and here's the amount of money we can provide to you for your

9   support.

10        So then you have to -- that gets into financial

11   planning.  That gets into creating a budget for the

12   beneficiary.

13     Q.   And are you familiar with the term like the

14   "fiduciary obligation" or "duty of loyalty," or things of

15   that sort?

16     A.   Yeah.  So a trustee is considered a fiduciary.  And

17   what that means is the fiduciary acts in the best interest of

18   another person.  So, in this case, a trustee has to -- they

19   should have no conflicts of interest.  They have to act in

20   the best interest of not only the current beneficiaries but

21   also the people that would eventually get the trust at some

22   point.

23     Q.   And is there a balance that needs to be done between

24   the interest of the trust and the interest of the beneficiary

25   or beneficiaries?

1    A.    The interest of the beneficiary is what governs how

2    you administer the trust.

3    Q.    And do you also have to protect the trust itself,

4    meaning that you can't just -- or maybe you can.  I'll ask

5    the question and you'll tell the jury.  Can you just give all

6    the money over to the beneficiary and say, Here you go?

7    A.    No.

8    Q.    Okay.  Tell us why not.

9    A.    Okay.  So, the trust, as a legal document, it lays

10   out what the trust -- what the trustee can do, what they're

11   allowed, the reasons why they're to distribute out money.

12           So, in this case, it was for health, education,

13   maintenance and support.  It's a very common term within the

14   trust document.  So the beneficiary can certainly request

15   money, but then the trustee exercises their discretion on

16   whether to make a distribution for them.  If they just say,

17   Look, I want to go out and I want to buy a Mercedes.  The

18   trustee would then say, Okay, I have your request -- it's

19   oftentimes in writing.  They would take a look at the trust

20   document and they would say, Well, that doesn't technically

21   fit within the definitions of health, education, maintenance

22   and support and it's not a reasonable request, so they would

23   decline it.

24           Another example:  They could call and say, I have

25   this health issue, my health insurance doesn't cover it, I

1  need $10,000.  They would make that request to the trust,

2  then the trustee would say that's clearly within the

3  definition of health, so they would take it in to a

4  committee.  The committee would make a decision on whether

5  that was an allowable distribution.  The approval would be

6  made and the distribution would be made out, ideally directly

7  to whoever is providing that service and not to the

8  beneficiary.

9      Q.   So, to the doctor, for instance?

10     A.   To the medical -- so, yeah.

11     Q.   You mentioned a committee.  If you could briefly

12  tell us what Salisbury Bank and Trust, what kind of

13  committee, how often did you meet?  And not just generally,

14  but speaking specifically with the Burton Trust to the

15  benefit of Lynn Burton?

16     A.   Sure.  So, a trust officer at Salisbury Bank has a

17  certain amount of flexibility on how much they can distribute

18  out without going to a committee.  I think at the time, say a

19  $1,000, or something along those lines.  Maybe 5,000.

20  Anything over that, any request over that they would have to

21  take it to what's called Trust Administration  Committee.

22  And this is a committee that's made up of other trust

23  officers, as well as usually the head of the department.

24          They would take it -- they would also look at the

25  trust document.  They would look at the request.  So it's not

1    just up to one person.  It's up to a committee to make that

2    decision, Is that request reasonable, does it fall within the

3    language of the trust.  And then they would make a decision

4    on whether to approve.

5            If the request was over $25,000, then that would go

6    up to the next level, which is Trust Committee.  The people

7    that sit on Trust Committee are the board members of the

8    bank.  There's a -- they -- certain members form this Trust

9    Committee, and any distribution over that $25,000 amount

10   would need to be approved at that committee before the money

11   goes out of the trust.

12   Q.   And do you also have any sort of software accounting

13   systems, anything else that helps you as the trust officer to

14   manage trusts, specifically the Sheila Burton Trust for the

15   benefit of Lynn Burton?

16   A.   Absolutely.  It's critical, at least for us.  It's

17   not like an investment management account.  A trust requires

18   accounting.  It has income and principal, which needs to be

19   separated.  So there is specific software that allows us to

20   administer a trust and accounts for everything going in and

21   out -- you know, return on the assets, income earned, capital

22   gains, and then any distributions going out.

23   Q.   And for all of this work that you've been

24   describing, did Salisbury Bank -- or does it, and

25   specifically did it -- charge a fee?

1      A.    Yes.

2      Q.    And do you know what the fee was based on?

3      A.    The market value of the account.

4      Q.    And approximately -- do you remember, approximately

5  how big was the Burton Trust?  I'm going to call it the

6  Burton Trust; is that okay?

7      A.    Sure.

8      Q.    Okay.  How big the Burton Trust was when Salisbury

9  Bank and Trust was managing it.

10     A.    It went up and down according to the performance of

11 the market and the investments, but it ranged between a half

12 a million and 600,000, somewhere in that range.

13     Q.    And, so, approximately what would the fee be?  Was

14 it based on, you said, a percentage?

15     A.    A percentage.  So our fee schedule is tiered.  So it

16 was 1.25 percent on, say, the first million, and then it goes

17 down to -- it went down to 1.15, and there's additional

18 tiers.

19     Q.    So, again, I'm not going to ask you to do math on

20 the stand.  1 percent of $500,000, do you recall how much the

21 bank charged for the service, roughly?

22     A.    If it were $500,000, it would be about $6,250.

23     Q.    So you did do math on the stand.  But you're a

24 banker.

25     A.    It's a frequent question.

1    Q.   Is that per year, per month?  What is the time?

2    A.   Per year.

3    Q.   I'm sorry?

4    A.   Per year.

5    Q.   Per year.

6    A.   Charged on a quarterly basis in arrears, which means

7    that we perform the service, a quarter of the fee is charged,

8    perform the service, another quarter of the fee is charged

9    throughout the year.

10   Q.   With all that as background, can you tell us based

11   on your position related to the Burton Trust, do you know the

12   name Sheila Burton, who set up the Sheila Burton Trust?  And

13   not do you know her personally, but do you know who she is or

14   who she was?

15   A.   She was Lynn Burton's mother.

16   Q.   And was Sheila Burton still alive when you were the

17   trust officer for the Burton Trust?

18   A.   No.  She had passed away, I think in 2007 or 2006,

19   somewhere around there.

20   Q.   And who is Lynn Burton?

21   A.   Her daughter.

22   Q.   Her daughter.  And have you met her?

23   A.   Yes.

24   Q.   And have you spoken with her when you were the trust

25   officer?

1    A.   Frequently.

2    Q.   Okay.  When you were the trust officer, did you send

3    monthly statements or did you send statements at all?

4    A.   Sent statements.  I'm not sure if they were monthly,

5    but probably quarterly.

6    Q.   What information was included on the statements?

7    A.   The first part of the statement -- well, the cover

8    of the statement is just the title of the trust and who --

9    the address of who it's going to.  Then it would have the

10   list of all the holdings with the name -- name of the

11   companies or the name of the bonds that are in there, what

12   those positions were purchased for, the value, approximately

13   what they earned in income.

14       And then the following pages are just the

15   transactions within that period.  Any kind of income that was

16   earned, any distributions going out, money market

17   interest.

18   Q.   Let me pull up 750.  Right in front of you.

19       MR. EINHORN:  No objection, Your Honor.

20       THE COURT:  Full exhibit.

21   BY MR. McGARRY:

22   Q.   Do you recognize -- a photocopy here, but what is

23   Government's Exhibit 750?

24   A.   Looks like the cover page of the trust document.

25   Q.   And let me take you to the second page.  Do you

757

1   recognize that page?

2        A.   Yes, I do.

3        Q.   Okay.  And what is that?

4        A.   This is the preliminary language of the trust.  It

5   establishes who the grantor or settlor in this case was, who

6   created the trust, who's named as trustee, when it was

7   created.

8        Q.   Okay.  And let me see if I can zoom-in.  Okay.

9             And, so, who was the settlor and who -- who created

10  the trust?

11       A.   Okay.  So, the settlor was Margaret Sheila Burton,

12  known as Sheila Burton.  Apparently, at that time she lived

13  in Salisbury, in Connecticut.  She had named Salisbury Bank

14  and Trust Company, my current employer, as the trustee.  That

15  was the original.  And then this particular one was a second

16  amendment of that trust.  And the underlined portion that

17  says "Amended and restated in its entirety," which means

18  there was an original version of the trust that was created

19  in 1991, and then September 15 of 1997 the second amendment

20  took place that replaced that first version entirely.  So

21  this is the entire document.

22       Q.   And it says, "The settlor, desiring to establish a

23  revocable life insurance and property trust, does hereby

24  transfer and assign to the trustee the property."

25            So what's the difference between -- I guess since we

1    have you here -- revocable life insurance and property trust,

2    as opposed to perhaps an irrevocable trust?

3        A.   The primary word being "revocable" or "revocable"

4    (phonetic), which is just that she can change it during her

5    lifetime, and while she's able, you know, she still has

6    capacity, she can change it at any time.

7        Q.   And that's the --

8        A.   Revoke it.

9        Q.   That would be Sheila Burton?

10       A.   That's Sheila Burton.

11       Q.   But the beneficiaries, can they change it --

12       A.   No.

13       Q.   -- or is it set?

14            So Lynn -- go ahead.

15       A.   But at this point, the -- Sheila Burton was always

16   the beneficiary during her lifetime.

17       Q.   All right.  And, so, let's scroll down just to --

18   I'm going to make this a little bigger so the jury can

19   appreciate, but still big enough so you can read it.

20            What happens upon the death of Ms. Sheila Burton?

21       A.   Then the trust lays out how the trust is to be

22   administered.  If this trust can pay for any kind of final

23   expenses, expenses of the estate, taxes.  And then further

24   on, it would just -- well, in this case it would also --

25   looks like it took in the proceeds of an insurance policy.

1          And then further on, it would say how the Trust is

2     to be administered going forward.

3          Q.   Okay.  Well, let's kind of go down.  I'd like to

4     direct your attention just briefly, because I think it

5     relates to your position and your reason here as a witness

6     here today -- Article 5, does that relate -- directing your

7     attention to the part that says "including."  Does that

8     relate to Salisbury Bank and Trust when you were the trust

9     officer?

10         A.   Hold on.  Let me read it.

11         Q.   Sure.  I'm focusing your attention on the part that

12     says "Including a reasonable charge as compensation for the

13     trustee's services in connection therewith and shall

14     apportion and charge all such expenses and charge to

15     principal or income as the trustee in the trustee's sole

16     discretion deems reasonable and proper."

17              Is that kind of referring to the fee, or have I

18     misread --

19         A.   Yeah.  No, that referred to a trustee's ability to

20     charge a reasonable fee.

21         Q.   Okay.  And is that what Salisbury did?

22         A.   Yes, according to our published fee schedule.

23         Q.   And was that something that was negotiable where

24     people could say, Hey, how about for my trust you give us a

25     little break, or was it just set?

1    A.   Sometimes, if the trust is large enough, a

2    bank/trust company will negotiate.  But oftentimes, it's

3    according to the published fee schedule.

4    Q.   I'm going to skip a page and go down to page 5.

5    Maybe you can just explain to the jury real briefly the names

6    that they're seeing under paragraph B, the relationship, and

7    what this paragraph and the little indents, what it's saying.

8    A.   Okay.  This is referring to -- okay, now the settlor

9    has passed away.  It's saying how the trust is to be

10   distributed out.  In this case, it goes to settlor's two

11   sons, Anthony -- Antony and Rufus, and two daughters, Carolyn

12   and Linda.  Antony, Rufus, Carolyn get their portions

13   outright and free of trust.  That means they get it freely

14   distributed.  They can do with their portion whatever they

15   wish.  Lynn's is to continue on in trust for her benefit for

16   her lifetime according to the provisions of the next section,

17   which is paragraph -- which is C.

18   Q.   Okay.  So, just to be clear, "outright and free"

19   means that Anthony, Rufus and Carolyn would get their

20   beneficiary from their mom, and it would be given to them; is

21   that accurate?

22   A.   Yeah.  So if it was a $1,000,000, each one of those

23   would get $250,000.  They could do with it what they will.

24   Q.   Okay.  But Linda, she didn't get it free and clear.

25   That was going to be held in trust; correct?

1    A.    Correct.

2         MR. McGARRY:  Your Honor, we have a special

3    appearance by Ms. Konarski to help with the computer.

4         Can I keep asking questions?

5         MS. KONARSKI:  Yeah.

6         MR. McGARRY:  I've been given permission to ask

7    questions, Your Honor.

8         THE COURT:  Your reputation is on the line, you

9    know, Ms. Konarski.

10        MR. McGARRY:  Okay.  Thank you.  It's like manna

11   from Heaven, Your Honor.

12   BY MR. McGARRY:

13   Q.   So then it says if the settlor's daughter Linda

14   survived the settlor -- and now that we have our yellow

15   feature back -- the trust shall continue during her lifetime.

16   What does that mean?

17   A.   If Linda -- or Lynn -- survives her mother, then

18   this trust that's created for her is to be established to

19   care for her and support her for her lifetime.

20   Q.   And I just want to focus on that, "establish for

21   her" and focus "during her lifetime."  Did that impact how

22   you and the committee and the accounting software had to

23   manage the trust?

24   A.   Yes.

25   Q.   Tell the jury how that clause or that request

1    affected the way you managed the trust?

2        A.    So if the trust is for a beneficiary's lifetime,

3    you're constantly worried about the level of distributions

4    out of the trust.  So if you've got, you know, we'll say a

5    $1,000,000 and you're -- you know it has to last for that

6    person's lifetime, you're taking a look at their age, their

7    health, how much is required for their support, and you're

8    trying to do -- and manage the trust appropriately so it

9    lasts for the rest of their lifetime.

10            So if you've got a $1,000,000, and you think that a

11   reasonable return on those assets is, you know, 5 percent,

12   that would give you -- you have to work within -- $50,000 is

13   5 percent of a million.  That's what you have to work with

14   every year.  But then the market value is going up and down,

15   so it's a constantly monitoring of the assets and making sure

16   that you're not drawing down the trust.

17       Q.    And the more you spend, the less that's left in the

18   market, the more you don't spend, the more that is left in

19   the market?

20       A.    Right.

21       Q.    Okay.  If that made sense.  Let's take you to the

22   next paragraph -- or the next page.

23            "During the continuation of this trust" -- and I'll

24   just read it for the record -- "the trustee shall pay to or

25   for the settlor's and daughter so much of the net income and

1  principal of this trust as the trustee" -- that would be the

2  bank, correct -- not you, the person, but the bank?

3      A.   Yeah, the bank.

4      Q.   -- "deems necessary or advisable for her health,

5  maintenance, education and support any distributions of net

6  income or principal to the settlor's said daughter, Linda,

7  hereunder, however, shall be made after taking into

8  consideration other assets or sources of income reasonably

9  available to the settlor's said daughter."

10      It kind of sounds like a legalese, almost a little

11  old English, but what is that paragraph instructing the

12  trustee to do?

13      A.   That gives -- that outlines our discretion, what

14  we're able to make distributions for.  There's a little

15  latitude in what you can determine as health, maintenance,

16  education and support.  It at least gives us a little bit of

17  guidance there.  But then it says that we shall also consider

18  other assets or sources of income available to the daughter,

19  which means -- which would say to us that before we could

20  make a distribution, we really should do our best effort to

21  gather from the beneficiary what other assets she has and

22  what other income.  Is she getting Social Security?  Does she

23  have a pension?  Does she have an investment account

24  someplace else that she could use for what she's requesting

25  from the trust?  So that's what we should do.

1      Q.    Do you know, based on your interaction with

2   Ms. Burton -- I'm talking about Linda -- do you know her as

3   Lynn or Linda?

4      A.    Lynn.

5      Q.    I'm going to refer to her as Lynn, not to be

6   familiar but so that there's no confusion between the trust,

7   Margaret, and Lynn.

8           Okay.  Do you know if Lynn Burton had a job or a

9   source of income other than this trust when you were the

10  trust officer?

11     A.    She did not.

12     Q.    And was this -- do you know if she had other means

13  of support, other investment funds, other pensions or

14  anything else?

15     A.    She had said at one point that she was getting

16  Social Security.  We were never able to confirm that.  We

17  tried as -- quite hard to get documentation for that.  She

18  was saying at one point that she was getting checks for

19  Social Security, but I think at that time Social Security

20  moved all to electronic transfers, so that didn't seem to

21  make sense.

22          We were able to determine at one point that she had

23  a small account over at Merrill Lynch, so then we were trying

24  to collect and make -- see if we can get a statement from

25  there.  But we could ask as much and as often as we could.

1   If she doesn't provide it, then there's no way we can go

2   directly to Social Security or to a Merrill Lynch financial

3   advisor and ask them to -- or demand that they provide us a

4   statement.

5       Q.   And is it fair to say that she never had, as far as

6   you could tell, meaningful employment or a meaningful

7   alternative avenue of income?

8       A.   Not to my knowledge.  I think she had some small

9   jobs along the way that might have even paid her under the

10  table.  Nothing, I don't think, meaningful during her

11  lifetime.

12      Q.   Did you try to put her on a budget?

13      A.   Yes.

14      Q.   Briefly tell the jury about that.

15      A.   Oh, briefly.

16      Q.   I understand.  How long were you the trust

17  officer?

18      A.   I would say two, three years, maybe.

19      Q.   And had you taken it over from somebody else?

20      A.   Yes.

21      Q.   Okay.  In a sentence or two, why did you take it

22  over from that other person?

23      A.   There were -- Lynn and the woman that was our senior

24  person within the Trust Department, they were often butting

25  heads.  And as part of the resolution -- I had dealt in my

1    past with difficult beneficiaries or challenging situations,

2    so I was requested to take over as the trust officer at that

3    point and see if I could find some kind of resolution and

4    hopefully get a little more cooperation from Lynn.

5         Q.   And was she difficult?

6         A.   She was challenging.

7         Q.   Just to put this in context.  Do you know her --

8    roughly her age, how old she is now?

9         A.   Seventies.

10        Q.   Okay.  And, so, we kind of had a little diversion, a

11   little detour when I asked you if you tried to put her on a

12   budget.

13        A.   Yeah.

14        Q.   Now putting into context that she was difficult, can

15   you explain to the jury how you tried to put her on a

16   budget?

17        A.   Sure.  Give a little context to it.  While her

18   mother was alive -- it's my understanding, because I wasn't

19   at the bank at that time -- when Lynn would make requests,

20   you know, I need money for this, I need money for that, the

21   mother would just give her money.  So she got accustomed to

22   just getting money outright.  And that was hard when her

23   mother passed away -- one, she lost her mother; and secondly,

24   it's like turning the ship around.  Now all of a sudden,

25   instead of just asking for money and getting it, now you've

1  got to go to the trustee, this bank that's serving as a

2  trustee of the trust, and make her formal request.  And then

3  it has to go through a process, and it may or may not get

4  approved.

5         So, in order for us to exercise our discretion, we

6  needed information from her.  We can't just say, you know,

7  she requests $10,000, we give her $10,000.  We have to work

8  within the language of the trust.

9         So we would go to her and say -- she would make a

10  request and say, I need $5,000.  Okay, Lynn, well, tell me

11  what your expenses are.  What do you need this money for?  We

12  could see the bills.  You are asking us for reimbursement for

13  certain bills.  How much are you paying for your medical

14  care, your prescriptions, your food -- whatever else --

15  insurance?

16     Q.   Her rent.

17     A.   Rent is another one.

18     Q.   So we're going from her getting just cash outright

19  and gradually trying to put into place, Okay, here's the

20  amount you have to live within and, therefore, we need to

21  know all your expenses.  And that was just a process we

22  couldn't -- it was a constant back-and-forth trying to figure

23  out what she's paying, how much she needs.

24         But as we could find out what her expenses were -- a

25  good example, a utility bill.  Okay, you're paying your

1   utilities, that's what you're requesting money for.  Let the

2   trust pay that directly.  Okay, we're going to take that off

3   your plate.  We're going to approve a distribution for that,

4   because that's your support -- you need electricity.

5          So we're going to pay that directly to the utility

6   provider and we're going to decrease the amount of cash that

7   we're just sending out to you every month for your support.

8   So it's still your support, but we're starting to pay the

9   service providers directly.  And by that way, we're getting

10  more control about what's going out of the trust for her

11  care, allowing us to better control how the trust is

12  administered.

13         And that was a several-year process in trying to

14  nail this down gradually and trimming back what we were

15  providing her as cash that she could do whatever she wished

16  with in paying these providers directly as we were trying to

17  create this budget.

18     Q.    So let me just ask a simpler question.  Are you

19  familiar with the term "Crate Newell" or -- "Crate Newell,"

20  if I'm saying that correctly, to pay her rent?

21     A.    Yes.  That was the landlord's company, yeah.

22     Q.    Is that, I guess, N-E-W-E-L-L?

23     A.    Yeah.

24     Q.    Is there a fellow David Newell?

25     A.    Yeah, landlord.

1    Q.   Was that -- just for an example, was that one of the

2    services that you tried to take direct payment of so you

3    could pay him directly so you didn't give her cash?

4    A.   Yeah.

5    Q.   And that way you made sure her rent was paid?

6    A.   Yeah, because it was a frequent call in a panic, I'm

7    behind on my rent, I need $2,000 to bring myself current and

8    pay the current rent.  And this was happening over and over

9    again.  And we're saying, give us the name of your landlord,

10   all right.  And then we're able to contact the -- eventually

11   able to contact the landlord directly, get a copy of the

12   lease, so we understand what is required on what schedule,

13   and then we started paying the rent directly out of the

14   trust.

15        We still have to get it approved for payment, and it

16   was approved for an entire year, but then we'd pay it out

17   month by month directly from the trust to the landlord to

18   make sure that she didn't fall behind on her rent.

19   Q.   That was to Mr. Newell's company?

20   A.   Yes.

21   Q.   Okay.  And all the while were you trying to also

22   maintain the corpus of the trust?

23   A.   Yes.  Can I have some water?

24   Q.   Yes, please get yourself a fresh glass.

25        While you're doing that, I'm going to pull up

1  Government's Exhibit 751.  And let me kind of then direct

2  your attention -- it's --

3         MR. EINHORN:  No objection.

4         THE COURT:  All right.  Full exhibit.

5  BY MR. McGARRY:

6     Q.   And I'll ask you what this is.  Before we get to --

7  actually, let me pull up 781, if you have that.  It's an

8  account statement.

9         MR. EINHORN:  Well, no objection anyway.  No

10 objection.

11        THE COURT:  All right.  781 is a full exhibit.

12 BY MR. McGARRY:

13    Q.   Do you recognize what's Government's Exhibit 781?

14    A.   It's one of our statements.

15    Q.   Okay.  And directing your attention to the date.

16    A.   Covering the period of January, 2013.

17    Q.   Okay.  I am going to direct your attention to that

18 time frame.  Tell the jury what they're seeing on the screen.

19 I'm just going to page down, and I'll stop here in the middle

20 on the investment summary.

21        What does page 3 of Government's Exhibit 781 show?

22    A.   This is some of the overall allocation of the

23 investment portfolio, which is assets of the trust.  So it's

24 showing that it had about three-quarters in stock, about a

25 quarter in bonds and cash.

1    Q.    I see what you're saying.  When you say stocks,

2    that's the line for equities?

3    A.    Yeah.

4    Q.    Fixed income?

5    A.    Bonds.

6    Q.    Okay.  And they pay, I guess, on a regular basis?

7    A.    Uh-huh.

8    Q.    And then cash equivalent.  Would that be like a

9    treasury bill or money market?

10   A.    Money market.

11   Q.    Okay.  And what is the total amount of the trust in

12   January of -- is this 2013?

13   A.    $515,505.88.

14   Q.    Okay.  And was that pretty representative of about

15   the size in 2013 and 2014, if you recall?

16   A.    Yes.

17   Q.    Okay.  Let me show you what's been marked as

18   Government's Exhibit 751 -- at some point -- which is in

19   evidence.

20        At some point in time, having told us about your

21   efforts preventing Lynn from not spending it, protecting the

22   corpus of the trust, did there come a time when there was

23   going to be a change made with relationship to the trust --

24   the trustee?

25   A.    Yes.

1    Q.   Okay.  Tell us -- tell the jury about that.  What

2    took place in around January of 2014?

3    A.   Well, prior to that point, we were having

4    discussions with her -- again, unable to get cooperation that

5    we needed, to fully exercise our discretion or effectively do

6    our job.  And we said, Look, Lynn, if there's somebody else

7    that you would rather work with or could work with better,

8    we'll step aside, we'll resign.

9         And that discussion happened, I think, for over a

10   year.  And in the late part of 2013, her attorney, Bob

11   Kolesnik, said that we found somebody and they're willing to

12   serve as a successor trustee.

13   Q.   And do you know who that somebody was?

14   A.   It was Leon W.L. Vaccarelli.

15   Q.   And have you met Mr. Vaccarelli?

16   A.   Only once.

17   Q.   Was that at the probate hearing?

18   A.   Yes.

19   Q.   Okay.  I'll show a document to that in a second.

20   But directing your attention to the highlighted part:  "I am

21   willing to accept the responsibilities of successor trustee

22   in the matter of the Margaret Sheila Burton Second Amended

23   Trust, amendment dated August 27, 1999 -- sorry.  Signed by

24   Leon Vaccarelli.

25        What was your understanding of the responsibilities

```
1    of successor trustee?
2         A.   Well, that you're taking over as trustee of a trust,
3    so it's responsibility to provide support for the
4    beneficiary, act in their best interest, do all the functions
5    of a trustee -- invest the assets, provide the tax
6    preparation for the trust --
7         Q.   And --
8         A.   -- trust administration, accounting.
9         Q.   That's what you've been talking to us for the last
10   15 minutes or so about?
11        A.   Yes.
12        Q.   So, was it your understanding that Mr. Vaccarelli
13   was going to take the shoes, not necessarily of you but of
14   the bank?
15        A.   Yes.
16        Q.   Fill the shoes of the bank?
17        A.   Yes.
18        Q.   And let me show you what's been marked as
19   Government's Exhibit 752.
20             MR. EINHORN:  No objection.
21             THE COURT:  I think I already admitted it.
22             MR. McGARRY:  Okay.
23   BY MR. McGARRY:
24        Q.   Let me pull up a section of that.  Have you seen
25   this document before?
```

1      A.   Yes.

2      Q.   Okay.  Do you see your name listed there?

3      A.   Yes.

4      Q.   Okay.  What -- tell the jury what this Court of

5   Probate, Litchfield Hills Probate document is showing.

6      A.   This was just the court hearing to recognize our

7   resignation as trustee of the trust and the appointment and

8   acceptance of Leon Vaccarelli and Lux Financial Services as

9   the successor trustee.

10     Q.   Okay.  Do you recall if -- or if not -- if Mr.

11  Vaccarelli was there?

12     A.   I seem to recall that he was.

13     Q.   And it says if -- you could read the highlighted

14  part under "The Court further finds"?

15     A.   "The Court further finds that Salisbury Bank and

16  Trust Company filed a resignation of trustee of the

17  above-captioned trust.  Leon W.L. Vaccarelli of Lux Financial

18  Services filed an acceptance of successor trustee."

19     Q.   Okay.  And then does it further state that Leon

20  Vaccarelli is hereby appointed to serve as sole successor

21  trustee?

22     A.   It does.

23     Q.   And is it so ordered or signed by Judge Blick?

24     A.   It is.

25     Q.   Okay.  So let me direct your attention to

1    Government's Exhibit 753, another account statement.

2            MR. EINHORN:  No objection, Your Honor.

3            THE COURT:  Full exhibit.

4    BY MR. McGARRY:

5        Q.   Again, does this -- is this a Salisbury Bank

6    document?

7        A.   Yes, it is.

8        Q.   Okay.  And this is dated approximately January 7 --

9        A.   Yes.

10       Q.   -- of 2014.  Is that at or about the same time as

11   the hearing?

12       A.   Yes.

13       Q.   Okay.  And I'm going to blow up -- enlarge the

14   bottom.  That doesn't really help, because you can't see the

15   columns.  But can you tell us what the value of the trust was

16   -- the market value, I guess -- in January of '14?

17       A.   Well --

18       Q.   Sorry.  That's big.  I'm trying to be helpful.  I

19   don't know if I am being helpful.  There you go.

20       A.   That's good.  $514,774.24.

21       Q.   So what happened next?  What did the bank have to do

22   in order -- with relationship to the trust and with

23   relationship to Mr. Vaccarelli?

24       A.   As of the date of that court document, we are no

25   longer trustee.  We are -- then it's we have to work with the

1    successor trustee to transition the administration from the

2    bank to the newly appointed successor trustee, so that it's

3    collecting all the information for how the assets are to be

4    transferred and making sure that along the way Lynn is still

5    able to get distributions for her support.

6         Q.   Let me show you what's been marked 783, an e-mail

7    from you to Jennifer Anderson -- not Aniston, but Anderson.

8    Do you recognize that e-mail?

9              MR. EINHORN:  783.

10             MR. McGARRY:  Correct.

11             MR. EINHORN:  You only went up to 780 on my list,

12   so --

13   BY MR. McGARRY:

14        Q.   Take a look.

15        A.   So, yes, I recognize the e-mail.

16        Q.   And tell the jury what it is.

17             MR. EINHORN:  No objection.

18             THE COURT:  Any objection?  Okay.  Full exhibit.

19             THE WITNESS:  Jen Anderson was my, what we call

20   client service associate.  So she was my assistant to help

21   administer the trust.  She does all the day-to-day stuff of

22   processing of requests and things like that.  So Jen was

23   asking me if we needed approval, if we needed to send it to

24   our committee before we made a distribution.

25   BY MR. McGARRY:

1    Q.   Let me make it easier for you by scrolling down to

2  the bottom.

3    A.   Yeah.  You can kind of work it up.

4         So Jen got an e-mail from Leon Vaccarelli and it

5  says -- she was asking me:  "Steve, this e-mail from Leon

6  contained wire instructions for $13,000.  Please send me a

7  quick e-mail approving Leon's request to send him the

8  $13,000."  It was over her automatic approval rating of

9  $10,000.

10    Q.   Your $10,000 rule?

11    A.   Yeah, which she would otherwise be able to just --

12  if it was a regular request, she could have just processed

13  it, but since it was over 10,000, she wanted my additional

14  okay for it.

15         She says:  "I will set up the wire transfer.  Also

16  is this request for a distribution to a beneficiary?  If so,

17  for what exactly, so I know what to put on the explanation?"

18         So for every -- when we're serving as trustee, any

19  time we make a distribution, we have to put an explanation of

20  what it's for and document it.

21    Q.   And, so, what did you -- and then she said -- I

22  guess she had a quick follow-up a minute later, "Also, do we

23  need to get TAC?"  I'm going to guess that's the Trust

24  Administration --

25    A.   Trust Administration Committee.

1     Q.   And you said to her "no" on both questions.

2     A.   So, yeah, I said no on both of those questions, we

3   don't need to put it through our committee or through our

4   process, essentially because we're not trustee anymore.

5   Anything that we did from that date, the court date where the

6   new trustee is approved, we can't do anything.  We can't do

7   any transactions.  We can't buy, ourselves, securities.

8   Can't make distributions.  We need the authority and we need

9   the okay of the new trustee.  So I was saying we don't need

10   to put it through our process.  We just need good

11   instructions from the new trustee and how he wants the assets

12   delivered.

13     Q.   So, at this point in time, is it fair to say that

14   you were more of a custodian of the assets?

15     A.   Yeah.

16     Q.   And Mr. Vaccarelli was now the trustee?

17     A.   Yes.

18     Q.   And you had to follow his instructions?

19     A.   Directive, right.

20     Q.   Directing your attention to 784.

21          MR. EINHORN:  Mine only goes up to 780.

22   BY MR. McGARRY:

23     Q.   So, again, not yet in evidence, but if you can take

24   a look and identify this e-mail.  Just without reading the

25   e-mail, who's it from?

1      A.   Leon Vaccarelli.

2      Q.   And who's it to and who's copied?

3      A.   To Jennifer Anderson, copying me.

4           MR. McGARRY:  I'd move this into evidence.

5           MR. EINHORN:  No objection.

6           THE COURT:  Full exhibit.

7   BY MR. McGARRY:

8      Q.   And Mr. Vaccarelli writes:  "Jen, thank you for the

9   information.  My office will get the updates out ASAP.  Also,

10  I spoke with Steve Essex today, and he asked me to send you

11  wire instructions for $13,000, and they are, Ion Bank,

12  Naugatuck, Connecticut."

13          Is that formerly Naugatuck Savings Bank, if you

14  know?

15     A.   I am not -- not for sure.

16     Q.   So what -- do you remember talking to him?

17     A.   I don't, no.

18     Q.   Okay.  Do you remember?

19     A.   This was five years ago.

20     Q.   Do you remember your bank wiring $13,000 to

21  Mr. Vaccarelli?

22     A.   Yeah, I seem to recall that.

23     Q.   Okay.  And let me show you wire -- 785, wire

24  transfer.

25          MR. EINHORN:  No objection.

1           THE COURT:  Full exhibit.

2    BY MR. McGARRY:

3        Q.   Showing you this wire transfer, I believe it says

4    "Fed Funds payments manager funds."  It has the date.  "TA

5    Sheila Burton FBO Lynn Burton."

6             And I'll zoom-in on the sender.

7             You see that?

8        A.   Uh-huh.

9        Q.   And do you see where it says "Lux Financial

10   Services"?

11       A.   Yeah.

12       Q.   Okay.  Why was the bank, Salisbury Bank and Trust,

13   wiring through Fed Funds $13,000 to Leon Vaccarelli?

14       A.   It was just a wire for the initial funding of his

15   trust account for -- just to give cash, so there would be no

16   lapse in the ability to pay bills for the beneficiary of Lynn

17   Burton.

18       Q.   Was that so that he could undertake his

19   responsibilities of successor trustee?

20       A.   Yes.

21       Q.   Okay.  And scrolling down and showing you the next

22   page, does that appear that the wire's been approved and

23   processed?

24       A.   Yeah.  It's just additional documentation of the

25   wire.

1    Q.   Okay.  And showing you 754, bank account of -- whose

2  bank account is that -- up top, top left?

3    A.   It says Leon W.L. Vaccarelli.

4    Q.   Okay.  And paging down, do you see the wire being

5  received in this account?

6    A.   Yes.  So it says it's coming from us, $13,000.

7    Q.   Okay.  And what is the balance before the $13,000

8  came in?

9    A.   Looks like it's a $155.65.

10    Q.   Okay.  Did the -- moving forward.

11         Did the bank, referring to Salisbury Bank and Trust,

12  have other assets to send to the new trustee --

13  Mr. Vaccarelli?

14    A.   Yes.  At that time, we still had an additional money

15  market balance, we had individual stocks, and we had mutual

16  funds still in the account.

17         MR. McGARRY:  Okay.  Just want to make sure I've

18  moved 754 into evidence.

19         THE COURT:  Any objection?

20         MR. EINHORN:  No objection.

21         MR. McGARRY:  And 756 into evidence.

22         THE COURT:  Any objection to 756?

23         MR. EINHORN:  No, Your Honor, no objection.

24         THE COURT:  Okay.  754 and 756 are full exhibits.

25  BY MR. McGARRY:

1      Q.   Take a look at Government's Exhibit 756.  Do you

2    recall Mr. Vaccarelli setting up an account to which

3    securities could be transferred?

4      A.   I seem to recall that was done, yeah.

5      Q.   Okay.  And what is -- just for the record, what is

6    756?  What does it appear to be?

7      A.   Looks like a fax cover sheet to Ameritrade New

8    Accounts Unit, from Leon Vaccarelli, 22 pages, regarding a

9    trust account.  It says "New paperwork for trust, attached

10   to trust account application checking/debit card application,

11   probate court documentation appointing me, Leon Vaccarelli,

12   as successor trustee, and the underlying trust agreement."

13     Q.   Okay.  And let me show you what's been marked as

14   Government's Exhibit 786.  Taking care of some of the --

15          MR. McGARRY:  Which is not yet in evidence.

16          MR. EINHORN:  No objection, Your Honor.

17          THE COURT:  786 is a full exhibit.

18   BY MR. McGARRY:

19     Q.   Now, what is 786?  Do you recognize an e-mail that

20   you're copied on?

21     A.   Yes, I think I've seen this before.

22     Q.   Okay.  Let me hand you a paper copy.  It might make

23   it easier for you.  So is this -- without getting into too

24   much of the details, is this -- do you see where

25   Mr. Vaccarelli is sending to you -- and is it pronounced

1   Kristen Higgins?

2     A.   Kirsten.

3     Q.   Kirsten.  And he writes, "Steve, please confirm

4   that we can transfer the assets now, or should we wait until"

5   -- I guess Jen is saying that, but --

6     A.   Yeah, to me.

7     Q.   Jen?  Okay.

8     A.   Oh, I'm sorry.  Yeah, yeah, Jen was saying that to

9   me.

10     Q.   And there's Mr. Vaccarelli writing, "I was finally

11   able to obtain new certificates from the probate court naming

12   me trustee, not successor trustee.  As a result, please

13   initiate the DTC transfer to TD Ameritrade DTC."

14         What is a DTC transfer?

15     A.   Well, DTC stands for Depository Trust Company.  It's

16   just a way to transmit, electronically, assets from one

17   institution to another.

18     Q.   So like if equity securities are held at, let's say

19   Northern -- is that -- where did you guys hold --

20     A.   Northern Trust, yeah.

21     Q.   At Northern Trust -- and Mr. Vaccarelli sets up TD

22   Ameritrade, does the Depository Trust Company help transfer

23   them from Northern over to TD Ameritrade?

24     A.   I believe so, yeah.

25     Q.   And is that what happened in this case?

1    A.    It looks like that, yeah.

2    Q.    Okay.  Let me show you Government's Exhibit 758.

3          And I'll take that off your hands.

4          MR. McGARRY:  I'd offer Government's Exhibit 758.

5          MR. EINHORN:  No objection.

6          THE COURT:  Full exhibit.

7 BY MR. McGARRY:

8    Q.    What is this document, Mr. Essex?  Do you know a

9 Michelle LaPlant?

10   A.    I do.  She's in our trust operations area.

11   Q.    And what has Michelle written on March 17, 2014 to

12 Leon W. Vaccarelli of Lux Financial Services?

13   A.    It's standard for us to provide additional

14 information on the assets that are transferred.  It's giving

15 Mr. Vaccarelli the cost basis and acquisition dates of those

16 stocks that were transferred, which he needs.  In order to

17 understand the tax consequences of selling any of those

18 assets, he needs that information.

19   Q.    Okay.  And let me show you Government's Exhibit 760.

20         MR. McGARRY:  Which I'd offer into evidence.

21         MR. EINHORN:  No objection.

22         THE COURT:  Full exhibit.

23 BY MR. McGARRY:

24   Q.    Again, do you see where you are sending an e-mail to

25 Leon:  "As an alternative, we can sell the mutual funds."  Do

1   you see that?

2       A.   Yes, I do.

3       Q.   Okay.  We talked about the Depository Trust Company

4   transferring assets from Northern, which is -- that's where

5   Salisbury Bank and Trust held the assets, they were the --

6       A.   Uh-huh.

7       Q.   Yes?

8       A.   Mutual funds are located at a company called Matrix,

9   I believe.  So, different.

10      Q.   Okay.  Tell the jury how it's different, how in one

11  sense you can transfer the equities or the stocks.  What

12  happens with mutual funds?

13      A.   You're testing my detailed knowledge of it, but --

14      Q.   It doesn't have to be too detailed.

15      A.   Essentially, we have accounts established at Matrix

16  for every single mutual fund that we have.  It's separate

17  delivery instructions that you need for mutual funds,

18  different than what you would provide for individual stocks.

19           So what we were doing prior to this e-mail is

20  reaching out to Mr. Vaccarelli and saying, we'll have -- he

21  would need to do some work on his end to establish an account

22  to receive in those mutual funds.  And as I recall, there was

23  a little bit of back and forth, How exactly can we get these

24  to you, When can we get these to you?

25      Q.   Was that relatively complex just to try to figure

1   everything out, fair to say?

2       A.   Yeah.  Yeah, there was a little bit of delay causing

3   that.

4       Q.   And was he pretty good at understanding what you

5   were asking, and working with you?

6       A.   Yeah, I think so.

7       Q.   So he seemed to know what he was doing?

8       A.   Yeah.

9       Q.   And at some point did you come up with an

10  alternative, rather than doing like a transfer, but doing

11  something that might have some capital gains implications?

12      A.   Yeah.  At some point, just to try to speed the

13  process along, because, again, it's not to the beneficiary's

14  advantage if this thing is spread out over a period of a

15  year.  So we offered up the alternative, Well, what if we

16  just -- what if we sold the mutual funds and we would

17  transmit the proceeds from that?  But just understanding that

18  if we were to do that, it's going to incur some capital

19  gains, which has a tax consequence to it.

20          So the successor trustee would need to be aware of

21  that, because that's something that would impact the trust.

22      Q.   So that sounds relatively complex, but you and

23  Mr. Vaccarelli both understood what was going to take

24  place?

25      A.   I think so.

1      Q.   Let me show you Government's Exhibit 761.

2           MR. McGARRY:  And I'll offer that into evidence.

3           MR. EINHORN:  No objection, Your Honor.

4           THE COURT:  Full exhibit.

5    BY MR. McGARRY:

6      Q.   It seems here like Mr. Vaccarelli is now telling the

7    bank what to do; is that correct?

8      A.   He instructs the bank --

9      Q.   I guess because you're now the custodian, he's

10   trustee; is that correct?

11     A.   Right.  Right.  Yeah.  So he's instructing us to

12   sell the mutual funds, acknowledging that it's going to

13   recognize $14,000 in capital gains, so go ahead and do it,

14   and signed it as trustee.

15     Q.   Okay.  And let me show you Government's Exhibit 762.

16          MR. EINHORN:  No objection, Your Honor.

17   BY MR. McGARRY:

18     Q.   And what is Jen communicate --

19          THE COURT:  762.

20          MR. McGARRY:  Offered into evidence.

21   BY MR. McGARRY:

22     Q.   What is Jen copying you and telling Leon at Lux

23   Financial Services that you had done?

24     A.   Good morning, Leon.  Per your instructions, we have

25   -- we are just acknowledging that we sold the mutual funds

1    held in the Burton Trust.  Let us know where to wire the

2    proceeds, essentially, so we can transfer the cash to the

3    trust -- to your trust account, or let us know if you would

4    prefer us to cut a check for it.

5         Q.   Okay.  Just double-checking one.  Okay.  Let's see.

6    I'm going to show you 788.

7              MR. McGARRY:  And offer that into evidence.  And

8    then also offer Government's Exhibit 4.

9    BY MR. McGARRY:

10        Q.   This one looks -- I'm going to expand this.

11             So, again, is this the same e-mail where Jen says:

12   Good morning, Leon.  Per your instructions, we have

13   liquidated the mutual funds held in the Burton Trust, and

14   asking for the wire instructions?

15        A.   Looks to be, yeah.

16        Q.   Okay.  And --

17             MR. EINHORN:  There's no -- I assume it's going be

18   offered.  I have no objection.

19             MR. McGARRY:  I offer 788.

20             THE COURT:  How does 788 differ from 762?

21             MR. McGARRY:  It has a little footer on there.

22             THE COURT:  788.

23             MR. McGARRY:  And I'd offer 789, a wire transfer.

24   BY MR. McGARRY:

25        Q.   Do you see Government's Exhibit 789 in front of

1    you?

2           THE COURT:  Any objection, Mr. Einhorn?

3           MR. EINHORN:  I hadn't gotten this before, so I'm

4    just looking at it.  No objection.

5           THE COURT:  All right.  Full exhibit.

6    BY MR. McGARRY:

7       Q.   What is Government's Exhibit 789?  Is it a Fed Fund

8    payment record?

9       A.   Yeah, looks like just a confirmation of a wire in --

10   from us to Ion Bank in the amount of $164,988.26, going from

11   our trust checking account from the trust department to Lynn

12   Burton Trust for the benefit of -- and then to Lux Financial

13   Services for the beneficiary of the Lynn Burton Trust.

14      Q.   So that was sent for the benefit of Lynn Burton

15   Trust, and it was -- that was for the benefit of the Lynn

16   Burton Trust; correct?

17      A.   Yes.

18      Q.   And that was being sent to Mr. Vaccarelli as

19   successor trustee?

20      A.   Yes.

21      Q.   Is that so that he could accept -- in connection

22   with his acceptance of the responsibilities as successor

23   trustee?

24      A.   Yes.

25      Q.   Okay.  And let me show you Government's Exhibit 4.

1    MR. McGARRY:  I believe in evidence; but if not, I

2 would offer it in evidence.

3    MR. EINHORN:  No objection.

4    THE COURT:  Full exhibit.

5 BY MR. McGARRY:

6    Q.   What is -- do you see that same amount, $164,988.26,

7 appears from Salisbury Bank and Trust on March 27?

8    A.   Yes.

9    Q.   Okay.  And do you see the balance of that prior to

10 the money coming in?

11    A.   Yes.

12    Q.   Okay.  Okay.  Do you, by any chance, know what

13 Paychex is?

14    A.   Paychex Systems is just a -- I think they have a

15 number of, you know, payroll services, things like that, like

16 ADP.

17    Q.   Okay.  Okay.  Let me jump ahead and show you a

18 Salisbury Bank statement for Government's Exhibit 782.

19    MR. McGARRY:  And I would offer Government's Exhibit

20 782 -- or I do offer it.

21    MR. EINHORN:  No objection.

22    THE COURT:  All right.  Full exhibit.

23 BY MR. McGARRY:

24    Q.   And what is 782?

25    A.   Looks like one of our statements covering the month

1  of March, 2014 for the Burton Trust that was still with us,

2  and that was a statement being sent to the successor

3  trustee.

4      Q.    Okay.  Now, it seems to have $50,000 left in it?

5      A.    Uh-huh.

6      Q.    So having moved the securities to TD Ameritrade,

7  having liquidated and wired the mutual funds, why are you

8  still holding on to $50,000?

9      A.    I think at this time we were having the discussion

10  there was a potential disagreement with the amount of legal

11  fees that were charged to the trust in the run up to

12  transferring our trusteeship to successor trustee.  We wanted

13  that question answered and approved by the Court, Probate

14  Court, prior to making our final distribution to the

15  successor trustee, so we held back a reserve of $50,000.  And

16  we also wanted our final accounting approved to close off our

17  administration prior to stepping aside.

18      Q.    And can you tell the jury what a final accounting

19  is?

20      A.    It's just a final accounting of our administration

21  from the inventory where we started off with assets, all the

22  transactions, all the distributions, transfers that were

23  made, and then the final accounting says, This is it, these

24  are the last fees that we're taking and we have nothing left,

25  we've transferred it all.

1          And the Court takes a look at that, makes sure that

2     all those transfers and expenses were reasonable.  And once

3     the Court approves that final accounting, then we're

4     officially done as a prior trustee.

5          Q.   And let me show you Government's Exhibit 765, an

6     e-mail from Mr. Vaccarelli to you, which I think is what you

7     just testified about.  Was this regarding the -- there was

8     still some debate or discussion about some bills that were

9     being paid from the law firm.

10          MR. McGARRY:  I'd offer this into evidence.

11          MR. EINHORN:  No objection.

12          THE COURT:  Full exhibit.

13          THE WITNESS:  Well, the top one looks likes it's his

14     okay for us to take our final $485 fee.

15     BY MR. McGARRY:

16          Q.   Okay.

17          A.   As well as our standard closing fee, and then

18     transfer the balance to your account.  So it looks like this

19     happened in June.  So it was about the time we're trying to

20     close off our expenses.

21          We have a bill from Robinson & Cole for -- looks

22     like March and April of 2014, about $2,000.  It references

23     past due invoices of $2,900 and 750, so we were concerned

24     that they hadn't been paid.

25          Q.   Okay.

1    A.    "Which I forwarded to you at those times requesting

2  payment.  Please let me know if the past due invoices have

3  been paid."

4    Q.    Okay.

5    A.    Robinson Cole was saying they haven't and --

6    Q.    Kind of pulling you out of the page for a second.

7    A.    Yep.

8    Q.    Were you just kind of wrapping up the expenses of

9  the trust --

10   A.    Yes.

11   Q.    -- is that fair to say?

12         And let me show you 757 -- or is it 67?  Looks like

13 767, in the same vein, an e-mail from Mr. Vaccarelli.

14         MR. McGARRY:  Which I would offer into evidence.

15         MR. EINHORN:  No objection.

16         THE COURT:  Full exhibit.

17 BY MR. McGARRY:

18   Q.    Again, is this, similarly, in the same discussion

19 with Mr. -- from Mr. Vaccarelli to Jennifer, I guess, where

20 he is disputing some of the legal fees, that Robinson Cole's

21 bills are outrageous.  Is that -- do you recall that

22 discussion?

23   A.    Yeah, I do.

24   Q.    Okay.  And let me show you a document, I believe

25 authored by you, Government's Exhibit 790.  Do you recognize

1    Government's Exhibit 790?

2            MR. EINHORN:  No objection, Your Honor.

3            THE COURT:  Full exhibit.

4    BY MR. McGARRY:

5        Q.   What is Government's Exhibit 790?

6        A.   This looks like our closing memo.  So whenever we

7    close an account, we just summarize what account it was, what

8    account number, officers, CSAs involved.  It says what the

9    market value was -- obviously, we're not trustee so we can't

10   charge fees anymore, so we want to know how much fees that we

11   will have lost, annualized.

12       Q.   And was there a final wire of approximately $21,309,

13   and perhaps $0.42?

14       A.   Yep.

15       Q.   Or about that amount.

16       A.   So that was the final closing amount.  And we

17   probably had a small fee from a partial quarter, which we

18   said it's not even worth calculating and charging.

19       Q.   So let me show you what's been marked as

20   Government's Exhibit 791 and Government's Exhibit 6.

21           MR. McGARRY:  Showing Mr. Einhorn what's been marked

22   791 (handing).

23           MR. EINHORN:  No objection, Your Honor.

24           THE COURT:  791 is a full exhibit.

25   BY MR. McGARRY:

1      Q.    And do you recognize -- are you familiar with the

2    wire transfer of $21,000, on the top right-hand corner of

3    what's on your screen, Government's Exhibit 71?

4      A.    Yeah.   That was a final amount plus a little bit of

5    money market interest.

6      Q.    And showing you also Government's Exhibit 6.

7            MR. McGARRY:   Which I offer into evidence.

8            MR. EINHORN:   No objection.

9            THE COURT:   Full exhibit.

10   BY MR. McGARRY:

11     Q.    And looking at this account statement, do you see a

12   wire transfer in from Salisbury Bank and Trust?

13     A.    Yes, I do.

14     Q.    And approximately the same amount?

15     A.    Yes.

16     Q.    Okay.   And, again, just -- I'm trying to move along

17   here, as you can maybe tell by the speed at which I'm

18   speaking.

19           MR. EINHORN:   That's normal.

20   BY MR. McGARRY:

21     Q.    Why is Salisbury Bank --

22           THE COURT:   You can go to New Jersey and do that.

23           MR. McGARRY:   Thank you, Your Honor.

24   BY MR. McGARRY:

25     Q.    Why is Salisbury Bank and Trust wiring Leon

1    Vaccarelli $21,000 in what looks like it's in September, even

2    though he became trustee earlier in January of that year?

3        A.   Again, a trust is not like an investment management

4    account.  There's administration to wrap up.  There's court

5    accountings that need to be done.  We need to explain any

6    questions or disputed amounts along the way.

7        Q.   Including Robinson Cole, for instance?

8        A.   Robinson & Cole.  We have to get the instructions of

9    where the cash is to be transferred, assets to be

10   transferred.  And that just takes time.  And, actually, in

11   the scheme of things, a nine-month time frame for

12   transferring a trust is not unusual.

13       Q.   Okay.  And when the bank is wiring the money to

14   Mr. Vaccarelli, what was your understanding as to the purpose

15   of the money?  What was that money to be used for when you

16   wired it?  What was your understanding?

17       A.   To -- it's assets of the trust.  To fund the trust

18   over on Leon Vaccarelli's side, to continue the

19   administration.

20       Q.   Okay.  And can -- one question that I didn't ask you

21   at the very beginning:  Can a trustee borrow money from a

22   trust?  Like could Salisbury Bank and Trust take money out of

23   the Lynn Burton Trust, use it and then, say, put it back

24   later?

25       A.   No.

1    Q.   Okay.  Why not?

2    A.   I think there would be a conflict of interest.  It's

3    using it for own personal reasons, and it would be against

4    the fiduciary duty of a trustee.

5    Q.   Have you at all been in contact with Lynn Burton

6    since you were no longer trust officer of her trust?

7    A.   Yes.

8    Q.   And in what capacity?

9    A.   She had called in, asking for a distribution.

10   Q.   And did you have -- were you able to give a

11   distribution?

12   A.   No.  We had informed her that we were -- we no

13   longer had an account for her, and we gave her -- so I'd

14   reached out to her, returned her telephone call.  I spoke to

15   her, I think for about 30 seconds.  She was rushing to an

16   appointment so I wasn't able to reach her that day.  I wrote

17   her a letter and just said that we don't have your account,

18   it had transferred back on this date, and gave her the

19   documentation from the Probate Court saying that we had

20   transferred our trusteeship to Leon Vaccarelli.

21   Q.   And did you hear -- did she correspond back with

22   you?

23   A.   No.

24   Q.   Okay.  Since this September transfer of

25   approximately $21,000, have you had any communications with

1 Mr. Vaccarelli?

2      A.   No.

3      Q.   At any point in time, did Mr. Vaccarelli ask you for

4 your trust plan or your trust strategy or anything that you

5 discussed at the beginning of your testimony?  Remember you

6 were telling us about using the software, the committees, the

7 budgets?

8      A.   Uh-huh.

9      Q.   Did, at any point in time, he call and ask you to

10 share your experience of the budgets, the work plan, anything

11 like that?

12         MR. EINHORN:  Objection, Your Honor.  That's -- it's

13 beyond the purview of this case, and I don't see how it's

14 relevant to any of the issues in the case, nor is it

15 required.

16         THE COURT:  Well, that may be, but I'm not sure it's

17 irrelevant, since it has to do with the -- all of the details

18 and the complexities of moving this trust over.  I'm going to

19 permit the question.

20         THE WITNESS:  I don't recall those conversations

21 happening after the transfer.  I think we had those type of

22 conversations prior to, as we were trying to give as much

23 detail as we could of the complexities that we were running

24 into.

25 BY MR. McGARRY:

1    Q.   Did he -- did he appear to understand what you were

2    explaining to him in those conversations regarding the

3    intricacies of the trust?

4    A.   I seem to recall yes, but that was years ago.

5    Q.   Sure.  Do you recall ever having any difficulty in

6    communicating with him or understanding his words back to you

7    when you were talking about the intricacies of the trust?

8    A.   I don't recall any difficulties in that.

9    Q.   Did he at all -- since wiring the 164,000 or the

10   $21,000, or moving the money to TD Ameritrade, did he ever

11   call you and ask you for advice?

12   A.   No, I don't believe so.

13   Q.   All right.

14        MR. McGARRY:  Your Honor, I have no more questions.

15        THE COURT:  All right.  Cross-examination.

16        MR. EINHORN:  Yes, Your Honor.

17                         CROSS-EXAMINATION

18   BY MR. EINHORN:

19   Q.   Good afternoon, Mr. Essex.

20   A.   Good afternoon.

21   Q.   My name is Jon Einhorn.  I represent Leon

22   Vaccarelli.  I'm going to ask you a few questions this

23   afternoon.  The first one I think is -- I think I speak for a

24   lot of people here who want to know the answer to this:  Why

25   did the bank voluntarily withdraw as trustee?  This is what

1  you do for a living?

2      A.   Uh-huh.  We determined that we were unable to do our

3  job effectively because of the difficulties that we were

4  having with the beneficiary.  So at some point you've got to

5  make a decision, if you're not making any headway, is it in

6  the best interest of the beneficiary to step aside and let

7  somebody else take over.

8      Q.   Sure.  And what were those difficulties?

9      A.   We had a lot of difficulties in getting information

10 from her in order to exercise our discretion.  We needed

11 copies of bills that she was asking to be reimbursed for, her

12 expenses, her other assets that she might have had.  We spent

13 many years trying to get this information out of her, and it

14 was a constant back-and-forth.  And at the end, we determined

15 that it was best for us to resign.

16     Q.   Now, this may be an understatement, but would you

17 agree with me she was a difficult client?

18     A.   She was a challenge, yeah.

19     Q.   You use the word "challenging," the Government used

20 the word "difficult" before and you didn't seem to disagree.

21     A.   No.  I think I said that she was a challenge.

22     Q.   You did.  The Government used the word "difficult."

23          But is she -- was she, in fact, at any point

24 verbally abusive to you or to the bank?

25     A.   Yes.

1    Q.   And what does that mean?  How was she verbally

2  abusive to you or the bank?

3    A.   Just accusing her of -- accusing us of not being

4  cooperative, of not giving her her money.  She didn't

5  understand, although we tried to explain it many times over

6  and over, this was not her money.  It was money that was set

7  aside by her mother, through her estate planning, to care for

8  her for the rest of her life.  It's owned by the trust.  It's

9  not her money but it's there for her support.

10    Q.   So it's fair to say that from time to time she would

11  say, It's my money, I want whatever I want?

12    A.   She did.

13    Q.   Okay.  And was she ever threatening to you or to the

14  bank in the that regard?

15    A.   Explain.  Threatening how?

16    Q.   Well, did she ever threaten to make a complaint

17  against you or the bank if you didn't give her her money?

18    A.   I'm sure, yeah.

19    Q.   Was there also something about a -- and I'm not sure

20  if it was you or your predecessor at the bank, but something

21  about a $75,000 incarceration lien that was paid from the

22  trust?  Was there an incarceration lien paid?

23    A.   I don't remember the exact amount, but, yeah, that

24  was about that amount.  Yeah.

25    Q.   Okay.  And what's that all about?

1    A.    It's --

2         MR. McGARRY:  Your Honor, I'm going to object as to

3    relevance.

4         MR. EINHORN:  Gosh, the Government has opened that

5    door so wide on this, I claim it.

6         THE COURT:  You know, we're almost at three o'clock.

7    I'm going to take the last five minutes and hear you outside

8    the presence of the jury.

9         I will release you.  Have a pleasant weekend.

10   Remember, we're not coming in tomorrow and we'll see you

11   Monday at 9:30.

12        (Jury out, 2:55 p.m.)

13        THE COURT:  All right.  Mr. Essex, would you remain

14   here for just a moment?

15        THE WITNESS:  Yes.

16        THE COURT:  Just be seated.  Everybody can be

17   seated.

18        This issue of a $75,000 incarceration lien.  Is

19   there a document, an exhibit that relates to this?

20        MR. EINHORN:  I'm just starting to get into it with

21   this witness, but I don't intend to go --

22        THE COURT:  What is the date of this lien?

23        MR. EINHORN:  It would be prior to the date that the

24   bank resigned as --

25        THE COURT:  I'm sure.  But when?

1          MR. EINHORN:  -- trustee.   I don't know otherwise.

2     I was just starting to inquire.

3          THE COURT:  What is the purpose of your offer?

4          MR. EINHORN:  Getting -- again, if I can just

5     retreat for just a second.  As I indicated earlier, however,

6     I have a box of materials in my office on Ms. Burton, which I

7     would obviously use for her examination.  And I'm sure

8     details on the lien are in that box.

9          My purpose is only that the Government opened the

10    door, talking about her nature as a client and the fact that

11    the bank got out and Mr. Vaccarelli got in, and I just wanted

12    to get into a little bit of detail.  I have no intention of

13    going very far down this path.

14         THE COURT:  But what is an incarceration lien?

15         MR. EINHORN:  Oh, I'm sorry, Your Honor.  In the

16    State of Connecticut, if a person is incarcerated, the State

17    of Connecticut has a lien on a per diem basis -- I used to

18    know what it is.

19         THE COURT:  All right.

20         MR. EINHORN:  So, they go after a person.

21         THE COURT:  In other words, what you want to get in

22    is that she had been locked up and that the trust had to pay

23    for the time period that she was incarcerated?

24         MR. EINHORN:  I think the fact that she was

25    incarcerated.  I wasn't planning to -- that wasn't my intent

1    here, but it would be my intent when she testifies, her --

2    there's a lot about her, I think, that's relevant to this

3    case, including her drugs and so forth.

4          THE COURT:  Not everything about her?

5          MR. EINHORN:  I'm sorry?

6          THE COURT:  Not everything about her?

7          MR. EINHORN:  Yes, Your Honor.

8          THE COURT:  What's the objection, Mr. McGarry?

9          MR. McGARRY:  I think -- I guess, first of all, I'd

10    object as to relevance.  I don't know how perhaps the

11    character or the criminal record of the beneficiary of the

12    trustee is relevant.

13          Also, I would object on 403 grounds that, to the

14    extent it may tangentially be relevant, that it's more

15    confusing/distracting to the jury, that we've acknowledged

16    that she's a difficult client, the fact that she has a

17    criminal record.  And I don't believe the $75,000

18    incarceration lien came out of any of Mr. Vaccarelli's

19    accounts.  And I don't think we ever saw a payment of that

20    size to the State of Connecticut.

21          So if it was prior to him getting the money, I don't

22    know why it would be relevant, other than to try to make it

23    seem like Ms. Burton is a bad person.

24          MR. EINHORN:  No.  What I indicated in my question

25    to the witness was that, in fact, it appeared as though that

1  was one of the reasons that the bank got out of the case, and

2  it appeared as though the witness agreed.

3       THE COURT:  Well, one of the reasons, that she was

4  incarcerated is the reason?

5       MR. EINHORN:  No, no.

6       THE COURT:  I don't see the relevance of this.

7       MR. EINHORN:  One of the reasons that the bank

8  relinquished its trusteeship.  That's what they do for a

9  living.  They don't voluntarily --

10      THE COURT:  I understand that.  And they decided she

11  was too difficult.

12      MR. EINHORN:  And that's one of the reasons.

13      THE COURT:  But the fact that she was in prison, she

14  wasn't going to be very difficult to them.

15      MR. EINHORN:  Not the fact that she was in prison.

16  It's the fact that they paid this incarceration lien over her

17  objection.

18      THE COURT:  I think, on a 403 analysis, thus far it

19  seems to me that the risk of confusing and misleading the

20  jury into thinking that what Lynn Burton does is something

21  that alters the fiduciary's duties is a real potential.  So

22  I'm going to sustain the objection.  It may be that that

23  comes up later within a context that is relevant.  But to the

24  extent it may -- Ms. Burton's conduct may confuse the jury as

25  to any justification for what was or was not done with the

1    trust money, I see that significant risk of confusion, and I

2    will sustain the objection.

3              MR. EINHORN:  Yes, Your Honor.

4              THE COURT:  All right.  Mr. Essex, I'm going to need

5    to have you back Monday at 9:30.

6              THE WITNESS:  Okay.

7              THE COURT:  Okay.

8              THE WITNESS:  Uh-huh.

9              THE COURT:  Thank you very much.  Please don't

10   discuss your testimony with anybody.  Don't let anybody

11   discuss your testimony with you.  We will just pick up on

12   Monday as if you continued to discuss it today.  All right?

13             MR. McGARRY:  Your Honor, if I may.  I know that he

14   has a lawyer -- maybe provided by the bank, I'm not sure.

15   Does -- and I'm honestly asking because I don't know.  Does

16   the rule apply to if his lawyer is talking to him and his

17   lawyer wants to say, Tell the truth, be candid, you did a

18   great job today?  Or should he not discuss it with his

19   lawyer?

20             THE COURT:  So it seems to me -- and I'm happy to

21   hear from counsel.  You want to give me your name.

22             MR. DEBASSIO:  Should I approach, Your Honor, so I

23   can speak in the microphone?

24             THE COURT:  Sure.

25             MR. DEBASSIO:  Your Honor, my name is David

 1    DeBassio, of Hinckley Allen, on behalf of the Salisbury Bank

 2    and Trust, representing Mr. Essex.

 3         THE COURT:  So it's important when we have to take

 4    breaks, particularly when we take long breaks, that the

 5    testimony of a witness not be altered or impeded in any way

 6    just because we had to take that break.

 7         Since he is testifying about the wrap-up details for

 8    this trust, and has done so and will be cross-examined, what

 9    would be the need you would have, if any, to talk to him

10    about the substance of his testimony?

11         MR. DEBASSIO:  Your Honor, I don't anticipate that I

12    would have any need to talk to him about the substance of his

13    testimony.  I would certainly -- and I am available to him to

14    answer any questions he may have -- he's not a professional

15    witness.  He's here under subpoena as a fact witness -- and

16    obviously to answer any questions he may have.

17         If the institution wants to speak to Mr. Essex and

18    find out what's going on, I would, in front of everyone here,

19    instruct him to have the institution contact me, so that he's

20    not put in a position where he has to talk to anybody else

21    about this, but basically to answer any questions he may have

22    and be a shield for him with the bank and with anyone else

23    that may contact him, so that he can say, I'm not allowed to

24    talk about this, please contact Mr. DeBassio, he's my lawyer,

25    and if anything needs to be addressed you can take it up with

1    him.

2            But I certainly don't see a need to address the

3    substance of his testimony.

4            THE COURT:  So that my request that he not discuss

5    his testimony with anyone could include you?

6            MR. DEBASSIO:  Yes.  I don't see any reason why that

7    would be a problem, Your Honor.

8            THE COURT:  Okay.  With that clarification, thank

9    you very much.

10           MR. DEBASSIO:  Thank you, Your Honor.

11           THE COURT:  And, Mr. Essex, you may go.  You are

12   excused until Monday.

13           THE WITNESS:  Okay.

14           THE COURT:  Thank you.

15           (Witness excused, 3:04 p.m.)

16           THE COURT:  Anything further, Counsel?

17           MR. EINHORN:  No, Your Honor.  Thank you.

18           MR. McGARRY:  No, Your Honor.  Thank you.

19           THE COURT:  Very well.  See you on Monday at 9:30.

20   Don't forget about supplemental charges, please.

21           MR. EINHORN:  Do we have a date for the charge

22   conference?

23           THE COURT:  We don't.  I'm trying to figure out

24   where we are timewise.

25           MR. EINHORN:  Thank you.

1          THE COURT:  If the Government concludes by

2     Wednesday, how much more time are you going to need?

3          MR. EINHORN:  I would say that our case, knowing

4     Mr. McGarry's lengthy cross-examination of Mr. Vaccarelli if

5     he testifies, I would guess a day and a half at most.

6          THE COURT:  I will try to get you a draft charge by

7     the 21st -- Tuesday, the 21st.  I'm going to have to make

8     some adjustments in our calendar for the charge conference

9     immediately thereafter.  Okay?

10         MR. EINHORN:  Okay.

11         THE COURT:  All right.  All right.  Let me briefly

12    take this opportunity to address Mr. Vaccarelli.

13         You understand, sir, as I have instructed the jury

14    throughout, that it is your right to testify, but you have no

15    requirement to testify and that is purely your choice.  All

16    the other trial strategy decisions are ultimately your

17    attorney's choice, but this is the one that's yours.  You

18    should make this decision very carefully.  You should consult

19    with your attorney about that decision.

20         You need to understand that there are consequences

21    if you do take the stand and you do testify under oath -- you

22    are subject to cross-examination, and that cross-examination

23    will be a broad one, given the scope of the affairs at issue

24    in this case.

25         Would you please think about whether -- and I

1    recognize Mr. Einhorn told the jury that you would testify.

2    You can still change your mind.  That is not binding you in

3    any way.

4            Do you understand?

5            THE DEFENDANT:  I understand.

6            THE COURT:  All right.  Will you let me know on

7    Monday if you have been able to reach a decision -- a final

8    decision, whether, in fact, you will testify?

9            THE DEFENDANT:  I can let you know on Monday.

10           THE COURT:  All right.  And please do so with all

11   consideration and without regard to what Mr. Einhorn has

12   said.  But his advice, with respect to the downside of

13   testifying, should be listened to carefully and should be

14   acknowledged in your calculus of the decision whether to

15   testify or not.

16           All right?

17           THE DEFENDANT:  Okay.

18           THE COURT:  Very good.  All right.  We'll stand in

19   recess.

20           (Proceedings adjourned, 3:09 p.m.)

21

22

23

24

25

1          COURT REPORTER'S TRANSCRIPT CERTIFICATE

2          I hereby certify that the within and foregoing is a true

3      and correct transcript taken of the proceedings in the

4      above-entitled matter.

5

6                                    /s/  Tracy L. Gow
                                     Tracy L. Gow, RPR
7                                    Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25