```
               UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT



_____
UNITED STATES OF AMERICA,      )
              Plaintiff,       ) No: 3:18-CR-92 (JBA)
                               )
     v.                        ) May 20, 2019
LEON VACCARELLI,               )
              Defendant.       ) 9:42 a.m.
_____)
                                 141 Church Street
                                 New Haven, Connecticut



                     JURY TRIAL DAY 5



B E F O R E:
          THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
          and 14 JURORS
```

```
                                  Official Court Reporter:
                                  Tracy L. Gow, RPR
                                  203-910-0323
```

```
1    A P P E A R A N C E S:

2    For the Government:
          MICHAEL S. McGARRY, AUSA
3         U.S. Attorney's Office-NH
          157 Church Street, 25th Floor
4         New Haven, CT 06510
          203-821-3751
5         Email: michael.mcgarry@usdoj.gov

6         JENNIFER LARAIA, AUSA
          U.S. Attorney's Office-BPT
7         1000 Lafayette Boulevard, 10th Floor
          Bridgeport, CT 06604
8         203-696-3029
          Email: jennifer.laraia@usdoj.gov

9
     For the Defendant:
10        JONATHAN J. EINHORN, ESQ.
          Law Office of Jonathan J. Einhorn
11        129 Whitney Avenue
          New Haven, CT 06510
12        203-777-3777
          Email: einhornlawoffice@gmail.com

13
          RACHEL MIRSKY, ESQ.
14        Mirsky Law LLC
          900 Chapel Street
15        10th Floor
          New Haven, CT 06510
16        203-290-2779
          Email: rachel@mirskylawct.com

17
     Also present:
18        LEON VACCARELLI
          SA RUSSEL DAY, FBI

19

20

21

22

23

24

25
```

**<u>INDEX</u>**

**EXAMINATION**

**Witness Name**                                                      Page

KATHLEEN STROBEL

   Direct By MR. McGARRY.................................... 822

   Voir Dire By MR. EINHORN ............................... 846

   Direct By MR. McGARRY.................................... 847

   Voir Dire By MR. EINHORN ............................... 850

   Direct By MR. McGARRY.................................... 854

   Cross By MR. EINHORN..................................... 864

   Re-Direct By MR. McGARRY ............................... 867

   Re-Cross By MR. EINHORN ................................ 869

BRIAN KLANICA

   Direct By MS. LARAIA..................................... 870

   Cross By MR. EINHORN..................................... 889

LINDA WARREN

   Direct By MS. LARAIA..................................... 895

   Cross By MR. EINHORN..................................... 912

   Re-Direct By MS. LARAIA ................................ 917

   Re-Cross By MR. EINHORN ................................ 919

VICTORIA HUGHES

   Direct By MR. McGARRY.................................... 921

   Cross By MR. EINHORN..................................... 978

   Re-Direct By MR. McGARRY ............................... 983

**INDEX Cont'd**

**Witness Name**                                                        **Page**

THOMAS CAROCCI

   Direct By MS. LARAIA....................................... 986

   Cross By MR. EINHORN....................................... 1012

   Re-Direct By MS. LARAIA ................................... 1014

1           (Call to Order, Out of the Presence of the Jury,

2     9:41 a.m.)

3           THE COURT:  Good morning, ladies and gentlemen,

4     counsel.  Please be seated.

5           MR. McGARRY:  Good morning, Your Honor.

6           MR. EINHORN:  Good morning, Your Honor.

7           THE COURT:  Yale University has now permitted us to

8     proceed with our operations today -- that is, you can get

9     through.  Traffic was a problem.  I apologize for the delay.

10          Before I bring in the jury, I want to follow up with

11    a matter that I raised on Thursday, and that was Mr.

12    Vaccarelli's decision to testify or to not testify.

13          Mr. Vaccarelli, you'll remember that I told you that

14    it was certainly your right to do that, but that if, in fact,

15    you chose to do so, that you could anticipate a vigorous

16    cross-examination by the Government, which would be on any of

17    the subjects of your testimony and would be for the purpose

18    of, among other things, discrediting your testimony.

19          Have you had a chance to speak further -- have you

20    had the chance you wanted to speak further with Mr. Einhorn

21    about this decision?

22          THE DEFENDANT:  I have.

23          THE COURT:  And have you had enough time and

24    information to make that decision?

25          THE DEFENDANT:  I have.

```
 1                  THE COURT:  And have you made that decision?
 2                  THE DEFENDANT:  I have.
 3                  THE COURT:  And what is your decision?
 4                  THE DEFENDANT:  I will testify.
 5                  THE COURT:  All right.  And until the moment that
 6       you take the stand and raise your hand, you can still change
 7       your mind.  You understand that?
 8                  THE DEFENDANT:  I do.
 9                  THE COURT:  Okay.  And I will be happy to instruct
10       the jurors that that is your prerogative to do and they
11       shouldn't take anything from it because things change,
12       circumstances change, et cetera.
13                  Okay.  Let's bring in the jury.
14                  MR. EINHORN:  With one quick thing, if I may, Your
15       Honor.
16                  THE COURT:  Yes.
17                  MR. EINHORN:  I can't recall if I mentioned this
18       last time, but the Government is now about to put on four
19       additional investor witnesses, who I believe are almost
20       exactly repetitive to prior testimony that we've heard in
21       this case, repetitive in the sense that I could -- anyone, I
22       guess in the courtroom, could probably say what they're going
23       to say about their relationship with Mr. Vaccarelli, how
24       much -- the amounts will be different, but aside from that
25       the facts will be the same.  And, so, I would object to
```

1   hearing four separate witnesses with essentially repetitive

2   testimony.

3           THE COURT:  Repetitive with respect to the same

4   facts or repetitive with respect to how they claim to have

5   been defrauded?

6           MR. EINHORN:  Yes, repetitive as to how they claim

7   to have been defrauded.

8           THE COURT:  So how is that duplicative?

9           MR. EINHORN:  It's the same scheme.  The jury has

10  heard the scheme.  They know the scheme.  They're just going

11  to hear the exact same thing with different names and

12  different amounts, and I believe that to be repetitive.  I

13  mean, it -- well --

14          THE COURT:  All right.  Mr. McGarry.

15          MR. McGARRY:  Ms. Laraia, if it's okay.

16          THE COURT:  Ms. Laraia.

17          MS. LARAIA:  Yes, Your Honor.  I don't think that

18  the testimony is duplicative, as Your Honor pointed out.

19          THE COURT:  He's revised it -- it's repetitive.

20          MS. LARAIA:  It may be repetitive in the sense that

21  the Defendant did the same thing or very similar things with

22  different people, but I think the Government's entitled to

23  put on evidence of the scheme to defraud.

24          I'll note that three of those witnesses each have

25  charged counts, one or more charged counts, and another one

1    of the witnesses would testify as to money that was

2    commingled with money from another victim who already

3    testified -- that being Ms. Chauncey.

4          So I don't think that any of the testimony is

5    duplicative or repetitive, and I think that in order to prove

6    the charged counts the Government needs to put on those

7    witnesses.

8          And I'll note, with respect to the witness who's not

9    testifying about a specifically charged mail fraud, wire

10   fraud, securities fraud or money laundering account, that

11   victim received back $15,000 from money that was commingled

12   with Ms. Chauncey.  So I think that that's intertwined in

13   part of the scheme to defraud, and I think the Government

14   should be entitled to put on that evidence.  The Government

15   doesn't intend to put on any other victim -- any other

16   victims to testify aside from these four, so I don't think

17   that we've called a, sort of, unreasonable number of people

18   to testify.

19          THE COURT:  I don't see a basis for precluding these

20   witnesses.  The nature of a scheme or artifice to defraud is

21   going to be repetitive events as to different people.  That

22   seems to be what this is.  This does not yet seem to be what

23   we might call "overkill."

24          Does the Government have a position as to what the

25   universe of victims was in terms of numbers?  No?

1          MR. McGARRY:  I think we do, Your Honor.  And I

2    think Mr. Almodovar will shed some light on that when he

3    testifies tomorrow.  I believe it's between ten and twenty.

4          THE COURT:  And how many witnesses who would be

5    deemed victims have you put on, including these four?

6          MR. McGARRY:  I think it would be -- I think it

7    would be about ten, if my count is correct.  So ten of the

8    twenty.  So, about half.

9          THE COURT:  All right.  I'm going to overrule your

10   objection, Mr. Einhorn, and we'll proceed.

11         Now, tell me who we're proceeding with.  We've

12   excused -- you know, I'm sorry for the absence of

13   communication about Mr. Essex.  I did text back my law clerk

14   at 7 a.m. this morning.  It did not go through.

15         MR. McGARRY:  I had that problem myself.

16         THE COURT:  So, in any event, the parties agree that

17   Mr. Steven Essex was no longer required after his testimony

18   on May 16 and that he could be released; is that correct?

19         MR. EINHORN:  Yes, Your Honor, it is.

20         THE COURT:  All right.  And there's no reason to

21   require him to return.  I'm sorry we couldn't get that

22   message to him earlier.

23         Okay.  I will note that he's been excused.

24         All right.  And then we have the Government's memo

25   to preclude introduction of medical records that suggests

1   that there is some further focusing of what these medical

2   records would be, the basis for the claim of their

3   admissibility.  So we should take that up a little bit later.

4           MR. EINHORN:  Actually, Your Honor, I think we can

5   resolve that amongst ourselves first.

6           THE COURT:  Okay.  All right.

7           Let's see where we are at the end of the trial day.

8           MR. EINHORN:  Sure.

9           THE COURT:  Perhaps we can sort things out a little

10  bit.  And right now let's bring the jury back in.

11          MR. McGARRY:  Should we call the witness and have

12  her come out?

13          THE COURT:  And who are you calling?

14          MR. McGARRY:  Ms. Kathleen Strobel.  I believe it is

15  S-T-R-O-B-E-L.

16          THE COURT:  Please bring her in.

17          (Witness enters, 10:14 a.m.)

18          (Jury in, 10:15 a.m.)

19          THE COURT:  Good morning, ladies and gentlemen.

20          ALL:  Good morning.

21          THE COURT:  I'm really sorry for the late start.  A

22  number of factors have converged, not the least of which is

23  Yale University and graduate schools all having their

24  graduation today and thousands of students crossing streets,

25  to which we defer, and that has delayed many people here.

1          So I hope you had a pleasant weekend -- and it was a

2     pretty one -- and please be seated and we will proceed.  The

3     parties have agreed that Mr. Steven Essex, the trust officer

4     that you heard on Thursday, is not needed by either side, so

5     he will not be returning to testify any further for you.

6          And the Government will now call its next witness.

7          MR. McGARRY:  Thank you, Your Honor.  At this point

8     the Government calls Ms. Kathleen Strobel.

9          THE COURT:  And, Ms. Strobel if you'll raise your

10    right hand, the oath will be administered to you.

11          (KATHLEEN STROBEL sworn, 10:16 a.m.)

12          COURTROOM DEPUTY:  Please be seated and state your

13    name for the record.

14          THE WITNESS:  Kathleen Strobel.

15          COURTROOM DEPUTY:  Can you spell your last name?

16          THE WITNESS:  S-T-R-O-B-E-L.

17          COURTROOM DEPUTY:  And can you tell us what city and

18    state you live in?

19          THE WITNESS:  Yes.  Watertown, Connecticut.

20          COURTROOM DEPUTY:  Thank you.

21          THE COURT:  You may proceed, Mr. McGarry.

22                      DIRECT EXAMINATION

23    BY MR. McGARRY:

24     Q.   Good morning, Ms. Strobel.

25     A.   Good morning.

```
1        Q.   You just told the Court and the Courtroom Deputy

2   that you live in Watertown, Connecticut.  Is that where you

3   came from this morning?

4        A.   Yes.

5        Q.   Okay.  Have you ever testified in Federal Court

6   before?

7        A.   No.

8        Q.   Are you nervous?

9        A.   Sure.

10        Q.   Okay.  If you don't understand any of my questions

11   or anything, just let me know, and I'll rephrase them or try

12   to ask a better question.  Okay?

13        A.   Okay.

14        Q.   Are you married?

15        A.   Yes.

16        Q.   Okay.  Who are you married to?

17        A.   My husband, Robert.

18        Q.   Is he here in the courtroom?

19        A.   Yes, he is, with that green shirt on over there.

20        Q.   Okay.  And do you have any children?

21        A.   Yes.

22        Q.   How many?

23        A.   Two.

24        Q.   Do you have any grandchildren?

25        A.   Five.
```

```
 1        Q.   Okay.  Do you help out at all with the
 2   grandchildren?
 3        A.   Yes.
 4        Q.   Okay.  I'm sure it's appreciated.  Other than
 5   helping out with the grandchildren, are you employed?
 6        A.   No.
 7        Q.   Okay.  Were you previously employed?
 8        A.   Yes.
 9        Q.   What did you do?
10        A.   I was a real estate agent for twenty-five years and
11   a teacher before that.
12        Q.   And when you were a teacher, what did you teach?
13        A.   English.
14        Q.   Okay.  And your husband, Robert, who you pointed
15   out.
16        A.   Yes.
17        Q.   How was he employed?
18        A.   He worked in a plastics factory.
19        Q.   Where?
20        A.   Cheshire.
21        Q.   Cheshire, Connecticut?
22        A.   Yep.
23        Q.   Okay.  And is he retired?
24        A.   Yes.
25        Q.   Okay.  Other than retirement pensions, do you guys
```

1    work part-time or any other source of income?

2        A.    No.

3        Q.    Okay.  I want to kind of turn your attention to the

4    reason that brings you here today.  Do you know the

5    Defendant, Leon Vaccarelli?

6        A.    Yes.

7        Q.    Okay.  Tell the jury, if you would, how you know

8    him, or how you first met him.

9        A.    We met him through his father.  We knew the father

10   prior to meeting Leon.

11       Q.    Okay.  And Mr. Vaccarelli -- I'll call him --

12   introduced you to his son?

13       A.    Yes.

14       Q.    Why?

15       A.    Because we were interested in having our finances

16   put someplace else.

17       Q.    Okay.

18       A.    Because we were taking care of them on our own.

19       Q.    You had been taking care of them on your own?

20       A.    Yeah.

21       Q.    And, so, what did you --

22       A.    I didn't like it, doing it, because they were all

23   over the place and it just didn't make any sense.

24       Q.    Okay.  And what do you remember about your first

25   meetings or interactions with Mr. Leon Vaccarelli?

1      A.   They were very pleasant.

2      Q.   Okay.  Was he initially helpful with some things

3  that you had?

4      A.   Yes.

5      Q.   Tell the jury about that.

6      A.   Well, he was always helpful to do anything, and he

7  helped us get a person to cut down our trees in our

8  yard and -- let's see.  What else?  We had water damage in

9  our house, and he got his partner attorney to talk to us to

10 see if he could help with the process.

11     Q.   Great.

12          MR. McGARRY:  Your Honor, at this time I'd like to

13 offer -- I'll just offer them, I think without objection but

14 I'll give Mr. Einhorn an opportunity -- Government's Exhibit

15 17, 17A, 17B, and Government's Exhibit 600 to 612, and I will

16 not offer 613 or 613A at this time.

17          MR. EINHORN:  No objection, Your Honor.

18          THE COURT:  All right.  Full exhibits.

19 BY MR. McGARRY:

20     Q.   Okay.  So, Ms. Strobel, when you first invested with

21 Mr. Vaccarelli, do you remember what year that was,

22 approximately?

23     A.   I think, 2007.

24     Q.   And do you remember where you met him?  Was it

25 face-to-face, was it on the phone?

1    A.   I think the first time he came to our house.

2    Q.   Okay.  Is that -- did he do that frequently --

3    A.   Yes.

4    Q.   -- throughout your -- tell the jury about that.

5    A.   He always came to our house when we -- he was going

6  over our finances.

7    Q.   Okay.  And how frequently did he come to your

8  house?

9    A.   Probably twice a year.

10    Q.   Okay.  Did you ever go to his office down --

11    A.   Yes.

12    Q.   -- on Leavenworth Street?

13    A.   Yes.

14    Q.   Do you remember a point in time when Mr. Vaccarelli

15  moved his affiliation from QA3 to The Investment Center?

16    A.   Yes, more or less.

17    Q.   Okay.  Let me show you what's been marked as

18  Government's Exhibit 602 in evidence.  And I will enlarge it

19  for you.  Do you recognize this document?

20    A.   Yes.

21    Q.   Okay.  And does it have you and your husband's name

22  in the middle?

23    A.   Yes.

24    Q.   Okay.  Showing you the second page.  And just

25  directing your attention, do you see that number up there,

 1    account number AB1, and then it's partially redacted?

 2        A.   yes.

 3        Q.   Does that appear to be your account with The

 4    Investment Center?

 5        A.   I can't say.  I can't say if that's the account or

 6    not.  I don't remember.

 7        Q.   Fair enough.  And do you recognize the signature

 8    down on the bottom?

 9        A.   Yes, that's Leon's.

10        Q.   Let me show you Government's Exhibit 603 in

11    evidence.  Okay.  Do you recognize this document?

12        A.   Yes, I guess.

13        Q.   Okay.  And --

14            THE COURT:  Please be sure to keep your voice up and

15    you're speaking into that black bar.  That's your

16    microphone.

17            THE WITNESS:  Okay.

18    BY MR. McGARRY:

19        Q.   So, directing your attention to the middle of the

20    page, do you see where it says "full" and there's a little

21    check mark "transfer all assets"?

22        A.   Yes.

23        Q.   And firm name.

24            Okay.  Tell the jury, just basically, what you were

25    doing by way of this form.

```
 1        A.   Well, was this the form -- we were transferring it,
 2   I guess, over to the new account.
 3        Q.   Okay.  And I think you used -- does the top of the
 4   form say exactly what you said, "transfer form"?
 5        A.   Yes.
 6        Q.   And scrolling down to the second page of this
 7   document, do you recognize your signature?
 8        A.   Yes.
 9        Q.   And do you recognize your husband's signature?
10        A.   Yes.
11        Q.   Okay.  Directing your attention to 603 in
12   evidence --
13             MR. McGARRY:  I just want to get these in.
14             THE COURT:  Wasn't that --
15             MR. McGARRY:  That was 603.  Thank you.
16             604.  Thank you, Your Honor.
17   BY MR. McGARRY:
18        Q.   Do you recognize you and your husband's name on
19   Government's Exhibit 604?
20        A.   Yes.
21        Q.   Okay.  And do you remember getting this welcome
22   letter from The Investment Center?
23        A.   Yeah.
24        Q.   Okay.  And do you see we've blocked out your street
25   address, but do you see your town and you see the -- and who
```

1    is your account executive on the right side?

2        A.    Yes, Leon.

3        Q.    Okay.  And, again, that same number?

4        A.    Right.

5        Q.    Okay.  Do you see where it says "profile"?

6        A.    Uh-huh, I do.

7        Q.    And it says you're retired, and that you're married.

8    And that was the case then and that's the case now;

9    correct?

10       A.    Correct.

11       Q.    Okay.  Directing your attention to the next page.

12   Okay.  Let's see.  Directing your attention, I guess to

13   Government's Exhibit 607 in evidence.  Do you see where it

14   says "important information about your account"?

15       A.    Yeah.  Make it larger.

16       Q.    I will definitely do that.  Is that helpful or would

17   you like it one level larger?

18       A.    That's good.  That's good.

19       Q.    Okay.  Why don't I grab this section and make it one

20   level larger.  Can you read that?

21       A.    Yes.

22       Q.    Okay.  Directing your attention to where it says

23   "payment information," do you see where it says:  "Payment

24   for the purchase of stocks, options, bonds, mutual funds

25   should always be payable to Pershing, LLC, and mailed to The

1    Investment Center"?  Do you see that?

2        A.   Yes.

3        Q.   Okay.  And directing your attention to this section,

4    I'm going to highlight this section.  Do you see where it

5    says "Please do not make checks payable to the account

6    executive handling your account, the account executive's

7    branch officer, or any other entity.  These cannot be

8    accepted and will be returned, creating a delay in

9    processing."

10       A.   I see that.

11       Q.   What, if any, conversations did you have with Mr.

12   Vaccarelli about those two provisions in the account

13   information?

14       A.   I don't remember having anything said to me about

15   that.

16       Q.   Okay.  Okay.  And just directing your attention to

17   606, does this appear to be an additional new account form

18   with your husband's name on it?

19       A.   Yes.

20       Q.   Okay.  So when you were speaking with Mr.

21   Vaccarelli, did you -- and I could pull up your investment

22   profile, but did you talk to him about, like, your investment

23   goals and what you wanted to achieve?

24       A.   Yes.

25       Q.   And what did you guys talk about?

1      A.   Not making it too advanced, too -- oh, what would

2   you say?  Keeping it like as a small investment, not going

3   crazy, you know, to -- because we're retired and we didn't

4   want to overdo it.

5      Q.   Did you talk about risk and levels of risk?

6      A.   Right, yes.

7      Q.   And what did you say to him, if you remember?  I

8   know it was ten or more years ago.  Do you remember what you

9   said to him and what he said to you?

10     A.   I said low risk.  We didn't want to be -- have

11  anything too risky, and he agreed.

12     Q.   And did he seem to understand what you were

13  saying?

14     A.   Yes.

15     Q.   Ever have any trouble communicating with him?

16     A.   No.

17     Q.   Okay.  Did there come a time when you made an

18  investment with Mr. Vaccarelli related -- connected to --

19  and I'll show you Government's Exhibit 17 -- related to a

20  Private Direct Investment Agreement?  Pulling up Government's

21  Exhibit 17.  And let me show you -- I'll just go to the last

22  page of 17.  Do you recognize your signature and your

23  husband's signature?

24     A.   Yes.

25     Q.   Okay.  What do you remember about your conversations

1  with Leon regarding a Private Direct Investment Agreement?

2      A.   I don't remember anything about that, truthfully.

3      Q.   Do you remember -- let me show you Government's

4  Exhibit 17.  I'll show you 17A.  Do you see Government's

5  Exhibit 17A in front of you?

6      A.   Yes.

7      Q.   Okay.  What is Government's Exhibit 17A?

8      A.   It's a check I wrote to Leon.

9      Q.   Okay.  Do you remember that?

10     A.   Yes.

11     Q.   Okay.  So tell the jury what you remember about this

12 $45,000 investment?

13     A.   I remember that the Athene was up, the time was up

14 for us to have that investment.  And he was going to roll it

15 over into another IRA, and he said write the check out to

16 this LWLVACC, LLC.

17     Q.   Okay.  And do you remember what he told you the

18 length of this rollover was going to be?

19     A.   Like thirty-two months, I think.

20     Q.   Okay.  And pulling up the middle of Government's

21 Exhibit 17, is that consistent with what is in Government's

22 Exhibit 17, what he told you?

23     A.   Yes.

24     Q.   Okay.  Do you remember what, if anything, he said

25 about that the liquidity of the rollover?

1      A.   No.

2      Q.   Okay.  You had mentioned Athene.  Just so the jury

3   can understand, what is Athene?  From your perspective, what

4   is Athene?

5      A.   I think that's insurance.

6      Q.   Okay.  And did you have money with them?

7      A.   Yes.

8      Q.   Okay.

9      A.   That's where the $45,000 were.

10     Q.   That's where the $45,000 was?

11     A.   Yes.

12     Q.   And then did you have to move it?

13     A.   Yes.

14     Q.   Before writing that check that we saw?

15     A.   Correct.

16     Q.   That was 17A?

17          Okay.  Let me show you Government's Exhibit 17B.

18          Okay.  Now, is that your handwriting on Government's

19   Exhibit 17B?

20     A.   No.

21     Q.   Okay.  Do you see your husband's name?

22     A.   Yes.

23     Q.   Okay.  What do you remember -- do you remember if

24   you went down to the office to fill out any forms?  Or what

25   do you recall about the money being at Athene?

```
 1      A.   The only thing I recall is that it had to stay in
 2  for eight years.
 3      Q.   It had stayed in?
 4      A.   It -- yes.
 5      Q.   Okay.
 6      A.   And that if you didn't take it out, you didn't lose
 7  anything; but if you did, there was a huge penalty.
 8      Q.   Okay.  And directing your attention to the second
 9  page, do you see where it says "full surrender" and there's
10  another check?  What was your understanding as to what was
11  going to happen with the money from Athene?
12      A.   I thought it was going to be rolled over into
13  another IRA.
14      Q.   And is that your husband's signature?
15      A.   Yes.
16      Q.   And what was your understanding based on?  Who had
17  you spoken to?
18      A.   Leon.
19      Q.   Okay.  And did he tell you that it was going to be
20  rolled over?
21      A.   Yes.
22           THE COURT:  Okay.  You need to wait 'til the end of
23  the question for your answer.  Thank you.
24  BY MR. McGARRY:
25      Q.   Okay.  Just for the benefit of the court reporter,
```

```
1    what did he tell you about the money from Athene being rolled

2    ever into another IRA-type investment?

3         A.   He just said it was another investment that was

4    similar, I guess.

5         Q.   And that was, again, 32 months.  And do you remember

6    the percentage rate that's there?

7         A.   Well, I don't remember the percentage rate, but it

8    says here 8 percent.

9         Q.   Were you expecting some type of interest rate or --

10        A.   Yes.

11        Q.   Okay.  And what was your -- what was your

12   understanding based on that you'd get some type of interest

13   rate when you rolled it over?

14        A.   I was assuming that it would be pretty close to what

15   it was before.

16        Q.   And what was that based on?  Who had you spoken

17   to?

18        A.   Leon.

19        Q.   Do you remember generally what he told you?

20        A.   Not really.  It was so long ago.

21        Q.   Do you remember what he told you about the risk?

22        A.   I would assume -- I was assuming that it was the

23   same as we were doing, low risk.

24        Q.   And is that based on your earlier conversation with

25   him?
```

1    A.   Correct.

2    Q.   Okay.  So showing you Government's Exhibit --

3  actually, let's go back to 17B.  And we'll go to the last

4  page.  This is not a particularly great copy, but it appears

5  to say "Wells Fargo."  And does that appear to you to be a

6  voided check?

7    A.   Yes.

8    Q.   Okay.  Did you have an account at Wells Fargo?

9    A.   Yes.

10   Q.   Do you still have an account at Wells Fargo?

11   A.   Yes.

12   Q.   Let me show you Government's Exhibit 608.  All

13  right.  Zooming-in on Government's Exhibit 608.  Okay.  Have

14  you had a chance, at least a little bit, to look at some of

15  these records before coming today?

16   A.   Yes.

17   Q.   Okay.  Tell the jury what's going on here in your

18  account with those two lines that I just highlighted yellow.

19   A.   Leon told us to deposit the check into our account,

20  because he couldn't take that check, and to write him out a

21  new check.

22   Q.   Okay.  So the money from Athene had to go directly

23  to your account?

24   A.   Yes.

25   Q.   And then what were you going to do after?  What did

1   he tell you to do after the money got to your Wells Fargo

2   account?

3       A.   He said to write him another check so he could

4   deposit it into the new IRA.

5       Q.   Okay.  And showing you again Government's Exhibit

6   17B in evidence -- oh, that's, I'm sorry, 17A.  And is this

7   the check that he --

8       A.   Yes.

9       Q.   Showing you check number 2354, Government's Exhibit

10  17A, whose signature is on this check?

11      A.   Mine.

12      Q.   Did you write out that check?

13      A.   Yes.

14      Q.   Okay.  And can you read "Pay to the Order of"?

15      A.   Yes.  LWLVACC, LLC.

16      Q.   Okay.  And do you know what that is?

17      A.   Well, I thought -- the LLC, I thought was a check

18  that would go into, because it says "LLC," rather than just

19  didn't say Leon Vaccarelli, just said LLC.

20      Q.   So was this -- who told you to write it out to

21  LWLVACC?

22      A.   Leon.

23           MR. EINHORN:  Didn't we hear this testimony already,

24  Your Honor?

25           THE COURT:  I'm sorry, what?

1          MR. EINHORN:  I thought all of this had been asked
2    and answered previously, this whole line of questioning.
3          THE COURT:  Is this the same check coming from
4    Athene?
5          MR. McGARRY:  Well, I think --
6          Well, going back to Government's Exhibit 608.  I'll
7    ask Ms. Strobel.
8    BY MR. McGARRY:
9    Q.    Is this your Wells Fargo account?
10   A.    Yes.
11   Q.    Okay.  And the judge had asked -- the Court had
12   asked if money came in from Athene.  And do you see the date
13   on that?
14   A.    Yes.
15   Q.    And is the Athene money the money that you used for
16   17A?
17   A.    Yes.
18   Q.    Okay.  And just so it's clear for the Court and
19   clear for the jury, there's only one -- we're only talking
20   about one $45,000 check; correct?
21   A.    Correct.
22   Q.    Okay.  And let me show you what's been marked as
23   Government's Exhibit 609.  Or let me show you first the back
24   of this check, which I don't think I've asked you about.  See
25   where it says "deposit only"?

```
 1      A.   Yes.

 2      Q.   And you see where it says 7051?

 3      A.   Yeah.

 4      Q.   Okay.  Is that your handwriting?

 5      A.   No.

 6      Q.   Okay.  Do you know whose handwriting it is?

 7      A.   No.

 8      Q.   Okay.  Let me show you Government's Exhibit 609.

 9   And does this account have the same LWLVACC that your check

10   was made out to?

11      A.   Yes.

12      Q.   Okay.  And do you see where it says "deposit"?

13      A.   Yes.

14      Q.   Is that the same amount?

15      A.   Yes.

16      Q.   Is that approximately the same date?

17      A.   Yes.

18      Q.   Okay.  And what was your understanding as to what

19   your $45,000 was going into when you gave him the check to

20   deposit?

21      A.   Was going to be rolled over into another IRA.

22      Q.   Okay.  Was this money ever intended to be a gift for

23   Mr. Vaccarelli?

24      A.   No.

25      Q.   Was it ever intended to be a loan to Mr.
```

1  Vaccarelli?

2       A.   No.

3       Q.   Was it ever -- did he ever say -- or what, if

4  anything, did he say about using it to pay other debts?

5       A.   He didn't.

6       Q.   Okay.  So jumping forward a little bit in time, what

7  happened next that you recall regarding your $45,000

8  investment?

9       A.   I don't recall anything until we got the letter from

10  the IRS.

11      Q.   Let me show you what's been marked -- let me show

12  you what's been marked and not yet in evidence Government's

13  Exhibit 613A (handing).  I have a copy.  I think I should put

14  it on the Elmo for the Court.  This is called the Elmo.

15           Do you recognize Government's Exhibit --

16           MR. McGARRY:  Breigh, do we need to switch over to

17  the Elmo?

18  BY MR. McGARRY:

19      Q.   Do you recognize Government's Exhibit, which now has

20  a sticker on it, 613A?

21      A.   Yes.

22      Q.   Okay.  And what is this document?

23      A.   This is the letter the IRS sent.

24      Q.   And is this the document that you gave to Mr. Russ

25  Day this morning?

1      A.   Yes.

2      Q.   Okay.  And what is the date on this document?

3      A.   June 26, 2017.

4      Q.   And directing your attention way to the bottom of

5  the screen, do you see those three initials?

6      A.   Yes.

7      Q.   What are your initials?

8      A.   KGS.

9      Q.   And those were added since you gave it to Mr. Day;

10 correct?

11     A.   Yes.

12          MR. McGARRY:  Okay.  I would offer Government's

13 Exhibit 613A.

14          MR. EINHORN:  Objection, Your Honor.  There's no

15 showing that there's any relevance of this to the case before

16 us.

17          THE COURT:  Well, do you want to -- let's leave that

18 for ID until you link that up, and then maybe we can

19 determine --

20          MR. McGARRY:  Sure.

21          THE COURT:  -- whether it does have relevance to

22 this case.  Okay?

23          MR. McGARRY:  Thank you, Your Honor.

24 BY MR. McGARRY:

25     Q.   Do you remember getting 613A, that document?

1    A.    I do.

2    Q.    Okay.  Were you surprised when you got it?

3    A.    Shocked.

4    Q.    Okay.  Why were you shocked?

5    A.    Because of the amount it said that we owed the

6  IRS.

7    Q.    Okay.  And without reading from the document, do you

8  remember approximately what the amount was that you said you

9  owed the IRS?

10   A.    I think it's $12,000.

11   Q.    And why did you owe $12,000 to the IRS?

12   A.    I had no idea at the time.

13   Q.    Okay.  And did you call Mr. Vaccarelli?

14   A.    I did.

15   Q.    And did you talk to him about it?

16   A.    Yes.

17   Q.    Okay.  And what did he say?

18   A.    He said that we'd make an appointment and it'd be no

19  problem, he'd see what was the situation.

20   Q.    Okay.  And directing your attention to the second

21  page, did you say that you disagreed with their assessment?

22   A.    Yes.

23   Q.    Okay.

24         MR. EINHORN:  Your Honor, if we're not using the

25  exhibit, counsel shouldn't be referring to the exhibit.

1          MR. McGARRY:  Well, I would offer Government's

2     Exhibit 613A in evidence.

3          THE COURT:  I think it still needs to be linked.

4          MR. McGARRY:  Okay.

5     BY MR. McGARRY:

6     Q.   Was this document an important document in the

7     decision that you made to call Leon Vaccarelli and ask him

8     about your investment?

9     A.   Yes.

10    Q.   Why was it an important document?

11    A.   Because I couldn't understand why I owed any

12    taxes.

13    Q.   And the date on the document, does the date on the

14    document -- what is the -- without reading from it, what is

15    the date on the document?

16    A.   June 26, 2017.

17    Q.   Okay.  Is that -- was that -- did that date turn out

18    to be an important date in your interactions with Mr.

19    Vaccarelli regarding the $45,000 rollover?

20    A.   Yes.

21    Q.   Okay.  Why?

22    A.   Because I wanted to meet with him to see what the

23    situation was.

24    Q.   Okay.  And were you able to meet with him to see

25    what the situation was?

 1      A.   No.

 2      Q.   Did you, you know, at some point in time present

 3   this document to Mr. Vaccarelli or his business partner?

 4      A.   Yes, business partner.

 5      Q.   And why did you do that?

 6      A.   Because I was trying to find out where there was a

 7   lost check.

 8      Q.   Okay.  And the lost check was which check?

 9      A.   The $45,000.

10      Q.   Okay.  And when you presented this document to the

11   business partner, what did he do?

12      A.   They looked for the check.

13      Q.   Okay.

14           MR. McGARRY:  Again, Your Honor --

15           THE WITNESS:  In their office.

16           MR. McGARRY:  -- I would offer 613A.

17           MR. EINHORN:  Same objection, Your Honor.

18           THE COURT:  I think we'll leave it for

19   identification until there's evidence associating this tax

20   bill with the alleged scheme and artifice here.

21   BY MR. McGARRY:

22      Q.   Okay.  Was the tax bill based on the $45,000

23   investment, if you know?

24      A.   Correct.

25      Q.   Okay.  And how did you come to learn that?

1     A.    Because it was right in there what it was, written.

2  The $45,000 that wasn't rolled over.

3     Q.    And is that the money you took out of Athene?

4     A.    Yes.

5           MR. McGARRY:  Okay.  I'll try one more time, Your

6  Honor, to offer Government's Exhibit 613A.

7           THE COURT:  Do you want *voir dire?*

8           MR. EINHORN:  Yes, please.

9           THE COURT:  Go ahead.

10                   *VOIR DIRE* EXAMINATION

11  BY MR. EINHORN:

12     Q.    Good morning, Ms. Strobel.

13     A.    Good morning.

14     Q.    My name is Jon Einhorn.  We met outside, actually.

15           I'm just seeing this for the first time, because I

16  know you just gave it to the Government this morning, but you

17  just told us that you know this was related to the $45,000

18  because it says that in here.

19     A.    Maybe it's not in this one.

20     Q.    I was just about -- you beat me to the punch.  I was

21  just about to ask you, can you tell us where that is in here?

22  Take your time, go through it.

23     A.    I thought I saw it --

24           (Pause.)

25           THE WITNESS:  I don't see it.

1          MR. McGARRY:  Let me withdraw my offer now, Your

2     Honor, and go to another document.

3          THE COURT:  Very well.  613A remains for

4     identification only.

5                    CONTINUED DIRECT EXAMINATION

6     BY MR. McGARRY:

7          Q.   Okay.  Let me show you --

8          MR. McGARRY:  I'm going to ask Breigh to switch

9     back, but not put it for the jury.

10    BY MR. McGARRY:

11         Q.   Take a look at Government's Exhibit 613, if you

12    will.  Okay.  Do you recognize Government's Exhibit 613?  And

13    I'll zoom-in on it a little bit.  Do you see your name?

14         A.   I do.

15         Q.   And your husband's name?

16         A.   Yes.

17         Q.   And is this a subsequent notice from the IRS?

18         A.   Yes.

19         MR. EINHORN:  Well --

20    BY MR. McGARRY:

21         Q.   Okay.  Without reading from it, turning your

22    attention to the second page of Government's Exhibit 613, do

23    you see -- is this the document that you were referring to

24    that referenced the 45,000 that came out of Athene?

25         A.   That's correct.

1    Q.   Okay.  And is that the same $45,000 that you

2  provided to Mr. Vaccarelli?

3    A.   Yes.

4         And what, if anything, had Mr. Vaccarelli told you

5  about the tax consequences when you were rolling over the

6  money from Athene to LWL -- and writing out the check to

7  LWLVACC.

8    A.   I don't think he said anything regarding taxes.

9    Q.   Okay.  Would -- if there had been a tax liability by

10 virtue of taking it from Athene, would that have been

11 something you wanted to know?

12   A.   Absolutely.

13   Q.   And did you have a meeting about the rollover of the

14 45,000?

15   A.   Yes.

16   Q.   Okay.  And were you talking to him?

17   A.   Yes.

18   Q.   And did you leave that meeting thinking he had told

19 you everything that was important in making your decision to

20 invest with him?

21   A.   Yes.

22   Q.   Okay.

23        MR. EINHORN:  Well, I would object to leading the

24 witness through her testimony on this.  Questions can be

25 asked that aren't necessarily leading, What did he say?  How

```
 1   did he say it?  Where did he say it?  As opposed to, Didn't
 2   he tell you this?
 3          THE COURT:  We'll sustain the objection.  You want
 4   to rephrase?
 5   BY MR. McGARRY:
 6       Q.   Sure.  What did he say about the tax implications of
 7   the rollover, if anything?
 8       A.   He didn't say anything.
 9       Q.   How did he say it?
10          MR. EINHORN:  She said he didn't say anything.
11          THE WITNESS:  He didn't say anything.
12   BY MR. McGARRY:
13       Q.   Where were you when he said it?
14          THE COURT:  When he didn't say it?
15          MR. McGARRY:  Correct.
16   BY MR. McGARRY:
17       Q.   When you retained him as an investment advisor, what
18   was your understanding as to the amount of information he
19   would give you with respect to your investments?
20       A.   Everything he could.
21       Q.   And would tax implications be included in that?
22       A.   Absolutely.
23          MR. McGARRY:  Your Honor, I would offer Government's
24   Exhibit 613 and 613A together as completing the story of the
25   rollover, the tax implications, and the initial date of the
```

1    first notice.

2            THE COURT:  I'm going to permit 613A and 613 to be

3    admitted --

4            MR. EINHORN:  Your Honor --

5            THE COURT:  -- with the connection between the

6    notice of deficiency notice of -- reference to Athene annuity

7    in the 45,539 amount.

8            MR. EINHORN:  Well, can I *voir dire* the witness on

9    613, Your Honor?

10           THE COURT:  You may.

11           I'm not sure if the Government is claiming that this

12   document, that we see in pieces, reflects the amount

13   identified in 613A.  Does it?

14           MR. McGARRY:  Yes.  If I may, Your Honor.  I'm

15   showing you 613 on the screen, November -- dated November,

16   and there is a deficiency listed in the middle.  And if the

17   Court --

18           THE COURT:  But it's different from the amount she

19   testified to.  Let's just focus on 613.  Did you wish to *voir*

20   *dire* further?

21           MR. EINHORN:  I do, Your Honor.  Yes, please.

22           THE COURT:  Go ahead.

23           MR. EINHORN:  Thank you.

24                      *VOIR DIRE* EXAMINATION

25   BY MR. EINHORN:

1      Q.   I'm back, Ms. Strobel.  And I just want to ask you a

2      couple questions about the other IRS document that you were

3      just shown.  Okay?

4      A.   Okay.

5      Q.   So, you have it in front of you there.  So I'm going

6      the ask you -- first of all, there's a different amount --

7      you don't have to tell us what it is, but there's a different

8      amount claimed as a deficiency on 613, as opposed to 613A;

9      isn't there?

10     A.   Where am I supposed to see it?

11     Q.   Look at the very top of 613.

12     A.   This document here?

13     Q.   Yeah, the -- yes, please.  613.  Take a look at the

14     one on your screen, please.  Okay?

15     A.   Yeah.

16     Q.   Okay.  So there's a different amount on that one, as

17     opposed to what was on 613A; isn't there?

18     A.   Yes.

19     Q.   Okay.  And then -- stay with me for just a sec as I

20     I scroll down this document, and I don't want you to read the

21     figures out loud, but isn't it fair to say that various items

22     were adjusted by the IRS, including your retirement --

23          MR. EINHORN:  I got it, Mike.

24          MR. McGARRY:  No, I'm just checking the document.

25     I'd like to see it.

1    BY MR. EINHORN:

2        Q.   Including your retirement income; right?  There were

3    various items that were adjusted by the IRS?

4        A.   Let me see.

5        Q.   All right.  Let me give you an example.  Again, I'm

6    not going to tell you a figure.  Isn't it so that they

7    increased railroad requirement by a very large amount; didn't

8    they?

9        A.   I don't see that.

10       Q.   Social Security, slash, railroad requirement --

11   railroad retirement.  That's a pretty big increase; isn't

12   it?

13       A.   Yes.

14       Q.   Okay.  And then continuing down on the form, and

15   I've tried to scroll down just to help you out, it's not just

16   the 45,000 that you talked about with Mr. McGarry just a

17   moment ago, but it also has to do with other items, too;

18   right?  The IRS seems to be referring to other matters?

19       A.   I see -- what the heck is that?

20       Q.   Down on the bottom of the page that I've just shown

21   you.

22       A.   Social Security, Social Security.

23       Q.   Oops.  I did not mean to do that.  This is the

24   probably with letting me touch electronic devices.

25            So, just without telling the jury the amounts, on

1   the bottom they do have --

2       A.   You'll have to make that larger.  I can't see it.

3       Q.   Okay.

4           MR. EINHORN:  On that, I guess I do need your help.

5           MR. McGARRY:  Happy to do it.

6           MR. EINHORN:  That's the one I missed.  Okay.

7   Thanks.  All right.

8   BY MR. EINHORN:

9       Q.   So, with Mr. McGarry's assistance, we enlarged that

10  particular screen.  And I wanted to point out to you the

11  amounts on the bottom -- don't tell us what they are -- but

12  there's several items that were adjusted by the IRS, that's

13  my question for you, in addition to the 45,000 that you were

14  talking about with Mr. McGarry; right?

15      A.   There's two Social Security.

16      Q.   Right.  Right.  And as a matter of fact, on the --

17  as we went up higher on that particular page -- and, again,

18  I'd rather you don't tell us specific amounts, but when the

19  IRS announced in this particular document a change to your

20  taxable income, right -- oops.  Sorry -- a change to your

21  taxable income, they actually -- it's actually more than just

22  the -- it's actually more than just the 45,000; isn't it?

23      A.   I can't see that again.

24      Q.   All right.  We can do that.  All right.  There were

25  other items that they corrected.  That's all I'm asking, just

1  if they corrected more -- if it appears to you they corrected

2  more than just the $45,000 issue?

3      A.   You have this showing, but I don't have the other

4  part of it, so I don't know what it is.

5      Q.   Okay.

6          MR. EINHORN:  I'm sorry, Your Honor.  I think the

7  document speaks for itself.  I stand on my objection.

8          THE COURT:  I'm going to admit 413.

9          MR. McGARRY:  613, your Honor.

10         THE COURT:  613.  Isn't it 613?  Yes.  The IRS

11 notice of deficiency dated November 20, 2017.  The other

12 remains for identification.

13         MR. McGARRY:  That's 613A remains for

14 identification?

15         THE COURT:  Yes.

16         MR. McGARRY:  Okay.

17                 CONTINUED DIRECT EXAMINATION

18 BY MR. McGARRY:

19     Q.   Do you remember getting -- let's put these aside,

20 since you came down here.  Do you remember getting a notice

21 from the IRS?

22     A.   Yes.

23     Q.   Were you surprised?

24     A.   Yes.

25     Q.   Okay.  I don't know if I asked you this before, but

```
 1   why were you surprised?
 2        A.   Because --
 3             MR. EINHORN:  Your Honor, we've been through this
 4   before.
 5             MR. McGARRY:  I'm trying to get back on the track.
 6   BY MR. McGARRY:
 7        Q.   What did you do after you were surprised?
 8             MR. EINHORN:  We've been through this before.
 9             THE COURT:  That has been asked and answered.
10             MR. McGARRY:  It has been, Your Honor?
11             THE COURT:  Yes.
12   BY MR. McGARRY:
13        Q.   What did Mr. Vaccarelli say to you and your
14   husband?
15             MR. EINHORN:  Again, this was asked twice before.
16             THE COURT:  Sustained.
17   BY MR. McGARRY:
18        Q.   Okay.  I believe your answer may have been, Don't
19   worry, we'll take care of it.  Was that your answer?
20        A.   Yes.
21        Q.   Was that before or after you were going to Cape
22   Cod?
23        A.   Before.
24        Q.   Okay.  So, before you were going to Cape Cod, you
25   had a conversation with Mr. Vaccarelli; correct?
```

1    A.    Yes.

2    Q.    Okay.  Did you set up a meeting?

3    A.    We set up a time for a meeting.

4    Q.    Okay.  When was that?

5    A.    The following week.

6    Q.    Okay.  Did you go to Cape Cod?

7    A.    Yes.

8    Q.    Okay.  Where did you go?

9    A.    Mashpee.

10   Q.    Okay.  And what was your understanding while you

11   were on vacation in Cape Cod was going to happen with this

12   whole tax issue that we've been talking about back and forth

13   for ten minutes or so?

14   A.    That when we returned we were going to get together

15   and sort it out.

16   Q.    Get together with who?

17   A.    Leon.

18   Q.    And who was going to sort it out?

19   A.    He was.

20   Q.    Okay.  And did you come back from Cape Cod?

21   A.    Yes.

22   Q.    Okay.  What did you do next?

23   A.    I got a call from the office, saying that Leon was

24   sick so he couldn't meet with us at the date we had.

25   Q.    Okay.  Did you set up another appointment?

1    A.   Yes.

2    Q.   Okay.  And what happened then?

3    A.   Then that was canceled again.

4    Q.   Who canceled it?

5    A.   Maryanne told me, his secretary.

6    Q.   Okay.  And why was it canceled?

7    A.   Because he was sick.

8    Q.   Okay.  And did you get a chance to meet with him?

9    A.   No.

10   Q.   Okay.  Did something happen next that was out of the

11   ordinary?

12   A.   Yes.  The FCC [sic] called.

13   Q.   Sorry.  The SEC?

14   A.   Yeah, SEC.

15   Q.   What did they say?  Or without telling me what they

16   said, what was -- what did you say to them?

17   A.   I said I didn't want to talk to them.

18   Q.   Okay.  And why not?

19   A.   Because I needed a reason to talk to them.  I didn't

20   know why they were asking me the questions they were.

21   Q.   Okay.  And what did you do after getting a call from

22   the SEC?

23   A.   I called the office of -- Leon's office.

24   Q.   And why?

25   A.   And asked why they were investigating Leon.

```
 1      Q.   Okay.  And did you go down to the office?
 2      A.   Not at that point.
 3      Q.   What did you do at that point?
 4      A.   I said, Why are they investigating Leon, and Barry
 5  told me that --
 6           MR. EINHORN:  Objection.  Objection.
 7  BY MR. McGARRY:
 8      Q.   Okay.  Let me stop with what Barry told you, since
 9  he's not here?
10      A.   Uh-huh.
11      Q.   But what did you do next?
12      A.   I talked with the FEC [sic].
13      Q.   Okay.  At any point in time did you go to Wells
14  Fargo?
15      A.   Yes, to get the check.
16      Q.   Tell the jury about why you went to Wells Fargo and
17  what you did?
18      A.   I had them look up the copy of the check to see if
19  it was deposited.
20      Q.   Okay.  And what did you find out?
21      A.   That it was.
22      Q.   Okay.  That was your check?
23      A.   Right.
24      Q.   Okay.  What did you do next?
25      A.   As to what?
```

1    Q.   Did you go anywhere or do anything after you

2    had -- you had the information from Wells Fargo?

3    A.   Right.

4    Q.   What did you do with that information?

5    A.   I brought it down to their office to show them.

6    Q.   Mr. Vaccarelli's office?

7    A.   Yes.  Copies, yes.

8    Q.   Was he there?

9    A.   No.

10   Q.   Okay.  And did you observe people trying to help you

11   out?

12   A.   Yes.

13   Q.   What were they doing?

14   A.   Actually, I think I got the check after we had gone

15   down to their office.

16   Q.   Okay.

17   A.   And they were looking everywhere to look for our

18   files and couldn't find them.

19   Q.   And that's when you went to Wells Fargo?

20   A.   Yes.

21   Q.   And then did you go back?

22   A.   Yes.

23   Q.   Did you observe them -- did you give them the

24   check?

25   A.   Yes.

1    Q.   And when we say "them," do you remember who you gave

2  the check to?

3    A.   Yes, to Barry.

4    Q.   Okay.  What did he do?

5    A.   He -- we -- while we were there, we called the IRS

6  to see what was going on.

7    Q.   Okay.  And did you talk to -- were you on that

8  call?

9    A.   Yes.

10    Q.   Okay.  What did you say on that call?

11    A.   I couldn't understand why we owed that money or what

12  was going on.  We wanted to know what happened.

13    Q.   Okay.  And were you making an attempt -- did you on

14  that phone call tell the IRS that the money had been intended

15  as a rollover?

16    A.   Yes.

17    Q.   Okay.  Did you make any headway?

18    A.   No.

19    Q.   Okay.  You realize Mr. Day doesn't work for the IRS;

20  correct?

21    A.   Oh, no.

22    Q.   All right.  Did you ever get the meeting with Mr.

23  Vaccarelli?

24    A.   No.

25    Q.   Okay.  Let me show you Government's Exhibit 612 in

1  evidence.  Do you remember getting this letter from The

2  Investment Center?

3     A.   Yes.

4     Q.   Okay.  And what did you do when you got this

5  letter?

6     A.   I was shocked.  I don't remember what I did,

7  though.

8     Q.   Okay.  Let me jump forward in time.  The date of

9  this letter is what?  Before I take it down, do you see the

10  little date up on the top?

11     A.   Yeah.

12     Q.   What's that date?

13     A.   July 24, 2017.

14     Q.   Okay.  And were you still trying to figure out what

15  happened to your money?

16     A.   Yes.

17     Q.   Okay.  What, if anything, did you do next?

18     A.   At that time that we were in the office with Barry,

19  we called The Investment Center, also.

20     Q.   Okay.

21     A.   To see where the check was.

22     Q.   Did you say anything when you were on that call to

23  TIC, to the folks at The Investment Center?

24     A.   Just we were wondering where the check was.

25     Q.   And without telling us what they said, did they give

1   you a satisfactory answer?

2       A.   No.

3       Q.   Showing what's been marked as Government's Exhibit

4   601, what is Government's Exhibit 601?

5       A.   This is a letter I wrote to The Investment Center.

6       Q.   And why did you write a letter to The Investment

7   Center?

8       A.   Because I wasn't getting anywhere.

9       Q.   Okay.  And what happened after that?

10      A.   A lot of back-and-forth.

11      Q.   Okay.

12      A.   But no -- no answers.

13      Q.   Okay.  Did you eventually get any money back from

14  The Investment Center?

15      A.   I did.

16      Q.   How much?

17      A.   45,000.

18      Q.   Okay.  Did you ever get any money back from Mr. Leon

19  Vaccarelli?

20      A.   No.

21      Q.   Okay.  Now, there's been a lot, probably too much --

22  I've asked probably too many questions about taxes.  Did

23  you -- regardless of, like, other adjustments and railroad

24  things, did you inquire about The Investment Center about

25  the -- where you told them that the IRS said you did not pay

1    tax owed on money?

2            Let me rephrase the question.

3            You wrote:  Because the IRS informed us that we did

4    not pay tax owed on the money taken out, and not reinvested,

5    where are you on this process?

6            What happened with that aspect of your conversation

7    with The Investment Center?

8        A.   They were still searching to try to figure out what

9    happened.

10       Q.   Okay.

11       A.   That was for, like, two years.

12       Q.   Okay.  And, again, if you could just read the

13   unhighlighted part.  I'm writing?

14       A.   I'm writing to inquire about our missing money that

15   we entrusted to Lux Financial as a rollover investment.  The

16   check has been missing since October of 2015, and we only

17   became aware of this as of July 1st, 2017.

18       Q.   Okay.  And did you get any anything from The

19   Investment Center regarding your tax bill?

20       A.   No.

21       Q.   Are you -- what did you end up doing with that?

22       A.   Still working on it, for two years.

23       Q.   What about the interest that had been represented

24   you would get?

25       A.   No.

```
 1        Q.    Okay.

 2              MR. McGARRY:  If I could just have a minute.

 3              (Pause.)

 4              MR. McGARRY:  Okay.  I have no more questions at

 5     this time, Your Honor.

 6              THE COURT:  Cross-examination.

 7              MR. EINHORN:  Yes, Your Honor.

 8                        CROSS-EXAMINATION

 9     BY MR. EINHORN:

10        Q.    Hi, Mrs. Strobel.  A few more questions.

11              You told us at least twice that Leon didn't say

12     anything about the tax consequences of the withdrawal on the

13     IRA; right?

14        A.    Right.

15        Q.    Okay.  A third time.  So did you go to a tax

16     professional, an accountant or someone, to go over the issues

17     on the rollover, taxability of a rollover?

18        A.    No.

19        Q.    Okay.  My mother's not going to be happy if I ask

20     you this question, but let me ask it tactfully.  Are you over

21     59-and-a-half?

22        A.    Certainly.

23        Q.    And you were at the time of this transaction, too?

24        A.    Yes.

25        Q.    Back in 2017?
```

1       A.   Yes.

2       Q.   Okay.  All right.  Now -- and you say that's all

3   still pending; you're working on it?

4       A.   Yes.

5       Q.   You got back the 45,000 that you invested with Leon,

6   so that you're whole on that.

7       A.   Just got that back two weeks ago.

8       Q.   Just two weeks ago.  Okay.  Good.  But you got it

9   back.  And with regard to this tax issue, it's fair to say

10  it's disputed; right?  Yes?

11      A.   Yes.

12      Q.   Okay.  All right.  Good.

13           Now, just one other thing.  It seems pretty clear

14  you were trying to meet with Leon.  You wanted to talk to

15  him.  Not surprisingly, you wanted to ask him some questions

16  about what was going on.  And then you get a letter from The

17  Investment Center, Exhibit 612, and can you see the date on

18  that?

19      A.   No, I can't see it.

20      Q.   I know.  Let me just help.  What's the date on

21  that?

22      A.   July 24, 2017.

23      Q.   So that's when you got the letter from The

24  Investment Center, telling you that Leon was no longer with

25  them and not authorized to do anything with them; right?

1   Sort of a short summary?

2       A.   I guess.

3       Q.   Something like that; right?

4       A.   Yes.

5       Q.   And did you know Leon, in fact, at the time was in

6   the hospital?  He was being hospitalized for detox?

7       A.   I didn't know that for -- let's see.  This is -- not

8   on July 24th I didn't know.

9       Q.   You didn't realize it then.  And as a matter of

10  fact, you said you were trying to make an appointment before

11  that, before you got this letter; right?

12      A.   Correct.

13      Q.   In June.  And is it fair to say, also early July?

14      A.   Yes.

15      Q.   And, again, did you know at the time you were trying

16  to make this appointment that Leon was already hospitalized

17  or inpatient for his alcohol -- alcoholism?

18      A.   No.

19      Q.   No?

20      A.   No.

21      Q.   Okay.  Just one other thing.  And I'm not trying to

22  pry into your finances here, but at the time you were working

23  with Leon on reinvesting what did come from an IRA

24  investment, did you have other IRA investments?

25      A.   Yes.

```
1        Q.   Okay.

2        A.   With him you mean?  Is that what you're talking

3   about?

4        Q.   With anybody.  I didn't ask, but with anybody did

5   you have other IRA investments?

6        A.   Yes.

7        Q.   Okay.  So you were generally familiar with how those

8   things worked?

9        A.   Yes.

10       Q.   Okay.

11            MR. EINHORN:  May I have just a moment, Your

12   Honor?

13            THE COURT:  Yes.

14            (Counsel confers with client.)

15            MR. EINHORN:  Thank you very much, Your Honor.

16   Nothing further.

17            THE COURT:  All right.  Anything further?  Redirect?

18            MR. McGARRY:  Thank you, Your Honor.

19                      REDIRECT EXAMINATION

20   BY MR. McGARRY:

21       Q.   You were asked if you were generally familiar with

22   how things worked.  What was your familiarity with, if you do

23   a rollover are there any tax consequences?

24       A.   No.

25       Q.   No what?
```

1    A.   No, there is no tax consequence until you take it

2    out totally.

3    Q.   Okay.  And was it your intention to take this out

4    totally?

5    A.   No.

6    Q.   Okay.  You were asked some questions about alcohol.

7    How long have you known Mr. Vaccarelli?

8    A.   I'd say eleven years.

9    Q.   Was he ever drunk at any of your meetings?

10   A.   No.

11   Q.   Did you ever see him drunk?

12   A.   No.

13   Q.   How many times a year did you meet him?

14   A.   I'd say about twice a year.

15   Q.   And when you were doing business with him, did he

16   appear to have all his faculties?

17   A.   Yes.

18   Q.   Any question in your mind about that?

19   A.   No.

20   Q.   You -- Mr. Einhorn said that, quote, "you got it

21   back."  Okay.  Did you ever get your money back from Mr.

22   Vaccarelli, or did you get paid from The Investment Center?

23   A.   The Investment Center.

24        MR. McGARRY:  I have no more questions.

25        THE COURT:  Anything further?

1          MR. EINHORN:  May I ask one question based on that,

2     Your Honor?

3          THE COURT:  Yes.

4                         RECROSS-EXAMINATION

5     BY MR. EINHORN:

6     Q.   So you were just asked about generally familiar with

7     the concept of rollovers.  We just asked you about that.  Are

8     you familiar with -- and you said -- I'm sorry, you said that

9     there shouldn't be a tax if it's rollover; right?

10    A.   Correct.

11    Q.   Are you familiar with the fact that when you reach a

12    certain age -- that's why I was bringing up my mother

13    before -- that there is no tax if you don't reinvest it;

14    right?  At some point there's no tax when you take money out

15    of an IRA; right?  You know that; don't you?

16    A.   No.

17    Q.   Okay.  You don't.  And you also told me earlier that

18    you hadn't been working with a tax professional, though, on

19    this issue?

20    A.   Right.

21    Q.   Okay.

22         MR. EINHORN:  Nothing further, Your Honor.  Thank

23    you.

24         THE COURT:  All right, then.  Ms. Strobel, you may

25    step down.  You are excused.  Thank you.

```
 1              (Witness excused, 11:13 a.m.)

 2              THE COURT:  Please call your next witness.

 3              MS. LARAIA:  Your Honor, the Government calls Brian

 4    Klanica.

 5              MR. McGARRY:  Your Honor, if I may approach.  I have

 6    613 marked for identification -- 613A

 7              THE COURT:  Thank you.

 8              MR. McGARRY:  (Handing.)

 9              (Witness takes stand, 11:13 a.m.)

10              THE COURT:  All right, sir.  Please raise your right

11    hand and you will be sworn.

12              (BRIAN KLANICA sworn, 11:14 a.m.)

13              COURTROOM DEPUTY:  Please be seated.  State your

14    name for the record.

15              THE WITNESS:  Brian Klanica.

16              COURTROOM DEPUTY:  Can you spell your last name?

17              THE WITNESS:  K-L-A-N-I-C-A.

18              COURTROOM DEPUTY:  And can you tell us what city and

19    state you live in?

20              THE WITNESS:  Cheshire, Connecticut.

21              COURTROOM DEPUTY:  Thank you.

22              THE COURT:  You may proceed.

23              MS. LARAIA:  Thank you, Your Honor.

24                          DIRECT EXAMINATION

25    BY MS. LARAIA:
```

```
 1        Q.   Good morning, Mr. Klanica.

 2        A.   Good morning.

 3        Q.   I believe you just testified that you live in

 4   Cheshire?

 5        A.   Yes.

 6        Q.   And did you come from Cheshire to come here this

 7   morning?

 8        A.   Yes.

 9        Q.   What do you do for work?

10        A.   I'm an investment banker.  I own a mergers and

11   acquisition firm called Spring Bridge Capital, and I have a

12   marketing agency in Prospect.

13             THE COURT:  I'm going to need you to speak louder

14   and slower, please.

15             THE WITNESS:  Okay.

16   BY MS. LARAIA:

17        Q.   And the microphone is on the black bar, if that

18   helps.

19             Mr. Klanica, have you ever met Mr. Vaccarelli?

20        A.   Yes.

21        Q.   How was it that you met Mr. Vaccarelli?

22        A.   There was a meeting at my mother-in-law, Pat

23   Sienkowski's, house back in February of 2014, somewhere

24   around there.

25        Q.   Okay.  So I want to back up for a minute.  You said
```

```
1    Pat Sienkowski?

2         A.   Yes.

3         Q.   Is that Patricia?

4         A.   Yes.

5         Q.   What is your relationship with Patricia

6    Sienkowski?

7         A.   I'm her son-in-law.

8         Q.   Do you know how old Ms. Sienkowski is at this

9    point?

10        A.   About 84.

11        Q.   And what is her condition right now?

12        A.   She's got really bad feet.  She's immobile, and she

13   had cancer, and she's in kind of rough shape.

14        Q.   Okay.  Where does she live?

15        A.   In Cheshire.

16        Q.   Is Ms. Sienkowski married?

17        A.   No.

18        Q.   Was she married at --

19        A.   She's widowed.

20        Q.   -- at some earlier point?

21        A.   Yes.

22        Q.   Has her husband passed away?

23        A.   Yes.

24        Q.   Do you remember approximately when that was?

25        A.   December, 2012.
```

1     Q.   Does Ms. Sienkowski have any children?

2     A.   Yes.

3     Q.   Do you know how many?

4     A.   Yes, two.

5     Q.   Okay.  And one of them being your wife?

6     A.   My wife's passed.

7     Q.   Okay.  So -- but your wife was one of her --

8     A.   So it would have been three, yes.

9     Q.   Okay.  Now, at some point, did you become involved

10    in reviewing Ms. Sienkowski's finances?

11    A.   Yes.

12    Q.   Okay.  And I think that you testified that you met

13    with Mr. Vaccarelli?

14    A.   Yes.

15    Q.   Just describe for us how that meeting came about?

16    A.   My mother-in-law came to us and the family and said

17    that she was going to have a meeting with Leon, and that she

18    was -- had some concerns, and she wanted us to look over her

19    investments and a few other requests that she was concerned

20    about.

21    Q.   Okay.  And when you said "us," who did your

22    mother-in-law address that to?

23    A.   Yeah.  So, at the time, it would be Tom Sienkowski,

24    her son; Andrea Sienkowski, her daughter; and Connie

25    Sienkowski, her daughter -- my wife.

1    Q.   Okay.  And do you remember any specific concerns

2    that you or other people had prior to that meeting?

3    A.   Yes.  Everybody got concerned, my mother-in-law,

4    included, that there was a request that he become the Trustee

5    of her assets, and that the partner of his, who is an

6    attorney, would be the executor of her estate.

7    Q.   So at that point was a meeting set up?

8    A.   Yes.

9    Q.   Where did that meeting take place?

10   A.   At my mother-in-law's house.

11   Q.   And was that in Cheshire at the time?

12   A.   Yes.

13   Q.   Okay.  Now, who was present for this meeting?

14   A.   Tom Sienkowski, Andrea Sienkowski, Connie

15   Sienkowski -- or Connie Klanica -- myself, and my

16   mother-in-law.

17   Q.   Okay.  And Mr. Vaccarelli --

18   A.   Yes.

19   Q.   -- I assume?

20        Now, what do you remember about Mr. Vaccarelli, just

21   when he first arrived?

22   A.   I'm not sure what you mean.

23   Q.   Can you just describe what he looked like, for

24   example?

25   A.   You know, long trench coat and top hat, I think.

1    Q.   Okay.  Do you remember if he -- how he got to your

2    mother-in-law's house?

3    A.   He drove.

4    Q.   Okay.  Now, what was discussed at the meeting?

5    A.   We -- he would typically -- I guess typically --

6    would give my mother-in-law a summary statement of her

7    accounts, which it started from there.

8    Q.   Okay.  You've mentioned this question about Mr.

9    Vaccarelli potentially becoming a Trustee; is that right?

10   A.   Yes.

11   Q.   Did that issue come up during the meeting?

12   A.   No.

13   Q.   With respect to a summary statement, did Mr.

14   Vaccarelli provide anything to you or anyone else at the

15   meeting?

16   A.   Yeah, there was a summary statement of her

17   accounts.

18   Q.   Okay.

19        MS. LARAIA:  Your Honor, I'd offer, just all at

20   once, Government's Exhibits 1051, 1052, 1054, 1056 and 1057.

21        MR. EINHORN:  No objection, Your Honor.

22        THE COURT:  Full exhibits.

23   BY MS. LARAIA:

24   Q.   I'm going to pull up for you what's just been

25   admitted into evidence Government's Exhibit 1057.  Now, do

1    you recognize that first page?

2        A.    I do.

3        Q.    And tell us what it is.

4        A.    That's the summary statement of her assets.

5        Q.    Okay.  And this -- and you said that's the summary

6    statement.  Was that the summary statement provided by Mr.

7    Vaccarelli?

8        A.    Yes.

9        Q.    At the meeting that you attended?

10       A.    Yes.

11       Q.    Okay.  I'm just going to make this part a little

12   larger here.  Can you read for us the date that this summary

13   is based on?

14       A.    January 15, 2014.

15       Q.    And was this around the time of the meeting with Mr.

16   Vaccarelli?

17       A.    Yes.

18       Q.    Okay.  Now, is there some handwriting on this

19   document?

20       A.    Yes.

21       Q.    Whose handwriting is that?

22       A.    That's mine.

23       Q.    Okay.  Can you just tell us what kind of notations

24   you were making on this document?

25       A.    I took this summary statement, and I just wanted to

1    confirm with the actual portfolio statements to see if it

2    would just tie in.

3        Q.   Okay.  And I'm going to show you just page -- going

4    down here -- page 2.  Do you recognize this?

5        A.   Yes.

6        Q.   Okay.  What's this?

7        A.   Do you want to turn that one or is that --

8        Q.   Yeah, that's something that I don't know how to do.

9    But if you were looking at it sideways, do you see where it

10   say "The Investment Center"?

11       A.   Yes.

12       Q.   And is that your mother-in-law's name?

13       A.   Yes.

14       Q.   Okay.  Now, is this something that Mr. Vaccarelli

15   provided or something that you had?

16       A.   No, that's something we had.  It was mailed to

17   her.

18       Q.   All right.  Now, at the time of the meeting, did you

19   have this backup statement?

20       A.   We did.

21       Q.   And I'm just going to go down to the next page, page

22   3.  Is this also another, I guess backup document?

23       A.   Yes.

24       Q.   And is that your handwriting with the circle?

25       A.   Yes.

1    Q.   And this is page 4.  Just tell us what that is, just

2   generally.

3    A.   Same.  It's another backup document.

4    Q.   Okay.  And page 5?

5    A.   Same.

6    Q.   Okay.  And page 6?

7    A.   That's a shareholder letter that describes two

8   portfolio investments, which were wreaths that were combined

9   into one.

10    Q.   And how about the next page here.  This is page 7.

11    A.   Same, another backup document.

12    Q.   Okay.  Now, just going back up to page 1.  Okay.

13   Just tell us what this means here.  Well, let me back up,

14   actually.

15         So, when Mr. Vaccarelli provided this sheet, were

16   the figures input in the typewritten text provided by Mr.

17   Vaccarelli?

18    A.   Yes.

19    Q.   And I'll highlight here, Total -- a little difficult

20   to read, but -- $493,067.81?

21    A.   Yes.

22    Q.   Okay.  Now, is there anything about that figure that

23   you had an issue with?

24    A.   Yeah, I just added up the actual statements, and

25   it -- which are the handwritten numbers here, and it came up

1    to 483,066, so it was $10,000 off.

2        Q.   Okay.  And is that where this notation says here

3    "off 10,000" and there's a circle with a question?

4        A.   Yes.

5        Q.   And, again, that's your handwritten notation?

6        A.   Yes.

7        Q.   Now, during the course of this meeting, did you have

8    any discussion with Mr. Vaccarelli about that potential

9    discrepancy?

10       A.   We did.  I just asked him why it was off.

11       Q.   And what did Mr. Vaccarelli say?

12       A.   He didn't have an answer.  He just said he thought

13   his girl might have made a mistake.  That was his direct

14   quote.

15       Q.   Were you satisfied with that answer?

16       A.   Not real -- I mean --

17       Q.   Yes or no?

18       A.   Yes, at the time.  I mean, it was just -- it was

19   off.

20       Q.   Okay.  Now, what, if anything, did you do after the

21   meeting, with respect to Ms. Sienkowski's profile or her

22   assets?

23       A.   After he left, we got together and everybody kind of

24   voiced concerns that maybe --

25            MR. EINHORN:  Objection, Your Honor.

1    BY MS. LARAIA:

2        Q.    Without going into what people say or what people

3    said --

4            MR. EINHORN:  Would Your Honor move to strike that

5    and instruct the jury to disregard the comment?

6            THE COURT:  All right.  It may be struck, and the

7    jury will disregard the beginning of the response.

8    BY MS. LARAIA:

9        Q.    Let me just jump forward a little bit.  Do you know

10   whether Ms. Sienkowski continued to invest with Mr.

11   Vaccarelli long-term or whether there was any change at any

12   point?

13       A.    No, there was a change immediately.

14       Q.    Okay.  And when you said there was a change, what do

15   you mean by a change?

16       A.    The following day we met with Merrill Lynch and they

17   took over the management of the accounts.

18       Q.    Okay.  Now, before that happened, before there was

19   this change-over to Merrill Lynch, did you, yourself, say

20   anything?

21       A.    Yes.

22       Q.    What did you say?

23       A.    I was concerned.

24       Q.    And did you give any specifics about what you were

25   concerned about?

1    A.   In general, the investment portfolio had some

2  nontraditional investments included in it, which for someone

3  in her age group I wouldn't recommend.

4    Q.   Okay.  Now, I want to go back a little bit in time.

5  So, this meeting here occurred approximately when?

6    A.   February.  Beginning of February, 2014.

7    Q.   Okay.  Now, going back to 2012, can you just tell us

8  what was going on in terms of Patricia Sienkowski's family

9  life in 2012?

10   A.   Her family life?

11   Q.   Yeah.  What was going on at her house at that

12  point?

13   A.   My father-in-law was in hospice at home, so it was

14  pretty rough.

15   Q.   Okay.  And he passed away that year?

16   A.   Yes.

17   Q.   Now, I'm going to show you what's been marked and

18  admitted as Government's Exhibit 1051.  And I just want to

19  ask you to read what's on this document.

20        Now, do you recognize the top part here, it says

21  "Lux Financial Services"?

22   A.   Yes.

23   Q.   Okay.  And how do you recognize that?

24   A.   That would be Leon's firm.

25   Q.   Okay.  Similar to what you saw on the document we

1    looked at previously?

2        A.   Similar, yes.

3        Q.   Just looking at -- just asking you to read along

4    here, what's the date on this fax cover sheet?

5        A.   February 27, 2012.

6        Q.   Okay.  February -- it looks like 17, '12; is that

7    right?

8        A.   Yes.

9        Q.   And do you see your mother-in-law's name here?

10       A.   Yes.

11       Q.   And just read for us what's in the comments

12   section?

13       A.   "Cash surrender."

14       Q.   Okay.  I just want to go down to page 2.  So

15   highlighting up here, up at the top, which box is checked

16   off?

17       A.   Cash surrender.

18       Q.   And which company is this document from, just

19   looking at the top?

20       A.   ING.

21       Q.   And was it your understanding that Ms. Sienkowski

22   had an investment at ING?

23       A.   Yes.

24       Q.   Okay.  And just looking at the bottom here, what's

25   the box that's checked?

1      A.    "Process for full contract surrender."

2      Q.    Okay.  Now, looking here -- this is page 4 -- do you

3  see the section that says "payment options"?

4      A.    Yes.

5      Q.    Okay.  What's checked in this section?

6      A.    "Check payable to another party or to the owner at

7  the alternate address."

8      Q.    Okay.  And who is listed as the payee?

9      A.    Patricia Sienkowski.

10     Q.    And is the address listed there her address?

11     A.    No.

12     Q.    All right.  And where was she living at the time?

13  Or, I'm sorry.  Back in 2012, where was she living?

14     A.    In Cheshire.

15     Q.    I just want to go down to the last page here.  Do

16  you recognize this signature?

17     A.    Yes.

18     Q.    Whose signature is that?

19     A.    That's Patricia Sienkowski, my mother-in-law.

20     Q.    Now, do you see here at the bottom there's a notary

21  signature and a seal on the right?

22     A.    Yes.

23     Q.    Okay.  Now, back in 2012, back in February, to the

24  best of your knowledge, was Ms. Sienkowski generally leaving

25  the house?

1    A.   No.

2    Q.   To go down to an office, for example?

3    A.   No.

4    Q.   I want to show you Government's Exhibit 1052.  And

5    just tell us what this is.

6    A.   A check payable to Patricia Sienkowski for

7    $100,343.36.

8    Q.   And which company is this check from?

9    A.   ING.

10   Q.   Okay.  Just going down to the bottom here, do you

11   recognize any of the signatures on the back of that check?

12   A.   Patricia Sienkowski's signature I recognize.

13   Q.   Is that the top signature?

14   A.   Yes.

15   Q.   Okay.  Now, I want to also show you Government's

16   Exhibit -- actually, I want to back up for a second, to look

17   at the date here.  What is the date of that check?

18   A.   March 6, 2012.

19   Q.   Okay.  Now, I want to show you Government's Exhibit

20   1054, which has just been admitted.  And tell us what this

21   is.

22   A.   That's a check to Patricia Sienkowski for $15,000.

23   Q.   Okay.  And what's the date on that check?

24   A.   April 24, 2012.

25   Q.   And could you just read for us what the "Remitter"

1    says?

2         A.   LWLVACC, LLC.

3         Q.   Do you happen to know what LWLVACC, LLC is?

4         A.   No.

5         Q.   Okay.  Now, just looking at the bottom portion here,

6    do you recognize this signature on that check?

7         A.   I do.  It's Patricia Sienkowski.

8         Q.   Okay.  What, if anything, do you know about Ms.

9    Sienkowski's banking, in terms of her use of cash?

10        A.   I'm not clear on the question.

11        Q.   Does Ms. Sienkowski have any -- are you familiar

12   with what kind of money she liked to keep in her checking

13   account?

14        A.   Yeah, she always liked to have like $25,000 in her

15   checking account.

16        Q.   Okay.  I'm going to show you Government's Exhibit

17   1056.  Are you familiar with this document?

18        A.   Yes.

19        Q.   How are you familiar with this document?

20        A.   This was provided to us, I think by my mother-in-law

21   to everybody, a copy of it.

22        Q.   Okay.  And I want to show you at the top here.  Is

23   this an e-mail?

24        A.   Yes.

25        Q.   Who does the e-mail appear to be from?

1      A.    From Leon Vaccarelli.

2      Q.    Okay.  And do you see how it's addressed here, "Dear

3 Pat, Connie and Tom Jr."?

4      A.    Yes.

5      Q.    Okay.  And Pat was your mother-in-law?

6      A.    Yes.

7      Q.    And Connie was your wife?

8      A.    Yes.

9      Q.    And who is Tom Jr.?

10     A.    My brother-in-law.

11     Q.    Okay.  And I'd just ask if you could read the

12 paragraph of text in there.

13     A.    Sure.  "Here is a brief summary of all the assets

14 that I am aware of.  Again, I'm very saddened to hear about

15 Tom.  Please let him know that he is in my prayers, and I

16 sincerely appreciate his business and trust over the years.

17 He is one of my first clients.  Please keep me posted on his

18 condition.  And if I can do anything at all, please do not

19 hesitate to ask."

20     Q.    And what's the date on this e-mail?

21     A.    November 30, 2012.

22     Q.    Okay.  And was he -- was Tom, Patricia Sienkowski's

23 husband, ill at that point?

24     A.    Very.

25     Q.    Now, can you just tell us what comes next in this

1    e-mail?

2        A.    Just a list of assets.

3        Q.    Okay.  So, can you just read through what those are

4    for us?

5        A.    Sure.  Residence on Long Hill Road, which is

6    350,000.  Gold coins, 40,000.  Tom's IRA, 249,300.  Pat's

7    individual account 43,000.  Pat's annuity, 61,272.  Pat's

8    CPA-14, 75,000.  Joint CPA-16, 44,000.  Cash in banks 20,000,

9    approximate as of September 2012.  Estimated total net worth

10   882,572, not including life insurance.

11       Q.    Okay.  Anywhere in this list of assets and in this

12   estimated total net worth do you see that $100,000 check?

13       A.    No.

14       Q.    How about the $100,000 minus the 15,000?

15       A.    No.

16       Q.    So, no $85,000?

17       A.    No.

18       Q.    At the time that you met with Mr. Vaccarelli in the

19   beginning of 2014, did Mr. Vaccarelli say anything about

20   Patricia Sienkowski's hundred thousand dollar check?

21       A.    No.

22       Q.    Or $85,000 of Ms. Sienkowski's money?

23       A.    No.

24       Q.    When did you find out about the hundred thousand

25   dollar check?

1      A.   I think when we were e-mailed or sent a letter from
2    the FBI regarding this.
3      Q.   Okay.  And at any point have you looked into Ms.
4    Sienkowski's financial records to attempt to locate that
5    check or any repayments?
6      A.   Yes.
7      Q.   Have you done anything in an attempt to obtain the
8    $85,000 for Ms. Sienkowski?
9      A.   Yes.  We -- The Investment Center had an insurance
10   policy, apparently for these types of losses, and we
11   vigorously contacted them numerous times.
12     Q.   Okay.  And you said "we."  Were you directly
13   personally involved in that process?
14     A.   Yes.
15     Q.   Okay.  And at any point did you obtain any money for
16   Ms. Sienkowski?
17     A.   We did.  About, I think, two and a half weeks ago.
18     Q.   Okay.  And what was that, if you know?
19     A.   $85,000.
20     Q.   Okay.  At any point, did you obtain any money back
21   from Leon Vaccarelli?
22     A.   No.
23     Q.   Now, just looking to -- I'm just going to look back
24   for a second.  This check in Government's Exhibit 1052, based
25   on your experience with your mother-in-law -- and how long

1   have you known your mother-in-law?

2       A.   I was married 32 years, so probably 40.

3       Q.   Okay.  In the time that you've known your mother,

4   has she ever given someone a hundred thousand dollar gift?

5       A.   No.

6       Q.   An $85,000 gift?

7       A.   No.

8       Q.   Based on what you know of your mother-in-law, would

9   she loan anybody $85,000 or a hundred thousand dollars?

10      A.   No.  No.

11           MS. LARAIA:  No further questions at this time, Your

12  Honor.

13           THE COURT:  Cross-examination.

14           MR. EINHORN:  Yes, Your Honor.

15                    CROSS-EXAMINATION

16  BY MR. EINHORN:

17      Q.   Good morning, Mr. Klanica.  My name is Jon Einhorn.

18  I represent Leon Vaccarelli, and I'm just going to ask you a

19  few questions.

20           Early on in your testimony here -- it's still this

21  morning?  Yes, it's still this morning.

22           Early on in your testimony, you said something about

23  Leon suggesting or talking about being a Trustee or an

24  executor.  Do you remember that?

25      A.   Yes.

1   Q.   Did he say that to you?

2   A.   No.

3   Q.   So you got that from other people?

4   A.   Yes.

5   Q.   All right.

6        MR. EINHORN:  Your Honor, I'd move to have that

7   stricken and the jury instructed to disregard that portion of

8   the witness's testimony.  That was based on hearsay.

9        MS. LARAIA:  Your Honor, it wasn't offered for the

10  truth.  It was offered for the purpose of the meeting.

11       THE COURT:  I think that's right.  The limited

12  purpose of that was having the family meeting to review Ms.

13  Sienkowski's portfolio and assets.

14       MS. LARAIA:  Correct, Your Honor.

15       THE COURT:  It was not for the truth that he was to

16  be the Trustee.

17       MR. EINHORN:  Would Your Honor instruct the jury as

18  to the distinction.  It's a fairly subtle distinction, I

19  think.

20       THE COURT:  So when we say something is admitted for

21  the truth of the matter, it means that that evidence is being

22  presented to you as true and accurate.  Whether it is or not

23  is a different question.  It may be offered just for a more

24  limited purpose, and that's what this is.  The limited

25  purpose is that a concern was with respect to Mr. Vaccarelli

1   potentially becoming a Trustee.  That is not for the truth.

2   It is that that was the concern precipitating the meeting.

3   Okay?  That's the distinction.

4           MR. EINHORN:  Thank you, Your Honor.

5   BY MR. EINHORN:

6       Q.   Now, you would agree with me, sir, that you only had

7   one meeting where Mr. Vaccarelli was present; right?

8       A.   Yes.

9       Q.   You've only met him once in your life?

10      A.   Yes.

11      Q.   And you said at that meeting he was wearing a top

12  hat?

13      A.   Yes.

14      Q.   Kind of like Abe Lincoln or Charles Dickens?  What

15  are we talking about here?

16      A.   I don't know, just --

17      Q.   I mean, are we just talking about a hat or why did

18  you use the term "top hat"?

19      A.   It's what I would call a top hat.

20      Q.   You weren't referring to a stovepipe hat or anything

21  like that; right?

22      A.   No.

23      Q.   Okay.  All right.  Now, you only met with him once.

24  And in that one meeting, apparently you reviewed some of

25  his -- well, in particular, one of his summary statement

1   exhibits, 1057, and you testified that he made a $10,000 math

2   error; right?

3       A.   Yes.

4       Q.   Okay.  And you say you confronted him -- or didn't

5   -- "confront" is kind of a harsh word.  You raised it to him,

6   and I believe your testimony was that he said, Gosh, or Gee,

7   I've made a mistake, probably made -- he didn't deny it; did

8   he?

9       A.   No, he -- I remember specifically he said his girl

10  must have made a mistake.

11      Q.   All right.  And you also told us that there was a

12  check that your mom had made to Leon's company, for I think

13  $103,000 and change, and then another check came back to her

14  for 15,000.

15      A.   No, she didn't make out a check to him.  It was made

16  out to her.

17      Q.   It was made out to her, and she made out a check to

18  Leon's company, though; wasn't it?

19      A.   No.

20      Q.   How did that happen then, please?

21      A.   She just endorsed the back.

22      Q.   She just endorsed the back.  That's right.  I

23  apologize.  She endorsed the back, that's right.

24           So, she endorsed that check over to Leon's company.

25  And do you know the reason for the $15,000 check back to

```
1    her?
2        A.   No, I don't.
3        Q.   Okay.  And if, in fact, that was something that she
4    wanted for one of her daughters, for her daughter Andrea, to
5    get her a car, would you know whether or not that happened?
6        A.   No, I do not.
7        Q.   Okay.  Because you weren't privy to all the
8    discussions between Ms. Sienkowski and Mr. Vaccarelli; were
9    you?
10       A.   No.
11       Q.   Okay.  In fact, the only conversations you really
12   were privy to were at that one meeting at the house; right?
13       A.   No.  There was many before that with my
14   mother-in-law, but not with --
15       Q.   But not with Leon?
16       A.   No.
17       Q.   All right.  Okay.  All right.  And just one last
18   thing.  So when The Investment Center or its insurance
19   carrier paid back Ms. Sienkowski's claim, you said you were
20   part of that, you were part of the group working on that;
21   right?
22       A.   Yes.
23       Q.   And you know, in fact, she got back 85,000, because
24   that's all she was entitled; right?
25       A.   That's what she got back.
```

```
 1        Q.   That's what she got back because she got back

 2   fifteen thousand -- there's no question about that; right?

 3        A.   Right.

 4        Q.   Okay.

 5             MR. EINHORN:  May I have just a moment, Your

 6   Honor?

 7             THE COURT:  Yes.

 8             MR. EINHORN:  Nothing further, Your Honor.  Thank

 9   you.

10             THE COURT:  Redirect?

11             MS. LARAIA:  I don't have any, Your Honor.  Thank

12   you.

13             THE COURT:  All right, then.  Mr. Klanica, thank you

14   very much.  You are excused.  You may step down.

15             (Witness excused, 11:51 a.m.)

16             THE COURT:  Please call your next witness.

17             MS. LARAIA:  Your Honor, the Government calls Linda

18   Warren.

19             (Witness enters, 11:41 a.m.)

20             THE COURT:  All right.  Ms. Warren, that's the

21   witness stand.  Please go there.  Please stand there.  Please

22   raise your right hand.

23             (LINDA WARREN sworn, 11:41 a.m.)

24             COURTROOM DEPUTY:  Please be seated.  State your

25   name for the record.
```

```
1              THE WITNESS:  My name is Linda Warren.
2              COURTROOM DEPUTY:  And can you spell your last name?
3              THE WITNESS:  W-A-R-R-E-N.
4              COURTROOM DEPUTY:  And can you tell us which city
5     and state you live in?
6              THE WITNESS:  Wolcott, Connecticut.
7              COURTROOM DEPUTY:  Thank you.
8              THE COURT:  You may proceed.
9              And, Ms. Warren, that black bar is the microphone.
10             THE WITNESS: Okay.  Thank you.
11             THE COURT:  You can direct your comments there.
12    Thank you.
13             THE WITNESS: Okay, thank you.
14                         DIRECT EXAMINATION
15    BY MS. LARAIA:
16        Q.   Good morning, Ms. Warren.
17        A.   Good morning.
18        Q.   Can you tell the jury what kind of work you do?
19        A.   I'm a registered nurse.
20        Q.   And how long have you been a nurse?
21        A.   Forty-six years.
22        Q.   Where do you work as a nurse?
23        A.   I'm presently working at Waterbury Hospital.
24        Q.   Is there a particular department that you're
25    assigned to?
```

1    A.    Yeah, I work in the Intensive Care Unit.

2    Q.    Okay.  And how long have you been with Waterbury

3    Hospital?

4    A.    It'll be 40 years in July.

5    Q.    Do you do anything other than work as an ICU

6    nurse?

7    A.    Yes, I'm tenured faculty at Western Connecticut

8    State University.  I'm an associate professor.

9    Q.    Okay.  And what do you do as an associate

10   professor?

11   A.    I teach nursing.

12   Q.    Okay.  How long have you been doing that?

13   A.    It'll be 10 years.

14   Q.    Okay.  And do you have a nursing degree of any

15   sort?

16   A.    Yes.  I have a bachelor's in nursing from Southern,

17   and a Master's in nursing from the University of Hartford.

18   Q.    Do you have any other educational credentials for

19   your teaching?

20   A.    Yes, I have a doctorate in education, as well as I

21   have a certification in critical care and trauma nursing.

22   Q.    And where did you get your doctorate of teaching?

23   A.    University of Hartford.

24   Q.    Now, Ms. Warren, do you know Mr. Vaccarelli?

25   A.    Yes, I do.

1    Q.   Would you describe for us how you met Mr.

2    Vaccarelli?

3    A.   He was recommended to me by a friend after my

4    husband died, as a person that I could use for financial

5    advisement.

6    Q.   Do you remember approximately how long ago it was

7    that you were introduced to Mr. Vaccarelli or recommended to

8    him?

9    A.   It was around -- well, after my husband died, it was

10   2007/2008.  So that would be about 11 years ago.

11   Q.   Okay.  Now, do you remember what company Mr.

12   Vaccarelli was affiliated with at the time?

13   A.   At the time, I think he had started his own business

14   of Lux Financial.

15   Q.   Do you remember something before that called QA3?

16   A.   Yes.

17   Q.   Okay.  So at some point he was with Lux Financial,

18   which you mentioned?

19   A.   Yes.

20   Q.   And have you heard the term "The Investment Center"

21   before?

22   A.   Yes.

23   Q.   And what was The Investment Center?

24   A.   It was the company that he dealt with, as far as

25   where my investments were being held.

1    Q.   Okay.  Now, Lux Financial, was that the name that

2    Mr. Vaccarelli used when he was doing business for The

3    Investment Center?

4    A.   Yes.

5    Q.   Now, what kind of work did Mr. Vaccarelli do for

6    you?

7    A.   He did most of my -- I had a brokerage account.  He

8    did most of the business of that with investment.  He

9    also -- I started a life insurance policy, and that was

10   really about all.

11   Q.   Okay.  And in the time that you knew Mr. Vaccarelli,

12   going back 11 or so years, how frequently were you in contact

13   with him?

14   A.   Usually only about once a year, to review

15   everything.

16   Q.   And when you met with Mr. Vaccarelli, where did you

17   meet with him?

18   A.   In his office.

19   Q.   Do you remember where his office was?

20   A.   Originally it was on Bank Street in Waterbury, and

21   then he moved to Leavenworth.

22   Q.   Also in Waterbury?

23   A.   Yes.

24   Q.   Now, during those meetings, what kind of

25   conversations did you have with Mr. Vaccarelli?

1      A.   Mostly he just went over what I had in my accounts,
2   and that was really about the extent of our meetings.
3      Q.   Okay.  Now, during any of those meetings with Mr.
4   Vaccarelli, did you have any difficulty communicating with
5   him?
6      A.   No.
7      Q.   During your meetings with Mr. Vaccarelli, did he
8   tell you anything about himself?
9      A.   Not much.  It was very superficial.  I just asked
10  how his family was and, you know, that kind of
11  conversation.
12     Q.   Were you familiar with Christmas parties thrown by
13  Mr. Vaccarelli's office?
14     A.   Yeah, he had them at least once every year.
15     Q.   And did you ever attend any of those parties?
16     A.   Once or twice.
17     Q.   And I'm going to go forward a little bit.  At some
18  point in 2016, did Mr. Vaccarelli present you with an
19  investment opportunity?
20     A.   Yes, he did.
21     Q.   And would you just describe for us what that was?
22     A.   Well, he basically told me that an annuity that I
23  had, which was, you know, worth $111,000, was coming -- was
24  not going to be worth very much -- it would only gain one
25  percent interest -- and said that if I just, you know, cashed

1  that in, that he would be able to invest it for a 7 percent

2  return.

3      Q.   Okay.  Did he say anything to you about what the

4  money would be put into, if you remember?

5      A.   No.

6      Q.   Okay.  But it would earn 7 percent, or at least 7

7  percent?

8      A.   I assumed it was going to go into The Investment

9  Center with the rest of my accounts.

10     Q.   Now, was there any kind of time period that this

11  investment was going to take place over?

12     A.   Basically, he said that I wouldn't be investing the

13  money, but would not be able to take it out for at least five

14  years and that no one could touch it, not even the Pope.

15     Q.   Do you remember that specifically, "not even the

16  Pope"?

17     A.   Absolutely, because he just kept mentioning -- he

18  said that every time I talked with him.

19     Q.   That not even the Pope could get it out?

20     A.   That's correct.

21     Q.   Did Mr. Vaccarelli say anything to you about any

22  risk associated with that investment?

23     A.   No, he didn't.

24     Q.   Okay.  Now, were you willing to make an investment

25  and have the money tied up for a period of time?

1    A.   Yes, because I'm still working.

2    Q.   Okay.  And did you decide to enter into that

3    particular investment?

4    A.   Yeah, at his advice; yes.

5    Q.   Okay.  And why was it that you wanted to do that?

6    A.   Basically, for the 7 percent return for my

7    retirement.

8    Q.   Okay.

9         MS. LARAIA:  Your Honor, I would offer Government's

10   Exhibits 311, -21 I believe is already admitted, but if not

11   I'll move its admission now, 700, 702, 703, 704, and 705?

12        MR. EINHORN:  No objection.

13        THE COURT:  Full exhibits.

14        MS. LARAIA:  Thank you, Your Honor.

15   BY MS. LARAIA:

16   Q.   I'm going to show you Government's Exhibit 11, which

17   has just been admitted into evidence.  Now, just looking at

18   this first page here, do you recognize the name at the top on

19   the letterhead?

20   A.   Yes.

21   Q.   And what is that?

22   A.   Lux Financial Services.

23   Q.   And what did you understand that to be?

24   A.   The brokerage firm that I was dealing with with Mr.

25   Vaccarelli.

1    Q.   And do you see the address 49 Leavenworth Street?

2    A.   Yes.

3    Q.   And were you familiar with that?

4    A.   Yes, because that's where his business is.

5    Q.   Okay.  Just going down into the body of it here, do

6  you see your name?

7    A.   Yes.

8    Q.   Okay.  And what's the date just below that?

9    A.   8/2 of 2016.

10   Q.   And would you just read for us what's in the

11 "Comments" section?

12   A.   It says "Full surrender of contract, check payable

13 to owner and mailed to address of record.  Withhold a total

14 of 15 percent federal tax, no state tax withheld."

15   Q.   Okay.  Now, I just want to go to the next page here.

16 So what was the company that held your annuity that you were

17 going to be moving the money from?

18   A.   Voya.

19   Q.   Okay.  All right.  And in the Instructions section,

20 which is the checked box?

21   A.   It just basically says cash surrender.

22   Q.   Okay.  And were you taking out the entire amount of

23 that annuity?

24   A.   Yes, because -- and then whatever taxes were

25 withheld.

1    Q.   Okay.  And on the first page is -- just to go back.

2  See where it says here, withhold tax of 15 percent?

3    A.   Yes.

4    Q.   Or "withhold total of 15 percent federal tax"?

5    A.   Uh-huh.

6    Q.   Okay.  And then the next part here, this is I

7  believe page -- this may be page 4 of the exhibit.  Do you

8  see this section that says "Payment Options"?

9    A.   Yes.

10    Q.   Okay.  What is the box that's checked?

11    A.   "Check payable to the owner and mailed to the

12  address of record."

13    Q.   And the owner of this annuity was who?

14    A.   Yes.

15    Q.   Who was the owner of the annuity?

16    A.   Myself.

17    Q.   Do you recognize your signature on this page?

18    A.   Yes, I do.

19    Q.   And what's the date next to your signature?

20    A.   August 1st of 2016.

21    Q.   I want to show you Government's Exhibit 3.  Do you

22  recognize this?

23    A.   Yes, that's a check I received from Voya.

24    Q.   And how did you receive this check?

25    A.   Through the mail.

1    Q.   Okay.  Was it -- or where was it sent to?

2    A.   It was sent to my home address.

3    Q.   And which city was that in?

4    A.   Wolcott, Connecticut.

5    Q.   And what's the date on that check?

6    A.   August 4th, 2016.

7    Q.   Okay.  And can you read for us the amount of that

8    check?

9    A.   $94,619.81.

10   Q.   All right.  Now, just scrolling down a little bit

11   here, looking at the bottom here -- that maybe didn't help.

12        Okay.  What did you do with this check when you got

13   it?

14   A.   Well, I called Mr. Vaccarelli and he -- I brought it

15   to his office, and he instructed me to sign it and told me

16   who to sign it out to.  And it's hard to read now, but it

17   says "Pay to the Order of LWLVACC, LLC."

18   Q.   And is your signature below that?

19   A.   Yes.

20   Q.   Okay.  And, so, why did you write -- or is that your

21   writing, where it says "Pay to the Order of LWLVACC, LLC"?

22   A.   Yes.

23   Q.   And why did you write that?

24   A.   Because that's the account he told me to make it out

25   to.

1    Q.   Okay.  And did you know at the time what LWLVACC

2    was?

3    A.   No.  I assumed it was part of an account that was

4    associated with The Investment Center.

5    Q.   Okay.  Now, after you wrote in "Pay to the Order of

6    LWLVACC, LLC," and you signed it, what did you do with the

7    check?

8    A.   I gave it to Mr. Vaccarelli.

9    Q.   And was that in person or some other way?

10   A.   No, it was in person.

11   Q.   Okay.  At any point did Mr. Vaccarelli tell you that

12   this check was going to be deposited to an account that he

13   controlled?

14   A.   No.

15   Q.   I'm going to show you Government's Exhibit 700.

16   Have you seen this document before?

17   A.   No.

18   Q.   Okay.

19   A.   I don't remember -- I don't recall that.

20   Q.   Okay.  I'm going go all the way down to the bottom,

21   the last page.  Do you recognize the signature on this

22   document?

23   A.   Yes, that's my signature.

24   Q.   Okay.  Do you remember being given this document to

25   sign?

1      A.   I remember signing a document, but I don't recall

2    the front page that you showed me.

3      Q.   Okay.  And, so, you recall being shown or given a

4    document to sign.  Who gave you the document to sign?

5      A.   Mr. Vaccarelli.

6      Q.   And when did that happen and where did that

7    happen?

8      A.   That was in his office, and I can't -- there's no

9    date on it, so I can't tell you the exact date.

10     Q.   Okay.  Do you remember if this was at or around the

11   same time that you provided that check to Mr. Vaccarelli?

12     A.   Yes, because that's the only time I met with him

13   then.

14     Q.   Okay.  Now, I'll just show you -- actually, you know

15   what?  I'm just going to show you Government's Exhibit 702

16   first.  Can you read the name on this particular bank

17   account?

18     A.   LWLVACC, LLC.

19     Q.   Okay.  And this is not your bank account; is that

20   correct?

21     A.   No, it's not.

22     Q.   Okay.  I'm going to show you this part.  Just make

23   it a little bit larger.  Do you see a deposit on August

24   10th?

25     A.   Yes.

1    Q.   Okay.  Can you read for us the amount of that

2  deposit?

3    A.   $94,619.81.

4    Q.   Okay.  Now, before that deposit was made to the

5  account, can you read for us what the balance was in the

6  account?

7    A.   There was a minus $65.44.

8    Q.   Okay.  I just want to show you a couple things

9  coming out of here.  Do you see a check number 4035?

10    A.   Yes.

11    Q.   And what's the amount of that check?

12    A.   $30,000.

13    Q.   Okay.  And do you see another check just below

14  that?

15    A.   Yes, for 5,000.

16    Q.   Okay.  At any point did Mr. Vaccarelli tell you that

17  your money would be deposited to an account under LWLVACC and

18  then be used to pay expenses?

19    A.   No.

20    Q.   I'm just going to show you -- again, this is

21  Government's Exhibit 3.  Does the amount on this check match

22  the amount of the deposit we just saw, the $94,619.81?

23    A.   Yes.

24    Q.   Going back to Government's Exhibit 702, do you

25  remember that $30,000 check that we looked at a minute ago?

1      A.    Yes.

2      Q.    4035?

3      A.    Uh-huh.

4      Q.    Okay.  I'm going to show you Government's Exhibit

5  21.  Can you just read for us the amount on that check?

6      A.    The amount was $30,000.

7      Q.    And do you recognize the check number 4035?

8      A.    4035.

9      Q.    And can you read for us the payee, or "Pay to the

10  Order of" line?

11      A.    Leavenworth Professional Center.

12      Q.    And what's written on the "For" line?

13      A.    It says "loan."

14      Q.    At any point did Mr. Vaccarelli tell you that any of

15  your money would be used for a loan to the Leavenworth

16  Professional Center?

17      A.    No.

18      Q.    I'm just going to go back for a second to

19  Government's Exhibit 702, and do you see a check number 4036

20  for $5,000?

21      A.    Yes.

22      Q.    I'm going to show you Government's Exhibit 704.  Do

23  you see the check number 4036?

24      A.    Yes.

25      Q.    And what's the amount of that check?

1    A.    $5,000.

2    Q.    Okay.  And can you read for us what's on the For

3    line?

4    A.    Mortgage and -- something, and Monica, deposit.  And

5    it says "loan."

6    Q.    Okay.  And what does it say under the "Pay to the

7    Order of" line?

8    A.    Pay to the Order of Cash.

9    Q.    At any point, did Mr. Vaccarelli tell you that he

10   was going to use some of your money to write a check for

11   cash?

12   A.    No.

13   Q.    Or for his mortgage?

14   A.    No.

15   Q.    Or for Monica?

16   A.    No.

17   Q.    Okay.  At any point, did Mr. Vaccarelli tell you

18   that the $94,000 was a loan to him or a gift to him?

19   A.    No.

20   Q.    After you provided the $94,000 check to Mr.

21   Vaccarelli, did you ever ask him about it?

22   A.    Yeah.  I called him in January, I think it was, and

23   I asked him -- I told him I hadn't received any statement or

24   anything regarding what had happened to it, and he told me

25   not to worry about it, that the money was safe and that, like

```
1    I said, even the Pope couldn't touch it.  He just kept
2    repeating that same phrase.
3        Q.   That even the Pope couldn't touch it?
4        A.   Right.
5        Q.   And what was the accounting -- or what was that
6    money supposed to be earning?
7        A.   Seven percent.
8        Q.   And who told you that?
9        A.   He did.
10       Q.   At any point, did Mr. Vaccarelli return your money
11   or provide any of that interest?
12       A.   No.
13       Q.   And what was that money intended for?
14       A.   For my retirement.
15       Q.   Are you still working at this point?
16       A.   Yes, I am.
17       Q.   Have you received any of that money back from
18   anywhere?
19       A.   I did receive a check back this -- just this past
20   Friday, from The Investment Center.
21       Q.   Okay.  And do you remember what the amount of that
22   check was, from The Investment Center?
23       A.   It was the original amount of the $94,619.81.
24       Q.   Did you receive any of the 7 percent interest?
25       A.   No.
```

1    Q.   Okay.  Just to back up for a minute, what was your

2    understanding of the tax consequences of moving the money

3    from the Voya account you had and investing it in the 7

4    percent interest investment?

5    A.   Well, originally when I saw the check, I asked him

6    if that was enough money that he had kept out in taxes, and

7    and he said yeah, he felt that it was.  And then when I

8    brought my income tax returns to my accountant, he called me

9    up --

10            MR. EINHORN:  Objection.

11            THE COURT:  Okay.  Don't tell us what your

12   accountant said.

13            THE WITNESS:  Okay.

14            THE COURT:  All right.  Let's have the next

15   question.

16   BY MS. LARAIA:

17   Q.   Okay.  So I believe you just said that you asked Mr.

18   Vaccarelli whether the amount of money that was being taken

19   out was enough to cover the taxes?

20   A.   I did ask him that, yes.

21   Q.   At any point, did you learn that it was not

22   enough?

23   A.   Yes.

24   Q.   Okay.  And did you receive a tax bill?

25   A.   Yes, I did.

1     Q.   And do you remember how much you had to pay in

2     additional taxes?

3     A.   $23,000.

4     Q.   Did you say anything to Mr. Vaccarelli about that?

5     A.   Yes, I called him on the phone and I told him what

6     my tax bill was.  And it was always "No problem," because I

7     could just take it out of one of my other accounts.

8     Q.   Did you receive any money back from The Investment

9     Center to cover any of the additional tax money that you had

10    to pay?

11    A.   No.  I did speak with them, and they told me that

12    they would not cover any of that additional amount.

13         MS. LARAIA:  Nothing further, Your Honor.

14         THE COURT:  All right.  Cross-examination.

15         MR. EINHORN:  Yes, Your Honor.

16                        CROSS-EXAMINATION

17    BY MR. EINHORN:

18    Q.   Good afternoon, Ms. Warren.  Dr. Warren, I should

19    say.

20    A.   Oh, thank you.

21    Q.   My name is Jon Einhorn, and I represent Leon

22    Vaccarelli.  I'm just going to ask you a couple of quick

23    questions.  First of all, you were asked a few moments ago

24    whether or not you ever noticed Mr. Vaccarelli impaired.

25         What does the word "impaired" mean to you in that

1   context?

2       A.   It means that he acts strangely or -- could be

3   anything, any one of a number of things.  Either under the

4   influence.  He could have had a stroke.  Could have been

5   anything.

6       Q.   And one of the things you just said was "under the

7   influence."  That would qualify, in your judgment, as being

8   impaired?

9       A.   Yes.

10      Q.   Okay.  Now, you also told us that you only saw Leon

11  once a year.  Approximately how long did you see him on those

12  annual occasions?

13      A.   Usually, maybe only twenty minutes to a half an

14  hour.

15      Q.   Okay.  So, in the course of a year, you saw him

16  twenty minutes to a half an hour.  And you would agree with

17  me, Doctor, wouldn't you, that, in fact, it's possible he

18  could have been impaired some other time during the year?

19          MS. LARAIA:  Objection, Your Honor.

20          THE COURT:  Sustained.

21          MR. EINHORN:  I'll withdraw it.

22  BY MR. EINHORN:

23      Q.   You only saw him twenty minutes to a half-hour a

24  year.  Any idea how many hours there are in a year?

25      A.   No.

1          MS. LARAIA:  Objection, Your Honor.

2          THE WITNESS:  I didn't calculate.

3          MR. EINHORN:  It's cross-examination, Your Honor.

4          THE COURT:  She doesn't know.  Next question.

5          MR. EINHORN:  Okay.  Thank you.

6     BY MR. EINHORN:

7     Q.   If, in fact, I told you there's eight thousand seven

8     hundred-and-some-odd hours in a year, would that sound about

9     right to you?  Okay.

10         THE COURT:  What was your answer to that?

11         THE WITNESS:  No, I would have no idea.

12    BY MR. EINHORN:

13    Q.   You would have no idea, but you would agree with me

14    that there are 365 days in a year; right?

15    A.   That's correct.

16    Q.   And your involvement with Leon was only for twenty

17    minutes to a half-hour within that year; right?

18    A.   Yes.

19    Q.   So if, in fact, he was impaired at some other time

20    or times during that year --

21         MS. LARAIA:  Objection, Your Honor.

22         MR. EINHORN:  May I finish the question?

23         THE COURT:  Finish the question.

24         MR. EINHORN:  Thank you.

25    BY MR. EINHORN:

1    Q.   So, in fact, if Mr. Vaccarelli was impaired during

2    some other time during the rest of the year, you would have

3    no idea of knowing that; would you?

4              MS. LARAIA:  Objection, Your Honor.

5              THE COURT:  Basis?

6              MS. LARAIA:  I believe it's, one, been asked and

7    answered and already sustained by the Court.

8              THE COURT:  It borders speculation, and I'm going to

9    permit the question.

10              MR. EINHORN:  Thank you, Your Honor.

11              THE COURT:  It is cross-examination verging on

12    argument.  Go ahead.

13              MR. EINHORN:  Thank you, Your Honor.

14              THE COURT:  Go ahead.

15    BY MR. EINHORN:

16    Q.   Do you recall the question?

17    A.   No.

18    Q.   Okay.  All right.  Let's see if I can remember it as

19    closely as possible.  If, in fact, Mr. Vaccarelli was

20    impaired during some other time during the rest of the year,

21    the other 364 days and hours, you would have no way of

22    knowing that?  You don't know that; do you?

23    A.   No.

24              MR. EINHORN:  Okay.  Nothing further, Your Honor.

25              Oh, I do have one quick question -- I'm sorry.  I

1    apologize.  Lawyers always do this.

2    BY MR. EINHORN:

3        Q.   You testified that you had about a $23,000 tax

4    bill?

5        A.   Yeah, on top of the 16,000 that was already

6    withheld.

7        Q.   Right, on top of the money that was already

8    withheld.

9        A.   Uh-huh.

10       Q.   And, in fact, you testified that you were working

11   two jobs at that time; is that right?

12       A.   Yes.

13       Q.   And did you have other investments at that time,

14   also?

15       A.   I don't know what you mean.

16       Q.   Sure.  Besides this particular IRA that I guess --

17       A.   Uh-huh.

18       Q.   -- wasn't rolled over, or you wanted rolled over,

19   did you have other investments -- IRAs or any other

20   investments, whatsoever?

21       A.   Yes, and they were all with Mr. Vaccarelli and The

22   Investment Center.

23       Q.   Okay.

24           MR. EINHORN:  Nothing further, Your Honor.  Thank

25   you.

1          THE COURT:  Redirect.

2                     REDIRECT EXAMINATION

3    BY MS. LARAIA:

4        Q.   Ms. Warren, in the yearly meetings that you had with

5    Mr. Vaccarelli, what was the purpose of those meetings?

6        A.   Just to go over what my accounts were, my investment

7    accounts, and, you know, just how they -- if they were

8    progressing or not.

9        Q.   And, so, that was to do business?

10       A.   Yes.

11       Q.   And going back to 2016, when Mr. Vaccarelli

12   presented you with this investment opportunity to earn 7

13   percent interest -- do you remember that?

14       A.   Yes.

15       Q.   At the time when you were talking to Mr. Vaccarelli,

16   did he slur his words?

17       A.   No.

18       Q.   Did he act, in any way, drunk?

19       A.   No.

20       Q.   Did you smell any alcohol?

21       A.   No.

22       Q.   At any point when you met with Mr. Vaccarelli in his

23   office was he drinking anything that appeared to be

24   alcohol?

25       A.   No.

1    Q.   Did he ever seem impaired?

2    A.   No.

3    Q.   Did he ever seem drunk?

4    A.   No.

5    Q.   At the time that he explained to you that this

6    investment was for 7 percent and even the Pope couldn't touch

7    it for a period of time, period of years, did you understand

8    what he was saying?

9    A.   Yes.

10   Q.   Did he appear to be drunk?

11   A.   No.

12   Q.   At the time when Mr. Vaccarelli showed you that

13   document, had you sign it, did he appear to be drunk?

14   A.   No.

15   Q.   At the time that he told you to endorse over that

16   check to him and write in the LWLVACC, did he appear to be

17   impaired?

18   A.   No, he spoke very clearly.

19   Q.   At the time that Mr. Vaccarelli caused you to have

20   that check mailed to yourself, mailed to you from Voya, did

21   he appear to be drunk?

22   A.   No.

23   Q.   Or impaired in any way?

24   A.   No.

25   Q.   Did you ever see Mr. Vaccarelli drunk or impaired?

1     A.   No.

2     Q.   And how long have you known Mr. Vaccarelli?

3     A.   Well, for the amount that I've had the investments.

4   So it's been at least ten or eleven years.

5          MS. LARAIA:  Nothing further, Your Honor.

6          MR. EINHORN:  I have one thing, Your Honor.

7          THE COURT:  Yes.

8                    RECROSS-EXAMINATION

9   BY MR. EINHORN:

10    Q.   And during all those periods when -- withdrawn.

11         During those times that the Government just asked

12   you about when you met with Mr. Vaccarelli, that was once a

13   year on each occasion; right?

14    A.   Yes.

15    Q.   Okay.  Just once a year?

16    A.   Uh-huh.

17         MR. EINHORN:  Nothing further, Your Honor.

18         THE COURT:  All right.  Thank you very much,

19   Ms. Warren.  You are excused.  You may step down.

20         (Witness excused, 12:09 p.m.)

21         THE COURT:  We will take lunch early -- because we

22   got started late, we didn't take a morning break -- and we'll

23   be back at quarter 'til 1.  Okay?

24         (Jury out, 12:10 p.m.)

25         THE COURT:  Who will be your next witness?

1    MR. McGARRY:  I believe it will be Ms. Victoria

2  Hughes, Your Honor, and she would be the 800 series of

3  exhibits.

4    THE COURT:  And who else is it your intention to

5  call today?

6    MR. McGARRY:  We have an individual by the name of

7  Tom Carocci, who is from FINRA.  I don't think he's going to

8  be a particularly lengthy witness.  And then I think after

9  that, if we still have time, we might be able to start Agent

10  Russ Day; however, him being the case agent, I think we would

11  still need to talk to him tonight or he won't be able to tell

12  us what to do tomorrow, so...

13    THE COURT:  All right.  We have a full day, and

14  we'll be back at quarter 'til 1.  Thank you very much.

15    MR. McGARRY:  Thank you, Your Honor.

16    (Recess taken, 12:11 p.m.)

17    (Call to Order, out of the presence of the Jury,

18  12:53 p.m.)

19    THE COURT:  All right.  Please bring in the jury and

20  Ms. Hughes.

21    (Jury in, 12:54 p.m.)

22    THE COURT:  Please be seated, ladies and gentlemen.

23  Will the Government call its next witness, please?

24    MR. McGARRY:  Yes, Your Honor.  At this time, the

25  Government calls Ms. Victoria Hughes to the stand.

```
 1                    (Witness takes stand, 12:55 p.m.)

 2              THE COURT:  Thank you.  And, Ms. Hughes, if you will

 3    stand and raise your right hand, the oath will be

 4    administered to you.  And when you testify, that black bar in

 5    front of you is the microphone, so be sure to direct your

 6    words to that.

 7              THE WITNESS:  Okay.  Thank you.

 8              (VICTORIA HUGHES sworn, 12:55 p.m.)

 9              COURTROOM DEPUTY:  Please be seated and state your

10    name for the record.

11              THE WITNESS:  Victoria Hughes.

12              COURTROOM DEPUTY:  Can you spell your last name?

13              THE WITNESS:  H-U-G-H-E-S.

14              COURTROOM DEPUTY:  And can you tell us what city and

15    state you live in?

16              THE WITNESS:  I live in Madison, Connecticut.

17              THE COURT:  You may proceed, Mr. McGarry.

18              MR. McGARRY:  Thank you, Your Honor.

19                         DIRECT EXAMINATION

20    BY MR. McGARRY:

21         Q.   Good afternoon, Ms. Hughes.  You just told the Court

22    and the Courtroom Deputy you came from Madison -- you live in

23    Madison.  Is that where you came from this morning to join

24    us?

25         A.   Yes, it is.
```

1    Q.   Okay.  And can you tell us a little bit about

2    yourself?  Are you married?

3    A.   Yes, I am.

4    Q.   And what's your husband's name?

5    A.   Thomas Hughes.

6    Q.   And do you have any kids?

7    A.   I do.

8    Q.   How many?

9    A.   Two.

10   Q.   Okay.  Do you have any brothers and sisters?

11   A.   I have a sister.

12   Q.   What's her name?

13   A.   Christine Kuper (phonetic).

14   Q.   And where does Christine live?

15   A.   Reston, Virginia.

16   Q.   Okay.  Also asking about your family, who's your

17   mom?

18   A.   Carmela Truhan.  She goes by Mildred.

19   Q.   Do you see who goes by Mildred in the courtroom

20   today?

21   A.   Yes, she's right there in the first row.

22   Q.   She's the smiling, gray-haired woman that just waved

23   at me?

24   A.   Yes.

25   Q.   Or maybe she waved at you -- I don't know.

1    A.   Yes.

2    Q.   And is she seated next to your husband?

3    A.   She is.

4    Q.   Are you a little bit nervous today?

5    A.   A little bit.

6    Q.   And how old is your mom?

7    A.   She just turned 90.

8    Q.   Did you have a party?

9    A.   We did.

10   Q.   Okay.  Do you think she would be a little nervous to

11   testify today?

12   A.   Yes.

13   Q.   Okay.  So just to kind of jump way ahead, is it fair

14   to say that you were at the meetings that your mom had with

15   Leon Vaccarelli?

16   A.   Yes.

17   Q.   And is it your understanding that you're going to

18   testify today instead of having your 90-year-old mom

19   testify?

20   A.   Yes.

21   Q.   Okay.  Let's jump back maybe about, I don't know,

22   twenty years or so.  Are you familiar -- well, first of all,

23   tell us, what was your dad's name?

24   A.   Eugene Joseph Truhan.

25   Q.   And has he passed away?

1      A.   He did.  He passed away, it'll be 14 years in

2   December.

3      Q.   And where did your mom and dad live?

4      A.   In Bridgewater, New Jersey.

5      Q.   Okay.  Prior to your dad passing away, did he set up

6   something that's called "a Trust"?

7      A.   He did.

8      Q.   Okay.

9           MR. McGARRY:  And, Your Honor, I don't know if

10   there's any objections, but I plan on offering 800, 801, 802,

11   803, 804 -- well, actually, 805 through 813 inclusive, and 18

12   and 18A.

13           MR. EINHORN:  I'm sorry.  Can I have just the range

14   of numbers again?

15           MR. McGARRY:  800 to 18 -- 13, and 18 and 18A.

16   BY MR. McGARRY:

17      Q.   While Mr. Einhorn's flipping through the documents,

18   back in 1999, did your family do some sort of estate planning

19   or financial planning?

20      A.   Yes, my mom and dad did.

21      Q.   Did they set something up?

22      A.   They set up a Trust.

23      Q.   Okay.  Let me show you -- at least just you for

24   now -- what's been marked as Government's Exhibit 800.  Do

25   you recognize that document that's on your screen but not

1    before the jury?

2         A.   Yes.

3              MR. McGARRY:  So I would move 800 to 813 inclusive,

4    and 18 and 18A.

5              MR. EINHORN:  What was the last one again?  That's

6    what I didn't have.

7              MR. McGARRY:  18 and 18A.

8              MR. EINHORN:  Oh, okay.  Sorry.  Yes, Your Honor.

9    No objection.

10             THE COURT:  All right.  Full exhibits.  Thank you.

11   BY MR. McGARRY:

12        Q.   So, if you could take a look at what's been marked

13   as Government's Exhibit 800 on your screen.  Do you recognize

14   that document?

15        A.   I do.

16        Q.   Okay.  And what is Government's Exhibit 800?

17        A.   It's the Certificate of Trustee Authority and Power

18   for the Truhan Living Trust.

19        Q.   And it says the Truhan Living Trust is dated January

20   13, 1999?

21        A.   Yes.

22        Q.   Okay.  So, again, about 20 years ago.  And you're

23   not an attorney; are you?

24        A.   No, I'm not.

25        Q.   Okay.  Is -- what does your husband do, by the

1    way?

2       A.   He's an attorney.  He's a patent attorney.

3       Q.   Patent attorney?

4       A.   Uh-huh.

5       Q.   Not a Trust attorney?

6       A.   No.

7       Q.   Okay.  What -- did he have anything to do with

8    setting this up?

9       A.   No.

10       Q.   Okay.  So, your mom and dad, you said, set this up.

11            Let me just scroll through it.  Directing -- I'm

12    going to go to the last page, but just ask if you recognize

13    their signatures.  And showing you the last page --

14       A.   Yeah.

15       Q.   -- of Government's Exhibit 800, do you recognize

16    your mom and dad's signatures on the right-hand side?

17       A.   Yes, I do.

18       Q.   Again, acknowledging that you're not an attorney,

19    what is your understanding of the purpose of the Trust?  Why

20    was it set up?

21       A.   The Trust was opened by my parents, basically for my

22    sister and I and our children in the future.  My dad had

23    always planned that -- you know, my dad kind of knew that my

24    mom would outlive him and said that she would become, I think

25    it's call the successor of the Trust, and she could use the

1   money if she needed it for her expenses.

2       Q.   And then if there was any money left?

3       A.   It would go to my sister and myself, and we were to

4   split it with our children.

5       Q.   Okay.  And what did your dad do for work?

6       A.   He worked at AT&T, and he was a manager there --

7       Q.   Okay.

8       A.   -- of service cost and rates.

9       Q.   And did his profession at -- being working for the

10  telecom company of AT&T in any way influence his decision as

11  to what to invest in, if you know?

12      A.   Yes.  He truly believed in the telecom industry and

13  did most of his investments with that.

14      Q.   And did that, kind of, family tradition kind of

15  continue?  Like, has the Trust continued to hold some telecom

16  stocks, if you know?

17      A.   It did, but I -- at this moment, I don't -- it did,

18  yes, but I don't know.

19      Q.   Okay.

20      A.   I think some of it may have changed.

21      Q.   Okay.  At some point in time -- or maybe you know

22  the point in time --

23      A.   Uh-huh.

24      Q.   -- did your mom move from New Jersey to

25  Connecticut?

1      A.   Yes.  My mom moved from Bridgewater in about 2008 to

2   Madison, Connecticut.  She bought a house there.

3      Q.   Okay.  And was that -- that was after your dad

4   passed away?

5      A.   Yes.

6      Q.   Now, with respect to your mom moving to Madison,

7   Connecticut, was there a change made with respect to the

8   Trust and the investments of the Trust and the account

9   executive or registered representative handling the money?

10      A.   Yes.  She had -- she was told by Mr. Vaccarelli that

11   she had just a few too many investments in the telecom

12   industry.

13      Q.   Let me -- you mentioned Mr. Vaccarelli.  Do you

14   recognize the Defendant, Leon Vaccarelli?

15      A.   Yes.

16      Q.   Okay.  Taking one step back --

17      A.   Uh-huh.

18      Q.   -- and showing you what's been marked as

19   Government's Exhibit 801 in evidence and going to the second

20   page, do you see here where there is -- the names looks like

21   Maria Munth and Mark J. Morrow?

22      A.   Uh-huh.

23           THE COURT:  You're going to need to say yes or no.

24           THE WITNESS:  Yes, I'm sorry.  Thank you.

25   BY MR. McGARRY:

1     Q.   And then at some point in time did Mr. Vaccarelli

2   become the account executive?

3     A.   Yes.

4     Q.   Okay.  Tell the jury what you remember about that.

5     A.   When -- after my mom moved to Connecticut, she was

6   advised by The Investment Center --

7          MR. EINHORN:  Well, I'm going to object.  It's hard

8   to tell, but it sounds like this is hearsay coming in.

9   BY MR. McGARRY:

10    Q.   Do you know, based on --

11         THE COURT:  Wait.  You're withdrawing that question

12   and you'll ask a different one?

13         MR. McGARRY:  Yes.

14         THE COURT:  Thank you.

15   BY MR. McGARRY:

16    Q.   Based on your personal experience and working and

17   handling and help handling your moms's finances, do you know

18   why the registered representative on the account switched?

19    A.   Yes, because she needed a representative that had

20   a -- I'm guessing it's a license in Connecticut, or had the

21   ability to handle her account in Connecticut since she had

22   moved from New Jersey.

23    Q.   Okay.  And did -- how did you guys come across Mr.

24   Vaccarelli?

25    A.   A letter was sent to my mom from The Investment

1    Center.

2         Q.    And was he recommended?

3         A.    Yes, with his name.

4         Q.    Okay.  Let me show you -- again, having shown you, I

5    think, Government's Exhibit 801, let me show you 802.  Do you

6    recognize this document.  And I'll scroll down.  Do you

7    recognize your mom's signature?

8         A.    Yes.

9         Q.    Okay.  And what is the document entitled?

10        A.    It's the Account Agreement from The Investment

11   Center.

12        Q.    Okay.  So, having covered the part where your mom

13   moves to Connecticut, I think you said she bought a house in

14   Madison, Connecticut?

15        A.    Yes.

16        Q.    Where were you living at the time?

17        A.    Killingworth, Connecticut.

18        Q.    And where was your sister living?

19        A.    Reston, Virginia.

20        Q.    Where was your mom's house, the street?

21        A.    It was on Downing Way in Madison.

22        Q.    Okay.  And did you visit the house?

23        A.    Yes.

24        Q.    Did you go there on a regular basis?

25        A.    Yes.

1    Q.   Did you continue to work with your mom regarding her

2   investments?

3    A.   Yes.

4    Q.   Okay.  Did you have meetings with the Defendant,

5   Leon Vaccarelli, and your mom to talk about her investments

6   and the Truhan Living Trust?

7    A.   Yes.

8    Q.   Okay.  Where were those meetings?

9    A.   At my mom's home on Downing Way.

10    Q.   Did you guys ever drive to Waterbury?

11    A.   No.

12    Q.   Did you ever go to his office, either on Bank Street

13   or 49 Leavenworth?

14    A.   No.

15    Q.   Okay.  Tell us about the meetings and approximately

16   what year would these meetings have started.

17    A.    I think that they started either winter of 2008 or,

18   like, you know, early year 2009.

19    Q.   Okay.  What was the purpose of the meetings?

20    A.   The purpose of the meetings was -- the first

21   meeting, of course, was to meet him, since he was going to be

22   handling her accounts at that point.  And then the meetings

23   that we had after, he would come maybe, you know, somewhere

24   yearly and go over her investments, and, you know, just kind

25   of explain what was going on with her investments.

1      Q.   Okay.  And did he seem --

2           MR. EINHORN:  Excuse me, Your Honor.  Could it be

3      clarified that this witness was present at these meetings,

4      that these were meetings she was at and not just --

5           MR. McGARRY:  I can ask her.  And I might get an

6      objection that it was asked and answered, but I'll ask it.

7           THE COURT:  Just clarify with a question to that

8      effect.

9      BY MR. McGARRY:

10     Q.   Okay.  Did you attend all, as far as you know, all

11     the meetings that Mr. Vaccarelli had with your mom?

12     A.   Yes, my mom invited me to all the meetings.

13     Q.   And did you go?

14     A.   And I went, yes.

15     Q.   And were you there?

16     A.   Yes.

17     Q.   And did you hear him speak?

18     A.   Yes.  Yes.

19     Q.   Okay.

20     A.   All at her house, yes.

21     Q.   Okay.  All right.  So, approximately -- you said

22     about 2009.  Did you have meetings in 2009, if you

23     remember?

24     A.   Yes.  Yeah, we had one meeting.

25     Q.   One meeting a year?

1    A.    Uh-huh, normally it was about one meeting.

2    Q.    How long did the meeting last?

3    A.    Not that long.  About an hour, I would say.

4    Q.    Did he bring documents and go over her portfolio?

5    A.    Yeah.  He would carry a couple files or a file with

6  information in there.

7    Q.    Okay.  Did he ever wear a top hat?

8    A.    No.

9    Q.    Okay.  Just asking.

10        The meetings -- when he was at these meetings, did

11 he seem to know what he was talking about?

12   A.    Yes.

13   Q.    Was he clear in what he was explaining?

14   A.    Yes, he was very clear and answered all of my mom's

15 questions.

16   Q.    And did he answer your questions?

17   A.    Yes.

18   Q.    Okay.  At some point -- and I mentioned 2009.  Did

19 you have meetings every year?

20   A.    Uh-huh.  It was about every year that we met with

21 him at my mom's home.

22   Q.    2009, 2010, 2011?

23   A.    Uh-huh, yes.

24   Q.    All the way up through, let's say, jumping forward

25 to about 2016?

1    A.   Yes.

2    Q.   Okay.  What happened in 2016?

3    A.   In 2016, my mother and I decided that she would sell

4  her home and my mom would live -- move to a place called The

5  Hearth, which is, like, an assisted living facility.

6    Q.   And can you just describe, what is The Hearth?  And

7  in case people don't know what it is, does she have her own

8  apartment there?

9    A.   Sure.  The Hearth is a place where you can live when

10 you're -- I think you need to be over 55.  There's

11 apartments.  My mom has a one-bedroom apartment there.

12 There's also, like, a memory care unit there, and there's

13 nurses there.  And there's a caf -- not really a cafeteria.

14 More like a restaurant, so that my mom can go down for her

15 meals, three meals a day.  And they do all sorts of

16 activities with the residents.

17    Q.   So it's kind of like some of those senior

18 assisted-living facilities you might see a commercial for on

19 late night TV?

20    A.   Correct.

21    Q.   Like Joan Lunden or something?

22    A.   Correct.  It's a really nice place.

23    Q.   And they have a -- you said they have a restaurant.

24 Does she also have a dining room?

25    A.   Yes, that's really what it is.  It's a dining room

 1    where they, you know -- but they have it all set up kind of

 2    like a restaurant.  It's really quite nice.

 3        Q.   And the food is?

 4        A.   The food is pretty good.

 5        Q.   Okay.  And does she, in her apartment, have her own

 6    space for eating and have a table there?

 7        A.   Yes, she has a kitchenette and, like, a dining room

 8    table.

 9        Q.   Okay.  It sounds like The Hearth is not inexpensive.

10        A.   No, it's not.

11        Q.   Okay.  Approximately how much does it cost?

12        A.   My mom pays $5,000 a month, approximately, to live

13    there.

14        Q.   And are there medical facilities, or not?  Like, is

15    there, like, nurses, nurse's aides, things -- people there,

16    as well?

17        A.   Yes.  Yes.

18        Q.   And all that's generally covered?

19        A.   No, that's all extra.

20        Q.   That's extra, okay.

21        A.   Yes.

22        Q.   So, moving to The Hearth, did that impact, somewhat,

23    your thinking with respect to her finances?

24        A.   Yes.  My mom -- my mom's concern was that she lived

25    in a house in Madison that she owned, so he her living

1    expenses were rather, you know, small, just the normal bills

2    that you would get at your house.  And her concern --

3        Q.   The mortgage was paid off?

4        A.   Yes.  Yes.  She owned the house in full, so her

5    expenses were relatively small.

6        Q.   Okay.

7        A.   One of the questions that her and I were really

8    working on a lot was, you know, could she afford living at

9    The Hearth for many years?

10       Q.   Okay.  And did you have a conversation or multiple

11   conversations with Leon Vaccarelli about this?

12       A.   Yes.  My mom had called him and invited him to the

13   house -- and I went, as well.  And -- to talk about, you

14   know, would she be okay for the rest of her life living

15   there.

16       Q.   Okay.  And is this still -- we're still in around

17   December or November of 2016?

18       A.   This was right before she sold the house, so it

19   might have been, like, August 2016.

20       Q.   Okay.  And did Mr. Vaccarelli offer some advice?

21       A.   Yes, he did.

22       Q.   Did you find it somewhat useful?

23       A.   Yes, he did.

24       Q.   Do you remember what he said?

25       A.   Oh, yeah.  He said that what we could do was, my

1  mom -- The Investment Center held two accounts for my mom, an

2  IRA and a Trust account.  My mom had never really withdrawn

3  any money from the Trust since -- of course, since it was

4  started in 1999.

5      Q.   So, she was living off the IRA?

6      A.   No, she was -- at that time, she was living off the

7  sale of her house in New Jersey, as well as her Social

8  Security pension and my dad's pension.

9      Q.   Okay.

10     A.   So, Mr. Vaccarelli had suggested that we could

11 withdraw money from her IRA each month that would

12 automatically go into her checking account, which would

13 automatically get paid to The Hearth, so my mom didn't even

14 have to do anything for this to happen.

15     Q.   Just so we're clear, the IRA is separate from the

16 Trust?

17     A.   Yes, it's a separate account.

18     Q.   So the money was going to be coming from the IRA to

19 cover expenses?

20     A.   Uh-huh.

21     Q.   And he had suggested that?

22     A.   Yes.  Yes.

23     Q.   And there's water up there if you need it.

24     A.   Thank you.

25     Q.   Again, this might sounds like a silly question, but

1  let me ask it anyway.  When he was giving this advice about

2  taking money from the IRA every month, did he seem to make

3  sense?

4      A.   Yes.

5      Q.   Did he slur his words?

6      A.   No.

7      Q.   Did he seem to be impaired in any way?

8      A.   No.

9      Q.   Okay.

10     A.   He seemed very knowledgeable about what he was

11 instructing her to do.

12     Q.   Okay.  And, so, did you start to do that?

13     A.   Yes.

14     Q.   Okay.  And did he facilitate that, as far as you

15 know?

16     A.   Yes.  Yes.

17     Q.   Okay.  Did he also suggest something else in the

18 Fall of 2016, with respect to the Trust?

19     A.   Yes.

20     Q.   Okay.  What did he suggest?

21     A.   So, he was talking about eventually money would need

22 to come from the Trust because my mom's IRA was smaller than

23 the balance in the Trust account.  So he had said that in

24 order to take money from the Trust, it needs to go into an

25 account in the Trust's name.  And we needed to open up a

1    checking account for that to happen.

2        Q.   Had you -- at any point in time between 1999 and the

3    suggestion by Mr. Vaccarelli in the Fall of 2016, had you

4    ever had a need to use a Trust checking account?

5        A.   No.

6        Q.   Okay.  Had you ever had a need to draw money from

7    the Trust?

8        A.   No.

9        Q.   Okay.

10       A.   No.

11       Q.   Now, we're here now, today, in 2019.  Is your mom

12   still using her IRA?

13       A.   Yes.

14       Q.   Okay.  Has she even -- jumping ahead a couple years

15   now, has she had any need to draw on the Trust as of yet?

16       A.   No.

17       Q.   So that -- there was -- the Trust hadn't been

18   touched, as far as you know.  He suggested a checking

19   account?

20       A.   Yes.

21       Q.   Okay.  What happened next?

22       A.   I had to take my mom to the bank to open up a

23   checking account --

24       Q.   Did you do --

25       A.   -- in the name of the Trust.

1    Q.   Did you open the checking account right away when he

2 asked you to do it?

3    A.   No, we didn't.

4    Q.   Were you doing other things?

5    A.   Yeah.  You know, we were doing other things, and we

6 didn't open up the account right away.

7    Q.   Did you talk to Mr. Vaccarelli about that?

8    A.   I did.  I told him I hadn't opened up the account

9 yet.

10    Q.   What did he say?

11    A.   He was a bit miffed and annoyed that I hadn't done

12 it yet and said, you know, that this account needed to be

13 opened so that my mom would be able to take money from the

14 Trust and put it in the checking account when she needed

15 it.

16    Q.   From your perspective, as the person advising your

17 mom and working with your mom, did it seem like time was of

18 the essence at that point for a checking account, to you

19 guys?

20    A.   Not to me.  It seemed like the IRA had enough money

21 in it for a while.

22    Q.   Okay.  And did you -- after him being miffed, what

23 happened next?

24    A.   So, I called my mom and said, you know, we have to

25 open up this checking account at Liberty Bank, and I took

```
1   her.  We made arrangements to go do so, and I took her to the
2   bank to open up the account.
3       Q.   Which bank was that?
4       A.   We went to Liberty Bank in Madison.
5       Q.   And do you remember the name of the person who was
6   there?
7       A.   It was Corey.
8       Q.   Corey at Liberty Bank, Liberty Bank?
9       A.   Yes.
10      Q.   Okay.  Now, at some point in time -- approximately
11  when was that bank account opened?
12      A.   That was in December of 2016.
13      Q.   Okay.  Did you get a checkbook with a lot of checks,
14  did you get a big ledger checkbook?  What did you get?
15      A.   So, when my mom opened it, she had to deposit $25
16  into the account.
17      Q.   Just to open up the account?
18      A.   Just to open up the account.
19      Q.   Okay.
20      A.   And we got like an eight by -- a letter-size piece
21  of paper with three checks on it.
22      Q.   So, were they kind of perforated?
23      A.   Yeah, that you could tear off.  And there was, like,
24  a little thing on the side where you could write what the
25  check was for.
```

1    Q.   Like a little check stub?

2    A.   Yes, thank you.

3    Q.   And -- okay.  And, so, what did you do with those

4    three checks?  Do they call them starter checks?

5    A.   Yes.  That day what did we do with them?

6    Q.   If you remember.

7    A.   Yeah, we just went home and put them in -- my mom

8    has a drawer that she keeps all of her financial stuff in,

9    like a bureau, and we put them in that bureau.

10   Q.   Did your mom have any other accounts in the name of

11   the Trust?  We talked about the Trust account itself.  You

12   talked about this new checking account.  Did she have a

13   savings account?

14   A.   She had a savings account at Liberty Bank in the

15   name of the Trust.

16   Q.   When had that been opened up?

17   A.   I don't know.  I think when she moved to

18   Connecticut, but sometime after that.

19   Q.   Okay.  So, sometime around -- was it like, would you

20   say two thousand and --

21   A.   Sometime around 2008.

22   Q.   Had there ever been a need to move money from the

23   Trust into the savings account at Liberty Bank?

24   A.   No, there was never withdrawals taken from the

25   Trust.

1    Q.   Okay.  So, after you opened up the account, the

2  checking account, what happened next?  I'm sure a lot in your

3  life, but focusing on the reason you're here today.

4    A.   Uh-huh.

5    Q.   Did you subsequently have a meeting or was there a

6  meeting called with Mr. Vaccarelli?

7    A.   Yes.  We had another meeting with Mr. Vaccarelli at

8  my mom's place at The Hearth.

9    Q.   Okay.  Approximately when was that?

10   A.   That was in January of 2017.

11   Q.   Okay.  Let me show you what's been marked in

12  evidence as Government's Exhibit 803.

13   A.   Okay.

14   Q.   And I'm just going to highlight that portion for

15  you.

16   A.   Uh-huh.

17   Q.   What is this document that the jury is seeing,

18  Government's Exhibit 803?

19   A.   This is the sign-in sheet for The Hearth.  Whoever

20  comes to The Hearth, or when residents leave, they have to

21  stop at the front desk and fill out this log.

22   Q.   And you have to put your car, make, and model?

23   A.   Yes.  If you've driven a car there, you need to put

24  your car.

25   Q.   So did Mr. -- does it appear from this document that

```
1    Mr. Vaccarelli drove there?

2         A.   Yes.

3         Q.   It says, "Lincoln MKS, white," I guess?

4         A.   Yeah.

5         Q.   And what vehicle were you driving on that day?

6         A.   I was driving my Jeep.

7         Q.   Now, is that your own handwriting, by the way?

8         A.   Yes, where I wrote my name; yes.

9         Q.   Okay.  What was the -- if you remember, what was the

10   purpose of the meeting, if you know?  Do you know if there

11   was a set purpose, that you remember?

12        A.   No, they were --

13        Q.   Do you know who called for the meeting?

14        A.   I think Leon did.  I don't think my mother did.

15        Q.   Okay.  Just as an aside, it says "apartment number,"

16   and I won't say it --

17        A.   Okay.

18        Q.   -- just because it's your mom's own apartment

19   number, but was there some issue related to getting account

20   statements from The Investment Center with respect to the

21   account -- sorry, with respect to the apartment number?

22        A.   Yes.

23        Q.   Tell the jury -- try not to use the account numbers.

24        A.   Okay.

25        Q.   But just try to tell the jury about that.
```

1    A.   Okay.  So, the statements that were mailed from The

2    Investment Center that came on the Trust and the IRA were

3    going to the wrong apartment.  Two of the numbers were mixed

4    up.

5    Q.   Transposed, or whatever?

6    A.   Transposed, yes.

7    Q.   So, she wasn't necessary -- the statements were

8    being sent, but she wasn't getting them in a timely manner?

9    A.   Right, she wasn't getting them for a little while.

10   Q.   So, you said that you don't remember the purpose of

11   the meeting.  Tell us what you recall about the meeting.

12   A.   We went -- they talked about her Wills again -- or

13   her Will again.  She was not comfortable signing anything.

14   And they talked about the account, that it was set up and

15   ready to go.

16   Q.   Okay.  Now, directing your attention to the time,

17   did something happen that day?  You're -- what do they call

18   it -- you're like the sandwich generation, where you have

19   your mom and you have your kids?

20   A.   Right.  My son was home sick from school that day.

21   He had a stomach bug.  And at the time he was, like, 11 or

22   12.  And I don't remember if he text me or he called me, but

23   I had to call him back because he had gotten sick and wanted

24   me to come home.

25   Q.   And was anything of any moment -- that's not a

1    great -- that sounds like a lawyer word.  Was anything going

2    on at this meeting that you felt you would miss if you

3    left?

4        A.    No, they weren't even really discussing anything

5    about any of her accounts.  And, so, I said that I needed to

6    leave and go take care of my son.

7        Q.    Okay.  Was there any discussion at this meeting

8    before you left of selling securities or mutual funds?

9        A.    No.

10       Q.    Was there any discussion of moving money from the

11   Trust?

12       A.    No.

13       Q.    Was there any -- any financial discussions of any

14   significance happening while you were there?

15       A.    Absolutely not.

16       Q.    Okay.  And then you left?

17       A.    Then I left.

18       Q.    Okay.  Let me show you -- and, again, just to put

19   things in context, now we're talking about January of 2017.

20   Let me show you Government's Exhibit 806.  Do you recognize

21   this document?

22       A.    Yes.

23       Q.    That's going to turn it yellow.  What's Government's

24   Exhibit 806?

25       A.    This is the account statement for the living trust

1   dated January 31, 2017.

2       Q.   Okay.  And looks like the account number has been

3   redacted in part, but does that appear to be the account

4   number for the Truhan Living Trust?

5       A.   Yes.

6       Q.   And, again, we've redacted the apartment number.  Do

7   you know if this was before or after they got the apartment

8   number correct?

9       A.   I think this was while the apartment number was

10  incorrect.

11      Q.   While it was incorrect.

12           Now that we're talking -- now that we're in January

13  of '17 --

14      A.   Uh-huh.

15      Q.   -- how was your mom's IRA holding up at that

16  point?

17      A.   Good.

18      Q.   Okay.  Did she have any need, at this point, to move

19  money from the Trust?

20      A.   No.

21      Q.   Okay.  Let me scroll down to page 7 of 11, and

22  direct your attention -- actually, I'm going to go to page 8

23  and direct your attention -- I'm going to zoom-in on the top.

24           Okay.  Directing your attention to this part, the

25  date of the meeting was what date, if you recall?

1    A.    The 11th of January.

2    Q.    Okay.  Do you see where it says, "January 12, 2017;

3    Trade date January 11, 2017," and it looks like it says,

4    "Settlement date January 12, 2017."

5    A.    Yes.

6    Q.    Okay.  Can you read what that transaction appears to

7    be, in the middle of Government's Exhibit 806?

8    A.    Sure.  There's two transactions listed that were

9    sold.  One's Franklin -- all the letters are a little smashed

10   together.  I can't read the whole thing.

11   Q.    Okay.

12   A.    And it looks like there was --

13   Q.    Like an Ivy --

14   A.    A whole bunch of shares sold.

15   Q.    When you say "a whole bunch," you mean approximately

16   2,567?

17   A.    Yes, there was that many shares sold for that.  And

18   there was a Ivy Fund, and over 10,000 shares was sold on

19   that.

20   Q.    Okay.  And approximately how much did the sale of

21   those securities yield, or how much money came from

22   securities that were sold?

23   A.    From those two, $316,000.

24   Q.    Okay.  And directing your attention up to the top,

25   do you see where it says "total cash"?

1    A.   Yes.

2    Q.   Okay.  And what is the total cash under "Debits Year

3  To Date"?

4    A.   $300,000.

5    Q.   Okay.  And let me direct your attention to the

6  earlier page.  You see where it says "Withdrawals"?

7    A.   Yes.  It says $300,000 was withdrawn.

8    Q.   Okay.  Were there any discussions about -- with Mr.

9  Vaccarelli at the meeting at The Hearth on January 11th about

10 selling funds?

11   A.   No, there was no discussions.  My mom did not take

12 money from this account.

13        MR. EINHORN:  Objection.  She wasn't there at the

14 entire meeting.

15        THE WITNESS:  I was only there for a few minutes.

16 BY MR. McGARRY:

17   Q.   At the part of the meeting that you were at with Mr.

18 Vaccarelli and your mom, who was then 88 years old, were

19 there any discussions about selling securities?

20   A.   There were not.

21   Q.   At any point in time from 2009 or so, when your mom

22 moved into Connecticut up until two thousand -- or even until

23 now, has your mom ever sold anything -- any stock in this

24 Trust?

25   A.   My mom has never withdrawn money from this

1   account.

2       Q.   Okay.  And let me show you what has been marked --

3   sorry, it's on page 9.  Do you see -- highlighting the part,

4   January 13th, it appears to say, "Federal funds sent"?

5       A.   Yes.

6       Q.   And then it says 300,000 USD to the Liberty Bank?

7       A.   To Liberty Bank, yes.

8       Q.   Okay.  At the meeting on January 11th, the portion

9   at which you were at --

10      A.   Uh-huh.

11      Q.   -- were there any discussions with Mr. Vaccarelli of

12  sending $300,000 by federal funds from The Investment Center

13  account in the name of the Truhan Living Trust to Liberty

14  Bank?

15      A.   No, there was no discussions.

16      Q.   Based on your 10 years of meetings with Mr.

17  Vaccarelli, where he appeared to know what he was doing --

18          MR. EINHORN:  Well, I'll object to that.

19  BY MR. McGARRY:

20      Q.   Okay.  Based on your 10 years of meetings with Mr.

21  Vaccarelli, were significant decisions always discussed in

22  your presence, regardless --

23      A.   Yes.  Yes.

24      Q.   Did your mom go rogue sometimes and make her own

25  decisions without you being there?

1    A.   No.  My mom is not a rogue person.  She doesn't go

2    rogue.

3    Q.   Okay.  Let me show you what's been marked as

4    Government's Exhibit 804 in evidence.

5    A.   Okay.

6    Q.   Okay.  Have you seen this document before, in

7    anticipation of your testimony today?  Do you

8    recognize -- let me rephrase it.

9         Take a look at the whole document.

10   A.   Uh-huh.

11   Q.   Have you seen this document when meeting with the

12   Government?

13   A.   Yes.

14   Q.   Okay.  Prior to meeting with the Government, had you

15   seen this document?

16   A.   No.

17   Q.   Okay.  Could you read the date for the ladies and

18   gentlemen of the jury?

19   A.   It's dated January 12th, 2017 at the top.

20   Q.   And what was the date of the meeting at The

21   Hearth?

22   A.   January 11th, 2017.

23   Q.   And do you remember what the settlement date was on

24   the sale of the securities in The Investment Center?

25   A.   It was January 12, 2017.

1    Q.   Okay.  And do you see where it says, "Amount to be

2    withdrawn"?

3    A.   Yes.  It says $300,000.

4    Q.   Actually, I misspoke.  Does it say, "Amount to be

5    wired"?

6    A.   Yes.

7    Q.   Okay.  And what is the name of the bank?

8    A.   Liberty Bank in Madison, Connecticut.

9    Q.   Okay.  And what is the registered name on the

10   account?

11   A.   Carmela T. Truhan, Truhan Living Trust.

12   Q.   And just so --

13   A.   And then the date after, when the Trust was

14   created.

15   Q.   And that's 1999; correct?

16   A.   Yes.

17   Q.   And there appears to be a signature there.  Do you

18   see that?

19   A.   Yes.

20   Q.   Okay.  Then going down here, do you see that

21   notary?

22   A.   Yes.

23   Q.   Okay.  Do you know the name Maryanne Monticelli, if

24   I'm saying that correctly?  Monticello?  Do you know who that

25   is?

1     A.    No, I think that there was a Maryanne that worked

2     with Mr. Vaccarelli at his office.

3     Q.    Did she come to The Investment Center on January

4     11th -- showing you -- sorry.

5           Did she come to The Hearth on January 11th, 2017?

6     A.    No.  It was only myself and Mr. Vaccarelli.

7     Q.    Okay.  On January 12th, going back to Government's

8     Exhibit 804, focusing again on the date.  Did your mom drive

9     to Waterbury on January 12, 2017 to sign a document?

10    A.    Oh, no.

11    Q.    Why do you say, "oh, no"?

12    A.    My mom doesn't drive -- well, at the time, she

13    didn't drive on the highway.  She'd never drove really on the

14    highways.  And in order to get from Madison to Waterbury,

15    you'd have to take a highway.

16    Q.    And scrolling down to the second page of

17    Government's Exhibit 804, do you recognize that as one of the

18    starter checks?

19    A.    Yes, that was -- it's check number 89.  I think it

20    was the first one.  It had to be voided out.  In order to do

21    a wire transfer, they need all that information that's on

22    the -- well, the check's not there, but all that information

23    on the bottom of the check with, like, the routing numbers

24    and the account numbers.

25    Q.    And is that a voided check that you gave to Mr.

1    Vaccarelli, if you recall?

2        A.    Yes.

3        Q.    And that was when you were setting up the account?

4        A.    Yes.

5        Q.    Okay.  And just directing your attention to the

6    third page.  Do you see where it says, "Truhan Living Trust,

7    Carmela Truhan Trustee"?

8        A.    Yes.

9        Q.    I won't read the apartment number, but is that the

10   wrong apartment number?

11       A.    That is the wrong apartment number.

12       Q.    So, would that wrong apartment number impact the

13   ability for your mom to get statements?

14       A.    Yes, she did not receive mail that was addressed to

15   that apartment.

16       Q.    Okay.  Let me show you what's been marked

17   Government's Exhibit 18 in evidence.  Do you recognize this

18   document -- and I'll go to the end.  Let me ask you this

19   question:  Do you recognize your mom's signature?

20       A.    I do.

21       Q.    Okay.  At the meeting on January 11th, at the period

22   of time that you were at the meeting, was this document or

23   any document like it ever pulled out by Mr. Vaccarelli?

24       A.    No.  I never saw my mom sign a document while I was

25   at the meeting.

1    Q.   Okay.  If your mom were doing an investment

2    program --

3    A.   Uh-huh.

4    Q.   -- is that something she would have discussed with

5    you?

6    A.   She would have discussed it with me.  And then if

7    she needed to discuss it further, she would have discussed it

8    with, you know, my husband or my sister.

9    Q.   Okay.  Because did they sometimes get involved, as

10   well?

11   A.   Very rarely.  When she had a question.

12   Q.   Okay.

13   A.   Or if we needed, like, more than one person's

14   opinion.

15   Q.   Okay.  All right.  Directing your attention a few

16   pages down, I think you had told us, again, something about

17   that you needed to have a broker licensed in Connecticut.  Is

18   that what you testified to earlier?

19   A.   Yes.

20   Q.   Okay.  Do you have any idea why it says this

21   contract shall be governed by the state -- by the laws of the

22   State of New Jersey?

23   A.   No.

24   Q.   Okay.  Going to the last page, on or around January

25   11th or January 12th, did your mom ever go to New Jersey?

1      A.   No.  I would have had to drive her if she did.

2      Q.   Okay.  Let me show you what's been marked as

3   Government's Exhibit 807 in evidence.  Do you recognize this

4   document?  And let me enlarge it for you.

5           Is this your Liberty Bank statement from your -- the

6   Liberty Bank account for the Truhan Trust?

7      A.   I don't know exactly what it is.  It's just her --

8   all I see is her address.

9      Q.   Let me zoom-in to the middle part.

10      A.   Okay.  Yes.  Yes, this is the statement, because she

11   put in the $25 when we started it.  And then it's showing a

12   $300,000 deposit, and then a $300,000 withdrawal and the fee

13   for the wire transfer of $10.

14      Q.   Okay.  So tell the jury, if you would, about

15   the -- about the balance.  Is that how much you put in?  Is

16   that what you opened the account with?

17      A.   The ending balance is $15.  No, we opened it with

18   25.

19      Q.   Did your mom, or you or your husband, or your sister

20   ever put any other money into this account, the checking

21   account?

22      A.   No.

23      Q.   Okay.  And were you aware at all of a $300,000 wire

24   into the account?

25      A.   No.

1    Q.   Okay.  And it says here Check 90.  Do you remember

2    the number on the voided check that we just saw?  Was the

3    voided check --

4    A.   I thought the voided check was 89.

5    Q.   And this is 90?

6    A.   This is check 90.

7    Q.   Okay.  Did you or your mom know anything about a

8    check for $300,000 being written on this account?

9    A.   No, I did not.

10   Q.   Okay.  You did not know?

11   A.   Nope.

12   Q.   Okay.  Let me show you what's been marked as

13   Government's Exhibit 18A.  Identifying the top.  Again,

14   pointing you to top of the page of Government's Exhibit 18A,

15   is this the bank account that you opened up with your mom?

16   A.   Yes.

17   Q.   Okay.  And it has her name, Truhan Living Trust, and

18   Carmela T. Truhan, Trustee?

19   A.   Yes.

20   Q.   And what's the amount?

21   A.   It's a check for $300,000.

22   Q.   Okay.  And what is the date?

23   A.   January 11, 2017.

24   Q.   Okay.  Is that the date that you were physically

25   sitting with Mr. Vaccarelli at The Hearth?

1      A.   Yes, it was.

2      Q.   Okay.  Was anything discussed about this check on

3  January 11th, 2017 when you were sitting with him at The

4  Hearth?

5      A.   No, it was not.

6      Q.   Okay.  Would you have expected Mr. Vaccarelli to,

7  based on your 10-year relationship with him, to advise you if

8  he were moving $300,000 of your mother's money?

9           MR. EINHORN:  That's argumentative, Your Honor.

10           THE COURT:  I'm going to sustain the objection.

11  BY MR. McGARRY:

12      Q.   As a general matter -- over the years, did he speak

13  with you about decisions being made in your

14  mother's Investment Center account, as a general matter?

15      A.   Yes.

16      Q.   And was that generally the nature of your meetings

17  with him?

18      A.   Yes.

19      Q.   Was there anything that was different, from your

20  perspective, going into that meeting on January 11th, 2017,

21  that he wouldn't tell you information that was important

22  related to your mom's account?

23      A.   No, there was no discussion of $300,000 being taken

24  out of the Trust because money never came out of the Trust

25  account.

1      Q.   And do you know what Lux Financial is?

2      A.   It's Leon Vaccarelli's investment company.

3      Q.   Okay.  And did you ever discuss with him, or did

4   your mom ever discuss with him in your presence, putting

5   $300,000 into a Lux Financial account?

6      A.   No.

7      Q.   Directing your attention to the back of the check,

8   do you see where it says, "Deposit Only"?

9      A.   Yes.

10      Q.   And "Lux Financial"?

11      A.   Yes.

12      Q.   And what was the date that this check appears to

13   have been negotiated on?

14      A.   January 14, 2017.

15      Q.   Okay.  And going back to Government's Exhibit 807,

16   does this check appear to have cleared on around January

17   18th?

18      A.   Yes, the check cleared for $300,000 on January

19   18th.

20      Q.   Okay.  And that's, again, check number 90?

21      A.   Check number 90.

22      Q.   Okay.  And apparently there was also a service

23   charge; correct?

24      A.   Yes, a $10 wire -- incoming wire fee.

25      Q.   And let me show you Government's Exhibit 809.  What

1  is the name on this account?

2     A.   Leon W.L. Vaccarelli doing business as Lux Financial

3  Services.

4     Q.   Okay.  And does there appear to be a deposit on or

5  about January 17th, 2017?

6     A.   Yes.  There's a deposit for $300,000.

7     Q.   Okay.  Was there -- and the type of account that's

8  highlighted there, before it says 5007, what type of account

9  is that?

10    A.   It's a small business checking account.

11    Q.   Was there ever any discussions with Mr. Vaccarelli

12 regarding putting money into a small business checking

13 account?

14    A.   No, there were not.

15    Q.   And showing you Government's Exhibit 810.  I'm

16 sorry, what's the balance -- the ending balance as of the end

17 of January?

18    A.   The ending balance is $196,285.80.

19    Q.   And showing you what has been marked as Government's

20 Exhibit 810, does this appear to be the same small business

21 checking account?

22    A.   Yes, it does.

23    Q.   And 811; does this appear to be the same small

24 business checking account?

25    A.   Yes, it does.

1    Q.   And 812; does this appear to be the same small

2    business checking account?

3    A.   Yes, it does.

4    Q.   And 813; does this appear to be the same small

5    business checking account?

6    A.   Yes, it does.

7    Q.   And what is the balance as of May?

8    A.   $38,419.90.

9    Q.   Okay.  At some -- so we just looked all through

10   January, February, March, April, May.  During that time

11   period, did you have any meetings with Mr. Vaccarelli?

12   A.   No.

13   Q.   Was there any need, as far as you knew, to have

14   meetings with Mr. Vaccarelli?

15   A.   No.

16   Q.   What happened next with respect to -- of

17   significance, that happened with respect to your mom's Trust

18   account?

19   A.   At the end of June, I received a phone call.

20   Q.   Tell us -- don't tell us what they said, but tell us

21   from whom?

22   A.   From the SEC, out of Boston, Massachusetts.

23   Q.   Okay.  And did that phone call give you concern?

24   A.   Yes.

25   Q.   Okay.  Did you do something after that phone call?

1      A.    Yes.

2      Q.    Okay.  And what --

3      A.    The first one was actually a message, the first

4   call.  And when they said they were from the -- the lady said

5   that she was from the SEC, I called up the SEC main office in

6   Washington, D.C., because I thought it was just somebody

7   trying to scam me for my mom's Social Security number.

8      Q.    Okay.

9      A.    And they said that it was -- I was told it was a

10  legit call and I needed to call the Boston office.

11     Q.    Okay.  And did you call the Boston office?

12     A.    I did.

13     Q.    Okay.  What -- don't tell us what they said.

14     A.    Uh-huh.

15     Q.    What did you say to them?  It's kind of weird, but

16  give us your half of the conversation.

17     A.    I basically said that I needed to do some research

18  for what they were telling me.

19     Q.    Okay.  Fair enough.  And did you do some research?

20     A.    I did.

21     Q.    Okay.  Why did you do the research?

22     A.    I was very alarmed by the news and thought that I

23  needed to get to my mom's apartment immediately and start

24  looking up some information.

25     Q.    Okay.  So what was it -- what did they tell you that

1  made you alarmed, that caused you to do research and go to

2  your mom's apartment?

3          MR. EINHORN:  Well, I'm not sure if that's calling

4  for a hearsay.  I think it's calling for --

5          THE COURT:  So it's what was said --

6          MR. EINHORN:  -- what did they tell you.

7          THE COURT:  -- for the purpose of motivating her to

8  do what she did next.  That's not the truth of the statement.

9  It's the fact that that statement was made.  Isn't that

10  right?

11          MR. McGARRY:  That's why it's offered at this point,

12  Your Honor.

13          MR. EINHORN:  I don't agree.  I think that that

14  offer is the truth of what they said --

15          THE COURT:  Why can't -- Mr. McGarry, why can't you

16  simply ask her what she did in response to what she was told,

17  as opposed to what she was told for whatever purpose.

18          MR. McGARRY:  I certainly can, Your Honor.  I just

19  think the offer was --

20          THE COURT:  That way.  It's not as clear, but --

21          MR. McGARRY:  And I was trying to be a little bit

22  easier for both the witness and the jury to see it in context

23  as to why she did what she did.

24          MR. EINHORN:  I don't think we need Mr. McGarry to

25  be easy.  We need him to ask questions that are proper.

1          THE COURT:  Well, now.

2          MR. McGARRY:  I'm happy to do it your way, Your

3    Honor.  I think that might speed things along.

4    BY MR. McGARRY:

5      Q.   What did you do next?

6      A.   I went to my mom's place.  Well, I dropped off my

7    kids first, but I went to my mom's place and told my mom that

8    I had a very interesting phone call, and I did tell her what

9    the phone call was.  She was a little concerned about what I

10   was telling her.

11         So I said, let's not get concerned until we see

12   everything in black and white.  And I proceeded to go into

13   her bedroom, where she has the bureau that I think I

14   mentioned earlier, where she keeps all of her statements, and

15   we started looking for statements.

16     Q.   What statements did you look for?

17     A.   I was looking for statements from the Investment

18   Center regarding the Trust account.

19     Q.   Okay.  Had the statements caught up with your mom

20   from the apartment numbers that had been transposed and did

21   you have the right statements?  Or was there still -- were

22   you still missing some?

23     A.   We only had some of the statements.

24     Q.   Okay.

25     A.   So we didn't really know what to do.  And she was --

```
1    you know, she was clearly upset, as was I.  I went back home.
2    I asked my husband to come home from work and help me go
3    through her -- help me go through these statements because we
4    were both a little, you know, overwhelmed by the whole thing.
5    And --
6         Q.   Again, had the --
7              MR. McGARRY:  I'm going to ask this question, your
8    Honor.  If it's objected to, I understand.
9    BY MR. McGARRY:
10        Q.   Had the magnitude of the issue been discussed with
11   you on the phone, that caused you to not just look at your
12   mom's statements but call your husband and take all those
13   steps?  Meaning, did you know -- had they said anything about
14   the number?
15        A.   Yes, the thing was, I --
16             MR. McGARRY:  Is that okay?
17             THE WITNESS:  Yes, it was very upsetting.  The
18   information that I was given over the phone was very
19   upsetting.
20   BY MR. McGARRY:
21        Q.   Because it was a big number?
22        A.   It was a huge number, yes.
23        Q.   Okay.  So you're telling us you went through the
24   dresser, you looked for statements.  Did you look for any
25   Liberty Bank statements, or did you know at that point to
```

1    look for Liberty Bank checking account statements?

2         A.    We found something from Liberty Bank.  And I --

3         Q.    Okay.

4         A.    -- was, like, Wait, why is the balance less than

5    $25?  And that was the first thing that I had -- that drew me

6    to start looking in the Liberty Bank account.

7         Q.    So, in all this, it's the difference between 25 and

8    15, that kind of clued you into it?

9         A.    Uh-huh.

10        Q.    Okay.  And what did you do next?  Did your husband

11   come home?

12        A.    Oh, he did, yes.

13        Q.    Okay.

14        A.    I went home and -- because my mom doesn't really use

15   a computer or anything where she is.  So I went home to go

16   back on to my computer.  And I started pulling up the

17   electronic statements on Liberty Bank.

18        Q.    Okay.

19        A.    And that's when I saw the check that you had shown

20   me.  I don't remember what exhibit number it was, but there

21   was a check that had been written for $300,000.

22        Q.    Let's see.  Let's see if that's it.  I think I have

23   the wrong one.  Hold on.  So you saw the check that had been

24   written?

25        A.    Right, check number 90.

1    Q.   Okay.  Which is 18A.  Okay.  And what did you do

2    when you saw this check?

3    A.   I showed my husband when he came home, and I was

4    really upset.  And we thought that we needed to show my mom,

5    to see if she had ever written out the check.

6    Q.   Did you?

7    A.   I did.  We drove to my mom's house and we showed her

8    the check, and she told me that she never wrote out the

9    check.

10        MR. EINHORN:  Objection, Your Honor.  This is the

11   problem with not having a live witness.

12        MR. McGARRY:  Let me ask the question this --

13        THE COURT:  Are you withdrawing the question and

14   re-asking it?

15        MR. McGARRY:  I'm not, Your Honor.

16        THE COURT:  So the question was, what did she do --

17   what did you do when you saw this check?  And you described

18   you showed it to your husband.  You needed to show it to your

19   mom.  You went to your mom's house.  Showed her the check.

20        I think that next part is fine.  It's what she told

21   her in response to the question about signing the check.

22        MR. EINHORN:  I thought the witness started to

23   answer that.

24        THE COURT:  Yes, she did.  And I think that's proper

25   because it's not whether her mother was being truthful to her

1    but that she told her, because I'm assuming there's something

2    she did in response.  Can we put that all together so it is

3    not what her mother said --

4            MR. McGARRY:  Sure.

5            THE COURT:  -- the substance of what her mother said

6    as to truth for the jury.

7            MR. McGARRY:  Yes.

8    BY MR. McGARRY:

9        Q.   Did what your mother say cause you to, then, do

10   something else?

11       A.   Yes.  We did further research.

12       Q.   Okay.  And --

13       A.   And had to get copies of statements and look through

14   for statements and all sorts of things out of the drawer.

15   And when my husband was there, it was a little bit more

16   sensical, because, you know, we were a little -- you know, we

17   knew what our mission was and what we had to look for.

18       Q.   Okay.  And did you end up going to Liberty Bank or

19   were you able to get the stuff from, like, online banking?

20       A.   I got it from online banking off my printer.

21       Q.   How about, I think what was marked as Government's

22   Exhibit 806; were you able to get a copy of Government's

23   Exhibit 806 and look at that?

24       A.   Yes.

25       Q.   Okay.  How did you get that document?

1    A.   I think we were able to find that in one of the

2    notebooks that my mom had.

3    Q.   Okay.  And was this a surprise to you?

4    A.   Yes.

5    Q.   Had there ever been any communication with you,

6    personally, with Mr. Vaccarelli about selling securities

7    now -- and I'm either -- before the research?

8    A.   No.

9    Q.   Now, having done the research, did you contact

10   the -- what did you do next?  Who did you contact next?

11   A.   We called him and we called The Investment Center.

12   Q.   Do you remember who you called first?  If not --

13   A.   Okay.  So, by the time we found everything, it was

14   late that night.  And then we went the next day, and we

15   called The Investment Center, to tell them that I didn't

16   want -- that my mom did not want Mr. Vaccarelli on the

17   accounts anymore.

18   Q.   Okay.  And did you communicate that to The

19   Investment Center?

20   A.   Yes.

21   Q.   Okay.  Without telling us what they said, did they

22   take Mr. Vaccarelli off the accounts?

23   A.   Yes.

24   Q.   What did you do next?

25   A.   We -- we brought two gentlemen with us, so that they

1  could help us close out the accounts at The Investment Center
2  and transfer to their company, which is WJ Financial.
3      Q.   Did you go to their office or did you go to Mr.
4  Vaccarelli's office?
5      A.   No, we brought them into my mom's house.
6      Q.   So, you were at The Hearth.
7      A.   My mom was upset.  We brought them into her house,
8  and they were helping us with the closing of the account and
9  transferring it over to WJ.
10     Q.   And this was all right around the same time?
11     A.   This was all -- yeah, like that Friday.  They were
12 there for quite a few hours with us.
13     Q.   Okay.  And you said that took a couple of hours?
14     A.   Yeah, they were there a long time.
15     Q.   Okay.  And was this around the end of June, near the
16 Fourth of July weekend, if you recall?
17     A.   Yes, it was Fourth of July weekend; yes.
18     Q.   Okay.  And did you -- at some point, did you move
19 the money first and then call Mr. Vaccarelli or call Mr.
20 Vaccarelli first and then move the money, if you recall?
21     A.   I didn't speak with Mr. Vaccarelli until after the
22 weekend.  I think it was that Monday.
23     Q.   Okay.
24     A.   And I asked him if he could tell me where the money
25 was.

1    Q.   Okay.  So I want to focus you on this conversation.

2    You called him, and what did you say to him?

3    A.   Yeah, and then I think he called me back.

4    Q.   Okay.

5    A.   And I asked him -- my mom was there, too.  It was --

6    my mom and I were together, and I asked him what happened to

7    the $300,000.

8    Q.   And what did he say?

9    A.   He -- the first thing he said was that he had

10   transferred the money to a 6 percent 30-something month CD.

11   Q.   Okay.

12   A.   With, like, a big return.

13   Q.   Okay.

14   A.   And I was like, that's not acceptable.  She didn't

15   authorize this, or, you know, I was kind of like

16   argumentative.

17   Q.   Right.

18   A.   And he told me that this was nothing nefarious.

19   Q.   Okay.

20   A.   Then he started saying, like, Well, you know.  Your

21   mom, she's with it.

22   Q.   Okay.

23   A.   And I told him I needed the money back in the

24   account immediately.

25   Q.   Okay.  So let's break that down.  What was your

1   reaction when he told you it was in a 6 percent 30-something

2   month CD?

3        A.   I swore.

4        Q.   Okay.  You don't have to say it here.

5        A.   Thank you.

6        Q.   Did he respond to your use of an expletive?

7        A.   Yeah, that's when he told me that this was not

8   nefarious.

9        Q.   Not to put you on the spot, but did that word throw

10  you for a second?

11       A.   Yeah.  I didn't know exactly what it meant.

12       Q.   Fair enough.  You know now what it means?

13       A.   Yes.

14       Q.   What does it mean?

15       A.   It basically means that it was nothing bad that he

16  was doing, it was nothing -- you know, it -- this was all

17  legit.  It was all, you know, this legit thing that he was

18  doing to put the money into the CD.

19       Q.   Okay.  And when he said it was not nefarious, even

20  though you didn't fully appreciate it, what did you say back

21  to him?

22       A.   I think I swore again.

23       Q.   Okay.  And what did he say to you?

24       A.   He told me, You know, your mom, she's with it.

25       Q.   Okay.  So if she's with it, what did you take -- why

1  is he telling you that?

2      A.    I don't know.  I just wanted the money back in the

3  Trust account.  No money was ever supposed to come out of the

4  Trust account, and I wanted it back in there and -- as my

5  mother did, too.

6          MR. EINHORN:  Objection, Your Honor.  Same

7  objection.  I'm going to move for a mistrial if the

8  Government keeps doing this.  This is not -- it's not

9  proper.

10          THE COURT:  Okay.  All right.  The question was, you

11  just wanted the money back, it was never supposed to come out

12  of the Trust account, you wanted it back in there, and then

13  we will strike the rest.

14          MR. McGARRY:  So, that's the answer.

15          THE COURT:  That's the answer, and we'll just strike

16  the few remaining words of that answer.  Please move on.

17  BY MR. McGARRY:

18      Q.    Did you tell him that you wanted it back in there?

19      A.    Yes.

20      Q.    Okay.  What did he say?

21      A.    He did explain that with the holiday weekend, you

22  know, it was going to take him a day or two.  And then the

23  phone call -- I had kind of enough of the phone call.  I

24  didn't -- and I just kind of ended the call.

25      Q.    Okay.  When he was discussing your mom being with it

1    or a 6 percent 30-month CD, did he mention anything about

2    what is now Government's Exhibit 18, which is on your

3    screen?

4         A.    No.

5         Q.    Okay.  Did he mention anything about, oh, no,

6    there's a Direct Investment Agreement?  Did he say anything

7    to that effect?

8         A.    No.

9         Q.    And did you convey to your mother any information

10   about the 6 percent 30-something CD?

11        A.    Yes.

12        Q.    Okay.  After telling that to your mom, what did you

13   do next?

14        A.    We went to go see if there was any paperwork about

15   any sort of CD or anything.

16        Q.    And where did you guys go?

17        A.    Back to the bureau in her bedroom.

18        Q.    Okay.  And was there any paperwork?

19        A.    There was not anything.

20        Q.    Okay.  Did you call The Investment Center?

21        A.    Yes.

22        Q.    Okay.  And what did you tell them?

23        A.    We didn't really tell -- I didn't really tell them

24   too much, just that, you know, that we were going to be

25   closing out the accounts and moving them over, and they did

```
1   ask why a couple of times.  And at the time, we didn't say
2   too much, what was going on, because we wanted to get the
3   money out of there before something else happened.
4       Q.   And did you get the money out of there?
5       A.   Yes.
6       Q.   Let me take a little bit of a detour for a second.
7   You mentioned that you lived in Killingworth.  Did I get that
8   right?
9       A.   Yes.
10      Q.   At some point, did you move to Madison?
11      A.   We did.
12      Q.   Okay.  And you have -- was your house in Madison
13  slightly bigger than your house in Killingworth, about the
14  same size?
15      A.   We first moved to our beach house that's in Madison,
16  and we lived there for almost two years.
17      Q.   And then did you buy --
18      A.   Then we bought another house.
19      Q.   The house that you're currently in?
20      A.   That we currently live in.
21      Q.   And you and your husband, the lawyer, bought that
22  house?
23      A.   Yes.
24      Q.   Your sister; she lives where?
25      A.   She lives in Reston, Virginia.
```

1    Q.   Okay.  Nice house?

2    A.   Yes.

3    Q.   Okay.  Was there ever any discussion or any plans

4    that you had to have your mom buy you a house?

5    A.   No, none at all.  My husband would never allow us to

6    have my mom buy us a house.

7    Q.   And how about have your mom buy your sister a

8    house?

9    A.   No.  My sister has lived in the same house for 20

10   years.

11   Q.   Okay.  Was there ever any discussion of moving the

12   money from the Trust so your mom could buy someone a house?

13   A.   No.  My mom wouldn't buy anybody a house.

14   Q.   Okay.  Okay.  So at some point after the Fourth of

15   July weekend, after Mr. Vaccarelli told you that he would put

16   the money back -- is that what you testified to?

17   A.   Yes.

18   Q.   Okay.  Did you have further conversations with

19   him?

20   A.   No.

21   Q.   Okay.  Did he put any money -- did he ever put any

22   money back?

23   A.   No.

24   Q.   Okay.  Did you take other steps to try to, I guess,

25   mitigate your -- the downside?  Did you take any steps to try

1  to get some money back?

2      A.    We contacted the -- or I contacted The Investment

3  Center and asked them for the money.

4      Q.    Okay.  And did you seek help from other

5  professionals or other people to try and get the money

6  back?

7      A.    Yes, my mom had to hire an attorney.

8      Q.    Okay.  And just tell the jury -- and were you part

9  of those discussions?

10     A.    Yes, I was.

11     Q.    Okay.  What did you ask the attorney to do?

12     A.    We asked the attorney to help us get the money

13  back.

14     Q.    Don't tell us what you and your attorney talked

15  about.

16     A.    Okay.

17     Q.    But do you know if something was filed or a lawsuit

18  was started or anything like that?

19     A.    They filed a lawsuit.

20         MR. EINHORN:  I'll object, Your Honor, to the

21  relevancy of a proceeding with this -- in this direction.

22         MR. McGARRY:  It's fine.  I'll withdraw it.

23  BY MR. McGARRY:

24     Q.    Do you know -- what happened with the $300,000?

25  Have you gotten any money back?

1    A.    No.

2    Q.    And when was the last time that either you or your

3  mom in your presence spoke with Leon Vaccarelli?

4    A.    It was that day with the phone conversation with

5  the -- when he explained the -- this made-up CD.

6    Q.    And was that the day that he said there was nothing

7  nefarious?

8    A.    Yes.

9    Q.    Okay.  As you sit here today, do you think that

10 there was or there wasn't something nefarious?

11   A.    I think that there was.

12         MR. McGARRY:  I have no more questions.

13         THE COURT:  Cross-examination.

14         MR. EINHORN:  Yes, Your Honor.

15                   CROSS-EXAMINATION

16 BY MR. EINHORN:

17   Q.    Good afternoon, Mrs. Hughes.

18   A.    Good afternoon.

19   Q.    My name is Jon Einhorn, and I represent Leon

20 Vaccarelli.  The Government just ended its examination by

21 asking you if you got any money back and you said no.

22         But that's pending now; right?  The claim is

23 pending, it's in process, it's underway, whatever the lawyers

24 are doing?

25   A.    There's no process.  We haven't received anything.

1    Q.   I understand that.  But it's not over; right?  It's

2    still -- it's still alive, that claim?

3    A.   Oh, sorry.  Yes.

4    Q.   Okay.  So what I meant, was pending, I guess,

5    meaning that your claim is still working its way through

6    whatever system, whatever process you're going through?

7    A.   Yes, we are trying to get the money back.

8    Q.   Sure.  Okay.  All right.  Now, when you started

9    testifying here, I can't recall if it was you or the

10   Government testifying to this, but how many years had you had

11   meetings with Leon Vaccarelli?

12   A.   Since my mom moved to Connecticut.  So around 2008,

13   2009.

14   Q.   So, roughly, what are we talking about; eight years

15   of meetings?

16   A.   Let's see.  It would be --

17   Q.   And I'm not trying to put words in your mouth.

18   Whatever it is.

19   A.   About eight years of meetings, yeah.

20   Q.   And in those eight years of meeting with Mr.

21   Vaccarelli, how many times a year would you meet with Leon

22   Vaccarelli?

23   A.   About one.

24   Q.   About one a year?

25   A.   About one, yeah.

1    Q.   So, once a year over those 10 years.  And that's one

2    day of 365 of every year.  You were asked by the

3    Government -- and his exact words -- the Government's

4    question, exact words were, "Did he slur his words?  Did he

5    seem to be impaired?"  And your answer to both of those

6    questions -- it was a compound question -- was "no;" right?

7    Do you remember that?

8    A.   Correct.

9    Q.   But you don't know about his condition the other 364

10   days of each of those eight years; do you?

11           MR. McGARRY:  Objection, Your Honor.

12           MR. EINHORN:  I'll claim it.

13           THE COURT:  I'm overruling that.  It's --

14           MR. EINHORN:  Thank you.

15           THE COURT:  It's cross-examination.

16           MR. EINHORN:  Thank you, Your Honor.

17           THE WITNESS:  Does that mean I answer the question?

18           MR. EINHORN:  Please.

19           THE WITNESS:  Can you just ask me that one more

20   time?  I'm sorry.

21           MR. EINHORN:  Sure.

22           THE COURT:  Do you know about his condition --

23   meaning Mr. Vaccarelli's -- the other 364 days of the eight

24   years?

25           THE WITNESS:  I would assume the other 364 days out

```
 1   of the year he was doing the same thing he was doing with us,

 2   being a financial person, doing his job.

 3   BY MR. EINHORN:

 4       Q.   Now, I'm not trying to be rude.  I just want you to

 5   listen to my question.  You were asked whether or not on that

 6   one day, one day of each of the eight years --

 7       A.   Right.

 8       Q.   -- he seemed to be impaired.  And you said no.

 9       A.   Okay.

10       Q.   And my question was -- maybe it's my fault.  I

11   should make it clear.

12       A.   Okay.

13       Q.   You don't know if he was impaired on the other days

14   of the year though; do you?  You don't know that?

15       A.   No.

16       Q.   No.  Of course not.  Because you weren't with him

17   those other days; right?

18       A.   Right.

19       Q.   So, for each of those eight years, with the

20   exception of the one day that you saw him, you don't know if

21   he was impaired or what his condition was, do you, because

22   you weren't with him?

23       A.   No.  Correct.

24       Q.   And on that one day of each of those eight years

25   that you met with him, how long would you meet with him?
```

1    A.    An hour.  Maybe a little bit more, maybe a little

2    bit less, depending on what was being talked about.

3    Q.    In the ballpark, hour or less, more --

4    A.    Yeah, yeah.

5    Q.    -- somewhere around there?

6    A.    About an hour, I would say.

7    Q.    Okay.  I know that you were asked about the cost of

8    moving to The Hearth.  You were asked about the cost of

9    moving there, how expensive it was.  And you told us, in

10   fact, that medical care and nursing, and so forth, is extra.

11   Your mom is still at The Hearth, though; isn't she?

12   A.    She is at The Hearth, yeah.

13   Q.    She's still there.  The implication wasn't that she

14   can't afford it and she's gone; right?  She's still there?

15   A.    No.  She's still there.

16   Q.    Okay.  And, again, just so it's clear -- and that's

17   why I kept hopping up there like a jack rabbit -- you weren't

18   at that full meeting of January 11th; were you?

19   A.    No, I was -- I came about seven minutes after him,

20   and I left about 12 minutes before he did.

21   Q.    Okay.  So you really don't know what transpired in

22   the remaining time, through your own senses; you weren't

23   there?

24   A.    That would be 19 minutes.  No, I don't know what

25   happened, but it's not enough time to ask her for $300,000.

1     Q.   I didn't -- really?  May I have $300,000, please,

2  Mrs. Hughes?  How long did that take me to ask you?

3     A.   Well, I don't know you.  I mean, that would be --

4  you know, that's not the same thing.

5     Q.   All right.  My question to you, though, is, there

6  really is no time that's required.  So long as you weren't

7  there, anything could have happened; right?

8     A.   But if somebody's your investment guy, aren't they

9  explaining an investment to you?

10     Q.   If you weren't there, would you agree with me, you

11  do not know what happened?  Isn't that true?  Yes or no,

12  please.  Don't give me a speech.  Yes or no?  You weren't

13  there.  Do you know what happened?

14     A.   No.

15     Q.   Thank you.

16          MR. EINHORN:  May I have just a moment, Your Honor?

17          THE COURT:  Yes.

18          MR. EINHORN:  Nothing further.  Thank you.

19          THE COURT:  Redirect.

20          MR. McGARRY:  Yes.

21                    REDIRECT EXAMINATION

22  BY MR. McGARRY:

23     Q.   Directing your attention to Government's Exhibit

24  803, date of January 11th.  You see that?

25     A.   Yes.

1    Q.   Okay.  For the time that you were there --

2    A.   Uh-huh.

3    Q.   -- why were you there?

4    A.   I was there to talk about investments that my mom

5    does with her accounts.

6    Q.   And Mr. Einhorn asked you a number of questions

7    about that one day; correct?

8    A.   Yes.

9    Q.   Okay.  And what's that day?  What's that date?

10   A.   January 11, 2017.

11   Q.   Take a look at Government's Exhibit 806.  Directing

12   your attention to page 8.  Directing your attention to the

13   sale of stock.

14   A.   Okay.

15   Q.   What is that one date that the stock was sold?

16   A.   January 11, 2017.

17   Q.   Is that the same one day that you testified about?

18   A.   It's the same one day.

19   Q.   Okay.  Let me show you what's been marked as

20   Government's Exhibit 18A.  Sorry, let's get rid of the

21   yellow.  And what is the date on this check?

22   A.   January 11, 2017.

23   Q.   Is that the same one day that you met with the

24   Defendant, Leon Vaccarelli?

25   A.   Yes, it is.

```
 1      Q.   Okay.  I'd also like to ask you, you said --
 2   Mr. Einhorn said you talked to him on one day.  Did you have
 3   a phone call earlier in 2016, where you described him as
 4   being miffed?
 5      A.   Yes.
 6      Q.   Was that a different day?
 7      A.   Yes.
 8      Q.   Did you have a phone call later in 2017 when he --
 9   where he said it was in a 6 percent CD and there was nothing
10   nefarious?
11      A.   Yes, I did.
12      Q.   Was that a different day?
13      A.   Yes, it was.
14      Q.   So, in fact, more than one day?
15      A.   Yes.
16      Q.   Okay.
17           MR. McGARRY:  I have no more questions.
18           THE COURT:  Any further questions?
19           MR. EINHORN:  No.  Thank you, Your Honor.
20           THE COURT:  Thank you, Ms. Hughes.  You may step
21   down.  You are excused.
22           THE WITNESS:  Thank you.
23           (Witness excused, 2:12 p.m.)
24           THE COURT:  Will the Government please call its next
25   witness.
```

```
 1            MS. LARAIA:  Your Honor, the Government calls Thomas
 2   Carocci.
 3            (Witness takes stand, 2:13 p.m.)
 4            THE COURT:  All right.  Mr. Carocci, would you
 5   please come to the witness stand over there.  And will you
 6   raise your right hand and you'll be sworn.
 7            (THOMAS CAROCCI sworn, 2:13 p.m.)
 8            COURTROOM DEPUTY:  Please be seated and state your
 9   name for the record.
10            THE WITNESS:  It's Thomas Carocci, C-A-R-O-C-C-I.
11            COURTROOM DEPUTY:  And can you tell us what city and
12   state you live in?
13            THE WITNESS:  I live in Bethlehem, Pennsylvania.
14            THE COURT:  You may proceed.
15            MS. LARAIA:  Thank you, Your Honor.
16                        DIRECT EXAMINATION
17   BY MS. LARAIA:
18       Q.   Good afternoon, Mr. Carocci.
19       A.   Good afternoon.
20       Q.   You said you came from Bethlehem, Pennsylvania?
21       A.   Yes.
22       Q.   Or that you live in Bethlehem, Pennsylvania,
23   rather?
24       A.   Correct.
25       Q.   Where do you work?
```

1       A.   I work in New York for the Financial Industry

2    Regulatory Authority.

3       Q.   Okay.  Is there an acronym that describes the place

4    you work?

5       A.   Yes, FINRA, F-I-N-R-A.

6       Q.   Okay.  And before we get into more about what FINRA

7    does, what is your educational background?

8       A.   Right.  I have a law degree from Duquesne University

9    in Pittsburgh, Pennsylvania, and undergraduate degrees in

10   finance and economics.

11      Q.   And where are those from?

12      A.   Shippensberg University.

13      Q.   Okay.  And what is your title at FINRA?

14      A.   I'm the Assistant General Counsel in the Criminal

15   Prosecution Assistance Group.

16      Q.   Okay.  And what are your duties?

17      A.   We assist federal, state, and local prosecutors with

18   their white-collar criminal investigations.

19      Q.   So, what kind of work would you do?

20      A.   Right.  So we help with investigations,

21   investigating securities fraud or white-collar crime;

22   analyzing documents, books, and records -- performing

23   analysis on those; and then often testifying at trials or

24   before Grand Juries.

25      Q.   Okay.  And how long has it been that you've worked

1    at FINRA?

2        A.   Approximately 20 years, in total.

3        Q.   Okay.  And you said "in total."  Was there any break

4    in the time that you were at FINRA?

5        A.   Yes.  I went for a year and worked at Goldman Sachs

6    in their compliance department.

7        Q.   Okay.  And before that, before you worked at FINRA,

8    did you do any other kind of work in the securities

9    industry?

10       A.   Yes, I worked for a mutual fund that was starting

11   up, for a couple years -- a year or so.

12       Q.   Now, let's just get back to FINRA.  What kind of

13   organization is FINRA?

14       A.   FINRA is what's called a private, self-regulatory

15   organization.  So, we're not a governmental entity.  We're

16   private.  And we're -- we regulate the securities industry,

17   and we're funded by the securities industry.

18       Q.   And you said that FINRA regulates the securities

19   industry.  What do you mean by "the securities industry"?

20       A.   Well, we regulate the brokerage firms that conduct

21   securities transactions for the investing public.  For

22   example, buys stocks and bonds, securities for the investing

23   public, any individuals that work for those firms that do

24   that type of stuff.

25       Q.   Okay.  Does that include sale of stock on a

1    traditional exchange?

2        A.   Yes.

3        Q.   Okay.  And does that also include regulation of any

4    private securities?

5        A.   Yes, it does.

6        Q.   How about things like investment agreements?

7        A.   Yes.

8        Q.   And where does FINRA get its funding?

9        A.    So, from the industry.  So, firms are required to be

10   members of FINRA if they're going to sell securities to the

11   investing public.  So, it would be firms like Goldman Sachs,

12   E*Trade, you know, Merrill Lynch, those types of firms that

13   you may have heard of would be members of FINRA.

14       Q.   Okay.  And when you said firms, are those also

15   referred to as broker-dealers?

16       A.   Yes.

17       Q.   And what's the purpose of FINRA?

18       A.    So, our mission statement is investor protection,

19   stock market integrity.  So we're there to protect investors

20   by putting rules on the industry in their dealings with

21   investors.  And then we also regulate trading on the NASDAQ

22   stock market, in particular, and some other exchanges and

23   markets.  So, making sure that the stock trading has

24   integrity.

25       Q.   So, there are rules regulating the broker-dealers

1   and also regulating brokers?

2       A.    Correct.

3       Q.    And are brokers sometimes called by anything else?

4       A.    We refer to them as registered representatives.

5   They're registered with FINRA and they're representatives to

6   their clients.

7       Q.    Can you tell us what that term means, "registered

8   rep"?

9       A.    Right.  It means that an individual would be working

10  for a brokerage firm and would have passed FINRA administered

11  exams to test their qualifications and their knowledge of the

12  industry.

13      Q.    Okay.  And would they have to be, then, affiliated

14  with a broker-dealer?

15      A.    Correct, you'd have to be affiliated with a

16  brokerage firm.

17      Q.    And we'll talk about those exams in a minute.

18  What's one of the standard exams that a registered rep would

19  take?

20      A.    It would be a Series 7 examination, kind of the

21  general securities registered representative exam.  And that

22  would test basic knowledge of the products and the

23  suitability of those products for particular investors, as

24  well as rules, regulations and federal securities laws

25  regarding the sale of those products or securities.

1     Q.   And do registered reps ever take something called a

2     Series 66 examination?

3     A.   Yes.   That's another examination that allows -- it's

4     called the uniform state law exam.   And it allows an

5     individual to be, kind of, an investment advisor,

6     representative and securities agent in the states.   So

7     instead of taking 50 separate exams, the states have gotten

8     together and created one exam administered by FINRA, and they

9     also take that exam.

10    Q.   So, after someone has, let's say passed a Series 7

11    and a Series 66, what does he or she have to do in order to

12    be able to buy and sell securities for clients?

13    A.   Well, they have to be registered with a firm and

14    file what's called a Form U4, disclosing that they're

15    employed with this firm and kind of what their -- what exams

16    they've passed and where they are going to be working and

17    that type of stuff.

18    Q.   And we'll get to a little bit more of the U4, but,

19    just generally, what kind of information would be recorded on

20    a Form U4?

21    A.   Prior employment history, any type of outside

22    business activity or other business activity that an

23    individual's involved in.

24    Q.   So, is someone who's a registered rep considered to

25    be registered with FINRA?

```
 1        A.   Yes.

 2        Q.   Okay.  Now, just to be clear, if someone has an

 3   account -- let's say, an Ameritrade brokerage account,

 4   something like that -- does he or she need to be a registered

 5   rep if he or she wants to trade or sell some stock?

 6        A.   No.  You know, there's online trading, where you

 7   have to set up an account with a registered firm, a

 8   registered FINRA firm.  And then you can place orders on the

 9   Internet to buy and sell stock, for example.  And that order,

10   it goes to the brokerage firm first, and then it goes to the

11   appropriate market to be traded.

12             It basically just replaces the old phone call.  30

13   years ago, you used to have to call your registered rep to

14   buy a 100 shares of IBM or something like that, and he'd

15   execute the order.  Now you can do it online.

16        Q.   So, what you are talking about is someone's personal

17   account?

18        A.   Correct.

19        Q.   In terms of someone who's buying and selling for

20   clients, FINRA is required.

21        A.   Right.  They're required to be registered; that is

22   correct.

23        Q.   Now, at any point was someone named Leon Vaccarelli

24   registered at FINRA?

25        A.   Yes.
```

1      Q.    And what was he registered as?

2      A.    He had a Series 7 exam, so he was a registered

3  representative; and also the Series 66 exam, so he was a

4  securities agent in the states; and then investment

5  advisor/representative.

6      Q.    And I'm just going to ask you, are you familiar with

7  a term called "CRD"?

8      A.    Yes.

9      Q.    What is CRD?

10     A.    It stands for the Central Registration Depository.

11  And this is a database that FINRA maintains of all

12  individuals and firms that are in the industry.  And, you

13  know, it's a way we keep track of the firms and also keep

14  track of individuals, who they're working for and basically

15  what they're doing.

16     Q.    All right.  I'm going to show you what's been marked

17  for identification as Government's Exhibit 405.

18            MS. LARAIA:  And I'll just show that to the witness

19  and to the Court and counsel.

20  BY MS. LARAIA:

21     Q.    Okay.  Is this a -- well, actually, tell me what

22  this is.

23     A.    This is a CRD report that I downloaded from the CRD

24  system.

25     Q.    Who is this CRD for?

1      A.   It's for a Mr. Leon William Vaccarelli.

2           MS. LARAIA:  Your Honor, I'd offer Government's

3      Exhibit 405A as a full exhibit.

4           MR. EINHORN:  No objection, Your Honor.

5           THE COURT:  405A, and that's different from 405 that

6      you were just discussing?

7           MS. LARAIA:  Yes, Your Honor, that's a portion.

8           THE COURT:  Very well, 405A.

9      BY MS. LARAIA:

10     Q.   Mr. Carocci, do you see Government's Exhibit 405A on

11     your screen?

12     A.   Yes.

13     Q.   And can you just -- I'm just going to flip down for

14     a minute -- is this a portion of Government's Exhibit 405 I

15     just asked you about?

16     A.   Yes.

17     Q.   Okay.  Now, I'm just going to start on page 3.  So

18     just tell us what the CRD provides on this page?

19     A.   Okay.  So you see at the top it says "Individual,"

20     and then there's a number, "3227636."  That's the number

21     assigned by FINRA, as each registered rep has a different

22     number.  It's kind of their Social Security number within

23     FINRA.  And that one is for Leon William Vaccarelli.

24     Q.   And what is the date of the running of this

25     report?

1      A.    April 28, 2019.

2      Q.    Okay.  Now, what else can you see on this page?

3      A.    That Mr. Vaccarelli was employed at The Investment

4  Center from February 14, 2011 to July 19, 2017.

5      Q.    And before that, did he work somewhere else?

6      A.    Yes.  He worked at a firm called QA3 Financial

7  Corp., from May 24, 2007 to February 11, 2011.

8      Q.    Okay.  I'm going to go down another page.  Now, on

9  this page, do you see any other firm information for Mr.

10  Vaccarelli's employment?

11      A.    Well, there's Ameriprise Financial Services from May

12  8, 1999 to May 22, 2007.

13      Q.    And how about below?

14      A.    IDS Life Insurance Company from May 8, 1999 to July

15  3, 2006.

16      Q.    Okay.  Now, going down to this page, 5, is this a

17  more complete employment history, going all the way back

18  to --

19      A.    Yes.

20      Q.    Well, going back pretty far.

21      A.    Going back to -- and even education, going back to

22  1981.

23      Q.    Okay.  So, that -- Holy Cross High School?

24      A.    Correct.

25      Q.    Where does this information come from that appears

1    on the CRD concerning someone's background and educational

2    experience?

3         A.   Right.  It comes from what's called a Form U4.  And

4    that is a form filled out by the registered representative,

5    kind of -- the form elicits this type of information, prior

6    employment history, education history, that type of stuff.

7              They're required to file that and -- with their

8    firm, and then their firm files it electronically with FINRA.

9    And that's how we get the information into our database that

10   we maintain as a FINRA business record.

11        Q.   Okay.  So, FINRA doesn't look up where someone goes

12   to high school, for example?

13        A.   Correct.  No, we don't look it up.  They disclose it

14   to us where they went to high school.

15        Q.   And I'm going to scroll down to page 8.  Do you see

16   a section on here that says, "Other Business"?

17        A.   Yes.

18        Q.   Okay.  Just describe for us what this -- what this

19   section means.

20        A.   Right.  So, registered reps are supposed to --

21   representatives are supposed to disclose other businesses

22   that they're involved in, both to the firm and then to FINRA.

23   The reason behind this rule is that they -- so the firm is

24   aware of other businesses that they're involved in so that

25   they can prevent conflicts, and that there's transparency and

1   it can be supervised.  And it's disclosed to FINRA so we can

2   regulate properly knowing the other businesses that an

3   individual is in.

4       Q.   Now, looking at the CRD, where would this

5   information appearing on the top of page 8 have come from?

6       A.   It would come from a Form 4, particularly Section 13

7   or Question 13 of a Form U4.

8       Q.   Okay.  So, would this come from the latest U4 or

9   from a compilation of the U4s?

10      A.   Well, it would come from the latest.  So whenever

11  information on a Form U4 changes, the registered

12  representative and the firm are required to update it to

13  amend the old Form U4 and add any new information, or changed

14  information.

15      Q.   Okay.  I just want to ask you here to go through

16  just the first part of each of these sections here.  Could

17  you just read off what's listed here for other business for

18  Mr. Vaccarelli?

19      A.   Yes.  So, there's number 1 there, there's a Lux

20  Financial Services DBA.  They offer and manage financial

21  services for our clients.

22      Q.   Okay.  Then going down to number 2, what's that

23  one?

24      A.   "Archdiocese of Hartford, Catholic School Board."

25      Q.   Lists some other things like advisory board member

1    and a little more detail?

2        A.    Yeah.

3        Q.    How about number 3?

4        A.    "Our Lady of Mount Carmel Parish and School of

5    Waterbury, Connecticut; volunteer PTA, finance committee,

6    budget committee, scholarship committee."

7        Q.    "Coach basketball" in there?

8        A.    Yeah.

9        Q.    How about number 4?

10       A.    Number 4, it looks like says, "Commercial property

11   management.  Property to be purchased for investment and also

12   to locate Lux Financial Services, LLC, to be formed after

13   closing."

14       Q.    Does it say, "Owner of office building"?

15       A.    Yes.

16       Q.    Okay.  Now, going down a little more, number 5, can

17   you just tell us what that says?

18       A.    Says, "Commissioner for the Financial Audit and

19   Review Commission of the City of Waterbury, Connecticut."

20       Q.    Okay.  Is there anywhere in here that you see any

21   mention of an entity called LWLVACC?

22       A.    No.

23       Q.    Is there anywhere in here that you see mention of

24   Mr. Vaccarelli being a Trustee?

25       A.    No.

1    Q.   Okay.  I'm going to go down -- scroll a little bit

2    further down the page.  Okay.  Going back to page 8.  Now,

3    could you tell the jury what this next section tells us?

4    A.   All right.  So these are Mr. Vaccarelli's exam, kind

5    of, results.

6    Q.   Okay.  And did he pass any FINRA exams?

7    A.   Yes, he passed the Series 7 exam -- the general

8    securities registered representative exam -- on August 12,

9    1999.

10   Q.   Any others?

11   A.   Yes.  The Series 66 exam on October 22nd of 1999.

12   Q.   Okay.  Are those the two exams that you described

13   previously?

14   A.   Yes.

15   Q.   Okay.  Are those exams administered by FINRA?

16   A.   Yes, they are.

17   Q.   Now, back in 1999, would those exams have been

18   administered by FINRA?

19   A.   FINRA at that time was known as the NASD, or the

20   National Association of Securities Dealers.  About 10 or 11

21   years ago, we merged with the New York Stock Exchange

22   regulation to create FINRA, the Financial Industry Regulatory

23   Authority.

24   Q.   Okay.  So, at the time, those exams were

25   administered by a predecessor?

1    A.    Correct, they would have been NASD exams.

2    Q.    And just based on your knowledge of the past exams

3    or study guides, would they have covered roughly the same

4    topics?

5    A.    Yes.

6    Q.    Okay.  I'm going go down to the next page.  Okay.

7    What does "CE" mean?

8    A.    "CE" stands for "continuing education."  So,

9    registered representatives are required to take periodic

10   continuing education to test, you know, to -- you know, keep

11   updating their knowledge of rules, regulations, securities

12   laws, as well as products that are coming on the market.

13   Q.    And did Mr. Vaccarelli complete continuing education

14   requirements?

15   A.    Yes, he did.  He completed it every three years,

16   approximately every three years from 2001 through 2016.

17   Q.    Is that the bottom here, it says, "10/11/2001,

18   11/22/2004, 12/4/2007, 12/6/2010, 11/25/13 and 3/4/16"?

19   A.    Yes, he completed continuing education on those

20   dates.

21   Q.    Okay.  And what kind of topics are covered as part

22   of continuing education?

23   A.    Right.  Like I said, there are a lot of compliance

24   topics, from suitability, private securities transactions, to

25   anything with new products.  But basically just a refresher

1  on rules and regulations.

2     Q.   Okay.  All right.  And who administers the

3  training?

4     A.   FINRA has modules that the firms administer.

5     Q.   So, are the firms responsible for ensuring that

6  their registered reps are given training and complete it?

7     A.   Ultimately, the firms are -- their compliance

8  officers are responsibile for administering the training.

9     Q.   And you've mentioned the term U4 a number of times.

10 Just generally, what might trigger the need to file a Form

11 U4?

12    A.   Any change in employment status with the firm that

13 they're registered with would require a change.  Even the

14 office that they're mainly located at, if that changed,

15 because we need to know which offices people are working out

16 of.  But changes in other business activity, obviously,

17 whether --

18    Q.   So, changes in, like that box we just saw, the

19 "other business activity," would someone need to file a new

20 form?

21    A.   Yes.  They'd have to notify the firm and file an

22 amended Form U4.

23    Q.   Okay.  How does the form get to FINRA?

24    A.   Electronically.  So, the forms are filled out online

25 by the member firms, and they send it to FINRA.  It's

1002

1    referred to as web CRD, because they can do it over the

2    Internet.

3        Q.   Okay.  Now, I'm going to show you for identification

4    Government's Exhibits 407, 408 and 409 --

5            MS. LARAIA:  -- and ask just to show them to the

6    witness and the Court and counsel.

7    BY MS. LARAIA:

8        Q.   Start with 407.  Are you familiar with that

9    document?

10       A.   Yes.

11       Q.   Okay.  How about 408?

12       A.   Yes.

13       Q.   And 409?

14       A.   Yes.

15       Q.   Are those all Forms U4 that FINRA received for Leon

16   Vaccarelli?

17       A.   Yes, they are.

18       Q.   Okay.  And I'm going to show you Government's

19   Exhibits 407A, 408A and 409A.  Do you recognize those

20   documents?

21       A.   Yes, they're also Form U4s for Mr. Vaccarelli.

22       Q.   Just some exclusions on 407A, 408A, and 409A?

23       A.   Yes.

24           MS. LARAIA:  Your Honor, I'd move for the admission

25   of Government's Exhibit 407A, 408A, and 409A.

1    MR. EINHORN:  No objection, Your Honor.

2    THE COURT:  Full exhibits.  Have the exhibits that

3    don't have A's been admitted?

4    MS. LARAIA:  No, Your Honor.

5    THE COURT:  Okay.

6    MS. LARAIA:  I'd just offer those for

7    identification.

8    THE COURT:  Very good.

9    BY MS. LARAIA:

10   Q.   Okay.  Now, looking at Government's Exhibit 407A,

11   I'm going to make this a little bit larger -- oops.  I'm

12   going to make it yellow first.

13        Okay.  Just explain for us what we're seeing on the

14   screen.

15   A.   So it's Form U4 at the top, Uniform Application for

16   Security Industry Registration or Transfer.  And the first

17   name is Leon, and then William Vaccarelli.  There's the firm

18   CRD number for The Investment Center, which is 17839.  And

19   then the employment date.

20   Q.   And I just want to make this is a little larger

21   here.  It's hard to read.  What's the filing date for this

22   document?

23   A.   Looks like August 7 -- I can't read it.  Hold on.

24   Q.   Does that help at all?

25   A.   Yeah.  Looks like August 7.  Is it two thousand

1004

1     and -- can't tell.

2          Q.   Potentially, 2014?

3          A.   '14, yes.  Now I can see it.

4          Q.   I just want to scroll down a little bit.  This is

5     page 3.  Can you just explain for us what this section is?

6          A.   So, it's Section 13, "Other Business."  And it asks,

7     "Are you currently engaged in any other business, either as a

8     proprietor, partner, officer, director, employee, Trustee,

9     agent or otherwise?"  And the individual is supposed to list

10    other businesses.

11         Q.   Okay.  And you see where it says, "Exclude

12    noninvestment-related activity that's exclusively charitable,

13    civic, religious or fraternal and is recognized as tax

14    exempt"?

15         A.   Yes.

16         Q.   But, otherwise, someone is required to list if

17    they're a proprietor, partner, officer, director, employee,

18    Trustee, agent, or something else; is that right?

19         A.   Yes.

20         Q.   And if that is the case, what is someone supposed to

21    provide in the box in response to this question?

22         A.   Well, they're supposed to disclose, you know, their

23    role and the identity of whatever firm or company or business

24    they act in that role for.

25         Q.   So when it says here the name of the other business,

1    whether the business is investment-related, the address of

2    the other business, the nature of the other business, your

3    position, title or relationship with the other business, the

4    start date of your relationship, the approximate number of

5    hours per month you devote to the other business, the number

6    of hours you devote to the other business during securities

7    trading hours, and describe your duties relating to the other

8    business, are all of those things that a registered

9    representative is required to detail in his or her U4?

10       A.   Yes, they are.

11       Q.   Okay.  And I just want to go down a little bit, make

12   this larger.  So, on this particular Form U4, did Mr.

13   Vaccarelli disclose whether he had any outside business that

14   fell within this definition?

15       A.   Yes.

16       Q.   Okay.  And what kind of things did he list here?

17       A.   The ones I talked about earlier:  Lux Financial

18   Services, the Archdiocese of Hartford, the Our Lady of Mount

19   Carmel parish, and then the commercial property management to

20   be purchased for the Lux Financial building, and a

21   Commissioner for Financial Audit for the City of Waterbury,

22   Connecticut.

23       Q.   And anywhere in this response did he indicate that

24   he was Trustee of a Trust?

25       A.   No.

1    Q.   And did he ever indicate LWLVACC, LLC, as an outside

2    business?

3    A.   No.

4    Q.   Is there anywhere else on this form that that was

5    reported?

6    A.   No.

7    Q.   I'm going to show you Government's Exhibit --

8    actually, before we leave this, I'm going to focus on page 5

9    here.  So just describe for us what we see in the bottom

10   15(d) and 15(e).

11   A.   Right.  So 15(d) is where the registered rep signs.

12   It's an electronic signature, stating that he consents to

13   this information, acknowledges and consents to this

14   information.  And then under that is a signature for the --

15   so, 15(e) would be a signature for a firm employee --

16   generally, a compliance officer -- acknowledging Mr.

17   Vaccarelli signed the form.

18   Q.   Okay.  And can you just tell us who is listed as

19   the -- what is the E-signature under 15(d) for the registered

20   representative?

21   A.   Leon W. Vaccarelli.

22   Q.   And how about under 15(e) for the firm?

23   A.   Ralph Devito.

24   Q.   And can you see the dates on the left-hand side?

25   A.   Yes.  August 7, 2014 for both.

1    Q.   Okay.  I want to show you Government's Exhibit 408A.

2  Is this another Form U4 filed for Mr. Vaccarelli?

3    A.   Yes, this one was filed on December 3, 2015.

4    Q.   Okay.  Again, the date's not great, but December 3,

5  2015?

6    A.   Correct.

7    Q.   Okay.  Now, just scrolling down again, is this same

8  question or substantively the same question for other

9  business, has that appeared on Forms U4 for a length of

10 time?

11   A.   Yes.  I don't know exactly how many years, but many

12 years.  As you can see, it's on this one, as well.

13   Q.   Okay.  Again, asking if you're currently engaged in

14 any other business, either as a proprietor, partner, officer,

15 director, employee, Trustee, agent or otherwise -- is that

16 accurate?

17   A.   Yes.

18   Q.   Okay.  And, again, I'd just ask you to take a look

19 here.  Did Mr. Vaccarelli disclose whether he, in fact, had

20 outside business?

21   A.   Yes, he did.

22   Q.   And, again, would you just give us a little bit of a

23 summary of what was reported in response to that question?

24   A.   Yes.  It's really the same five as before -- Lux

25 Financial Services, Archdiocese of Hartford, Our Lady of

1   Mount Carmel parish, commercial property management, and

2   Commissioner for Audit for the City of Waterbury.  So the

3   same five as the previous one the previous year.

4        Q.    Okay.  And in this one, is there any mention that

5   Mr. Vaccarelli is a Trustee or successor of a Trust?

6        A.    No, no mention.

7        Q.    Or of something called LWLVACC?

8        A.    No.

9        Q.    And I'm just going to scroll down again to page 5.

10  Is there also -- are there also blocks here for electronic

11  signatures?

12       A.    Yes, Mr. Vaccarelli signed the Form U4 on December

13  2nd, 2015.

14       Q.    Okay.  And is that same person, Ralph Devito, the

15  signatory for the firm?

16       A.    Yes.

17       Q.    I want to show you Government's Exhibit 409A.  Just

18  tell us what this is.

19       A.    Form U4 for Mr. Vaccarelli dated April 6th, I think,

20  2017.

21       Q.    Okay.  I'm just going to go down again to page 3.

22  And in April of 2017, did FINRA still ask whether someone was

23  currently engaged in any other business as a proprietor,

24  partner, officer, director, employee, Trustee, agent or

25  otherwise?

1    A.    Yes.

2    Q.    Okay.  And did Mr. Vaccarelli answer yes or no with

3    respect to that question?

4    A.    He answered yes.

5    Q.    Okay.  And, just generally, can you tell us again

6    what's -- a little bit of a summary of what's indicated

7    here?

8    A.    Seems to be the same five entities:  Lux Financial

9    Services, the Archdiocese of Hartford, Our Lady of Mount

10   Carmel, commercial property management, and Commissioner for

11   Financial Audit for the City of Waterbury.

12   Q.    Okay.  Any mention here of LWLVACC, LLC?

13   A.    No.

14   Q.    Any mention that Mr. Vaccarelli is a Trustee?

15   A.    No, none.

16   Q.    Okay.  I'm just going to go to page 5 here.  Is this

17   the signature block area on this particular U4?

18   A.    Yes, Mr. Vaccarelli signed it on April 6, 2017, as

19   well as Mr. Devito.

20   Q.    Okay.

21        MS. LARAIA:  One moment, Your Honor.

22        (Pause.)

23   BY MS. LARAIA:

24   Q.    I'm going to show you what's been previous admitted

25   as Government's Exhibit 380.

1    Okay.  Now, can you tell us where this particular

2    exhibit came from?  Not came from in terms of possession to

3    the Government, but what this web address at the bottom

4    means.

5    A.   Right.  So, this is FINRA's web CRD.  So, this is

6    what firms use, and they can download documents, print

7    documents out from web CRD.

8    Q.   Okay.  And is this the firm's menu, I guess, in

9    terms of accessing the FINRA data?

10   A.   Right.  The firm would have done this, correct.

11   Q.   Okay.  So, is this different information available

12   to the firm, as opposed to a person on the street?

13   A.   Yes, a person on the street would just have what's

14   called BrokerCheck.

15   Q.   And I just want you to take a look at this

16   information here for "Other Business Activity."  Do you see

17   anything here in the categories, just generally, 1 through 5,

18   Lux Financial Services, Archdiocese of Hartford, Our Lady of

19   Mount Carmel, commercial property management, and

20   Commissioner for the Financial Audit and Review Commission

21   for the City of Waterbury that's different from the Form U4

22   that we've just looked at?

23   A.   No, it doesn't appear to be different at all.

24   Q.   Okay.  Now, in addition to the Forms U4 that we've

25   just looked at here for Government's Exhibit 407A, 408A, and

1    409A, have you had a chance to review any other Forms U4

2    filed for Mr. Vaccarelli?

3        A.   Yeah, I reviewed all of them.

4        Q.   Okay.  All the ones that you had access to, in any

5    event?

6        A.   Yes.

7        Q.   Okay.  On any of those Forms U4, did you see whether

8    Mr. Vaccarelli listed LWLVACC, LLC, or that he was Trustee of

9    a Trust in that "Other Business" section?

10       A.   That wasn't disclosed in any of the Form U4s for Mr.

11   Vaccarelli that I reviewed.

12       Q.   Okay.  And, again, is a registered representative

13   required to provide information to FINRA, for example, that a

14   person uses an LLC to conduct business?

15       A.   Yes, they are.

16       Q.   Or that a person is the Trustee of a Trust?

17       A.   Yes, they are.

18       Q.   Okay.  Does FINRA invest money for people?

19       A.   No.

20       Q.   Okay.  So, if a registered representative provided

21   money to FINRA, would it be for the purpose of investing a

22   customer's money?

23       A.   No.  No.

24       Q.   Does FINRA do any investing for customers?

25       A.   No, not for customers.  That's what the firms do

1  that we regulate.

2          MS. LARAIA:  That's all I have, Your Honor.

3          THE COURT:  Cross-examination.

4          MR. EINHORN:  Thank you, Your Honor.

5                          CROSS-EXAMINATION

6  BY MR. EINHORN:

7     Q.   Mr. Carocci, good afternoon.  I'm Jon Einhorn, and I

8  represent Mr. Vaccarelli.  Just a couple of quick questions.

9     A.   Nice to meet you.

10    Q.   Nice to meet you, too, sir.  I'm just curious, what

11 happened to the NASD?  That just disappeared, dissipated into

12 FINRA?

13    A.   No, when the NASD and the New York Stock Exchange

14 regulation merged, they created a new entity and decided to

15 come up with a new name.

16    Q.   It's a new entity.

17    A.   Yeah.

18    Q.   Okay.  So, FINRA itself, it's a private

19 organization; is that fair to say?

20    A.   Yes.

21    Q.   It's not a Governmental organization; is it?

22    A.   No.

23    Q.   All right.  So, what are the consequences for, as

24 you've told us, for failure to disclose this additional LLC

25 as outside business and also being a Trustee on a Trust?

1    A.   Oh, individuals can be fined, barred or suspended

2    from the industry.  That's all we can do.

3    Q.   All right.  So let me get that down.  Fined, barred

4    or suspended.  So -- and who would fine them, bar them, or

5    suspend them from the industry; FINRA?

6    A.   Right.  FINRA would, yes.

7    Q.   FINRA would do this.  Okay.  Because FINRA has a

8    relationship with -- not only with the broker-dealer, but

9    obviously with the registered rep; right?

10        In other words, the rep takes the Series 7 or

11   whichever other test Leon took here, and that's what

12   established his relationship.  FINRA, in other words, I want

13   to say supervises him?

14   A.   Well, we only have jurisdiction over registered

15   representatives like Mr. Vaccarelli.

16   Q.   Okay.  But you would have jurisdiction over him?

17   A.   Over him, yes.

18   Q.   Okay.  So, again, his punishment then, if he did

19   violate some of the FINRA rules, was just to be subject to

20   FINRA discipline?

21   A.   Correct.

22   Q.   Okay.  All right.  Thank you.

23        MR. EINHORN:  Nothing further, Your Honor.  Thank

24   you.

25        THE COURT:  Redirect?

1    REDIRECT EXAMINATION

2    BY MS. LARAIA:

3        Q.    Just a couple questions.  So you mentioned that

4    there are sanctions, or there can be sanctions for violating

5    FINRA rules; is that right?

6        A.    Yes.

7        Q.    Does FINRA ever make criminal referrals?

8        A.    Yes, we do.  So if the activity that's uncovered by

9    our enforcement department or other investigators at FINRA,

10   we feel that it rises to a level of criminal fraud, then we

11   refer those matters to the Securities and Exchange

12   Commission, the Government entity that kind of oversees

13   FINRA, we'd refer to them.

14       Also, if there's somebody that comes across in an

15   investigation that we don't have jurisdiction over, that's

16   not a registered representative, we would also refer that

17   matter for potential criminal followup to the Securities and

18   Exchange Commission.

19       Q.    Okay.  And one other follow-up.  Can someone who is

20   a registered representative execute trades online using the

21   Internet?

22       A.    Somebody who's a registered representative, yes, can

23   put those orders in on behalf of clients, uh-huh.

24       MS. LARAIA:  That's all I have, Your Honor.

25       THE COURT:  Anything further?

1     MR. EINHORN:  Nothing further.  Thank you.

2          THE COURT:  All right, then, Mr. Carocci.  Thank you

3     very much.  You are excused.  You may leave.

4          THE WITNESS:  Thank you, Your Honor.

5          (Witness excused, 2:50 p.m.)

6          THE COURT:  Who would be your next witness?

7          MS. LARAIA:  Your Honor, it would be Special Agent

8     Day.  Or it may actually be, if we -- if we start tomorrow,

9     we have a short witness.  We could potentially start with

10    Mark Gera.

11         THE COURT:  Do you have that person here today?  No?

12         MS. LARAIA:  We don't, Your Honor.

13         THE COURT:  All right.  I think what I'm going to

14    do, to keep Mr. Day's testimony all in one place, is start it

15    tomorrow at 9:30.

16         MS. LARAIA:  That would be fine, Your Honor.

17         THE COURT:  We'll let you leave a little early.  To

18    my knowledge, you will not encounter many Yale graduates

19    walking the streets.  We can all get here on time.  Thank you

20    very much.  Have a pleasant afternoon.  Leave your notebooks

21    here.  Don't discuss the case.  Don't do any research.

22         (Jury out, 2:51 p.m.)

23         THE COURT:  All right.  Tomorrow we will have whom?

24    Agent Day?

25         MR. McGARRY:  We have under -- I don't know if we

1   have him under subpoena, but we have Mr. Mark Gera from the

2   SEC.  He would be our next witness.  We're still debating on,

3   you know, whether or not -- the value of calling him, given

4   the Court's earlier ruling and given the fact that a lot of

5   the documents have come in.  He would be very short in

6   time.

7            THE COURT:  How do you spell his name?

8            MR. McGARRY:  I believe it's G-E-R-A.

9            THE COURT:  Why do I not see him on this list?

10            MR. McGARRY:  He was on our original witness list.

11   And part of it is the SEC was --

12            THE COURT:  He's from the SEC?

13            MR. McGARRY:  Correct.  They were giving us some

14   back-and-forth as to who the agency would authorize to come

15   down to discuss the examination of Lux Financial in June of

16   '17, and they gave us a couple of names.

17            After that -- and, again, just to be candid with

18   Mr. Einhorn, as we always try to be, we may not call him.

19   We're going to just try to check our exhibits and everything

20   else and work with the Courtroom Deputy to make sure

21   everything that would be needed would be admitted.

22            After that, I believe that we would have Special

23   Agent Day, followed by a certified financial analyst -- no,

24   that's Certified Forensic Accountant, Mr. Almodovar.  And I

25   believe that would end the Government's proof.  Again, but

```
1   for any other documents, stray documents that we would maybe
2   want to make sure that were in, we'd put those in through Mr.
3   Day.
4            THE COURT:  All right.  Then we will conclude for
5   today.  But are you in a position to discuss the Government's
6   motion that was -- that we alluded to as we started our day?
7            MR. EINHORN:  Not just yet, Your Honor.  We still
8   believe we can come to a resolution, though.  There just
9   hasn't been time with the trial day.
10            THE COURT:  Okay.
11            MR. EINHORN:  We believe we'll have it resolved to
12   report back to the Court tomorrow.
13            THE COURT:  All right.  If you need to come in
14   earlier because you can't resolve it and it will take a
15   significant amount of time to address, let me know, and we
16   will all come in earlier.  Thank you very much.
17            MR. McGARRY:  Um.
18            THE COURT:  Yes?
19            MR. McGARRY:  I'm not sure -- we did not serve a
20   courtesy copy over the weekend of our supplemental jury
21   instructions.
22            THE COURT:  I have it.
23            MR. McGARRY:  I just want to make sure -- I wasn't
24   sure of your practice, if everybody downloaded it and gave it
25   to you.  So, I wanted to just make sure that the Court,
```

1   itself, had the -- what we filed over the weekend.

2        THE COURT:  All right.  We're coming down the home

3   stretch in getting that finished.

4        MR. McGARRY:  Great.

5        THE COURT:  We don't have anything more from the

6   Defendant.

7        MR. McGARRY:  Well, that's why we wanted to give it

8   to you on Sunday, Your Honor, because we thought maybe they'd

9   have a work day today, and tomorrow if necessary.

10       MR. EINHORN:  We filed a supplemental request for

11  charge this morning.

12       THE COURT:  Oh, you did.  Okay.

13       MR. EINHORN:  About 9:30, I think.

14       THE COURT:  I'll take a look at that, then.  All

15  right.  Anything else?  Very good.  We're in recess.  Have a

16  pleasant afternoon.

17       (Proceedings adjourned, 2:55 p.m.)

18

19            COURT REPORTER'S TRANSCRIPT CERTIFICATE

20  I hereby certify that the within and foregoing is a true and

21  correct transcript taken of the proceedings in the

22  above-entitled matter.

23

24                          /s/  Tracy L. Gow
                            Tracy L. Gow, RPR
25                          Official Court Reporter