```
                   UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT


_____
UNITED STATES OF AMERICA,       )
                 Plaintiff,     ) No: 3:18-CR-92 (JBA)
                                )
       v.                       ) May 21, 2019
LEON VACCARELLI,                )
                 Defendant.     ) 9:27 a.m.
_____ )
                                 141 Church Street
                                 New Haven, Connecticut




                      JURY TRIAL DAY 6



B E F O R E:
         THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
         and 14 JURORS
```

```
                                 Official Court Reporter:
                                 Tracy L. Gow, RPR
                                 203-910-0323
```

1020

```
 1   A P P E A R A N C E S:

 2   For the Government:
          MICHAEL S. McGARRY, AUSA
 3        U.S. Attorney's Office-NH
          157 Church St., 25th Floor
 4        New Haven, CT 06510
          203-821-3751
 5        Email: michael.mcgarry@usdoj.gov

 6        JENNIFER LARAIA, AUSA
          U.S. Attorney's Office-BPT
 7        1000 Lafayette Blvd., 10th Floor
          Bridgeport, CT 06604
 8        203-696-3029
          Email: jennifer.laraia@usdoj.gov
 9
     For the Defendant:
10        JONATHAN J. EINHORN, ESQ.
          Law Office of Jonathan J. Einhorn
11        129 Whitney Avenue
          New Haven, CT 06510
12        203-777-3777
          Email: einhornlawoffice@gmail.com
13
          RACHEL MIRSKY, ESQ.
14        Mirsky Law LLC
          900 Chapel Street
15        10th Floor
          New Haven, CT 06510
16        203-290-2779
          Email: rachel@mirskylawct.com
17
     Also present:
18        LEON VACCARELLI
          SA RUSSEL DAY, FBI
19

20

21

22

23

24

25
```

1    **<u>INDEX</u>**

2    **EXAMINATION**

3    **Witness Name**                                          **Page**

4    SA RUSSELL DAY

5        Direct By MS. LARAIA ..................................... 1032

6        Cross By MR. EINHORN ..................................... 1086

7    BIENVENIDO ALMODOVAR

8        Direct By MR. McGARRY .................................... 1088

9        Cross By MR. EINHORN ..................................... 1188

10       Re-Direct By MR. McGARRY................................. 1205

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to Order, Out of the Presence of the Jury,

2    9:27 a.m.)

3          THE COURT:  All right, Counsel.  We will open court

4    for the day and please be seated.  Your message that

5    apparently was sent at nine o'clock last night was not

6    received until this morning; and, so, we cannot deal with

7    your Motion to Preclude at this time.  We need to put the

8    witness on, and we need to proceed with our evidence.  We'll

9    catch up as soon as possible.

10          Can I put three quick questions in your mind about

11   the charge?  Is forfeiture being claimed as an issue for the

12   jury here?  It's in the Superseding Indictment, but is it

13   being claimed here?

14          Secondly, with respect to advice of counsel, I had

15   thought the Defendant was not going to pursue advice of

16   counsel.  Am I incorrect?

17          MR. EINHORN:  Yes, I withdrew it on my supplemental

18   request for charge.

19          THE COURT:  All right.  I can't tell what's --

20          MR. EINHORN:  I'm sorry, yeah.

21          THE COURT:  All right.  And then there is a lot of

22   what was the request to charge on the securities fraud that

23   did not seem applicable here, since this is not an issue of

24   market manipulation.  I'd like to you to take a look at how I

25   at least attempt to draft that.

```
1            And then, lastly, may I add, in the charge, to the
2    actual reading of the Superseding Indictment, in brackets
3    next to the initials of victims their name, to the extent
4    they testified?
5            MR. McGARRY:  That would be proper, Your Honor,
6    yes.
7            THE COURT:  I mean, I think it would make it a much
8    easier proposition for the jury.  Okay.  Those are my four
9    questions that we will get back to.
10           All right.  Your next witness is going to be Agent
11   Day; is that right?
12           MS. LARAIA:  Yes, Your Honor.
13           THE COURT:  Okay.  Let's bring in the jury, please.
14           THE WITNESS:  Would you like me to approach the
15   witness chair?
16           THE COURT:  That would be fine.
17           (Witness takes stand, 9:39 a.m.)
18           THE COURT:  All right.  Juror No. 14 apparently is
19   missing.  We will call her -- him/her -- so let's take that
20   time, instead, to take up -- at least begin taking up the
21   Government's motion to preclude.
22           All right.  Is there a framework for considering
23   categories of cases -- excuse me -- exhibits that remain in
24   dispute?  Mr. McGarry?
25           MS. LARAIA:  Your Honor, in terms of the categories
```

1   of exhibits, I think -- so, Mr. Einhorn --

2            THE COURT:  This is 102, the Government's Motion to

3   Preclude Introduction of Medical Records.

4            MS. LARAIA:  Okay.  And, Your Honor, so there are

5   the Blue Sky records and there are Solutions records.  We did

6   receive from counsel last night a narrowed set, which I think

7   I'm not sure that there was any narrowing of the Solutions

8   records, but of the Blue Sky records.

9            The Government's objections remain, in large part

10  because there continue to be in those documents hearsay

11  statements.  For example, there are notes about group

12  treatment, what a group talked about.  Not things said by --

13  not necessarily by Mr. Vaccarelli.  I think there's still

14  some mention in there by Mr. Vaccarelli about commentary

15  about the case, which is confusing.  Many of them were

16  inaccurate and self-serving hearsay, but -- and also would

17  just be confusing to the jury and not helpful to its

18  determination.

19           The second category of sort of objections the

20  Government has is to -- a lot of the records consist of

21  recitations of his diagnoses and recitations of all the

22  medications that he is prescribed at various times.

23           I think it would be very difficult for a jury,

24  without having an expert witness or a doctor to explain what

25  those medications are for, to even parse out what that means.

1    And the same thing with the diagnoses.  I think that

2    to have formal diagnoses and potential diagnoses -- I believe

3    some of them are actually listed as possible diagnoses under

4    the DSM -- we'd need someone to be able to testify about

5    that, and there is not an expert here.

6    So, I think it would be very confusing to a jury to

7    just have lists of what a diagnosis -- you know, the various

8    diagnoses and have to parse for themselves what that means.

9    In addition, there are a number of medical and

10   psychological tests, and some of what's in there -- for

11   example, blood test records just showing all sorts of levels

12   of substances or not substances -- but, like, if a doctor did

13   a CBC, for example, like a complete blood count, I don't see

14   how that's relevant.  I don't see how a jury would interpret

15   that.

16   There are documents continuing to remain in the

17   exhibits -- for example, about Mr. Vaccarelli's blood sugar,

18   like what it was at particular times of the day.  I don't see

19   how that's relevant to a jury's determination or even

20   relevant to the proffered defense.

21   Probably more troubling are the psychological tests

22   and some of the findings, because there are indices, for

23   example, showing his scores within particular ranges, and I'm

24   not sure how a jury would be able to interpret what that

25   means or really why it's relevant.  I don't think that

1    there's -- you know, part of the reason that the Court

2    excluded the testimony or the proffered testimony of Dr.

3    Zonana was due to relevance, because there's not a connection

4    to the *mens rea*, and I don't think here that we have that.

5            And, certainly, I don't know how the jury would be

6    able to look at these tests and sort of figure out for

7    themselves what they mean.

8            Some of it is -- in fact, it looks like it could be

9    prejudicial to the Defendant.  There's -- for example,

10   there's a report that lists a number of potential diagnoses

11   under the DSM, and it appears to have been based on some

12   testing where Mr. Vaccarelli would have answered questions.

13   I think it's called a "Million" [sic].

14           And the person who writes it up -- I think there's a

15   copy in both the Solutions records and in the Blue Sky

16   records -- but the person who writes it up indicates all

17   sorts of things about Mr. Vaccarelli's personality and --

18   which largely appear to be sort of character flaw-type

19   information.  I don't know how that is relevant to the jury,

20   but there is a part in that section that actually says --

21   suggests that someone -- well, Mr. Vaccarelli -- would have a

22   propensity to commit fraud.

23           So, it's a little bit -- I feel like that could

24   affect the jury's determination, and in a way that isn't

25   appropriate.  So, the Government continues to have

1    objections, largely on relevance grounds -- so, hearsay

2    grounds, relevance grounds, and also for reasons of 403, as I

3    think there's a real potential for creating jury confusion.

4            THE COURT:  All right.  Mr. Einhorn.

5            MR. EINHORN:  Attorney Mirsky is going to handle

6    this argument, if Your Honor please.

7            THE COURT:  Okay.

8            MS. MIRSKY:  Your Honor -- let me just make sure

9    this is close enough.  Okay.  Your Honor, good morning.

10   We've had conversations -- I've had conversations with

11   opposing counsel about these records.  Just to be clear,

12   there are numerous pages that have been removed from both.

13   There's -- the Blue Sky records are -- I don't want to say

14   it's half the size it originally was, but it's something

15   close to that.  I manually removed a large amount yesterday

16   in reaction to what I understood that the Government -- many

17   of the concerns the Government was voicing at that time.

18           We -- and that includes -- there are many, many

19   narratives that were in the records.  Those were removed.

20           THE COURT:  Excuse me just one moment.

21           (Off-the-record discussion.)

22           THE COURT:  Go ahead.  Thank you.

23           MS. MIRSKY:  Okay.  Those had been removed so as to

24   not create confusion for the jury.  In regards to the

25   Government's concern about medications that are listed,

1  diagnoses that are listed, many of those terms go to the

2  argument that we're going to have here in this case regarding

3  Mr. Vaccarelli's alcoholism.

4       As the Court knows, we're not here to present an

5  expert.  The individual we're bringing in who had personally

6  written and made notes in these records for Blue Sky, she's

7  going to be here as a lay witness.

8       THE COURT:  What is name of that witness?

9       MS. MIRSKY:  Her name is Donna Gleissner.  I could

10  spell the last name if the Court would request that.  She's

11  to be here on Thursday, is our expectation, to have her

12  testify.  We believe --

13       THE COURT:  I'm sorry.  What's her position?

14       MS. MIRSKY:  She's a social worker, Your Honor.

15       THE COURT:  And she treated Mr. Vaccarelli?

16       MS. MIRSKY:  Yes.  She currently treats him, yes.

17       THE COURT:  All right.  I'm going to ask you to hold

18  that thought.

19       MS. MIRSKY:  Okay.

20       THE COURT:  All right.  Juror No. 14 is not here.

21  We cannot reach her by phone.  It's twenty minutes after our

22  start time and her voicemail box is full.  I'm going to

23  excuse Juror No. 14, if there's no objection from counsel,

24  and that will simply mean that we will pick up one of our two

25  alternates to serve when the time comes.

1     MR. EINHORN:  I cannot -- no objection.  I cannot

2  recall which of the two alternates is next, however.  We

3  selected them, obviously, in order.

4     THE COURT:  Juror No. 1 is our first alternate.

5     MR. McGARRY:  Your Honor --

6     THE COURT:  Juror No. 4 is our second alternate.

7     MR. McGARRY:  My concern is, and just to put it on

8  the record, I think Juror No. 1, if I'm correct, is the

9  former doctor no longer practicing who does some day trading,

10  if I remember from the jury *voir dire*.  The --

11     THE COURT:  But he's on the jury.

12     MR. McGARRY:  Sure.  And I guess my concern is,

13  while we're talking about these medical issues, I would hate

14  to see someone with previous medical training have undue sway

15  over other members of the jury --

16     THE COURT:  Shouldn't that have been raised at jury

17  selection?

18     MR. McGARRY:  We didn't think these medical records

19  were relevant and were coming in at the time, so --

20     THE COURT:  They weren't precluded; were they?

21     MR. McGARRY:  Well, the doctor who had -- they were

22  first going to be proffered through was precluded, so we

23  didn't think that they would try to introduce Mr.

24  Vaccarelli's statements to a psychological treater through

25  that psychological treater, since he said everything to her

1   for her to get her conclusions.

2          But that said, speaking about the jury, I think the

3   Court is right and we wouldn't object.  If I could just

4   inquire, is Juror No. 14 the one who sits right under the

5   monitor at the end?

6          THE COURT:  Yes.

7          MR. McGARRY:  And it looked like she was in a lot of

8   pain yesterday.  I saw her wincing and moving, so --

9          MR. EINHORN:  Well, I'd object to monkeying with the

10  jury pool.

11         MR. McGARRY:  No.

12         THE COURT:  I'm not going to monkey.

13         MR. McGARRY:  There was no motion to monkey.

14         THE COURT:  The question is, shall I excuse number

15  14?  She has been actually evidently in discomfort.  I

16  believe she suffers from sciatica.  This is not the way to

17  bring her dilemma to the Court's attention, but we need to

18  move on.

19         MR. McGARRY:  I think that's correct, Your Honor.  I

20  think that's why we have alternates, and they've all been

21  attentive.  She, herself, has been attentive, but in obvious

22  pain yesterday, so we would not object to the Court taking

23  the exact procedure that you outlined.

24         MR. EINHORN:  No objection.

25         THE COURT:  All right.  Let's bring in the jury.

```
 1              Juror No. 14 will be advised that she is excused but
 2       she remains under an obligation not to discuss the evidence
 3       in the case until the case has been concluded.  I'll ask
 4       Ms. Freberg to convey that.
 5              (Jury in, 9:54 a.m.)
 6              THE COURT:  Good morning, ladies and gentlemen.
 7              ALL:  Good morning.
 8              THE COURT:  Please be seated.  Your colleague, Juror
 9       No. 14, is not here and we are unable to reach her.  I have
10       excused her, so you are the remaining jury.  She remains
11       under an obligation not to discuss any of the evidence in the
12       case until you all have concluded your work.  So, we will
13       proceed with you, with 13 of you.
14              All right.  Will the Government please call its next
15       witness or introduce its next witness?
16              MS. LARAIA:  Your Honor, the Government calls
17       Special Agent Russell Day.
18              THE COURT:  All right.  Agent Day, please raise your
19       right hand.
20              (SA RUSSELL DAY sworn, 9:55 a.m.)
21              COURTROOM DEPUTY:  Please be seated.  State your
22       name for the record.
23              THE WITNESS:  Good morning.  Russell Day.  Last
24       name, D-A-Y.
25              COURTROOM DEPUTY:  And can you tell us what city and
```

1    state you live in?

2              THE WITNESS:  I work for the FBI in Meriden,

3    Connecticut.

4              COURTROOM DEPUTY:  Thank you.

5              THE COURT:  You may proceed.

6              MS. LARAIA:  Thank you, Your Honor.

7                        DIRECT EXAMINATION

8    BY MS. LARAIA:

9        Q.   Good morning, Special Agent Day.

10       A.   Good morning.

11       Q.   Where are you a Special Agent?

12       A.   I'm assigned to the FBI, New Haven division, and I

13   work out of an office we have in Meriden, Connecticut.

14       Q.   How long have you been a Special Agent with the

15   FBI?

16       A.   I joined the FBI in May of 2002.

17       Q.   Okay.  And what kind of work have you done as an FBI

18   agent?

19       A.   I primarily work on financial crimes, which would

20   include market manipulations, insider trading, bank fraud

21   cases, embezzlements by bank employees, embezzlements by

22   company employees.  I've worked on a variety of securities

23   fraud matters, including broker embezzlements.  I've worked

24   on public corruption matters.  And I've spent some time

25   working on national security matters.

1    Q.    And before you joined the FBI, where did you work?

2    A.    Back in 1996, I worked for a publicly traded bank

3    called National Bank of Alaska in Anchorage, Alaska.  And

4    when I was there, I started off in a management training

5    program and worked in various areas of the bank.  And then I

6    spent time in their internal audit department.

7          Do you want me to continue?

8    Q.    Let me just ask you:  Other than the National Bank

9    of Alaska, did you work in any other banking industry or

10   field?

11   A.    In 1998, I moved back east to Albany and I worked

12   for KPMG, which is an international accounting firm.  And I

13   primarily worked on financial institutions, doing financial

14   statement audits.  I did that for a few years.

15         And I also worked on -- I had a large client that

16   was a family office that managed over a billion dollars in

17   assets and some other different clients.  For one year, with

18   KPMG, I worked in their forensic litigation practice.  And I

19   had a variety of clients that were private banks and managed

20   money for people, and we were looking at anti-money

21   laundering compliance issues.

22   Q.    And was any of that time in New York City?

23   A.    Yes, it was.

24   Q.    And before your time at KPMG and the National Bank

25   of Alaska and the FBI, did you obtain any educational

1   degrees?

2   A.   Yes.  In 1995, I graduated from the University of

3   Vermont with a business degree, with a concentration in

4   accounting.

5   Q.   Now, as a Special Agent with the FBI, have you been

6   involved in the investigation of Leon Vaccarelli?

7   A.   Yes, I have.

8   Q.   And in what capacity?

9   A.   I'm what would be called an FBI case agent.  And,

10  so, I've been working with the United States Postal

11  Inspector, Tom Ardito, to investigate this matter.

12  Q.   Now, as a case agent, what kind of work do you do

13  when you're investigating a case?

14  A.   As a case agent, we work with the U.S. Attorney's

15  Office and we obtain records.  We identify witnesses that

16  we'd like to speak to, go out to the people's houses or make

17  phone calls and try to talk to people.

18       We review the paperwork that gets submitted by the

19  various financial institutions or witnesses, and we provide

20  that to the United States Attorney's Office and come up with

21  a -- what we would consider to be evidence for the case, and

22  present that to the U.S. Attorney's Office.

23  Q.   Okay.  And based on your investigation, are you

24  familiar with the name Susan Rustic?

25  A.   Yes, I am.

1    Q.    And I'm going to show you what's been previously

2    admitted as Government's Exhibit 8.  Can you just tell us

3    what this document is?

4    A.    This was a document provided by Prudential

5    Annuities, and it was a fax dated 11/19/2015 from Lux

6    Financial to Prudential Annuity Center.

7    Q.    And do you see the name Susan Rustic on that

8    document?

9    A.    Yes, I do.

10    Q.    And what's in the "Comments" section there?

11    A.    "Partial withdrawal."

12    Q.    Okay.  Now, going down to page 2, what is this

13    document?

14    A.    This is the Request for Partial Withdrawal, which is

15    a Prudential form that was provided by Prudential.

16    Q.    Okay.  And I'm just going to make this part a little

17    bit larger here in the Middle.  Do you see the name of the

18    account holder?

19    A.    Yes, Susan Rustic.

20    Q.    Okay.  Just going forward a little bit to, I believe

21    it's page 6.  Can you explain what's in Section 6, the

22    Payment and Mailing Instruction section?

23    A.    This is the direct deposit/ACH instructions to send

24    the funds to Susan Rustic's Thomaston Savings Bank account.

25    Q.    Okay.  And do you see a canceled check there or

1    voided check?

2        A.   Yes, I do.

3        Q.   And I want to show you what has been marked for

4    identification as Government's Exhibit 9.

5            MS. LARAIA:  And I would offer that, if there's no

6    objection.

7            MR. EINHORN:  No objection.

8            THE COURT:  Full exhibit.

9    BY MS. LARAIA:

10       Q.   Okay.  Can you tell us what Government Exhibit 9

11   is?

12       A.   This was a document provided by Prudential, which

13   summarizes the November 23, 2015 EFT transaction sending

14   $30,000 to Susan Rustic's checking account at Thomaston

15   Savings Bank.

16       Q.   And how was this transfer made, if you know?

17       A.   It's through the interstate wires.

18       Q.   Okay.  And you said the date again was what?

19       A.   November 23, 2015.

20       Q.   And just flipping back for a minute to Government's

21   Exhibit 8, what's the date on that fax cover sheet?

22       A.   November 19, 2015.

23       Q.   Okay.  And I'm going to show you Government's

24   Exhibit 654, previously admitted.  Do you recognize this

25   document?

1    A.   Yes.

2    Q.   And did you obtain this document as part of your

3    investigation?

4    A.   Yes.   Susan Rustic provided me this printout of her

5    account statement.

6    Q.   Okay.  And going now to page 2, can you just tell us

7    what happened -- the first transaction on November 24th.

8    A.   November 24th is an external deposit from Pruco Life

9    of Arizona, a payment for $30,000.

10   Q.   Is that consistent with the document we just looked

11   at, Government's Exhibit 9, this summary from Prudential?

12   A.   Yes.

13   Q.   Okay.  Now, just to switch topics for a minute.  As

14   part of your investigation, are you familiar with someone

15   named Linda or Lyn Burton?

16   A.   Yes, I am.

17   Q.   How is that?

18   A.   Lyn Burton, from the documents and testimony, is the

19   beneficiary of the Margaret Sheila Burton Trust.

20   Q.   And I'm going to show you what has been previously

21   admitted as Government's Exhibit 752.  Are you familiar with

22   this document?

23   A.   Yes.

24   Q.   Okay.  Now, is this a court document?

25   A.   Yes.  This is a document from the State of

1    Connecticut Court of Probate.  I believe it's dated January

2    7th, 2014.  And it's a --

3         Q.   Sorry.  Go ahead.

4         A.   And it's appointing Leon W.L. Vaccarelli as

5    successor Trustee.

6         Q.   And would you just read that sentence for us?

7         A.   "Leon W.L. Vaccarelli is hereby appointed to serve

8    as sole successor Trustee."

9         Q.   Okay.  Now, I want to show you what has been marked

10   for identification as Government's Exhibit 756.

11             MS. LARAIA:  And I'd offer that as a full exhibit.

12             MR. EINHORN:  No objection.  Sure.

13             THE COURT:  Full exhibit.

14   BY MS. LARAIA:

15        Q.   Special Agent Day, do you recognize this document?

16        A.   Yes, I do.

17        Q.   What is it?

18        A.   This is one of the account applications to TD

19   Ameritrade to establish the TD Ameritrade account for the

20   Trust by Leon Vaccarelli.

21        Q.   And just tell us what we're looking at on this first

22   page?

23        A.   It's the Lux Financial cover sheet addressed to

24   Ameritrade for a new account.

25        Q.   Okay.  And just, what does it say -- in the

1    "Regarding" line, what does it say?

2        A.    "Trust account."

3        Q.    And what is the date?

4        A.    February 18, 2014.

5        Q.    Okay.  And would you read the "Comments" sections

6    for us, please?

7        A.    "New account paperwork for Trust attached.  Trust

8    account application, 5 pages; checking/debit card

9    application, 4 pages; Probate Court documents appointing Leon

10   W.L. Vaccarelli as successor Trustee, 2 pages; Trust

11   agreement, 10 pages."

12       Q.    Okay.  And I'm going to flip forward now to page

13   3 -- actually, we'll go back to page 1 for a minute.  What is

14   this document?

15       A.    It says "Trust Account Application."

16       Q.    Okay.  Do you understand this to be a document used

17   in connection with opening an account?

18       A.    Yes.

19       Q.    Okay.  Now, this is page 3.  Can you tell us what is

20   indicated here for Trustee information?

21       A.    Trustee information, Mr. Leon W.L. Vaccarelli, and

22   it provides a date of birth, tax ID, and 84 Joshua Town Road,

23   Waterbury, Connecticut as an address, and a phone number.

24       Q.    Is there an employer listed?

25       A.    Yes.

1    Q.   What is that?

2    A.   Lux Financial Services.

3    Q.   And moving now to page 4.  Okay.  Going to Category

4    7, do you see where it says "Trade Confirmations and Account

5    Statements"?

6    A.   Yes.

7    Q.   Okay.  And what's in this section?

8    A.   Section 7, Trade Confirmations and Account

9    Statements, allows the account applicant to select how

10   they're going to receive account statements and trade

11   confirmations.  And this says -- is checked for "electronic

12   monthly" for account statement and trade confirmations are to

13   be sent electronic.

14   Q.   Okay.  And what's an account statement?

15   A.   An account statement is provided by a financial

16   institution to summarize the assets that are being held by

17   the financial institution for the customer.  And in this

18   case, it's going to be an account statement.

19        And I think they actually call it a portfolio

20   summary that describes cash, if there's a checking account,

21   mutual funds, options, stocks, fixed income securities and

22   other assets that would be held by TD Ameritrade in an

23   account.

24   Q.   Okay.  And what is a trade confirmation?

25   A.   A trade confirmation is a document that's sent by

1   the financial institution to the customer.  And it describes,

2   if a trade was executed, what date the trade was executed,

3   how much the transaction was for, any fees that are going to

4   be charged by the broker or other parties.  It describes how

5   much cash is going to be received.

6          And it's used for the customer to know if they have

7   cash coming in, so they can manage their investments and

8   confirm that the trade was executed properly.

9   Q.   Now, what's the next section that you see on this

10  page?

11  A.   The next section is Financial Information.

12  Q.   Okay.  And what's indicated here for the approximate

13  net worth?

14  A.   The approximate net worth is listed as 250,000 to

15  499,999.

16  Q.   And what is listed for approximate liquid net

17  worth?

18  A.   The same amount.

19  Q.   And do you know what the term "liquid net worth"

20  means?

21  A.   Liquid net worth would generally be assets that can

22  be sold in a reasonable amount of time.

23  Q.   Could that include stock?

24  A.   Yes.

25  Q.   Just based on your review of account documents, was

1  this accurate, that there was, at least in the beginning,

2  between 250,000 and $499,999 in possession of the Trust and

3  going into that Trust account?

4  A.  Yes.

5  Q.  I'm going to go down to the next page, if I can.

6  And do you see a signature on this page?

7  A.  Yes, I do.

8  Q.  Who's signature is that, if you know?

9  A.  I'm assuming it's Leon Vaccarelli.  I don't -- I've

10  seen different versions, but it says Trustee next to it.

11  Q.  So what is the date next to the signature?

12  A.  February 18, 2014.

13  Q.  All right.  And based on your review of documents,

14  what kind of account was opened for the Trust?

15  A.  I would call it a brokerage account, but it's an

16  account held with a brokerage firm that would have the assets

17  that I just mentioned, including cash, stocks, fixed income,

18  mutual funds.

19  Q.  Okay.  And is there any kind of checking account

20  component or checking account incorporated?

21  A.  Yes, there is.

22  Q.  Okay.  Now, if a person has a TD Ameritrade account

23  like you're describing, a brokerage account, does he or she

24  need to use a separate broker to buy or sell stock?

25  A.  No.  My understanding is TD Ameritrade acts as the

1  broker in this situation.  So the account holder enters --

2  either requests the trade and TD Ameritrade is acting as

3  broker.

4      Q.   Okay.  So, do you know how, mechanically, someone

5  could make a sale from his or her TD Ameritrade account?

6      A.   In this case, I'm aware that they can make trades

7  online through TD Ameritrade's web page, and they have a

8  portal to get into their trading platform.  I would assume

9  that you can walk into an office, if there's an office

10 nearby, and speak to a TD Ameritrade employee.  And I'm not

11 sure if you could also still make phone calls.

12     Q.   Okay.  I think you mentioned that someone might be

13 able to access a portal?

14     A.   Yes, through their web page.

15     Q.   Okay.  And would that there be an account name or an

16 account password?

17     A.   Yes.

18     Q.   Okay.  Now, if someone sells stock from a brokerage

19 account like the one we're about to look at, what happens?

20     A.   So, the customer is going to make their request to

21 either sell a stock or buy a stock.  The broker is going to

22 enter that requested trade into their system, and they're

23 going to direct it to whatever financial exchange to execute

24 the trade -- in theory, at the best price.

25          And that once the trade is executed, the custodians

1  for TD Ameritrade and the counterparties are going to work

2  with the Depository Trust Corporation to move those shares to

3  the proper -- or be allocated to the proper custodian.

4      Q.    And what happens with the proceeds from the sale?

5      A.    The proceeds would be deposited into the portfolio

6  or the brokerage account.

7      Q.    So, the person selling it would then receive the

8  cash?

9      A.    Yes.

10     Q.    As part of your investigation, did you receive any

11 account statements for this account opened for the Trust to

12 benefit Lyn Burton?

13     A.    Yes, we did.

14     Q.    I'm going to show you what's marked for

15 identification as Government's Exhibit 755.

16          MS. LARAIA:  And I'd offer that as a full exhibit.

17          MR. EINHORN:  Yeah, no objection.

18          THE COURT:  Full exhibit.

19 BY MS. LARAIA:

20     Q.    Just looking on this first page, can you tell us

21 whose account this is a statement for?

22     A.    The statement name is Leon W.L. Vaccarelli.  I

23 believe it's a Trust For Benefit Of Margaret Sheila Burton.

24 I believe it's under agreement, second amendment dated August

25 27, 1999, For Benefit of Lyn Burton under agreement, and the

1  address is listed 49 Leavenworth Street, Suite 204,

2  Waterbury, Connecticut.

3      Q.   Now, going down to page 3 here, okay.  Tell us what

4  you see in this Portfolio Summary.  What does this mean?

5      A.   So, the Portfolio Summary section covers the assets

6  that are in the account as of the statement date or the

7  ending statement date, 3/31/2014.

8      Q.   And I'll just go up a little bit.  Do you see the

9  date?

10     A.   Yes.

11     Q.   So, what's the reporting period for this

12  statement?

13     A.   The statement reporting period is February 1, 2014

14  to March 31, 2014.

15     Q.   Okay.  And looking -- harkening back to that court

16  document we looked at earlier, do you remember in what month

17  Mr. Vaccarelli was appointed as a successor Trustee?

18     A.   Yes, in January 2014.

19     Q.   Now, looking back down in this Portfolio Summary,

20  what kind of information does the statement provide?

21     A.   The statement is going to show the different types

22  of investments that are in the statement, which includes

23  cash, an insured deposit account, it could have a money

24  market.  It could have stocks, fixed income, options, mutual

25  funds, other, and they can also I believe short if they have

1   approval.

2       Q.   And what are the types of assets that are held in

3   this account as of the ending date of this statement?

4       A.   On the ending date, there's $600 in the insured

5   deposit account, and there is $286,129.64 in stocks, which

6   would be the market value of the stocks on the last business

7   day of the month.

8       Q.   And does the market value change?

9       A.   Yes.

10      Q.   Okay.  And, so, I think you just testified that this

11  is the -- this reflects the market value as of the ending

12  date of the statement?

13      A.   Yes.

14      Q.   So, the amount could be different a few days earlier

15  or a few days later?

16      A.   Yes.

17      Q.   Okay.  Now, looking down at this next section, tell

18  us what is indicated in this Cash Activity Summary.

19      A.   The Cash Activity Summary shows that $600 in funds

20  were deposited into the account.

21      Q.   And do you happen to know anything about the deposit

22  of the $600?

23      A.   Yes.  My understanding is, later in the statement it

24  says that there is a cash award into the account.  And I

25  looked up on TD Ameritrade, and they award a cash amount

1   depending on the size of the account that's being opened.

2       Q.   Okay.  And looking under the Performance Summary

3   section, what does that tell us about any stock received in

4   that account?

5       A.   It says, securities received $280,000 -- 285,017.68

6   cents.

7       Q.   And that's in stock?

8       A.   Yes, that's the market value of the stock.

9       Q.   Okay.  And what happened with that stock?

10      A.   Salisbury Bank & Trust had a portfolio of stock, and

11  the stock was delivered via the Depository Trust Corporation

12  to the TD Ameritrade account.

13      Q.   And now going down to the next page.  Now, what does

14  this page show us?

15      A.   The -- it's hard to see in the top portion, but it

16  says Account Positions.  And, so, these are the stocks that

17  were in the account on the statement date, totaling

18  $286,129.64.  And it lists a variety of equity securities

19  that are in the account.

20      Q.   So, it lists the particular stock on the left-hand

21  column; is that correct?

22      A.   Yes, under Investment Description.

23      Q.   And then what does "Quantity" mean?

24      A.   Quantity is the number of shares held.

25      Q.   And then "Market Value"?

```
 1        A.   Yes.

 2        Q.   What is that?

 3        A.   $286,129.64.

 4        Q.   Now, moving down to the next page, what does this

 5   show?

 6        A.   This is the account activity for the equities.  And

 7   it's showing, under the Description field, the DTCs -- the

 8   Depository Trust Corporation -- showing that the stocks were

 9   delivered to TD Ameritrade.

10        Q.   Okay.  During this reporting period?

11        A.   Yes, on March 18th.

12        Q.   And do you see anything about cash on this page?

13        A.   Yes.

14        Q.   What's that?

15        A.   This is showing the cash award into the account.

16        Q.   Is that continued on to the next page?

17        A.   Yes.

18        Q.   Okay.  For that $600?

19        A.   Yes.

20        Q.   And do you know what this means here, when it says

21   "Purchase FDIC-insured"?

22        A.   Yes.  So, on the front of the portfolio statement,

23   there's three different types of cash accounts.  There's the

24   one that says "cash," I believe it says FDIC-insured and

25   money market funds.  And, so, those are all cash or cash
```

 1    equivalents.

 2            So, in the statements, when cash comes in, they'll

 3    go into the one cash account, and then it gets sweeped into

 4    the FDIC-insured account so that they can write checks on the

 5    account.

 6        Q.   Now, as part of your investigation, have you

 7    received statements other than this statement ending March

 8    31, 2014?

 9        A.   Yes, we have.

10        Q.   And approximately what's the time period for which

11    you received statements?

12        A.   I believe we have statements through December, 2018,

13    now.

14        Q.   Okay.  Have you also reviewed or received checks and

15    other documents associated with this account?

16        A.   Yes.  They provided pages of checks, the scanned

17    images of checks that were drawn on the account.  And they

18    provided trade confirmations for any stocks that were sold

19    from the account.

20        Q.   Have you created a summary of the account activity

21    for any time period?

22        A.   Yes, I have.

23        Q.   And what was that time period?

24        A.   We put -- from the statement date here, starting

25    February 1st, 2014 to December 31, 2016.

1    Q.   I'm going to show you what has been marked for
2  identification as Government's Exhibit 27.  Is that the
3  summary that you created?
4    A.   Yes.
5    Q.   And does that fairly and accurately represent the
6  account activity occurring in this account, or this TD
7  Ameritrade account held for the benefit of -- or for the
8  Trust For the Benefit of Lyn Burton?
9    A.   Yes, it's --
10   Q.   And, I'm sorry, for the period February 2014 to
11 December 2016?
12   A.   Yes.  It's a summary that consolidates a lot of the
13 cash transactions, so it's simpler to view than the
14 statements that were provided.
15        MS. LARAIA:  Your Honor, I'd move the admission of
16 Government's Exhibit 27.
17        MR. EINHORN:  No objection.
18        THE COURT:  27 is a full exhibit.
19 BY MS. LARAIA:
20   Q.   Now that we have that up, just tell us what kind of
21 information is recorded in your summary?
22   A.   The first column is the date of the transaction.  In
23 some transactions there were checks that were distributed, so
24 there's a column that identifies the checks, the check
25 number.

1    The third column can contain two different pieces.

2    It's either the detail of a transaction or payee.  So an

3    example of a payee would be farther down, the sheet on

4    8/1/2014, a check was paid to Springer Sanitation, Inc.

5    And a different detail would be just below that, on

6    8/6/2014 stocks were sold out of the account.  And, so, it

7    says, sell, securities sold.

8    And, so, to go back to the check being paid, there's

9    a memo section, which I tried to read the handwriting on the

10   checks and type out what I saw in reviewing for today.  I

11   know I've made at least one or two typos, like an "I" instead

12   of an "O," so there are a few mistakes in there for -- just

13   transposed letters.

14   Q.   Typographical.

15   So, there's a note section -- or, I'm sorry.  At the

16   top of the column, do you see where it says "Memo" and

17   "Note"?

18   A.   Yes.  So, in the Note section, in the parenthesis is

19   a note that I would have made on the account for information

20   that I observed in very limited cases.  For example, just

21   making a note that the securities received were transferred

22   from Salisbury Bank & Trust.

23   Q.   Is that on this line that I'm highlighting here?

24   A.   Yes.

25   Q.   And, for example, going down, on 8/6/2014, there's a

1  parenthetical reference next to Medtronic, Inc.  Do you see

2  that?

3      A.   It says 8/1/14, which is trade date.  And, so, for

4  the securities, there's a trade date when the trade is

5  entered from the customer to the broker, and then the cash

6  will settle different periods later.

7      Q.   Okay.  And, so, in this particular case, would the

8  cash have settled on 8/6 --

9      A.   8/6/2014 the cash went into the account.

10     Q.   Now, just looking over -- keep going over on the

11 columns.  What does the Transaction Amount mean?

12     A.   The Transaction Amount is, for example, is the

13 amount that was deposited into one of the cash accounts.

14     Q.   So, for example, looking at 3/19.  What does that

15 mean?

16     A.   That would be the balance in the FDIC-insured

17 account of $600.

18     Q.   So, that's a deposit?

19     A.   Yes.

20     Q.   And then where it says "Current value of cash and

21 cash equivalents," what is a cash equivalent?

22     A.   So, like I discussed before, there's the three

23 accounts on the portfolio statement.  There's the cash, the

24 FDIC-insured account, and I don't believe the money market

25 account was used in this case.

1    So, this is the net balance of the -- either the
2    cash or the FDIC-insured accounts for that day, showing the
3    total amount of cash in the account.
4    Q.   Now, what's described in this other column "Current
5    Value Stocks"?
6    A.   The Current Value Stocks is showing the market value
7    that was reported on the portfolio statement as of that day,
8    as the summary just shows the month end of the market values.
9    I didn't attempt to capture the market value of the portfolio
10   every day in 2014, '15, or '16.  I just summarized it
11   directly from the statement for the end of the month.
12   Q.   Okay.  And the Total Current Value, what does that
13   include?
14   A.   Total Current Value is the sum of the current value
15   of cash and cash equivalents, the current value of stocks,
16   and that is the total.
17   Q.   Just to walk through this a little bit.  So
18   beginning here, 3/18/14, what happens?
19   A.   3/18/2014 Salisbury Bank & Trust put their request
20   order in to transfer from their custodian to TD Ameritrade
21   the stocks that were held in the Lyn Burton or the Sheila
22   Burton Trust.
23   Q.   Now, going down a little bit, do you see where it
24   says, for example, on 4/25/14 -- do you see where it says
25   "Income"?

1    A.    Yes.

2    Q.    What could be income to this account?

3    A.    Equity securities often earn dividend income.  So

4    the equities companies, like Coca-Cola or Abbott that are

5    listed, may pay a dividend.  So the Income line is going to

6    capture the dividend income from the companies.

7    Q.    And in this particular case, what was the income?

8    A.    $201.

9    Q.    And does that, then, get added to cash and cash

10   equivalents?

11   A.    Yes, it does.

12   Q.    Is there any interest income?

13   A.    Yes, there is.

14   Q.    So, for example, looking down at 6/30/14, what's

15   described there?

16   A.    There was one penny in interest.

17   Q.    Okay.  And then added to the balance?

18   A.    Yes.

19   Q.    Okay.  Now, just to go down a little bit.  8/31, for

20   example, what does that show?

21   A.    This is the statement current value.  So, on 8/31,

22   there was a statement showing there was $7,450.39 in cash in

23   the account and that the market value of the stock portfolio

24   was $283,379.94.

25   Q.    Okay.  And what was the total value of the account

1   as of 8/31/2014?

2       A.   The total value was $290,830.33.

3       Q.   And just so the jurors know, where would you have

4   gotten that number?

5       A.   From the statements.

6       Q.   Directly from the statement?

7       A.   Yes.

8       Q.   All right.  Looking down now on page 2, I just want

9   to highlight 9/16/14.  What happens here?

10      A.   9/16/2014, a trade was entered to sell Proctor

11  Gamble stock.  The cash that was settled into the account on

12  9/16/2014 was $16,723.66.

13      Q.   Okay.  And just below that, do you see a check?

14      A.   Yes, I do.

15      Q.   And what's that?

16      A.   This was a check, 115.  It said "Mountainside Rehab

17  Center."  And it listed "Lyn Burton rehab" in the memo

18  section for $17,872.50.

19      Q.   Okay.  And do you see a couple other checks just

20  below that?

21      A.   Yes.

22      Q.   As we go down a little further.

23           Okay.  I want to highlight on 11/16/14 [sic], what

24  do you see here?

25      A.   On 11/26/2014, Check 130 was made payable to

1    LWLVACC, LLC for $7,500.

2         Q.   And what's the Memo line on that check?

3         A.   The Memo line said "Trustee fees."

4         Q.   Okay.  Are you familiar with the name LWLVACC from

5    the investigation?

6         A.   Yes, I am.

7         Q.   Have you obtained or seen any documents from the

8    Secretary of State concerning that entity?

9         A.   Yes, from the Connecticut Secretary of State.

10        Q.   I'm going to show you what has been marked for

11   identification as Government's Exhibit 1148.

12             MS. LARAIA:  And I'd move the admission.

13             MR. EINHORN:  No objection.

14             THE COURT:  Full exhibit.

15   BY MS. LARAIA:

16        Q.   Just tell us what this document is.

17        A.   The Connecticut Secretary of State has a database

18   that shows corporations and entities that are registered with

19   the State of Connecticut.  And, so, this is a document I

20   printed from their website, showing the business name,

21   LWLVACC, LLC, and it shows the principal details.  And it

22   lists Leon Vaccarelli as member.

23        Q.   Is there anyone else listed as a member here?

24        A.   No one else is listed.  And, in my experience,

25   sometimes there can be other members that are shown, but I

1 don't see it here.

2     Q.   Okay.  And based on this document, when was this

3 entity formed or registered?

4     A.   The document says July 25, 2001.

5     Q.   Okay.  I just want to go back now to Government's

6 Exhibit 27.  I believe we were on page 2.

7     Okay.  Just highlighting this portion.  Going to

8 12/9, what happens here?

9     A.   12/9/2014, Check 131, made payable to LWLVACC, LLC

10 for $5,000.

11     Q.   And what was the -- indicated on Memo line for that

12 check?

13     A.   "Trustee fees."

14     Q.   I'll go down to page 3.  Now looking at -- just

15 focusing your attention on 12/31 of 2014, did you obtain a

16 statement for the period ending 12/31/14?

17     A.   Yes.

18     Q.   Okay.  And what was the total current value of the

19 account as of 12/31/14?

20     A.   The Total Current Value is listed $267,021.79.

21     Q.   And just to show this to the jury, I'm going to show

22 you Government's Exhibit 771.

23     MS. LARAIA:  I'd offer that for admission.

24     MR. EINHORN:  No objection.

25     THE COURT:  All right.  Full exhibit.

1   BY MS. LARAIA:

2        Q.   What is this document -- once I get this up for

3   you?

4        A.   Yeah.  So this is the TD Ameritrade statement for

5   the Burton Trust account for the statement period 12/1/2014

6   to 12/31/2014.

7        Q.   Okay.  And just looking at the Portfolio Summary,

8   what is the Total Account Value?

9        A.   The Total Account Value is $267,000 -- or

10  $267,021.79.

11       Q.   Okay.  And is that where you got that figure that's

12  put on to Government's Exhibit 27?

13       A.   Yes.

14       Q.   Just going back to Government's Exhibit 27.  I'll go

15  back to page 3.  All right.  So, starting back where we ended

16  up, what happens after 12/31/14?  Just what are the next few

17  items?

18       A.   For example, on 1/9/2015, there's Check 140 was paid

19  to Robert S. Kolesnik, and the Memo said "Lyn Burton" for

20  $3,610.

21       Q.   And were there any checks that you see here to Leon

22  Vaccarelli?

23       A.   Yes.  On 1/13/2015, Check 142 was processed and then

24  reversed.

25       Q.   Okay.  That same amount -- do you see that same

1    amount actually coming out of the account?

2        A.   I believe it's a different check number, but it

3    comes out of the account on 1/20/2015, Check 143.

4        Q.   And what was the amount of that check?

5        A.   $3,120.

6        Q.   Just going down a little further, just focusing your

7    attention on 2/17/15, can you tell us what happened there?

8        A.   On 2/17/2015, Check 150 was made payable to Leon

9    Vaccarelli.  And it says "2015 retainer" for $8,000.

10       Q.   And did that check clear?

11       A.   Yes, it did.

12       Q.   Okay.  And I want to focus your attention on the

13   item two -- two down from that one.  Can you tell us what

14   happens in the entry that begins 2/26/15?

15            On 2/23/2015, a trade was entered for Coca-Cola

16   stock.  And the cash was settled into the account on

17   2/26/2015 for $20,844.62.

18       Q.   And was there a second check that indicates a

19   retainer?

20       A.   Yes.  On 2/24/2015, Check 172 was made payable to

21   LWLVACC, LLC, and it says "Retainer 2015" for $8,000.

22            And I would note that throughout the summary it

23   looks like TD Ameritrade will -- is -- once the trade has

24   been executed, they will pay an item.  So the negative

25   balance, I wouldn't make an inference on the negative

1  balance.  It's the -- I think they go off the trade date.

2      Q.   Okay.  So just looking at this, so there were two

3  checks for $8,000; is that right?

4      A.   Yes.

5      Q.   One to Leon Vaccarelli and the other payable to

6  LWLVACC, LLC?

7      A.   Yes.

8      Q.   And did both of those clear?

9      A.   Yes.

10      Q.   And I think we were just explaining to the jury, is

11  it looks, you know, on this column where I have my cursor

12  right now, that looks negative; is that right?

13      A.   Yes.

14      Q.   And, in fact, there was a trade that had been

15  requested by that date?

16      A.   Yes.  Prior to 2/24 when the check cleared, I think

17  TD Ameritrade gives them credit for anticipating the cash

18  coming into the account.

19      Q.   And cash did, in fact, come into the account; is

20  that accurate?

21      A.   Yes, it did.

22      Q.   So, the 20,844.62?

23      A.   Yes.

24      Q.   Okay.  And just to be clear, the stock that's sold

25  here, is that all stock that was owned by the Trust

1    account?

2         A.    Yes.

3         Q.    Or owned by the Trust?

4         A.    Yes.

5         Q.    Okay.  Going down a little bit further.  What

6    happens on 3/9/15?

7         A.    On 3/9/2015, Check 175 was made payable to LWLVACC

8    for $5,000.

9         Q.    Okay.  And how about 3/17/5?

10        A.    On 3/17/2015, Check 174 was made payable to Leon

11   Vaccarelli for $9,116.

12        Q.    And what was the Memo line for that check?

13        A.    MISC.

14        Q.    Okay.  Let's look at some of these other checks

15   here.  Do you see a Check 156?

16        A.    Yes.

17        Q.    What was that for?

18        A.    On March 30, 2015, Check 156 was issued to Craig

19   Newell for March rent, 2015, for $975.

20        Q.    Looking down here on page 4.  Do you see another

21   check that indicates it's for rent?

22        A.    Yes.

23        Q.    And just tell us what that one is.

24        A.    On April 10, 2015, Check 161 was made payable to

25   Craig Newell for April 2015 rent.

1    Q.   Okay.  Now I want to show you 5/19/15.  What happens

2    on that date?

3    A.   On 5/19/2015, Check 167 was paid -- or made payable

4    to Leon Vaccarelli.  In the parenthesis -- I had trouble

5    reading the note on the image, so I didn't attempt to

6    guess.

7    Q.   So, there's something, and then "retainer"?

8    A.   Yes.  It said something "retainer" for 7,500.

9    Q.   Okay.  And before that could be paid, was there a

10   sale of any sort?

11   A.   On 5/15/2015, a trade was entered for United Parcel

12   Service.  And the cash was settled into the account on

13   5/20/2015 for $8,557.01.

14   Q.   Okay.  Going down a little further, on 6/3/15, what

15   happens?  This first entry I've highlighted.

16   A.   So, this is describing, on 5/29/2015 a trade was

17   entered to sell Sigma-Aldrich Corporation stock on 6/3/2015.

18   The cash was settled into the account for $16,221.31.

19   Q.   Okay.  I'm going to show you Government's Exhibit 13

20   for identification.

21        MS. LARAIA:  I'd offer that as a full exhibit.

22        MR. EINHORN:  No objection.

23        THE COURT:  13 is a full exhibit.

24   BY MS. LARAIA:

25   Q.   What is Government's Exhibit 13?

1    A.   This is a confirmation notice that was provided by

2  TD Ameritrade for the Burton trust.  This document shows the

3  Sigma-Aldrich Corporation stock was sold on the trade date,

4  it says 5/29/2015.  It lists the number of shares.  It shows

5  the price.  It shows the principal amount, which was the

6  total amount of the transaction.  It shows a regulatory fee

7  of 30 cents, a commission fee of 9.99.  And then the net

8  amount, $16,221.31, is what gets deposited on the settlement

9  date into the TD Ameritrade account.

10   Q.   Okay.  And you note -- I think you mentioned there

11  was some kind of regulatory fee and commission fee.  What are

12  those, if you know?

13   A.   The commission fee is charged by the broker.  I'm

14  not sure what the regulatory fee is.

15   Q.   And the broker being TD Ameritrade or something --

16   A.   Yes.

17   Q.   -- affiliated with it?

18   A.   Yes, a commission.

19   Q.   Okay.  And you said -- what was the settlement

20  date?

21   A.   June 3rd, 2015.

22   Q.   And, again, what does it mean for something -- for

23  money to settle?

24   A.   It means that the cash is provided through the

25  custodians to be allocated to the customer's portfolio.

1    Q.   Now, going back to Government's Exhibit 27 -- and I

2    believe we're on page 4 -- do you see that sale of securities

3    indicated here?

4    A.   Yes.

5    Q.   Okay.  And just above that entry, please describe

6    for us what is listed here?

7    A.   On 6/2/2015, Check 170 was made payable to Leon

8    Vaccarelli for $11,000.

9    Q.   And what's the memo for that check?

10   A.   It says "Deposit."

11   Q.   Okay.  In order for that check to be paid -- well,

12   let me move to strike that.

13        Just before that check was made out or was paid, was

14   there this sale of Sigma-Aldrich securities?

15   A.   Yes.  As noted in the confirmation and on the

16   summary, trade was entered on May 29, 2015.

17   Q.   And just going down a little bit further here, do

18   you see another payment that indicates it's for rent?

19   A.   Yes.  On 6/29/2015, Check 173 was made payable to

20   Craig Newell for June rent for $975.

21   Q.   And do you see another check on Craig Newell on this

22   spreadsheet, this bottom portion I'm looking at?

23   A.   Yes.  7/14/2015.

24   Q.   Just above that, what do you see?

25   A.   On 7/13/2015, Check 180 to Leon Vaccarelli for fees

1    due --

2         Q.    Okay.

3         A.    -- for $6,840.

4         Q.    Going down to page 5, can you tell us what happens

5    in the entry 7/24/15?

6         A.    This is describing a 7/21/2015 trade of Johnson &

7    Johnson stock that settled on 7/24/2015 for $16,708.24.

8         Q.    So that increases the amount in the -- or current

9    value of cash and cash equivalents column?

10        A.    Yes.

11        Q.    Let me show you Government's Exhibit 14 for

12   identification.

13             MS. LARAIA:  And then I'd offer that as a full

14   exhibit.

15             MR. EINHORN:  No objection.

16             THE COURT:  Full exhibit.

17   BY MS. LARAIA:

18        Q.    What is Government's Exhibit 14?

19        A.    This is also a TD Ameritrade confirmation notice.

20   This is showing that a trade was entered on 7/21/2015 for

21   Johnson & Johnson stock.  It lists the number of shares, the

22   price, the principal amount and the fees.  And on the

23   settlement date, 7/24/2015, the net amount was $16,708.24.

24        Q.    Okay.  And going back to Government's Exhibit 27 --

25   I believe we're on page 5 -- is that sale indicated on your

1   summary?

2       A.   Yes.  On 7/24/2015, it shows the cash being settled

3   into the account.

4       Q.   Okay.  What's the next entry that you see under that

5   sale of the Johnson & Johnson securities?

6       A.   Check 185, for Lyn Burton for $500.

7       Q.   And below that?

8       A.   Check 184, for Leon Vaccarelli for $5,000.

9       Q.   Okay.  I want to make this a little bit larger here.

10          Okay.  If you keep going down, how about on 8/3/15;

11  what is that entry?

12      A.   Check 186 to Leon Vaccarelli for $17,500.

13      Q.   Okay.  And what's the entry on 8/4?

14      A.   On 8/4, there was a -- to step back, there was a

15  trade entered on 7/30/2015 for United Tech Corporation stock,

16  to sell it, and the cash settled on 8/4/2015.

17      Q.   And the amount of the cash was what?

18      A.   $16,730.11.

19      Q.   Okay.  And, so, this check to Mr. Vaccarelli, 186,

20  did that clear the account?

21      A.   Yes, it did.

22      Q.   And looking down a little further, do you see

23  another check to Mr. Vaccarelli?

24      A.   On 8/21/2015, Check 189 to Leon Vaccarelli for

25  $4,500.

1   Q.   And what was indicated in the memo line of that

2   check?

3   A.   "July/August 2015."

4   Q.   Okay.  And 8/24, is there a little bit of interest

5   earned?

6   A.   Yes.

7   Q.   How much interest was earned?

8   A.   Seven cents.

9   Q.   Okay.  Now, going to 9/1, what happens there?

10  A.   On 9/1/2015, Check 190 made payable to LWLVACC, LLC

11  for $25,000.

12  Q.   Okay.  The entry just below that, what happens

13  there?

14  A.   On 8/31/2015, a trade was entered to sell

15  Sigma-Aldrich Corporation stock.  The cash was settled into

16  the account on 9/3/2015 for $34,852.94.

17  Q.   I'm going to show you Government's Exhibit 15 for

18  identification.

19       MS. LARAIA:  I'd offer that as a full exhibit.

20       MR. EINHORN:  No objection, Your Honor.

21       THE COURT:  Full exhibit.

22  BY MS. LARAIA:

23  Q.   Is this another one of those trade confirmation

24  notices?

25  A.   Yes.  This is a TD Ameritrade trade confirmation for

1   the Trust showing that on 8/31/2015, there was a trade of

2   Sigma-Aldrich Corporation stock.  It goes through the

3   quantity sold, the price, the principal amount, the fees.

4   And it just mentions the net amount that was settled on

5   9/3/2015 for $34,852.94.

6        Q.   Okay.  I'm going to go back to Government's Exhibit

7   27.  We're on page 5.

8             Okay.  Do you see that transaction that you just

9   described for us from that trade confirmation notice?

10       A.   Yes.

11       Q.   Okay.  Now, looking down a little bit further, do

12   you see another check to Craig Newell?

13       A.   Yes.

14       Q.   How about to Mr. Vaccarelli?

15       A.   On 9/22/2015, Check 197 made payable to Leon

16   Vaccarelli for $6,000.

17       Q.   Is there another sale of securities that you see?

18       A.   Yes.  On 10/12/2015, a trade was entered.  And the

19   trade was settled on 10/15/2015 for 10,515.46.

20       Q.   Just so we keep track of what's happening in the far

21   right column.  Looking at 10/31/15, what has happened in the

22   account at this point?

23       A.   The statement date there indicates that there was

24   $9,284.55 in cash, there was $97,807.50 in stocks, for a

25   portfolio statement balance of $107,092.05.

1    Q.   Okay.  And now I'm going on to page 6.  I just want

2    to focus your attention on 12/29.  What do you see there?

3    A.   On 12/29/2015, Check 223 was made payable to Leon

4    Vaccarelli.  The memo said "Merry Xmas" and for $2,000.

5    Q.   Okay.  Now, looking at 12/31, what was the statement

6    value as of 12/31 -- so the end of the year, 2015?

7    A.   The statement balances on 12/31/2015 were -- in the

8    cash, $2,457.95.  The market value of the stocks was 82,441,

9    and the total portfolio was $84,898.95.

10   Q.   And I'm going to show you Government's Exhibit 773

11   for identification.

12        MR. EINHORN:  No objection, Your Honor.

13        MS. LARAIA:  I'd offer that.

14        THE COURT:  Full exhibit.

15   BY MS. LARAIA:

16   Q.   Just going down to page 3, what is this document?

17   A.   This document is the TD Ameritrade statement for the

18   Burton Trust.  The statement reporting period of 12/1/2015 to

19   12/31/2015, and this shows the current value.

20        The insured deposit account shows $2,457.95.  The

21   market value of the stocks as of 12/31/2015 was $82,441.  The

22   total portfolio summary lists the current value of

23   $84,898.95.

24   Q.   So, in the column just next to that "current value"

25   column, what's described?  Just to right of the "current

1  value" column, what's described in the next column?

2      A.   Yes.  The statements show the prior value, which

3  would be the amount listed on the statement as of the end of

4  November, 2015.

5      Q.   Okay.  And what was the nature of the change between

6  the end of November 2015 and the end of December of 2015?

7      A.   The account decreased, and there was a decrease in

8  the cash and the stock values.

9      Q.   Okay.  I just want to go back to Government's

10  Exhibit 27 -- and I believe we're on page 6.  Okay.  So we

11  were just looking at the end of December 2015; is that

12  right?

13      A.   Yes.

14      Q.   Okay.  Do you see an entry just below that 12/31/15

15  statement "current value" entry?

16      A.   Yes.  On January 6, 2016, Check 220 was made payable

17  to Zackin Zimyeski for $410.

18      Q.   Are you familiar with the name Zackin Zimyeski?

19      A.   It's a public accounting firm located in Waterbury,

20  Connecticut.

21      Q.   Okay.  And just below that entry, what's described

22  for the first entry for 1/15/16?

23      A.   On 1/15 -- or on 1/12/2016 a trade was entered for

24  Exxon Mobil Corporation, and the cash was settled into the

25  account on 1/15/2016 for $22,453.14.

1    Q.   And looking down a little further here.  Do you see

2    any checks to Mr. Vaccarelli?

3    A.   On 1/19/2016, Check 230 was made payable to Leon

4    Vaccarelli for 15,000.  And on 2/1/2016, Check 248 was made

5    payable to Leon Vaccarelli for $6,500.

6    Q.   Just below that, what do you see for 2/4/16?

7    A.   On 2/4/2016, Check 231 was made payable to LWLVACC,

8    LLC for 5,500.

9    Q.   Okay.  And how about 2/10?

10   A.   On 2/10, Check 232 was made payable to Leon

11   Vaccarelli for $7,500.

12   Q.   And continuing on, we're on page 7 here, what's the

13   statement value by this time now, the end of February 2016?

14   A.   The statement value was $2,193.27 in the cash

15   accounts.  The market value of the stocks was $40,075, and

16   the total current value was $42,268.27.

17   Q.   Okay.  And there's some other checks coming out of

18   the account at this point.

19   A.   Yes.  A variety of, I believe, Burton expenses.

20   Q.   Also continuing to be some interest -- for example,

21   5/6/16?

22   A.   Yes.

23   Q.   Okay.  And what was the statement value as of

24   5/31/16?

25   A.   The statement value of 5/31/2016 was there was

1  $16,053 in cash, $22,255 in stocks, and the total portfolio

2  value was 38,308.

3      Q.   Okay.  And I just want to focus your attention here

4  on 6/7/16.  What happens there?

5      A.   The check, 273, to Leon Vaccarelli for $8,632.

6      Q.   Okay.  And how about the 6/15 entry?

7      A.   On 6/10/2016, a trade was entered to sell Exxon

8  Mobil stock.  The cash settled on 6/15/2016.

9      Q.   And how much was that for?

10     A.   $11,251.64.

11     Q.   Going down to page 8, the top here, 7/1/16.  What's

12  described in that entry?

13     A.   7/1/2016, Check 259 to Leon Vaccarelli, continuing

14  of work, for $4,000.

15     Q.   And how about the entry right below that?

16     A.   July 6, 2016, Check 249, made payable to Lyn Burton

17  for food for $1,500.

18     Q.   How about 7/29?

19     A.   7/29/2016, Check 262, for Maryanne Marticello for

20  reimbursement for phone, $27.99.

21     Q.   And fair to say, there are a couple of other entries

22  also on 7/29?

23     A.   Yes.

24     Q.   How about 8/1?

25     A.   8/1, Check 272 made payable to Leon Vaccarelli for

1    $2,750.

2        Q.   Okay.  How about the next entry for 8/2?

3        A.   8/2 is showing a 7/28/2016 trade for Exxon Mobil

4    Corporation is being sold.  And the cash and being deposited

5    into -- or settled into the account for $6,715.86.

6        Q.   Okay.  And going down a little bit here.  As of

7    8/31/16, what was the value of the Trust account?

8        A.   The total value is $5,297.55.

9        Q.   Okay.  And what happens on 9/2?

10       A.   On 9/2/2016, a trade was entered for Exxon Mobil

11   Corporation to sell the stock.  And cash was added to the

12   account on 9/8/2016 for $4,351.17.

13       Q.   And are there some more expenses or some checks

14   out?

15       A.   Yes.

16       Q.   So what's the statement value as of the end of

17   September, 2016?

18       A.   $1,389.15.

19       Q.   Now, at this point, what is contained in the

20   account?

21       A.   Just cash.

22       Q.   Okay.  So, are there any stocks at this point?

23       A.   No.

24       Q.   Just going down a little bit here.  Does LWLVACC

25   give some money or put some money into this account?

1  A.  Yes.  On 10/27/2016, there was a deposit from an

2  LWLVACC check for $5,000.

3  Q.  Now, going down to the last page here, page 9, what

4  happens by the end of your summary, by the end of December

5  2016?

6  A.  The total current value is $372.82.

7  Q.  Now, I'm going to show you Government's Exhibit 776.

8  MS. LARAIA:  I'd offer that for -- as a full

9  exhibit.

10  MR. EINHORN:  No objection, Your Honor.

11  THE COURT:  Full exhibit.

12  BY MS. LARAIA:

13  Q.  Just looking at page 3 here.  What is this?

14  A.  This is the statement for 12/1/2016 to 12/31/2016

15  from TD Ameritrade for the Burton Trust, and it's showing a

16  total portfolio value of $372.82.

17  Q.  Now, I'm also going to show you Government's

18  Exhibit -- just to focus on this for a second.  That's just

19  in --

20  A.  It's in the insured deposit account.

21  Q.  So, is that generally cash?

22  A.  Yes.

23  Q.  I'm going to show you Government's Exhibit 780.

24  MS. LARAIA:  And I'd offer this for full

25  admission.

1    MR. EINHORN:  No objection.

2    THE COURT:  Full exhibit.

3    BY MS. LARAIA:

4    Q.   And just looking at page 3, what is this?

5    A.   This is the 12/1/2017 to 12/31/2017 statement

6    showing the total balance of 372.82.

7    Q.   So, is this a full year after the statement that we

8    just looked at?

9    A.   Yes.

10   Q.   So had there been any change in the account

11   balance?

12   A.   No.  I believe for 2018 there may have been a couple

13   pennies of interest added.

14   Q.   I'm just going back to Government's Exhibit 27, just

15   focusing now on the total value of the account.  When the

16   account -- or as of 3/31/14, what was the total value of the

17   account at that point?

18   A.   The total value of the assets in the TD Ameritrade

19   account were $286,729.64.

20   Q.   Okay.  And that amount, did that go up a little bit

21   at some point?

22   A.   Yes.  The market value of the stocks changes in the

23   account.

24   Q.   Okay.  So -- and there's a little bit of income

25   earned; is that right?

1  A.   Yes.

2  Q.   So, for example, 6/30/14, what's the total value?

3  A.   $299,593.66.

4  Q.   Okay.  And by the end, if we go all the way to the

5  bottom, what was the balance?

6  A.   Yes.

7  Q.   $372.82?

8  A.   Yes.

9  Q.   We talked about some of the income that this account

10  would earn.  Do you remember that?

11  A.   Yes.

12  Q.   Okay.  And just looking back at the first page here.

13  For example, do you see some income on 6/10/14?

14  A.   Yes.  There was $905.43 deposited into the

15  account.

16  Q.   And what happens -- are any of those earnings still

17  in the account?

18  A.   They're summarized in the cash transactions and how

19  the cash is distributed from the account.

20  Q.   Okay.  So fair to say that the remaining balance as

21  of the ending date in the summary, of $372 and change,

22  accounts for any income earned by the Trust?

23  A.   Yes.

24  Q.   Now, as part of your investigation, have you

25  received information from TD Ameritrade about the logins into

1    their trading platform with reference to the account held in

2    the name of the Trust?

3        A.   Yes, we have.

4        Q.   Okay.  I want to show you Government's Exhibit 792.

5            MR. EINHORN:  No objection.

6            MS. LARAIA:  I'd offer that as a full exhibit.

7            THE COURT:  So it's 11:00 o'clock.  I'm wondering if

8    we should take our morning break before you get into this

9    exhibit.  Okay?

10           So, 792 is a full exhibit, and we'll take a

11   15-minute recess.

12           (Jury out, 11:00 a.m.)

13           THE COURT:  All right.  If there's nothing else,

14   we'll take a 15-minute recess, and we'll return to continue

15   with Agent Day.

16           MR. McGARRY:  Thank you.

17           (Recess taken, 11:00 a.m.)

18           (Out of the presence of the Jury, 11:20 a.m.)

19           THE COURT:  Please be seated, ladies and gentlemen.

20   Adding to the list of questions that I had for you with

21   respect to the draft charge, I'm -- this question is for the

22   Government -- is aiding and abetting a part of this charge?

23   Aiding and abetting requires there to be somebody else.

24           MR. McGARRY:  I think, if I may, Your Honor, I

25   believe it's -- I think it's aiding and abetting and

1  causing.

2          THE COURT:  Yeah, but causing is separate from

3  aiding and abetting.  Aiding and abetting has a whole

4  description about you can't aid and abet unless there's

5  somebody who committed a crime because you can't aid and abet

6  no crime.

7          MR. McGARRY:  Right.

8          THE COURT:  So that doesn't seem applicable to this

9  case; am I right?

10          MR. McGARRY:  I think -- I believe you're right,

11  Your Honor.  I think, for instance, if there were anyone in

12  Lux Financial who were sending faxes or doing -- if it were

13  to be claimed that they were doing something causing the

14  mail, I think it would all probably fall under the causing.

15          Like, I don't think that there would be any -- and

16  I'm agreeing with the Court -- I don't think there's anything

17  where we would say, okay, Maryanne committed wire fraud by

18  sending the faxes but Mr. Vaccarelli was merely aiding and

19  abetting her.  I think the argument would be Mr. Vaccarelli

20  was causing -- was committing wire fraud by causing Maryanne

21  to send the fax.

22          So I would agree with the Court that we would

23  request the causing instruction, rather than the aiding and

24  abetting.

25          THE COURT:  Okay.  Thank you.

```
 1            MR. EINHORN:  I can answer the forfeiture question
 2    now if Your Honor wants.
 3            THE COURT:  Okay.
 4            MR. EINHORN:  We discussed it, the forfeiture issue
 5    will not go to the jury.  We can give Your Honor more
 6    details, but basically it would be reserved, depending upon
 7    the verdict, and then Your Honor would -- if it's a verdict
 8    of guilty on all counts, then Your Honor would determine the
 9    forfeiture issue.
10            THE COURT:  The amounts of forfeiture?
11            MR. EINHORN:  Yes, Your Honor would --
12            THE COURT:  And they would be determined by a
13    preponderance, not beyond a reasonable doubt?
14            MR. EINHORN:  Yes.  Different standard.  Different
15    procedure, different standard of proof, yes.
16            THE COURT:  And that's a whole separate proceeding
17    after the jury returns its verdict if it's guilty.
18            MR. EINHORN:  Yes.  I tried the last one with Judge
19    Kravitz, actually, over there -- yes.  I don't think it's
20    going to come to that.  Mr. McGarry and I have had that issue
21    before.
22            MR. McGARRY:  And it's my understanding, Your Honor,
23    it's the Defendant's prerogative, the Defendant's right to
24    waive his right to have the jury hear any forfeiture
25    allegation and decide on -- if there is a number of dollars
```

 1   to be forfeited.

 2          So the Government really is a bystander in that

 3   decision.  If he waives his right, we're happy to go with the

 4   Court and not trouble the jury.

 5          THE COURT:  All right.  And that's what you're

 6   representing, Mr. Einhorn, is that Mr. Vaccarelli is waiving

 7   the right to have the jury determine forfeiture, in terms of

 8   its amounts and its applicability to criminal conduct?

 9          MR. EINHORN:  Yes, Your Honor.  We'll leave that to

10   Your Honor if it comes down to that.

11          THE COURT:  That's fine.  Okay.  But that's clear

12   for the record that that's what the Defendant has elected.

13          MR. EINHORN:  Yes, Your Honor.

14          THE COURT:  Okay.  Okay.

15          THE COURT:  All right.  Let's bring the jury back.

16          (Jury in, 11:25 a.m.)

17          THE COURT:  Please be seated, ladies and gentlemen.

18   We'll continue with the direct examination of Agent Russell

19   Day.

20          You may proceed.

21          MS. LARAIA:  Thank you, Your Honor.

22   BY MS. LARAIA:

23     Q.   Special Agent Day, I just want to start with going

24   back to Government's Exhibit 27.  Is this the summary that

25   you've been testifying about?

1    A.   Yes.

2    Q.   Okay.  I just want to go to page 3.  Okay.  As part

3    of your investigation, have you looked at amounts of money

4    that have gone from this account to Leon Vaccarelli or to

5    LWLVACC?

6    A.   Yes, we have.

7    Q.   Okay.  And just for example, 2015, was more or less

8    than $24,000 paid to Mr. Vaccarelli or to LWLVACC, for

9    2015?

10   A.   In 2015, more than $24,000.

11   Q.   And just tell us what I'm highlighting here, 2/17/15

12   and 2/24/15?

13   A.   Two checks, one to Leon Vaccarelli and one to

14   LWLVACC.  Both checks are for $8,000.

15   Q.   Okay.  Is there another check to LWLVACC a little

16   less than a month later?

17   A.   Yes, for $5,000.

18   Q.   Okay.  And a little bit further down, 3/17, eight

19   days later, how about that?

20   A.   For $9,116.

21   Q.   Okay.  And just to highlight this for a second.  Did

22   you testify previously about some checks listed as being

23   payable to Craig Newell?

24   A.   Yes.

25   Q.   Do you happen to know what Craig Newell is?

1   A.   During the investigation, we learned that Craig

2   Newell was the landlord for Lyn Burton.  And I think on some

3   of the other checks, it may say her apartment number in -- I

4   forget if it was Woodbury.

5   Q.   Okay.  So checks to Craig Newell, fair to say,

6   appear to be for rent for Lyn Burton?

7   A.   Yes.

8   Q.   Just going down to the next page.  And how about for

9   2016; was more or less than $24,000 paid to Mr. Vaccarelli,

10   or to LWLVACC?

11   A.   Without adding up the numbers, I believe more than

12   24,000.

13   Q.   Okay.  I'm just going to highlight for you 1/19/16,

14   if I can.

15   A.   So on 1/19/2016 there was 15,000 made payable to

16   Leon Vaccarelli.

17   Q.   And how about 2/1?

18   A.   On 2/1/2016, there was 6,500 paid to Leon

19   Vaccarelli.

20   Q.   And 2/4?

21   A.   On 2/4/2016, Check 231 made payable to LWLVACC for

22   5,500.

23   Q.   And 2/10?

24   A.   On 2/10/2016, Check number 232 to Leon Vaccarelli

25   for 7,500.

1    Q.   Altogether right there, between 1/19 and 2/10, more

2    or less than 24,000?

3    A.   Greater than 24,000.

4         MS. LARAIA:  And I just want to go back.  I believe

5    that I moved the admission of Government's Exhibit 792 before

6    we broke, but if I didn't, I'd move its admission now.

7         THE COURT:  792 has been admitted.

8         MR. EINHORN:  No objection.

9    BY MS. LARAIA:

10   Q.   What is Government's Exhibit 792?

11   A.   This is a document provided by TD Ameritrade, which

12   shows the login into the account for -- it was named Burton

13   49.  TD Ameritrade captures the login times to their web page

14   and they capture the IP address of the account where the IP

15   address is coming for the account signing in.

16   Q.   Okay.  And what was the significance of that?

17   A.   On various trade dates during the investigation, we

18   identified the IP address, which is listed as 50.198.105.214,

19   and that was identified as a Comcast IP address.  And we were

20   able to determine that that IP address was assigned to Lux

21   Financial.

22   Q.   Okay.  And now for the trades made on May 29th of

23   2015, July 21st, 2015, and August 31st, 2015, what was the IP

24   address that was used to access the TD Ameritrade platform or

25   website to initiate those trades or request the trades?

1    A.   All right.  On 5/29/2015, at 10:11 a.m., Burton 49,

2  IP address 50.198.105.214.

3    Q.   And was that same IP address used for the other

4  trades, 7/21/15 and 8/31/15?

5    A.   Yes.

6    Q.   I'm just going to go back and show you Government's

7  Exhibit 13.  Is that the 5/29/15 trade that we're talking

8  about?

9    A.   Yes.

10   Q.   And Government's Exhibit 14.  What's the trade date

11  for that one?

12   A.   7/21/2015.

13   Q.   And Government's Exhibit 15.  What's the trade date

14  for this one?

15   A.   August 31, 2015.

16   Q.   All right.  And this last one being Sigma-Aldrich

17  securities being sold?

18   A.   Yes.

19   Q.   And Government's Exhibit 14.  What was being sold

20  here?

21   A.   This is Johnson & Johnson stock on 7/21/2015.

22   Q.   And how about on Government's Exhibit 13, what was

23  being sold?

24   A.   On 5/29/2015, Sigma-Aldrich Corporation.

25   Q.   Okay.  I'm going to pull up on the screen

1    Government's Exhibit 49 previously admitted.  And do you see

2    where it says "Joint Stipulation"?

3        A.   Yes.

4        Q.   Okay.  This next section here, where it says --

5    paragraph 1, could you read that paragraph for the jury?

6        A.   Yes.  "The sales of securities referenced in Counts

7    13, 14, and 15 of the Superseding Indictment involved use of

8    instruments of communication in interstate commerce where IP

9    address 50.198.105.214, which was assigned to Lux Financial

10   and located in Connecticut, was used to access the TD

11   Ameritrade web-based trading platform to execute the sales of

12   securities and causing the settlement of proceeds in a TD

13   Ameritrade account."

14       Q.   And is that information that you learned based on

15   communications and review of documents from TD Ameritrade?

16       A.   Yes.

17       Q.   And the next paragraph, does that indicate that if

18   called as a witness or representative -- a representative of

19   TD Ameritrade would testify that the authentication server

20   for the TD Ameritrade web-based trading platform was located

21   in Carrollton, Texas in 2015?

22       A.   Yes.

23       Q.   Was that also information you learned based on

24   communication with TD Ameritrade?

25       A.   Yes.

1    MS. LARAIA:  No further questions, Your Honor.

2    THE COURT:  Cross-examination.

3    MR. EINHORN:  Yes, Your Honor.

4                    CROSS-EXAMINATION

5  BY MR. EINHORN:

6    Q.   Good morning, Special Agent Day.  I'm just going to

7  ask you questions in one area.  I've put before us on the

8  screen what's been entered into evidence as Exhibit 27, and I

9  just wanted to ask you, you've gone through with us -- very

10  recently, actually -- a number of payments that Mr.

11  Vaccarelli made either to himself or to his company, or a

12  company controlled by him, over the time period, I guess

13  2014-2016.  That's the right time period, by the way?

14    A.   Yes.

15    Q.   And during that time period -- actually, it's March

16  2014 to December 2016 -- did you know Mr. Vaccarelli?

17    A.   No.

18    Q.   You didn't know him.  You hadn't met him, I don't

19  think, in that time period yet; had you?

20    A.   Not until 2017.

21    Q.   Not until 2017, right.  So during the time period

22  2014 through the end of 2016, you didn't know him personally,

23  to see him and talk to him; did you?

24    A.   No.

25    Q.   Okay.  So if, in fact, Mr. Vaccarelli was impaired

```
 1    in some way during that time period, you wouldn't know based
 2    upon any observations you had; right?
 3         A.   I've never met him before.
 4         Q.   Okay.
 5              MR. EINHORN:  Nothing further, Your Honor.  Thank
 6    you.
 7              THE COURT:  All right.  Any redirect?
 8              MS. LARAIA:  No, Your honor.
 9              THE COURT:  All right.  Agent Day, you may step
10    down.  You are excused.
11              (Witness excused, 11:35 a.m.)
12              THE COURT:  Will the Government please call its next
13    witness?
14              MR. McGARRY:  Thank you, Your Honor.  At this time,
15    the Government calls Bienvenido Almodovar.
16              THE COURT:  All right.  Mr. Almodovar, would you
17    please remain standing at the witness stand, and you will be
18    sworn.
19              (BIENVENIDO ALMODOVAR sworn, 11:35 a.m.)
20              COURTROOM DEPUTY:  Please be seated and state your
21    name for the record.
22              THE WITNESS:  My name is Bienvenido Almodovar.
23              COURTROOM DEPUTY:  Can you spell your last name?
24              THE WITNESS:  B-I-E-N-I-V-O -- I missed a letter.
25    I'm sorry.  B-I-E-N-V-E-N-I-D-O.  The last name is Almodovar,
```

```
 1   A-L-M-O-D-O-V-A-R.
 2             COURTROOM DEPUTY:  And can you tell us what city and
 3   state you live in?
 4             THE WITNESS:  I work for the FBI out of the Meriden,
 5   Connecticut office.
 6             COURTROOM DEPUTY:  Thank you.
 7                        DIRECT EXAMINATION
 8   BY MR. McGARRY:
 9        Q.   Good morning, Mr. Almodovar.
10        A.   Good morning.
11        Q.   You just, in answering the Courtroom Deputy's
12   question, indicated that you work for the FBI out of the
13   Meriden office.  How long have you been with the FBI?
14        A.   The FBI, I've been -- 13 years, going on 14 this
15   year, actually.
16        Q.   And can you tell the jury, briefly, your educational
17   background?
18        A.   I have an accounting degree from UConn -- from the
19   University of Connecticut back in '86.  It's been a few
20   years.  And I'm a -- that was my accounting degree, which led
21   me to going into the accounting profession.
22        Q.   And I take it you studied accounting?
23        A.   I did.
24        Q.   And are you a Certified Public Accountant?
25        A.   I'm certified -- as part of -- after I graduated
```

1    from UConn, I ended up getting a job with Ernst & Young, and

2    I worked there for three years, which is -- three or four

3    years -- and it was during that period I became a Certified

4    Public Accountant licensed in Connecticut.  And currently, my

5    license to practice accounting is inactive because I am not

6    practicing public accounting.  I'm with the Government.  And,

7    so, in Connecticut, you can be inactive and still be

8    Certified Public Accountant.

9        Q.   Okay.  And after working at Ernst & Young, did you

10   go someplace else?

11       A.   Yes.  After Ernst & Young, I got a little tired of

12   the long hours and all that stuff, so I went to work for

13   United Technologies in the internal audit department, the

14   corporate office.  And there, I was an auditor, for the most

15   part.  I basically did audit -- financial and operational

16   audits for all the UTC divisions.  I was a part of the team

17   that did all the audits in all the divisions, but --

18              (Reporter interruption.)

19              THE WITNESS:  I'll slow down.  I'm sorry.

20              So I did a lot of financial and operational audits

21   for United Technologies divisions, UTC divisions, throughout

22   the world.  And, so, I traveled a lot to various countries.

23   And since I have a Spanish and Portuguese and other language

24   skills, I travel a lot to Mexico, Portugal, Brazil and some

25   of the other European countries.

1    BY MR. McGARRY:

2        Q.   And when you were traveling and working for UTC, did

3    you do audits and internal audits?

4        A.   Primarily operations audits.  So basically went into

5    the different divisions -- primarily, manufacturing

6    divisions.  They manufacture -- for example, Pratt & Whitney

7    did the aircraft engines, Otis Elevators, and the other

8    entities, such as Carrier, did the air conditioners, still

9    does them.

10            So we would go in and look at the operations and do

11   the audits of how they do their manufacturing.  And we also

12   focused a lot on the financial controls of the businesses to

13   make sure they were operating within the -- all the rules

14   that we had at UTC.  And then for financial reporting

15   purposes as well, to make sure they were complying with all

16   the regulations that they -- we needed to have them comply in

17   order to be able to report to the SEC and everything that the

18   internal control structure at all those divisions conformed

19   to those requirements.

20       Q.   In addition to being certified as an accountant, do

21   you have other -- any other certifications or additional

22   education-based certifications?

23       A.   Yes.  I became a Certified Fraud Examiner back in

24   the late 1990s.

25       Q.   And what does that mean?

1    A.    Certified Fraud Examiner is a designation -- is

2  sponsored by the American Certified Fraud Examiners.

3            THE COURT:  Whoa.  Slow down, please.

4            THE WITNESS:  American fraud examiner's association.

5  BY MR. McGARRY:

6    Q.    Okay.

7    A.    And then the -- similar to the certified public

8  accounting process, you have to take an exam.  You have to be

9  qualified as a -- have some sort of financial accounting

10  background.  And once you take the exam, then you get -- you

11  have to put in an application and get approved by their

12  group.

13    Q.    And have you maintained your certification over the

14  years with that organization?

15    A.    I have.

16    Q.    Okay.  And how do you do that?

17    A.    So, in order to be -- to maintain the

18  certifications, as similar to CPA, you have to take

19  continuing education courses throughout the year.  For the

20  CFE, Certified Fraud Examiner, it has to be 24 credits a

21  year.  So what I do is I -- for example, with the Bureau, the

22  FBI, they sponsor a CPA conference every year, where the same

23  curriculum, basically, that applies to the CPA certifications

24  applies to the Certified Fraud Examiner certification.

25            So it's all the same, so I basically double-dip, if

1   you will.

2       Q.   I'm going to guess those CPA conferences are just

3   wacky, huh?

4       A.   No, they're not.  They're very exciting things.

5       Q.   Okay.  Just pushing you forward a little bit.  You

6   said you joined the FBI, I believe, about 13 years ago.  What

7   do you do as a Certified Forensic Accountant for the FBI?

8       A.   So, our main mission is to follow the money.  That's

9   our main job.  We get involved with the investigative team,

10  and our main focus is on the financial aspect of the

11  investigation.  So, we follow the money.  That's a key

12  phrase.

13          We look at all the financial statements that we

14  receive and we analyze the bank accounts, and we try to

15  follow the money and take, you know, whatever -- wherever it

16  leads, that's where we go.

17      Q.   And without going into too much detail, are you also

18  on something called the "ERT"?

19      A.   I like to be more than busy, so I also joined the

20  Evidence Response Team with the Bureau.  Those are the guys

21  you see on TV sometimes, with the yellow letters on their

22  back, searching for evidence at many crime scenes and in some

23  very bad places that you've seen on the news.  So, we always

24  go where we're called.

25          So I'm a member of that team.  I've been there since

1    -- almost since I joined, so it's almost 12 years now.  And

2    I've been deployed to many of the big events that you have

3    heard on the news over the years.

4         Q.   So going back to reviewing financial records, do you

5    also do some financial analysis?

6         A.   So what we do is we review the financial records,

7    obviously, but we also prepare analysis of those records to

8    be able to --

9              (Reporter interruption.)

10             THE WITNESS:  Prepare analysis of those records in

11   order to be able to, for example, come in to -- and testify

12   to a jury and explain what has happened, for example, in a

13   bank account.

14   BY MR. McGARRY:

15        Q.   And you looked -- for this case, did you review bank

16   account, bank statements?  Tell the jury what you did.

17        A.   For this case specifically, I joined earlier this

18   year.  In preparation for the trial, the case agents

19   requested that I assist in analyzing the bank records that

20   they already had.  He had already started some spreadsheets.

21   So I took the bank records that he had obtained already

22   through subpoenas and the spreadsheets, and I reviewed all

23   those documents and started to work on the spreadsheets that

24   -- the exhibits that I prepared for trial.

25        Q.   And the jury just saw an exhibit.  Did you prepare

1 other exhibits similar to that?

2    A.   I did quite a few, yes.

3    Q.   Could you tell the jury, briefly, maybe about

4 BankScan and Excel and how it is you get the information from

5 the subpoenaed records into the Excel spreadsheet form?

6    A.   The process -- we follow similar processes, all the

7 analysts in the Bureau and other places.  Instead of having a

8 box of documents that might be this high (indicating), you

9 know, two or three boxes of financial documents, records,

10 bank statements, we scan all that documentation into PDFs and

11 then we have the software that converts -- we can convert the

12 statements into Excel.

13        And from there, we begin the process of looking at

14 all the transactions.  And in Excel, it's much easier because

15 you can just follow all the way down.  And then we start

16 scheduling the banks' checks, the deposits, and that's how we

17 come up with the exhibits.

18    Q.   And then once they're in Excel, do you have to go

19 through and verify, line by line, page by page, the

20 investigation that's in there?

21    A.   Definitely.  That's a process, that we always

22 double- and triple-check all the documentation, because it's

23 software, so anything can happen.  But -- and not all banks

24 give us very good quality documents.  So sometimes we get

25 very fuzzy, very -- documents that are hard to read.  Such as

1   you heard before, the checks are hard to read sometimes.  So

2   we have to go and double-check the transaction details -- the

3   dates, the amounts, and all the other documentation -- just

4   to make sure they agree -- that they are in conformity, that

5   they agree with the bank statements, the hard copies.

6      Q.   So, previously, I think you made a hand gesture that

7   sometimes the bank records can be, what, about three or four

8   feet high for the accounts that you get.  Is that accurate?

9      A.   Correct.  If you were to print some of these bank

10  records, there are thousands of checks, so they start to

11  build up fairly quick.  And depending on the case, you may

12  have 10, 15 different accounts, and they can be very

13  voluminous.  So that's why we do the analysis and get into

14  Excel.

15     Q.   And approximately how many bank accounts did you --

16  I'll call them Excel spreadsheets, but the analysis that you

17  did, approximately how many bank accounts?

18     A.   I think it was six or seven.

19     Q.   And you made spreadsheets?

20     A.   I did.

21     Q.   And we'll go through them, but do you remember off

22  the top of your head what some of the bank accounts were?

23     A.   It was like -- there was account 7051, which was a

24  LWLVACC account.

25     Q.   Okay.

1   A.   The 757 account -- the 1757 account, which was the

2   Leon Vaccarelli's personal account, I call it.

3   Q.   Okay.

4   A.   And there was a 5007 account.  That was the Lux

5   Financial account.  That's the three -- the ones that I

6   remember.  There's some others, as well.

7   Q.   Was there one for Leavenworth?

8   A.   Yes.

9   Q.   And were there a couple for Monica Vaccarelli?

10  A.   There were three.

11      MR. McGARRY:  At this point, Your Honor, I'd like to

12  move Government's Exhibits 25, 26 -- I believe 27 is already

13  in evidence -- 28, 29, 31 and 36, pursuant to Rule 1006.

14      MR. EINHORN:  May I have just a moment, Your Honor?

15      THE COURT:  You may.

16      (Counsel confer.)

17      MR. EINHORN:  No objection, Your Honor.

18      THE COURT:  All right.  25, 26, 28, 29, 31 and 36

19  are full exhibits.  And these are all summaries of voluminous

20  documents more easily presented in a consolidated form.  You

21  may proceed.

22      MR. McGARRY:  Thank you, Your Honor.

23  BY MR. McGARRY:

24  Q.   Before we get into the nitty-gritty, I'm going to

25  ask you to explain the columns.  Let me show you Government's

1  Exhibit 25.  And I'm going to direct your attention to page

2  27.

3         Just, before we get right into it, can you just go

4  through, briefly, from left to right, and tell the jury what

5  these various columns are and what conventions you used --

6  what accounting conventions you used to show deposits and

7  withdrawals, adding and subtracting from the accounts?

8     A.   Yes.  So this is a representation of the bank

9  statements.

10    Q.   Okay.  Which account -- which account is this?

11    A.   This account is the LWLVACC, LLC, account at Ion

12 Bank, the 7051 account.

13    Q.   Okay.

14    A.   And the first two columns of Date and Transaction

15 represent the information directly from the bank statements.

16    Q.   Okay.

17    A.   So we just scan them in, and this is what we put in

18 here.  We always double-check it, obviously, because

19 sometimes the 8 comes out as a 6, or a 5 as a 6.  So we

20 always double-check those to make sure they are accurate.

21 And the Transaction, the same thing.

22    Q.   Okay.  And Detail.  What is Detail?

23    A.   The Detail is when we go back and look at the checks

24 with -- the hard copies of the checks, and that's what we put

25 in, what the check was for.  For example, if there's a check

1   number, we go in there and type in what it was for.

2       Q.   And I see the word "Memo," and then there's various

3   entries in the Memo.  Is that something that you put in or is

4   that something that you get from the bank records?

5       A.   That is directly from the check.  We try to read

6   what the check says on the Memo line.  And sometimes we are

7   -- do better than other times.  But usually we're pretty

8   close.  Because handwriting is hard to read sometimes, so we

9   just put in what we think it represents.

10      Q.   Okay.  Like, for instance, on this one where it says

11  "Draw," would that be something that was written on the

12  check?

13      A.   That would be what was written on the Memo line of

14  the check.

15      Q.   Okay.  And then you have Amount, and then you have

16  Balance.  What is in the Amount column?

17      A.   The Amount column represents what -- for example,

18  what the check amount was.  And it should be -- it's the same

19  as what was in the bank statement.

20      Q.   Okay.  And I see that you have parentheses.  Some

21  don't have parentheses.  For instance, this one says

22  "deposit" and there's no parentheses, and then other ones

23  where there are checks and overdrafts and other checks, they

24  seem to have parentheses.  I guess, they're parentheses.

25      A.   Yes.

1    Q.   A fun word to say.

2         What does that mean in accounting usage?

3    A.   In order to follow the balance on the account, we

4    put in the deposits or money coming into the account as a --

5    without parentheses, just a straight number.  If it's

6    deducting from the account, it would be in parentheses.

7         So it follows -- and basically, you just roll down

8    the balance continues.  It's a running balance.  So the

9    deposit of numbers without parentheses are deposits of money

10   coming in, and then the ones in parentheses are deductions

11   from the balance, which are the debits.

12   Q.   So, just so everybody is clear, and so my question

13   is clear, if it doesn't have parentheses, is that the

14   equivalent of if there were like a plus sign?  Like in

15   elementary school we have plus signs and minus signs; right?

16   A.   This would be equivalent.  So plus would be money

17   coming in, minus would be deductions from the balance.

18   Q.   And the parentheses are the accountant's equivalent

19   of a minus sign -- or my kid calls it a "take-away" sign?

20   A.   Correct.

21   Q.   And you don't -- you didn't use colors, you didn't

22   use red for money coming out and green for money coming in,

23   you just kind of did it black and white as a CPA would do;

24   correct?

25   A.   Basically, that's how we -- that tends to be our

```
 1   convention, just to make sure that there's nothing -- we're
 2   just trying to follow the money and we're not trying to --
 3   there's no judgment whether it's good or bad.
 4        Q.   Okay.
 5        A.   So, red -- we usually do it in black and white.
 6        Q.   Okay.  I'd also -- did you also -- in addition to
 7   putting together these charts, did you also put together some
 8   demonstrative exhibits?
 9        A.   Yes, I did.
10        Q.   Okay.  And are those demonstrative exhibits in the
11   form of pie charts?
12        A.   They are.
13        Q.   And I think I might have an extra set.  I'm going to
14   hand you and then ask you if you could describe --
15             I'm handing you what's been marked for
16   identification, Your Honor, as Government's Exhibit 63
17   through 75.
18             THE COURT:  And when you describe these as
19   demonstrative exhibits, they are to be shown to the jury in
20   connection with Mr. Almodovar's testimony, but they will not
21   be full exhibits for the jury.
22             MR. McGARRY:  Correct, Your Honor.
23             THE COURT:  Okay.  So you will not see these in the
24   jury room.  Okay.
25   BY MR. McGARRY:
```

1    Q.   Would you tell the ladies and gentlemen of the jury

2    and the judge what Government's Exhibit 63 is and then what

3    Government's Exhibit 64 through 75 are?

4    A.   Exhibit 63 represents the summary chart of the

5    client's funds.  The funds in and the funds out.

6    Q.   Okay.  And what are -- what is 64 through 75?  Just

7    generally, what are they?

8    A.   64 through 75 represent the client's money and how

9    it was spent.

10   Q.   Okay.  And do you believe these charts will help aid

11   your testimony to the jury?

12   A.   Correct.  Instead of looking at the numbers, which

13   would be a lot of numbers, we'll have a representation of how

14   the money was spent in a pie chart format, would be chunks of

15   the different categories that I came up with.

16       MR. McGARRY:  And, Your Honor, rather -- I did that

17   all together, rather than laying a foundation for each

18   demonstrative.

19       THE COURT:  That's fine.

20       MR. McGARRY:  Thank you, Your Honor.

21   BY MR. McGARRY:

22   Q.   Before we jump into the charts.  Did you also, as

23   part of -- part of the investigative team, did you also go

24   through and pull together the signature cards and other

25   banking documents in order to identify the names of the

1102

1    accounts?

2        A.   Yes.

3            MR. McGARRY:  Okay.  I'd like to offer at this time

4    Government's Exhibit 32, 33, 34, 35, and 37 as signature

5    cards and backup banking documents.

6            MR. EINHORN:  No objection, Your Honor.

7            THE COURT:  Full exhibits, 32, 34, 35 and 37.

8            THE COURT REPORTER:  Wait, Your Honor.  Can you

9    repeat that?

10           THE COURT:  32, 34, 35 and 37.

11           THE COURT REPORTER:  Did you say 33?

12           THE COURT:  I did not.

13           THE COURT REPORTER:  I'm sorry.  Thank you.

14           MR. McGARRY:  I would offer 33, if I didn't say 33.

15   I would offer 32 --

16           THE COURT:  Any objection to 33?

17           MR. EINHORN:  No, Your Honor.

18           THE COURT:  All right.

19           MR. McGARRY:  Great.

20   BY MR. McGARRY:

21       Q.   And let me just pull those up really quick, Mr.

22   Almodovar.  What is Government's Exhibit 32?

23       A.   This is the signature card for account 7051 in the

24   name of LWLVACC, LLC.

25       Q.   Okay.  And is it signed?

1    A.   It is signed on -- was signed on December 19,

2  2002.

3    Q.   Okay.  And is that a one-page document?

4    A.   It is.

5    Q.   Let me show you what's been marked as Government's

6  Exhibit 33.  What is Government's Exhibit 33?  And I will

7  enlarge it on the screen for you to see.

8    A.   This is the signature card for account ending 5007.

9  It is for Leon W.L. Vaccarelli d/b/a -- doing business as Lux

10 Financial -- Lux Financial Services.  And the name of the

11 owner is Leon W.L. Vaccarelli, and it's signed.

12   Q.   And does it also have his home address and his

13 business address?

14   A.   It does.  The first address is 84 Joshua Town Road,

15 Waterbury, and the mailing address is 49 Leavenworth Street,

16 Suite 204, Waterbury, Connecticut.

17   Q.   Okay.  And let me show you Government's Exhibit 34.

18 Do you recognize this resolution?

19   A.   Yes.  This is a resolution that goes hand-in-hand

20 with the previous signature card for the Lux Financial

21 Services account.

22   Q.   And could you read -- what is line A right there?

23   A.   Line A shows the -- that Leon W.L. Vaccarelli, sole

24 member.

25   Q.   Okay.  And let me show you Government's Exhibit 35.

1    What is Government's Exhibit 35?

2         A.   This is a Thomaston Savings Bank signature card.

3         Q.   Sorry.  Supposed to be yellow.  Actually, let me put

4    it up again.  Okay.  Thomaston Savings Bank signature card?

5         A.   Correct.

6         Q.   Okay.  And the name on the card -- or the name here

7    that I highlighted yellow?

8         A.   It's for an entity named Leavenworth Professional

9    Center, LLC, and the address is 84 Joshua Town Road,

10   Waterbury, Connecticut.

11        Q.   Okay.  And does it describe the nature of the

12   business as "property management," over on the right, in

13   handwriting?

14        A.   Yes.  Yes, it does.

15        Q.   And approximately when was this established --

16   referring you, again, to over on the right?

17        A.   It was established on December 4, 2012.

18        Q.   Let me show you Government's Exhibit 37.  Okay.  And

19   what is Government's Exhibit 37?

20        A.   This is a signature card for account ending 1757.

21        Q.   And whose name is on it?

22        A.   Leon W.L. Vaccarelli.

23        Q.   And if I were to take the first initial and the two

24   middle initials and then the first four initials, would that

25   be L-W-L-V-A-C-C?

1  A.  Yes.

2  Q.  Okay.  And is this signed?

3  A.  It is signed, and it's dated October 20, 2000.

4  Q.  Okay.  Okay.  So let me take you back.  We had it up

5  before.  Let me show you what's been marked as Government's

6  Exhibit 25.  Let me take you to page 27 of Government's

7  Exhibit 25, now in evidence.  And let me -- okay.  I would

8  want to do 25, and page 27.

9       And let me take you back -- all the way back to the

10  start of last week.  Do you remember an individual by the

11  name of Mike Brough?

12  A.  Yes.

13  Q.  Michael Brough.  Okay.  Directing your attention to

14  the middle of the page, do you see his name here?

15  A.  I do.

16  Q.  Okay.  And what is that amount of money?

17  A.  It is a deposit in his name on January 16, 2014 for

18  $38,862.61.

19  Q.  And if I were to go and pull up Government's Exhibit

20  301, and is that the same amount on this check on the right

21  in Government's Exhibit 301?

22  A.  Yes.

23  Q.  Okay.  And that's the same as on your chart here;

24  correct?

25  A.  Correct.

1    Q.    And if we go to the second page of the deposit

2    ticket on Government's Exhibit 301, is that the account that

3    it was deposited into?

4    A.    Yes, 7051.

5    Q.    Okay.  And is this -- is taking documents like the

6    one on the right of your screen and putting it in a chart

7    like we see on the left of the screen, is that what you

8    described as your practice and what you do to get -- to do

9    the analysis?

10   A.    Yes.  We looked at the deposit slip or -- for

11   example, in this case, shows the amount, and then we look at

12   the check, which is usually attached to the deposit slip.

13   Q.    Okay.  So going again back to Mr. Brough in the

14   middle of the page, did you schedule out what happened in

15   this account with respect to Mr. Brough's money?

16   A.    Yes.  I put in the amount, when it came in, the

17   money coming in, the $38,000.  And, then, obviously all the

18   transactions that happened afterwards --

19   Q.    Okay.

20   A.    -- would be reflective in the bank statement.

21   Q.    And what was the balance before Mr. Brough's money

22   came in?

23   A.    The balance on the day before the money came in was

24   $1,031.60.

25   Q.    And what was the balance after his money came in?

1      A.    $39,894.21.

2      Q.    Okay.  And can you read some of these entries?  What

3    is the second entry after his money comes in?

4      A.    Second entry is a $4,000 check, number 3883, written

5    out to Leon Vaccarelli, for Draw.

6      Q.    Okay.  Now, I know that accountants sometimes use

7    the reference to First-In, First-Out/Last-In, Last-Out, and

8    I'm sure you're familiar with those expressions.

9      A.    I am.

10     Q.    Without even using those expressions, what can you

11   tell us about this $4,000 draw with respect to the source of

12   funds that at least made up that draw in part?

13     A.    The majority of the funds used to make -- to pay for

14   that $4,000 came out of the $38,000 deposit.

15     Q.    And do you know that because of the size of the

16   balance before the money came in?

17     A.    Correct.

18     Q.    Okay.  And then going down, what is this entry here

19   on January 28th, highlighted for you?

20     A.    There is a payment to Capital One Bank -- looks like

21   it's for the credit card -- for $2,000.

22     Q.    Okay.  And scrolling down to the next page, what did

23   you see on the -- on January 31st of 2014?

24     A.    I see two withdrawals.  One withdrawal for $5,000 --

25   $5,100.  Looks like it was made out to Cash.  And a check

1    written out to Robert Kolesnik with a memo "payback 2 of 2"

2    for $16,546.25.

3        Q.   Okay.  And how about the $3,601.42; did that money

4    come out of the account or did that -- oh, that looks like a

5    reimbursement; correct?

6        A.   That is money coming in.

7        Q.   And, so, that money -- did you trace Mr. Brough's

8    money all the way down, let's say to about March 4th of

9    2014?

10       A.   Traced it -- yes, I did.

11       Q.   Okay.  And what did the balance go down to on March

12   4th and then on March 6th?

13       A.   After all the transactions, it went down to $200 --

14   $213.07.

15       Q.   And then what happened in the account next?  Did the

16   account appear to go into the negative at least until that

17   next deposit came in?

18       A.   Correct.  It went to -- had a negative balance of

19   $786.93.

20       Q.   And when it goes into the negative balance, is that

21   -- as an accountant, does that help you in tracing the source

22   of funds?

23       A.   Yes.  It means that all the funds were used up at

24   that point.

25       Q.   Okay.  And did you prepare a pie chart, Government's

1    Exhibit 64, with respect to Mr. Brough's money, to help

2    demonstrate or explain your testimony to the jury?

3        A.   Yes.  In order to get a sense of the total numbers,

4    because it is hard to add up all the different cash or

5    whatever in your head, so I tried to put it in perspective in

6    summary form.

7        Q.   And directing your attention to the screen, tell the

8    jury what they're seeing on this pie chart.

9        A.   Here, we see the $38,000 coming in from Michael

10   Brough.

11       Q.   You referenced the beginning balance.  Down here;

12   correct?

13       A.   I did, yes.

14       Q.   And you referenced the other funds coming in, like

15   we saw that reimbursement coming in; correct?

16       A.   Correct.  Just to show that not all the funds were

17   just from that $38,000.

18       Q.   Okay.  And tell the jury the categories that you've

19   broken this up.  I assume the computer helps you do this?

20       A.   Yes.  It's all summarized in Excel, so it's all

21   formulas.

22       Q.   How much cash came out?

23       A.   The total cash was $11,000 -- $11,551.42.

24       Q.   And --

25       A.   There were payments to Capital One, the $2,000 which

```
1   you saw before.  The payment to Robert Kolesnik, $16,000,
2   which you saw in the Detail, as well.  Laurelton Hall, 4500
3   bucks -- $4,500, sorry.
4       Q.   And do you know what Laurelton Hall is?
5       A.   It is a school.
6       Q.   Okay.
7       A.   And then payments to Leon Vaccarelli, total
8   $4,000.
9       Q.   And then there's -- did you mention Mr. Kolesnik?
10      A.   I did.
11      Q.   Okay.  Did you also schedule out Mr. Brough's second
12  transaction?
13      A.   I did.
14      Q.   Okay.  Let me show you what's Government's Exhibit
15  30 in evidence.  And directing your attention to the bottom
16  third of the screen, what was the -- what is this line?
17  April 18, 2016, what does that show?
18      A.   On April 18, there was a deposit from LPL Financial,
19  and the memo line or what was written on the check that I
20  looked at said, For the benefit of Michael Brough IRA account
21  ending 4096.
22      Q.   Okay.  Let me show you Government's Exhibit 2.  Is
23  this what you're referring to?  Oh, let me see.  Hold on.
24  Where it says "Pay to the Order of" and "FBO Michael Brough
25  IRA"?
```

1    A.   Correct.

2    Q.   And what's the amount of money on this one?

3    A.   $41,011.81.

4    Q.   Okay.  And going back to Exhibit 30, bottom third of

5    the page, what is the -- you were talking about the balance

6    and then the deposit; correct?

7    A.   Yes.

8    Q.   What did you trace after that?  What did you see

9    happen after that?

10   A.   After the money -- the $41,000 came in, there were

11   various transfers out to the account ending 1757, and also to

12   the 7051 account.

13   Q.   Okay.  And are you also referring to the May 6th

14   transfer?

15   A.   Yes.

16   Q.   And the May 17th transfer?

17   A.   Yes.

18   Q.   And then does this account appear to go into the

19   negative?

20   A.   It did.

21   Q.   Okay.  And were you able to trace this money from

22   the 41,000 that was transferred to account ending in 1757?

23   A.   Yes.

24   Q.   Okay.  And did that go into Government's Exhibit 26

25   in evidence?  I'll pull that up and I'm directing your

1     attention to page 116.

2          Okay.  What are we seeing on page 116?  Are there

3     transfers in that you just showed us on the other page?

4     A.   Yes.

5     Q.   Okay.  Well, first of all, what is the balance on

6     April 18th on this account?

7     A.   It is $1,031.43 overdrawn.  $1,031.43.  And the

8     account is overdrawn, so it's a negative balance.

9     Q.   Okay.  And tracing all of these transfers into this

10    account, were you able to see what happened with this money

11    that went into this account?

12    A.   Yes.

13    Q.   Do you see the $1200 payment?

14    A.   Yes, I do, to Capital One.

15    Q.   And, again, scrolling down, other payments.  You see

16    a small check to Our Lady of Mt. Carmel School?

17    A.   Yes.

18    Q.   Now, between the time that the account was negative,

19    can you tell the jury what source of funds that you saw

20    coming into this account?  Is there any other deposits other

21    than transfers from account 5007?

22    A.   No.  There's -- most of the funds came from the 5007

23    account.

24    Q.   Okay.  And does there appear to be a -- looks like a

25    $2,000 over-the-counter check made out to a Monica

1    Vaccarelli?

2        A.   Yes.

3        Q.   Okay.  And just tracing that down, does the balance

4    appear to go -- after another $2,000 check to a Monica

5    Vaccarelli, does that account appear to go to a balance of

6    approximately $700?

7        A.   Yes.

8        Q.   Okay.  Let me take you back to Government's Exhibit

9    30.  Again directing your attention to page 1, I think where

10   we left, and following this down.  Again, we saw all these

11   transfers.  And prior to this entry on December 2nd, 2016,

12   from MassMutual for Denise Augelli, what is the balance in

13   the account?

14       A.   The balance is $325.15.

15       Q.   And did you prepare two additional demonstratives

16   with respect to Mr. Brough's $41,000?

17       A.   I did.  In order to explain what happened with the

18   funds, I needed to break it down further to be able to say

19   exactly what happened.

20       Q.   Let me show you Government's Exhibit 65 in evidence

21   -- I'm sorry -- demonstrative.

22            What is on the screen now in Government's Exhibit

23   65.

24       A.   I added up -- this is the $41,000 that we saw

25   before.  And what I did was I added up all the transfers to

1    the 1757 account.

2         Q.    Okay.

3         A.    And other transfers to the other account, the

4    7051.

5         Q.    Okay.

6         A.    To come up with a total amount of the funds,

7    $41,000.

8         Q.    Okay.  And did you then trace the 39,000?

9         A.    I broke out that amount further in the next pie

10   chart.

11        Q.    Showing you what's Government's Exhibit 66 as a

12   demonstrative exhibit.  What does 66 show?

13        A.    66 shows the total amount that was transferred over

14   to account 1757, and how it was spent.

15        Q.    Okay.  And you mentioned -- did more than $12,000 go

16   to Laurelton Hall?  Directing your attention --

17        A.    Yes, there was $12,670 to Laurelton Hall.

18        Q.    Okay.  And approximately how much went to Monica

19   Vaccarelli?

20        A.    There were -- to Monica Vaccarelli, there were about

21   $9,227.

22        Q.    And how about $2,000 to a Briean Sodano?

23        A.    Yes, that's another category.

24        Q.    And what did you see over here with respect to cash,

25   vacation rental and Barry Michitsch?

```
 1        A.   So cash is -- I added all the cash amounts that were
 2   withdrawn, $4,520.50.  There was also money paid out for
 3   vacation rental -- it's $2,100.  And to Barry Michitsch --
 4        Q.   Michitsch?
 5        A.   -- Michitsch, okay, $3,000.
 6        Q.   Directing your attention back to the first day of
 7   trial, do you remember a woman by the name of Susan Rustic
 8   testified?
 9        A.   Yes, I do.
10        Q.   Okay.  And did you see her name in the bank
11   accounts?
12        A.   I did.
13        Q.   Okay.  Directing your attention to Government's
14   Exhibit 25 in evidence, and specifically directing your
15   attention to page 51.  Let me zoom-in to the middle of the
16   page.  And do you see the name Susan Rustic?  And I will
17   highlight it yellow.
18        A.   Yes, I see the name.
19        Q.   Is that November 30th of '15?
20        A.   Yes, there's a deposit in her name for a hundred
21   thousand dollars.
22        Q.   Okay.  And staying on -- let's see -- I guess --
23   what happens to that money?  Hold that thought right there.
24             Take a look at Government's Exhibit 658, if you
25   would -- I believe in evidence.
```

```
1              MR. McGARRY:  And if it's not in evidence, I would
2     move it into evidence.  But I believe it's in evidence.
3     BY MR. McGARRY:
4         Q.   Seeing a nodding -- a friendly, nodding head, what
5     is 658?
6         A.   This is a check from Susan Rustic for $100,000.
7         Q.   Okay.
8         A.   Payable to LWLVACC.
9         Q.   Okay.  And does that appear to be deposited in the
10    7051 account?
11        A.   Yes.
12        Q.   And is that what is Government's Exhibit 25
13    scheduled out to page 51 right there?
14        A.   Yes.
15        Q.   Okay.  And the balance is how much?  Just -- I know
16    I asked you that, but just to set it up here.  Before the
17    money comes in?
18        A.   Before the money comes in, the balance is $712.04.
19        Q.   Okay.  And then what happens to -- is there a check
20    the next day?
21        A.   Yeah.  There's a check to Thomaston Savings Bank for
22    $14,935.25 --
23        Q.   Okay.
24        A.   -- for loan number ending 6463.
25        Q.   And let me see if I can do this.  That didn't work.
```

1117

```
 1   Oh, there it goes.  Okay.  That didn't work, so we'll -- hold
 2   on.  Stay with me, please.
 3         Okay.  And showing you Government's Exhibit 19 on
 4   the right side, what do we have -- what -- I don't know if I
 5   can blow this up, but is this the $14,935?
 6   A.   Yes.
 7   Q.   So if we have that money -- oh, that didn't help,
 8   did it?  I'll tell you --
 9         THE COURT:  So Ms. Konarski is here to the rescue.
10         MR. McGARRY:  How about that?  Do you see a big red
11   line that the lawyer put on the screen?
12         MS. KONARSKI:  Yes.
13         MR. McGARRY:  Do you see the paralegal clear the
14   line off the screen?
15         MS. KONARSKI:  Don't use this.  Use this.
16         MR. McGARRY:  Can I make a red line?  What if we
17   go --
18         MS. KONARSKI:  It's a thick line.
19         MR. McGARRY:  I don't know.  Let's clear that.  How
20   do you clear it?
21         MS. KONARSKI:  Hit the clear button.
22         MR. McGARRY:  All right.  So just -- so much for
23   arts and crafts this morning.
24   BY MR. McGARRY:
25   Q.   Tell us what happened here in this bank account and
```

1118

1  this check.

2      A.   This is a check that was reflected on the schedule

3  after the hundred thousand dollars came in.

4      Q.   Okay.  And was there any other source of money in

5  the account other than Ms. Rustic's money and other than the

6  $712?

7      A.   I think if you'll make it bigger I can probably see

8  it, but I don't think there was any other money.

9      Q.   Sure.  Okay.  Is that helpful?

10     A.   It is.

11     Q.   So -- okay.  So, actually, on a serious note, asking

12  you to use your just basic accounting.  For this $14,935,

13  would more than $10,000 -- more than $10,001, necessarily

14  have come from Susan Rustic's money?

15     A.   Yes.

16     Q.   Okay.  Explain that to the jury.  Explain how you

17  know that factually.

18     A.   Well, if you look at the beginning balance, it's

19  only $700.  So the check is for $14,000, so basic math will

20  show that that it is definitely more than $10,000.

21     Q.   So more than $10,001 has to be from Susan Rustic's

22  money?

23     A.   Correct.

24     Q.   I want to ask you the same question about this

25  $75,000.  Do you see that?

1  A.  I see the $75,000, yes.

2  Q.  Okay.  And showing you on the right side of the

3  screen, Exhibit 20, and not using the red demonstrative giant

4  line but using the cursor, what can you tell us about this

5  check that's on the right with respect to the bank account on

6  the left?

7  A.  I think we saw it before, that the name on this

8  $75,000 check was June Antonacci.  And, so, that's what that

9  check is.

10  Q.  Okay.  That's this line here that is in yellow?

11  A.  The one that you just made yellow, yes.

12  Q.  And do the check numbers match?

13  A.  Yes.  3907.  And the memo is "payoff" senior note

14  "SR note" with an exclamation point.

15  Q.  And it says "pay off senior note" on your chart,

16  exclamation point.  Why did you put the exclamation point in

17  your chart?

18  A.  I saw it on the check, so I put it there.

19  Q.  So you just take what's in the memo line?

20  A.  Yes.

21  Q.  Okay.  And again using some basic accounting, there

22  seems to be -- after Ms. Rustic comes out, is this first --

23  leaving this check aside, we'll just literally go back to the

24  main screen.

25        Okay.  Focusing your attention again on Ms. Rustic

1120

1   and the $75,000, are there any deposits at all, funds into

2   the account, after Mrs. Rustic's money came in, before the

3   $75,000?

4        A.   No.

5        Q.   Okay.  So what are you able to tell the jury about

6   the source of funding -- in other words, where the money came

7   from -- to go for the $75,000?

8        A.   The $75,000 came from the hundred thousand dollars

9   from Ms. Rustic's account.

10       Q.   Okay.  So even if an accountant were to take this

11  $712 and credit it into the 75,000, what -- would there still

12  be more than $10,000 -- more than $10,001 of Ms. Rustic's

13  money necessarily used to comprise the -- to make up the

14  $75,000 in that payoff of senior notes check?

15       A.   If there was a need for that, definitely the $75,000

16  came from the hundred thousand dollars.  But the funds are

17  already commingled with the beginning balance, so it's all

18  the same, pretty much.

19       Q.   Fair enough.  But even if you credit the $712,

20  there's still more than $74,000 that would have come from

21  Ms. Rustic's; is that right?

22       A.   Correct.  Okay.

23       Q.   Okay.  And, by the way, in the middle of all of

24  this, did you see a deposit or a check going to Thomaston

25  Savings Bank?

1    A.   Yes, there's a check 3920 for the account number

2    ending 3433 for $5,388.24.

3    Q.   Okay.  And do you know what that was for?

4    A.   I believe that's a loan for the home.

5    Q.   Okay.  And right above it, the first one that we

6    looked at when it was check -- Government's Exhibit 19.  That

7    says "Loan Com 6463."  What is that?

8    A.   That's -- I believe that's the commercial loan on

9    the building.

10   Q.   Okay.  All right.  And let me just scroll down

11   again.

12        Have there been any other deposits on the remainder

13   of page 51?

14   A.   No.

15   Q.   Okay.  And taking you to page 52, December 18th, are

16   there any more deposits?

17   A.   No.

18   Q.   And what is the approximate balance in the account

19   on or about, I'll say December 18th, and then again on

20   December 28th?

21   A.   During that period the account is overdrawn.  As of

22   December 28th, the balance was overdrawn by $269.59.

23   Q.   And did you prepare a pie chart to demonstrate -- or

24   as a demonstrative exhibit, to help explain your testimony

25   with respect to Susan Rustic?

1122

1    A.   Yes.

2    Q.   Okay.  Let me show you Government's Exhibit 67.

3 Okay.  What does this show?

4    A.   This shows the hundred thousand dollars from

5 Ms. Rustic, and then how it was used up.  The $75,000, which

6 we saw before, it's in the blue there, since the majority of

7 the funds were used for that.  Then we have the mortgage on

8 the home.  The payment on that was $5,000.  It's in yellow.

9 And the mortgage on the business is in green, the $14,935.25.

10 There was also a payment to Verdi Restaurant for $3200.

11   Q.   And do you recall if there was something in the memo

12 about what that was for?

13   A.   I'd like to see it again.  There's something about

14 -- a party, I think it is.

15   Q.   Okay.

16   A.   Yes.  It was a -- the memo said "Tony, Christmas

17 party," and that was on the memo line of the check.

18   Q.   Okay.  And just scrolling down from page 51, 52,

19 what is -- can you read -- do you see parentheses on the

20 bottom of page 52 under "balance"?

21   A.   Yes.

22   Q.   Okay.  Is that account in the negative?

23   A.   That's -- the account is overdrawn at that point.

24   Q.   Okay.  And then at some point is there a deposit

25 into this account?

1123

1    A.    Yes.

2    Q.    Okay.  And how much is that deposit?

3    A.    There's a transfer from the 1757 account for $500 on

4    February 1st.

5    Q.    I was talking about -- I was asking you about the

6    next one.  What's the next deposit?

7    A.    The next deposit is $5,500.  That came from the

8    Burton Trust Account.

9    Q.    And that's what it said on the detail of that check;

10   correct?

11   A.    That was -- that's the check, yes, the account name

12   on the check.

13   Q.    Okay.  And does the account go back into the

14   negative on in February of 2016?

15   A.    Yes.

16   Q.    Okay.  And then it says something, insufficient

17   funds charge.  What does that mean?  I see a couple -- I see

18   -- one, two, three -- four of those.  What does that mean?

19   A.    That means that the -- there were not enough funds

20   in the account to cover the checks that were being cleared

21   through, so the bank charges a fee for that.

22   Q.    Okay.

23   A.    Can get very expensive, yes.

24   Q.    Let me direct your attention to February 16, 2016.

25   Do you see a hundred thousand dollar deposit where it says,

1    "Labriola and Labriola, pay to Ciro Peluso."  Do you see

2    that?

3         A.   Yes, I do.

4         Q.   And do you remember Mr. Peluso testifying about

5    house flipping?

6         A.   Yes.

7         Q.   Okay.  What happened after Mr. Peluso's money came

8    into the account?

9         A.   After Mr. Peluso's money came in, there were

10   payments, for example, to Leavenworth Professional Center,

11   for loan $6,500.  There were some transfers to the 757

12   account for $9,000.

13        Q.   Okay.

14        A.   And some others.  Monica Vaccarelli, $3,500.

15        Q.   And is there one that says "Mortgage J. Town Road"

16   or "J. Town R-D"?

17        A.   Yes.

18        Q.   Does that appear to be the same mortgage amount for

19   the Joshua Town Road property?

20        A.   Similar to the other amount, yes.

21        Q.   And going to page 54 of Government's Exhibit 25.  Is

22   there another check to Monica Vaccarelli?

23        A.   Yes.  There's a check for 3,500.

24        Q.   Let me ask you:  Have there been any other deposits

25   into this account since the money came in payable to Ciro

1    Peluso?

2        A.    If you can scroll down, I can probably answer that

3    better.

4        Q.    Sure.

5        A.    Ciro Peluso.  Not so far.

6        Q.    I'm going to keep going.  Stop me if you see a

7    deposit.

8        A.    Okay.

9        Q.    Just yell it out.  Is there one there, $800?

10       A.    Yes, April 18 there's $800.

11       Q.    What was the balance of the account before that $800

12   deposit?

13       A.    The balance was -- the account was overdrawn

14   $264.20.

15       Q.    And before it was overdrawn, going up, do you see

16   these two entries on April 11, 2016?

17       A.    Yes.

18       Q.    Do you know what "OLMC" stands for where it says

19   "draw, kids"?

20       A.    Yes.  I believe that's stands for Our Lady of Mt.

21   Carmel.

22       Q.    Okay.  And then under that it says "Monica

23   Vaccarelli"?

24       A.    Yes, it does.  There was a check for $2,000.

25       Q.    And, again, having not seen any deposits between the

1    check deposited for a hundred thousand dollars, what can you

2    tell us about the payments to Monica Vaccarelli, to Thomaston

3    Savings Bank, to Monica Vaccarelli, to Leon Vaccarelli for

4    draw 5,000, to Monica, to Brie and to someone named Sherry

5    Kolesnik?  What would have been the source of funds in the

6    account when all those withdrawals or checks took money out

7    of the account?  What would have been the source of funds?

8        A.    The source would have been the money coming in from

9    Mr. Peluso.

10       Q.    That would include covering the $40 to Watertown

11   High School Musical Theater?

12       A.    Yes.

13       Q.    And the draw, house mortgage $2,640.87 in March of

14   '16?

15       A.    Yes.

16       Q.    Did you put together a pie chart as a demonstrative

17   showing Mr. Peluso's funds?

18       A.    Yes, I did.

19       Q.    Let me show you Government's Exhibit 68.  What is

20   this document?  Maybe you can explain that to the jury?

21       A.    Again, this is again the hundred thousand dollars

22   coming in from Mr. Peluso and then summarizing the different

23   categories of the payments that were made out after his money

24   came in.  And you can see here that I added up all the

25   payments to Monica Vaccarelli.  It's $22,300.  The payment to

1    OLMC was $10,000.  There was some transfers over to the 1757

2    account Mr. Vaccarelli's personal account --

3        Q.   Okay.

4        A.   -- for $17,000.  And then the others, you had the

5    mortgage --

6        Q.   How much did Brie Sodano get?

7        A.   Ms. Sodano received $4,000.

8        Q.   How much did Leavenworth Professional Center, LLC

9    get?

10       A.   $6,500.

11       Q.   And how about the home mortgage?

12       A.   The home mortgage was $5,281.74.

13       Q.   And what color is that piece of the pie?

14       A.   That's yellow.

15       Q.   Okay.  Let me show you what's Government's Exhibit

16   124 in evidence.  What color is the house?

17       A.   Yellow.

18       Q.   Okay.

19            MR. EINHORN:  Seriously, Your Honor.  Sorry.

20   BY MR. McGARRY:

21       Q.   Let me now ask you some questions.  I'm going to try

22   to group them together to go a little quicker.  I want to ask

23   you about Mr. Roussel, Sienkowski, Izzi, Chauncey -- their

24   investments.  Okay?

25       A.   Okay.

1   Q.   Did you review bank records with respect to all of

2   those individuals?

3   A.   I did.

4   Q.   Let me take you to the very beginning, page 1, of

5   Government's Exhibit 25.  And directing your attention to the

6   middle of the page.

7        Okay.  What is the balance in the account before

8   Mr. -- before a deposit of $30,000 -- and six hundred ninety

9   -- $30,695 for ING USA Annuity and Life Insurance Company,

10  Pay to the Order of Dennis F. Roussel.  What is the

11  balance?

12  A.   The balance was $183.74.

13  Q.   And then what does the balance become?

14  A.   $30,879.22.

15  Q.   Okay.  And what is the $7,000, check, 2886?  Who is

16  that made payable to?

17  A.   This check was made out to Carmine DiSapio.  It was

18  for work at Joshua Town Road.

19  Q.   And then is there a check to Cash after that?

20  A.   Yes.  There's a $5,000 check to Cash.

21  Q.   Okay.  Is there another check to Cash that says

22  "draw" on it?

23  A.   Yes, $6,500.

24  Q.   Okay.  And just going down, I'm going to direct your

25  attention -- let's go all the way to page 6.  I guess in the

1    middle of January -- or January 4, 2012.  Did the account dip

2    into the negative?

3        A.   Yes.  As of January 4th, the account was negative

4    balance.

5        Q.   And then was there a deposit of $3,000?

6        A.   Yes.

7        Q.   And what was the name on that deposit?

8        A.   That deposit came from Marcia Schultz.

9        Q.   Okay.  And let me ask you:  On January 20th, did you

10   see a $22,000 deposit?

11       A.   Yes.

12       Q.   And what was that?

13       A.   That was a check -- or a deposit from Manuel -- or

14   Maria Correa.

15       Q.   Okay.  And let me show you what's been marked

16   Government's Exhibit 900 in evidence.  Do you recognize the

17   name on Government's Exhibit 900?

18       A.   Yes.

19       Q.   Okay.  And showing you Government's Exhibit 901, do

20   you recognize the name and the date on Government's Exhibit

21   901?

22       A.   Yes.  It's a check for $22,000 made out to Lux

23   Financial.

24       Q.   Okay.  Going back to Government's Exhibit 25, back

25   to page 4, can you tell us what happened after that money

1    came in?

2        A.    After the $22,000 came in, there was a check written

3    out to Cash with a memo line saying that it was withdrawal

4    for Monica, $2,000.

5        Q.    Okay.

6        A.    There was another withdrawal, and there was some

7    notation on the withdrawal slip that said Cash for $5,000.

8        Q.    Okay.  And scrolling down to page 5, was there

9    another withdrawal for cash?

10       A.    Yes.  There's another cash withdrawal for $1,100,

11   and another one for, again, cash, $3,000.

12       Q.    Okay.  And again I'm just scrolling up.  Are there

13   any other deposits coming in?  I see Marcia Schultz; correct?

14   Do you see where that is?

15       A.    Yes.

16       Q.    And then before her money came in, there was $28;

17   correct?

18       A.    Yes.

19       Q.    Okay.  And then there was Correa?

20       A.    Yes.

21       Q.    Are there any other deposits coming in throughout

22   this time period?  I guess there is.

23       A.    The first one came in on March 13.

24       Q.    And that was for cash?

25       A.    For cash -- a deposit of cash of $3,000.

1    Q.   And what happened on March 16th, 2012?  Was there a
2    deposit of over a hundred thousand dollars?
3    A.   Yes.
4    Q.   Okay.  And whose name was that in?
5    A.   There was a check from Patricia Sienkowski --
6    Q.   All right.
7    A.   -- on her behalf, 100,343.36.
8    Q.   And let me show you what's Government's Exhibit 1052
9    in evidence, is that a check for the same amount?
10   A.   Yes.
11   Q.   Taking you back to Government's Exhibit 25, taking
12   you to page 6 -- I think it was page 6.  Let's see.  Did I go
13   too far?  There it is.
14        Okay.  Were you able, using the spreadsheet and the
15   bank records, able to schedule out what happened with respect
16   to Ms. Sienkowski's hundred -- hundred and -- over a hundred
17   thousand dollar check, slightly over a hundred thousand
18   dollars?
19   A.   Yes, I scheduled that out.
20   Q.   And what happened?
21   A.   The biggest payment was $35,000, Eric Strachan.
22   Q.   Okay.  And what did it say in the memo?
23   A.   It said "house."
24   Q.   And now, again, just to repeat, you didn't make
25   those memos up; that is what was on the check?

1132

1    A.   That was on the check, yes.

2    Q.   Okay.  All right.  And what happened in the account

3    after that?

4    A.   After that, there's more withdrawals.  One for

5    $3,000 to Cash.  Payments to the OLMC for $3,492.25.

6    Q.   Okay.

7    A.   And the memo line says, probably "stuff."  It's just

8    kind of hard to read the memo line, but --

9    Q.   So it might have been "OLMC stuff" instead of

10   "staff"?

11   A.   Correct.  It's hard to read the memo.

12   Q.   Okay.  Fair enough.  And again going down, what is

13   the next deposit that you see into this account?

14   A.   There's a check from Christine Chauncey for

15   $20,596.79 on April 5th.

16   Q.   Okay.  And then what happens after that?

17   A.   After that, there's a series of withdrawals and

18   checks payments.  There's a withdrawal for $9,000.  A payment

19   to an electric company -- or A. Longo Electric, for $2,000.

20   Q.   Okay.

21   A.   $4,500 payment to Sarah Sygia.

22   Q.   Okay.

23   A.   For work done at --

24   Q.   Would that be spelled S-Y-G-I-A?

25   A.   As I saw it on the check, yes.

1     Q.    And going down for the remainder of April, was there

2    a payout to a Patricia Sienkowski?

3     A.    Yes.  There was $15,000 payment to Ms. Sienkowski.

4     Q.    Okay.  And what would have been the source of funds

5    -- if you look at this -- I'm going to go up on the screen,

6    back in time from April to early April, and I want you to

7    look at the deposits to see if you can determine -- noting,

8    of course, there's a deposit from someone called United

9    Concrete Products, what would have comprised the $15,000?

10         There's the United Products, there's Christine

11   Chauncey.  What, if any, other money was in this account?

12   And if I'm going too fast, stop me.

13    A.    Yes, you are going fast.  There was a hundred

14   thousand dollars.

15    Q.    Oh, there you go.

16    A.    From Ms. Sienkowski.  So some of the funds -- the

17   funds are all commingled at this point.

18    Q.    Right.

19    A.    So you have money coming in from Ms. Sienkowski and

20   also from the subsequent Chauncey --

21    Q.    And then from --

22    A.    -- deposit, and the $7500 coming in from United

23   Concrete Products.  So this is when they're all commingled.

24   It's hard to say where the money came from.  But that's where

25   the $15,000 was.

1    Q.   Are you able to say if the money that went back to

2  Ms. Sienkowski was commingled with money from Ms. Sienkowski

3  and Ms. Chauncey?

4    A.   Yes.

5    Q.   All right.  Let me -- I'm going to jump down a

6  little bit to page 12.  Do you see a deposit in the middle of

7  the page for a Ms. Izzi?

8    A.   Yes, I do.  It's a deposit for $28,910.71.

9    Q.   Okay.  And what was the balance before Ms. Izzi's

10  money came in?

11    A.   The balance before that was $919.87.

12    Q.   Okay.  And scrolling down, what happened next?

13    A.   Again, a series of withdrawals and checks written

14  out.  There was a cash withdrawal for $5,000.

15    Q.   Okay.

16    A.   A payment to Thomaston Savings Bank for $7500.

17    Q.   Okay.

18    A.   Something escrow and 84 Joshua Town Road.

19    Q.   And is there a $2,000 cash withdrawal that says

20  "Leon and Monica"?

21    A.   Yes.

22    Q.   And at some point, did this go into the negative?

23    A.   Yes.  As of -- by the end of November 6, 2012, the

24  account was overdrawn by $32.99.

25    Q.   Okay.  And directing your attention to page 14, is

```
1   there a significant deposit at a time that the account has

2   approximately $62 in it?

3       A.   Yes.  there's a deposit on December 6, 2012 for

4   $200,000 from Mr. Raymond Antonacci.

5       Q.   And do you remember June Antonacci testifying?

6       A.   Yes, I do.

7       Q.   And were you able to schedule out Mr. Raymond

8   Antonacci's money?

9       A.   Yes.

10      Q.   Okay.  And, again, the balance in the account before

11  that money came in?

12      A.   62 dollars, yes, and 63 cents.

13      Q.   Okay.  And what happened on November -- I'm sorry,

14  December 11, 2012?

15      A.   The one you're highlighting is a payment to Eric

16  Strachan.

17      Q.   Okay.

18      A.   Regarding "Joshua Town payoff," with a "thank you"

19  and exclamation point.

20      Q.   And after that?

21      A.   A payment to OLMC school for $8,000.

22      Q.   And are there a number of withdrawals to Cash?

23      A.   Yes.

24      Q.   Okay.  Are there also some payments to someone named

25  -- maybe you can read that name better than I.
```

1    A.   Gennaro Bizzarro, $75,000.  And a $15,000.

2    Q.   And do you recall Ms. Lebron mentioning that name

3    when she testified -- from Thomaston Savings Bank?

4    A.   Yes.

5    Q.   Okay.  And, again, tell me -- I'm going to try not

6    to go too quickly, but moving along, are there any

7    significant deposits coming in in January of '13 into late

8    January/February of '13 --

9    A.   I don't see any so far.

10   Q.   Okay.  Into March of '13.  So is the Antonacci money

11   the only money that appears to be funding the account?

12   A.   Yes.

13   Q.   I do see Angelo and Frances Mazzeo have a $200

14   deposit?

15   A.   Yes.  That's the primary source of the funds

16   there.

17   Q.   I appreciate that -- primary source.  Thank you.

18        And does the account go down to approximately $36

19   and then $136?

20   A.   Yes.  That's in April.

21   Q.   And is there a deposit of $4,000?

22   A.   Yes.  There's a deposit from Marcia Schultz.

23   Q.   Okay.  And then does the account go back down to

24   $192?

25   A.   Yes.

1     Q.   Okay.  And then let me direct your attention to

2  April 30th.  What did you see there?

3     A.   There's a check from Marcia Schultz for $50,000.

4     Q.   Okay.  And then what happens after that?  And

5  actually, let me stop you there for a second, just to show

6  you Government's Exhibit 950.

7          Do you recognize the name Marcia Schultz?

8     A.   Yes.

9     Q.   Okay.  And 951.  That's 3,000.  And 952 in evidence.

10  Okay.  And what is check 952 in evidence?

11     A.   This is a check from Marcia Schultz for $50,000,

12  payable to Lux Financial.

13     Q.   And let me take you back.  Let's see.  Before I do

14  that -- and was it deposited?

15     A.   Yes, it was.

16     Q.   Does it appear to have been deposited?

17     A.   Yes.

18     Q.   And let me take you back to Government's Exhibit 25.

19  Let me take you to page 19, and take you to the $50,000.

20  What happened after the $50,000 came in?

21     A.   After the $50,000 came in, there's a series of

22  payments out, including a payment to Thomaston Savings Bank,

23  for $4,880.48.

24     Q.   Okay.

25     A.   A withdrawal from the account for $4500.  A payment

1    to OLMC for $5,373.84.

2        Q.   Okay.  And those three payments that you just

3    testified about, what can you tell us regarding the source of

4    funds that would have funded the account in order for those

5    checks and withdrawals to clear?

6        A.   By that point, the sources would have been the

7    Marcia Schultz $50,000.

8        Q.   Okay.  Okay.  And before her money came in, there

9    was approximately $1,519; correct?

10       A.   Yes.

11       Q.   Okay.  Just -- I'm flipping through the account.  Is

12   there another -- let's see -- deposit -- actually, let me

13   stop you there.

14            Did you do a pie chart related to Ms. Schultz's

15   deposit?

16       A.   Yes.

17       Q.   Let me show you Government's Exhibit 69.  That would

18   be -- this is not related to her four -- one, I guess, was

19   three or four thousand dollars, but the $50,000; correct?

20       A.   Yes.  Given the volume of transactions after that,

21   it would be easier to see it in the summary form so I did

22   this pie chart.

23       Q.   And, again, I see down here the beginning balance,

24   $1,519.  That's what was in the account; correct?

25       A.   Correct.

1    Q.    And there was some other funds in; correct?

2    A.    Yes, $700 or so.

3    Q.    So acknowledging that caveat, what were you able to

4    notice from the $50,000?

5    A.    So based on the transactions, I added the amounts

6    that were made out to Cash, $21,550; the payment to OLMC

7    school, $5,373.84; and the other payments, including Stephen

8    Petrucelli (phonetic), $2,568.50; payment to John Hancock

9    Life Insurance, 2,160.61; and the mortgage home payment,

10   also, 4,880.48.  So this summarizes everything.  It's easier

11   to comprehend.

12   Q.    Okay.  Let me take you back to Government's Exhibit

13   25.  Let me take you to page 24 of that, and enlarging that

14   so we can see it.  And, again, I'm going up now to try to

15   find where we left off.  Actually, why don't I just take you

16   right to -- I'm going to take you right to page 30.  Checking

17   if we're on page 30.  Okay.

18         Okay.  Now directing your attention, I think,

19   to -- let me click out -- the bottom of page 30.  Do you see

20   a $19,500 deposit --

21   A.    Yes.

22   Q.    -- come in?

23   A.    Yes.  It's a transfer from the account 1757.

24   Q.    Okay.  And on page 30 -- and what is the balance

25   before that transfer comes in?

1    A.    The balance before was $2,240.92.

2    Q.    Okay.  And is there a payment out to Raymond

3  Antonacci?

4    A.    Yes, $16,000.

5    Q.    Okay.  And would that be Government's Exhibit 5, a

6  wire transfer -- we'll leave that yellow for a second.  Would

7  that be a wire transfer to Mr. Antonacci of $16,000?

8    A.    Yes.

9    Q.    Okay.  Now, were you able to trace where that

10 $19,500 came in from?

11   A.    Yes, I did.  It was from account 1757.

12   Q.    Okay.  And if we go to page -- sorry -- Government's

13 Exhibit 26, and we go to page 55 of Government's Exhibit 26,

14 are you able to see this $19,500 go out?

15   A.    Yes.  This is the exhibit for the -- that account,

16 the 1757.  I can see the money withdrawal -- the withdrawal

17 from this account for $19,500.

18   Q.    Okay.  And, so, this is -- that 19,500, was that the

19 source for the $16,000 that went to Mr. Antonacci?

20   A.    Yes.

21   Q.    And showing you Government's Exhibit 26, and showing

22 you on page 55, if we went up, would you be able to see where

23 the source of funds was for that $19,500 that went to the

24 other account that funded the $16,000?

25   A.    Yes.

1    Q.   Okay.  And what was the large source of funds that

2    funded this account?  Directing your attention to March 27th,

3    2014.

4    A.   So the primary source of that amount were the funds

5    coming in from Salisbury Bank and Trust for $164,988.26 on

6    April 27th, 2014.

7    Q.   Okay.  And let me show you what's Government's

8    Exhibit 4.  And was that the -- hold on -- is that the wire

9    in from Salisbury Bank and Trust for $164,000?

10   A.   Yes.

11   Q.   Okay.  And were you here when Mr. Essex testified

12   from the Salisbury Bank and Trust?

13   A.   Yes, I was.

14   Q.   Okay.  Taking you back to Government's Exhibit 26,

15   taking you to page 53 and directing your attention to the

16   $164,000, what was the balance of this account before the

17   wire came in?

18   A.   The balance was -- the account was overdrawn by

19   $427.87.

20   Q.   Okay.  And tracing this account down, are there

21   any -- I see -- tell us what we see here on April 1st.  Are

22   there a number of withdrawals?

23   A.   On April 1st there were withdrawals, about four of

24   them.  There was a Cash for $500; a transfer to 7051.

25   Q.   Okay.

1     A.    Which is $7500.  A payment to Robert Kolesnik,

2   $6,000; and for Lyn Burton, $4,000.

3     Q.    And do you recall if Robert Kolesnik had an

4   affiliation with Lyn Burton with respect to the Salisbury

5   Bank and Trust, if you recall that testimony?

6     A.    I don't recall it, but --

7     Q.    Okay.  Fair enough.  And scrolling down, is there

8   any other money coming into this account in April of 2014

9   that you saw?

10    A.    Well, there's a $19,000 April --

11    Q.    Payroll?

12    A.    Yeah.  Scroll up a little bit.  Oh, there it is.

13  Yes, April 18th, there was a payroll, a direct deposit from

14  The Investment Center for $19,307.09.

15    Q.    Okay.  And then do we get -- is this where we get to

16  the transfer, the $19,500 transfer that we saw funding the

17  $16,000 wire that went to the Antonaccis?

18    A.    Yes.

19        MR. McGARRY:  Your Honor, I see it's 1 o'clock.

20        THE COURT:  I was just going to ask whether you're

21  anywhere near finishing this, or shall we do that after

22  lunch?

23        MR. McGARRY:  I guess it depends on the word

24  "anywhere," but --

25        THE COURT:  Let's take lunch.

```
1              All right.  We'll be back at 1:35, and we'll
2    continue with Mr. Almodovar.  Okay?  Please leave your
3    notebooks here.  Don't discuss the case.
4              (Jury out, 1:02 p.m.)
5              THE COURT:  After Mr. Almodovar finishes, do you
6    have additional witnesses?
7              MR. McGARRY:  I don't believe so, Your Honor.  Let
8    me be more clear.  No, Your Honor, we do not have additional
9    witnesses.
10             THE COURT:  Are you ready to proceed, Mr. Einhorn?
11             MR. EINHORN:  Yes, Your Honor.
12             THE COURT:  Very well.  We'll stand in recess until
13   1:35.  I'm thinking that perhaps we should come back at 1:25,
14   and let me see if I can make headway on the motion to
15   preclude medical exhibits.  I've been given a notebook,
16   Ms. Mirsky, that you say is the most up-to-date after you
17   pulled the documents out that you indicated this morning you
18   had done.  Is that correct?
19             MS. MIRSKY:  That's from last night; correct, Your
20   Honor.
21             THE COURT:  I need to know what you're currently
22   claiming as an exhibit.
23             MS. MIRSKY:  In further conversation with Attorney
24   Einhorn, I didn't quite finish my argument, which --
25             THE COURT:  You did not, correct.
```

1    MS. MIRSKY:  Right.  There was -- in the last few

2  hours, I would argue --

3    THE COURT:  Mr. Almodovar, you may go, and be back

4  at 25 'til.

5    MS. MIRSKY:  Right.  I just wanted to indicate to

6  the Court that we might be able to agree to remove some other

7  pages.  When you asked me about a current notebook, I didn't

8  mention -- make that explanation, but that could be part of

9  your consideration, when you asked me about the amount.

10   THE COURT:  All right.  I'm looking at dates,

11  also.

12   MS. MIRSKY:  Uh-huh.

13   THE COURT:  All right.  Why don't we come back at 25

14  past and take this matter up.  And to the extent that you are

15  asking me to rule on specific exhibits, I need to see what

16  those specific exhibits are in their current iteration.

17   Okay.  Thank you.  We stand in recess.

18   (Recess taken, 1:04 p.m.)

19   (Out of the presence of the jury, 1:31 p.m.)

20   THE COURT:  All right.  The United States District

21  Court is now open after recess.

22   Okay.  Let us hear the argument that you have, Ms.

23  Mirsky --

24   MS. MIRSKY:  Yes.

25   THE COURT:  -- that I interrupted earlier.

```
1          MS. MIRSKY:  Yes, Your Honor.  Just for clarity, I
2    did hand Breigh some --
3          THE COURT:  Use the microphone, please.
4          MS. MIRSKY:  Just for clarity, Your Honor.  I did
5    hand Breigh some documents.  They might not be in front of
6    you at this time, and she might -- because I know she stepped
7    away.
8          There were some binder-clipped -- two with new
9    additions of the documents we're considering, which is
10   separate from the binder that you were handed.  I'm more than
11   willing to, depending on what the Court decides, to
12   hole-punch those or replace them from the notebook.  I just
13   -- at lunchtime, we didn't have -- weren't able to find a
14   three-hole punch.  But I handed them to her.  I don't know if
15   they're below you or not.  If you want me to find them, I
16   can.
17         THE COURT:  Well, let's go -- let's get to the
18   generic arguments.
19         MS. MIRSKY:  Yes.  So, just to also clarify, as part
20   of the argument, I did mention Donna Gleissner before.  I
21   referenced her specifically as a social worker.  I just want
22   to clarify that her specific professional qualifications make
23   her a licensed alcohol and drug counselor, also a licensed
24   professional counselor, which is not specifically an MSW.
25   Just for the Court's notes, I wanted to clarify that one
```

1    point.

2            In addition -- for the rest of my argument, Your

3    Honor, the Government had referenced concerns regarding

4    diagnoses, medications and certain tests, such -- that were

5    indicated as a negative in the records, regarding Mr.

6    Vaccarelli's health, and they also have a reference to

7    concerns about anything related to psychiatric medications or

8    psychiatric diagnoses.

9            In referencing those, I would draw the Court's

10   attention to the Federal Rule 803.6, for the business records

11   exception, for the hearsay exception, because in this case

12   Ms. Gleissner, she made the majority, if not all, of the

13   notes that the Court has to consider in the records, and she

14   can speak to the fact that these records, including things

15   that were not specifically related to alcohol, are done in

16   the regular course of business for Blue Sky, that this is in

17   reference to the Blue Sky records specifically, which is

18   separate from the Solutions Recovery that's also in front of

19   the Court today.

20           She makes those notes that all patients that go

21   through Blue Skies [sic] are asked certain basic things about

22   their medicals.  Comments that are made about patients who go

23   to groups -- that was a comment also made by the Government,

24   it expressed concern.  That's something that typically

25   patients engage in.  The notes that are limited in scope that

1    reference Mr. Vaccarelli going to those groups, it indicates

2    that Mr. Vaccarelli may have attended those groups, the types

3    of things that the groups discussed, but there is no

4    reference or I removed any reference to anyone specifically,

5    other than Mr. Vaccarelli making comments.  It only

6    references group members attending.  It does not mention

7    names.  It does not mention any commentary made by any other

8    group members that may have attended those groups from Blue

9    Sky.

10          And as reference to the Solutions Recovery records

11   that have also been discussed here, large portions of those

12   records have been removed, as well.  I would draw the Court's

13   attention to the fact that the Defense has stipulated to

14   almost all of the Government's records.  We had a discussion

15   about stipulations previously, and that, given that where

16   there has been substantial cooperation in the past, we would

17   ask that -- there's references to Solutions in the Blue Sky

18   records.  That given the previous cooperation, we would ask

19   that Ms. Gleissner, who is going to reference Solutions in

20   her knowledge of having reviewed them, that that is part of

21   the business records, that they review previous records of

22   treatment for a client in order to keep a medical history of

23   what the person has done and the previous happenings of that

24   client, to reference the fact that he just went to the

25   program, how long the program was, and that that is basically

1148

```
1   stated as a fact in those records themselves.
2           The records that are in the binder clips on top of
3   that binder, Your Honor, are the most recent versions.
4   That's what I was referencing prior to having them in hand.
5           THE COURT:  All right.  Let's briefly hear from the
6   Government, and then we'll need to bring the jurors back
7   in.
8           MS. LARAIA:  Yes, Your Honor.
9           THE COURT:  I don't have numbers on these, but start
10  -- they seem to be in two categories, Blue Sky and Solutions.
11  Let's start with Blue Sky.
12          MS. LARAIA:  Yes, Your Honor.  So, first, I'll just
13  note, that while these may be business records of Blue Sky,
14  the rule requires that there not be a showing that the source
15  of the information indicates a lack of trustworthiness.  And
16  a lot of the records from Blue Sky are simply a recitation of
17  what Mr. Vaccarelli said, and there are a lot of
18  inconsistencies.
19          And, in fact, Dr. Zonana, who is not going to be
20  permitted to testify, noted that, that there's -- that there
21  does appear to be a lot of inconsistencies.  I think there's
22  an inherent lack of trustworthiness in some of what was in
23  there.
24          THE COURT:  Okay.  You need to be specific as to
25  which document you're referring to.  I recognize that they do
```

1   have numbers at the bottom.

2           MS. LARAIA:  Certainly, Your Honor.  So I'm not

3   prepared to respond to each and every page, because it has

4   changed somewhat what is being offered or not offered, but

5   there's another -- I'll just note, for example, page 47 in

6   the Blue Sky documents, just as an example of something the

7   Government would find to be inappropriate.

8           This is a note from 11/8/2017 about group members

9   sharing information, and just talking about the group.  I

10  don't think that -- I mean, Rule 803.6 doesn't allow

11  admission of hearsay within hearsay.  I think what anyone

12  else said or other group members say during a group activity

13  is not -- doesn't qualify as non-hearsay.  It's not for those

14  -- well, and it's certainly not relevant here either.

15          THE COURT:  So this is November of 2017.  What are

16  the relevant time periods in this case when Mr. Vaccarelli's

17  mental state is at issue?

18          MS. LARAIA:  Your Honor, I think that -- so the

19  scheme begins --

20          MR. McGARRY:  Excuse me one minute.

21          MS. LARAIA:  Your Honor, the scheme begins in 2011.

22  So the first victim provided money to Mr. Vaccarelli in 2011,

23  and I believe that was Denis Rousell, and the conduct charged

24  goes into 2017.

25          THE COURT:  Oh, it does go into 2017.  Okay.

1150

1    MS. LARAIA:  It does.  I think the latest act -- the

2  message that Mr. Vaccarelli sent to Ms. Augelli that was

3  produced in evidence, that was while he was in treatment in

4  Las Vegas.  So I believe the Blue Sky records postdate the

5  time that he was in Las Vegas, because I believe he attended

6  or participated in outpatient therapy upon return to

7  Connecticut, and at which time he went to Blue Sky.

8    THE COURT:  So let's take for an example -- I

9  understand what you are saying about how all of what the

10  group members said as reflected in the notes, and

11  particularly the Defendant's own statements, which he himself

12  would not be able to offer for the truth.

13    Let's go to something like page 45, that seems to be

14  Ms. Gleissner's records of Mr. Vaccarelli's attendance or

15  not.

16    MS. LARAIA:  Your Honor, I just -- I don't quarrel

17  with this being a business record, but I just don't see that

18  there's any relevance whether she left -- she called and left

19  a voicemail and asked someone to call her back, that he

20  didn't make it to a meeting.  I guess I don't object if those

21  -- if that record were offered, but I don't think it's

22  particularly relevant.

23    THE COURT:  All right.  So one category of objection

24  is not to the fact that Mr. Vaccarelli was in these group

25  treatment sessions --

1       MS. LARAIA:  That's fair, Your Honor.  The

2  Government wouldn't object to that.

3       THE COURT:  -- but the substance of those notes.

4  Why is the substance of those notes relevant, Ms. Mirsky?

5       MS. MIRSKY:  Well, Your Honor, I would argue that --

6  I mean, the substance of these notes is part of the program

7  that Mr. Vaccarelli is in as an outpatient individual in Blue

8  Skies [sic] at the time.

9       THE COURT:  I understand that.

10      MS. MIRSKY:  Right.  So I -- and there's -- I mean,

11 I'm not speaking as an expert.  We're not bringing

12 Ms. Gleissner in as an expert, but I believe she can

13 basically explain what the process is for patients, the

14 things that he's expected to do, and that they could include

15 addressing issues -- emotional issues associated with

16 alcoholism.  I'm not saying, you know, from her -- from her

17 lay witness experience, as she's had 25 years as a

18 professional counselor, she has additional training, alcohol

19 and drug -- as a drug counselor, as well, which she's going

20 to testify to in her background, that this is part of them

21 discussing -- not saying what those people said, but what --

22 that's part of having that conversation.

23      THE COURT:  So that does seem to at least require

24 some redacting of these records.  I think it's permissible

25 for her to testify as to what this program was about, what it

1   included by way of groups, individual therapy, examination,

2   et cetera, without the specifics, just for the purpose of

3   giving an overall view of what this program is.

4        But there's so much more in here than that.  I'm

5   wondering if we need to wait for her testimony to see what it

6   is you are offering by way of her testimony and any exhibits

7   that relate to that.  Does that make sense?

8        MS. MIRSKY:  It does, Your Honor.

9        THE COURT:  You're not claiming the specific

10  medications and specific diagnoses; correct?

11       MS. MIRSKY:  Your Honor, there would be one or two

12  diagnoses I would specifically have Ms. Gleissner discuss

13  briefly, and there is specifically one medication that is

14  directly related to the alcoholism.  I acknowledge there are

15  many other medications listed that are not related to the

16  alcoholism.

17       THE COURT:  What's the medication related to the

18  alcoholism?

19       MS. MIRSKY:  It is called -- one moment, Your Honor.

20  Let me make sure I pronounce it correctly.  It's called

21  Revia.  I believe it is the -- one, two, three, four, five --

22       THE COURT:  I see it.

23       MS. MIRSKY:  You see it there on page 2?  It's

24  listed several times.  On page 2 it's there, as well.

25       THE COURT:  And then with respect to diagnosis --

1    MS. MIRSKY:  So there's a primary di -- on page 1,

2    there's a primary diagnosis of alcohol use disorder severe.

3    There's also a reference --

4    THE COURT:  Who is making this diagnosis?

5    MS. MIRSKY:  I didn't hear.  Can you repeat that

6    again, Your Honor?

7    THE COURT:  Who is making this diagnosis?

8    MS. MIRSKY:  My understanding, and I can clarify

9    with the witness prior to her testifying, is that was part of

10   what Ms. Gleissner would have done.  The medication

11   prescription would not have been done by her.

12   THE COURT:  She can make a medical diagnosis on her

13   own with her credentials?

14   MS. MIRSKY:  I understand that the diagnoses was a

15   separate part of her job.  The medication would not have

16   been.  So she cannot obviously speak to -- she can read a

17   type of medication I've referenced, but she couldn't speak to

18   what it's supposed to do.  She can say that she -- that it

19   was prescribed by the doctor, I believe, related to the

20   alcoholism.  But she wouldn't be able to say much beyond

21   that.  That's my sense.

22   THE COURT:  And why is it that she would have the

23   credentials to make a medical diagnosis, as opposed to doing

24   that -- adopting that from the psychiatrist?

25   MS. MIRSKY:  Well, she -- if we're allowed to bring

1  this in under the 803.6, then she is the custodian being able

2  to say what is in these records.

3          THE COURT:  Okay.

4          MS. MIRSKY:  We want the jury to have exposure to

5  it.

6          THE COURT:  Okay.  803.6 can't supervene other

7  reasons for exclusion, like relevance --

8          MS. MIRSKY:  Right.

9          THE COURT:  -- and like competence to testify.

10         MS. MIRSKY:  Right.  Well, I think it is relevant.

11 We're using a defense for alcoholism.  The things I mentioned

12 are relevant.  I mean, in terms of her competence, I imagine

13 at this hour she would have to testify to her credentials.

14 And if there were concerns at that time, they could be

15 addressed then.

16         And we don't have -- we wanted an expert previously.

17 Obviously, the Court decided against that.  That is the only

18 individual who can speak to anything related to Mr.

19 Vaccarelli's treatment at this time.

20         THE COURT:  So, in general, her testimony about the

21 dates that he was treated, the place he was treated, the

22 nature of the program, what the participants such as

23 Mr. Vaccarelli would do, how long they were there, what the

24 program was composed of, that they may receive medication,

25 that that may receive mental health counseling and analysis,

1    and so forth, that's fine.  I think we're going to have to

2    wait to see anything more specific than that.

3            As to Solutions, do you have a witness from this

4    facility in Nevada?

5            MS. MIRSKY:  We do not, Your Honor.  There was

6    discussion amongst the parties about a stipulation at the

7    time, and that -- I note Ms. Gleissner had reviewed -- it was

8    part -- what happens in Blue Solutions [sic], according to

9    Ms. Gleissner, which she can testify to, is that, given that

10   they have to compile a client's medical history, they would

11   only say that, given he has a medical history, that he

12   attended Solutions.  The reference to Solutions is in Blue

13   Sky's, that he went there and that's what they typically

14   report.  So they're aware of what the patient had done, had

15   experienced prior to entering their program.

16           She obviously cannot personally speak to Solutions

17   and we do not have a witness --

18           THE COURT:  So Solutions came before Blue Sky's or

19   after?

20           MS. MIRSKY:  Before.

21           MR. EINHORN:  May I have a quick moment, Your Honor?

22           THE COURT:  Yes.

23           (Counsel confer.)

24           MS. MIRSKY:  Your Honor, I've just been informed

25   that I believe the Government is willing to stipulate to the

1  authenticity to the Solutions records.  I -- I recognize the

2  relevancy may still be at issue.

3          MS. LARAIA:  That's accurate, Your Honor.  The

4  Government has said for a long time now that the Government

5  -- well, I guess over the course of the week, that the

6  Government would stipulate to the authenticity, but we

7  preserve our objections to the documents otherwise.

8          The -- just with respect to the Solutions documents,

9  I'll note that there are a number of tests and test results

10 which the Government would object to, among other things.

11 There are also a number of diagnoses that would appear to

12 require testimony of an expert in order to render such an

13 opinion.

14         But there are all sorts of tests in here.  Just as

15 an example, page 5, page 41, page 42.  I don't know how any

16 of those relate to the charged conduct or how the jury could

17 be asked to figure out what those mean and their relevance,

18 just as examples.

19         THE COURT:  All right.  Let's -- I think what we'll

20 do is we will have -- will Mr. Vaccarelli testify before

21 Ms. --

22         MR. EINHORN:  Gleissner.

23         THE COURT:  -- Gleissner?

24         MR. EINHORN:  Yes.  Yes, Your Honor.  We don't

25 anticipate calling her until Thursday.

1    THE COURT:  All right.  Thank you for your

2    explanation.  Let's bring in the jury and continue with

3    Mr. Almodovar, who can return to the stand.

4            (Jury in, 1:50 p.m.)

5            THE COURT:  Please be seated, ladies and gentlemen.

6    We'll continue with the testimony of Mr. Almodovar.

7            Mr. McGarry, you may continue.

8            MR. McGARRY:  Thank you, Your Honor.

9    BY MR. McGARRY:

10   Q.   Mr. Almodovar, can you see your screen?

11   A.   Yes.

12   Q.   Okay.  I want to show you -- during the lunch break,

13   I took the liberty -- liberty -- of highlighting a couple

14   things on Government's -- the exhibit that's before you,

15   which is Government's Exhibit 26, I believe.  Do you see

16   that?

17   A.   Yes.

18   Q.   Okay.  And do you recognize the entry for the

19   $164,000 wire from Salisbury Bank?

20   A.   Yes, I do.

21   Q.   Okay.  And I believe we were -- you had testified

22   about that that being the primary source of funds in the --

23   primary source of funds deposited into this account.  Do you

24   remember that?

25   A.   As of that date, yes.

1    Q.   Okay.  And scrolling down, I'll just note -- I'm

2    just going to highlight a few documents -- highlight a few

3    entries, and ask you to keep those numbers in your mind.

4         As we head down into April, is it still the primary

5    source of funds in the account?

6    A.   Yes, it is.

7    Q.   Okay.  Does it -- would it cover more, about at

8    least 17 more -- a vast majority of what's funding the

9    $19,000 transfer?

10   A.   I think there was another deposit further up the

11   page.  19,000 or so.

12        THE COURT:  I'm sorry.  Can you keep your voice up?

13        THE WITNESS:  Yes.

14   BY MR. McGARRY:

15   Q.   You're right.

16   A.   I think there's a deposit from The Investment

17   Center.

18   Q.   Right.  That would appear to be Mr. Vaccarelli's

19   paycheck?

20   A.   Yes.

21   Q.   Or his commissions for that period?

22   A.   Yes.

23   Q.   And scrolling down, you see the 19,500; correct?

24   A.   Yes, I do.

25   Q.   Okay.  And then do you see another $30,000 transfer

1    to -- looks like 30,500 transferred to account 0751.  Do you

2    see that?

3         A.   Yes, I do.

4         Q.   Okay.  Directing your attention to Government's

5    Exhibit 25, directing your attention to -- let's see, page --

6    I believe page 33.  If that's the right date.  Let's see.

7    Actually, let me go to page 30 first.

8              Okay.  Do you see the deposit of $19,500 coming into

9    this account?

10        A.   Yes, I do.

11        Q.   Okay.  And then do you see the $30,500 coming into

12   this account?

13        A.   Yes.

14        Q.   Okay.  And do these two deposits make up -- and

15   that's where you had previously, before lunch, testified

16   about Mr. Antonacci's 16,000 -- the wire that went to

17   Mr. Antonacci; correct?

18        A.   Yes.

19        Q.   Okay.  Is it accurate that these two wire transfers

20   from account number 1757 are the primary source of money in

21   this account?

22        A.   These are transfers in.  They're not wire transfers,

23   but, yes, those are the primary transfers.

24        Q.   Okay.  And if we go to July 2nd, do you see a

25   transfer of $7,000 to Monica Vaccarelli?

1   A.   That's a check written out to Monica Vaccarelli for
2   $7,000.
3   Q.   And that's check number what?  What's the check
4   number?
5   A.   3599.
6   Q.   Okay.  And did you have an occasion to schedule-out
7   accounts of Monica Vaccarelli?
8   A.   Yes, I did.
9   Q.   Just showing you on paper form Government's Exhibit
10  36, what account is that?
11  A.   That's the account number ending 2241.
12  Q.   Do you need it?  You good?
13  A.   I'm good.  Thank you.
14  Q.   And whose name is on that account?
15  A.   That's under Monica Vaccarelli.
16  Q.   Okay.  So take a look at, if you would, Government's
17  Exhibit 36 in evidence.  Directing your attention to page 79.
18  And do you see the deposit -- is there a deposit coming into
19  that account?
20  A.   Yes, there is a $7,000 deposit coming in from
21  LWLVACC.
22  Q.   And does that mirror the one that just left the
23  other account?
24  A.   Yes.
25  Q.   Okay.  And if we scroll down -- and what's the

1   balance before that check comes, the approximate balance in

2   the account?

3        A.   Look at -- the beginning balance as of that day was

4   $3,958.

5        Q.   So you're talking, up here, the beginning of

6   the day?

7        A.   July 1st, yes, beginning of July 1st.

8        Q.   Okay.  And let me direct your attention down here.

9   Do you see a check for $7,350?

10       A.   Yes, I do.

11       Q.   Okay.  And what was that made out to?

12       A.   That check was made out to Barbara Keller.

13       Q.   Okay.

14       A.   It says For Rental Madison, 8/2-8/8 2016.

15       Q.   And let me show you what has been marked

16   Government's Exhibit 1121.  And is that the Monica Vaccarelli

17   check?

18       A.   Yes.

19       Q.   Okay.  And does it say Madison Rental, and then have

20   a date on there?

21       A.   Yes, it does.

22       Q.   8/2-8/8 2016

23       A.   Correct.

24       Q.   Let me take you back to Government's Exhibit 25.

25   Let me take you to page 33, and let me direct your attention

1162

```
1   -- I guess we have -- actually -- well, that's page 1.  It
2   didn't take.  Let's do page 33 again.  Okay.
3        And I'm going to take you up to page 31.  And
4   directing your attention to -- okay.  I think we see a --
5   again, we see a transfer in from that account, of 30,000 --
6   from the other account, for $30,500; correct?
7        A.   Yes.
8        Q.   Okay.  Let me show you what's been -- let me take
9   you to page 42.  Oh, that's an interesting thing.  Okay.  All
10  right.
11       Directing your attention to page 42, down at the
12  bottom.  There it is.  Do you see the "Prudential, Pay to
13  Giuseppina LaPorta," what -- that entry?
14       A.   Yes, I see that number.
15       Q.   And what is the deposit into this account?
16       A.   The amount was $27,361.55.
17       Q.   Okay.  And do -- were you here when Ms. LaPorta
18  testified and when her daughter testified after her?
19       A.   Yes, I was.
20       Q.   Okay.  And the balance -- and then were there some
21  transactions, including a draw, immediately after her money
22  came in?
23       A.   Yes.  There was a check for $5,800 to Leon
24  Vaccarelli, and a payment to Thomaston Savings Bank for
25  $5,466.16.
```

1    Q.   And what was -- what was written on there?

2    A.   It was a "Draw, Mortgage, J. Town Road."

3    Q.   Okay.  And directing your attention to the next

4    page, was there another check to Monica Vaccarelli?

5    A.   Yes.  There's a check for $1200.

6    Q.   And, again, the balance before Ms. LaPorta's money

7    came in was how much?

8    A.   The balance was $1,441.10.

9    Q.   Okay.  And directing your attention to check number

10   3781, how much was that check made out for?

11   A.   That was a $7,000 check.

12   Q.   Okay.  And are you able to trace at least a portion

13   of that $7,000 having been from Ms. LaPorta?

14   A.   Yes.

15   Q.   Okay.  And just scrolling down, showing you the

16   remainder of the schedule, did at some point in time this

17   account, after a wire transfer to Ray Antonacci, go down to

18   approximately $16?

19   A.   Yes, on May 1, 2015, $16.20.

20   Q.   Okay.  And did you prepare a pie chart showing how

21   Ms. LaPorta's money was spent?

22   A.   Yes, I did.

23   Q.   Okay.  Let me show you Government's Exhibit -- I

24   believe 70.  And tell the jury what is shown here.

25   A.   Similar to the other charts, I took the money that

1164

1    came in from Ms. LaPorta and summarized the different

2    categories, if you will.  So as you can see her, the $5800 to

3    Leon Vaccarelli; OLMC check for $7,000; the mortgage for the

4    home, $5,466.16; and Cash, $5,400.

5        Q.   Okay.

6        A.   And the other entries here.  There's a payment to --

7    a couple of payments, I think, to June Antonacci, totaling

8    $2,000.

9        Q.   Okay.  And if we go to Government's Exhibit 25, and

10   we go back to page 44, we have Ms. LaPorta's money.  Again,

11   I'll just highlight it quickly.

12            Do you see that?

13       A.   Yes.

14       Q.   Okay.  And let me zoom-in a little bit.  I want

15   to -- and scrolling down, you had taken us down to where it

16   was $16?

17       A.   Correct, yes.

18       Q.   And, again, moving to June of 2015, page 45.  I'm

19   going to just scroll, somewhat expeditiously.

20            Do you then see a $25,000 deposit come in?

21       A.   Yes.  It looks like it's coming in from Ms. Burton's

22   Trust account.

23       Q.   And what was the balance before that $25,000 came

24   in?

25       A.   The balance the day before that money came in was

1   $31.26 negative, or overdrawn.

2        Q.   Oh, I see.  Right here?

3        A.   Yes.

4        Q.   Okay.  And are you able to trace how that money was

5   used?

6        A.   Yes.

7        Q.   Were there checks to Thomaston Savings Bank?

8        A.   There were two checks, at least.  One for $5,000 --

9   or $5,456.16, and another one to -- for 10,365.40.

10       Q.   Okay.  I want to just scroll down.  Again, do you

11  see any significant deposits after the one from the Burton

12  Trust?

13       A.   No, I do not.

14       Q.   Okay.  There seems to be a transfer -- I guess it

15  doesn't help you if I point at it.  Let me highlight it.  You

16  see there's a transfer; correct?

17       A.   Yes.

18       Q.   Okay.  And what is the next significant deposit?

19       A.   There is a $47,000 deposit from Ms. Chauncey.

20       Q.   Okay.  And was she the retired school teacher who

21  testified during the trial?

22       A.   She testified before, yes.

23       Q.   Okay.  Let me -- directing your attention to page 49

24  of this exhibit.  I want to show you what's on page 49, and

25  then kind of just go down and have you take a look at the

1    deposits and the withdrawals.

2          Was there a significant withdrawal to -- marked as

3    loan to Leavenworth?

4        A.   Yes.  On 9/30, there was a payment to Thomaston

5    Savings Bank.

6        Q.   And I said withdrawal.  Is it more accurately called

7    a check?

8        A.   It was a check, yes, for 19,617.06.

9        Q.   Was there then a deposit of 70,000?

10       A.   Yes.  Came from Ms. Izzi.

11       Q.   Okay.  And if we scroll down, was there then a

12   deposit from -- let me not do that.  Was there then a deposit

13   from a Robert and Kathleen Strobel?

14       A.   Yes.  On October 13, there was a deposit for

15   $45,000.

16       Q.   And did that push the balance up to approximately

17   $132,000?

18       A.   Yes.

19       Q.   Okay.  Tell the jury what happened in this account

20   on October 15, 2015.

21       A.   On October 15th, there was a payment to June

22   Antonacci for $125,000.

23       Q.   Okay.  And did you prepare a pie chart showing the

24   Izzi, Chauncey, Strobel, Correa money that was in the

25   account?

1    A.   Yes.

2    Q.   Okay.  Let me show you, for demonstrative purposes,

3    Government's 71.  Okay.  What is this showing?

4    A.   So, in this chart, I wanted to show the sources that

5    made all the -- for example, the big payments to

6    Mrs. Antonacci, and there was a 125, but there was another

7    payment of a thousand dollars within the same period.  And,

8    so, I added all the sources of the funds, which were those

9    four items -- the 47,000 to Chauncey; 70 from Ms. Izzi;

10   Strobel, 45,000; and Mr. Correa, $4700, which totaled about

11   $166,000.

12         So the primary use of that funds was to pay that --

13   make that payment to Antonacci, totaling 126.  And then there

14   was a payment that we saw, the mortgage for the business,

15   $19,000.  There was some payments to Ms. Monica Vaccarelli

16   for $5,000.  And there was a transfer to the 1757 account,

17   $6,000.  Briean -- or Brie -- Sodano, $2,075.  And there was

18   some cash, totaling $2900.

19         So that shows us, you know, all the -- where all

20   that money -- in terms of following the money, that's what

21   the money was used for.

22   Q.   And if there's a relatively small beginning balance

23   of $267, as there was in this analysis, how do you account

24   for that when you're dividing up the pie?

25   A.   What I do is I try to make up -- I include all the

1  items that add up to that number.

2      Q.   And you --

3      A.   So the other category basically is the net

4  difference between all these bigger items and the total

5  amount of those funds.

6      Q.   Okay.  Let me take you to Government's Exhibit 25,

7  specifically to page 57.  And do you see -- right down on the

8  bottom -- I'm going to grab it here.  But right down on the

9  bottom of page 57, do you see a deposit from Voya?

10     A.   Yes.  On August 10, 2016, there was a deposit from

11  Voya Insurance.  I am assuming for the benefit of Linda

12  Warren, or payable to Linda Warren, for $94,619.81.

13     Q.   And what was the balance before her money came in?

14     A.   The balance before was $65.44 overdrawn.  The

15  account was overdrawn at that point.

16     Q.   And did you schedule-out how her money was spent?

17     A.   Yes, I did a similar chart for this.  I scheduled

18  all the items that were subsequent to her money coming in, as

19  was shown here.  Some withdrawals, some transfers to 1757.

20  There was a payment to Leavenworth Professional Center,

21  described as a loan, for $30,000.

22     Q.   Okay.  And that's right here?  Let me highlight.

23     A.   That is the fourth item down, I believe -- third

24  item down.

25     Q.   Okay.  And that is -- now, let me ask you a couple

1  questions:  There's a negative balance in the account;

2  correct?

3      A.  Yes.

4      Q.  And Ms. Warren's money comes in on August 10th; is

5  that right?

6      A.  Yes.

7      Q.  Okay.  What can you tell us about the source of

8  money related to that check to Leavenworth, check number

9  4035?

10     A.  The source of that, for that payment, was the money

11 coming in from Linda Warren.

12     Q.  Okay.  Now, let's see if that comes up.

13         The lunch didn't even help.

14         Okay.  So the -- let me show you what's been marked

15 as Government's Exhibit 20 -- I'm sorry -- 21 in evidence.

16         Okay.  And what can you tell us about this check?

17     A.  This is a check that was written out to Leavenworth

18 Professional Center, with the memo line "Loan," for $30,000.

19     Q.  And the source of the money, was that Ms. Warren's

20 money?

21     A.  Yes.

22     Q.  Okay.  And if we were to zoom-in here, would we see

23 the $30,000 right there?

24     A.  Yes.

25     Q.  Okay.  And oh, forget it.  Let's not do that.

1    Let's -- so, again, did the money -- was the money

2  transferred from this account, which is on the right of your

3  screen, over to here, on the left of your screen?

4    A.   Yes.

5    Q.   Okay.  And if we did that, there'd almost be a

6  yellow line going all the way to that; correct?

7    A.   Yes.  Yes.

8    Q.   Okay.  And looking at what was the balance in the

9  account, was -- can you say that more than $10,000 of that

10 $30,000 -- more than $10,001 of that $30,000 is attributable

11 to Ms. Warren?

12   A.   Yes, I can.

13   Q.   Okay.  And why can you say that?  Just explain that

14 in your own words.

15   A.   Well, the balance before that money came in was

16 negative, the account was overdrawn.  So anything that

17 happened after that, if there were no other deposits of money

18 coming in, would have been from -- any payments would have

19 been coming out of that -- those funds.

20   Q.   Okay.  Okay.  So that is -- that would have been a

21 transfer of funds that Mr. Vaccarelli had gotten from

22 Ms. Warren?

23   A.   Yes.  It was written out with -- by check.

24   Q.   Okay.  Let me show you what's -- the rest of the

25 account.  So her deposit was $94,000, approximately; is that

1171

1    correct?

2        A.    Yes.

3        Q.    Okay.  And scrolling through, did the account go

4    either down to approximately $91, and then there was a check

5    and was it credited back?  Just briefly explain this to the

6    jury.  What appears to be going on here?

7        A.    So it looks like the account on 9 --

8        Q.    9/21 or so?

9        A.    Yes, the account on 9/21, the balance was $91.61.

10   And there was a check put through on -- for $2500 on 9/27,

11   which was rejected, or bounced, so it was debited back into

12   the account -- or credited back into the account -- so going

13   back to the same balance, and there was an insufficient fund

14   charge.

15       Q.    So since it went down to such a small balance, were

16   you able to do a pie chart for Ms. Warren's money?

17       A.    Yes, I did.

18       Q.    Let me show you Government's Exhibit 72 for

19   identification.  Tell the jury what is shown here.

20       A.    The total amount of the money -- the use of the

21   monies coming in from Linda Warren, the $94,000, and we had

22   $16,000 total transferred to the 1757 account; 4,000 to

23   Ms. Sodano; Cash, $7,400.  There was -- the total amount

24   going to Monica Vaccarelli added up to 9,350.  Mortgages --

25   the mortgage payment for the business, $8,000.  The mortgage

1    for the home was $2,640.87.  And there were other charges,

2    smaller items that I just grouped together here, that added

3    up to the -- for the difference, $17,000.  And there's a

4    $30,000 payment to Leavenworth Professional Center.

5        Q.   Okay.  Let me take you back to Government's Exhibit

6    25.  Let me take you to approximately page 57.  And scrolling

7    down, I want to ask you about a second investment from a

8    Denis Roussel, if I'm pronouncing his name correctly.

9            Directing your attention to the middle of the page,

10   was there a deposit of $54,000?

11       A.   Yes.  On October 13, 2016, there was a $54,000

12   deposit from Mr. Roussel.

13       Q.   And what was the balance before that money came

14   in?

15       A.   The balance was 683.91 [sic].

16       Q.   And is that 6 or 783?

17       A.   I'm sorry.  $783.91.

18       Q.   And were there some payments out of the account?

19       A.   Yes.

20       Q.   Did you make a pie chart of this account?

21       A.   Yes, I did.

22       Q.   Let me show you what has been marked Government's

23   Exhibit 73.  What does this show?

24       A.   So this shows, in summarized form, the details on

25   the exhibit, and it shows that the payments coming out of the

1   $54,000 deposit of Mr. Roussel were made out to -- Ciro

2   Peluso was paid $28,000 out of this money.  There were

3   transfers out to the 1757 account for $8,200.  Briean Sodano,

4   4,000.  Vito deCarlo, 600 bucks.  Monica Vaccarelli, $6,750.

5   The mortgage for the home, 7,566.96.  And there was some

6   payments -- there was some money in and out for Ms. Burton

7   totaling $4,900.

8       Q.   Okay.  Let me jump and take you to Government's

9   Exhibit 30.  What is Government's Exhibit 30?  That's a

10  different account; correct?

11      A.   Yes.  It's the Lux account, 5007.

12      Q.   And that was the account that Mike Brough's $41,000

13  went in; correct?

14      A.   Yes.

15      Q.   Taking you to the second page.  Do you see a deposit

16  from a woman named Denise Augelli?

17      A.   Yes, I do.  There was a deposit on December 2,

18  2016.

19      Q.   And what has the amount before her money comes in?

20      A.   Before the money came in, the balance was $325.15.

21      Q.   Okay.  And how is that money used?  What's the

22  biggest payment there?

23      A.   The $72,000 that came in from her were used

24  primarily for that.  Well, I think this check bounced.  You

25  see the bottom?

1174

1    Q.   Oh, right.

2    A.   It subsequently bounced.

3    Q.   So tell the jury what happened.  So there was a

4  check, and then it bounced?

5    A.   Actually, it didn't -- on this one, as I recall,

6  there was a cashier's check, and then it was redeposited into

7  the account.

8    Q.   Okay.

9    A.   I think it was something to do with -- it was not

10  used.

11    Q.   Okay.  And then was there other money that came into

12  the account?

13    A.   Subsequently, there was a deposit of -- on January

14  17, 2017, there was a $300,000 deposit from -- related to

15  Ms. Truhan.

16    Q.   Okay.  Just going up.  Before Ms. Augelli's money

17  comes in, the balance was $78; is that correct?  About?

18  Well, at most, a couple hundred dollars, depending on how

19  checks clear, but...

20    A.   Yeah, $78.

21    Q.   $78, okay.

22    A.   No, no, you got to scroll up a little bit, actually.

23  So Ms. Augelli's money came in, the $72,000.

24    Q.   Oh, I see.  I understand.

25    A.   It was $325.

1    Q.   Thank you.  And then there's Ms. Augelli's money

2   comes in.  You said that check came out and went back in; is

3   that correct?

4    A.   Correct.

5    Q.   Okay.  And then Ms. Truhan's money came in;

6   correct?

7    A.   Yes.

8    Q.   And then after Ms. Truhan's money came in, was there

9   a withdrawal to an Attorney Sean Fitzmaurice?

10    A.   Yes.  There was a check for $59,692.66.

11    Q.   And do you know -- do you know -- did you hear

12   testimony about who Mr. Fitzmaurice represented?

13    A.   I heard testimony.  It was --

14    Q.   Do you remember if it was Ms. Chauncey?

15    A.   Yes, it was -- it was a repayment of some sort.

16    Q.   Okay.  And if we scroll down, and I'd like -- again,

17   I'm going to try to go not too quickly, but move things

18   along.  If you can look at the deposit, the column for

19   Amount, and see if there are any significant deposits.  It

20   appears that there's a thousand dollars and 3750.  You see

21   that?

22    A.   Yes, I do.

23    Q.   A couple hundred dollars; correct?

24    A.   Yes.  Five hundred.

25    Q.   And then does there appear to be a transfer to

1   7051?

2       A.   Transfer out, yes.

3       Q.   Okay.  And another transfer out?

4       A.   Yes, $6,000.

5       Q.   And another transfer out?

6       A.   6,000.

7       Q.   Another transfer out?

8       A.   $13,000.

9       Q.   There appears to be cash out?

10      A.   Yes.

11      Q.   Maybe while we're doing this, could you explain for

12  the jury -- sometimes it might say cash out or cash in.  If

13  someone goes to the counter and negotiates a check, how the

14  bank might categorize it if they get some money and put some

15  money in an account.  Does that question make sense to you?

16      A.   The way that I look at -- sometimes the deposits

17  will be for an amount or one amount.  For example, the line

18  item on the check -- on the bank statement will say $10,000,

19  but the actual check that the customer brought to the bank

20  was $10,500.

21           So what happens is, the deposit -- and the bank only

22  says 10,000, and when you look at the deposit slip, the

23  deposit slip will show that there was a $10,500 deposit --

24  check, and then cash out, which means that the customer took

25  the $500 in cash and just deposited the net amount, which

1   will be $10,000.  So that's what cash out is, and that's how

2   I use it in my terminology.  And sometimes it's written on

3   the -- on the deposit slip.

4       Q.   Okay.  So of the $300,000 -- what happened to this

5   $300,000?

6       A.   It was -- that was transferred out to the 7051

7   account, and to the 757 account.

8       Q.   Okay.  Did you make a pie chart -- and I'm just

9   going to keep scrolling down.  That appears to be the end of

10  the chart.

11       Did you make a pie chart related to Ms. Augelli's

12  money and the Truhan money that came in?

13       A.   Yes.

14       Q.   Okay.  Let me show you what's been marked for

15  identification Government's Exhibit 74.  Do you see that?  I

16  see it.  Now do you see it?

17       A.   I do, yes.

18       Q.   Tell the jury what's going on here.

19       A.   This chart, similar to the other one I did, I show

20  the money of -- what happened to the money that came in from

21  Ms. Augelli and Ms. -- and related to Ms. Truhan, which was

22  372,000.  So the majority of the funds were transferred out

23  to the account 7051, $135,000.  There was $74,000 transferred

24  out to 1757.  Then we saw the -- we talked about this

25  already, but the payment to Sean Fitzmaurice, $59,692.66.

1  Cash taken out was $34,720.  The payment to Mr. Peluso,

2  4,000.  Conti & Levy, which is $7,580.  Mr. Correa was paid

3  $32,205.11.  And that made up the bulk of that money.

4          There was a balance at the end of the account, as of

5  May 31st, '17, which is what I put there.  So not all the

6  money was used as of that date, but there was a balance of

7  $38,000.

8          MR. McGARRY:  Okay.  Your Honor, just in case I

9  haven't done it.  I want to make sure I move Government's

10  Exhibit 30 into evidence.  It's not a summary chart.  It is a

11  summary -- it's a summary chart, but not a demonstrative

12  chart.  And I think I moved 30, but I wanted to --

13          THE COURT:  We'll double-move it.

14          MR. McGARRY:  Thank you, Your Honor.

15  BY MR. McGARRY:

16  Q.  So, while I was checking that, you were talking

17  about this chart.  Did you also schedule-out and follow --

18  you said -- or testified earlier you follow the money.

19          Did you also follow the $135,000 that got

20  transferred to account ending in 7051?

21  A.  Yes, I did.  And in order the get a better

22  understanding of what was -- what that money was used for, I

23  broke out that amount further and I prepared a pie chart on

24  it.

25  Q.  And, so, this is primarily, if not almost

1   exclusively, from Ms. Augelli and Ms. Truhan.  And I think

2   you put down the bottom the beginning balance, and then there

3   was some other funds in; correct?

4       A.   Yes.

5       Q.   So you kind of clarified that for -- okay.  So let's

6   take a look at demonstrative Exhibit 75.  What does that

7   show?

8       A.   On this business chart, I broke out the $135,000.

9   So basically I just went back to account 7051 and tried to

10  follow the money there and see what happened to the money

11  transfers as they came in.  And this is what happened.

12          I -- the $3,000 to Sterling Security.  There was a

13  transfer to the 1757 account, totaling -- the total transfer

14  to that account were $17,000.  Payments to Vito Vaccarelli is

15  $4,000.  Payments for the bond or bonding for the 49

16  Leavenworth, Facade (phonetic) for $10,665.39.  Payments to

17  Briean Sodano $8,805.  Cash, 2,500.  There was some payments

18  For the Benefit of Lyn Burton, $15,035.12.

19      Q.   So there were -- let me stop you there.  So there

20  were some -- to be fair, there were some payments to Lyn

21  Burton?

22      A.   Oh, yes.

23      Q.   And some payments to -- that seemed to be for her

24  benefit; correct?

25      A.   Correct.  That's what that means, for her benefit.

1    Q.   Did you see like three or $400,000 worth of things

2    that were for the benefit of Lyn Burton?

3    A.   No, I did not.

4    Q.   And you were telling us about this chart.  How much

5    did Ms. Vaccarelli get?

6    A.   There were -- the total was $25,800 to

7    Ms. Vaccarelli.

8    Q.   So, according to your analysis, from this money, did

9    Mrs. Vaccarelli get more money than Lyn Burton?

10   A.   Yes.

11   Q.   Okay.  And OLMC; what was that?

12   A.   That's the school, $10,000 -- $10,100.

13   Q.   Okay.  So let me show you a couple of -- briefly.

14   You showed us a number of bank accounts, including -- we also

15   moved in some accounts for Ms. Vaccarelli -- Monica

16   Vaccarelli.

17        Let me show you what's been marked into evidence as

18   Government's Exhibit 46.  And do you recognize this document

19   as a stipulation that was very clearly read to the jury last

20   week?

21   A.   Yes.

22   Q.   Okay.  And just, without reading it again, what was

23   the title of this and what is your understanding of the

24   interstate banking transfers?

25   A.   Could you repeat the question?

```
 1      Q.   Yeah.  What is the title of this document?
 2      A.   It is a Joint Stipulation Regarding the Interstate
 3   Banking Transfers and Instruments of Communication in
 4   Interstate Commerce.
 5      Q.   Okay.  And let me show you what's been marked as 48,
 6   which is in evidence.  And if you could just read the title
 7   of this document -- and I'm going to blow it up again so you
 8   can read that.
 9      A.   Joint Stipulation Regarding FDIC and Banking
10   Activities Affecting Interstate Commerce.
11      Q.   Okay.  And just scrolling down, did your analysis
12   include the Ion Bank?
13      A.   Yes.
14      Q.   Which was formerly Naugatuck Savings?
15      A.   Excuse me?
16      Q.   Was it formerly known as Naugatuck Savings Bank?
17      A.   Yes, it was.
18      Q.   And did you look at the Thomaston Savings Bank?
19      A.   Yes.
20      Q.   And Salisbury Bank -- some bank records from
21   Salisbury Bank?
22      A.   I saw some items coming from that.
23      Q.   And Liberty Bank?
24      A.   Yes.
25      Q.   Teachers Federal Credit Union?
```

1  A.  Yes.

2  Q.  Okay.  I'd like to take you to one final area.  Did

3  you prepare an overall demonstrative exhibit showing

4  financial activity in the case?

5  A.  Yes, I did.

6  Q.  Let me show you, for demonstrative purposes,

7  Government's Exhibit 63 in evidence, and I'm going to zoom-in

8  on it so you can take a look at it.  And just getting the top

9  there.

10  What does this chart -- did you prepare this

11  chart?

12  A.  I did.  Yes, I did.

13  Q.  Tell the jury what this chart is showing.

14  A.  So, in order to get an understanding of the -- all

15  the sources of funds that we're looking at, we looked at all

16  the clients that -- funds that came in, and I totaled them

17  here.  So they total $1,471,341.63.

18  Q.  And that's the money that came in to the accounts

19  that you looked at; correct?

20  A.  From clients that we have identified.

21  Q.  And that's not including money from the Burton

22  Trust; correct?

23  A.  Correct.

24  Q.  Which means -- is it accurate this chart would not

25  include what Special Agent Day testified about regarding the

1  TD Ameritrade accounts, money coming in to Mr. Vaccarelli's

2  checking accounts; correct?

3      A.   Correct.  It doesn't include that, no.

4      Q.   Okay.  This is just the folks listed on this

5  chart?

6      A.   Yes.

7      Q.   Okay.  And tell us about -- maybe just start at the

8  top.  Tell us briefly about June Antonacci.  What were you

9  able to determine?

10     A.   June Antonacci, that she put in $200,000, which we

11  saw, and then I totaled the payments out to her.  They total

12  233,000.

13     Q.   And those were like the interest payments that she

14  thought she was getting?

15     A.   Correct.

16     Q.   And how about the next one -- Ms. Augelli?

17     A.   Augelli just shows the money that came from her,

18  72,696.42.

19     Q.   Michael Brough?

20     A.   The same thing.  His amount totaled 79,874.42.

21     Q.   And Ms. Chauncey; I believe she had two, as did

22  Michael Brough, she had two investments, but you combined

23  them; is that correct?

24     A.   I merged them, yes.  So, in total, she had

25  67,596.79.

1184

1    Q.   And she got back some money from a legal settlement;

2    correct?

3    A.   Correct.  That's the 59,692.66 that I talked about

4    before.

5    Q.   And that was a legal settlement that was paid out of

6    the bank accounts that you looked at; correct?

7    A.   Yes.

8    Q.   Just -- you did not put any money that people may

9    have received from The Investment Center; correct?

10   A.   No.  This is just from the accounts that I looked at

11   from Ion Bank and the others.

12   Q.   So would it be fair to say that this would be client

13   funds, not including the Burton Trust, with their interaction

14   with the Defendant, Leon Vaccarelli?

15   A.   Correct.

16   Q.   And leaving aside what The Investment Center did

17   after the fact; correct?

18   A.   Correct.  Okay.

19   Q.   Okay.  How about Manuel Correa?

20   A.   Manuel Correa, he had -- he put in $26,743.09, and

21   he was paid back $32,205.11.

22   Q.   Okay.  And Antoinette Izzi put in about 98,900 and

23   got back no -- you saw no money back to her; correct?

24   A.   I did not see any money going back to her.

25   Q.   Ms. LaPorta received a small payment back; is that

1    correct?

2         A.   Yes.

3         Q.   And Ms. Warren?

4         A.   That's the 94,000 that we were talking about

5    recently.

6         Q.   All right.

7         A.   There was no money back to her that I saw.

8         Q.   Mr. Peluso from last week?

9         A.   Correct.  He put in a hundred thousand dollars, and

10   received $24,000 back.

11        Q.   And Mr. Roussel; he had two payments, as well,

12   correct, or two investments?

13        A.   He put in two deposits, totaling $84,695.48.

14        Q.   Ms. Rustic; $100,000, no money back?

15        A.   Correct.

16        Q.   Marcia Schultz; 57,000, no money back?

17        A.   Yes.

18        Q.   Sienkowski, over -- the hundred thousand dollar --

19   $100,343, and she got the $15,000 back?

20        A.   Yes.

21        Q.   Ms. Strobel?

22        A.   $45,000, and she did not get any money back.

23        Q.   And Carmela Truhan?

24        A.   Yes.  That's the one we just talked about.  She put

25   in $300,000.

1    Q.   And you mean when we talked about it, that was her

2    daughter, Victoria Hughes, testified yesterday?

3    A.   Yes.

4    Q.   And that was where Ms. Carmela Truhan was sitting

5    where Amy Konarski is sitting at the present time?

6    A.   She was sitting in the front row there, yes.

7    Q.   And, so, I noticed just -- if there has somebody who

8    had more money out than in, you didn't include them in the

9    column entitled "Loss"; is that correct?

10   A.   Yes.

11   Q.   Because presumably they didn't lose any money?

12   A.   Correct.

13   Q.   Okay.  And what was the total amount of adding up

14   all of the clients who invested with Mr. Vaccarelli and came

15   out with less money than they gave him?

16   A.   The total amount that I computed was

17   $1,142,185.97.

18   Q.   And, again, that does not include the Burton Trust

19   that Agent Day testified about; correct?

20   A.   Correct.

21        MR. McGARRY:  Okay.  If I could just have a minute,

22   Your Honor?

23        THE COURT:  Yes.

24        (Counsel confer.)

25   BY MR. McGARRY:

1187

1    Q.   If there were -- I'm going to direct your attention
2    to Giuseppina LaPorta.  Do you remember that, the woman who
3    spoke Italian who came and testified?
4    A.   Yes.
5    Q.   You looked at the bank records; correct?
6    A.   Yes.
7    Q.   If somebody had given Mr. Vaccarelli cash, and it
8    hadn't been deposited in his account or it was deposited
9    without putting a notation on it, would you be able to pick
10   that up into this big schedule?
11   A.   I would not be able to identify it as from anybody
12   specifically, no.
13   Q.   So then, also, if he happened to give somebody cash
14   from funds out and just handed them a small amount of cash,
15   would you have been able to pick that up?
16   A.   No.
17   Q.   Okay.  So this is based on the bank records?
18   A.   Correct.
19   Q.   Okay.
20        MR. McGARRY:  I have no more questions, Your
21   Honor.
22        THE COURT:  All right.  Cross-examination,
23   Mr. Einhorn.
24        MR. EINHORN:  Yes, Your Honor.
25                    CROSS-EXAMINATION

1    BY MR. EINHORN:

2        Q.   Good afternoon, Mr. Almodovar.

3        A.   Good afternoon.

4        Q.   I'm Jon Einhorn, and, as you know, I represent Leon

5    Vaccarelli.  I'm going to ask you some questions about your

6    testimony here this afternoon in this case.

7             Let me start with a general question, if you don't

8    mind, sir.  Prior to sitting here in the court throughout the

9    trial, had you ever met Leon Vaccarelli?

10       A.   No, I have not.

11       Q.   All right.  And, so, it's fair to say that during

12   the time period that the bank records you evaluated concerned

13   an entire period -- 2011, I think, through 2017 -- you've

14   never seen -- you hadn't seen him during that time period or

15   meet him during that time period?

16       A.   No, I have not met him before.

17       Q.   All right.  So if, in fact, Mr. Vaccarelli had some

18   sort of an impairment during --

19            MR. McGARRY:  Objection.  Beyond the scope.

20            THE COURT:  It is beyond the scope.  I will sustain

21   the objection.

22            MR. EINHORN:  Yes, Your Honor.

23   BY MR. EINHORN:

24       Q.   Mr. Almodovar, please stick around tomorrow so I

25   can call you as a witness first thing in the morning.

1    Let me --

2        MR. McGARRY:  Your Honor, if Mr. Einhorn would like

3    to save Mr. Almodovar the trouble, we'll withdraw our

4    objection.

5        MR. EINHORN:  That works for me.

6        THE COURT:  Proceed.

7        MR. EINHORN:  Thank you, Your Honor.

8    BY MR. EINHORN:

9    Q.   All right.  Let me ask you the question again.  So,

10   assuming, as you say, then, that you hadn't seen Mr.

11   Vaccarelli and hadn't met him between 2011 and 2017, you

12   wouldn't know if, in fact, he was under some impairment

13   during that time period; would you?

14   A.   No, I would not.

15   Q.   Okay.  You're here -- and I'm not trying to minimize

16   your role, please understand.  But you're here exclusively

17   for the purposes of numbers, showing us numbers, right --

18   bank records and forensic accounting, as you do?

19   A.   Following the money, yes.

20   Q.   That's what you're doing, you're following the

21   money?

22   A.   Correct.

23   Q.   That sounds like a TV show; doesn't it?

24        So in terms of following the money, I just wanted to

25   go over a couple of things with you.  Before we get down to

1    brass tacks, in reviewing the various expenses that came out

2    of -- I think it was Exhibit 25 in general, that was one of

3    the accounts that seemed to be the one we focused most of our

4    time on.  And looking -- calling on your memory on that and

5    other banking records, do you remember a number of expenses

6    for restaurants or bars?

7        A.   I remember, yes, a couple, a few.

8        Q.   A few.  Diorio's?  Do you remember the name

9    Diorio's?

10       A.   I do.

11       Q.   Do you remember the name?

12       A.   I do.

13       Q.   Yes.  We heard.  Thank you.  Do you remember the

14   name LaTavola in there?

15       A.   Don't remember it right now.

16       Q.   Tiramisu?

17       A.   No, it doesn't ring a bell.

18       Q.   Signature's?

19       A.   Yes.

20       Q.   Sure.  Grotto.

21       A.   That doesn't --

22       Q.   Not sure.  Shamrock Pub?

23       A.   Which one?

24       Q.   Shamrock Pub?

25       A.   No.

1191

1    Q.    But you remember a number of restaurants or bars?

2    A.    Yes, I do.

3    Q.    I may not have asked you about all of the ones that

4    are in there.  There's an awful lot of entries --

5    A.    There's a lot of entries.  Thousands, actually.

6    Q.    Thank you.  There's a lot of -- I'm not expecting

7    you to memorize them, but there's a lot of entries.

8          Okay.  And another general question.  You were asked

9    at the conclusion of the Government's examination about cash,

10   and you said that you really wouldn't be able to follow cash,

11   in terms of following the money.  You were following checks;

12   right?

13   A.    Checks and deposits from documents from the bank

14   that showed what kind of deposits they were, which sometimes

15   they say Cash on them.

16   Q.    That's my question.  Thank you.

17         So, as a matter of fact, my recollection is there

18   were some notations, banking notations that indicated "Cash";

19   is isn't that so?

20   A.    Correct.

21   Q.    And as you sit here today, you don't know if, in

22   fact, that the "Cash" notations out, for example, might have

23   gone to Lyn Burton, for example?

24   A.    No, I do not know that.

25   Q.    You knew, I think -- well, you've been sitting here

1192

1  the whole trial, so you know that, in fact, my client,

2  Mr. Vaccarelli, was Lyn Burton's Trustee, and he paid many

3  expenses on her behalf; right?

4      A.   Correct.

5      Q.   Okay.  So you don't know if some of those cash

6  expenses might have been for Lyn Burton?

7      A.   No, I do not know that.

8      Q.   Okay.  All right.  And getting right down to the

9  issues then, you showed us a number of demonstrative pie

10  charts; right?  You remember those?

11     A.   Yes.

12     Q.   Did you make those up?

13     A.   Did I make them up?  No.

14     Q.   Did you make them?

15     A.   I created them, yes.

16     Q.   You created them -- I'm sorry.  Inartfully said.

17  You created them; right?

18     A.   Yes.

19     Q.   Okay.  So, in your profession, in your work -- and I

20  say this as a compliment -- accuracy is what you strive for;

21  right?

22     A.   Yes.

23     Q.   That's what you do.  I've known plenty of

24  accountants in my time and --

25     A.   We try, yes.

1    Q.   And you are.  That's what you try to do?

2    A.   I'm an accountant, yes.

3    Q.   Looking at some of these pie charts, however, it

4    seems to me there are a few questions that are raised, at

5    least in my mind.  For example, I just want to start going

6    through them.

7         Exhibit 64.  Again, it was just a demonstrative

8    exhibit.  You note that Michael Brough put in

9    38,000-and-change, but you note that there was a beginning

10   balance in that account -- or at least there was a beginning

11   balance in the area you looked at, and there were other funds

12   deposited there, too; right?

13   A.   Yes.

14   Q.   So, a little bit of rough math on my part.  If I add

15   those two figures on your caveat, the note on the bottom, it

16   comes up to about $6200.  Would you agree with me that -- I

17   didn't really do the math on it.  What's it about 12 percent

18   of $38,000?  Is that ballpark?

19   A.   I'm not going to do quick math here, but --

20   Q.   You don't have to.  But it's more than 10 percent;

21   right?  $6,100 is roughly -- well, I -- I want to say it's

22   about -- I think it's about 15 percent of 38,000.

23   A.   Okay.

24   Q.   Okay.  Now, this means that this particular pie

25   doesn't account for that 15 percent; does it?  Where do I see

1194

1   on that pie the fact that there were $15,000 that started?

2       A.   So the way that -- that would be included in the

3   others.  So it would be -- so if I included the -- added the

4   6,000, for example.  And, so, I think if you add up all the

5   numbers here -- I would need to add them up -- the other

6   category is what accounts for all that, all those

7   differences, all that money that was before and the -- all

8   the money that came in.  That's my intent there.

9       Q.   Okay.  If it was $100 or $200, you have, Other $264,

10  I wouldn't stand here wasting your time.  But if it's

11  6,000-some-odd dollars, doesn't that deserve its own little

12  slice of the pie?

13      A.   We could do that, but it depends on, you know, how

14  complicated you want to make the chart, basically.

15      Q.   Well, when you say --

16      A.   That's why I noted it there, to make sure that there

17  was no --

18      Q.   Well, when you say we could do that.  In fact, it

19  would be more accurate if you did that; isn't that true?

20      A.   It would be -- so I need to -- I would need to add

21  up all the numbers and show you what the number is, which

22  would be -- what I'm saying, that that 6,000 would be in that

23  Other category.

24      Q.   Let me show you another pie chart.  And this is

25  Exhibit 66.  Now, this particular pie chart is Michael

1    Brough, $39,000 it talks about.  And in this one you note a

2    beginning balance again, Other funds again.  And if you add

3    those two up, comes up to about $11,700.  That's a pretty

4    healthy percentage of 39,000; isn't it?

5         A.   Yes.

6         Q.   Okay.  Doesn't that deserve at least some reference

7    on this chart besides the caveat?

8         A.   So, maybe I'm not clear how I'm explaining this, but

9    when I do this chart, I'm accounting for the $39,000.  So if

10   we look at the detail that makes up, you know, that came in

11   after that $39,000, it will include all these other smaller

12   items, but it would also include the other funds that came in

13   and the beginning balance, if there was any.

14        So when I do the -- the Other is just a net of all

15   those -- you know, the minuses and the -- or all the other

16   funds that were available.

17        Q.   So the 39 -- and, again, we're looking at Exhibit

18   66.  So the $39,000 referred to in Exhibit 66 is $39,000 plus

19   the $11,700 referred to on the bottom?  Is that what you're

20   telling us?

21        A.   So if I were to look at all the transactions that

22   happened after that money came in, the $39,000, there would

23   be a lot of other smaller items that are not the bigger

24   categories here.  So let's -- and I don't know what the

25   numbers are now, but let's say that all those other items

1196

1    were like $11,000 in total.  So what I do is I, you know, all

2    those expenses, instead of saying Other $11,000, I add up,

3    you know, the other funds that came in, so it's just comes up

4    to $39,000.

5        Q.   And showing you Exhibit 70 -- showing you Exhibit

6    70, there's a similar situation where if you add the

7    beginning balance and the other funds, it comes to more than

8    10 percent of Giuseppina LaPorta's money; right?

9        A.   Yes.

10       Q.   And that 10 percent still doesn't deserve its own

11   little piece of the pie?  It's built in somehow, you say?

12       A.   Yes.  So if I were to include that, it would be a

13   negative number.  So it's not going to be reflected on the

14   chart.  That's why this footnote is there.  But it's included

15   in the net number, the Other.

16       Q.   Let me ask you about Exhibit 74, because that's a

17   slightly different situation, I think, as near as I

18   understand your pie charts.

19            So I'm referring to Exhibit 74, Augelli and Truhan's

20   money that went into the account that you were looking at.

21   In the caveat -- I'm sorry.  I keep calling it that.

22   accountants refer to it as notes; right?

23       A.   Footnotes.

24       Q.   Footnotes.  It's a lawyer term.

25            So, in the note on the bottom, you also refer to a

1   -- what I think is fair to say, a fairly large ending

2   balance, 38,419.90.  Am I correct, then, in reading that, as

3   that's unaccounted for in your pie?

4        A.   Yes, that's why it's included there.

5        Q.   All right.  So going back to my baker's analogy, if

6   you will.  Why doesn't that amount deserve its own little

7   piece of the pie.  Shouldn't there be a slice for 38,419.90

8   maybe labeled Undistributed?

9        A.   It could included that if it was -- if this was

10  meant to show like what percentage of the funds went to the

11  different categories, that would be more meaningful.  I

12  think -- I mean, this is my judgment here.  I just -- so

13  that's why I put the balance on the footnotes.  So it's just

14  -- I was just showing what the money was spent on, not

15  necessarily what was left over, which is -- obviously, I

16  included what was left over so there's no misleading, if you

17  will.

18       Q.   I ask you these questions only because all of the

19  money part is confusing enough.

20       A.   Correct.

21       Q.   And I'm just trying to understand, and I'm not

22  certain I do yet at this point, but I'm trying to understand

23  how you constructed the pie charts when there were still

24  pieces unexplained except for a note.

25       A.   Well, if I didn't know what the balance was used for

1  at that point, then that's what the note is for.  But the
2  intent is to show, you know, what's known and how -- what the
3  amounts were.  If it was a chart based on percentages, it
4  would be a different looking chart, I guess.
5      Q.   Right.  You would agree with me, if it was a chart
6  -- if it was a pie based on percentages, you'd have to
7  include what was left at the end?
8      A.   If that was the intent of that, yes.
9      Q.   Well, the only thing that would make sense, right,
10  from an accounting perspective?
11     A.   Not necessarily.  I mean, the intent here was to
12  show what the actual amounts were.
13     Q.   I understand that, except that it shows a completed
14  pie, and it seems to me that what you're trying to show by
15  this graphic is where the money went.  But, in fact, again
16  looking at Exhibit 74, the graphic doesn't show where the
17  money went -- you have to refer to your note and say, oh,
18  gosh, there's another piece that isn't shown on the graphic.
19     A.   Well, that's why you have to take the exhibit in
20  total.
21     Q.   With the note?
22     A.   Yes.
23     Q.   Now, let me ask you about one last demonstrative.
24  You've sat here, we know this of course, for the entire
25  trial.  So I assume that you've had a chance to listen to the

1    witnesses, and I know you've been doing that, and that's part

2    of what went into your compiling this demonstrative, this --

3    what you call, you say "total loss chart"; right?  That's

4    based upon what you heard?

5        A.   Not -- no.  This is based on the documents, on the

6    bank statements.

7        Q.   So why were you here, then, if you didn't need to

8    listen to what the witnesses said to add them all up in your

9    head?

10       A.   People here not -- I don't think everybody here was

11   a witness.

12       Q.   So, the people who were here, you heard; the ones

13   who weren't here, you added them onto this list because you

14   saw them on the bank documents?  That's what you're telling

15   us?

16       A.   They were clients.

17       Q.   Okay.  So just pick one out.  Who wasn't here who's

18   on this particular demonstrative?

19       A.   I know Correa wasn't here.

20       Q.   Okay.  Great.  So Manuel Correa was not here.  And

21   it's your testimony you picked out his information from one

22   or more of the exhibits that you told us about this

23   afternoon?

24       A.   Yeah.  There were checks coming in from Mr.

25   Correa.

1200

1    Q.    There were "texts" you said?

2    A.    Checks.

3    Q.    Oh, checks.  I'm sorry.  Okay.

4          Now, calling your attention again to this exhibit,

5    Government's Exhibit 63.  In fact, as the Government alluded

6    to earlier, your Loss column is not an "actual loss" column,

7    is it?  Let me rephrase it.

8    A.    What do you mean by "actual"?

9    Q.    Let me rephrase the question.  Sure.  Your Loss

10   column doesn't take into consideration the fact that several,

11   if not many, of these clients have received their money back

12   already; right?

13   A.    It does not include that, no.

14   Q.    It doesn't include that, okay.

15         And, again, you sat here throughout the entire

16   trial, so you heard the testimony of many, if not -- well,

17   not all, but many of the clients who said that they had

18   received their money back; right?

19   A.    Yes.

20   Q.    Do you have those figures handy?  Did you write them

21   down while you were sitting here, listening?

22   A.    No.  The intent of the chart is to show based on the

23   bank accounts what the -- the money went -- what money went

24   in from those individuals and what money was paid out to

25   them.  So it does not include the -- the money that was not

1201

1  paid by Mr. Vaccarelli.
2      Q.   No, I got it.  I got it.  But I'm asking you
3  something a little bit different.  I'm saying that,
4  considering that you've been here all this time --
5      A.   Yes.
6      Q.   -- and I know you're paying attention, you're a
7  good, excellent forensic accountant -- did you make notes of
8  who actually has gotten paid from this list?
9      A.   Not on this chart, no.
10      Q.   Do you have that information?
11      A.   I do not.
12      Q.   Okay.
13      A.   It's on the testimony, I believe.
14      Q.   It's on the testimony, yes.  But you don't have any
15  chart or notes of that?
16      A.   No, no.
17      Q.   Okay.  That's fine.
18          Now, going through this particular list, you know
19  that -- that, in at least two instances I can see quickly,
20  Mr. Vaccarelli paid back more than the amount of the funds
21  that were placed in; right?  Taking Antonacci, for example.
22  Okay?
23      A.   Yes.
24      Q.   Okay.  But you didn't give any credit to
25  Mr. Vaccarelli for having paid that.  I understood from your

1  testimony, you were just doing this on an individualized

2  basis?

3      A.   Correct, for each person, what -- the money that

4  they put in and the money that they took out, or got paid

5  back.

6      Q.   Absolutely.  Absolutely.  But if you looked at it on

7  a basis from Mr. Vaccarelli's eyes, the amount would be

8  different, right, the total amount would be different?

9  Because he would have paid more than just the amounts set

10  forth in your "funds in" account -- you'd agree with me on

11  that, right, in some instances?  Antonacci was one.

12     A.   The intent is to show for the people that didn't get

13  any money back, the net amount of what they received.  So

14  it's not to show that, you know, some people got more than

15  the others.

16     Q.   I understand.

17     A.   Because the money -- you know, the excess money that

18  was paid, for example, to Antonacci is not going to cover the

19  other people.  I don't think it's going to cover the other

20  people's loss.

21     Q.   No, of course not.  But what I'm asking you is, if,

22  in fact, you added up all the money that Mr. Vaccarelli paid,

23  whether or not he double-paid one client or overpaid one or

24  whatever, it would still reduce his total loss.  Maybe not

25  affect an individual person, but he certainly would have a

1   bigger credit coming to him, is what I'm getting at.

2       A.   I don't understand that.

3       Q.   All right.  Let me move on.

4       A.   Doesn't make sense to me.

5       Q.   Let me move on, see if I can make it a little

6   clearer.  In Christine Chauncey, for example, there's an

7   asterisk next to hers and it says "legal settlement," and she

8   got back certain money; right?

9       A.   Yes.

10      Q.   All right.  You gave her credit on the legal

11  settlement, and I gather that's because it was shown in the

12  banking records?

13      A.   Yes.

14      Q.   But other people who received money from legal

15  settlements that you heard about in court, you didn't give

16  credit to?

17      A.   This is -- because this reflects what was in the

18  bank accounts.

19      Q.   Right.  Exactly.

20      A.   And not including --

21      Q.   Just the bank accounts?

22      A.   Yes.

23      Q.   And, so, you sat here and you heard that there were

24  other settlements that were affected besides that particular

25  one, besides the Chauncey one?  You heard it?

1    A.    I saw them, yes.

2    Q.    Yes.

3    A.    They were paid by The Investment Center --

4    Q.    The insurance carrier?

5    A.    Insurance carriers, yes.

6    Q.    And just one last thing.  I'm sorry, I don't want to

7    hold you too long.

8          In terms of these -- the amounts that clients paid

9    in this case, have you heard any discussion about whether or

10   not some of the funds that came to Leon Vaccarelli were, in

11   fact, fees that he received?  Not just monies that were

12   invested or loaned to him, but, in fact, were fees that he

13   received?

14   A.    From these clients?

15   Q.    Yes, sir.

16   A.    No.

17   Q.    You haven't heard that?

18   A.    No.

19   Q.    That would certainly change the amount of -- the

20   loss amounts, if there were fees, though; wouldn't it?

21   A.    Yes.

22   Q.    Okay.  All right.  And I said this before, but I'll

23   say it last time.  One last thing.

24         On Antonacci, you sat here and you heard -- and you

25   heard the testimony, didn't you, sir, that, in fact, June

1   Antonacci testified it was a loan?  Not an investment, but a

2   loan; right?

3       A.   Yes.

4       Q.   She did; right?

5       A.   Yes.

6       Q.   Thank you.

7            MR. EINHORN:  May I have just a moment, Your Honor?

8            THE COURT:  You may.

9            MR. EINHORN:  I'm trying to be sensitive to the

10  time.

11           (Counsel confer.)

12           MR. EINHORN:  Nothing further, Your Honor.  Thank

13  you.  Thank you, sir.

14           THE WITNESS:  You're welcome.

15           THE COURT:  Any redirect?

16           MR. McGARRY:  Yes, Your Honor.  With mind of the

17  time, I will be quick.

18                     REDIRECT EXAMINATION

19  BY MR. McGARRY:

20      Q.   Mr. Einhorn showed you some of the pie charts and

21  was going through them.  Let me show you what's been marked

22  in evidence as Government's Exhibit 16, Government's Exhibit

23  17, and Government's Exhibit 18.  Do you see that?

24      A.   Yes.

25      Q.   Okay.  Going back to Government's Exhibit 17.  In

1  any of your pie charts or in any of the bank accounts that

2  you saw, did you ever see money moving from a client to

3  Mr. Vaccarelli's account and then that whole amount of money

4  going into a Private Direct Investment?

5      A.   No, I did not see that.

6      Q.   Did you ever see any money going into a separately

7  managed account?

8      A.   No.

9      Q.   Okay.  You were also asked questions about, I

10 believe, Ms. Antonacci and the fact that she got back more

11 than she put in.  Did you see that?

12     A.   Yes.

13     Q.   In fact, do you know if in a scheme sometimes people

14 -- some people get back more than they put in and some people

15 lose money?

16          MR. EINHORN:  I'll object, Your Honor.  The witness

17 isn't competent to testify on that.

18          THE COURT:  Sustained.

19 BY MR. McGARRY:

20     Q.   Would your training and experience as a Certified

21 Fraud Examiner make you qualified to answer that question?

22     A.   It's -- yes.

23     Q.   Have you seen instances where people who get --

24 well, let me put -- let me withdraw the question.

25          Mr. Einhorn asked you questions about Ms. Antonacci

1  getting money back -- and he called it a loan; correct?  Do
2  you remember that question?
3      A.   Yes.
4      Q.   Okay.
5      A.   Yes.
6      Q.   What was the source of funds for money that Ms.
7  Antonacci got in the 125 or $126,000 that was returned to
8  her?
9      A.   The sources of funds there were from Ms. Chauncey,
10 Ms. Izzi, Ms. Strobel and Mr. Correa.  That was the $166,000
11 that I did the chart for.
12     Q.   And when Ms. Antonacci got back money, the 75,000,
13 what was the source of funds?
14     A.   The source there was Susan Rustic's money.
15     Q.   And when -- he asked you a number of questions about
16 people getting money back.  Did you see any money coming back
17 from Leon Vaccarelli to these people, other than what was on
18 your chart?
19     A.   Not other than the ones that were on the charts,
20 no.
21     Q.   So could you just clarify for the jury the
22 difference between getting money from The Investment Center
23 and why that's not included, as compared to getting money
24 from Mr. Vaccarelli?
25     A.   Yes.  The charts is intended to show what happened

```
1   within the accounts that were under his control at the time
2   and the money that he received, the money that he paid out to
3   some of the clients, and then what -- you know, the
4   difference.
5        So those are the ones that are at a loss, and the
6   money that is paid out by other third parties is not included
7   on those charts because that's not -- first of all, it wasn't
8   paid by him, I'm assuming.  It was paid by the insurance
9   company, insurance carrier.  So that's why it's not included
10  there.
11       MR. McGARRY:  Thank you.  I have no more
12  questions.
13       THE COURT:  Anything further, Mr. Einhorn?
14       MR. EINHORN:  No, Your Honor.  Thank you.
15       THE COURT:  Mr. Almodovar, thank you.  You are
16  excused.  You may step down.
17       THE WITNESS:  Thank you.
18       (Witness excused, 3:02 p.m.)
19       THE COURT:  Will the Government have any more
20  evidence tomorrow, or shall we wait?
21       MR. McGARRY:  I think it's unlikely, Your Honor.  I
22  think that we have completed, but as the Court knows,
23  sometimes there's bits and pieces.  We may have one
24  housekeeping matter, but I think maybe we'll wait till
25  tomorrow to make it --
```

1    THE COURT:  That's fine.  All right.  It's fair to

2  say that the Government is almost completed with its case, in

3  which case it will be the opportunity, but not the

4  requirement, for the Defendant to go forward.

5    So we will adjourn for today, be back at 9:30, and

6  we are well on track.  At some point tomorrow, I may be able

7  to give you a projection of when evidence will be completed,

8  but I don't want to do so before I have a very sound basis

9  for that.  Okay?  Enjoy your afternoon.  And we'll see you at

10  9:30.

11    (Jury out, 3:03 p.m.)

12    THE COURT:  All right.  Then, if, in fact, the

13  Government is going to rest tomorrow morning, you will be

14  beginning.

15    MR. EINHORN:  I'll make a Rule 29 motion first and

16  then we'll begin with evidence, yes.  My an -- just following

17  along with Your Honor's estimate, if you'd like, it's likely

18  Mr. Vaccarelli will testify.  My guess is, with direct and

19  cross, it will be all day Wednesday, and then we have three

20  somewhat brief witnesses on Thursday.

21    THE COURT:  And your Thursday witnesses are?

22    MR. EINHORN:  Yes, one is Donna Gleissner, who Your

23  Honor heard about earlier.  The second person named Brie

24  Sodano.

25    THE COURT:  And Ms. Sodano is what?

1    MR. EINHORN:  She was a -- also worked in the office

2  as a registered rep at Lux Financial during some of the

3  time.

4    THE COURT:  On Leavenworth?

5    MR. EINHORN:  Yes, and during some of the time

6  period we're talking about.  And, finally, Mr. Vaccarelli's

7  former secretary, Maryanne, whose last name I forgot --

8    THE DEFENDANT:  Marticello.

9    MR. EINHORN:  Marticello.  Sorry.  And those three

10  witnesses, none of whom, I believe, would be particularly

11  extensive.

12    THE COURT:  All right.

13    MR. McGARRY:  Your Honor, it sounds like, depending

14  on the Government's rebuttal case, which, in my experience,

15  are usually very brief, we may be closing on Thursday.  Is

16  that a possibility?

17    THE COURT:  So what I'm going to do is, I can give

18  you a draft charge that I last made some changes on over

19  lunch but have not looked at since.  I can give that to you

20  now, or -- I've got a meeting right now -- I can send it to

21  you at 5:00.

22    MR. EINHORN:  That's fine.

23    MR. McGARRY:  I would say we're in no rush.

24  Whenever the Court feels comfortable.

25    THE COURT:  All right.

1       MR. McGARRY:  5:00, 6:00, 7:00, as long as we have

2    it sometime tonight, we can probably give you comments in the

3    morning.

4       THE COURT:  All right, then.

5       MR. EINHORN:  Yes, except that I'll probably be

6    preparing for examination.  You're not planning a charge

7    conference in the morning?

8       THE COURT:  No, no.  No.  I'm trying to -- I'm

9    looking to think that we might not even be doing the charge

10   conference 'til Friday.

11      MR. EINHORN:  Okay.

12      THE COURT:  So, for example, if, in fact, we have

13   finished evidence by early Friday, if the Government's

14   rebuttal case is short, any reason we can't just do the

15   charge conference then?

16      MR. EINHORN:  I think we're going to finish evidence

17   Thursday, Your Honor.  I think we agree, that even if the

18   Government puts on any rebuttal, it would be Thursday.

19      THE COURT:  So we can just excuse the jury for

20   Friday and do a charge conference Friday morning.

21      MR. McGARRY:  Or we could do a charge conference

22   Thursday night and charge the jury Friday morning.

23      THE COURT:  Okay.  I can't do the charge conference

24   Thursday 'til 5:00.  If you're willing to do that, and we can

25   have all of the appropriate recording done.  There are minors

 1    who come into play here.

 2             MR. McGARRY:  Sure.

 3             THE COURT:  We'll work it out.

 4             MR. McGARRY:  And maybe we're being overly

 5    optimistic.  The Court certainly, I think, has a good sense

 6    of scheduling, but I think we're holding out hope that maybe

 7    we get the case to the jury early, you know -- however early

 8    Friday would be, with charge and close.  It's the hope.

 9             THE COURT:  We can aim for that.  Okay.  All right.

10    Thank you very much.  We'll stand in recess until 9:30

11    tomorrow morning.

12             (Proceedings adjourned, 3:07 p.m.)

13

14

15             COURT REPORTER'S TRANSCRIPT CERTIFICATE

16    I hereby certify that the within and foregoing is a true and

17    correct transcript taken of the proceedings in the

18    above-entitled matter.

19

20                           /s/  Tracy L. Gow
                             Tracy L. Gow, RPR
21                           Official Court Reporter

22

23

24

25