```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT


_____
UNITED STATES OF AMERICA,      )
               Plaintiff,      ) No: 3:18-CR-92 (JBA)
                               )
     v.                        ) May 22, 2019
LEON VACCARELLI,               )
               Defendant.      ) 9:38 a.m.
_____)
                                 141 Church Street
                                 New Haven, Connecticut




                      JURY TRIAL DAY 7


B E F O R E:
          THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
          and 14 JURORS
```

```
                                 Official Court Reporter:
                                 Tracy L. Gow, RPR
                                 203-910-0323
```

1214

1    A P P E A R A N C E S:

2    For the Government:
          MICHAEL S. McGARRY, AUSA
3         U.S. Attorney's Office-NH
          157 Church St., 25th Floor
4         New Haven, CT 06510
          203-821-3751
5         Email: michael.mcgarry@usdoj.gov

6         JENNIFER LARAIA, AUSA
          U.S. Attorney's Office-BPT
7         1000 Lafayette Blvd., 10th Floor
          Bridgeport, CT 06604
8         203-696-3029
          Email: jennifer.laraia@usdoj.gov

9
     For the Defendant:
10        JONATHAN J. EINHORN, ESQ.
          Law Office of Jonathan J. Einhorn
11        129 Whitney Avenue
          New Haven, CT 06510
12        203-777-3777
          Email: einhornlawoffice@gmail.com
13
          RACHEL MIRSKY, ESQ.
14        Mirsky Law LLC
          900 Chapel Street
15        10th Floor
          New Haven, CT 06510
16        203-290-2779
          Email: rachel@mirskylawct.com
17
     Also present:
18        SA RUSSEL DAY, FBI
          LEON VACCARELLI
19

20

21

22

23

24

25

1    **<u>INDEX</u>**

2    **EXAMINATION**

3    **Witness Name**                                           **Page**

4    LEON VACCARELLI

5       Direct By MR. EINHORN.................................... 1225

6       Cross By MR. McGARRY.................................... 1310

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Call to Order, Out of the Presence of the Jury,

2    9:38 a.m.)

3        THE COURT:  Good morning, Counsel, ladies and

4    gentlemen.

5        MR. EINHORN:  Good morning, Your Honor.

6        THE COURT:  Mr. Vaccarelli, good morning.

7        THE DEFENDANT:  Good morning.

8        THE COURT:  So as you have been told, Juror No. 5

9    thought he recognized the name of his fiancee on an exhibit,

10   and I'm advised that you all have searched it and it is not

11   the name of his fiancee, it is someone else, who I gather was

12   a client of Mr. Vaccarelli's but has not been mentioned in

13   this evidence.  Is that correct?

14       MR. McGARRY:  That is correct, Your Honor.  The last

15   name is spelled the same.  The name of the fiancee, which I'm

16   not going to say, is not in the spreadsheets.  We found a

17   similar last name on page 10 of Government's Exhibit 26, but

18   it was not the subject of any testimony.  I don't even

19   believe the court reporter would find it in the record.  From

20   my recollection, I don't remember ever calling that entry

21   out.  I think it was one of the literally thousands of lines

22   of text of a male and female with the same last name, but not

23   the fiancee.

24       THE COURT:  And, in any event, it's not the name.

25       MR. McGARRY:  Correct.

1   THE COURT:  All right.  We're satisfied?

2   MR. EINHORN:  Yes, Your Honor.

3   MR. McGARRY:  And I think Mr. Einhorn did some

4   research, as well, and found something similar.

5   THE COURT:  I think we should bring in Juror No. 5

6   and just explain that to him, that that's not who is in any

7   of the exhibits and nobody by that name was mentioned in

8   testimony.  Is that satisfactory?

9   MR. McGARRY:  It is, Your Honor.  And if I may just

10  add for the record, I believe Mr. Einhorn did some research

11  on his end, and the name of the fiancee is not a client and

12  is not familiar to the Defense.

13  MR. EINHORN:  That's accurate; yes.

14  THE COURT:  All right.  And just a word about the

15  witness who will testify tomorrow -- Ms. Gleissner.  I have

16  been reviewing the documents with the eye to their purpose,

17  and I think that we need to keep in mind that certified

18  alcohol rehabilitation counselors have a great deal of

19  training and a great deal of understanding and experience

20  with alcohol-related problems, and I think she should be able

21  to fully testify about that.

22  And to the extent that involves, if there is the

23  predicate laid for her credentials, that she can identify

24  alcoholism or severe alcohol -- I can't remember what the

25  diagnosis was in some of those records -- if that's what she

1  does as her work and as her treatment, that seems to me to be

2  perfectly admissible.  The medication that Mr. Vaccarelli may

3  have been on may also be something that she has a training in

4  "this medication is for this particular condition."

5          So I just wanted to share that I think that,

6  although Mr. Zonana did not provide opinions that would

7  permit him to testify, it may well be that Gleissner has a

8  lot of expertise and training and experience.

9          In addition, since Mr. Vaccarelli was seeing her for

10 treatment, the statements that he makes to her, for the most

11 part, if they are related to obtaining treatment they ought

12 to be admissible and not hearsay -- not excluded as hearsay.

13 Isn't that right?

14         I mean, there may be some business about "I'm really

15 concerned about whether the Court's going to postpone the

16 start of trial."  I mean, that's probably not for treatment

17 purposes -- I mean, it may be for treatment purposes, but the

18 fact that he is stressed on a number of factors would

19 presumably relate to his treatment and condition.

20         Obviously she's not going to be able to

21 retrospectively offer any view as to what was happening in

22 2014 to 2017, because she starts treating him in 2018.

23         MR. EINHORN:  That's correct.

24         THE COURT:  Right?

25         MR. EINHORN:  That is correct.

```
1              THE COURT:  So I intend --

2              MR. EINHORN:  '17.  A little bit after October

3    2017 -- sorry, Your Honor.

4              THE COURT:  After.

5              MR. EINHORN:  After the period of --

6              THE COURT:  After Mr. Vaccarelli returns from

7    Solutions.

8              MR. EINHORN:  -- Solutions.

9              THE COURT:  Okay.  So I just wanted to share with

10   you my current view, that I think that a witness like

11   Gleissner, what she tells us, all of what she is licensed to

12   do, and what her credentials are and what her experience is,

13   may have a great deal of admissible testimony that might have

14   been included in a Zonana opinion but wasn't.  So, let's

15   proceed there.

16             MR. McGARRY:  If I may, just to protect the record,

17   Your Honor.  Is it the Court's -- is it fair to say that it

18   is the Court's finding -- and I don't want to say something

19   that the Court doesn't agree with -- that since the scheme is

20   alleged beginning in 2011 and continuing to at least August

21   of 2017, quoting page 3 of the Indictment, that the fact that

22   the treatment is in '17 and into '18 would largely go to the

23   weight that the jury would give her testimony, in that it is

24   admissible; and if it's not unduly prejudicial or confusing

25   and admitted, that it would then be for the jury to see what
```

1  weight to give a 2018 conversation or analysis with respect

2  to a 2014 wire fraud, for instance?

3          THE COURT:  I think that's right.

4          MR. McGARRY:  Okay.

5          THE COURT:  But the way I heard the Government

6  arguing its objection, it was much narrower and would have

7  precluded a great deal of what she would testify to, none of

8  which says that -- I looked at those records, and I don't see

9  how they particularly add to this.  But we can wait and see

10  what she needs to either refer to or, I mean, she can be

11  cross-examined about them, presumably.

12          But let's proceed.  I just wanted to advise you that

13  I believe there to be a potentially broader view of what she

14  is qualified to testify to, because it is -- will be of

15  assistance to the jury in understanding what Mr. Vaccarelli

16  is going to have described as what had gone on in the past.

17          She can't opine as to whether or not that which went

18  on in the past in any way impaired or undermined his

19  potential to have fraudulent intent at any time.  But I do

20  think that it has relevance for the jury, and it is purely

21  weight for the jury.

22          MR. McGARRY:  And as I would assume that the Court's

23  decision is somewhat impacted by the fact that since Mr.

24  Vaccarelli will be testifying before her, that it's not -- or

25  at least it does not appear to be an attempt to get

1    conversations that are replete with self-serving hearsay into

2    the record by after one commits a crime, after one is

3    indicted, to run and tell your story to a psychiatrist or a

4    psychologist and then have that person come and say, Oh,

5    here's my opinion of him or her because he told me all these

6    wonderful things, then that would certainly be self-serving

7    hearsay.

8            But I presume that since he's going to testify

9    today, he can say what he's going to say and that would

10   ameliorate the problem of trying to use the counselor as a

11   stalking horse or as a trojan horse to run in self-serving

12   hearsay.

13           THE COURT:  And that was one of the main arguments

14   the Government had with the record and the description of

15   what Zonana -- Dr. Zonana was talking about.

16           MR. McGARRY:  Correct.

17           THE COURT:  Because it was replete with what Mr.

18   Vaccarelli told him this, that and the other.

19           MR. McGARRY:  Correct.

20           THE COURT:  And I quite agree that we can't get in

21   in that indirect way what you couldn't have gotten in

22   directly.  This is a view, and I'm not quite sure it is

23   formed an opinion.  I just wanted to have you all be thinking

24   about this view, because he will testify.  He's been advised

25   that he doesn't have to testify.  Even as we speak, before --

1    moments before you might take the stand, sir, you can change

2    your mind.  We might have a short trial day, but that's okay,

3    as long as you understand that.  And you do; correct?

4             THE DEFENDANT:  I do.

5             THE COURT:  All right.  And it's still your intent

6    to carry on --

7             THE DEFENDANT:  It is.

8             THE COURT:  -- with testifying?

9             THE DEFENDANT:  Yes.

10            THE COURT:  All right.  Okay.  So, that's that.

11   Let's bring out juror -- and the reason I say this is not

12   really a decision, is that we haven't heard Mr. Vaccarelli's

13   testimony, we haven't heard the therapist's credentials and

14   offered testimony.  I just think that there's going to be

15   more than the Government thought was admissible.

16            The relevance part is very much for argument.  The

17   Government will undoubtedly make their argument about, "Oh,

18   suddenly in July of 2017" and he will make the argument that

19   he had hit bottom.

20            All right.  Please bring in Number 5.

21            (Juror No. 5 enters, 9:50 a.m.)

22            THE COURT:  All right.  Juror No. 5, please have a

23   seat.  You indicated to my Courtroom Deputy that you thought

24   you recognized your fiancee's name in one of the documents

25   that was shown yesterday -- you all may be seated.

1    We have done a search of all the documents that have

2 been in evidence.  Your fiancee's name does not actually show

3 up there.  There is a couple with a similar last name, but

4 they do not bear any name resemblance to your fiancee's full

5 name; and, moreover, none of it has been the basis of

6 testimony about that person.  And, further, a check has been

7 made that your fiancee never was a client of Mr. Vaccarelli.

8    So, that said, are you satisfied that you can

9 continue to serve as a juror in this case?

10    JUROR NO. 5:  Yes, I can.

11    THE COURT:  Okay.  And your fiancee's name will not

12 be mentioned, it wasn't mentioned, and we don't anticipate

13 that it will be.  Okay?

14    JUROR NO. 5:  Thank you.

15    THE COURT:  Very good.  All right.  Let's bring in

16 the rest of the jurors.  You can stay here if you wish.

17    (Jury in, 9:52 a.m.)

18    THE COURT:  All right.  Good morning, ladies and

19 gentlemen.

20    ALL:  Good morning.

21    THE COURT:  We have taken care of the unanticipated

22 matters that have come up this morning.  We are satisfied

23 that we have resolved them and we can proceed.  So, please be

24 seated, and we will resume evidence.

25    Mr. McGarry.

1    MR. McGARRY:  Yes, Your Honor.  I did have an

2  opportunity to speak with your Courtroom Deputy and, in part,

3  we didn't get a chance to fully reconcile our records because

4  of other legal matters that we were all dealing with.

5  However, with the provision that if there's a stray document

6  here or there that has not -- that we believe has been

7  admitted but the Court's records are slightly different, with

8  the provision that we can reconcile that housekeeping matter,

9  I would say the United States of America rests.

10    THE COURT:  All right.  Thank you.  And with that

11  proviso, always described quaintly as a "housekeeping

12  matter," we will tell you that the Government has now

13  presented all the evidence it intends in its case-in-chief.

14  And although there may be a rebuttal case after the Defendant

15  finishes whatever evidence he chooses to put in, although

16  he's required to put none in, that will be the body of

17  evidence that you decide whether the Government has met its

18  burden of proof beyond a reasonable doubt.

19    So, we are moving along, and I will now ask

20  Mr. Einhorn to please call his first witness.

21    MR. EINHORN:  Before we do that, Your Honor, I have

22  a motion to make.  Would you like us to make it at sidebar?

23    THE COURT:  May I ask you to reserve that motion --

24    MR. EINHORN:  Sure.

25    THE COURT:  -- with the placeholder that it was made

1  at the conclusion of the Government's case?

2          MR. EINHORN:  Absolutely.  Thank you.

3          THE COURT:  Thank you.

4          MR. EINHORN:  If Your Honor please, the Defense

5  calls Leon Vaccarelli.

6          THE COURT:  All right.  Mr. Vaccarelli, if you'd

7  kindly come to the stand, remain standing, raise your right

8  hand, and the oath will be administered.

9          (LEON VACCARELLI sworn, 9:55 a.m.)

10          COURTROOM DEPUTY:  Please be seated, and state your

11  name for the record.

12          THE WITNESS:  My name is Leon Vaccarelli.

13          COURTROOM DEPUTY:  Can you spell your last name?

14          THE DEFENDANT:  V, as in Victor, A-C-C-A-R-E-L-L-I.

15          COURTROOM DEPUTY:  And can you tell us what city and

16  state you live in?

17          THE DEFENDANT:  Waterbury, Connecticut.

18          COURTROOM DEPUTY:  Thank you.

19          THE COURT:  All right.  You may proceed.

20          MR. EINHORN:  Thank you, Your Honor.

21                       DIRECT EXAMINATION

22  BY MR. EINHORN:

23      Q.   Sir, would you tell us again who you are?

24      A.   My name is Leon Vaccarelli, and I am an alcoholic.

25      Q.   Leon, where do you live at the present time?

1    A.   In my parent's house in Waterbury, Connecticut.

2    Q.   Okay.  And that was your pop who was here sitting in

3  some of the trial before?

4    A.   Yes, it was.

5    Q.   Okay.  And are you working at the present time?

6    A.   I am not.

7    Q.   All right.  Tell us what you do all day.

8    A.   I prepare for trial.

9    Q.   Okay.

10   A.   I assist with taking care of my children.  Before my

11  mother passed away, which was this past February, I took care

12  of her.  She was on dialysis three times a week.  She was

13  essentially bedridden.  I transported her to dialysis.

14   Q.   All right.  And I did skip over one thing.  How old

15  are you, sir?

16   A.   I'm 42.

17   Q.   Okay.  All right.  42.  In that regard, I'm going to

18  show you what we're marking --

19        MR. EINHORN:  I guess I'll use the numbers to just

20  start with 1 again, Your Honor.  Is that okay?

21        THE COURT:  Maybe A would be better.

22        MR. EINHORN:  Sure.

23  BY MR. EINHORN:

24   Q.   I'm going to show you what I've placed on the

25  screen, and I would offer as Exhibit A.

1     Can you identify who this is?

2     A.   That's my family.

3          MR. EINHORN:  I'd offer this, Your Honor.

4          MR. McGARRY:  As a full exhibit or demonstrative

5     exhibit?

6          MR. EINHORN:  Full exhibit.

7          MR. McGARRY:  No objection.

8          THE COURT:  Full exhibit, A.

9          MR. EINHORN:  Thank you, Your Honor.

10    BY MR. EINHORN:

11    Q.   Now, tell us who's in Exhibit A.

12    A.   All right.  That was taken last May at my son

13    Brian's 8th grade graduation.  I'm in it.  My son Brian is it

14    in it, and then my dad.  Going to the second row, in front of

15    me in the white dress is my daughter Sarah.  Next to Brian is

16    my daughter Lucy.  Next to Lucy in the polka dots is my

17    daughter Isabel.  In front of Lucy is my daughter Charlotte,

18    who did not want to have her picture taken.  In the

19    wheelchair is my mom.  Sitting in my mom's lap is my daughter

20    Eleanor.  And in front of Sarah is my daughter Paulina.  My

21    daughter Mary Grace, who rarely gets into a picture, is not

22    present, which is kind of normal.

23    Q.   Okay.  Now, how many kids do you have, Leon?

24    A.   I have eight.

25    Q.   There's only seven here.  What happened?

1    A.    Well, Mary Grace doesn't like to be in pictures and

2    we tried to get her in the picture.  And Charlotte doesn't

3    either, but we got Charlotte in, but Mary Grace was not

4    able.

5    Q.    Now, obviously your wife is not in the picture.  Are

6    you married at this time?

7    A.    No.  I'm divorced.

8    Q.    Okay.  And what's your ex-wife's name?

9    A.    Monica Vaccarelli.

10   Q.    How long were you married?

11   A.    2005 through 2018, so 13-plus years.

12   Q.    And fair to say these were all your kids with

13   Monica?

14   A.    No.  Sarah, the girl in the white dress, she's now

15   20.  I met her when -- days before her 4th birthday.

16   Q.    All right.  And whose child was she then?

17   A.    Monica's child and a gentleman by the name of John

18   LaFabre (phonetic), who does not reside in the state.

19   Q.    Okay.  Now, you said you were -- you're divorced

20   from your wife?

21   A.    I am.

22   Q.    When did that happen?

23   A.    The divorce -- she filed in October, I believe it

24   was October of 2016, and the divorce was finalized in

25   February of 2018.

1    Q.   All right.  I don't want to go through the issues of

2    your divorce with you here, and I don't think the jury cares

3    either, but there was one particular issue in your divorce,

4    wasn't there, sir, that actually stood out?

5    A.   Alcoholism.

6    Q.   Okay.  And as a matter of fact, in connection with

7    your divorce, did you enter into a separation agreement?

8    A.   I did.

9    Q.   All right.  And what is a -- I know you're not a

10   lawyer.  What is a separation agreement?

11   A.   Basically the rules that you follow after the

12   divorce.

13   Q.   Okay.

14        MR. EINHORN:  Can we have just a moment, Your Honor,

15   please?  Actually, I can continue while the Government is

16   looking at this.

17        THE COURT:  All right.

18   BY MR. EINHORN:

19   Q.   These are rules you follow after the divorce, you

20   said?

21   A.   Yes.

22   Q.   Okay.  And is there, in fact, a provision in this

23   agreement pertaining to your alcoholism?

24   A.   There is.

25   Q.   All right.  And what's that all about?

1    A.   I have to -- well, through the end of the previous

2    year, I had to utilize something called SoberLink before and

3    during when I had my parenting time with the children, which

4    was pretty much between four and five days a week I had

5    children.

6        Q.   What is SoberLink?

7        A.   SoberLink is a device that you breathe into.  It

8    takes your picture and it registers whether or not there's

9    alcohol on your breath, and it sends an e-mail or a

10   notification to Monica that there's, in fact, no alcohol on

11   your breath, and then I was okay to have my parenting time

12   with the children.

13       Q.   And what if you failed a test?

14       A.   I have not.

15       Q.   Okay.  But what if you had?

16       A.   Then she would have had the right to not allow me to

17   be with the children.

18       Q.   All right.  So this is a significant issue; is that

19   fair to say?

20       A.   Yes.

21       Q.   Okay.  And to what extent was this an issue -- your

22   alcoholism -- an issue in your marriage?

23       A.   It was an issue from before we got married.

24       Q.   And can you explain what that means?

25       A.   It was an issue between Monica and I forever.  It

1    was always an issue.  We drank together when we dated, in the

2    early years of the marriage we had a good time together.  As

3    life went on, you know, instead of me being a good husband

4    and a good father, it just became more about drinking and

5    getting to the next drink.  And that eventually wore away at

6    Monica, and the children as they got older became much more

7    sensitive.

8            MR. McGARRY:  Objection to the -- what other

9    people's opinions and thoughts are.

10           THE COURT:  All right.  Let's stick with what

11   Mr. Vaccarelli said and heard and did.

12           MR. EINHORN:  Sure.

13           THE COURT:  Thank you.

14   BY MR. EINHORN:

15      Q.   So the divorce itself, who brought it?  Did you

16   bring it or did Monica bring it?

17      A.   Monica brought the divorce.

18      Q.   And was there a reason -- a specific reason why she

19   brought the divorce?

20      A.   She was done with the drinking.  She was fed up.

21           MR. McGARRY:  Objection, Your Honor.

22           MR. EINHORN:  I claim it.  It's not hearsay.

23           THE COURT:  Yes, it is.  I'm going to sustain the

24   objection.

25           MR. EINHORN:  All right.  I wasn't --

1    THE COURT:  There may be another way to ask it.

2    BY MR. EINHORN:

3    Q.    Sure.  Do you know why you and your wife were

4    divorced?

5    A.    Because of my drinking.

6    Q.    Fair enough.

7    MR. EINHORN:  Your Honor, I would offer only page 5

8    of the separation agreement.  The rest is going to be

9    confusing, I think, to the jury.

10    THE COURT:  All right.  B is page 5, and the

11    Government is looking at that.

12    MR. McGARRY:  So, Your Honor, we don't object to

13    page 5.  I might just note for the record it's dated February

14    16, 2018, which doesn't appear on page 5.  But as long as

15    we're all in agreement, we do not object to it.

16    THE COURT:  So B, page 5 of a document dated

17    February 16, 2018, is a full exhibit.

18    MR. EINHORN:  Thank you, Your Honor.

19    BY MR. EINHORN:

20    Q.    Mr. Vaccarelli, I'm showing you now page 5, Exhibit

21    B.  And there's a section in there, isn't there, sir,

22    pertaining to SoberLink?

23    A.    Yes.

24    Q.    Just read us the first sentence of section D,

25    please.

1   A.   "Father shall continue to utilize SoberLink until

2   the end of 2018.  Renewable by motion to the Court in the

3   event of repeated failed or refused tests.  He shall test at

4   commencement of his parenting access and upon reasonable

5   request of the mother during his parenting time.  Should the

6   father fail a test -- a refusal is considered a failed

7   test -- as well as not being able to test due to nonpayment

8   of his account, the mother shall have the right to terminate

9   access until the next scheduled parenting time commences.

10  Should the father fail or refuse three tests during the

11  period of 2018, that shall constitute a basis for the mother

12  to file a motion to modify custody and access inclusive of

13  sole legal custody."

14       Q.   Okay.  Thank you.  Now, are you still on

15  SoberLink?

16       A.   I am.

17       Q.   Okay.  And is that something you carry around with

18  you?  How does that work?

19       A.   Yes.  It's in my car.

20       Q.   All right.  Now, I asked you earlier what you do all

21  day, and you said obviously preparing for trial.  You've got

22  eight kids, Leon.  What portion of your day is involved with

23  helping to take care of these eight kids?

24       A.   Mondays, Tuesday and Wednesdays I'm with children

25  after school.  I have children sleep over every night.  We do

1   a divide and conquer.  So the kids like having smaller groups

2   with the parents.  There's more time.  So, like on Monday

3   evenings I get Brian and Lucy, after school through -- I

4   bring them to school on Tuesday morning.  Tuesday evenings, I

5   have Mary Grace, Isabel and Eleanor.  Then I bring them to

6   school Wednesday morning.  Wednesday, I have all of the

7   children for dinner, and Charlotte and Paulina stay with me

8   and I bring them to school Thursday morning.  Thursday

9   afternoons/Thursday evenings is my day off or Monica's day

10  with all the children.  And then we divide the weekends.  So

11  I have every other Friday, Saturday, Sunday with all of the

12  children, and then I have the following weekend off and

13  they're with their mother for, all of them, for that

14  weekend.

15      Q.   Okay.  Now, just a few more things about your

16  background and then we'll get down to brass tacks.

17          Can you tell us a little about your educational

18  background?

19      A.   Yes.  I -- grammar school, high school.  I went to

20  college at Johnson & Wales University in Providence, Rhode

21  Island, and I graduated with an associate's degree in

22  accounting and then a bachelor's degree in accounting.

23      Q.   Okay.  Now, you're obviously here because of issues

24  involving securities trades, securities practice.  When was

25  your first job in the securities industry?

1    A.    1999.

2    Q.    And what was that?

3    A.    I was with -- when I was hired, it was -- the name

4    of the company was IDS, Investors Diversified Syndicate.  In

5    1999, shortly after I was hired, it became American Express

6    Financial Advisors.  And then eventually after that, it

7    became -- I think in '03 or '04, it became Ameriprise, and I

8    think that company is still Ameriprise today.

9    Q.    All right.  Stay with your first job in the

10   securities industry.  How were you trained to work in the

11   securities industry?

12   A.    I went through a program in Cranston, Rhode

13   Island.

14   Q.    Okay.

15   A.    And when it became apparent -- you know, I had to

16   make a choice if I was going to start working in Rhode Island

17   or if I was going to go back home.  Obviously, you have to

18   get customers.  You know, they don't just give you customers.

19   And it made more sense to me that I knew a lot more people

20   back home than my drinking buddies in college, I went back

21   home and started in Waterbury, Connecticut.

22   Q.    All right.  And you started with IDS, you said?

23   A.    Yeah, but at that point I think it was American

24   Express Financial Advisors.

25   Q.    All right.  And what was your job?  What sort of

1    work did you do?

2        A.    I was -- my title was financial advisor.

3        Q.    What does that mean?  Did you hold any securities

4    licenses?

5        A.    Yes.  Prior to that, I had gotten the Series 7,

6    which is a stockbroker's license, and then a Series 66, which

7    is a -- I guess an investment advisor's license.

8        Q.    All right.  How do you get a Series 7 license?

9        A.    You take an eight-hour test.  I mean, you study for

10   it, you go to a class, and then you go to a place with a

11   computer and you take an eight-hour test.

12       Q.    All right.  And what about the investment advisor's

13   test?

14       A.    That's a shorter test, but same -- you get a book,

15   you study for it, you go to a testing center, and I believe

16   that's like a four-hour test.

17       Q.    Okay.  So these are the standard sort of tests,

18   though, that other registered reps -- we used to call them

19   stockbrokers, but other registered reps use?

20       A.    Yes.

21       Q.    Okay.  Is that, in fact -- is that the same thing,

22   by the way, stockbroker and a registered rep?

23       A.    Yes.

24       Q.    All right.  Now, you started in the industry with

25   IDS, and you said you continued with IDS through its

1237

 1  permutations with American Express?

 2      A.   Yes.

 3      Q.   Just tell us a little bit about your work for IDS

 4  and then American Express.  What did you do?

 5      A.   I would go -- your first year in the business,

 6  you're kind of training in what they call a district office.

 7  You're learning the trade.  You're getting leads.  One of the

 8  things that were -- that was very big that kind of set them

 9  aside from other places, they had American Express

10  cardmembers that would become leads.  They would send a thing

11  in -- you know, some sort of promotion in with the American

12  Express billing statement to the customer, and the customer

13  would call the 800 number or fill something out and send it

14  back in, and then, based on the geography, you would get the

15  lead.  And we were trained to call the lead and how to talk

16  to them and how to bring them in as a client.

17          Then you're also trained how to -- what they called

18  your "natural market," people you know -- how to promote your

19  business to people you know.  And then once you get the

20  client, you know, how to basically conduct business with the

21  advisor-client relationship.

22          And then the last piece is once you have some

23  clients, then you have to go through how do you manage the

24  money or write insurance products, do a financial plan,

25  things of that nature.

1    Q.   And how did you learn those things?

2    A.   Just by going through the program at Ameriprise --

3    or American Express.

4    Q.   Okay.  So you started with American Express and its

5    various companies.  Then you said that morphed into

6    Ameritrade?

7    A.   Ameriprise.

8    Q.   Ameriprise?

9    A.   Yes.

10   Q.   Was that basically the same thing?

11   A.   Yes.

12   Q.   And, roughly, what years was that?  What years were

13   you working for American Express, roughly?

14   A.   '99 through '06, I believe.

15   Q.   And what happened after Ameriprise?

16   A.   After Ameriprise, I -- you know, you're in a

17   corporate entity.  They're telling you what to do, what

18   products to put people in, how to manage money.  It became,

19   you know, very -- the culture had changed from when it was

20   American Express to when they became Ameriprise.  And, so,

21   there were what was called independent broker-dealers that

22   were out there, where they kind of let you do whatever you

23   wanted to do.

24   Q.   Let me interrupt you right there.  So is it fair to

25   say that you wanted to move on from the more heavily

1   regulated American Express setup to something that gave you a

2   little more independence?

3       A.   Yeah.  I didn't like -- I mean, basically, they had

4   a mutual fund family, American Express funds, and they paid

5   you more if you put clients' money in American Express funds,

6   yet their performance wasn't that great.  So it became

7   difficult when a client would say, Well, why do I got to go

8   in this fund when, you know, an American fund family or a

9   Vanguard or a different fund family had better performance.

10  So, you know, that was really a big issue with making the

11  move to an independent.

12      Q.   All right.  Now, let's stay with American Express

13  for just moment.  During those years when you were with

14  American Express or the affiliates all the way to Ameriprise,

15  what sort of book did you have?  Roughly, how many clients,

16  what sort of money did you manage?

17      A.   In those years, you know, it wasn't -- it didn't

18  grow to where it was before I stopped working, but it was a

19  good size book of business.  You know, two, three hundred

20  clients, I would suspect.  I don't know for sure, but --

21      Q.   Not something you kept records on or you would keep

22  a like a baseball score, nothing like that?

23      A.   Nothing like that, no.

24      Q.   All right.  And that was your time with Ameritrade

25  [sic], and then I interrupted you when you were about to tell

```
 1    us that you wanted to move on to something else.  And what
 2    was that all about?
 3        A.   Well, you know, Ameriprise, you know, became, you
 4    have to sell this, you have to do this, you have to do a
 5    financial plan for every client.  And if you didn't do it,
 6    you got penalized.  They would reduce your payout, they'd
 7    reduce your commissions, they would increase your expenses.
 8             And, so, if you didn't buy into the Kool-Aid --
 9    that's kind of what we called it.  They lost a lot of
10    advisors at this time period -- you went to an independent.
11        Q.   So did you go to an independent?
12        A.   I did.
13        Q.   And who did you go to?
14        A.   A company called QA3.
15        Q.   What is QA3?
16        A.   They were another broker-dealer.  They were out of
17    Omaha, Nebraska.
18        Q.   I should ask you to explain for the members of the
19    jury what is the distinction between, I guess, a registered
20    rep and a broker-dealer?
21        A.   A registered rep is the advisor, the person that is
22    doing business with the client.  The broker-dealer is the
23    company that oversees the registered rep and that the
24    registered rep is affiliated with.
25        Q.   Okay.  Thank you.  All right.  So you're talking
```

1  about the Canadian company, QA3?

2      A.   They're not Canadian.

3      Q.   All right.  Tell us about QA --

4      A.   They're from Omaha, Nebraska.  They're no longer in

5  business.

6      Q.   Okay.  And tell us about your time with them.

7      A.   It was a good time.  They were a great

8  broker-dealer.  They knew how to work with advisor.  They

9  knew how to work with the client.  It was a really good

10  situation.  We brought on more clients.  We had different

11  products to offer that worked well for clients, and I was

12  very, very happy with QA3.

13      Q.   And, roughly, what years were you with QA3?

14      A.   Through 2010, 2011.  I'm not quite sure.  Around

15  there.

16      Q.   And what happened then in 2010, 2011?

17      A.   We got an e-mail -- the person who founded QA3 was a

18  person by the name of Sandy Wild, and he actually was with

19  American Express Financial Advisors and he went out and

20  started -- he was a big -- big-wig and he started his own

21  broker-dealer.  And eventually as the years went on and

22  American Express became Ameriprise and things changed, they

23  went out and they recruited a lot of the people like me from

24  American Express and Ameriprise.

25          He ended up having some legal actions, and we got an

1  e-mail on a Friday -- I'll never forget it -- a Friday

2  evening at six o'clock, so most people didn't see it until

3  Monday morning, that they were closing in a week and we

4  needed to find a new broker-dealer.

5       Q.   And what did you do?

6       A.   We panicked.

7       Q.   Now, you -- let me just interrupt you for a second.

8  You used the word "we."  Who is "we"?

9       A.   Barry was in my office at the time.

10      Q.   Barry who?

11      A.   Barry Michitsch.

12      Q.   Okay.  And I know we've heard that name throughout

13  the trial.  When did you first start doing business with

14  Barry Michitsch?

15      A.   I want to say I was still with Ameriprise or

16  American Express.  He came in in the earlier days, maybe '02,

17  '03, somewhere around there.

18      Q.   And can you just explain for the jury the

19  relationship between you and Barry in the office?

20      A.   Yeah.  You know, it started out where I think he was

21  -- you know, we were -- I was paying him a base rate and then

22  if he brought any customers in, you know, he would get more.

23  And then it basically matured to where he got 20 percent of

24  the book of business and then -- of everything.  And then if

25  he brought a customer in, he would get 50 percent of what he

1    brought in.

2         Q.   All right.  How would you describe that

3    relationship?  Were you partners, maybe not even partners, or

4    did he work for you?

5         A.   He was a partner in the income of the business.

6         Q.   All right.  I interrupted you when you started to

7    tell us what you say "we" decided to do after QA3 folded.

8         A.   Well, we had to hurry up and find a broker-dealer.

9    We had a week.

10        Q.   And what did you do?

11        A.   Well, we panicked.  And, fortunately, there were

12   headhunters because the news had come out that QA3 was

13   closing, so the headhunters were calling us, the phones were

14   ringing off the hook.  And we got a call from the headhunter

15   representing The Investment Center.

16        Q.   All right.  Let me stop you right there.  What was

17   your book of business like at this time?  Was it bigger than

18   it had been --

19        A.   It was bigger.

20        Q.   Okay.

21        A.   Yes.

22        Q.   All right.  Go ahead.  I'm sorry.

23        A.   And, so, we talked to him.  We liked what we heard.

24   He immediately e-mailed us a package to look at.  They were

25   very -- this particular headhunter, I forget his name.  I

```
 1    want to say it was Brian, but I could be wrong.  You know, he
 2    was on point.  He knew the urgency of the situation.  He said
 3    we could go down to New Jersey anytime we wanted and they
 4    would make time for us.  You know, we were a book of business
 5    that they wanted, and --
 6        Q.   And what was the relationship that they were
 7    envisioning between them, The Investment Center, and you and
 8    Barry?
 9        A.   Well, they would just take the place of QA3.
10        Q.   Okay.  Was it as employees, independent
11    contractors?
12        A.   Independent contractor.
13        Q.   Okay.  And what does that mean?
14        A.   You know, just -- the whole relationship from when I
15    started was an independent contractor relationship, back with
16    IDS, American Express Financial Advisors, Ameriprise to QA3.
17    So it would just be a continuation of having an independent
18    contractor relationship with the broker-dealer.
19        Q.   And did you go with The Investment Center?
20        A.   Yes.  We did look at two other places seriously, and
21    it was clear that The Investment Center was going to be the
22    best fit.
23        Q.   So you go with The Investment Center.  And in that
24    regard, where were you located in Waterbury?
25        A.   I was at that time on Bank Street.
```

1    Q.   Okay.  Was that your first professional location in

2    Waterbury?

3    A.   In -- no.  Well, let me explain.

4    Q.   Please.

5    A.   When I got out of college and I started the training

6    program with American Express, the office was in Waterbury.

7    After that time, my American Express office was in

8    Middlebury, Connecticut.  And then when we made the move to

9    QA3, we located at Bank Street in Waterbury and we had a

10   Waterbury address ever since.

11   Q.   Because QA3 was more independent for you, you had

12   more flexibility as to what you were going to do?  Is that

13   fair to say?

14   A.   Yes.

15   Q.   All right.  So you went to Bank Street.  And what

16   were your offices like there?  Who was in your offices

17   then?

18   A.   It was Barry, and then we had a secretary.  At first

19   it was Jamie, and then it became Maryanne.  Jamie was going

20   through school and became an RN, and it was time for her to

21   move on.

22   Q.   And when did you start with The Investment Center,

23   what year?

24   A.   Well, it would have been whenever QA3 closed.  So

25   2010, 2011.

```
1     Q.   So you start with The Investment Center.  I'm not
2   going to show you them.  We saw them earlier.  Did you sign
3   various documents and agreements with The Investment
4   Center?
5     A.   Yes.
6     Q.   And these were agreements in evidence, the
7   relationship between the parties?
8     A.   Yes.
9     Q.   Okay.  Is it fair to say you had a contract with
10  them?
11    A.   Yes.
12    Q.   All right.  Now, we'll go through that contract a
13  little more in a minute.  Did there come a time when you
14  moved from Bank Street to another location?
15    A.   Yes.
16    Q.   Where did you go?
17    A.   We went to Leavenworth Street.
18    Q.   And what was that?
19    A.   That was a building.  We needed -- you know, we
20  wanted bigger office space.  We were looking to expand in
21  Waterbury at the time.  Waterbury -- the downtown district in
22  Waterbury was in a slump, and the building was a foreclosure.
23  And I was talking to my friend, Attorney Kolesnik, and a
24  client -- who was a client, and a client and a friend of
25  mine, Mr. Antonacci, and I was actually trying to put them
```

1  together.

2      Q.   All right.  Let me interrupt you right there.  So

3  was it the plan then to purchase this property?

4      A.   Eventually it became the plan the purchase the

5  property.

6      Q.   And did that happen?

7      A.   Yes.

8      Q.   Okay.  And who did you purchase the property with --

9  Leavenworth?

10     A.   With Mr. Kolesnik.

11     Q.   Was there a name -- I know we heard it earlier on in

12 the trial, but was there a name of the legal entity that owns

13 the property?

14     A.   Yeah.  There's two entities that own the property.

15     Q.   And they're what?

16     A.   Carmel LLC -- that's me -- and then Therese LLC

17 (phonetic).  That's Mr. Kolesnik.

18     Q.   Okay.  And this is the -- well, withdrawn.

19          What is it?  What is Leavenworth Street?  What kind

20 of building?  What kind of property?

21     A.   It's a commercial office building.

22     Q.   How big is it?

23     A.   Thirty thousand square feet, approximately.

24     Q.   And what floor was your business on?

25     A.   I had an office on the second floor.

1    Q.    And what about Attorney Kolesnik?

2    A.    He also has an office on the second floor.

3    Q.    You were shown some pictures -- well, not you.  The

4    witnesses were shown pictures of, for example, a conference

5    room.  And the Government, I think, characterized it as posh

6    or plush.  Whose conference room was that?

7    A.    It was a shared conference room.  There were other

8    offices on the second floor, and it was one of three

9    conference -- four conference rooms that were shared.

10   Q.    Okay.  Who shared it?  Who used it?

11   A.    Myself.  The lawyers.  There was a realtor.  I mean,

12   you know, whoever needed to use the conference room used

13   it.

14   Q.    Okay.  Was it plush or posh or --

15   A.    It looked good.  The table -- the conference room

16   table and credenza was from one of the attorneys.  The chairs

17   were mine from Bank Street.  They were bought -- they weren't

18   leather chairs.  They were fake leather or something like

19   that.  They were comfy, very comfy.  And I bought them used

20   from a -- there's a furniture store in Waterbury where you

21   buy used furniture.

22   Q.    Okay.  Was the purpose of this room to impress

23   clients?

24   A.    Absolutely.

25   Q.    All right.  And why is that?

1   A.   You want to give a first impression.

2   Q.   Okay.  And I'm not trying to ask you the same

3   question again, but why is that?

4   A.   You want to make clients feel comfortable, that

5   they're with a professional.

6   Q.   And is that standard in your business?

7   A.   Yes.

8   Q.   Okay.  All right.  So you're in Leavenworth, and you

9   say that Barry Michitsch was there with you working, and

10  along with a secretary who may have changed from time to

11  time.  That's fair to say?

12  A.   Yes.

13  Q.   Nobody else?

14  A.   Yes.

15  Q.   Who else?

16  A.   Well, eventually, we got a receptionist, and we had,

17  you know, a few different receptionists over the years, and

18  then I brought in another broker, Brie Sodano, at some point,

19  as well.

20  Q.   Okay.  All right.  Now, you testified that you're in

21  the securities industry and you did this securities work.

22  Did you do any other business from that office, anything

23  else, or were you basically primarily a securities

24  operation?

25  A.   Well, we did insurance.  We definitely wrote

1    insurance, financial planning.

2        Q.    Financial planning.  Was there a name of your

3    company?  Did you have an LLC or a corporation?

4        A.    Yes.

5        Q.    What was that?

6        A.    There was LWLVACC, LLC.

7        Q.    All right.  And what was Lux Financial?

8        A.    Lux Financial was the name.  You know, it was

9    basically doing business as Lux Financial.  There was no LLC

10   Lux Financial.  It's the DBA.

11       Q.    Okay.  Lux Financial was just a DBA.  We've seen

12   that name, obviously, through this trial.  Let me ask you to

13   back up for just a second on Lux Financial.

14            When did you first start using that DBA?

15       A.    When we went to QA3.

16       Q.    So that had been in effect before you even entered

17   into an agreement, a contract, with The Investment Center?

18       A.    That's correct.

19       Q.    Okay.  And who were the owners of the Lux

20   Financial?

21       A.    It was just me.  It was me.  It was a DBA -- Leon

22   Vaccarelli doing business as Lux Financial.

23       Q.    Okay.  And then you started to tell us about an LLC.

24   What was that?

25       A.    That was LWLVACC, LLC.

1251

1    Q.    And what was that?

2    A.    That was established -- I was still with Ameriprise.

3    It was -- basically, the intention of that was just to, you

4    know, separate myself from any business I was in and the

5    business to go -- flow through the LLC.

6    Q.    Okay.  Why would you want to separate yourself from

7    the business?

8    A.    The tax accountant said you should have an LLC to

9    keep your business expenses in order or your business

10   activities.

11   Q.    What did you use the LLC for if you didn't use it

12   for business purposes?

13   A.    Well, I did use it for business purposes.

14   Q.    But you separated those from what?  That's my

15   question.  If you used that -- if that was for business

16   purposes and you already had the DBA for business purposes,

17   why did you need to have the LLC?

18   A.    The LLC was before the DBA.  The DBA was just a

19   name, that was it.  It was really nothing else.

20   Q.    Okay.  And let me see if I can ask it a little

21   better.  What was the purpose of having both a DBA -- Lux

22   Financial -- and the LLC?

23   A.    In hindsight, I probably did not need both of them,

24   but the DBA came after the LLC, so we kind of just went with

25   it.

1    Q.   Okay.  All right.  Let me get down to brass tacks

2    now.  Did there come a time when you started drinking

3    heavily?

4    A.   Yes.

5    Q.   When did that start?

6    A.   College.

7    Q.   All right.  What does this mean?  I used the phrase

8    "drinking heavily."  What does that mean to you?

9    A.   In college, I mean, it was common, you know.  You

10   just -- you drank a lot in college.  Going into my industry,

11   the culture was drinking.  We would have phone clinics with

12   American Express Financial Advisors, and we were drinking

13   beers as we were dialing for dollars.

14   Q.   All right.  Let me back up before we get to that for

15   a sec.  What did it mean that you were drinking in college.

16   How much were you drinking?

17   A.   Every day.

18   Q.   Every day?

19   A.   Yes.

20   Q.   Roughly, how much every day?

21   A.   Beer was popular in college.  It wouldn't be

22   uncommon for myself and my friends to go through three or

23   four 30-packs of Coors Light in a day.

24   Q.   All right.  And did that continue then after you

25   left college?

1    A.    Yes.

2    Q.    Okay.  Now, I started to -- I interrupted you.  You

3    started to tell us about your first job.  And that was with

4    American Express?

5    A.    Yes.

6    Q.    What does that mean "dialing for dollars"?

7    A.    You would have your leads from the American Express

8    cardmembers, and we would have phone clinic three or four

9    nights a week.  And phone clinic is, there's a big room, as

10   you may have seen on TV or in movies, the phone clinic, and

11   you have the headphones.  And you have all the leads, and

12   you're dialing the leads.  And it was called "dialing for

13   dollars," and you wanted to set up your appointments.  And

14   that's what we did.

15   Q.    We used to call those bucket shops.  Is that what

16   they are?

17   A.    I guess that may be an older term, but yeah.

18   Q.    And at these clinics, you were drinking around the

19   clock?

20   A.    Yeah, we were drinking during the phone clinic,

21   yes.

22   Q.    All right.  The rest of the day when you weren't at

23   the clinic, can you describe your drinking for us?

24   A.    Yeah.  That time period, if there was a golf

25   tournament in the morning, because people worked during the

1   day so it wasn't a good time to make phone calls because you

2   weren't going to get anyone on the phone, so they wanted you

3   to go out into the community.

4           So we were always going to morning, you know, golf

5   tournaments, charity golf tournaments.  And, you know,

6   there'd be drinking in the morning at the golf tournaments.

7   That was definitely during the golf season at least once a

8   week, sometimes three or four times a week.  At lunches,

9   there would be drinking.  We were taught how to drink during

10  lunch so no one knew that you were drinking.

11      Q.   How do you do that?

12      A.   Well, basically, they said -- you know, we had a --

13  in the first year, we had a luncheon.  I want to say it was

14  at one of the Carmen Anthony restaurants.  And the two

15  big-wigs came in and said that, you know, we're all

16  alcoholics, it's okay, all stock brokers are, and this is how

17  you drink without anyone knowing during lunch or wherever.

18      Q.   What do you do?  What does that mean?

19      A.   You get a vodka drink or a gin drink, and you have

20  it with club soda or tonic water and you ask for it in a soda

21  glass with a straw.

22      Q.   Now, there came a time when you say you went to

23  Middlebury, an office for American Express in Middlebury?

24      A.   That's correct.

25      Q.   That was your first office?

1    A.    That was my first where it was me.

2    Q.    Okay.  And can you describe for the ladies and

3    gentlemen of the jury the nature and extent of your drinking

4    at that first office?

5    A.    We drank -- we drank a lot.

6    Q.    What does that mean?

7    A.    We would have a refrigerator, and we would have beer

8    in the refrigerator, and we would start the day with our

9    beers, looking at the markets from the night before, the

10   overseas markets.  We would do choo-choo trains.  Choo-choo

11   trains are, we would line up shot glasses.  I would drink

12   Jagermeister, or we would line up the beers like a choo-choo

13   train.  During the middle of the day when there was nothing

14   going on, we would sometimes play flip-cup or we would do

15   darts and incorporate drinking.  We would go to the Western

16   Hills Golf Course, which was right around the corner.  It was

17   maybe a four-minute drive from the office.  And we would have

18   lunch up there, and, you know, we would drink with all the

19   golfers.  At the time, we were golfers.  We would golf.  A

20   lot of drinking going on.  We were -- at that time, beer was

21   the big drink.

22        And interesting story, we drank Miller Lite.  It was

23   on tap up there, and we consumed so many pitchers of beer

24   during the course of the week that the Bud Light sales rep

25   wanted to get the tap, and the owners of the restaurant were

1256

1    like, no, these guys drink Miller Lite, they're my best

2    customers.  And over the course of several months, it came

3    down that we had to make the decision.  So the Bud Light guy

4    gave us golf clubs.  He gave us jackets.  He gave us all

5    kinds of gifts for us to agree to let them switch it to Bud

6    Light.

7         Q.   And you did?

8         A.   Yeah, because the Miller Lite guy wasn't willing to

9    do anything.

10        Q.   Okay.  You're now in Middlebury.  And you

11   subsequently moved to an office in Waterbury; right?

12        A.   Bank Street.

13        Q.   Okay.  Did your drinking increase or decrease when

14   you went to Waterbury?

15        A.   Increased.

16        Q.   All right.  How did it increase?

17        A.   Well, we had an office on Bank Street, and it was a

18   pretty neat setup.  If -- the front door of the office would

19   come from the street, but the back door of the office went

20   into a hallway.  And if you turned left, you'd go into the

21   Courtyard by Marriott, which had a bar.  And if you turned

22   right, you would go into Diorio's Restaurant, right into the

23   bar, and you wouldn't even have to go outside.

24             And the people who owned Diorio's Restaurant were my

25   landlords, and it just became -- you know, became friendly

1  with the staff.  They would deliver drinks when we called, to

2  the office, or we would go over.  We would do client

3  luncheons there, client dinners.  It became a very easy spot

4  to drink.

5      Q.   Let me ask you specific questions about that.  First

6  of all, you're on Bank Street.  And who are you working for

7  at that time?

8      A.   We were affiliated with QA3.

9      Q.   You're affiliated with QA3.  Specifically, what time

10 of day would you start drinking in those days when you were

11 working for QA3?

12     A.   Well, in the morning, I mean, lots of times before I

13 even went to the office I would drink in the shower.

14     Q.   And what does that mean, drink in the shower?

15     A.   Well, I would wake up and I'd want to get started

16 and I would have a drink in the shower.

17     Q.   And after that shower drink, when was your next

18 drink?

19     A.   On my way to the office.  There are several

20 establishments in Waterbury, Italian, that are open in the

21 morning, that serve alcohol at breakfast, you know, with your

22 espresso or with your coffee.  And I was out marketing

23 myself, looking to get clients, looking to be known in the

24 community, and many times I would stop at one of those places

25 and have something.  And then I would go to the office, and

1258

1  then when -- the girl's name was Meg -- the bartender at

2  Diorio's, got in around 10:30 or so, the phone call would

3  always come:  Do you guys want anything?

4      MR. McGARRY:  Objection as to hearsay.  We're

5  getting these --

6      MR. EINHORN:  Yeah.  I'll ask him -- withdrawn.

7  I'll ask him a specific question.

8  BY MR. EINHORN:

9      Q.  As the day progressed, how did your drinking

10  increase or decrease?

11      A.  It increased, because then eventually you hit lunch

12  and you hit happy hour.  You're with clients, you're

13  entertaining clients.  It increased.

14      Q.  You told us that your drinking day began in the

15  shower in the morning.  What were you drinking, by the way,

16  in the shower?

17      A.  I liked to have cognac.

18      Q.  So it started in the morning in the shower and it

19  continued.  And how late at night did you continue

20  drinking?

21      A.  I mean, eventually, I mean, you know, I'd go home

22  and, you know, my wife would be upset with me and it kind of

23  stopped at that point.  But then, you know, when the kids

24  were in bed, she'd want to have a drink with me and it would

25  kind of, you know, pump up again a little bit at that point.

1    Q.   Do you know why your wife was upset with you?

2    A.   Well, she thought I was drinking too much.  She said

3    that there was nothing left of me --

4         MR. McGARRY:  Your Honor.

5    BY MR. EINHORN:

6    Q.   Okay.  You can't tell us what she said.

7    A.   Okay.

8    Q.   So you continued drinking.  About how late at night

9    did you stop drinking?

10   A.   10, 11.

11   Q.   And the next day, it would continue when --

12   A.   Right.  Or sometimes, you know, instead of stopping

13   at the coffee shops, I would stop -- I would have client

14   appointments and I'd have breakfast.  And when you have an

15   Italian breakfast, there's typically red wine and Sambuca or

16   Anisette with the coffee.

17   Q.   All right.  Now, we're still back on Bank Street.

18   We're talking about the time period when you worked for QA3.

19   This drinking that you've described for us here, was this

20   something that happened seven days a week, one day a week?

21   How often did it happen?

22   A.   Six days a week.  Sundays I didn't have to go

23   anywhere.

24   Q.   All right.  And, so, six to seven days a week -- six

25   out of seven -- sorry -- days a week, you had this drinking

1    schedule that you just told us about?

2         A.    Pretty much, yes.

3         Q.    All right.  Did you go for any help at that time?

4         A.    No.

5         Q.    Okay.  And there came a time, you also told us

6    earlier, when you moved from Bank Street to Leavenworth.

7    Okay?

8         A.    That's correct.

9         Q.    And did that coincide with your work -- well, you

10   tell us.  How did that coincide with working for The

11   Investment Center?

12        A.    We had switched to The Investment Center before we

13   went to Leavenworth Street because we had to.

14        Q.    Right.

15        A.    And then, you know, it was time -- you know, we

16   wanted to move.  We moved to Leavenworth.

17        Q.    All right.  You're in Leavenworth, and you already

18   told us it was with Barry Michitsch, a receptionist, and I

19   think a secretary at one time or another.

20             Tell us about your office.  What would I find in

21   your office?

22        A.    We had a bar.

23        Q.    In your office?

24        A.    Yes.

25        Q.    And what was it stocked with?

1    A.   Everything.  I mean vodka, gin, whiskey, bourbon,

2    rum.  We kept something called St. Elders.  It was a liqueur

3    for -- we had a client that really enjoyed it.  We had a lot

4    of homemade wine in the office.  We had cognac.

5    Q.   All right.  We are on Leavenworth Street now.  And

6    you used the word "we" a couple times.  You're referring to

7    Barry?

8    A.   Yes.

9    Q.   All right.  Who was drinking with you on Leavenworth

10   Street then?

11   A.   Barry drank with me.

12   Q.   And can you describe what a day would be like

13   between you and Barry and your drinking situation?

14   A.   Well, he typically didn't come in when -- by the

15   time we got to Leavenworth Street, he didn't come in early.

16   He had responsibilities with his children.  His wife was a

17   school teacher and was out the door like at 6 in the morning.

18   So he -- by the time he got in, it would be probably close to

19   10 in the morning.  You know, by that time, I already did a

20   lot of our morning responsibilities.  And, so, I had already

21   been drinking, but typically by -- certainly by 10:30, 11:00,

22   he would be joining in.

23   Q.   And how long did this continue during the course of

24   a typical day?

25   A.   Well, it depends if he had appointments or not, you

1    know.  But if there were no appointments, it would just

2    continue throughout the day.  Through happy hour.  We would

3    leave at happy hour.  We usually attended happy hour

4    together.  Sometimes we divided and conquered, and he went to

5    one spot and I went to a different spot.

6        Q.    And this continued through nightfall, too?

7        A.    Well, then at night you might have another -- an

8    appointment at night, because people worked during the day,

9    they can't meet 'til nighttime, you know, or you would go for

10   dinner.  I mean, the last few years, I did a lot of dinners

11   out.

12       Q.    All right.  And how did all this drinking, all this

13   alcohol affect your business?

14       A.    Looking back at it now, I believe I lost some good

15   customers because of it.

16       Q.    How did it impact your ability to make decisions and

17   judgment?

18       A.    We stopped buying stocks.  We kind of got out of it

19   because we weren't doing the work, and we went more to mutual

20   funds.

21       Q.    What does that mean, "we weren't doing the work"?

22       A.    Well, we were drinking.

23       Q.    Okay.  Now, early on in your testimony -- earlier on

24   you used the phrase culture of drinking, and then I skipped

25   over that.  Tell us what you meant by that.  You were talking

1  about the culture of drinking in the brokerage industry.

2  What does that mean?

3      A.   You come up, you're a stock broker, you drink.

4  That's what you do.  That's what they all do.  That's the

5  culture.  You're drinkers.  You drink all the time.  It's --

6  we go to, you know, education days, compliance meetings, you

7  know, advisor conferences, things of that nature.  It's a big

8  party.

9          MR. McGARRY:  Can we have -- objection as to, like,

10 time frame.  I mean, it's just --

11         MR. EINHORN:  Sure.

12         THE COURT:  That's fine.  If you could pinpoint

13 that, please, Mr. Einhorn.

14         MR. EINHORN:  Absolutely.

15 BY MR. EINHORN:

16     Q.   So this culture of drinking that you're talking

17 about.  First of all, when did you first realize that there

18 was such a thing?

19     A.   In Cranston, Rhode Island, at the first meeting of

20 the -- there were four people signing up at the same time

21 studying for the Series 7 test.

22     Q.   And this culture, again, that you've described, how

23 long, in your opinion, did it continue from that point, at

24 least in your life?

25     A.   Up until I stopped working.

1      Q.   Okay.  Is this something that was a joke among

2   people in the securities industry or was it the real thing?

3      A.   It was the real thing.  This is serious.  It's a

4   problem in the industry, in the entire industry.  I think it

5   was more prevalent in the earlier years in my career.  I

6   think, you know, due to the depiction in movies and whatnot

7   of the drinking in the industry, I think also the regulators

8   are cracking down, but it's definitely a problem in the

9   industry.

10     Q.   All right.  Did there come a time when you were

11  working for American Express that you received some sort of

12  award?

13     A.   Yes.

14     Q.   What was that for?

15     A.   I was the top advisor in Connecticut the first year

16  of -- my first full year, which would have been the year of

17  2000.  I started in '99.  My first full year was the calendar

18  year of 2000.

19     Q.   All right.

20         MR. EINHORN:  And would Your Honor turn this so it's

21  not -- so I can just show it to the witness and not to the

22  jury, please?  Thank you.

23  BY MR. EINHORN:

24     Q.   All right.  I'm showing you now what I'm proposing

25  as an exhibit.  Can you tell us what it is, sir?

 1    A.   That's a bull and a bear seal for wine glass -- wine

 2   bottles.

 3    Q.   Okay.  And where -- what is it?  Where did it come

 4   from?

 5    A.   I got a gift when I won the award, when I was -- at

 6   an awards night.  I received a plaque, and then I received a

 7   wrapped gift, and this was the wrapped gift.

 8    Q.   And I'm not going to ask you to read it yet, but the

 9   wording, the lettering on the top, that's all part of it?

10    A.   Yes.

11    Q.   It came with it, in other words?

12    A.   Yes.  It was in a box.  It's in a -- like a jewelry

13   box.

14    Q.   Okay.  Do you still have this, by the way?

15    A.   I do.

16    Q.   Okay.

17         MR. EINHORN:  Your Honor, please, I'd offer this.

18         MR. McGARRY:  I'd object under Rule 16 and Rule 801.

19         THE COURT:  Basis for your objection?

20         MR. McGARRY:  Rule 16.

21         THE COURT:  I hear that.

22         MR. McGARRY:  And Rule 801.

23         THE COURT:  Can you be a little more specific?

24         MR. McGARRY:  We've never been provided this before.

25   I just saw it 30 seconds ago.

1    MR. EINHORN:  Gee, I just spent over a week on trial

2  where the Government's been giving me things at my desk.

3    THE COURT:  Excuse me.  I'm going to reserve on your

4  objection.  Please move on.

5    MR. EINHORN:  Sure.

6    MR. McGARRY:  My second -- oh, sorry.

7  BY MR. EINHORN:

8    Q.   All right.  So this culture of drinking that you

9  talked about, and you described that for us a little bit.  Is

10  that something that was discussed among other registered

11  reps?

12    A.   The culture?

13    Q.   Yes, sir.

14    A.   No, no one discussed it.

15    Q.   And --

16    A.   It was just, this is what happened.

17    Q.   Okay.  All right.  Fair enough.  And I'm taking you

18  now to 2011.  Okay?  Now, specifically in 2011, where were

19  you working?

20    A.   It was with The Investment Center, and I was located

21  at -- it was either I was located at Leavenworth Street or

22  upon -- just getting there.

23    Q.   Okay.

24    A.   That might have been the year the move happened.

25    Q.   All right.  And you're working for The Investment

1  Center.  And could you just tell -- we've heard some details,

2  but can you just tell us the -- what the arrangement was

3  between you and The Investment Center?

4      A.   I was an independent contractor.  They were the

5  broker-dealer.

6      Q.   Okay.  And it was a contract relationship; right?

7  We talked about that.

8      A.   Yes.

9      Q.   And how did it -- again, how did Barry fit into this

10  equation?

11      A.   He also had a contract with The Investment Center.

12      Q.   Thank you.  He had a separate contract with them?

13      A.   Yes, he did.

14      Q.   Now, when you're working for The Investment Center,

15  you've already heard testimony and you know that one of their

16  requirements was that everything had to go through The

17  Investment Center; right?

18      A.   I heard that.

19      Q.   And you also would agree with me that there were

20  various monies that didn't go through The Investment Center;

21  right?

22      A.   Yes.

23      Q.   All right.  They went through the LLC; right?

24      A.   That's right.

25      Q.   Why did you do that?

1    A.   I was drunk.  I was just doing whatever I needed to

2    do to get to the next drink.  There were things that were

3    allowed to not go through The Investment Center.

4    Q.   Like what?  Before we go back.  Like what?

5    A.   You know, insurance.  Rental checks from real

6    estate.  You know, other businesses.  I mean, there were

7    things that were not pertaining to my business with The

8    Investment Center.

9    Q.   Okay.  But what we saw as evidence in this

10   particular case were these direct investment contracts;

11   right?

12   A.   That's right.

13   Q.   Okay.  That's not insurance?

14   A.   No.

15   Q.   Do you know if The Investment Center knew about any

16   of your dealings with these people through these direct

17   investment contracts?

18   A.   They did not.

19   Q.   You never told them about it?

20   A.   I did not.

21   Q.   Okay.  And would you tell us how these vehicles were

22   characterized?  Were they notes or were they stocks or were

23   they bonds?   What were they?

24   A.   They were loans.  They were made to look like loans.

25   I came up with the idea when I was drunk.  First, the loan

1    with Mr. Antonacci, we said something should be in writing.

2    We were drinking at LaTavola Restaurant.  He drank Southern

3    Comfort Manhattans, and we just -- he said, just whip

4    something up.  And I went back to the office that night and I

5    whipped it up.

6        Q.   And when you say you whipped it up, the evidence in

7    this case is that you actually copied from a form that The

8    Investment Center had?

9        A.   I did.  I modified one of their forms.

10       Q.   And that's accurate?

11       A.   Yes.

12       Q.   And there's actually some -- I don't want to call

13   them typos, but some errors in the copy that the

14   representative of The Investment Center told us about;

15   right?

16       A.   Yes.  I guess in one of the copies there was a

17   barcode in the middle of a paragraph.

18       Q.   Why would there be problems like that?

19       A.   I surmise I was drunk at the time.

20       Q.   All right.  So these were notes.  And, again, we've

21   heard the evidence in this case.  Where did the money go?

22       A.   The money went to me.

23       Q.   Okay.  And The Investment Center, obviously, wasn't

24   kept apprised of it?

25       A.   They were not.

1    Q.   Okay.  At the time you did this, at the time you had

2    these notes, I think it's alleged 2011 through 2017, what was

3    your condition with regard to drinking?

4    A.   I was drinking all the time.  It had gotten worse.

5    Obviously, when we purchased the restaurant, that was not a

6    good thing, as far as my drinking went, but I was drinking

7    all the time.

8    Q.   All right.  Let me just back up.

9    A.   Nothing mattered to me for a long time other than

10   when was it time to get the next drink.

11   Q.   Okay.  Let me back up for just a second.  You said

12   something about "we purchased a restaurant."  What's that all

13   about?

14   A.   Well, we purchased another building on Leavenworth

15   Street, 29 Leavenworth, and it had a restaurant in it.  And

16   the restaurant was a tenant, and a few weeks before the

17   closing, I guess, we found out we needed to take the

18   restaurant, too.  So we weren't going to do it, but then we

19   got talked into it.

20   Q.   Well, who's "we"?

21   A.   Mr. Kolesnik and I.

22   Q.   All right.  What was the significance of owning a

23   restaurant, on your alcoholism?

24   A.   Well, now I didn't really have to pay to get

25   alcohol.  I could get it for free.

1    Q.    And did you drink more or less now that you had a

2    restaurant?

3    A.    More.

4    Q.    What does that mean?  How could you drink more than

5    the schedule you told us about before, shower in the morning

6    to bed at night?

7    A.    Well, because then I would go into the restaurant

8    and I would drink for free, you know.  Before, you're kind of

9    paying for drinks.  Now you're drinking for free.

10   Q.    All right.  Now, there came a time when you went

11   somewhere for -- we'll get into the details -- for detox;

12   right?

13   A.    That's right.

14   Q.    All right.  Immediately -- well, withdrawn.

15         When was that?  That was in July of 2017?

16   A.    That's right.

17   Q.    Okay.  Immediately prior to that, what was your

18   condition *vis-a-vis* alcohol and drinking?  How bad were

19   you?

20   A.    I was probably 50 pounds heavier than I am now, 40

21   to 50 pounds heavier.  I couldn't go more than a few hours

22   without drinking.  I would start to have withdrawal symptoms,

23   which would include retching, bloody nose, trembling hands,

24   sweats.  As soon as I took a drink, I was fine.

25   Q.    And this situation, before you went into detox, was

1   this the worst it had been in your life or were there other

2   times that were as bad or worse?

3       A.   No, this was the worst.

4       Q.   How did it affect your family?  You've got eight

5   kids.

6       A.   I was going through a divorce.  This is why in the

7   divorce decree I had to go to SoberLink.  There was no if,

8   ands or buts coming back from rehab.  The judge wasn't going

9   to allow me to --

10      Q.   All right.  Don't tell us about that, but let me

11  just stay with my question for a second.  How did it affect

12  your relationship with your children, this drinking that

13  would go on all day?

14      A.   It got to the point that they were afraid.  They

15  didn't -- you know, they didn't know when daddy was coming

16  home.  They didn't know what was going on.  At the time, I

17  was coaching basketball.  I have very little recollection of

18  that time period.  My son stopped playing basketball.

19           MR. McGARRY:  Objection, Your Honor.

20           THE COURT:  What's the objection?

21           MR. McGARRY:  It's going to be hearsay, what's about

22  to come out.

23           THE COURT:  Would you rephrase the question so we

24  don't get there?

25           MR. EINHORN:  Sure.

1    BY MR. EINHORN:

2        Q.    Generally speaking, was your relationship with your

3    children better or worse when you were drinking heavily?

4        A.    It was worse.

5        Q.    And why?

6        A.    They didn't want daddy to drink.

7        Q.    Okay.  Now, how did the drinking you were doing at

8    this time -- again, I'm talking about the period before you

9    went into detox -- how did it affect your memory?

10       A.    It's a haze.  Everything in this time period is --

11   it's a drunken haze.  I'm living the movie The Hangover, and

12   this trial is the hangover, and it's not funny and it's

13   awful.  And I always was taught and to believe that you teach

14   your kids what you believe in, and you live what you teach.

15   And I didn't do that.

16       Q.    How do you maintain a business, particularly

17   something customer-intensive in the securities industry, if

18   you're in this sort of alcoholic haze?

19       A.    I don't know.  I did it.  It just -- I just did

20   whatever I had to do to get to the next drink, to keep

21   drinking, to push any problem aside and go drink.

22       Q.    All right.  Now, you said that there came a time

23   when you went into detox.  Before that happened -- well

24   withdrawn.

25            Why did you go, first of all, to detox?

```
1    A.   I couldn't -- I tried to stop.  I tried to stop.  I

2    tried to stop cold turkey, and I got myself so sick I gave

3    myself a hernia with the retching.

4    Q.   And --

5    A.   And I finally had an intervention with my father and

6    my brother and my wife.  We were still married at the time.

7    She was on the phone.  And I had to go.

8    Q.   All right.  What does that mean, you had an

9    intervention?

10   A.   They said, You need to get help and you have to do

11   it for your kids.  You have to do it for your kids.

12   Q.   Where did this happen?  Where was this

13   intervention?

14   A.   It was at the kitchen table at my parents' house.

15   Q.   And, again, who was present?

16   A.   My father, my brother, my mother was in the house

17   but she wasn't in the room, and then Monica was on the

18   telephone.

19   Q.   Okay.  And what condition were you in during the

20   intervention?

21   A.   I was drunk.

22   Q.   Okay.  Were you in favor or opposed to --

23   A.   I was opposed.

24   Q.   You were opposed to going away?

25   A.   I did not want to go.  I had business to attend
```

```
 1   to.
 2       Q.   All right.  Without telling us specifically what
 3   anyone else said, what was the general proposal of the
 4   intervention?
 5           MR. McGARRY:  I'm going to say objection.  I
 6   understand Mr. Einhorn is being careful, but I think even the
 7   general proposal is going to necessarily call for hearsay.
 8           MR. EINHORN:  I can rephrase it.
 9   BY MR. EINHORN:
10       Q.   What did you understand to be the purpose of the
11   intervention?
12       A.   To save my life.
13       Q.   And how was that to be accomplished?
14       A.   By going to rehab.
15       Q.   Okay.  Did you go to rehab?
16       A.   Yes.
17       Q.   Okay.  Where'd you go?  Go ahead.  I'm sorry.
18           MR. McGARRY:  Time frame on this, as well.
19           MR. EINHORN:  Sure.
20   BY MR. EINHORN:
21       Q.   You told us, I think, earlier we're talking July of
22   2017?
23       A.   Yes.  I went to Solutions Rehab in Las Vegas,
24   Nevada.
25       Q.   Stop right there.  When was that?
```

```
 1      A.    July 10, 2017.

 2      Q.    All right.  That's in Las Vegas, Nevada.  And how

 3   did you find out about Solutions?

 4      A.    My wife -- you know the American Addiction

 5   commercials on TV, call for help, call the 800 number -- she

 6   called, and they took the insurance, and they said for

 7   someone like me --

 8           MR. McGARRY:  Objection.

 9   BY MR. EINHORN:

10      Q.    Yeah, don't tell us, again, about what they say.

11      A.    It was for someone like me --

12           MR. McGARRY:  Objection.  Same objection.  He just

13   took out the words "they said."

14           MR. EINHORN:  I'll rephrase it.

15           THE WITNESS:  For people --

16           MR. EINHORN:  Time out.  I'll rephrase.

17           THE COURT:  Okay.  The problem is you cannot tell us

18   what others said who are not testifying in this case and are

19   not subject to cross-examination.

20           Go ahead.

21           MR. EINHORN:  Thank you, Your Honor.

22   BY MR. EINHORN:

23      Q.    All right.  You went to Solutions in Las Vegas.  And

24   how did you get there?

25      A.    Airplane.
```

1     Q.   Okay.  Somebody had to take you to the airport?

2     A.   Monica drove me to the airport that morning.

3     Q.   All right.  And you drove to the airport and you

4  flew to Las Vegas; right?

5     A.   That's right.

6     Q.   Okay.  Were there some directions you were given

7  about cash or money you were supposed to bring, or

8  limitations on what you could bring?

9     A.   Yes.  Yes.  The idea behind their philosophy at

10 Solutions was no money, very little, out of state, far away

11 from home, so I can't just check myself out and go to a

12 friend or whatever.  And, so, I was given $200 cash, no debit

13 cards, no credit cards.  And that $200 was so I could

14 continue to drink, because the people from American Addiction

15 Center said you have to --

16          MR. McGARRY:  Objection.

17 BY MR. EINHORN:

18    Q.   Well, don't tell us what they said.

19    A.   Sorry.

20    Q.   That's okay.  It's hard, I know.  You're not used to

21 this.

22          But just tell us why do you believe you were still

23 drinking?

24    A.   So I didn't go into withdrawal.

25    Q.   Okay.  So you go to Las Vegas to Solutions.  And

1  what happened when you got to the airport in Las Vegas?

2      A.    I spent a 160-some-odd dollars at the bar.

3      Q.    Drinking?

4      A.    Yes.

5      Q.    All right.  What were you drinking, anyway?

6      A.    At that time, I was drinking gin and tonic with

7  lemon, and then my last drink was a double Hennessy Cognac.

8      Q.    Okay.  And did there come a time when you got to

9  Solutions, however, from the airport?

10     A.    Yes.

11     Q.    How much money did you have left?

12     A.    Under $40.

13     Q.    Where did the rest go?

14     A.    It was my drinking money on the way to Las Vegas.

15     Q.    Okay.  So tell us about Solutions.  What did you do

16  there?  What did they do for you?

17     A.    I went through detox.  That was awful.  It's -- they

18  tell me I had hallucinations.  I don't remember.  I was put

19  on medicine.  My blood pressure was so uncontrollable the

20  third day that I was there they almost sent me to the

21  hospital, and they also were looking in the cabinet -- they

22  couldn't stop it with medicine.  They were looking to give me

23  vodka just to stop my blood pressure.  They couldn't find

24  any, but, fortunately, my blood pressure went down.

25     Q.    All right.  What medication were you on when you

1  were at Solutions; do you remember?

2       A.   The detox medication was Ativan.

3       Q.   Ativan?

4       A.   Yes.

5       Q.   Okay.  So you're on Ativan.  And what do they do for

6  you?  How do you get detoxed?

7       A.   You're in a detox house.  They feed you.  They

8  hydrate you.  They give you the Ativan, and they let you

9  sleep.  That's, I mean, essentially what happened.

10           When I was a little better, you know, towards the

11  end of the first week, I started going to what they call

12  classes or to the campus.  And you would have -- you would go

13  to AA meetings.  You would go through group sessions.  You

14  would have individual therapy.  Then you were given chores to

15  do, and then more AA meetings.  And that's what would happen.

16           Eventually, then you progressed, where you would --

17  they would incorporate exercise into your regimen.

18       Q.   All right.  Is it fair to say or is it accurate to

19  say that this is inpatient?

20       A.   Yes.

21       Q.   You couldn't leave?

22       A.   No.

23       Q.   All right.  How long were you inpatient at

24  Solutions?

25       A.   92 days.

1280

1    Q.   92 days.  And that's in Las Vegas; right?

2    A.   Yes.

3    Q.   What sort of contact were you allowed to have with

4    the outside world during that time?

5    A.   The first -- when get there, you're allowed to make

6    a ten-minute phone call to say you're there and you're safe.

7    The first month, no phone calls, no anything.  And then after

8    that, it was like a ten-minute phone call a day you were

9    permitted to have.

10   Q.   Okay.  And you said 92 days inpatient.  And did

11   there come a time when you were outpatient there, too?

12   A.   Yes.  The last two weeks was considered outpatient.

13   They basically bought a Best Western motel and they outfitted

14   it, and it's to get you ready to go back.  So you had a

15   little more freedom.  You could leave, walk around, you know,

16   do some volunteer work.  Go to, you know, some meetings that

17   are not, you know, through the Solutions campus, you know,

18   just to see how you do.  And when you came back in, they

19   breathalyzed you to make sure -- you know, or for the people

20   that were on other drugs, they did other forms of testing to

21   make sure they were compliant.

22        MR. EINHORN:  Okay.  Does Your Honor want me to

23   continue or -- I just noted the time.  That's all.

24        THE COURT:  We can take our recess.  We'll take

25   fifteen minutes.

1     (Jury out, 11:01 a.m.)

2          THE COURT:  All right.  Mr. Vaccarelli, you may be

3     excused for 15 minutes.  Please don't discuss your

4     testimony.

5          THE WITNESS:  Yes.

6          THE COURT:  All right.  Counsel, I'd like to address

7     Defendant's C for identification, the bull and bear gift.

8     The Government is claiming that it objects on the basis of

9     16, is claiming that it did not receive any notice or

10    opportunity to review this exhibit before trial.  Presumably,

11    under Rule 16, which the Government asserts, you are claiming

12    the Defendant had requested disclosure, you had complied,

13    thus triggering the obligation of the Defendant to permit the

14    Government, upon request, to inspect and copy, among other

15    things, items the Defendant intends to use in the Defendant's

16    case in chief.

17         Do I have that right?

18         MR. McGARRY:  Yes, I think the Government did

19    request and -- yes.

20         MR. EINHORN:  If I can only add that I was following

21    the Government's procedure, which was that I submitted the

22    bulk of my exhibits and then on a daily basis, sometimes more

23    frequently, the Government would supplement their discovery.

24    And I thought we were working by those ground rules.

25         There's nothing to be -- I wasn't trying to hide

1  this.  I thought I was playing by the same rules the

2  Government was playing by.

3          MR. McGARRY:  Well, we did get a book yesterday.

4          MR. EINHORN:  It wasn't yesterday.

5          MR. McGARRY:  And, also, the difference between Rule

6  16 discovery and marking evidence for trial I think needs to

7  be pointed out that Mr. Einhorn, Mr. Vaccarelli's firm and

8  his entities were subpoenaed.  Mr. Einhorn did make documents

9  available, but they weren't produced.  We went to his office

10 and went through the documents.  This was not in there.  We

11 continued to ask for anything he expects to use in his case

12 in chief.  He has given us some things.  He even was kind

13 enough to give us a binder of documents, I think as recently

14 as yesterday.

15         MR. EINHORN:  It was last week.

16         MR. McGARRY:  Last week there was some.  We got some

17 more.  We've been dealing with the medical records.  This was

18 not in them.  And the first time that we saw it was during

19 the testimony.  So I think it's more of a discovery than the

20 fact that he turned something from discovery into an exhibit,

21 which I understand, but that would be it.  And then also our

22 hearsay objection.

23         THE COURT:  So no matter what the issue of things

24 being turned over as matters go along, the assumption, I

25 gather, with that is that they got turned over before we got

1    to trial; is that correct?

2             MR. EINHORN:  No.

3             MR. McGARRY:  Well --

4             MR. EINHORN:  It is not correct, Your Honor.  If I

5    may, Your Honor.  I would come in every morning with new

6    exhibits on the counsel table right before trial would start.

7    And I, in having done this for a while and having a good

8    relationship with the Government, I have -- I never raised

9    any objection for that, and I thought we were playing by the

10   same rules.

11            MR. McGARRY:  And we do --

12            THE COURT:  You also claim it's hearsay?

13            MR. McGARRY:  Well, if you look at the text, Your

14   Honor.

15            THE COURT:  Yes.

16            MR. McGARRY:  Someone has made the assertion that

17   the market ups and downs and the best advice some people

18   think is to just relax and have a drink.  I don't know who

19   said it, I don't know why they say it, and I don't know why

20   it needs to be put in front of the jury.  He got an award.

21   That's nice.  That's fine.

22            THE COURT:  It's offered before the jury as

23   illustrative of the culture that he was describing, I'm

24   assuming.

25            MR. McGARRY:  But it also seems to have the

```
 1   imprimatur of American Express attached to it, and I think --
 2            THE COURT:  It does.  It was the -- they gave the
 3   exhibit; right?
 4            MR. McGARRY:  That's what the testimony is.
 5            THE COURT:  Right.
 6            MR. McGARRY:  And then I think it's just the words,
 7   as compared to the photos of the award, I think the words are
 8   hearsay within the photo.
 9            THE COURT:  Mr. Einhorn.
10            MR. EINHORN:  It's offered again just to show what
11   the culture was at the time.  And I think the fact that this
12   is offered as a trophy with that particular language on it is
13   just indicative of the culture.  It's a very limited purpose.
14   I suppose I could just have him read it, but I think I offer
15   this for the same reason the Government offers checks when a
16   witness says I gave 75,000 or whatever, it's just something
17   in writing.
18            THE COURT:  So he's testified that he got the
19   award.
20            MR. EINHORN:  Yes, Your Honor.
21            THE COURT:  He was the best that year.
22            MR. EINHORN:  Yes, Your Honor.
23            THE COURT:  Top advisor in 2000 in Connecticut.  The
24   award, he gets a bull and a bear that are wine stoppers.  Why
25   isn't the little aphorism offered and attributed to American
```

1  Express annuities hearsay?

2       MR. EINHORN:  I think the simple answer is, because

3  it's not offered for the truth of the matter as asserted.  I

4  think even American Express would probably agree that that's

5  probably not the truth.  It's just a logo.  Like Truth,

6  justice and the American way, or some sort of a logo that

7  isn't offered really for that purpose, just to show a

8  concept, I guess.

9       THE COURT:  I'm persuaded that it really isn't

10  hearsay -- that is, the truth that the market has its ups and

11  downs and one brings laughs and the other frowns, and the

12  best advice some people think is just relax and have a drink.

13  I am more troubled by the surprise element of this exhibit.

14       To the extent the Government sees this during

15  testimony and not having it placed on its table before

16  testimony began, albeit on the day of testimony, isn't that a

17  distinction from what you're talking about of what you

18  perceive to be rules that were being followed by the

19  Government?

20       MR. EINHORN:  I would offer it as a demonstrative,

21  which is exactly how the Government offered the pie charts

22  and the chart listing the amount of the losses, which was

23  Exhibit 63.  They were put on the table right before

24  Mr. Almodovar testified, and I have no objection to them to

25  do -- following the same rule, which is it's just offered for

1   -- as a demonstrative.

2       THE COURT:  You didn't have the pie charts before

3   Mr. Almodovar was on the stand?

4       MR. EINHORN:  They were changed.  They were

5   modified.  I had general charts.  I had all of the -- I had

6   all of the banking records for some time before that.  The

7   pie charts were new.

8       MR. McGARRY:  If I may, Your Honor.  He had them 48

9   hours in advance.  They were produced on Sunday.  To

10  Mr. Almodovar's credit, he was in all weekend fixing them.

11  The difference was that they had exhibit stickers and there

12  may have been one or two typos.  But those were -- and the

13  ones with the exhibit stickers, that Ms. Konarski came in

14  early to make sure they had stickers on, the stickered ones

15  were plopped on his table in the morning.  The charts

16  themselves, but for perhaps one or two typos, were -- the pie

17  charts -- were produced on I believe Saturday or Sunday.  I

18  think it was Sunday.

19      MR. EINHORN:  It might have been Sunday, I think.

20      THE COURT:  I'm going to preclude Exhibit

21  Defendant's C for late disclosure.  He may testify that he

22  got this award and what this award was -- that is, a bull and

23  a bear and they were wine stoppers.  That's sufficient to

24  make his point.  It avoids this unseemliness of having

25  whatever was the pattern of delayed disclosure, this is the

1   ultimate of delayed disclosure.

2          So I will sustain the objection, but I will not

3   preclude him from describing what it was.

4          MR. EINHORN:  Yes, Your Honor.  Thank you.

5          THE COURT:  Okay.  Let's take five minutes.

6          (Recess taken, 11:11 a.m.)

7          (Out of the presence of the jury, 11:29 a.m.)

8          THE COURT:  All right.  Please be seated, ladies and

9   gentlemen.  Mr. Vaccarelli, please resume the stand.  You

10  remain under oath.

11         Please bring in the jury.

12         (Jury in, 11:30 a.m.)

13         THE COURT:  All right.  Please be seated, ladies and

14  gentlemen.  We'll continue with the direct examination of

15  Mr. Vaccarelli by Mr. Einhorn.

16         MR. EINHORN:  Thank you, Your Honor.

17  BY MR. EINHORN:

18     Q.   Mr. Vaccarelli, I believe we left off talking about

19  your final time at the detox clinic at Solutions in Las

20  Vegas.  Do you remember when you left there?

21     A.   It was in October.

22     Q.   All right.  And when you left, you came back to

23  Waterbury?

24     A.   Yes.

25     Q.   All right.  When you came back to Waterbury, did you

1  go into any other detox or counseling programs?

2      A.   I went into what's called intensive outpatient.

3      Q.   And where was that?

4      A.   At Blue Sky in Danbury, Connecticut.

5      Q.   And how often did you go to Blue Sky on an

6  outpatient basis?

7      A.   Five days a week.

8      Q.   And how long did that last?

9      A.   Quite a while.

10     Q.   Beg your pardon?

11     A.   Quite a while.

12     Q.   Quite a while.  Any idea what that means?  A

13  month?

14     A.   I'm still going there, but I don't go five days a

15  week.

16     Q.   When you first went to Blue Sky in Danbury, what did

17  they do for you?

18     A.   You know, getting used to being back home, getting

19  used to having freedom, to help control my cravings, to help

20  control my medications.  I left Solutions with several

21  medications I was taking.

22     Q.   What were they?

23     A.   I was taking Gabapentin, 800 milligrams three times

24  a day, for alcohol craving.  I was taking ReVia also for

25  alcohol craving.  I was taking Cymbalta.  I still take all of

1  these.  Cymbalta for depression.  Wellbutrin for depression.

2  Vistaril for anxiety.  Lisinopril for blood pressure.

3  Metformin for prediabetic.  We're hoping to maybe get off of

4  that one at some point.  Trazodone for sleeping and for

5  anxiety.

6      Q.   Now, when you left Solutions --

7      A.   Oh, a couple --

8      Q.   Go ahead.  You have more?

9      A.   I have Vitamin B1 for my Wernicke's encephalopathy,

10  and for a period of time I was taking Nuvigil, also for the

11  Wernicke's encephalopathy.

12      Q.   What's Wernicke's?

13      A.   It's a B1 deficiency in your brain due to alcohol

14  abuse, and it causes a lot of problems with my cognitive

15  functioning.

16      Q.   Okay.  Now, in terms of your alcohol abuse, when you

17  left Solutions in Las Vegas, were you totally alcohol-free or

18  were you put on a specific program with regard to alcohol?

19      A.   I was alcohol-free at the time; however, due to my

20  situation and my cravings, and I was basically maxed out on

21  all of the medicine I was taking that some point it was

22  recommended if I couldn't control the cravings or I was

23  having -- I was having at the time, but if they didn't

24  subside, what's called PAWS, P-A-W-S, post-acute withdrawal

25  symptoms, there's a method.  It's called the Sinclair

1   Method.

2      Q.   All right.  Let me stop you right there.  Who

3   prescribed the Sinclair Method?  Where did that come from?

4      A.   It came from Nevada.

5      Q.   It came from Nevada?

6      A.   Yes.

7      Q.   And what is it?  What is the Sinclair Method?

8      A.   You use your ReVia, which I was already on.

9      Q.   That's a medication?

10     A.   That's a medication.  And you take it about an hour

11   before you have a drink.

12     Q.   And how much drinking do you do, then, if you are on

13   the Sinclair Method?

14     A.   Only one or two.  It's to --

15     Q.   Slow down.  One or two a what?  A day, a month, a

16   year?

17     A.   Whenever you were having the insatiable craves.

18     Q.   And are you on a Sinclair Method?

19     A.   No, not currently.

20     Q.   All right.  Were you on the Sinclair Method,

21   though?

22     A.   Yes, I was.

23     Q.   And for what time period were you on the Sinclair

24   Method?

25     A.   I don't remember exactly.  I started -- you know, I

1  couldn't handle the PAWS symptoms, and the whole goal of my

2  recovery is not to relapse.  And relapse is falling into old

3  habits and behaviors and drinking and getting drunk and going

4  back to that.

5      Q.  All right.  So you came back to Waterbury.  Did you

6  go back to the securities industry?

7      A.  No.

8      Q.  All right.  And as a matter of fact, since July of

9  2017 you haven't been in the security industry, have you?

10     A.  I have not.

11     Q.  All right.  So you came back here.  And now you say

12  you went to Blue Sky.  By the way, you're still going to Blue

13  Sky?

14     A.  Yes.

15     Q.  How often do you go now?

16     A.  One to two times a week.

17     Q.  What do they do for you there?

18     A.  Right now -- I mean, what they did was, it was

19  initially -- and for a good period of time -- it was very

20  intense.  I was there maybe five to six hours a day.  Now I'm

21  there, I go for therapy, I see my psychiatrist who does my

22  medications.  And on occasion, not really since my mom passed

23  away, but prior to that I was attending occasional group

24  therapy.

25     Q.  Okay.  Now, I asked you early on what you do every

1    day, because you hadn't -- you're not working; right?

2        A.    No.

3        Q.    How do you live?

4        A.    I collect disability insurance.

5        Q.    Okay.  Thank you.  So at the present time, are you

6    on disability insurance that you've obtained previously?

7        A.    Yes.

8        Q.    Do you remember when you got the policies?

9        A.    Years ago.

10       Q.    All right.  You have three policies, sir?

11       A.    Yes.

12       Q.    All right.  I just want to take them one at a time,

13   first of all.

14            MR. EINHORN:  If Your Honor, please, I would offer

15   first a disability policy, number 7775698, and it was

16   previously provided to the Government.  In fact, it's in the

17   Government's discovery.  That's how I obtained a copy, too.

18            MR. McGARRY:  No objection, Your Honor.

19            THE COURT:  Defendant's D, which is the first of

20   these policies, is a full exhibit.

21            MR. EINHORN:  Thank you, Your Honor.

22   BY MR. EINHORN:

23       Q.    Mr. Vaccarelli, I'm going to show you just the face

24   sheet for now of this policy.  Who is it with, sir?

25       A.    It's a with the Principal Financial or Principal

1   Life Insurance Company.

2       Q.   The number of this particular exhibit is policy

3   7775698.  Does that mean anything to you?  Do you know which

4   policy it is?

5       A.   No, I don't.

6       Q.   That's okay.  I'm going to show you page 3 of the

7   policy.  Does this help refresh your recollection at all?

8       A.   Yes.

9       Q.   Okay.  Tell us about that policy.

10      A.   This policy is an owner occupation policy.  It pays

11  me until age 65, as long as I'm disabled.  The monthly

12  benefit on it is $6,000.  Due to COLA increases, that's now

13  slightly over 7,000 per month.  I'm being labeled disabled

14  because of my severe alcohol use disorder.

15      Q.   Let me stop you right there.  First of all, who

16  labeled you disabled because of your severe alcohol abuse

17  disorder?

18          MR. McGARRY:  I'm going to object to that, Your

19  Honor.

20          MR. EINHORN:  I will rephrase the question.

21  BY MR. EINHORN:

22      Q.   You just told us you're getting this disability

23  income because you were labeled severe alcohol abuse.  This

24  is something that came from Principal Financial Group, the

25  company that is giving you the benefits?

1    A.   That is correct.

2    Q.   Okay.  And is this policy still in effect?

3    A.   Yes.

4    Q.   You're still getting these benefits on a regular

5    basis?

6    A.   Yes.

7    Q.   And --

8    A.   I don't get the entire benefit, because the child

9    support gets paid directly to Monica from that policy.

10   Q.   I understand, but there is a gross benefit that's

11   still coming per the policy?

12   A.   Yes.  Yes, correct.

13        All right.  I'm going to show you what I think is --

14        MR. EINHORN:  Is no objection.  I'm doing all three

15   of them.  If Your Honor please, policy labeled 77756999, same

16   company, same insured.

17        THE COURT:  Shall we mark that Defendant's Exhibit

18   E?

19        MR. EINHORN:  Please.

20        THE COURT:  Any objection?

21        MR. McGARRY:  No objection, Your Honor.

22        THE COURT:  Full exhibit.

23   BY MR. EINHORN:

24   Q.   I'm going to show you this sheet -- front sheet as I

25   did before.  I assume you can't tell us much about the policy

```
1    'til I give you the details; right?
2       A.   Correct.
3       Q.   I'm going to open it to page 2, which is called data
4    page.  Does this refresh your recollection as to what this
5    is?
6       A.   Yes.
7       Q.   What is it?
8       A.   That's a business overhead expense policy.
9       Q.   And how much are you receiving from this policy?
10      A.   Nothing.
11      Q.   And why is that?
12      A.   Because I need to show tax returns, and I haven't
13   filed a tax return since I was in rehabilitation.
14      Q.   Okay.
15      A.   And I still pay the premium.
16      Q.   You're still paying the premium, you still have the
17   policy.  Has the company made a determination of you as being
18   disabled or not disabled?
19      A.   They have.  They actually --
20      Q.   Wait.  Let me ask the question.  Sorry.
21           Have they made a determination that you're disabled
22   within the purview of this policy?
23      A.   Yes, they have.
24      Q.   And what is that determination?
25      A.   That I have alcohol -- severe alcohol use
```

1296

1   disorder.

2       Q.   Okay.  But you're not collecting because you haven't

3   filed a tax return?

4       A.   Correct.

5       Q.   I'm going to show you a third policy.  This is

6   777-5700.

7            MR. EINHORN:  I believe there's no objection, Your

8   Honor?

9            THE COURT:  Mark that as Defendant's Exhibit F.

10           MR. McGARRY:  F.

11           THE COURT:  Full exhibit.

12           MR. EINHORN:  Thank you, Your Honor.

13  BY MR. EINHORN:

14      Q.   I'm going to show you the face sheet of this policy,

15  and then, sir, I'm going to turn to page 3 to see if this

16  helps you in telling us what it's all about.  Do you

17  recognize this policy?

18      A.   I do.

19      Q.   What is it?

20      A.   This is a disability policy that is to provide

21  $1,050.00 per month to go into an account that's designated

22  for my retirement, but also for, you know, hardship, because

23  the theory behind this policy is if I'm disabled and not

24  working I can't save for retirement.  So this is to -- is

25  meant to supplement that.

1   Q.   Now, with regard to this exhibit, this policy, do

2   you know if the Principal Financial Group has made a

3   determination as to whether or not you're disabled and

4   qualified for the benefits?

5   A.   Yes.

6   Q.   And what was that determination?

7   A.   Alcohol -- severe alcohol use disorder.

8   Q.   You started to say something earlier about the --

9   about your -- some of the benefits going to your divorce.

10  This was something that was negotiated in the purview of your

11  divorce decree?

12  A.   That's correct.

13  Q.   Some of the benefits go directly to Monica and for

14  the eight children?

15  A.   The majority.

16  Q.   The majority.  All right.  Thank you.

17       These are -- if I can say, these seem like pretty

18  good policies.  When did you do them?  When did you take them

19  out?

20  A.   The date said April of 2012.

21  Q.   And how did you know so much about insurance at the

22  time?  Is this an area you worked in?

23  A.   Yes, I was engaged in the insurance business.

24  Q.   Okay.  Now, you talked about your alcoholism and

25  your drinking from the shower in the morning 'til nighttime.

```
 1   Did you ever get a DUI?  Were you ever arrested by

 2   Connecticut police for DUI?

 3        A.   Yes.

 4        Q.   How many times?

 5        A.   One time.

 6             (Counsel confer.)

 7             MR. EINHORN:  If Your Honor please, I'm offering an

 8   officer's DUI arrest and alcohol test form, on which I

 9   believe there's no objection.

10             MR. McGARRY:  No objection, Your Honor.

11             THE COURT:  Defendant's E, the officer's DUI and

12   test form is a full exhibit.

13             MR. EINHORN:  Thank you, Your Honor.

14   BY MR. EINHORN:

15        Q.   Do you remember getting arrested for DUI, operating

16   under the influence -- OUI, actually?

17        A.   I remember it happening.  It's a very cloudy memory.

18        Q.   Was there a motor vehicle accident involved?

19        A.   Apparently so.

20        Q.   Did you throw up and were you sick at the time?

21        A.   I don't remember.

22        Q.   Looking at this particular exhibit, does this help

23   you with regard to the date of this incident?  And I'm

24   calling your attention to the middle of the form.

25        A.   Yes.
```

1    Q.    And what was the date of the incident?

2    A.    March 2, 2016.

3    Q.    You were arrested at the time?

4    A.    Yes.

5    Q.    Did you go into an alcohol rehab program that was

6    mandated by the State of Connecticut to resolve this?

7    A.    Yes.

8    Q.    And did you successfully complete that program?

9    A.    I did.

10   Q.    All right.  Now, during the course of this case --

11         MR. EINHORN:  May I just have a minute, Your Honor?

12         THE COURT:  Yes.

13         MR. EINHORN:  I just wanted to use one of the

14   Government's exhibits.  I actually can take it out of your --

15   if Your Honor doesn't mind -- your exhibits.

16         THE COURT:  As long as you put it back.

17         MR. EINHORN:  Thank you.

18   BY MR. EINHORN:

19   Q.    Mr. Vaccarelli, I'm going to show you what's been

20   marked and introduced into evidence previously as

21   Government's Exhibit 63, and it lists various former clients

22   of yours.  Do you remember this?

23   A.    Yes.

24   Q.    All right.  I just wanted to go through this with

25   you.  First of all, with regard to June Antonacci and her

1    husband Ray, what sort of investment was this?

2        A.    That was a loan.

3        Q.    Okay.  Was it paid back?

4        A.    Yes, it was.

5        Q.    As a matter of fact, was it paid back more than the

6    amount that was put in?

7        A.    Yes.

8        Q.    All right.  Why is that?

9        A.    I owed interest.

10       Q.    So you paid them interest?

11       A.    I did.

12       Q.    Okay.  And I'm going to go through some of the other

13   persons whom the Government claims in this particular case as

14   claimants, but is it fair to say that you heard -- you've

15   been here at trial, obviously -- that many of these losses

16   have already been paid; right?

17       A.    That's correct.

18       Q.    And where have they been paid from?

19       A.    They've been paid from my insurance policy through

20   The Investment Center.

21       Q.    Okay.  Did you have any interest in that policy?

22       A.    Yes.  I paid the premiums as part of my agreement

23   with The Investment Center.

24       Q.    Okay.  All right.  The next one is Denise Augelli.

25   Do you know if Ms. Augelli received any portion of the monies

1    that she gave you by direct investment loan?

2         A.   My understanding is that she filed the paperwork.

3              MR. McGARRY:  Your Honor, I'm going to object to the

4    Defendant commenting on what he knows from being at trial,

5    whereas the jury's recollection --

6              THE COURT:  I'm going to sustain the objection.  You

7    may rephrase.

8              MR. EINHORN:  I'll rephrase.  Thank you.

9    BY MR. EINHORN:

10        Q.   Do you know if Denise Augelli received compensation

11   for her claim in full or in part?

12        A.   No --

13             MR. McGARRY:  Same --

14             MR. EINHORN:  Well, you've got to let him answer

15   first, I think.

16   BY MR. EINHORN:

17        Q.   You don't know, sir?

18        A.   I don't know.

19        Q.   Do you know if any of these people have received

20   compensation back from The Investment Center?

21        A.   Yes.

22             MR. McGARRY:  Your Honor, objection.  Again, it's I

23   think --

24             THE COURT:  Well, we may be able to get the basis

25   for his knowledge if it's other than at trial.

```
 1            MR. EINHORN:  Sure.
 2            THE COURT:  That will be able to be examined.
 3   BY MR. EINHORN:
 4       Q.   Do you know -- well, withdrawn.
 5            How do you know whether or not some of these people
 6   already received their money back?
 7       A.   Based on the evidence provided from The Investment
 8   Center.
 9       Q.   Okay.
10       A.   If that's the right term, "evidence."
11       Q.   Okay.  And just calling your attention to one in
12   particular, Christine Chauncey, on Government's Exhibit 63,
13   it says 59,000 was returned from legal settlement.  Whose
14   funds did that come from?
15       A.   My funds.
16       Q.   And it was paid back to her for her claim?
17       A.   That's correct.
18       Q.   Okay.  Now, in some cases -- the Government has
19   labeled all of these as losses and so forth.  In some cases,
20   do you claim that, in fact, part of the monies paid you were
21   for fees?
22       A.   In some of the cases.
23       Q.   What does that mean?  Fees for what?
24       A.   Financial planning, advice, time spent with the
25   client.
```

1    Q.   All right.  Looking at Government's Exhibit 63, can

2    you find one in particular where you can identify as the

3    amount that was paid or shown as "funds in" partially

4    included your fees?

5    A.   One example -- am I allowed to reference evidence

6    that was shown previously?

7    Q.   In discovery?

8    A.   Yes.

9         MR. EINHORN:  Yes, Your Honor, I believe that's

10   proper.  Yes.

11        MR. McGARRY:  Well, wait.

12        THE COURT:  You mean an exhibit?

13        MR. EINHORN:  63.

14        THE COURT:  Reference that when you ask the

15   questions.

16        MR. EINHORN:  I did.  I'm sorry, Your Honor.

17   BY MR. EINHORN:

18   Q.   Exhibit 63, look at that and tell us which

19   particular person you believe their "funds in" represents

20   partial fees that you were paid?

21   A.   The Marsha Shultz, 57,000.

22   Q.   What portion of that represents fees to you and not

23   an investment?

24   A.   At -- during the trial, I noticed there were two

25   checks, one for 3,000 and one for 4,000, and those were fee

1    checks.

2        Q.   Why would someone be paying you a fee separately?

3    For other services you were rendering?

4        A.   Yes.

5        Q.   Were there more on this list than Marsha Schultz?

6        A.   Yes.

7        Q.   Who?

8        A.   The one that sticks out the most is the Patricia

9    Sienkowski.

10       Q.   And why is that?

11       A.   That $85,343.36 was a fee in the entire amount.

12       Q.   All right.  That's a big fee.  Why would she owe you

13   an $85,000 fee?

14       A.   They were amongst my first clients in 1999.  They

15   had a relationship with IDS, a very long relationship.  And

16   for whatever reason, I don't recall, they fell out of favor

17   with their advisor and they were getting ready to pull all of

18   their accounts.  And the district manager at the time said,

19   You can't pull the accounts, you're going to have surrender

20   charges, I'll see if I can get them waived but in the

21   meantime let me give you our top -- one of our top young

22   advisors and see if maybe you can work with him.

23            And, so, I met with them.  Her husband, Tom, was an

24   accountant, and we hit it off good.  We became great drinking

25   buddies.  She was a hairdresser and really didn't care about

1   the finances at all.  And Tom said, If you make me a million

2   bucks, I'll give you a hundred thousand.  And we shook on it.

3       Q.   So it's your testimony that the client knew that a

4   portion of the "funds in" was for a fee and not just

5   investment?

6       A.   Back then, because I had finally made them more than

7   a million dollars.  And yes, they knew that they had to pay

8   taxes on the surrender, which they knew about.  The family

9   was not happy -- after Tom had died -- was not happy about

10  it.  They thought the fee was excessive.  I did negotiate

11  with Tom and gave them that 15,000 back, because they needed

12  to -- they wanted to buy a car for their daughter.  And

13  obviously, you know, the family wasn't happy with the fee,

14  but it was a deal that Tom and I made.

15      Q.   All right.  Now, this particular exhibit,

16  Government's Exhibit 63, indicates that it's not including

17  the Burton Trust; right?

18      A.   That's right.

19      Q.   With regard to the Burton trust generally, were

20  there occasions when you gave Ms. Burton cash?

21      A.   Yes.

22      Q.   How often?  How frequently?

23      A.   Very often.

24      Q.   Why?

25      A.   Ms. Burton had several DUIs and lost her driver's

```
 1  license.  And where she lived in Woodbury, she, you know,
 2  couldn't walk to the bank.  You know, it was a burden for
 3  her.  This time she was a little older, and she was very,
 4  very difficult, and she wanted cash.
 5      Q.  Was the cash just for the DUI or was it for --
 6      A.  Oh, it was for her living expenses, for whatever she
 7  wanted cash for.
 8      Q.  All right.  Did you pay any other expenses out of
 9  your own -- well, withdrawn.
10          Did you pay any expenses out of your own pocket for
11  Lyn Burton?
12      A.  Yeah.  I mean, obviously the money was commingled
13  and I did pay a lot of expenses for Lyn Burton.  You know,
14  Lyn Burton --
15          MR. McGARRY:  Is there a question. Your Honor?
16  BY MR. EINHORN:
17      Q.  There isn't.  Let me ask the questions,
18  Mr. Vaccarelli.
19          Mr. Vaccarelli, so you've gone through the -- the
20  nature of your practice with us, and your disability.  And
21  it's your testimony you're no longer in the insurance -- in
22  the securities industry; is that right?
23      A.  No, I'm not.
24      Q.  All right.  You know, obviously, that you owe people
25  -- you owe people money, don't you, from the time you were --
```

1   A.   Yes.

2   Q.   -- under the influence of alcohol; right?

3   A.   Yes, I do.

4   Q.   Okay.  And as a matter of fact, is there a reason

5   why you haven't tried to start some sort of restitution?

6   A.   Yes.

7   Q.   Why is that?

8   A.   The Government has frozen all of my assets.

9   Q.   Okay.  And with regard to your alcoholism as it

10  existed during the time period of this Indictment, 2011-2017,

11  you told us, in fact, it was the culture of the securities

12  industry at the time; right?

13  A.   Yes.

14  Q.   All right.  I'm going to show you something -- I

15  think -- I believe we marked this for ID, this particular

16  exhibit, with the American Express one.

17       MR. EINHORN:  May I approach the witness with it,

18  Your Honor?

19       THE COURT:  You may.  That is C for identification.

20       MR. EINHORN:  C for ID.  Thank you.

21  BY MR. EINHORN:

22  Q.   First of all -- first of all, before you read it,

23  what is it again?  Was this an award you received, sir?

24  A.   Yes.  This was a present.  I received an award, a

25  plaque, for being the top first-year advisor in the

```
 1   Connecticut market group, and then this was a present that
 2   came with the award.
 3       Q.   All right.  And what does it say?  What is the
 4   legend on it?
 5           MR. McGARRY:  Your Honor, is that -- is reading it
 6   what you --
 7           MR. EINHORN:  No.  You know, I didn't mean to do
 8   that.
 9   BY MR. EINHORN:
10       Q.   Just tell us if you remember what the legend says,
11   or words to the effect on the legend.
12           THE COURT:  No.  That's the same thing.
13           MR. EINHORN:  I think Your Honor allowed him to
14   testify about it.  I'm just asking him about it.
15           THE COURT:  Let me hear your question.
16           MR. EINHORN:  Sure.
17   BY MR. EINHORN:
18       Q.   Would you tell us -- without reading it, of
19   course -- what the legend said above the gift you got?  What
20   was the gist of the legend?
21       A.   The gift was in a box.  It was a bull -- in two
22   pieces, a bull and a bear wine stopper.  So one is the bull,
23   one is the bear.  That's the stock market.  And above the box
24   -- so the bull and bear were in the bottom, and you open the
25   box and on the inside of upper -- the top of the box says
```

1  "The market has its ups and downs.  Some bring smiles, some

2  bring frowns.  The best advice is to relax and have a drink."

3    Q.   Okay.  Did you understand that to be the culture of

4  the industry?

5    A.   Yes.

6    Q.   And we're talking about the time period between

7  2011-2017?

8    A.   Yes.

9    Q.   Okay.  Now, just one last thing, Mr. Vaccarelli.

10  You've looked at and you've seen Exhibit 63.  You've heard

11  from people, obviously, who claim you owe them money.  Can

12  you tell us, did you ever intend to hurt anybody?

13    A.   No.

14    Q.   Why did you hurt people?

15    A.   It's awful.  I'm astonished and embarrassed by my

16  behavior.  I didn't intend to hurt anybody.  I can't

17  reconcile in my own brain that I would hurt someone that was

18  one of my first client -- my first client and lives on the

19  same street as me, that I would hurt someone that I knew from

20  when I was a little boy that lives less than a mile from me.

21  These people were in the wrong place at the wrong time, and I

22  just was in a haze and all that mattered to me was getting to

23  my next drink.

24    Q.   Mr. Vaccarelli, tell us your name again.

25    A.   My name is Leon Vaccarelli, and I'm an alcoholic.

1   MR. EINHORN:  Thank you.  Nothing further at this

2   time, Your Honor.

3   THE COURT:  All right.  Cross-examination.

4   MR. McGARRY:  If I could just have a minute, Your

5   Honor, to get the computer set up.  If we can enlist the help

6   of Ms. Konarski.

7   CROSS-EXAMINATION

8   BY MR. McGARRY:

9   Q.  Good morning, Mr. Vaccarelli.

10   A.  Good morning.

11   Q.  I'd like to ask you a couple questions.  Actually,

12   that's probably an understatement.  I'd like to ask you

13   questions about your conduct, beginning in or about 2011 and

14   continuing until at least August of 2017.  Okay?

15   A.  Okay.

16   Q.  Now, you swore -- you took an oath today; correct?

17   A.  I did.

18   Q.  You took an oath to tell the truth?

19   A.  Yes.

20   Q.  Same oath that every other witness took; correct?

21   A.  Yes.  Yes.

22   Q.  Okay.  Let me start by directing your attention to

23   Susan Rustic.  Do you remember Susan Rustic?

24   A.  I do.

25   Q.  And she came and testified at the trial; correct?

1    A.    Yes.

2    Q.    Okay.  If we take a look at Government's Exhibit 25,

3    and picking up somewhat with where we were yesterday,

4    Ms. Rustic invested a hundred thousand dollars with you;

5    didn't she?

6    A.    Yes.

7    Q.    Let me get the -- we're going to go to -- I'll try

8    to move that up, but if we can get the regular function.

9         And that was on or about November 30, 2015;

10   correct?

11   A.    Yes.

12   Q.    Okay.  And your account had $712 in it before

13   Ms. Rustic's money came in; didn't it?

14   A.    Yes.

15   Q.    And you never gave her any money back; did you?

16   A.    No.

17   Q.    Okay.  And you had told her that she was going to be

18   investing in an investment that would -- you told her that

19   she would be investing in something that would pay 6 and a

20   half or 7 percent; correct?

21   A.    Yes.

22   Q.    Okay.  You called her up on the phone and I believe,

23   in a big voice, you said, Susan, I have an investment for

24   you.

25   A.    I don't remember that.

1    Q.   Okay.  And you met with her; didn't you?

2    A.   I met with her.

3    Q.   Okay.  And you provided her a document.  Okay.  And

4    you  provided her an investment agreement; didn't you?

5    A.   I did.

6    Q.   Okay.  And she signed it; correct?

7    A.   Yes.

8    Q.   And you got a hundred thousand dollars; correct?

9    A.   Yes.

10   Q.   And the account that you had $712 in on November

11   30th, a hundred thousand dollars came in; correct?

12   A.   Yes.

13   Q.   And the next day, you paid one of your mortgages;

14   correct?

15   A.   Yes.

16   Q.   Okay.  And two days later -- or on December 2nd, you

17   paid June Antonacci $75,000 of the money that you owed to her

18   and Ray; correct?

19   A.   Yes.

20   Q.   Okay.  So Susan Rustic's money did not go into a

21   separate client managed funds account; did it?

22   A.   No.

23   Q.   And it did not earn any interest; did it?

24   A.   No.

25   Q.   It got sent to June Antonacci and Ray Antonacci;

1  correct?

2      A.   Yes.

3      Q.   Now, you mentioned earlier that you had sat down

4  with Mr. Antonacci.  And I think you said that you came up

5  with a plan, and the plan was that you were going to -- he

6  was going to loan you some money; right?

7      A.   Yes.

8      Q.   Okay.  And that was in 2012; correct?

9      A.   I believe so.

10     Q.   Okay.  And, so, you had a plan to get money from Mr.

11  Antonacci, and then you took Ms. Rustic's money to pay him

12  back; correct?

13     A.   Yes.

14     Q.   Okay.  And you never told Ms. Rustic that; did

15  you?

16     A.   No.

17     Q.   She thought she was investing in something that

18  would earn -- looking at Government's Exhibit 657 -- and pay

19  off of Senior Notes.  Was that a Senior Note for

20  Mr. Antonacci?

21     A.   Yes.

22     Q.   Okay.  Now, was it a Senior Note because you only

23  gave it to your clients who were senior citizens?

24     A.   No.

25     Q.   Okay.  What was it senior to?

```
 1         A.    First -- I'm assuming my thought process was it'd be
 2    the first debt from my business.
 3         Q.    But there was no junior note?
 4         A.    No junior notes.
 5         Q.    There was no medium note?
 6         A.    No.
 7         Q.    There was just a Senior Note?
 8         A.    Yes.
 9         Q.    And most of the people who got the Senior Notes were
10    senior citizens; correct?
11         A.    I guess so, most of them.
12         Q.    And this is the document, Government's Exhibit 657,
13    that Susan Rustic got; correct?  And it says "36 month Senior
14    Note 7 percent per annum"; correct?
15         A.    Yes.
16         Q.    Now, did you just happen to type this "36 month 7
17    percent" by accident?
18         A.    No.
19         Q.    Did you -- just kind of your hands fell on the
20    keyboard and the words just came out?
21         A.    I probably did a paste and copy.
22         Q.    You did a paste and copy, and then you put in the
23    percentage; correct?
24         A.    I probably got that from somewhere.
25         Q.    Okay.  You got that from somewhere and you put it in
```

1    this document?

2         A.    Yes.

3         Q.    And then you gave her this document?

4         A.    Yes.

5         Q.    Okay.  And then you asked her to sign this document;

6    correct?

7         A.    Yes.

8         Q.    And she signed it?

9         A.    She did.

10        Q.    And you kept this document?

11        A.    I did.

12        Q.    Okay.  You kept this document because you were

13   trained as an investment advisor and you knew it was

14   important to keep financial records; correct?

15        A.    Yeah, I kept everything.  Yes.

16        Q.    You kept everything.  You made the decision and you

17   said, I'm going doing to keep this; correct?

18        A.    Yes.

19        Q.    It wasn't just like, I don't know where it is.  You

20   knew what you were doing on that.  You saved it and then you

21   kept it; correct?

22        A.    I kept it.

23        Q.    Okay.  And if we look at, for demonstrative

24   purposes, 67, you also took some of the money for your home

25   mortgage; correct?

1316

1    A.   Yes.

2    Q.   Okay.  And throughout the time of dealing with

3    Ms. Rustic, I think she said she met you dozens of times;

4    didn't she?

5    A.   I guess.  I don't remember what she said.

6    Q.   You don't remember what she said a couple days

7    ago?

8    A.   No.  I mean, she said she met with me.  I don't know

9    if she said dozens of times, but she probably did.

10   Q.   Well, the jury's recollection will control.  But she

11   also testified that in that time she only saw you with a

12   drink once; correct?

13        MR. EINHORN:  Are we asking the witness to comment

14   on the testimony of another witness?  I would object to that.

15        THE COURT:  Can you rephrase your question?

16        MR. McGARRY:  Sure.  Sure.

17   BY MR. McGARRY:

18   Q.   Do you disagree with her that she only saw you with

19   a drink in your hand one time?

20        MR. EINHORN:  Same objection, Your Honor.

21        THE COURT:  Overruled.

22        THE WITNESS:  If she was at my Christmas party more

23   than once, then it would be -- then I would disagree with

24   her.

25   BY MR. McGARRY:

1    Q.   But not when you met her to talk about her hundred

2    thousand dollar investment.

3    A.   Probably not.

4    Q.   You didn't have a drink in your hand then?

5    A.   No.

6    Q.   And if we talk about Ms. Strobel.  Turning your

7    attention to Government's Exhibit 600.  Do you remember

8    Kathleen Strobel?

9    A.   I do.

10   Q.   Okay.  And you offered her a 32-month Senior Note;

11   correct?

12   A.   I did.

13   Q.   Okay.  And she was going to roll over her IRA for

14   $45,000; correct?

15   A.   I'm not sure of the genesis or where the money -- I

16   think it was an IRA, yes.

17   Q.   Okay.  And Kathleen Strobel gave you $45,000 to

18   invest; correct?

19   A.   Yes.

20   Q.   Okay.  And you deposited that money into your

21   account; didn't you?

22   A.   Yes.

23   Q.   Okay.  If we look at Government's Exhibits 17, 17A,

24   okay, and you deposited -- you had her write it out to

25   LWLVACC; correct?

1    A.   Yes.

2    Q.   Okay.  You told her how to write the check out;

3 didn't you?

4    A.   Yes.

5    Q.   She didn't know how to do it; you told her?

6    A.   Yes.

7    Q.   Okay.  You didn't just make -- this didn't get

8 written out to Barry; correct?

9    A.   No.

10    Q.   It didn't get written out to Maryanne?

11    A.   No.

12    Q.   It didn't get written out to Brie Sodano?

13    A.   No.

14    Q.   It also didn't get written out to The Investment

15 Center; did it?

16    A.   No.

17    Q.   It got written out to LWLVACC, and that's what you

18 told her to do?

19    A.   Yes.

20    Q.   Right.  You didn't just make something up, like you

21 weren't inadvertently saying, Oh, just write it out to cash

22 or write it out to anything?  You told her where it should

23 go; correct?

24    A.   Yes.

25    Q.   And that's because you wanted it to go to your

1   LLC?

2       A.   Yes.

3       Q.   Okay.  And that was the LLC -- I think you testified

4   that -- or you testified that you wanted to keep the LLC

5   separate?  Was that what you testified this morning?

6       A.   It was for business transactions.

7       Q.   Right.  But it was business transactions that you

8   weren't telling the The Investment Center about; correct?

9       A.   Yes.

10      Q.   Because you weren't supposed to be doing private

11  investment agreements; correct?

12      A.   The Investment Center did not want me to do that.

13      Q.   Right.  And, so, you made a decision not to tell

14  them; correct?

15      A.   Yes.

16      Q.   Because you would have had to get anything approved,

17  and they likely would not have approved it; correct?

18      A.   Likely.

19      Q.   Okay.  And then you would not have gotten

20  Mrs. Strobel's $45,000; correct?

21      A.   Correct.

22      Q.   Going back to Government's Exhibit 25, showing you

23  page 50.  Ms. Strobel's money came in; correct?  And then you

24  took her money and you gave it to the Antonaccis; correct?

25           Did you not understand my question?

1    A.   I'm just looking at the --

2    Q.   Sure.  Take a look at Government's Exhibit 25.

3    A.   Yes, their money went towards the Antonaccis.

4    Q.   Right.  Because Ms. June Antonacci, I think she had

5    called a lawyer friend of hers; correct?

6    A.   She did.

7    Q.   And he had called you; correct?

8    A.   Yes.

9    Q.   And he was kind of putting pressure on you;

10   correct?

11   A.   He didn't put pressure on me, but he wanted me to

12   resolve the matter.

13   Q.   And you wanted to resolve the matter, too; didn't

14   you?

15   A.   Yes.

16   Q.   So you decided, Well, I should resolve the matter,

17   so you paid them the money back?

18   A.   Yes.

19   Q.   Okay.  That's what you decided to do on that one;

20   correct?

21   A.   Yes.

22   Q.   Okay.  Do you remember meeting with Ms. Warren?

23   Showing you Government's Exhibit 700.  Do you remember this

24   document, where you had a private direct -- going to the top,

25   Private Direct Investment Agreement with Ms. Warren?

1    A.   Yes.

2    Q.   Okay.  And again, separately managed account,

3  30-month Senior Note.  She was the nurse that was here;

4  correct?

5    A.   Yes.

6    Q.   6.5 percent per annum.

7    A.   Yes.

8    Q.   Okay.  Did Barry type this?

9    A.   No.

10    Q.   Did Maryanne type this?

11    A.   No.

12    Q.   Did Brie Sodano type this?

13    A.   No.

14    Q.   Did Leon Vaccarelli type this?

15    A.   Yes.

16    Q.   Okay.  So you typed up this agreement.  That's

17  something you decided to do; right?

18    A.   Yes.

19    Q.   Okay.  And then you offered it to Ms. Warren?

20    A.   Yes.

21    Q.   Okay.  And you also met with Brian Klanica; didn't

22  you?

23    A.   I don't remember that meeting, but I -- it was said

24  that I did.

25    Q.   Okay.  And you provided him a detailed list that

1   included gold coins and everything else; didn't you?

2       A.   Yes.

3       Q.   But you didn't mention the $85,000; did you?

4       A.   No.   That was already resolved.

5       Q.   The Investment Center is considering, I believe,

6   whether or not they should pay him the $85,000; correct?

7       A.   I believe he said they did already.

8       Q.   They did.   So then it couldn't have been a fee to

9   you, could it have been, if The Investment Center is paying

10  $85,000 from the insurance to pay them back; correct?

11      A.   It was a fee.

12      Q.   But The Investment Center paid back $85,000; didn't

13  they?

14      A.   The insurance did, I believe.

15      Q.   The insurance did.   Because you took the money?

16      A.   That, I did not take that money.

17      Q.   Okay.   And it was a handshake deal; is that what you

18  testified to?

19      A.   Yes, it is.

20      Q.   With somebody who passed away?

21      A.   Yes.

22      Q.   Okay.   And he couldn't be called to testify; could

23  he?

24      A.   They know -- the family knew about this.

25      Q.   Brian Klanica came here and testified; didn't he?

1     A.    He wasn't part of those meetings, though.

2     Q.    It was a handshake deal with somebody who passed

3  away; correct?

4     A.    Yes.

5     Q.    That's your testimony?

6     A.    Yes.

7     Q.    Okay.  But The Investment Center is going to pay

8  them back $85,000?

9     A.    Apparently the insurance courier [sic] decided to.

10    Q.    So you like it when the insurance pays back some

11 people, but you don't like it when it pays back other

12 people?

13    A.    I didn't say that.

14    Q.    But they didn't consider it a proper fee; did

15 they?

16    A.    They didn't ask me.

17    Q.    But you did list gold coins; didn't you?  $40,000 of

18 gold coins?

19    A.    They had gold coins.

20    Q.    So Government's Exhibit -- showing you Government's

21 Exhibit 16.  This is Christine Chauncey.  You see that?

22    A.    Yes.

23    Q.    Okay.  And I believe she was one of your first

24 clients; wasn't she?

25    A.    Yes.

1   Q.   Okay.  And you got $47,000 from her; didn't you?

2   A.   I did.

3   Q.   Okay.  And you were -- talked about her on your

4   direct.  Let me show you Government's Exhibit 30.  Let me

5   show you page 3.  Okay.  And directing your attention to the

6   middle of the page.  You see that, where the $59,000 -- Leon

7   Vaccarelli endorsed to the order of Sean Fitzmaurice?

8   A.   Yes.

9   Q.   You see that?  Okay.  Now, I believe about ten

10  minutes ago or so you testified the money that you paid from

11  Chauncey came from -- and I'm sure our court reporter has it

12  -- came from my funds.  Do you remember that?

13  A.   Yes.

14  Q.   The balance in this account before the $300,000

15  check came in from the Truhan Living Trust was $22,000;

16  correct?

17  A.   Yes.

18  Q.   Okay.  Going above that, the deposit before that was

19  from Ms. Augelli; correct?

20  A.   Yes.

21  Q.   That's the woman who knew you since you were five

22  years old?

23  A.   Yes.

24  Q.   You played at her house?

25  A.   Yes.

1   Q.   Marty coached you in basketball?

2   A.   Yes.

3   Q.   And she gave you the money because she had promised

4   you that you could take care of her retirement; isn't that

5   correct?

6   A.   Yes.

7   Q.   And when they closed down her retirement fund and

8   sent her the check from Mass Mutual, she reached out to you

9   by Facebook or through the Internet, because she didn't have

10  your number; correct?

11  A.   I don't remember, but sounds right.

12  Q.   And she met you because she kept her word to let you

13  handle her retirement; correct?

14  A.   Yes.

15  Q.   Because you had told her:  Ms. Augelli, don't forget

16  you got to let me handle your retirement?  You said that to

17  her; didn't you?

18  A.   No, I don't believe so.  What happened was she --

19  Q.   You said that to her; didn't you?

20  A.   I said I'd be happy to.

21  Q.   Okay.  And you got her $72,000; didn't you?

22  A.   Yes, I did.

23  Q.   And you put it into this account -- going up for the

24  title -- at Lux Financial at Ion Bank where you had $325 in

25  the account; correct?

1    A.    Yes.

2    Q.    And her money came in.  You transferred some of it.

3    You had a check.  And then it came back in, as Mr. Almodovar

4    testified to.  Then the Truhan money came in, and then you

5    wrote -- endorsed a check payable to Sean Fitzmaurice,

6    Ms. Chauncey's attorney; correct?

7    A.    Yes.

8    Q.    Okay.  And you testified about half an hour ago that

9    the Chaunceys' money was paid from my funds; didn't you?

10   A.    I did.

11   Q.    Okay.  But the money in your account was from

12   Ms. Augelli and from the Truhan Family Trust; correct?

13   A.    Yes.

14   Q.    Okay.  It wasn't your money to do whatever you

15   wanted with; was it?

16   A.    I can see how you would say that.

17   Q.    Okay.  It wasn't your money to do with whatever you

18   wanted; was it?

19   A.    They gave me that money, but it wasn't my money.

20   Q.    They didn't give you the money; did they?  They

21   invested it with you; didn't they?  Ms. Augelli did.  The

22   Truhans didn't even know about it; did they?

23        MR. EINHORN:  Could you ask Mr. McGarry to not be

24   yelling at my client, Your Honor?

25        THE COURT:  Maybe yelling isn't necessary.

1    MR. McGARRY:  Just for the record, I don't think I

2  was yelling.  I think my voice was a little --

3    THE COURT:  It always is.  It was a little bit -- it

4  was a little higher than usual.

5    MR. McGARRY:  Fair enough.

6    THE COURT:  Go ahead.  All right.  So the last

7  question was:  It wasn't your money to do with what you

8  wanted; was it?

9    You said:  They gave me that money, but it wasn't my

10 money.

11    Question:  They didn't give you the money; did they?

12 BY MR. McGARRY:

13    Q.   They invested the money.

14    A.   Yes.

15    Q.   Well, the Chauncey -- I'm sorry.  The Truhan family

16 didn't even know that the money went to your account; did

17 they?

18    A.   I don't know what they knew.  I don't -- I'm not

19 sure.

20    Q.   You wrote -- or there was a $300,000 check that got

21 deposited into your account that Victoria Hughes knew nothing

22 about; correct?

23    A.   That's what she said.

24    Q.   Okay.  And then you used that money in a check that

25 you endorsed Pay to the Order of Sean Fitzmaurice, which was

1   Mrs. Chauncey's lawyer; correct?

2       A.   Yes.

3       Q.   Okay.  So when you testified about 40 minutes ago

4   that it was paid from my funds, that wasn't a true statement;

5   was it?

6       A.   I disagree with that statement.

7       Q.   It were -- this money wasn't your money; was it?

8       A.   It was in my checking account, though.

9       Q.   It was in your custody; wasn't it?

10      A.   Yes.

11      Q.   It was in your control; wasn't it?

12      A.   Yes.

13      Q.   You had had the money moved from the Truhan Trust;

14  hadn't you?

15      A.   I did.

16      Q.   And then you decided what to do with it?

17      A.   Correct.

18      Q.   So let's talk a little bit about -- you went through

19  a long discussion about your background, and Mr. Einhorn had

20  the family picture up on the screen for an extended period of

21  time.

22          MR. EINHORN:  Do you need it back?

23          MR. McGARRY:  I've seen it.  Thank you.

24  BY MR. McGARRY:

25      Q.   So you live on Joshua Town Road now?

1    A.   No.

2    Q.   You did during the relevant time period, 2011 to

3    approximately August of 2017, you lived -- well, when did you

4    move to Joshua Town Road?

5    A.   I don't know the exact date.

6    Q.   Okay.  What year?

7    A.   2012.

8    Q.   You had the house built?

9    A.   Yes.

10   Q.   From Eric Strachan was the general contractor?

11   A.   Yes.

12   Q.   And then you had Carmine DiSapio, your second cousin

13   once removed, do some cement work and fill?

14   A.   Yes, he did.  He did -- he poured a patio and a

15   wall.

16   Q.   And it was going to be bluestoned; is that right?

17   A.   No, I don't remember that at all.

18   Q.   And then he was going to do the front sidewalk?

19   A.   Never, because that was included with the

20   contractor.

21   Q.   And that's what he was angry about?

22   A.   He was angry, and he was also -- my ex-wife --

23   Q.   He was your ex -- I'm sorry.  Go ahead.  I don't

24   want to hear what your ex-wife said, so let me stop you

25   there.

1    A.    Okay.

2    Q.    Okay.

3    A.    She --

4    Q.    I just don't want to get into the whole hearsay

5    thing with what Monica said.

6    A.    Can I say something in regards to Carmine DiSapio?

7    Q.    Why don't we -- let me rephrase the question.  I'll

8    ask you a question, and you can answer the question.

9    A.    Okay.

10   Q.    Okay?  Carmine DiSapio was the fellow who was doing

11   the cement work; correct?

12   A.    Yes.

13   Q.    Okay.  And you had a disagreement with him about the

14   front walk?

15   A.    Amongst other items.

16   Q.    Okay.  And you worked through that with Eric

17   Strachan, the general contractor?

18   A.    Eric did not speak to Carmine DiSapio.  He was

19   upset we even brought him into the picture.

20   Q.    To do the back.  Okay. Fair enough.

21         So you have this house on Joshua Town Road?

22   A.    Yes.

23   Q.    Okay.  From 2011 to 2017, did you have a car?

24   A.    Yes.

25   Q.    How many cars?

```
 1      A.   I had one and Monica had one.

 2      Q.   Okay.  And the cars were registered?

 3      A.   I believe so.

 4      Q.   You kept the registration up?

 5      A.   I didn't do that, but, yes, I'm sure that they

 6  were.

 7      Q.   Okay.  You paid the insurance on the car?

 8      A.   I'm sure I did.

 9      Q.   You paid the insurance on the house?

10      A.   I believe so.

11      Q.   You kept the lights on -- you paid the electric

12  bill?

13      A.   Yes.

14      Q.   Okay.  You helped buy food?

15      A.   I didn't necessarily do the grocery shopping, but --

16      Q.   You paid for it?

17      A.   I'm assuming so, yes.

18      Q.   And you have eight kids.  We saw them?

19      A.   Yes.

20      Q.   Okay.  They go to different schools?

21      A.   Yes.

22      Q.   One goes to -- or one goes to Laurelton Hall?

23      A.   Went.

24      Q.   Okay.  Others go to Our Lady of Mount Carmel?

25      A.   Yes.
```

1    Q.   We saw some deposits there; correct?

2    A.   Yes.

3    Q.   Payments there?

4    A.   Yes.

5    Q.   Kind of expensive for that many kids; correct?

6    A.   It's actually a deal, if you divide it out, yeah.

7    Q.   The school gave you a better -- did you have to

8  negotiate that with the priest or whatever?

9    A.   No.  It's standard.  The more kids you have, the

10  less per kid.

11    Q.   So it's amortized or it's figured out so -- okay.

12  So was that a decision you made, to send the kids to that

13  school?

14    A.   Yes.

15    Q.   And do you help them with their homework?

16    A.   Not really.

17    Q.   Now, also during this time period I think you had a

18  nanny; correct?

19    A.   Yes.

20    Q.   Okay.  And you had a cleaning service; correct?

21    A.   I don't know about that.  Monica may have had a --

22    Q.   You don't know whether --

23    A.   Monica may have had a maid, yes.  Not a cleaning --

24  a maid.

25    Q.   Okay.  A maid.  We'll call it a maid.  I was calling

```
1   it a cleaning service.  We'll call it a maid.  So Monica had
2   a maid, the kids are in private school, and you had a nanny;
3   correct?
4       A.   Yes.
5       Q.   Did you pay the nanny in cash or in checks?
6       A.   I didn't pay the nanny.
7       Q.   Did you give Monica cash or money to pay the nanny?
8       A.   I gave Monica money.
9       Q.   Okay.  Did she pay the nanny in cash?
10      A.   I don't know.
11      Q.   Well, we didn't see any checks to a nanny, did we,
12  out of your --
13      A.   That would have came out of Monica's account.
14      Q.   Okay.  And did you file the necessary paperwork for
15  a home employee for the nanny or the maid?
16      A.   I have no idea.
17      Q.   So we want to jump and talk about your commission
18  split with Barry.  That was 50/50 on the new business that he
19  brought in?
20      A.   On what he brought in.
21      Q.   And 80/20 on what you had; correct?
22      A.   Correct.
23      Q.   Okay.  At some point, you negotiated to buy a
24  building; correct?
25      A.   Yes.
```

1334

1    Q.   Okay.  Who did the negotiation; you or

2    Mr. Kolesnik?

3    A.   I don't remember.

4    Q.   Okay.  And then you found out that Signature's

5    Restaurant was attached; correct?  So when you decided --

6    when you made the decision to buy the building, you didn't

7    have enough money yourself to put the money up, so you had to

8    borrow some money; correct?

9    A.   There's two buildings.  I think perhaps you're

10   confusing them.  There's 49 Leavenworth, which is where I

11   borrowed the money.  And then a couple years after that,

12   there was 29 Leavenworth, which had Signature's Restaurant.

13   Q.   Okay.  And when you bought Signature's Restaurant,

14   you went back to Thomaston Savings Bank; correct?

15   A.   We did a refinance.

16   Q.   Take a look at Government's Exhibit -- we'll go to

17   503 first.  Government's Exhibit 503.  Okay.  And if we look

18   at page 1, where it says Liabilities -- see if I can blow

19   this up.  Let's see.  Notes over there.  We'll move over a

20   little bit.

21        Okay.  So it talks about installment.  You have an

22   auto loan; correct?  You know, you decided -- you put that

23   down; correct?

24   A.   Yes.

25   Q.   Was that a decision you made to put that down?

1    A.    No.  I didn't fill this out.

2    Q.    You signed it; correct?

3    A.    I'm sure I signed it.

4    Q.    And nowhere on this form does it say that you owe

5    the Augellis [sic] any money; correct?

6    A.    No.

7    Q.    Okay.  So you didn't tell the bank that you owed the

8    Augellis $200,000; correct?

9    A.    No, but that would have been a --

10   Q.    That would have been a liability; correct?

11   A.    Yeah, but not a personal liability.

12   Q.    Well, who was going to pay them back?

13   A.    The business.

14   Q.    So you told the bank -- so it's your testimony that

15   it's okay to not disclose that LWLVACC -- which is only you;

16   correct?  There's no one else affiliated with it?

17   A.    No.

18   Q.    There's not shareholders, stockholders, business

19   partners -- it's just you; correct?

20   A.    Yes.

21   Q.    Okay.  LWL owes the Augellis -- I'm sorry, the

22   Antonaccis $200,000, but -- and I'm going to go to the second

23   document, go to page 1, zooming in on that one.  This is

24   Government's Exhibit 508.

25         Again, auto loan; correct?  That's there?  See

1   that?

2   A.   Yes.

3   Q.   Do you see -- it has home mortgage; you see that?

4   A.   Yes.

5   Q.   It has student loan; you see that?

6   A.   Yes.

7   Q.   And you didn't disclose anywhere on this document

8   that you signed, that, in fact, you had owed $200,000 to Ray

9   and June Antonacci?  Did you?

10   A.   That's because it was a business debt.  And that was

11   discussed with the bank, because -- if you go back to the

12   front page.

13   Q.   I will.

14   A.   The cash that was put on there that I had on hand

15   was 28,000, and the bank knew that I was getting the loan

16   from Mr. Antonacci.

17   Q.   It's not disclosed on here; is it?

18   A.   I understand that.  But when those checks came in --

19   it kind of came back to me when you saw the checks from

20   Gennaro Bizzaro, that was from Mr. Antonacci.  And the bank

21   didn't question, because they knew --

22   Q.   Because you didn't disclose anywhere on this form

23   that you had a $200,000 loan out; did you?

24   A.   No.

25   Q.   Okay.  Going back to Government's Exhibit 25.

1   Directing your attention to page 49.  Let me start again, and

2   going to page 49.  Okay.  And that's where Ms. Chauncey's

3   money came in; correct?  Do you see that, the middle of the

4   page?

5        A.   Yes.

6        Q.   Okay.  And that's on September 28th.  On September

7   28th, you did a transfer; correct?

8        A.   Yes.

9        Q.   And then a payment to The Hartford on the 29th;

10  correct?

11       A.   Yes.

12       Q.   Okay.  And then a check to Main Street Waterbury.

13  Do you see that?

14       A.   Yes.

15       Q.   So the money is -- you're moving the money

16  throughout to make your payments; correct?  You paid Maryanne

17  Monticello for office supplies and stamps; correct?

18       A.   Yes.

19       Q.   Okay.  So you're able to move all this money around

20  from place to place from Ms. Chauncey and other people,

21  including the Strobels, to pay back June Antonacci, to pay

22  back for office supplies.  But your testimony was that you're

23  just in a drunken haze?

24       A.   I was.

25       Q.   And this -- you're making these technical moves from

1  account to account, paying the mortgages, paying the

2  mortgages on the building, negotiating with the bank and

3  you're in a drunken haze.  Is that your testimony?

4      A.   Yes.  There is no rhyme or reason as to why --

5      Q.   Let me just stop you.  Is your answer yes or no?

6      A.   I was in a drunken haze.

7      Q.   Okay.  So at some point, in fact, you got a

8  complaint filed against you with FINRA; didn't you?

9      A.   Yes, I believe so.

10      Q.   Okay.  And that was a complaint filed by the

11  Sienkowski family; wasn't it?

12      A.   Yes.

13          MR. McGARRY:  Okay.  And Your Honor, we had

14  previously marked Government's Exhibit 407, 408 and 409 for

15  identification, which are the U-4s.  I'd like to offer them

16  at this time.

17          MR. EINHORN:  Your Honor, I would object.  I think I

18  know where Mr. McGarry is going, but for one thing, it's

19  outside the scope of my direct examination.  For another

20  thing, I think it's, under 403, it's unduly prejudicial.

21          THE COURT:  I'm going to overrule that objection.

22  These U-4s that would have been issued by FINRA -- is that

23  correct?

24          MR. McGARRY:  Yes, Your Honor.

25          THE COURT:  -- are relevant to Mr. Vaccarelli's

1   direct testimony, and you may offer them over objection.

2   407, 408 and 409 are full exhibits.

3           MR. McGARRY:  Thank you, Your Honor.

4   BY MR. McGARRY:

5       Q.   Let me show you Government's Exhibit 407.  Okay.

6   Let me -- it's a little small.  Hold on a second.

7           MR. McGARRY:  I'm just going to pull up the part

8   that was previously redacted, Your Honor.

9   BY MR. McGARRY:

10      Q.   Directing your attention -- okay.  Well, let's --

11  while I'm looking for the right section, let me pose a

12  question for you.  So the Sienkowski family complained to you

13  about a decision that you had made; correct?

14      A.   Yes.

15      Q.   Okay.  And they filed a formal complaint with The

16  Investment Center; didn't they?

17      A.   I believe so.

18      Q.   And they claimed that you had moved money -- sold

19  some stock that you otherwise shouldn't have sold; correct?

20      A.   Well, I disagree with their complaint, but that was

21  their complaint.

22      Q.   And when they complained and you disagreed, you told

23  your side of the story to The Investment Center; correct?

24      A.   I'm sure I did.

25      Q.   Okay.  And you wrote letters to that effect; didn't

1    you?

2        A.   Yes.

3            MR. McGARRY:  Okay.  I'd like to -- maybe I'll just

4    show the Court Government's Exhibit 1231, 1232, and 1233

5    marked, and I would offer them in full.

6            THE COURT:  Can you put that up here?

7            MR. McGARRY:  Yeah.  That is -- I'm going to scroll

8    up a little, Your Honor, 1232.  1231, 1232 and 1233.

9            And should I inquire, Your Honor?

10           THE COURT:  You may.

11           MR. EINHORN:  Well, may I note my objection first,

12   Your Honor?

13           THE COURT:  Okay.  Let me hear what the question is

14   that this exhibit is going towards?

15   BY MR. McGARRY:

16       Q.   Showing you on your screen Government's Exhibit

17   1231.  Do you see Government's Exhibit 1231 on your screen?

18       A.   I do.

19       Q.   Is this a letter that you wrote?

20       A.   It looks like it.

21       Q.   A letter that you wrote on September 15th, 2014?

22       A.   I probably drafted it and someone else typed it, but

23   yes.

24       Q.   Okay.  And is this a letter that you wrote in

25   response to the Sienkowski complaint about your conduct with

1  respect to the securities?

2      A.   I believe it's to what happened, yes.

3      Q.   Okay.  And let me show you 1232.  Is that also a

4  letter that you wrote a few days later regarding the

5  securities?

6      A.   Yes, it was a follow-up.

7      Q.   Okay.  And then 1233; did you also write this letter

8  to Jack Lietzke from FINRA?

9      A.   Yes.

10     Q.   And are those all letters that you wrote at the

11 time, between 2011 and 2017, where you wrote to FINRA

12 discussing the securities trades that you had engaged in?

13     A.   Yeah.  I didn't -- I'm sure I didn't type the

14 letters or -- but I drafted them, though.

15     Q.   You signed them?

16     A.   I signed them.

17         MR. McGARRY:  Okay.  Your Honor, I would offer these

18 as evidence of -- in response to the testimony on direct, to

19 show Mr. Vaccarelli's conduct during the relevant time

20 period.

21         THE COURT:  Basis of your objection?

22         MR. EINHORN:  Yes, Your Honor.  The Government is

23 actually seeking to open up an entire mini-trial on this

24 issue.  I don't see the relevance of going down this pathway.

25 I'm going to examine on these.  They're not all FINRA, by the

1  way.  Two of them are to The Investment Center, one's to

2  FINRA.  I'm going to have to examine on these, too, and I

3  don't think it's relevant to the issues before us.

4           MR. McGARRY:  I think --

5           THE COURT:  Mr. McGarry.

6           MR. McGARRY:  Yes, Your Honor.  I think it is

7  directly relevant to what Mr. Vaccarelli testified to on

8  direct about the state that he was in during this entire time

9  period.

10           THE COURT:  I'm going to permit 1231, -2 and -3 to

11  come in on the issue of his conduct and functioning during

12  the relevant time period.  You may proceed.

13           MR. McGARRY:  Okay.  Thank you, Your Honor.

14  BY MR. McGARRY:

15    Q.   Take a look at Government's Exhibit 12 -- I want to

16  make sure I start with 1231.  Okay.  Do you see this

17  letter?

18    A.   Yes.

19    Q.   Okay.  And you drafted this letter; correct?

20    A.   Yes.

21    Q.   And it says:  I'm writing in response to FINRA

22  inquiry regarding Patricia Sienkowski as you requested.  Upon

23  review of the file, I submit the following recap regarding

24  the ICON-12 investment and the McDonald's purchase on October

25  21, 2013.

1343

1     You see that?

2     A.   Yes.

3     Q.   And then you go on to discuss the ICON-12

4  investment; correct?

5     A.   Yes.

6     Q.   Okay.  And then you go on to talk about the

7  McDonald's stock that you had purchased; correct?

8     A.   Yes.

9     Q.   Okay.  And you talk about:  It was discussed in a

10  previous meeting because it paid a 3.8 percent dividend yield

11  and had a great opportunity for growth.  The 200 shares or

12  $19,109.97 investment in McDonald's represented a small

13  holding as compared to Pat's net worth and other holdings.

14     Did I read that correctly?

15     A.   Yes.

16     Q.   And this is a document -- a letter that you drafted;

17  correct?

18     A.   Yes.

19     Q.   And you were drafting this letter in response to a

20  complaint they had made; correct?

21     A.   Yes.

22     Q.   This seems pretty technical; doesn't it?

23     A.   I just copied what was in the file.

24     Q.   Okay.  But you kept the file; correct?

25     A.   Yes.

1    Q.   Okay.  And this seems like you've got a pretty good

2    grasp on what's going on with the ICON-12 investments; don't

3    you?

4    A.   Actually, I didn't, because The Investment Center

5    had to go in and do an entire analysis --

6    Q.   Right?

7    A.   -- because my file and recordkeeping didn't make

8    sense.

9    Q.   And you have your -- you're telling them about --

10   let's just talk about the actual drafting of the letter.

11   Okay?  You drafted this letter -- you testified to that.  And

12   you're giving Justin at The Investment Center the details

13   behind the portfolio, the percent, the yield, and what a

14   great opportunity for growth is; aren't you?

15   A.   Yes.

16   Q.   And this is in 2014; correct?

17   A.   Yes.

18   Q.   Okay.  That's right in the middle of all this other

19   activity that we've seen for the last week; isn't it?

20   A.   Yes.

21   Q.   Take a look at Government's Exhibit 1232, a few days

22   later, okay, where you are again writing to Justin:  We sold

23   FB for Patricia on Friday morning, October 18, 2013 at 9:53

24   a.m.  We decided to meet that afternoon at 2:00 p.m.

25        Now, going to Number 5, which I'm sure you'll point

1  to, We enjoyed a glass of wine.  Do you see that?  Nowhere in

2  this letter does it say "drunken haze"; does it?

3      A.   Well, I wouldn't put that in a letter.

4      Q.   Right.  Because you put all this other technical

5  stuff in here, in the first letter and in the second letter.

6  And now jumping all the way to 1233 -- and this is to FINRA;

7  correct?

8      A.   I don't know --

9      Q.   This letter is to FINRA; correct?

10     A.   It's to FINRA, but I don't -- I had a lawyer, and he

11 may have helped me write that letter because it was to

12 FINRA.

13     Q.   Okay.  I don't want to know what you talked about

14 with the lawyer, but did you make the decision to hire the

15 lawyer?

16     A.   I was told I better get one, by The Investment

17 Center.

18     Q.   And did you get one?

19     A.   Yes.

20     Q.   Did you make that decision?

21     A.   Yes.

22     Q.   Did you make that decision by accident?

23     A.   No.

24     Q.   Did you make that decision by inadvertence?

25     A.   No.

1    Q.   Did you make that decision by mistake?

2    A.   No.

3    Q.   Did you just happen upon a lawyer in the street and

4    say, in a drunken haze, I need a lawyer?

5    A.   No.

6    Q.   You thought about it, you hired a lawyer; didn't

7    you?

8    A.   I followed directions.

9    Q.   Right.  And the directions were, You better hire a

10   lawyer.  You did that; didn't you?

11   A.   Yes.

12   Q.   Because you had the faculties at the time to hire a

13   lawyer; correct?

14   A.   In my drunken haze, I did have faculties to call a

15   lawyer and say I need a lawyer.

16   Q.   So you could make that decision to hire a lawyer

17   because it was important; correct?

18   A.   Yes.

19   Q.   Okay.  And as a matter of fact, this puts you on

20   notice, did you not, that it was -- did it not -- that it was

21   important to take care of client funds; didn't it?

22   A.   It was very important.  And getting the lawyer was

23   just allowing me to get to my next drink.  It was something I

24   had to do.

25   Q.   Okay.  Let me just stop you there, because I didn't

1    ask you that question.

2         MR. McGARRY:  So moving forward, Your Honor, at this

3    point in time, let me -- I'm going to play, Your Honor, if I

4    can, Government's Exhibit 261 and 262 in evidence.

5         Is it going in --

6         MS. KONARSKI:  What did you do?

7         MR. McGARRY:  I hit the little button.  261.

8    BY MR. McGARRY:

9    Q.   Okay.  While Ms. Konarski is doing that, let me ask

10   you:  Do you remember calling Silvanna, Ms. LaPorta's

11   daughter, and leaving her a voice messages?

12   A.   I didn't remember until I heard the voice message

13   the other day.

14   Q.   And that was regarding where the money was going, to

15   put it in -- I think you said it was going to go into the

16   Wells Fargo account that had her dad's name still on it;

17   didn't you?

18   A.   I don't remember.

19   Q.   Okay.  Okay.  Well, maybe we'll play that a little

20   bit later.

21        Let me show you Government's Exhibit 409.  Directing

22   your attention to page 3.

23        BY MR. McGARRY:  Okay.  Can you -- can everyone see

24   that?

25   BY MR. McGARRY:

1    Q.   Okay.  Do you see where it says:  Are you currently

2    engaged in any other businesses, other, as a proprietor,

3    partner, officer, director, employee, trustee, agent or

4    otherwise?  Do you see that?

5    A.   I see it.

6    Q.   Okay.  And then you answered the question; didn't

7    you?  You answered the question; didn't you?

8    A.   I didn't do this, just so you know.  I mean, I

9    agreed to it, and I said yes these were done, in our annual

10   audits at the office, and the auditor just sat there and

11   typed it in.

12   Q.   And you didn't tell the auditor about LWLVACC; did

13   you?

14   A.   I think the auditor determined that it didn't need

15   to go in.  I don't remember those conversations, but it's not

16   in there.

17   Q.   So you didn't tell him about managing the Sheila

18   Burton Trust; did you?

19   A.   No.

20   Q.   Okay.  Let's see what you did tell him.  All right.

21   Number 2, Archdiocese of Hartford, Catholic school board,

22   advisory board, member, charity, nonprofit organization.

23        Do you see that?

24   A.   Uh-huh.

25   Q.   So you were on the board of the Catholic school

1   Archdiocese nonprofit in Hartford; correct?

2        A.   Yes.

3        Q.   Okay.  You managed to go there; correct?  Did you

4   vote on decisions as a member of the board?

5        A.   It wasn't really a voting board, but I attended

6   meetings.

7        Q.   Did you give advice?

8        A.   I gave my opinion.

9        Q.   Did you talk to people?

10       A.   I did.

11       Q.   Did they talk to you?

12       A.   They did.

13       Q.   Okay.

14       A.   We also drank at a lot of the meetings.

15       Q.   But you were there functioning as a board member;

16  correct?

17       A.   I was present, yes.

18       Q.   Okay.  Meet six times per year and offer suggestions

19  and ideas to help strengthen Catholic schools.  Okay.  Which

20  is, you know, by all accounts, laudable; correct?

21       A.   Yes.

22       Q.   Okay.  And that was something that you're proud of;

23  correct?

24       A.   Yes.

25       Q.   You're proud of your involvement with the church?

1   A.   Yes.

2   Q.   Okay.  Were you a eucharistic minister at the

3   church?

4   A.   For a short period.

5   Q.   Did you have to get trained to do that?

6   A.   Not really.  There was a one-hour quick session.  I

7   wouldn't call it training.

8   Q.   Okay.  But you were involved in your church?

9   A.   Yes.

10  Q.   Did you teach CCD?

11  A.   No.

12  Q.   Okay.  Now, Lady of Mount Carmel Parish and School

13  of Waterbury, volunteer PTA finance committee.  So you were

14  also on the finance committee; correct?

15  A.   Yes.

16  Q.   You were on the feast committee?

17  A.   Yes.

18  Q.   You were on the budget committee?

19  A.   Yes.

20  Q.   You were on the scholarship committee?

21  A.   Yes.

22  Q.   You coached basketball; correct?

23  A.   Yes.

24  Q.   You attended meetings and made recommendations,

25  charity nonprofit organization; correct?

1351

1      A.    Yes.

2      Q.    Okay.  So you were -- and you signed this document;

3   correct?

4      A.    I don't think I signed it.  I think this was just

5   submitted online.

6      Q.    This was filed in order to keep your license;

7   correct?

8      A.    I suppose.  I didn't -- yes.

9      Q.    Okay.  So you did all these things and you disclosed

10  all these things, but you didn't disclose that you were a

11  trustee; correct?

12     A.    I did not.

13     Q.    That was trustee of half -- about a half a million

14  dollars; correct?

15     A.    Yes.

16     Q.    When you took over it, it had money at TD -- TD --

17  moved the money to TD Ameritrade; correct?

18     A.    Yes.

19     Q.    And we saw when Agent Day testified that that went

20  up to be at one point about $299,000; correct?

21     A.    I guess, yes.

22     Q.    And then you also had $164,000 wired in to your

23  account from the Salisbury Bank and Trust and into the

24  account that you controlled; correct?

25     A.    Yes.

1    Q.    That's 299,000 and 164,000; correct?

2    A.    Yes.

3    Q.    Okay.  And then you also got 13,000; correct?

4    A.    I don't remember, but I --

5    Q.    And then at the end, you got 21,000; correct?

6    A.    At the end, after the final fees were paid.

7    Q.    Okay.  And if you add all that up, it comes out to

8    be about $497,000; correct?

9    A.    If you say so.

10   Q.    Okay.  So, would you say so?

11   A.    If you give me a calculator.

12   Q.    Let's say nearly half a million dollars; correct?

13   A.    Sure.

14   Q.    Okay.  And that was a trust that was established --

15   that's the Sheila Burton Trust, and that was established in

16   -- was that established in -- was it 1991?  Let's see.  Going

17   to Government's Exhibit 750 -- and notice it's not disclosed

18   on here, before we lose this exhibit so Ms. Konarski doesn't

19   have to come up again -- it's not disclosed on here;

20   correct?

21   A.    Yeah.  Can I just say something about that?

22   Q.    No.  You can answer my question, though.  It's not

23   disclosed on here; correct?

24   A.    No, it isn't.

25   Q.    Okay.  Going to Government's Exhibit 750.  Oh,

1  that's not.  That's 75.  750.  Okay.  That's the trust;

2  correct?

3      A.   Yes.

4      Q.   Okay.  And zooming in on the first paragraph, the

5  trust was dated November 1991; correct?

6      A.   Yes.

7      Q.   Okay.  And you took over the trust when?

8      A.   I don't remember.

9      Q.   Okay.  Was it in approximately January of 2014?

10     A.   I suppose so.

11     Q.   Okay.  And this trust had been around since 1991.

12 And how many years did it take for you to run it down to

13 $300?

14     A.   Three years.

15     Q.   Two and a half?

16     A.   Something.

17     Q.   So a trust that had a half a million dollars in it,

18 you went through in about two and a half, three years;

19 correct?

20     A.   Yes.

21     Q.   And you had told the judge at Probate you had made

22 a -- 751 -- you had made a representation to the Court,

23 didn't you?  And you submitted this to Judge Diane S. Blick,

24 Litchfield Hills Probate Court; didn't you?

25     A.   Yes.

1    Q.   And you wrote, and signed:   In connection with the

2  above referenced matter, I, Leon WL Vaccarelli, hereby

3  certify on January 6, 2014 I reviewed the trust documents.

4         Did you review the trust documents?

5    A.   I'm sure I did.

6    Q.   Okay.  Met with both Linda Burton and Attorney

7  Robert Kolesnik.

8         Did you meet with them?

9    A.   I did.

10   Q.   Okay.  And I am willing to accept the

11  responsibilities of successor trustees in the estate of the

12  Matter of Margaret Sheila Burton.  And you signed it;

13  correct?

14   A.   Yes.

15   Q.   And the responsibilities included protecting the

16  trust; didn't it?

17   A.   Yes.

18   Q.   Okay.  And within two and a half years, it was gone;

19  correct?

20   A.   Yes.

21   Q.   Okay.  Let me show you Government's Exhibit 27, and

22  let me show you -- let's see if it -- it's page 2, I think.

23  Let's see.

24         MS. LARAIA:   Page 6.

25         MR. McGARRY:   Page 6.   Thank you.

```
 1   BY MR. McGARRY:
 2       Q.   Directing your attention to page 6.  On this page,
 3   you sold securities from the trust; didn't you?
 4       A.   Yes.
 5       Q.   Okay.  And then some money went to Lyn Burton;
 6   correct?  The smaller ones; correct?
 7       A.   Yes.
 8       Q.   And $15,000 went to Leon Vaccarelli; correct?
 9       A.   That's what it says.
10       Q.   Okay.  And that's what you did.  You got $15,000;
11   correct?
12       A.   Yes.
13       Q.   Okay.  Moving up.  On page 5 -- let's see.  You sold
14   securities.  Let's see.  There's $25,000.  So there's
15   $17,000.  I'm looking for -- okay.  So you sold Johnson &
16   Johnson; correct?
17       A.   Yes.
18       Q.   And then some money went to Lyn Burton for
19   miscellaneous; correct?
20       A.   Yes.
21       Q.   And then $5,000 went to you; correct?
22       A.   Yes.
23       Q.   Okay.  So you sold her securities, she got $500 on
24   that day and you got $5,000 on that day; correct?
25       A.   Yes, but it's also probable that she got cash and
```

1    other expenses were paid from my other accounts.

2        Q.   Okay.  You didn't write cash for Lyn Burton; did

3    you?

4        A.   Not out of this account.

5        Q.   Okay.  And going down out of this account, here's an

6    additional retainer of $17,500.  You're not going to tell the

7    jury that that additional retainer didn't go to you; are

8    you?

9        A.   It absolutely went to me because --

10       Q.   Okay.

11       A.   -- she was --

12       Q.   Just let me -- this went to you; correct?

13       A.   Yes.

14       Q.   Okay.  Then we go down a little further, and you got

15   $25,000; correct?  LWLVACC?

16       A.   Yes.

17       Q.   And Lyn Burton wasn't a signatory on this account,

18   on the LWLVACC; was she?

19       A.   No.

20       Q.   That went to -- again, that went to your account;

21   correct?

22       A.   Yes.

23       Q.   That's the account you didn't tell The Investment

24   Center about; correct?

25       A.   I did not tell them about it, but they did know

1    about it.

2        Q.   So you were doing these trades.  Let's talk about

3    Lyn Burton for a minute.  Lyn Burton, from what Mr. Essex

4    said, and presumably what you would say, she was difficult?

5        A.   That's an understatement.

6        Q.   She took a lot of time; correct?

7        A.   That's an understatement.

8        Q.   You had to deal with her; correct?

9        A.   We became famous drinking buddies, unfortunately.

10       Q.   Okay.  But you were in charge of the trust;

11   correct?

12       A.   I was in charge.

13       Q.   And you had told the judge that you would take care

14   of the trust and fulfill the responsibilities of the

15   successor trustee; didn't you?

16       A.   I told her that.

17       Q.   And you spent through the money in less than two and

18   a half years, and a lot of the money went through your

19   account that you didn't tell The Investment Center about;

20   correct?

21       A.   Yes, but The Investment Center knew about that

22   account.

23       Q.   Okay.  Let me show you, if we can -- let's go to

24   some of those compliance questionnaires.  Remember the

25   compliance questionnaires?

1    A.   Yes.

2         MR. McGARRY:  Okay.  And, Your Honor, I think

3    previously we had moved 353A -- sorry and 355A, 356A,

4    357A,and 358A.  I think at this time we would move the

5    exhibits without the A of those same numbers.

6         MR. EINHORN:  Same objection as before, under 403.

7         THE COURT:  All right.  I'm going to take your

8    objection up at lunch.  It's one o'clock.  Ladies and

9    gentlemen, we'll take 35 minutes.  Please leave your

10   notebooks here.  Don't discuss the case and all the other

11   rules.

12         (Jury out, 12:58 p.m.)

13         THE COURT:  Can you put up --

14         MR. McGARRY:  Yes.

15         THE COURT:  -- 353A and 353?  Mr. Vaccarelli, you

16   are excused for lunch.

17         THE WITNESS:  Thank you.

18         THE COURT:  Please be back at 25 'til 2:00.

19         MR. McGARRY:  So 356 might be an easier one to show

20   the Court, if that's okay.  It's just I can find the question

21   quicker.  356 -- and I'll zoom-in down the bottom, Judge.

22   And 356A had Question 8, and the follow-on questions onto the

23   second page redacted.

24         MR. EINHORN:  What?  I don't have any objection to

25   Question 8.  What was the other one, if I can ask, that is

```
1    coming back or that you're trying to have admitted?

2           MR. McGARRY:  I think it's 8, and then 8.1 and 8.11.

3           MR. EINHORN:  8.1.1; is that the other one you're

4    trying to get back?  If it's just those two, I don't have any

5    objection.

6           MR. McGARRY:  I'll pull up -- Your Honor, if I can,

7    356A, so we know what we're all talking about.  We're

8    basically removing --

9           THE COURT:  So you took out all of 8?

10          MR. McGARRY:  Correct.  And back to 356, so the

11   Court can see.  I'll zoom-in on that part.

12          THE COURT:  So it doesn't sound as if Mr. Einhorn

13   has any continuing objection.

14          MR. EINHORN:  No.

15          THE COURT:  All right.  Then we will admit 353, 355,

16   356, 357 and 358.  Is it all the same question, Number 8,

17   that's --

18          MR. McGARRY:  I believe it is, Your Honor.

19          THE COURT:  -- at issue?

20          MR. EINHORN:  As long as that's all it is, that's

21   fine with the Defendant.

22          THE COURT:  All right.  All right, then.  Okay.  So

23   they are now going to be full exhibits.  With respect to the

24   Defendant's objection under 403 to the Exhibits 1231, -2 and

25   -3, which were Mr. Vaccarelli's letters of explanation to
```

1  various entities with respect to the Sienkowski complaint, I

2  did not want to go into a great detail about the 403

3  balancing, but the basis is that Mr. Vaccarelli's capacity to

4  understand and act and to act in a manner that is consistent

5  with knowing what he's doing is very much at issue.  And for

6  that reason, any prejudice that is resulting from that is

7  not, in my view, undue.

8           It was not my intention, nor do I think it's

9  necessary, to go into all of the ramifications of the

10  Sienkowski complaint, nor do I think that will address what

11  is the purpose of the offer, which is Mr. Vaccarelli's

12  competence to function in whatever state he was in.  Okay.

13           MR. McGARRY:  Thank you, Your Honor.

14           THE COURT:  I just did not want to have to lay that

15  all out before the jury.  Okay.

16           MR. EINHORN:  Well, would Your Honor then charge the

17  jury that the facts as stated in those letters are not being

18  offered for the truth of the matter asserted, but rather,

19  these three exhibits are only offered, as the Government

20  says, to attempt to argue as to his mental state?  Otherwise,

21  there's details in there that I need to go through.

22           MR. McGARRY:  Well --

23           THE COURT:  But that is the purpose of your offer.

24           MR. McGARRY:  It is the purpose of our offer, and I

25  think I read in your proposed charge that there was a section

1  that any -- that he's not on trial for violating FINRA

2  regulations or Investment Center regulations, but only on the

3  charges that's here.  And I would think that that would

4  probably be sufficient, rather than pointing out any

5  particular pieces of evidence or trying to marshal -- it

6  might unnecessarily highlight these three letters if the

7  Court were to give a separate instruction just about these

8  three letters.

9          MR. EINHORN:  Well, I'm glad the Government is

10  concerned about fairness.  But I don't see why it isn't

11  fairer to have an immediate instruction when there's

12  something coming in that might be prejudicial.  I can't

13  conceive of any reason why not.

14          THE COURT:  If they were to get a mini instruction

15  that a violation of a FINRA regulation is not in and of

16  itself a violation of criminal law, why don't we do that at

17  this time.

18          MR. EINHORN:  That's fine.  Thank you.

19          THE COURT:  All right.  We'll take lunch, then, and

20  be back at 25 'til.  We stand in recess.

21          (Recess taken, 1:05 p.m.)

22          (Out of the presence of the jury, 1:57 p.m.)

23          THE COURT:  All right.  Counsel, can we be seated?

24  Are we now functional again?

25          MR. McGARRY:  We're just going to -- the answer is

1  yes, as Ms. Konarski stated, Your Honor, we're going to start

2  with the laptop at counsel table, play what we need to play,

3  and then she'll move it up here.

4        THE COURT:  Please bring in the jury.

5        Counsel, you have the proposed verdict form, what --

6  we sent it to you over lunch.  It's being sent at this

7  moment, actually.

8        MR. EINHORN:  Okay.

9        THE COURT:  So include that, please, in your

10  consideration of the draft charge you received.

11        (Jury in, 1:59 p.m.)

12        THE COURT:  All right.  Ladies and gentlemen, please

13  be seated.  Before you harbor resentments about coming back

14  in your jury room when it's such a pretty day, only to wait,

15  we apologize.  The IT system has not cooperated with us.  We

16  think we have a solution for it.

17        In addition, I want to give you a specific

18  explanation of the Exhibits 407, 408, and 409, which were the

19  U-4s that you saw earlier.  They were offered not for the

20  substance of what they contained, but as evidence of the

21  Defendant's mental state at the time those letters were

22  written, because I want to clarify, and I will clarify this

23  in the charge you receive, violation of a FINRA regulation is

24  not in and of itself a violation of criminal law.  Okay?

25        So I think we're all organized.

```
 1              MR. McGARRY:  I believe so, Your Honor.  I believe

 2     the letters -- if I may approach.

 3              THE COURT:  Are 1231, 1232 and 1233.

 4              MR. EINHORN:  Yes, Your Honor.

 5              THE COURT:  Yes, that's what I am referring to and

 6     not the U-4s.

 7              MR. McGARRY:  Thank you, Your Honor.

 8              Your Honor, may I inquire?

 9              THE COURT:  You may.

10     BY MR. McGARRY:

11        Q.   Mr. Vaccarelli, before we broke this morning, we had

12     a little trouble playing the voicemail messages.  Do you

13     remember the voicemail messages that you left for

14     Ms. Silvanna Moffa?

15        A.   I remember them from when they were played in court

16     the other day.

17        Q.   And I'm going to play them, and then I'll have a

18     couple questions.

19              (Audio playing, 2:01 p.m.)

20              MR. McGARRY:  Okay.  And then we'll play the second

21     one.

22              (Audio playing, 2:02 p.m.)

23     BY MR. McGARRY:

24        Q.   Okay.  Did you hear those voicemails?

25        A.   I did.
```

1    Q.   Okay.  Was that your voice on there?

2    A.   It was.

3    Q.   Were you calling Silvanna Moffa?

4    A.   Yes.

5    Q.   Had you tried calling her mom and gotten no

6  answer?

7    A.   I believe that's what it said.

8    Q.   And, in fact, you called Silvanna Moffa to talk

9  about where the money was going that you were going to be

10  sending to her mom; correct?

11    A.   Yes.

12    Q.   And it was going to be going to a Wells Fargo

13  account; correct?

14    A.   That's what I said.

15    Q.   Correct.  And you didn't butt-dial her; did you?  Do

16  you know what that expression means?  The phone goes

17  accidentally.

18    A.   No, I didn't do that.

19    Q.   You didn't do that?

20    A.   No.

21    Q.   You actually dialed the numbers; correct?

22    A.   I assume so.

23    Q.   Or you had her name in your directory on your cell

24  phone maybe, and you picked her name and you hit enter and

25  hit the little green button and you called her?

```
 1            MR. EINHORN:  Is there more than one time that he --

 2   counsel needs to ask the witness the same question?

 3            THE COURT:  Overruled.

 4            THE WITNESS:  I dialed her number.

 5   BY MR. McGARRY:

 6       Q.   Okay.  And then you gave -- in the first one you

 7   said you were sorry for the confusion -- you were giving her

 8   an explanation; correct?

 9       A.   Yes.

10       Q.   Okay.  And then if she called you back, you were

11   going to give her the -- like it sounded like you were going

12   to give her the rundown, but then you said I'll give you

13   scoop; right?

14       A.   Yes.

15       Q.   Okay.  So you made a decision to call her and you

16   called her; correct?

17       A.   Yes.

18       Q.   Okay.  And then you left her a message about her

19   account; correct?

20       A.   Her mother's account.

21       Q.   Her mother's account.  Okay.  And then the next --

22   and you left your own number; correct?

23       A.   Yeah.

24       Q.   Okay.  We heard your voice.  Did it sound clear to

25   you?
```

1366

1    A.   It did.

2    Q.   Did you convey information?

3    A.   I did.

4    Q.   Did you tell her what you wanted to tell her?

5    A.   Yes.

6    Q.   Okay.  And did you call her the next day?

7    A.   I don't know if that was the next day or the same

8    day or two days later.  I'm not sure.

9    Q.   Okay.  Did you leave a message?

10   A.   I did.

11   Q.   Did you convey information?

12   A.   I did.

13   Q.   Did you do that just by accident, like butt-dialing

14   someone?

15   A.   No.

16   Q.   No.  And you're grinning a little bit because

17   that --

18   A.   Well, butt-dialing, I mean --

19   Q.   Go ahead, answer that one.  Butt-dialing is what?

20   You sit on your phone?

21   A.   Oh, okay.  Sure.  Yeah.  Yeah.  The kids say it.

22   Yeah.

23   Q.   Okay.  So you sit on your phone, and you don't mean

24   to call someone, and then someone is like, you called me, and

25   then, you know, you say, No, I didn't.

1     A.    I understand.

2     Q.    Right.  So there's a difference between when you --

3     I'm just going to say it one more time -- when you butt-dial

4     someone or when you actually push the buttons?  There's a

5     difference; correct?

6     A.    Yes.

7     Q.    And this time you made the decision to call her;

8     correct?

9     A.    I did.

10    Q.    Okay.  I'd like to go to Government's Exhibit 355,

11    and I'd like to show you 1.11 on page 2.  And it says:  Have

12    you acted as a trustee or custodian of any account, money,

13    securities or stock powers?  You checked No; correct?

14    A.    Yes.

15    Q.    Okay.  And this is Government's Exhibit 355, which

16    would be the 2013-2014 annual compliance questionnaire;

17    correct?

18    A.    I'm not sure if that's the year, but --

19    Q.    Sure.  Showing you the top of it.

20    A.    Yes.

21    Q.    Okay.  And the date on that is February 28th;

22    correct?

23    A.    Yes.

24    Q.    Okay.  And about a month earlier, you had just

25    become the trustee of the Lyn Burton Trust; correct?

1     A.    I believe so.

2     Q.    Okay.  And going down to question 1.1.  Let's go to

3   1.11:  Have you acted as a trustee or custodian of any

4   account, money, securities or stock powers for any customers?

5   And you said No.  That wasn't true; was it?

6     A.    No, it wasn't.

7     Q.    You made a false statement to The Investment Center;

8   didn't you?

9     A.    I checked No.

10    Q.    Okay.  You checked No and you made a false

11  statement; correct?

12    A.    Yes.

13    Q.    Okay.  And you did this form in order to keep your

14  license; correct?  Part of staying with The Investment Center

15  is to complete these forms; correct?

16    A.    Yes.

17    Q.    Okay.  And you made the decision to answer No?

18    A.    Yes.

19    Q.    Okay.  And they didn't -- you didn't tell them about

20  the trust; correct?

21    A.    No.

22    Q.    Okay.  And that's 2014, a few weeks after you became

23  trustee; correct?

24    A.    Yes.

25    Q.    356, page -- I believe it's page 3.  Again, same

1  question:  Have you acted as a trustee or custodian?  You

2  again picked No.  Do you see that?

3      A.   I do.

4      Q.   So you chose to pick No instead of picking Yes;

5  correct?

6      A.   No was selected.

7      Q.   You picked No.  Let's not talk in the passive voice.

8  You selected No; correct?

9      A.   I selected No.

10      Q.   And that wasn't true; was it?

11      A.   No.

12      Q.   You made a false statement to The Investment Center

13  filling out this compliance form; didn't you?

14      A.   I did.

15      Q.   Going to 357, the 2015-2016 questionnaire.  Taking

16  you to the same question.  Again, they asked you the same

17  question; didn't they?

18      A.   They did.

19      Q.   You selected the same answer; didn't you?

20      A.   I did.

21      Q.   Okay.  Not by mistake, but you consistently year

22  after year selected No; correct?

23      A.   I did.

24      Q.   And that wasn't a true statement; was it?

25      A.   It was not a true statement.

1    Q.    So you made a false statement to The Investment

2    Center in connection with your annual compliance

3    questionnaire; correct?

4    A.    When you're in a haze, you do things that --

5    Q.    That's -- you made a false statement to The

6    Investment Center on your annual compliance questionnaire;

7    didn't you?

8    A.    I did.

9    Q.    Let me show you, finally, 358.  And I'll show you on

10   page 2, again question 1.1-1, or 1.11.  You made a false

11   statement on this document; didn't you?

12   A.    Yes.

13   Q.    Four years in a row you made the same false

14   statement; didn't you?

15   A.    Yes.

16   Q.    Let me take you to Government's Exhibit 377.  And

17   you signed Government's Exhibit 377; didn't you?

18   A.    Yes.

19   Q.    And this is the outside business form.  Before we

20   looked at FINRA.  This is with The Investment Center;

21   correct?

22   A.    Yes, and they put that in the same one --

23   Q.    There's no question pending.  There's no question

24   pending.

25         You signed this document; didn't you?

1    A.   Yes.

2    Q.   You signed this document as part of being a licensed

3  registered representative; didn't you?

4    A.   Yes.

5    Q.   And you signed this attesting that it was true and

6  accurate; didn't you?

7    A.   Yes, but it's wrong.

8    Q.   And it's wrong and you signed it; correct?

9    A.   Yes, I didn't review it.

10   Q.   It's inaccurate; isn't it?

11   A.   It is.

12   Q.   It's, in fact, false; isn't it?

13   A.   It's missing information.

14   Q.   It's omitting information; correct?  There's an

15  omission on this form; isn't there?

16   A.   There's several.

17   Q.   Correct.  It doesn't mention trustee; does it?

18   A.   No.

19   Q.   It doesn't mention LWLVACC; does it?

20   A.   No.

21   Q.   And is there anyone's name up at the top other than

22  Vaccarelli, Leon W.?

23   A.   No.

24   Q.   That's your name; isn't it?

25   A.   It is.

1    Q.   Take a look at 378.  Okay.  You signed this

2  document; didn't you?

3    A.   Yes.

4    Q.   Okay.  And you have your own CRD number up there;

5  don't you?  That's your broker number; isn't it?

6    A.   Yes.

7    Q.   That's not Barry's number; is it?

8    A.   No.

9    Q.   It's not Brie Sodano's number; is it?

10    A.   No.

11    Q.   And this document that you signed, July of '16, it

12  does not have the information regarding the trustee; does

13  it?

14    A.   No.

15    Q.   And it does not have the information regarding

16  LWLVACC; does it?

17    A.   No.

18    Q.   And you signed this document; didn't you?

19    A.   I did.

20    Q.   And you dated it; didn't you?

21    A.   I did.

22    Q.   And you attested it was true and accurate.  That's

23  why they wanted you to sign it; right?

24    A.   I did.

25    Q.   And that's why they wanted you to sign it, correct,

```
 1    because they needed the information?
 2        A.   Yes.
 3        Q.   And the information you submitted was not correct;
 4    right?
 5        A.   That's the information they submitted, because
 6    that's the same information that they --
 7        Q.   Let me stop you there.
 8        A.   -- copied and pasted every year.
 9        Q.   378.
10        A.   Because even --
11        Q.   Let me stop you there.  There's no question pending.
12             378.  They didn't sign it; did they?
13        A.   They did not sign it.
14             MR. EINHORN:  Same objection, Your Honor.  if
15    counsel would stop yelling at my client, please.
16             THE COURT:  We will stay calm and carry on.  Yes?
17             MR. McGARRY:  Yes, Your Honor.
18    BY MR. McGARRY:
19        Q.   They didn't sign it; did they?
20        A.   They did not sign it.
21        Q.   Leon Vaccarelli signed it; didn't he?
22        A.   Yes.
23        Q.   You're Leon Vaccarelli.  You signed it; didn't
24    you?
25        A.   I am.
```

1374

1    Q.   Okay.  And it's not true; is it?

2    A.   It's not accurate.

3    Q.   Okay.  It's not true; is it?

4    A.   It's not true.

5    Q.   380.  You signed this document; didn't you?

6    A.   Yes.

7    Q.   Okay.  Regardless of who created the form, you

8    attested to its accuracy; didn't you?

9    A.   I did by signing it.

10   Q.   And it's not true; is it?

11   A.   No.

12   Q.   Let me show you Government's Exhibit 379.  Okay.  Do

13   you recognize the annual private securities transaction

14   attestation?

15   A.   No.

16   Q.   Do you recognize the signature of Leon Vaccarelli?

17   A.   That may not be my signature, but I -- I recognize

18   the signature and what-not, yes.

19   Q.   So is it your testimony that Maryanne or somebody

20   else signed it for you?

21   A.   I don't know.  That doesn't look like my signature,

22   but I could have been drunk at the time or it's possible

23   someone in the office could have jotted it down.

24   Q.   So you're going to blame someone else in the

25   office?

1   A.   No, I'll take responsibility for it.

2   Q.   Okay.  Because it says:  In the past year I have not

3   engaged in any private securities transactions.

4        Do you see that?

5   A.   I do.

6   Q.   That was not an accurate statement; was it?  Do you

7   want me to pull up all the other --

8   A.   No, no, no, no.  Just private securities

9   transactions.  I guess you're saying that the private direct

10  investments are considered private securities transactions?

11  Q.   You engaged in this one; correct?  Private direct

12  investment agreement.

13  A.   I don't know if that's a security.  If it is, then

14  it's not accurate.  If that's not a securities transaction,

15  then it would be.

16  Q.   So 379 -- provided that's a security, 379 is not

17  accurate; correct?

18  A.   If that's a security, yes.

19  Q.   You're a licensed registered representative?

20  A.   Yes.

21  Q.   You know what a security is?

22  A.   A stock, a bond.

23  Q.   An investment.  To make money, largely based on the

24  activities of others; correct?

25  A.   I believe that could be a definition.

1  Q.   And FINRA regulates private direct investment

2  agreements; don't they?

3  A.   I don't know about that.

4  Q.   And you're not -- you weren't supposed to engage in

5  them, correct, without permission from The Investment

6  Center?

7  A.   Without permission from The Investment Center, yes,

8  private securities transactions.

9  Q.   Okay.  Let me show you what's been marked as

10  Government's Exhibit 375.  Do you recognize your signature on

11  this document?

12  A.   That's my signature.

13  Q.   Okay.  And that is in 2014?

14  A.   Yes.

15  Q.   And you signed this document; didn't you?

16  A.   Yes.

17  Q.   Okay.  And you wrote -- and you marked:  In the past

18  year I've not been engaged in any private securities

19  transactions.  That's checked.  I have not been engaged in

20  any private securities transactions for which I have not

21  received prior approval.  And that's checked; correct?

22  A.   Yes.

23  Q.   In fact, during 2014 you took money from clients;

24  didn't you?

25  A.   Yes.

1    Q.    And you promised them a return; didn't you?

2    A.    Yes.

3    Q.    And you put the money in LWLVACC; didn't you?

4    A.    Yes.

5    Q.    And in some instances you took that money and you

6    paid it back to other clients who had given you money

7    earlier; didn't you?

8    A.    Yes.

9    Q.    Okay.  And you made those decisions because, for

10   one, June Antonacci had hired a lawyer friend to call you and

11   you wanted to get her her money back; didn't you?

12   A.    He called as a courtesy.  He was a friend of mine,

13   as well.

14   Q.    And you wanted to make sure she got her money back,

15   so you made the decision to take the money from the later

16   people -- the later investors and give it to the Antonaccis;

17   correct?

18   A.    I paid June back with money I had received.

19   Q.    Okay.  Did you hear my question?  You made the

20   decision to take this money that you got from the later

21   investors and pay it to June Antonacci who you owed money

22   from an earlier investment; correct?

23   A.    From her loan, yes.

24   Q.    Okay.  And you did the same thing to pay Sean

25   Fitzmaurice, was the lawyer for Ms. Chauncey, your neighbor;

1    correct?

2        A.    Yes.

3        Q.    And she was your first client; correct?

4        A.    Yes.

5        Q.    You introduced her as that; correct?

6        A.    Yes.

7        Q.    And you owed her money when she went to your house

8    and she said -- as she testified, you told on yourself.  Do

9    you remember that?

10       A.    That's what she said.

11       Q.    You got the piece of paper and you turned around

12   and she said, Holy guacamole, to herself.  That's what she

13   testified; correct?

14       A.    That's what she said.

15       Q.    And you told her, Don't tell The Investment Center

16   because I could get in trouble, words to that effect?

17       A.    I don't remember that.

18       Q.    Okay.  Take a look at Government's Exhibit 376.  You

19   signed that document; didn't you?

20       A.    I did.

21       Q.    Okay.  And again -- well, you didn't check any boxes

22   on this one.  But you did engage in the same private

23   transactions; didn't you?

24       A.    If you consider them security transactions, yes.

25       Q.    369.  Okay.  This was made part of the training,

1   correct, that you could not take personal control of any

2   customer funds?

3        A.   It was in the manual, looks like.

4        Q.   And at some point, you got the manual; didn't you?

5        A.   It was online.

6        Q.   And that was required to that you follow the manual;

7   correct?

8        A.   I'm not sure if it was required or not.

9        Q.   But it was online.  And, in fact, you took funds --

10  you took personal control of customer funds; didn't you?

11       A.   Yes.

12       Q.   Okay.  And that is not appropriate for you to do;

13  correct?

14       A.   According to that.

15       Q.   And that's where you were a registered rep;

16  correct?

17       A.   Yes.

18       Q.   Let me show you for demonstrative purposes --

19  looking for Ms. Rustic.  There you go.  We had just talked

20  earlier about taking custody of client funds.  You took

21  Ms. Rustic's money; didn't you?

22       A.   Yes.

23       Q.   And you sent it and paid it to June Antonacci;

24  didn't you?

25       A.   Yes.

1    Q.   Okay.  Let me go way back to page 1 of Government's

2    Exhibit 25.  Do you see your balance in your account on

3    September 16, 2011?

4    A.   Is that all the accounts that I had or just this one

5    account?

6    Q.   Take a look at Government's Exhibit 25.  Do you see

7    the balance in the account at Ion Bank, ending in 7051, on

8    September 16, 2011?

9    A.   Yeah, in that one account it was -- September 16th?

10   Is that what -- I'm sorry.  Did you say September 16th?

11   Q.   September 16, 2011.

12   A.   $183.74.

13   Q.   And then money came in from Denis Roussel;

14   correct?

15   A.   Yes.

16   Q.   Okay.  And take a look at what happened with the

17   money.  He put in $30,000; correct?  $30,695.48; correct?

18   A.   Yes.

19   Q.   Okay.  And then you proceeded to -- money went to --

20   a check went to AT&T, to parking, and to Mr. DiSapio;

21   correct?

22   A.   Yes.

23   Q.   Okay.  Now, Mr. Einhorn had talked about and asked

24   you some questions regarding your policy that you had gotten,

25   your principal policy.  Do you remember seeing those put in

1    -- I believe one of them was Exhibit -- maybe D, E and F.

2        A.    Just today; right?

3        Q.    Correct.

4        A.    Yes.

5        Q.    Okay.  Let me show you what we've marked, just a

6    piece of it, Government's Exhibit 1228.

7            MR. McGARRY:  And I would offer it into evidence.

8            MR. EINHORN:  No objection.

9            THE COURT:  All right.  Full exhibit.

10   BY MR. McGARRY:

11       Q.    Let me show you Government's Exhibit 1228.  Now,

12   take a look at this date again.  Remember, Roussel, September

13   19, 2011.  Okay?  And directing your attention to page 4.

14   And this is to get your disability policy that you're drawing

15   on now; correct?

16       A.    Yes.

17       Q.    Okay.  And you were asked:  In the last ten years

18   have you consumed alcoholic beverages?  And you said Yes.

19   And then:  Last date used, 2012.  And then they say:

20   Additional details for Number 4.  And -- oh, it says:  Number

21   of drinks per week.  Five.  Five drinks per week.  And then

22   down on this form it says four to five drinks per week.  Do

23   you see that?

24       A.    I do.

25       Q.    Okay.  And the date of this document, going to the

1  last page, is March 29, 2012.  Do you see that?

2      A.   Yes.

3      Q.   Okay.  If we go back to Government's Exhibit 25, and

4  we go to page 1, with Mr. Roussel.  In fact, you took

5  Mr. Roussel's money and you gave it to Mr. DiSapio; didn't

6  you?

7      A.   I can see where you would say that, yes.

8      Q.   Okay.  And, in fact, that was before you submitted

9  this signed insurance form where you wrote and signed:  I

10  represent that all the above statements in this application

11  are true and complete; didn't you?

12     A.   I did.

13     Q.   And if we go up to page 4 -- in fact, you wrote on

14  page 4 that you have four to five drinks per week.

15     A.   I wrote -- that's what was filled in.

16     Q.   Okay.  And that is after you had taken Mr. Roussel's

17  money and sent it to Mr. DiSapio to pay for the cement work

18  behind your house on Joshua Town Road; correct?

19     A.   Yes.

20     Q.   Take a look at Government's Exhibit 1229.  And

21  directing your attention to -- you signed this document;

22  correct?

23     A.   Yes.

24     Q.   I represent all the above statements in this

25  application are true and complete.

1    Do you see that?

2    A.    Uh-huh.

3    Q.    Getting to the right page.  There it is.  Okay.  And

4    you said on this document:  Number of drinks per week, five.

5    Do you see that?  Additional details, four to five drinks per

6    week.  Do you see that?

7    A.    I do.

8    MR. McGARRY:  Okay.  Your Honor, I move the

9    admission of 1228 and 1229.  I think I said 1228.  I'd also

10   say 1229.

11   THE COURT:  I think 1228 is in.

12   MR. McGARRY:  And 1229.

13   THE COURT:  And 1229 there's no objection to, so

14   it's a full exhibit, now, too.

15   BY MR. McGARRY:

16   Q.    And this is March of 2012; correct?

17   A.    Yes.

18   Q.    Okay.  Going back to Government's Exhibit 25.  Going

19   to March of 2012 -- February, March.  I believe it was March

20   29th.  And March 16th, you got a check from Ms. Sienkowski;

21   correct?

22   A.    Yes.

23   Q.    Okay.  March 29th is right about here; correct?

24   That's March 28th and March 30th.  Do you see that?

25   A.    I do.

1    Q.   And then on April 5th, about seven days after you

2  told the Principal in a sworn document that you attest to is

3  true and correct that you had about four or five drinks per

4  week, you took money from Christine Chauncey and you spent

5  it; didn't you?

6    A.   Yes.

7    Q.   Now, Mr. Einhorn asked you a number of questions,

8  including asking you about drunk driving.  Do you remember

9  this -- him asking you those questions?

10   A.   Yes.

11   Q.   And he asked you if you took an alcohol treatment

12 program.  Do you remember that?

13   A.   I do.

14        MR. McGARRY:  Your Honor, at this time I'd like to

15 offer Government's Exhibit 1200 into evidence.  I have a copy

16 for the Court.

17 BY MR. McGARRY:

18   Q.   Do you recognize -- and I'll give Mr. Vaccarelli a

19 copy.  It might save some time.

20        Do you recognize Government's Exhibit 1200 in

21 evidence, if it's let in?

22        (Handing.)

23   A.   Yes, I do.

24        MR. McGARRY:  Your Honor, I'd offer this into

25 evidence.  Okay.  I'll ask a few questions while

1   Mr. Einhorn's reading it.

2          MR. EINHORN:  I'm trying to remember if I provided

3   this to the Government.

4          MR. McGARRY:  Yes, you did.

5          MR. EINHORN:  Which I think I did.  No objection.

6          THE COURT:  1200 is a full exhibit.

7   BY MR. McGARRY:

8      Q.   And tell -- I'll say it this way.  This is a book

9   from your pretrial alcohol education program; isn't it?

10     A.   It is.

11     Q.   And you were required to take -- to go through this

12  as part of your treatment or part of your -- after you got

13  the drunk driving; correct?

14     A.   That's right.

15     Q.   And let's see.  I believe it says on page 2.  It

16  says Leon.  That's your name; correct?

17     A.   Yes.

18     Q.   And your handwriting; correct?

19     A.   Yes.

20     Q.   Take a look, if you will, at Government's Exhibit

21  12000, page 16.

22          THE REPORTER:  12000?

23          MR. McGARRY:  1200.  We have a lot of exhibits.

24  Not that many.

25  BY MR. McGARRY:

1    Q.   Okay.  I'm going to read this question, and then I'm

2    going to read your answer:  If you do something under the

3    influence of alcohol that you would not normally do, are you

4    still responsible for your actions?  Check-marked Yes.

5    Q.   And you wrote in, in your own handwriting:  Of

6    course you are responsible, exclamation point, You did it.

7         You wrote that; didn't you?

8    A.   I did.  I did.

9         MR. EINHORN:  Well, you know, Your Honor,

10   considering that that's a legal issue in this particular

11   case, and considering that Mr. Vaccarelli is not a lawyer,

12   and considering the purposes for which this document was

13   made, seems to me it's just confusing to the jury to have

14   information like this.  This is not -- it sounds like it's

15   equivalent to a legal determination, which it isn't.

16        THE COURT:  Mr. McGarry.

17        MR. McGARRY:  It's the Defendant's own statement

18   that he put at issue regarding his intent, his knowledge, and

19   his specific intent regarding him putting his own

20   decision-making under the influence of alcohol at issue

21   before the jury.  And this is his own statement regarding the

22   same thing he testified to on direct before he was charged.

23        MR. EINHORN:  That's not a statement of intent or

24   knowledge at all, I believe.

25        THE COURT:  It is a statement of his state of mind.

1   I'm going to permit it and let you carry on.

2   BY MR. McGARRY:

3       Q.   I'm going to ask you one more question about this

4   book.  On page 17, you were asked:  Describe the riskiest

5   thing that you've done under the influence of alcohol.  And

6   you wrote:  "Drive, and that's not kool," exclamation

7   point -- "kool" with a K, for our court reporter.

8            You filled out this booklet and you wrote that down;

9   didn't you?

10      A.   We were copying answers off the board, yes.

11      Q.   You wrote this down; didn't you?

12      A.   Yes.

13      Q.   Okay.  You didn't write that the riskiest thing that

14  you did while under the influence of alcohol was manage

15  millions of dollars for people; did you?

16           MR. EINHORN:  Well, I'll object to that.  That's

17  contrary to the evidence.

18           THE COURT:  This is cross-examination.  Go ahead.

19           MR. EINHORN:  It's not based on facts in evidence,

20  though, Your Honor.

21           THE COURT:  It's not based on facts.  It is based on

22  his answer at the time that he filled this out in describing

23  the riskiest thing you've done while under the influence of

24  alcohol.

25  BY MR. McGARRY:

1    Q.   You didn't write that the riskiest thing you did was

2    manage people's money; did you?

3    A.   No.

4    Q.   You didn't write that the riskiest thing you did was

5    run a scheme; did you?

6    A.   No.

7    Q.   Your state of mind when you wrote that was what you

8    were doing under the influence of alcohol was driving;

9    correct?

10   A.   When I wrote that, yes.

11   Q.   You didn't write filling out compliance

12   questionnaires or writing letters to clients; did you?

13   A.   No.

14   Q.   Let me -- unless Ms. Laraia has anything -- just let

15   me show you Government's Exhibit 27.  I'm sorry.  I did that

16   wrong.  Page 27 of Government's Exhibit 1200.  And you

17   testified a lot on direct about your behavior.  And in

18   response to "Describe some behaviors you think show

19   responsible alcohol or other drug use" -- jumping to the

20   second paragraph, you write:  I drink and I believe over the

21   course of a three-hour dinner one martini and two glasses of

22   wine are responsible.

23        You wrote that; didn't you?

24   A.   I wrote that.

25   Q.   So, presumably, having some Capicola and some heroes

1    over a four-hour lunch with Ciro Peluso would also be

2    responsible; correct?

3         A.   We had a gallon of wine.

4         Q.   And there were four or five of you; correct?

5         A.   No, there wasn't.

6              MR. McGARRY:  All right.  Let me move to

7    Government's Exhibit 1063.  And I would offer it if -- was it

8    in evidence?  Oh, not yet in evidence, but we'll --

9    BY MR. McGARRY:

10        Q.   Do you recognize Government's Exhibit 1063?

11        A.   I do.

12        Q.   Okay.  Is this a letter that you wrote to Pat

13   Sienkowski in 2014?

14        A.   Yes.

15        Q.   Okay.  And it also references some confirmations of

16   trades down at the bottom.  Do you see that?

17        A.   Yes.

18             MR. McGARRY:  Okay.  I would -- Your Honor, I would

19   offer Exhibit 1063.

20             MR. EINHORN:  No objection.  I thought it was in

21   already.

22             THE COURT:  Full exhibit.

23   BY MR. McGARRY:

24        Q.   In February of 2014, you wrote:  It was very nice

25   meeting with you and your family the other day.  You are

1    truly blessed to have such a kind and concerned family who is

2    willing to step in and help you.  As I said, I am willing to

3    play whatever role ongoing that you would like.  I believe

4    very strongly that I have advised and served you and Tom in

5    an appropriate and very profitable manner over 14 years.  I

6    look forward to continuing to work with you and your family

7    over the next 14 years or more.

8              You wrote that; didn't you?

9         A.   I did.

10        Q.   Okay.  And you signed it; didn't you?

11        A.   I did.

12        Q.   And then you also said:  Enclosed is the

13   confirmation from the McDonald's purchase back in October.  I

14   feel very badly about that, and as I have mentioned I will

15   never act without speaking with you first.

16             You wrote that; didn't you?

17        A.   I did.

18        Q.   And you felt bad about it; didn't you?

19        A.   I had discretion with her husband, and she didn't

20   really understand that concept.

21        Q.   And discretion --

22        A.   And, so, then I sold the McDonald's stock as I

23   normally would, and she didn't -- she felt I should have

24   called her.  And, so, now I'm not going to do that anymore.

25        Q.   Right.  And you thought at the time, before Tom

1  passed away, that it would be a good move for them?

2      A.   This was after Tom passed away.

3      Q.   Right.  But after Tom passed away you thought this

4  would be a good move for them?

5      A.   Yes.

6      Q.   And you thought that maybe it had run its course and

7  the dividend wasn't what it could be and they could do better

8  in something else?

9      A.   I'm sure I did.

10     Q.   And then when they -- someone complained, we saw the

11 letters earlier from FINRA, you kind of defended your

12 position and said, No, this is what I did, This is why I

13 thought it was appropriate; right?

14     A.   I believe so.

15     Q.   Okay.  So you were explaining to her that you felt

16 bad.  Fair enough?

17     A.   Yes.

18     Q.   Okay.  And you wanted to keep them as a client;

19 correct?

20     A.   I did.

21     Q.   Now, I think -- did they have upwards of more than

22 $500,000 in an account?

23     A.   Much more than that.

24     Q.   Was it a million?

25     A.   I'm not sure, because there were different --

1    Q.   But they were a big client?

2    A.   They were a big client.

3    Q.   And you didn't want to get them angry, so you wanted

4    to kind of ameliorate the situation?

5    A.   I don't know what that word means.

6    Q.   Okay.  And there was nothing nefarious -- okay.  You

7    wanted to make the situation a little better?

8    A.   Yes.

9    Q.   Okay.  And there was nothing nefarious about your

10   trade?

11   A.   No.

12   Q.   And you wanted to explain that to them?

13   A.   Yes.

14   Q.   Okay.  And, so, you decided to send them this

15   letter?

16   A.   Yes.

17   Q.   Okay.  And did -- after the letter, did they stay

18   with you, for a little while at least?

19   A.   I believe so.  I'm not sure.

20   Q.   This is 2014.

21   A.   I think they did.

22   Q.   So the letter had its intended effect; fair to

23   say?

24   A.   I guess so.

25   Q.   Okay.  I'd like to -- maybe Mr. Einhorn also asked

1    you -- let me jump over to talk about Ms. Linden Warren,

2    which I think we touched on briefly this morning, but I want

3    to show you the pie chart for Linda Warren.  If I didn't show

4    you that this morning, this was Linden Warren's money coming

5    into the account; correct?  Do you recognize this pie

6    chart?

7         A.   I recognize the pie chart.

8         Q.   And after Linda Warren signed over that check -- I

9    believe from Voya -- to you, $30,000 went to Leavenworth

10   Professional Center; correct?

11        A.   Yes.

12        Q.   And that was from Linda Warren's investment;

13   correct?

14        A.   Yes.

15        Q.   Okay.  And just to close the loop on that, the money

16   in the account before her money came in, there was negative

17   money; correct?

18        A.   Yes.

19        Q.   And then the Leavenworth Professional check went

20   out; correct?

21        A.   Yes.

22        Q.   Okay.  So you did that financial transaction using

23   Linda Warren's money to pay the rent or mortgage at

24   Leavenworth Professional Center, you moved it to the other

25   account?

1    A.    I wrote a check to that account.

2    Q.    And the check cleared -- as far as you know, the

3    check cleared?

4    A.    Oh.  I'm sorry.  Yes.

5    Q.    Let me show you Government's Exhibit 252 in

6    evidence.  Show you the date on this letter.  Now, this is

7    April 6, 2016.  This is to Giuseppina LaPorta.  Do you see

8    that?

9    A.    Yes.

10   Q.    Okay.  So you wrote her this letter to serve as an

11   attestation that:  As of today, April 6, 2016, you have on

12   deposit $33,482 in the client funds account, okay, of Leon

13   Vaccarelli.

14         She really didn't have that money in a client fundS

15   account; did she?

16   A.    No.

17   Q.    This letter wasn't true; was it?

18   A.    That was the money I owed her.

19   Q.    That was the money you owed her, but it wasn't in a

20   separate client funds account; was it?

21   A.    No.  The money would have been commingled with

22   mine.

23   Q.    And then you say:  The account earns 4 percent

24   annual interest.

25         There really wasn't an account earning 4 percent

1    annual interest?

2    A.   That's what I agreed to pay her.

3    Q.   Right, that's what you agreed to pay her.  But you

4    didn't say, I owe you this money and I'll pay you this

5    interest.  You said the account earns 4 percent annual

6    interest; didn't you?

7    A.   Yes.

8    Q.   And the account really didn't earn 4 percent annual

9    interest; did it?

10    A.   Well, I said I was going to pay her for it.

11    Q.   I understand that you said you were going to pay

12    her, but there was not an account earning 4 percent annual

13    interest; was there?

14    A.   No.  No.

15    Q.   Okay.  And the account is available for withdrawal

16    in any amount with three days' notice.

17    That wasn't any rule or regulation or process from

18    any bank or entity.  That was the three days that you wanted

19    in case she wanted her money back; correct?

20    A.   That's right.

21    Q.   Okay.  And you wrote this letter to her, and you

22    gave it to them; correct?

23    A.   Yes.

24    Q.   Okay.  And that's -- and then on March 31st:  Due to

25    changing suitability practices and code of conduct practices,

1  as well as concerns regarding liability and potential

2  conflict of interest, the account will be retired -- one

3  sentence -- and in early April of 2017, you will receive a

4  check for your full balance.

5          Do you see that?

6     A.   I do.

7     Q.   Could you tell the jury what the changing

8  suitability practices and code of conduct practices, as well

9  as concerns regarding liability and potential conflict of

10 interest were regarding the account that really didn't

11 exist?

12    A.   In my drunken haze, I put that in there because I

13 wanted to give her her money back because she wanted to make

14 4 percent.  The banks weren't paying 4 percent.  She wanted

15 to give me more money.  She wanted to give me a lot more

16 money, and I didn't want it, and I just -- I don't even

17 remember coming up with that, but apparently I did.

18    Q.   Let me stop you there.  It's your testimony that, in

19 your drunken haze you were able to find the keys on the

20 keyboard to give her the number and the percent and type all

21 those words, and there's one typo, "withdrawl."  Is that your

22 testimony?

23    A.   As most people who have addiction --

24    Q.   Is that --

25    A.   -- they're able to get through daily routine.

1     MR. EINHORN:  Well, let him answer the question,

2  Your Honor, please.

3  BY MR. McGARRY:

4     Q.   Yes or no; is it your testimony that you were able,

5  in a drunken haze, to come up with all this word salad

6  verbiage and put it in a letter?

7     A.   Yes.

8     Q.   And it's your testimony that you only made the one

9  typo, "withdrawl"?

10     A.   I guess so.

11     Q.   And then did you go over to her house and give it to

12  her?

13     A.   I probably mailed it in the mail.

14     Q.   Take a look at Government's Exhibit 253.  Now,

15  actually, before we go back for a second, you seem to be okay

16  writing a letter to the Sienkowskis, who had a million

17  dollars, or almost, in the account, when you're trying to

18  keep their business.  But when we asked you about

19  Ms. LaPorta, who I think had $27,000, that's when you had the

20  drunken haze.  Is that your testimony?

21     A.   Both times.

22     Q.   You didn't mention anything about it when we were

23  talking about the other exhibit related to the Sienkowskis;

24  did you?

25     A.   I don't remember.  I don't know.

1    Q.   Three minutes ago I'm saying you didn't talk about

2    the drunken haze; did you?

3    A.   I was always in a drunken haze in this period of

4    time.

5    Q.   But your testimony three minutes ago.  When we

6    talked about the Sienkowski letter, you were happy -- and let

7    me rephrase that.

8         You answered the questions about why you wrote them

9    the letter; didn't you?

10   A.   Right, and I got in trouble for that letter.

11   Q.   From FINRA.

12   A.   If I wasn't in a drunken haze, I wouldn't have

13   written the letter because I would have known that I

14   shouldn't have written that letter.

15   Q.   Let me show you what's in evidence as Government's

16   Exhibit 253:  This letter is to serve as an attestation that

17   as of today -- I can't read that.

18        Okay.  So this -- you testified, I believe, that you

19   didn't want any more money after you wrote the letter.  But,

20   in fact, you did get another 16,500 from her; isn't that

21   true?

22   A.   I know.  I know.

23   Q.   Okay.

24   A.   Sometimes you don't say no to people.

25   Q.   Right.  And when -- I think didn't Ms. LaPorta say

1  that?  When they put the cheese and the meat in front of you,

2  you take it; right?

3      A.   And the wine.

4      Q.   Right.  But let's talk about the cheese and the

5  meat.  I think she testified, through the interpreter, when

6  she put it in front of you -- you -- you take it?

7      A.   She wanted to give me 250,000, as I recall.

8      Q.   But she didn't; right?

9      A.   I didn't want it, so I just said that was it.

10     Q.   So you just took the 27 and 16?

11     A.   To make her happy, the last one.  The first one --

12     Q.   I'm sorry.  To make her happy?

13     A.   Well, she was giving me -- she wanted to give me

14  money and money, and 4 percent was wonderful, and I didn't

15  want to pay her 4 percent.

16     Q.   Well, you didn't pay her any percent?

17     A.   No.  Well, I thought I paid her something.

18     Q.   Okay.  Take a look at this letter:  This letter is

19  to serve as an attestation that as of today, October 11th,

20  you have on deposit $50,728.98, in the client funds account

21  of Leon Vaccarelli.

22          There really was no client funds account the next

23  year, either; was there?

24     A.   No.  It's the same stuff.

25     Q.   And you wrote that the account earns 4 percent;

```
 1  didn't you?
 2      A.   Yes.
 3      Q.   And there was no account earning 4 percent; was
 4  there?
 5      A.   No.  I was intending to pay her the 4 percent.
 6      Q.   You were hoping maybe somehow you could pay her the
 7  4 percent?
 8      A.   That was my plan.
 9      Q.   It didn't work; did it?
10      A.   I didn't mean to get sick.
11      Q.   The account is available for withdrawal in the
12  amount of -- with five business days' notice.
13           Again, there's no account; correct?
14      A.   The account would have been the money in with my
15  money.
16      Q.   Right, mixed in with your money?
17      A.   Yeah.
18      Q.   And maybe spent, maybe some sitting there.
19  Mr. Almodovar did it yesterday; right?
20      A.   Yes.
21      Q.   Okay.  But there's no account that takes five
22  business days to get it out of; correct?
23      A.   No.
24      Q.   You just said that to them so if they gave you
25  notice, you could have five days to get some money to
```

1    hopefully maybe pay them?

2        A.    That's correct.

3        Q.    Okay.  So it wasn't true that there was an account

4    that was available with five days' notice.  It was just what

5    you said; correct?

6        A.    That's what I said.

7        Q.    Okay.  And I guess we have some suitability things

8    in 253, as well.  Let me show you 261.  Oh, we did that.

9    I'll get out of that.  We did the voicemail.  Amy helped us.

10           Let me show you Government's Exhibit 16B.  This

11   letter to Christine Chauncey.  Do you remember this letter?

12       A.    Yes.

13       Q.    It's the same day -- it's October of 2016 -- the

14   same day as the second LaPorta letter; correct?

15       A.    I didn't observe the date, but if you say so I

16   believe you.

17       Q.    Okay.  So the letter is to serve as an attestation

18   that as of today, October 11th, you have on deposit $47,000

19   in the Senior Note program of Leon Vaccarelli.

20           Now, I'm not going to jump to that spreadsheet with

21   the 47 and all the other stuff, because everyone's seen it.

22   But there was no Senior Note program of Leon Vaccarelli, was

23   there?

24       A.    Well, the direct investment form would have said

25   that there was.

1    Q.   So that investment, that's the form you're going

2    with?

3    A.   Yeah.

4    Q.   Okay.  And then it goes into your bank account?

5    A.   Yes.

6    Q.   Okay.  And then it gets used and spent and some goes

7    to Monica; correct?

8    A.   I believe so.

9    Q.   Okay.  And, so, it says:  This one account earns

10   four percent annual interest.

11        But Ms. LaPorta's only getting -- I'm sorry, this

12   says eight percent.  Ms. LaPorta was only getting four

13   percent.  Ms. Chauncey was getting eight percent; right?

14   A.   That's right.

15   Q.   Is that because Ms. Chauncey was your first

16   client?

17   A.   I think Ms. LaPorta said she would have liked four

18   percent and I would have said okay.

19   Q.   Okay.  Because whatever just to get -- to go along

20   to get along; right?  Say what you need to say to get her to

21   give you the money?

22   A.   To get the next drink, yes.

23   Q.   Okay.  But you wrote this very nice letter -- and

24   let's go on to the part:  You'll receive appropriate income

25   tax documentation and independent verification from the CPA

1  firm of Zackin Zimyeski and Sullivan.  You wrote that; didn't

2  you?

3       A.   I did.

4       Q.   Okay.  And there was no income tax documents; was

5  there?

6       A.   Well, you would get your 1099s at the end of the

7  year, so at that time there wouldn't have been.

8       Q.   But there's no account generating 1099s; right?

9       A.   Well, when I would have paid her the interest, then

10  the accountant would have issued a 1099.

11       Q.   Okay.  But they -- Zimyeski and Sullivan said they

12  didn't do anything like this for a Senior Note program of

13  Leon Vaccarelli; right?

14       A.   They said that, but they did for Antonacci.

15       Q.   Okay.  But they knew nothing about a Senior Note

16  program, did they?

17       A.   I don't think that's accurate, but I don't remember

18  at the time.

19       Q.   Mr. Sullivan called you, didn't he?

20       A.   He did.

21       Q.   And he was angry; wasn't he?

22       A.   He was angry about the independent verification.

23       Q.   Because he wasn't going to do any independent

24  verification?

25       A.   He was angry that I used the word "independent

1404

1    verification."  He said --

2        Q.   And because you used his name?

3        A.   I used his name all the time.  We referred clients

4    back and forth.  That -- he wasn't angry about me using the

5    name.

6        Q.   Let me stop you.  You said you used his name all the

7    time, but you got his name wrong.

8        A.   Apparently, I didn't know it wasn't "and" Sullivan.

9    I believe it was "and Sullivan."

10       Q.   So when you were typing it up, you made the decision

11   to type "and Sullivan" instead of just "comma Sullivan";

12   right?

13       A.   I guess so.

14       Q.   It wasn't, you know, you didn't butt-dial this thing

15   and hit the word "and"; right?

16       A.   Nope.

17       Q.   So, if you have any questions, then you can call.

18            So after Ms. Chauncey got this, that's when she

19   turned and said, Holy guacamole.  She asked you to leave;

20   correct?  You left?

21       A.   I don't think I -- she -- I just said -- you know,

22   the meeting ended.

23       Q.   The meeting ended.  You're not still there; you're

24   here.

25       A.   I'm not still there, but she didn't --

1     Q.   So you left?

2     A.   Yeah.

3     Q.   And you left her some homemade wine?

4     A.   I did.  We used to drink a lot of wine together,

5  Ms. Chauncey and I.

6     Q.   And this one she dumped down the drain?

7     A.   That's what she said.

8     Q.   Okay.  And she called Ms. Sullivan -- let's talk

9  about Ms. Sullivan for a minute.  Showing you Government's

10  Exhibit 56, do you recognize this e-mail from 2013 where you

11  wrote -- I'm going to read it slowly -- "Thanks for your

12  question.  It's nice to know some clients are paying

13  attention to their accounts."

14        So Carrie Zimyeski was paying attention to her

15  account; wasn't she?

16     A.   Yes.

17     Q.   And you don't mess with Carrie Zimyeski; do you?

18     A.   No.  I don't --

19     Q.   Nobody does, right?  Sullivan puts his name second.

20  You didn't put her in a private investment; did you?

21     A.   No.

22     Q.   Okay.  "Two mutual funds in your portfolio account

23  for only 13 percent of the total portfolio and they're both

24  international funds."

25        So you had her in some international funds; right?

1    A.   That's what it says.  I don't remember

2    specifically.

3    Q.   Okay.  And the focus is certainly on equities and

4    U.S. equities.  That was kind of what you were talking about

5    with her?

6    A.   Yes.

7    Q.   Okay.  And this's where she wanted her money.  You

8    gave her this well-reasoned letter and she was satisfied?

9    E-mail, not letter -- and she was satisfied; correct?

10   A.   Yes.

11   Q.   Okay.  Let me just jump ahead a little bit.

12   Maryanne Marticello correct am I pronouncing her name

13   correctly?

14   A.   Mart.

15   Q.   She works for you correct?

16   A.   She used to.

17   Q.   Okay and she worked in your office -- you told her

18   didn't you, to hide the checkbook from regarding LWLVACC,

19   when The Investment Center was coming to do the audit didn't

20   you?

21   A.   No.

22   Q.   Okay.  You didn't?

23   A.   I don't believe so.  No.

24   Q.   You told her to sign a document witnessing Carmela

25   Truhan's signature when she wasn't there to see the signature

1    didn't you?

2        A.    I don't remember that.

3        Q.    Take a look at Government's Exhibit 804.  On this

4    12th day of January, 2017, it says Ms. Truhan appeared before

5    Maryanne Marticello.  Do you see that?

6        A.    I do.

7        Q.    Ms. Truhan never appeared in front of Maryanne

8    Marticello; did she?

9        A.    No, she didn't.

10       Q.    And you asked Maryanne to use her notary stamp and

11   notarize a signature that she did not witness; correct?

12       A.    No.  I probably didn't even realize we needed to do

13   it.  She just processed it.

14       Q.    Okay.  If transaction is over $25,000, this form

15   must be notarized.  Do you see that?

16       A.    I do.

17       Q.    And that's a rule of The Investment Center, so that

18   very large transactions don't happen without a notary

19   watching someone sign to make sure that there's someone else

20   involved; correct?

21       A.    Correct.

22       Q.    It's for client protection?

23       A.    I would say so.

24       Q.    And yet you asked Maryanne to notarize Carmela

25   Truhan's signature when Maryanne did not personally appear --

1  or Carmela Truhan did not personally appear before Maryanne;

2  correct?

3       A.   I did not ask her.  I just gave her the paperwork.

4       Q.   You did not -- okay.  Let me stop you right there

5  because this is important.  Is it your testimony that you did

6  not ask her to notarize it?

7       A.   I don't remember that, no.

8       Q.   Okay.  So now it's you don't -- now your testimony

9  is you don't remember.

10      A.   Yeah, I don't remember this form.

11      Q.   Okay.  Yes or no, did you ask her to notarize a form

12  for Carmela Truhan when she didn't personally watch her

13  sign?

14           MR. EINHORN:  It's been asked before, and the

15  witness answered the question, indicating he didn't

16  remember.

17           THE COURT:  Let's get one final question, and then

18  no more asking that question.

19  BY MR. McGARRY:

20      Q.   Yes or no, did you ask Maryanne to notarize Carmela

21  Truhan's signature though Carmela Truhan never personally

22  appeared before Maryanne?

23      A.   I don't remember.

24           THE COURT:  We've gotten to 3:00.

25           MR. McGARRY:  Can I ask -- well, that's fine.

```
 1            THE COURT:  If you need to finish up a subject area
 2     fine, but --
 3            MR. McGARRY:  It's fine, Your Honor.  The jury has
 4     been very patient.
 5            THE COURT:  All right.  We'll return tomorrow at
 6     9:30, and we'll continue with cross-examination.  Have a
 7     pleasant afternoon.  Leave your notebooks here.  Don't
 8     discuss the case.
 9            (Jury out, 2:58 p.m.)
10            THE COURT:  All right.  You may go, Mr. Vaccarelli.
11     We'll see you tomorrow at 9:30.  Don't discuss your testimony
12     with others.
13            (Witness steps down, 2:58 p.m.)
14            MR. McGARRY:  Other than Mr. Einhorn.
15            THE COURT:  Other than Mr. Einhorn, yes, or
16     Ms. Mirsky.
17            MR. McGARRY:  Correct.
18            THE COURT:  All right.  Now, with respect to a
19     charge conference, I have comments back from the Government.
20     I need -- if there are to be comments, I need them back from
21     Mr. Einhorn.
22            MR. EINHORN:  Yes, Your Honor.  I didn't print it
23     out until this morning, and then I was here doing Mr.
24     Vaccarelli.  So I'll -- when I get back to the office I will
25     go through Your Honor's proposed charge.
```

1     THE COURT:  And send appropriate --

2     MR. EINHORN:  And send comments.

3     THE COURT:  Okay.  That being the case, I know you

4  all desired to have the case charged, closed and

5  deliberations begin on Friday.  Is that going to happen?

6     MR. McGARRY:  I probably have about fifteen to

7  twenty minutes at the most, I believe.  I hate to represent

8  to the Court and then overshoot my mark, but I think Ms.

9  Laraia has instructions to at some point just pull me back to

10 the chair, which is probably at about the half-an-hour mark

11 from now.

12    MR. EINHORN:  Do you have the hook?

13    MS. LARAIA:  I'll bring it.

14    THE COURT:  All right.  And do you have any way of

15 estimating how long your redirect will be?

16    MR. EINHORN:  Oh, gosh.  I'm guessing that the

17 witnesses we have for tomorrow -- we're only going to have

18 two witnesses.  One will be extremely brief, and the other

19 will be Donna Gleissner, who we talked about this morning.  I

20 can't imagine that we --

21    THE COURT:  You gave me three names yesterday.

22    MR. EINHORN:  Beg your pardon?  Oh, sorry.  Brie

23 Sodano would be our first witness, and then we would end with

24 Donna Gleissner.  I can't imagine that it would take longer

25 than noon.

1    THE COURT:  All right.  You are not going to call

2  Maryanne --

3    MR. EINHORN:  No, we elected not to.

4    MR. McGARRY:  If I hd known that, I could have spent

5  less time on the document.

6    THE COURT:  And does the Government have any concept

7  that it will share about a rebuttal case?

8    MR. McGARRY:  I think the concept is that less is

9  more.  I think there might be a short witness.

10    MR. EINHORN:  Did I hear this?  Mr. McGarry's

11  concept is less is more.

12    MR. McGARRY:  On rebuttal.

13    MR. EINHORN:  I'm sorry, Your Honor.  I apologize.

14    MR. McGARRY:  That's perfectly acceptable at this

15  point in my career.

16    MR. EINHORN:  I'm going to run that by his office,

17  though.

18    THE COURT:  Just get a transcript, frame it.

19    MR. EINHORN:  I'll get a transcript.

20    THE COURT:  All right.  So we may have some time

21  then to discuss the charge before 2:30 -- before 2:45.

22    MR. McGARRY:  Yes.  I mean, I will say this, if it'd

23  be helpful to the Court to do so, that further informs our

24  decision as to how many questions to prepare for rebuttal.

25    THE COURT:  Well, I'm trying to get the charge in as

1  pristine form as possible.

2          MR. McGARRY:  Yes.

3          THE COURT:  If you all want to go to the jury on

4  Friday, we've got to do something about the charge.

5          MR. McGARRY:  Yes.

6          THE COURT:  And then, otherwise, it's going to be

7  after five o'clock that we're going to work on the final

8  charge.

9          MR. McGARRY:  So we'll have a short rebuttal if we

10 have a rebuttal at all.

11         MR. EINHORN:  I mean, I have concerns about sending

12 a case to a jury on a Friday afternoon, particularly before a

13 long holiday weekend.  I'd want them to take as much time as

14 they need and not to feel like we need to leave here as

15 quickly as possible.

16         THE COURT:  Well, we're still within a lot of the

17 range that we told them they would be here.

18         MR. EINHORN:  We are.

19         THE COURT:  So we're not really in a rush.  And if

20 we don't have to stay after 5, even though our court reporter

21 has made all the appropriate arrangements to do so, let's get

22 it right.  Okay?  We'll see how we do tomorrow.

23         MR. EINHORN:  I just got notice this afternoon that

24 Judge Covello wants me in Hartford on Tuesday, so I'm going

25 to tell him I'm still on trial assuming there's a good

1413

1    possibility I could be back here.

2            THE COURT:  You may be giving a closing argument at

3    that time.

4            MR. EINHORN:  Yes, Your Honor.

5            THE COURT:  Okay.  Very good.  We stand in recess.

6    Have a nice day.

7            (Proceedings adjourned, 3:03 p.m.)

8

9

10            COURT REPORTER'S TRANSCRIPT CERTIFICATE

11   I hereby certify that the within and foregoing is a true and

12   correct transcript taken of the proceedings in the

13   above-entitled matter.

14                              /s/  Tracy L. Gow
                                Tracy L. Gow, RPR
15                              Official Court Reporter

16

17

18

19

20

21

22

23

24

25