```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT


_____
UNITED STATES OF AMERICA,       )
                Plaintiff,      ) No: 3:18-CR-92 (JBA)
                                )
      v.                        ) May 23, 2019
LEON VACCARELLI,                )
                Defendant.      ) 9:31 a.m.
_____ )
                                  141 Church Street
                                  New Haven, Connecticut



                       JURY TRIAL DAY 8



B E F O R E:
         THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
         and 14 JURORS
```

```
                                  Official Court Reporter:
                                  Tracy L. Gow, RPR
                                  203-910-0323
```

1415

```
 1   A P P E A R A N C E S:

 2   For the Government:
           MICHAEL S. McGARRY, AUSA
 3         U.S. Attorney's Office-NH
           157 Church St., 25th Floor
 4         New Haven, CT 06510
           203-821-3751
 5         Email: michael.mcgarry@usdoj.gov

 6         JENNIFER LARAIA, AUSA
           U.S. Attorney's Office-BPT
 7         1000 Lafayette Blvd., 10th Floor
           Bridgeport, CT 06604
 8         203-696-3029
           Email: jennifer.laraia@usdoj.gov
 9
     For the Defendant:
10         JONATHAN J. EINHORN, ESQ.
           Law Office of Jonathan J. Einhorn
11         129 Whitney Avenue
           New Haven, CT 06510
12         203-777-3777
           Email: einhornlawoffice@gmail.com
13
           RACHEL MIRSKY, ESQ.
14         Mirsky Law LLC
           900 Chapel Street
15         10th Floor
           New Haven, CT 06510
16         203-290-2779
           Email: rachel@mirskylawct.com
17
     Also present:
18         SA RUSSEL DAY, FBI
           LEON VACCARELLI
19

20

21

22

23

24

25
```

1

**<u>INDEX</u>**

2

**EXAMINATION**

3

**Witness Name**                                                        **Page**

4

LEON VACCARELLI

5

   Cross By MR. McGARRY......................................... 1418

6

   Re-Direct By MR. EINHORN.................................... 1500

7

   Re-Cross By MR. McGARRY.................................... 1505

8

BRIEAN SODANO

9

   Direct By MR. EINHORN....................................... 1507

10

   Cross By MS. LARAIA........................................ 1514

11

   Re-Direct By MR. EINHORN.................................... 1529

12

   Re-Cross By MS. LARAIA..................................... 1530

13

DONNA GLEISSNER

14

   Direct By MS. MIRSKY....................................... 1536

15

   Cross By Ms. Laraia........................................ 1581

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to Order, Out of the presence of the Jury,
 2    9:31 a.m.)
 3              THE COURT:  All right.  Counsel, ladies and
 4    gentlemen, Mr. Vaccarelli, good morning.
 5              THE DEFENDANT:  Good morning, Your Honor.
 6              ALL:  Good morning, Your Honor.
 7              THE COURT:  We are ready to proceed.  We now have a
 8    full complement of all our jurors.  May I, however, before we
 9    bring them in, tell you what I think should be the schedule
10    here.
11              I think Mr. Einhorn's observation that charging,
12    closing and submitting on Friday before a three-day weekend,
13    given how many exhibits they have to consider and how many
14    witnesses' testimony they have to consider, that it would be
15    better if we did all of that on Tuesday after a three-day
16    weekend so they could have that continuity of purpose, and
17    moreover, it will allow you all plenty more time to prepare
18    your closings.
19              So, let's do it that way.  And what that means, is
20    that we will do whatever we need on evidence today.  If
21    there's a large amount of time left over, we'll start with a
22    charge conference and we'll use tomorrow for our charge
23    conference.
24              Does that work for you all?
25              MR. McGARRY:  Yes, Your Honor.
```

```
 1              MR. EINHORN:  Yes, Your Honor.  Thank you very
 2    much.
 3              THE COURT:  Let's do that.  Let's bring in the
 4    jurors.
 5              MR. EINHORN:  Mr. Vaccarelli, I assume, can be
 6    excused from the charge conference, we'll do it in chambers?
 7              THE COURT:  Yes.
 8              MR. EINHORN:  Thank you.
 9              (Jury in, 9:41 a.m.)
10              THE COURT:  Good morning, ladies and gentlemen.  We
11    are going to resume the cross-examination of Mr. Vaccarelli
12    by Mr. McGarry.
13              And you may proceed.
14              MR. McGARRY:  Thank you, Your Honor.
15              THE COURT:  Mr. Vaccarelli, you do remain under
16    oath.
17              THE DEFENDANT:  Yes.
18                  (LEON VACCARELLI, previously sworn,
19                     resumes stand, 9:42 a.m.)
20                  CROSS-EXAMINATION - CONTINUED
21    BY MR. McGARRY:
22       Q.   Mr. Vaccarelli, yesterday you testified, All stock
23    brokers are alcoholics.  Do you remember saying that to this
24    jury?
25       A.   I think it was a --
```

1419

1    Q.   Do you remember saying that to this jury?

2    A.   Yes.  Yes.

3    Q.   You were a broker or registered representative in

4    Waterbury, Connecticut; correct?

5    A.   Yes.

6    Q.   You were trained in Cranston, Rhode Island;

7    correct?

8    A.   And Waterbury.

9    Q.   Okay.  And you described being trained in a call

10   room, which you described as "dialing for dollars";

11   correct?

12   A.   One of the areas where I was trained.

13   Q.   And you used that term yesterday, "dialing for

14   dollars"; correct?

15   A.   Yes.

16   Q.   And that, in essence, means that you're calling

17   clients to get investments; correct?

18   A.   Prospects.  They weren't clients yet.

19   Q.   You're calling prospects to get clients; correct?

20   A.   Yes.

21   Q.   And in order to get dollars for yourself, as well,

22   by way of commissions; correct?

23   A.   Yes.

24   Q.   Okay.  And you said it was like it was in the

25   movies, with people wearing headsets; right?

1    A.    Yes.

2    Q.    And you were referring to movies like that Wolf of

3  Wall Street with Leonardo DiCaprio or, I don't know, the

4  movie with Vin Diesel, Boiler Room, something like that; is

5  what you're referring to?

6    A.    Yeah.   There's a lot of movies.

7    Q.    Okay.   And I believe your attorney referred to it as

8  a "bucket shop" yesterday; correct?

9    A.    I remember that.

10   Q.    Okay.   And in a lot of those movies, you know, some

11 of the characters get charged with crimes; don't they?

12   A.    Yes.

13        MR. EINHORN:   Objection, Your Honor.   Are we here

14 doing movie reviews?   Whether not they're charged with crimes

15 isn't relevant.

16        THE COURT:   I'm going to sustain the objection.

17 BY MR. McGARRY:

18   Q.    Okay.   You also testified extensively about the,

19 quote, "culture."   Do you remember that?

20   A.    Yes.

21   Q.    Do you remember that you said how there was a

22 culture of the industry?

23   A.    Yes.

24   Q.    Okay.   Going back to your other topic that all stock

25 brokers are alcoholics.   You don't know all stock brokers; do

1421

1    you?

2        A.    No, I do not.

3        Q.    You've never worked in New York City; have you?

4        A.    No.

5        Q.    You've never worked in L.A.; have you?

6        A.    No.

7        Q.    Chicago?

8        A.    No.

9        Q.    London?

10       A.    No.

11       Q.    So when you say all stock brokers are alcoholics,

12   you really don't have any basis for saying that; is that

13   correct?

14       A.    It was an expression.

15       Q.    It was hyperbole; wasn't it?

16       A.    I guess so.

17       Q.    It was an expression not based in fact; correct?

18       A.    Correct.

19       Q.    Yet, you said it to this jury; didn't you?

20       A.    I did say that.

21       Q.    And when you testified about the culture, you

22   testified, Oh, this was the culture, that there was a lot of

23   drinking; correct?

24       A.    Yes.

25       Q.    Okay.  Let me show you Government's Exhibit 1200.

1    Let me direct your attention -- in evidence -- let me direct
2    your attention to page 34.  And let me direct you to -- and
3    I'll zoom in here.
4             Do you recognize your handwriting on this document
5    that you completed after your -- your alcohol training?
6    A.    That was completed during my classes.
7    Q.    During, okay.  Do you recognize your handwriting?
8    A.    Yes.
9    Q.    Okay.  And does the question read?  "How do you
10   think your culture or community has affected your own
11   decisions about alcohol or other drug use?"  That's the
12   question that's written; correct?
13   A.    It is.
14   Q.    And you answered in your own handwriting:  "They
15   haven't," exclamation point; do you see that?
16   A.    I do.
17   Q.    Okay.  That's what you wrote there; didn't you?
18   A.    I copied it off a board.
19   Q.    Okay.  That's what you wrote there; didn't you?
20   A.    I wrote that copying it off a board.
21   Q.    That's what you wrote there; didn't you?
22            MR. EINHORN:  Objection, Your Honor.
23            THE COURT:  Well, he's not answering the question,
24   so overruled.  Do you want to just answer the question?
25            THE WITNESS:  I wrote that.

```
1              THE COURT:  Thank you.
2   BY MR. McGARRY:
3       Q.   And you wrote, "I make my own decisions," open
4   parentheses, "good or bad," closed parentheses, exclamation
5   point; didn't you?
6       A.   I wrote that, and I make my own decisions whether
7   I'm in an alcoholic haze or not.
8       Q.   Okay.  But you wrote that the culture haven't -- or
9   hasn't affected your own decisions; didn't you?
10      A.   I wrote that down.
11      Q.   And that was part of what you were required to do,
12  was to take this course; correct?  You were required to take
13  this course?
14      A.   I did.
15      Q.   And that's your name and that -- this is your
16  booklet; correct?
17      A.   Yes.
18      Q.   Now, let me pull up what's in evidence, Government's
19  Exhibit 458.  Do you recognize this e-mail exchange with
20  Ms. June Antonacci?
21      A.   Yes.
22      Q.   Okay.  Taking you to the last page of this document.
23  That's your name, correct -- Leon Vaccarelli, Founder LUX
24  Financial Services?
25      A.   It is.
```

1   Q.   Founder, LUX Financial Services.  And then you have

2   your address; correct?

3   A.   Yes.

4   Q.   Okay.  And then it says underneath, "All securities

5   offered through The Investment Center, Bedminster, New

6   Jersey."  That's part of your footer; correct?

7   A.   Yes.

8   Q.   But, in fact, The Investment Center didn't know

9   anything about the $200,000 transaction that you had with

10  Ms. Antonacci and -- with Ray and June Antonacci; did they?

11  A.   It wasn't a security.  It was a loan.

12  Q.   Okay.  They didn't know anything about the

13  investment opportunity that you gave to Ms. -- to Ray

14  Antonacci and June Antonacci; did they?

15  A.   No.

16  Q.   And you say it was a loan; that's your testimony?

17  A.   From the Antonaccis?  Yes.

18  Q.   Where they were going to make money by giving you

19  money and you were going to pay it back with interest;

20  correct?

21  A.   Yes.

22  Q.   Okay.  And that, in fact, they wrote a $200,000

23  check to LWLVACC; correct?

24  A.   Yes.

25  Q.   Government's Exhibit 451.

1    Not to LUX; correct?

2    A.    Correct.

3    Q.    Thank you.  Okay.  And -- let's see.  You said you

4    were out of the office.  I just want the jury to see the

5    start.  Okay.

6    "Hi, Leon.  Just received another interest payment

7    into my checking account.  My records show that you deposited

8    $16,000 on April 2014, and I have been receiving monthly

9    payments for $1,000 each month since."  Do you see that?

10   A.    Yes.

11   Q.    "A total of $15,000.  The note was for 30 months.

12   So Ray's investment of $200,000 should have been returned to

13   me this month, rather than the $1,000 interest."  Do you see

14   that?

15   A.    I do.

16   Q.    She referred to it as an investment; didn't she?

17   A.    In that e-mail, but --

18   Q.    Thank you.

19   A.    -- actually she said it was a loan.

20   Q.    She referred to it as an investment in this e-mail;

21   correct?

22   A.    In the e-mail, yes.

23   Q.    Okay.  And you responded back to her; correct?

24   "June, I am out of the office until Friday.  I will

25   review and respond on Friday.  I hope all is well.  Regards,

1    Leon."

2           You wrote that back to her; correct?

3      A.   Yes.

4      Q.   And then you wrote:  "June, I just spoke to the

5    accountant and reviewed the paperwork ledger."

6           Do you see that?

7      A.   I do.

8      Q.   Okay.  So you had paperwork and a ledger related to

9    her $200,000; correct?

10     A.   I believe so.

11     Q.   And you reviewed it; correct?

12     A.   Yes.

13     Q.   Okay.  "You are scheduled for one more interest

14   payment on September 1st and final distribution of your 200K

15   in October."  Do you see that?

16     A.   Yes.

17     Q.   Okay.  Now, nowhere in here, by the way, does it say

18   -- did you correct and say "loan" versus "investment";

19   correct?  You didn't say anything about that in this

20   e-mail?

21     A.   No.

22     Q.   Okay.  "As you may recall, the program started in

23   December 2012, but interest did not start accruing until

24   February 2013.  It took about six weeks to start."  Do you

25   see that?

```
 1        A.    I do.
 2        Q.    Okay.  Now, there was no program; was there?
 3        A.    Yes, there was.
 4        Q.    Take a look at Government's Exhibit 25.  Take a look
 5    at page 14.  This is the LWL -- do we still have that check?
 6    -- the LWL account that their check went into; correct?
 7        A.    Yes.
 8        Q.    Okay.  And their $200,000 was deposited into your
 9    checking account on December 6, 2012?
10        A.    Yes.
11        Q.    Okay.  So it's in your checking account.  And then
12    immediately thereafter -- oh, first of all, how much was in
13    your checking account, in the program, before their $200,000
14    came in?
15        A.    It was -- that wasn't the program, my checking
16    account; however, the balance was $62.63.
17        Q.    Okay.  And then you -- their $200,000 came in.  You
18    transferred some money, correct, to another account?
19        A.    Yes.
20        Q.    Okay.  And then you used $883, presumably to put an
21    advertisement in a Catholic transcript; is that correct?
22        A.    383.
23        Q.    383.  And then you reimbursed Maryanne.  And you
24    paid Eric Strachan, the general contractor for your house.
25    "Joshua Town payoff.  Thank you," exclamation point.
```

1     Is it your testimony that you using their money for

2   your house was part of the program?

3     A.    It was a loan, but yes.

4     Q.    Okay.  And this is the program that's going to take

5   six weeks for interest to start to accrue?

6     A.    That's what we agreed to.

7     Q.    Okay.  But you wrote, "Interest did not start

8   accruing until" -- February 13 -- "February 2013.  It took

9   about six weeks to start."

10    A.    That's accurate.

11    Q.    It -- you used the word "it" as if there's something

12  that's going to start.  It's just your checking account;

13  isn't it?

14    A.    I suppose so.

15    Q.    There's nothing that's actually going to start

16  generating interest; is there?

17    A.    Well, I'm paying the interest.  It was a loan for me

18  to pay, and I was paying the interest.

19    Q.    You didn't say, "I'll pay you some interest starting

20  six weeks from now"; did you?

21    A.    I'm not sure what I said.

22    Q.    Well, then let's go back to Government's Exhibit

23  458.  You said:  "As you may recall, the program started in

24  December 2012."

25        Your checking account was open before that.  Your

1    house was being built before that.  There was no program

2    started in December 2012; was there?

3        A.   The loan -- perhaps I should have written "the loan

4    started in December 2012."  I think if we looked at the

5    agreement, it would show that.

6        Q.   There was no program; was there?

7        A.   I disagree.

8        Q.   "On exit, it also takes about six weeks to

9    liquidate, but you still receive interest."

10            If you're just paying interest from -- made-up

11   interest from your checking account, there's nothing to

12   liquidate; is there?

13       A.   Liquidation meaning giving her her money back.

14       Q.   Liquidation meaning you sell something to turn it

15   from one asset into cash; correct?

16       A.   That could be one way of looking at it.  It could

17   also be paying -- creating liquid money to give it back to

18   her.

19       Q.   And the way you created liquid money was getting

20   money from other people to give it to her; didn't you?

21       A.   Yes.

22       Q.   So it really means it's going to take about six

23   weeks for me to find other people to get money from to pay

24   you your money back?

25       A.   That wasn't the agreement with --

1    Q.   Of course it wasn't the agreement, because she

2    wouldn't have agreed to that.

3    A.   Her and Ray --

4    Q.   You told her there was a program.

5    A.   Her and Ray agreed to loan me the money, and they

6    did.  And it took six weeks for the interest to start, which

7    the direct investment agreement said.  And it was known -- it

8    wasn't written in there, but it was known between them that

9    it would take six -- up to six weeks to liquid -- to give

10   them their liquid money back.

11   Q.   And you -- the date of this e-mail -- and she

12   disagreed with you, by the way; didn't she?

13        MR. EINHORN:  Are you asking the -- is the witness

14   being asked to comment on the testimony of another witness?

15        MR. McGARRY:  No.  On this e-mail.

16        THE COURT:  All right.  Would you clarify your

17   question?

18        MR. McGARRY:  Yes, Your Honor.

19   BY MR. McGARRY:

20   Q.   In Government's Exhibit 458, where June Antonacci

21   wrote back to you in response to your e-mail, she didn't

22   agree with you; did she?

23   A.   No.

24   Q.   She said, "Sorry.  Don't agree with your accountant.

25   Will expect payment in full in October then."

1     Do you see that?

2     A.   I do.

3     Q.   Now, as far as the interest that was accruing, they

4     didn't know that those thousand dollar payments that were

5     coming were coming from their own investment account; did

6     they?

7     A.   That's not true.  They did.  Or Mr. Antonacci did.

8     Q.   You took -- you promised them interest of a thousand

9     a month; correct?

10    A.   Yes.

11    Q.   And then what you did was you sent a fax to The

12    Investment Center requesting that they send a thousand

13    dollars from the Antonaccis' own account to them; didn't

14    you?

15    A.   Yes.  And that's because Mr. Antonacci said to defer

16    the interest and just give June a thousand a month from the

17    account.

18    Q.   The question was --

19    A.   And I deferred the interest until she asked for

20    it.

21    Q.   The question was:  You sent them a, quote -- air

22    quotes -- "interest payment" from their own account; didn't

23    you?

24    A.   It was their own money from their own account.  It

25    was not an interest payment from me.  Of course it wasn't.

1    Q.   But she thought she was getting an interest payment,

2    and that's one of the things she complained to you about;

3    didn't she?

4    A.   And I clarified it, what she said --

5    Q.   Listen.  If I may.  Mr. Einhorn is going to get a

6    chance to come up here and ask you questions on redirect.  If

7    you can answer my questions without the mini speeches, it'll

8    go quicker.  Okay?

9    A.   Okay.

10   Q.   Thank you.  You also wrote in this e-mail that, "On

11   exit, it will take six weeks to liquidate, but you still

12   receive interest"; didn't you?

13   A.   Yes, I did.

14   Q.   Okay.  Going back to -- and this e-mail is dated

15   approximately August 7 -- it's dated August 7, 2015; isn't

16   it?

17   A.   Yes, it is.

18   Q.   Going back to Government's Exhibit 25.  And

19   directing your attention to page 35.  If we go to -- it was

20   August.  If we go about five, six weeks from that, your

21   checking account had a negative balance; didn't it?

22   A.   That checking account did, yes.

23   Q.   Okay.  So there was -- if this is the checking

24   account that their program their -- for the program their

25   money went into, then there was nothing in this program to

1    liquidate; was there?

2        A.    Not on that date.

3        Q.    And that's about five, six weeks from the e-mail;

4    correct?

5        A.    Yes.   But the date from when the 30 months

6    corresponded wouldn't have been that date.

7        Q.    And were you keeping accurate track of the 30

8    months?

9        A.    I believe the accountant was.

10       Q.    Okay.   And were you -- you said you checked the

11   file.   So you checked with the accountant; correct?

12       A.    I had a phone call, I'm sure.   I don't remember

13   exactly.

14       Q.    Was that Mr. Sullivan or Ms. Zimyeski?

15       A.    Probably Mr. Sullivan.

16       Q.    And did you tell him that you were trying to get

17   money from other investors to pay back June Antonacci?

18       A.    No.

19       Q.    Let me show you what's been marked Government's

20   Exhibit 359 in evidence.   Okay.   Do you recognize

21   Government's Exhibit 359?

22       A.    Looks like a commission statement.

23       Q.    Right.   A commission statement for you for all of

24   those clients; correct?

25       A.    Yes.

```
 1        Q.   And Government's Exhibit 360; is that a commission
 2   statement for all the work that you were doing?
 3        A.   Yes.
 4        Q.   Earning commissions on trades, on --
 5        A.   There were trails, asset-based -- there's several
 6   different things in there.
 7        Q.   And 361.  Trails is where you get a commission on
 8   something that you had previously put a client into;
 9   correct?
10        A.   Yes.
11        Q.   Okay.  And then there were some buys and sells
12   commissions; correct?
13        A.   Probably.
14        Q.   Because you were buying and selling securities for
15   clients; correct?
16        A.   Yes.
17        Q.   And then there was some funds, like Franklin
18   Templeton Fund; correct?
19        A.   Yes.
20        Q.   Wells Fargo Advantage Fund.  Is that something that
21   you had some of your clients in?
22        A.   Looks like it, yes.
23        Q.   Okay.  And, you know, we see, for instance, Marcia
24   Schultz is in this -- is in a fund; Kenneth Antonacci; some
25   names that haven't come up in this trial before.  But those
```

1    are your clients; correct?

2        A.    They are.

3        Q.    Okay.  384 -- again, another commission sheet.  And

4    this is for October of 2014; correct?

5        A.    Yes.

6        Q.    Okay.  And just at the top, this is Giuseppina

7    LaPorta's money at Prudential before she took it out and

8    invested it in your program; correct?

9        A.    Yes.

10       Q.    Okay.  And there was -- was that an annuity?

11       A.    Yes.

12       Q.    Okay.  And it was earning her some return;

13   correct?

14       A.    Yes.

15       Q.    By leaving it with Prudential, it earns some return?

16   You could call it interest, you could call it a payment, but

17   the annuity pays her on a regular basis; correct?

18       A.    I believe it was a variable annuity.

19       Q.    Okay.  So you remember that, that it was a variable

20   annuity, and you got a small commission --

21       A.    No, you know what?  Now I'm thinking, if it was a

22   variable annuity, it wouldn't have appeared that way.  It

23   might have been a fixed annuity.  I'm not sure.  It was an

24   annuity.

25       Q.    Okay.  It was an annuity and you got a commission?

1    A.   Yes.

2    Q.   Okay.  And you got a commission -- again, 385.  You

3  got -- again, now we're looking at December of 2016.  So

4  we've kind of jumped forward a little bit.  Again, we have

5  your list of clients.  Your name on the top; correct?

6    A.   Yes.

7    Q.   And these are commissions for clients through

8  December of 2016; correct?

9    A.   Yes.

10    Q.   Okay.  For instance, I'm not going to call out the

11  name, but there seems to be a purchase here for

12  GlaxoSmithKline.  Do you see that?

13    A.   I do.

14    Q.   And John Hancock.  You see that?

15    A.   Yes.

16    Q.   Vodafone Group, PLC, new sponsored.  Is that a

17  stock?  Or is that a fund?

18    A.   I'm not sure.

19    Q.   It's invested 9,000 -- let's see.

20    A.   Possibly a fund.  It's a lower amount of money, but

21  I'm not sure what it is.

22    Q.   Okay.  But you earned a commission on that;

23  correct?

24    A.   Yes.

25    Q.   Okay.  And you didn't screw up these trades; did

1    you?

2        A.    I probably did not make those trades.

3        Q.    Okay.  Well, you're getting commissions on those.

4    You're getting commissions from your clients.

5        A.    But I didn't do the trading in the office.

6        Q.    Okay.  You didn't -- let me put it this way:  You

7    are receiving all of these commissions; correct?

8        A.    Yes.

9        Q.    Okay.  And this money is not disappearing into your

10   LWLVACC bank account; was it?

11       A.    I'm not sure where it went at the time.

12       Q.    For instance, we looked at some annuities.  They're

13   kept with Prudential or they're kept with John Hancock;

14   correct?

15       A.    Yes.

16       Q.    And that money from all these other clients didn't

17   move into the Leon Vaccarelli Senior Note program; did it?

18       A.    No, the vast majority did not.

19       Q.    Right.  And you weren't in a drunken haze when you

20   were dealing with, for instance, Carrie Zimyeski and some of

21   your other clients; correct?

22       A.    I disagree with that.

23       Q.    Take a look at Government's Exhibit 56.  November of

24   '13, you're talking about "Our focus is certainly equities

25   and U.S. equities at that."  You wrote that, didn't you?

1    A.    I did.

2    Q.    You wrote a very clear, lucid e-mail to her

3    describing the investment strategy; didn't you?

4    A.    I did.

5    Q.    Okay.  And you didn't have any trouble conveying

6    information to her; did you?

7    A.    Just because I was drinking at the time or in a haze

8    doesn't mean I wasn't able to type an e-mail.

9    Q.    Okay.  You were able to make a decision to type a

10   coherent e-mail to her; correct?

11   A.    Yes.

12   Q.    It wasn't random.  It wasn't by accident.  She sent

13   you a question and you gave her a response; correct?

14   A.    I did.

15   Q.    Okay.  Let me move to another topic.  I want to ask

16   you about the transaction with Carmela Truhan and her family.

17   Okay?  Okay?

18   A.    Yes.

19   Q.    Directing your attention to the Fall of 2016.  At

20   some point, you had a meeting with Victoria and Carmela

21   Truhan and you talked about -- with them -- and you talked

22   about financial planning with respect to Carmela, the

23   then-88, now 90-year-old woman who sat in the front row,

24   about making a move from her house to the Hearth and how

25   there would be financial issues; correct?

1   A.   I believe so.

2   Q.   And there was an --

3   A.   It happened.  I don't remember when it happened.

4   Q.   And there was also a meeting that Barry was at where

5   you discussed how they were going to keep their money

6   invested; correct?

7   A.   I don't remember.

8   Q.   Okay.  And you also told them to set up a bank

9   account at a bank, happened to be Liberty Bank, but set up a

10  bank account in the name of the trust so the trust could get

11  money -- I'm sorry -- in the name of the trust so the bank

12  account could get money from the trust; right?

13  A.   That's not unusual.  I'm sure I did.

14  Q.   Okay.  You hesitate.  You're sure you did it.  You

15  did it; didn't you?

16  A.    I don't remember exactly, but I'm sure I did; yes.

17  Q.   Okay.  You remember exactly that Ray Antonacci gave

18  you a loan, but when we ask you about the Truhans, you start

19  saying, I don't remember, I must have, I should have.  You

20  remember it was a loan, but you can't remember meeting with

21  the Truhans in 2016?

22  A.   I'm sure I did meet with the Truhans.  I don't

23  remember exactly the contents of the meeting, but it wouldn't

24  be irregular for me to say open a checking account for your

25  trust.  I'm sure I did that hundreds of times in my career.

1    Q.    And you did that with the Truhans; didn't you?

2    A.    Yes.

3    Q.    And yesterday, you told this jury that in 2012 when

4    you met with Ray Antonacci, that he ordered a Southern

5    Comfort Manhattan when you were talking about a loan, and you

6    remembered that detail; didn't you?

7    A.    Because that didn't happen hundreds of times in my

8    career, and Ray always drank Southern Comfort Manhattans.

9    Q.    You remembered that little detail about Ray, but you

10   don't remember a meeting four years later closer in time to

11   where we are now?

12   A.    But that was more of a typical client meeting, which

13   I had dozens or hundreds of over that time.  The meeting with

14   Ray, who was a friend, drinking -- him drinking Southern

15   Comfort Manhattans, which was normal, and discussing a loan

16   which was not normal -- I mean, you're talking about apples

17   and oranges, in my opinion.

18   Q.    You met with the Truhans.  Barry was there, you were

19   there, Victoria was there, Carmela was there.  Was anyone

20   else there?

21   A.    I don't recall the meeting specifically, but I'm

22   sure if those four people were there, then it happened.

23   Q.    And you told them to open up a checking account at

24   Liberty Bank; correct?

25   A.    That would not be unusual.

1    Q.   I didn't ask you is it unusual or is it not unusual.

2    I asked you did you tell them -- recommend to them, as their

3    investment advisor, to open up a checking account in the name

4    of the trust so it could receive payments from the trust?

5    A.   I guess I did.

6    Q.   And she didn't open it up right away; did she?

7    A.   I don't recall.

8    Q.   And then you talked to her about it and you were

9    somewhat miffed that she didn't open up the bank account;

10   correct?

11   A.   I don't remember that conversation.

12   Q.   So, now you don't remember; is that your

13   testimony?

14   A.   I was miffed that she didn't open a checking

15   account?  I don't know if I would get miffed over a client

16   not opening a checking account at another bank.

17   Q.   Then at some point you went out -- after -- so then

18   she opened up the checking account; correct?

19   A.   She did.

20   Q.   And then at some point you went out to the Hearth,

21   didn't you?

22   A.   Yes.

23   Q.   Okay.  And showing you what's Government's Exhibit

24   803.  This is the sign-in sheet; correct?

25   A.   Yes.

1    Q.   You went there on January 11th; correct?

2    A.   Yes.  Is there a sign-in sheet for the other

3    meetings?

4    Q.   Take a look at Government's Exhibit 803.  January

5    11th, 2017, at the Hearth.  You signed in; correct?

6    A.   I did.

7    Q.   And Victoria Hughes signed in; correct?

8    A.   She did.

9    Q.   And Maryanne, your secretary, did not sign in;

10   correct?

11   A.   Correct.

12   Q.   Okay.  And Victoria was there for the majority of

13   the meeting; correct?

14   A.   Yes.

15   Q.   Okay.  And then she had to leave because she got a

16   text or a call from her son; right?

17   A.   That's what she said, yes.

18   Q.   Okay.  And she left the meeting before you;

19   correct?

20   A.   Yes.

21   Q.   Okay.  Now, at that meeting, when Victoria was

22   there, you never talked about liquidating securities from

23   Mrs. Truhan's trust; did you?

24   A.   I don't recall that.

25   Q.   Okay.  Because it didn't happen; right?  You don't

1    recall it.  It didn't happen.  You didn't talk about

2    liquidating securities; correct?

3        A.   It may, in fact, have happened.  We did lots of

4    transactions on the trust over the years.

5        Q.   Okay.  But you didn't talk about liquidating

6    $300,000 from securities and putting them in a cash account,

7    did you, when Victoria was there?

8        A.   I can't say that.  I don't remember.

9        Q.   So, just so we're clear, when we're talking about

10   the Truhan meeting, you don't remember?

11       A.   I don't remember the specifics of that meeting, no.

12       Q.   Take a look at Government's Exhibit 806, and let me

13   page down, I believe to page 7.  Okay.

14            And see here -- I'm going to zoom-in on this part

15   where it says "securities sold."  Do you see that?

16       A.   Yes.

17       Q.   Okay.  And if we go down to the next page.  Again,

18   I'll zoom-in on this one where it has the date.  Okay.  See

19   where it says -- let me try that again and get a bigger

20   piece.

21            "Type of transaction," it says sold; correct?

22   January 11th, same date; correct?

23       A.   It says bought and sold, but, yes, and it looks like

24   they may have been sold because of the negatives.

25       Q.   And then it generated cash; correct?

1  A.  Yes.

2  Q.  Okay.  And you had a conversation with Barry where

3  you told him that Mrs. Truhan was buying a house for one of

4  his daughters; didn't you?

5  A.  I don't remember that.

6  Q.  You don't remember that conversation with your

7  partner?

8  A.  No.

9  Q.  Where he asked, "Why are they selling stock," and

10  you said, "Because she's buying a house for one of her

11  daughters"?

12  A.  I don't remember that.

13  Q.  And the stock -- then directing your attention to

14  Government's Exhibit 804, which is kind of where we left off

15  yesterday, a $300,000 wire request for the Truhan Living

16  Trust was sent to The Investment Center, wiring money to the

17  bank account that you instructed Victoria Truhan and Carmela

18  to open; correct?

19  A.  It was wired to the Liberty Bank account.

20  Q.  Okay.  And that was the account that you told them

21  to open; correct?

22  A.  That's what they said.  I don't remember that.

23  Q.  So this -- so, again, now we're to believe that

24  you're in the haze and you don't remember this?

25  A.  I don't remember this.  I truly don't.

1    Q.    $300,000 in January of 2017.

2    A.    I remember the 300,000, the transaction, but I don't

3    remember the paperwork or anything about buying a house or

4    anything like that.  I typically just got signatures and they

5    filled the paperwork out.

6    Q.    And this signature did not occur on the 12th; did

7    it?

8    A.    Well, when did it occur?

9    Q.    You went to the Hearth on the 11th.  Carmela Truhan

10   didn't come to your office on the 12th.

11   A.    So, then I guess she signed it on the 11th.

12   Q.    You're guessing.

13   A.    I'm guessing.  I don't recall.

14   Q.    So your testimony is that you don't recall a wire

15   transfer for $300,000?

16   A.    I didn't -- I did not -- I never did -- I don't

17   think probably since the early 2000s did I actually transact

18   a wire transfer.

19   Q.    Is it your testimony -- all right.  Let me start a

20   new question.

21         You told Maryanne to just notarize this, regardless

22   of the fact that Carmela Truhan was not in front of you?

23         MR. EINHORN:  Objection, Your Honor.  We went

24   through that before we broke from the day before.  My notes

25   indicate that part of the examination and testimony.

1    THE COURT:  I'm going to let Mr. McGarry drill down

2  on what was testimony begun yesterday, but not to repeat what

3  was done.

4    MR. EINHORN:  Thank you, Your Honor.

5  BY MR. McGARRY:

6    Q.   You told -- you had a conversation with Maryanne

7  where you told her to notarize this even though Carmela

8  Truhan was not in front of her; didn't you?

9    MR. EINHORN:  Same objection.  That's exactly where

10  we were yesterday.

11    MR. McGARRY:  I was doing to drill down.

12    THE COURT:  Are you going beyond that question?

13    MR. McGARRY:  I have another question about the

14  stamp and the sending and a couple of other things.

15    THE COURT:  I'm going to permit that as context.

16    THE WITNESS:  I don't remember that.  I didn't look

17  at this paperwork other than the signature.

18  BY MR. McGARRY:

19    Q.   So you don't remember?

20    A.   No, I don't.

21    Q.   Oh, so other than getting the signature.  So when

22  did you get the signature?

23    A.   Probably on the 11th.

24    Q.   Okay.  So --

25    A.   The day before.  And then it's typical if you're out

1    at an appointment to transact the paperwork the next day.

2        Q.    The day -- it's not typical, is it, to have someone

3    notarize something where someone did not appear before

4    them?

5            MR. EINHORN:   I thought Your Honor instructed

6    Mr. McGarry to move on to something different.  This is

7    exactly where we were yesterday.

8            THE COURT:   Well, now this is getting to what are

9    typical practices or procedures in his industry.

10           MR. EINHORN:   That part I don't object to.  I object

11   to him going into specifics with Maryanne Marticello.

12           THE COURT:   Okay.  Then let's --

13           The last question, however, related to -- or the

14   answer was it's typical if you're on the appointment to

15   transact the paperwork the next day.  Okay.  Proceed,

16   please.

17   BY MR. McGARRY:

18       Q.    It's not typical to -- when something needs to be

19   notarized, when it's over $25,000, to have someone do a fake

20   notarization; is it?

21           MR. EINHORN:   Same objection.

22           THE COURT:   Sustained.

23           THE WITNESS:   I didn't have anyone do a fake

24   notarization.

25           THE COURT:   Sustained.

1    THE WITNESS:  It was just process the paperwork.  I

2  probably didn't even know it needed to be notarized.

3    THE COURT:  Excuse me.  I have sustained the

4  objection.  The answer is stricken.  You may proceed with

5  another question.

6  BY MR. McGARRY:

7    Q.    And, yes or no, did you tell Maryanne to shade over

8  the notary so that it would show up on a fax?

9    A.    No.

10   Q.    And then it was faxed to The Investment Center;

11  wasn't it?  Or wired.

12   A.    Yes, I'm sure it was.

13   THE COURT:  The Investment Center?

14   MR. McGARRY:  Yes, Your Honor.

15   The wire -- well, let me ask the question so we're

16  all on the same page.

17  BY MR. McGARRY:

18   Q.    The money is at -- currently at The Investment

19  Center; correct?  And this form was faxed to The Investment

20  Center to cause them to wire the money to the bank account;

21  correct?

22   A.    Yes.

23   Q.    Okay.  And then on January 14th, showing you

24  Government's Exhibit 809, the next day, that check was

25  deposited -- sorry.

1    There was a check.  We missed a step.  Let's see.

2    Let's go to 805.  Oh, that's the agreement; correct?  Do you

3    see Government's Exhibit 805?

4    A.   Yes.

5    Q.   Okay.  And then -- hold on.  And then Government's

6    Exhibit 808, there's a check from the Carmela Truhan account

7    dated January 11, 2017, that is deposited into your LUX

8    Financial account; correct?

9    A.   Yes.

10   Q.   Okay.  And showing you Government's Exhibit 809.

11   That is the deposit showing up in your account; correct?

12   A.   Yes.

13   Q.   Okay.  And then on the same day the deposit is

14   credited, you transferred $5,000 to account ending in 7051;

15   didn't you?

16   A.   Yes.

17   Q.   Then you transferred $5,000 to the account ending in

18   1757; didn't you?

19   A.   Yes.

20   Q.   Then you purchased a cashier's check for $59,692.66;

21   didn't you?

22   A.   Yes.

23   Q.   And that cashier's check from the account that

24   Ms. Truhan's check cleared into was "Pay to the order of Leon

25   W. Vaccarelli"; wasn't it?

1    A.   Yes.

2    Q.   And the memo line says, "Leon WL Vaccarelli";

3    doesn't it?

4    A.   Yes.

5    Q.   Okay.  And you bought this treasurer's check or

6    cashier's check and pulled that money out of that account

7    that we saw in Government's Exhibit 809; correct?

8    A.   Yes.

9    Q.   And then you endorsed it "Pay to the order of Sean

10   Fitzmaurice"; didn't you?

11   A.   Yes.

12   Q.   And by doing that -- by writing "Pay to the order"

13   and signing it, because the check is a negotiable instrument,

14   it then becomes "Pay to the order of" -- instead of Leon

15   Vaccarelli, it now becomes "Pay to the order of Attorney Sean

16   Fitzmaurice"; correct?

17   A.   Yes.

18   Q.   Okay.  And that was the attorney who represented

19   Christine Chauncey; correct?

20   A.   I believe so.

21   Q.   Okay.  And you didn't tell the Truhans or Victoria

22   Hughes that the $300,000 was going to Attorney Sean

23   Fitzmaurice; did you?

24   A.   No.

25   Q.   Okay.  So then as we saw earlier -- showing you

1    Government's Exhibit 810 the balance throughout February, and

2    811 into March, and 812 into April, from that account, the

3    money got used; correct?  The money was spent?

4         A.   Yes.

5         Q.   It didn't go to any investment at all; did it?

6         A.   No.

7         Q.   Okay.  And then when Victoria called you.  You said,

8    "Don't worry it's in a 6 percent CD"; didn't you?

9         A.   I don't remember that.

10        Q.   So you don't remember?

11        A.   I don't remember any phone calls with -- the

12   daughter.

13        Q.   There was no 6 percent CD; was there?

14        A.   There was no 6 percent CD.

15        Q.   There was no any percent CD; was there?

16        A.   No.

17        Q.   There was no investment vehicle; was there?

18        A.   No.

19        Q.   There was no direct investment, there were no

20   managed mutual funds that it went into; were there?

21        A.   No.

22        Q.   There was no variable annuity; was there?

23        A.   No.

24        Q.   There was no annuity investment form on file; was

25   there?

1    A.   No.

2    Q.   And there certainly wasn't a separately managed

3    account, because it went to your own bank account; correct?

4    A.   No.

5    Q.   So -- wait.  That's not correct?  There was not --

6    A.   There was not, no.

7    Q.   There was not a separately managed account;

8    correct?

9    A.   Yes.

10   Q.   Thank you.  And when Victoria asked you about it,

11   you told her something that wasn't true; right?

12   A.   I don't remember a conversation with the

13   daughter -- with Victoria.

14   Q.   Okay.  So you don't remember the -- telling them to

15   open up a checking account.  You don't remember having the

16   meeting with Barry out there for the planning.  You don't

17   remember -- is that correct?  You don't remember that?

18   A.   Not specifically, no.  I'm not saying it didn't

19   happen, though.

20   Q.   And you don't remember what you said at the

21   Hearth?

22   A.   I mean, I'm sure we discussed it, because she wrote

23   the check out and signed the agreement, but I don't remember

24   the discussions.

25   Q.   Did she write -- did she sign the agreement and

```
1   write the check after her daughter left?
2       A.   I don't think there would have been enough time,
3   based on when the timing is.  I just don't remember.
4       Q.   We saw Mr. Einhorn ask for $300,000 dollars in a
5   split second.  You had 19 minutes of alone time with an
6   88-year-old woman.  Is that when you had her sign the
7   agreement?
8       A.   I don't remember.
9       Q.   Is that when you had her sign the check?
10      A.   I don't remember.
11      Q.   Is that when you told her you were going to move
12  securities from what was earning interest into your own
13  account?
14      A.   I believe the conversation could have taken place
15  both while the daughter was there and after she left.  That's
16  probably what happened.
17      Q.   Okay.  But you said before you don't remember?
18      A.   I don't remember.
19      Q.   And Victoria Hughes had no trouble remembering.
20           MR. EINHORN:  Well, I'm going to object to
21  characterizing her testimony.
22           THE COURT:  Sustained.
23  BY MR. McGARRY:
24      Q.   Okay.  So is it your testimony that you took all of
25  these individual steps, including having accounts opened,
```

1454

1  selling securities, moving money, moving it from one account

2  into a checking account, moving it from a checking account

3  into your account, moving it into your account to a check

4  made out to you, signing the back, making it out to Sean

5  Fitzmaurice, giving it to him, and you don't remember?  Is

6  that your testimony?

7      A.   I was drunk.  I'm sure I did it all.  I'm not saying

8  I didn't.

9      Q.   You don't remember?

10     A.   The specifics, the details, no, I don't.

11     Q.   You took all of these individual steps to get

12 $300,000 into your account, and it's your testimony to this

13 jury that you were drunk and you don't remember?

14     A.   I was drunk while I was doing it, absolutely.

15     Q.   And you drove from Waterbury to Madison, had a

16 meeting at an assisted living home, filled out documents,

17 drove back, talked to Barry, had him sell securities, and

18 you're saying "I was drunk the whole time"?  That's your

19 testimony?

20     A.   That was my normal day, yes.

21     Q.   And isn't it interesting -- do you find it

22 interesting that in your normal day, when you were drunk you

23 ended up with $300,000?

24     A.   That -- I believe that was the plan.  That was what

25 was discussed.

1     Q.   That was the plan, correct.  For you to end up with

2   $300,000, not with Mr. Truhan to end up with $300,000 of your

3   money?

4     A.   No.

5     Q.   So when you were drunk, the money all seems to work

6   its way to you; correct?

7     A.   I did whatever I had to do to get to the next drink.

8     Q.   But yesterday you testified you didn't have to pay

9   for drinks because you owned Signature's Restaurant?

10     A.   Only there.  Not everywhere else.

11     Q.   But you needed $300,000 to get the next drink;

12   that's your testimony?

13     A.   To solve my problems so I can get the next drink.

14     Q.   Okay.  And you knew that so that -- to solve your

15   financial problems; correct?

16     A.   Just any problem to get to the next drink.

17     Q.   But the money solved your financial problems; didn't

18   it?

19     A.   In this case with that person, yes.

20     Q.   Okay.  And all of this activity while you were in a

21   drunken haze, the money goes to you and your family;

22   correct?

23     A.   Yes.

24     Q.   So looking at the chart from Mr. Almodovar,

25   demonstrative Exhibit 63, all of this money, not including

1    the Burton Trust, worked its way to you.  The money didn't go
2    from you to your clients; correct?
3         A.   Well, some of the money did, yes.
4         Q.   Some --
5         A.   Some of the money went back to the clients.
6         Q.   Right.  To the early clients, like June Antonacci
7    who had called a lawyer.  That was -- let me see.  It was
8    Norman -- that's right, thank you -- Norman Drummond
9    (phonetic).  Remember that name?
10        A.   Sure.  He's a friend -- well, he was a friend.
11        Q.   He's a friend.  And he also was a friend of Ray's;
12   correct?
13        A.   Yes.
14        Q.   And he called you --
15        A.   He was a good drinking buddy.
16        Q.   Okay.  He called you to tell you, "You got to get
17   Ray his money back"; didn't he?
18        A.   It was a very friendly phone call.
19        Q.   And he was a friend, and you didn't want everyone to
20   know you didn't pay Ray back, because you're a financial
21   advisor or registered representative, so you did what you had
22   to do to pay Ray back; correct?
23        A.   Yes.
24        Q.   Now, yesterday, you testified about the fact that
25   you bought not one building but two buildings; correct?

1    A.   Yes.

2    Q.   Okay.  You testified about that.  You also testified

3  about having a handshake deal with Tom Sienkowski; correct?

4    A.   Yes.

5    Q.   Okay.  You remembered your meeting with Ray

6  Antonacci; correct?

7    A.   Yes.

8    Q.   Okay.  You remembered that you got some swag --

9  that's my word, not yours -- from Budweiser, like golf clubs

10 and jackets and hats; correct?

11   A.   When we -- yes, when we switched from Miller Lite to

12 Bud Light.

13   Q.   And today, you testified -- we saw all the

14 commissions that were generated; correct?

15   A.   I did.

16   Q.   And yesterday, you also said that, "Oh, I drink all

17 the time."  Do you remember that?

18   A.   I do.

19   Q.   Okay.  But there are -- but not on Sundays; right?

20   A.   No, I drank on Sundays, but it wasn't -- I went to

21 the office on Saturdays.  So the difference is I didn't go to

22 the office on Sundays.

23   Q.   Okay.  But turning your attention to Government's

24 Exhibit 1228.  And directing your attention to page 4.  When

25 you filled out this insurance form to get disability

1   insurance that you were applying for at that time, not taking

2   a claim, you testified -- I'm sorry -- you filled out that

3   you drank four to five drinks per week; correct?

4         MR. EINHORN:  We've been here before, Your Honor,

5   yesterday.

6         THE COURT:  This is a different context.  It may be

7   repetitious, but it makes a different point.  I'm going to

8   permit the question.

9   BY MR. McGARRY:

10    Q.   So here, when you're applying for insurance, you

11  said you drank only four to five days per week; correct?

12    A.   I was in denial about my drinking.

13    Q.   So you're saying that you lied on this form?  Is

14  that your testimony?

15        MR. EINHORN:  If Your Honor, please, that is the

16  same context, exactly the same -- I believe -- as yesterday.

17  I think it was the same question, too.

18        MR. McGARRY:  It's not the same answer.

19        MR. EINHORN:  Well, that's the problem when you ask

20  the same question over and over.

21        THE COURT:  Okay.  Hold on.  What precisely is your

22  question, Mr. McGarry, that's different from the question

23  that you asked about this form yesterday?

24        MR. McGARRY:  Well, I'm moving towards it.

25  Mr. Einhorn asked questions about him collecting on the

```
 1   policy, so I was establishing -- and I can move on, and I'll
 2   --
 3            THE COURT:  Okay.
 4            MR. McGARRY:  -- and we'll get to it.
 5   BY MR. McGARRY:
 6       Q.  I'll come back to it when we talk about the
 7   accepting of the policy.
 8            So you talked about your drinking buddies.  That's a
 9   term that you've used a number of times in your testimony;
10   correct?
11       A.  I believe so.
12       Q.  Okay.  And you mentioned -- at this trial, you
13   mentioned Mr. Roussel was one of your drinking buddies;
14   correct?
15       A.  He was a drinking buddy. I'm not sure if I mentioned
16   it previously.
17       Q.  And I believe -- do you remember the meeting -- or
18   the lunch where you told him you couldn't have any more
19   drinks, you had to go back to work?  Do you remember that?
20       A.  I don't think that ever happened.
21       Q.  Okay.  Now, you also testified that -- you testified
22   that Mr. Peluso was one of your drinking buddies?
23       A.  Homemade wine, all the time.
24       Q.  And let's see.  I think you also testified that you
25   had wine with Ms. Chauncey; correct?
```

1    A.    Over the years, many times.

2    Q.    And you testified, I believe, that Lyn Burton from

3    the Burton Trust was one of your drinking buddies?

4    A.    Unfortunately so.

5    Q.    Now, it seems -- would you agree with me that all of

6    your drinking buddies seem to be in their 60s and 70s, and

7    you're in charge of their retirement funds?

8    A.    If you go back to when we became drinking buddies,

9    they were maybe in their 50s and 60s, but, yes, I would agree

10   with that statement.

11   Q.    So your drinking buddies -- your word -- are people

12   who are in their 60s and 70s and you're in charge of their

13   retirement funds?

14   A.    My average client over that time span would have

15   been in that age period because people in their 20 and 30s

16   don't have assets.

17   Q.    And you were meeting with and trying to get seniors

18   to give you control of their retirement funds; correct?

19   A.    I was meeting with any client that I could.  There

20   were -- Mike Brough certainly doesn't fit that description.

21   I was just like the drunken pied piper, and people liked to

22   drink with me even if they weren't drinkers, and we did

23   business.  And I did okay for a long time.

24   Q.    And, so, when you say "for a long time," until it

25   turned out that you didn't have enough money to pay people

1  back; correct?

2      A.   I didn't plan on getting sick.

3      Q.   You didn't plan on the SEC coming to your office on

4  June 21st, 2017; did you?

5           MR. EINHORN:  Objection.  That -- I don't believe

6  that's in evidence.

7           THE COURT:  Sustained.

8  BY MR. McGARRY:

9      Q.   Did the SEC come to your office on June 21st,

10  2017?

11          MR. EINHORN:  Objection, Your Honor.  I thought we

12  discussed this issue.

13          THE COURT:  Where are you going with that,

14  Mr. McGarry?

15          MR. McGARRY:  I think it's directly relevant to what

16  happens after that.

17          THE COURT:  I'm going to permit that question, but

18  no --

19          MR. McGARRY:  Understood.

20          THE COURT:  Nothing further as to the SEC.

21          THE WITNESS:  Would you please repeat the question?

22  BY MR. McGARRY:

23      Q.   The SEC and the Connecticut Department of Banking,

24  Securities Division, came to your office to do an examination

25  on June 21, 2017, an unannounced examination; correct?

1462

1     A.    The Connecticut Banking -- the Connecticut Banking
2  Department came previously, and they did do an examination.
3  The SEC did come on a date that -- that sounds like around
4  the time.
5     Q.    June 21, 2017?
6     A.    If you say that's the date.
7     Q.    Now, going back -- I meant to ask you a question
8  about Lyn Burton.  Lyn Burton got evicted from her apartment
9  for lack of payment; correct?
10    A.    I don't believe it was for lack of payment.
11    Q.    And do you remember Mary Tyrell (phonetic), her
12 pharmacist?
13    A.    I've never met her.
14    Q.    But you had to pay money for her prescriptions;
15 didn't you?
16    A.    I believe so.
17    Q.    At some point in time, the trust ran out of money to
18 pay for prescriptions; correct?
19    A.    I don't remember that.
20    Q.    At some point in time, the trust ran out of money to
21 pay for rent for Lyn Burton; didn't it?
22    A.    The trust may have run out, but I believe I was
23 still paying that out of my accounts.
24    Q.    And do you know where Lyn Burton is now?
25    A.    I believe she's in a convalescent home.

1   Q.   And do you know the cost of that home?

2   A.   I do not.

3   Q.   And the trust is not paying for that; is it?

4   A.   I don't believe so.

5   Q.   Because the trust money is all gone; isn't it?

6   A.   I believe so.

7   Q.   Now, take a look at Government's Exhibit 309.  Do

8   you remember these text messages and exchange with Mike

9   Brough -- Michael Brough?

10  A.   I don't remember them, but I see that they

11  happened.

12  Q.   Do you remember you wrote, "Hi, Mike.  I just landed

13  at JFK from San Diego."

14       Do you remember going to San Diego?

15  A.   I do remember.

16  Q.   And you remember coming back?

17  A.   I did.

18  Q.   And then you tried to set up a meeting.  You said:

19       "Good morning. I'm conforming tonight at 6:15 p.m.

20  at my office"; correct?

21  A.   Yes.

22  Q.   And he said:  "Let's make it 6:00"; correct?

23  A.   Yes.

24  Q.   Okay.  And I'm going to only read part of this text,

25  but you said:  "No worries.  Wednesday is my daughter's award

1   night at Liturgy in Milford, so that doesn't work, of course.

2   How is tomorrow at 6:00 p.m.?"

3       A.   Well, that's because he --

4       Q.   Go ahead.

5       A.   If you read above it, he changed the appointment.

6       Q.   Okay.

7       A.   So then we were trying to reschedule.

8       Q.   Right.  And you were working on your phone trying to

9   reschedule?

10      A.   Yes.

11      Q.   And then you had to, you know, go to Liturgy down in

12  Milford?  Were you speaking at the Liturgy, or were you just

13  attending?

14      A.   I just attended.

15      Q.   And you drove down there; didn't you?

16      A.   I may have driven down with Monica.  I don't

17  recall.

18      Q.   And then -- I'm not going to read that text out

19  loud, but you're again going back and forth to try to pick a

20  time and a day; correct?  And then you tell him that's

21  there's no -- he writes that he wants to talk about a Roth

22  IRA; correct?

23      A.   Yes.

24      Q.   Okay.  He writes:  "I was thinking about a Roth IRA

25  ASAP."  Do you see that?

1   A.   Yes.

2   Q.   Okay.  You said:  "Friday lunch, come to you."

3        And then you texted him:  "There's no deadline for a

4   Roth by the way, and we have pending recharacterization for

5   IRA."

6        Okay.  He didn't have -- his money was not in an

7   investment account by that point; was it?

8   A.   No.

9   Q.   It had been gone into the Leon Vaccarelli program --

10  that is, your checking account; correct?

11  A.   Yes.

12  Q.   So there really was no recharacterization for his

13  IRA funds, unless you had told him candidly what had happened

14  with his money; correct?

15  A.   What I believe happened was, when he was going to

16  get repayment, because we were holding the money for his

17  business, we were going to recharacterize the IRA to a Roth.

18  That's what I remember.

19  Q.   Okay.  But his money -- let's see.  Is it 62?

20  Government's Exhibit 62.  Let's see.  There you go 64.  Okay.

21  His first money had gone to Mr. Kolesnik, Laurelton Hall and

22  cash; correct?

23  A.   According to the chart, yes.

24  Q.   And according to the long black and white

25  spreadsheet that we've seen; correct?

1    A.    I believe so.

2    Q.    And if we go to 65, then you transferred some of his

3   41,000 to your other account and then it went to Laurelton

4   Hall, to Monica, to Brie Sodano -- and that's a woman who

5   worked in your office; correct?

6    A.    Yes.

7    Q.    And your other partner, Barry; correct?

8    A.    Yes.

9    Q.    Okay.  So if we go back to Government's Exhibit 309

10   and we scroll down with all this back and forth, that

11   approximately $80,000 could not have been moved from where it

12   was to either a Roth or any kind of IRA because it had been

13   spent; correct?

14    A.    At the time of the meeting, no, it could not have

15   been.

16    Q.    No, it could not have been put into a Roth because

17   it had been spent; correct?

18    A.    Yes.

19    Q.    And the meeting -- if this helps refresh your

20   recollection on the date -- the meeting -- that meeting you

21   were at with Mike Brough was the same day that the

22   examination people had been at your office; correct?

23    A.    If it was, in fact, that day, yes.

24    Q.    And you then sat with Mike Brough; didn't you?

25    A.    No, I don't -- I think he was -- at night we met,

1    with him.

2         Q.   Correct.

3         A.   Yeah.

4         Q.   You met with Mike at night.

5         A.   Right.

6         Q.   And that was --

7         A.   Because, as I recall, when they came, I believe I

8    was leaving to go bring my mother to dialysis.

9         Q.   There was a lot going on at that point.

10        A.   I think, yeah, my mother was very sick at that time;

11   yes.

12        Q.   And I genuinely don't want to go down that road, but

13   your mom was sick; you had a lot of financial pressure; and

14   then the examiners showed up.  Correct?  Right about the same

15   time, same day that you had this meeting with Mike Brough;

16   correct?

17        A.   Yes.

18        Q.   Okay.  And that was not a good day; correct?

19        A.   No, of course not.

20        Q.   It was a bad day?

21        A.   I would say so.

22        Q.   And that was just about two weeks before you had an

23   intervention; correct?

24        A.   Maybe a little more than two weeks.  But, yeah,

25   three weeks, four weeks, maybe a month.

1468

1       Q.   Okay.  And then after that, you went out and you

2   flew out to Las Vegas; correct?

3       A.   Yes.

4       Q.   And you, I believe, testified yesterday that you

5   specifically remember that you were given $200, and you spent

6   it at the airport bar on your way to Vegas?

7       A.   Something like that, because I had very little money

8   left when I got there.

9       Q.   And that was part of the program.  And you

10  remembered that; correct?

11      A.   Yes.

12      Q.   And that was in, I believe, July of '17; correct?

13      A.   Yes.

14      Q.   So you remembered getting $200 and spending 160;

15  correct?

16      A.   I remember spending almost all my money on drinks

17  going out.

18      Q.   Okay.  But you don't remember details of getting

19  $300,000 from Carmela Truhan?

20      A.   I remember going there.  I remember getting the

21  check, her signing the paperwork.  That's about it.

22      Q.   But you have a good recollection of your own $200;

23  correct?

24      A.   It was my drinking money.  That's all that

25  mattered.

1    Q.   Okay.  Now, Mr. Einhorn asked you, and at some point

2    you sought disability insurance; correct?

3    A.   Yes.

4    Q.   Okay.  Let me show you not yet in evidence

5    Government's Exhibit 1234.  Okay.  Do you recognize this

6    document?  And I will enlarge it for you.  Do you recognize

7    your handwriting?

8    A.   Yes.

9    Q.   And do you recognize your signature; correct?

10   A.   Yes.

11   Q.   Okay.  And this is a different document.  And

12   scrolling down, I believe it's a four-page document in your

13   handwriting; correct?

14   A.   Yes.

15   Q.   Okay.  And this was the document that you completed

16   in order to put in for a claim from the insurance company for

17   disability; correct?

18   A.   Yes.

19        MR. McGARRY:  Okay.  I'd move this into evidence,

20   Your Honor.

21        MR. EINHORN:  No objection, Your Honor.

22        THE COURT:  Full exhibit.

23   BY MR. McGARRY:

24   Q.   Okay.  And since we've been talking about it and the

25   jury is now seeing it, this is a document that you signed in

1  order to claim on the Principal Group Life Insurance;

2  correct?

3      A.  Yes.

4      Q.  Okay.  And down at the bottom, right above your

5  signature, there's a statement where it says, "Fraud

6  statement:  Any person who knowingly and with intent to

7  defraud any insurance company or other person submits a

8  statement of claim or application form containing any

9  materially false information or" -- I can't read that word,

10  to be honest with you -- "for the purposes of misleading,

11  information concerning any fact material thereto commits a

12  fraudulent insurance act, which is a crime."

13          It says that, and you signed underneath it;

14  correct?

15      A.  Yes.

16      Q.  Okay.  And if we go to the second page, I believe

17  you're claiming total disability and you say the date is June

18  22nd that you stopped working; correct?

19      A.  Yes.

20      Q.  Okay.  And that is the day after the examiners came

21  to your office; correct?

22      A.  Yes.

23      Q.  Does that help refresh your memory that it was June

24  21st that they came?

25      A.  Well, it makes sense.

1    Q.   And staying with this Exhibit 1234 for a minute, at

2    some point -- that was -- let's get the correct date.  That

3    was September 20, 2017.  That was when you were back from

4    Solutions; correct?

5    A.   No, I was still --

6    Q.   You were still at Solutions?

7    A.   I was still at Solutions, I believe.

8    Q.   And then on or about November 20th, you were

9    interviewed at 9:50 a.m. at your then house, Joshua Town

10   Road, in connection with your insurance claim; correct?

11   A.   I don't remember.  I believe there was an interview

12   along the way.

13        MR. EINHORN:  I'm sorry, Your Honor.  Is this an

14   exhibit?  What are we referring to?

15        MR. McGARRY:  Not yet.

16        THE COURT:  Well, don't have him testify from an

17   exhibit not in evidence.

18        MR. McGARRY:  I'm not asking him to read it.  I'm

19   asking if he remembers.

20        THE COURT:  All right.  Go ahead.

21        MR. EINHORN:  I move it be stricken, Your Honor.

22        THE COURT:  What should be stricken?

23        MR. EINHORN:  The -- it wasn't really a question.

24   Well, the question that counsel started to propose, or was

25   proposing -- it sounded like a speech, but --

1    THE COURT:  Hang on.  The answer was to the
2    question, On November 20 you were interviewed at 9:50 at your
3    house, correct?
4    I don't remember.  I believe there was an interview
5    along the way.
6    May I ask you to please ask your next question?
7    MR. McGARRY:  Yes, Your Honor.
8    THE WITNESS:  Excuse me.  Is it okay if -- I know
9    they told me if during interview if I had to use the
10   restroom, I could ask.  Is that -- I'm sorry.
11   THE COURT:  That's fine.  We'll take an early -- I
12   mean a morning recess.
13   MR. McGARRY:  Your Honor -- all right.  Fine.  He's
14   got to -- that's fine.
15   THE COURT:  You're not that tough.
16   MR. McGARRY:  No.
17   THE COURT:  We'll take a 15-minute break.
18   (Jury out, 10:53 a.m.)
19   THE COURT:  All right.  We'll be back in 15
20   minutes.
21   MR. McGARRY:  Your Honor, could I --
22   So, Your Honor, just so the Court is clear now the
23   jury is out, I plan on asking Mr. Vaccarelli about some
24   statements that he made, which I think I'm entitled to under
25   Rule 613, and then we'll see what his answer is.

```
 1              THE COURT:  What sort of things?
 2              MR. McGARRY:  Well --
 3              THE COURT:  I mean, why are you telling me this with
 4    no substance?
 5              MR. McGARRY:  I just wanted the Court to be aware
 6    that there is prior statements that I think are relevant that
 7    I will ask him about, I will confront him about it, I will
 8    ask him if he accepts or denies the statement, and then I
 9    would impeach him under Rule 613 if he seeks to deny the
10    statement.
11              THE COURT:  We'll wait and hear.
12              MR. McGARRY:  Very good.
13              THE COURT:  All right.  Thank you.  We are in
14    recess.
15              (Recess taken, 10:55 a.m.)
16              (Out of the presence of the jury, 11:15 a.m.)
17              THE COURT:  All right.  Please be seated.  All is
18    well, Mr. Vaccarelli?
19              THE WITNESS:  Thank you.
20              THE COURT:  Okay.  Let's bring in the jury.
21              MR. EINHORN:  Well, before we do, since Mr. --
22    rather than ask them to leave again I guess in a few minutes,
23    Mr. McGarry just -- and I have no clue, because I know
24    nothing else about it except what Mr. McGarry said when we
25    broke, but it sounds like he's talking about bringing in
```

1  other statements by this particular witness, which may or may

2  not be inconsistent, and then counsel cited to Your Honor the

3  mechanics for doing that under Rule 613.  But, presumably,

4  he's going to be doing this under Rule 806.

5          I'd like to ask for a proffer from the Government

6  first before we get there, otherwise we're literally talking

7  about a mini trial additional witnesses.  The Government has

8  a witness in the hallway dealing with these particular

9  exhibits.  I think we should ferret out exactly where -- if

10  there is a prior inconsistency before we go down this rabbit

11  hole.

12          THE COURT:  So, Mr. McGarry, can you give me the

13  subject matter that you are about to --

14          MR. EINHORN:  Did Your Honor want Mr. Vaccarelli

15  excused while we do this or -- I'm not suggesting it.

16          MR. McGARRY:  I would very much suggest it, Your

17  Honor.

18          THE COURT:  Of course.  All right.  Mr. Vaccarelli,

19  may I ask you to absent yourself from the courtroom?

20          THE DEFENDANT:  Into the conference room or the

21  hallway?

22          THE COURT:  Out in the hallway, please.

23          THE DEFENDANT:  Oh, the hallway.  Okay.

24          THE COURT:  Can you give us an idea of what the

25  prior inconsistent statements relate to?

1    MR. McGARRY:  His -- the core or the gravamen of his

2  direct testimony is inconsistent with what he told the

3  insurance investigator when he was seeking to get his policy

4  honored to pay him money.

5    THE COURT:  Is this with respect to his alcohol

6  impairment?

7    MR. McGARRY:  Yes, and his judgment --

8    THE COURT:  All right.

9    MR. McGARRY:  -- when it came to his clients'

10  money.

11    THE COURT:  Sounds appropriate, Mr. Einhorn.

12    MR. EINHORN:  First of all, under Rule 613, I'm

13  entitled to see a transcript of this prior inconsistent

14  statement -- or this statement -- sorry -- on request, which

15  I am now requesting.

16    THE COURT:  Do you have copies?

17    MR. McGARRY:  I do.

18    THE COURT:  Okay.  Would you show them to

19  Mr. Einhorn, and obviously --

20    MR. McGARRY:  (Handing.)

21    THE COURT:  We will not yet show them to Mr.

22  Vaccarelli because he might not disagree with them.  All

23  right.

24    MR. EINHORN:  Sorry, Your Honor.  I don't believe

25  these are inconsistent with what he was -- with what we're

1   doing here.  And, in particular --

2           THE COURT:  I think the statement, according to the

3   insured, his judgment, when it came to investing his clients'

4   money, was never impaired.  If he admits that, fine, this

5   won't come in.  If he denies it, he can be examined on it.

6           MR. EINHORN:  But continuing down the rest of that

7   paragraph, he states, "Our insured stated there's always risk

8   involved with investing.  These clients are looking for a way

9   to make up their financial losses by blaming him and his

10  abuse of alcohol for them."

11          So right there he talks about his abuse of alcohol.

12  That's what brought us here in the first place, so I don't

13  see the inconsistency if it's -- if his claim is his abuse of

14  alcohol.

15          THE COURT:  The impairment of judgment is the

16  critical part of his claim that his alcohol impairment

17  precluded his having the intent to defraud.

18          MR. EINHORN:  This appears to be page 9 of 11, and

19  so far as I know, it's taken out of context from a much

20  larger statement.  As Your Honor can see in the top left-hand

21  corner of the -- of not the first page but the second page,

22  it indicates page 9 of 11.

23          THE COURT:  All right.  Do you have the entire

24  document, Mr. McGarry?

25          MR. McGARRY:  I do, Your Honor.

1    THE COURT:  Thank you.

2    MR. McGARRY:  We've marked the entire document

3  Government's Exhibit 1226 for identification, and it was also

4  bearing the Bates stamp numbers from when it was produced.

5  Handing a full copy to Mr. Einhorn and to the Court.

6    (Handing.)

7    (Pause.)

8    THE COURT:  All right.  Let's see where this goes.

9  You've got the documents that you need.

10    MR. EINHORN:  If Your Honor please, I would withdraw

11  my objection if the Government will submit the entirety of

12  the document piece, which was taken out of context, which is

13  1226.  I'd withdraw any objection to the use of -- on that

14  basis.

15    MR. McGARRY:  We are offering the part -- if we're

16  first going to see if he says it.  If he says it, it's not

17  inconsistent, then his testimony would stand.  If it's

18  inconsistent, we would offer the piece that is inconsistent

19  with this testimony, whereas the other parts of the document

20  relate to other topics -- mention children, and is -- are

21  consistent with his testimony, so I don't think that they

22  would come in under the impeachment doctrine, which is why we

23  took those two narrow paragraphs and the front page to put

24  them into 1227.

25    MR. EINHORN:  I disagree, Your Honor.  I think that

1   the Government is taking something out of context.  And if

2   you read it within the full context, and I think the jury is

3   entitled to hear the full context, then it talks about many

4   things besides just his children, as Mr. McGarry suggests.  I

5   suggest that, in all fairness, the way this should be handled

6   is either all of the document comes in or none of the

7   document should come in.

8          THE COURT:  Well, I don't think the Government can

9   be forced to put in the whole document.

10         MR. EINHORN:  I apologize.  Referred to, yes.  I

11  don't think --

12         THE COURT:  And I'd like to hear whether or not he

13  will agree that the nine civil actions claimed his judgment

14  regarding the managing of their investments was impaired by

15  his use of alcohol and cost them money, his judgment when it

16  came to investing clients' money was never impaired, and the

17  rest.

18         So let's see where this goes.  Let's bring back the

19  jury.  Let's bring back the Defendant.

20         (Jury in, 11:30 a.m.)

21         THE COURT:  Please be seated, ladies and gentlemen.

22         Mr. McGarry will proceed.

23         MR. McGARRY:  Thank you, Your Honor.

24  BY MR. McGARRY:

25     Q.   Mr. Vaccarelli, on the screen is the form that you

1    signed where you submitted a claim on your disability

2    insurance.  Do you see that?

3        A.   Yes.

4        Q.   Okay.  In connection with your disability claim, you

5    were interviewed by a representative of the Principal;

6    weren't you?

7        A.   I was.

8        Q.   Okay.  And he came to your residence -- or your

9    former residence of Joshua Town Road; correct?

10       A.   Yes.

11       Q.   And it was in or about November 20th of 2017;

12   correct?

13       A.   It was after I was back from Nevada.

14       Q.   Which would be November?

15       A.   Around that, yes.

16       Q.   And he asked you some questions; correct?

17       A.   I believe so, yes.

18       Q.   And you gave him some answers; correct?

19       A.   Yes.

20       Q.   And you knew it was important because you had put in

21   a disability claim; correct?

22       A.   Yes.

23       Q.   And you needed the disability claim because you were

24   no longer working; correct?

25       A.   Yes.

1    Q.   That would be a source of income for you if you did

2  get the claim approved and paid; correct?

3    A.   Yes, I was -- I felt I was disabled at the time.

4    Q.   And you knew that it was important to tell the

5  truth; correct?

6    A.   Yes.

7    Q.   Okay.  And you knew that it was important to listen

8  to his questions and answer his questions truthfully if you

9  wanted the claim; correct?

10    A.   Yes.

11    Q.   Okay.  And you told him, did you not, that your

12  judgment, when it came to investing your clients's money, was

13  never impaired; didn't you?

14    A.   I don't recall that.

15    Q.   This is after you are back from Solutions?

16    A.   I still don't recall making that statement.

17    Q.   You stated that there were civil actions against

18  you; didn't you?

19    A.   I don't remember.  I believe so.

20    Q.   And you stated that -- well, let me ask you this

21  question one more time, because you said you didn't

22  remember -- then I'm going to ask for a minute, Your Honor.

23        He asked you some questions about lawsuits;

24  correct?

25    A.   I guess so.  I don't -- I don't remember

1   specifically.

2       Q.   All right.  Well, let me put the question this way:

3   Is it your testimony that you do not recall telling him in

4   connection with your claim that when it came to investing

5   your clients' money your judgment was never impaired?

6       A.   I don't recall that statement.

7            MR. McGARRY:   Can I just have a minute, Your Honor?

8            (Counsel confer.)

9   BY MR. McGARRY:

10      Q.   So, again, moving forward, this is an instance where

11  in November of 2017, after you're back from Solutions, when

12  you're in a meeting where someone was asking you questions,

13  this is something that now you don't remember?

14      A.   No, I -- just thinking back to it, I was very

15  nervous that they were sending someone out.

16      Q.   Okay.  The question was:  You don't remember?

17      A.   I don't -- No, I don't recall that statement.

18      Q.   And you spent 90 days inpatient in Vegas?

19      A.   I did.

20      Q.   You remember after you hit rock bottom -- I think

21  that was your term yesterday -- the details of where you were

22  in the airport, what kind of drinks you got, going out to

23  Vegas, an incident where you said they needed to get you

24  vodka.  You testified to that yesterday; right?

25      A.   I did.

1    Q.   And, so, is it your testimony today that, when

2    Mr. Einhorn asked you questions yesterday, at the very

3    beginning of a 90-day detox you could give this jury

4    specifics, but after coming back in November when you were

5    asked a question about your judgment and investing clients'

6    money, you don't remember that today?

7    A.   I remember everything about drinking.  Going to the

8    detox was very, very, you know -- I didn't want to go, so

9    that's why I remember that.

10   Q.   Let me stop you there.  You were in detox for 90

11   days?

12   A.   Yes.

13   Q.   You were drinking substantially less alcohol,

14   correct, after detox than before?

15   A.   Oh, yes.

16   Q.   Okay.  You weren't near rock bottom like you were a

17   couple days after the examination of your office; correct?

18   A.   After I came back from rehab, during rehab, not

19   drinking alcohol, even to this day, I'm not the same

20   person.

21   Q.   I understand.  But what I'm saying is, you don't

22   remember what you said to the investigator?

23   A.   No, I don't recall the conversation.

24        MR. McGARRY:   I'm going to move on, Your Honor.

25   BY MR. McGARRY:

1    Q.   So since coming back, you've also been going to

2  counseling, that Mr. Einhorn talked to you about; correct?

3    A.   Counseling?  Yes.  Therapy, yes.

4    Q.   At Blue Sky; correct?

5    A.   Yes.

6    Q.   Okay.  And you have a counselor.  A Ms. Donna

7  Gleissner?

8    A.   Yes.

9    Q.   Okay.  And you meet with her about weekly; correct?

10  Or were you meeting with her every day for a while?

11    A.   For a while every day, and it's down to once a

12  week.

13    Q.   Okay.  And do you remember saying to her that you

14  broke -- you didn't -- I'll give you the full context.

15          MR. EINHORN:  Well, before we go there, this sounds

16  like the same issue we just had, and I don't have a copy of

17  whatever statements we're talking about here.

18          Under the rule, as Mr. McGarry knows, I'm entitled

19  to see a copy of the statement.

20          THE COURT:  Okay.  There it is.

21          MR. McGARRY:  (Handing.)

22          MR. EINHORN:  May I have just a moment, Your Honor?

23          THE COURT:  Yes.

24          MR. McGARRY:   May I inquire, Your Honor?

25          MR. EINHORN:  Well, I would object.  May we have a

```
1   sidebar on this, Your Honor?
2           THE COURT:  Let me get a predicate question to --
3           MR. EINHORN:  Sure.
4           THE COURT:  -- have the context for this.  And this
5   is -- you have given him a copy of 1213 for identification?
6           MR. McGARRY:  Correct.
7   BY MR. McGARRY:
8       Q.  And this is page 20 of 75 of a report authored by
9   Ms. Donna Gleissner.  You remember meeting with her;
10  correct?
11          MR. EINHORN:  Whoa.
12          MR. McGARRY:  I'm going to ask a predicate
13  question.
14          THE COURT:  Okay.  But not anything about this
15  document.
16          MR. McGARRY:  Correct.  Okay.
17  BY MR. McGARRY:
18      Q.  You remember meeting with her; correct?
19      A.  I meet with her often.
20      Q.  And you speak with her; correct?
21      A.  Often.
22      Q.  And as part of your counseling, she asks you
23  questions and you give her answers; correct?
24      A.  We have a conversation.
25          MR. EINHORN:  Can we have that sidebar before the
```

1   Government goes any further on this, Your Honor?

2           THE COURT:  I'll see you at sidebar.  Excuse us,

3   ladies and gentlemen.

4                              ***

5   **SIDEBAR CONFERENCE AS FOLLOWS:

6           THE COURT:  What is your next question?

7           MR. McGARRY:  My next question was going to be, Is

8   it important to listen -- to answer questions truthfully,

9   tell the truth?  And then I was going to ask if he, in fact,

10  told her that he broke the rules by taking nine people's

11  money and investing it, and the firm was investigated due to

12  a staff member's actions and that was how he got caught.

13          And then I would inquire as to who the nine people

14  were, because we know there are more, and who was the staff

15  member who was getting investigated.  And then I would ask

16  him the second question, that he has made money on his

17  victims' accounts that they will get back.  And then that, in

18  fact, that's not true.

19          THE COURT:  What is inconsistent with his prior

20  testimony?

21          MR. McGARRY:  Well, if I ask him this question and

22  he says that he agrees with it, then I would not introduce

23  this, because he will have -- I suspect his answer to this

24  question will be inconsistent with his prior statement.  I

25  haven't impeached him yet.  He hasn't answered the question.

1            If he says yes, I told her that, then we move on.

2    If he says no, I didn't tell her that, then I think we're

3    entitled to introduce it.

4            THE COURT:  What is it about what you claim he told

5    his counselor that is inconsistent with what his prior

6    testimony was?

7            MR. McGARRY:  Well, nine as opposed to sixteen, but

8    I think that also a staff member's actions.  I think the

9    point -- the bigger point, Your Honor, is Mr. Einhorn is

10   going to call this woman to say that she has either an

11   opinion or she's treating him, and I think it's important to

12   point out, at least an example, though there are a number of

13   examples, that he's not entirely candid with her, that he's

14   not telling her the truth.

15           THE COURT:  Why is that not appropriate for

16   cross-examination of her?

17           MR. McGARRY:  Well, because I think -- I think it

18   is, but I think we are entitled to the predicate from him

19   that she doesn't know what's true and what's not true; that

20   if he acknowledges that he's not telling her the truth, then

21   it goes to the fact that she is counseling based on bad

22   information.

23           THE COURT:  Perhaps I'm not remembering everything,

24   but I don't remember his blaming a staff member's actions.

25           MR. McGARRY:  I don't either.

```
1            THE COURT:  So why would this be inconsistent with
2    his prior testimony?
3            MR. McGARRY:  Because I think it goes to his
4    truthfulness and his candor and his veracity, as far as he's
5    telling one story here in this document to her and another
6    story to the jury.
7            THE COURT:  But that's not what 613's about.
8            MR. EINHORN:  That's not the rule.
9            THE COURT:  613 is when he gives testimony here.
10           MR. McGARRY:  Right.
11           THE COURT:  He says A and it is documented that he
12   said B.
13           MR. McGARRY:  Agreed.
14           THE COURT:  I don't think this is yet shown to be a
15   prior inconsistent statement.  As I read this, we haven't
16   heard a position from him about blaming a staff member,
17   claiming that his assets that the Government has frozen will
18   enable him to repay the victims, and I don't think the number
19   of people is particularly --
20           MR. McGARRY:  Well, I think then -- sorry.
21           THE COURT:  -- material.
22           MR. McGARRY:  I think I then should be able to
23   inquire -- just as a question, not necessarily 613 -- if he
24   told Donna Gleissner that he made money on the victims'
25   accounts that they will get back, because that -- he can say
```

1    he told her and he can say he didn't tell her that.

2              THE COURT:  And why would you not be framing the

3    question in, Did you make money on the victims' account that

4    they will get back, as opposed to what he told his counselor?

5              MR. McGARRY:  Right.  So I would ask that, and if he

6    says no, I didn't, then I can say, but you told your

7    counselor something different; didn't you?

8              THE COURT:  Well, that would at least set up that he

9    has said something on the subject of either a staff member's

10   action leading to his getting caught and that he has made

11   money on the victims' accounts that they will get back.

12             MR. McGARRY:  Right.

13             THE COURT:  Any problem with that, Mr. Einhorn?

14             MR. EINHORN:  No, I think that's accurate.  So far,

15   there's no inconsistency.  That may set up one, I don't

16   know.

17             THE COURT:  Okay.  All right.

18             MR. EINHORN:  Thank you.

19             MR. McGARRY:  So just so we're clear as not to waste

20   time with my fumbling, the Court would permit a question to

21   the effect of, Did a staff member's actions at your firm

22   cause you to get investigated and that's how you got caught?

23   And secondly I could ask -- and he could say yes or no.  And

24   then secondly I could ask, Did you make money on the victims'

25   accounts that they'll get back?

1    MR. EINHORN:  I don't see -- first of all, I don't

2    see the relevance as to whether or not a staff member turned

3    him in or not.  It doesn't matter who turned him in.

4    THE COURT:  It seems to me that the focus here is if

5    he says he made money on the victims' accounts.  And then you

6    can follow that with, and he claims that they will,

7    therefore, get that money back.

8    MR. EINHORN:  I would agree.  I think that's

9    relevant.

10    THE COURT:  The business about -- I can't quite tell

11    from this statement whether -- it looks as if it's a question

12    about the firm was investigated because of a staff member's

13    actions, which is really getting quite peripheral.

14    MR. McGARRY:  But for the fact -- I understand, but

15    for the fact he's -- he's the staff member, he's the

16    person.

17    THE COURT:  That may be, but we are trying very hard

18    not to get into the reasons and the substance of the

19    investigation by the SEC.

20    MR. McGARRY:  Right.

21    THE COURT:  I think that your objective is achieved

22    if he acknowledges he made money on the victims' accounts.

23    Whether or not you include that they will get back is up to

24    you.

25    MR. McGARRY:  And then I think I'm inquired to ask,

1    Did you ever tell anyone that you did?

2              THE COURT:  If he says he didn't make money.

3              MR. McGARRY:  Right.

4              THE COURT:  Yeah.

5              MR. EINHORN:  As long as it's clear.  It sounds a

6    little bit of double negative in there, but, yes, I think --

7              THE COURT:  Okay.

8              MR. EINHORN:  Okay.  Thank you.

9              THE COURT:  Thank you.

10                              ***

11             **SIDEBAR CONFERENCE CONCLUDES, 11:47 a.m.**

12             THE COURT:  We're back.

13   BY MR. McGARRY:

14        Q.   Mr. Vaccarelli, did you make money on the -- talking

15   about in this case, the victims in this case -- did you make

16   money on the victims' accounts -- question mark.

17        A.   Which accounts?

18        Q.   The individuals that we've been referring to in this

19   case.

20        A.   On their brokerage accounts or their annuities or --

21        Q.   On the money they gave to LWLVACC.

22        A.   I did not make money on that.

23        Q.   Okay.  Did you ever tell anyone that you made money

24   on their accounts that they will get back?

25        A.   Well, sure, in their regular accounts, absolutely.

1    Q.   Well, Mike Brough didn't have a regular account for

2  his $85,000; did he?

3         MR. EINHORN:  Your Honor, I don't think that's the

4  -- well, all right.

5         THE COURT:  Overruled.

6         THE WITNESS:  He had other accounts.

7  BY MR. McGARRY:

8    Q.   Not the IRA account, he didn't?

9    A.   I believe he had an IRA.

10   Q.   Karen had an IRA.

11   A.   I believe he had one, as well.

12   Q.   But as far as the money that went into LWLVACC that

13 we've been talking about for two weeks, you never made money

14 for those victims on those investments; did you?

15   A.   The ones that got paid back made money.

16   Q.   The Antonaccis made money.

17   A.   I believe there were a couple others, as well.

18   Q.   Christine Chauncey didn't make money.  So the

19 Correas and the Antonaccis?

20   A.   I believe Ms. Chauncey did make money.  She was

21 overpaid due to taxes.

22   Q.   Now, she gave you $20,000 early on that never made

23 it into an investment?

24   A.   But I believe there was another reason for that,

25 which she didn't dispute at the time.

1    Q.   Even -- even conceding the people that got some --
2    some money back, Denis -- now I'll ask you about Denis
3    Roussel, Susan Rustic, Marcia Schultz, Kathleen Strobel,
4    Carmela Truhan, Antoinette Izzi, Michael Brough, Denise
5    Augelli, they did not make money on investments that they
6    gave you on page -- referenced in Government's Exhibit 63,
7    did they?
8    A.   The intention was for them to make money.
9    Q.   But they never made money; did they?
10   A.   No.
11   Q.   Okay.  Did you ever state, in form or in substance,
12   that these nine or so individuals made money on their
13   accounts and that they'll get that money that they made back
14   from you?
15   A.   I don't know if I stated that or not.  It may have
16   been confused that they made money on their other accounts or
17   that I intended to make them money and give it back to
18   them.
19   Q.   So your testimony is that you don't remember one way
20   or another whether or not you said that?
21   A.   I don't know what accounts I was referring to.
22   Q.   Okay.
23        MR. McGARRY:  I'll move on, Your Honor.
24   BY MR. McGARRY:
25   Q.   Okay.  Let's go back.  We were talking about --

1493

1    let's go back and talk briefly about when you were at

2    Solutions.  Okay?

3        A.    Okay.

4        Q.    So after there was -- after the SEC, Connecticut

5    Department of Banking, you stopped working -- on the form you

6    wrote June 22nd; correct?

7        A.    I believe so.

8        Q.    Okay.  Then you went out to Solutions and you were

9    at the Solutions facility; correct?

10       A.    Yes.

11       Q.    Okay.  And you were getting treatment; correct?

12       A.    Yes.

13       Q.    Okay.  And, presumably, they had you on a program --

14   an actual program -- to reduce any drinking that you might

15   have wanted to do; correct?

16       A.    It was called detox, but --

17       Q.    And you weren't drinking in the shower at Solutions?

18   You weren't drinking a snifter of cognac in the shower at

19   Solutions?

20       A.    No.

21       Q.    They don't permit that?

22       A.    No.

23       Q.    You weren't in a drunken haze when you were at

24   Solutions because you were getting treatment; correct?

25       A.    Right, but I wasn't -- I was -- it's all a blur.

1    Solutions is a blur, but I wasn't in a drunken haze.

2        Q.   You weren't in a drunken haze.  And, in fact, you

3    were getting some advice -- and I don't want to know the

4    advice.  You were getting some advice from lawyers -- not

5    Mr. Einhorn -- while you were at Solutions; correct?

6        A.   I remember a couple instances of that, yes.

7        Q.   Okay.  So you're not in a drunken haze, you're at

8    Solutions, you've got some advice of counsel, and you wrote

9    the letter to Ms. Augelli; didn't you?

10       A.   I did.

11       Q.   Showing you what's in evidence as Government's

12   Exhibit 204.  And you wrote:  "Dear Ms. Augelli.  I'm

13   e-mailing you, probably against the advice of my attorney,

14   but I could not in good conscience let you and Mr. Augelli

15   continue to think your money is gone or stolen.  I am

16   horrified and distraught that you were led to believe this.

17   You will retire and be able to buy your granddaughter's

18   wedding dress."

19            Okay.  You wrote that to her; didn't you?

20       A.   I did.  It was in the evening, I recall.

21       Q.   Well, so this you do recall.

22       A.   Well, can I tell you why?

23       Q.   No.  You don't recall what you said to the insurance

24   person when you were back, but you do remember that;

25   correct?

```
 1        A.    When I was about to --
 2        Q.    Excuse me.  The question is:  You do remember this
 3   incident, you just don't remember talking to the insurance
 4   adjuster?
 5        A.    This was a crisis incident.
 6        Q.    Okay.  And you don't remember --
 7        A.    An emergency because I was going to leave --
 8        Q.    The question is whether or not do you remember.
 9              THE COURT:  Only one person can talk at a time.
10              MR. McGARRY:  Okay.  I pick me.
11              THE COURT:  The question -- you need to restrict
12   your answer to the question.  Mr. Einhorn can examine you
13   more fully, if that is appropriate.  Okay?
14              THE WITNESS:  Okay.
15              THE COURT:  Okay.
16   BY MR. McGARRY:
17        Q.    So you wrote this to Ms. Augelli; didn't you?
18        A.    Yes.
19        Q.    And you wrote that you could not in good conscience
20   let her to continue to think that her money was gone or
21   stolen?  Do you see that?
22        A.    I do.
23        Q.    Okay.  You were horrified and distraught that she
24   was led to believe this.  Do you see that?
25        A.    I do.
```

1    Q.    Okay.  In fact, showing you Government's Exhibit 30,

2    and directing your attention to the middle of the page -- and

3    this e-mail was while you were at Solutions in 2017;

4    correct?

5    A.    Yes.

6    Q.    To repeat a familiar phrase, what was the balance in

7    the account before Ms. Augellis' money came in?

8    A.    $325.

9    Q.    Okay.  And then it was transferred, and then

10   Ms. Truhan's money came in; correct?

11   A.    I believe so.

12   Q.    Okay.  And, in fact, by the time you're writing this

13   letter to Ms. Augelli, her money was gone; wasn't it?

14   A.    Yes.

15   Q.    Okay.  So when you wrote this to Ms. Augelli, it was

16   not true; correct?

17   A.    I believed there was money --

18   Q.    Yes or no.  It was not true; correct?

19   A.    I believed there was money in the account.

20   Q.    When you told her -- you had spent her money about

21   nine months earlier; hadn't you?

22   A.    I didn't remember that at the time.

23   Q.    And when you told -- when you wrote this to her that

24   you were horrified that she was led to believe it, you wrote

25   something that was not true; correct?

1    A.    In my mind, it was true.

2    Q.    Okay.  But you're at Solutions.  You just testified

3    a minute ago you weren't in a drunken haze.  And you're

4    writing to her to tell her that you want her to take the post

5    down because "I was hoping to keep all of this information

6    private as it's very embarrassing to me."

7          You wrote that, didn't you?

8    A.    I didn't want anyone to know I was in rehab.

9    Q.    But you're talking about her money.

10   A.    No.  I was talking about being in rehab, I

11   believe.

12   Q.    "While I am ill and away, all hell breaks loose with

13   the regulatory people."  You weren't talking about your

14   drinking.  You were talking about the regulatory people,

15   including the SEC and the Connecticut Department of Banking;

16   weren't you?

17   A.    I was talking about my drinking, as well.  I would

18   say I was talking about everything.

19   Q.    But the sentence immediately before -- "I was hoping

20   to keep this information private" -- was that "all hell had

21   broken loose with the regulatory people"; isn't it?

22   A.    It's the sentence before.

23   Q.    And that would be included in all of this

24   information; wouldn't it?

25   A.    Yes, it would be.

1      Q.   And you wanted to keep all of this information

2  private; didn't you?

3      A.   Yes.

4      Q.   And Ms. Augelli, who knew you since you were five

5  years old, had lost her retirement money and was going to

6  have trouble buying the wedding dress; wasn't she?

7      A.   That's what she said.

8      Q.   Okay.  And you didn't want anyone to know what was

9  going on with the money; correct?

10     A.   I didn't want her to feel that way.

11     Q.   You didn't want her to feel that her money was

12 gone?

13     A.   I didn't want her to be scared.

14     Q.   Because you took and spent her money?

15     A.   I left instructions with the lawyers that I had at

16 the time, and I believed at that time that there was money

17 and if she had contacted them they could get her money.

18     Q.   And, in fact, she did contact them; didn't she?

19     A.   That, I'm not sure of.

20     Q.   And they wouldn't talk to her; would they?

21         MR. EINHORN:  Objection, Your Honor.

22         THE WITNESS:  I believe they wrote her a letter.

23         THE COURT:  Wait a minute.  I'm sorry.  What is your

24 objection?

25         MR. EINHORN:  McGarry is going into hearsay areas.

```
1          MR. McGARRY:  Well, she was --

2          THE COURT:  That they wouldn't talk to her is not

3    hearsay.

4          MR. EINHORN:  Well, he had to get -- the information

5    had to come from somewhere and I don't --

6          MR. McGARRY:  I believe it's in the record.

7          MR. EINHORN:  -- Ms. Augelli testifying.

8          MR. McGARRY:  I believe it's in the record.

9          THE COURT:  I'm going to permit the question.  I

10   don't think it's hearsay.  It's the fact, not the substance.

11   BY MR. McGARRY:

12   Q.   They wouldn't talk to her; would they?

13   A.   I don't know that.

14   Q.   And you wrote that "You'll be able to buy your

15   granddaughter's wedding dress"; correct?

16   A.   Yes.

17   Q.   And Ms. Augelli never got any money back from you;

18   did she?

19   A.   Not from me, no.

20   Q.   And even if you were drinking, if you do something

21   under the alcohol that you wouldn't normally do, you're still

22   responsible because you did it; correct?

23          MR. EINHORN:  This was proffered before, Your Honor.

24   We went through this.  This exhibit and these exact words

25   were brought to the jury's attention from Exhibit 1200.
```

1          THE COURT:  1200 is a full exhibit.

2          MR. McGARRY:  Correct.

3          THE COURT:  You may ask.  But the question is what?

4    BY MR. McGARRY:

5     Q.   If you, Mr. Vaccarelli, did something, even if you

6    were under the influence of alcohol, you're still responsible

7    because, "Of course you are responsible, you did it";

8    right?

9     A.   That's what was written there by me.

10          MR. McGARRY:  I have no more questions.

11          THE COURT:  Redirect.

12                    REDIRECT EXAMINATION

13    BY MR. EINHORN:

14     Q.   Mr. Vaccarelli, after five hours of cross, I'll try

15    and be brief.  You were asked numerous questions attacking

16    your medical diagnosis; isn't that so?

17     A.   Yes.

18     Q.   As a matter of fact, you sat here for five hours

19    and, for the most part, heard questions questioning whether

20    or not you're really an alcoholic; isn't that true, sir?

21     A.   Yes.

22     Q.   Okay.  Did you really have an intervention with your

23    family in July of 2017?

24     A.   Yes.

25     Q.   That really happened; didn't it?

1501

1   A.   Yes, it did.

2   Q.   And after that, where did you go?

3   A.   To Solutions in Las Vegas, Nevada.

4   Q.   And you really went; didn't you?

5   A.   Yes, I did.

6   Q.   And that was an alcohol detoxification clinic?

7   A.   Yes.

8   Q.   And you were essentially on lockdown in that clinic

9   for 90 days; is that right -- 92 days?

10  A.   Yes.

11  Q.   All right.  And after that, you spent a little time,

12  I guess, outpatient there, too?  They had some facility --

13  A.   Yeah, yeah.

14  Q.   All right.  After you left there, the inpatient

15  treatment for your alcohol problems, did you continue with

16  outpatient counseling back home?

17  A.   Yes.  I was in a -- what's called an intensive

18  outpatient program at Danbury, Connecticut.

19  Q.   This is Blue Sky's?

20  A.   Yes.

21  Q.   Do you still go to Blue Sky's?

22  A.   Yes, I do.

23  Q.   And the treatment you received at Blue Sky, what was

24  it for?

25  A.   Alcoholism.

1    Q.   Okay.  And we already submitted, and the jury saw

2    them, three disability policies, three disability insurance

3    policies.  And what was the cause of the disability on those

4    three policies?

5    A.   Severe alcohol use disorder.

6    Q.   Okay.  Are you sitting here today and making up your

7    alcohol disorder?

8    A.   No.

9    Q.   This isn't something you fabricated just to give us

10   something to do here in court; is it?

11   A.   No.

12   Q.   And it's not something you fabricated so Mr. McGarry

13   could do five hours of cross-examination; is it?

14   A.   No.

15   Q.   Now, you did use the phrase that -- you said all

16   stockbrokers are alcoholics; right?

17   A.   Yes.

18   Q.   All right.  Would you please explain what you meant

19   by that for the ladies and gentlemen of the jury.

20   A.   When we were being taught how to drink and no one

21   knowing about it back in the early days, the comment from the

22   big-wigs was, We're all alcoholics.

23            MR. McGARRY:  Objection, Your Honor.

24            THE WITNESS:  All stockbrokers --

25            MR. EINHORN:  Don't tell us what anybody else said.

1   Let me rephrase the question, if I may, Your Honor.

2   BY MR. EINHORN:

3       Q.   When you made that statement about -- I want to get

4   it right -- all stockbrokers are alcoholics, were you

5   referring to people in particular or to a culture?

6       A.   To a culture.  It's a general statement.  Obviously,

7   not 100 percent of stockbrokers are alcoholics.  It wasn't

8   intended to mean 100 percent of all stockbrokers in the

9   country were alcoholics.

10      Q.   Okay.  And in terms of your alcoholism, how has it

11  affected your cognitive function?  Do you know what cognitive

12  function is?

13      A.   I do.

14      Q.   What is cognitive function, as you understand it?

15      A.   How my brain works, essentially -- how it thinks,

16  how it remembers.

17      Q.   So as you sit here today and having been through

18  what you've been through with your alcoholism, tell us how

19  you believe you have been affected by the alcoholism?

20      A.   I'm diminished.  I can't do numbers like I used to.

21  I need to use a calculator for simple addition.  I can't

22  focus to read a book more than 10, 15 minutes at a time.

23  Preparing for this trial was agonizing because I can't think

24  like I used to, to read all the pages and to go back there

25  when I was drinking.  I'm -- I just -- it's almost like it's

1 trying to start a car and the engine won't turn over.  And
2 that's my brain when I try to really get into something.

3          I'm not right.  And the sick thing is -- the twisted
4 thing is, I think if I start drinking again it'll all come
5 back.  I used to function at a very high level, I know I did,
6 for a long time.  I was smart.  I did good things.  I'm not
7 the person -- my core being isn't the person with these
8 diagnoses, with these labels, with the sins, with whatever I
9 did when I just wasn't right.  And my brain, I can't -- I
10 just -- I can't -- I can't focus.  I can't -- I just can't
11 even get the words out right now.

12     Q.   Now, the Government spent a considerable amount of
13 time going through instances where you wrote letters or
14 e-mails, correspondence with people and so forth --

15     A.   Uh-huh.

16     Q.   -- that appeared to make some sense, actually.  Can
17 you explain how you were able to do that when in the grips of
18 this disease?

19     A.   The alcohol was a high for me.  It put me into a
20 manic.  It kept me going.  It made me feel like Superman.  I
21 was able to function.  I was able to write a letter.  I was
22 able to, you know, articulate whatever strategy.  I mean,
23 I've been drinking heavy for over 20 years.  I was used to
24 it.  I needed to drink.  If I didn't drink, I wasn't able to
25 function.  It was just part of the day.

1    Most people -- I've learned people that have

2    addictions, whether it's, you know, drugs, you know, alcohol,

3    heroin, cocaine, opioids, they're workaholics, sexaholics,

4    overeating disorder -- eating disorders, they still get

5    through their daily routine.  You know, I'm able to get

6    through my daily living routine.  I get up, I take a shower.

7    And when I was in my haze, I was able to get through

8    that routine.  I mean, a lot of it is second nature.

9    MR. McGARRY:  All right.  Nothing further, Your

10   Honor.  Thank you.

11   THE COURT:  Recross.

12   MR. McGARRY:  Just briefly, Your Honor.

13                  RECROSS-EXAMINATION

14   BY MR. McGARRY:

15   Q.   Mr. Einhorn's first question was if you were asked

16   about your medical diagnosis.  In fact, you weren't asked

17   questions about a medical diagnosis; were you?  You were

18   asked questions about your ability to form intent; weren't

19   you?

20   A.   Aren't they the same thing?

21   Q.   You were asked questions about what you were able to

22   do, decisions you were able to make, choices you were able to

23   make, and what you did; correct?  Not about your medical

24   diagnosis.

25   A.   I don't -- I guess.  I don't know.

```
 1            MR. McGARRY:  No more questions, Your Honor.

 2            THE COURT:  All right.  Thank you.

 3            Thank you, Mr. Vaccarelli.  You may step down.  You

 4    are excused.

 5            (Witness excused, 12:10 p.m.)

 6            THE COURT:  Please call your next witness.

 7            MR. EINHORN:  Yes, Your Honor.  Sorry, Your Honor,

 8    we left her in the hall.  She'll be right here.

 9            THE COURT:  Ma'am, would you kindly come over to the

10    witness stand here?

11            THE WITNESS:  Okay.

12            THE COURT:  Remain standing.  Raise your right hand.

13    Ms. Freberg will administer the oath to you.

14            (BRIEAN SODANO sworn, 12:11 p.m.)

15            COURTROOM DEPUTY:  Please be seated and state your

16    name for the record.

17            THE WITNESS:  My name is Briean Sodano.

18            COURTROOM DEPUTY:  And can you spell your last name?

19            THE WITNESS:  S-O-D-A-N-O.

20            COURTROOM DEPUTY:  And can you tell us what city and

21    state you live in?

22            THE WITNESS:  Watertown, Connecticut.

23            THE COURT:  You may proceed, Mr. Einhorn.

24            MR. EINHORN:  Thank you, Your Honor.

25                          DIRECT EXAMINATION
```

1507

```
 1    BY MR. EINHORN:
 2         Q.    May I call you Brie?
 3         A.    Please.
 4         Q.    Brie, my name is Jon Einhorn.  We've met, obviously.
 5    And I'm just going to ask you a couple questions, obviously,
 6    about Leon Vaccarelli.
 7               First of all, can you tell us what you do for a
 8    living right now?
 9         A.    So, I own my own business.  I do financial
10    coaching.
11         Q.    Financial coaching?
12               And in that regard --
13               (Reporter interruption.)
14               THE WITNESS:  Oh, okay.
15    BY MR. EINHORN:
16         Q.    If you haven't done this before, it takes a little
17    getting used to.  You'll be fine.
18         A.    This is my first time.
19               THE COURT:  One of the things you need to do is
20    speak loudly enough and clearly enough so that that bar in
21    front of you, which is a microphone, picks it up and we can
22    all hear you and the court reporter can hear you.
23               And, also, when you are being asked a question, you
24    need to do a "yes" or a "no," not "uh-huh" or "uh-uh."  All
25    right?
```

1508

1    THE WITNESS:  Thank you.

2    THE COURT:  Thank you.

3    MR. EINHORN:  Thank you, Your Honor.

4    BY MR. EINHORN:

5    Q.   And in that regard, do you hold any -- used to say

6    NASD, now it's FINRA -- licenses?

7    A.   I do not.

8    Q.   What is that?  Or what are they?

9    A.   FINRA licenses?

10   Q.   Yes.  Do you hold those -- do you hold a registered

11   rep license or broker/dealer license or any securities

12   licenses?

13   A.   No.

14   Q.   You don't?

15   A.   I do not.

16   Q.   Okay.  Good.  Now, let me get right down to it.  How

17   do you know Leon Vaccarelli?

18   A.   So, I did have my licenses and I did work with Leon

19   at Lux, and that's how we know each other.

20   Q.   And when was that?

21   A.   I think I started in 2015.

22   Q.   Okay.  And you started in 2015.  And when did you

23   leave working with Leon?

24   A.   2017.

25   Q.   So, you were there about a two-year period?

1    A.   Correct.

2    Q.   Okay.  And would you tell us -- to explain a little

3   bit about your comment that you had a license, during that

4   time you had a securities license?

5    A.   Yes.

6    Q.   And which license did you hold?

7    A.   I had my 7, 66, and my insurance licenses.

8    Q.   Okay.  And with those licenses, what did you do when

9   you were working with Mr. Vaccarelli?

10    A.   So, I sold investments.  I did retirement planning.

11   I helped people with their student loans, FAFSA, all types of

12   financial work.

13    Q.   Okay.  And during that time period when you were

14   working with Mr. Vaccarelli, where were you working?  Where

15   were you located?

16    A.   At 49 Leavenworth Street.

17    Q.   Okay.  And can you just -- just to describe -- just

18   so it's clear, this was a -- I want to say a large building

19   in the center of Waterbury; right?

20    A.   Correct.

21    Q.   And what floor did you work on; do you remember?

22    A.   The second floor.

23    Q.   Okay.  Good.  And did you have your own office or

24   did you share an office with Leon?

25    A.   So, we had a suite.  So, we had separate offices,

1510

```
1    but we were in the same corner of the building.
2        Q.   Okay.  Now, do you know -- well, withdrawn.
3             Can you tell us, generally, your hours at work
4    during those days?  Obviously, I'm talking about --
5        A.   So, I would get to work about 10:00, and then I
6    would stay till 6:00 --
7        Q.   Okay.
8        A.   -- about, you know.
9        Q.   That's a standard day?
10       A.   Pretty standard for me, yeah.
11       Q.   Okay.  And do you remember the time you were hired
12   -- interviewed and hired by Leon for the job?
13       A.   Yes.
14       Q.   All right.  Tell us about that.
15       A.   So, we had a morning appointment.  We decided we
16   were going to work together.  He had a client, and I think I
17   left and ate lunch or something.  We finished up our
18   negotiations, and then we went to Diorio's to celebrate, I
19   guess, and that -- yeah.
20       Q.   And was Leon drinking at that time?
21       A.   Yes.
22       Q.   Okay.  Now, in terms of Leon's drinking, which is
23   really what I wanted to ask you about, you're in the office,
24   you said from 10:00 'til 6:00.  What did you observe about
25   Leon Vaccarelli's drinking habits during that time period?
```

1511

1    A.    Between 10:00 and 6:00?

2    Q.    Yes, please.

3    A.    So, we had a liquor cabinet in our office.  It was

4    in Leon's -- Leon's office.  It was fully stocked with all of

5    the things that you would have in a liquor cabinet.  And, so,

6    sometimes there would be drinking during the day, and then

7    sometimes we would maybe stay after -- you know, after the

8    end of the day, and have a drink, like before we went home.

9    Q.    All right.  You say you got there at 10:00.  Were

10   there ever any breakfast meetings where Leon had been

11   drinking over breakfast?  Do you remember those Wednesday

12   meetings, Wednesday breakfasts?

13   A.    I don't ever think Leon ever drank at -- we were at

14   -- Leon and I would have breakfast, and there was -- we would

15   have coffee at the breakfast meeting.

16   Q.    When you got in at 10:00, do you know if Leon had

17   already been drinking, usually, or did he start -- just start

18   once he got in the office?  Do you remember?

19   A.    I don't think there were -- there was maybe a couple

20   of times where there was questions of whether or not he

21   showed up to work drunk, but mostly he would drink at work.

22   Q.    Mostly he would drink at work.  What would he drink;

23   do you know?  Do you remember?

24   A.    Like, I think it depends on what time of day it

25   was.

1512

1    Q.   Okay.  Well, start with the early part of the day.

2    A.   So, the earlier part of the day, there might be

3    blackberry brandy in a coffee cup.

4    Q.   And continuing through the day, what would he

5    drink?

6    A.   Maybe wine in the middle of the day, and more

7    whiskey or vodka toward the end of the day.

8    Q.   Now, I only asked you about Leon.  Was there another

9    person, another rep in the office at the time?

10   A.   Yeah.

11   Q.   And that was Barry Michitsch?

12   A.   Correct.

13   Q.   Did Barry drink with Leon, too?

14   A.   Yes.

15   Q.   Can you describe the sort of -- I want to -- the

16   drinking relationship they had, if that makes any sense?

17   A.   So, usually they would go sit in Leon's office, and

18   I don't really know what happened in there -- I would be in

19   my office -- but if you opened the door, it definitely had a

20   smell of drunk stock brokers.

21   Q.   Drunk stock brokers?

22   A.   Yeah.

23   Q.   So, from your answer to that question, I take it

24   that Mr. Michitsch would drink with Leon, some of the time

25   anyway?

1    A.    Yeah.

2    Q.    Okay.  Now, you say you left at around 6:00.  Do you

3    know if Leon stopped drinking at 6:00, or did you ever have

4    occasion to see him or be at meetings with him at night when

5    he might be drinking?

6    A.    So, most of the time I left around 6:00.  Sometimes

7    I would work late, if I had a -- because sometimes, like, I

8    would have a client come visit me at 6:00.  So if Leon was

9    still -- if Leon was at the office after 6:00, there was a

10   pretty solid chance that he was drunk.

11        MR. EINHORN:  Okay.  May I have just a moment, Your

12   Honor?

13   BY MR. EINHORN:

14   Q.    Oh, just one thing.  I apologize.

15        Are -- you were familiar during that time period

16   with something called Signature's Restaurant?

17   A.    Yeah.

18   Q.    And that was next door to where your office was?

19   A.    Yes.

20   Q.    Would you tell us, if you recall, how often Leon

21   might be found in Signature's or go to Signature's?

22   A.    Several hours a day.

23   Q.    Several hours a day.

24        MR. EINHORN:  Okay.  Thank you.  Nothing further,

25   Your Honor.  Thank you.

1514

1     THE COURT:  Cross-examination?

2                    CROSS-EXAMINATION

3  BY MS. LARAIA:

4     Q.   Good afternoon, Ms. Sodano.

5     A.   Hi.

6     Q.   So I think you testified that you are no longer a

7  registered representative?

8     A.   I'm not.

9     Q.   Okay.  So you do something different?

10     A.   Uh-huh, yes.

11          THE COURT:  You need to say --

12          THE WITNESS:  Sorry.  Sorry.  Yes.

13  BY MS. LARAIA:

14     Q.   And that's also something financial-related; is that

15  right?

16     A.   Correct.

17     Q.   So, sort of helping people with their finances and

18  figuring out where someone might be able to cut some

19  expenses?

20     A.   Exactly.

21     Q.   Is that an accurate characterization?

22     A.   Yes.

23     Q.   Okay.  So, when you were hired by Mr. Vaccarelli and

24  you came on board, you were doing securities work at the

25  time; is that right?

1    A.    Correct.

2    Q.    So, you had -- I think you said your Series 7, your

3    Series 66, and you had maybe an insurance license?

4    A.    Yes.

5    Q.    And when you came on board to Lux, they had a fairly

6    successful firm; is that right?

7    A.    Yes.

8    Q.    And Mr. Vaccarelli had a number of clients?

9    A.    Yes.

10   Q.    And he was also a registered representative?

11   A.    Yes.

12   Q.    At the time, was that with The Investment Center?

13   A.    Yes.

14   Q.    And Mr. Vaccarelli was someone who had a lot of

15   experience at that point?

16   A.    Yes.

17   Q.    Fair to say he had more experience in securities

18   work than you did at the time?

19   A.    Yes.

20   Q.    And, so, when you started, he had sort of a little

21   bit of a mentor relationship with you; is that right?

22   A.    Yes.

23   Q.    And, so, I think you mentioned that you sometimes

24   had breakfast with him?

25   A.    Yes.

1    Q.    And you'd have some coffee?

2    A.    Correct.

3    Q.    Is that right?

4    A.    Uh-huh.

5    Q.    And you'd sit down and talk over coffee about how

6    things were going, maybe?

7    A.    Yes.

8    Q.    And he'd check in with you and see how things were

9    going?

10    A.    Yeah.

11    Q.    When you arrived at Lux, you had your own clients or

12    you brought some clients with you; is that right?

13    A.    Yes.

14    Q.    So, would Mr. Vaccarelli check in with you and just

15    see how things are going with your clients or maybe any new

16    clients?

17    A.    Yes.

18    Q.    Okay.  Fair to say Mr. Vaccarelli had a bigger book

19    of business, let's say a bigger group of clients than you did

20    when you started?

21    A.    Yes.

22    Q.    And Mr. Vaccarelli met with those clients?

23    A.    His clients?

24    Q.    His clients.

25    A.    Yes.

1    Q.   Did you ever see him maybe go into a conference room

2  with clients?

3    A.   Yes.

4    Q.   Do you know if he ever went to their houses?

5    A.   Yes, he did.

6    Q.   Did you ever go to clients' houses?

7    A.   To my clients?

8    Q.   To your clients' houses.

9    A.   Occasionally.

10    Q.   How about with Mr. Vaccarelli; did you ever go with

11  Mr. Vaccarelli to his clients' houses?

12    A.   Once I went, to be a witness on a Will.  It was

13  really Stephanie's client -- actually, it was Stephanie

14  Cummings' client.  Leon and I both went as a -- as witnesses

15  for a Will.

16    Q.   Okay.  And as a witness, you and Mr. Vaccarelli both

17  saw the person sign a document; is that right?

18    A.   Yes.

19    Q.   And, so, did you have to sign something to say that

20  you had witnessed the signature?

21    A.   I think my signature is on her Will, yes.

22    Q.   And Mr. Vaccarelli would have done the same thing?

23    A.   Yeah.

24    Q.   Okay.  Now, as part of the work that you did with

25  Lux, did you observe Mr. Vaccarelli doing work for his

1518

1    clients?

2       A.   Yes.

3       Q.   So, he made decisions about client investments; fair

4    to say?

5       A.   Correct.

6       Q.   And he managed clients' accounts, whether at The

7    Investment Center or whether that was some other investment

8    product?

9       A.   Yes.

10      Q.   And as part of being a stock broker, you do trades

11   sometimes; right?

12      A.   Yes.

13      Q.   Like, stock trades?

14      A.   Yes.

15      Q.   So, Mr. Vaccarelli did that?  He either ordered

16   trades or he did them himself; is that right?

17      A.   Yes.

18      Q.   And did you ever go into meetings with

19   Mr. Vaccarelli and hear him sort of pitch an investment idea

20   to a client?

21      A.   We've done a couple client meetings together,

22   yeah.

23      Q.   Okay.  And when you sat in on some of those meetings

24   with Mr. Vaccarelli, did you observe whether he had a

25   particular style in how he related to clients?

1    A.   Yeah.  Yes.

2    Q.   And how would you describe his style?

3    A.   I mean, he's an effective salesman.  He's kind.

4    He's -- he would listen thoroughly, and generally consider

5    more than just the investment money when he was advising,

6    consider cash flow and...

7    Q.   So he might give a client sort of a holistic picture

8    of what might be a good investment?

9    A.   Yeah.

10   Q.   And you said he was an effective salesman; is that

11   right?  So he could sometimes -- he could get clients to buy

12   into his ideas?

13   A.   Yeah.  Yes.

14   Q.   And did he give what you believed to be appropriate

15   advice to clients?

16   A.   In the meetings that I sat in, the advice was always

17   appropriate.

18   Q.   Okay.  And during those meetings, did Mr. Vaccarelli

19   speak clearly?

20   A.   Yes.

21   Q.   And did he give clients sometimes brochures or

22   documents to explain investments?

23   A.   Possibly.  I think he mostly did work on a legal

24   pad.

25   Q.   Okay.  So he might be writing something down for a

1    client?

2         A.   Yeah.

3         Q.   And maybe showing them the advantages or

4    disadvantages of one or more particular approaches?

5         A.   Yeah.

6         Q.   And the advice he was giving to people -- or the

7    information he was giving to people, based on your experience

8    as a registered representative, it was sound advice?

9         A.   It was sound advice.

10        Q.   Now, when you were working with Mr. Vaccarelli, both

11   you and he had children attending the same preschool; is that

12   right?

13        A.   Correct.

14        Q.   Or a child who was attending the same preschool.

15             And, so, when you came in, had you already dropped

16   off your child at preschool and then come into the office?

17        A.   Yes.

18        Q.   And had Mr. Vaccarelli sometimes done the same

19   thing, dropped off a kid and then came in?

20        A.   I think his wife usually did the drop-offs, but,

21   yeah, we were there after the kids were at school.

22        Q.   Okay.  And how did Mr. Vaccarelli get to the

23   office?

24        A.   In his car.

25        Q.   Did he drive himself or did anyone else drive him?

1    A.    Oh, I think he drove himself.

2    Q.    Did you ever see him driving to or from the

3  office?

4    A.    Yes.

5    Q.    Okay.  And you both had kids at the same preschool.

6  Did you ever have to cover for each other for a client?

7    A.    It was rare, but one time my son needed stitches and

8  Leon sat in on an appointment.  Actually, I think the

9  appointment ended up being canceled, but Leon was there if I

10  needed it.

11    Q.    So he was able and willing to help out if you needed

12  it?

13    A.    Yeah.

14    Q.    Okay.  And did you ever cover for Leon if he needed

15  something at home?

16    A.    It was rare, but if he needed me to sit with a

17  client or something, I would do it, yes.

18    Q.    So if he had you sit in for a client, was everything

19  -- did everything go smoothly, was everything okay?

20    A.    Usually, if Leon was asking me to sit with a client,

21  it was more for expertise than, like, him not being able to

22  show up.  Like I think I helped a client with a little bit of

23  FAFSA work, where the client came in, sat with me, and they

24  were in their residency and I helped, you know, decipher,

25  like, which student loan payment was really it.  So it was

1522

1   less about him not seeing his clients and more about I had a

2   different skillset.

3       Q.   Okay.

4       A.   But, like, if he needed me to print something or be

5   helpful, I was helpful.

6       Q.   And when he consulted you -- for example, you gave

7   the expertise on the FAFSA.  Is that a student loan form or

8   is that a student loan program?

9       A.   That's what you would apply with when your kids are

10  going to college, to be able to get student loans.

11      Q.   Okay.  And, so, he had a client where something

12  about the FAFSA was relevant?

13      A.   Yeah.  Yes.

14      Q.   And, so, he brought you in as someone who knew more

15  about that issue?

16      A.   Yeah.

17      Q.   And at that meeting, did Mr. Vaccarelli make

18  sense?

19      A.   I don't think he was there for that meeting.

20      Q.   Okay.  But did it make sense for him to consult you,

21  to bring you in for that particular issue?

22      A.   Yes.

23      Q.   Now, during the time that you worked for Lux

24  Financial, did you ever take clients' money and put it into

25  your own bank account?

1  A.  No.

2  Q.  Because you weren't allowed to do that; right?

3  A.  No.

4        MR. EINHORN:  I'll object, Your Honor.  It's outside

5  the scope of the direct.

6        THE COURT:  Well, the subject matter of her work at

7  Lux with Mr. Vaccarelli was at least addressed.  The business

8  during the day was addressed, even though focused on

9  drinking, and her hours of work were addressed.

10        Can you rephrase your question with respect to the

11  context of her work with Mr. Vaccarelli?

12        MS. LARAIA:  Certainly, Your Honor.

13  BY MS. LARAIA:

14  Q.  During the time that you worked for Lux, did you

15  also become a registered representative with The Investment

16  Center?

17  A.  Yes.

18  Q.  And, so, there were particular protocols that you

19  had to follow as a registered representative; is that right?

20  A.  Correct.

21  Q.  And did The Investment Center allow registered

22  representatives to put clients' money into their own bank

23  accounts?

24  A.  No.

25  Q.  When you were working for Mr. Vaccarelli, did he

1524

1    ever give you clients' money to deposit into your own bank

2    account?

3         A.   No.

4         Q.   Did he ever give you clients' money to deposit into

5    his bank accounts?

6         A.   No.

7         Q.   You didn't handle Mr. Vaccarelli's bank accounts; is

8    that fair to say?

9         A.   That is fair to say.

10        Q.   And you didn't move money from his bank accounts --

11   you know, between his bank accounts; is that right?

12        A.   No.

13        Q.   Okay.  Just to make sure the record is clear.

14             So, you didn't move money between his bank

15   accounts?

16        A.   No, I never moved money between his bank accounts.

17        Q.   Okay.  I just want to ask you:  At the time you were

18   working for Mr. Vaccarelli, did you have a payment

19   arrangement with him?

20        A.   Yes.

21        Q.   And, so, what was the payment arrangement you had?

22        A.   So when I was first starting, Leon would pay me a

23   draw of $2,000 a month, and then the commissions that I would

24   make on my investments, The Investment Center would get a

25   cut, like their fee, and then Leon and I would split the

1    remainder 50-50.

2        Q.   And you said that it was -- 2,000 a month was the

3    draw that Mr. Vaccarelli paid to you?

4        A.   Yeah.  I don't know if it was technically a draw.

5    It was basically, like, for stability.  When you're first

6    getting started as a registered rep, your payments could be

7    -- you can make, you know, $1100 one month and $10,000 the

8    next.  So it kind of gave me a base for stability to grow my

9    practice.

10       Q.   But the $2,000 a month would come from Mr.

11   Vaccarelli, as opposed to The Investment Center?

12       A.   Correct.

13       Q.   So you'd get a separate commission from The

14   Investment Center, based upon any commissions that you earned

15   during that period; is that fair to say?

16       A.   Yes.

17       Q.   And do you know whether The Investment Center

18   approved that arrangement?

19       A.   I do not know whether The Investment Center approved

20   that arrangement.

21       Q.   At any point, did Mr. Vaccarelli tell you that he

22   used a client's money to pay you?

23       A.   No.

24            MR. EINHORN:  Objection, Your Honor.

25            THE COURT:  Basis?

1    MS. LARAIA:  Your Honor, I think it goes --

2    THE COURT:  I'm sorry.  The basis for your

3  objection?

4    MR. EINHORN:  I think it's outside the scope of

5  direct.

6    THE COURT:  But we've had this arrangement where

7  witnesses who are testifying can testify outside that area

8  rather than bringing them back.  If you would like to change

9  that so that the Government will bring her back for rebuttal,

10  we can do that.

11    MR. EINHORN:  I think the only way the Government

12  brings her back at this point is on rebuttal, and there won't

13  be anything to rebut on that point.  I'll let it -- that's

14  fine.  It can be asked.  I'll withdraw my objection.

15    THE COURT:  Okay.

16  BY MS. LARAIA:

17    Q.   I'll repeat the question.

18    At any point, did Mr. Vaccarelli tell you that he

19  used a client's money to pay you any of your $2,000 monthly

20  payments?

21    A.   No.

22    Q.   I think you mentioned in your direct testimony that

23  sometimes you and Mr. Vaccarelli, and maybe Mr. Michitsch,

24  had a drink at the end of the day --

25    A.   Correct.

1527

1    Q.    -- is that right?

2          So you'd have a drink, and then you'd maybe go home

3    or do something else?

4    A.    Correct.

5    Q.    Fair to say when Mr. Vaccarelli was meeting with his

6    clients, when you saw him every day, he wasn't drunk every

7    day; was he?

8    A.    He was drunk at some point probably every day.

9    Q.    For the entire period of the time you worked with

10   him?

11   A.    Yeah.

12   Q.    When he met with clients -- those meetings that you

13   are describing, he's giving accurate information -- he wasn't

14   drunk; was he?

15   A.    Depends on the meeting.  Sometimes he may have been

16   medium drunk.

17   Q.    And, so, how do you know what medium drunk is?

18   A.    It's not real drunk.  Less than very drunk.  It's

19   medium.  It's in the middle of drunk.  Like maybe more than

20   one drunk, maybe less than six.

21   Q.    Okay.  So in those meetings, Mr. Vaccarelli was, I

22   think you testified, speaking clearly?

23   A.    Yeah.

24   Q.    And he gave accurate advice?

25   A.    He could hold it together.

1528

```
 1      Q.   And the truth is, you don't know how many drinks he
 2   had on any given day; right?
 3      A.   I do not know how many drinks he had on any given
 4   day.
 5      Q.   Now, did you go out with Mr. Vaccarelli to visit
 6   Mrs. Truhan at the Hearth in Madison?
 7      A.   No.
 8      Q.   Were you with Mr. Vaccarelli when he got a $300,000
 9   check from Mrs. Truhan?
10      A.   No.
11      Q.   Were you with Mr. Vaccarelli when he took a $72,000
12   check from Denise Augelli?
13      A.   No.
14      Q.   You didn't go out with Mr. Vaccarelli to visit Ciro
15   Peluso and get money from him; did you?
16      A.   No.
17      Q.   And you weren't there when Susan Rustic made a
18   hundred thousand dollar investment with Mr. Vaccarelli; is
19   that right?
20      A.   No.
21      Q.   Right that you weren't there, or right that --
22      A.   I was not there.
23      Q.   And you didn't go out with Mr. Vaccarelli to
24   Giuseppina LaPorta's house; did you?
25      A.   No.
```

1529

1    Q.   And you weren't there with him when Linda Warren

2    invested $94,000 with him; is that right?

3    A.   I was not.

4    Q.   And you didn't go with him to visit Christine

5    Chauncey at her house and deliver her a letter; did you?

6    A.   I did not.

7    Q.   And you weren't there when Mr. Vaccarelli took

8    Mr. Roussel's money to invest; were you?

9    A.   No.

10   Q.   And before you started working with Mr. Vaccarelli,

11   had you ever met him before?

12   A.   Once.

13   Q.   Did you know him for the whole period between 2011

14   and 2014?

15   A.   No.

16   Q.   So anything he was doing during that period, you

17   don't know what he did?

18   A.   That's correct.

19        MS. LARAIA:  Nothing further, Your Honor.

20        THE COURT:  Redirect?

21        MR. EINHORN:  Just one thing.

22                     REDIRECT EXAMINATION

23   BY MR. EINHORN:

24   Q.   I just wanted to ask you very quickly about the time

25   period that you worked there.  I thought you said when you

1  took the witness stand that you worked for Mr. Vaccarelli, or

2  with him, between 2015 and 2017.  Is it possible that you

3  started in 2014?

4      A.  I actually really don't remember.  It was -- I

5  remember my job interview was on my birthday, so it's -- July

6  31st was -- like that was the day we decided we'd work

7  together.  And I really -- I would have to check.  Like, I

8  don't know if it was 2014 or 2015.

9      Q.  Okay.  And one last thing.  Was your testimony just

10  a moment or two ago that Leon was drunk at some point of

11  every day?

12      A.  Yes.

13      Q.  I think your exact words I wrote down were "he was

14  drunk at some point every day"; that's correct?

15      A.  Yeah, at some point every day, if you saw Leon

16  enough times in a day, he'd be drunk at least one of them.

17          MR. EINHORN:  Nothing further, Your Honor.  Thank

18  you.

19          THE COURT:  Ms. Laraia?

20          MS. LARAIA:  Just briefly, Your Honor.

21                    RECROSS-EXAMINATION

22  BY MS. LARAIA:

23      Q.  Just to clarify.  When you testified earlier, you

24  said he was not real drunk in these meetings you had; is that

25  right?

1531

```
1        A.   I said "medium drunk," yes.

2        Q.   Which was not real drunk?

3        A.   It's somewhere less than real drunk.

4             MS. LARAIA:  Okay.  Nothing further, Your Honor.

5             MR. EINHORN:  Nothing further, Your Honor.  Thank

6    you.

7             THE COURT:  All right, then.  Ms. Sodano, you may

8    go.  You are excused.

9             THE WITNESS:  Oh, thank you.

10            (Witness excused, 12:38 p.m.)

11            THE COURT:  She has not enjoyed her time with us.

12            All right.  Please call your next witness.

13            MR. EINHORN:  Would it be possible to start our next

14   witness after a luncheon break?  She's our last witness and

15   the Defendant will rest.

16            THE COURT:  All right.  We'll have an early lunch.

17   We will be back at quarter past 1:00.

18            (Jury out, 12:39 p.m.)

19            THE COURT:  All right.  Anything before we break?

20            MR. EINHORN:  No, Your Honor.  Thank you.

21            MR. McGARRY:  No, Your Honor.

22            THE COURT:  Very well.  See you at quarter past.

23            (Recess taken, 12:39 p.m.)

24            (Call to Order, Out of the Presence of the Jury,

25   1:35 p.m.)
```

1    THE COURT:  All right.  Please be seated, ladies and

2    gentlemen.  We'll bring in the jury.

3    Are you ready now?

4    MS. MIRSKY:  Your Honor, we just wanted to clarify

5    one bit of information.  We think it's beneficial outside of

6    the jury.

7    We -- myself and Ms. Laraia were just comparing our

8    editions of the two different sets of documents to make sure

9    they're consistent with yours.  We did discover that there

10   are slight number of problems, and your edition will not

11   reflect the small changes we made to make sure the numbers

12   are consistent.  There's a slight error we discovered.  So I

13   just want to make sure that you --

14   THE COURT:  Yours were also not in chronological

15   order, and in my set I rearranged them so the numbers aren't

16   any longer in sync anyhow, but --

17   MS. MIRSKY:  It doesn't matter.  We acknowledge we

18   discovered there's no 10, and there was two 17s.  We turned

19   one 17 into a 17A so that we could work off the same

20   document.  If that doesn't matter to Your Honor, that's fine.

21   I just wanted to make sure you were aware.

22   THE COURT:  Did you discover that 39 and 38 are

23   duplicates?

24   MS. MIRSKY:  Say that again, Your Honor.

25   THE COURT:  38 and 39 are duplicates.

 1          MS. MIRSKY:  Yes, there's also a duplicate.  Yes, we

 2    discovered that, as well.

 3          THE COURT:  I'll just wait and see what appears on

 4    here.

 5          MR. McGARRY:  Okay.  Well, my concern, Your Honor,

 6    is not a substance one but a procedural one, is that I don't

 7    know if we all know what, let's say, Defendant's Exhibit R

 8    is.  And that's my concern, that the Court might have one

 9    version, the parties might have another, and the witness

10    might be provided yet another.  I just want to know what

11    we're all talking about.  That's my -- our concern.

12          THE COURT:  How shall we accomplish this amazing

13    feat?

14          MS. MIRSKY:  Well, if I may suggest.  My intention

15    -- I know we may have an issue with the actual giving of the

16    documents to the jury, but my understanding is we review all

17    that before they actually are handed those documents later

18    on.  And my intention with the witness is I will be pointing

19    out specific documents with numbers.  So I'll be able to show

20    on the Elmo, I'm on page such and such.  And, so, that will

21    easily be identifiable by both the Court and by the

22    Government when I do that.  So that shouldn't be a problem.

23          I clarified those issues with the Government.  If I

24    say page 17, page 17 will then appear.

25          MR. McGARRY:  So I guess it almost sounds like we're

1534

1     kind of building the exhibit, which is a way to do it, and

2     then at the end, everything that comes in is then marked in

3     total.  Again, just trying to be helpful and not trying to

4     advocate any missing of particular pages, just want to make

5     sure the record is clear on this medical witness.

6           THE COURT:  So it sounds to me as if there's sort of

7     two sets.  One of them is Solutions and one of them is Blue

8     Sky.  If we can do Defendant's -- whatever letter we're up

9     to -- for identification and go through them, then with the

10    sub-numbers, that probably works.

11           MR. EINHORN:  Okay.

12           THE COURT:  Okay.

13           MR. EINHORN:  Sounds good.

14           THE COURT:  So what are we up to?

15           MS. MIRSKY:  I believe we're up to H.  I just spoke

16    to Breigh, but --

17           THE COURT:  H.

18           MS. MIRSKY:  I believe that's correct.

19           THE COURT:  So either we'll mark Solutions as H and

20    Blue Sky as I, or vice versa.  And then as you use page

21    numbers, that will be H28, H -- so forth.  Okay?

22           MS. LARAIA:  Just to be clear, Your Honor, because

23    we don't have a solid, you know, sort of cohesive exhibit.

24           So if one page is offered, if there's an objection

25    on just that one page, we'd offer the objection but the rest

```
 1   of the document is sort of separate and not included, so
 2   they're just sort of each a separate exhibit?
 3           THE COURT:  It's a separate sub-exhibit.
 4           MS. LARAIA:  Separate sub-exhibit, okay.
 5           THE COURT:  Yes, let's do it that way.
 6           MS. LARAIA:  Thank you, Your Honor.
 7           MR. EINHORN:  Okay.  That's fine.
 8           THE COURT:  Okay.  If you'd tell Breigh that they
 9   can come out now.
10           (Jury in, 1:40 p.m.)
11           THE COURT:  All right.  Please be seated, ladies and
12   gentlemen.  We're ready to proceed with the Defendant's
13   evidence.
14           All right.  This is the witness stand over here.
15   You will go there and remain standing.  Raise your right hand
16   and take the oath.
17           (DONNA GLEISSNER sworn, 1:40 p.m.)
18           COURTROOM DEPUTY:  Please be seated.  State your
19   name for the record.
20           THE WITNESS:  Donna Gleissner.
21           COURTROOM DEPUTY:  Spell your last name.
22           THE WITNESS:  G-L-E-I-S-S-N-E-R.
23           COURTROOM DEPUTY:  And can you tell us what city and
24   state you live in?
25           THE WITNESS:  Danbury, Connecticut.
```

```
 1              THE COURT:  And as you answer questions,
 2   Ms. Gleissner, would you please answer with a "yes" or "no,"
 3   not a head symbol?
 4              THE WITNESS:  All right.  Yes.
 5              THE COURT:  The court reporter can't take down other
 6   than words.
 7              And, secondly, will you please make sure you keep
 8   your voice up, and be aware that you are directing it to the
 9   bar in front of you.  That's the microphone.
10              THE WITNESS:  Yes.
11              THE COURT:  Thank you.
12              All right.  Ms. Mirsky, you may proceed.
13              MS. MIRSKY:  Thank you, Your Honor.
14                         DIRECT EXAMINATION
15   BY MS. MIRSKY:
16       Q.   Good afternoon.
17       A.   Good afternoon.
18       Q.   Good afternoon.  Are you a little nervous?
19       A.   A little bit.
20       Q.   A little bit?  Well, we can both be a little nervous
21   together.
22              So what is it -- please tell the jury, what is your
23   profession?
24       A.   So I'm a licensed professional counselor, and I'm
25   also a licensed drug and alcohol counselor.
```

1    Q.   Okay.  I want to get into that in just a moment.

2         Can you also tell us about your educational

3    background?  What led to you getting those licenses?

4    A.   Yes.  So I have a bachelor's in psychology.  I have

5    a master's in counseling.  From there, I've been a counselor

6    for about 23 years -- I don't know exactly how long -- which

7    requires a license, a number of clinical hours, and then

8    passing an exam for both my licenses.

9         My drug and alcohol counseling license is a separate

10   exam.  That I've had for the past approximately three years,

11   three and a half years.

12   Q.   Okay.  You mentioned the licensed alcohol drug

13   and -- drug counselor separately as a specialty.  Can you go

14   into more detail about that?  I mean in terms of classes, the

15   training, anything that's specific to that license.

16   A.   So, as a licensed alcohol and drug counselor, my

17   training and any -- there's a certain number of clinical

18   hours you need to perform in order to be a drug and alcohol

19   counselor.  You have to pass an exam.  It's substance

20   abuse-related disorders, as opposed to things like

21   depression, anxiety.

22        And after that, once you have a license, you're

23   required to keep up on continuing education.  So every year

24   there's a requirement for learning, you know, what's new and

25   updated in the field of substance abuse.

1538

1    Q.   Okay.  Does that training also include clinics,

2    where you're able to apply this knowledge?

3    A.   I'm sorry?

4    Q.   Does this training that you do, does it also include

5    clinics, whereby you might be able to take the knowledge you

6    learn from class and apply it in the real world --

7    A.   Yes.

8    Q.   -- or to actual individuals?

9    A.   Yes.

10   Q.   Okay.  Now, you talked about different topics that

11   your license can cover.  Can that also include alcoholism?

12   A.   Yes.

13   Q.   Okay.  And does -- your training, does that include

14   any discussion that you might have about whether or not

15   alcoholism is considered a disease, and do you discuss that

16   in your coursework?

17   A.   Yes.

18   Q.   So, what is discussed?  Can you elaborate upon

19   that?

20   A.   Sure.  So the training that I've received over the

21   years is, the science is pretty clear that alcoholism is a --

22   classified as a disease.  When someone is labeled with an

23   alcohol use disorder, substance abuse disorder, it's

24   something that they carry through their life.

25   Q.   So would that also be -- just to add an extra piece,

1   just to make sure that I understand.  If it's a disease, are

2   you trained that, given that it's a disease, that means that

3   there's no cure for it?  Is that a fair statement?

4       A.    Yes.

5       Q.    Okay.  Okay.  Now, where do you currently work?

6       A.    I work at Blue Sky Behavioral Health.

7       Q.    And how long have you worked there?

8       A.    I've worked there almost three years.

9       Q.    Okay.

10      A.    I'm also in private practice.

11      Q.    Okay.  Is your -- without getting into details about

12  the private practice, do you also cover -- you help

13  patients -- rely on these same licenses, meaning you get

14  extra experience and you apply your principles of the

15  alcohol/drug counseling, as well; correct?

16      A.    Yes.

17      Q.    You mentioned Blue Sky Behavioral Health.  Where is

18  that located?

19      A.    In Danbury, Connecticut.

20      Q.    And can you give the jury an overview of your

21  responsibilities at Blue Sky?

22      A.    Yes.  So as a -- I am the only licensed alcohol and

23  drug counselor at Blue Sky Behavioral Health, so my

24  responsibilities include running groups.  They also include

25  individual counseling sessions with my caseload.  And I am

1    also responsible for supervising one of our certified drug

2    and alcohol counselors, which is just a step below someone

3    who is licensed.

4        Q.   Okay.  And I apologize if you just said this before,

5    but did your duties include counseling individuals

6    specifically for alcoholism as part of what you do?

7        A.   Yes.

8        Q.   Can be.  Okay.

9             I think I asked you, does your duties as a counselor

10   include counseling individuals who struggle with

11   alcoholism?

12       A.   Yes.

13       Q.   Okay.  Now, from your experience that you've

14   discussed about being this licensed drug and alcohol

15   counselor, can you please explain how alcoholism can impact a

16   person's daily life?

17       A.   Okay.  So, someone who has alcoholism -- I mean,

18   there are certain criteria that have to be met.  It's -- and

19   we don't use the term "alcoholism," so someone is given a

20   classification of "alcohol use disorder," is what the actual

21   term is.  And that would be sort of, on a severity level,

22   mild, moderate, severe.

23            So someone with an alcohol use disorder would have

24   difficulty controlling the amount of alcohol they drink;

25   would have difficulty functioning in school, work, home

1    environments; would drink alcohol in dangerous situations --

2    driving a car or operating heavy machinery, things like that;

3    have difficulty controlling the amount of alcohol they drink

4    or being able to stop drinking for a period of time.

5         It also would possibly interfere with their ability

6    to perform social obligations at home, maybe obligations they

7    have with their family.  People with alcohol use disorder can

8    also have difficulty with, say, recreational activities or

9    things that they once participated in that they no longer

10   can.

11        They build a tolerance up, which by -- that means

12   that they have to have more of the alcohol to sustain the

13   effect that prior amounts of alcohol made them feel a certain

14   way.  So they build up a tolerance and need more and more of

15   that alcohol in order to feel the effects.

16        And, also, people who have alcohol use disorder can

17   have withdrawal symptoms, which are both physical and mental,

18   within hours, days of stopping or slowing down the amount of

19   alcohol they drink.  So they can have anything from anxiety,

20   insomnia; actually, tonic-clonic seizures, which people might

21   know as "DTs"; just some kind of like high -- rapid pulse,

22   things like that; sweating.

23        So it's basically -- someone who's suffering from

24   alcohol use disorder is really having difficulty managing

25   their life because alcohol is getting in the way of that.

1    Q.   Okay.  Thank you.

2         Do you know Mr. Leon Vaccarelli?

3    A.   Yes.

4    Q.   And how do you know him?

5    A.   He's a client of mine at Blue Sky.

6    Q.   How long has he been a client of yours?

7    A.   Since October, 2017.

8    Q.   So, you said since October, 2017.  When you say

9    since then, does that mean he is still a client of yours?

10   A.   Yes.

11   Q.   And how often do you see him?

12   A.   Currently, once a week.

13   Q.   Has that changed over time --

14   A.   Yeah.

15   Q.   -- your professional relationship with him?

16   A.   Yes.

17   Q.   And how so?

18        So when he was admitted to our program back in 2017,

19   he was coming to the program -- by "the program," I mean

20   groups and -- twice a week individual counseling with me --

21   five days a week.  And that over time -- which dropped down

22   to three days a week and then two, and then depending on

23   insurance coverage and things, it kind of drops down from

24   there.

25   Q.   Understood.  And, just briefly, why do you see

1    him?

2        A.   So I -- well, Leon came to us from an alcohol rehab.

3    I'm treating him for the symptoms of the alcohol use

4    disorder, which includes some underlying other issues that

5    are mental health-related.

6        Q.   Okay.  Now, you're familiar with, like, general

7    records that Blue Sky keeps on their patients; correct?

8        A.   Yes.

9        Q.   Okay.  And how does Blue Sky maintain patient

10   records?

11       A.   Electronically.  Is that what you mean?

12       Q.   Well --

13       A.   How do we do the records?

14       Q.   Okay.  How do you do them?  A little more

15   elaboration would be great.  Thank you.

16       A.   I understand.  So we have -- there are group notes.

17   So when people are in group, there's an electronic, kind of a

18   populated group note that is for anyone who is in the group.

19   It's kind of just a generic note what was discussed in the

20   group.

21            And then if there was something pertaining to --

22   it's populated by the computer, but if there's something

23   pertaining to a particular client, there would be an

24   additional addendum only on that client's chart, electronic

25   chart, indicating that, and then any notes that otherwise

1    would be for individual counseling sessions.  And there are

2    also notes in there from the prescribing physician who

3    prescribes the medication, as well as treatment plans,

4    treatment plan reviews.  That's pretty much it

5        Q.   Now, is this -- these records are required for all

6    clients, anyone that's admitted to your program?

7        A.   Yes.

8        Q.   Okay.  And how much time, on average, can you

9    estimate elapses from the time you might meet a client or the

10   client might engage in activities, such as the groups that

11   you mentioned, and when you or a staff member might create a

12   note regarding that patient?

13       A.   Same day.

14       Q.   Same day, okay.  Now, do you review and/or approve

15   notes?  I mean, either review your notes or approve the notes

16   of a staff member that might be underneath you or someone who

17   has authored those notes?

18       A.   So any notes that I do for a group I run or a

19   session that I've had with a client, the only notes that I

20   would also sign would be for that person who is a certified

21   alcohol and drug counselor that I would be supervising.  So I

22   would supervise, oversee his notes.

23       Q.   Okay.  I'm sorry?

24       A.   Just one person.

25       Q.   Okay.  Now, is it fair to say that the notes that

1   you are either personally recording or reviewing of this

2   other counselor that you mentioned, are they either accurate

3   based on your knowledge or on information that you obtained

4   from the client -- from a client?

5       A.   Could you repeat that?

6       Q.   Okay.  I said is it a fair statement that the notes

7   that you either personally record or review from your other

8   staff member, are they accurate based on either your

9   knowledge or based on information you obtain from a client --

10      A.   Yes.

11      Q.   -- you would see?

12           Okay.  And all of these steps that we referred to

13  regarding how Blue Sky maintains records, the parts that you

14  cover, in terms of progress notes and medications, et cetera,

15  all of those things apply to Leon Vaccarelli and the records

16  that are kept at Blue Sky related to him; correct?

17      A.   Yes.

18           MS. MINSKY:  Okay.  I mean, Your Honor, I would ask

19  at this point to have the Blue Sky records that have been

20  under review by this Court and the Government to be admitted

21  as a full exhibit at this time.

22           THE COURT:  We're going to mark the Blue Sky records

23  as Defendant's Exhibit H for identification.

24           MS. MIRSKY:  Yes.

25           THE COURT:  And if there are individual portions

1    that become a part of Ms. Gleissner's testimony, we will take

2    them up one by one, marking them by their page number.  All

3    right.

4          MS. MIRSKY:  Yes, Your Honor.

5    BY MS. MIRSKY:

6      Q.   Now, is it correct that Blue Sky's clients are

7    required to provide an initial intake or answer some

8    questions that are considered part of the initial intake

9    process?

10     A.   Yes.

11     Q.   Okay.  And why is that initial intake requested?

12     A.   So there is -- when someone comes to our program,

13   there's an initial phone screen that is done, and that is to

14   see whether the person is appropriate for our level of care.

15     Q.   Okay.  And did Leon do this upon being admitted?

16     A.   Prior to admission.  The phone screen is prior to

17   admission.

18     Q.   Prior to admission?

19     A.   From wherever he's coming from, yeah.  And there's

20   an intake when he came into the program, and then there's a

21   whole intake procedure, which includes just a lot of

22   paperwork.

23     Q.   Okay.  And did Leon provide information about

24   alcoholism on his intake?

25     A.   Yes.

1    Q.   Do you recall what information he would have

2    provided?

3    A.   Yes.  Upon intake, Leon stated that he had come from

4    a three-month stay at a rehab in Las Vegas, Nevada, and that

5    his alcohol use had started at a young age, approximately 15

6    years old, and had progressed over the years.

7    Q.   Okay.  You mentioned -- you said three months -- or

8    in a three-month inpatient.  What was the name of that

9    inpatient program?

10   A.   Silver Solutions, I believe.

11   Q.   Solutions Recovery?

12   A.   Solutions Recovery in Las Vegas.

13   Q.   That sound familiar?

14   A.   Yes.

15   Q.   I know it's been a while.  I understand.

16        And do you know if Mr. Vaccarelli completed that

17   program?

18   A.   Yes, he did.

19   Q.   Okay.  Did you also -- as part of the Blue Sky's

20   record review process, did you also have a chance to review

21   these records from Solutions Recovery?

22   A.   Yes.

23   Q.   And would you say that it's customary to review

24   records as part of compiling a client's past history?

25   A.   Yes.

1    Q.   Okay.  And that obviously going to Solutions

2  Recovery is part of Leon's history?

3    A.   Yes.

4         MS. MIRSKY:  Okay.  At this time, Your Honor, I'd

5  ask for the Solutions Recovery documents to be admitted as a

6  full exhibit, if the Court -- I believe that would make it I,

7  depending on the Court's position.

8         THE COURT:  Similarly, we're going to mark it

9  Defendant's I for identification, and then not -- it will not

10  be admitted in its entirety.  We'll do it piece by piece.

11  BY MS. MIRSKY:

12    Q.   You have had a chance to review the records on

13  Mr. Vaccarelli that come from Blue Sky, correct, before you

14  came here today?

15    A.   Yes.

16    Q.   Okay.  So I'm going to isolate certain pages, as

17  soon as I do not mess up -- oh, my technological difficulties

18  here.  One second.

19         Okay.  So I'm pulling up here what -- we've used a

20  separate number system, not -- so it doesn't confuse you.

21  You'll notice the numbers that we've used are -- oops -- can

22  you see this, or should I zoom-in a little bit?  Can you read

23  that?

24    A.   I can see it.

25    Q.   Okay.  So this is -- for everyone's identification,

```
 1    this is page 14 based, on the new number system that was
 2    created.
 3              THE COURT:  So it'll be H14 for identification.  Go
 4    ahead.
 5              MS. MIRSKY:  Right.
 6    BY MS. MIRSKY:
 7        Q.   Now, on this page these are some initial intake
 8    notes; yes?
 9        A.   Yes.
10        Q.   Okay.  And what is the progress note date on this
11    document?
12        A.   I have terrible eyesight.  The progress note is
13    10/17/2017.
14        Q.   And is that shortly around the time of Leon's
15    admission?
16        A.   Yes.
17        Q.   Just to clarify -- I may not have asked before -- do
18    you remember Leon's admission date?
19        A.   I think that was his admission date.
20        Q.   You think it was.  Okay.
21             And the section that's underneath -- I just have to
22    clarify.  I think I'm going to have to use this pen to point
23    out.  But this section that's right here, what is this
24    called?
25        A.   The psychiatric -- the presenting symptoms, that
```

1550

1    section?

2         Q.   Correct.

3         A.   The presenting symptoms.

4         Q.   Okay.  And could you please read the first sentence

5    for the jury, please?

6              MS. LARAIA:  Objection, Your Honor.

7              THE WITNESS:  "Mr. Vaccarelli is" --

8              THE COURT:  One moment.  It's not a full exhibit.

9              MS. LARAIA:  I don't object, Your Honor, but it

10   hasn't been admitted as a full.

11             THE COURT:  She is offering it.  If there's no

12   objection, H14 is a full exhibit.  You may proceed.

13             MS. MIRSKY:  Thank you, Your Honor.

14   BY MS. MIRSKY:

15        Q.   Go ahead.  You can read it, if you wouldn't mind.

16        A.   "Mr. Vaccarelli is a 40-year-old married" -- that's

17   a typo -- "but separated white male, father of eight, with

18   diagnosis of major depressive disorder, MDD, anxiety, chronic

19   alcohol abuse.  Patient only recently started treatment for

20   his depression, which he reported recognizing in 2015 after

21   his mother got sick.  Due to severe alcoholic withdrawals, he

22   had treatment for the first time at Recovery Solutions in

23   Nevada from July 10, 2017 to October 6, 2017.  Patient has no

24   known psychiatric hospitalization or past substance abuse."

25        Q.   Okay.  Great.  I was going to ask you about the

1   acronyms, but you beat me to it, so I appreciate that.

2          And then also -- one moment.

3          Now, there's also a section that's a little further

4   down, which I -- which is right here.  Can you -- what is

5   that section?

6       A.   The past psychiatric history.

7       Q.   Okay.  Great.  And the -- there's a section that's,

8   you know, a subsection in there, and it says "drug use."

9   What does that say by "drug use"?

10      A.   "Alcohol since age 17.  Progressing more frequently

11  in the years with increasing stressors, including his mom

12  getting sick in 2015, and" mom -- "and wife filing for

13  divorce in 2016."

14      Q.   Great.  Thank you.  There's also a section which is

15  the last line in that past psych history section.  What does

16  that say?

17      A.   The family psychiatric history, "Everybody except my

18  mother" quote/unquote "drinks."

19      Q.   Great.  Thank you.

20          I'm now going to just show another section on the

21  following page, which is page 15.

22          MS. MIRSKY:  I would ask that this be admitted as a

23  full exhibit.

24          MS. LARAIA:  No objection, Your Honor.

25          THE COURT:  D15 [sic] is a full exhibit.

1    MS. LARAIA:  Your Honor, I think it's H15.

2    THE COURT:  You're right.  H.

3  BY MS. MIRSKY:

4    Q.   Now, can you just go over briefly -- I know you

5  talked about generally before we looked at documents, the

6  different sections that are covered here on this page, like

7  sort of the headings that we briefly talked about before.

8    A.   You want to know what the headings are, or just --

9    Q.   Yeah.  Yes.  And I'll ask questions about what some

10  of them mean, as well.

11    A.   This is a psychiatric note, by the way, from the

12  prescriber.  So the admission -- these are the current

13  medical -- medical/surgical history, which says "Please see

14  biopsychosocial."  That's a separate document.  Admission.

15  Current medications:  Cymbalta capsules, 69 milligrams,

16  maintenance.  Lisinopril tablets, 20 milligram,

17  maintenance.

18    Q.   Could I just stop you?  I appreciate it.  I just

19  want to have -- what I'm trying to achieve is just a general

20  overview, because the jury didn't visually see -- we'll talk

21  about the medications in a second, but you don't have to read

22  all of them.  Okay?

23    A.   So you just want all the categories?

24    Q.   Yeah.

25    A.   Yes.  So, Admission/Current Medications, Past

1553

1    Medications, Labs, and Medication Monitoring, Working

2    Diagnostic Impression, Necessity Determination, and Plan and

3    Recommendations.

4        Q.   Great.  Under the admission/current meds section,

5    from your knowledge and experience, which of these

6    medications relate to treatment of alcoholism?

7        A.   The Revia is a medication used to treat cravings for

8    alcohol or drugs.

9        Q.   Okay.  And then, also, a little lower down, you did

10   read Working Diagnostic Impression.  Can you just briefly

11   explain to the jury what that means?

12       A.   What a working diagnostic impression means?

13       Q.   Yes.

14       A.   So someone coming in, it's a work -- so you're

15   getting a diagnosis when the person comes in.  It's kind of a

16   work in progress.  When someone comes into the program, it's

17   going to be based on their prior treatment, because we

18   haven't gotten to form our own impression of the client.

19            So coming into the program, what is here, which is

20   major depressive disorder, generalized anxiety disorder,

21   alcohol abuse severe, and multiple medical complications were

22   the diagnostic impression by the prescriber when he came

23   in.

24       Q.   Okay.  Thank you.

25            Now, there's some other documents in the records

1554

1   that talk about a clinical treatment plan; correct?

2       A.   Yes.

3       Q.   And that's a separate thing.  We talked about

4   there's an initial intake, and that's different than a

5   clinical treatment plan; correct?

6       A.   Yes.

7       Q.   And what is clinical treatment plan?

8       A.   So a clinical treatment plan is based on the goals

9   that the client is in the program to work on.  They're based

10  on the client's -- what the client is reporting and also the

11  diagnostic impressions.  And those are done -- the initial

12  treatment plan is done -- it's for the first 30 days of

13  treatment, and then they're done every three months

14  thereafter.

15      Q.   Okay.  Thank you.

16           So I'd like to go over some of the -- well, some of

17  the documents that cover this treatment plan.  I'm looking at

18  page 1 --

19           MS. MIRSKY:  And I'd ask that that be admitted as a

20  full exhibit, although I would point out to the Court that

21  pages 1 and 2 are actually the whole plan.  I'm going to go

22  one page at a time, but I would ask that both be admitted

23  because they're directly related to one another.

24           THE COURT:  Can you put 1 and 2 up?

25           MS. MIRSKY:  I think I may be restricted by space,

1    Your Honor, but --

2              THE COURT:  Okay.  That's 1?

3              MS. MIRSKY:  Yeah.  I can switch, if that's all

4    right?

5              THE COURT:  All right.  Any objection to 1 and 2?

6              MS. LARAIA:  No, Your Honor.

7              THE COURT:  All right.  This will be H1 and -2.

8              MS. MIRSKY:  Thank you.

9    BY MS. MIRSKY:

10        Q.   Now, do you recognize this as the clinical treatment

11   plan?

12        A.   Yes.

13        Q.   And you recognize, at the very top, the client.  Who

14   is that?

15        A.   Leon Vaccarelli.

16        Q.   Okay.  And then also -- not to be repetitive, but

17   obviously it's labeled a clinical treatment plan.  And then

18   below that, where it says "team assignments."  Team

19   assignments means what?

20        A.   So the team assignment is the primary therapist, the

21   psychiatrist or prescriber, the certified drug and alcohol

22   counselor, as part of the team, the clinical -- director of

23   our clinic and the overseeing psychiatrist.

24        Q.   Okay.  So, obviously the first name on the list is

25   yours; correct?

1    A.   Yes.

2    Q.   And it lists your licenses in abbreviated form, and

3    then also you were just mentioning -- you were saying

4    primary.  Is that a way of basically saying that you're in

5    charge?  And there's another counselor listed here.  He's

6    obviously the one that you are supervising that you had

7    referenced previously?

8    A.   Yes.

9    Q.   Okay.  Great.  And then below that section where it

10   says "team assignments," what's the next section?

11   A.   Diagnoses.

12   Q.   And which of these diagnoses on this list relate to

13   alcoholism?

14   A.   Alcohol use disorder severe.  The alcoholic

15   hepatitis.  The Wernicke's encephalopathy -- however you say

16   that -- and the generalized anxiety disorder, major

17   depressive disorder relate, as underlying issues, to the

18   alcohol use disorder.

19   Q.   Just so that we go back to the top, just to clarify

20   a bit of information.

21        The alcohol use disorder, that says "severe."  To

22   the left of that phrase, there's a word and there's a series

23   of numbers.  What do each of those refer to?

24   A.   Okay.  So the "primary" would be the primary

25   diagnosis, and "secondary" would be anything that is

1557

1    secondary to the primary.  So the codes next to that, the

2    F10.20, those are diagnostic codes from the DS -- the

3    Diagnostic Statistical Manual.  That's the DSM-5, which is

4    what we use to come up with the criteria for diagnosing.

5        Q.   Great.  We are going to talk about that, and I'm

6    glad you said it, because you got all -- the whole acronym

7    correct.

8            So in terms of -- we're going to get to alcohol use

9    disorder in just a moment, but you did reference alcoholic

10   hepatitis.  From your experience as a counselor, can you just

11   -- what is that?

12       A.   I cannot speak to that.  That's more of a medical

13   term.

14       Q.   Okay.

15       A.   I don't have --

16       Q.   Do you have any general sense of what it is, from

17   being a counselor for 25 years, or no?

18       A.   No.

19           MS. LARAIA:  Objection, Your Honor.

20           THE COURT:  Sustained.  She doesn't know.

21   BY MS. MIRSKY:

22       Q.   I'm going to ask you again, just in case -- if you

23   have any information about Wernicke's.

24       A.   Yeah, Wernicke's I am familiar with.  In my

25   experience, Wernicke's is caused -- can be caused by chronic

1558

1    alcohol use over the years.  And it's a deficiency of the B1

2    vitamins in the brain.  So part of the reason why you'll see

3    on there a medication for that is for that Wernicke's, it's

4    just caused by chronic alcohol.

5        Q.   And you mentioned the word "chronic" a couple of

6    times.  How would you describe what that means, in terms of

7    the severity of the disease, to the jury?

8        A.   Chronic is something that's gone on long-term.  So

9    it's not something that's intermittent and it's not -- it

10   would be lasting for a number of years.  Long-standing, I

11   guess.

12       Q.   Okay.  You also mentioned the last one here, the --

13   the generalized -- you said a generalized anxiety disorder as

14   being related to alcohol.  Am I missing -- I think you said

15   that; correct?

16       A.   Yes.

17       Q.   Great.  So how would that relate to the alcohol?

18       A.   Well, often -- you know, generalized anxiety

19   disorder is very -- often people with alcoholism have social

20   anxiety disorder, so they drink to feel more comfortable in

21   social situations.  So this is a diagnosis that Leon has,

22   which is just being anxious around people in general

23   situations.

24            So it can, and does, lead to people drinking to kind

25   of feel more social.  So people that have alcohol use

1   disorders, it's very rare that someone would just have an
2   alcohol use disorder without there being some underlying
3   reason as to why they started drinking in the first place.
4        Q.   Okay.  Thank you.
5             Before, when you were talking about the alcohol use
6   disorder that was classified as severe, you mentioned the
7   DSM.  I'm going to mispronounce the whole phrase.  We're
8   going to call that thing you referred to as DSM, but the jury
9   may not -- probably does not know what that is.  So can you
10  explain to them, what is the DSM, and, actually, its full
11  name as well, because I know it's a little bit longer than
12  that.
13       A.   So, the DSM is Diagnostic and Statistical Measures
14  for mental health disorders.  It's labeled DSM-5 because it's
15  in the fifth revision, so that's the most recent version of
16  it.  And it's what we use to diagnose any mental disorders,
17  whether they be substance related or mental health.
18       Q.   Okay.  And is this a document -- if you're trying to
19  decide whether a patient -- or, specifically, Mr.
20  Vaccarelli -- applies, you know -- the symptoms he has apply
21  to this classification that's been put on the treatment plan,
22  that's the book that you would refer to to help figure that
23  out; correct?
24       A.   Yes.  That would list the criteria that someone
25  would need to meet in order to have this formal diagnosis.

1    Q.   Okay.  And the criteria you mentioned.  So how many

2    criteria do you consider?

3    A.   Yeah.  So for alcohol use disorder, there are a

4    total of 11 criteria, and then they -- it is separated into

5    severity level of mild, moderate or severe.  Someone with

6    mild would have to meet two to three of those over a 12-month

7    period, four to five for moderate, and six or more for

8    severe.

9    Q.   Okay.  Do you recall what criteria that Leon met?

10   A.   I could try my very best.  So there are 9 of the 11

11   that Leon meets for the alcohol use severe category.  Some of

12   those being needing to drink more alcohol to maintain or get

13   the same effect; trying to unsuccessfully control or limit

14   the amount of alcohol that one drinks; continuing to drink

15   even when putting themselves in dangerous situations, such

16   as, like I said earlier, driving, operating heavy machinery,

17   things like that; interfering with social work or family

18   obligations; cravings, urges to drink; drinking -- I'm kind

19   of going out of order in my -- persistent attempts to control

20   -- to control or limit the amount of one -- of alcohol one

21   drinks.

22        There's a tolerance factor, so at -- the more one

23   drinks, the more they need to drink to get the same effect.

24   And there's also withdrawals, which is another criteria.  So

25   someone with an alcohol use disorder who stops drinking,

1  within hours to days of either stopping or cutting back on

2  the amount of alcohol they drink, can have a series of

3  withdrawal symptoms.  That's another criteria.  I don't know

4  how many that is.

5      Q.   It's a lot.

6      A.   Yeah, there's quite a few.  I mean, I work in this

7  manual all the time.  It's not something that you recite off

8  the top of your head.  It's kind of -- so I'm doing my best

9  to remember them all.

10     Q.   It's okay.  You've done a great job.  If you think

11 of --

12     A.   If I had it in front of me, I could tell you right

13 off the top of my head what those nine were, but I know there

14 were nine.

15     Q.   Is there anything in the criteria that when someone

16 has a -- depending on the level -- you referenced the mild,

17 moderate and severe -- that a person could engage in certain

18 activity and not remember what they did or said?  Is that --

19 could that be part of it?

20     A.   Yes.

21     Q.   Okay.  Now, we're also referring to this alcohol

22 disorder severe.  You -- and now this phrase -- is this the

23 -- is this the phrase from the DSM?  This is why you choose

24 -- you placed this phrase on the record?

25     A.   Yes.

1562

```
 1      Q.   Okay.  Are there other synonyms that might be
 2   comparable to the word "disorder"?
 3      A.   Well, I -- someone -- may, who's not in the field
 4   may hear the term "alcoholic," "alcoholism."
 5      Q.   Is it possible, so that -- like alcoholism is
 6   considered a disease, is that something that is reasonably
 7   used in a similar fashion?
 8      A.   Yes.
 9      Q.   Okay.  So at -- Leon's classification of alcohol use
10   disorder severe, would it be fair to say that Leon Vaccarelli
11   suffers from a -- the disease of alcoholism?
12      A.   Yes.
13      Q.   Okay.
14           MS. MIRSKY:  May I have one moment, Your Honor?
15           THE COURT:  Yes.
16           MS. MIRSKY:  Thank you.
17           (Counsel confer.)
18           MR. EINHORN:  Can we have just a moment, Your Honor?
19           THE COURT:  Yes.
20           (Counsel confer.)
21           MS. MIRSKY:  Thank you, Your Honor.
22   BY MS. MIRSKY:
23      Q.   Okay.  Well, just to clarify.  I'm going to actually
24   have you go through quite a few pages, just to -- I was going
25   to avoid this, but we're going to have a lot of repetition.
```

1     So we'll try to do this as quickly as possible, but
2  we're going to have you identify part of the record.
3     And am I correct -- seems repetitive, but we're
4  going to go through a lot, just to give you a heads-up on
5  that.  Okay?
6     MS. MIRSKY:  So, just to clarify, Your Honor.  Pages
7  1 and 2, as H1 and -2, have been admitted?
8     THE COURT:  They have been.
9     MS. MIRSKY:  And H14 and -15 have also been
10  admitted; correct?  Thank you.
11     THE COURT:  Yes, 14 and 15.
12     MS. MIRSKY:  Okay.  So I'm going to go to page 3,
13  and ask that it be admitted -- actually, I'm going to ask for
14  -- good Lord.  One moment.
15     I'm going to actually ask the Court to consider
16  admitting pages 3 through 6 all at one time.  I can expose
17  each of them, obviously, on the Elmo, because they're all
18  related to the same document.  This being 3, 4, 5 and 6.
19     MS. LARAIA:  Can I ask for the date of the document?
20     MS. MIRSKY:  It doesn't -- it appears that it's --
21  well the closest date I would indicate is in the top right
22  corner.  It says "Clinical Treatment Plan," which indicates
23  November 9, 2018 through February 7 of 2019.  That's the
24  closest to a date that's actually on this document.
25     THE COURT:  Do you want to review with the witness

1564

```
1   how and when a treatment -- clinical treatment plan is
2   developed?
3         MS. MIRSKY:  We certainly can.  I thought I covered
4   that.
5         THE COURT:  That would help us with the dates.
6   BY MS. MIRSKY:
7   Q.    Okay.  So you did discuss how you create one, but
8   how is one -- and you talked about you do a review every
9   three months, I think you said.
10  A.    Yes.
11  Q.    How is that review actually done?  What questions do
12  you ask, steps do you go through, whatever it is that you do?
13  What occurs?
14  A.    So if there has been any change in the goals
15  identified by -- primarily by the client, because it's a very
16  person-centered document -- there would be changes to that.
17  There would also be any changes if there were changes to --
18  you'll see on there some group -- groups that the person is
19  attending or frequency of their level of care.  That would be
20  reflected in the three-month treatment plan.
21        So the initial -- as I said earlier, the initial
22  treatment plan is for 30 days, and then they're every three
23  months thereafter.
24  Q.    So you -- I think this is correct -- you were saying
25  he was admitted early around -- you were saying October 17th
```

1565

1    or so, and the date -- the first date on this document that

2    I briefly showed was November 9th.  It's not exactly 30 days,

3    but is that like -- meaning that would be the first time it

4    would be reviewed, or is that off a little?

5         A.   Okay.  Can you --

6         Q.   I'll put it back up.

7         A.   Yeah.  Thank you.  It's a little bit blurry on my

8    end here.  But it's also small writing because I'm trying to

9    see.  November 8th.  It appears -- so when someone comes into

10   the program, the dates that they're admitted and the first

11   time they're seen by the clinician to create the treatment

12   plan often are not the same day.  So I believe if you -- the

13   last page of that, where it was signed, was actually the date

14   that it was reviewed and signed.

15        Q.   I'm going to switch to that right now, just so you

16   can look at it again.  This, I believe, is the last page of

17   that plan.

18        A.   Focus it, please.

19        Q.   Oh, absolutely.

20        A.   Yes.  So 11/20 is when it was reviewed and signed.

21   It covers the period of time from admission -- well, this is

22   a -- yeah, this was 2018 -- the writing is very small at the

23   top.  So 2018, but he came in on 2017.  So we're looking at a

24   treatment plan that's a further along treatment plan.

25        Q.   Okay.  This treatment plan that you briefly looked

1566

1  at, I can show you any page you'd like to see if you need

2  that assistance.  This is an example of one.

3       A.   Yes.

4       Q.   Okay.

5            MS. LARAIA:  Your Honor, I'd object to the exhibit

6  just based on the time period.  I just don't think the time

7  period is relevant, given we're over a year out.

8            THE COURT:  Are there earlier treatment plans prior

9  to November 20, 2018; do you know?

10           THE WITNESS:  Yes.  There are earlier treatment

11  plans, and there are treatment plans after that date, as

12  well.

13           THE COURT:  Do you intend to offer earlier treatment

14  plans?

15           MS. MIRSKY:  Well, I believe, Your Honor -- and I

16  believe the witness would have to clarify, but the pages that

17  I looked at, the 1 and 2, that was referencing treatment

18  plans, that was from the earlier date.  We already had talked

19  about that -- I believe so.  They seemed to look different,

20  but the pages 1 and 2 that I had provided do clearly say

21  "Clinical treatment Plan" and the -- I believe there's a date

22  at the bottom of that document that references when he --

23  October of 2017, on the page 2.

24           THE COURT:  Right.  But this document that you're

25  offering, which is H3 through -6, is a year later.

```
1          MS. MIRSKY:  Yes, Your Honor.  The witness had also
2     testified that he's still currently under the care, and she
3     also testified that --
4          THE COURT:  Can I make a suggestion?  Can you put
5     the paper record in front of the witness -- and have you
6     explain what treatment plan is applicable for the time
7     shortly after Mr. Vaccarelli was admitted to your program.
8          THE WITNESS:  Yes.
9          MS. MIRSKY:  (Handing.)
10         THE WITNESS:  Okay.  So this is the --
11         THE COURT:  This -- can you use the numbers at the
12    bottom when you're saying "this".
13         THE WITNESS:  Oh.  This in the corner here, number
14    1, this is a later treatment plan.  There would have been
15    prior treatment plans to this, because he was admitted in
16    October, 2017.  His first treatment plan would have been
17    October to November, 2017.  So this treatment plan that I
18    have in my hand is from a year later.
19         MS. LARAIA:  Your Honor, the Government wouldn't
20    object to the admission of the remainder of the document.
21         THE COURT:  As long as we have that time frame
22    established.
23         MS. LARAIA:  If the time frame is established.
24         THE COURT:  Okay.  So the time frame for this
25    treatment plan that you have in front of you --
```

```
1              THE WITNESS:  Sorry.

2              THE COURT:  -- is November 2018?

3              THE WITNESS:  Yes.

4              THE COURT:  All right.  Then those are admitted.

5              MS. MIRSKY:  Thank you, Your Honor.

6    BY MS. MIRSKY:

7         Q.   Now, that -- we're going to just go over, briefly,

8    the information that's on the document.  We don't have to

9    read everything.  We're going to do a brief overview.

10             Looking at page 3, I'm going to put it back here.

11             All right.  I just want to be able to make it a

12   little larger for you.  So just this is a -- I know we agreed

13   this is a plan at a later date.

14             Can you just go over the general style, and perhaps

15   there's -- well, the general style.  You'll agree there are

16   goals right towards the top?  There's a reference to goals;

17   correct?

18        A.   Yes.

19        Q.   And then, also, a little below that, we see

20   something where it says "Objective"?

21        A.   Yes.

22        Q.   So if you could just explain -- there's what -- we

23   have -- sorry.  We have problem -- like problem 1.1, which is

24   right before the goal.  And then we also have -- we talked

25   about the other two.  Can you just explain the relationship
```

1    between those different terms?

2        A.   Yes.  So the problem -- the goal under the problem

3    area would be the overall goal that the client is trying to

4    achieve.  In this case, reducing or eliminating the use of

5    substances.  The objective is in the client's words.  They

6    are the actual goal that they want to accomplish.

7             The way our system works, it's also an electronic

8    record that populates certain -- certain kind of broad-range

9    goals, and then the ones that are in quotes would be more

10   specific to the client.

11       Q.   Okay.  So we're just going to go down and just talk

12   about -- if you could read problem 1.1.

13       A.   Objective 1.1 is "I will stop or cut back on my use

14   of alcohol."

15       Q.   Okay.  Now, I wanted to read that, too.  Just above

16   that, we're going to start early, where it says "problem

17   1.1," just so that we know what you're discussing.

18       A.   Okay.  So Problem 1.1, "Admitted alcohol use."

19       Q.   And the goal?

20       A.   The goal?  "I'll reduce or eliminate my use of

21   substances."  And the objective 1.1A is "I will stop or cut

22   back on my use of alcohol."

23       Q.   Okay.  I'm just moving it down a little bit further.

24   At the end, there's problem, goal and objective again.

25       A.   Yeah.  So, problem 1.2:  "Verbalize alcohol

1    craving."  And the goal:  "I will reduce or eliminate my

2    cravings for alcohol."  And objective 1.2A:  "I will learn

3    how to live in the world and change my lifestyle to one

4    without alcohol use."

5         Q.   Okay.  Now we're going to go on to the next page,

6    and to more quickly -- I'm going to ask you the same things,

7    right.  So for this problem, this is problem 1.3.

8         A.   Yeah.  So 1.3:  "Lack of knowledge of proven

9    practices for alcoholism treatment."  Goal:  "I will increase

10   my knowledge of evidence-based practices for alcoholism

11   treatment."  Objective:  "I will be more educated on the

12   types and successes of evidence-based practices for

13   alcoholism treatment."

14        Problem heading 2, "Mood."  Problem 2.1:  "Stressful

15   response to event or events."  The goal:  "I will decrease my

16   level of stress so that I can meet lifestyle demands at a

17   level normative for my age and cognitive abilities."

18        Objective 2.1:  "I will learn how to manage the

19   stressful events in my life without the use of alcohol."

20   Problem 2.2:  "Lack of cognitive behavioral skills to manage

21   life's stress."  Goal:  "I will improve my knowledge of

22   cognitive behavioral therapy."

23        Q.   One moment.

24        A.   Objective 2.2:  "I will utilize cognitive behavioral

25   therapy to make changes in my life and how I view things in

1  my life."  Problem heading 3, "Family."  Problem 3.1:

2  "Dysfunctional family interaction."  Goal:  "I will improve

3  the quality of interaction with my family members and peers."

4  Objective 3.1A:  "I will have better, more trusting

5  relationships with my family, friends and peers and work out

6  custody issues with my wife."

7      Q.   Okay, great.  Just a couple of questions about some

8  of the headings that you've read.  Some of them reflected

9  specifically alcohol, and then some of them I know you

10 mentioned mood, and you also mentioned the problem heading 3,

11 Family.

12      Even though these do not specifically mention the

13 word "alcohol" or "alcohol disorder," why are they part of

14 this plan?

15     A.   Well, they're part of the plan because they all

16 somehow relate to the alcohol use disorder.  Our electronic

17 records are categorized in different categories.  So there

18 are substance use, there's a mood disorder category, and

19 there's family.  There's all sorts of electronic records.

20 You choose kind of what the person is working on.  So these

21 Goals, Mood, Family, relate to the alcohol use disorder.

22     Q.   I want to return back to two pages that have already

23 been admitted, just to ask you a couple of brief questions.

24      We already looked at an example of some notes from

25 this document here.  I will move -- as I ask you this

1   question, I will obviously move the document so you can

2   visually see the different portions.

3              THE COURT:  You need to tell me what document you're

4   talking about.

5              MS. MIRSKY:  I apologize, Your Honor.  This is H14.

6              THE COURT:  Thank you.

7   BY MS. MIRSKY:

8       Q.   So I'd like to know -- of these different sections,

9   obviously the headings there you've provided or that are

10  required by Blue Sky policy, which of these headings, as you

11  meet the client at different intervals, remain on the

12  document -- remain on the record and that you review with the

13  client?

14             If you want to check up on his medication or his

15  symptoms, et cetera, which of these sections would mimic

16  those documents throughout his treatment?

17      A.   So what you're -- what is here is a psychiatric

18  intake assessment, which is what would have -- what was done

19  by the prescriber of his medication on initial intake.  The

20  initial assessments are done at intake, at the beginning of

21  someone's treatment, and then there are periodic reviews.

22  But this is an initial intake from the prescriber.

23      Q.   Okay.  If I also -- are there references in other

24  documents?  They would also reference the alcohol and

25  substance abuse, as well?

1    A.   Yes.

2    Q.   Not specifically the words under that heading, but

3  I'm just asking if it would generally be in other records

4  throughout his treatment?

5    A.   Yes.   There is a psychosocial intake that's done

6  upon admission.   And this is -- like I said, this is the

7  prescriber's initial, and there's also a nursing evaluation.

8  There's three initial intakes done at admission.

9    Q.   Okay.   Thank you.

10   A.   Similar information.

11   Q.   Okay.   I'm also going to refer back to, briefly, to

12 H15.   I'm also going to ask you a similar question, like, for

13 example, the admission I recognize is not part of future

14 records beyond admission date, but in terms of listing

15 current meds, would that also be written and/or reviewed to

16 see if Mr. Vaccarelli was to stay on those meds or there was

17 changes, consistency, et cetera?

18   A.   Yes.

19   Q.   Okay.   And would that also apply to discussions or

20 plans and recommendations as Mr. Vaccarelli was under your

21 care from 2017 up to today?

22   A.   Yes.

23   Q.   Thank you.

24        Now, you mentioned, when I asked you about

25 medications at one point -- I'm going to return back to the

1  treatment plan, just so that we can specifically refer to one

2  medication that you already testified to.  That would be H2.

3  And you -- I believe you said that the Revia --

4      A.   Yes.

5      Q.   -- is related to cravings?

6      A.   Yes.

7      Q.   Okay.  Can you -- cravings mean -- it's an easy to

8  understand word, but can you elaborate more, a little bit,

9  about the cravings and how that pill -- from your knowledge,

10 how it may help Mr. Vaccarelli with that issue?

11     A.   Yes.  So --

12          MS. LARAIA:  Objection, Your Honor.  I'd ask for the

13 basis of the witness's knowledge of how the medication

14 works.

15          THE COURT:  All right.  Get that first, how she

16 knows about Revia and what it does and how it helps, how it's

17 used.

18          MS. MIRSKY:  Okay.

19          THE WITNESS:  So cravings are also -- a craving --

20 for someone who may not know what a craving is, is an urge to

21 drink, in the situation of alcoholism.  Revia is a medication

22 that is given to people to reduce the amount of cravings one

23 has to drink.  What it does is it works in -- in the brain to

24 give the person -- if the person were to take Revia and drink

25 on that, it would block the endorphins in the brain and not

1  give the person the full effect of the drinking.  But

2  generally why it's given to a person is to cut down on the

3  cravings.

4          So whether it's alcohol or drugs, it's a medication

5  that's widely used to reduce cravings in people with

6  substance use disorders.

7          MS. MIRSKY:  May I continue?

8          THE COURT:  You may.

9          MS. MIRSKY:  Okay.  Thank you.

10 BY MS. MIRSKY:

11   Q.   So is this the kind of medication -- let me rephrase

12 that question, excuse me.

13         So it was determined that Mr. Vaccarelli would

14 benefit from the medication, or at least you would agree that

15 he was prescribed it?

16   A.   Yes.

17   Q.   Actually, let me also ask:  You did mention that you

18 reviewed Solutions' records.  From your review, was he on

19 that medication prior to being admitted to your program?

20   A.   Yes.

21   Q.   He was, okay.  And since he's been under your care

22 from October, 2017, up until today and perhaps past today --

23         MS. LARAIA:  Objection, Your Honor.

24         THE COURT:  Sustained.  Just go up to today.

25         MS. MIRSKY:  Today.  Yes, Your Honor.

1   BY MS. MIRSKY:

2       Q.   Up until today, has he consistently been on this

3   medication?

4       A.   Yes.

5       Q.   Okay.  And is he on this medication because

6   cravings, as you've already explained, is part of the alcohol

7   disorder or disease?

8       A.   Yes.

9       Q.   Okay.  Now, I'm also going to draw your attention to

10  a couple other pages here in the record.

11          I think that you previously had mentioned when you

12  did an overview of the kinds of things that you do in your

13  job at Blue Sky and the programs that are offered to clients,

14  that can include going to groups?

15      A.   Yes.

16      Q.   Okay.

17          MS. MIRSKY:  I would ask that H41 be admitted as an

18  exhibit.

19          MS. LARAIA:  Objection, Your Honor.

20          THE COURT:  Basis?

21          MS. LARAIA:  Relevance.  Discusses what group

22  members said, which I don't think is --

23          THE COURT:  Let's -- with respect to 41, I think the

24  objection is well-founded, but you may certainly ask the

25  witness about what is covered in groups by way of issues,

1577

1    who's in the group, what is the nature of

2    Mr. Vaccarelli's -- what was the nature of his participation

3    in the group.

4            MS. MIRSKY:  That was my intention, Your Honor,

5    because it's part of the --

6            THE COURT:  I real -- but 41 covers more than that.

7    So let's just ask her.  Okay?

8    BY MS. MIRSKY:

9        Q.   So elaborating on what we discussed about how groups

10   are part of this treatment, can you explain perhaps the types

11   of topics that might be discussed in groups?

12       A.   So, the groups at Blue Sky are individualized for

13   the client, so we offer every -- there's four hours of

14   groups.  Every hour, there are three groups going on.  There

15   may be a substance abuse group.  It could be an interpersonal

16   feedback group.  It could be an anxiety skills group.

17   There's a whole host of groups.  People are in these groups

18   that have similar issues, and the topics discussed can be --

19   it depends, honestly, on the group that the person is in.

20           So if it's a skills-based group, anxiety skills,

21   that people in the group are talking about how they relate to

22   anxiety, what skills they use, and they're being taught

23   skills.

24           Some of them are process-based groups, like an

25   interpersonal feedback group would be people bringing up

1    issues that they're struggling with.  It could be anything

2    from high craving ratings to family issues to, you know,

3    anything.  The sky's the limit.  It's in a process group.

4           And as far as the notes go, we -- as the clinician

5    running the group, there is a general note that's written for

6    everyone.  So everyone that would be in that particular group

7    would have the same note.  The only difference being there's

8    no names mentioned in the notes for anyone else.

9           So in a client's record, there may be a group note

10   that, you know, says "group members discussed X, Y and Z."

11   If something were particular to Leon that was pertinent to

12   the group, because we're talking about groups that sometimes

13   have, you know, 15, 20, sometimes more people in them,

14   everyone doesn't always get a chance to participate, he would

15   have a line, a sentence or two, under his note saying what he

16   specifically spoke about in that group.

17   Q.   Okay.  And just to remind us, these other topics

18   that you're discussing, you had previously mentioned these

19   underlying issues, they're not specifically -- they're not

20   necessarily about alcoholism, but they can be related to the

21   treatment of the alcoholism?

22   A.   Yes.

23   Q.   Okay.  I'm also going to ask you to look at another

24   page, which is H44.

25          MS. MIRSKY:   Again, this is another group note.

1  I'm asking it to be admitted for a different reason than the

2  previous one.

3          MS. LARAIA:  Your Honor, same objection.

4          MS. MIRSKY:  In this example, Your Honor, there is

5  a specific note about Mr. Vaccarelli, unlike the --

6          THE COURT:  But we are more interested in the

7  charges in this case than the specifics of the treatment.

8  Unless it is shown to relate to the conduct alleged to have

9  been conducted in this case, that's the relevance objection

10 here.

11         So if you want to have her describe how the issues

12 in group related to his -- if she can -- his conduct before

13 treatment, that's fine.  But I think that -- at least

14 observing 44, that doesn't seem to be what it does.  But that

15 would be the relevance demarcation.

16         MS. MIRSKY:  Okay.  We're going to move past that

17 and we'll come back briefly.

18 BY MS. MIRSKY:

19     Q.   In regards to Mr. Vaccarelli's care, he's still

20 under your care; correct?

21     A.   Yes.

22     Q.   Okay.  And why is that?  Why is it relevant that

23 he's still under your care?

24     A.   He continues to be under my care for the treatment

25 of his alcohol use disorder and depression and anxiety.  It's

1    an ongoing issue.  There's things that come up that can

2    cause, you know, cravings to drink, to be high, stress,

3    things that need to continue to be discussed and monitored.

4        Q.   Okay.  Is Mr. Vaccarelli -- excuse me.  Let me

5    retract that.

6            Are -- the diagnoses associated with Mr. Vaccarelli,

7    do those diagnoses still include the severe alcohol use

8    disorder?

9        A.   Yes.

10       Q.   And why is that?

11       A.   Because he continues to meet the criteria.  Alcohol

12   use disorder, as I said earlier, is -- it may go into

13   remission in people.  It never -- alcohol use disorder never

14   goes away.  It's a life-long disease.  So there's going to

15   be, you know, situations where it's going to come up more and

16   more.  You know, I can -- he can have sustained recovery and

17   abstinence from alcohol for years, and -- and then drink.

18           So it's something that we need to continue to

19   monitor, as well as the underlying issues of what's led to

20   him drinking, what continues to lead to the cravings and the

21   drinking.

22       Q.   So you mentioned monitoring.  Was it -- is it fair

23   to say that you're monitoring this condition because once you

24   have an alcohol use disorder -- or alcoholism, as, you know,

25   we might say outside of your profession -- once you have it,

1   it's always -- it stays with you forever?

2       A.   Correct.

3            MS. MIRSKY:   Thank you.

4            One moment, Your Honor.

5            (Pause.)

6            MS. MIRSKY:   Nothing further, Your Honor.   Thank

7   you.

8            THE COURT:   Thank you.   Cross-examination, please.

9            MS. LARAIA:   Your Honor, did you want the Government

10  to start cross-examination today?   I know we'll not be

11  finished.

12           THE COURT:   Yes, start cross-examination, please.

13           MS. LARAIA:   Certainly, Your Honor.

14                         CROSS-EXAMINATION

15  BY MS. LARAIA:

16      Q.   Good afternoon, Ms. Gleissner.

17      A.   Good afternoon.

18      Q.   So I think you testified that Mr. Vaccarelli started

19  treatment with you at Blue Sky in October of 2017; is that

20  right?

21      A.   Yes.

22      Q.   Okay.   And before October of 2017, had you ever met

23  him?

24      A.   No.

25      Q.   So you didn't know him between 2011 and 2017 -- and

1582

```
 1   October of 2017; is that accurate?
 2        A.   Yes.
 3        Q.   So you can't say today, sitting here, what his
 4   mental condition was between 2011 and October of 2017; is
 5   that right?
 6        A.   Yes.
 7        Q.   Okay.  Now, you testified about some of the factors
 8   that are used to diagnose alcohol use disorder.  Do you
 9   remember that?
10        A.   Yes.
11        Q.   Okay.  And I think you also testified that the word
12   "alcoholic" or "alcoholism" is -- isn't really a medical term
13   or a term used in your field; is that right?
14        A.   Yes.
15        Q.   And that's because the -- I think you called it the
16   DSM?
17        A.   Yes.
18        Q.   The DSM-5 calls it something else, the alcohol use
19   disorder?
20        A.   Yes.
21        Q.   So the term "alcoholic" doesn't actually have a
22   medical term or a medical meaning; is that right?
23        A.   Yeah.
24        Q.   Okay.  And I think you said that there are 11
25   factors?
```

1    A.    Yes.

2    Q.    Okay.  And fair to say that someone can be diagnosed

3    with alcohol use disorder if he or she exhibits two to three

4    symptoms, for example?

5    A.    Yes.

6    Q.    Okay.  And that would be a mild form?

7    A.    That would be mild, yeah, over a 12-month period.

8    Q.    So in the last 12 months, someone exhibited two or

9    three symptoms?

10   A.    Yes.

11   Q.    Okay.  And someone who maybe exhibited a few more

12   symptoms, let's say four or five symptoms over the past year,

13   what would that be?

14   A.    That would be moderate.

15   Q.    Okay.  So -- and then severe is how many?

16   A.    Six or more.

17   Q.    Okay.  Over the past year?

18   A.    Yes.

19   Q.    Okay.  And I think that you testified that once

20   someone's diagnosed with alcohol use disorder, that's not

21   going to change; is that right?

22   A.    Yes.

23   Q.    Because it's chronic?

24   A.    Yes.

25   Q.    So even if someone has had successful treatment, I

1584

1    think you said a long-term remission maybe might have been

2    the word you used, then they would still have that diagnosis

3    of alcohol use disorder once he or she has been diagnosed?

4        A.   Yes.

5        Q.   So someone doesn't have to actively exhibit the

6    symptoms that are listed in the factors in the DSM in order

7    to be considered to have this diagnosis; is that right?

8        A.   No.   They do have to have those symptoms to be

9    diagnosed, if I'm understanding your --

10       Q.   Let me just repeat the question.   So once someone --

11   let's say someone has been diagnosed -- they were diagnosed a

12   year ago -- and then today they're coming in for treatment

13   and they've achieved a remission, so they're no longer

14   drinking, they're fairly successful and moving forward.   That

15   person will still have a diagnosis; is that right?

16       A.   Yes.

17       Q.   So even if they're not actively craving alcohol,

18   they would still have that diagnosis?

19       A.   Yes.   There would be a modifier about early

20   remission.

21       Q.   Okay.   So let's go through, if you don't mind, what

22   those factors are.   So, just correct me if I'm wrong.   Is one

23   of those factors that someone had times when he or she ends

24   up drinking more or longer than he or she intended?

25       A.   Yes.

1     Q.   Okay.  How is that factor measured?

2     A.   How is it measured?  It's measured by self-report of

3  the client.

4     Q.   So that relies on a patient or a client coming in

5  and telling a practitioner that he or she had times when he

6  or she drank more or longer than he or she intended?

7     A.   Yes.

8     Q.   Is there any kind of machine to test someone about

9  that factor, or is that just based on what someone tells a

10  practitioner?

11     A.   Well, there are -- there are breathalyzers.  There

12  are SoberLink applications.  There are alcohol monitoring

13  bracelets.  There are things out there that would measure if

14  someone was drinking -- not the exact amount.

15     Q.   But in terms of whether they're drinking more than

16  they intended, that's not something that can be tested other

17  than just through someone's own self-reporting; is that

18  right?

19     A.   Yes.

20     Q.   Okay.  I just want to go into another factor.  So is

21  another one of those factors that more than once someone

22  wanted to cut down or to stop drinking, the person tried and

23  they were unable to stop?

24     A.   Yes.

25     Q.   Okay.  And, again, how would you know whether

1    someone exhibited that symptom?

2        A.   Again, self-report.  Unless it's something that was

3    physically seen, someone came in intoxicated, you know, had a

4    DUI, something along those lines.

5        Q.   So it requires a truthful reporting by a patient or

6    a client?

7        A.   Yes.

8        Q.   Okay.  Is one of the other criteria that a person

9    spent a lot of time drinking or spent time being sick or

10   getting over other effects from drinking?

11       A.   Yes.

12       Q.   Okay.  And, again, how is that factor -- how is it

13   determined whether a person is exhibiting that symptom?

14       A.   That's also self-report.

15       Q.   Also requires a truthful report from a client or a

16   patient?

17       A.   Yes.

18       Q.   Okay.  And is another one of the criteria that a

19   person wanted a drink so badly that they couldn't think of

20   anything else?

21       A.   Is -- that's not a true --

22       Q.   Is that one of the factors?

23       A.   It's not one of the criteria, but that would maybe

24   go along with, like, having cravings or urges to drink might

25   be what you're referring to.

1    Q.   Okay.  So let's talk about that one.  So is it a

2  factor that someone has cravings to drink alcohol?

3    A.   Yes.

4    Q.   And how would you measure what someone's cravings

5  are?

6    A.   Again, self-report.  It's usually a 1-to-10 scale.

7    Q.   So you would ask a patient or a client to rank on a

8  scale of 1 to 10 how bad a craving was?

9    A.   Yes.

10   Q.   So you'd rely on whatever number someone chose along

11  the 10-point scale?

12   A.   Yes.

13   Q.   Okay.  Is there another factor that drinking or

14  being sick from drinking could interfere with their taking

15  care of their home or family?

16   A.   Yes.

17   Q.   Okay.  And how is that -- how is it determined

18  whether someone -- a patient exhibits that symptom?

19   A.   Well, other than someone having, let's say,

20  Department of Children and Families' involvement, or some

21  legal aspect that's known, that would, again, be self-report

22  of what's going on in the home.  Sometimes outside sources.

23  It's usually Department of Children and Families.

24   Q.   Okay.  So, generally a self-report of a client or

25  family member or something like that?

1    A.    Yeah.

2    Q.    Okay.  How about if someone continued to drink even

3    after it was causing problems with family or friends; is that

4    a factor?

5    A.    Yes.

6    Q.    Okay.  And how would you determine whether someone

7    exhibited that particular symptom?

8    A.    That's also self-report.

9    Q.    So, again, requires a truthful report of a client?

10    A.    Yes.

11    Q.    Okay.  How about if someone is giving up activities

12    that are -- that used to be important to a person?  Is that

13    one of the factors under the DSM-5?

14    A.    Yes.

15    Q.    And how would you know if someone is giving up an

16    activity that he or she previously enjoyed in favor of

17    alcohol?

18    A.    That's also truthful self-report.

19    Q.    So, again, it would require truthful information

20    from a client?

21    A.    Yes.

22    Q.    Okay.  How about if someone -- is there a factor

23    whether someone has gotten into situations while or after

24    drinking that increased his or her chance of getting hurt,

25    say getting in a car or something like that?

1    A.   Yes, driving under the influence, DUIs.

2    Q.   Again, is that information generally something

3    provided by a client, to say that an incident like that had

4    occurred?

5    A.   A client or other referral source -- a probation

6    officer, police report --

7    Q.   Okay.

8    A.   -- something like that.

9    Q.   But, again, something that requires a report of

10   someone, as opposed to, you know, a blood test, for

11   example?

12   A.   Yes.

13   Q.   How about -- is there another factor that someone

14   continues to drink, even though it made him or her feel

15   depressed or anxious or added to another health issue?

16   A.   Yes.

17   Q.   Okay.  And, again, was that something that would

18   require self-reporting of a client about the amount that he

19   or she is continuing to drink?

20   A.   That situation could be -- if it's a medical

21   situation, someone has liver issues, that's -- blood work,

22   lab work could certainly show that.  Other than that, it's,

23   you know, again report --

24   Q.   Okay.

25   A.   -- from the client.

1    Q.   Do people -- is another factor if someone has to

2    drink more than he or she used to in order to have the same

3    impact that that same amount would have had before?

4    A.   Yes.

5    Q.   Okay.  And, again, how would you know how many

6    drinks that a person had, as opposed to what they used to

7    have?

8    A.   Self-report by the client.

9    Q.   Okay.  Is another factor someone who has experienced

10   withdrawal symptoms?

11   A.   Yes.

12   Q.   And are those something that sometimes can have a

13   more physical manifestation, if you happen to see them?

14   A.   Yes.

15   Q.   So based on the fact that a lot of the criteria

16   require self-reporting of a patient or client, is it possible

17   that someone can falsely report symptoms of alcohol use

18   disorder?

19   A.   Yes.

20   Q.   Because there's not a test for most of these

21   factors; right?  Aside from your reliance on truthful

22   information, there's not like a blood test; is that right?

23   A.   Well, there is blood test, but it wouldn't tell you

24   how much the person was drinking, just that they had alcohol

25   in their system.

1    THE COURT:  We are at 3:00.  I take it you are not

2  almost finished?

3    MS. LARAIA:  I'm not, Your Honor.

4    THE COURT:  Okay.  Ladies and gentlemen, we will be

5  back tomorrow at 9:30.  It is anticipated that evidence will

6  be completed tomorrow.  That means that when you return on

7  Tuesday, anticipate, please, spending the whole day with us

8  because we will have the closing arguments, the jury charge,

9  you will begin to deliberate, you will get lunch on the

10  house, and you will be entering a very serious stage of your

11  duties.

12    So we'll see you tomorrow at 9:30.

13    (Jury out at 3:03 p.m.)

14    THE COURT:  All right.  Ms. Gleissner, I'm going to

15  need to have you come back at 9:30 tomorrow morning.  We

16  will, indeed, finish your testimony, however, tomorrow.

17  Thank you.  Please don't discuss your testimony with anyone

18  before you come back and complete it, and don't let anyone

19  speak to you about your testimony.  All right?

20    THE WITNESS:  Yes.

21    THE COURT:  Thank you very much.  You are excused

22  and you may leave.

23    (Witness excused, 3:04 p.m.)

24    THE COURT:  All right.  Counsel, is there anything

25  before we recess?

1    MR. McGARRY:  I don't think so, Your Honor.

2    MR. EINHORN:  No, Your Honor.  Thank you.

3    THE COURT:  All right.  We will make an effort to

4  take all of the proposed changes, et cetera, that you have

5  submitted and prepare an advanced draft for discussion

6  tomorrow after we complete evidence.  I will have no -- I

7  will note the changes that you have requested in my own

8  draft, so that if I don't include your changes, we can

9  discuss whether that's -- what we have produced is

10  serviceable and meets your objective.  Okay?

11    MR. EINHORN:  Thank you.

12    THE COURT:  So, this is your last witness?

13    MR. EINHORN:  Yes, Your Honor.  The Defendant will

14  rest.

15    THE COURT:  Okay.  And then what will the Government

16  be doing, by way of witnesses?

17    MR. McGARRY:  I believe we may have one rebuttal

18  witness.

19    THE COURT:  And who is that?

20    MR. McGARRY:  Do I have to tell you, Your Honor?

21    THE COURT:  No.  Is it a long witness or a short

22  witness?

23    MR. McGARRY:  I believe it is a short witness.

24    THE COURT:  So, my representation to the jury that

25  we will finish evidence tomorrow is accurate?

1   MR. McGARRY:  Yes, it is, Your Honor.

2   MR. EINHORN:  I think if this person is not on the

3   witness list, we're entitled to know and be given advance

4   notice, actually.

5   THE COURT:  For a rebuttal witness?

6   MR. EINHORN:  Pardon?

7   THE COURT:  For a rebuttal witness?

8   MR. EINHORN:  Yes, Your Honor.  We still need to

9   know beforehand, I believe, under the rules.

10   MR. McGARRY:  Well, Your Honor, so much for the

11   surprise.

12   THE COURT:  Let me guess.

13   MR. McGARRY:  I was going to let you guess.

14   THE COURT:  An insurance interviewer.

15   MR. McGARRY:  Correct, Your Honor.

16   MR. EINHORN:  And we would object to that.  There's

17   nothing for him to rebut.  The evidence that we argued at

18   sidebar and before the Court didn't go anywhere.

19   THE COURT:  What we argued at sidebar was whether it

20   was inconsistent with what Mr. Vaccarelli had testified.  It

21   was not inconsistent.  If it is independently a statement

22   made by the Defendant relevant to the conduct charged in this

23   Indictment, and which has obviously been the basis for the

24   Defense -- that is, lack of intent, lack of act to form

25   intent -- this would be relevant.  This would be appropriate

1594

1   rebuttal; would it not?

2   MR. EINHORN:  Of course; yes, Your Honor.  He would

3   also be a beneficial witness for us if he chooses to take the

4   witness stand.

5   THE COURT:  Then he'll be a welcome witness.

6   MR. EINHORN:  Yes, Your Honor.

7   THE COURT:  All right.  Thank you very much.

8   MR. McGARRY:  Your Honor, may I make one comment

9   about the jury charge?  In response to an e-mail from your

10  staff regarding the jury verdict form, there was a cryptic

11  e-mail from me, which was not particularly long, related to

12  opposing the removal of the causing charge that Mr. Einhorn

13  had suggested.

14  I just wanted to make sure that the Court was able

15  to -- it was late at night -- take it that we want the

16  causing charge, which was sent with the verdict form, and

17  make sure that it reaches the discussion about the charge

18  itself.

19  THE COURT:  That will be a good subject for us to

20  discuss, because willfully causing is not a separate count;

21  correct?

22  MR. McGARRY:  Correct.

23  THE COURT:  And, so, they don't have to reach a

24  verdict on proof of willfully causing.  It's a part of the

25  other charges.

1595

```
 1          MR. McGARRY:  Correct.  So, again, I would have to
 2   take a look at the charge, but --
 3          THE COURT:  Take a look and see if there is a way to
 4   incorporate that concept or whether it will be sufficient to
 5   do that in the charge itself.
 6          MR. McGARRY:  I will, Your Honor.
 7          THE COURT:  And we'll discuss that tomorrow.
 8          MR. McGARRY:  Yes.  And I think we're all on the
 9   same page, but just so the record is clear.  There are
10   various faxes that say "from Leon Vaccarelli" that appear to
11   be, perhaps, in someone else's handwriting.  And we just
12   don't want the jury to be confused that -- that by Mr.
13   Vaccarelli -- and I think today he even testified, "Well, I
14   don't know if I did that, someone else might have typed it
15   and I signed it."  Just that the causing aspect should not be
16   confusing -- of all the things that they have to confront in
17   the charge, the fact that he instructs someone to send a fax
18   shouldn't be confusing to them.
19          THE COURT:  Obviously, our objective is not to
20   confuse the jury.  So if you would kindly take a second look
21   and see where we can be clear about how willfully causing
22   fits into the counts, but I don't think it belongs on a
23   verdict form.
24          MR. McGARRY:  Oh, that's exactly why I made the
25   statement, because I had sent it in an e-mail back to your
```

1596

1  staff on a verdict form e-mail chain, and I wanted to make

2  sure that it was clear that it was a comment that was

3  intended for the actual charge itself.

4          So I agree a hundred percent, Your Honor, it's not

5  related to the verdict form.

6          THE COURT:  Okay.

7          MR. McGARRY:  And late at night I responded to one

8  e-mail, and that was the point of raising it this time.

9          THE COURT:  Okay.  All right.  So you are on the

10  verdict form e-mail chain, and that's not, however, what you

11  were responding to.  Got it.

12          MR. McGARRY:  Yes.

13          THE COURT:  All right.

14          MR. McGARRY:  Thank you.

15          THE COURT:  We'll see you tomorrow at 9:30.  Have a

16  pleasant afternoon.

17          MR. EINHORN:  Thank you, Your Honor.

18          MR. McGARRY:  Thank you.

19          (Proceedings adjourned, 3:11 p.m.)

20          COURT REPORTER'S TRANSCRIPT CERTIFICATE

21  I hereby certify that the within and foregoing is a true and

22  correct transcript taken of the proceedings in the

23  above-entitled matter.

24                          /s/  Tracy L. Gow
                            Tracy L. Gow, RPR
25                          Official Court Reporter