```
              UNITED STATES DISTRICT COURT
               DISTRICT OF CONNECTICUT


_____
UNITED STATES OF AMERICA,      )
              Plaintiff,       ) No: 3:18-CR-92 (JBA)
                               )
       v.                      ) May 24, 2019
LEON VACCARELLI,               )
              Defendant.       ) 9:40 a.m.
                               )
_____)
                          141 Church Street
                          New Haven, Connecticut




                     JURY TRIAL DAY 9

                     VOLUME I of II


B E F O R E:
         THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
         and 14 JURORS
```

```
                               Official Court Reporter:
                               Tracy L. Gow, RPR
                               203-910-0323
```

1598

```
1   A P P E A R A N C E S:

2   For the Government:
         MICHAEL S. McGARRY, AUSA
3        U.S. Attorney's Office-NH
         157 Church St., 25th Floor
4        New Haven, CT 06510
         203-821-3751
5        Email: michael.mcgarry@usdoj.gov

6        JENNIFER LARAIA, AUSA
         U.S. Attorney's Office-BPT
7        1000 Lafayette Blvd., 10th Floor
         Bridgeport, CT 06604
8        203-696-3029
         Email: jennifer.laraia@usdoj.gov

9
    For the Defendant:
10       JONATHAN J. EINHORN, ESQ.
         Law Office of Jonathan J. Einhorn
11       129 Whitney Avenue
         New Haven, CT 06510
12       203-777-3777
         Email: einhornlawoffice@gmail.com
13
         RACHEL MIRSKY, ESQ.
14       Mirsky Law, LLC
         900 Chapel Street
15       10th Floor
         New Haven, CT 06510
16       203-290-2779
         Email: rachel@mirskylawct.com
17
    Also present:
18       LEON VACCARELLI
         SA RUSSEL DAY, FBI
19

20

21

22

23

24

25
```

1   **<u>INDEX</u>**

2   **EXAMINATION**

3   **Witness Name**                                                    **Page**

4   DONNA GLEISSNER

5      Cont'd Cross By MS. LARAIA................................ 1609

6      Re-Direct By MS. MIRSKY ................................. 1624

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Call to Order, Out of the presence of the Jury,

2    9:40 a.m.)

3    THE COURT:  Good morning, Counsel, ladies and

4    gentlemen, Mr. Vaccarelli.  Please be seated.

5    THE DEFENDANT:  Good morning, Your Honor.

6    THE COURT:  I gather our technological problems have

7    been solved.

8    MR. McGARRY:  That's our understanding, Your Honor,

9    yes.

10   THE COURT:  Do you want to tell the jury?

11   I have two motions that have been filed.  109, the

12   Defendant's Motion for a Proffer Prior to Rebuttal Testimony.

13   That being -- I'm not sure we marked the Munder to Rosales

14   (phonetic) November 2017 interview.

15   MR. McGARRY:  I believe the complete interview has

16   been marked as 1226, and the redacted two-paragraph portion

17   was 1227.  And I have some extra copies, though I gave some

18   out yesterday.

19   THE COURT:  All right.  The Defendant moves for a

20   proffer of why this is rebuttal testimony, and makes the

21   point that it is the same statements that were originally

22   intended as prior inconsistent statements if they -- if the

23   predicate could be set up, which it was not.

24   Anything further on explaining why this is not

25   rebuttal?  You know what it is; right, Mr. Einhorn?

1    MR. EINHORN:  The only thing I would add is, if Your

2    Honor wanted, to have the court reporter read back

3    Mr. Vaccarelli's testimony on that point.  My recollection --

4    THE COURT:  I'm sorry.  What point?

5    MR. EINHORN:  I apologize.  On the question of

6    whether or not it was a prior inconsistent statement.

7    Yesterday, Mr. McGarry asked questions attempting to

8    elicit that from the witness, and it sounded like it was

9    consistent.  And, so, he --

10    THE COURT:  Well, he didn't remember.

11    MR. EINHORN:  He didn't?

12    THE COURT:  He didn't remember; isn't that right?

13    MR. EINHORN:  Yes.  Yes, that's right.  And, so,

14    without memory, he couldn't establish there was a prior

15    inconsistent statement.

16    THE COURT:  But why does it have to be a prior

17    inconsistent statement to be rebuttal?  That's what I don't

18    understand.

19    MR. EINHORN:  I am trying to understand -- I agree

20    with that, but it still has to be in rebuttal of something

21    that happened on the Defense case.  And I don't know what it

22    is they're rebutting, because just the fact that he doesn't

23    remember, they're going to rebut that?  I don't see the

24    rebuttal.

25    THE COURT:  But I don't understand why it matters

1    whether he remembered or didn't remember making this

2    statement, if he did, to the disability insurance

3    investigator.  Isn't rebuttal going to the whole defense?

4         MR. EINHORN:  Yes, I agree.  I agree.

5         THE COURT:  Okay.  And isn't the defense that his

6    severe alcohol disorder impaired his ability to form the

7    requisite criminal intent?

8         MR. EINHORN:  Exactly.  And that's why I was asking

9    for a proffer, because I just -- I don't -- I just want to

10   make certain, or understand, and ask the Court to share in

11   this, that, in fact, the rebuttal is to rebut that

12   proposition, you know, rather than just be some cumulative

13   evidence in this case.

14        THE COURT:  All right.  Mr. McGarry.

15        MR. McGARRY:  Well, I believe it's being offered --

16   let me restart.

17        It is being offered, to the extent that portions

18   that the Court decides are proper to admit, to rebut his

19   defense that when it came to investing his clients' money --

20   or handling his client's money, because it was never

21   invested -- but when it came to investing his clients' money

22   his judgment was impaired.  And he argued and stated it was

23   impaired to such an extent that he could not form intent.

24        And this statement, which was made in the Fall of

25   '17, is contrary to that.  The fact that it's a prior

1    inconsistent statement is true, but it's not the only thing

2    it is.  It's also evidence, direct substantive evidence, that

3    when it came to investing his clients' money, his judgment

4    was not or never impaired.

5          So it is a statement of the Defendant that is

6    relevant to show an element of the crimes, and it's

7    admissible to rebut his defense that he did not have intent.

8          MR. EINHORN:  I would call the Court's attention to

9    the exact language there.  That, in fact, is not our

10   proposition at trial.

11         I would call the Court's attention to the exact

12   language on Government exhibit for ID, 1227.  It says, "His

13   judgment when it came to investing his clients' money was

14   never impaired."  There's no testimony in this trial that his

15   investing of the clients' money was impaired.  In fact, he

16   testified, I believe, that he was doing a good job and knew

17   what he was doing.

18         It has to do with his -- his taking the clients'

19   money, the *Ponzi* scheme argument.  The taking the money,

20   that's not investing his clients' funds.  That's stealing.

21   That's a fraud argument in this particular case.  That's

22   different from what's in here.

23         THE COURT:  Mr. McGarry.

24         MR. McGARRY:  Well, I think that distinction that

25   Mr. Einhorn is making this morning, while I understand the

1  distinction that he's making, I think it really cuts too

2  fine; and also, which we included for context, the prior

3  paragraph talks about people beginning to learn they -- there

4  are civil lawsuits, and related to those actions, which I

5  think put in context that he's not talking about the actual

6  investments but the people who were aggrieved and were then

7  complaining that their money was gone.  And I think that's

8  what he's responding to, that, in fact, that's the money that

9  he's saying his judgment was never impaired.

10      THE COURT:  So the first paragraph says that the

11  civil actions claimed his judgment regarding the managing of

12  their investments was impaired.  And his statement is, when

13  it came to investing his clients' money -- excuse me -- "that

14  his judgment, when it came to investing his clients' money,

15  was never impaired."

16      In the first paragraph where this -- he's reciting

17  that the civil actions claim his judgment regarding the

18  managing of their investments was impaired, seems to reflect

19  what the clients thought he had their money for -- that is,

20  to manage their investments.

21      It seems to me that his statement that his judgment

22  when it came to investing his clients' money was never

23  impaired is not intended to carve out some part of his work

24  as to which his judgment wasn't impaired, because that's what

25  he did, is invested client money.

1    MR. EINHORN:  Isn't it possible to read those two

2    paragraphs together as being consistent?  That's the way I

3    read it.  I know it sounds -- Mr. McGarry says this is a fine

4    line, but that's what the case is all about.

5        If you read them together, what he's basically

6    saying is "managing your money, I was impaired by the use of

7    alcohol; but investing your money, everything was

8    hunky-dory."

9        THE COURT:  But what's the difference between

10   managing and investing?

11       MR. EINHORN:  Sure.  And I think he testified that

12   investing the money had to do with buying stocks, bonds,

13   securities, insurance, and so forth.  Managing the money, I

14   think, is basically a broader statement about "I've got your

15   money in my hands, what am I going to do with it?"

16       Investing is a more narrow thing than managing the

17   money.  You can manage money without investing.  And I think

18   that was his intent.  It would make no sense, otherwise, Your

19   Honor, because why would he say -- why would the same thing

20   appear in two paragraphs that would be inconsistent?  I know

21   it's not Mr. Vaccarelli's language, but I think they have to

22   be read together.  And reading them together --

23       THE COURT:  But even if you read them together, they

24   are two contiguous paragraphs related to his judgment and his

25   opinion that juxtaposes his view of his judgment with that of

1  the civil actions.

2       I think you are free to cross-examine on what wasn't

3  said, what wasn't asked, what lack of clarity you believe

4  that examination will show as to the significance of this.  I

5  don't see how that doesn't make it rebuttal.

6       MR. McGARRY:  Your Honor, if I may.  With some sense

7  of hearing you and Mr. Einhorn having this discussion, and

8  having -- and the input from Ms. Laraia, as well as reading

9  the cases, I think this brief conversation here has been

10  instructive in the sense that if the four of us are parsing

11  it this thin and seeing different interpretations, with what

12  we thought was pretty straight-forward when we marked it, I

13  think that -- I think, perhaps discretion being the better

14  part of valor, we, I think, are not going to try to have a

15  jury of nonlawyers try to figure this out.  And I think at

16  that point, I think we're better off not trying to admit bits

17  and pieces of this report for the confusion -- to the

18  confusion of the jury.

19       And I just didn't mean to -- I agree with what I

20  think the Court is saying, but I think it might be better to

21  just not offer this in rebuttal.

22       THE COURT:  And not call that witness?

23       MR. McGARRY:  Correct.

24       THE COURT:  And not have a rebuttal case?

25       MR. McGARRY:  That seems to be where we would be.

1          THE COURT:  And end with the testimony of

2   Ms. Gleissner.

3          MR. McGARRY:  Unless something crazy happens in the

4   next 20 minutes with Ms. Gleissner, yes, Your Honor.

5          THE COURT:  All right.  That resolves that.  It also

6   resolves the Government's motion with respect to whether the

7   entirety of the insurance investigator's report comes in;

8   right?

9          MR. McGARRY:  And if I may, Your Honor.  To the

10  extent that the Court spent time, and Mr. Einhorn spent time,

11  I think it was educational for us to actually go through

12  this.  So I apologize if it was time that seems to be wasted,

13  but I don't think it was wasted.

14         THE COURT:  No time is wasted.  I don't think any of

15  this is wasted.  It's a thoughtful approach from two very

16  diametrically opposed standpoints that is illuminating.

17         So 108, the Government's motion, is denied as moot.

18         109 has been granted, and we've had the proffer.

19         MR. EINHORN:  Yes, Your Honor.  Thank you.

20         THE COURT:  All right.  Are we ready to begin?

21         MR. McGARRY:  One housekeeping matter, which I think

22  we alluded to, and I guess I would maybe ask if we should do

23  it when the jury is here.

24         There were three unredacted U4s -- Exhibit 407, 408

25  and 409.  We -- I put 407 up on the screen.  It was in front

1  of the jury, so we would ask that -- in full -- we'd ask that

2  it stay in full.

3       408 and 409, since we never got to them in the

4  testimony, rather than have the jury have those U4s, we would

5  ask that they -- we would just, I guess, withdraw our offer

6  of having them in full and just not send them back to the

7  jury.

8            MR. EINHORN:  I have no objection.

9            THE COURT:  So, 407 has been fully admitted.

10            MR. McGARRY:  Correct.

11            THE COURT:  And you are withdrawing -8 and -9?

12            MR. McGARRY:  Correct.  They were fully admitted,

13  but in the course of cross-examination we never got to them,

14  so --

15            MR. EINHORN:  It's the Government's call.  I mean,

16  if they want to offer them, I'll agree.

17            THE COURT:  That's fine.  They will be withdrawn.

18  Okay.

19            All right.  Are we ready for the jury?

20            MS. LARAIA:  Yes, Your Honor.

21            THE COURT:  Okay.  We're ready for Ms. Gleissner.

22  She can be brought in.

23            (Jury in, 9:57 a.m.)

24            THE COURT:  All right.  Please be seated, ladies and

25  gentlemen.  After our usual morning technical difficulties

1    and our unexpected motions, we are now ready to proceed.

2              (DONNA GLEISSNER, previously sworn, resumes stand,

3    9:57 a.m.)

4              THE COURT:  All right.  Ms. Gleissner has returned

5    to the stand.  Good morning.

6              THE WITNESS:  Good morning.

7              THE COURT:  And you remain under oath, and Ms.

8    Laraia will continue her cross-examination.

9              Go ahead.

10              MS. LARAIA:  Thank you, Your Honor.

11                   CROSS-EXAMINATION - CONTINUED

12    BY MS. LARAIA:

13       Q.   Good morning, Ms. Gleissner.

14       A.   Good morning.

15       Q.   When we broke yesterday, do you remember we were

16    talking about your work at Blue Sky?

17       A.   Yes.

18       Q.   Okay.  And just to get back into your job a little

19    bit, your job at Blue Sky is to help people who come to Blue

20    Sky as a treatment center?

21       A.   Yes.

22       Q.   And some of those people are inpatient and some are

23    outpatient?

24       A.   Not technically inpatient, but close to it.  It's

25    like a boarding with a clinic attached to it.

1    Q.   Okay.  So there are some clients who are --

2    A.   There's some level of freedom, but yes, different

3    types.

4    Q.   Okay.  So there's some clients who are boarding and

5    some who come and meet in person and go home?

6    A.   Correct.  Yes.

7    Q.   Okay.  And, so, your job there is you counsel people

8    there?

9    A.   Yes.

10   Q.   Okay.  And, so, as part of your job, do you try to

11   help people who have mild alcohol abuse disorder?

12   A.   Yes.

13   Q.   And moderate alcohol abuse disorder?

14   A.   Yes.

15   Q.   And also severe alcohol abuse disorder?

16   A.   Yes.

17   Q.   Okay.  And I think you've testified that you've been

18   treating Mr. Vaccarelli since October of 2017; is that

19   right?

20   A.   Yes.

21   Q.   Okay.  And in the beginning, about how many times a

22   week did you see Mr. Vaccarelli?

23   A.   Twice a week for individual therapy.

24   Q.   Okay.  And now, you know, looking into May of 2019,

25   what's the schedule now?

1    A.   Once a week.

2    Q.   So during that time between October 2017 and today,

3    you've been trying to help him, through counseling?

4    A.   Yes.

5    Q.   Okay.  So when Mr. Vaccarelli came to you, he came

6    from Solutions, I think you testified; is that right?

7    A.   Yes.

8    Q.   Okay.  And when he came to you, he had already been

9    diagnosed; is that right?

10    A.   Yes.

11    Q.   Okay.  So you weren't in -- you or Blue Sky wasn't

12    in the position of having to do an initial diagnosis or

13    diagnoses, because he had already come with something; is

14    that right?

15    A.   Correct, yes.

16    Q.   At any point during your treatment of Mr.

17    Vaccarelli, did you go out to Las Vegas and visit

18    Solutions?

19    A.   No.

20    Q.   Did any doctors from Solutions ever come to

21    Connecticut and go to Blue Sky to talk about Mr.

22    Vaccarelli?

23    A.   No.

24    Q.   Okay.  So during the time that Mr. Vaccarelli's been

25    with Blue Sky, you've been trying to help him; is that fair

1612

1    to say?

2        A.    Yes.

3        Q.    Okay.  And during counseling, Mr. Vaccarelli has

4    told you particular things about his symptoms; is that

5    right?

6        A.    Yes.

7        Q.    So, for example, symptoms might be "drinking

8    interfering with work or family," things like that, like we

9    talked about yesterday; is that right?

10       A.    Yes.

11             (Reporter interruption.)

12   BY MS. LARAIA:

13       Q.    Okay.  So I think -- I just want to make sure I got

14   the answer, but -- so he's described symptoms for you; fair

15   to say?

16       A.    Yes.

17       Q.    So things like cravings, for example?

18       A.    Yes.

19       Q.    Okay.  And when you're treating him, you rely on

20   what he tells you?

21       A.    Yes.

22       Q.    Okay.  And if he or someone else wasn't completely

23   candid with you, would that affect your ability to help that

24   person, as part of their treatment?

25       A.    Yes.

1    Q.   Now, in the time that you were treating Mr.

2    Vaccarelli, you were aware that he was facing some legal

3    trouble; is that right?

4    A.   Yes.

5    Q.   Okay.  And, in fact, he told you about the fact that

6    he was charged, and now you're here for the trial; is that

7    right --

8    A.   Yes.

9    Q.   -- fair to say?

10        And was there ever a time during the course of your

11   treatment of Mr. Vaccarelli between October 2017 and now that

12   he was less than candid with you?

13   A.   Not to my knowledge.

14   Q.   Okay.  So there was never a time that Mr. Vaccarelli

15   told you something that wasn't true, to your knowledge?

16   A.   To my knowledge.

17   Q.   I just want to ask you about --

18        MS. MIRSKY:  Your Honor, I have to object to what I

19   believe the direction that Ms. Laraia is going into.  I mean,

20   I think -- and I want to address it before we go any

21   further.

22        THE COURT:  What's the basis of your objection?

23        MS. MIRSKY:  I'm anticipating that Ms. Laraia is

24   going to ask Ms. Gleissner about something very -- some

25   specific wording that Mr. Vaccarelli would have conveyed to

 1   her about his legal troubles, which has nothing to do with

 2   discussing his alcoholism or the treatment.  I recognize

 3   there is parts of that record, but there's nothing about

 4   that --

 5          THE COURT:  Let's see if there's a way the questions

 6   can be fashioned that don't get into Mr. Vaccarelli's

 7   description of any of the substance of the charges that he

 8   faces.  Okay?

 9          MS. LARAIA:  Your Honor --

10          THE COURT:  That's your objection; right?

11          MS. MIRSKY:  Yes, Your Honor.

12          MS. LARAIA:  Just to make this easier, Your Honor.

13   I'm not intending to ask about that.  That's not my line of

14   questions.

15          THE COURT:  Okay.

16   BY MS. LARAIA:

17     Q.   Was there a time that Mr. Vaccarelli reported to you

18   that he had had a car accident?

19     A.   Yes.

20     Q.   And when he initially told you about the car

21   accident, did he tell you something about how he tried to

22   switch lanes, or something like that, and he got in a car

23   accident?

24     A.   Yes.

25     Q.   And he said he wasn't drinking; is that right?

1    A.    Yes.

2    Q.    Okay.  And at any time later, did you learn that

3    that was not, in fact, true?

4    A.    Yes.

5    Q.    How is that?

6    A.    In a later session, he reported that he, in fact,

7    had been drinking prior to the accident.

8    Q.    Okay.  So, in a later session, maybe a few weeks

9    later, Mr. Vaccarelli came in and said, What I told you

10   before was not true?

11   A.    Yes.

12   Q.    Okay.  So, fair to say that during the course of

13   your treatment of Mr. Vaccarelli, that's an instance where

14   Mr. Vaccarelli was not completely candid with you?

15   A.    In the moment, yes.

16   Q.    And so, now, when you said not to your knowledge

17   that Mr. Vaccarelli had ever said something untruthful, now

18   you recall there was a time where he was less than candid?

19   A.    Yes.

20   Q.    Okay.  So when you're taking these -- yesterday you

21   were shown some reports or some notes; is that correct?

22   A.    Yes.

23   Q.    Okay.  So when you're taking notes or reports of

24   individual sessions with a client, do you record things

25   like -- you know, important things, details that they told

1616

1    you?

2        A.   Yes.

3        Q.   Okay.  So on the time when he told you, initially,

4    that he had the car accident, you recorded that he had a car

5    accident and he wasn't drinking; is that right?

6        A.   Yes.

7        Q.   Or that he told you he wasn't drinking?

8        A.   Yes.

9        Q.   Okay.  So, fair to say that that report has

10   inaccurate information because it was conveyed to you by Mr.

11   Vaccarelli?

12       A.   Yes.

13       Q.   Okay.  Because you weren't in the car with him; were

14   you?

15       A.   No.

16       Q.   Okay.  So the only way you know about it is from his

17   report?

18       A.   Yes.

19       Q.   And this is all during a time where you are working

20   with Blue Sky and attempting to help Mr. Vaccarelli with

21   issues; is that right?

22       A.   Yes.

23       Q.   And, so, you're spending your time with him, and he

24   was not completely candid with you?

25       A.   Yes.

1617

1   Q.   And that incident involved drinking; is that
2   right?
3   A.   Yes.
4   Q.   And, so, drinking is the very thing that you're
5   treating him for; is that right?
6   A.   Yes.
7   Q.   Fair to say that it's a problem for the treatment
8   process if a client isn't completely candid or truthful with
9   you?
10  A.   Yes.
11  Q.   Now, the vast majority of patients, let's just
12  assume, go to you for treatment for all the right reasons,
13  because they want to get help; is that a fair statement?
14  A.   For the most part, yes.
15  Q.   Okay.  If there was a benefit for a person to
16  exaggerate signs of alcohol use disorder, is it possible for
17  someone to self-report inaccurate information about their
18  symptoms or the severity of their symptoms?
19  A.   Yes, it's possible.
20  Q.   Now, during the course of the time that you've met
21  with Mr. Vaccarelli, I think you said it was initially twice
22  a week?
23  A.   Yes.
24  Q.   And then, now it's -- we're going into May of
25  2019 -- it's more like once a week?

1    A.    Yes.

2    Q.    Okay.  And during the time that you've met with him,

3    he never told you about drinking Cognac in the shower; did

4    he?

5    A.    Not in the shower.

6    Q.    Okay.  Not --

7    A.    No, not drinking -- no, not actually drinking.

8    Q.    Okay.

9    A.    And not in the shower, no.

10   Q.    Okay.  Now, I just want to bring up for you -- this

11   is Exhibit H3 and I've put it into the -- or our IT people

12   have put it into the computer, so it's going to come up on

13   the screen in front of you.

14         MS. LARAIA:  This was previously admitted.

15   BY MS. LARAIA:

16   Q.    I just want to highlight the top here.  Was this

17   part of the treatment plan that you testified about

18   yesterday?

19   A.    Yes.

20   Q.    Okay.  I'm going to ask you to read the Goal under

21   problem 1.1.

22   A.    Under the Goal:  "I will reduce or eliminate my

23   abuse of substances."

24   Q.    Okay.  Just going up, if I can, a little bit.  This

25   is a treatment plan for November 9, 2018 through February 7,

1  2019; is that accurate?

2  A.  Yes.

3  Q.  Okay.  At this point, going into November 2018, Mr.

4  Vaccarelli wasn't drinking; was he, to your knowledge?

5  A.  To my knowledge -- going into 2018?

6  Q.  Between November of 2018 and February of -- well,

7  I'm sorry.  It's a treatment plan for November to February,

8  because I think you testified that treatment plans are done

9  on a three-month basis?

10  A.  Yes.

11  Q.  Okay.  So this would have been prepared for use

12  going forward from November and into February of 2019; is

13  that right?

14  A.  Yes.

15  Q.  So, as of November 2018, fair to say Mr. Vaccarelli

16  at least wasn't reporting to you that he was drinking?

17  A.  Yes.

18  Q.  Okay.  It's still in his treatment plan here --

19  "Objective:  I will stop or cut back on my use of alcohol."

20  Do you see that?

21  A.  Yes.

22  Q.  Why does that end up or why is it still in his

23  treatment plan if he's not drinking at this point?

24  A.  Typically, anyone with an alcohol use disorder,

25  they're going to have cravings and urges, so at any time that

1  can come back.  So someone can have abstinence over a period

2  of time, and then drink, you know, due to whatever --

3  stressful event, whatever is going on, whatever, for many

4  reasons.  So we almost never will use the phrase "eliminate

5  alcohol use," because sometimes it's just cutting back and

6  there can be changes in that over time.

7      Q.   Okay.  So when it says "pending" here, I just want

8  to be clear it's not because he relapsed, it's because that's

9  something that -- that's something he would be working on for

10 a long period of time?

11     A.   Yes, ongoing.  Yep.

12     Q.   Now, I want to also look down -- this is now H4.

13 I'm just going to highlight the bottom part here.

14          All right.  So do you see the problem heading,

15 "Mood," and then problem 2.1, "stressful response to events";

16 do you see that?

17     A.   Yes.

18     Q.   Okay.  So, do you see where it says "I will learn

19 how to manage the stressful events in my life without use of

20 alcohol"?

21     A.   Yes.

22     Q.   Okay.  And I think you talked a little bit about

23 stressors on your direct testimony; do you remember that?

24     A.   Yes.

25     Q.   Okay.  So let's just talk about those for a minute.

1621

```
1    In your experience with treating people with alcohol use
2    disorder, are there people who exhibit more or more severe
3    symptoms during a time of greater stress?
4         A.   Yes.
5         Q.   Okay.  And have you observed people who get worse --
6    maybe who just had mild symptoms go to moderate or maybe to
7    severe -- if they're experiencing a lot of life stress and
8    pressure?
9         A.   Yes.
10        Q.   Okay.  Could financial pressure be a stressor that
11   contributes to someone's experiencing of symptoms of alcohol
12   use disorder?
13        A.   Yes.
14        Q.   Okay.  Would that include maybe having debts that
15   are growing?
16        A.   Yes.
17        Q.   Maybe owing money to a lot of people?
18        A.   Yes.
19        Q.   Could someone experience stress from wanting to
20   maintain a certain lifestyle and having difficulty doing
21   that?
22        A.   Yes.
23        Q.   How about getting calls from attorneys trying to
24   collect money?
25        A.   Yes.
```

1   Q.   Have you ever heard of the attorney or know the

2   Attorney Sean Fitzmaurice?

3   A.   No.

4   Q.   How about Norman Drubner?

5   A.   No.

6   Q.   Okay.  So if someone was experiencing a lot of

7   financial pressure, could that exacerbate the person's

8   symptoms?

9   A.   Yes.

10   Q.   Okay.  And fair to say that could affect his or her

11   use of substances?

12   A.   Yes.

13   Q.   How about losing a job or a source of income?

14   A.   Yes.

15   Q.   Okay.  Could that cause someone to experience an

16   episode of heightened symptoms?

17   A.   Yes.

18   Q.   Now, you didn't meet Mr. Vaccarelli until October of

19   2017; is that accurate?

20   A.   Yes.

21   Q.   Okay.  So before that, you didn't know him?

22   A.   No.

23   Q.   Okay.  Did you ever go with Mr. Vaccarelli to

24   someplace called "The Hearth" and visit with Carmela

25   Truhan?

1    A.    No.

2    Q.    Okay.  Were you with Mr. Vaccarelli when he took a

3    hundred thousand dollar check from Susan Rustic?

4    A.    No.

5    Q.    Did you go with Mr. Vaccarelli to visit a gentleman

6    named Ciro Peluso?

7    A.    No.

8    Q.    Did you go with him to Giuseppina LaPorta's house

9    and get a -- when he got a check from her?

10   A.    No.

11         MS. MIRSKY:  Your Honor, I have to object to this

12   line of questioning, also.  I mean, the witness already

13   testified that she obviously met him in October 2017 and

14   hadn't known him before then.  So, obviously, we already know

15   the answer to these questions about the individual victims is

16   going to be irrelevant to this witness.

17         THE COURT:  It's not irrelevant, but it may be

18   repetitious.  Do you intend to go through all the people we

19   heard from?

20         MS. LARAIA:  That's okay, Your Honor.

21         THE COURT:  Okay.  Thank you.

22         MS. LARAIA:  I'll just ask one follow-up question.

23   BY MS. LARAIA:

24   Q.    At any point, did you ever go with Mr. Vaccarelli to

25   meet any of his clients?

1624

```
1     A.   No.
2          Q.   So you don't know what Mr. Vaccarelli's mental state
3     was at any point when he met with clients?
4     A.   No.
5               MS. LARAIA:  Nothing further, Your Honor.
6               THE COURT:  All right.  Redirect.
7                         REDIRECT EXAMINATION
8     BY MS. MIRSKY:
9          Q.   Good morning.
10         A.   Good morning.
11         Q.   So, one of the things that you were just asked
12    before by the other attorney was several questions about
13    self-reporting.
14         A.   Yes.
15         Q.   Now, would you agree that it's an industry custom,
16    meaning based on your experience as a counselor, that you use
17    self-reporting with your clients?
18         A.   Yes.
19         Q.   So, I'm not -- let me just clarify.  I'm not getting
20    into number of clients, but if you considered all the clients
21    you've had, that's something you'd typically do and it's
22    accepted -- it's an acceptable practice at Blue Sky?
23              MS. LARAIA:  Objection, Your Honor.  Leading.
24              THE COURT:  Okay.  Don't lead.  Just, what is the
25    practice with respect to use of self-reports from clients.
```

1    MS. MIRSKY:  I'll rephrase the question.

2    BY MS. MIRSKY:

3    Q.   Okay.  So, can you just clarify the practice as it

4    applies to self-reporting at Blue Sky?

5    A.   Yes.  So the client would typically come to a

6    session and self-report symptoms, life stressors, whatever

7    happened to be going on in their lives.

8    Q.   And this a piece of what you consider when you

9    set up your treatment plan?

10   A.   Yes.

11   Q.   Okay.  So when you set up the treatment plan, it's

12   one factor of several others that you use to make a decision

13   that you make separate from what the client solely tells

14   you?

15       MS. LARAIA:  Objection.  Same objection.

16       THE COURT:  Please don't lead.

17   BY MS. MIRSKY:

18   Q.   What other factors do you use, besides what the

19   client reports to you, in determining that treatment plan?

20   A.   In determining their treatment plan?

21   Q.   Yes.

22   A.   We -- well, in the initial treatment plan, we are

23   referring to records from where the person came from, to make

24   sure that we're still treating these same or similar issues.

25   But the goal of the treatment plans, the goals and objectives

1  are client-centered goals, so they would be goals that the

2  client has.

3      Q.   Okay.  You also testified, just before, to the fact

4  that when Leon came to you, he saw you more frequently than

5  he would today -- or more recently.

6          Does the amount -- the number of times that you see

7  him during the week, does that have any impact on the

8  diagnosis you've already testified to, the alcohol use

9  disorder severe?

10     A.   No.

11     Q.   Okay.  There was also a little conversation

12  regarding a driving incident that Leon discussed with you.

13  Was there an opportunity when Leon came to you and he

14  clarified or provided further explanation to change -- to

15  give you more information about that incident?

16     A.   Yes.

17     Q.   What did he say that changed your understanding of

18  that incident?

19     A.   Yeah, so the -- what he had said at the time, to my

20  recollection, was that he had been harboring a lot of, like,

21  guilt about not being truthful in his prior session, and that

22  he needed to kind of get that off his chest, if you will, and

23  be forthcoming with the fact that he had had a few drinks

24  prior to the accident.

25          MS. MIRSKY:  One moment.

```
 1    BY MS. MIRSKY:

 2        Q.   You were also shown a couple of pages from the

 3    record up here, just before with Ms. Laraia, and she

 4    highlighted the word "pending" by some of the -- I don't want

 5    to call them diagnoses -- like part of the plan or the

 6    characteristics -- like "Mood" she had referenced.

 7             Now, the word "pending" in your industry, what does

 8    that really mean?

 9        A.   So, if the client has not achieved the goal, totally

10    achieved the goal, it would be a pending goal, which means

11    it's ongoing in their treatment.  If they have attained the

12    goal at some point, then it would be removed or sometimes

13    revised on the treatment plan.

14        Q.   So it's, just to clarify, it's an ongoing goal that

15    Leon is trying to achieve?

16        A.   Yes.

17        Q.   Okay.  Is liver damage, is that often evidence of

18    alcohol abuse?

19             MS. LARAIA:  Objection.

20             THE COURT:  Basis?

21             MS. LARAIA:  She's not --

22             MS. MIRSKY:  Well, it's --

23             THE COURT:  I'm sorry.

24             MS. LARAIA:  I'm not sure of the witness's

25    qualifications.
```

1    MS. MIRSKY:  She actually --

2    THE COURT:  Let me hear the full objection.

3    MS. LARAIA:  I am not sure of the witness's

4    qualification to answer that question.

5    THE COURT:  Let's have a foundation for what she --

6    how she would know about liver and alcoholism, if her

7    training and experience gave her certain knowledge and what

8    the limits of that would be.  Ms. Laraia?

9    MS. LARAIA:  I also just had a second -- I believe

10   it's beyond the scope of the cross.

11   THE COURT:  What part of cross do you claim this is

12   bearing on, Ms. Mirsky?

13   MS. MIRSKY:  She did bring up some documents that

14   relate to Mr. Vaccarelli's diagnoses, and in the diagnoses,

15   they're already testified to, there is -- this question

16   refers to those diagnoses.  The treatment -- she brought up

17   the --

18   THE COURT:  Will you tell me what exhibit Ms. Laraia

19   used that you're referring to?

20   MS. MIRSKY:  I have to apologize.  I'm not sure of

21   the exact number, but it was -- I think it was in the 3 to 6

22   page range.  Is that page 3 and page 6?

23   MS. LARAIA:  Page 4.

24   MS. MIRSKY:  Page 4.  So she relied on page 4, which

25   is part of 3, H3 to H6.  I would argue, Your Honor, that that

```
 1    document is a part of the plan that was based on H1 through
 2    H2, which is the initial treatment plan that creates the
 3    documents that are H3 through H6.
 4              THE COURT:  All right.  You can examine her on 4 and
 5    what went into that and what is the focus of achieving those
 6    goals and objectives.
 7              MS. MIRSKY:  Just to clarify, Your Honor, are you
 8    saying solely relying on H4 or can that extend to the entire
 9    document that's --
10              THE COURT:  Depends on how the witness testifies
11    that this --
12              MS. MIRSKY:  Okay.
13              THE COURT:  -- Page 4 description of problem
14    headings and goals relates to any other part of the exhibit
15    that we have and otherwise numbered.  Okay?
16              MS. MIRSKY:  Understood.  Thank you.
17    BY MS. MIRSKY:
18      Q.   Can you -- before I continue, can you read this
19    document as is or is it too small for you?
20      A.   It's too small.
21      Q.   Understood.  That's fine.
22              So we just looked at this document that Ms. Laraia
23    had referenced.  Now, these are some of the goals obviously
24    that you previously testified to.  In what ways do these
25    examples that are here -- the chemical use and there's also
```

1  the Mood -- how do they relate back to the diagnoses that you

2  had previously testified to?

3      A.   So, in terms of the alcohol use disorder, the first

4  problem, "lack of knowledge of proven practices" with the

5  Objective being, "being more educated on types of

6  evidence-based practices for alcoholism treatment" refers

7  back to -- there are several ways that someone can go about

8  recovery in -- if they have alcohol use disorder, whether

9  that be AA -- Alcoholics Anonymous -- you know, SMART

10  recovery.  There are a lot of methods out there.  This was

11  something that Leon had expressed an interest in learning

12  more about what types of evidence-based practices were

13  available for the treatment of alcohol use disorder.

14      Q.   Okay.  Specifically I'm focusing on the chemical use

15  aspect.  You had testified to these other diagnoses.  The

16  chemical use on this page could relate to which specific

17  diagnoses?

18      A.   The chemical use could relate to the diagnoses of

19  the major depressive disorder, the generalized anxiety

20  disorder.  Also, in terms of the medical, the Wernicke's and

21  the alcoholic hepatitis.

22      Q.   Okay.  So of these diagnoses, do you have any

23  knowledge about any of these diagnoses being related to liver

24  damage?

25      A.   Yes.

1    Q.   In which diagnosis would that be -- or, singular or
2  plural?
3    A.   Well, that would be the alcoholic hepatitis, would
4  be the one related to liver damage.
5    Q.   So, just to clarify, the alcohol hepatitis is
6  evidence of liver damage based on Mr. Vaccarelli's alcohol
7  abuse; correct?
8         MS. LARAIA:  Objection.
9         THE COURT:  Sustained.  Please don't lead.
10        MS. MIRSKY:  Nothing further, Your Honor.  Thank
11  you.
12        THE COURT:  Any recross?
13              FURTHER RECROSS-EXAMINATION
14  BY MS. LARAIA:
15    Q.   Ms. Gleissner, just a couple questions.
16        When you put together a client's treatment goals and
17  objectives, that's based, in part, on input from the client;
18  is that accurate?
19    A.   Yes.
20    Q.   Okay.  And the factors that are used to assess
21  someone's alcohol use disorder are based -- those factors are
22  based, at least in part, on self-reporting; is that
23  accurate?
24    A.   Yes.
25        MS. LARAIA:  Nothing further, Your Honor.

1632

```
1    THE COURT:  All right, then.  We will excuse

2    Ms. Gleissner.  You may go.  You are excused.

3         (Witness excused, 10:24 a.m.)

4    THE COURT:  Mr. Einhorn.

5    MR. EINHORN:  Yes, Your Honor.  The Defendant rests.

6    THE COURT:  Thank you.  And as to any rebuttal from

7    the Government, will there be any?

8    MR. McGARRY:  There'll be no witnesses, Your Honor.

9    We do want to make sure we have all the documents in, but we

10   do not have any other witnesses, nor the need for a rebuttal

11   case, so we --

12   THE COURT:  Is there a need to hold the jury further

13   today in the event something you discover needs a bit of

14   clarification?  Or do you believe that what you call

15   "housekeeping" can be done just on the record with respect to

16   what was offered and what was admitted?

17   MR. McGARRY:  You realize it's the Friday before a

18   holiday weekend, and you're asking me if there's the need to

19   hold the jury?

20   MR. EINHORN:  You can ask me, because my comment

21   would be send them home, Your Honor.

22   THE COURT:  I just don't want to lose the

23   opportunity to finish, complete the evidence for them

24   today.

25   MR. McGARRY:  Right.  In all seriousness, Your
```

1  Honor, if we could have five or ten minutes?

2          THE COURT:  Ladies and gentlemen, let's ask you to

3  return to the jury room -- presumably, it will not be for

4  terribly long -- see if there is any further evidence that

5  needs to be presented to you and, otherwise, you get a head

6  start on the long weekend.  Okay.

7          (Jury out, 10:26 a.m.)

8          THE COURT:  All right.  Shall we recess or are there

9  matters that will involve the Court or do you --

10         MR. McGARRY:  I think it might involve the Court

11 personnel, but not the Court.  So if we can recess and maybe

12 borrow Breigh for a few moments.

13         THE COURT:  That's fine.

14         MR. McGARRY:  All right.

15         THE COURT:  We're also going to be sending you --

16 actually, I'll print out for you the latest revised draft

17 charge for discussion, which incorporates those of your

18 proposals that seem appropriate, that highlights those that

19 we will discuss in our charge conference, and I want to give

20 you a chance to look at those before we convene in the

21 conference room.  All right?

22         MR. EINHORN:  Can I ask, do we have a time for the

23 conference, Your Honor?  The only reason I ask is I have an

24 arraignment at 3:30 upstairs with someone coming from New

25 Jersey, which I'll call off if Your Honor thinks we'll still

 1  be going at 3:30.

 2          THE COURT:  I don't think so.

 3          MR. EINHORN:  I don't think so, either, Your

 4  Honor.

 5          THE COURT:  The one or two substantive disputes

 6  you have, we can air.  The rest, I think, is largely

 7  stylistic or scrivener.  Where is your arraignment?

 8          MR. EINHORN:  Magistrate Merriam, I believe.

 9          THE COURT:  Okay.  I think that's fine.  And we'll

10  break for that, in any event.

11          MR. EINHORN:  I wasn't sure what time Your Honor

12  planned on starting the conference, so -- I'm ready anytime.

13          THE COURT:  Let me get you copies, and then we will

14  take whatever time you need to review them and then we'll

15  start.  We'll stand in recess.

16          (Recess taken, 10:29 a.m.)

17          (Call to Order, Out of the presence of the jury,

18  10:53 a.m.)

19          THE COURT:  All right.  Counsel, ladies and

20  gentlemen, please be seated.  I'm advised that counsel agree

21  that the jury is no longer needed for evidence, that evidence

22  is closed, and that they can be excused until Tuesday.  Is

23  that correct?

24          MR. McGARRY:  That is correct, Your Honor.

25          MR. EINHORN:  Yes, Your Honor.  And I'd also like to

1635

1     excuse Mr. Vaccarelli, since he won't be at the charge

2     conference.

3            THE COURT:  That's fine.  All right.  Let's bring

4     the jurors in.  I want to describe a little bit about what

5     will happen on Tuesday, and then we will send them home.

6            And then we'll come back, and I'll hear the

7     Defense's motion.

8            MR. EINHORN:  Yes.

9            THE COURT:  And then we will recess and give you the

10    latest draft of the charge for discussion whenever you're

11    ready.

12           (Jury in, 10:54 a.m.)

13           THE COURT:  Please be seated, ladies and gentlemen.

14    There is no further evidence to be offered to you.  Each side

15    has rested; and, therefore, we are prepared, on Tuesday, to

16    move to the final stage.

17           You will come in at 9:30 on Tuesday.  Please plan to

18    spend the entire day Tuesday, Wednesday, Thursday, however

19    long it takes you, to fully deliberate on all the counts and

20    have the full discussion that you believe is necessary.

21           We will serve you lunch each day, and we will expect

22    you to be here at 9:30 and expect you to stay until at least

23    5.  If you wish to stay longer, you are welcome to do so, and

24    Breigh will check in with you around 5 to see what your

25    pleasure is.

1    One of you will be drawn to be the alternate, and

2    that person will have to remain in the courthouse during the

3    deliberations, and the reason -- although not participating

4    in the deliberations.  The reason, is that if the jurors have

5    questions that they want the Court to answer, if they request

6    readback of certain testimony, the alternate needs to also

7    hear that, in the event he or she is called in to become a

8    full juror if one of the jurors cannot continue to

9    deliberate.

10    So, that will be how we will handle Tuesday.  The

11    first order of business will be, I will give you the charge

12    of law.  You will have a notebook that will have a copy of

13    it.  That notebook also will contain a copy of the, what we

14    call the "Superseding Indictment," the thing that sets out

15    what the Defendant is charged with.

16    After I have concluded the charge, you will hear the

17    closing arguments of the Government -- who goes first because

18    it bears the burden of proof -- the Defendant, and then a

19    rebuttal closing by the Government.  After that, I will have

20    just a couple more instructions for you, and then you will

21    begin your deliberation in this case.

22    So, that's how we will proceed on Tuesday.  I hope

23    you have a very pleasant Memorial Day weekend.  You still

24    remain under the Order not to discuss the case with anyone,

25    not to allow anyone to discuss it with you, not to read

1  anything or listen to anything about the case, advise me if

2  that happens, and not to do any research or any investigation

3  of any sort about any aspect or person or entity in this

4  case.

5         So, with that reminder, leave your notebooks here --

6  we'll secure them and return them to you -- and have a very

7  nice Memorial Day.  You may go.

8         (Jury out, 10:59 a.m.)

9         THE COURT:  All right.  I'll hear from defense

10  counsel.  The motion that was noted to have been made at the

11  close of the Government's evidence, the grounds of which I

12  will now hear, the motion was under Rule 29.  You may

13  proceed.

14         MR. EINHORN:  Thank you, Your Honor.  Yes, I had

15  previously made a motion under Rule 29(a).  I'd like to make

16  it again at this point, although I'm not sure the rule

17  requires it to be done now that the case has been -- the

18  evidence has closed.  But under the Rules, Your Honor is

19  allowed to reserve judgment, and I would ask at this time for

20  the opportunity to submit a memorandum of law.

21         At some later date I intend to -- well, depending on

22  the jury verdict, there's a possibility I would file another

23  motion -- I think it's 29(c) -- at that point.  So I would

24  just ask Your Honor to reserve judgment until after Your

25  Honor has received briefs on this particular issue.

1    THE COURT:  In order to effectuate at least

2    something of the reason why the motion is being made

3    before --

4    MR. EINHORN:  Sure.

5    THE COURT:  -- the submission to the jury, may I

6    hear what the general grounds are?

7    MR. EINHORN:  The general grounds will consist of

8    the lack of criminal intent.  And the evidence -- we would,

9    in the memorandum of law, recite the evidence at trial as

10   pertains to Mr. Vaccarelli's severe alcoholic disorder and

11   how it affected any possibility of his having criminal intent

12   during the time period charged in the Indictment, and that

13   would be the sole ground.

14   THE COURT:  So, do I understand your intended

15   procedure, that you are going to ask me to reserve on your

16   Rule 29 motion?

17   MR. EINHORN:  Yes, Your Honor.

18   THE COURT:  And then decide it after the jury

19   returns a verdict of guilty or is discharged without having

20   returned a verdict, recognizing that such a reservation

21   requires that the decision be made on the basis of the

22   evidence at the time the ruling was reserved, which is the

23   entirety of the record in this case?

24   MR. EINHORN:  That's correct; yes, Your Honor.

25   THE COURT:  All right.  Does the Government wish to

1    be heard?

2         MR. McGARRY:   I'm not objecting to the procedure,

3    Your Honor.  I'll just put on the record that on the issue of

4    intent, the Government -- intent means to act knowingly and

5    with specific intent to deceive or defraud for the purpose of

6    causing some financial or property loss to another.

7         I'd point out that while there's never really direct

8    evidence of intent, in the sense that you can't necessarily

9    see it, there's certainly circumstantial evidence -- the way

10   that Mr. Vaccarelli conducted the scheme -- and we would rely

11   on all the testimony of all the witnesses, as well as the

12   documents and the conduct that, including the intricate

13   nature of some of the transactions, that would support having

14   intent to commit all of the crimes.

15        I think even before Mr. Vaccarelli took the stand,

16   there was evidence as to what he did for the *actus reus*, all

17   the acts devised a scheme and artifice to defraud, to obtain

18   money and property, and using the mails, the wires in

19   connection with sale of securities and money laundering.

20   Mr. Einhorn mentioning the specific intent being not shown by

21   virtue of his purported impairment, I don't think that there

22   was at the point of time of reserve -- if that's properly

23   said -- at the point in time that he did reserve, I don't

24   think that there was much, if any, evidence of alcohol use

25   but for perhaps one or two anecdotes that would negate all

1  the circumstantial evidence that was before the jury and

2  before the Court at this time.

3        So that would be the basis, in part, on any written

4  motion we would follow up on, but I would submit that at that

5  point in time the evidence of intent was established -- I

6  would say beyond a reasonable doubt, but certainly enough to

7  get it to the jury; and, accordingly, we would -- if the

8  Court has Mr. Einhorn submit a written motion, we would

9  submit a written motion to draw the evidence from the

10  Government's case.  And if there's a subsequent motion or an

11  additional motion, our response would include the

12  Government's case and any evidence during the Defendant's

13  case.

14        THE COURT:  Anything further from Defendant?

15        MR. EINHORN:  No, Your Honor.  Thank you.

16        THE COURT:  My anticipation is actually that if you

17  have reserved in the way you have, having timely made your

18  motion at the close of the Government's case, that would be

19  the basis for your motion.  That preserves, however, any

20  appellate issue of timing as to your Rule 29 motion at that

21  point.  The Rule 29 motion at the close of discovery is a

22  different motion; correct?

23        MR. EINHORN:  Yes.

24        THE COURT:  And does that have a different basis?

25        MR. EINHORN:  No, Your Honor.  The way I look at it,

1  under Rule 29, is it's essentially three different times, I

2  believe -- the way I've always construed it -- one is at the

3  close of the Government's case; second, when the evidence

4  goes to the jury; and third, if there's a verdict adverse to

5  the Defendant or no verdict.

6          And the way I would anticipate briefing this would

7  be based on all three and, most importantly, the final time

8  period; otherwise, it wouldn't make much sense just to have

9  three separate Rule 29 memoranda.

10          THE COURT:  Well, if, in fact, the Government's

11  case-in-chief is deficient, it does make sense.

12          MR. EINHORN:  I apologize.  Yes, it would.  That's

13  not our -- our claim is -- I was making the motion at that

14  point just to preserve it for appellate purposes, that's

15  all.

16          THE COURT:  Okay.  And my anticipation is that, if,

17  in fact, there is a guilty verdict, that there was going to

18  be a merger of these three.

19          MR. EINHORN:  Yes.

20          THE COURT:  Of these three motions, and that the

21  separation that the Government notes -- namely, at the close

22  of the Government's case there was no medical evidence in --

23  isn't going to become a deeply meaningful distinction.  Okay.

24          All right, then.  With that procedure in mind, any

25  such motion would be filed 14 days after any guilty verdict,

1642

1  if that is what happens here.

2       Okay.  Let's recess.  I think copies of your

3  draft proposal -- proposed charge are being made, and maybe I

4  could see you at 11:30?

5       MR. McGARRY:  Could we push it just a little bit?

6  So I guess it's about 45 or 55 pages, from what I saw

7  previously, just so we could --

8       THE COURT:  There's not much change, but that's

9  fine.

10      MR. McGARRY:  I don't know what time the Court was

11  planning on having lunch, but if we could do 12?  Or if you

12  wanted to do it shortly after a quick lunch?  Whatever the

13  Court's preference.  I just think 11:30 is a little tight for

14  reading the whole thing.

15      THE COURT:  All right.  We'll get back at noon.

16  Mr. Einhorn is concerned about getting upstairs to his

17  arraignment.

18      MR. EINHORN:  It shouldn't take long at all for the

19  charge conference.

20      THE COURT:  Okay.

21      MR. EINHORN:  But I don't know what Mr. McGarry is

22  referring to.  Do we have a new version?

23      THE COURT:  So, there is one more last "new and

24  improved" version with the very latest of corrections and

25  changes noted in it.

1643

1      MR. EINHORN:  Okay.

2      THE COURT:  That is being copied right now, and you

3  will get copies of it.

4      All right.  And then I will see you in the

5  conference room that is across the hall from my chambers at

6  noon.

7      MR. EINHORN:  Thank you.

8      THE COURT:  Thank you.  We stand in recess.

9      (Proceedings adjourned, 11:09 a.m.)

10

11

12      COURT REPORTER'S TRANSCRIPT CERTIFICATE

13  I hereby certify that the within and foregoing is a true and

14  correct transcript taken of the proceedings in the

15  above-entitled matter.

16

17                          /s/  Tracy L. Gow
                            Tracy L. Gow, RPR
18                          Official Court Reporter

19

20

21

22

23

24

25